**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**AT NASHVILLE**

| | | |
|---|---|---|
| G. MARIE NEWBY, individually, and as Administratrix of THE ESTATE OF TERRY CHILDRESS, | § § § § | |
| *Plaintiffs*, | § § | Case No. _____ |
| v. | § § | JURY DEMANDED |
| CORECIVIC OF TENNESSEE, LLC, as owner and operator of TROUSDALE TURNER CORRECTIONAL CENTER, DAMON HININGER, STEVE CONRY, RAYMOND BYRD, and SHAWNA CURTIS, | § § § § § § § | |
| *Defendants*. | § § | |

## COMPLAINT

For their Complaint, the Plaintiffs state to the Court and the Jury as follows:

## I.  INTRODUCTION

1.     This action arises from yet another preventable death at CoreCivic's "severely understaffed" Trousdale Turner Correctional Center[1]—Tennessee's most dangerous and notorious prison.

2.     According to one of its own former employees, CoreCivic—a private prison corporation that operates Trousdale Turner Correctional Center for profit—is driven by "the power of the almighty dollar."[2]  As a result, CoreCivic severely understaffs Trousdale

---

[1] *See* **Ex. 1,** Tr. of Treyton Lattimore Interview at 31:1.

[2] *Id.* at 33:19.

Turner Correctional Center while willfully disregarding inmate safety there. CoreCivic is also willing to tolerate preventable deaths at Trousdale Turner Correctional Center because adequately staffing the facility would exceed the cost of liability that CoreCivic faces when inmates die from CoreCivic's profit-motivated deliberate indifference.

3. In addition to being made aware of—and asked to adjudicate—claims arising from CoreCivic's chronic deliberate indifference to inmate safety at Trousdale Tuner Correctional Center specifically,[3] this Court has been made aware of "inadequate medical staffing that was endemic of broader issues with staffing levels at CoreCivic facilities" generally, it has been made aware of CoreCivic's "failures to maintain accurate records of medication administrations," and it has been made aware of at least one "inadequate emergency response in the case of an inmate who eventually died."[4] This Court is also privy to sealed communications among CoreCivic's executives and lobbyists that confirm CoreCivic's chronic, profit-motivated deliberate indifference to inmate safety.[5]

4. Among the results that CoreCivic has achieved through its profit-motivated deliberate indifference to inmate health and safety, Tennessee inmates who are housed at CoreCivic facilities are approximately twice as likely to die and more than four times as likely to be murdered—even though CoreCivic houses inmates with disproportionately low security designations.[6]

---

[3] *See, e.g.,* **Ex. 2**, First Amended Complaint, Pleasant-Bey v. State of Tennessee et al. No. 3:19-CV-486 (MDTN Dec. 21, 2020), ECF No. 68 at 9–15, 17.

[4] *See, e.g.,* **Ex. 3**, Memorandum, Grae v. Corrections Corporation of America, No. 3:16-cv-02267 (MDTN March 26, 2019), ECF No. 165.

[5] *See id.* at 7, n. 2.

[6] *See, e.g.,* Cassandra Stephenson, *Inmate death ruled homicide in a Tennessee CoreCivic prison where rate is twice as high as TDOC's, records show,* JACKSON SUN (Jan. 28, 2020),

5.      A scathing Performance Audit Report of Tennessee's CoreCivic facilities conducted by the Tennessee Comptroller of the Treasury recently determined that CoreCivic's management failed to "implement or enforce established internal controls to ensure state and CoreCivic correctional facilities staff collected and accurately reported incident information" regarding "inmate deaths, inmate assaults, inmate violence, correction officers' use of force, and inmate accidents and injuries," and it found that in many instances, CoreCivic had destroyed records and evidence in contravention of state law.[7]

6.      Shortly before that, another state audit determined that Trousdale Turner Correctional Center, in particular, "operated with fewer than approved correctional staff, did not have all staffing rosters, did not follow staffing pattern guidelines, and left critical posts unstaffed"; that "CoreCivic staffing reports at Trousdale Turner Correctional Center contained numerous errors"; and that "Trousdale Turner Correctional Center management's noncompliance with contractual requirements and department policies relating to inmate services challenged the department's ability to effectively monitor the correctional facility."[8]

---

https://www.jacksonsun.com/story/news/crime/2020/01/28/corecivics-tennessee-prisons-have-twice-homicide-rate-tdocs/2776928001/ ("The corporation's four Tennessee facilities hold roughly 35% of the state's prison population but accounted for about 63% of the state's prison homicides."); Prison Legal News, *CoreCivic Prisons in Tennessee Have Twice as Many Murders, Four Times the Homicide Rate as State-Run Facilities*, PLN (Aug. 6, 2019), https://www.prisonlegalnews.org/news/2019/aug/6/corecivic-prisons-tennessee-have-twice-many-murders-four-times-homicide-rate-state-run-facilities/ ("from 2014 through June 2019, there were twice as many murders in the four Tennessee prisons operated by CoreCivic (formerly Corrections Corporation of America) than in the 10 prisons run by the Tennessee Department of Correction (TDOC). Also, the homicide rate in CoreCivic facilities was over four times higher than the rate for TDOC prisons.").

[7] **Ex. 4,** Tennessee Comptroller of the Treasury, Performance Audit Report, Tennessee Department of Correction (Jan. 2020), *available at* https://comptroller.tn.gov/content/dam/cot/sa/advanced-search/2020/pa19032.pdf.

7.      In addition to unlawfully failing to collect—and in many instances destroying—records and evidence bearing upon its potential liability, CoreCivic has recently been caught *fabricating* evidence in an effort to evade legal liability.[9]

8.      The reality that CoreCivic chronically fails to comply with its legal obligations and is willing to conceal, destroy, or fabricate evidence that would expose its deliberate, profit-motivated indifference to inmate safety are not new revelations. Indeed, the State of Tennessee itself has all but stated directly that CoreCivic—and Trousdale Turner Correctional Center in particular—extensively engages in such behavior.  In the Tennessee Comptroller's January 2020 Performance Audit Report, for example, the Comptroller specifically found that "health services staff had not entered any serious accidents or injuries on the Accidents screen in TOMIS" at Trousdale Turner Correctional Center during *a one-and-a-half-year audit period*—something auditors found to be "questionable given the nature of the correctional environment" and determined was "unlikely" to be accurate.  Trousdale Turner Correctional Center officials ultimately acknowledged that their incident reporting was, in fact, inaccurate, claiming not to have been "aware" of applicable state reporting requirements.

9.      The data that ultimately was reported to regulators reflected that Trousdale Turner Correctional Center experienced the highest number of Class A incidents—defined as "life-threatening matters and breaches of security that are likely to cause serious operational problems," including "escapes and attempted escapes, deaths, assaults,

---

[8] **Ex. 5,** Tennessee Comptroller of the Treasury, Performance Audit Report, Tennessee Department of Correction (Nov. 2017), *available at* https://comptroller.tn.gov/content/dam/cot/sa/advanced-search/2017/pa17275.pdf.

[9] *See, e.g.,* Brinley Hineman, *After Tennessee prison suicide, CoreCivic counselor fabricated health records of treatment: TDOC,* The Tennessean (Aug. 25, 2020), https://www.tennessean.com/story/news/crime/2020/08/26/after-tennessee-prisoners-suicide-corecivic-worker-faked-health-records/3404186001/.

hostage situations, total institutional lockdowns, rapes, certain uses of force, and various weapons"—of any facility audited in the entire State of Tennessee. CoreCivic also managed to achieve that extraordinary result despite the fact that "CoreCivic correctional facilities staff did not appropriately maintain original documentation of Class A incidents." The following graph, appended to the Comptroller's 2020 report as Appendix-B-2, summarizes reported Class A incidents by each audited facility from October 1, 2017 through April 12, 2019:



**Appendix B-2**
**Summary of Class A Incidents (Those Involving Serious Risk to the Facility or Community) Reported by Location**
**October 1, 2017, Through April 12, 2019**

Source: Tennessee Offender Management Information System.

10. Despite all of the foregoing; despite multiple additional preventable deaths at Trousdale Turner Correctional Center since the aforementioned audits and even since Mr. Childress's death in this case occurred; and despite near-constant reports of brutality, criminality, neglect, and death both at CoreCivic's Tennessee facilities generally and at

Trousdale Turner Correctional Center in particular year after year after year;[10] state

---

[10] *See* Demetria Kalodimos, *Woman says she paid off gangs to keep son safe in prison*, WSMV (Oct. 5, 2017), https://www.wsmv.com/news/woman-says-she-paid-off-gangs-to-keep-son-safe-in-prison/article_a4e670ea-78be-5087-86e5-a65ecd485475.html; Joseph Wenzel, *Over 1,200 staff, inmates test positive for COVID-19 at Trousdale Turner Correctional Center*, WSMV (May 1, 2020), https://www.wsmv.com/news/over-1-200-staff-inmates-test-positive-for-covid-19-at-trousdale-turner-correctional-center/article_568c03d2-8bde-11ea-a447-4b7eaabeb67b.html; Adam Tamburin, *Tennessee prison inmate dies after fight at Trousdale Turner*, THE TENNESSEAN (Jan. 26, 2020), https://www.tennessean.com/story/news/2020/01/26/tennessee-prison-inmate-dies-after-fight-trousdale-turner-correctional-center/4581013002/; Dave Boucher, *New Tennessee CCA prison stops taking inmates amid 'serious issues,'* THE TENNESSEAN (May 24, 2016), https://www.tennessean.com/story/news/politics/2016/05/24/new-tennessee-private-prison-stops-taking-inmates/84867834/; Chris Conte, *Prisons for profit: Concerns mount about Trousdale Turner Correctional Center, operator CoreCivic*, WTVF (Jun. 13, 2019), https://www.newschannel5.com/longform/prisons-for-profit-concerns-mount-about-trousdale-turner-correctional-center-operator-corecivic; Staff Report, *Scathing state audit slams Tennessee prisons, CoreCivic for staffing, sexual assaults, and deaths in jails*, WTVF (Jan. 10, 2020), https://www.newschannel5.com/news/scathing-state-audit-slams-tennessee-prisons-corecivic-for-staffing-sexual-assaults-and-deaths-in-jails; Jamie McGee, *CoreCivic shareholders granted class action status in fraud lawsuit*, THE TENNESSEAN (May 27, 2019), https://www.tennessean.com/story/money/2019/03/27/corecivic-class-action-securities-fraud-lawsuit/3289913002/; Chris Gregory, *Family seeks answers in loved one's death at Trousdale prison*, LEBANON DEMOCRAT (Jan. 2, 2021), https://www.lebanondemocrat.com/hartsville/family-seeks-answers-in-loved-ones-death-at-trousdale-prison/article_1ffe90f7-0e9f-5021-bb94-9ec1b4d23139.html; Demetria Kalodimos, *Inmates at CoreCivic prisons say they sometimes go months without medical care*, WSMV (Jun. 22, 2017), https://www.wsmv.com/news/inmates-at-corecivic-prisons-say-they-sometimes-go-months-without-medical-care/article_8d28e630-bd12-5f1c-8b68-92b9336553e1.html; Prison Legal News, *Incorrect Cause of Tennessee Prisoner's Death Reported by CoreCivic Employees*, PLN (Jun. 7, 2018), https://www.prisonlegalnews.org/news/2018/jun/7/incorrect-cause-tennessee-prisoners-death-reported-corecivic-employees/; Staff Report, *Private prison company CoreCivic's history of problems in Tennessee*, THE TENNESSEAN (Jan. 16, 2020), https://www.tennessean.com/story/news/local/2020/01/17/private-prison-corecivic-history-problems-tennessee/4470277002/; Stephen Elliott, *State audit criticizes CoreCivic facilities*, THE NASHVILLE POST (Nov. 14, 2017), https://www.nashvillepost.com/business/prison-management/article/20982796/state-audit-criticizes-corecivic-facilities; Matt Blois, *CoreCivic reports $25M in profits as COVID infects 2,500+ inmates*, THE NASHVILLE POST (Jun. 30, 2020), https://www.nashvillepost.com/business/prison-management/article/21138792/corecivic-reports-25m-in-profits-as-covid-infects-2500-inmates; Steven Hale, *Problems Persist at Tennessee's Mismanaged Prisons*, THE NASHVILLE SCENE (Jan. 22, 2020), https://www.nashvillescene.com/news/features/article/21111586/problems-persist-at-tennessees-mismanaged-prisons; Dave Boucher, *CoreCivic investigating ex-officer's allegations of negligent deaths at private prison*, THE TENNESSEAN (Dec. 12, 2017), https://www.tennessean.com/story/news/2017/12/12/corecivic-investigating-ex-officers-allegations-negligent-deaths-private-prison/946196001/; Elizabeth Weill-Greenberg, '*Just Let Him Kick,*' THE APPEAL (Sep. 6, 2018), https://theappeal.org/just-let-him-kick/; Brinley Hineman, *Murfreesboro man charged in prison cellmate's death at Trousdale*, DAILY NEWS JOURNAL (Feb. 20, 2020), https://www.dnj.com/story/news/2020/02/20/murfreesboro-man-jacob-kado-charged-death-prison-cell-mate-ernest-hill-trousdale-turner/4818354002/; Ethan Illers, *Man killed during inmate-on-inmate altercation at Trousdale Turner prison*, WSMV (Jun. 16, 2019), https://www.wsmv.com/news/man-killed-during-inmate-on-inmate-altercation-at-trousdale-turner-prison/article_8d8b6806-9066-11e9-b749-7b44cac1c002.html; Jeremy Finley, *Recorded conversations reveal life inside prison ravaged by COVID-19*, WSMV (May 6, 2020), https://www.wsmv.com/news/investigations/recorded-conversations-reveal-life-inside-prison-ravaged-by-covid-19/article_91ef5b06-8fe2-11ea-9b75-f36db06e1ab1.html; Demetria Kalodimos, *Gang activity, security a concern at Trousdale Turner facility*, WSMV (Jun. 21, 2017), https://www.wsmv.com/news/gang-activity-security-a-concern-at-trousdale-turner-

regulators have failed to curb Trousdale Turner Correctional Center's worst abuses. Instead, in May of 2021—approximately 10 weeks after multiple murders at Trousdale Turner Correctional Center including the murder at issue in this Complaint occurred— the Trousdale County Commission approved a new, five-year contract with CoreCivic to operate Trousdale Turner Correctional Center.

11. To date, this Court, too, has been unable to remedy CoreCivic's operation of a chronically unsafe prison within the Middle District of Tennessee where inmates in CoreCivic's care die or incur serious bodily injury with enraging frequency.

facility/article_df82a358-7073-552e-b5e4-9feb2e9cf8bc.html; Steven Hale, *Tennessee's Largest Prison Still Appears as Troubled as Ever*, THE NASHVILLE SCENE (Feb. 13, 2019), https://www.nashvillescene.com/news/features/article/21047078/tennessees-largest-prison-still-appears-as-troubled-as-ever; Jessie Williams, *Trousdale Turner Corrections Officer Arrested*, MACON COUNTY CHRONICLE (Feb. 5, 2019), https://www.maconcountychronicle.com/news/5680-trousdale-turner-corrections-officer-arrested; Brett Kelman, *At Tennessee's largest prison, diabetic inmates say they are denied insulin to 'maximize profits'*, THE TENNESSEAN (Aug. 7, 2018), https://www.tennessean.com/story/news/2018/08/07/corecivic-diabetic-inmates-denied-insulin-trousdale-turner/925297002/; Natalie Allison, *Lawmakers hear from prison rape survivor, parents of man who hanged himself in CoreCivic facility*, THE TENNESSEAN (Dec. 19, 2018), https://www.tennessean.com/story/news/politics/2018/12/19/tennessee-legislators-hear-rape-suicide-corecivic-prison/2355556002/; Dave Boucher, *Private prison chief: 'We've got work to do' at Trousdale facility*, THE TENNESSEAN (Dec. 13, 2016), https://www.tennessean.com/story/news/2016/12/13/private-prison-chief-weve-got-work-do-trousdale-facility/95223230/; Demetria Kalodimos, *Former chaplain describes conditions inside TN prison*, WSMV (Jun. 19, 2017), https://www.wsmv.com/news/former-chaplain-describes-conditions-inside-tn-prison/article_9b30af82-8297-5101-b11f-b5fd9270bf18.html; Chris Gregory, *Trousdale Turner employee charged with smuggling contraband*, LEBANON DEMOCRAT (Apr. 23, 2020), https://www.lebanondemocrat.com/hartsville/trousdale-turner-employee-charged-with-smuggling-contraband/article_6b865daf-fbc8-5a59-9a35-e84b61ace2e4.html; Andy Cordan, *Prison corrections officer in Trousdale County arrested carrying drugs*, WKRN (Jan. 20, 2021), https://www.wkrn.com/news/prison-corrections-officer-in-trousdale-county-arrested-carrying-drugs/; Dave Boucher, *Gangs, insufficient staffing plague troubled Tennessee private prison, state audit finds*, THE TENNESSEAN (Nov. 14, 2017), https://www.tennessean.com/story/news/politics/2017/11/14/tennessee-private-prison-operated-by-corecivic-blasted-ongoing-problems-new-state-audit/858884001/; Keith Sharon and Adam Tamburin, *'This is unreal': Family seeks answers in death of Trousdale Turner prison inmate*, THE TENNESSEAN (Feb. 2, 2021), https://www.tennessean.com/story/news/2021/02/03/trousdale-turner-inmate-aaron-blayke-adams-dead-family-wants-answers/4290646001/; Alex Corradetti, *Investigation underway following death of inmate at Trousdale Turner Correctional Center*, WKRN (Sep. 8, 2021), https://www.wkrn.com/news/investigation-underway-following-death-of-inmate-at-trousdale-turner-correctional-center/; Chris Gregory, *Former Trousdale Turner corrections officer indicted*, LEBANON DEMOCRAT (Oct. 7, 2021), https://www.lebanondemocrat.com/hartsville/former-trousdale-turner-corrections-officer-indicted/article_aac20d8d-16e5-5edc-9e7e-d5fd9f8bfd0e.html; Levi Ismail, *NAACP calls for closure of Trousdale Turner Correctional Center, cites 'barbaric treatment' of Black men*, WTVF (Nov. 11, 2021), https://www.newschannel5.com/news/naacp-calls-for-closure-of-trousdale-turner-correctional-center-cites-barbaric-treatment-of-black-men (all attached as Collective **Ex. 6**).

12.     With each additional preventable death that occurs at Trousdale Turner Correctional Center that is not met with meaningful regulatory action, CoreCivic is emboldened by the knowledge that it may continue to act with deliberate indifference toward inmate safety and allow inmates to die needlessly in its care without fear of experiencing meaningful legal consequences.

13.     This Complaint—filed by the mother of decedent Terry Childress, who was brutally assaulted and needlessly died at Trousdale Turner Correctional Center in February 2021—demands that this Court compensate the Plaintiffs for Mr. Childress's preventable death; order CoreCivic to disgorge all profits arising from its chronically unconstitutional operation of Trousdale Turner Correctional Center; assess a punitive monetary sanction against CoreCivic sufficient to deter CoreCivic from maintaining its profit-motivated deliberate indifference to inmate safety; declare Trousdale Turner Correctional Center to be acting illegally and unconstitutionally; and appoint an independent monitor to audit and ensure Trousdale Turner Correctional Center's compliance with minimum constitutional obligations.  Alternatively, this Court should enjoin Trousdale Turner Correctional Center's continued operation going forward.

## II.  PARTIES

14.     Plaintiff G. Marie Newby is the mother of decedent Terry Childress, the personal representative of Mr. Childress's estate, and Mr. Childress's next-of-kin.  Ms. Newby is a citizen of Alabama and may be contacted through her counsel.

15.     Plaintiff the Estate of Terry Childress is the estate of decedent Terry Childress.  At all times relevant to this Complaint, Mr. Childress resided at CoreCivic's Trousdale Turner Correctional Facility in Trousdale County, Tennessee, where he was brutally murdered by his cellmate just a day after appearing for a parole hearing.  The

-8-

Estate of Terry Childress is represented by its personal representative, Ms. Newby, and it may be contacted through its counsel.

16.     Defendant CoreCivic of Tennessee, LLC—which went by the name "Corrections Corporation of America" before that name became synonymous with the most insidious aspects of America's private prison industry—is a private, for-profit prison corporation that cages human beings for money.  CoreCivic owns and operates Trousdale Turner Correctional Center, the private prison that enabled Mr. Childress's preventable death through customs and policies of understaffing, misclassification, and profit-motivated deliberate indifference to inmate safety.  CoreCivic is a citizen of Tennessee with its principal place of business and corporate headquarters located in Brentwood, Tennessee.  CoreCivic may be served with process through its registered agent at CoreCivic of Tennessee, LLC, Registered Agent: C T CORPORATION SYSTEM, 300 MONTVUE RD., KNOXVILLE, TN 37919-5546.

17.     Defendant Damon Hininger is the Chief Executive Officer of CoreCivic.  Mr. Hininger's commitment to prioritizing shareholder profit over inmate safety gave rise to the chronically unconstitutional understaffing and misclassification conditions that resulted in Mr. Childress's preventable death.  Defendant Hininger may be served at his residence or wherever he may be found.

18.     Defendant Steve Conry is CoreCivic's Vice President of Operations Administration. As the primary individual responsible for ensuring that CoreCivic's facilities are adequately staffed and that staff are trained properly, Mr. Childress's murder is directly attributable to Mr. Conry's failed oversight and calculated, profit-motivated understaffing decisions.  Defendant Conry may be served at his residence or wherever he may be found.

19.     Defendant Raymond Byrd was the warden of Trousdale Turner Correctional Center at all times relevant to this Complaint.  As Trousdale Turner Correctional Center's day-to-day overseer who was responsible for supervising its staff—including staff members who were responsible for maintaining adequate staffing and staff members who were responsible for inmate classification—Mr. Childress's murder is directly attributable to Mr. Byrd's deliberate indifference to Trousdale Turner Correctional Center's chronically unconstitutional understaffing and misclassification conditions.  Defendant Byrd may be served at his residence or wherever he may be found.

20.     Defendant Shawna Curtis was a classification counselor at Trousdale Turner Correctional Center at the time Mr. Childress was murdered and the individual who misclassified Mr. Childress's murderer.  Despite inmate Tymothy Willis's violent criminal history and institutional history, Defendant Curtis misclassified Tymothy Willis as a low security risk and minimum custody inmate when he was not.  As a result of that misclassification, Tymothy Willis was housed with Mr. Childress, a low security risk inmate whom Tymothy Willis brutally murdered.  Defendant Curtis may be served at her residence or wherever she may be found.

### III.  JURISDICTION, VENUE, AND AUTHORITY

21.     This Court has jurisdiction over the Plaintiffs' federal claims in this civil action pursuant to 28 U.S.C. § 1331.

22.     This Court has supplemental jurisdiction to adjudicate the Plaintiffs' state law claims related to the Plaintiffs' federal claims in this action pursuant to 28 U.S.C. § 1367(a).

23.     As the judicial district in which a substantial part of the events or omissions giving rise to the Plaintiffs' claims occurred, venue is proper in this Court pursuant to 28

U.S.C. § 1391(b)(2). Venue is independently proper in this Court pursuant to 28 U.S.C. § 1391(b)(1).

24. Plaintiff Newby has authority to maintain her own claims individually and to maintain this wrongful death action as next-of-kin to Mr. Childress and as the personal representative of Mr. Childress's estate pursuant to Tenn. Code Ann. § 20-5-107(a).

## IV. FACTUAL ALLEGATIONS

25. On February 23, 2021, Terry Childress appeared for a parole hearing in advance of his forthcoming release date.

26. On February 24, 2021, Terry Childress was brutally murdered in his prison cell at Trousdale Turner Correctional Center by his violent and misclassified cellmate, Tymothy Willis.

27. The cause of Mr. Childress's death was "blunt force injuries of the head," and the manner of death was "homicide."[11] Mr. Childress also suffered two broken ribs as a result of Tymothy Willis's assault.

28. Mr. Childress was 37 years old at the time of his murder. He left behind his mother, siblings, and other family members and friends who loved him very much.

29. Video surveillance footage inside Trousdale Turner Correctional Center confirms that corrections officers were not making timely rounds at the time of Mr. Childress's murder. As a result, no corrections officers were nearby to hear Mr. Childress being viciously assaulted by Tymothy Willis, notwithstanding reports of "escalating arguments" between them.[12] Thus, no corrections officers were nearby to intervene and

---

[11] **Ex. 7,** Report of Investigation by County Medical Examiner at 5.

[12] *Id.*

prevent the assault from becoming fatal.

30.     Tymothy Willis did not have any serious injuries and was not defending himself when he murdered Mr. Childress.   At the time he murdered Mr. Childress, Tymothy Willis also sported a tattoo that simply stated: "Death."



CCI 000027

31.     The reason why officers were not making timely rounds at Trousdale Turner Correctional Center at the time of Mr. Childress's murder and were unavailable to prevent Tymothy Willis's assault of Mr. Childress from becoming fatal is because Trousdale Turner Correctional Center—and the unit where Mr. Childress was housed in particular—was understaffed.  The understaffed positions in Mr. Childress's housing unit are "critical" positions that must be staffed under Tennessee Department of Correction policy.

-12-

32.     Defendants CoreCivic, Hininger, Conry, and Byrd knew that Trousdale Turner Correctional Center was chronically understaffed and that critical posts routinely went unstaffed at the time of Mr. Childress's murder.  They also willfully understaffed Trousdale Turner Correctional Center because doing so was and remains more profitable.

33.     According to a former Trousdale Turner Correctional Center officer, understaffing Trousdale Turner Correctional Center "definitely" helps CoreCivic save money, and "they would much rather pay, you know, eight officers on night shift a bunch of overtime to run that entire facility, you know, versus having three officers per unit 24 hours a day, which they're supposed to."[13]

34.     At the time that Mr. Childress was murdered, he was a low security risk.

35.     At the time that Mr. Childress was murdered, Tymothy Willis was misclassified as a low security risk inmate who should have been designated—at minimum—a medium security inmate.[14]

36.     Even though Trousdale Turner Correctional Center was designed to be a minimum security facility and is "not supposed to house anybody with medium to maximum points," it regularly and improperly accepts higher security level inmates, resulting in "a huge mix of different security levels under one roof."[15]  This mixture of inmate security levels dramatically increases the risk of inmate-on-inmate violence.  A former Trousdale Turner Correctional Center officer describes this situation as "like adding a gallon of gasoline to an open flame."[16]

---

[13] *See* **Ex. 1** at 34:3–10.

[14] *See generally* **Ex. 8,** Decl. of Roy T. Gravette.

[15] **Ex. 1**, at 13:18–14:2.

[16] *Id.* at 14:4–5.

37.     At the time Mr. Childress was murdered, CoreCivic had actual knowledge that Mr. Willis posed a heightened security risk and was a volatile, dangerous inmate with a history of violence.

38.     At the time Mr. Childress was murdered, CoreCivic had actual knowledge that Mr. Willis was a violent offender who had been convicted of a violent offense involving the use of a deadly weapon and had a long history of felony convictions. Tymothy Willis's "Offender Attributes" profile dated 7/31/2018 also designated Mr. Willis as a "High Risk: Violent" inmate with a "Maximum" custody level:



39.    Based on generally accepted practices in prison management, a recent maximum custody level inmate like Tymothy Willis should not have been classified as a minimum custody level inmate a mere two-and-a-half years after receiving a maximum custody level classification.

40.    Based on generally accepted practices in prison management, a recent maximum custody level inmate like Tymothy Willis should not have been housed in a Special Housing Unit with a minimum security inmate like Mr. Childress a mere two-and-a-half years after receiving a maximum custody level classification.

41.    Based on generally accepted practices in prison management, a recent maximum custody level inmate like Tymothy Willis should not have been housed in a Special Housing Unit with a minimum security inmate like Mr. Childress in a cell with no windows or means of escape if one inmate attacks another.

42.    Defendant CoreCivic's own reports regarding Mr. Childress's murderer expressly refer to Mr. Willis as a medium security inmate.  Generally accepted practice in the prison management field also required classifying Mr. Willis as—at minimum—a medium security inmate considering his violent criminal and institutional history.

43.    Despite Tymothy Willis's long history of violence, numerous felony convictions, and poor institutional record—including serious disciplinary reports and an institutional incident report in the previous six months before he murdered Mr. Childress—Defendant Curtis misclassified Tymothy Willis as a low security risk and minimum custody inmate who had just two "points."  Mr. Willis should instead have been classified as at least a medium custody inmate who had at least thirteen points.

44.    In addition to Defendant Curtis misclassifying Tymothy Willis notwithstanding Willis's documented violent history and institutional record, at the time

-15-

of Mr. Childress's murder, Defendants CoreCivic and Byrd had specific knowledge that Mr. Willis was an informant on the compound—otherwise known as a "snitch"[17]—and that he posed a heightened danger to anyone with whom he was housed as a result.

45. Because Tymothy Willis had acted as an informant, shortly before Mr. Childress's murder, Tymothy Willis "had gotten a message from everybody in Segregation [that] was like, 'Look, if you don't take out your cellie, we're going to take you out. But you have to leave this facility some way or another.' And the only way out -- he could get out was killing somebody."[18]

46. As a result of the threats that he received from other inmates at Trousdale Turner Correctional Center, Tymothy Willis brutally murdered Mr. Childress in order to ensure his prompt transfer out of Trousdale Turner Correctional Center.

47. Nobody employed by CoreCivic intervened while Tymothy Willis murdered Mr. Childress, because nobody employed by CoreCivic was around to hear it. Video surveillance reveals that corrections officers were not nearby at the time of Mr. Childress' murder and that they did not return to Mr. Childress's cell for an extended time period that was longer than normal rounds and adequate staffing required.

48. CoreCivic has actual knowledge that its surveillance footage proves its understaffing and associated liability arising from Mr. Childress's preventable murder. In an effort to conceal its liability and its actionable deliberate indifference, however, CoreCivic has withheld release of that footage to Plaintiffs under the pretense of security concerns that are not genuine.

49. On a routine basis, Trousdale Turner Correctional Center's Special Housing

---

[17] **Ex. 1** at 31:12–13.

[18] *Id.* at 31:14–18.

Unit has only two of its positions staffed, requiring each of the officers on duty to do the work of three officers in addition to doing his or her individually assigned job. As a direct result of this understaffing, rounds were not conducted either properly or timely in the Special Housing Unit during the time period leading up to Mr. Childress' murder. When conducting rounds, officers routinely failed to verify the inmates' status properly in violation of TDOC policy and generally accepted practices in prison management. Neither were checks conducted with the frequency required by TDOC policy and generally accepted practices in prison management. As a result of these chronic failures, Tymothy Willis was aware that he could murder Mr. Childress without intervention from any nearby officers, who would not discover the assault until after Mr. Childress was dead.

50. As of December 2020—approximately two months before Mr. Childress's murder—only two of the five positions in Trousdale Turner Correctional Center's Special Housing Unit were staffed. Trousdale Turner Correctional Center also continued to remain severely understaffed thereafter.

51. Adequate staffing would have enabled CoreCivic's officers to respond to Tymothy Willis's assault of Mr. Childress and to prevent that assault from becoming fatal.

52. Trousdale Turner Correctional Center's understaffing is so severe that two units holding 360 inmates are often manned by just a single officer. Such severe understaffing is woefully insufficient to prevent serious injury to inmates resulting from inmate-on-inmate violence. It is also reasonably foreseeable that such gross understaffing will result in an increased number of inmate-on-inmate assaults and that those assaults will be more severe due to the absence of intervention from officers.

53. CoreCivic routinely staffs Trousdale Turner Correctional Center with just a single officer per unit, which is woefully insufficient to maintain a constitutionally

adequate level of inmate safety in the facility.

54.    CoreCivic has—and it has long had—actual knowledge that Trousdale Turner Correctional Center is severely understaffed.    Indeed, Trousdale Turner Correctional Center is understaffed *deliberately*, because paying for sufficient staffing is expensive and understaffing is more profitable.

55.    Generally speaking, the less money that CoreCivic spends on staff and inmate safety at Trousdale Turner Correctional Center, the higher CoreCivic's profit margin.    In all instances, CoreCivic acts to maximize profit for the benefit of its shareholders.

56.    Given its focus on maximizing profit, CoreCivic routinely fails to meet constitutionally adequate safety standards at Trousdale Turner Correctional Center, resulting in recurring, preventable, and disproportionately high instances of inmate-on-inmate assaults and deaths.

57.    Inmates at Trousdale Turner Correctional Center—including Terry Childress—have died and continue to die needlessly as a result of Trousdale Turner Correctional Center's premeditated and profit-motivated understaffing choices.

58.    Defendant Hininger—CoreCivic's Chief Executive Officer—has actual knowledge of Trousdale Turner Correctional Center's chronic understaffing.  Even so, he has willfully failed to remedy Trousdale Turner Correctional Center's deliberate indifference to inmate safety, both because understaffing is more profitable and because he does not care when inmates in CoreCivic's care needlessly die.

59.    Defendant Conry, CoreCivic's Vice President of Operations Administration, also has actual knowledge of Trousdale Turner Correctional Center's endemic understaffing.  Even so, he has similarly failed to remedy Trousdale Turner Correctional

-18-

Center's understaffing and the heightened risk of fatal inmate-on-inmate violence resulting from it, because understaffing is profitable and because he, too, is unbothered when inmates in CoreCivic's care needlessly die.

60. Defendant Byrd—who was the warden of Trousdale Turner Correctional Center at the time of Mr. Childress's preventable murder—was similarly aware of Trousdale Turner Correctional Center's extreme understaffing problems. Indeed, he observed them personally almost every single day that he served as warden. Even so, Defendant Byrd consciously neglected to remedy Trousdale Turner Correctional Center's chronic understaffing despite his personal knowledge of the extraordinary and frequently fatal inmate-on-inmate violence enabled by it.

61. Owing to the fact that the Defendants' tortious misconduct caused Mr. Childress to die from his injuries, Mr. Childress was unable to exhaust administrative remedies regarding the causes of action at issue in this Complaint in advance of its filing.

## V. CAUSES OF ACTION

### CLAIM #1: 42 U.S.C. § 1983—DELIBERATE INDIFFERENCE TO AND FAILURE TO PREVENT FORESEEABLE INMATE-ON-INMATE VIOLENCE (AS TO ALL DEFENDANTS)

62. The Plaintiffs incorporate and reallege the foregoing allegations as if fully set forth herein.

63. At all times relevant to this Complaint, all Defendants had legal duties under the Eighth Amendment to protect Mr. Childress from violence at the hands of other prisoners and to ensure Mr. Childress's reasonable safety at Trousdale Turner Correctional Center.

64. CoreCivic has an unconstitutional policy or practice of maintaining staffing levels that are insufficient to ensure that inmates like Mr. Childress are protected from

-19-

inmate-on-inmate violence.

65. All Defendants are and may be held liable for acting with deliberate indifference to Mr. Childress's safety at Trousdale Turner Correctional Center.

66. Defendants CoreCivic, Hininger, Conry, and Byrd failed to protect Mr. Childress from a known risk of violence at the hands of another prisoner.

67. All Defendants failed to ensure Mr. Childress's reasonable safety at Trousdale Turner Correctional Center.

68. All Defendants acted with deliberate indifference to Mr. Childress's safety while he was an inmate at Trousdale Turner Correctional Center.

69. Defendants CoreCivic, Hininger, Conry, and Byrd knew that Mr. Childress faced a substantial risk of serious harm at Trousdale Turner Correctional Center as a result of its chronic understaffing. Similarly, Defendant Curtis knew that misclassifying a violent and dangerous inmate like Tymothy Willis as a low security risk created a heightened and specific risk of violence to any low security cellmate with whom Tymothy Willis was housed.

70. Defendants CoreCivic, Hininger, Conry, Byrd, and Conry disregarded known risks to Mr. Childress at Trousdale Turner Correctional Center by failing to take reasonable measures to abate them.

71. Defendants CoreCivic, Hininger, Conry, and Byrd were actually aware of the specific and particularized risks of serious harm posed to inmates like Mr. Childress as a consequence of, *inter alia*, CoreCivic's deliberate understaffing of Trousdale Turner Correctional Center; CoreCivic's failure to properly train and supervise the staff at Trousdale Turner Correctional Center to ensure adequate staffing levels; Trousdale Turner Correctional Center's failure to adhere to safety protocols; and Trousdale Turner

Correctional Center's failure to classify and house inmates in its care correctly and in accordance with generally accepted practices in prison management.

72. At the time Mr. Childress was murdered, Trousdale Turner Correctional Center was plagued by constant and pervasive risks of physical harm to inmates.

73. At the time Mr. Childress was murdered, Trousdale Turner Correctional Center's pervasive risk of harm to inmates manifested in actual harm and a dramatically outsized number of serious inmate-on-inmate attacks, only a fraction of which were ever officially documented.

74. At the time Mr. Childress was murdered, Trousdale Turner Correctional Center was plagued by longstanding, pervasive, well-known, and expressly observed inmate-on-inmate attacks that routinely went unreported to state regulators.

75. At the time Mr. Childress was murdered, Defendants CoreCivic, Hininger, Conry, and Byrd had been exposed to information concerning the risk of physical harm to inmates housed at Trousdale Turner Correctional Center, including audits by regulators, and they must have known about it.

76. At the time Mr. Childress was murdered, Defendants CoreCivic, Hininger, Conry, and Byrd had actual or constructive knowledge of the constant and pervasive risk of physical harm to inmates generally and to Mr. Childress specifically at Trousdale Turner Correctional Center.

77. Defendants CoreCivic, Hininger, Conry, and Byrd were additionally aware of the specific and particularized risk of serious harm posed to inmates like Mr. Childress as a consequence of the fact that—rather than maintaining inmate safety—CoreCivic's officers facilitate violence within Trousdale Turner Correctional Center by smuggling in drugs and needles to enable the drug trade, drug use, and the spread of contraband within

the facility.

78. To the extent that CoreCivic attempts to segregate violent inmates from non-violent inmates at Trousdale Turner Correctional Center, such attempts are rendered ineffectual by the facts that inmates are misclassified; are not meaningfully secured in their cells; and that entire pods are often left unsecured—even during lockdowns—due to understaffing. In combination with these chronic failures, Defendant Curtis's misclassification of Tymothy Willis proximately enabled Mr. Childress's preventable murder.

79. Despite Defendants CoreCivic's, Hininger's, Conry's, and Byrd's actual awareness of the severe risks to inmate safety within Trousdale Turner Correctional Center, they consciously and deliberately failed to address those risks because deliberate indifference to inmate safety is more profitable.

80. Because so many previous deaths at Trousdale Turner Correctional Center have not been met with meaningful remedial action, CoreCivic continues to maintain a chronically unsafe and understaffed facility, because it does not expect that regulators or this Court will take any meaningful remedial action against it.

CLAIM #2: LIABILITY UNDER *MONELL V. DEPT. OF SOCIAL SERVICES*, 436 U.S. 658 (1978)
(AS TO DEFENDANT CORECIVIC)

81. The Plaintiffs incorporate and reallege the foregoing allegations as if fully set forth herein.

82. Defendant CoreCivic has adopted a policy and practice of severely understaffing its facilities, including Trousdale Turner Correctional Center, without regard to inmate safety because understaffing is more profitable.

83. As a result of multiple audits identifying Trousdale Turner Correctional

Center's severe understaffing issues and thousands of violent incidents—both reported and unreported—at the facility over a period of years, CoreCivic had actual knowledge of Trousdale Turner Correctional Center's chronic understaffing problems, but it opted not to staff Trousdale Turner Correctional Center adequately because doing so would have been less profitable.

84.    At the time of Mr. Childress's murder, CoreCivic's employees—including Defendants Hininger, Conry, and Byrd—had actual knowledge that Trousdale Turner Correctional Center's chronic understaffing problems resulted in an extraordinary and outsized level of inmate-on-inmate violence at the facility.

85.    CoreCivic's policy and practice of understaffing is widespread, rampant, and endemic to CoreCivic's prison facilities, including Trousdale Turner Correctional Center.

86.    Defendants CoreCivic, Hininger, Conry, and Byrd knew of the heightened and chronic safety risks to inmates resulting from understaffing at Trousdale Turner Correctional Center, but they tolerated, maintained, and promoted understaffing to generate greater profits for CoreCivic at the expense of the safety of inmates like Mr. Childress.

87.    Mr. Childress's death is attributable to Defendant CoreCivic's policy and practice of failing to ensure adequate staffing at its prison facilities, including Trousdale Turner Correctional Center, which was explicitly or impliedly authorized by Hininger, Conry, and Byrd, and in which they knowingly acquiesced in accordance with CoreCivic's policy, custom, and practice of prioritizing profit over inmate safety.

88.    If Trousdale Turner Correctional Center's Special Housing Unit had been properly supervised and staffed, Mr. Childress would not be dead.

89.    Trousdale Turner Correctional Center's chronic understaffing also

continues to remain unremedied even after Mr. Childress's death. Indeed, several more inmates have died at Trousdale Turner Correctional Center following Mr. Childress's death—including as recently as January 2022—and inmates continue to die there with dramatically outsized frequency. In many cases, such deaths are kept hidden from and unreported to the public.

<u>CLAIM #3: TENNESSEE COMMON LAW NEGLIGENCE</u>
<u>(AS TO DEFENDANTS CORECIVIC, BYRD, AND CURTIS)</u>

90. The Plaintiffs incorporate and reallege the foregoing allegations as if fully set forth herein.

91. Defendants CoreCivic, Byrd, and Curtis owed a legal duty of care to Mr. Childress to protect him from reasonably foreseeable harm.

92. Because Tymothy Willis was a known informant and violent inmate whose safety had been threatened if he did not murder his cellmate, Defendants CoreCivic and Byrd knew of or had reasons to anticipate an attack on Mr. Childress by Tymothy Willis, but they did not use reasonable care to prevent it.

93. Based on Tymothy Willis's violent and dangerous history and his institutional history, Defendant Curtis knew that misclassifying Tymothy Willis as a low security inmate posed a specific risk of physical harm to any low security cellmate with whom Tymothy Willis was housed. Similarly, based on Tymothy Willis's violent and dangerous history, his institutional history, his status as an informant on the compound, and specific threats communicated to Tymothy Willis by other inmates if he did not murder Mr. Childress, Defendants CoreCivic and Byrd had actual and constructive notice of the risk of foreseeable harm that Tymothy Willis posed to Mr. Childress specifically, and they had reason to anticipate the attack.

94. Accordingly, Defendants CoreCivic and Byrd knew or should have known that Mr. Childress would become the victim of an attack by Tymothy Willis, but they failed to use reasonable care to prevent it.

95. Defendants CoreCivic's, Byrd's, and Curtis's breaches of their duty of care to Mr. Childress proximately caused Mr. Childress to die at the hands of his violent, dangerous, and misclassified cellmate.

### CLAIM #4: LOSS OF CONSORTIUM
### (AS TO ALL DEFENDANTS)

96. The Plaintiffs incorporate and reallege the foregoing allegations as if fully set forth herein.

97. Tennessee allows for an award of damages for loss of filial consortium and other damages for the death of one's child under Tenn. Code Ann. § 20–5–113. *See Hancock v. Chattanooga-Hamilton Cty. Hosp. Auth.*, 54 S.W.3d 234, 236 (Tenn. 2001).

98. The Defendants' wrongful acts, faults, omissions, and tortious misconduct caused Ms. Newby to suffer a loss of filial consortium and other damages arising from the death of her beloved son.

99. Accordingly, Ms. Newby is entitled to an award of damages, including the pecuniary value of Mr. Childress's life and the loss of her son's attention, guidance, care, protection, companionship, cooperation, affection, and love.

### CLAIM #5: TENN. CODE ANN. § 1-3-121
### (AS TO DEFENDANT CORECIVIC)

100. The Plaintiffs incorporate and reallege the foregoing allegations as if fully set forth herein.

101. Defendant CoreCivic knowingly and deliberately fails to ensure a

-25-

constitutionally adequate level of inmate safety at its Tennessee-based facilities.

102.    Defendant CoreCivic knowingly and deliberately fails to ensure a constitutionally adequate level of inmate safety at its Tennessee-based facilities because it is cheaper and more profitable not to do so and because it does not fear meaningful regulatory or judicial consequences if it maintains understaffed facilities.

103.    In an effort to prevent the fact of its chronic, profit-motivated deliberate indifference to inmate safety from reaching Tennessee regulators, legislators, and others, Defendant CoreCivic fails to document, disposes of, takes measures to conceal, and falsifies records and evidence of its deliberate indifference to inmate safety.

104.    Tenn. Code Ann. § 1-3-121 enables plaintiffs to vindicate claims for declaratory and injunctive relief in cases involving illegal and unconstitutional government action.   It specifically provides that: "Notwithstanding any law to the contrary, a cause of action shall exist under this chapter for any affected person who seeks declaratory or injunctive relief in any action brought regarding the legality or constitutionality of a governmental action."

105.    Defendant CoreCivic's chronic deliberate indifference to inmate safety contravenes the provisions of the Eighth Amendment to the United States Constitution.

106.    Defendant CoreCivic's actions additionally contravene Tenn. Const. art. I, § 32, which provides that: "That the erection of safe prisons, the inspection of prisons, and the humane treatment of prisoners, shall be provided for."

107.    Absent, at minimum, regular independent monitoring and unannounced inspections designed to determine whether Defendant CoreCivic has remedied its chronic and profit-motivated deliberate indifference to inmate safety and other unlawful conduct described above, CoreCivic will continue to act both illegally and unconstitutionally with

-26-

respect to its operation of Trousdale Turner Correctional Center.

108. To remedy CoreCivic's chronically illegal and unconstitutional actions at Trousdale Turner Correctional Center, this Court should appoint an independent monitor to conduct regular unannounced inspections of Trousdale Turner Correctional Center and report whether Defendant CoreCivic has remedied its chronic and profit-motivated unlawful conduct.

109. In the absence of CoreCivic coming into compliance with its obligation to ensure a constitutionally adequate level of inmate safety, this Court should issue an injunction permanently enjoining Defendant CoreCivic from continuing to operate Trousdale Turner Correctional Center going forward.

## VI. PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs pray for the following relief:

1. That proper process issue and be served upon the Defendants, and that the Defendants be required to appear and answer this Complaint within the time required by law;

2. That the Plaintiffs be awarded all compensatory, consequential, and incidental damages to which they are entitled in an amount not less than $2,500,000.00;

3. That the Plaintiffs be awarded punitive damages of not less than $7,500,000.00;

4. That Defendant CoreCivic's profits arising from its chronically unconstitutional understaffing at Trousdale Turner Correctional Center be disgorged;

5. That the Plaintiffs be awarded all costs and discretionary costs of trying this action;

6. That the Plaintiffs be awarded their reasonable attorney's fees pursuant to

-27-

42 U.S.C. § 1988(b) and an appropriate multiplier of said fees;

7.     That a jury of 12 be empaneled to try this cause;

8.     That pre-judgment and post-judgment interest be awarded to the Plaintiffs;

9.     That this Court declare that CoreCivic acted illegally by failing to ensure a constitutionally adequate level of inmate safety at Trousdale Turner Correctional Center;

10.     That this Court appoint an independent monitor to conduct regular unannounced inspections of Trousdale Turner Correctional Center and report whether Defendant CoreCivic has remedied its chronic and profit-motivated unlawful conduct, and that this Court issue an injunction permanently enjoining Defendant CoreCivic from continuing to operate Trousdale Turner Correctional Center if it fails to do so; and

11.     That the Plaintiffs be awarded all further relief to which they are entitled.

Respectfully submitted,

/s/ Daniel A. Horwitz
Daniel A. Horwitz, BPR #032176
Lindsay E. Smith, BPR #035937
HORWITZ LAW, PLLC
4016 Westlawn Dr.
Nashville, TN 37209
daniel@horwitz.law
lindsay@horwitz.law
(615) 739-2888

Brice M. Timmons #29582
Craig A. Edgington #38205
DONATI LAW, PLLC
1545 Union Ave.
Memphis, Tennessee 38104
(901) 278-1004 – Telephone
(901) 278-3111 – Facsimile
brice@donatilaw.com
craig@donatilaw.com

*Attorneys for Plaintiffs*