# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

|  |  |  |
|---|---|---|
| NIKKI BOLLINGER GRAE, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 3:16-cv-2267 |
| | ) | Judge Aleta A. Trauger |
| CORRECTIONS CORPORATION OF AMERICA, DAMON T. HININGER, DAVID M. GARFINKLE, TODD J. MULLENGER, and HARLEY G. LAPPIN, | ) ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM

Amalgamated Bank, as Trustee for the LongView Collective Investment Fund, ("Amalgamated") has filed a Motion for Reconsideration of the January 18, 2019 Order Denying Class Certification (Docket No. 148), to which CoreCivic, Inc. ("CoreCivic") has filed a Response (Docket No. 160), and Amalgamated has filed a Reply (Docket No. 162). For the reasons set out herein, Amalgamated's motion will be granted.

## I. BACKGROUND[1]

### A. The Class Period and the Nature of Amalgamated's Allegations

CoreCivic is a publicly traded real estate investment trust ("REIT") that owns and operates private prisons and detention facilities. Amalgamated is the lead plaintiff in a putative class action against CoreCivic and four CoreCivic executives for securities fraud, based on the

---

[1] Because this matter is before the court only with regard to class certification, none of the factual assertions relevant solely to the merits of Amalgamated's claims has yet been contested. Nevertheless, the scope and nature of the allegations are relevant to determining whether class certification is warranted. Accordingly, where the court is discussing only the scope and nature of the allegations, the facts cited will mostly be taken, unless otherwise indicated, from Amalgamated's Amended Consolidated Complaint (Docket No. 57.) Where the court is discussing facts that go directly to whether Amalgamated has satisfied a condition of class certification, it will rely on evidence introduced into the record.

defendants' history of making allegedly false and/or misleading public statements about the quality of CoreCivic's services and its history of performance relative to the expectations of its government clients, including the Federal Bureau of Prisons ("BOP"). Amalgamated sought the certification of a class consisting of those investors allegedly defrauded by defendants' actions and omissions during a period beginning on February 27, 2012, and ending on August 17, 2016 ("Class Period").

The day after the close of the proposed Class Period, August 18, 2016, Deputy Attorney General Sally Q. Yates issued a memorandum to the BOP entitled "Reducing our Use of Private Prisons" ("Yates Memorandum"). (Docket No. 149-4.) The BOP is a subdivision of the U.S. Department of Justice ("DOJ"), *see Mauldin v. United States*, No. 3:07-0496, 2008 WL 821523, at \*3 (M.D. Tenn. Mar. 27, 2008) (Haynes, J.), making the BOP's contracting decisions subject to DOJ supervision. The Yates Memorandum directed that, "as each [BOP private prison] contract reaches the end of its term, the Bureau should either decline to renew that contract or substantially reduce its scope in a manner consistent with law and the overall decline of the Bureau's inmate population." (Docket No. 149-4at 3.) DAG Yates explained that, while "[p]rivate prisons served an important role during a difficult period, . . . time ha[d] shown that they compare poorly to our own [BOP] facilities." (*Id.* at 2.) Private facilities, Yates wrote, "simply do not provide the same level of correctional services, programs, and resources; they do not save substantially on costs; and . . . they do not maintain the same level of safety and security." (*Id.*) Yates concluded that the BOP should "begin[] the process of reducing—and ultimately ending—our use of privately operated prisons." (*Id.* at 3.) In the wake of the Yates Memorandum, CoreCivic's stock price dropped precipitously. (*See* Docket No. 122-2 ¶ 73.)

During the Class Period, CoreCivic's BOP contracts had covered five facilities collectively housing approximately 8,000 inmates, accounting for a sizable amount of

CoreCivic's business. Accordingly, some decrease in the value of CoreCivic's stock in the wake of the Yates Memorandum was likely inevitable; after all, it would make very little sense for CoreCivic to be worth the same amount with or without the BOP's business. Amalgamated argues, however, that the severity of the drop did not need to be as great as it was. Rather, the steepness of the decline was, at least in part, attributable to the fact that CoreCivic and its executives had, for years, provided the public with an image of CoreCivic's contract performance that sharply diverged from the truth apparent behind the scenes. CoreCivic did not claim to be perfect, but it did publicly claim to be providing services that were, at least generally, in line with client expectations. Meanwhile, the feedback that CoreCivic was actually receiving from the BOP painted a different picture. The BOP routinely sent "Notices of Concern" and other forms of notification informing CoreCivic of shortcomings at specific facilities. Among the most commonly addressed issues were CoreCivic's chronically inadequate staffing and its failure to provide sufficient medical services to its inmates. As the Class Period progressed, warnings to CoreCivic that it was falling short of expectations piled up. At some point, DOJ leadership began to seriously question whether its continued reliance on private prison contractors, such as CoreCivic, should continue. The Yates Memorandum was the result.

Amalgamated seeks to represent a class of investors who bought and sold CoreCivic stock during the Class Period at prices that reflected the confidence that CoreCivic projected publicly, while, unbeknownst to investors, CoreCivic was routinely falling short of BOP expectations and putting the entities' relationship in jeopardy as a result. On December 17, 2017, the court denied a CoreCivic motion to dismiss, recognizing that Amalgamated had pled a viable theory of liability and met the exacting pleading standards of the Private Securities Litigation Reform Act ("PSLRA"), *see* 15 U.S.C. § 78u-4. (Docket Nos. 75–76.) On January 18, 2019, however, the court denied class certification on the ground that Amalgamated had failed to

establish shared questions of reliance among potential class members and, therefore, did not satisfy Rule 23(b)(3) of the Federal Rules of Civil Procedure. Amalgamated now seeks reconsideration of that decision, in light of new evidence unearthed during discovery as well as additional argument under the law.

## B. Representative CoreCivic Statements

The court will not reiterate the full list of allegedly false and misleading statements that Amalgamated has cited, many of which can be found in the court's Memorandum of December 18, 2017, denying CoreCivic's Motion to Dismiss. (Docket No. 76 at 14–19.) Nevertheless, the precise nature of what CoreCivic claimed is relevant to Amalgamated's motion, because the crux of the parties' disagreement concerns whether particular events during the Class Period can be considered "corrective" of those misstatements. (*See* Docket No. 143 at 11–19.) Accordingly, the court will include a few representative statements here.

CoreCivic and its executives, as might be expected, typically portrayed its services in a positive light to shareholders. The statements at issue here, however, frequently went beyond generic puffery to claims that their services were of a high quality, specifically, in the eyes of their government clients. As the court observed in its December 18, 2017 Memorandum, CoreCivic's business model was marked by a heavy reliance on a few specifically identifiable clients. (Docket No. 76 at 28.) CoreCivic's viability and profits, therefore, were closely tied to those clients' perceptions of the value of CoreCivic's services. Recognizing as much, CoreCivic and its executives routinely boasted about meeting the expectations of its identifiable government clients.

For example, on March 30, 2016, CoreCivic CEO Damon T. Hininger wrote, in his annual letter to shareholders, "Every day we remain focused on providing high-quality, safe and secure facilities that meet the needs of our government partners. By consistently doing so, we

4

have experienced more than three decades of continued growth and contract retention rates in excess of 90 percent." The letter boasted that CoreCivic's "strong record of operational excellence" had "earned [CoreCivic] the confidence of our government partners." (Docket No. 57 ¶ 35.) Similarly, numerous CoreCivic annual and quarterly reports throughout the Class Period claimed, in identical or slightly modified form:

> We believe the outsourcing of prison management services to private operators allows governments to manage increasing inmate populations while simultaneously controlling correctional costs and improving correctional services.

> We believe *our customers discover* that partnering with private operators to provide residential services to their inmates introduces competition to their prison system, resulting in *improvements to the quality and cost of corrections services throughout their correctional system*.

(*Id.* ¶ 126 (emphasis added).)

CoreCivic frequently claimed to be, at least generally, compliant with its government clients' standards. Several annual reports included the following passage or slightly modified versions thereof:

> We operate our facilities in accordance with both company and facility-specific policies and procedures. The policies and procedures reflect the high standards generated by a number of sources, including . . . federal, state, and local government guidelines, established correctional procedures, and company-wide policies and procedures that may exceed these guidelines.

(*Id.* ¶ 135.)

CoreCivic specifically tied this alleged high performance to an optimism that it would continue to receive government business in large volumes. Several annual and quarterly reports included the following claim:

> We believe our renewal rate on existing contracts remains high as a result of a variety of reasons including, but not limited to, the constrained supply of available beds within the U.S. correctional system, our ownership of the majority of the beds we operate, and the quality of our operations.

(*Id.* ¶¶ 132–33.)

At a June 8, 2016 investor forum, Hininger characterized CoreCivic's business model as resilient in the face of political changes, due to the high level of quality CoreCivic provided:

> One thing I'd point to when people ask us what's a Clinton White House look like for you all, what's a Trump White House look like for you all and their respective administrations, and I can't speak in absolutes and make definitive statements. But I would say that being around 30 years and being in operation in many, many states, and also doing work with the federal government going back to the 1980s, where you had Clinton White House, you had a Bush White House, you had Obama White House, we've done very, very well. *We have operationally made sure that we are providing high quality and standard and consistent services to our partners* and being very flexible and innovative in the solutions. And with that, we've had some nice growth in our business under those three respective Presidents. We had a lot of growth under Clinton, we had a lot of growth under Bush, and we've had a lot of growth under President Obama. *And so, with that, if we continue to do a good job on the quality, and with that, we can demonstrate savings . . . , then I think we'll be just fine.*

(*Id.* ¶ 168 (emphasis added).)

## C. CoreCivic Contracts in Jeopardy

Meanwhile, however, there were reasons to believe that CoreCivic's relationship with the BOP was not fine. On January 9, 2015, the BOP had sent CoreCivic a "Cure Notice" regarding its Cibola County Correctional Center ("Cibola"). (*Id.* ¶ 79.) The BOP wrote:

> [CoreCivic] is notified that the Government considers the failure to perform in the area of Health Services a condition that is endangering performance of the contract. . . . unless the conditions are cured by April 21, 2015 the Government may terminate this contract under the terms and conditions of [federal acquisition regulations.]

> The Cibola County Correctional Center has **numerous and repetitive items of critical non-conformance in the area of Health Services**, specifically, Patient Care . . . .

(*Id.*) The Notice listed seven specific failures to perform, including the facility's mishandling of inmates with HIV or positive tuberculosis tests, failures to maintain accurate records of medication administrations, and an inadequate emergency response in the case of an inmate who eventually died. (*Id.*) The BOP's complaints about poor health services at Cibola were of a piece

6

with numerous Notices of Concern it had sent regarding other CoreCivic facilities, as detailed in the court's December 18, 2017 Memorandum. Those deficiencies were sometimes tied to inadequate medical staffing that was endemic of broader issues with staffing levels at CoreCivic facilities. (*See* Docket No. 76 at 5–12.)

Although the BOP did not immediately cancel its Cibola contract, issues with the health services at Cibola and other CoreCivic facilities continued. On October 22, 2015, one CoreCivic executive wrote, in an email[2] to Hininger, that "apparently we had a bad day today with BOP

---

[2] A number of internal CoreCivic communications relevant to Amalgamated's motions have been filed under seal pursuant to the parties' Revised Stipulation and Protective Order. (Docket No. 86.) That Order protected "Confidential Discovery Material," defined pursuant to the following provision:

> Any Producing Party may designate as confidential any Discovery Material that it believes in good faith contains: (i) trade secret or other confidential research, development, or commercial information; (ii) information the disclosure of which would, in the good faith judgment of the Producing Party, negatively impact the management of any corrections facility or be detrimental to the health and safety of inmates, corrections officers or the public; or (iii) "protected health information" ("PHI") as defined in 45 C.F.R. §§ 160.103 and 164.501, which includes but is not limited to health information, including demographic information, relating to either (a) the past, present, or future physical or mental condition of an individual, (b) the provision of care to an individual, or (c) the payment for care provided to any individual, which identifies the individual or which reasonably could be expected to identify the individual (collectively, "Confidential Information"), in accordance with Rule 26(c) of the Federal Rules of Civil Procedure.

(Docket No. 86 ¶ 2.) The court has, so far, honored the parties' confidentiality claims in this case. Nevertheless, the court has now determined that it is necessary, in the interests of justice and transparency, to cite some covered communications and facts explicitly, without redaction, in the court's Memorandum. These limited disclosures are justified by the interests of the unnamed class members in evaluating and understanding the case, as well as the public interest in transparency related to underlying facts—which involve potential fraud by and on behalf of a company performing a public function and entrusted with the safety of individuals sentenced to incarceration by this country's courts. *See Rudd Equip. Co., Inc. v. John Deere Constr. & Forestry Co.*, 834 F.3d 589, 594 (6th Cir. 2016) ("[A] court must balance the litigants' privacy interests against the public's right of access, recognizing our judicial system's strong presumption in favor of openness."). CoreCivic has argued that its internal responses to BOP scrutiny should be kept under seal because their disclosure could harm CoreCivic in the marketplace. (Docket No. 155 at 6.) The court, however, discerns no serious threat of unfair competition associated with disclosure of the relevant communications. None of the cited internal conversations reveal any confidential CoreCivic strategies, practices, or research and development. The conversations cited may be awkward or embarrassing for CoreCivic to see disclosed, but that, alone, is not enough to justify an unyielding seal in this case. The court concludes that, at least with regard to the limited facts cited in this Memorandum, the harms of maintaining the seal would be greater than any associated with relaxing it.

medical audit at Cibola." He expressed concern that the issues at Cibola might have a negative impact on the possibility of renewal of the Cibola contract, as well as CoreCivic's bid regarding a second facility, the Eden Detention Center. (Docket No. 149-26 at 2.) Another email exchange between CoreCivic executives expressed concern that "[t]his is going to kill us at both Cibola and Eden." (Docket No. 149-27 at 3.)

In June 2016, the BOP was conducting a further review of Cibola's medical services. As the review continued and the BOP remained silent about what its ultimate conclusions would be, CoreCivic executives apparently inferred that a negative outcome was forthcoming. "Silence is NOT GOLDEN!!!," wrote one. "We're dead," replied another executive, whose duties specifically included relations with government partners. (Docket No. 149-31.) Other correspondence during the Class Period echoes similar concerns about the BOP's assessment of CoreCivic's services and the possibility of lost contracts as a result. (*See, e.g.*, Docket Nos. 149-9, -10, -24, -25, -27.)

On July 28, 2016, CoreCivic executives were forwarded an email chain, apparently through CoreCivic-affiliated lobbyists, discussing the fact that "BOP is making a round of phone calls to private prison companies ([CoreCivic and another company] so far) giving them notice that they are cancelling contracts effective October 2016." The email beginning the thread characterized the BOP's actions as a "realignment." Although a cancellation or non-renewal of the Cibola contract had not yet been publicly announced, the emails made clear that CoreCivic was aware that the contract was going to be cancelled or not renewed. (Docket No. 149-32.)

The BOP's non-renewal of CoreCivic's Cibola contract became public knowledge in the early days of August 2016. The parties disagree, however, with regard to when the market should be assumed to have become aware of the non-renewal. Acknowledgment of the non-renewal first

appeared in local New Mexico news media as early as August 1 or 2. (Docket No. 135-1 ¶¶ 7–8.) Amalgamated suggests that the non-renewal should be treated as having been announced after the close of trading on August 3, 2016, when the non-renewal was included in CoreCivic's second quarter 2016 earnings announcements. (Docket No. 120-1 ¶ 82.) The next day, August 4, 2016, the value of CoreCivic's stock dropped significantly. (*Id.* ¶ 84.)

## D. The OIG Report

On August 11, 2016, the DOJ's Office of the Inspector General ("OIG") published a report entitled "Review of the Federal Bureau of Prisons' Monitoring of Contract Prisons" ("OIG Report"). (Docket No. 99-1.) The authors of the OIG Report explained that the OIG "initiated this review to examine how the BOP monitors [private prison] facilities" as well as to "assess[] whether contractor performance meets certain inmate safety and security requirements and analyze[] how contract prisons and similar BOP institutions compare with regard to inmate safety and security data." (*Id.* at *i*.) The Report, which included examination of CoreCivic facilities and data, found that, "in most key areas, contract prisons incurred more safety and security incidents per capita than comparable BOP institutions." (*Id.*) The OIG Report noted that, in "recent years, disturbances in several federal contract prisons resulted in extensive property damage, bodily injury, and the death of a Correctional Officer"—that death being the death of an officer killed during a riot at a CoreCivic facility. (*Id.* at 2.) The OIG Report observed that CoreCivic facilities experienced substantially higher rates, relative to BOP institutions, of a number of unwelcome occurrences, such as inmate fights, inmate-on-inmate assaults, and suicide attempts or self-mutilations. (*Id.* at 60–67.)

The OIG Report, however, had some express limitations. First, it was addressed to the BOP's monitoring of contract prisons from FY 2011 through FY 2014, although it did include some field work that extended into early 2015. (*Id.* at 3.) The BOP's 2014 fiscal year ended on

9

September 30, 2014. Accordingly, by the time the OIG Report was published, there had been nearly two more years of developments in the DOJ/BOP/CoreCivic relationship that were not covered by the Report.

The Report also elected to focus its data analysis on "eight key categories: (1) contraband, (2) reports of incidents, (3) lockdowns, (4) inmate discipline, (5) telephone monitoring, (6) selected grievances, (7) urinalysis drug testing, and (8) sexual misconduct." (*Id.* at *ii*.) While those categories did capture a number of ways in which CoreCivic had underperformed relative to BOP prisons, none of the categories directly addressed the two issues that were arguably most pervasive in CoreCivic's history of deficiencies—its chronic understaffing and the poor quality of its medical care. Staffing issues were mentioned in the Report but were not the subject of a systematic analysis. (*Id.* at 2–3.) Similarly, the Report did acknowledge the existence of problems related to medical care in contract facilities, but the Report's authors specifically conceded that "the clinical adequacy of inmate medical care fell outside the scope of our review." (*Id.* at 20.)

Internal CoreCivic correspondence confirms that knowledgeable CoreCivic employees considered the scope of the Report to have avoided, or at least downplayed, key issues about which they were concerned. CoreCivic received an advance version of the Report so that it would have an opportunity to respond or raise any objections. In an e-mail exchange between two CoreCivic executives about the report, one remarked—twice—that she was surprised that the Report had not, in her view, addressed CoreCivic's staffing issues. (Docket No. 149-2.) The other CoreCivic executive observed that the criticisms in the Report "are all BOP directed"— meaning that the Report was chiefly focused on improving the BOP's oversight practices, not merely finding fault with contractors. The executive who had noted the lack of content addressing staffing issues concluded that, after looking over the draft Report, her initial concern

about the Report "may [have been] a false alarm." (*Id.*) In another e-mail exchange, a different CoreCivic executive wrote, "What I'm shocked over is they totally overlooked the consequences of our staff vacancies. They mentioned staffing at the end but could have been much more critical." (Docket No. 149-3.)

The Report did not recommend that the BOP stop using contract prisons. Rather, it offered four recommendations, all of which contemplated, or at least did not foreclose, continuing to work with private prison contractors. First, the Report recommended that the BOP

> 1. Convene a working group of BOP subject matter experts to evaluate why contract prisons had more safety and security incidents per capita than BOP institutions in a number of key indicators, and identify appropriate action, if necessary.

(Docket No. 149-1 at 45.) The remaining three recommendations were made for the purpose of "improv[ing] monitoring and oversight of BOP contract prisons":

> 2. Verify on a more frequent basis that inmates receive basic medical services such as initial medical exams and immunizations.
>
> 3. Ensure that correctional services observation steps address vital functions related to the contract, including periodic validation of actual Correctional Officer staffing levels based on the approved staffing plan.
>
> 4. Reevaluate the checklist and review it on a regular basis with input from subject matter experts to ensure that observation steps reflect the most important activities for contract compliance and that monitoring and documentation requirements and expectations are clear, including for observation steps requiring monitors to engage in trend analysis.

(*Id.*)

Appendix 9 to the Report consisted of response letters from the contractors under review, including CoreCivic. CoreCivic suggested that the allegedly higher incidences of undesirable events at contract prisons could be attributed to the fact that contract prisons tend to house a demographically different population than BOP prisons. In particular, CoreCivic noted that its

prisons housed a disproportionate number of foreign nationals, which, CoreCivic argued, posed

unique security challenges. Ultimately, CoreCivic wrote:

> We share the interests of the OIG and the BOP in ensuring contract prisons are operated safely and securely and in compliance with contract requirements. We are also committed to working in partnership with the BOP to address any recommendations in furtherance of these goals. . . . We look forward to further discussions with the BOP regarding the data and recommendations in the report and collaboration on any policy or operational changes.

(*Id.* at 70.)

As the court previously observed, the value of CoreCivic's stock does not appear to have

immediately suffered in a statistically significant way from the release of the OIG Report. (See

Docket No. 99-3 ¶ 58.) A week later, however, on August 18, 2016, the Yates Memorandum was

released, leading to an immediate and substantial devaluation of the stock.


**E. Amalgamated's Class Certification Motion**

Amalgamated, which has been appointed lead plaintiff (Docket No. 52), filed a Motion to

Certify Class (Docket No. 91), seeking certification of a class defined as follows:

> All persons who purchased or otherwise acquired Corrections Corporation of America, Inc. ("CCA") [now "CoreCivic"] securities between February 27, 2012 and August 17, 2016, inclusive, and who were damaged thereby. Excluded from the Class are: (a) CCA, its parents, subsidiaries and any other entity owned or controlled by CCA; (b) Damon T. Hininger, Todd J. Mullenger, and Harley G. Lappin; (c) all other executive officers and directors of CCA or any of its parents, subsidiaries or other entities owned or controlled by CCA; (d) all immediate family members of the foregoing, including grandparents, parents, spouses, siblings, children, grandchildren and steprelations of similar degree; and (e) all predecessors and successors in interest or assigns of any of the foregoing.

(Docket No. 92 at 1.) CoreCivic opposed the motion. (Docket No. 98.) The principal

disagreement between the parties centered around whether Amalgamated could establish that

common questions of fact or law predominated among the various putative class members'

claims. Specifically, Amalgamated sought to rely on a presumption of reliance under one or both

of two Supreme Court cases: *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), which allows for a rebuttable presumption of reliance with regard to material public statements about a stock traded on an efficient market; and *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), which allows for a rebuttable presumption of reliance in cases primarily involving a failure to disclose.

The court concluded that Amalgamated could not rely on either presumption in order to show shared questions of reliance. The court held, first, that Amalgamated was entitled to the *Basic* presumption, but CoreCivic had successfully rebutted that presumption with evidence that CoreCivic's allegedly fraudulent statements had had no price impact, as permitted by *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 283 (2014) ("*Halliburton II*"). (Docket No. 143 at 18–19.) The court concluded that Amalgamated was not entitled to the *Affiliated Ute* presumption because its allegations primarily involved statements, not failures to disclose. (*Id.* at 23–24.)

Amalgamated filed a Motion to Reconsider, in which it has (1) presented new evidence, received during discovery, that it argues is relevant to the court's class certification decision, (2) argued that the court's interpretation of *Halliburton II* was incorrect, and (3) advanced additional legal and factual arguments that it did not raise in its initial class certification motion but which bear on aspects of the court's reasoning in its earlier opinion, particularly with regard to the *Basic* presumption. (Docket No. 148.) CoreCivic opposes the motion. (Docket No. 160.)

## II. LEGAL STANDARDS

### A. Motion to Reconsider

While the Federal Rules of Civil Procedure fail to explicitly address motions to reconsider interlocutory orders, "[d]istrict courts have authority both under common law and Rule 54(b) to reconsider interlocutory orders and to reopen any part of a case before entry of final judgment." *Rodriguez v. Tenn. Laborers Health & Welfare Fund*, 89 F. App'x 949, 959

(6th Cir. 2004) (citing *Mallory v. Eyrich*, 922 F.2d 1273, 1282 (6th Cir. 1991)); *see also In re Life Investors Ins. Co. of Am.*, 589 F.3d 319, 326 n.6 (6th Cir. 2009) ("[A] district court may always reconsider and revise its interlocutory orders while it retains jurisdiction over the case.") (citing *Rodriguez*, 89 F. App'x at 959; *Mallory*, 922 F.2d at 1282). Thus, district courts may "afford such relief from interlocutory orders as justice requires." *Rodriguez*, 89 F. App'x at 959 (quoting *Citibank N.A. v. FDIC*, 857 F.Supp. 976, 981 (D.D.C.1994)) (internal brackets omitted). Courts traditionally will find justification for reconsidering interlocutory orders when there is (1) an intervening change of controlling law; (2) new evidence available; or (3) a need to correct clear error or prevent manifest injustice. *Louisville/Jefferson Cty. Metro Gov't v. Hotels.com, L.P.*, 590 F.3d 381, 389 (6th Cir. 2009) (citing *Rodriguez*, 89 F. App'x at 959). This standard "vests significant discretion in district courts." *Rodriguez*, 89 F. App'x at 959 n.7.

## B. Motion for Class Certification

The principal purpose of class actions is to achieve efficiency and economy of litigation, both with respect to the parties and to the courts. *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 159 (1982). The Supreme Court has observed that, as an exception to the usual rule that litigation is conducted by and on behalf of individual named parties, "[c]lass relief is 'peculiarly appropriate' when the 'issues involved are common to the class as a whole' and when they 'turn on questions of law applicable in the same manner to each member of the class.'" *Id.* at 155 (quoting *Califano v. Yamasaki*, 442 U.S. 682, 701 (1979)). The Court directs that, before certifying a class, district courts must conduct a "rigorous analysis" of the prerequisites of Rule 23 of the Federal Rules of Civil Procedure. *Id.* at 161. The Sixth Circuit has stated that district courts have broad discretion in deciding whether to certify a class but that courts must exercise that discretion within the framework of Rule 23. *Coleman v. Gen. Motors Acceptance Corp.*, 296 F.3d 443, 446 (6th Cir. 2002); *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996).

14

Although a court considering class certification should not inquire into the merits of the underlying claim, a class action may not be certified merely on the basis of its designation as such in the pleadings. *See Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974); *In re Am. Med. Sys.*, 75 F.3d at 1079. In evaluating whether class certification is appropriate, "it may be necessary for the court to probe behind the pleadings," as the issues concerning whether it is appropriate to certify a class are often "enmeshed" within the legal and factual considerations raised by the litigation. *Falcon*, 457 U.S. at 160; *see also In re Am. Med. Sys.*, 75 F.3d at 1079; *Weathers v. Peters Realty Corp.*, 499 F.2d 1197, 1200 (6th Cir. 1974). Moreover, the party seeking class certification bears the burden of establishing that the prerequisites are met. *See Alkire v. Irving*, 330 F.3d 802, 820 (6th Cir. 2003); *Senter v. Gen. Motors Corp.*, 532 F.2d 511, 522 (6th Cir. 1976).

### III. ANALYSIS[3]

### A. Amalgamated's Failure to Raise Arguments in Support of its Initial Motion

CoreCivic points out that many of the arguments that Amalgamated has raised in support of its Motion to Reconsider could have been raised in support of its initial class certification motion, but Amalgamated chose not to pursue those arguments at the time. While Amalgamated has supported some of its arguments with new evidence[4] unearthed during discovery, CoreCivic is correct that most of the key points that Amalgamated now makes could have been raised based

---

[3] This Memorandum's analysis will focus on the issues raised in Amalgamated's Motion to Reconsider and CoreCivic's briefing in opposition to that motion. However, a number of other issues related to class certification were raised by the parties and addressed by the court in its earlier Memorandum. (Docket No. 143.) The court hereby incorporates the analysis of that Memorandum, except with regard to issues specifically addressed in this Memorandum.

[4] CoreCivic disputes the contention that this evidence is truly "new," pointing out that it was made available to Amalgamated before the completion of briefing on its initial motion. Regardless of whether one treats the evidence as newly discovered, however, it would not excuse a failure to raise arguments that could have been raised initially, as Amalgamated's could have been. The specific timing of the relevant discovery, therefore, is not determinative in the court's analysis.

15

only on the materials available at the time of the initial motion. Some of those arguments did appear, in some form, in Amalgamated's original briefing, but others did not. CoreCivic argues that, because Amalgamated has raised its new arguments belatedly, the court should not revisit its class certification decision. Amalgamated responds that "[a] district court's order denying or granting class status is inherently tentative," and the court, therefore, has "the discretion, even the obligation, 'to reassess [its] class ruling[] as the case develops.'" *In re Polyurethane Foam Antitrust Litig.*, No. 1:10 MD 2196, 2015 WL 4459636, at *1 (N.D. Ohio July 21, 2015) (quoting *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469 n. 11 (1978); *McNamara v. Felderhof*, 410 F.3d 277, 281 n. 8 (5th Cir. 2005)).

There are good reasons for requiring a party to raise all of its viable arguments in support of its initial motion, and those reasons do not simply go away when the issue at hand is class certification. Nevertheless, Amalgamated is correct that there are issues in the Rule 23 context that are relevant to the court's consideration of whether to give its earlier decision a second look. First is that, because Amalgamated is seeking to represent a class, the rights of parties other than it are at stake. Refusing to consider a meritorious argument simply because Amalgamated's counsel failed to raise it earlier risks punishing unnamed parties who had no role in the earlier litigation decisions. Second, the nature of Rule 23 itself carries a special risk of a premature, ultimately erroneous, ruling, because the Rule prizes resolving class certification questions early, even if relevant evidence and issues may arise later. A court is required to make a decision regarding class certification "[a]t an early practicable time after a person sues or is sued as a class representative." Fed. R. Civ. P. 23(c)(1)(A). Determining when that early practicable time should be, however, is not an exact science, particularly while the contours of a case are still taking shape. Accordingly, Rule 23 explicitly reserves to the court the power to "alter[] or amend[]" an order "grant[ing] or den[ying] class certification" at any time "before final

16

judgment." Fed. R. Civ. P. 23(c)(1)(C); *see also Microsoft Corp. v. Baker*, 137 S. Ct. 1702, 1711 (2017) (observing that, after denying class certification, a district court can "later reverse course and certify the proposed class").

Ultimately, "[i]t is within the sole discretion of the court to determine if a prior ruling should be reconsidered, and the Sixth Circuit has declined to impose any conditions or limitations upon a court's power to review a prior ruling," at least as long as the prior ruling was on an interlocutory matter and the case remains pending. *Grant v. Metro. Gov't of Nashville & Davidson Cty., Tennessee*, No. 3-04-CV-00630, 2017 WL 1153927, at *2 (M.D. Tenn. Mar. 27, 2017) (Crenshaw, J.) (citing *Gillig v. Advanced Cardiovascular Sys., Inc.*, 67 F.3d 586, 590 (6th Cir. 1995)). While Amalgamated is admonished that both it and the court would have been better served by all viable arguments' having been raised in support of the original motion, the court concludes that the harms of refusing to consider those arguments now would outweigh any benefits of treating the arguments as forfeited or waived. Moreover, while much of what Amalgamated now argues could have been raised before, aspects of its argument are significantly bolstered by evidence not previously available to the court. The court, accordingly, will consider the arguments that Amalgamated has raised on their own merits.

## B. Application of *Halliburton II*

Amalgamated argues, first, that the court erred in its application of *Halliburton II*, particularly in light of two Supreme Court cases that preceded it, *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804 (2011) ("*Halliburton I*"), and *Amgen Inc. v. Connecticut Retirement Plans and Trust Funds*, 568 U.S. 455 (2013). Specifically, Amalgamated argues that the court, in its Rule 23(b)(3) analysis, improperly considered certain evidence pursuant to *Halliburton II*, when consideration of that evidence should have been treated as barred by *Halliburton I* and *Amgen*.

### 1. The Role of the Basic Presumption under Rule 23(b)

A class action will be certified only if, after rigorous analysis, the court is satisfied that the prerequisites of Fed. R. Civ. P. 23(a) have been met and the action falls within one of the categories under Fed. R. Civ. P. 23(b). *Bridging Cmtys. Inc. v. Top Flite Fin. Inc.*, 843 F.3d 1119, 1124 (6th Cir. 2016). Amalgamated sought to rely on Rule 23(b)(3), which allows for certification of a Rule 23(a)-compliant class if

> the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:
>
> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3). Although Amalgamated retained the initial burden of demonstrating compliance with the provisions of Rule 23(a) and Rule 23(b)(3), CoreCivic only specifically challenged its compliance in one respect: whether "questions of law or fact common to class members predominate over any questions affecting only individual members," in particular with regard to the issue of reliance.

"Investors can recover damages in a private securities fraud action only if they prove that they relied on the defendant's misrepresentation in deciding to buy or sell a company's stock." *Halliburton II*, 573 U.S. at 263. For example, in a conventional securities fraud case, an individual might show, via documentary or testimonial evidence, that he personally relied on a particular misrepresentation in making the decision to buy or sell at a specific price. *See Chelsea*

*Assocs. v. Rapanos*, 527 F.2d 1266, 1271 (6th Cir. 1975) ("In the usual fraud case or case brought for misrepresentation in violation of Rule 10b-5, proof of reliance upon the misstated or false fact is required.") (citing *Schlick v. Penn-Dixie Cement Corp.*, 507 F.2d 374, 380 (2d Cir. 1974), *cert. denied*, 421 U.S. 976 (1975)). Although that approach may be adequate for traditional, single-plaintiff securities fraud cases, proving individual reliance in such a manner for each member of a class numbering in the hundreds or thousands would likely be prohibitively difficult. Accordingly, securities fraud class action plaintiffs often rely on *Basic* and/or *Affiliated Ute*, each of which allows a plaintiff to establish a "rebuttable presumption of reliance," without the need for individual information about each plaintiff. *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 159 (2008). In the current motion, Amalgamated only disputes the court's analysis under *Basic*.

The court, in its prior Memorandum, provided a detailed discussion of the theoretical underpinnings of the *Basic* presumption, which it will not repeat here. (Docket No. 143 at 7–9.) Put succinctly, *Basic* assumes that buyers and sellers of stock in an efficient market rely on the market as an intermediary for setting the stock's price in light of all publicly available material information; accordingly, when one buys or sells the stock at the market price, one has, in effect, relied on all publicly available information, regardless of whether the buyer and/or seller was aware of that information personally. *See Basic*, 485 U.S. at 243–44. Fraud committed by artificially affecting a stock's price through public information, as contemplated by *Basic*, is known as "fraud-on-the-market."

In order to rely on the *Basic* presumption at the merits stage of a case, "a plaintiff must prove that: (1) the alleged misrepresentations were publicly known, (2) they were material, (3) the stock traded in an efficient market, and (4) the plaintiff traded the stock between when the misrepresentations were made and when the truth was revealed." *Halliburton II*, 573 U.S. at

19

277–78 (citing *Basic*, 485 U.S., at 248 n.27). Then, once the plaintiff makes an initial showing that it is entitled to the *Basic* presumption, "a defendant may rebut it with 'evidence that the asserted misrepresentation (or its correction) did not affect the market price of the defendant's stock.'" *In re BancorpSouth, Inc.*, No. 17-0508, 2017 WL 4125647, at *1 (6th Cir. Sept. 18, 2017) (quoting *Halliburton II*, 573 U.S. at 279–80). The Supreme Court's recognition of fraud-on-the-market in *Basic*, however, left open the question of which of those issues must be considered by the court at the class certification stage and which can be saved for the court's consideration of the plaintiffs' claims on the merits.

### 2. *Halliburton I*, *Amgen*, and *Halliburton II*

The Supreme Court has cautioned that "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen*, 568 U.S. at 466. While some questions may be relevant to both the merits and the class certification inquiry, a court may consider those questions "only to the extent . . . that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.* (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 352 n.6 (2011)). A plaintiff, then, is not required to show that its fraud-on-the-market claims will prevail in order to receive class certification. The plaintiff is, however, required to eliminate any obstacles to commonality or any other Rule 23 requirement, even if doing so requires the broaching of topics also relevant to the merits of the underlying claims.

**Haliburton I.** In *Halliburton I*, the plaintiff sought certification of its class under a fraud-on-the-market theory, but the district court denied certification on the ground that Fifth Circuit precedent required a plaintiff to establish loss causation in order to rely on the *Basic* presumption to satisfy Rule 23(b)(3). 563 U.S. at 808. The Fifth Circuit, consistently with its precedents, affirmed, but the Supreme Court reversed. *Id.* at 815. The Supreme Court conceded that a plaintiff seeking class certification via *Basic* must establish some threshold facts relevant to the

fraud-on-the-market presumption, namely "that the alleged misrepresentations were publicly known . . . , that the stock traded in an efficient market, and that the relevant transaction took place 'between the time the misrepresentations were made and the time the truth was revealed.'" *Id.* at 811 (citing & quoting *Basic,* 485 U.S. at 241–47, 248 n.27; citing *Stoneridge*, 552 U.S. at 159). The Court held that requiring a plaintiff to show loss causation, however, improperly added an additional element with no relation to either the Rule 23(b)(3) commonality inquiry or *Basic* itself. "Loss causation," the Court reasoned, "addresses a matter different from whether an investor relied on a misrepresentation, presumptively or otherwise, when buying or selling a stock." *Id.* at 812. For example, a plaintiff might have relied on a misrepresentation relating to one matter when he bought a stock, and the stock's later devaluation might have been the result of a wholly unrelated intervening event. In such a case, the plaintiff would be unable to show loss causation and its claim would fail on the merits. That issue, though, would have been wholly distinct from determining whether common issues of law or fact predominated with regard to reliance. Considering loss causation at the class certification stage, therefore, was error. *Id.* at 813.

In the alternative, the defendant argued that, even if the plaintiff should not have been required to prove loss causation as it is ordinarily understood, "loss causation," in this context, "was merely 'shorthand'" for "price impact"—the lack of which can be used to rebut the *Basic* presumption. *Id.* at 813–14. The Supreme Court rejected the defendant's argument but did not offer an opinion on whether price impact might be properly raised at the Rule 23 stage in an appropriate case. Rather, the Supreme Court rejected the defendant's "wishful interpretation of the Court of Appeals' opinion" and "t[ook] the Court of Appeals at its word" that it was considering only the "familiar and distinct concept" of loss causation. *Id.* at 814–15.

*Amgen.* Two years later, in *Amgen*, a plaintiff sought to rely on the *Basic* presumption to satisfy Rule 23(b)(3), but the defendant argued that, in order to do so, a plaintiff must "prove[] materiality, [because] immaterial misrepresentations or omissions, by definition, would have no impact on [the] stock price in an efficient market." 568 U.S. at 459 (emphasis removed). As the defendant pointed out, materiality, unlike the loss causation at issue in *Halliburton I*, is "an essential predicate of the fraud-on-the-market theory," and, therefore, a failure to show materiality would result in a loss of the *Basic* presumption itself, not merely the failure of the plaintiff's claim on some other ground. *Id.* at 467.

The Court agreed that materiality was a necessary element for establishing the fraud-on-the-market presumption on the merits but disagreed that it followed, from that premise, that a plaintiff must establish materiality at the Rule 23 stage. The Court, rather, grounded its analysis in the commonality inquiry, observing that, "[b]ecause materiality is judged according to an objective standard, the materiality of [the defendant's] alleged misrepresentations and omissions is a question common to all members of the class." *Id.* at 459. The class could, therefore, "prevail or fail in unison," as contemplated by Rule 23(b)(3). *Id.* at 460. Whether a defendant must address a particular element of its case as part of the Rule 23(b)(3) inquiry, the Court explained, depends, not on whether the element is "essential" to the fraud-on-the-market presumption, but whether that element has any bearing on the question of if common questions of fact or law will predominate. *Id.* at 467–68.

The Court rejected the argument that, if the putative class failed to establish materiality, the result would be for the court to be left with numerous plaintiffs needing to establish reliance on an individual basis because they could not rely on the *Basic* presumption. Materiality can safely be saved for the merits stage, the Court explained, because materiality is not only a requirement for a fraud-on-the-market claim but also an "indispensable element[] of a Rule 10b–

5 claim." *Id.* at 473. Accordingly, if a plaintiff class fails to show materiality and loses the *Basic* presumption, that will not lead to individual questions of reliance predominating in the case, because, reliance aside, all of the individual claims will fail on the merits due to the immateriality of the statements at issue. Even with the *Basic* presumption lost, common issues would predominate, albeit in defendant's favor. *Id.*

The defendant argued, in the alternative, that the district court erred by refusing to consider rebuttal evidence "show[ing] that[,] in light of all the information available to the market," the defendant's alleged misrepresentations did not "significantly alter[] the total mix of information made available" to the public and, therefore, "could not be presumed to have altered the market price." *Id.* at 480 (quoting *Basic*, 485 U.S. at 232; citation and other internal quotation marks omitted). The Court held that the district court did not err because that evidence "aimed to prove that the misrepresentations and omissions alleged . . . were immaterial." *Id.* at 481 (citation omitted). Accordingly, the fact that the plaintiff was not required to establish materiality rendered the evidence inapposite. *Id.*

**Halliburton II.** The next year, the Halliburton litigation returned to the Supreme Court. As *Halliburton I* foreshadowed, the defendant had argued, on remand, that "the evidence it had earlier introduced to disprove loss causation also showed that none of its alleged misrepresentations had actually affected its stock price" and, therefore, the evidence, when presented on the issue of price impact, "rebutted *Basic*'s presumption that the members of the proposed class had relied on its alleged misrepresentations simply by buying or selling its stock at the market price." *Halliburton II*, 573 U.S. at 265. The district court and the Fifth Circuit held that merely repackaging that evidence under the rubric of price impact did not permit the defendant to rely on it to defeat class certification. *Id.* at 266. The Supreme Court reversed, holding that, while a plaintiff is not required to establish price impact, as part of its initial

showing, in order to rely on the *Basic* presumption at the class certification stage, the defendant is entitled to present evidence of the *lack* of price impact to rebut the presumption. *Id.* at 279, 283.

The plaintiff argued that allowing the defendant to present price impact evidence at the class certification stage was inconsistent with the reasoning of *Amgen*, because *Amgen*'s analysis of materiality would apply with equal force to price impact. Price impact, like materiality, could be resolved on a class-wide basis. Moreover, a total lack of price impact would likely spell the end of plaintiffs' claims regardless of the issue of reliance, because it would be difficult, if not impossible, to show that the plaintiffs were harmed. The Supreme Court did not dispute the plaintiff's premise—conceding that it was "[f]air enough" to suggest that *Amgen*'s materiality analysis would apply, in largely the same manner, to price impact. The Court, nevertheless, concluded that price impact was ultimately distinguishable from materiality in one "crucial respect"—that, while materiality is a "discrete issue that can be resolved in isolation," price impact is "*Basic*'s fundamental premise" and therefore "has everything to do with the issue of predominance." *Id.* at 282–83 (internal citations, quotation marks, and brackets omitted). Accordingly, the Court held that, *Amgen*'s reasoning aside, a defendant could seek to rebut the *Basic* presumption with price impact analysis at the class certification stage. *Id.*

### 3. This Court's Interpretation of **Halliburton II**

Amalgamated and CoreCivic agreed that Amalgamated had established the elements necessary for initially invoking the *Basic* presumption at the class certification stage—that is, publicity, contemporaneousness, and market efficiency. CoreCivic argued, however, that it had successfully rebutted that presumption with evidence that none of the relevant statements had had any price impact, as permitted by *Halliburton II*. First, CoreCivic provided a Report, by economist Lucy P. Allen, evaluating the price impact of various events, including CoreCivic's

alleged misrepresentations, the publication of the OIG Report, and the publication of the Yates Memorandum. (Docket No. 99-3.) With regard to CoreCivic's alleged misrepresentations, Allen found no evidence that any of the misrepresentations caused a statistically significant increase in the value of CoreCivic's stock. (*Id.* at 12–14.) Similarly, she found no statistically significant decrease in the stock's value in the immediate wake of the OIG Report's release. (*Id.* at 33.) CoreCivic argued, therefore, that the evidence showed that its statements touting the quality of its services and client relationships did not contemporaneously inflate the price of its stock, and the revelation of CoreCivic's shortcomings in the OIG Report did not result in a devaluation.

The court held that a lack of stock price increases correlated with CoreCivic's statements did not necessarily establish a lack of price impact, because those statements might instead merely have perpetuated an already inflated valuation. In other words, Amalgamated could still argue for what is known as the "price maintenance" theory of price impact. *See Willis v. Big Lots*, Inc., 242 F. Supp. 3d 634, 656–57 (S.D. Ohio 2017) ("[T]he price maintenance theory [is] the theory that a misrepresentation can have a price impact not only by raising a stock's price but also by maintaining a stock's already artificially inflated price . . . ."). Indeed, a price maintenance theory would be consistent with the facts presented, as CoreCivic concedes that it had made similar positive statements prior to the advent of the Class Period. (*See* Docket No. 160 at 4 ("The alleged false and misleading statements were made years before (and years after) the alleged class period . . . .").)

The court was persuaded, however, by CoreCivic's argument based on the OIG Report. Amalgamated argued that price impact was established by the decline in price following the release of the Yates Memorandum, via a "materialization of risk" theory.[5] The court agreed that

---

[5] "Materialization of risk" refers to a situation where a party's fraud is revealed, not by an express disclosure of the truth, but by a fraudulently concealed risk's coming to fruition. For example, a company

materialization of risk was, as a general matter, a viable theory of price impact, for reasons the court will not repeat here. (Docket No. 143 at 12–13.) As the court explained, however, the materialization of a risk can only be evidence of the price impact of an earlier false statement concealing the risk if the risk was not disclosed at some point between the statement and the materialization. If a previously concealed risk is disclosed before the risk comes to fruition, then the price adjustment attributable to the fraud should occur when the risk is revealed, not when the potential harm actually comes to pass. The price of the stock might still go down, again, when the risk materializes, but, because the risk was no longer concealed, that price decrease would not be attributable to the fraud. The court concluded that the OIG Report was an intervening event that revealed the risk that CoreCivic's statements had allegedly concealed and that, therefore, the price drop after the Yates Memorandum did not negate the evidence showing a lack of price impact. (Docket No. 149 at 12–13.)

Amalgamated argues that, by considering the effect of the OIG Report, the court misapplied *Halliburton II*. Specifically, Amalgamated urges the court to adopt the following reading of *Halliburton II*, advanced by Judge James L. Dennis of the Fifth Circuit, in his concurrence to a *per curiam* order granting leave to appeal the district court's post-*Halliburtion II* certification of the plaintiff's class in the Halliburton litigation:

> I do not read *Halliburton II* to require that any evidence that is somehow related to price impact must be considered at the class certification stage. Instead, *Halliburton II* merely rejected our categorical holding below, prohibiting all direct evidence of lack of price impact to rebut the presumption of reliance at the class certification stage. The Court did not hold that issues that would otherwise be strictly merits issues under *Amgen* can be raised at the class certification stage merely because they bear on the issue of price impact. Indeed, materiality, too, is

---

might fraudulently conceal a product defect, but the defect might be revealed via product failures. Even without an express acknowledgment of the defect by the company, the materilization of the risk would serve as the equivalent of a corrective disclosure and precipitate a revaluation of its stock. The Sixth Circuit has recognized that materialization of risk is a viable theory of loss causation in a securities fraud case. *See Ohio Pub. Employees Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 830 F.3d 376, 388 (6th Cir. 2016).

directed at price impact. Yet *Halliburton II* made clear that courts should not consider defendants' evidence that their alleged misrepresentations were immaterial and thus had no price impact at the class certification stage. The Supreme Court in *Halliburton II* did not so much as hint that it intended to overrule *Amgen*.

*Halliburton II*, therefore, only allows defendants to introduce at the class certification stage evidence of lack of price impact that *Amgen* does not otherwise preclude . . . .

*Erica P. John Fund, Inc. v. Halliburton Co.*, No. 15-90038, 2015 WL 10714013, at *2 (5th Cir. Nov. 4, 2015) (Dennis, J., concurring) ("2015 Judge Dennis Concurrence").[6] In other words, the 2015 Judge Dennis Concurrence suggests that *Halliburton II* only permits price impact evidence that would not be relevant to the issue of materiality, because evidence bearing on materiality would continue to be barred by *Amgen*. Because the OIG Report is relevant to materiality, Amalgamated argues, the court should not have considered it.

The court finds no error in its earlier conclusion that *Halliburton II* requires it to consider evidence of a lack of price impact, even if that evidence would also be evidence of immateriality. The conclusion that considering such evidence would be barred by *Amgen* conflates the question of which *issues* can be considered at the class certification stage with which *evidence* can be considered then—a conflation that *Halliburton II* necessarily must reject in order for it to be consistent with *Halliburton I*. The evidence at issue in *Halliburton II* was the same evidence that had been presented to dispute loss causation in *Halliburton I*. Moreover, it was being offered in support of the same general factual inference at issue in *Halliburton I*—that the allegedly fraudulent statements did not affect the price of Halliburton stock. Nevertheless, the Supreme Court allowed the defendant to present that evidence in *Halliburton II*, because it was being offered in relation to a different issue. Amalgamated has identified no convincing reason why the

---

[6] Amalgamated refers to the 2015 Judge Dennis Concurrence as "*Halliburton III*" and attributes its analysis to "the Fifth Circuit." (Docket No. 149 at 16.) Judge Dennis's concurring opinion, however, was not joined by any other judges.

same rule would not apply with regard to evidence relevant to materiality. *Amgen* prevents a defendant from directly disputing materiality *qua* materiality at the Rule 23 stage, just as *Halliburton I* prevents it from disputing loss causation *qua* loss causation. It does not flow from either premise, however, that a court must exclude all evidence that might be relevant to those issues, if offered for another purpose.

Indeed, both *Amgen* and *Halliburton I* rejected certain arguments on the ground that the determinative issue, regarding whether to consider evidence at the class certification stage, is the purpose for which evidence is offered. The defendant in *Halliburton I* sought to reframe its loss causation evidence as price impact evidence, but the court rejected the maneuver because it "t[ook] the Court of Appeals at its word" when that court stated that it was considering only loss causation. 563 U.S. at 815. Similarly, the defendant in *Amgen* sought to present evidence suggesting that its statements had not affected the mix of information available to investors, but the Court rejected that maneuver as well, because the evidence, as presented, "aimed to prove that the misrepresentations and omissions alleged . . . were immaterial." 568 U.S. at 481. It was the aim, not the content of the evidence, that mattered.[7]

---

[7] Amalgamated attempts to characterize this aspect of *Amgen*'s reasoning as involving the same issue here, because both cases involve allegations that the market was or became aware of the truth during the relevant class period. The situations, however, are different, as are both what is being contested and why it is being contested. The defendant in *Amgen* argued that, when it made the allegedly false statements or omissions, the truth was already available to investors from other sources:

> For example, Connecticut Retirement's complaint alleges that an Amgen executive misleadingly downplayed the significance of an upcoming Food and Drug Administration advisory committee meeting by incorrectly stating that the meeting would not focus on one of Amgen's leading drugs. Amgen responded to this allegation by presenting public documents—including the committee's meeting agenda, which was published in the Federal Register more than a month before the meeting—stating that safety concerns associated with Amgen's drug would be discussed at the meeting.

568 U.S. at 481 (citations omitted). In other words, the defendant sought to argue that, based on the truth already being out, its statements would have been disregarded by a reasonable investor—a classic materiality argument. CoreCivic does not make such an argument with regard to the OIG Report, nor could it, because the OIG Report did not come out until nearly the end of the Class Period. Rather,

At the heart of this confusing area of the case law is the fact that all three concepts addressed—loss causation, materiality, and price impact—are, in essence, slightly different takes on the same fundamental question: Did a statement matter? As a result, evidence relevant to each issue is likely also to be relevant to the others. Evidence of price impact is relevant to materiality, because evidence that a statement affected a stock's price confirms that a reasonable investor would have cared about the statement. Evidence of loss causation is relevant to price impact, because, if the plaintiff is to succeed, the price impact must be what caused the loss—the two become one and the same. And evidence of materiality is likely to be relevant to both price impact and loss causation, because, as the Court observed in *Halliburton II*, materiality, when used in the context of the *Basic* presumption, is itself merely a piece of indirect evidence offered to establish that a statement can be assumed to have affected a stock price. 573 U.S. at 278. Taking a piece of evidence and placing it in any of the three boxes, to the exclusion of the others, would be an artificial and logically questionable exercise.

The court pauses to note that, if this issue had come before it after *Amgen* but before *Halliburton II*, the court likely would have reached a different result. As the Supreme Court itself largely conceded, the reasoning applied to materiality in *Amgen* would seem to apply, with similar force, to price impact. Moreover, the ground given by the Supreme Court, in *Halliburton II*, for treating price impact differently—that price impact is an especially central concept to fraud-on-the-market—is difficult to reconcile with *Amgen*'s admonition that a Rule 23 commonality analysis is what should guide the court, not the necessity of the contested element. The court, if asked to interpret the law as it stood immediately after *Amgen*, likely would have held that price impact is an issue to be saved for the merits stage.

CoreCivic offers the OIG Report on the question of whether the Yates Memorandum was corrective, because the possibility of the Yates Memorandum's being corrective is an obstacle to CoreCivic's ability to demonstrate a lack of price impact.

29

*Halliburton II*, however, precludes the court from denying CoreCivic the opportunity to argue a lack of price impact at the class certification stage. Given that that issue is properly before the court, there is no reason to artificially limit the evidence on which CoreCivic can rely, merely because that evidence would also be relevant to a different issue that is reserved for the merits stage of litigation. To the contrary, the Court, in *Halliburton II*, made clear that a defendant can rely on "*[a]ny showing* that severs the link between the alleged misrepresentation and . . . the price received (or paid) by the plaintiff" to rebut the *Basic* presumption. 573 U.S. at 281 (quoting *Basic*, 485 U.S. at 248) (emphasis added). The court, therefore, finds no error in its earlier interpretation of *Halliburton II*.

### 4. Whether the OIG Report was Corrective

Amalgamated argues that, even if the court was permitted to consider the OIG Report in its price impact analysis, the court erred in concluding that the Report was sufficiently corrective to preclude relying on the price impact of the Yates Memorandum under a materialization of risk theory. The court's previous analysis on this issue was as follows:

> The Report discussed specific deficiencies at CoreCivic's Eden Detention Center, which was one of the facilities closely examined in the OIG's review. It included detailed statistics about various undesirable events at CoreCivic facilities, such as inmate-on-inmate assaults, suicide attempts, grievances, and lockdowns. The Report also made specific reference to private prisons' issues with inadequate staffing, one of the deficiencies central to CoreCivic's alleged quality control issues in this case. The Report, moreover, "caution[ed] against drawing the conclusion . . . that contract prisons are necessarily lower cost than BOP institutions on an overall basis." In short, an investor who read the Report on the day of its publication, August 11, 2016, would have been well-apprised of the fact that there was evidence of significant quality issues with the BOP's contract prisons, including, specifically, CoreCivic's. . . .
>
> Prior to the release of the Yates Memorandum, the truth, as alleged by Amalgamated, was this: 1) CoreCivic and other private prison operators had a history of major quality deficiencies, and the extent of the cost savings they offered was questionable. 2) There was ample reason for the DOJ to reconsider its relationship with private prison contractors, but CoreCivic defended its practices and hoped to continue doing business with the BOP. That is exactly the picture

one receives when one reads the OIG Report . . . . There was no concealed truth, then, left for the Yates Memorandum to disclose. All that the Memorandum revealed was the ensuing policy decision.

(Docket No. 143 at 16–17 (citations omitted).) Amalgamated now points to two issues with the OIG Report that, it argues, prevented the Report from precluding the later corrective effect of the Yates Memorandum. First, Amalgamated argues that the OIG Report ignored or gave short shrift to many of CoreCivic's problems, particularly in the areas of staffing and medical care—and that even CoreCivic's own executives internally conceded as much. Second, Amalgamated notes that, while the OIG Report was released shortly before the Yates Memorandum in 2016, it only covered FY 2011 through FY 2014. Accordingly, the picture painted by the Report did not capture the deterioration of the CoreCivic/BOP/DOJ relationship that occurred after the close of FY 2014, a deterioration embodied by the mounting concerns around the Cibola facility, the BOP's ultimate non-renewal of the Cibola contract, and CoreCivic executives' concerns that other contracts might be in jeopardy.

CoreCivic responds by arguing that Amalgamated's reliance on internal CoreCivic communications is inappropriate, because non-public communications would have had no bearing on the market price of CoreCivic's stock. CoreCivic argues that, if anything, those communications would be relevant to the merits of a fraud claim, but the merits are not currently before the court. (Docket No. 160 at 10–11.) CoreCivic's argument, however, is merely another iteration of the same reasoning that CoreCivic correctly urged the court to reject with regard to evidence relevant to materiality. Amalgamated cannot, at this stage, use the internal CoreCivic communications to demonstrate, for example, that CoreCivic executives were acting knowingly when they made particular allegedly false statements. That issue would be irrelevant to class certification. Nevertheless, the internal communications are relevant insofar as they pertain to any of the matters currently contested.

Internal CoreCivic communications evaluating the OIG Report are relevant to the price impact inquiry because those communications demonstrate how individuals knowledgeable about the private prison industry reacted to the Report. The efficient market hypothesis assumes that the market will be able to assimilate publicly available information about a company with a level of insight and sophistication that accounts for the realities of the industry in which the company does business. Before Amalgamated identified the internal CoreCivic correspondence, the court was forced to read the OIG Report largely in isolation. Now, the court can see how people familiar with the private prison industry read the Report, and it appears that there is a strong case to be made that CoreCivic got off easy. That evidence is directly relevant to the issue of whether the OIG Report was corrective and, if so, to what degree.

Moreover, the correspondence regarding Cibola and the possibility of that and other contracts being in jeopardy is relevant because it demonstrates what being "corrective," in this context, would have meant. The OIG Report, as the court already acknowledged, painted a picture of CoreCivic as a company that had often failed to meet government expectations. That picture, however, is far less severe than the reality apparent from the CoreCivic correspondence. While this reasoning unavoidably involves going far down the road toward considering issues relevant to the merits of Amalgamated's claims, it was CoreCivic, in its attempt to demonstrate a lack of price impact, that made such an inquiry necessary. The court, accordingly, is entitled to consider evidence regarding how corrective the OIG Report really was.

CoreCivic's boasts about the quality of its services and client relationships were mostly general in nature, and it was not necessary for the OIG Report to reveal every problem or shortcoming CoreCivic had had in order to qualify as corrective. Nevertheless, for the Report to sufficiently undercut the Yates Memorandum's capacity to demonstrate price impact, the Report must have revealed at least enough to bridge the gap between CoreCivic's representations and

32

the truth. Amalgamated has demonstrated that the OIG Report, due to limitations on its date range, subject matter, and methodology, failed to do so.[8] The court, accordingly, erred in concluding that CoreCivic had rebutted the *Basic* presumption and, by doing so, shown that Amalgamated had failed to satisfy Rule 23(b)(3). To the contrary, as long as Amalgamated can rely on a fraud-on-the-market theory, it is clear that common questions of law and fact predominate over individual ones, and Rule 23(b)(3) is satisfied. The court will, accordingly, go on to considering whether the other requirements of class certification are met.

## C. Other Requirements of Class Certification

While CoreCivic focused its opposition to class certification on the issue of common reliance, it is still ultimately Amalgamated's obligation, as the party seeking certification, to establish that it has met the requirements of Rule 23. *See Alkire*, 330 F.3d at 820; *Senter*, 532 F.2d at 522. "The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Wal-Mart Stores*, 564 U.S. at 348 (quoting *Califanoi*, 442 U.S. at 700–01). "A class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Id.* (citation and internal quotation marks omitted). To be certified, a class must satisfy the prerequisites set forth in Rule 23(a) of the Federal Rules of Civil Procedure: that "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a); *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 537 (6th Cir. 2012).

---

[8] In its initial Memorandum, the court also considered and rejected Amalgamated's alternative argument that the non-renewal of the Cibola contract could be treated as a corrective event demonstrating price impact. (Docket No. 143 at 18.) Because CoreCivic has failed to rebut the *Basic* presumption regardless, that issue should have been left for the merits stage of litigation. The court, accordingly, withdraws its analysis on that point without passing judgment on whether such an argument will prevail at a later stage in the proceedings.

### 1. Numerosity

Rule 23(a)(1) requires that the class be so numerous that joinder of all members is impracticable. Although there is no strict numerical test, substantial numbers usually satisfy the numerosity requirement. *Gilbert v. Abercrombie & Fitch Co.*, No. 2:15-cv-2854, 2016 WL 4159682, at * 4 (S.D. Ohio Aug. 5, 2016) (citing *Daffin v. Ford Motor Co.*, 458 F.3d 549, 552 (6th Cir. 2006)). "There is no magic minimum number that will breathe life into a class." *Russo v. CVS Pharmacy, Inc.*, 201 F.R.D. 291, 294 (D. Conn. 2001) (quoting *Jones v. CCH–LIS Legal Info. Servs.*, 1998 WL 671446, *1 (S.D.N.Y. Sept. 28, 1998)). A plaintiff must show some evidence of or reasonably estimate the number of class members, and, in assessing numerosity, the court may make common sense assumptions without the need for precise quantification of the class. *Id.* "[T]he exact number of class members need not be pleaded or proved" for a class to be certified, as long as the class representatives can show that joinder would be impracticable. *Golden v. City of Columbus*, 404 F.3d 950, 965–66 (6th Cir. 2005) (quoting *McGee v. E. Ohio Gas Co.*, 200 F.R.D. 382, 389 (S.D. Ohio 2001)).

Although Amalgamated has not identified the exact number of potential plaintiffs in this case, it has more than established numerosity. According to the report of Amalgamated's expert, Professor Steven P. Feinstein, SEC filings show that "at least 783 major institutions owned [CoreCivic] stock during the Class Period." (Docket No. 93-3 ¶ 61.) Over 110 million shares of CoreCivic's common stock were traded on the New York Stock Exchange. (Id. ¶ 79.) Whatever the total number of plaintiffs, it is plain that they are too numerous for joinder to be practicable.

### 2. Commonality and Typicality

In order for the court to certify the class under Rule 23, the class members' claims must depend upon a common contention of such a nature that it is capable of class-wide resolution. *In re Whirlpool Corp. Front–Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 852 (6th Cir.

2013). Variation in the ancillary details of the class members' cases is insufficient to defeat certification, as long as "[i]t is unlikely that differences in the factual background of each claim will affect the outcome of the legal issue." *Bacon v. Honda of Am. Mfg., Inc.*, 370 F.3d 565, 570 (6th Cir. 2004) (quoting *Califano*, 442 U.S. at 701).

Typicality is met if the class members' claims are fairly encompassed by the named plaintiffs' claims. This requirement ensures that the class representative's interests are aligned with the interests of the represented class members so that, by pursuing its own interests, the class representative also advocates the interests of the class members. *Whirlpool*, 722 F.3d at 852–53. Thus, a plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and if his claims are based on the same legal theory. *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1082 (6th Cir. 1996). Commonality and typicality tend to merge because both of them serve as guideposts for determining whether, under the particular circumstances, maintenance of a class action is economical, and whether the plaintiff's claims and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence. *Young*, 693 F.3d at 542.

The issues related to reliance that CoreCivic raised under Rule 23(b)(3) also bear on the issues of commonality and typicality, but, as the court now holds, CoreCivic's arguments in that regard are unavailing. Because Amalgamated has established that CoreCivic stock traded on an efficient market and the defendants' statements were public and made during the Class Period, and because CoreCivic has failed to rebut the *Basic* presumption by demonstrating a lack of price impact, Amalgamated is entitled to rely on the *Basic* presumption to establish commonality, and typicality, with regard to issues of reliance.

CoreCivic's expert also took issue with Amalgamated's model for using a single class-wide model for establishing individual plaintiffs' damages. Allen's methodological critique does

not, however, appear to undermine the conclusion that the plaintiffs' claims will ultimately hinge on shared issues of fact. Rather, Allen suggests that Amalgamated's proposed model fails to account for a "structural break" in the valuation of CoreCivic's stock associated with the February 7, 2013 conversion to the REIT form. (Docket No. 99-3 ¶¶ 96–99.) At most, however, this appears to create a generally applicable wrinkle with regard to all of the class members' damages based on the respective dates of the plaintiffs' transactions; it does not establish that damages will have to be determined on a wholly individual basis, without a shared methodology. Allen's observation regarding shared damages, therefore, does not defeat commonality or typicality. Nor does CoreCivic identify, or the court observe, any other obstacle. Because this is a fraud-on-the-market case, it hinges overwhelmingly on shared questions, and Amalgamated's claims are typical of those of the class.

### 3. Adequacy of Representation

Rule 23(a)(4) requires the court only to certify the class if "the representative parties will fairly and adequately protect the interests of the class." That requirement considers both general commonality of interests and whether the putative representative "will vigorously prosecute the interests of the class through qualified counsel." *Gonzales v. Cassidy*, 474 F.2d 67, 73 (6th Cir. 1973). As the court has already held, Amalgamated has established commonality. The court similarly sees no obstacle to class certification related to adequacy of representation. While Amalgamated should have raised some of its arguments sooner, it rectified any oversight, and its prosecution of this case has otherwise been vigorous, competent, and well-executed, as far as the court can tell. Because Amalgamated has satisfied the requirements of Rule 23, the court will certify its proposed class.[9]

---

[9] The court requested briefing on whether the court would be permitted to certify a class with a reduced Class Period, based on the possibility that the OIG Report may have been corrective with regard to some,

36

## IV. CONCLUSION

For the foregoing reasons, Amalgamated's Motion for Reconsideration of the January 19, 2018 Order Denying Class Certification (Docket No. 148) will be granted.

An appropriate order will enter.

ENTER this 26th day of March 2019.

_____
ALETA A. TRAUGER
United States District Judge

---

but not all, portions of the Class Period. Because the court has concluded that the OIG Report included substantive deficiencies that undermined its ability to be corrective with regard to the entire Class Period, it is unnecessary to consider whether a shortened Class Period would be permissible. The court will certify the class with the originally requested scope.