```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE MIDDLE DISTRICT OF TENNESSEE
 2                    NASHVILLE DIVISION

 3

 4   BOZA PLEASANT-BEY,            )
                                   )
 5      Plaintiff,                 )
                                   )   Case No. 3:19-cv-00486
 6   VS.                           )   JUDGE TRAUGER
                                   )   JURY DEMAND
 7   STATE OF TENNESSEE, et al,    )
                                   )
 8      Defendants.                )
     _____X
 9

10

11

12

13   _____

14

15               DEPOSITION OF RAYMOND BYRD

16                 TAKEN ON MAY 7, 2021

17

18   _____

19

20

21

22
     Prepared by:
23   Carole K. Briggs, LCR #345
     Briggs & Associates
24   222 Second Avenue, North, Suite 340M
     Nashville, Tennessee  37201
25   Briggscourtreporting@hotmail.com
```

Page 2

```
 1                         APPEARANCES:

 2


 3


 4    FOR THE PLAINTIFF:


 5


 6    JANNA MAPLES, ESQUIRE
      Branstetter, Stranch & Jennings, PLLC
 7    The Freedom Center
      223 Rosa L. Parks Avenue
 8    Suite 200
      Nashville, Tennessee   37203
 9    triciah@bsjfirm.com
      jannam@bsjfirm.com
10


11
      FOR THE DEFENDANT, STATE OF TENNESSEE:
12


13
      NIKKI N. HASHEMIAN, ESQUIRE
14    Tennessee Attorney General's Office
      P.O. Box 20207
15    Nashville, Tennessee   37202-0207
      thomas.aumann@ag.tn.gov
16    Nikki.hashemian@ag.tn.gov


17


18    FOR THE DEFENDANT, CORECIVIC:


19


20    JOSEPH F. WELBORN, ESQUIRE
      ERIN PALMER POLLY, ESQUIRE
21    K&L Gates, LLP
      222 Second Avenue South
22    Suite 1700
      Nashville, Tennessee   37201
23    joe.welborn@klgates.com
      Erin.polly@klgates.com
24


25
```

1                          TABLE OF CONTENTS

2

3    Witness                                                      Page

4

5

     RAYMOND BYRD
6
     Examination by Ms. Maples                                    5
7

8

9

10
                             LIST OF EXHIBITS
11

12
     Number      Description                                      Page
13

14
     1           Comptroller's audit report            33
15
     2           audit report authored by              62
16               Jon Walton, 2/25/21

17   3           review drug testing substance         73
                 abuse treatment July-December 2020
18
     4           2/1/21 audit report concerning        79
19               searches

20   5           Bates 002376                          82

21   6           use-of-force audit                    94

22

23

24

25

```
 1                  S T I P U L A T I O N

 2

 3

 4              The deposition of Raymond Byrd, taken on behalf

 5     of the plaintiff, remotely via Zoom, by agreement of

 6     parties, on May 7, 2021, for all purposes allowed under

 7     the Federal Rules of Civil Procedure.

 8              It is agreed that Carole K. Briggs, licensed

 9     court reporter for the State of Tennessee, may swear the

10     witness, take his deposition, and afterwards reduce same

11     to typewritten form, and that the reading and signing of

12     the completed deposition by the witness is not waived.

13              All formalities as to notice, caption,

14     certificate, et cetera, are expressly waived. All

15     objections, except as to the form of the question, are

16     reserved to the hearing.

17

18     (Unless previously provided, all names are spelled
       phonetically, to the best of the court reporter's
19     ability.)

20

21

22

23

24

25
```

Page 5

```
 1                  (Whereupon, the foregoing deposition

 2                  began at 9:02 a.m.)

 3                  THE COURT REPORTER:  Today is May 7, 2021 at

 4     9:02 a.m.  At this time, would each attorney please

 5     introduce yourself, who you represent and that you agree

 6     to take this deposition virtually by Zoom.

 7                  MS. MAPLES:  Janna Maples with Branstetter,

 8     Stranch and Jennings for the plaintiff.  And we agree.

 9                  MR. WELBORN:  Joe Welborn and Erin Polly.  We

10     represent CoreCivic.  And we agree.

11                  MS. HASHEMIAN:  Nikki Hashemian.  I represent

12     the State of Tennessee.  And I agree.

13     Whereupon,

14                         RAYMOND BYRD,

15     having been first duly sworn, was examined and deposed

16     as follows:

17     EXAMINATION BY MS. MAPLES:

18         Q.    Good morning.  Could you state your name for

19     the record.

20         A.    Raymond Byrd.  Byrd is spelled B-Y-R-D.

21         Q.    And where are you currently employed?

22         A.    CoreCivic.

23         Q.    Are you currently assigned to a facility?

24         A.    Not at this time.

25         Q.    Up until recently, which facility were you
```

1    assigned to?

2         A.    The Trousdale Turner Correctional Facility.

3         Q.    What were the exact dates of your employment

4    at the Trousdale facility?

5         A.    I am not going to be able to tell you exact

6    dates.  I do know it was April -- March -- April, excuse

7    me, April of 2020 to March of 2021.

8         Q.    And where were you before you were assigned

9    to Trousdale?

10        A.    I was at the Cimarron Correctional Facility

11   in Cushing, Oklahoma, CoreCivic.

12        Q.    Did you ask to be transferred or did

13   CoreCivic approach you about the Trousdale position?

14        A.    CoreCivic approached me.

15        Q.    When you started working at Trousdale, did

16   you have an understanding of what conditions were like

17   at the facility?

18        A.    I don't know exactly what you mean by

19   conditions.  Help me out just a little bit on that.

20        Q.    When CoreCivic approached you about

21   potentially being transferred to Trousdale, did they

22   tell you anything about what day-to-day was like at the

23   facility?

24        A.    When I was approached about the job,

25   basically I was told that the warden, I recall his name,

Page 7

1    Rusty Washburn, was getting transferred to Georgia to be

2    close to his family.  And I was asked would I take the

3    job.  I told them, yeah, I'll take it.

4         Q.    Did CoreCivic make you aware of any problems

5    at the Trousdale facility?

6         A.    No, not any problems per se, no.

7         Q.    Did they make you aware of any conditions at

8    the prison outside of the ordinary?

9         A.    Respectfully, I don't -- outside or condition

10   -- I don't know what that means.  Respectfully, I don't

11   know what that means.

12        Q.    Okay.  Well, I'm just asking if when you are

13   talking about going to Trousdale with CoreCivic, if they

14   told you anything about issues or concerns that

15   CoreCivic, as a company, had about the Trousdale

16   facility?

17        A.    Actually, before I transferred, I went up and

18   toured the facility.  I looked at the facility myself.

19        Q.    But did CoreCivic tell you about anything

20   that the company had concerns about or issues with at

21   the facility?

22        A.    Give me a minute to try to think of the

23   conversation I had with Mr. Keaton.  Mr. Keaton was the

24   managing director who asked me about the job.  Tennessee

25   inmates.  Staffing, which dealing with that everywhere.

1    Basically that was about it.  And again, I went up and

2    looked at the place for myself before I actually

3    accepted the job.  When I looked at it, I told them,

4    yes, I'll take it.  Not a problem.

5         Q.    When you say Tennessee inmates, what do you

6    mean?

7         A.    The contract, Tennessee contract.

8         Q.    So you understood before you accepted the job

9    that staffing was an issue at the Trousdale facility?

10        A.    Yes.

11        Q.    When you discussed the job with Mr. Keaton or

12   anyone else at CoreCivic before you began the job, did

13   anyone mention the level of violence at the prison?

14        A.    No.

15        Q.    Did anyone mention any violent incidents at

16   the prison?

17        A.    Not per se, no.  Not to me, no.

18        Q.    When you say not per se, what do you mean?

19        A.    No one said, hey, we had incident X, Y, Z,

20   no.  That's per se.

21        Q.    When you started at Trousdale, were you aware

22   that the Tennessee comptroller of the treasury had

23   compiled several reports concerning audits they

24   performed at Trousdale and other Tennessee prison

25   facilities?

1       A.    No, I was not aware of any audit.  The

2   comptroller, no.

3       Q.    During the course of your employment at

4   Trousdale, did you become aware of any audits conducted

5   by the Tennessee comptroller of the treasury?

6       A.    Yes, I heard about it from one of the

7   contract monitors.  And actually, I never heard of the

8   branch that did that.  So he mentioned it to me when I

9   had a face-to-face with one of the contract -- Chris

10  Brun's the name.

11      Q.    Did you ever review any audit reports from

12  the Tennessee comptroller of the treasury?

13      A.    No.

14      Q.    You never did?

15      A.    No.

16      Q.    And why is that?

17      A.    I never did.  I mean, no specific reason, I

18  never did.  He -- Chris gave me a rundown on it.  So no,

19  I did not read the document.

20      Q.    When you say Chris gave you a rundown on it,

21  what did he tell you?

22      A.    Basically, that this branch, whatever it's

23  called.  You just mentioned it to me, but I forgot what

24  it's called.  They come in and they do audits of

25  prisons.  And Trousdale had an audit.  Staffing had an

```
 1    audit.  Staffing was an issue.  But other than that,

 2    that's all I really recall Chris talking about this

 3    comptroller's audit.

 4        Q.    Yes.  Did Chris tell you anything else about

 5    the conclusions or the findings of the audit?

 6        A.    No.

 7        Q.    So just staffing?

 8        A.    Basically staffing, yeah.

 9        Q.    Other than Chuck Keaton, which CoreCivic

10    executives have you been in contact with during your

11    time at Trousdale?

12        A.    When you say been in contact with, about -- I

13    need you -- I need a little more, respectfully, a little

14    more.  Are you referring to --

15        Q.    Well --

16        A.    I am sorry, go ahead.

17        Q.    I'm just asking, since you've been at

18    Trousdale or while you were as Trousdale, which

19    CoreCivic executives did you have meetings with, did you

20    Correspond with via e-mail, did you text or talk on the

21    phone with?

22        A.    In regard to Trousdale?

23        Q.    Yes.

24        A.    Okay.  Patrick Swindall, I think chief

25    correctional officer.  He came out shortly after I got
```

Page 11

```
 1   there and we walked around.  Jason Medlin.  Jason is the
 2   -- I don't want to demote him or promote him -- VP, I
 3   believe it is.  Harold Shannon.  Harold is over IT.
 4   Some HR people.  Cathy something.  Cathy is essentially
 5   retired.  Cathy.  That's all I can recall right now.
 6        Q.    What about the CEO?
 7        A.    Who is that?
 8        Q.    Damon?
 9        A.    Damon Hininger.
10        Q.    Yes.
11        A.    No, I've not spoken to Damon.  No.
12        Q.    Have you ever been to the CoreCivic
13   headquarters?
14        A.    The new one, no.
15        Q.    Where is the new one?
16        A.    I don't really know.  I know we've got a new
17   corporate office.  But I don't -- it's somewhere in
18   Tennessee.  I don't know where it's at.  I've never been
19   to it.
20        Q.    Where was the old one?
21        A.    I don't know the exact address, but -- I
22   don't know the exact address.  I know it's in Tennessee.
23   We built a new one somewhere.  I don't know the exact
24   address of the old building, but I've been to the old
25   building several times.
```

1          Q.     I don't need the exact address, I'm just

2     trying to figure out which one you've been to, that's

3     all.

4          A.     The old one.  Yes, the old one.

5          Q.     How often did you have contact with CoreCivic

6     executives while you were warden at Trousdale?

7          A.     Mr. Keaton, my manager director, he would

8     come by at least two days a week.  At least two days a

9     week.  Mr. Medlin, not so often.  Patrick, I think I

10    just saw him maybe twice.

11         Q.     How many times would you say you saw Jason

12    Medlin or interacted with him?

13         A.     Maybe 10, 10 or 15 times.

14         Q.     Now, when you say Chuck Keaton was the

15    managing director and you worked with him most closely,

16    what was his role as it applied to you?  Was he -- did

17    you report to him?

18         A.     He was my direct report, yes.

19         Q.     Did you submit any kind of formal reports to

20    him?

21         A.     Formal?  I mean, if a situation would arise,

22    if he asked for it I would.  I mean, if he asked me for

23    something, of course I would give it to him.  Again, I

24    need...

25         Q.     Okay, well, so it sounds like you might

Case 3:22-cv-00093   Document 53-2   Filed 03/04/22   Page 12 of 72 PageID #: 685

1    submit a report situationally.  But are there any

2    reports that you would be required to send him, just on

3    a regular basis?  A monthly report, a weekly report?

4        A.    We had weekly --

5              MR. WELBORN:  Object to the form.  You can go

6    ahead and answer.

7              THE WITNESS:  Okay.  We had weekly -- well,

8    sometimes, not always weekly, because sometimes they

9    would be canceled -- division calls.  When I say we, I

10   mean the other Tennessee facilities because Mr. Keaton

11   was over all of those.

12   BY MS. MAPLES:

13       Q.    When you say division calls, you mean

14   Tennessee?

15       A.    Well, Mr. Keaton had Tennessee -- has

16   Tennessee and Georgia.  So the wardens from Georgia and

17   Tennessee on the call.

18       Q.    What kind of things were discussed during the

19   weekly division call?

20       A.    Whatever Mr. Keaton wanted to talk about.

21       Q.    Well, give me some examples.

22       A.    Incidents.  Counts.  Graduation -- what are

23   the graduations -- GEDs or Vo-tech graduations,

24   certificates.  Facility count.  I'm trying to go down

25   the document in my mind.  Oh, hiring events that we

 1    would have.  Vacancies.  Anything else that he brought

 2    up that he wanted to talk about.

 3         Q.    I think you said I am going down that

 4    document in my mind.  Was there some kind of agenda or

 5    something submitted around by Mr. Keaton?

 6         A.    There was a format that he wanted us to go

 7    by.

 8         Q.    What do you mean?

 9         A.    Again, if we had any kind of graduations.

10    Facility count.  Vacancies.  Incidents.  There was a

11    little document that we had to -- a little format.

12         Q.    Okay, so when you say format, do you mean

13    that you would fill it out in advance of the call or

14    that you would just have the answers ready and provide

15    them to him over the call?

16         A.    Yes.

17         Q.    Which one?

18         A.    The latter you just said.

19         Q.    Okay.  And I think you said that sometimes

20    these calls got canceled.  How often would you say they

21    got canceled?

22         A.    I can't tell you.  I don't know an exact

23    number.  From time to time, depending on what Mr. Keaton

24    had going on, he may cancel some calls.  The exact

25    number of times, I don't know.

Case 3:22-cv-00093   Document 33-2   Filed 05/04/22   Page 14 of 72 PageID #: 687

1      Q.    Okay, that's fair.

2      A.    Thank you.

3      Q.    I think you said you would typically talk to

4  Mr. Keaton twice a week.  Is that including the weekly

5  division calls?

6      A.    Yes.

7      Q.    Did you submit memos of any kind to Mr.

8  Keaton?

9      A.    If Mr. -- if he requested a document from me,

10  I gave it to him.  And memos, I wouldn't say memos.

11  E-mails.

12      Q.    So you sent e-mails to Mr. Keaton, then?

13      A.    If he asked for something, sure, yeah.

14      Q.    How often did Mr. Keaton ask you for things?

15      A.    Occasionally.  I can't give you an exact

16  number.

17      Q.    That's okay.  I understand that you can't

18  remember every time that he asked you for something over

19  a year.  I completely understand that.  I'm just trying

20  to get a general sense of if you felt like it happened,

21  you know, multiple times a week or just multiple times a

22  month.  You know, that kind of thing.

23      A.    I'm not trying to be difficult.

24  Respectfully, whenever he would ask, I would give it to

25  him.  Respectfully.

1      Q.    But you don't really have a sense of how

2   frequently that was?

3      A.    No.

4      Q.    It just happened and you did it?

5      A.    Yes, ma'am.

6      Q.    Did Mr. Keaton ask you for information

7   related to certain incidents at Trousdale?

8      A.    Mr. Keaton -- if we had an incident, of

9   course, I had to call my boss, yes.

10     Q.    Okay, so you're saying every time there was

11  an overdose, you would give him a call?

12     A.    Every time there was a -- say it again.

13     Q.    Let's say there was an overdose, is that

14  something that you would call Mr. Keaton about?

15     A.    What, on drugs?

16     Q.    Yes.

17     A.    Not always, no, huh-uh.

18     Q.    Okay, how about an inmate on employee

19  assault, is that something you would call him over?

20     A.    Not always.

21     Q.    But sometimes?

22     A.    Sometimes, yes, definitely.

23     Q.    How about a homicide of an inmate?

24     A.    Absolutely.  Yes, ma'am.

25     Q.    How about just a stabbing that did not result

Case 3:22-cv-00093   Document 33-2   Filed 05/04/22   Page 16 of 72 PageID #: 689

1    in death?

2         A.    A stabbing that did not result in death?

3    Generally, I would call him about something like that.

4    Unless it -- I mean, if it was something that didn't

5    break the skin, I wouldn't call him.  Because he would

6    always get notified of that on our system, so...

7         Q.    When you discussed the comptroller report

8    with Christopher Brun, did Mr. Brun give you his opinion

9    about the findings and the conclusions in those reports?

10        A.    I don't recall.  I don't recall him giving me

11   his opinion on it.

12        Q.    Did anyone else give you their opinion on the

13   findings and conclusions of the comptroller report?

14        A.    Not that I can recall, no.

15        Q.    Did you ever discuss the comptroller reports

16   with Mr. Keaton or anyone else at CoreCivic?

17        A.    Not that I can recall.  No, other than he

18   might -- he, Mr. Keaton, might mention that the state,

19   you know, conducts those reports, audits, whatever you

20   want to call them.  Other than that, no, not getting

21   down into the weeds of the specific details of the

22   report, no.

23        Q.    So you all did discuss staffing issues at

24   Trousdale, it just may not have been in the context of

25   the comptroller report --

Page 18

1        A.    Yes.

2        Q.    -- is that right?

3        A.    That's correct.

4        Q.    When you started working at Trousdale, did

5   you work with CoreCivic to put together some kind of

6   plan or strategy on how you might address the staffing

7   issues at Trousdale?

8        A.    That was already in place when I got there.

9   I mean, all those things you just mentioned were already

10  in place.

11       Q.    So you didn't come in to do anything new or

12  different or enhanced with regard to staffing; is that

13  right?

14       A.    Again, those -- there's a word I'm trying to

15  come up with.  That was already in place when I got

16  there.

17       Q.    What are some of the things that, during your

18  tenure at Trousdale, CoreCivic did to attempt to

19  increase the staffing levels?

20       A.    Okay, during my time there, several things

21  the company's trying to do to get staffing.  Referrals.

22  Employee could refer a person and get a bonus of

23  referring people.  Retention bonuses.  I think, and I

24  may be wrong on this, but I think -- no, I am not wrong.

25  After six months -- starting pay was 16.50.  After six

 1   months, it went up $1.  All kind of hiring events.

 2   Radio advertisements.

 3              As a matter of fact, I went to Fort Campbell

 4   a couple of times while I was there to try and recruit

 5   staff.  Flyers around town.  The little things at the

 6   gas pumps you put on -- I can't think of the name of

 7   them.  All kind -- a lot of different ways of trying to

 8   get people in.  I had a pretty good pipeline there, too.

 9   A pretty good pipeline.

10       Q.    When you say -- I think you said the pay

11   started at 16.50 and then went up a dollar; is that

12   right?

13       A.    Yeah, after six months, yes.  Relocation

14   bonuses.  We had this group called Walls Group,

15   W-A-L-L-S, that we hired to go out and set up different

16   job fairs.  Walls Group recruit folks.  The company

17   would pay, I mean, really good.  Moving expenses.  Give

18   folks a bonus.  Doing a lot to get the staffing up, in

19   my opinion.

20       Q.    The salary of 16.50 an hour, was that

21   determined by you or was that in place before you got

22   there?

23       A.    That was in place before I got there.

24       Q.    And when you say it went up a dollar after

25   six months, was that your decision?

```
 1        A.    It was in place when I got there.
 2        Q.    Did you ever suggest, let's raise the salary
 3   per hour by $3?
 4        A.    No.
 5        Q.    Why is that?
 6        A.    Why did I never suggest paying them three
 7   more dollars an hour?  It never crossed my mind, to be
 8   honest with you.
 9        Q.    Well, it doesn't just have to be $3.  Any
10   amount more an hour?
11        A.    No, I did not.  I didn't ask for anything
12   above and beyond what the company already had in place
13   when I got there.
14        Q.    Did the company decide the hourly pay for
15   Trousdale employees or was that up to, you know,
16   individuals employed at the facility?
17        A.    The salary was determined by the company.
18        Q.    So that's not something that Warden Washburn
19   had put into place, that was decided by the executives
20   at CoreCivic?
21        A.    Well, I just assumed -- maybe I should never
22   assume nothing.  So 16.50 is what they were being paid
23   when I got there, and I was told after six months that
24   it was raised to 17.  If Rusty done that, I didn't know
25   anything about it.  I just thought that's what the
```

1    company put in place.  Maybe I should -- just let me

2    slow down and shut up.  16.50 is what they made when I

3    got there.  And I was told after six months, they got a

4    dollar raise.  Who put that in place, I guess I really

5    don't know.

6         Q.   Did you have authority over or responsibility

7    for the amounts that were being spent by CoreCivic on

8    increasing the staffing levels at Trousdale?

9         A.   If I -- during the time I was there, if I

10   wanted to add a position to the staffing pattern, I

11   would have to request that through Mr. Keaton.  And I

12   don't think I ever did.  I don't think I did.

13        Q.   So some of the things you described,

14   referrals, retention bonuses, relocation bonuses, job

15   fairs, are those something that you were responsible

16   for, or that were handled by CoreCivic headquarters?

17        A.   It was some of each.  We had -- I say we.

18   The facility had a budget, recruiting advertising

19   budget.  So I guess I had -- I had control over that,

20   but anything over that was approved from corporate

21   office.

22        Q.   When you say the facility had a budget, was

23   there just one budget or did you have a series of

24   budgets?

25        A.   We had a line item on our budget for

1    advertising, recruiting, retention.

2         Q.    I think you stated that you never requested

3    to add any employees to the staffing pattern; is that

4    right?

5         A.    You know, I don't think I did.  I may have, I

6    just don't recall adding a position or taking away.  I

7    may have, but again, if I did, there was a form that we

8    had to fill out that goes through Mr. Keaton.  But right

9    now, sitting here today, I can't recall asking him for

10   that.  I can't recall.  Sitting here today, I can't.

11        Q.    How often would you say you talked about

12   staffing with Mr. Keaton?

13        A.    Again, when we had our little calls -- when

14   we had our division calls, again, that was one of the

15   agenda items that was on the agenda.  So when we had the

16   calls, for sure.  And I guess, you know, when he came in

17   to do his visit, when we would walk and talk, I'm sure

18   he asked me about it and I told him where we were at.

19   I'm sure that happened, yeah.

20              That happens everywhere.  Every prison I ever

21   worked at, the warden talks to his boss about staffing.

22   He should.  I have.  Raymond Byrd has.  Every prison

23   I've worked as a warden.  Let me say this:  When I got

24   Trousdale -- maybe I'm talking too much -- in April,

25   okay?  And then COVID hit.  Like it hit everywhere else

1    in the world, it hit us hard, too.  Yeah.  While I was

2    there.

3         Q.    Are you saying COVID impacted staffing

4    levels?

5         A.    Big time.  Everything.  Every part of

6    operations at the prison it affected.

7         Q.    Staffing levels were already a problem,

8    though, before COVID hit, to be fair, right?

9         A.    Yeah.

10              MR. WELBORN:  Object to the form.

11              THE WITNESS:  Did somebody say something?

12              MR. WELBORN:  You can answer if you can.

13              THE WITNESS:  Again, when I arrived in April,

14    there was recruiting events going on.  Always get your

15    staffing up.  That's nothing new.  I mean, that's

16    nothing new to any in every prison I've ever worked at,

17    even as a CO.  It's nothing new.  You're never going to

18    be fully staffed.  Never.  Raymond Byrd has never worked

19    at a prison, from a correctional officer until now, that

20    was fully staffed.  So you're always hiring.  You're

21    always hiring.  And when I got to Trousdale, we were

22    hiring.

23    BY MS. MAPLES:

24         Q.    But when you got to Trousdale, I think we

25    have already talked about this, you were informed that

1   staffing was a problem pre-COVID?

2        A.    Yes, ma'am, I was.  But again, every prison

3   I've worked at, staffing is priority one.

4        Q.    How often did Chuck Keaton visit Trousdale?

5        A.    I would say at least twice a week, I would

6   see him.

7        Q.    So he actually physically visited the

8   facility?

9        A.    He lived right there in town, yes.  Well, he

10  lived about 30 miles away, so yeah.

11       Q.    Okay, I'm just trying to make sure I fully

12  understand.

13       A.    I'm sorry, I'm laughing because me and him

14  are good friends and I saw him too much, I told him.

15  But yeah, we're good friends.

16       Q.    So you did your weekly division calls with

17  Chuck Keaton.  You saw him probably twice a week at the

18  facility.  And then you also corresponded with him,

19  either by e-mail or you talked to him on the phone,

20  about various incidents as they occurred; is that right?

21       A.    Incidents.  He may have just called to say,

22  hello, how are you doing, man?  Yeah, we talked.  It

23  wasn't always about an incident.  I mean, we would -- he

24  would just check in on me.  Check in on Raymond, just

25  individually.

1      Q.    When there were homicides at the facility,

2  what kind of discussions did you have with Mr. Keaton?

3      A.    The who, what, when, where.

4      Q.    What kind of feedback were you given from Mr.

5  Keaton?

6      A.    Well, basically -- feedback.  Well, Raymond,

7  did you make sure the customer is notified?  Of course.

8  How about the next of kin?

9      Q.    Did he ever say anything like, wow, Raymond,

10 we've had a lot of homicides at Trousdale?

11     A.    No, he never said that, not to me.

12     Q.    Did he ever tell you any remedial measures

13 that you should take at Trousdale as a result of

14 homicide?

15     A.    We would always go back and, you know, look

16 at the incident and what happened, how was it caused.

17 And if there is something that we need to change or do.

18 I mean, that was just SOP, that's standard operating

19 procedure.  Any, not only incident, that's standard

20 procedure.  You always look at what caused it, what

21 happened.  That's standard.

22     Q.    I understand that, I'm just trying to figure

23 out exactly or generally what kinds of communications

24 you and Mr. Keaton had about those homicides.  So any

25 specific suggestions that he gave you about how you

Page 26

1   might remedy situations that led to a homicide?

2        A.    Right here, sitting here today, I cannot

3   think of any kind of remedies he may have gave me, other

4   than what I just mentioned, that's again, the standard.

5   Any time you have incident, you are always looking at

6   the who, what, when and how it happened.  All of that's

7   standard stuff.

8        Q.    How many homicides were there while you were

9   warden of Trousdale?

10       A.    Let me think.  I want to say two.

11       Q.    Do you know the names of those inmates?

12       A.    No, ma'am, I'm sorry, I do not.

13       Q.    Does the last name Adams ring a bell?

14       A.    It does not.

15       Q.    So Aaron Blake Adams, does that refresh your

16  recollection?

17       A.    No, I'm sorry, it does not.  I'm not saying

18  it wasn't.

19       Q.    What about Terry DeShawn Childreth?

20       A.    The name doesn't ring a bell.  It does not.

21       Q.    Do you know how many overdoses there were

22  while you were at Trousdale?

23       A.    No.

24       Q.    Can you describe what a lockdown is?

25       A.    Well, at nighttime, I think we had nine

1    o'clock, everybody had to go in their cells and

2    lockdown.  Lockdown.  Rack up, lockdown.

3        Q.    Okay.  What about a lockdown that is not

4    regularly scheduled, but is related to an incident; do

5    you know what I'm referring to?

6        A.    Sure.  From time to time, if you have an

7    incident and you deem that you have to secure the

8    institution, you will lock -- maybe not the whole

9    institution, you will lockdown the actual -- we call

10   them pods there at Trousdale.  Lockdown that pod that it

11   happened in.

12       Q.    Is there a different term for that, for an

13   incident-related lockdown versus a regularly scheduled

14   lockdown?

15       A.    It's a lockdown.

16       Q.    Do you have to report to TDOC or to CoreCivic

17   every time there is a lockdown?

18       A.    Not every time, no.

19       Q.    Which lockdowns do you have to report?

20       A.    I hope I am not misstating this, but for TDOC

21   -- and that might have been Oklahoma.  If there was an

22   incident -- no, not every incident.  We didn't have to

23   report every incident.  If it was an out-of-the-norm, we

24   would have to call -- well, actually, just call the

25   contract monitor.  Contract monitor, tell them about it.

1   And then there was a report you had to report to -- I

2   think it's called the CCC, and I don't know what the

3   three C's stand for.  CCC.  They're in Tennessee.  But

4   if you didn't lockdown the whole institution, you didn't

5   have to report that to the CCC.

6        Q.   So there is a report you fill out and then

7   you have to let the contract monitor know; is that

8   right?

9        A.   That's correct.

10            MR. WELBORN:  Object to the form.

11  BY MS. MAPLES:

12       Q.   Did you discuss lockdowns with CoreCivic?

13       A.   Not all the time, no.  No.

14       Q.   How often would you say you had a lockdown of

15  the entire institution?

16       A.   Are you asking me how many -- this is, of

17  course, respectfully -- how many times while I was there

18  that we had to lock the prison down?

19       Q.   Yes, that are unrelated to regularly

20  scheduled lockdowns?

21       A.   The entire institution or a pod?

22       Q.   Yes, the entire institution.

23       A.   Okay.  While I was there -- I can't give you

24  an exact number.  If I shoot too low, I'm wrong, if I

25  shoot too high.  We had to do it.  It wasn't an everyday

1    thing, it wasn't an every week thing, but from time to

2    time, we had to lock the institution down.  I don't know

3    an exact number.  I do not.

4        Q.    Okay, and I am going to ask you some

5    questions about numbers.  And I understand that you

6    don't have an exact sense, but I'm just trying to get in

7    the ballpark, okay?

8        A.    Yes, ma'am.

9        Q.    Is it more than ten times when you were

10   there?

11       A.    Respectfully, I don't know sitting here

12   today, how many times.  We did, from time to time, have

13   to lock the institution down.  I don't know --

14   respectfully, I don't know a number.

15       Q.    No, I understand.  It sounds like you can

16   say, though, that it wasn't more than 50.

17       A.    Respectfully, I don't want to throw a number

18   out there because I'm going to be wrong.  I don't know.

19   Respectfully, I just don't know.  But I will

20   wholeheartedly admit yes, from time to time, we had to

21   lock the institution down, yes.  But I just don't

22   know...

23       Q.    Okay.  So did partial lockdowns occur more

24   frequently than total institutional lockdowns?

25       A.    A pod, that would be considered a partial,

Case 3:22-cv-00093   Document 33-2   Filed 05/04/22   Page 29 of 72 PageID #: 702

1   yes, definitely.  They -- yeah, pods, I'm sure in my

2   head that we would lock down a pod quicker than we would

3   the whole institution, yes.  For a variety, yeah, of

4   reasons.  Shakedown.  Surprise shakedown.  Stuff like

5   that.  So that number would be higher than the whole

6   institution.

7        Q.    Did you also have partial lockdowns related

8   to violent incidents?

9        A.    We had fights, yeah.  Again, it would come a

10  time we would have to lock the pod down to figure out

11  what happened.  Yes.  COVID.

12       Q.    What was your role in ensuring that

13  CoreCivic's reporting at Trousdale was complete and

14  accurate?

15       A.    My role as a warden?

16       Q.    Uh-huh.

17       A.    Was to do just what you said, the reports are

18  complete and accurate to the best of my ability and

19  knowledge.

20       Q.    When you were warden at Trousdale, did

21  CoreCivic have trouble submitting complete and accurate

22  reports?

23       A.    Trouble reporting to the customer, being

24  TDOC?  I'm sorry, I know you're asking the question, but

25  I am just asking for clarity, respectfully.

1      Q.    Yes.  That's what I mean, TDOC.

2      A.    If we -- if they needed additional

3   information, we would provide that.  If they had

4   additional follow-up questions.  I don't -- a problem?

5   I don't -- I wouldn't call it a problem.  I mean, if

6   they had follow-up questions or what have you, yes, we

7   would provide additional information.

8      Q.    Well, I mean, CoreCivic has certain reporting

9   requirements at Trousdale, right?

10     A.    Yes, correct.

11     Q.    Did CoreCivic experience difficulties or

12  trouble in complying with those reporting requirements

13  at Trousdale?

14     A.    Again, and respectfully I'm asking this to

15  you, referring to the customer, TDOC?

16     Q.    Yes.

17     A.    If there was ever a problem that I was made

18  aware of, again, we got them what they wanted.  Now,

19  when I was off, of course, the AW stepped up and stepped

20  in and took care of business.  We had two contract

21  monitors on site that we work real close with.  So if

22  there was a problem with the report, they would bring it

23  to our attention, we would rectify it, get additional

24  information, whatever the request was.  Sometimes, you

25  know, we would have to correct spelling on some reports

1    and stuff like that.

2         Q.    I guess what I'm trying to figure out is how

3    often, in your opinion or in your recollection,

4    CoreCivic failed to submit complete and accurate reports

5    to TDOC?

6         A.    Respectfully, if a report was submitted --

7    and again, if the customer had a question and wanted

8    additional information about a report, I mean, we

9    responded to their request.  I didn't -- respectfully, I

10   didn't sit down and keep numbers of the requests that we

11   would get about, hey, we need this, we need that from a

12   report.  And again, we had two contract monitors on

13   site.

14        Q.    So you're telling me about what you did when

15   someone pointed out that there was an issue with a

16   report.  I'm trying to figure out how often there was an

17   issue with a report.  Does that make sense?

18        A.    It makes sense, and I don't have the answer

19   today.  I'm sorry, but I don't have that answer.

20        Q.    Was ensuring that reports that were submitted

21   were complete and accurate a priority for you while you

22   were warden at Trousdale?

23        A.    One hundred percent.

24        Q.    Did you, when you became warden of Trousdale,

25   change any of the policies that were in place before you

Page 33

1    arrived concerning reporting?

2        A.    No.

3        Q.    Did you have an understanding about whether

4    reporting, the accuracy of reporting and the

5    completeness of reporting, was an issue at Trousdale

6    before you became the warden?

7        A.    No, ma'am.

8              MS. MAPLES:  I'm going to show you a

9    document.

10             (Exhibit 1 was marked.)

11   BY MS. MAPLES:

12       Q.    Mr. Byrd, Do you see that on your screen,

13   there is a performance audit report dated January of

14   2020?

15       A.    Yes, ma'am.

16       Q.    And do you see that it's from the Tennessee

17   Comptroller of the Treasury?

18       A.    Justin P. Wilson.

19       Q.    And I'm going to scroll down.  Do you see on

20   this page, it's PDF Page 5, it's unnumbered in the

21   document, there is a heading, key conclusion?

22       A.    Yes, ma'am, I see it.

23       Q.    Do you see that if we scroll down to PDF Page

24   6, there is a heading, public reporting of inmate deaths

25   and other serious incidents?

Page 34

1      A.    Yes, ma'am, I see that.

2      Q.    Do you see that the line under that, also in

3   red, states:  Management did not ensure that state and

4   CoreCivic facility staff collected and reported

5   complete, accurate and valid information.  As a result,

6   their ability to provide reliable data is problematic.

7      A.    May I read this, please?

8      Q.    Sure.

9      A.    I just want to -- it says management --

10      Q.    The whole thing or --

11      A.    No, just the part we're talking about right

12   now.

13      Q.    Okay.

14      A.    Okay.  Yes, ma'am, I read that.

15      Q.    And of course, this report is dated before

16   you got there, right?

17      A.    I got there -- this was January, I think,

18   yes.  Before I got there, yes.

19      Q.    So it sounds like, based on this, would you

20   agree that complete and accurate reporting was an issue

21   before you got to Trousdale?

22            MR. WELBORN:  Object to the form.

23            MS. HASHEMIAN:  Object to the form.

24            THE WITNESS:  This was before I arrived.  I

25   don't have an opinion one way or the other on this

1    report, respectfully.

2    BY MS. MAPLES:

3         Q.    Do you think any of this would have been

4    useful to you to be aware of while you were warden of

5    Trousdale?

6         A.    Respectfully, I talked to Chris Brun about

7    the report.  This never came up.  My job, as you stated

8    earlier, was that when we had incidents, that the

9    customer was notified timely.  When I got there from

10   April going forward.  This -- may talk to Rusty about

11   this.  I'm sorry, respectfully, I mean...

12        Q.    We've already talked a little bit about

13   staffing, but do you see that on Page 8 of the PDF,

14   there is a section titled correctional staffing

15   department turnover?

16        A.    Yes, ma'am, I do.

17        Q.    So based on this report, staffing was a

18   concern?

19             MR. WELBORN:  Object to the form.

20             THE WITNESS:  Before my time, ma'am, again.

21   When I got there, as I stated earlier, we talked about

22   the staffing in April and the things we were doing.  So

23   this -- this says management.  Are they talking about

24   the management of the state?  Where I'm reading, it says

25   management.

Case 3:22-cv-00093  Document 53-2  Filed 05/04/22  Page 35 of 72 PageID #: 708

 1    BY MS. MAPLES:

 2         Q.    They are.

 3         A.    Yeah, state.  Okay.

 4         Q.    Right.  Do you see that this heading here

 5    says inmate services and support, still on PDF Page 8?

 6         A.    Yes, ma'am.

 7         Q.    And do you see that -- and I agree with you,

 8    when they're saying management, they're referring to

 9    TDOC management -- but it states:  Management did not

10    ensure that state and CoreCivic facilities performed

11    mandatory procedures designed to protect and serve

12    inmates?

13         A.    May I read this, please?

14         Q.    Sure.

15         A.    I would like to see what Finding 15 was, if

16    that's permissible.

17         Q.    Sure.  Let me get you right to the page.

18    Give me just a second.

19         A.    All right, thank you.  I'm good.

20         Q.    Do you see that it states in the second

21    sentence, in the paragraph under the line we just read:

22    Furthermore, Trousdale Turner Correctional Center did

23    not conduct the minimally required number of random

24    inmate drug screenings.  And I'm not going to continue

25    the rest of the sentence, but do you see that the first

1    part concerns Trousdale Turner and a random inmate drug

2    screening?

3         A.    Yes, ma'am.

4         Q.    Was conducting the minimally required number

5    of random inmate drug screenings a problem for CoreCivic

6    while you were at Trousdale?

7         A.    It probably was and I'll tell you why.

8    COVID, when COVID hit, again, it affected every piece of

9    operation at Trousdale.  Positive inmates had to be

10   cohorted.  Negatives this way.  You were the positive,

11   so you got to go this way.  So I'm sure it did.  I'm

12   sure, yeah, we probably didn't get them done because of

13   that COVID.

14        Q.    Well, according to this, does it seem like it

15   was also a problem before you got there?

16              MR. WELBORN:  Object to the form.

17              MS. HASHEMIAN:  Object to the form.

18              THE WITNESS:  This is a before-Raymond-Byrd

19   question.  Somebody before me, respectfully.

20   BY MS. MAPLES:

21        Q.    I understand that.  I'm just saying, based on

22   what we've just read, does it seem like there was a

23   problem with Trousdale completing the minimally required

24   number of random inmate drug screenings?

25              MR. WELBORN:  Object to the form.  Asked and

1    answered.

2              THE WITNESS:  Respectfully, ma'am,

3    respectfully, this was before my time.  There could have

4    been situations such as what I dealt with COVID, that

5    same thing.  I don't know.  So I don't really -- I don't

6    know what went on at that time.  I don't know.

7    BY MS. MAPLES:

8        Q.    When you became warden of Trousdale, did you

9    change any of the policies with regard to conducting the

10   minimally required number of random inmate drug

11   screenings?

12       A.    No, ma'am.

13       Q.    Is that because you didn't know that it was a

14   problem before you got there?

15       A.    It's because I can't change --

16             MR. WELBORN:  Object to the form.

17             THE WITNESS:  I can't change policy.  I can't

18   change policy.

19   BY MS. MAPLES:

20       Q.    You can't change what policy?

21       A.    Which policy you just asked me about?

22       Q.    Well, you just said I can't change policy.

23       A.    About this drug screening?

24       Q.    And I said what policy are --

25       A.    No, ma'am.  In order for a policy to be

1    changed, in general, generally speaking, it has to go

2    through legal counsel at the CoreCivic.  So no, I never

3    changed any policy while I was there.

4        Q.    Well, can you change certain activities that

5    might impact whether or not CoreCivic employees at

6    Trousdale are adhering to a policy?

7        A.    I'm sorry, please, one more time.  I'm sorry.

8        Q.    Well, I'm just saying, I understand that you

9    can't change policy, right?  That makes sense.  But it

10   doesn't seem like you're completely powerless to take

11   certain action that might enable CoreCivic employees to

12   better adhere to policy, right?

13       A.    That's correct.

14       Q.    So what did you do to help CoreCivic

15   employees at Trousdale better adhere to policies

16   concerning the minimally required number of random

17   inmate drug screenings?

18       A.    Again, ma'am, respectfully, shortly after I

19   arrived at Trousdale, the pandemic hit.  It hit the

20   prison.  A lot of things that we would normally do, we

21   didn't do.  A lot by the advice of medical doctors from

22   TDOC.  Again, I keep bringing up this -- it's just a

23   fact.  When the pandemic hit, ma'am, we had 1300 cases

24   of that stuff.  We had to cohort people all the time.

25   So this wasn't on my mind at that time, to be totally

```
 1   honest with you.

 2              Trying to keep that COVID from -- out as best

 3   we could was my focus.  This -- while I was there.

 4   COVID almost dominated my time at Trousdale.  Totally

 5   out of my control.  I wish it wouldn't happen anywhere.

 6   But my focus of the time at Trousdale, for every bit of

 7   six or seven months, was dealing with COVID.  It really

 8   was.  And a lot of things didn't take place.  The state

 9   knew it.  They were having the same issues.  So COVID

10   dominated my time at Trousdale.  COVID.  And I am not

11   making light of COVID, because we lost staff because of

12   COVID.  So that was really on my mind while I was there.

13              MS. MAPLES:  Do you all want to take a quick

14   break?

15              THE WITNESS:  I would, please, and I

16   appreciate that.

17              MS. MAPLES:  Okay, great.  Can we go off the

18   record?

19              (Recess observed.)

20   BY MS. MAPLES:

21      Q.    Mr. Byrd, what are some of the consequences

22   of not having an adequately staffed prison?  Hello?  Mr.

23   Byrd, we can't hear you.  Are you --

24      A.    Can you hear me now?

25      Q.    Yes.
```

1       A.      Okay, I'm sorry about that.

2       Q.      No problem.

3       A.      A lot of activities are going to fall short

4    on.  Activities.  I mean, there's a list of things that,

5    you know, when you don't have the staff, you just can't

6    get the stuff done.  But then you have to -- you have to

7    -- and you don't have the staff for a variety of reasons

8    sometimes.  So you have to make do with what you got.

9    You can't cry about not having it.  Not having it, you

10   have to make due with what you got.  Make it happen.

11   Because I've not worked at a prison that, again, my

12   37-year-career, that was fully staffed.

13      Q.      So what are some examples of some of the

14   consequences of not having an adequately staffed prison?

15      A.      Respectfully, if you can narrow down

16   examples.  I can give you example after example after

17   example.  If you can just narrow it down, we can go

18   through this quicker.  I can give you all kinds of

19   examples, respectfully.

20      Q.      No, you're fine.  Would you agree that

21   there's a relationship between the number of staff you

22   have and your ability to conduct an adequate number of

23   cell searches?

24      A.      Could.

25      Q.      Would you agree that having an inadequately

Page 42

```
 1    staffed prison might result in inmates having greater

 2    access to contraband, like homemade weapons or drugs?

 3         A.    Might.

 4         Q.    Would you agree that having an adequately

 5    staffed -- strike that.  Would you agree that having an

 6    inadequately staffed prison might impact your ability to

 7    make the required number of rounds?

 8         A.    Might.

 9         Q.    Throughout the prison?

10         A.    Might.

11         Q.    Would you agree that an understaffed prison

12    would have less oversight of inmates, generally?

13         A.    Could.

14         Q.    Would you agree that an understaffed prison

15    results in more stress for the employees that are there?

16         A.    Definitely could, yes.

17         Q.    Would you agree that when a prison is

18    understaffed, employees are less able to intervene in a

19    violent incident?

20         A.    Could.

21         Q.    Can understaffing lead to a decrease in the

22    amount of ongoing training that employees receive on the

23    job?

24         A.    Could.

25         Q.    Does understaffing also kind of create a
```

1    circular effect where it leads to higher turnover?

2         A.    Could.

3         Q.    Do you think there is a relationship between

4    understaffing and safety at a prison, generally?

5         A.    It could.

6         Q.    Okay, you're saying it could.  What are the

7    things that -- the factors that might influence that

8    from could to would?

9         A.    I don't, respectfully, don't really

10   understand what you're asking me there.  But again, I'm

11   agreeing with you, it could.  It could.  All of those

12   things you mentioned, I said it could.

13        Q.    Are there any others related to safety?

14        A.    Are there any others?

15        Q.    Yeah, I'm just trying to figure out the

16   consequences of having an understaffed prison.  You

17   know, I've given you a number of examples, so you kind

18   of see where I'm going.  Are there any others?

19             MR. WELBORN:  Object to the form.

20             THE WITNESS:  Ma'am, there's -- again, it

21   could be seating in chow, fed on time.  People get

22   hungry, like I get hungry.  I'm hungry now.  You get

23   hungry sometimes.  You get chow fed, because you don't

24   have -- understaffed could lead to a plethora of the

25   things you just talked about.  Yes, could.  Could.

Page 44

 1    BY MS. MAPLES:

 2        Q.    Okay, well, give me some examples related to

 3    inmate safety or violence.

 4        A.    You just -- excuse me, I'm sorry.

 5    Respectfully --

 6              MR. WELBORN:  Object to the form.

 7              THE WITNESS:  You mentioned those things,

 8    ma'am.  Your rounds and all of that.

 9    BY MS. MAPLES:

10        Q.    I'm just asking if there is any more.

11        A.    I'm sure there is.  I just can't think of

12    them right now.

13        Q.    Okay.  What about does staffing have an

14    impact on the prison's ability to conduct inmate

15    programming?

16        A.    Yes, ma'am.  It could.

17        Q.    Would you agree that inmate programming has

18    an important role in reducing violence inside a prison?

19        A.    It definitely could, depending on the

20    individuals, yes, it could.  Very much so, yes.

21        Q.    You've mentioned having to make due with what

22    you have in terms of staff.  Is one of the ways that

23    CoreCivic has had to make due with what they have at

24    Trousdale having employees work overtime?

25        A.    Yes, ma'am.

Page 45

1        Q.    How much overtime have employees had to work?

2        A.    That's a broad question, respectfully, but I

3    will tell you this:  It's CoreCivic's policy that

4    employee, an employee, cannot work more than 80 hours in

5    a pay period.

6        Q.    What is a pay period?

7        A.    Every other week.  Not two weeks, every other

8    week.  So you can't work 80 hours -- you cannot work

9    over 80 hours of overtime in a pay period, which is

10   every other week.  Two weeks, every other week.

11       Q.    Okay, so they can't work more than 80 hours

12   of overtime in a two-week period?

13       A.    Yes, ma'am.

14       Q.    How many hours do employees work in a

15   two-week period that is not considered overtime?

16       A.    80.

17       Q.    Okay.  So that means employees work 40 hours

18   a week, right, of regular non-overtime?

19       A.    There's a schedule that we had, that in a

20   two-week period, the employee worked, based off the

21   schedule, 84 hours.  Which four of that would have been

22   overtime, based off the schedule that we were working at

23   the time.

24       Q.    Okay, so 84 hours is non-overtime; is that

25   right?

1          A.     Four of that --

2          Q.     In a two-week period?

3          A.     Four of that 80 hours would be overtime,

4    based off the schedule.

5          Q.     Okay.  And then according to CoreCivic

6    policy, they're not allowed to work more than 80

7    additional hours in overtime; is that right?

8          A.     Yes, ma'am.

9          Q.     So that means that according to CoreCivic

10   policy, employees are permitted to work 164 hours in a

11   two-week period?

12                MR. WELBORN:  Object to the form.

13                THE WITNESS:  Was that a question, ma'am?

14   I'm sorry.

15   BY MS. MAPLES:

16         Q.     Yes.  Is that right?

17         A.     I'm not doing the math again.  And

18   respectfully, the schedule allows for four hours of

19   overtime, depending -- four hours overtime.  So you work

20   84 hours, okay?  And then you cannot work the additional

21   80 hours over that.  Anything between is good.  You

22   can't go over that.

23         Q.     Okay, so anything up to 164 hours in a

24   two-week period is allowed?

25         A.     So you are adding that overtime on there, I

1    am with you now.  I am just not good with math.

2         Q.    Me either.

3         A.    Yeah, you're pretty good.  You fooled me.

4         Q.    Okay, so 164 hours in a two-week period, you

5    can't work more than that according to CoreCivic policy?

6         A.    Yes, ma'am.

7         Q.    Okay, how often did employees have to work

8    more than that in violation of CoreCivic policy at

9    Trousdale while you were there?

10        A.    I don't know the answer to that right now.  I

11   don't without looking at some kind of report.  I don't

12   know the answer to that.  I mean, we tried everything

13   that I know to not let that happen.  But if it happened,

14   I don't know.  I don't know.

15        Q.    Are you saying that, yeah, I know it

16   happened, I just can't tell you how frequently, or I

17   don't know if it happened or not?

18        A.    Yeah, thank you for giving me the opportunity

19   to clean that up.  I don't know if it happened or not

20   without looking at some type of report.  I wouldn't

21   know.

22        Q.    Who would know that?

23        A.    The human resources department.

24        Q.    The human resources department at CoreCivic

25   or at Trousdale?

 1      A.      Trousdale, CoreCivic, either one, they can

 2  pull it.

 3      Q.      How hard is that to calculate?

 4      A.      I'm sorry, ma'am, I'm the wrong person to

 5  ask.  I rely on HR people to tell me stuff like that.  I

 6  don't know.

 7      Q.      Well, I mean, I'm just trying to get a sense

 8  of, you know, if you called and asked them for that

 9  information, would you expect them to say, sorry Warden

10  Byrd, that's going to take us a month, or would you

11  expect to have it the next day?

12      A.      Yeah, the next day is reasonable.

13      Q.      What are some of the consequences of having

14  employees work a substantial amount of overtime?

15      A.      Some of the consequences could be, you know,

16  fatigue sets in after so long.  Of course, could be.

17  Just not being as attentive as one should be.  Those

18  type of things could happen.  I think that's --

19      Q.      Could it impact an employee's response time

20  if there is some sort of violent incident going on?

21      A.      Could.

22      Q.      Is overtime mandatory in any way at

23  Trousdale?

24      A.      It was while I was there.

25      Q.      How much overtime was mandatory?

Page 49

```
 1        A.    It depends on -- it would have depended on

 2   the schedule and the need.  So I can't -- I'm sorry, I

 3   just can't give you a number answer to that question.  I

 4   mean, the -- what we call the master schedular, who

 5   makes the rosters out, would determine what -- at

 6   Trousdale it was that she -- she would need to cover the

 7   shifts.  So it just depends.

 8        Q.    Could the amount required of an employee of

 9   overtime have reached that 80-hour mark that CoreCivic

10   sets as the limit?

11        A.    I don't think that -- I don't recall that

12   being the case.  I don't.  I don't recall that being the

13   case.  Nobody brought that to my attention if that was

14   the case, no.

15        Q.    Would you agree that having employees work a

16   lot of overtime can lead to employees getting burned

17   out?

18        A.    It could, yes, could.

19        Q.    Which leads to turnover?

20        A.    Could.

21        Q.    If an employee is on shift and his or her

22   replacement has not arrived, is that employee kind of

23   frozen in place until someone arrives to fill the post?

24        A.    That could happen, yes.  That could be the

25   case.  Could.  Sometimes the supervisor pulls a rabbit
```

1    out of their hat and finds somebody.  But that could be

2    the case, yes.  But situations like that, because we

3    were on 12-hour shifts at the time, that employee could

4    only stay over for four hours, 16 hours.

5         Q.    Did everyone work a 12-hour shift?

6         A.    No, no.

7         Q.    Which categories of employees worked a

8    12-hour shift?

9         A.    It's not going to fall -- if you were on a

10   shift, then you were -- you may be required to work -- I

11   mean, you were required to work 12 hours.  So we had

12   some -- nothing but shifts is correctional officers.

13   All correctional officers didn't work shifts.  We had

14   some on transportation and other positions, not

15   technically assigned to the shift.

16        Q.    So you're saying the correctional officers

17   always had a 12-hour shift?

18        A.    Again, we had some correctional officers that

19   were not assigned to a shift.  The army.  We had -- the

20   individuals over the army that's not assigned to a

21   shift.  They -- typically, they're a five-day-a-week

22   employee.  So they're not assigned to a shift.  Am I

23   making -- I'm probably not making sense, but I'm trying.

24        Q.    So if an employee had been there 12 hours,

25   they could stay over, up to 16 hours; is that right?

Case 3:22-cv-00093   Document 33-2   Filed 05/04/22   Page 50 of 72 PageID #: 723

1     A.    If they were on shift doing 12 hours, they

2  could stay over an additional four hours.

3     Q.    Do you know of situations where an employee

4  stayed over more than four hours?

5     A.    I don't know that, but looking at some -- the

6  report can tell me that.  But I don't know that.

7     Q.    Would that be concerning to you if an

8  employee was there more than 16 hours?

9     A.    Yes.

10     Q.    Continuously?

11     A.    Continuously, yes, that would.  Yes.

12     Q.    What about if an employee is working more

13  than 160 hours in two weeks, is that concerning?

14     A.    It would be, yes.

15     Q.    Has CoreCivic policy always been that you

16  can't work more than 80 hours in a two-week period of

17  overtime?

18     A.    I don't know if that's always been the

19  policy.  I don't know.  I don't know that.

20     Q.    Well, do you recall if it was, at one point,

21  50 hours in a two-week period?

22     A.    No.  I don't know.

23     Q.    Okay.  So for the entire time you were at

24  Trousdale, it was 80?

25     A.    Yes.

```
 1        Q.    How many beds does Trousdale have?

 2        A.    I'm not -- I don't know the exact number.  I

 3   think it's a 2500-bed facility.  I don't know, let me

 4   put it like that.  I don't know.  I don't know the exact

 5   number.  I dont.

 6        Q.    While you were at Trousdale, was Trousdale at

 7   capacity or above capacity or below capacity?

 8        A.    No, we were -- at the time I was there,

 9   because of COVID, we were not over capacity.  No.  No.

10   COVID was -- no.

11        Q.    And when we say capacity, is capacity equal

12   to the number of beds or is it some number less than the

13   number of beds?

14        A.    I don't want to say -- to speak -- I don't

15   know the answer to that.  I don't know.  I want to say

16   the capacity is 25 something, but I don't want to be

17   wrong and, hey, you said this.  I don't know.

18        Q.    I think you misunderstood me.  I am not

19   asking for numbers here.

20        A.    Okay.

21        Q.    I'm just asking how you define the term

22   capacity?  Do we determine the number of -- do we

23   determine capacity based on the number of beds or is it

24   some number that's different than the number of beds?

25        A.    I don't know the answer to that.  I don't.
```

1   I'm sorry, I don't know.  I'm just not -- I don't want

2   to misspeak.

3        Q.   I'm not trying to --

4        A.   I can't hear you.

5             MS. HASHEMIAN:  Janna, we can't hear you.

6             (Off-the-record technical difficulties.)

7   BY MS. MAPLES:

8        Q.   Okay, Mr. Byrd, sorry about that.  Before we

9   lost connection, I was asking you about the relationship

10  between the number of beds the facility has and

11  capacity, okay?  And all I'm trying to figure out is

12  that if a facility has 2500 beds, would we say that

13  facility has a capacity of 2500 inmates?

14       A.   That is Raymond Byrd's understanding.  Simple

15  me.  That's my understanding.

16       Q.   Okay.  And if you have the exact number of

17  inmates that you have beds at the facility, does that

18  present challenges when it comes to housing assignments?

19       A.   I don't know the answer to that because I've

20  never had to -- I've never dealt with that.  So I don't

21  know.  I've never dealt with being at cap -- I don't

22  know.  Respectfully, I don't know.  I've not had to deal

23  with that.

24       Q.   Did you have issues with inmate segregation

25  when you were at Trousdale?

Case 3:22-cv-00093   Document 33-2   Filed 05/04/22   Page 53 of 72 PageID #: 726

1     A.    Inmate segregation?  I need a little clarity.

2   Did we have trouble with inmate segregation?

3   Respectfully, I don't --

4     Q.    What is inmate segregation?

5     A.    When you separate inmates from the general

6   population.  Segregate them from the population.

7     Q.    Why might inmates be segregated from the

8   general population?

9     A.    Escape risk, a risk to each other or self.

10  For protection.  There is one other one.  One other one

11  I can't think of right now.  Protection.  Escape.

12  Security risk.

13    Q.    Did Trousdale have inmates who were in inmate

14  segregation for protection who were then assaulted while

15  they were in inmate segregation for protection?

16    A.    Yes.

17    Q.    Do you know how many times?

18    A.    No, ma'am, I'm sorry.  With not looking at

19  documents, I couldn't tell you how many times.

20    Q.    Was that concerning to you?

21    A.    Yes, ma'am.

22    Q.    What did you determine caused or allowed that

23  to happen?

24          MR. WELBORN:  Object to the form.

25          THE WITNESS:  There were times staff -- staff

1    made mistakes by not properly securing doors.  We even

2    had a case where the inmates were very creative and

3    they'd found out a way to compromise their locks.

4    BY MS. MAPLES:

5         Q.    Staffing not securing doors, could that be

6    related to being understaffed?

7         A.    I wouldn't look at that as being the issue,

8    those two correlating, no.  If you open a door, you

9    close the door back.  I mean, it's just that simple.  If

10   you didn't have -- if no one -- if you didn't have

11   anybody to open the door, the door was not going to get

12   opened.  So if the correction officer opens the door,

13   it's expected the correctional officer to make sure the

14   door is secured.  So I wouldn't tie that together, no.

15        Q.    Well, if that correction officer has been

16   working for 15 hours and is exhausted or that correction

17   officer is having to monitor three pods instead of one,

18   might that correction officer be more likely to make a

19   mistake like not properly securing a door?

20        A.    I wouldn't say more likely.

21              MR. WELBORN:  Object to the form.

22              THE WITNESS:  I wouldn't agree with the term

23   more likely, no, ma'am.

24   BY MS. MAPLES:

25        Q.    When Trousdale staff conducts rounds or

```
 1    inspections, is checking doors part of those

 2    inspections?

 3         A.    Yes, ma'am.

 4         Q.    If you're short-staffed, might that impact

 5    the way that a cell search or an inspection is carried

 6    out?

 7         A.    Respectfully, I think I heard what you said,

 8    but if you don't mind, would you please repeat that one

 9    more time for me, please.

10         Q.    I'm asking if a prison is understaffed, might

11    its inspections or its cell searches be less effective,

12    less thorough?

13         A.    Probably not getting done.

14         Q.    So maybe if you're understaffed, you're less

15    likely to notice that a door was not secured during an

16    inspection or a cell search?

17         A.    That's possible.

18         Q.    I think you also mentioned as one of the

19    causes of inmates being assaulted while they were in

20    protective custody, staff making mistakes.  Can you be

21    more specific about that?

22         A.    Getting complacent probably is a better word.

23    I should have used complacent.  Instead of mistakes,

24    complacent.  Example, when you put those inmates in

25    segregation at Trousdale, handcuffs, you know, you've
```

Page 57

1   got to put them cuffs on and make sure they're properly

2   secured.  If you don't, they get out of them.  And

3   that's not only Trousdale, that's other prisons I worked

4   at, too.  That's not new to Trousdale.

5       Q.   Why might employees not put handcuffs on an

6   inmate in protective custody or in inmate segregation?

7       A.   Afraid to touch the inmate and actually

8   secure them because they don't want the inmate to

9   holler, cuss, scream at them when they walk by the cell.

10  Get feces chucked on them.  Stuff like that.  That's

11  what I've seen in my career.

12      Q.   What are some other things that led to

13  inmates getting attacked or assaulted in protective

14  custody?

15      A.   Protective custody or segregation or both?

16  Just in general, segregation?

17      Q.   Both.

18      A.   Both?  I've see cases when the inmates have

19  been moved from the cell to the shower, let's say.

20  Correction officer supposed to have a grip on that

21  inmate.  Sometimes the inmate pulls away from the grip

22  and they get to kicking at each other.  Like kicking,

23  stuff like that.

24      Q.   Is it important to have a rapid response time

25  when violent incidents are occurring?

1      A.    Yes.

2      Q.    Since you've been at Trousdale, can you think

3  of situations in which there has been a response time

4  that wasn't what it should have been or that in your

5  opinion was a bit too delayed?

6      A.    There were times when an incident would

7  happen, I wish staff would have gotten there sooner,

8  yes.  Yes.

9      Q.    Were there incidents that occurred that you

10 thought to yourself or told others, staff didn't get

11 there soon enough?

12     A.    I don't think I ever told anyone that, no.

13 Again, my general thinking on that, I wish staff could

14 have gotten there sooner.  Trousdale is a big place.

15 You've got to go through a number of gates to get --

16 doors to get to certain places.  And that's just the way

17 the place is designed.  Just like other prisons I worked

18 at, it's no different.  You don't leave your gates --

19 you aren't supposed to leave your gates and doors open.

20 But yeah, due to some physical plant issues, delayed the

21 response.  So my thinking, I wish they could have gotten

22 there sooner.  But knowing why they didn't, I always

23 understood that.

24     Q.    You did somewhat planning issues?  I am

25 sorry, I didn't catch that?

1       A.    If somebody could read back to me on --

2             MS. MAPLES:  Did the court reporter catch

3    that?  Can you just read it back?

4             (Off-the-record discussion.)

5             MS. MAPLES:  No worries, we'll just keep

6    going.

7    BY MS. MAPLES:

8       Q.    It sounds like you were saying something to

9    the effect of any delay in response time to a violent

10   incident was due to some kind of planning issues.  And

11   I'm just trying to figure out what you were saying.

12      A.    I don't --

13            MR. WELBORN:  Object to the form.

14            THE WITNESS:  I would like the court reporter

15   to read it back, because I don't think that's what I

16   said.

17            THE COURT REPORTER:  I don't have planning

18   issue anywhere in the answer.

19            MR. WELBORN:  It was plant.  It was plant

20   issue.

21            MS. MAPLES:  A what, Joe?

22            MR. WELBORN:  Plant.

23            THE WITNESS:  Physical plant.  Physical

24   plant.  Design of the physical plant.

25            MS. MAPLES:  Physical plant, okay.

1               THE COURT REPORTER:  That's what I have, too.

2               MS. MAPLES:  Got it.  Right.  Thank you.

3    BY MS. MAPLES:

4        Q.    What are the staffing assignments with regard

5    to a specific pod?

6        A.    In the general population, we have one -- we

7    had one building at Trousdale that was a dormitory

8    setting.  So I'm talking the pods.  Staffing assignments

9    would be one officer per pod.  Is that what you're

10   asking me?

11       Q.    Yes, that's what I'm asking you.  So every

12   pod is meant to have its own correctional officer; is

13   that right?

14       A.    Correct.

15       Q.    Okay, why is that important?

16       A.    It's called direct supervision.

17       Q.    Okay, and why is direct supervision

18   important?

19       A.    Well, as far as I'm concerned, some places,

20   you know, don't have direct supervision.  But Trousdale

21   is what we are talking about.  That the officers inside

22   the pod, the inmates actually see the officer.  If they

23   may have a question for the officer.  The officer is

24   making sure that nobody is doing anything they're not

25   supposed to be doing.  He or she is making the rounds

Page 61

1    and being visible.  That's why it's important.

2        Q.    Is it important for safety at Trousdale to

3    have direct supervision?

4        A.    Yes.

5        Q.    Because Trousdale was understaffed, were

6    there ever times in which each pod did not have its own

7    correction officer assigned?

8        A.    Yes.

9        Q.    How often would you say that happened?

10       A.    Respectfully, without looking at rosters, I

11   couldn't tell you.  I couldn't tell you and be truthful

12   about it.  Not that I am trying to be untruthful, but I

13   have to look and I can tell you.  Today, I don't want to

14   give you a number, just throw a number out there,

15   because I don't know.

16       Q.    I understand if you can't give me numbers.

17   In certain situations, you can just give me kind of a

18   descriptor.  Was it regular that that happened?  Did it

19   happen regularly?  Was it rare?  Was that a common thing

20   to have happen?

21       A.    No, it was not a common thing.

22       Q.    Was it a rare thing?

23       A.    Respectfully, that's why I want just rosters

24   because we -- rosters would tell matter of factly how

25   many times.  I don't want to get caught in that game.

```
 1   If I had the rosters --

 2              MS. MAPLES:  Okay.  Well, let's look at this

 3   Exhibit 2 to your deposition.

 4              (Exhibit 2 was marked.)

 5   BY MS. MAPLES:

 6        Q.    Do you see this is a document that appears to

 7   be authored by Jon Walton, TDOC contract monitor of

 8   compliance?

 9        A.    Yes, ma'am.

10        Q.    Do you see that it's dated February 25th of

11   2021?

12        A.    I see that.  Yes, ma'am.

13        Q.    And do you see that the audit period for this

14   report is listed as monthly staffing December 1st, 2020

15   to December 31st, 2020, and quarterly items October 1st

16   of 2020 through December 31st of 2020?

17        A.    Audit period, December.  Quarterly.  October.

18   Okay.  Yes, I see it.

19        Q.    If you look at Noncompliance No. 1, do you

20   see that they're referring to a monitoring instrument,

21   Staffing Item 1B?

22        A.    Yes, ma'am.

23        Q.    Are you familiar with the TDOC monitoring

24   instruments?

25        A.    I've heard -- they've spoken to me about it,
```

1    but I've not actually set down and looked at their

2    auditing instrument.  I have not.

3         Q.    Okay, did you, when you were at Trousdale,

4    ever get a noncompliance report that you understood to

5    have been based on these monitoring instruments used by

6    the contract monitors?

7         A.    Yes.

8         Q.    And do you understand this document that

9    we're looking at here, that's Exhibit 2, to be a

10   noncompliance report?

11        A.    I think that's what it's titled, right?  Yes.

12        Q.    And how often did you get noncompliance

13   reports concerning staffing?

14        A.    Respectfully, I can't give you a number

15   answer.  I don't know if they do these things monthly.

16   Whenever the contract -- respectfully, when they did

17   them, I mean, yeah, monthly staffing, they would send

18   them.  Yeah.  Quarterly.  December, no, that's monthly.

19   Auditing period monthly.  And then it talks about

20   quarterly items.

21        Q.    Do you see that if we scroll down to

22   Noncompliance No. 3, it states that the requirement

23   here, under applicable monitoring instruments, is check

24   every daily shift roster for all shifts for the previous

25   months, verify that all critical posts are staffed as

1    required?

2          A.    Okay.

3          Q.    Now, you referred a second ago to, I'd have

4    to see the rosters, right?

5          A.    Correct.

6          Q.    Is this the same roster that you're referring

7    to, the same one that they're talking about in this

8    noncompliance Item 3?

9          A.    Yes.  I'm -- yes.

10          Q.    Okay.  And do you see that here,

11    noncompliance Item 3, under noncompliance issue, Mr.

12    Walton has written:  All critical posts shall be staffed

13    as required.  However, multiple critical posts were not

14    covered during the monitoring period for the month of

15    December.  There were 31 days in the month of December,

16    which the shift rosters reflected 733 critical posts

17    were not filled on time or were left vacant during the

18    security shift?

19          A.    I see that.

20          Q.    Do you remember being notified in December of

21    2020, or after December of 2020, that for that month,

22    there were 733 critical posts not filled on time or left

23    vacant?

24          A.    No, I don't recall seeing this document, no.

25          Q.    Does that number, 733 critical posts not

1    filled on time or left vacant, concern you?

2         A.    If I knew that was a factual number, which I

3    don't, I am not saying it's one way or the other, but I

4    don't know that.  When these reports are submitted, they

5    go to the FSC, facility support center, in Nashville.

6    And they vet all of these posts he says are not covered.

7    And sometimes John was wrong.  So it would have to be --

8    I would have -- it would have to be vetted before I

9    could make a comment on that.

10        Q.    Well, let's say it's accurate.

11        A.    Let's say it's not accurate.  I don't -- I

12   would like to see facts if that's the case.  Again, our

13   FSC vetted these numbers and it went from there.

14        Q.    When you say your FSC, what do you mean your

15   FSC?  What does that mean?

16        A.    I'm sorry.  Facility support center staff.

17        Q.    Is that CoreCivic?

18        A.    Yes.

19        Q.    Facility support center?

20        A.    Yes.

21        Q.    And they would go through these for you?

22        A.    Yes, ma'am.

23        Q.    And tell you whether or not CoreCivic got it

24   right?

25        A.    Yes, ma'am.

1       Q.     Does the facility support center maintain

2    records of all of those?

3       A.     I don't -- they should.

4       Q.     Well, when there was a noncompliance report,

5    weren't you given the opportunity to work with the

6    contract monitor on it?

7       A.     We started actually working with the contract

8    monitors -- let me back up.  We started meeting with the

9    contract monitors right before I got relieved of my

10   duties, probably February.  We would do meetings with

11   them and discuss these issues and vet them right there

12   on the spot as best we could.  But up until then, these

13   things would go to Nashville.  Even after we met with

14   them, they still went to Nashville and went to the

15   facility support center to be vetted.

16      Q.     Well, what about the action that you were

17   going to take at the prison based on these reports?  I

18   mean, did that go to Nashville to CoreCivic or did you

19   handle that?

20      A.     The action to fill critical post, that's at

21   the facility level.  And sometimes, you know, there

22   could have been a very legitimate reason.  Staff could

23   have gotten sick.  I mean, you didn't have anybody else

24   to put.  So the key was what was happening when I got to

25   the prison April, all of the things the facility was

Case 3:22-cv-00093   Document 33-2   Filed 05/04/22   Page 66 of 72 PageID #: 739

1   doing to get the staffing increased.  That we already

2   talked about, that's the key.  I mean, that was going to

3   be our response back.  I mean, same thing we've been

4   doing.

5           But you can't -- and then while I was there,

6   you had COVID.  I keep bringing it up because COVID was

7   going on.  Family members had to stay at home because

8   the kids couldn't go to school or the husband caught

9   COVID and the wife couldn't come to work.  There was a

10  lot of reasons that we -- some of these noncompliance

11  issues came about.  Not just... They made us go to an

12  off-site hospital post.  That's not built into your

13  staffing plan.  You have to find two officers to go to

14  that hospital post.  And if it's three inmates, that's

15  six officers.

16      Q.   Well, I mean, here's the thing, I am wanting

17  to ask if you are concerned about this 733 critical post

18  number.  And you're telling me you would need more

19  information.  So I'm looking through this report right

20  now to see if I can get you the additional information

21  you need so that we can get an answer on your level of

22  concern, okay?

23          So let's see.  If we go to -- let's go here

24  first.  It looks like there was a response provided by

25  Trousdale to this report, right?

1      A.     That's what it says there, March 16th, 2021.

2      Q.     Okay, and then if we go down, we have this

3  paragraph on the very last page titled response to

4  contractor and plan of corrective action taken, okay?

5  And it looks like, as you were stating, there were some

6  discrepancies, maybe in the counting, right?  Do you see

7  that?

8      A.    What sentence?  (Reading to self.)  Is that

9  the sentence you're talking about, positions?

10     Q.     Well, it says positions -- there's a series

11  of four numbers -- incorrect filled dates pulled from

12  JDE and these were corrected and submitted to the

13  contract monitor on October 15th, 2020.  Do you see

14  that?

15     A.     I do.

16     Q.     So what I'm trying to figure out, I mean,

17  does this seem like the response from CoreCivic about

18  any discrepancies in the 733 number?

19     A.     What is the date of this again?  The response

20  was the 16th of March?

21     Q.     Uh-huh.

22     A.     I wasn't --

23     Q.     Well, I mean, I'm happy to let you scroll

24  through this report and see if you can get the

25  information you need to tell me whether the number 733

Page 69

 1    is concerning to you.

 2        A.    I don't know if that number is accurate,

 3    respectfully.

 4        Q.    Well, I mean, CoreCivic had the opportunity

 5    to respond to it if it was inaccurate, right?

 6        A.    Can we go to the top?

 7              MR. WELBORN:  Object to the form.

 8              THE WITNESS:  Respectfully, I don't know if

 9    that number is accurate.

10    BY MS. MAPLES:

11        Q.    Well, I mean, let's say they're off by 133

12    and then the answer is 600.  I mean, is that number

13    concerning to you?

14        A.    Again, respectfully, I don't know if these

15    numbers are accurate.  I don't know, respectfully.

16        Q.    Okay.  What is a reasonable number of

17    unfilled critical posts in a one-month time period in

18    your opinion?

19        A.    Is this a hypothetical?

20        Q.    Yeah.

21        A.    I like to deal with facts.  I don't know if

22    this is factual.  I don't have an answer to your

23    question.  I don't have an answer, respectfully.

24        Q.    Okay, well, this is factual.  I'm asking in

25    your opinion, as warden of Trousdale or former warden of

Page 70

1    Trousdale, what number of critical posts being left

2    unstaffed in a one-month time period is acceptable?

3                 MR. WELBORN:  Object to the form.

4                 MS. HASHEMIAN:  Object to the form.

5                 THE WITNESS:  Respectfully, I don't have an

6    answer to your question.  I've tried as best I can to

7    tell you why.  I don't have an answer to your question,

8    respectfully.

9    BY MS. MAPLES:

10       Q.    Well, you told me it's because you don't know

11   the accuracy of these numbers.  And I am not asking you

12   about the accuracy of the numbers.  I'm saying that what

13   number, if it is guaranteed to be accurate, would you

14   see on one of these reports and say, wow, that is

15   unacceptable, the prison is in bad shape and we can't

16   keep going on like this?

17                MR. WELBORN:  Object to the form.  Asked and

18   answered.

19                MS. HASHEMIAN:  Object to the form.

20                THE WITNESS:  Ma'am, respectfully, I have

21   given you my answer on this.  We can keep going back and

22   forth, but I am going to keep telling you the same

23   thing, respectfully.

24   BY MS. MAPLES:

25       Q.    Is 733 the highest number of critical posts

Page 71

1    that you had not filled on time or left vacant in a

2    one-month time period?

3              MR. WELBORN:  Object to the form.

4              MS. HASHEMIAN:  Object to the form.

5              THE WITNESS:  I don't know if 733 is

6    accurate, respectfully.

7    BY MS. MAPLES:

8        Q.    Well, is it the highest number that was

9    reported to you by the contract monitor, accurate or

10   not?

11             MR. WELBORN:  Object to the form.

12             MS. HASHEMIAN:  Object to the form.

13             THE WITNESS:  I don't know, respectfully.

14   BY MS. MAPLES:

15       Q.    When we have items here like response of

16   contractor and plan of corrective action taken, is that

17   something that would have been drafted by you or by

18   CoreCivic headquarters?

19       A.    Please, will you repeat your question,

20   please.

21       Q.    Sure.  So here on this page, which is Bates

22   stamped TDOC 002502, there is certain text that is in

23   blue, right?

24       A.    Everything is black and white on here.

25       Q.    Well, do you see the third paragraph down has

1    a header, response of contractor and plan of correction

2    action taken?

3        A.    I see that, yes.

4        Q.    Okay.  My question is just, is this something

5    that you would have drafted or that CoreCivic

6    headquarters would have drafted?

7        A.    It would have been a combination of -- and I

8    didn't get involved with these.  Our quality assurance

9    office, quality assurance office, and we have a team of

10   -- what do they call themselves?  TDOC compliance

11   specialists.  They would all sit down and review these,

12   forward them to my boss, who would then forward them on

13   up.

14       Q.    Okay, so you didn't get too involved with

15   these?

16       A.    During the time I was at Trousdale,

17   respectfully, I was dealing with COVID so much.  No, I

18   didn't.  I did not.  I didn't spend a lot of time with

19   these.

20       Q.    How many TDOC compliance specialists are

21   there at CoreCivic?

22       A.    Let's see.  Three, I believe.

23       Q.    And are they included in facility support

24   services or are they separate?

25       A.    Counselor, they work for Mr. Keaton, my boss.