```
              UNITED STATES DISTRICT COURT
               MIDDLE DISTRICT OF TENNESSEE
                    NASHVILLE DIVISION

BOAZ PLEASANT-BEY,                    )
                                      )
                       Plaintiff,     )
        vs.                           )No. 3:19-CV-00486
                                      )
STATE OF TENNESSEE, et al.,           )
                                      )
                       Defendants.    )
_____)



          DEPOSITION OF RUSSELL WASHBURN,


      Taken on Behalf of the Plaintiff, 9:00 a.m.,
   Monday, August 23, 2021, via Zoom, before:

                  BRIGGS & ASSOCIATES
          222 Second Avenue North, Suite 340M
              Nashville, Tennessee 37201
                    (615) 482-0037
                    MARTA G. HARRA
             Licensed Court Reporter # 468
             Certified Court Reporter #0317



                      APPEARANCES

   For the Plaintiff:
        BRANSTETTER, STRANCH & JENNINGS, PLLC
        Tricia Herzfeld
        223 Rosa L. Parks Avenue, Suite 200
        Nashville, Tennessee 37203
        triciah@bsjfirm.com

   For the Defendant State of Tennessee:
        TENNESSEE ATTORNEY GENERAL'S OFFICE
        Nikki N. Hashemian and Thomas J. Aumann
        P.O. Box 20207
        Nashville, Tennessee 37202-0207
        nikki.hashemian@ag.tn.gov
        thomas.aumann@ag.tn.gov
```

Page 2

### APPEARANCES CONTINUED:


For the Defendant CoreCivic:
     K&L GATES, LLP
     Erin Palmer Polly and Joseph F. Welborn, III
     222 Second Avenue South, Suite 1700
     Nashville, Tennessee 37201
     Erin.Polly@klgates.com
     Joe.Welborn@butlersnow.com



### I N D E X

RUSSELL WASHBURN                                   PAGE

     Direct Examination by Ms. Herzfeld        4


### E X H I B I T S


NO.                    DESCRIPTION                 PAGE


1    Re-Notice of Deposition Pursuant to
Rule 30(b)(6) and Document Requests Pursuant
to Rule 34 to Defendant CoreCivic              5

6    Two-Page December 12, 2019 Email Chain   5

7    4/7/2020 Letter from Inmate Daniel
Nielers (ph)                                   5

1               S T I P U L A T I O N S

2

3

4        The deposition of RUSSELL WASHBURN, taken on

5    behalf of the Plaintiff on Monday, August 23, 2021,

6    via Zoom, for all purposes under the Tennessee

7    Rules of Civil Procedure.

8        The formalities as to notice, caption,

9    certificate, et cetera, are waived.  All

10   objections, except as to the form of the questions,

11   are reserved to the hearing.

12       It is agreed that MARTA G. HARRA, being a

13   Licensed Court Reporter and Certified Court

14   Reporter for the State of Tennessee, may swear the

15   witness, and that the reading and signing of the

16   completed deposition by the witness are waived.

17

18

19

20

21

22

23

24

25        Marta G. Harra, LCR, CCR  (931) 626-4952

```
 1                      RUSSELL WASHBURN,

 2          was called as a witness, and after having been

 3          first duly sworn, testified as follows:

 4          DIRECT EXAMINATION BY MS. HERZFELD:

 5   Q.     Okay, Warden Washburn, my name is Tricia Herzfeld.

 6          I'm an attorney for Mr. Pleasant-Bey.  I deposed

 7          you before.

 8                 How are you doing?

 9   A.     Good.  How about you?

10   Q.     Good.  It's been, what, a month or so, since we've

11          seen each other over Zoom?

12   A.     Yes, ma'am.

13   Q.     Oh, very good.

14                 And has anything changed in the interim since

15          we did your last deposition about your position or

16          any of your background?

17   A.     No, ma'am.

18   Q.     Okay, great.

19                 And you understand that you're here today

20          pursuant to a notice, a 30(b)(6) Notice, which

21          means you're testifying as a representative of

22          CoreCivic?

23   A.     Yes, ma'am.

24   Q.     Okay.  And have you had an opportunity to look over

25          the notice and the topics that you've been
```

```
1          designated on?

2     A.   Yes, ma'am.

3     Q.   Okay, great.  Give me one second.

4     A.   And I have that in front of me.  So if you see me

5          looking down, that's what I'll be looking at.

6     Q.   Well, great, because that's actually what I was

7          going to -- that's actually what I was going to

8          give you, as soon as I figure out how to drop in

9          the exhibits.

10              MS. HERZFELD:  To the court reporter, I

11         know we provided exhibits ahead of time.  Did you

12         want to put them up or did you want us to drop them

13         into the chat?

14              THE REPORTER:  I prefer you take care of

15         that.  I've got all I can do writing down what you

16         guys are saying.

17              MS. HERZFELD:  Oh, okay, great.  Then I

18         will go ahead and take care of that.

19              THE REPORTER:  Thank you.

20              (Marked Exhibit No. 1, Re-Notice of

21         Deposition Pursuant to Rule 30(b)(6) and Document

22         Requests Pursuant to Rule 34 to Defendant

23         CoreCivic; Exhibit No. 6, Two-Page December 12,

24         2019 Email Chain; and Exhibit No. 7, 4/7/2020

25         Letter from Inmate Daniel Nielers (ph) and a
```

```
 1          discussion was held off the record.)

 2   Q.    (BY MS. HERZFELD)  Okay, just give me one second.

 3          Okay.  Exhibit 1 should be the 30(b)(6) Notice

 4    in the chat.

 5          Do you see that, Warden Washburn?

 6   A.    Yes, ma'am.  I'm just hitting download.

 7   Q.    Great.

 8   A.    Should it automatically open?

 9   Q.    Nope.  I think you have to click on it and open it.

10          Goodness.  Maybe we'll just do it as a share

11    screen.

12   A.    Yeah, because I'm not sure where it's trying to

13    make me save it at.

14   Q.    Okay, that's fine.

15               MS. HERZFELD:  Okay.  Let's go off the

16    record for just one second while we get this set up

17    and maybe I can just put them all up kind of, you

18    know, one at a time in the chat.

19               (A discussion was held off the record.)

20   Q.    (BY MS. HERZFELD)  Okay, Warden Washburn.

21   A.    Yes, ma'am.

22   Q.    Okay.  And do you see in front of you on the screen

23    Exhibit 1, which is the 30(b)(6) Notice?

24   A.    I did, but it's not -- I can't see it any longer.

25   Q.    What do you see now?  Do you see my face?
```

Page 7

```
 1   A.   I see your face and then off to the right I have

 2        the chat open and so I can see the documents listed

 3        out, but I can't actually see the document.

 4   Q.   Okay.  Hold on one second.  Let's try it again.

 5        How about now?

 6   A.   Yes, ma'am.

 7   Q.   Do you see the notice?

 8   A.   I do, yes, ma'am.

 9   Q.   Okay, great.  Wonderful.

10        Okay.  And you've had an opportunity to review

11        this notice with your attorneys?

12   A.   Yes, I have.

13   Q.   And you feel prepared to testify on all of these

14        topics?

15   A.   Yes, ma'am.

16   Q.   Okay.  In advance of today's deposition did you

17        review your previous deposition given in this case?

18   A.   Yes.

19   Q.   Okay.  And do you wish to change any of that

20        testimony that you gave at that time?

21   A.   No.

22   Q.   Okay.  And that's all correct for today's testimony

23        as well?

24   A.   Yes, ma'am.

25   Q.   Okay.  If I were to ask you the same questions in
```

1        your capacity as the CoreCivic representative that

2        I asked you in your personal capacity as the

3        warden, would those answers be the same?

4    A.  Yes, ma'am.

5    Q.  Okay, great.  Then we can move on from Exhibit 1.

6                MR WELBORN, III:  And, Tricia, can I say

7        something real quick?

8                MS. HERZFELD:  Sure.

9                MR WELBORN, III:  We're designating him

10       on topics -- the first two topics, not the

11       religious portion of it.  I'm scrolling down to see

12       what sections that is.  But I think we talked --

13       actually it's probably been over a month ago that

14       we talked to you about this, that on the religious

15       topics we were going to look at the deposition and

16       designate our -- you know, the chaplain as the

17       person on that and designate his testimony and see

18       if that's satisfactory to you.  Or if you had

19       follow-up questions, we're happy to put him up

20       again.  I just wanted to clarify.

21               MS. HERZFELD:  Well, I don't think I

22       quite understood that, so that will make today's a

23       little bit shorter.  Some of the exhibits that I

24       think I put in the chat have to do with religious

25       stuff.  So maybe we can just talk afterwards and

Page 9

1          see if there's a short way that we can deal with

2          the chaplain on those.

3                    MR WELBORN, III:  Sure.

4                    MS. HERZFELD:  Okay, great.

5    Q.   (BY MS. HERZFELD)  This will make this a lot

6          shorter then, Warden Washburn.

7                    MS. HERZFELD:  So it's Topics 1 and 2,

8          Joe?

9                    MR WELBORN, III:  Yeah.

10                   MS. HERZFELD:  Okay.

11   A.   When you're saying 1 and 2, that's A and B,

12         correct, under the notice?

13                   MS. HERZFELD:  You said Topics 1 and 2,

14         so I'm assuming that's staffing --

15                   MR WELBORN, III:  It's staffing and, I

16         think, it's the violence.

17                   THE WITNESS:  That's correct.  That's

18         what I'm trying -- on my notice.

19                   MR WELBORN, III:  Yeah.  I meant -- I

20         said 1 and 2.  It's A and B.

21                   MS. HERZFELD:  A and B?  Okay.

22                   MR WELBORN, III:  And C is what we're

23         designating the chaplain for.

24                   MS. HERZFELD:  Okay.  Very good.  So A

25         and B.  Perfect.

```
 1   Q.   (BY MS. HERZFELD)  Okay.  So with that

 2        clarification we'll move forward with some of the

 3        questions that I have for you to today.

 4             Are you prepared to testify today,

 5        Mr. Washburn?

 6   A.   Yes, ma'am.

 7   Q.   Okay.  And are you sick or have any sort of

 8        physical issues going on that would prevent you

 9        from giving honest and accurate testimony today?

10   A.   No, ma'am.

11   Q.   Okay.  I'm going to skip Exhibits 2, 3, 4, and 5

12        that were previously marked in a chat because those

13        have to do with religious accommodations, so we'll

14        skip directly to Exhibit No. 6.

15                  (Mr. Aumann joined the deposition via

16        Zoom.)

17   Q.   (BY MS. HERZFELD)  Do you see an email in front of

18        you, Mr. Washburn?

19   A.   Yes, ma'am, I do.

20   Q.   Okay, great.  And will you take a minute and please

21        read this deposition -- or this email?  I'll go

22        slowly if you need it or you can download it on

23        your computer and read it yourself.

24   A.   All right.  So am I going to start at the top or at

25        the bottom?
```

Page 11

```
 1   Q.   However you would prefer.  Would you like for me to

 2        start at the bottom?

 3   A.   Please, so I can kind of -- the context will follow

 4        in order.

 5             I would assume that's the order it would go

 6        in; correct?

 7   Q.   Yep.

 8   A.   Okay.

 9   Q.   Okay.  We'll start here where it says

10        December 12th, 2019, at 7:52.  Do you see it?  Can

11        you read it?

12   A.   Yes, ma'am.

13   Q.   Okay, great.  Just let me know when you're

14        finished.

15   A.   (The witness reviewed the document.)

16   Q.   Okay.  Here's the response from Denise Davidson.

17   A.   (The witness reviewed the document.)  Okay.

18   Q.   And then the response from Jennifer Petty.

19             And just tell me when you need for me to

20        scroll down.

21   A.   Yes, ma'am.  (The witness reviewed the document.)

22        Okay.  (The witness continued to review the

23        document.)  Okay.

24   Q.   Okay.  You've had an opportunity to read this

25        document?
```

Page 12

```
 1    A.    Yes, ma'am.

 2    Q.    Okay.  My first question is:  Do you know who

 3          Jennifer Petty is?

 4    A.    I do not recall the name off the top of my head,

 5          no.

 6    Q.    Okay.  What about Denise Davidson?

 7    A.    Yes.  She was the assistant warden of support

 8          services.

 9    Q.    And would she have reported directly to you?

10    A.    She would have.

11    Q.    Okay.  And what I've shown you here is a series of

12          emails between Ms. Petty and Ms. Davidson dated

13          December 12th, 2019; is that correct?

14    A.    Yes, ma'am.

15    Q.    And the email addresses that are on these emails

16          indicate that they are from a CoreCivic and to a

17          CoreCivic email address?

18    A.    That's correct.

19    Q.    Okay.  And what is a 51C?

20    A.    It's actually a 5-1C.  A 5-1 is the incident

21          reporting policy, and "C" would reference the

22          actual attachment to that policy which, in this

23          case, would be a statement.

24    Q.    Okay.  And what is Alpha Alpha, an Alpha Alpha

25          inmate?
```

```
 1   A.   That would be a pod that was located -- or is
 2        located within the restricted housing unit.
 3   Q.   Okay.  And when you say "restricted housing unit,"
 4        what do you mean?
 5   A.   It would be a unit where we detain -- inmates would
 6        be placed either for some type of administrative
 7        investigation or some type of disciplinary
 8        violation.
 9   Q.   Okay.  Is there a particular mental health pod or
10        ward?
11   A.   Not within this particular unit, no.  Housing,
12        specifically for mental health, would be completed
13        in the medical department.  Not to say a person
14        that has a mental health diagnosis could not be
15        here.  But if there's a mental health crisis that
16        was causing the person to be housed, they would not
17        be housed here, they would be housed in medical.
18   Q.   Okay.  And taking a look at this email from the
19        bottom up, as you had the opportunity to review it,
20        it looks, from this email, like Ms. Petty is
21        reporting that a prisoner had told her that he was
22        raped by a gang member that Sunday night; is that
23        correct?
24   A.   Based on what's in the email, yes.
25   Q.   Okay.  And what happens, from a procedure
```

Page 14

1          standpoint, when an inmate reports a rape?

2    A.    They would then be screened by medical.  The staff

3          member would keep that person under supervision,

4          separate them if the alleged aggressor is within

5          that location.  They would separate the

6          individuals, the alleged victim would be screened

7          by both medical and mental health, and then a

8          determination on whether or not the person would

9          need to go out -- go out to outside treatment or

10         evaluation would be made by the medical department.

11              And then we would start the investigation and

12         as well notify TDOC and any other criminal law

13         enforcement that was necessary.

14   Q.    Okay.  And it's your understanding that those

15         actions are mandated by the Prison Rape Elimination

16         Act?

17   A.    Yes, they are.

18   Q.    Okay.  And in this email in particular Ms. Petty is

19         indicating that the prisoner had a small scratch on

20         the left side of his nose and a scratch on the top

21         right side of his lip which he said happened during

22         the rape; is that right?

23              Sorry.

24   A.    That's all right.  I'm just rereading the email.

25   Q.    Sure.

Page 15

```
 1   A.   (The witness reviewed the document.)  Yes, ma'am,
 2        that's his allegation, based off of this email.
 3   Q.   Okay.  And then in response Denise Davidson, who
 4        you said was the assistant warden --
 5   A.   That's correct.
 6   Q.   -- who reported to you; is that correct?
 7   A.   That's correct.
 8   Q.   Okay.  She says, "Inmate Wampler in Alpha Bravo
 9        indicates he is suppose to receive a KOP after he
10        recently saw Leveck.  Can you check on this?"
11             First off, what is Alpha Bravo?
12   A.   That's another pod within the restricted housing
13        that would be directly beside the Alpha Alpha pod.
14   Q.   Okay.  And what is a KOP?
15   A.   Keep on person medication.
16   Q.   Okay.  And what is that?
17   A.   It means it's a medication that medical has
18        determined that it would be appropriate for the
19        inmate to keep in his possession.  And it's
20        typically in blister packs by the day.
21   Q.   Okay.  And could you give me some types of examples
22        of what type of medication would be keep on person?
23   A.   I'm not a medical person, so I wouldn't -- I can't
24        tell you today without looking at what would be
25        approved.
```

```
 1   Q.   Okay.  Well, do you think narcotics would be
 2        approved for something like that?
 3   A.   No.
 4   Q.   Okay.  So it's something more like Tylenol?
 5   A.   Yes, ma'am.
 6   Q.   Okay.  And do you know why it is in response to
 7        this issue about Inmate Culberson who said he was
 8        raped, the response then is about Inmate Wampler?
 9   A.   I do not know, no.
10   Q.   Okay.  Do you see any indication that Inmate
11        Wampler has anything to do with the rape that was
12        reported by Inmate Culberson?
13   A.   Not from the documents that I'm reviewing here.
14   Q.   Okay.  And who is Latanya Moore?
15   A.   She was the -- I believe her title is clinical
16        supervisor.  She worked in the medical department.
17   Q.   Okay.  And Wyllis Smith, do you know who that is?
18   A.   I do not recall off the top of my head, no.
19   Q.   Okay.  And Rafael Peralta, do you know who that --
20   A.   I believe he was the former health service
21        administrator.
22   Q.   Okay.  And then going back to her response here she
23        says she surely will, right, in response to the
24        request for checking up on the medication that the
25        other inmate is supposed to keep on person.
```

 1              And then she says, "I left you a 5-1C under

 2        your door because I told that Alpha Alpha inmate I

 3        would talk to you about his concern and get his

 4        5-1C to the right person."

 5              So that means getting a report of an incident

 6        to the right person; is that right?

 7   A.   Yes, that's what a 5-1C would be, an incident

 8        statement.

 9   Q.   Okay.  And it says, "Supposedly he was scheduled

10        for a hearing two weeks ago."

11              Do you know what type of hearing?

12   A.   I do not.

13   Q.   Okay.  Do you know what type of hearing they would

14        be talking about in a circumstance like this?

15   A.   I can't without -- I mean I would just be

16        speculating.

17   Q.   Okay.  Well, speculate for me just for a second.

18              Is there some sort of like a hearing that

19        folks have from time to time to get out of Alpha

20        Alpha?

21   A.   Yes.  I mean, again, not knowing what kind of

22        hearing they are referencing, it could be a

23        disciplinary hearing, there could be a protective

24        custody hearing.  It could, by all rights, be his

25        court hearings if he had any kind of appeals or

Page 18

```
 1         anything going on within the court system.
 2    Q.   Okay.  So then it says, "Supposedly he was
 3         scheduled for a hearing two weeks ago.  Someone had
 4         a death in their family and it has caused his
 5         hearing to be postponed to a later date.  He says
 6         he's been good, hasn't had any write-ups and only
 7         needs PCI."
 8              What is PCI?
 9    A.   Protect custody.
10    Q.   Okay.  And what is the difference between Alpha
11         Alpha and protective custody?
12    A.   Well, Alpha Alpha at that time was the designated
13         unit that replaced inmates that were pending that
14         had requested PC.  So this would be -- PCI is
15         actually protective custody investigation, that's
16         what the PCI stands for.
17    Q.   Okay.  And I'm sorry that I just quite don't
18         understand the lingo quite as well.  So pretend
19         like I'm four.
20              Physically or privileges wise, what would be
21         the difference between being in Alpha Alpha and
22         being in protective custody?
23    A.   So really I mean Alpha Alpha -- Well, so -- Again,
24         so you understand the layout, Alpha Unit is the
25         entire unit.  Within Alpha Unit you have Alpha
```

Page 19

```
 1          Alpha, Alpha Bravo, Alpha Charlie, Alpha Delta,

 2          and, I believe, Alpha Echo, if my memory serves me

 3          correctly.  So they are pods within that particular

 4          unit.

 5    Q.    Okay.

 6    A.    Alpha Alpha was the designated unit that we would

 7          typically place inmates who had requested some

 8          level of protection and, therefore, an

 9          investigation would start.  Not to say that the

10          inmate could not be housed in Alpha Bravo or Alpha

11          Charlie for these same type of reviews or

12          investigations, but primarily we went to Alpha

13          Alpha.

14              Really they were restricted to theirself to

15          make sure that -- to limit contact and for their

16          safety until the investigation was completed.

17              Trousdale did not have an approved protective

18          custody unit at the facility.  So if a person was

19          found to have a need for protective custody through

20          the investigative process, then we would then

21          notify the state and this person who's been granted

22          protective custody and the state would then

23          coordinate by moving them, at availability, to a

24          facility that actually had a designated protective

25          custody housing unit or pod, whatever they were
```

Page 20

```
 1              referencing at that specific facility.

 2                   So hopefully that's helps.

 3    Q.   Okay, that does.  That helps me a lot.  And I now

 4         understand, I think, the layout a little bit

 5         better.

 6                   And so when this inmate says he's been good

 7         and hasn't had any write-ups and only needs PCI,

 8         does that mean PCI at that point would be being

 9         transferred to a different facility through TDOC?

10    A.   Well, again, I think our terminology in this email

11         is a little wrong.  He's requesting PC.  And a part

12         of that, PCI, we have to do -- there has to be an

13         investigative process to determine whether or not

14         there's something that can be substantiated to

15         approve the protective custody request.

16                   And that's really -- And his part would be a

17         protective custody request.  PCI is the actual

18         investigation.

19    Q.   Okay.  And so with a protective custody request, if

20         the investigation were to find that an inmate

21         needed protective custody -- if I understand you

22         correctly -- and you did not have protective

23         custody at that particular facility, you would

24         notify TDOC and then that inmate would be taken to

25         a different facility in order to give him
```

Page 21

```
 1          protective custody?  Do I understand it correctly?
 2   A.     That's correct.
 3   Q.     Okay, very good.
 4          Okay.  So then it says, "He is most concerned,
 5          more than anything, about getting his food bag next
 6          week."
 7          What's a food bag?
 8   A.     Again, I'm assuming here that he means -- there's
 9          packages, quarterly packages, that inmates, by TDOC
10          policy, are allowed to order.  And so my assumption
11          would be that that's what he's referencing.
12   Q.     Okay.  Then she says, "I don't understand the rules
13          of segregation.  I wish I knew more.  Am I correct
14          that if they RCA, they are not allowed commissary?"
15          What is RCA?
16   A.     Refuse cell assignment.
17   Q.     Okay.  And what does that mean, refuse cell
18          assignment?
19   A.     It means that at some point a staff member directed
20          an inmate to move from one housing location or one
21          cell location to another location and the inmate
22          said, "I'm not going."
23   Q.     Okay.  And then are there certain punishments that
24          happen if somebody disobeys an order for a cell
25          assignment?
```

Page 22

1   A.   It is a disciplinary infraction.  So a person found

2        guilty could have disciplinary sanctions applied.

3   Q.   Okay.  And could one of those disciplinary

4        sanctions be a suspension of the ability to order

5        from the commissary?

6   A.   Yes.

7   Q.   Okay.

8   A.   And that's typically just food items.  Not

9        necessarily hygiene products or stationery, those

10       types of items.

11  Q.   Okay.  And when you say "food products," you mean

12       like extra food products?  Not like chow that's

13       being served, but instead it would be like chips or

14       something extra?

15  A.   That's correct.  It's typically snack items or

16       something they want for comfort.

17  Q.   Okay.  And then she says, "If they are PCI, they

18       are allowed to purchase commissary, correct?"

19            Do you know if people that are pending

20       investigation for protective custody, if they are

21       allowed to purchase commissary?

22  A.   Yes, they are.

23  Q.   Okay.  "He has been told by several people that

24       they are going to allow him to have his food next

25       week, and then someone else will come behind them

Page 23

```
 1          and tell them, no."
 2               Is there ever a suspension of meals for anyone
 3          as punishment at that facility?
 4    A.    No.
 5    Q.    Okay.  The suspension for punishment would be for
 6          commissary?
 7    A.    Again, that wouldn't be under the PCI.  That's for
 8          like an RCA.  It's a different situation.
 9          Protective custody is not punitive by nature -- or
10          by definition.
11    Q.    Right.  But RCA is?
12    A.    Yes, ma'am.
13    Q.    Okay.  So then she says, "If they are PCI, they are
14          allowed to purchase commissary, correct?  He has
15          been told by several people that they are going to
16          allow him to have his food next week and then
17          someone else will come behind them and tell them,
18          no."
19               So do you know what she's referring to there?
20    A.    I do not.
21    Q.    Okay.  "I have witnessed this behavior myself.  I
22          have heard officers tell them they aren't going to
23          feed them."
24               So if someone is in Alpha Alpha, for example,
25          are they allowed to go to chow or is chow brought
```

Page 24

1          to them?

2    A.    It's brought to them.

3    Q.    Okay.  And so if she's talking about an officer

4          telling someone that they are not going to feed

5          them, is it possible that she's talking about

6          someone not bringing them a chow tray?

7    A.    Yeah, I can't speculate to what she's referencing

8          here.

9    Q.    Is there ever a situation where it would be

10         appropriate to deny an inmate in Alpha Alpha, or

11         anywhere, a chow tray?

12   A.    No.

13   Q.    Okay.  Is that ever done as punishment, officially?

14   A.    No.

15   Q.    Have you ever heard reports of people denying chow

16         trays unofficially?

17   A.    No.

18   Q.    Okay.  Have you ever had any reports of any guards

19         or any staff at the facility denying anyone food at

20         any time?

21   A.    Not that I can recall, no.

22   Q.    Okay.  "I have witnessed this behavior myself.  I

23         have heard officers tell them they aren't going to

24         feed them.  They aren't getting fed tonight."

25              How often are inmates fed at the facility?

1    A.    Three times a day; breakfast, lunch, and dinner.

2    Q.    Okay.  "They aren't getting fed tonight.  Keep on

3          and you won't get fed today or tomorrow, et cetera.

4          That pisses me off."

5                How often do the inmates get fed every day?

6    A.    Three times a day.

7    Q.    Three times a day.

8                And so if someone is saying they are not

9          getting fed today and you are not getting fed

10         tomorrow, do you have any idea what she could be

11         referring to?

12   A.    I do not.

13   Q.    Okay.  If you were warden, which you were, and you

14         saw this email, how would you react to it?

15   A.    Well, obviously it's -- any allegation of such, we

16         take that seriously.  It would be investigated.

17         She would need to provide additional information

18         on -- provide more specific details as to who said

19         it, when did they say it, the location, who were

20         they referencing, as far as not getting fed.

21               This is a very generic allegation so we would

22         need more information to be able to determine if

23         it's accurate and, if so, what appropriate action

24         would be taken if we found that the person did, in

25         fact, make this allegation and this statement.

Page 26

 1   Q.   Okay.  So let's finish up with where she's at then.

 2            "They really do not treat those Alpha Alpha

 3        inmates humanely.  They talk to them like dogs and

 4        expect them to take it."

 5            Did I read that correctly?

 6   A.   That's how it's written, yes.

 7   Q.   Okay.  "I'm sure there are a few exceptions and

 8        perhaps some good, fair, ethical officers that

 9        treat them like they are human; however, I have yet

10        to see that displayed in Alpha Alpha."

11            Did I read that correctly?

12   A.   That's how it's written, yes.

13   Q.   Okay.  And is there anything in that exchange that

14        would cause you concern as the warden?

15   A.   Same level of concern as the initial statement.

16        Again, you're making -- If there's allegations of

17        inappropriate or unethical behaviors, more

18        information would be required and we would

19        investigate into it.

20   Q.   Did you ever investigate behaviors of guards in the

21        Alpha Unit?

22   A.   I'd have to go back and look.  Just to recall from

23        memory, I can't.

24   Q.   Okay.  We'll continue.

25            "No wonder they act out and set fires and

Page 27

```
1        wreak havoc on the officers.  Outside of not

2        getting their medications as they are scheduled.

3        Mental health has a full-time job keeping up with

4        Alpha Alpha because of the way they are treated."

5             Did I read that correctly?

6   A.   Yes, it's how it's written.

7   Q.   "From meeting their basic needs, such as food,

8        water, and shelter (protecting them from popping

9        out of their cells)."

10            Did I read that correctly?

11  A.   You did.

12  Q.   Okay.  What does it mean "protecting them from

13       popping out of their cells"?

14  A.   I'm not sure what she's referencing.  You know,

15       there was -- If an inmate was able to manipulate

16       the locking system on the door, then that could

17       actually allow them to exit the cell themselves.

18       And that's what I had heard, as the warden there,

19       "popping out of cells" that's typically what staff

20       are referencing.

21  Q.   Okay.  And is it concerning that inmates would be

22       able to manipulate the locks on their cells in

23       order to be able to get out?

24  A.   It is concerning, and that's why we took

25       appropriate action, when identified.  If an inmate
```

```
 1          was found to be popping out of his cell, he was
 2          subject to disciplinary.  There was routine locking
 3          mechanism inspections and checks for the locks.
 4               And so, yes, this was a serious type of
 5          situation that we took seriously and we took
 6          appropriate action to address.
 7    Q.    Okay.  And when did you -- when did you do that?
 8    A.    Throughout my tenure at Trousdale.
 9    Q.    Okay.  So was there some sort of an inspection of
10          the locks after this email was written in 2019,
11          December?
12    A.    I don't know whether it was following or even prior
13          to.
14    Q.    Okay.  If it was prior to, would they have problems
15          popping out of their cells if it was fixed?
16    A.    Yes, ma'am.  When you think of the volume of locks
17          within a prison system, there's opportunities.  And
18          so there was daily inspections that were directed
19          to occur throughout.  But to say that there wasn't
20          opportunity to manipulate a lock, with the volume,
21          would be an untruthful statement.
22    Q.    Okay.  And prisons are in the business of keeping
23          people who have been convicted of crimes, many
24          times dangerous crimes, locked in their cells; is
25          that right?
```

Page 29

```
 1   A.   If necessary, yes, ma'am.

 2   Q.   Okay.  And so isn't one of the basic tenants of

 3        being able to keep someone locked up for their

 4        safety and for others, is to make sure that the

 5        locks work?

 6   A.   Yes.  And that's the reasons that we had the

 7        protocols that we had in place in place.

 8   Q.   Okay.  And how is it that the locks didn't work?

 9        Was that some sort of a design flaw or what's the

10        deal?  Why weren't they working?

11                 MR WELBORN, III:  Object to the form.

12   A.   Again, I can't speak to the design and I'm not,

13        obviously, a lock specialist.  What I can say is

14        that inmates are -- they manipulate -- they

15        manipulate the locking mechanisms or various other

16        security devices in and outside of Trousdale.  And

17        so that's why we have security practices and

18        inspection processes, to try to lessen opportunity.

19        But I don't know that it's realistic to say that

20        you're going to eliminate the ability when the

21        inmate has the access to manipulate the lock or

22        tamper with the locking device.

23            And this is a cell door, so it's their door.

24        They have access to go in and out and so,

25        therefore, the lock would be able to be messed with
```

```
 1        by that inmate while that door is open.
 2   Q.   (BY MS. HERZFELD)  Okay.  And then it says -- it
 3        says in the passage I just read to you, "Outside of
 4        not getting their medications as they are
 5        scheduled."
 6             Do you know anything about people in Alpha
 7        Alpha not getting their medications as scheduled?
 8   A.   Again, if a -- not specifically of what she's
 9        referencing here.  If there was an allegation of
10        such, we would investigate and then deal with that,
11        however appropriate, based on the outcome of the
12        investigation.
13   Q.   Okay.  And then to pick back up here.  "I listen to
14        what they tell me, and I know you do as well.
15        There are some very cruel employees here and they
16        have no business in the field.  They are simply in
17        the field because they are allowed to, and can, get
18        away with it.  They could not behave in that manner
19        and talk to people the way they do out in the real
20        world."
21             Did I read that correctly?
22   A.   You did.
23   Q.   Okay.  Do you know of any guards that were treating
24        prisoners in a cruel way?
25   A.   Again, if it was an allegation or a report, we
```

1          would have investigated and addressed accordingly.

2     Q.    Okay.  "I told him I would come back and let him

3          know something.  He was in Alpha Alpha 122.  He

4          shared that his affiliation is Vice Lord.  I know

5          they all can threaten us with behaviors and cutting

6          and check into medical for mental health, but the

7          reasons they are doing so is due to them not being

8          able to have their basic needs met.  They tell me

9          they write the 5-1C's, but nothing is ever done or

10          they feel like they are done away with.  I believe

11          them sometimes.  I believe a lot of their bad

12          behaviors and their power struggles are reported,

13          yet when they turn them in to be placed in the

14          appropriate mailbox, et cetera, they are done away

15          with and nothing is resolved."

16               Did I read that correctly?

17     A.    You read it correctly, as written.

18     Q.    Okay.  And so this employee of CoreCivic is saying

19          that she doesn't think that these prisoners in

20          Alpha Alpha are being treated correctly and that

21          the 5-1C's are not being responded to

22          appropriately; is she not?

23     A.    She is writing it that way.  What I'll say is that

24          she's also not putting in a lot of context that

25          would allow follow-up with regards to her

Page 32

1      allegations.

2  Q.  Okay.  But she wrote it to Denise Davidson; is that

3      right?

4  A.  That's correct.

5  Q.  And Denise Davidson is an assistant warden?

6  A.  That's correct.

7  Q.  And she is one below you; is that right?

8  A.  That's correct.

9  Q.  So this is making an allegation here, expressing

10     her concerns to someone who is high up at the

11     prison; is she not?

12  A.  It is going to Ms. Davidson, yes.

13  Q.  Okay.  And what action, if any, did Ms. Davidson

14     take on these complaints?

15  A.  I do not know, sitting here today.

16  Q.  Okay.  And did she ever bring this to your

17     attention, these complaints?

18  A.  Not that I can recall, no.

19  Q.  Okay.  Is this the first time that you've ever

20     heard any of these complaints?

21  A.  Again, I heard of similar complaints, you know, to

22     some context.  Now, whether these specifically or

23     this person specifically, I can't answer that.

24  Q.  Okay.  And when you say you've heard of similar

25     complaints and similar context, what do you mean?

Page 33

1   A.   You know, I heard complaints that, you know, a

2        person did not receive medications, and those would

3        be looked into and handled accordingly.

4             You know, those are, again, not unique

5        complaints, to some regard, specifically to

6        Trousdale.  Throughout my career you'll see, from

7        time to time, concerns or allegations or

8        complaints, but with those they are investigated,

9        looked into, and then get handled and addressed

10       accordingly.

11  Q.   Okay.  And what about complaints of folks in Alpha

12       being treated like dogs or inhumanely, have you

13       ever heard complaints of that?

14  A.   Not that I can recall specifically to that regard,

15       no.

16  Q.   Okay.  What about anywhere in the prison people

17       being treated inhumanly or being treated by like

18       dogs, have you ever heard any allegations of that?

19  A.   Not that I can recall off the top of my head, no.

20  Q.   Okay.  Okay.  I'm putting in front of you what has

21       previously been marked as Exhibit 7.  Do you see it

22       in front of you?

23  A.   Yes, ma'am, I can see it.

24  Q.   Okay, great.  And looking at this, it's a document

25       dated April 7th, 2020, regarding, "State of mind of

```
1              Inmates at Trousdale Prison."

2                   Did I read that correctly?

3    A.    Yes, ma'am.

4    Q.    Okay.  I will give you an opportunity to read it

5          before I question you on it, if that's okay.  Just

6          tell me when you need me to scroll down.

7    A.    (The witness reviewed the document.)  Okay, I'll

8          need you to scroll up.

9    Q.    Uh-huh.

10   A.    (The witness reviewed the document.)  Okay.

11   Q.    Okay.  You've had an opportunity to read it?

12   A.    Yes, ma'am.

13   Q.    Have you seen this document before?

14   A.    I have not.

15   Q.    Okay.  And the letter went like this, "To Whom it

16         May Concern," from an inmate, where would it go?

17   A.    To wherever the inmate addressed it to.

18   Q.    Okay.  And obviously it was kept in a file

19         somewhere because it was produced to me.

20              Who would be the person -- pardon me --

21         responsible for responding to inmate complaints?

22   A.    It varied, based on the type of complaint.

23   Q.    Okay.  So let's go through this one.

24              "State of mind of Inmates at Trousdale Prison.

25         The following is a list of fixable problems at this
```

```
 1            institution that are hanging on the precipice and

 2            threatens to create a life-threatening result."

 3                 Is that something that you think the prison

 4            should take seriously, prisoners saying here are

 5            things that are going on and could be dangerous?

 6   A.   Yeah, I think that is, you know, things that should

 7            be looked into, yes.

 8   Q.   Okay.  So the first bullet point says, "Staff

 9            members are ill-equipped to handle control of

10            inmates and use gangs to control their pods."

11                 Did I read that correctly?

12   A.   That's how it's written, yes.

13   Q.   Okay.  And have you ever heard allegations that

14            gangs are being used to control the pods by the

15            staff?

16   A.   By the staff, no.

17   Q.   Okay.  Have you ever heard allegations that gangs

18            are being used to control the pods in general?

19   A.   Not that they are being used.  I heard that there

20            was -- you know, obviously there's concerns that

21            were shared with me about gang members, I guess,

22            preying on other gang members or non-affiliated

23            gang members.

24   Q.   Okay.  But what about controlling pods, is that one

25            of the things that you look out for is gangs
```

1          controlling particular pods?

2    A.   Any inmate, whether it's gang or not, is not

3          authorized to have any level of supervision or

4          oversight over another inmate.

5    Q.   Okay.  Not officially, but what about unofficially?

6          I mean how do you prevent that from happening?

7    A.   Same thing.  About having staff monitor.  And then,

8          obviously, if we have an inmate that's identified

9          as trying to run something or to supervise or

10         control a pod, we would address that inmate,

11         whether it was either; A, moving the inmate to a

12         different location, writing the inmate a

13         disciplinary and charging them with those types of

14         things, placing him in segregation.

15              There would be a battery of different ways

16         that that particular situation could be managed,

17         depending on the severity.

18   Q.   Okay.  Then the next one says, "Inmates are

19         placed in control of other inmates and given cart

20         blanc (sic) to roam freely and do whatever the

21         wish."

22              Did I read that correctly?

23   A.   That's how it's written, yes.

24   Q.   Okay.  So that goes to the same thing we were just

25         talking about, which is inmates are in control of

```
 1        other inmates.  And you just said that that's not
 2        policy, but that's something that you would have
 3        the guards look out for and pay attention to to try
 4        to interject if that were to be happening.
 5             Did I understand your testimony correctly?
 6                  MR WELBORN, III:  Object to form.
 7   A.   Yes.
 8                  THE WITNESS:  I'm sorry.
 9   Q.   (BY MS. HERZFELD)  Okay.  And what about inmates
10        being able to roam freely and do whatever they
11        want?  Is there a way that that could happen at the
12        facility?
13   A.   Well, again, outside of lockdown, inmates are given
14        the latitude of walking around in the pod, going to
15        chow hall, going to medical.  I wouldn't
16        necessarily indicate roam around freely.  But if
17        they are not in a segregation setting then they are
18        in general population and they would have mobility,
19        yes.
20   Q.   Okay.  "Inmates who have created the problems are
21        always out, even after higher staff orders them to
22        get in.  While inmates who give no problems are
23        stuck behind the doors."
24             Did I read that correctly?
25   A.   That's how it's written, yes.
```

1   Q.   Okay.  And do you know what this inmate is

2        referring to here?

3   A.   No, I don't.  I can't --

4   Q.   Always out versus stuck behind the doors, does that

5        mean people locked in their cell versus people who

6        are roaming freely?

7             MR WELBORN, III:  Object to the form.

8   A.   Again, I can't -- I mean based on what -- it's how

9        he has it written, but what his intent was, I can't

10       say.

11  Q.   (BY MS. HERZFELD)  What do you understand it to

12       mean?

13  A.   Again, it sounds like it's allegations that inmates

14       are problematic.  They are saying they are out of

15       segregation.  And the ones that aren't problematic

16       are in segregation of some form.

17  Q.   Okay.  "Inmates who have been placed in segregation

18       after creating a problem are brought right back to

19       the same pod.  Even after at RCA/check-in."

20            What is RCA/check-in?

21  A.   Refused cell assignment and, my assumption, is that

22       he's referring to check-in as somebody who's

23       requested protective custody.

24  Q.   Okay.  Do you know if inmates who are placed in

25       segregation after creating a problem are brought

1          back to the same pods?

2   A.     They could be, depending on the nature of the

3          infraction.  Not everything results in a person

4          staying in segregation forever or being transferred

5          to another facility.

6              If the person has fulfilled whatever the

7          requirement was or the outcome of the disciplinary,

8          if appropriate, then they would potentially return

9          back to their pod.

10  Q.     Okay.  "Problem inmates are, quote, popping out of

11         their cells, and the ones in the cell who don't pop

12         out are getting punished as if they themselves

13         have."

14             Did I read that correctly?

15  A.     That's how it's written, yes.

16  Q.     Okay.  So this is April of 2020, and we have

17         another complaint about inmates popping out of

18         their cells; is that right?

19  A.     That's what's written here, yes.

20  Q.     Okay.  "Commissary and rec time are taken from

21         inmates who have not committed any offenses, yet

22         are punished as if they have."

23             Did I read that correctly?

24  A.     Yeah, you did.

25  Q.     Okay.  And the next one, "Staff is outright

Page 40

```
 1          belligerent to inmates who have not committed any

 2          offense, all the while catering to the individuals

 3          who have threatened them."

 4               Did I read that correctly?

 5   A.    You did read it correctly.

 6   Q.    Okay.  Have you, during your time as warden or in

 7          your knowledge as the CoreCivic representative,

 8          have you ever known of any guards to have been

 9          disciplined for affiliating with any particular

10          gang members in the prison?

11   A.    I would need to review the disciplinary log, but

12          none that come to mind off the top of my head.  But

13          I would need to review the disciplinary log to

14          answer fully.

15   Q.    Okay.  What about a staff being disciplined for

16          abusing any inmates, do you have any knowledge of

17          that?

18   A.    When you say "abusing" --

19   Q.    Physically or mentally.

20   A.    Yes, there was at least one that was disciplined

21          and -- arrested and criminally charged, while I was

22          there.

23   Q.    Okay.  And what were the general circumstances of

24          that incident?

25   A.    It was an excessive use of force following an event
```

Page 41

```
 1        where a case manager -- or a mental health

 2        professional was assaulted by an inmate.

 3   Q.   Okay.  And that person was criminally charged?

 4   A.   Yes, he was.

 5   Q.   Okay.  Are there any others that you can think

 6        of --

 7   A.   Again, without reviewing the disciplinary log, not

 8        right off the top of my head, no.

 9   Q.   Okay.  So then skipping forward, the very last

10        paragraph here.  "We are not asking for you to go

11        easy on us, just simply the ones who have not

12        created the problem should not be punished.  If you

13        treat us like animals, that is exactly how we will

14        behave.  Please help the good inmates.  God Bless

15        You, Daniel" looks like Miller, maybe, or Nielers.

16             Did I read that correctly, with the exception

17        of the name?

18   A.   Yes, that's how it's written.

19   Q.   Okay.  And here he's complaining that he's being

20        treated like an animal; is he not?

21   A.   I mean that's his allegation.  Based off the way

22        it's written, it appears that way, yes.

23   Q.   Okay.  And what, if any, investigation was done in

24        response to this letter?

25   A.   I can't answer that.  I was not the warden there at
```

1        that time.

2   Q.   Okay.  And as a CoreCivic representative have you

3        been given information to be able to testify on

4        that?

5   A.   No.  This is the first I've seen this document.

6   Q.   Okay.  In keeping control -- I just want to make

7        sure I understand.  So dealing with the pop-out

8        issue and dealing with gang member issues and

9        making sure that there aren't various inmates that

10       are trying to take control of pods, that's all

11       done -- I would assume that's a pretty

12       labor-intensive process; is that right?

13  A.   It's a daily process, and it's part of the scope of

14       work and responsibilities of the correctional

15       officers and security staff as a whole.

16  Q.   Okay.  And how are they trained to monitor for

17       those types of things?

18  A.   They are trained, the staff, when they come in,

19       preservice orientation, which I believe consists of

20       six weeks of training.  Part of that is on-the-job

21       training with seasoned staff that would actually

22       show a new staff member the requirements in

23       realtime and processes.

24            So they would be trained in preservice, and

25       then you have periodic training that goes on

BOZA PLEASANT-BEY vs STATE OF TENNESSEE
WASHBURN, RUSSELL on 08/23/2021

Page 43

Page 43

```
1          throughout the year, as well as in-service

2          training, which is a minimum.  I believe that

3          Trousdale in-service was 48 hours annually.  And

4          then, of course, you have the day-to-day

5          interactions with security supervisors that may

6          address things with staff informally.

7   Q.    Okay.  And so these are the things that the guards

8          are supposed to be looking out for during their

9          shifts, and it's part of their employment, if I

10         understood you correctly; is that right?

11  A.    Yes, everything -- all security aspects are part of

12         that responsibility of the security staff.

13  Q.    Okay.  And is that to keep the inmates and the

14         staff safe?

15  A.    Yes.

16  Q.    Okay.  And, in doing so, they have to gather a lot

17         of information and pay attention to a lot of stuff,

18         I would assume?

19  A.    Yes.  And that's what they are trained to do.

20  Q.    Okay.  And when you have insufficient staffing in a

21         facility does that make those jobs harder?

22  A.    It could aid into some of that.  I won't say it's

23         always the case, but it could aid, depending on the

24         number of staff, the experience level of the staff.

25         So I won't just cart blanchely (ph) say that that's
```

Briggs & Associates 615/482-0037
Nashville, Tennessee

Case 3:22-cv-00093   Document 55-3   Filed 03/04/22   Page 43 of 57 PageID #: 1074

Page 44

```
 1          all the case, but there certainly could.
 2   Q.    Okay.  If you will just give me one minute.  If we
 3          can go off the record for a second, I think I might
 4          be finished.  One second.
 5                    (A short break was taken.)
 6                    MS. HERZFELD:  Okay, I lied.  Back on the
 7          record just for one second.
 8   Q.    (BY MS. HERZFELD)  I think you've got the 30(b)(6)
 9          Notice in front of you.  That's Exhibit 1.  If you
10          will turn with me to Page 4, Paragraph 4.
11   A.    Paragraph 4 or No. 4?
12   Q.    Page 4, Paragraph -- well, No. 4.
13   A.    Okay, all right.
14   Q.    Okay.  "All actions taken or discussions held by
15          the CoreCivic board of directors to address
16          staffing issues at Trousdale or concerning staffing
17          issues at CoreCivic institutions more broadly."
18          Did I read that correctly?
19   A.    Yes, ma'am, that's how it's written.
20   Q.    Okay.  And do you know at all about any discussions
21          held by the CoreCivic board of directors about
22          staffing issues at Trousdale?
23   A.    I can't speak to specific discussions, as I would
24          not be privy to the actual discussions.  I can
25          speak that as a warden there was many approvals
```

Page 45

```
 1        that were provided for incentive type.  Whether it

 2        was a relocation bonus, whether that was a

 3        retention bonus, whether it was a recruitment-type

 4        bonus.

 5             There was discussions and approvals for

 6        working with a local builder to build affordable

 7        housing apartments there locally.

 8             So I can speak to those approvals that were

 9        provided, but specific discussions that may have

10        been -- the board may have had, I would not have

11        been privy to that.

12   Q.   Okay.  So you're not really prepared to testify on

13        the topic for No. 4 today; is that correct?

14   A.   Not if you're looking for specific discussions that

15        may have been had with the board of directors.

16   Q.   Yeah.  It says, "All actions taken or discussions

17        held" by the board of directors.

18             So you don't have any information on

19        discussions or specific actions taken by the board

20        of directors, other than what you just told me?

21   A.   No.  Again, just mainly the approvals for funding

22        to support initiatives through either recruit,

23        retain, or retain staff.

24   Q.   Okay.  And looking at the paragraph numbered five,

25        "All actions taken or discussions held by CoreCivic
```

Page 46

```
 1            management to address staffing issues at Trousdale

 2            or concerning staffing issues at CoreCivic

 3            institutions more broadly."

 4                 And so is that more what you're talking about,

 5            management decisions to increase bonuses and that

 6            type of thing, in order to recruit more staff?

 7   A.     Yes.

 8   Q.     Okay.  And who is the highest level person that

 9            you've had communications with about staffing

10            issues at Trousdale?

11   A.     That would have been Jason Medlin, who is the vice

12            president of operations.

13   Q.     And how often would you say you spoke with

14            Mr. Medlin about staffing issues at Trousdale?

15   A.     I can't give you -- I mean it was frequent with

16            regards to the various incentives and those types

17            of things.  If I gave you a number, honestly it

18            would just be a guess.

19   Q.     Okay.

20   A.     But regular contact.

21   Q.     You'd say more than a dozen?

22   A.     In what period of time?

23   Q.     Ever?

24   A.     Oh, yes, ma'am.

25   Q.     Okay, very good.
```

Page 47

1            MS. HERZFELD:  Okay.  I don't think I

2    have any further questions, so I will pass the

3    witness.  Thank you.

4            THE WITNESS:  Thank you.

5            MR WELBORN, III:  No questions.

6            MS. HASHEMIAN:  No questions.

7            MS. HERZFELD:  Thank you very much,

8    Warden Washburn.  Hopefully I won't be seeing you

9    again for a while.

10           THE WITNESS:  All right.  So I'm good to

11   leave?

12           MS. HERZFELD:  Fine by me.

13        (The signature of the witness was waived

14   and the deposition was adjourned at 10:00 a.m.)

15

16

17

18

19

20

21

22

23

24

25

```
                                              Page 48
 1                  REPORTER'S CERTIFICATE

 2

 3    STATE OF TENNESSEE  )
      COUNTY OF MAURY     )
 4

 5
           I, MARTA G. HARRA, LCR #468 and CCR #0317,
 6    a licensed court reporter in and for the State
      of Tennessee, do hereby certify that I recorded
 7    to the best of my skill and ability by machine
      shorthand all the proceedings in the foregoing
 8    transcript, and that said transcript is a true,
      accurate, and complete transcript of my
 9    shorthand notes.

10
           I further certify that I am not related to
11    nor an employee of counsel or any of the
      parties connected with the action, nor am I in
12    any way financially interested in the outcome
      of this case.

13

14         I further certify that I am duly licensed by
      the Tennessee Board of Court Reporting as a
15    Licensed Court Reporter as evidenced by the LCR
      number and expiration date following my name below.

16

17         SIGNED this 8th day of SEPTEMBER 2021.

18

19

20    _____
      MARTA G. HARRA
21    Licensed Court Reporter #468
      Certified Court Reporter #0317
22    Expiration Date: 6/30/2022

23

24

25
```

**Exhibits**

**Exhibit 1** 5:20 6:3,23 8:5 44:9

**Exhibit 6** 5:23 10:14

**Exhibit 7** 5:24 33:21

**1**

**1** 5:20 6:3,23 8:5 9:7,11,13,20 44:9

**12** 5:23

**122** 31:3

**12th** 11:10 12:13

**2**

**2** 9:7,11,13,20 10:11

**2019** 5:24 11:10 12:13 28:10

**2020** 33:25 39:16

**3**

**3** 10:11

**30(b)(6)** 4:20 5:21 6:3,23 44:8

**34** 5:22

**4**

**4** 10:11 44:10,11,12

**4/7/2020** 5:24

**48** 43:3

**5**

**5** 10:11

**5-1** 12:20

**5-1C** 12:20 17:1,4,7

**5-1c's** 31:9,21

**51C** 12:19

**6**

**6** 5:23 10:14

**7**

**7** 5:24 33:21

**7:52** 11:10

**7th** 33:25

**A**

**ability** 22:4 29:20

**abusing** 40:16,18

**access** 29:21,24

**accommodations** 10:13

**accurate** 10:9 25:23

**act** 14:16 26:25

**action** 25:23 27:25 28:6 32:13

**actions** 14:15 44:14

**actual** 12:22 20:17 44:24

**additional** 25:17

**address** 12:17 28:6 36:10 43:6 44:15

**addressed** 31:1 33:9 34:17

**addresses** 12:15

**administrative** 13:6

**administrator** 16:21

**advance** 7:16

**affiliating** 40:9

**affiliation** 31:4

**aggressor** 14:4

**ahead** 5:11,18

**aid** 43:22,23

**allegation** 15:2 25:15,21,25 30:9,25 32:9 41:21

**allegations** 26:16 32:1 33:7,18 35:13,17 38:13

**alleged** 14:4,6

**allowed** 21:10,14 22:18,21 23:14,25 30:17

**Alpha** 12:24 15:8,11,13 17:2,19, 20 18:10,11,12,21,23,24,25 19:1, 2,6,10,12,13 23:24 24:10 26:2,10, 21 27:4 30:6,7 31:3,20 33:11

**animal** 41:20

**animals** 41:13

**annually** 43:3

**answers** 8:3

**appeals** 17:25

**appears** 41:22

**applied** 22:2

**appropriately** 31:22

**approvals** 44:25

**approve** 20:15

**approved** 15:25 16:2 19:17

**April** 33:25 39:16

**arrested** 40:21

**aspects** 43:11

**assaulted** 41:2

**assignment** 21:16,18,25 38:21

**assistant** 12:7 15:4 32:5

**assume** 11:5 42:11 43:18

**assuming** 9:14 21:8

**assumption** 21:10 38:21

**attachment** 12:22

**attention** 32:17 37:3 43:17

**attorney** 4:6

**attorneys** 7:11

**Aumann** 10:15

**authorized** 36:3

**automatically** 6:8

**availability** 19:23

**B**

**back** 16:22 26:22 30:13 31:2 38:18 39:1,9 44:6

**background** 4:16

**bad** 31:11

**bag** 21:5,7

**based** 13:24 15:2 30:11 34:22
38:8 41:21

**basic** 27:7 29:2 31:8

**battery** 36:15

**behave** 30:18 41:14

**behavior** 23:21 24:22

**behaviors** 26:17,20 31:5,12

**belligerent** 40:1

**bit** 8:23 20:4

**blanc** 36:20

**blanchely** 43:25

**Bless** 41:14

**blister** 15:20

**board** 44:15,21

**bottom** 10:25 11:2 13:19

**Bravo** 15:8,11 19:1,10

**break** 44:5

**breakfast** 25:1

**bring** 32:16

**bringing** 24:6

**broadly** 44:17

**brought** 23:25 24:2 38:18,25

**bullet** 35:8

**business** 28:22 30:16

_____

**C**

**called** 4:2

**capacity** 8:1,2

**care** 5:14,18

**career** 33:6

**cart** 36:19 43:25

**case** 7:17 12:23 41:1 43:23 44:1

**catering** 40:2

**caused** 18:4

**causing** 13:16

**cell** 21:16,17,21,24 27:17 28:1
29:23 38:5,21 39:11

**cells** 27:9,13,19,22 28:15,24
39:11,18

**cetera** 25:3 31:14

**Chain** 5:24

**change** 7:19

**changed** 4:14

**chaplain** 8:16 9:2,23

**charged** 40:21 41:3

**charging** 36:13

**Charlie** 19:1,11

**chat** 5:13 6:4,18 7:2 8:24 10:12

**check** 15:10 31:6

**check-in** 38:22

**checking** 16:24

**checks** 28:3

**chips** 22:13

**chow** 22:12 23:25 24:6,11,15
37:15

**circumstance** 17:14

**circumstances** 40:23

**clarification** 10:2

**clarify** 8:20

**click** 6:9

**clinical** 16:15

**comfort** 22:16

**commissary** 21:14 22:5,18,21
23:6,14 39:20

**committed** 39:21 40:1

**complaining** 41:19

**complaint** 34:22 39:17

**complaints** 32:14,17,20,21,25
33:1,5,8,11,13 34:21

**completed** 13:12 19:16

**computer** 10:23

**concern** 17:3 26:14,15 34:16

**concerned** 21:4

**concerns** 32:10 33:7 35:20

**consists** 42:19

**contact** 19:15

**context** 11:3 31:24 32:22,25

**continue** 26:24

**continued** 11:22

**control** 35:9,10,14,18 36:10,19,
25 42:6,10

**controlling** 35:24 36:1

**convicted** 28:23

**coordinate** 19:23

**Corecivic** 4:22 5:23 8:1 12:16,17
31:18 40:7 42:2 44:15,17,21

**correct** 7:22 9:12,17 11:6 12:13,
18 13:23 15:5,6,7 21:2,13 22:15,
18 23:14 32:4,6,8

**correctional** 42:14

**correctly** 19:3 20:22 21:1 26:5,
11 27:5,10 30:21 31:16,17,20
34:2 35:11 36:22 37:5,24 39:14,
23 40:4,5 41:16 43:10 44:18

**court** 5:10 17:25 18:1

**create** 35:2

**created** 37:20 41:12

**creating** 38:18,25

**crimes** 28:23,24

**criminal** 14:12

**criminally** 40:21 41:3

**crisis** 13:15

**cruel** 30:15,24

**Culberson** 16:7,12

**custody** 17:24 18:9,11,15,22
19:18,19,22,25 20:15,17,19,21,23
21:1 22:20 23:9 38:23

**cutting** 31:5

_____

**D**

**daily** 28:18 42:13

**dangerous** 28:24 35:5

**Daniel** 5:25 41:15

**date** 18:5

**dated** 12:12 33:25

**Davidson** 11:16 12:6,12 15:3 32:2,5,12,13

**day** 15:20 25:1,5,6,7

**day-to-day** 43:4

**deal** 9:1 29:10 30:10

**dealing** 42:7,8

**death** 18:4

**December** 5:23 11:10 12:13 28:11

**Defendant** 5:22

**definition** 23:10

**Delta** 19:1

**Denise** 11:16 12:6 15:3 32:2,5

**deny** 24:10

**denying** 24:15,19

**department** 13:13 14:10 16:16

**depending** 36:17 39:2 43:23

**deposed** 4:6

**deposition** 4:15 5:21 7:16,17 8:15 10:15,21

**design** 29:9,12

**designate** 8:16,17

**designated** 5:1 18:12 19:6,24

**designating** 8:9 9:23

**details** 25:18

**detain** 13:5

**determination** 14:8

**determine** 20:13 25:22

**determined** 15:18

**device** 29:22

**devices** 29:16

**diagnosis** 13:14

**difference** 18:10,21

**dinner** 25:1

**DIRECT** 4:4

**directed** 21:19 28:18

**directly** 10:14 12:9 15:13

**directors** 44:15,21

**disciplinary** 13:7 17:23 22:1,2,3 28:2 36:13 39:7 40:11,13 41:7

**disciplined** 40:9,15,20

**discussion** 6:1,19

**discussions** 44:14,20,23,24

**disobeys** 21:24

**displayed** 26:10

**document** 5:21 7:3 11:15,17,21, 23,25 15:1 33:24 34:7,10,13 42:5

**documents** 7:2 16:13

**dogs** 26:3 33:12,18

**door** 17:2 27:16 29:23 30:1

**doors** 37:23 38:4

**download** 6:6 10:22

**drop** 5:8,12

**due** 31:7

**duly** 4:3

**E**

**easy** 41:11

**Echo** 19:2

**eliminate** 29:20

**Elimination** 14:15

**email** 5:24 10:17,21 12:15,17 13:18,20,24 14:18,24 15:2 20:10 25:14 28:10

**emails** 12:12,15

**employee** 31:18

**employees** 30:15

**employment** 43:9

**enforcement** 14:13

**entire** 18:25

**ethical** 26:8

**evaluation** 14:10

**event** 40:25

**EXAMINATION** 4:4

**examples** 15:21

**exception** 41:16

**exceptions** 26:7

**excessive** 40:25

**exchange** 26:13

**Exhibit** 5:20,23,24 6:3,23 8:5 10:14 33:21 44:9

**exhibits** 5:9,11 8:23 10:11

**exit** 27:17

**expect** 26:4

**experience** 43:24

**expressing** 32:9

**extra** 22:12,14

**F**

**face** 6:25 7:1

**facility** 19:18,24 20:1,9,23,25 23:3 24:19,25 37:12 39:5 43:21

**fact** 25:25

**fair** 26:8

**family** 18:4

**fed** 24:24,25 25:2,3,5,9,20

**feed** 23:23 24:4,24

**feel** 7:13 31:10

**field** 30:16,17

**figure** 5:8

**file** 34:18

**find** 20:20

**fine** 6:14

**finish** 26:1

**finished** 11:14 44:4

**fires** 26:25

**fixable** 34:25

**fixed** 28:15

**flaw** 29:9

**folks** 17:19 33:11

follow 11:3

follow-up 8:19 31:25

food 21:5,7 22:8,11,12,24 23:16
24:19 27:7

force 40:25

forever 39:4

form 29:11 37:6 38:7,16

forward 10:2 41:9

found 19:19 22:1 25:24 28:1

freely 36:20 37:10,16 38:6

front 5:4 6:22 10:17 33:20,22
44:9

fulfilled 39:6

full-time 27:3

fully 40:14

**G**

gang 13:22 35:21,22,23 36:2
40:10 42:8

gangs 35:10,14,17,25

gather 43:16

gave 7:20

general 35:18 37:18 40:23

generic 25:21

give 5:3,8 6:2 15:21 20:25 34:4
37:22 44:2

giving 10:9

God 41:14

good 4:9,10,13 9:24 18:6 20:6
21:3 26:8 41:14

Goodness 6:10

granted 19:21

great 4:18 5:3,6,17 6:7 7:9 8:5
9:4 10:20 11:13 33:24

guards 24:18 26:20 30:23 37:3
40:8 43:7

guess 35:21

guilty 22:2

guys 5:16

**H**

hall 37:15

handle 35:9

handled 33:3,9

hanging 35:1

happen 21:24 37:11

happened 14:21

happening 36:6 37:4

happy 8:19

harder 43:21

havoc 27:1

head 12:4 16:18 33:19 40:12 41:8

health 13:9,12,14,15 14:7 16:20
27:3 31:6 41:1

heard 23:22 24:15,23 27:18
32:20,21,24 33:1,13,18 35:13,17,
19

hearing 17:10,11,13,18,22,23,24
18:3,5

hearings 17:25

held 6:1,19 44:14,21

helps 20:2,3

Herzfeld 4:4,5 5:10,17 6:2,15,20
8:8,21 9:4,5,7,10,13,21,24 10:1,
17 30:2 37:9 38:11 44:6,8

high 32:10

higher 37:21

hitting 6:6

Hold 7:4

honest 10:9

hours 43:3

housed 13:16,17 19:10

housing 13:2,3,11 15:12 19:25
21:20

human 26:9

humanely 26:3

hygiene 22:9

**I**

idea 25:10

identified 27:25 36:8

Ill 8:6,9 9:3,9,15,19,22 29:11 37:6
38:7

ill-equipped 35:9

in-service 43:1,3

inappropriate 26:17

incident 12:20 17:5,7 40:24

indicating 14:19

indication 16:10

individuals 14:6 40:2

informally 43:6

information 25:17,22 26:18 42:3
43:17

infraction 22:1 39:3

inhumanely 33:12

inhumanly 33:17

initial 26:15

inmate 5:25 12:25 14:1 15:8,19
16:7,8,10,12,25 17:2 19:10 20:6,
20,24 21:20,21 24:10 27:15,25
29:21 30:1 34:16,17,21 36:2,4,8,
10,11,12 38:1 41:2

inmates 13:5 18:13 19:7 21:9
24:25 25:5 26:3 27:21 29:14 34:1,
24 35:10 36:18,19,25 37:1,9,13,
20,22 38:13,17,24 39:10,17,21
40:1,16 41:14 42:9 43:13

inspection 28:9 29:18

inspections 28:3,18

institution 35:1

institutions 44:17

insufficient 43:20

intent 38:9

interactions 43:5

interim 4:14

interject 37:4

investigate 26:19,20 30:10

**investigated** 25:16 31:1 33:8

**investigation** 13:7 14:11 18:15 19:9,16 20:18,20 22:20 30:12 41:23

**investigations** 19:12

**investigative** 19:20 20:13

**issue** 16:7 42:8

**issues** 10:8 42:8 44:16,17,22

**items** 22:8,10,15

---

**J**

**Jennifer** 11:18 12:3

**job** 27:3

**jobs** 43:21

**Joe** 9:8

**joined** 10:15

---

**K**

**keeping** 27:3 28:22 42:6

**kind** 6:17 11:3 17:21,25

**knew** 21:13

**knowing** 17:21

**knowledge** 40:7,16

**KOP** 15:9,14

---

**L**

**labor-intensive** 42:12

**Latanya** 16:14

**latitude** 37:14

**law** 14:12

**layout** 18:24 20:4

**left** 14:20 17:1

**lessen** 29:18

**letter** 5:25 34:15 41:24

**Leveck** 15:10

**level** 19:8 26:15 36:3 43:24

**lied** 44:6

**life-threatening** 35:2

**limit** 19:15

**lingo** 18:18

**lip** 14:21

**list** 34:25

**listed** 7:2

**listen** 30:13

**located** 13:1,2

**location** 14:5 21:20,21 25:19 36:12

**lock** 28:20 29:13,21,25

**lockdown** 37:13

**locked** 28:24 29:3 38:5

**locking** 27:16 28:2 29:15,22

**locks** 27:22 28:3,10,16 29:5,8

**log** 40:11,13 41:7

**longer** 6:24

**looked** 33:3,9 35:7

**Lord** 31:4

**lot** 9:5 20:3 31:11,24 43:16,17

**lunch** 25:1

---

**M**

**made** 14:10

**mailbox** 31:14

**make** 6:13 8:22 9:5 19:15 25:25 29:4 42:6 43:21

**making** 26:16 32:9 42:9

**managed** 36:16

**manager** 41:1

**mandated** 14:15

**manipulate** 27:15,22 28:20 29:14,15,21

**manner** 30:18

**marked** 5:20 10:12 33:21

**meals** 23:2

**means** 4:21 15:17 17:5 21:8,19

**meant** 9:19

**mechanism** 28:3

**mechanisms** 29:15

**medical** 13:13,17 14:2,7,10 15:17,23 16:16 31:6 37:15

**medication** 15:15,17,22 16:24

**medications** 27:2 30:4,7 33:2

**meeting** 27:7

**member** 13:22 14:3 21:19 42:8, 22

**members** 35:9,21,22,23 40:10

**memory** 19:2 26:23

**mental** 13:9,12,14,15 14:7 27:3 31:6 41:1

**mentally** 40:19

**messed** 29:25

**met** 31:8

**Miller** 41:15

**mind** 33:25 34:24 40:12

**minimum** 43:2

**minute** 10:20 44:2

**mobility** 37:18

**monitor** 36:7 42:16

**month** 4:10 8:13

**Moore** 16:14

**move** 8:5 10:2 21:20

**moving** 19:23 36:11

---

**N**

**narcotics** 16:1

**nature** 23:9 39:2

**necessarily** 22:9 37:16

**needed** 20:21

**Nielers** 5:25 41:15

**night** 13:22

**non-affiliated** 35:22

**nose** 14:20

**notice** 4:20,25 6:3,23 7:7,11 9:12,18 44:9

**notify** 14:12 19:21 20:24

**number** 43:24

---

**O**

**Object** 29:11 37:6 38:7

**occur** 28:19

**offense** 40:2

**offenses** 39:21

**officer** 24:3

**officers** 23:22 24:23 26:8 27:1
42:15

**officially** 24:13 36:5

**on-the-job** 42:20

**open** 6:8,9 7:2 30:1

**opportunities** 28:17

**opportunity** 4:24 7:10 11:24
13:19 28:20 29:18 34:4,11

**order** 11:4,5 20:25 21:10,24 22:4
27:23

**orders** 37:21

**orientation** 42:19

**outcome** 30:11 39:7

**outright** 39:25

**oversight** 36:4

---

**P**

**packages** 21:9

**packs** 15:20

**paragraph** 41:10 44:10,11,12

**pardon** 34:20

**part** 20:11,16 42:13,20 43:9,11

**passage** 30:3

**pay** 37:3 43:17

**PC** 18:14 20:11

**PCI** 18:7,8,14,16 20:7,8,12,17
22:17 23:7,13

**pending** 18:13 22:19

**people** 22:19,23 23:15 24:15

28:23 30:6,19 33:16 38:5

**Peralta** 16:19

**Perfect** 9:25

**periodic** 42:25

**person** 8:17 13:13,16 14:3,8
15:15,22,23 16:25 17:4,6 19:18,
21 22:1 25:24 32:23 33:2 34:20
39:3,6 41:3

**personal** 8:2

**Petty** 11:18 12:3,12 13:20 14:18

**ph** 5:25 43:25

**physical** 10:8

**Physically** 18:20 40:19

**pick** 30:13

**pisses** 25:4

**place** 19:7 29:7

**placing** 36:14

**Pleasant-bey** 4:6

**pod** 13:1,9 15:12,13 19:25 36:10
37:14 38:19 39:9

**pods** 19:3 35:10,14,18,24 36:1
39:1 42:10

**point** 20:8 21:19 35:8

**policy** 12:21,22 21:10 37:2

**pop** 39:11

**pop-out** 42:7

**popping** 27:8,13,19 28:1,15
39:10,17

**population** 37:18

**portion** 8:11

**position** 4:15

**possession** 15:19

**postponed** 18:5

**potentially** 39:8

**power** 31:12

**practices** 29:17

**precipice** 35:1

**prefer** 5:14 11:1

**prepared** 7:13 10:4

**preservice** 42:19,24

**pretend** 18:18

**pretty** 42:11

**prevent** 10:8 36:6

**previous** 7:17

**previously** 10:12 33:21

**preying** 35:22

**primarily** 19:12

**prior** 28:12,14

**prison** 14:15 28:17 32:11 33:16
34:1,24 35:3 40:10

**prisoner** 13:21 14:19

**prisoners** 30:24 31:19 35:4

**prisons** 28:22

**privileges** 18:20

**privy** 44:24

**problem** 38:18,25 39:10 41:12

**problematic** 38:14,15

**problems** 28:14 34:25 37:20,22

**procedure** 13:25

**process** 19:20 20:13 42:12,13

**processes** 29:18 42:23

**produced** 34:19

**products** 22:9,11,12

**professional** 41:2

**Protect** 18:9

**protecting** 27:8,12

**protection** 19:8

**protective** 17:23 18:11,15,22
19:17,19,22,24 20:15,17,19,21,22
21:1 22:20 23:9 38:23

**protocols** 29:7

**provide** 25:17,18

**provided** 5:11

**punished** 39:12,22 41:12

**punishment** 23:3,5 24:13

**punishments** 21:23

**punitive** 23:9

**purchase**  22:18,21 23:14

**pursuant**  4:20 5:21,22

**put**  5:12 6:17 8:19,24

**putting**  31:24 33:20

---

**Q**

**quarterly**  21:9

**question**  12:2 34:5

**questions**  7:25 8:19 10:3

**quick**  8:7

**quote**  39:10

---

**R**

**Rafael**  16:19

**rape**  14:1,15,22 16:11

**raped**  13:22 16:8

**RCA**  21:14,15 23:8,11

**RCA/CHECK-IN**  38:19,20

**Re-notice**  5:20

**react**  25:14

**read**  10:21,23 11:11,24 26:5,11
  27:5,10 30:3,21 31:16,17 34:2,4,
  11 35:11 36:22 37:24 39:14,23
  40:4,5 41:16 44:18

**real**  8:7 30:19

**realistic**  29:19

**realtime**  42:23

**reasons**  29:6 31:7

**rec**  39:20

**recall**  12:4 16:18 24:21 26:22
  32:18 33:14,19

**receive**  15:9 33:2

**recently**  15:10

**record**  6:1,16,19 44:3,7

**reference**  12:21

**referencing**  17:22 20:1 21:11
  24:7 25:20 27:14,20 30:9

**referring**  23:19 25:11 38:2,22

**refuse**  21:16,17

**Refused**  38:21

**regard**  33:5,14

**religious**  8:11,14,24 10:13

**replaced**  18:13

**report**  17:5 30:25

**reported**  12:9 15:6 16:12 31:12

**reporter**  5:10,14,19

**reporting**  12:21 13:21

**reports**  14:1 24:15,18

**representative**  4:21 8:1 40:7
  42:2

**request**  16:24 20:15,17,19

**requested**  18:14 19:7 38:23

**requesting**  20:11

**Requests**  5:22

**required**  26:18

**requirement**  39:7

**requirements**  42:22

**rereading**  14:24

**resolved**  31:15

**responded**  31:21

**responding**  34:21

**response**  11:16,18 15:3 16:6,8,
  22,23 41:24

**responsibilities**  42:14

**responsibility**  43:12

**responsible**  34:21

**restricted**  13:2,3 15:12 19:14

**result**  35:2

**results**  39:3

**return**  39:8

**review**  7:10,17 11:22 13:19
  40:11,13

**reviewed**  11:15,17,21 15:1 34:7,
  10

**reviewing**  16:13 41:7

**reviews**  19:11

**rights**  17:24

**roam**  36:20 37:10,16

**roaming**  38:6

**routine**  28:2

**Rule**  5:21,22

**rules**  21:12

**run**  36:9

**RUSSELL**  4:1

---

**S**

**safe**  43:14

**safety**  19:16 29:4

**sanctions**  22:2,4

**satisfactory**  8:18

**save**  6:13

**scheduled**  17:9 18:3 27:2 30:5,7

**scope**  42:13

**scratch**  14:19,20

**screen**  6:11,22

**screened**  14:2,6

**scroll**  11:20 34:6,8

**scrolling**  8:11

**seasoned**  42:21

**sections**  8:12

**security**  29:16,17 42:15 43:5,11,
  12

**segregation**  21:13 36:14 37:17
  38:15,16,17,25 39:4

**separate**  14:4,5

**series**  12:11

**served**  22:13

**serves**  19:2

**service**  16:20

**services**  12:8

**set**  6:16 26:25

**setting**  37:17

**severity**  36:17

**share** 6:10

**shared** 31:4 35:21

**shelter** 27:8

**shifts** 43:9

**short** 9:1 44:5

**shorter** 8:23 9:6

**show** 42:22

**shown** 12:11

**sic** 36:20

**sick** 10:7

**side** 14:20,21

**similar** 32:21,24,25

**simply** 30:16 41:11

**sitting** 32:15

**situation** 23:8 24:9 28:5 36:16

**skip** 10:11,14

**skipping** 41:9

**slowly** 10:22

**small** 14:19

**Smith** 16:17

**snack** 22:15

**sort** 10:7 17:18 28:9 29:9

**sounds** 38:13

**speak** 29:12 44:23,25

**specialist** 29:13

**specific** 20:1 25:18 44:23

**specifically** 13:12 30:8 32:22,23
    33:5,14

**speculate** 17:17 24:7

**speculating** 17:16

**staff** 14:2 21:19 24:19 27:19 35:8,
    15,16 36:7 37:21 39:25 40:15
    42:15,18,21,22 43:6,12,14,24

**staffing** 9:14,15 43:20 44:16,22

**standpoint** 14:1

**stands** 18:16

**start** 10:24 11:2,9 14:11 19:9

**state** 19:21,22 33:25 34:24

**statement** 12:23 17:8 25:25
    26:15 28:21

**stationery** 22:9

**staying** 39:4

**struggles** 31:12

**stuck** 37:23 38:4

**stuff** 8:25 43:17

**subject** 28:2

**substantiated** 20:14

**Sunday** 13:22

**supervise** 36:9

**supervision** 14:3 36:3

**supervisor** 16:16

**supervisors** 43:5

**support** 12:7

**suppose** 15:9

**supposed** 16:25 43:8

**Supposedly** 17:9 18:2

**surely** 16:23

**suspension** 22:4 23:2,5

**sworn** 4:3

**system** 18:1 27:16 28:17

**T**

**taking** 13:18

**talk** 8:25 17:3 26:3 30:19

**talked** 8:12,14

**talking** 17:14 24:3,5 36:25

**tamper** 29:22

**TDOC** 14:12 20:9,24 21:9

**telling** 24:4

**tenants** 29:2

**tenure** 28:8

**terminology** 20:10

**testified** 4:3

**testify** 7:13 10:4 42:3

**testifying** 4:21

**testimony** 7:20,22 8:17 10:9
    37:5

**theirself** 19:14

**thing** 36:7,24

**things** 35:5,6,25 36:14 42:17
    43:6,7

**threaten** 31:5

**threatened** 40:3

**threatens** 35:2

**time** 5:11 6:18 7:20 17:19 18:12
    24:20 32:19 33:7 39:20 40:6 42:1

**times** 25:1,6,7 28:24

**title** 16:15

**today** 4:19 10:3,4,9 15:24 25:3,9
    32:15

**today's** 7:16,22 8:22

**told** 13:21 17:2 22:23 23:15 31:2

**tomorrow** 25:3,10

**tonight** 24:24 25:2

**top** 10:24 12:4 14:20 16:18 33:19
    40:12 41:8

**topics** 4:25 7:14 8:10,15 9:7,13

**trained** 42:16,18,24 43:19

**training** 42:20,21,25 43:2

**transferred** 20:9 39:4

**tray** 24:6,11

**trays** 24:16

**treat** 26:2,9 41:13

**treated** 27:4 31:20 33:12,17
    41:20

**treating** 30:23

**treatment** 14:9

**Tricia** 4:5 8:6

**Trousdale** 19:17 28:8 29:16 33:6
    34:1,24 43:3 44:16,22

**turn** 31:13 44:10

**Two-page** 5:23

**Tylenol** 16:4

**type** 13:6,7 15:22 17:11,13 19:11
    28:4 34:22

**types** 15:21 22:10 36:13 42:17

**typically** 15:20 19:7 22:8,15
27:19

---

### U

**Uh-huh** 34:9

**understand** 4:19 18:18,24 20:4,
21 21:1,12 37:5 38:11 42:7

**understanding** 14:14

**understood** 8:22 43:10

**unethical** 26:17

**unique** 33:4

**unit** 13:2,3,5,11 18:13,24,25 19:4,
6,18,25 26:21

**unofficially** 24:16 36:5

**untruthful** 28:21

---

### V

**varied** 34:22

**versus** 38:4,5

**Vice** 31:4

**victim** 14:6

**violation** 13:8

**violence** 9:16

**volume** 28:16,20

---

### W

**walking** 37:14

**Wampler** 15:8 16:8,11

**wanted** 8:20

**ward** 13:10

**warden** 4:5 6:5,20 8:3 9:6 12:7
15:4 25:13 26:14 27:18 32:5 40:6
41:25 44:25

**Washburn** 4:1,5 6:5,20 9:6 10:5,
18

**water** 27:8

**ways** 36:15

**week** 21:6 22:25 23:16

**weeks** 17:10 18:3 42:20

**WELBORN** 8:6,9 9:3,9,15,19,22
29:11 37:6 38:7

**wise** 18:20

**witnessed** 23:21 24:22

**Wonderful** 7:9

**work** 29:5,8 42:14

**worked** 16:16

**working** 29:10

**world** 30:20

**wreak** 27:1

**write** 31:9

**write-ups** 18:6 20:7

**writing** 5:15 31:23 36:12

**written** 26:6,12 27:6 28:10 31:17
35:12 36:23 37:25 38:9 39:15,19
41:18,22 44:19

**wrong** 20:11

**wrote** 32:2

**Wyllis** 16:17

---

### Y

**year** 43:1

---

### Z

**Zoom** 4:11 10:16