```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE MIDDLE DISTRICT OF TENNESSEE
 2                     NASHVILLE DIVISION

 3

 4   BOZA PLEASANT-BEY,            )
                                  )
 5      Plaintiff,                )
                                  )    Case No. 3:19-cv-00486
 6   VS.                          )    JUDGE TRAUGER
                                  )    JURY DEMAND
 7   STATE OF TENNESSEE, et al,   )
                                  )
 8      Defendants.               )
     _____X
 9

10

11

12

13   _____

14

15              DEPOSITION OF RUSSELL WASHBURN

16                 TAKEN ON APRIL 5, 2021

17

18   _____

19

20

21

22
     Prepared by:
23   Carole K. Briggs, LCR #345
     Briggs & Associates
24   222 Second Avenue, North, Suite 340M
     Nashville, Tennessee  37201
25   Briggscourtreporting@hotmail.com
```

```
 1                          APPEARANCES:

 2


 3


 4     FOR THE PLAINTIFF:


 5


 6     TRICIA HERZFELD, ESQUIRE
       JANNA MAPLES, ESQUIRE
 7     Branstetter, Stranch & Jennings, PLLC
       The Freedom Center
 8     223 Rosa L. Parks Avenue
       Suite 200
 9     Nashville, Tennessee  37203
       triciah@bsjfirm.com
10     jannam@bsjfirm.com

11

12     FOR THE DEFENDANT, STATE OF TENNESSEE:

13

14     THOMAS J. AUMANN, ESQUIRE
       NIKKI N. HASHEMIAN, ESQUIRE
15     Tennessee Attorney General's Office
       P.O. Box 20207
16     Nashville, Tennessee  37202-0207
       thomas.aumann@ag.tn.gov
17     Nikki.hashemian@ag.tn.gov

18

19     FOR THE DEFENDANT, CORECIVIC:

20

21     JOSEPH F. WELBORN, ESQUIRE
       ERIN PALMER POLLY, ESQUIRE
22     K&L Gates, LLP
       222 Second Avenue South
23     Suite 1700
       Nashville, Tennessee  37201
24     joe.welborn@klgates.com
       Erin.polly@klgates.com
25
```

1                          TABLE OF CONTENTS

2

3    Witness                                               Page

4

5
     RUSSELL WASHBURN
6
     Examination by Ms. Herzfeld                             5
7

8

9

10

11                         LIST OF EXHIBITS

12

13   Number     Description                                Page

14

15   1          social media post by                       197
                Chaplain Shonebarger
16

17

18

19

20

21

22

23

24

25

```
 1                    S T I P U L A T I O N

 2

 3

 4              The deposition of Russell Washburn, taken on

 5      behalf of the plaintiff, remotely via Zoom, by agreement

 6      of parties, on April 5, 2021, for all purposes allowed

 7      under the Federal Rules of Civil Procedure.

 8              It is agreed that Carole K. Briggs, licensed

 9      court reporter for the State of Tennessee, may swear the

10      witness, take his deposition, and afterwards reduce same

11      to typewritten form, and that the reading and signing of

12      the completed deposition by the witness is not waived.

13              All formalities as to notice, caption,

14      certificate, et cetera, are expressly waived. All

15      objections, except as to the form of the question, are

16      reserved to the hearing.

17

18      (Unless previously provided, all names are spelled
        phonetically, to the best of the court reporter's
19      ability.)

20

21

22

23

24

25
```

1           (Whereupon, the foregoing deposition

2           began at 9:08 a.m.)

3           THE COURT REPORTER:  Good morning.  We are on

4    the record.  Today is April 5, 2021 at 9:08 a.m.  At

5    this time, I would ask counsel to please introduce

6    yourself, who you represent, and that you agree to take

7    this deposition via Zoom.  We will start with Ms.

8    Herzfeld.

9           MS. HERZFELD:  Tricia Herzfeld and Janna

10   Maples for the plaintiff.  And we consent to take this

11   deposition by Zoom.

12          MR. WELBORN:  Joe Welborn and Erin Polly for

13   CoreCivic.  And we consent.

14          MR. AUMANN:  Tom Aumann and Nikki Hashemian

15   for the TDOC defendants.  And we consent to take this

16   deposition via Zoom.

17   Whereupon,

18               RUSSELL WASHBURN,

19   having been first duly sworn, was examined and deposed

20   as follows:

21   EXAMINATION BY MS. HERZFELD:

22       Q.   Good morning, Mr. Washburn.

23       A.   Good morning.

24          (Off-the-record technical discussion.)

25   BY MS. HERZFELD:

Page 6

```
 1          Q.    Could you state your name and spell it for
 2    the record, please.
 3          A.    It's Russell Washburn.  R-u-s-s-e-l-l.  Last
 4    is W-a-s-h-b-u-r-n.
 5          Q.    Okay, and what is your date of birth?
 6          A.    It is 5/15/1977.
 7          Q.    And Mr. Washburn, where are you employed?
 8          A.    I'm with -- employed at CoreCivic.
 9          Q.    What is your current position?
10          A.    Warden.
11          Q.    Warden of which facility?
12          A.    The Stewart detention facility in Lumpkin,
13    Georgia.
14          Q.    And how long have you been at Stewart?
15          A.    April 1st of 2020.
16          Q.    And what type of prisoners are housed at the
17    Stewart detention facility?
18          A.    Immigration.
19          Q.    So those would be civil detainees, not
20    criminal?
21          A.    Yes, ma'am.
22          Q.    Do you have any criminal detainees at
23    Stewart?
24          A.    Prior criminal, yes.
25          Q.    Okay, what do you mean by prior criminal?
```

1       A.      Means they had criminal -- they have a

2   criminal history, but they're all here for final order

3   for possible release or deportation that I actively have

4   here at the facility.

5       Q.      So when they're being held at Stewart

6   detention facility, they're being held as civil

7   detainees, though some may have a prior criminal

8   history?

9       A.      Yes, ma'am, that's correct.

10      Q.      And before you were at Stewart, where were

11  you located?

12      A.      Trousdale Turner Correctional Center in

13  Hartsville, Georgia -- Hartsville, Tennessee, sorry.

14      Q.      That's okay.

15      A.      Think about where I'm at.

16      Q.      And how long were you at Trousdale?

17      A.      Just shy of three years.  I went in May of

18  2017 and left the end of March of 2020.

19      Q.      And why did you leave?

20      A.      To get closer to my daughter and our new --

21  our newly born grandson.

22      Q.      Are they in Georgia?

23      A.      No, they're in Florida.  So we're about six

24  hours closer.

25      Q.      Oh, well, that makes a big difference.  Is it

1   a boy or girl?

2       A.    Boy.

3       Q.    Oh, you said grandson.  Well,

4   congratulations.

5       A.    Thank you.

6       Q.    That's such a blessing.  And before you were

7   at Trousdale where were you?

8       A.    I was the warden at the Citrus County

9   Detention Center in Lecanto, Florida.

10      Q.    And are those criminals, immigrants?  Who is

11  held at the Citrus County facility?

12      A.    Well, it's a county jail, so we have

13  pretrial, but we also had multiple contracts.  I had

14  U.S. Marshal population that was also pretrial.  And I

15  had the U.S. Virgin Islands population, which all were

16  convicted.

17      Q.    Were you a CoreCivic employee when you were

18  running that facility?

19      A.    Yes, ma'am.

20      Q.    And which county in Florida is that in?

21      A.    Citrus County.

22      Q.    Where is Citrus County?

23      A.    Lecanto, Florida.  It's central Florida.

24  It's about 70 miles north of Tampa.

25      Q.    How long did you work there?

```
 1      A.    Close to seven years.

 2      Q.    What was your position?

 3      A.    Warden.

 4      Q.    And before you were at Citrus County, where

 5 were you employed?

 6      A.    Hernando County jail with CoreCivic as

 7 warden.

 8      Q.    Where is Hernando County?

 9      A.    It's the neighboring county to Citrus County,

10 so it's probably about 50 miles north of Tampa.

11      Q.    What type of population was housed at the

12 Hernando County jail, pretrial?

13      A.    Pretrial, yes, ma'am.  We had county jail

14 inmates.  And at that facility, we also had U.S.

15 Marshal.

16      Q.    Did you have immigration detainees?

17      A.    We did at a period of time.  I'm not -- I

18 don't believe we had any at the conclusion when I left.

19 But we did during my tenure there, yes.

20      Q.    How long were you employed there?

21      A.    I was there twice.  That time, I believe it

22 was four years.

23      Q.    Roughly what years were you employed there

24 that time?

25      A.    Let's see, I left there in '10.  I would have
```

1   went back to Hernando in -- I believe it was 2006.  And

2   then left in 2010.

3          Q.    And before you were at Hernando, where were

4   you?

5          A.    I was at the Gadsden Correctional Facility in

6   Quincy, Florida.

7          Q.    And what type of a facility is that?

8          A.    That was an all female convicted felons for

9   the State of Florida.

10         Q.    And what was your position?

11         A.    Assistant warden.

12         Q.    So the first time you were warden, was that

13  at the Hernando County jail?

14         A.    Yes, ma'am.

15         Q.    And how long were you at the Gadsden

16  facility?

17         A.    Really stretching my memory here.  Let's see,

18  I think I went there -- it was '03 or '04, I believe I

19  went to Gadsden.  And then subsequently transferred to

20  Hernando from there.

21         Q.    What is your educational background?

22         A.    I graduated high school.  Went through the

23  law enforcement correctional academy in the State of

24  Florida.  Obtained my certification in the State of

25  Florida.  Do not have a college degree.

1        Q.    What year did you receive your certification?

2        A.    1997.

3        Q.    So we'll get back to your career history in a

4    minute.  Have you ever been deposed before, Mr.

5    Washburn?

6        A.    Yes, ma'am.

7        Q.    I can tell by the way that you are answering

8    so concisely and answering my questions.  You are being

9    such a good witness that you definitely have been

10   deposed before.  How many times would you say?  You can

11   approximate.

12       A.    A pure guess, 13, 14 times.

13       Q.    And what types of cases have those been?

14       A.    They've been all with CoreCivic.  Primarily

15   inmates' suits, lawsuits.

16       Q.    Have you ever testified in a deposition about

17   anything involving Trousdale, the Trousdale facility at

18   CoreCivic?

19       A.    Yes.

20       Q.    Okay, how many times?

21       A.    One, I believe.

22       Q.    And what was that case about?

23       A.    The -- let me make sure I'm referencing the

24   right case.  I don't know if I can ask Ms. Polly.  I

25   don't want to wrongly state.

Page 12

```
 1              THE WITNESS:  Can you remind me of that case

 2   or no, can I not do that?

 3              MR. WELBORN:  Just tell her what you

 4   remember.

 5              THE WITNESS:  Honestly, I'd have to go back

 6   and look to see what the case information was.

 7   BY MS. HERZFELD:

 8       Q.   Okay.  And do you have some notes there in

 9   front of you?

10       A.   I don't.  I have my note pad, I was going to

11   write it down to look.  Here, I'll show you, it's blank.

12       Q.   Okay, very good.  So we'll just -- we'll take

13   a break -- when we take a break, we'll see if you can

14   remember what that case was about.  Do you remember

15   anything at all?

16       A.   Not right now.

17       Q.   Was it about religion?  Was it about

18   violence?  Was it about anything -- you can't remember

19   anything at all?

20       A.   No, I would have to go back and look.  I'm

21   sorry.

22       Q.   Okay.  And when was that deposition that you

23   gave?

24       A.   It was a few weeks ago.  I don't remember

25   exactly what the time frame was.
```

1       Q.    And was it a prisoner case?

2       A.    Yes.

3       Q.    And was there a lawyer that was deposing you

4    or was it the prisoner?

5       A.    A lawyer.

6       Q.    And do you remember if the lawyer was a male

7    or a female?

8       A.    Male.

9       Q.    And do you remember his name?

10      A.    I do not.

11      Q.    How long would you say you were deposed for?

12      A.    A couple of hours.

13      Q.    Did it last after lunch?

14      A.    No, I don't believe I did.

15      Q.    Did you do it via Zoom like we're doing here?

16      A.    Yes, ma'am.

17      Q.    Okay, great.  Just give me one second.  Okay,

18   and so going back -- go ahead.

19      A.    I'm sorry.  I just completely had -- I

20   remember what it was referencing.  It was a PREA case.

21      Q.    Oh, okay.

22      A.    Yeah, I was completely drawing a blank, so my

23   apologies.

24      Q.    It happens and I appreciate the fact that you

25   corrected me.  Fantastic.

1       A.     No, it was on a PREA case, so I apologize.

2       Q.     What were the allegations in that PREA case?

3       A.     I don't know all of the specific allegations.

4    I know what -- it was the detainee indicated that, I

5    believe it was he didn't get appropriate medical care

6    following the reports of the preallegation.  And

7    specifically what the allegations were against me,

8    honestly, I don't recall specifics on that.  But I know

9    the gist of the complaint was that he didn't feel he got

10   adequate mental -- I believe it was mental health, not

11   necessarily medical treatment following the allegation.

12      Q.     And would you know if that was the Plemmons

13   case?  Does that sound familiar, Plemmons?

14      A.     No, I don't think that's the right name.

15      Q.     Do you know who Mr. Plemmons is?

16      A.     I know the name, but I don't know why I know

17   the name.

18      Q.     And this is the case of Mr. Pleasant-Bey.  Do

19   you know who Mr. Pleasant Bay is?

20      A.     I do.

21      Q.     And how do you know him?

22      A.     Well, be careful how I say this.  I mean,

23   just through conversations with my attorneys.

24      Q.     Okay.  But other than conversations with your

25   attorneys, do you have any independent recollection of

1    who Mr. Pleasant Bay is?

2         A.    No.

3         Q.    So he wasn't somebody that you knew when you

4    were a warden at Trousdale?

5         A.    I'm sure I had conversations with him.  I

6    mean, there was average population of 2400 plus, so to

7    say I remember anyone specific, I would be lying to say

8    that.

9         Q.    But so as you sit here today, you don't have

10   any specific memory of Mr. Pleasant Bay from your time

11   at Trousdale?

12        A.    No, ma'am.

13        Q.    Have you had an opportunity to read the

14   complaint in this case?

15        A.    I have not.

16        Q.    When were you notified of your deposition

17   today?

18        A.    I was notified not last week, but the week

19   before.  I am not sure of the exact day.

20        Q.    Are you aware of what the allegations are in

21   this case?

22        A.    Yes, I believe so.

23        Q.    Okay, and what is your understanding of what

24   the allegations are?

25               MR. WELBORN:  Objection to the extent those

 1   -- your understanding of the allegations come from

 2   counsel.

 3              THE WITNESS:  Correct.

 4              MS. HERZFELD:  I believe I am allowed to ask

 5   him if he knows what this case is about.

 6              MR. WELBORN:  That's fine, but with the

 7   understanding that his understanding comes from

 8   conversations with us, I believe.

 9              THE WITNESS:  That is a correct statement.

10   BY MS. HERZFELD:

11       Q.    And what is your understanding of the

12   allegations in this lawsuit?

13       A.    My understanding is the fact that something

14   to do with religious practice or religious rights.  I'm

15   not sure of the specifics to that.  And my understanding

16   is a violent incident.  It's not a full understanding of

17   what specific as it relates to violent incidents.

18       Q.    And what did you do to prepare for today's

19   deposition?

20       A.    Just had conversations with my legal counsel.

21       Q.    When were those conversations?

22       A.    Friday.

23       Q.    And Friday is the only day that you spoke

24   with your counsel to prepare for this deposition?

25       A.    Yes, ma'am.

1       Q.      How long did you speak with your counsel on

2   Friday?

3       A.      Approximately two hours.

4       Q.      Okay, back to your work history.  So you got

5   your certificate back in 1997.  And it looks like you

6   were the assistant warden in Gadsden in about '03.

7   Could you walk me through where you worked in between.

8       A.      Do you want me to -- it might be easier if I

9   start at the beginning and work my way through so I

10  don't confuse myself.

11      Q.      That's fine.

12      A.      So I started at the Hernando County jail in

13  1996 as a correctional officer.  I advanced through

14  multiple ranks at the Hernando County jail up to the

15  position of training manager prior to my departure.  And

16  I want to say that departure was in 2000, somewhere

17  around that time frame.

18              Went to Tulsa, Oklahoma, which was the David

19  L. Moss Criminal Justice Center, as a promotion to chief

20  of security.  That was another county jail.  We housed

21  county inmates for Tulsa.  And then also housed U.S.

22  Marshals at that particular facility.  Remained there as

23  a chief of security for approximately a year.

24              Did a lateral transfer to Gadsden

25  Correctional Facility as a chief of security.  Promoted

1    to assistant warden.  Prior to leaving Gadsden, did a

2    lateral transfer back to the Hernando County jail as an

3    assistant warden.  And then promoted to warden at the

4    Hernando County jail.  And then you have progression

5    from there to Citrus and then to Trousdale.  And now to

6    my current position here at Stewart.

7         Q.    And have you been a CoreCivic employee your

8    entire career?

9         A.    Yes, ma'am.

10        Q.    Do you understand that you're a defendant in

11   this case?

12        A.    Yes, ma'am.

13        Q.    And you haven't read a copy of the complaint?

14        A.    No, ma'am.

15        Q.    Has one been provided to you?

16        A.    Not that I am aware of.

17        Q.    Who was the chaplain at Trousdale when you

18   were working there?

19        A.    I had a couple.  I had Shonebarger was the

20   chaplain.  I don't remember the other gentleman's name

21   who transferred to one of our other facilities.  Sorry,

22   I don't recall his name.  I think he's still with us.

23   He might be at one of our other facilities.  I think he

24   transferred -- I know he transferred to Nevada Southern.

25   I'd have to go back and pull it up, but I can't recall

1   his name.

2        Q.    Okay, you remember Shonebarger.  Was he there

3   the majority of the time you were there?

4        A.    He was there the entire time.

5        Q.    And what is Mr. Shonebarger's job

6   description, if you could just tell me in a review?

7        A.    He is the chaplain, so he provides

8   nondenominational guidance and resources to all of the

9   inmate population.  Coordinates volunteers to provide

10  services to the population.  He also serves as a guide

11  to the administration to ensure that we understand the

12  religious requirements and that we're in -- the facility

13  is in order with those.  He facilitates schedules for

14  those services in conjunction with the security staff.

15  He also does, you know, emergency notifications to

16  family members.  And of course, provides some guidance

17  to staff or support, I should say, to staff when needed.

18       Q.    Was Tom Sivak (phonetic) the name of the

19  other --

20       A.    Yes, ma'am, thank you.

21       Q.    Okay, great.  And when you say that the

22  chaplain is providing those services for people who are

23  at Trousdale, is there a particular religious

24  denomination that he does that for?

25       A.    No, I mean, nondenominational.  He has to

 1    provide services to all, recognize the religions,

 2    whether he personally or through documentation, through

 3    volunteers, through various other technology that may be

 4    available.  So he would have to provide any recognized

 5    religious faith.

 6          Q.    What were the recognized religious faiths

 7    while you were at Trousdale?

 8          A.    I would be lying.  That's not my area of

 9    strength.  So you know, again, there is TDOC policy.

10    I'd have to refer back to the policies that define

11    those.  But to say I can recall each of the religions

12    that were recognized by memory, I couldn't do that.

13          Q.    Can you recall any?

14          A.    I mean, sure.  Christian.  You got Muslim.

15    You have Catholic services.  There's a good number, but

16    those are the three that most prominently stand out to

17    me.

18          Q.    Okay, what about Jewish, the Jewish religion?

19          A.    I believe so, yes.

20          Q.    What was the primary religion of the

21    prisoners?  What was the religion of most of the

22    prisoners, if you know?

23          A.    I don't know.

24          Q.    And when you said you're referring to TDOC

25    policy, which TDOC policy are you referring to?

1      A.    Again, I would have to go back.  I don't know

2   the number off the top of my head.  I mean, it's their

3   religious policy.

4      Q.    And when you refer to a religious policy from

5   TDOC, what would you be looking for?

6      A.    Policy would govern how we operate in the

7   religious aspect and how we meet the inmates' needs and

8   requirements.

9      Q.    As warden of Trousdale, you have how many

10  sets of policies that you follow.  Meaning TDOC,

11  CoreCivic, is there anything else?

12     A.    No.  I mean, it would be TDOC and CoreCivic

13  policy.  But hundreds, hundreds of policies.

14     Q.    In CoreCivic policies, were there specific

15  CoreCivic policies on religion?

16     A.    We have policies, but I would say at

17  Trousdale, we primarily followed the TDOC policies.

18     Q.    Were there specific policies for Trousdale

19  regarding religion?

20     A.    No, that varied from -- if I'm understanding

21  the question, different TDOC policies specific for

22  Trousdale?

23     Q.    Yes, sir.

24     A.    No, ma'am, not that I am aware.

25     Q.    And what training did you have on the TDOC

 1   policies that you needed to implement?

 2        A.    No formalized training that I received.

 3        Q.    And if there was a question about how a

 4   policy should be implemented, what would you do?

 5        A.    I would consult with either the chaplain, the

 6   TDOC officials, the contract monitor that was there on

 7   site.  We actually had two contract monitors that were

 8   there full-time.  Or consult with the religious staff

 9   there at our headquarters in Nashville.

10        Q.    Okay, so the chaplain we talked about, that

11   was Chaplain Sivak and Chaplain Shonebarger; is that

12   right?

13        A.    Yes, ma'am.

14        Q.    Okay, and then TDOC officials that you said

15   you would consult with if you had questions, who would

16   those TDOC officials be?

17        A.    Chris Brun would have been the contract

18   monitor at the facility that I would have consulted

19   with.

20        Q.    And what does a contract monitor do?

21        A.    He monitors our operations, meaning

22   CoreCivic's operation at the facility, to ensure that

23   the things that we're doing are consistent and in

24   compliance with contract requirements.

25        Q.    When you say contract, which contract are you

1    talking about?

2        A.    The Tennessee Department of Corrections.  It

3    was the only contract that Trousdale had with the

4    Tennessee Department of Corrections.

5        Q.    And so just to make it a little bit more

6    clear for the jury, when you are talking about a

7    contract, that's because CoreCivic is not affiliated

8    with TDOC; is that right?

9        A.    That's correct.  We provide services for

10   care, custody and control of inmates for the Tennessee

11   Department of Corrections through a contract.

12       Q.    Okay, and CoreCivic is a for-profit

13   corporation; is that correct?

14       A.    Yes, ma'am.

15       Q.    And you are employed by CoreCivic, not by

16   TDOC; is that right?

17       A.    That's correct.  Yes, ma'am.

18       Q.    Okay, and so the contract monitors are there

19   to make sure that the terms of the contract between TDOC

20   and CoreCivic are being enforced?

21       A.    That's correct.

22       Q.    And who were the contract monitors at TDOC --

23   I'm sorry, at Trousdale at the time that you were

24   employed there?

25       A.    Chris Brun was the primary.  I forget the

Page 24

```
 1    other gentleman's name.  He had just come shortly before

 2    my departure.  The majority -- from the time that I

 3    arrived at Trousdale until the time that I left, Chris

 4    Brun was in place.

 5         Q.    Is Chris Brun a TDOC employee or a CoreCivic

 6    employee?

 7         A.    TDOC employee.

 8         Q.    Does he have an office at Trousdale?

 9         A.    He does.

10         Q.    Does he go to that office at Trousdale every

11    day --

12         A.    Yes.

13         Q.    -- the time that you were warden at

14    Trousdale?

15         A.    Yes, ma'am.

16         Q.    And where is his office located in relation

17    to yours?

18         A.    I believe it was either two or three doors

19    down from my door when I was there.  I can't answer for

20    today.

21         Q.    Is that like an executive suite?

22         A.    The -- what we call the administration area.

23         Q.    What would the contract monitor do day to

24    day?

25         A.    I mean, obviously, we would talk daily.  He
```

1    would conduct rounds throughout the facility, inspecting

2    practice and inspecting documents to ensure that what

3    we're doing is compliant with policy.

4         Q.    Did Mr. Brun ever alert you to anything that

5    you were doing that was not in compliance with policy?

6         A.    I'm sure in the three years or close to three

7    years, yes, ma'am, I'm sure he did.

8         Q.    Can you think of any time in specific?

9         A.    Segregation rounds, I think was one of them,

10   where staff had missed maybe conducting rounds at the

11   durations or at least documenting that they had

12   conducted the rounds in segregation at the designated

13   times.

14        Q.    Anything else?

15        A.    Again, I'm sure there was quite a few things

16   throughout that three years.  But to say I can draw from

17   memory the specifics, I can't.

18        Q.    And so if the contract monitor was alerting

19   you to something you were doing that was out of

20   compliance, is that documented someplace?

21        A.    Yeah -- well, not always.  Sometimes it's a

22   verbal notification.  They did -- Tennessee Department

23   of Corrections had what, I believe it was CDRs, which

24   was contract deficiency reports that would be generated

25   in the event that there was something that was found

 1   outside of the compliance of policy.  I'm sorry, of

 2   contract, not policy.

 3        Q.    And is there a policy on these contract

 4   deficiency reports?

 5             MR. AUMANN:  Objection to form.

 6             THE WITNESS:  I don't know whether they had a

 7   specific policy for the contract monitor to follow or

 8   not.

 9   BY MS. HERZFELD:

10        Q.    And when you said sometimes there was just a

11   verbal discussion, give me some examples of that, if you

12   can recall.

13        A.    Yeah, I mean, we could be walking along and,

14   you know, an inmate walk by that didn't have on his arm

15   band, for say, that requires to have an arm band on

16   before they exit the unit.  You know, he would come up

17   and say, warden, those are -- you know, the inmates are

18   required to be wearing their arm bands.  And so we would

19   immediately address that type of situation.

20        Q.    Okay, but that type of situation wouldn't

21   have been written down anywhere to your knowledge?

22        A.    Not to say that it wasn't, but I don't

23   believe I ever received a CDR or anything that I am

24   aware of specific to arm bands.  But again, I would be

25   drawing from memory, so I can't say for certain that

1    there wasn't.

2         Q.    And when there was a contract deficiency

3    report, you would receive a copy?

4         A.    Yes, ma'am.

5         Q.    How would you receive a copy?

6         A.    It would typically come by via e-mail.  And

7    then Chris Brun would historically provide a copy or a

8    printed copy as well.

9         Q.    And do you know if those were filed away or

10   stored someplace?

11        A.    Yes, they would be stored within the quality

12   assurance manager's office.

13        Q.    Who was the quality assurance manager?

14        A.    When I left, it was Beverly Atwood.

15        Q.    What is the job of the quality assurance

16   manager?

17        A.    It's to ensure that we're operating in

18   compliance with American Correctional Association

19   standards, ACA.  To ensure that we are operating in

20   compliance with our contracts.  That we are operating in

21   compliance with audit standards, whether that be the

22   Tennessee Department of Corrections, whether that be

23   CoreCivic audit standards, ACA standards.  So that's

24   their primary role.

25        Q.    And that quality assurance manager, are they

Page 28

```
 1    employed by CoreCivic or TDOC or somebody independent?

 2        A.    CoreCivic.

 3        Q.    So if there was a contract deficiency report,

 4    that information would have gone to quality assurance,

 5    who is a CoreCivic employee, and filed away or kept

 6    wherever it is it's kept?

 7        A.    It would have been sent to -- we require --

 8    we process them and have to respond back to those

 9    contract deficiency reports to the partner which, in

10    this case, was Tennessee Department of Corrections.  So

11    it wouldn't be just that we filed them and did nothing

12    with them, it would be that we acted upon those.  We

13    respond back to the partner and how we address that

14    specific contract deficiency.  And then the contract

15    monitor would then follow up to ensure that the practice

16    that we put in place did, in fact, address wherever the

17    contract deficiency was.

18        Q.    And can you recall a time where you were

19    notified of a contract deficiency, you fixed it and the

20    contract monitor said no, still not good enough?

21        A.    Again, I'm sure there was, but to recall from

22    memory, I would have to go back and look at reports.

23        Q.    Were there any other reports that you know

24    that would have been generated or any other paperwork

25    about compliance with the contract if there was a
```

1    deficiency?

2         A.    No.

3         Q.    What other positions are housed in the

4    administrative office?

5         A.    Let's see, of course the warden's secretary.

6    I'm just going to kind of work my way around so I don't

7    miss any.

8         Q.    Sure.

9         A.    You have the human resource had a couple of

10   offices in that area.  Quality assurance manager.  The

11   facility investigator.  Of course, the two contract

12   monitors.  I don't think I missed anybody.  I think that

13   might be it.  Mail room.  Sorry, I did forget mail room.

14        Q.    Do you know why there's two contract

15   monitors?

16        A.    There was -- when I first arrived at

17   Trousdale, there was only one.  They increased it to

18   two.  I will tell you, the primary -- seemed like their

19   duties were somewhat broken down.  One was more with the

20   operational compliance aspect, where the other one was

21   more services compliance, with like medical -- over

22   medical and various other services that would be

23   provided.  That's probably the best description I could

24   give to the breakdown.  And Trousdale is a large

25   facility.

1        Q.    And so after you had been there for about how

2   long had they brought on the second contract monitor?

3        A.    A year-and-a-half, maybe two years.

4        Q.    What is a facility investigator?  What do

5   they do?

6        A.    They conduct internal investigations at the

7   facility.  They also provide assistance to the Tennessee

8   Department of Corrections investigative bodies, local

9   law enforcement.  They investigate not only inmate

10  issues internally, they also investigate the employee

11  type of situations internally as well.

12            If it was something that was being handled by

13  the Tennessee Department of Corrections, then they just

14  simply add -- provided assistance to the investigators

15  that were actually in the lead on the investigation.

16       Q.    And so when you're talking about

17  investigations, let's talk about investigations of

18  prisoners first.  Are you talking about what, if

19  somebody stole somebody's something or what type of

20  investigation?

21       A.    That could be.  A PREA allegation could be

22  one.  And then more often than not, that was a supported

23  role because any of the PREA allegations the Tennessee

24  Department of Corrections investigated, so they're more

25  of a support mechanism to those individuals.

1              But yeah, I mean, it's really anything that

2    would not have been escalated to a criminal

3    investigation.  The facility investigator is not a

4    criminal investigator, so if it was criminal in nature,

5    then that would obviously be handled by outside

6    resources.  And then just provide that assistance.  It's

7    all more administrative type of investigations inside

8    the facility.

9         Q.    Okay.  And so when you said the facility

10   investigator also investigates staff, what types of

11   situations would they be investigating for staff?

12        A.    Again, those vary.  Non-criminal, of course.

13   They would not be a criminal investigation.  But if we

14   had an example where we used the contract monitor

15   indicating that staff weren't necessarily conducting the

16   watch tours as designed, the investigator would then be

17   tasked with going back, reviewing video to determine did

18   the staff just simply neglect to document that they

19   completed the sets of rounds and they actually had

20   physically done them, or hey, they didn't do them nor

21   did they document them.  So that may be something that

22   they would investigate.

23        Q.    And I might have asked you this already, who

24   was the facility investigator when you were present?

25        A.    It was Amber Woods.

```
 1      Q.    Is Ms. Woods a TDOC employee?

 2      A.    No, CoreCivic.

 3      Q.    And if there was an issue with a contract

 4  deficiency report, would Ms. Woods be involved in that

 5  process and procedure at all?

 6      A.    Only if it required some level of

 7  investigation.

 8      Q.    You said if you had questions about

 9  implementations of any policies regarding religion,

10  other people you might call were the religious staff at

11  headquarters in Nashville.  Who would that be?

12      A.    Well, at the time, it was Tim O'Dell was the

13  head of our chaplaincy services.  So I would reach out

14  to Mr. O'Dell.  He is no longer -- he is retired now,

15  but it would have been Tim O'Dell.

16      Q.    And do you recall reaching out to Mr. O'Dell

17  with any questions about religious policies and how they

18  should be implemented?

19      A.    You broke up.  Could you repeat the question.

20      Q.    Sure.  I'm so sorry about that.  It looks

21  like the internet just kind of flickered there for a

22  minute.

23            (Technical issues.)

24  BY MS. HERZFELD:

25      Q.    My question was did you ever have cause to
```

1   call over to Mr. O'Dell at headquarters in Nashville to

2   ask questions or get advice on implementation of a

3   religious policy?

4       A.    I had conversationed with Mr. O'Dell pretty

5   regular.  To recall any specific conversations, whether

6   it was related to a policy, again, just to go off of

7   memory, I couldn't specifically say yes to that

8   question.

9       Q.    During your time when you were warden at

10  Trousdale, can you recall any time that you tried to get

11  clarification on a TDOC or CoreCivic policy having to do

12  with religion?

13      A.    No.

14      Q.    Did the chaplain ever come to you and say,

15  I've got some questions about these religious policies

16  or how to implement them?  Did you ever have a

17  conversation like that?

18      A.    Again, I'm sure we had -- I mean, we had

19  conversations regularly about various topics.  I'm sure

20  that was a topic of conversation.  But to draw specifics

21  to a specific conversation, I can't.

22      Q.    And turning to your time at Trousdale as the

23  warden, could you please list for me all religious

24  services and accommodations that Trousdale made for

25  Muslim prisoners?

1        A.    When you say made, what is that?  Can you --

2        Q.    How about which services did you provide for

3    Muslim prisoners?

4        A.    Again, I can't -- no, I couldn't tell you all

5    specifics, no, ma'am.

6        Q.    Can you tell me any?

7        A.    I mean, we provided them with the opportunity

8    and the area and the location to commence their

9    services.  Honestly, whether or not we were successful

10   in recruiting volunteers for the Muslim services, I

11   can't recall.  I do know that that's one that's commonly

12   very challenging to find volunteers to come in to

13   provide the service.

14             But at Trousdale, I can't say specifically

15   whether we were successful in recruiting a Muslim

16   volunteer or not.  But I do know that we provided them a

17   space and a location to practice their faith.  And it

18   was done in the -- within the educational building, I

19   believe in the chaplain location.  Or the chapel

20   location.

21       Q.    And when you say recruiting volunteers, what

22   do you mean?

23       A.    Meaning that we -- again, part of the

24   function, as I said previously with the chaplain, was to

25   try to recruit and solicit volunteers for various

1    services and faiths, so that those individuals could

2    come into the facility to assist in providing that

3    religious service to the population.

4          Q.    So when you talk about recruiting volunteers,

5    would that be like an elder in the religion or an Imam

6    or just somebody off the street who would come and pray

7    with people?  I just want to make sure I understand.

8          A.    No, it would have to be somebody that would

9    have to be vetted and verified, go through the

10   background screening process to ensure that they have

11   the appropriate background, appropriate credentialing,

12   whatever it may be required of that specific faith.  So

13   no, it's not just go pick somebody off the street.

14   It's, you know, they fill out an application.  They have

15   to go through the whole process, much like employment,

16   to ensure that they're appropriate to come inside the

17   facility.

18         Q.    Who would handle the processing of that

19   application?  Would that be the chaplain?

20         A.    It would be the chaplain, yes, ma'am.

21         Q.    And then you said that you know that they

22   were provided space and a location to have their

23   services and that was in the education building?

24         A.    Yes, ma'am, that's where the chapel -- we had

25   two chapel locations.  We had one that was in the

1   W-unit.  But primarily the one that was used, and I

2   believe was used for the Muslim access as well, was the

3   chapel located in the education building.

4        Q.    Could you describe that chapel for me?

5        A.    I mean, it's a large room with chairs.  It's

6   got a podium.  Some equipment in there for a choir and

7   the group that goes in there.  Religious materials for

8   checking out or to review while they are in the chapel.

9        Q.    Do you know if there is any Christian

10  iconography in that chapel?

11       A.    I'm sure there is, but to say that I can say

12  specific, I cannot.

13       Q.    And I guess my question is, is there a big

14  cross up?

15       A.    Honestly, I don't -- I can't recall.  I don't

16  think there is, but I don't want to say for certain.  It

17  wouldn't be out of character to see one in a prison

18  facility, but I can't recall specifically about

19  Trousdale.

20       Q.    Do you know how often the Muslim prisoners

21  were given that opportunity, that space to have their

22  services?

23       A.    No, ma'am, I would have to go back and refer

24  back to the schedule.

25       Q.    And what schedule are you referring to?

 1        A.    Fair to say that the chaplain would do a

 2   monthly schedule as to what services.  As you can

 3   imagine, there was multiple uses of that particular

 4   area.  So he would have to create a schedule that would

 5   allow the appropriate level of access to all religious

 6   faiths.

 7        Q.    And where would those schedules be stored?

 8        A.    I'm sure he stored them in the chapel, but

 9   they were also sent out to and posted in the units for

10   the population to see and then sent out to all of the

11   staff.

12        Q.    So other than the time to pray that was on

13   the schedule that the chaplain created, do you know if

14   Muslim prisoners were allowed to pray during the times

15   that they need to pray during the day individually?

16             MR. AUMANN:  Object to form.

17   BY MS. HERZFELD:

18        Q.    You can answer.

19        A.    All right.  So yes, I mean, anybody that

20   wants to practice their faith regardless, certainly had

21   the opportunity to do that in their cell, within their

22   area of living.  So to answer that, yes, anyone would

23   have had that ability to do that.

24        Q.    During your time as warden at Trousdale, did

25   you ever see Muslim prisoners stopping and praying?

```
1        A.     During like cell inspections, yes.

2        Q.     Explain to me what you mean by during cell

3    inspections.

4        A.     Each morning we would do an inspection of

5    specific areas throughout the facility and actually do a

6    well-being check of the inmates.  Look at their area of

7    responsibility to make sure that it was clean, it was

8    organized and appropriate.

9        Q.     Okay, and you would see prisoners praying at

10   that time?

11       A.     I did see that, yes, ma'am.  Or just general

12   rounds.

13       Q.     What about prayer rugs, did you see prisoners

14   with prayer rugs?

15       A.     Yes.

16       Q.     And in what context did you see that?

17       A.     I saw them within their cells.  I saw them

18   carrying them to and from the chapel locations.  So

19   yeah, that would be the places I would have saw.

20       Q.     Do you know if Muslims are designated as a

21   security threat group at Trousdale?

22       A.     They are not classified as a security threat

23   group.

24       Q.     Are they classified as any sort of a

25   particular group other than religious?
```

Page 39

1        A.      No.

2        Q.      Have Muslims at Trousdale ever been

3   designated as a security threat group?

4        A.      Not to my knowledge.

5        Q.      Do you know what khuffein is?  Prayer socks,

6   Muslim prayer socks?

7        A.      I have heard of them, yes.

8        Q.      What do you know about khuffein?

9        A.      Just what you just said, that they are a

10  sock.  I am not sure what they represent or anything of

11  that nature.

12       Q.      Do you know if Muslim prisoners at Trousdale

13  are permitted to purchase the Muslim prayer socks, the

14  khuffein?

15       A.      Those are the leather-type socks; is that

16  correct?

17       Q.      I believe so.

18       A.      Then the answer would be no.

19       Q.      Okay, and why is that?

20       A.      Because they pose a security risk.

21       Q.      You're going to have to help me out because I

22  haven't been a warden before.  What about prayer socks,

23  what about these leather prayer socks would be a

24  security risk?

25       A.      Anything that's leather, obviously, could be

1    used to help defeat -- could be used in the commission

2    of an escape, either to defeat and protect the person

3    from the razor wire.  That particular facility also had

4    a stun fence on it.  That could be used as an insulator

5    to prevent that person from being -- the stun fence from

6    working properly the way it's designed to work.  So

7    really, it would be a concern that it could be -- they

8    could be used as a commission to escape from the

9    facility.

10        Q.    Is that written in policy somewhere?

11        A.    I do not know.  I don't believe so, no.

12        Q.    And who makes that decision and

13   determination?

14        A.    It would typically be the chief of security,

15   the assistant warden of operations and myself.

16        Q.    Who was the chief of security at that time?

17        A.    I had several.  Ruben Risper as the chief

18   when I left, chief of security.

19        Q.    And can you recall any others?

20        A.    Let's see, who do I have before?  Risper was

21   there the bulk of the time that I was the chief.  You

22   had Keith Huggins was also the chief of security there.

23        Q.    And if I understood your testimony correctly,

24   that decision would have been made by you, the assistant

25   warden and the chief of security; did I understand that

1    correctly?

2         A.    Yes, ma'am, that's correct.

3         Q.    And was there ever a time when you were

4    called upon to make that decision to say no khuffein, no

5    prayer socks when you were at Trousdale?

6         A.    If they were denied, then the answer would

7    have been a yes.

8         Q.    Do you recall that when you were at

9    Trousdale, them being denied?

10        A.    To say those denied specifically, no.  But

11   again, if they were denied, then I would have been a

12   part of that discussion.

13        Q.    Would there have been something in writing

14   created during that consideration and denial process?

15        A.    Yes.

16        Q.    What would have existed in writing?

17        A.    Typically it's a memorandum that goes out to

18   all staff as well as the population.

19        Q.    And so that would have been like a general

20   memorandum, like to everybody, hey, these socks are not

21   allowed?

22        A.    Yes, ma'am.

23        Q.    Or would it have been specific in response to

24   somebody ordering?

25        A.    No, it would have been a general memorandum.

1  If we chose or made the decision based on our

2  experiences that they were a security breach, a safety

3  concern, then we would have put it out in writing.  More

4  often than not, it was memorandums for staff and

5  population so they understood what those restrictions

6  were.

7      Q.    And where could I find a copy of that

8  memorandum?

9      A.    At the time when I was there, we maintained a

10 memorandum book that was kept by my secretary.  I can't

11 tell you whether or not that still exists today because

12 I've been gone for a year.  But there was a memo book

13 that was maintained.

14     Q.    Okay, and would it have been e-mailed

15 someplace?  Would there have been an electronic copy?

16     A.    Typically, yes, we would -- I'm sure we would

17 have sent it out to Trousdale staff via electronic

18 e-mail.  So whether it came from the QA manager or

19 whether it came out from the chaplain, I can't answer

20 that, or if it came out from my office.

21     Q.    And when using those socks, would it be

22 possible for the prisoner to use those socks during, you

23 know, a religious service and then give them back?

24     A.    Again, anytime you introduce that type of

25 clothing article, there is always a risk of human error,

 1    somebody not doing something that they should have done.

 2    And ultimately, those things slipping out to locations

 3    that they should not have been.  And certainly, my job

 4    is to -- is equal to the public in the community that we

 5    serve to ensure that those offenders do not escape from

 6    that facility.

 7         Q.    Do you know of any religious gear that is

 8    used during services and then given back?

 9         A.    Again, there probably is, but to say that I

10    can say any specifics, no, ma'am.

11         Q.    What about a rosary?  Do you know if

12    prisoners are allowed to keep rosaries with them in

13    their cell?

14         A.    Are you talking about the rosary type, like

15    the necklace?

16         Q.    Yes, sir.

17         A.    I've seen those, yes, ma'am.

18         Q.    And they keep those in their cell?

19         A.    I believe so, yes, ma'am.

20         Q.    What about any other religious items?

21         A.    Well, you said -- I mean, the prayer rugs,

22    they keep those.  Other than like Bibles and documents,

23    you know, literature type stuff, they keep that type of

24    stuff.  And I'm sure there's some things within TDOC

25    policy that they are allowed to keep and did keep, but I

1    can't recall any specifics other than those.

2         Q.    When a chaplain comes in to do services, are

3    they permitted to bring things in with them?

4         A.    Only allowable items.  You know, specific to

5    the class or the service that they're providing.  And

6    again, they would have to be approved and appropriate

7    items.

8         Q.    And where could I find a list of what are

9    approved and appropriate items that can be brought in by

10   a chaplain or approved volunteer for religious purposes?

11        A.    CoreCivic has an approval policy for our

12   intake policy -- or checkpoint.  So it would have to be

13   items that would be approved to come inside of the

14   facility.

15        Q.    And what about belts?  Do you know anything

16   become Rastafarians being able to bring in Bob Marley

17   belts?

18        A.    No.

19        Q.    Have you ever had that situation happen at

20   Trousdale to your knowledge?

21        A.    Not that I can recall, no.

22        Q.    Would you consider a belt to be something

23   that's a security threat?

24        A.    A standard TDOC-issued belt, no, ma'am.

25        Q.    What if it's not a standard TDOC-issued belt?

Page 45

1      A.    Then again, there could be some concerns, you

2   know, with the belt.  There's belts all around that

3   have, specifically the belt buckle that can conceal

4   contraband and those types of items.  So again, there

5   would be some concern if it was a non-issued controlled

6   TDOC belt.

7      Q.    And TDOC belts, what are those made out of?

8      A.    I believe they're fabric, but again, I am not

9   a hundred percent.

10      Q.    If TDOC belts were made out of leather, do

11   you know if that's true or if it's not?

12      A.    I do not know.

13      Q.    And what about the Bob Marley belts, do you

14   know if those are made out of leather?

15      A.    No, ma'am, I have no clue.

16      Q.    Can you see any difference in security

17   threats between a leather belt and leather socks?

18      A.    I mean, width would be concerning.  You could

19   cover a larger portion of your body.  You could

20   specifically cover hands so that you could grab through.

21   I don't know that you could do that with a belt.  Maybe,

22   I guess, with a really wide belt maybe.  But that would

23   be one of the concerns, yes, ma'am.

24      Q.    Any others?

25      A.    No, not that I can think of.

```
 1              MS. HERZFELD:  We've been going for about an

 2    hour.  I think now is a good time to break if

 3    everybody's okay.

 4              MR. WELBORN:  Good with me.

 5              MR. AUMANN:  Sounds good.

 6              MS. HERZFELD:  Okay, let's take 10 minutes.

 7              (Recess observed.)

 8    BY MS. HERZFELD:

 9        Q.   Okay, we're back on the record after a short

10    break.  During that time, did you happen to remember the

11    name of the case that you gave a deposition in a couple

12    weeks ago?

13        A.   No, ma'am.

14        Q.   I'm going to ask you at your next break,

15    would you mind doing what you can to gather that

16    information so we know the name of the case?

17        A.   Yes.

18        Q.   Thank you very much.  What type of shoes do

19    prisoners wear at Trousdale?

20        A.   They have their slides, which is what they

21    would use like a shower slide.  Tennis shoes, as well as

22    boots.

23        Q.   What are the shower slides made out of?

24        A.   Rubber, I believe.

25        Q.   Okay, I think I know what you mean.
```

 1        A.    Rubber foam.  They're more like -- probably

 2   like foam, probably more so than anything.

 3        Q.    And then the tennis shoes, what material are

 4   the tennis shoes made out of?

 5        A.    Standard tennis shoe canvas.  Rubber type

 6   soles.

 7        Q.    And what about the boots?

 8        A.    They're -- I'm not sure what the actual

 9   material is.  It's a heavy -- it's like a work boot

10   style shoe.  It may be a type of leather.

11        Q.    And is there a difference in having leather

12   socks or leather shoes to your mind?

13        A.    Yeah.  Again, leather socks can be put over

14   the hands and kind of masks like gloves.  You can't

15   necessarily do that with a pair of shoes where you would

16   have gripping abilities.

17        Q.    What other types of socks do prisoners wear

18   at Trousdale?

19        A.    Just traditional, I guess cotton-style socks.

20        Q.    Are they issued a certain number of pairs of

21   socks when they arrive?

22        A.    They are.  Again, I believe it was three

23   pairs at Trousdale.  But I've been at several

24   facilities, so I'm guessing at the total number, but it

25   would have been at least three.

1      Q.     Do you know if they can purchase additional

2   socks?

3      A.     I believe so, yes.

4      Q.     And where would they purchase those through?

5      A.     Through, I believe -- of course commissary.

6   I believe we sold them on commissary that was there at

7   the facility.  I'm trying to remember back to the union

8   supply list.  They may have been able to order them

9   through union supply.

10     Q.     Can you explain to me if there is a

11  difference between the commissary and what people can

12  order through union supply?

13     A.     Union supply is managed through Tennessee

14  Department of Corrections, as far as the items that they

15  can purchase through union supply.  The internal

16  commissary are items that we have there at the facility

17  that they can purchase and get those on a weekly basis,

18  pending stock.  The union supply, I believe was

19  quarterly, is what they could actually purchase through

20  union supply.

21     Q.     Where could I find a listing of what was

22  available for purchase in the commissary during your

23  time as warden at Trousdale?

24     A.     They would have it at -- it should be there

25  at the facility in the business department, in the

 1   business office.

 2        Q.    And what is the business office?

 3        A.    It's the business manager.  It's a CoreCivic

 4   employee.  That's the one place -- person I did forget

 5   when I was telling you who was in administration was the

 6   business manager who would have supervised the staff in

 7   the commissary.

 8        Q.    Do you know if those records were kept

 9   electronically?

10        A.    Again, I'm sure they are.  But I would think

11   that they would at least have the hard copy, if not.

12        Q.    And do you know what a kaffiyeh is?

13        A.    No, ma'am.

14        Q.    What about an agal?

15        A.    No, ma'am.

16        Q.    What about traditional Islamic dress, have

17   you ever had someone request to be able to wear

18   traditional Islamic dress, long sleeve, covers the arms

19   and legs?

20        A.    Not that I can recall, no.

21        Q.    And would that be permitted?

22        A.    Again, we would have to evaluate what it is

23   that they were asking to secure, if it is outside of the

24   allowable items.

25        Q.    I don't think I quite understood your answer.

Case 3:22-cv-00093   Document 33-7   Filed 05/04/22   Page 49 of 226 PageID #: 1145

1   So what they could wear, is that on the list of what

2   people are allowed to wear?

3        A.    Yes, the TDOC-issued uniforms.  The items

4   that are sold on commissary, the items that are approved

5   but through union supply.  Anything outside of those

6   approved venues of securing items would have to be

7   evaluated to determine whether or not there was any

8   security concerns, life safety concerns that would exist

9   by that particular item being inside the facility.

10       Q.    Trousdale is what level of security?

11       A.    We have -- it was a low moderate -- or low

12  medium custody facility.

13       Q.    And who is classified as low medium

14  considered -- I am sorry, I just totally mangled that.

15  Who is considered to be low or -- did you say moderate

16  custody or did you say medium?

17       A.    Medium custody.

18       Q.    Okay, what types of -- how does one become

19  low?

20       A.    There's -- that's based off of a score sheet,

21  classification sheet.  There's a lot of factors that are

22  taken into consideration.  The person's current criminal

23  charges.  The person's criminal history in the last 10

24  years is typically looked at.  The age of the person.

25  The education of the person.  Whether or not they

1    participated in programs.  Their conduct while

2    incarcerated.  All of those things are weighted through

3    a score sheet of classification and that's how that

4    person's classification is obtained.

5          Q.    And so Trousdale, you said, is low and

6    medium.  So what does that mean for security?

7          A.    The two can be housed together.  Now, if they

8    -- if their score raised to close custody, then they

9    would be placed into the restrictive housing area, which

10   at Trousdale was alpha unit.  And then there would be a

11   coordination with the TDOC to move those individuals to

12   a facility that was classification appropriate.  So but

13   as far as the low custody and the medium custody

14   population, they could commingle and coexist inside of

15   the facility and they did.

16         Q.    When you say commingle and coexist in the

17   facility, what do you mean?

18         A.    It means that they could be housed in the

19   same housing pod or housing unit as one another.  They

20   could actually be celled in the same cell together even

21   inside of a housing unit.

22         Q.    And typically, how many prisoners do you have

23   in a cell?

24         A.    Two.

25         Q.    And how many cells, typically, in a pod?

Page 52

1      A.    Oh.  I believe there were 60.  So there were

2   125-man units, so 60 cells.

3      Q.    And how many pods are at Trousdale?

4      A.    Total?

5      Q.    Yes, sir.

6      A.    Or by unit?

7      Q.    Give me both.

8      A.    Okay, so there's three pods in each unit for

9   delta, echo, bravo and charlie and fox units.  And then

10   alpha unit, I believe had -- which was the restrictive

11   housing.  I'm trying to remember the make-up there.  I

12   believe there were six units there, which of course,

13   they were confined to their cells.  Those units actually

14   held -- there were only 30 cells per unit for 60 total

15   capacity in the restrictive housing.  And then W-unit

16   had four open bays.  And I believe each one of those

17   bays, the dorm style, were 128 beds, if my memory serves

18   correctly.

19      Q.    And what is it that people wear?  I think you

20   said that there is stuff that they can purchase from the

21   commissary.  There's obviously the uniform that's issued

22   to them.  And you said stuff that they could buy from

23   union supply.  So could you give me some examples?

24      A.    Sure.  The standard uniform in the Tennessee

25   Department of Corrections was the blue-jean-style type

1    pants that were marked appropriately with

2    identifications as being an inmate.  Either a pullover

3    or button.  They were -- I think they were phasing out

4    the button-style shirts and more of the pullover.  For

5    lack of a better way to describe, much like what you

6    would see as a scrub, scrub top was pretty standard as

7    far as the actual uniform.

8              You had thermals for winter wear.  You had a

9    jacket.  I believe they could purchase the sweats, sweat

10   clothing through both commissary and union supply.  I

11   believe we carry both of those in both of those

12   locations.  And of course, the standard undergarments,

13   boxers, t-shirts, socks.

14        Q.    So on any given day, could you see prisoners

15   walking around Trousdale in the standard-issue uniform

16   or, say, sweats, for example?

17        A.    Sweats only if they were going to the yard,

18   you know, meaning if they were going to go to

19   recreation, whether in the gym or the outside yard.

20   Other than that, if they were outside of their housing

21   units, then they would have been required to wear their

22   standard uniform.

23        Q.    So they were allowed to switch into their

24   sweats if they were going to exercise?

25        A.    Yes, like if they were going out to the gym

1    or go to the recreation area, they could wear their gym

2    attire to and from those locations.

3         Q.    Where would the gym attire be kept when they

4    were not wearing it?

5         A.    They would keep it inside their cell.

6         Q.    So if someone got cold in the middle of the

7    night, could they put on their sweats in their cell?

8         A.    Yes, ma'am.

9         Q.    And then they would have to take it off when

10   they leave the cell if they were going to rec?

11        A.    No, in the unit -- I was talking outside of

12   the unit.  They could wear their sweats in the common

13   areas of their housing unit or pod, but if they were

14   going to be leaving out of their pod, then they would be

15   required to wear their full uniform, unless they're

16   going to gym.

17        Q.    And what about religious attire?  Is there

18   any religious attire that you can think of that is worn

19   outside of an individual cell?

20        A.    I mean, I'm sure there is, but to say I know

21   the names of each of the religious attires, I can't say

22   that.  But yes, there is religious attire that is worn

23   in the cell, out of the cell, in the day rooms and out

24   of the units entirely.

25        Q.    If you don't know the names, that's okay.

1    I'm struggling with the names, too.  Could you describe

2    for me what you're thinking of?

3         A.    I know there's some head coverings that were

4    authorized or allowed to be worn.  Again, I couldn't

5    tell you the specific names of them.  But they wear,

6    like I said, religious jewelry that they had, whether it

7    had a cross on it or something along them lines.  That's

8    really not a uniform.  But outside of that is all I can

9    really recall.

10        Q.    And do you recall a time when there was a

11   request to wear the sal -- no -- the keffiyeh?  I am

12   going to say that correctly.  The keffiyeh, the long-

13   sleeve Muslim dress?

14        A.    Not that I can recall, no.

15        Q.    And to your knowledge, would that have been

16   permitted at Trousdale?

17        A.    Again, without seeing the item, I can't

18   answer that.

19        Q.    And you know what, I apologize.  It's not

20   called the keffiyeh, I am thinking just of the long-

21   sleeve dress.  The keffiyeh is the headdress that is

22   kind of like a towel that is broad above and around.

23   Have you seen anyone wearing that at Trousdale?

24        A.    I've seen some head coverings.  Now, whether

25   it was that, I don't know.  Because I don't know the

Page 56

```
 1    name until you just said it.  So I am not going to say

 2    that I didn't see that, but not that I can recall

 3    specifically.

 4         Q.    Do you know if that would be permitted at

 5    Trousdale?

 6         A.    Again, depending on what the material is, how

 7    much of the facing -- if it covers their facial areas

 8    that would create a security concern about positively

 9    identifying a person moving from one location to another

10    location, then the answer to that is I don't know

11    without looking at it.

12         Q.    If a request like that came in, where would

13    the response to that request be stored?

14         A.    It should have came via an inmate request

15    form.  The request form then would have been responded

16    back to.  The detainee -- or I am sorry, the inmate, by

17    the chaplain or the assistant warden of programs.  One

18    of the two typically would have been the ones that would

19    respond back to the inmate request.  And that document

20    should be maintained in the inmate file.

21         Q.    And is there a difference between filling out

22    an inmate request form and filling out a grievance?

23         A.    Yes.

24         Q.    What are the differences?

25         A.    A request is just a general request that
```

1   would go to a designated staff member.  A grievance

2   would actually go to the designated grievance

3   coordinator, who would then assign it a number and then

4   process it to ensure that it is reviewed, entered into

5   the TDOC system and then responded to within the certain

6   time frames.

7        Q.    And who was the grievance coordinator at the

8   time that you were at Trousdale?

9        A.    Oh, you're stretching my mind.  I do not

10  recall.

11       Q.    And the grievance coordinator, do you know if

12  that individual was the TDOC employee or a CoreCivic

13  employee?

14       A.    It would have been a CoreCivic employee.

15       Q.    And so when they receive a grievance, are

16  those grievances given in writing?  I am assuming the

17  prisoner writes it out on paper?

18       A.    Yes.

19       Q.    Or is there an electronic grievance?

20       A.    No, it's a written grievance by the inmate

21  and then a written response back by the designated

22  employee.

23       Q.    Has there ever been a time where a grievance

24  has not gotten logged?  It's gotten lost or slipped

25  through the cracks?

Case 3:22-cv-00093   Document 33-7   Filed 03/04/22   Page 57 of 226 PageID #: 1153

1       A.    With administrative error, I'm sure there

2    was.

3       Q.    Do you know anything about the provision of

4    traditional halal foods during Ramadan and the Eid

5    feast?

6       A.    I'm aware of the feast.  To say that I am

7    aware of the specific menu or items, no, ma'am.

8       Q.    And during the time you were warden at

9    Trousdale, do you know if prisoners were provided halal

10   foods for the entire month of Ramadan?

11      A.    We would have provided what the dietitian

12   approved as well as any religious requirements we would

13   have provided.  But I don't know what the specifics

14   would have been if we did provide.

15      Q.    Are the menus kept someplace?

16      A.    The menus for the facility, yes.

17      Q.    Where would be those be kept?

18      A.    They would be at the facility, as well as our

19   corporate office.  And with -- we contract with Trinity

20   Food Service, so Trinity would also have a copy.

21      Q.    And when you say that would be between the

22   dietitian and any religious service, what do you mean?

23      A.    If we are going to accommodate or if we're

24   going to provide a specific religious meal, then that

25   meal would then have to be vetted and verified -- or

Page 59

1    vetted through the dietitian and approved to ensure that

2    it meets all of the caloric requirements.

3         Q.    And then how does that process work if

4    somebody is requesting a particular meal?

5         A.    Outside of what we provide?

6         Q.    Yes, sir.

7         A.    Again, we would evaluate to determine whether

8    or not we're required or obligated to provide that

9    specific.  As you can imagine, inside of a correctional

10   facility, to honor every single menu request wouldn't be

11   feasible.  But if we were going to amend the approved

12   menu, it would have to go through Trinity and then go

13   through any of our folks there at our corporate

14   headquarters, which we refer to as FSC, which is

15   facility support center.  Our religious staff there

16   would have to evaluate the request as well.

17        Q.    And so to your knowledge, were there requests

18   for halal food for the month of Ramadan while you were

19   at Trousdale?

20        A.    Yes.

21        Q.    And what happened to those requests?

22        A.    They were processed just the way that I just

23   described.  I do know there were some denials.  What

24   those specific denials consisted of, I would have to go

25   back and look at the record.

1      Q.    And you didn't review or familiarize yourself

2  with that prior to today's deposition?

3      A.    No, ma'am.

4      Q.    As we sit here today, do you know if halal

5  foods were permitted at Trousdale during Ramadan during

6  any time that you were there?

7      A.    I do not, no.

8      Q.    Do you know about the Eid feast?

9      A.    What kind of feast?

10      Q.    Eid, the end of Ramadan, there's a feast.

11  Does that ring a bell to you?

12      A.    Yes, ma'am.  I didn't realize it was called

13  that.  So the end of Ramadan, I do know there is a

14  feast, yes.

15      Q.    And do you know if Trousdale provided Eid

16  food for a feast at the end of Ramadan?

17      A.    I believe we did have a feast.  What that

18  fully consisted of, I can't recall.

19      Q.    Would that be included within the menus and

20  information that you said that Trinity has?

21      A.    Yes, whatever we provided, there would be

22  records as to what we provided, yes.

23      Q.    And I'm sorry, I think you said Trinity would

24  have that information, but would somebody at Trousdale

25  also have that information?

1      A.    The chaplain would have also any specific

2    menus that we provided for any specific religion.

3      Q.    Give me just one second.

4            (Off the record.)

5    BY MS. HERZFELD:

6      Q.    What do you know about, if anything, do you

7    know about Islamic prayer oil?

8      A.    I've heard of Islamic prayer oil, but I don't

9    know anything further than that.

10     Q.    Do you know if Islamic prayer oil was

11   permitted at Trousdale during the time you were the

12   warden?

13     A.    I do not believe it was one of the approved

14   items, but I'm not a hundred percent.

15     Q.    How does someone, to your knowledge, go about

16   purchasing something from union supply?

17     A.    There is, I think -- I believe the family can

18   actually purchase, for like packages, and do it on their

19   end and send items.  There's also, I believe, an order

20   form that they can complete and send in for items.

21     Q.    Do you know if union supply is a government-

22   run company or if it's private?

23     A.    I believe it's private, but that's a guess.

24     Q.    Do you ever know if there was ever a request

25   to you -- do you have any recollection if there was a

Page 62

```
 1   request to you to have Islamic prayer oil blessed by an

 2   imam brought into the facility?

 3        A.    Not that I can recall.  But that doesn't mean

 4   that there wasn't.

 5        Q.    And if there were records of a request like

 6   that, where would those records exist?

 7        A.    Again, either in the inmate file, the

 8   chaplain's office if there was an approval or denial.  I

 9   would say that's probably the two locations that I would

10   say that they should be.

11        Q.    And you said before that there were approved

12   volunteers that could sometimes come in to assist with

13   religious services; is that right?

14        A.    Yes, ma'am.

15        Q.    Do you know if an organization called Men of

16   Valor were able to enter the Trousdale facility?

17        A.    They were.

18        Q.    What is Men of Valor to your knowledge?

19        A.    It's a -- really a mentor type program that

20   really -- mentor to re-entry style type program.  They

21   get inmates who sign up for the program.  It's

22   nondenominational, so any person of religion or faith

23   can participate.  And they teach them and provide them

24   with skills to better their opportunities as they

25   re-enter into society.
```

1          I do know they also have a program to where

2   they still connect with the person once they're released

3   to help them with employment or housing, securing

4   driver's license, social security cards, those types of

5   things that are important for a person to have.  But

6   it's more about mentoring and a re-entry type program

7   more than anything else.

8          Q.    Do you know if Men of Valor is Biblically

9   based?

10         A.    I don't know whether they're actually based.

11  I don't know.

12         Q.    Do you know if there is any reference to any

13  Christian text or prayers in the general meetings with

14  Men of Valor?

15         A.    There could be.  I've never actually

16  participated or went down when they had a session in

17  progress at the facility while I was there.  And that

18  was the first facility that I encountered Men of Valor.

19  But there very well could be, I just -- I don't know.

20         Q.    What about Kiros, do you know what Kiros is,

21  K-i-r-o-s?

22         A.    No, ma'am.

23         Q.    Do you know what outside groups are able to

24  donate food to inmates that are at Trousdale?

25         A.    No outside food is allowed to come into the

Page 64

1   facility unless it's been reviewed and approved.  And I

2   can't think of a time.  Minus like with graduations,

3   which would be store-bought type foods where facility

4   staff would pick those items up.  Like a cake and those

5   kinds of things would be provided.

6         Q.    And so to your knowledge, there have never

7   been outside meals that have been brought in or donated

8   by groups for Christmas or Easter, Thanksgiving,

9   anything like that?

10        A.    No, not that I can think of, no.

11        Q.    And if there was a record of that, where

12  would those records exist?

13        A.    Again, if it was an authorized item to come

14  in for religious purposes, the chaplain would be my --

15  I'd point to the chaplain cap's area.  I'm sorry, or the

16  other place might be education if it was for a

17  graduation.

18        Q.    Can you think of any groups that are allowed

19  to donate books or materials into the prison?

20        A.    Yeah, we allow donations of both religious

21  and nonreligious books into the facility, as long as

22  they're paperback, they didn't have anything that would

23  constitute of a security risk, anything of that nature.

24  So there is really no limitation on who, it's just the

25  type of items that they can donate.

1        Q.    Where would be a list of people or groups

2   that were permitted to donate materials to the facility?

3        A.    Again, that would come through the chaplain

4   or education.  If it was just general library books, it

5   would be through education.  If it was religious-based

6   materials, it would be through the chaplain.

7        Q.    Do you know if there were any groups that

8   were permitted to donate Bibles to the facility?

9        A.    There was.  I don't know which group it was.

10  I do remember some Bibles being donated while I was

11  there.

12       Q.    Do you know if Gideon's International donates

13  Bibles?

14       A.    They could, I don't know.

15       Q.    What about Korans, do you know of anyone

16  donating a Koran to the facility?

17       A.    No, not off the top of my head, no.

18       Q.    Do you know if anyone has ever tried?

19       A.    I do not, no.

20       Q.    Is the Koran considered a permitted text at

21  Trousdale?

22       A.    As far as I know, yes.

23       Q.    Has there ever been a time when the Koran has

24  not been permitted at Trousdale?

25       A.    I don't believe so.

1        Q.      If there was a record of that, where would I

2   find it?

3        A.      Again, any restrictions would be, if it was

4   memorandum-based, it would be -- it would have been in

5   that memorandum book that was maintained by my secretary

6   or the quality assurance manager or in the chaplain

7   area.

8        Q.      So to your knowledge, did you ever have a

9   memorandum banning the Koran from entering Trousdale?

10       A.      I think there was originally and then we

11  identified that that was done in error and amended that.

12       Q.      So when you say there was originally, what do

13  you mean?

14       A.      I believe we had drafted a memorandum that

15  had specific items that were not authorized.  And then

16  there was a discussion with Chaplain Shonebarger

17  following that that amended that memorandum.  I don't

18  know what specific items we changed, but there was some

19  that were accidentally placed onto the memo originally

20  that should not have been placed on the memo.

21       Q.      Do you have a copy of that memo?

22       A.      I do not.

23       Q.      Do you know where a copy of that memo would

24  exist?

25       A.      Again, I think the memo should be in that

1    memo book.

2        Q.    And who created the list of things that were

3    banned on that memo?

4        A.    Honestly, I don't recall whether the chaplain

5    drafted that information, if it was an effort between my

6    assistant warden of programs and services.  I don't

7    know.

8        Q.    And what things were banned in that memo?

9        A.    There was a list of items.  I would have to

10   refer back to the memo.

11       Q.    When you say accidentally put on there, what

12   do you mean by accidentally put on there?

13       A.    It means that somebody placed it on -- an

14   item that was not necessary to restrict was put on there

15   and should not have been put on there.

16       Q.    How did it come to your attention that

17   something was put on there that should not have been put

18   on there?

19       A.    I believe in discussion with Chaplain

20   Shonebarger.

21       Q.    So if Chaplain Shonebarger said this

22   shouldn't have been on there, you would think that

23   Chaplain Shonebarger wasn't the person who put the

24   particular item on the ban list in the memo; is that

25   right?

1              MR. WELBORN:  Object to the form.

2              THE WITNESS:  That's not to say that he

3    didn't make a mistake when he generated the list.

4    BY MS. HERZFELD:

5       Q.    And so to your knowledge, was the Koran on

6    that list?

7       A.    I believe it was.

8       Q.    Do you know how the Koran accidentally ended

9    up getting banned from Trousdale?

10      A.    I do not.

11             MR. WELBORN:  Object to the form.

12   BY MS. HERZFELD:

13      Q.    Is that one of the things that was fixed and

14   then allowed to come in later, the Koran?

15      A.    I believe so, but I would have to compare the

16   two to say for certain.  But I believe so, yes.

17      Q.    Do you recall what the discussion was about

18   the banning of the Koran?

19      A.    I do not.

20      Q.    Were you involved in a meeting about the

21   banning of the Koran?

22      A.    No.

23      Q.    What about changing the memo to allow the

24   Koran back in?

25      A.    It was a discussion between the chaplain and

1    I regarding the things that were accidentally placed on

2    the list, yes.

3         Q.    Why don't you tell me everything you remember

4    about that conversation.

5         A.    Just remembering the conversation that he

6    cited that there was a few -- there was at least one, if

7    not more than one item, that was placed onto the

8    memorandum that should not have been placed on the

9    memorandum.

10        Q.    When did you have that meeting with the

11   chaplain?

12        A.    I would have to refer back, I don't know.

13        Q.    You would have to refer back to what?

14        A.    The memo and then when the new memo was sent

15   out.

16        Q.    And do you have a copy of the new memo?

17        A.    I do not.

18        Q.    Would that be in that memo book?

19        A.    Yes, ma'am.

20        Q.    And did you have one meeting with the

21   chaplain about the banning of the Koran and other items

22   or did you have more than one meeting?

23             MR. WELBORN:  Object to the form.

24             THE WITNESS:  One as far as I know.

25   BY MS. HERZFELD:

Case 3:22-cv-00093   Document 33-7   Filed 03/04/22   Page 69 of 226 PageID #: 1165

 1      Q.    Was there anyone else present at that

 2   meeting?

 3      A.    If so, it would only have been my assistant

 4   warden of programs.

 5      Q.    Was that an in-person or a telephonic

 6   meeting?

 7      A.    I don't remember.  It could have been over

 8   the phone.  I don't remember.

 9      Q.    Did you ever meet with anyone at TDOC about

10   the banned items on that list?

11      A.    Contract monitor Brun, Chris Brun.

12      Q.    What was your meeting with Chris Brun?

13      A.    It would have been an evaluation of the memo

14   before it went out.

15      Q.    And so Chris Brun would have looked at the

16   memo of the banned items before it went out?

17      A.    Yes.

18      Q.    And so is your understanding that Chris Brun

19   approved or denied that memo before it went out?

20            MR. AUMANN:  Objection, form.

21            THE WITNESS:  I don't know that he

22   necessarily had to approve, it was just more of an

23   information and communication portion.

24   BY MS. HERZFELD:

25      Q.    And so that's -- I want to back up.  And I'm

Page 71

 1    going to rephrase some of my questions because we have

 2    two memos here that we're talking about.  So let's talk

 3    about the first memo.  So when the memo went out that

 4    was banning the Koran and other religious items, would

 5    that have had to pass by Chris Brun, the contract

 6    monitor, before it went out?

 7              MR. WELBORN:  Object to the form.

 8              THE WITNESS:  For information purposes, yes.

 9    BY MS. HERZFELD:

10       Q.    Did Chris Brun raise any objections at that

11    time or any concerns about the banning of the Koran or

12    other items on that list?

13              MR. WELBORN:  Object to the form.

14              THE WITNESS:  Not that I can recall.

15    BY MS. HERZFELD:

16       Q.    How long was the memo in place that banned

17    the Koran and other religious items?

18       A.    I do not know without looking at the two

19    memos.

20       Q.    Do you know if it was a matter of days,

21    weeks, months, years?

22       A.    I don't want to guess.

23       Q.    And how was it brought to your attention that

24    there needed to be a change in the memo?

25       A.    As previously stated, Chaplain Shonebarger

 1   brought it forward.

 2        Q.    What did Chaplain Shonebarger say to you or

 3   write to you about the need for the change?

 4        A.    I do not recall the specifics other than

 5   there were some items on there that should not have been

 6   placed on the original list.

 7        Q.    How many meetings did you have with Chaplain

 8   Shonebarger about the change?

 9        A.    As previously stated, one that I can say for

10   sure.

11        Q.    Was there a meeting with the chaplain when

12   the original memo went out banning the Koran and other

13   items?

14              MR. WELBORN:  Object to the form.

15              THE WITNESS:  I don't know if we had an

16   actual meeting or if it was just presented, the document

17   or the information.

18   BY MS. HERZFELD:

19        Q.    And when you say presented, what do you mean

20   by that?

21        A.    Whether it was sent to me electronically, if

22   the AW programs brought it forward, that I don't recall.

23        Q.    Do you know who drafted the original memo

24   banning the Koran and other items?

25              MR. WELBORN:  Object to the form.

 1              THE WITNESS:  I don't.

 2    BY MS. HERZFELD:

 3         Q.    Who typically drafts memorandums at the

 4    facility that have to do with items that are allowed or

 5    not allowed?

 6         A.    It depends.  If it's religious-based, it

 7    would typically start with the chaplain and the AW

 8    programs.  If it's security based, it would start with

 9    the chief of security or the assistant warden of

10    operations.

11         Q.    And how could I find out who did the initial

12    drafting of that original memo?

13         A.    I don't know that there would be a way if --

14    because I would sign the memorandum authorizing it.  To

15    who specifically drafted it, I'm not sure that there is

16    a mechanism that is currently in place or was in place

17    at that time.

18         Q.    So as we sit here today, you don't know who

19    drafted that memo banning the Koran and other religious

20    items?

21              MR. WELBORN:  Object to the form.

22              THE WITNESS:  What I can say is that I signed

23    it, but as far as whether the chaplain or whether the AW

24    programs or both, that I don't know.

25    BY MS. HERZFELD:

1          Q.    And when you signed it, you read it before

2     you signed it, yes?

3          A.    Yes.

4          Q.    And so when you read it, did you have any

5     concerns about the banning of the Koran or religious

6     text?

7                MR. WELBORN:  Object to the form.

8                THE WITNESS:  Again, that's not my area of

9     expertise.  We do lean on the chaplain to provide some

10     guidance there.  I did not have any initial immediate

11     concerns, but when those concerns were brought forward

12     at a later date, we corrected that issue.

13     BY MS. HERZFELD:

14          Q.    You have been in corrections your entire

15     career; is that right?

16          A.    That's correct.

17          Q.    And during that time, have you been trained

18     on the First Amendment by anyone?

19          A.    In the corrections academy.

20          Q.    In the corrections academy, did they talk to

21     you about the freedom of religion?

22          A.    Yes.

23          Q.    And did they talk to you about making sure

24     that one religion is not favored over another?

25          A.    Yes.

1        Q.    And did they talk to you about what the

2    particular religious texts are for particular religions,

3    the Bible for Christianity, for example?

4        A.    No.

5        Q.    Did you know that the Koran is the primary

6    text for Muslims?

7        A.    I do now.

8        Q.    At the time, were you aware what the Koran

9    was?

10       A.    Not in specifics, no.

11       Q.    Had you heard of the Koran at the time that

12   this memo that you signed banning the Koran from the

13   facility, did you know what the Koran was at that time?

14             MR. WELBORN:  Object to the form.

15             THE WITNESS:  No.

16   BY MS. HERZFELD:

17       Q.    Did you ask anyone, hey, what is a Koran?

18       A.    I did not.

19       Q.    Do you recall what year that policy was in

20   place?

21             MR. WELBORN:  Object to the form.

22             THE WITNESS:  No.

23   BY MS. HERZFELD:

24       Q.    Okay, and you were chaplain -- sorry, you

25   were warden at Trousdale for which years?

```
 1       A.     2017 -- or May 2017 through March 2020.

 2       Q.     How long was the Koran banned at Trousdale?

 3              MR. WELBORN:  Object to the form.

 4              THE WITNESS:  As previously stated, I'm not

 5   sure.

 6   BY MS. HERZFELD:

 7       Q.     How did you learn what the Koran was?

 8       A.     Through the chaplain.

 9       Q.     Through the chaplain when?

10       A.     I'm assuming when we had -- again, from

11   memory, the discussion we had when it was mistakenly

12   added versus when it needed be removed.

13       Q.     Before that time -- I just want to make sure

14   I understood your position.  Before that time, you had

15   never heard of the Koran?

16       A.     I did not say that.

17       Q.     Oh, okay.  So before that time, had you heard

18   of the Koran?

19       A.     I had heard of the Koran, yes.

20       Q.     And where is it that you had heard about the

21   Koran?

22       A.     I'd heard about -- I'd heard the Koran.

23   Specifically what the Koran was, it wasn't until that

24   discussion with the chaplain.

25       Q.     But you had heard about the Koran in what
```

Page 77

```
 1   context?

 2        A.    Honestly, I just heard the Koran used

 3   throughout my career.  Specifically what the Koran was,

 4   I did not ever have a need to know specifically what

 5   that was.

 6        Q.    Did you know that the Koran was associated

 7   with Muslims?

 8        A.    No, not specifically.

 9        Q.    So I just want to make sure I understand

10   this.  So you spent your entire career working in jails

11   and prisons; is that right?

12        A.    Yes.

13        Q.    And during that time, you have been

14   responsible for working around people, prisoners of a

15   variety of religions; is that right?

16        A.    Yes.

17        Q.    And those religions include Christians, yes?

18        A.    Yes.

19        Q.    And you know that the Bible is the primary

20   text for Christians?

21        A.    Yes.

22        Q.    How do you know that?

23        A.    I don't know how, I just know it.  I mean, I

24   am personally not a man of faith myself.  I don't go to

25   church.  I just heard about it through T.V.  I heard
```

 1    about it through various outlets.

 2         Q.    And during that time, you've been responsible

 3    for overseeing or housing prisoners of the Muslim faith

 4    throughout your career; is that right?

 5         A.    Yes, ma'am.

 6         Q.    And during that time, you didn't realize that

 7    the Koran had anything to do with the Muslim faith?

 8         A.    Again, I knew it was connected to the faith,

 9    but to what specific connection it was, I did not know

10    that.

11         Q.    Okay, so I guess I misunderstood you before.

12    So prior to the conversation with the chaplain, you did

13    have an understanding that the Koran had a linking to

14    the Muslim faith, yes?

15         A.    Yes.

16         Q.    Does the chaplain report to you?

17         A.    No.

18         Q.    Who does the chaplain report to?

19         A.    The assistant warden of programs.

20         Q.    And the assistant warden of programs, does

21    that individual report to you?

22         A.    Yes.

23         Q.    So ultimately, you are the boss of the

24    chaplain?

25         A.    Through the supervision of the assistant

 1   warden, yes.

 2        Q.    Buck stops with you?

 3        A.    Yes.

 4        Q.    And that's why you would be the one that

 5   signs the memorandums.  Those go out under your

 6   signature because you're the big boss.

 7        A.    I am the warden, yes.

 8        Q.    Did you ever discuss the Islamic faith with

 9   Chaplain Shonebarger?

10        A.    I'm sure we did.  To specifics of those

11   conversations, I don't know.

12        Q.    How often would you say you had conversations

13   with Chaplain Shonebarger about the Islamic faith?

14        A.    Various.  I wouldn't want to guess how many

15   times over the two-and-a-half years.

16        Q.    More than 12?

17        A.    Again, if you want to put a number to it,

18   it's just guessing.

19        Q.    That's all right, guessing is fine.

20        A.    Okay.  So yeah, I would say more than 12.

21        Q.    More than 50?

22        A.    No.

23        Q.    Did Chaplain Shonebarger ever express a

24   personal opinion to you about the Islamic faith?

25        A.    No.

1        Q.    Did you and Chaplain Shonebarger ever discuss

2    his views on individuals who were not Christian?

3        A.    No.

4        Q.    Do you know what Chaplain Shonebarger's

5    religion is?

6        A.    I do not.

7        Q.    Did Chaplain Shonebarger ever encourage

8    inmates to become Christians?

9        A.    Not that I am aware of.

10       Q.    Would that have been appropriate if he had?

11       A.    No.

12       Q.    Why not?

13       A.    Again, it's -- he has to have the unbiased,

14   you know, approach to all religions and be supportive,

15   whether he agrees or disagrees with the practice.  If

16   it's an approved, recognized religion, he is in a

17   position that he has to facilitate.

18       Q.    Have you ever had to discipline or do you

19   know if Chaplain Shonebarger was ever disciplined at the

20   time that you were at Trousdale?

21       A.    I'm not sure.  I think he might have been

22   disciplined, but I am not positive.

23       Q.    When you are thinking he might have been

24   disciplined, do you know what that was for?

25       A.    I don't.  I would have to go back and look at

```
 1    his record.

 2        Q.    And where would you find that?  What record

 3    would you look at?

 4        A.    His employee file.

 5        Q.    Let's talk about corrective action short of

 6    discipline.  Has there ever been any time that you know

 7    of Chaplain Shonebarger having some sort of corrective

 8    action taken in the way he did his job?

 9        A.    Can you clarify when you say -- are you

10    talking about informal?

11        Q.    Yes, sir.

12        A.    I'm sure there was.  Between the assistant

13    warden and himself, I am sure there was.

14        Q.    Do you know of any time in specifics?

15        A.    I don't.

16        Q.    Would any of that be in writing anywhere?

17        A.    Not if it was an informal, no.

18        Q.    Who would have the information?

19        A.    Informal would be the assistant warden of

20    programs at that time.

21        Q.    Did Chaplain Shonebarger ever express to you

22    that he wanted to convert inmates to Christianity?

23        A.    No.

24        Q.    Does Trousdale have Bible study classes?

25        A.    I believe they did, yes.
```

Page 82

1       Q.      Do you know if Chaplain Shonebarger

2    participated in that Bible study?

3       A.      I don't know if he personally participated or

4    if he just coordinated the program or the service.  He

5    very well could have.  I don't know.

6       Q.      Would it be have been appropriate for

7    Chaplain Shonebarger to participate in Bible study with

8    the prisoners?

9       A.      There would be nothing that I am aware of

10   that would preclude him from doing so.

11      Q.      No policy or memo?

12      A.      Correct.

13      Q.      Do you think it would be appropriate to have

14   him participating in Bible study with prisoners?

15      A.      I don't see anything that it would violate,

16   no.

17      Q.      But you said before it was supposed to be

18   nondenominational, his position; is that right?

19      A.      Doesn't mean he can't practice his faith, it

20   just means that he can't persuade others or degrade

21   others or belittle others in recognizing and practicing

22   their faith or be obstructive in giving them the

23   opportunity to practice their faith, as long as it's

24   within the guidelines of the policy.

25      Q.      And so do you know anything about the

Page 83

```
 1    Christian faith that would require Bible study at

 2    particular times or days during the week?

 3         A.    I do not.

 4         Q.    And so he was on the job when he was at the

 5    facility; is that right?

 6         A.    That's correct.

 7         Q.    Was he ever at the facility when he was not

 8    there for work?

 9         A.    Should not have been, no.

10         Q.    And so if he was participating in Bible study

11    with prisoners at the facility, he would have been on

12    the clock as in getting paid as an employee at the time

13    that he was participating in Bible study with the

14    prisoners; is that correct, sir?

15         A.    Yes.

16         Q.    Do you know if Chaplain Shonebarger

17    participated in any other religious services?

18         A.    I do not, no.

19         Q.    Do you know if Chaplain Shonebarger

20    participated in any services with Muslims?

21         A.    I do not, no.

22         Q.    Do you know if Chaplain Shonebarger

23    participated in any religious services that were

24    non-Christian?

25         A.    I do not, no.
```

Page 84

1        Q.    Did Chaplain Shonebarger have any religious

2   iconography or messaging in his office at Trousdale?

3        A.    There were some posters, I think, in his

4   office, but I am not sure exactly what the posters read.

5        Q.    Were they Christian in nature?

6        A.    I don't recall whether they were

7   motivational, whether they were religious-based.  I

8   don't recall.

9        Q.    Do prisoners ever come into the office of the

10  chaplain?

11       A.    Yes.

12       Q.    In what circumstance would they be in his

13  office?

14       A.    If they asked to see him, if they asked to

15  talk with him about anything or if he needed to talk to

16  them.  You know, if they generated a request and he was

17  following up on their request with them personally.

18  Those are just some reasons that I would think of.

19       Q.    And we call him Chaplain Shonebarger, but is

20  that -- is that an official title within Trousdale that

21  someone is the chaplain, or is that a title that was

22  given to him by a church or religion, do you know?

23       A.    No, it's an actual position on our staffing

24  pattern, chaplain.

25       Q.    And do you know if he's ordained in any way?

Page 85

```
 1       A.    I do not, no.

 2       Q.    Do you know if he attends a church?

 3       A.    I believe he does, but I am not certain.

 4       Q.    Would it be in his file if he had been

 5  ordained in some way?

 6       A.    Yeah, if he had any specific licensures or

 7  certifications, I would think it would be in his human

 8  resource file, his personnel file.  Either there or in

 9  his training file, sorry.

10       Q.    Did Chaplain Shonebarger ever quote religious

11  messaging to Muslim inmates at Trousdale?

12       A.    Not that I am aware of.

13       Q.    If he did, do you feel like that would be

14  appropriate for his job?

15       A.    No.

16       Q.    Did Chaplain Shonebarger ever question the

17  tenets of the Islamic faith that you know of?

18       A.    I am not sure I understand the question.

19       Q.    When you said before you'd had conversations

20  or at least one conversation with Chaplain Shonebarger

21  about the Muslim faith; is that right?

22       A.    That's correct.

23       Q.    And during that time, did he ever question

24  any, you know, tenet or practice of the Muslim faith?

25       A.    Not that I can recall, no.
```

Page 86

1        Q.    Did he ever say something like, oh, I don't

2   think that's necessary or this seems silly or that is

3   not required?

4        A.    Not that I can recall, no.

5        Q.    Did you ever see Chaplain Shonebarger behave

6   inappropriately with Muslim inmates at Trousdale?

7        A.    No.

8        Q.    Did you ever receive any complaints from

9   Muslim inmates at Trousdale about Chaplain Shonebarger?

10       A.    I think there were some grievances, but I

11  don't remember the specific details of the grievance or

12  the nature of the grievance.  But I do recall there may

13  have been some grievances filed by one or two of the

14  Muslims concerning Chaplain Shonebarger.  But I'd have

15  to go back to the grievance to see specific details.

16       Q.    And where could we find those grievances?

17       A.    It would be at the facility through the

18  grievance office.

19       Q.    And you don't recall what the substance was

20  at all about what the Muslim inmates were grieving about

21  Chaplain Shonebarger?

22       A.    I -- and again, I don't even recall if they

23  were specific to Chaplain Shonebarger or if they were to

24  Shonebarger in regards to them making the statement that

25  they weren't getting specific meals or specific access.

Page 87

```
 1    I don't know.  I do know that the Muslims had filed a

 2    grievance.  Again, whether it was specifically on

 3    Chaplain Shonebarger, I don't recall.

 4         Q.    Do you know how those grievances were

 5    resolved?

 6         A.    I don't, without reviewing them.

 7         Q.    Did anyone at Trousdale ever comment on the

 8    rate at which Islam is growing in the prisons?

 9         A.    No.

10         Q.    Did you ever hear anyone talk about the fact

11    that, you know, the Muslim population is growing?

12         A.    No.

13         Q.    Did the Muslim population, in fact, grow

14    during the time that you were at Trousdale?

15         A.    I don't know.  It could have decreased for

16    all I -- no, I don't know.

17         Q.    Did you ever hear anyone express any security

18    concerns about the Muslims at Trousdale?

19         A.    No, not that I can recall, no.

20         Q.    Did anyone at Trousdale ever suggest that

21    inmates should be discouraged from joining the Islamic

22    faith?

23         A.    Not that I am aware of.

24         Q.    Did you ever hear any Trousdale employee ever

25    refer to Islam as being a dangerous religion?
```

1       A.    No.

2       Q.    You didn't hear anybody ever talk about

3    Muslims being dangerous?

4       A.    Not that I recall, no.

5       Q.    Did you ever hear any Trousdale employees

6    commenting on the validity of the Islamic faith?

7       A.    No.

8       Q.    Do you know of any Trousdale employee ever

9    encouraging Muslim inmates at Trousdale to convert to

10   Christianity or to learn more about Christianity?

11      A.    None that I am aware of, no.

12      Q.    Would that have been appropriate if Trousdale

13   employees were doing that?

14      A.    No.

15      Q.    And I'm sorry, I think I might have asked you

16   this question, but do you know of any Trousdale employee

17   who tried to convert to Christianity any Muslim

18   prisoner?

19      A.    No.

20      Q.    Are you aware of any situation in Trousdale

21   that you believe had Muslims being treated unfairly by

22   any CoreCivic employees?

23      A.    None that I am aware of, no.

24      Q.    Do you think it was fair to ban the Koran?

25            MR. WELBORN:  Object to the form.

 1              THE WITNESS:  No, ma'am; otherwise, I

 2   wouldn't have changed it.

 3   BY MS. HERZFELD:

 4       Q.    So it was not appropriate to ban the Koran;

 5   is that right?

 6              MR. WELBORN:  Object to the form.

 7              THE WITNESS:  That's correct, and that's why

 8   we made that revision.

 9   BY MS. HERZFELD:

10       Q.    And during that time when the Koran was

11   banned, that would have denied a religious text to

12   Muslim inmates; is that right?

13       A.    It could have, yes.

14              MR. WELBORN:  Object to the form.  You know

15   that's not true.

16              MS. HERZFELD:  I'm sorry, I didn't hear you.

17              MR. WELBORN:  I said you know that's not

18   true.

19              MS. HERZFELD:  I'm sorry, are you speaking to

20   me?

21              MR. WELBORN:  You know the banning of the

22   Koran is not true.  That's the basis of my objection.

23              MS. HERZFELD:  Mr. Welborn, was that a

24   speaking objection?

25              MR. WELBORN:  I told you the basis of my

1  objection.

2          MS. HERZFELD:  Right, and I think that you

3  know that speaking objections in this jurisdiction are

4  inappropriate so I would ask you to refrain in the

5  future and let the witness answer the question, please.

6          MR. WELBORN:  Misleading questions are

7  inappropriate as well.

8          MS. HERZFELD:  Well, you may object if you

9  believe my question is inappropriate, but I will

10  continue questioning this witness.

11          MR. WELBORN:  I did.  I did object.

12          MS. HERZFELD:  Great.

13  BY MS. HERZFELD:

14      Q.    Did you ever reprimand or discipline a

15  Trousdale employee because that employee discriminated

16  against a Muslim inmate on the basis of their religion?

17      A.    Not that I can recall, no.

18      Q.    If there were records of that, where would

19  that be?

20      A.    Human resource department.

21      Q.    And where specifically within the human

22  resources department?

23      A.    Within our electronic disciplinary system.

24      Q.    Is there a way to search by like text, by

25  word?

Page 91

```
 1        A.     I'm not familiar that that system has that

 2   capability, but I don't know that it doesn't.

 3        Q.     Did Trousdale ever receive any kind of

 4   directive or order from anyone at CoreCivic headquarters

 5   concerning Muslim inmates or the Islamic faith?

 6        A.     Not that I can recall, no.

 7        Q.     Did you ever discuss Muslim inmates or the

 8   Islamic faith with anyone at CoreCivic headquarters?

 9        A.     Not that I can recall.

10        Q.     Do you have any personal views on Muslim

11   inmates?

12        A.     I do not.

13        Q.     Just one second, please.  Warden Washburn, do

14   you believe that Muslims are dangerous?

15        A.     I do not.

16        Q.     Do you believe that Muslims are a security

17   threat?

18        A.     I do not.

19        Q.     Do you believe that Muslims are terrorists?

20        A.     I do not.

21        Q.     Do you have a Facebook page, sir?

22        A.     That's on my screen?

23        Q.     I'm asking if you have a Facebook account?

24        A.     Oh, I do not.

25        Q.     Do you have a Twitter account?
```

1          A.    I do not.

2          Q.    So JT Shonebarger, is that you or that is not

3     you?

4          A.    I am not Shonebarger.

5          Q.    Oh, you're right, you're not Shonebarger.

6     Okay, and Shonebarger, does he have a Twitter account?

7          A.    I do not know.

8          Q.    When you look in this picture here, it says

9     at JT Shonebarger.  Do you see it on the right?

10         A.    I do.

11         Q.    Okay, and do you see that picture of the

12    individual there?

13         A.    I do.

14         Q.    Do you recognize that individual?

15         A.    I do.

16         Q.    Who is that individual?

17         A.    That is Mr. Shonebarger.

18         Q.    And looking at this image here that is on his

19    Twitter account, could you read it for me, please.

20               MR. WELBORN:  Object to the form.

21               THE WITNESS:  When the twin towers were

22    attacked by -- attacked, the left told us not to judge

23    all Muslims by the actions of a few.  It's kind of hard

24    to read that.  So why are they judging all cops for the

25    actions of a few?

```
 1   BY MS. HERZFELD:

 2       Q.   And so is he referencing Muslims here in the

 3   twin towers in 9/11?

 4            MR. WELBORN:  Object to the form.

 5            THE WITNESS:  I can't speculate as what he is

 6   referencing.

 7   BY MS. HERZFELD:

 8       Q.   Okay, but do you see a reference to the twin

 9   towers and Muslims here in this tweet?

10            MR. WELBORN:  Object to the form.

11            THE WITNESS:  I do, yes.

12   BY MS. HERZFELD:

13       Q.   Do you think that's appropriate for the

14   nondenominational chaplain at Trousdale to be tweeting

15   things about Muslims and 9/11?

16            MR. WELBORN:  Object to the form.

17            THE WITNESS:  Is this his tweet?  Or I don't

18   know anything about social media, so I don't know.

19   BY MS. HERZFELD:

20       Q.   Okay, so why don't I just ask you in a

21   different way.  Would it be appropriate for the chaplain

22   at a facility where you are the warden to be discussing

23   publicly Muslims and 9/11?

24            MR. WELBORN:  Object to the form.

25   BY MS. HERZFELD:
```

1        Q.      Did you answer?

2        A.      I'm sorry, yes.  I said no.

3        Q.      Okay, so let me ask again because I think it

4    got kind of all jumbled up with pausing and objections.

5    In your opinion, as a warden, would it be appropriate

6    for the nondenominational chaplain to be discussing

7    Muslims and 9/11 publicly?

8                MR. WELBORN:  Object to the form.

9                THE WITNESS:  No.

10               MS. HERZFELD:  Thank you very much.  Okay, if

11   we can take another break.  I need a comfort break,

12   unfortunately, but if you'll give me, I'd say about 10

13   minutes, I think that's probably a good stopping space.

14               (Recess observed.)

15   BY MS. HERZFELD:

16       Q.      Okay, we're back on the record after a short

17   break.  I think we had spoken before about during a

18   break, you were going to try to figure out the name of

19   the case that you testified in a couple weeks ago.  Did

20   you have an opportunity to do that?

21       A.      Yes, it's Mr. Gennoe, G-e-n-n-o-e.

22       Q.      Do you have a first name?

23       A.      I think it's Ricky, but I am not a hundred

24   percent on that.

25       Q.      And do you know if the case was filed in

```
 1   federal court?

 2        A.    I do not, no.

 3        Q.    Thank you for getting that information, I

 4   appreciate it.  You have been with CoreCivic your entire

 5   career; is that right?

 6        A.    Yes.

 7        Q.    During that time, have you learned that there

 8   are certain standards that CoreCivic must adhere to

 9   according to their contracts?

10        A.    Yes.

11        Q.    And were there certain standards that

12   CoreCivic had to adhere to at Trousdale?

13        A.    Yes.

14        Q.    Are those standards specified in the

15   contract?

16        A.    Yes.

17        Q.    And is that the purpose of the contract

18   monitor, to make sure that those standards are being

19   adhered to at the facility in practice?

20        A.    Yes, as previously stated.

21        Q.    Do you know what an operations plan is?

22        A.    In what context?

23        Q.    In the context of the contract.

24        A.    I'm not sure I understand what the -- what

25   you're calling operation plan.
```

Page 96

1       Q.      So have you had an opportunity to review the

2    contract between CoreCivic and Trousdale?

3       A.      Yes.

4       Q.      Would you say you're pretty familiar with it?

5       A.      As best as I can be after a year later and

6    reviewing other contracts in between, yes.

7       Q.      I'm going to just ask you a series of

8    questions about terminology, I think that may be in the

9    corrections world.  Do you know what a staffing pattern

10   is?

11      A.      Yes.

12      Q.      What is the staffing pattern?

13      A.      Staffing pattern is the designated position,

14   number of positions and shifts on which those positions

15   will cover.

16      Q.      Was there a staffing pattern in place for

17   Trousdale?

18      A.      Yes.

19      Q.      Is that something that is specified by

20   contract?

21      A.      Yes.

22      Q.      Does it change at all or is it stagnant?

23      A.      The contract -- there's two.  There's a

24   contract staffing pattern and then there's what is known

25   as a budget staffing pattern.  So the contract staffing

Page 97

1    pattern cannot change and does not change without the

2    customer, in this case, Tennessee Department of

3    Corrections, evaluating and approving.

4         Q.    And what is a budget staffing pattern?

5         A.    Budget staffing pattern is a -- is what we

6    actually are funded for, which is routinely higher than

7    the actual contracted staffing pattern.

8         Q.    During the time that you were the warden at

9    Trousdale, was your budget staffing pattern always

10   higher than the contract pattern?

11        A.    No.

12        Q.    When was it not?

13        A.    Can you -- so I can make sure I understand

14   the question, can you tell me specifically what you're

15   asking?

16        Q.    Sure.  You had said, if I understood your

17   testimony before, that there was a contract staffing

18   pattern that was in the contract between Trousdale and

19   CoreCivic; is that right?

20        A.    Yes.

21        Q.    And then there was also a budget staffing

22   pattern, which is something that was done by CoreCivic;

23   is that right?

24        A.    Well, both are done by CoreCivic.  One is

25   approved and mandated by contract, the other is not

Page 98

1    because it actually exceeds the contract requirements.

2         Q.    Okay, and so my question was during the time

3    that you were warden at Trousdale, was there any time

4    that the budget staffing pattern did not exceed the

5    contract staffing pattern?

6         A.    No.

7         Q.    So the entire time that you were warden of

8    Trousdale, the budget staffing pattern always exceeded

9    the contract staffing pattern; is that right?

10        A.    That's correct.

11        Q.    And when you say exceeded, exceeded by how

12   much?

13        A.    I would have to go back and compare the two

14   as far as the total numbers.  But again, it was higher

15   than the contracted numbers.

16        Q.    When you say higher, do you mean higher by

17   one person on one shift, or what do you mean by higher?

18        A.    It could be that, higher all the way across

19   the board, total number of staff that's allocated for

20   the facility.  Total number of -- example would be the

21   contracted assistant wardens was two and we had four.

22        Q.    And the contract staffing pattern, that would

23   be included within the contract specifically?

24        A.    Yes, the contract staffing pattern, yes.

25        Q.    And what about the budget staffing pattern,

1    where would I find that?

2         A.    It would be through our corporate office and

3    at the facility.

4         Q.    And at the facility, okay.  And who kept that

5    information at the facility?

6         A.    Human resource department.

7         Q.    And if I were looking for it, that's what I

8    would ask for, the budget staffing pattern?

9         A.    Yes.

10        Q.    And is it kept by year or by month, or do you

11   know?

12        A.    I mean, it's kept until revised.  So I mean,

13   if it was revised three times in a year, then obviously

14   the most current would be there at the facility.

15        Q.    And when you say it's a budget staffing

16   pattern, that's what's set by CoreCivic and how many

17   people they plan on providing to that facility; is that

18   right?

19        A.    That's correct.  That's what we're funded to

20   hire to, yes, ma'am.

21        Q.    Was there ever a time when you were warden at

22   Trousdale that all of those positions that were

23   contained within the budget staffing pattern weren't

24   filled?

25        A.    Which staffing pattern are you asking to?

1        Q.    The budget staffing pattern.

2        A.    Budget, yes.  There was a time that they were

3   not fully hired.

4        Q.    And when was that time period?

5        A.    I don't know that we were fully staffed the

6   entire time that I was there.

7        Q.    And when you say not fully staffed, do you

8   know how many positions you were deficient from the

9   budget staffing pattern to what was actually filled?

10       A.    It varies from month to month, or really day

11  to day.

12       Q.    Was it a significant deficit to your mind?

13       A.    Again, I don't know my significant to your

14  significant, but the variance is different.  So if you

15  can maybe -- are you looking for a specific number?  I

16  mean, because I can't -- what is significant, that's up

17  for interpretation.

18       Q.    You know what, I'll ask a different question.

19  Did you ever feel that Trousdale was understaffed?

20       A.    With full-time staff, we struggled.  But we

21  did have staff come from other facilities that were put

22  into our staffing pattern to augment those vacancies.

23       Q.    When you say you struggled, what do you mean?

24       A.    It means that to recruit and retain staff at

25  Trousdale Turner -- not unique to Trousdale Turner, I

1    should state.  You know, to find full-time applicants to

2    take the spots, you know, we were challenged.

3         Q.    And when you say you were challenged, what do

4    you mean by that?

5         A.    By securing applicants and getting applicants

6    to clear all of the requirements in order to fully hire

7    them as full-time employees at Trousdale Turner.

8         Q.    And for the time that you were the warden at

9    Trousdale Turner, was there ever a period of time where

10   the staffing was less than what was required under the

11   contract staffing pattern?

12        A.    Yes.

13        Q.    When was that?

14        A.    It was various times throughout my tenure.

15   Actually, I believe it was in one of the CDRs or a

16   couple -- it was on the contract deficiency reports.  I

17   would have to refer back to those for the frequency.

18        Q.    And did you ever have any conversations with

19   anyone at CoreCivic about the lack of staff at

20   Trousdale?

21        A.    Yes, it's what resulted in the additional

22   staff from the other facilities coming to provide that

23   assistance to Trousdale.

24        Q.    And who did you have those conversations with

25   at CoreCivic?

 1       A.    It would have been with my managing director

 2   at the time.

 3       Q.    And who was your managing director at the

 4   time?

 5       A.    My first one was Jason Medlin, and then the

 6   second was Stacey Stone.

 7       Q.    How many conversations would you say you had

 8   with them?

 9       A.    I can't guess a number.

10       Q.    More than a dozen?

11       A.    Yes.

12       Q.    Okay, more than 50?

13       A.    Maybe.

14       Q.    Was there ever any communications in writing

15   between you and anyone at CoreCivic about the lack of

16   staffing at Trousdale?

17             MR. WELBORN:  Object to the form.

18             THE WITNESS:  I'm sure there was.  You know,

19   to recall from memory, I don't know.

20   BY MS. HERZFELD:

21       Q.    Do you use e-mail?

22       A.    Yes.

23       Q.    Did you ever send e-mails to anyone at

24   CoreCivic about the lack of staffing to your knowledge?

25             MR. WELBORN:  Object to the form.

1                    THE WITNESS:  It would have been to one of

2        those two if I -- I'm sure I did.

3        BY MS. HERZFELD:

4             Q.   Did you ever have any meetings at CoreCivic

5        headquarters about staffing at Trousdale?

6             A.   Not that I personally physically went to, I

7        don't recall -- I don't believe so.

8             Q.   What about via Zoom?

9             A.   No.  I just learned how to use Zoom.

10            Q.   We've all just had to learn how to use Zoom.

11       What about telephone calls with higher ups at CoreCivic

12       about staffing?

13            A.   Yes, I'm sure I've had conversations.  Like I

14       said, Stacey Stone -- most of my communications with

15       Stacey Stone and Jason Medlin would have been by either

16       e-mail or by phone, because they didn't stay at the

17       facility.

18            Q.   And you were warden for roughly three years;

19       is that right?

20            A.   Just shy of, yes.

21            Q.   And during that time, were you communicating

22       with folks at CoreCivic throughout your tenure about the

23       lack of staffing at Trousdale?

24            A.   As previously stated, yes.

25            Q.   Did it ever get any better?

1       A.      Yes.

2       Q.      And when did it get better?

3       A.      I think the time period, and again, I'm

4   drawing from memory here, around January of 2019 to

5   around August of the same year.

6       Q.      Okay --

7       A.      And again, that's going from memory.  So I

8   believe that's the date range.

9       Q.      What changed during that period of time that

10  made it get better?

11      A.      What specific, I can't tell you specifics as

12  to what changed, you know, whether it was just an

13  increase in applicants or whether there was a downward

14  turn in the unemployment rate or upward tic -- downward

15  turn in the unemployment rate.  I don't know.  I do know

16  Tennessee had one of the lowest unemployment rates.  So

17  that made finding jobs a little hard during a period of

18  time.  So to say that I know what specifically caused

19  the staffing levels to go up at that period of time

20  versus others, I don't know.  I mean, there's probably a

21  conglomerate of things.

22      Q.      But you felt like the staffing levels went

23  back down sometime after around August of 2019; is that

24  right?

25      A.      Yes.

1      Q.    What did you do in response to that, if

2   anything?

3      A.    Again, we solicited and resecured support

4   from the other CoreCivic facilities from around the

5   country.  We increased our recruitment efforts.  We

6   partnered with specific groups.  And we went through

7   Indeed hiring processes.  I forget the name of the

8   outfit that we partnered with where they went out and

9   solicited people, men and women who were getting out of

10  the military to try to get them to join into

11  corrections.  We had several off-site meetings with

12  those individuals where we did live interviews and

13  processes of that nature to increase the total number of

14  staff that we had at Trousdale.

15     Q.    During the time that you were working at

16  Trousdale, was there ever a time that Trousdale had

17  sufficient staff to meet the contract staffing pattern?

18     A.    Yes.

19     Q.    When was that?

20     A.    I would say pretty much throughout my entire

21  tenure we had staff there.  Now, again, we had staff

22  from other facilities that were there assisting who

23  were, in fact, full-time employees at Trousdale at that

24  period of time.

25     Q.    So I want to make sure I understand it.  So

1   you had enough staff to meet the contract staffing

2   pattern the entire time you were at Trousdale, or you

3   did not?

4       A.    I didn't say that.  I said there was periods

5   of time that we did have and we did not meet.  But I

6   will tell you, again, understanding there is a

7   difference, when I say inadequate staffing, I am talking

8   about the full-time staff who were hired and permanently

9   staying at Trousdale Turner.

10              CoreCivic took steps to ensure the safety of

11  the staff, the inmates and the community by bringing in

12  resources from other areas and other correctional

13  facilities within our organization to augment for those

14  vacancies.  So short full-time staff at Trousdale, but

15  as far as delivering the service, we've gone through

16  other means.

17      Q.    Okay, so I think I'm starting to understand

18  you, so I want to make sure that I do.  Okay, so during

19  the entire time that you were warden at Trousdale, did

20  you have full-time staff that were in compliance with

21  the contract staffing pattern?

22      A.    Yes, minus the times we received contract

23  deficiency reports.

24      Q.    And when you received those contract

25  deficiency reports, then that's going to speak for

```
 1   itself; is that right?

 2        A.    Yes, ma'am.

 3        Q.    And then during other times, you may not have

 4   had full-time staff to meet the contract staffing

 5   pattern at Trousdale, but you did have some times where

 6   that was augmented by other CoreCivic employees from

 7   other facilities who were brought in to assist.  Did I

 8   understand that correctly?

 9        A.    Yes, ma'am, you did.

10        Q.    Was there ever a time that without full

11   staff, including all of the full -- I am going to back

12   up and start that question again.  Was there ever a time

13   throughout your time as warden at Trousdale that, either

14   utilizing full-time staff at Trousdale and/or utilizing

15   the folks that are being brought in from other CoreCivic

16   facilities, that you still did not have enough staff

17   present to meet the requirements of the contract

18   staffing pattern?

19        A.    Yes, as previously stated, that's when we

20   would have received the contract deficiency reports.

21        Q.    Okay, and those contract deficiency reports

22   are written by whom?

23        A.    By TDOC.

24        Q.    Is that facilitated through the contract

25   monitor?
```

1      A.    I believe they start there, yes, ma'am.

2      Q.    Is an operations plan for Trousdale?

3      A.    Again, I would -- you're going to give me

4   specifications as to what you're referring to as an

5   operations plan?

6      Q.    Written job descriptions for each position in

7   the staffing pattern.  Job title, responsibility,

8   requirement minimum experience and education.

9      A.    Yes, ma'am.

10     Q.    And where is that plan located?

11     A.    That would be the human resource department

12  would have all job descriptions and qualifications.

13     Q.    Do you know how often Trousdale's operations

14  plan has been modified?

15     A.    I don't.

16     Q.    Were you ever involved in the modification of

17  Trousdale's operation plan?

18     A.    If you're specifically referring to job

19  description and qualifications, no, not that I can

20  recall.

21     Q.    Does the warden at Trousdale, is that a

22  bonus-eligible position?

23     A.    It is.

24     Q.    How would one receive a bonus for being the

25  warden at Trousdale?

```
 1        A.     There are specific parameters or specific

 2   goals that are established for each facility.  And if

 3   you're able to achieve those specific goals, then

 4   there's a certain percentage for achieving the goals.

 5        Q.     And are those goals written down someplace?

 6        A.     Yes.

 7        Q.     Okay, where are they written down?

 8        A.     They are at the facility support center, our

 9   corporate office.

10        Q.     At the corporate office?

11        A.     Yes, ma'am.

12        Q.     Did you ever receive a bonus while you were

13   warden at Trousdale?

14        A.     I did.

15        Q.     And what years did you receive a bonus?

16        A.     Each year that I was there, I believe.

17        Q.     How much was your bonus?

18        A.     I would have to go back and look.

19        Q.     Do you have an estimate?  Was it a thousand,

20   ten thousand, a hundred thousand?

21        A.     I wish it was a hundred thousand.  Less than

22   ten.  But again, I'd be guessing.  I would have to go

23   back and look to give you an accurate response.

24        Q.     Do you know what your bonus was for, what

25   performance you hit or exceeded to receive a bonus?
```

1        A.    At Trousdale, I'm not sure that we met --

2    there's typically three goals that are established in

3    order for the bonus.  I am not sure at Trousdale if we

4    ever met any one of the bonus goals.  So any of the

5    bonus that we would have received would have qualified

6    under what they call discretionary.  But I don't believe

7    we met any of the goals during that period of time.

8        Q.    And where could I find written information

9    about those bonuses for you while you were at Trousdale?

10       A.    It would be through our corporate office, the

11   HR department.

12       Q.    And every year when you were a given a bonus,

13   was there an evaluation that was done at that time?

14       A.    You're talk -- a performance evaluation

15   specific for me?

16       Q.    Yes, sir.

17       A.    There was a performance evaluation.  I don't

18   think it was right at that time.  Ours are always done

19   typically in January.

20       Q.    Did you receive a performance evaluation

21   every year that you were at Trousdale?

22       A.    Yes.

23       Q.    And what were the results of your performance

24   evaluations?

25       A.    I am trying to think if I received two or

1   three during that time because of the way it fell.  I

2   would have received, let's see, two exceeds and one

3   meets overall performance, I believe.

4        Q.   Was your salary or compensation tied at all

5   to Trousdale's budget?

6        A.   Was it a part of the budget?  Yes.

7        Q.   Was it dependent at all upon whether you

8   stayed within your budgetary constrictions per year?

9        A.   My salary, no.

10        Q.   What about your bonus?  Did your bonus -- was

11   one of the factors that you would get bonused on and

12   evaluated on have to do with if you stayed within the

13   budget that was provided to you by CoreCivic?

14        A.   Yes, and...

15        Q.   I'm sorry, I didn't hear you.

16        A.   Yes, it was.

17        Q.   And if you saved money for CoreCivic, is that

18   something that was looked favorably upon for bonusing?

19        A.   You could receive a higher bonus.  I would

20   like to say -- add to that, that you know, one, I never

21   received the bonus for not making -- for making a

22   financial metrics because I never made it.  And that was

23   largely driven to our recruitment efforts and bringing

24   additional folks in to support those vacancies.  So I

25   will say, I never received the bonus metric for

Page 112

```
 1    financial success, but it is part of the metrics.  But

 2    we cannot and will not compromise life safety or

 3    security at the facility to meet those objectives.

 4         Q.    Were you given a specific budget to do

 5    additional recruitment for folks at Trousdale?

 6         A.    Was I given additional budget, yes.

 7         Q.    And where did that additional budget come

 8    from?

 9         A.    From our facility support center.

10         Q.    How much was the additional budget year by

11    year for advertising for additional positions at

12    Trousdale?

13         A.    I would have to go back and look at the

14    budget.  It was pretty -- it was lucrative, but I don't

15    remember what the actual figures were.

16         Q.    And when folks came from other CoreCivic

17    facilities to help out kind of temporarily at Trousdale,

18    where would they stay?

19         A.    At a hotel that we paid for.

20         Q.    What happens when a prison is understaffed?

21               MR. WELBORN:  Object to the form.

22               THE WITNESS:  That's a pretty open-ended

23    question.  I am not sure that I understand.

24    BY MS. HERZFELD:

25         Q.    Sure.  It's important to keep a prison
```

1    staffed fully according to what is required in a

2    contract; is that right?

3         A.    Yes.

4         Q.    And having full staffing is important for the

5    safety of the employees and for the prisoners; is that

6    correct?

7         A.    And for the general public, yes.

8         Q.    And so when you don't have adequate staff,

9    does that create a safety risk at a particular facility?

10        A.    It could, yes.

11        Q.    And if you don't have adequate staffing, that

12   could cause an escape risk, for example?

13        A.    It could, yes.

14        Q.    And what about safety issues for the prison?

15        A.    It could have an impact, yes.

16        Q.    And what about safety issues for the

17   employees?

18        A.    It could have an impact.

19        Q.    And what would be some of those types of

20   safety issues for the employees?

21        A.    Response.  If you had to respond to an

22   emergency of some nature, it could put people in harm's

23   way if you didn't have adequate numbers there to

24   effectively manage through whatever that particular

25   incident may be.

Page 114

```
 1        Q.     Because ultimately, I mean, what this prison

 2   is doing is it's housing people who have been convicted

 3   of crimes?

 4        A.     As all prisons, yes.

 5        Q.     And some of those crimes could be violent?

 6        A.     Yes.

 7        Q.     And some of the prisoners that are housed in

 8   a particular facility could be violent; is that right?

 9        A.     Yes.

10        Q.     And what about gang affiliation, are there

11   gangs that exist at Trousdale or did when you were

12   there?

13        A.     Yes.

14        Q.     Do you consider those to be security threats?

15        A.     Yes, by classification they're security

16   threat groups.

17        Q.     So gang affiliation, is that a particularly

18   difficult issue safety-wise for you as the warden at

19   Trousdale?

20        A.     At every facility.

21        Q.     Can a prison become more dangerous if there

22   is understaffing?

23        A.     It could, yes.

24        Q.     And do violent incidents, could they become

25   more frequent if there is understaffing at a particular
```

1  facility?

2      A.    It could, yes.

3      Q.    Did you see Trousdale become more dangerous

4  with the understaffing at Trousdale during your tenure?

5      A.    Actually, I think we -- and again, I will

6  have to go back and look at the statistical data, but I

7  think we actually saw a decline.

8      Q.    And so a decline in what?  When you say that,

9  what are you referring to?

10     A.    Inmate on inmate fights, staff assaults.

11 Again, I would have to go back and look at the

12 statistics, but I do believe there was a period of time

13 that we actually saw a reduction.

14     Q.    I'm going to back up a little bit.  When you

15 first arrived at Trousdale, was it considered a

16 dangerous facility?

17     A.    It's a prison.  I don't know that you can

18 define any prison as not an opportunity to be dangerous.

19     Q.    Would you say it was more dangerous than

20 other facilities in the State of Tennessee?

21          MR. WELBORN:  Object to the form.

22          THE WITNESS:  I can't compare, I've never

23 been in any other facility in Tennessee.

24 BY MS. HERZFELD:

25     Q.    Did anybody tell you anything about the level

1  of dangerousness at Trousdale before you got there?

2       A.    No.

3       Q.    Did anybody tell you about issues with

4  staffing before you got to Trousdale?

5       A.    Yes.

6       Q.    And who did you have that conversation with?

7       A.    At that time, Jason Medlin, who was the

8  managing director.

9       Q.    What was the conversation with Jason Medlin?

10      A.    Much what we just talked about.  The

11  challenges with recruiting and retaining staff in the

12  area and to the facility.

13      Q.    Anything else?

14      A.    Just the efforts that we were taking as a

15  company to provide the temporary staff that ran to the

16  facility from other facilities.  Incentives that were

17  being put in place to recruit staff and to retain staff.

18      Q.    And I think you had said before that you

19  would have to look at the statistics to see if the

20  violence got better or worse during your tenure; is that

21  right?

22      A.    Yes.

23      Q.    What statistics would those be?

24      A.    It would be -- we have an automated tracking

25  system, which is called the 5-1, five dash one, IRD

1    system.  And it's what we put in all of our -- any

2    incident that really meets a priority level that's

3    preestablished for those incident reports.  I'm trying

4    to explain it to where I make sure you guys understand

5    exactly what I'm talking about.

6         Q.    And is that, the 5-1 IRD, is that something

7    that's Trousdale specific or is that CoreCivic wide?

8         A.    It's CoreCivic wide, but each facility is

9    specific in their statistical data.

10        Q.    So there is like a code or something for

11   Trousdale?

12        A.    Correct, there's a facility code.

13        Q.    And every time that there was some sort of a

14   violent incident, that would be inputted into that

15   database; is that right?

16        A.    Yes.

17              MR. WELBORN:  Object to the form.

18              THE WITNESS:  As long as it met a priority

19   level, yes.

20   BY MS. HERZFELD:

21        Q.    And where could I find those priority levels?

22        A.    It's in our 5-1 policy.

23        Q.    And where is the 5-1 policy located?

24        A.    That's a CoreCivic policy, so it would be at

25   the facility and also our facility support center.

1        Q.     Who is responsible for inputting that

2    information into the 5-1 database?

3        A.     Shift captains, unit managers and above.

4        Q.     Was that information reviewed on an aggregate

5    basis at all by you?

6        A.     It's reviewed.  All incidents are electronic,

7    so once they're uploaded and submitted, they go to

8    myself, the assistant wardens and the chiefs, my boss.

9    Many, many people within our corporate office have the

10   ability to see those as they're populated.

11       Q.     Are -- what do you do with them if they come

12   in as populated?  Does that mean that you get like each

13   one at a time?  Like John and Jim got in a fight, it

14   gets entered into and then you see it?

15       A.     Correct.  It would be assigned an incident

16   number.  Each one is unique to the incident.  And then

17   it would give a description, who was involved, all of

18   the -- those types of things that have to be answered

19   for all reports.

20       Q.     And then was there a periodic report looking

21   at that data more in the aggregate?

22       A.     Yes.

23       Q.     How often would you have one of those

24   periodic reports?

25       A.     Typically, I believe they came out monthly

1    from our corporate office.  And actually, TDOC had their

2    own mechanism because we also had to double enter into

3    the TDOC system.  Because we had not only CoreCivic's,

4    but we had to enter the incidents into TDOC as well.

5    And then TDOC, I believe they sent theirs out quarterly,

6    but don't quote me on that because I am not a hundred

7    percent it was quarterly.  But I believe it was

8    quarterly that we received the documents from TDOC

9    giving evaluation of statistical data.

10        Q.    And those would all end up in your e-mail or

11   on your desk at some point?

12        A.    Yes.

13        Q.    When you received those monthly reports from

14   CoreCivic, what would you typically do in response to

15   receiving that?

16        A.    I would evaluate them with the administrative

17   duty staff, which consisted of the assistant wardens and

18   the chiefs and the assistant chiefs.  We would discuss

19   those and then ultimately we'd disseminate down to their

20   perspective subordinates if there was things that we may

21   need to change or look at opportunities to reduce in

22   specific areas, depending on what the report reflected.

23        Q.    When you were looking at that, were you just

24   looking at numbers of incidents or were you looking at

25   the severity of the incident or who was involved in the

1    incidents?  What types of things did you evaluate when

2    you were looking at those reports?

3         A.    Really kind of all of the above.  We would

4    look at that, all of the information.  But every

5    incident report is evaluated and the majority of them

6    are actually even investigated to determine whether or

7    not there is opportunity to lessen the chance for future

8    occurrences.

9         Q.    During your time as warden at Trousdale, what

10   would you say was the most common type of incident that

11   you had?

12        A.    Fights and assaults.

13        Q.    Was it fights or assaults between any

14   particular groups?

15        A.    It varied.  Unfortunately, when you have

16   security threat groups inside of the facilities, it's

17   really who's rivaling at that particular time.  You

18   know, this month it may be the Gangster Disciples and

19   the Bloods.  And it may be the Crips next week.  I mean,

20   it just varies.  And some of those things stem from the

21   streets into the prisons and some of it stems from the

22   prisons into the streets.  And from prison to prison, it

23   really varies.

24              You know, I've got to say that TDOC and

25   CoreCivic had some really good networking.  So if we

Page 121

1    seen a spike in incidents, specifically the STG at one

2    facility, there was a great job of communicating that

3    out to all of the other facilities so that we could

4    potentially evaluate as to whether or not we were going

5    to have similar types of issues at our own institution.

6         Q.    And so at Trousdale, did you have a frequent

7    issue with STG assaults?

8         A.    A lot of them, when we had assaults and

9    fights, they were STG connected, yes, ma'am.

10        Q.    Would you say that the majority of assaults

11   and fights were STG connected at Trousdale?

12        A.    Yes.

13        Q.    And what STGs came up the most often as being

14   problematic at Trousdale?

15        A.    The Crips.

16        Q.    Anyone else?

17        A.    I mean, they're the most unorganized group.

18   There's no real hierarchy.  So a bunch of young guys,

19   unfortunately, without much structure.  Gangs have

20   structure by nature and there are certain things.  But

21   unfortunately, with the Crips, there is not a whole lot

22   of governing, I guess, if you will, or bylaws or rules

23   that they follow.  Not that we sanction or imply or even

24   give credit to, but the Crips are probably your most

25   sporadic group.

Page 122

1      Q.    What did you do as warden of Trousdale to try

2    to minimize violence, specifically with the Crips,

3    during your tenure?

4      A.    I won't say we just tried to minimize it with

5    the Crips.  It was, you know, really an effort for all

6    violent incidents STG related.  Early on, we had

7    conversations with my boss, at that time Jason Medlin,

8    as well as with the contract monitor, looking at the

9    level of STG that was at the facility, how long some of

10   those STG members had been at the facility.

11           And then coordinated some effort with TDOC to

12   actually move some of the STGs, inmates who were a

13   little more problematic or had been there a long time so

14   they were well established.  So we moved some of them

15   out of the facility, first and foremost to try to lessen

16   our numbers at Trousdale.  And then looked at the ones

17   that were problematic to try to move them around so they

18   weren't all together.

19     Q.    Do you know how many murders of prisoners

20   there were at Trousdale during the period of time that

21   you were the warden?

22     A.    I don't think I had -- I don't think I had

23   any homicides, that were confirmed homicides, I don't

24   believe during my term that I was there.  I would have

25   to go back and look.  There was deaths for sure, but I

1   am not sure that we had any that were actually

2   categorized as a homicide during my tenure.  I would

3   have to go back and look.

4        Q.    How many deaths do you recall occurring while

5   you were warden at Trousdale?

6        A.    I would have to go back and look at the

7   statistical data.  I would just be guessing at a number.

8        Q.    Do you think it was more than a dozen?

9        A.    Yes.

10            MR. WELBORN:  Object to the form.

11  BY MS. HERZFELD:

12       Q.    And at the other facilities that you've

13  worked at, have you had a lot of inmate deaths?

14       A.    Again, the nature of the facility, the size

15  of the facility.  No, not at my previous facilities, but

16  most of my previous facilities were short stays.  It

17  being detention, they stay there less than 30, 40 days.

18       Q.    So Stewart detention facility where you are

19  right now, that's an immigration facility so that's

20  civil.  Have you ever been warden at a prison before?

21       A.    Prior to Trousdale, not ever -- no.

22       Q.    So it was mostly jails or you were the

23  assistant warden?

24       A.    Yes, ma'am.

25       Q.    Is CoreCivic required to provide security for

```
 1    Trousdale to your knowledge?

 2         A.    Yes.

 3         Q.    What type of security is that?  What do you

 4    mean by that?

 5         A.    Staff who meet the established job

 6    descriptions with regards to correctional officers and

 7    those ranking positions.

 8         Q.    Do you know what a post assignment is?

 9         A.    Yes.

10         Q.    What is a post assignment?

11         A.    It's the post in which the officer is

12    assigned to physically work.

13         Q.    Do you know what a critical post is?

14         A.    I do.

15         Q.    What is a critical post?

16         A.    It's a post that by contract has to be

17    covered for the specific duration.  Some are, you know,

18    first shift only, some are 24/7.  So it varies on the

19    length of time, but it's a post that has to be covered

20    for whatever that designated period is.

21         Q.    Do you know if there was ever a time when you

22    were warden of Trousdale that a critical post was not

23    covered?

24         A.    Yes.

25         Q.    When was that?
```

1        A.     Throughout my entire time there.  There was

2    various times that the critical posts were not covered.

3        Q.     What types of critical posts were not

4    covered?

5        A.     Typically, it would have been your escort

6    officer, utility officer, those officers who roam from

7    area to area, like to escort offenders from one location

8    to another.  Those types.  Periodically housing units,

9    pods that we didn't have the ability to cover due to

10   call-ins and things of that nature.

11       Q.     And so that was going to be my next question

12   is why they weren't covered.  So why weren't they

13   covered?

14       A.     Call-ins.  Hospital posts that come up,

15   meaning there were detainees that get sick and you have

16   to take them to the hospital.  Detainees who are placed

17   on one-on-one observations through mental health, for

18   whether it's suicide observation.  Those are things that

19   you can't plan for that unfortunately occur.  You know,

20   life happens.  And so we have to be able to provide

21   security support when you send somebody to the hospital.

22   And so we would have to pull those individuals to cover

23   that hospital run or that suicide post or to cover that

24   call-in.

25       Q.     Do you know why critical posts are considered

1   critical?

2        A.    For the safety and security of the

3   institution.

4        Q.    So if you had critical posts that are open,

5   that would make the facility less safe; is that right?

6        A.    It could, yes.

7        Q.    What is a non-critical post?

8        A.    It's a post that can be pulled that has

9   minimal impact to the facility with regards to life

10  safety and security concerns.

11       Q.    Could you give me some examples?

12       A.    So for example, like transportation, for

13  example.  If you didn't have transportation going on and

14  there was nobody going in and out of the facility, it

15  wouldn't make any sense that, you know, those staff

16  members would just sit in an area waiting for the next

17  transport to occur.  So you could reallocate or reassign

18  those individuals to do other duties until a transport

19  was to occur.

20       Q.    Do you know what I mean when I say security

21  staff?

22       A.    Yes.

23       Q.    What is security staff?

24       A.    Any uniformed employee.

25       Q.    And that would be the CoreCivic employees?

1      A.     Uniform.  You know, for example, the

2   correctional officers, the shift captains, the

3   lieutenants, the sergeants.  Those individuals who wear

4   a security uniform.

5      Q.     What types of employees do not wear a

6   security uniform at Trousdale?

7      A.     Support services, administration, education.

8   Medical has their own uniform, it's not a security

9   uniform, it's a medical uniform.  But primarily, your

10  services and administration.

11     Q.     Do you know what a staffing roster is?

12     A.     I do.

13     Q.     What is a staffing roster?

14     A.     It's the roster that the shift captain uses

15  in order to assign staff to specific areas around the

16  facility.

17     Q.     Are those kept someplace?

18     A.     Yes.

19     Q.     Where are they kept?

20     A.     They're kept at the facility.  The master

21  schedule.

22     Q.     Is that a record that's kept and like logged

23  for a particular period of time or it goes to

24  headquarters or what happens to those?

25     A.     No, it's maintained.  I forget what the -- I

Page 128

1   would have to go back to policy to see what the actual

2   retention period is for shift rosters.  But there is

3   established time that we keep or maintain those.

4         Q.    And to your knowledge, can CoreCivic change

5   the staffing patterns or post assignments?  Or would you

6   do that?  Who would do that?

7         A.    The staffing pattern is, again, part of the

8   contract.  So we can't change it without the partner's

9   approval if it's a contract staffing pattern change.

10        Q.    What about post assignments, who would be

11  able to change those?

12        A.    As far as who is working the post?

13        Q.    Yes, sir.

14        A.    The shift captain or the master schedular.

15        Q.    What about in the example you were talking

16  about before where say somebody needs to go to the

17  hospital or they need to be watched on suicide watch so

18  someone is pulled off of a critical post, who makes the

19  decision to pull that individual off of the critical

20  post?

21        A.    When I was there, the shift captain would

22  also have a conversation with the administrative duty

23  officer, whoever was on call for that particular week,

24  whether it be the chief of security, the assistant

25  warden or myself.

Page 129

1              And then if we were going to not cover the

2    critical post, maybe there was reasons either myself or

3    that a duty officer would also reach out to the contract

4    -- it's actually the correctional administrator, who was

5    John Fisher, who was the direct supervisor of the

6    contract monitor to report that we were going to have --

7    they need to close a critical post based on whatever the

8    reason may be and what our efforts were to back fill

9    that position and reopen it.

10       Q.    Okay, and so whenever there was a critical

11   post that was not being covered, there would be a record

12   of that somewhere at CCA -- I am sorry, CoreCivic?

13       A.    Yes, ma'am.

14       Q.    And the contract monitors would know where

15   those are?

16       A.    It's going to be on the shift roster, it

17   would be reflected.  And those shift rosters each day

18   were sent to the contract monitor as well.

19       Q.    And we talked a little bit before about the

20   memos that you drafted as the warden of Trousdale.  Did

21   you draft or sign memos often as the warden?

22       A.    Yes.

23       Q.    Do you have any idea how many memos you've

24   signed off on while you were warden?

25       A.    I don't.

1        Q.    Did you ever draft any of them yourself or

2   were they typically drafted by someone else for your

3   review and signature?

4        A.    Probably both.  I'm sure I did.

5        Q.    And you had a binder where you stored those

6   memos; did I understand that correctly?

7        A.    Correct.  An instructive memorandum binder.

8        Q.    As far as keeping track of records and

9   communication and stuff at Trousdale, would you say that

10  Trousdale was still primarily working on paper and

11  sending paper memos or had you switched over to things

12  were more electronic with e-mail?

13       A.    I wish.  Trousdale was a pretty paper intense

14  facility.

15       Q.    And if employees wanted to send messages to

16  each other, was there a way for them to do that?

17       A.    Outside of e-mail, face-to-face

18  conversations.  I mean, I guess they could write them a

19  note and put it in their mailbox or something like that,

20  yeah.

21       Q.    I don't think people even do that anymore.

22       A.    They do.

23       Q.    They do.  Now I don't feel quite so old.

24  What about like an instant messenger, was there some

25  sort of way for people to speak online in like an

 1    instant messenger capacity?

 2         A.    There is.  I am not an IT guy by any stretch,

 3    henceforth, I have no social medias or anything.  But I

 4    know that there is an instant messenger.  Whether that's

 5    connect to e-mail or if that -- I am not sure.

 6         Q.    Do you know if employees at Trousdale used

 7    some form of instant messenger?

 8         A.    I believe they had the capability.  Whether

 9    they used it or not, I don't know.

10         Q.    Who would know that?  Is there an IT person?

11         A.    At the facility?  I don't know even the IT

12    person.  I don't know how you would know that, honestly.

13         Q.    Is there some sort of internal server where

14    documents are kept for Trousdale?

15         A.    CoreCivic has a server, internal server, yes.

16         Q.    What types of documents are kept on that

17    internal server?

18         A.    Everything that is done on the computer, I

19    think, is backed up in some fashion or other for

20    whatever period of time.

21         Q.    Does that server have a name?

22         A.    If it does, I don't know what it is.

23         Q.    If electronic things -- I'm trying to figure

24    out what the electronic databases are that you would

25    have access to at Trousdale.  Are there any electronic

1   databases?  I think you talked about the --

2          A.    The 5-1 IRD.

3          Q.    5-1 IRD.

4          A.    The employee discipline is automated.  You

5   know, our purchasing stuff is automated.  I'm sure

6   there's others that I'm just forgetting.  The hiring and

7   separating of employees is automated, the HR component.

8          Q.    And can you think of any other sort of --

9   like here we'll say, oh, go ahead and save it on the

10  server.  That's what we say within our office.  Did you

11  save that on the server or did you save that on Worldox?

12  That's the name of where we save things.  Did you guys

13  have anything like that?

14         A.    A share drive, that's for Trousdale.  There

15  is what they call a share drive.

16         Q.    And what is the share drive for Trousdale?

17         A.    It's really an area that any person who's got

18  CoreCivic credentialing and access to a computer can

19  sign on for Trousdale.  You can go in -- so if there's a

20  form, say, that would be applicable to many people

21  inside the facility, they can go in there and pull that

22  form off of there.

23         Q.    What other things are on that share file,

24  other than kind of forms that could be filled out?

25         A.    It's hard to say.  I mean, anybody can save

1    anything to it.  So there's probably some things -- I

2    don't know, there's just a lot of things.  I don't know

3    if there's anything that's defined that says this can be

4    and this should be or this shouldn't be.

5        Q.    And so are the policies for Trousdale on that

6    share file?

7        A.    No, we have -- they're on the intranet for

8    CoreCivic.  So every employee, again, can get on and

9    review policy through the intranet process.

10       Q.    Do you know if individual employees save

11   things on the share file?

12       A.    I'm sure they do because everybody has access

13   and ability to do that.

14       Q.    During the time that you were working at

15   Trousdale, was Trousdale ever audited?

16       A.    Yes.

17       Q.    By whom?

18       A.    TDOC, CoreCivic, ACA, comptrollers.  I think

19   that was it, I mean, as far as the individual auditors

20   or outside people auditing.

21       Q.    And when you were -- when Trousdale -- let me

22   start again.  When Trousdale was audited by TDOC,

23   CoreCivic, ACA or the comptroller's office, were there

24   ever deficiencies found?

25       A.    Yes.

1        Q.     In which of those audits were deficiencies

2   found?

3        A.     There were -- I'm trying to remember what our

4   score was with ACA.  I don't remember if we had any

5   deficiencies with ACA.  Yeah, I think there was, but I

6   can't remember what the particulars were.  There's about

7   400 different standards that they measure, so I think

8   there was.  I mean, we were ultimately accredited

9   through ACA, but I don't remember what non-mandatory

10  standards would have been found noncompliant during that

11  period.

12             But during the medical audits we had through

13  TDOC, you know, from chart counts being off, needle

14  counts, between nursing staff were some of the common

15  things.  During the audits with the comptroller,

16  staffing was addressed.  Which again, was kind of

17  regurgitated through that CDR process and a lot of that

18  data was given to them when they got there, specifically

19  from the contract monitor and from us.  So I know

20  staffing was on there.  Segregation, as I mentioned

21  before, you know, doing rounds, documented rounds and

22  processes related to restrictive housing assignments.

23  There's a battery of things.

24       Q.     What about when you had audits done by

25  CoreCivic, were there any deficiencies found then?

```
 1        A.    Yes, ma'am.

 2        Q.    And do you recall what those deficiencies

 3   were?

 4        A.    Very similar, you know, to the findings that

 5   we -- occurred from the TDOC audits.  Much of our audit

 6   instrument is built to mirror the TDOC policies and

 7   practices at the facility.  So very similar in nature.

 8        Q.    And when we're talking about these audits,

 9   are those also called policy audits or are they called

10   something different?

11        A.    Well, I mean, the -- now, I've never heard

12   them referred to as policy audits.  I mean, they're

13   ultimately the indicators and the standards that are

14   built from policy or from contract.  But I've never

15   heard them referred to as a policy audit.

16        Q.    And with the contract monitors, I know you

17   had said that they have to issue something if they think

18   you're out of compliance.  Do they issue regular

19   reports?

20        A.    Not to me.  As far as -- but I do know that

21   they had to do monthly reports, you know, on either

22   contract deficiency issues or compliance issues that

23   went directly to the TDOC leadership.  But not directly

24   to me.

25        Q.    Were you copied on those monthly reports?
```

1      A.     I believe, yeah.  I can't remember if they

2  gave them to me in hard copy or if it was e-mail or

3  both.  But yeah, typically -- I mean, it wasn't a

4  surprise.  I knew what was being reported as far as

5  deficiencies.

6      Q.     Okay.  Do you know if CoreCivic employees are

7  unionized?

8      A.     Some of our sites, yes.

9      Q.     Do you know if there is a union representing

10  CoreCivic employees at the Trousdale facility?

11      A.     There was not at the time I was there.

12      Q.     How long were the officer shifts at Trousdale

13  when you were there?

14      A.     Twelve-hour shifts were what they were

15  designated.

16      Q.     Would folks sometimes work overtime?

17      A.     Yes.

18      Q.     What about double shifts?

19      A.     Did it occur on occasion, yes.

20      Q.     And with security staff, did you ever have

21  security staff pulling double shifts?

22      A.     Yes, we did.  A little less.  I don't know

23  that we ever had anyone go a full 24 hours.  But we did

24  have staff that would go 18, you know, 19 hours, yes.

25      Q.     Was that a somewhat regular occurrence?

1        A.    No.

2        Q.    Were shifts always 12 hours since the time

3   that you began at Trousdale?

4        A.    Since my arrival, yes.

5        Q.    Did they ever change at any point?

6        A.    During my time?

7        Q.    Yes.

8        A.    No.

9        Q.    And the individual employees that --

10   CoreCivic employees, those are generally, with the

11   exception of management, those are hourly employees?

12        A.    Yes.

13        Q.    And when those hourly employees worked more

14   than their 12 hours, are they given overtime?

15        A.    Actually, if they work more than 40 in a

16   single week.  So they're automatically built-in over-

17   time on a twelve-hour shift, automatic.

18        Q.    I want to make sure I understood that.  I'm

19   going to back up.  So how many 12-hour shifts a week

20   would an employee typically work?

21        A.    The way the shift schedules worked, they

22   would work 48 hours one week, so four 12-hour shifts.

23   And then the following week, it was a 36-hour.  They are

24   paid by the week -- or their hourly compensation was by

25   the week.  So the week that they worked the 48, there

```
 1   was eight hours of built in overtime for that actual

 2   time.

 3        Q.    So they would work 48 and then they work 36?

 4        A.    That's correct.

 5        Q.    Week to week?

 6        A.    Correct.

 7        Q.    Four 12-hour shifts and then three 12-hour

 8   shifts?

 9        A.    That's correct.

10        Q.    And so the week that they worked 48, they

11   would get overtime for those eight hours?

12        A.    That's correct.

13        Q.    Were folks able to take more overtime, work

14   more than the four 12-hour shifts during a week?

15        A.    Yes.

16        Q.    Was that opportunity just generally available

17   because you were so short staffed?

18        A.    It was to cover the vacancies, however those

19   were driven.  Whether it was call-ins or no call no

20   shows, or hospital duties that come up, those types of

21   things.  It was to cover those vacancies so that we

22   could, in turn, make sure that the things were met that

23   we were required to meet.

24        Q.    So if an individual was, say a guard, and

25   they wanted to make extra money for Christmas or for a
```

 1    car payment or, you know, whatever it is, would you say

 2    that there was basically an unlimited opportunity for

 3    people to work overtime if they chose to at Trousdale?

 4         A.    Not an unlimited, no.

 5         Q.    Were there limits on the amount of overtime

 6    an individual could work?

 7         A.    Yes.

 8         Q.    And what were those limits?

 9         A.    Not to exceed 50 hours in a single pay

10    period, so a two-week period.

11         Q.    Not to exceed 50 hours in a two-week pay

12    period?

13         A.    That's correct.

14         Q.    So if they're working 40 hours for each week,

15    that would 80 hours.  So you mean not more than 50 hours

16    of overtime in a two-week pay period?

17         A.    That's correct, yes.

18         Q.    Did you ever have any staff that worked their

19    40 hours -- I'm going to back that up.  Did you ever

20    have any staff that you know of during your time at

21    Trousdale that worked the 80-hour regular shift plus 50

22    hours of overtime during those two weeks?

23         A.    Yes.

24         Q.    How often would you say that happened?

25         A.    I would have to go back and look at the

1    records.  It happened each pay period, but the number of

2    people, I'm not sure.

3        Q.    And so I just want to make sure that I

4    understand this.  So over a two-week period, you've got

5    40 hours, which is you said the 48 one week and then the

6    36 hours the next week.  And then a total of 50 hours

7    per week they could work on top of that; is that right?

8        A.    That's correct.

9        Q.    And so is it 50 hours -- they had a maximum

10   of 50 hours of overtime over the two-week pay period or

11   50 hours of overtime for each week?

12       A.    The pay period, meaning the two weeks.

13       Q.    Okay, so if you take 80 hours of regular time

14   plus 50 hours of potential overtime, that could have

15   employees working 130 hours over the course of two

16   weeks?

17       A.    That's correct.

18       Q.    If you did that, that would be 65 hours a

19   week, roughly?

20       A.    Yes.

21       Q.    And you think that happened about every pay

22   period?

23       A.    Yes.

24       Q.    And then the overtime that CoreCivic full-

25   time employees were working, that helped to fill in the

 1    gaps for the lack in staffing; did I understand you

 2    correctly?

 3         A.    Correct.

 4         Q.    Do you know if it's more cost efficient to

 5    have full-time employees work overtime or hire an

 6    additional employee?

 7         A.    Actually, it's more costly to have the over-

 8    time employee.

 9         Q.    Do you ever know of a time where an employee

10    worked more than the 50 hours of overtime, even though

11    there was supposed to be a cap on it?

12         A.    As previously stated, yes.

13         Q.    Worked more than the 50 hours of overtime?

14         A.    Yes.

15         Q.    And how many times did that happen?

16         A.    Again, without going back to the records,

17    that's what I was referring to.  I would have to go back

18    and look to see the number of people per pay period that

19    that would have been applicable to.  I don't know.

20         Q.    Was it a somewhat regular occurrence to have

21    some folks work more than the 50 hours of overtime for

22    those two-week pay periods?

23         A.    Yes.

24         Q.    Did you ever talk to your higher-ups about

25    folks working over the 50-hour overtime cap?

1      A.    Yes.

2      Q.    And who did you speak to?

3      A.    The two same managing directors, Stacey Stone

4  and Jason Medlin.

5      Q.    What did they say about it?

6      A.    That discussion typically was prompting to

7  bring additional staff from the other CoreCivic

8  facilities, which they would have had to authorize.

9      Q.    When you would complain that you had people

10  working more than the 50 hours of overtime, would they

11  always bring in extra people to alleviate that concern?

12      A.    I can't recall a time that I was ever told

13  no.

14      Q.    Do you know what the purpose is behind having

15  a 50-hour overtime cap for a two-week pay period?

16      A.    Really, it's just to make sure that you don't

17  -- because you'll have individuals who would never go

18  home unless you just told them to go home.  And it's so

19  as to evenly space out to make sure that not one person,

20  any one single one person is doing all of the overtime

21  and the others aren't kind of pulling their fair share

22  to spread out the amount of overtime across the

23  individuals.  To be as fair as possible.

24      Q.    So if folks are working overtime, say 60, 70,

25  80 hours a week, do you think they're at their best?

```
 1        A.    I don't know that anybody can make that
 2   argument that, you know, a person who hasn't worked any
 3   versus a person who's worked a good number of hours
 4   would be the same person.  So no, I can't say that.
 5        Q.    Do you think folks would be more tired if
 6   they've been working a lot of overtime in a particular
 7   week?
 8        A.    Human element, yes.
 9        Q.    Do you think they might not be as sharp if
10   they were working a lot of overtime in a particular
11   week?
12        A.    Again, I think that varies from person to
13   person.  But I mean, if you work more versus a person
14   who is not, I think any reasonable person would say that
15   the person who's worked fewer hours should be more
16   alert.  But that doesn't necessarily mean the base
17   because you don't know what they're doing at home.  So I
18   can't always say that.
19        Q.    But your preference would be to have folks
20   working normal shifts and not working overtime; is that
21   right?
22        A.    Yes.
23        Q.    And is that because that's safer for the
24   facility?
25        A.    Yes.
```

1      Q.    Are employees required to work overtime at

2   Trousdale?

3      A.    Yes.

4      Q.    And what is the requirement for employees to

5   work overtime at Trousdale, when you were there?

6      A.    I mean, it's really the same -- the

7   requirement exists due to making sure that we cover all

8   critical and mandatory posts.  And so, I mean, that's

9   the real requirement.  And we require all staff to do

10   that, again, so that we can be fair and spread out the

11   amount of overtime across the entire workforce as

12   opposed to just having a certain group or a smaller

13   group.

14      Q.    And so was there mandatory overtime for

15   CoreCivic employees the entire time that you were

16   working at Trousdale?

17      A.    Yes.

18      Q.    How many hours for mandatory overtime?

19      A.    I don't recall the specific number.

20      Q.    How would folks know that there was mandatory

21   overtime while you were working at Trousdale?

22      A.    The master scheduler would coordinate the

23   schedule, letting them know what days that they have

24   been scheduled for mandatory overtime.  Or the shift

25   captains, if it was a post that couldn't have been

1    planned for, such as a call-in, hospital duty that just

2    arose, suicide observation post that just arose, they

3    would then look at the people with the fewest number of

4    hours for that particular week.  And then they would

5    start from that list and work backwards.  So fewest

6    number of hours first and so on and so forth.

7         Q.    So when there was the maximum of 50 hours of

8    overtime that wasn't always adhered to, was there ever a

9    time when CoreCivic employees were required to work

10   their 80 hours in a two-week period plus the additional

11   50 hours of overtime?

12        A.    Yes.

13        Q.    When folks are working more than the 50 hours

14   of overtime, were they ever mandated -- was it ever

15   mandatory overtime that put them over that 50-hour over-

16   time cap?

17        A.    Yes.

18        Q.    Was that a routine occurrence that people

19   would be scheduled for more than their 80 hours during

20   the two-week work week plus their 50-hour mandatory

21   overtime and then additional overtime beyond that?  Was

22   that mandatory overtime, was that a routine occurrence?

23        A.    It occurred.  How many of those beyond that

24   50, again, I would have to go back and look.  I mean, it

25   did occur, yes.  I couldn't tell you at what level of

 1    frequency.

 2         Q.    Are there any other ways that you think the

 3    amount of overtime that someone works is related to

 4    their job performance?

 5         A.    I don't understand the question.

 6         Q.    Sure.  Are there other concerns that you

 7    could have about security staff, for example, working a

 8    significant amount of overtime on their job performance?

 9         A.    Other than them personally, I mean, you know,

10    obviously a person working a large number of hours may

11    not necessarily be taking care of themselves.  So on a

12    personal side, that would be that element.  On the

13    professional side, it would be on the security side.

14         Q.    How many hours a week did you work when you

15    were warden at Trousdale?

16         A.    A day?

17         Q.    A day, a week, I mean, did you keep regular

18    hours as warden?

19         A.    No.  Typically, no fewer than 12.

20         Q.    Did you work weekends?

21         A.    Yes.

22         Q.    Did you work every weekend or just

23    occasionally work weekends?

24         A.    No, not every weekend.  When I was

25    administrative duty officer, my assignment, because we

1   cover seven days a week, Monday to Monday, there is an

2   obligation that we go into the facility, conduct rounds

3   on both Saturday and Sunday.  And then we also have to

4   do a night shift tour during that period of time between

5   the hours of 10:00 p.m. and 4:00 a.m., going into the

6   facility to spend time with the night shift staff as

7   well.

8          Q.    When you were warden, what was your typical

9   schedule?  If like your secretary was wondering when you

10  would come in, you were typically there 7:00 to 7:00,

11  8:00 to 8:00?

12         A.    I typically would get to work about 5:30, six

13  o'clock every morning.

14         Q.    So you are an early riser?

15         A.    Yes, ma'am.

16         Q.    And would you stay until about dinnertime?

17         A.    Usually until following dinner, the dinner

18  meal.  Not always, you know, but the majority of the

19  time, it was at the conclusion of the dinner meal.

20         Q.    And the dinner meal is served at what time at

21  Trousdale?

22         A.    We'd finish up between 6:30, seven o'clock

23  sometimes.

24         Q.    And I think I've been there, sometimes I

25  think I've seen dinner coming in as early as 4:30?  Does

 1    that sound right?

 2         A.    Yeah, but you've got to remember you're

 3    feeding 2600.

 4         Q.    You've got to get through the whole round?

 5         A.    You've got to get through the whole facility,

 6    yeah.

 7         Q.    Would you agree that excessive overtime could

 8    lead to employee burnout?

 9         A.    It could, yes, ma'am.

10         Q.    And do you think it would cause stress for

11    folks to be working all of that overtime?

12         A.    It could.

13         Q.    What about physical exhaustion?

14         A.    It could.

15         Q.    For your security staff, a lot of it is folks

16    are on their feet walking around a lot, right?

17         A.    Every work station had seats so they could

18    sit down.  Even on the housing units, there were stools

19    and chairs that they would routinely sit at, making

20    their log entries and things of that nature.  But the

21    floor officers, I would say probably would walk the

22    most.

23         Q.    When you're in a security position at a

24    prison, I am assuming you have to be on high alert all

25    the time?

1          A.      Yes, ma'am.

2          Q.      Looking out for folks and, you know, people

3    that are saying things or people that are doing things,

4    you have to have like a heightened level of awareness of

5    what is going on around you; is that right?

6          A.      Yes.

7          Q.      You said you were corrections officer at some

8    point; is that right?

9          A.      Yes, ma'am.

10          Q.      When you were a corrections officer, did you

11    find that having that heightened level of awareness

12    around you caused you to exert physical and emotional

13    energy?

14          A.      Me personally, no.  You know, it was just a

15    condition and part of the profession.  So I didn't

16    notice any specifics, me personally.  But how it impacts

17    me or affects me is going to be completely different

18    than the way it impacts or affects the next person.

19          Q.      When you're on as a security guard, you can't

20    really just be like checking your Facebook and kind of

21    hanging out and reading a book and, you know, relaxing

22    like you could in other positions; is that right?

23          A.      No, you shouldn't be doing that period.  No,

24    that is correct.

25          Q.      So during the shift when someone is working a

```
 1   security position, they need to be paying attention to
 2   what is going on within their area every minute of that
 3   shift; is that right?
 4        A.    That's correct.
 5        Q.    Have you ever heard of employees being
 6   frozen?  Someone having to stay in their shift until
 7   someone else can come in to replace them, like you can't
 8   leave until your replacement gets here?
 9        A.    Yeah, that's where that mandatory overtime
10   would be applicable.
11        Q.    Did you have a term for that at Trousdale?
12        A.    It was mandatory.
13        Q.    Mandatory, okay.  It wasn't called freezing
14   or frozen or anything like that?
15        A.    Not that I ever heard referred to.  Not to
16   say that staff didn't use that word, but I never --
17   actually never heard that.  That's the reason I paused
18   when you said frozen, I didn't know what that meant.
19        Q.    I wasn't talking about the musical.  How
20   often would you say those employees had that mandatory
21   overtime?  Was that once a week, twice a week, every
22   week?
23        A.    Again, it would be a pure guess.  I mean, it
24   occurred each day probably, but to the numbers, I would
25   have to go back and look at the shift rosters.
```

1        Q.    Are employees of Trousdale given sick leave?

2        A.    All I heard is employees and then came in at

3    sick leave.

4        Q.    Are employees at Trousdale given sick leave?

5        A.    It's PTO.  It's personal time off.  So it

6    would all be clustered into -- they utilize that bank of

7    hours however appropriate, whether it's for sick leave,

8    whether it's for vacation leave.  It's their discretion

9    how they use it.

10       Q.    Do you know how much PTO they get, or does it

11   depend on the employee?

12       A.    It depends on the employee and their

13   longevity.

14       Q.    Do you know if any employees were ever denied

15   PTO time while you were warden?

16       A.    I'm sure, yes.

17       Q.    Do you know what some of the reasons would

18   have been?

19       A.    Could have varied.  More often than not, it

20   would be the fact that they had already been given the

21   allowed number of people to be off in any given day.

22   Based on the number of people that were going to

23   training.  You know, those types of things.  It's kind

24   of hard to deny it for sick call-ins because you don't

25   know that in advance.

1              But more often than not, it was because we

2    had -- they had already exceeded the number or were at

3    the number of people that they could give off, and

4    that's been the designated by the shift and that relief

5    factor.

6         Q.   Did a situation like that ever cause you to

7    have to have folks working at Trousdale that were ill on

8    duty?  That were sick?

9         A.   No, I mean, because they would have called in

10   sick for that day if that's what you are asking.

11        Q.   I guess that's what I'm asking.  So has

12   anybody ever been, you know, hey, I am calling in sick,

13   I'm really not feeling well.  No, I'm sorry, we're too

14   short staffed, you're going to have to come in.  Was

15   there ever a situation that happened like that while you

16   were warden?

17        A.   No, I mean, if it was to the point, like for

18   example, if you had an employee who was routinely having

19   an issue, the person taking the call, either the shift

20   captain, the manager, whoever it may be, may ask them to

21   bring a doctor's note to support the fact that they were

22   truly utilizing that sick leave for a qualified reason.

23   But to say -- you know, you can't go reach through the

24   phone and make them come to work.

25        Q.   You said that there was a -- would you say

1    that there was a lot of turnover in positions at

2    Trousdale while you were there?

3         A.    Some positions, yes, and others, no.

4         Q.    And what were some of the higher turnover

5    positions?

6         A.    By shear number, correctional officers.

7         Q.    What were some of the factors while you were

8    warden at Trousdale that led to increased turnover in

9    the corrections officer positions?

10        A.    A matter of reasons.  I will tell you, this

11   profession is not for everyone.  So some would believe

12   that it was the profession that they would like to have.

13   The unfortunate side about this industry is that there

14   is not a test period.  You go through class and you go

15   to work.  It either fits you or it doesn't fit you.  So

16   a large number was that.  It was that the profession did

17   not -- wasn't what they anticipated or they expected.

18             We have a lot of the workforce today that

19   want to work Monday through Friday or some cases Monday

20   through Thursday and have every Friday, Saturday, Sunday

21   off.  Who don't want to do shift work, who don't want to

22   work weekends, don't want to work holidays.  Some that

23   don't want to be a part of mandatory overtime or

24   scheduled overtime.  But in this industry, as was as in

25   law enforcement as a whole and public safety as a whole,

 1   it's a -- one of uncertainty with regards to schedules

 2   and shifts.

 3           So that was probably your bigger -- your

 4   biggest two things, was just wasn't the right fit in

 5   profession.  And secondly, not wanting to commit to the

 6   level that the profession expects or needs.

 7       Q.    When you say not willing to commit to the

 8   level that the profession needs or expects, does that

 9   include the not wanting to work the mandatory overtime?

10       A.    Yes.

11       Q.    In your opinion, does the high turnover rate

12   impact the safety of the prison?

13       A.    It can, yes.

14       Q.    To your knowledge and your experience, is

15   there a level of turnover that becomes unacceptable for

16   a facility?

17       A.    I think any turnover should be considered

18   unacceptable.  You know, it's inevitable.  You're going

19   to have turnover.  I don't know that I know or can say

20   that, you know, a certain percentage is going to sway

21   the operations one way or the other.  But any turnover,

22   in my opinion, is not favorable.

23       Q.    While you were at Trousdale, did you ever

24   offer or do you know if CoreCivic ever offered retention

25   bonuses for folks that were already hired?

    1        A.    We offered recruitment bonuses, meaning that

    2   if you went out and recruited somebody who was able to

    3   come to work, met all of the background criteria and

    4   officially started, I know that there was, I want to say

    5   it was $1500 a person.  Where if that person was there

    6   at the three-month interval, the staff who made the

    7   recommendation got half of that bonus.  And then at the

    8   conclusion of six months, they got the remaining balance

    9   of that.  So I think it was paid out in two $750

   10   increments.

   11            There was also recruitment bonuses paid to

   12   the actual employee.  So it was paid out twice.  It was

   13   paid to the employee who came on, but it was also paid

   14   to the employee who was already actively there that

   15   recommended them for the position.

   16        Q.    So like a referral bonus?

   17        A.    Yes, ma'am.

   18        Q.    To your experience in your life-long career

   19   in corrections, what are some of the risks of bringing

   20   in temporary employees from other facilities?

   21        A.    If they're not from the same partner, you

   22   know, it's the lack of knowledge of the specific

   23   policies that relate to, for example, Tennessee.

   24   Bringing in from our other Tennessee facilities that are

   25   policy same and contract virtually same, very minimal.

1                   We do onboarding and we do some training with

2     those individuals who do come from the other non-

3     Tennessee facilities.  And so we provide them training

4     before we put them on a post by themselves and then

5     they're also provided on-the-job training by the staff

6     that are there before they're actually turned over to a

7     post by themselves.

8          Q.    How long is that new officer training?

9          A.    I believe it's 24 hours in the classroom and

10    16, I believe it was, for the on-the-job training.

11         Q.    Is that the same for new hires in general who

12    have never worked in a correction background?

13         A.    No, the academy for them is six weeks long.

14         Q.    Is that academy done through CoreCivic?

15         A.    Yes, ma'am.

16         Q.    Is there anything else that you would have

17    done when you were warden at Trousdale to keep staff, to

18    bring more staff on?

19         A.    Outside of what we did, I think we were doing

20    a lot.  Probably more so than any other facility that I

21    had ever worked with.  So I think anything that we

22    brainstormed on and pitched ideas, as long as it was in

23    line with all of the standards, was acted upon.  There

24    was never any effort to cut cost in any fashion as it

25    relates to staffing, overtime, recruitment efforts,

1    paying organizations to try to go out and find these

2    military individuals that are getting out of the

3    military and coming to work for us.  So I can't think of

4    any one specific thing that I would say that, hey, had

5    we done this, I think it would have made a difference

6    one way or the other.

7         Q.    Did you ever have a request while you were

8    warden at Trousdale for something to do with staffing at

9    the facility that was denied by CoreCivic?

10        A.    Not that I can recall.

11        Q.    What about any staffing requests or financial

12   requests to TDOC that were denied?

13        A.    Make sure I'm understanding the question.

14   Are you asking me requests that I made for TDOC to pay

15   for something?

16        Q.    Yes, sir.

17        A.    No, but that would not have originated with

18   me.  That would have -- if there was going to be any

19   change, for example, if we were going to change the

20   contracted staffing numbers at the customer's request or

21   ours, that would have prompted some discussions about a

22   per diem change potentially.  But none that I recall

23   while I was there.

24        Q.    What about requests for things to be paid for

25   by CoreCivic, did you ever have any of those requests

 1   denied?

 2       A.    You'll have to give me a little more detail

 3   what type of request you're referring to.

 4       Q.    Did you ever have any financial request made

 5   to CoreCivic denied while you were warden at Trousdale?

 6       A.    That I asked for?

 7       Q.    Yes, sir.

 8       A.    Not that I can recall, no.

 9       Q.    What about anybody at the facility?  Did

10   anybody at the facility make any requests financially of

11   CoreCivic that you know of that were denied?

12       A.    Other than like capital expenditure requests,

13   maybe.  That would be really the only thing.  We do that

14   annually to determine capital expenditures that could

15   have been denied or pushed to another year.  I don't

16   know any specifics.

17       Q.    I think you said before that CoreCivic gave

18   you like a supplemental budget in order to do

19   advertising to bring on more staff; is that right?

20       A.    Yeah, it was all in my budget, but it was an

21   elevated line item to support the efforts, yes.

22       Q.    Did that number go up year after year while

23   you were warden of Trousdale?

24       A.    Yes, ma'am.

25       Q.    Does it have a specific line item within your

1   budget?

2       A.    I think there is an actual recruitment and

3   retention line item, but I would have to go back to the

4   budget and actually look.  But I do think that there was

5   an advertising.  I am not sure exactly what it's

6   labeled.

7       Q.    Where could I find copies of your budgets?

8       A.    Our budgets are maintained at our facility

9   support center.

10      Q.    Would you agree that a prison's reputation

11  could impact the prison's ability to recruit and retain

12  quality employees?

13      A.    It could.

14      Q.    Do you think Trousdale had a good reputation

15  while you were warden?

16      A.    That's kind of open to -- you know, speaking

17  for how you view it, how I view it are going to be

18  totally different.  Do I think that some people had a

19  misconception of Trousdale Turner?  Absolutely.  Do I

20  think that there were false beliefs out in the

21  community?  Absolutely.

22      Q.    Did you ever hear of any of those beliefs or

23  conceptions making it into media stories?

24      A.    Yes.

25      Q.    And there was also the comptroller's

1  evaluation of Trousdale; is that right?

2      A.    Yes.

3      Q.    And the comptroller's reports, actually I

4  think there were two; is that right?

5      A.    That's correct.

6      Q.    And those reports from the comptroller's,

7  would you say they were favorable or unfavorable to

8  Trousdale?

9      A.    I think there was portions of that were

10  favorable and I think there were some things that they

11  listed some opportunity.

12      Q.    When you say listed some opportunity, what do

13  you mean?

14      A.    Opportunities to improve.  I don't know of

15  any correctional system or facility that is not going to

16  have opportunity for improvement.

17      Q.    Do you know if the comptroller does reports

18  on all facilities within Tennessee?

19      A.    I think they do now.  I am not sure if they

20  did previously.

21      Q.    And do you know what --

22      A.    And I'm not sure that they do all.  I think

23  it's just some.  I don't know that all have been.

24      Q.    Do you know what prompted the comptroller's

25  investigation of the Trousdale facility in Tennessee?

```
 1              MR. AUMANN:  Objection to form.

 2              THE WITNESS:  I do not know specifically what

 3    prompted them.

 4    BY MS. HERZFELD:

 5       Q.    Do you agree that Trousdale had a reputation

 6    as being a violent facility?

 7              MR. WELBORN:  Objection to the form.

 8              THE WITNESS:  Through the media, yes, I do

 9    believe the media gave that vision of Trousdale, yes.

10    BY MS. HERZFELD:

11       Q.    Would you want one of your family members to

12    be housed at Trousdale?

13       A.    I wouldn't want one of my family members

14    housed -- incarcerated, period.

15       Q.    Right.  But if one of your family members had

16    to be incarcerated, would you want them to be

17    incarcerated at Trousdale or someplace else?

18              MR. WELBORN:  Object to the form.

19              THE WITNESS:  I don't know that I understand

20    the line of questioning.  I wouldn't want them

21    incarcerated in any facility.

22    BY MS. HERZFELD:

23       Q.    But if you had a family member who was

24    incarcerated, would you feel safe having them at

25    Trousdale?
```

1          MR. WELBORN:  Object to the form.

2          THE WITNESS:  Where they had to do their time

3   would be not my decision.  I mean, ultimately, wherever

4   they committed their crime, they would be responsible to

5   do their time at whichever facility the classification

6   has deemed appropriate.  I would have no control over

7   that.

8   BY MS. HERZFELD:

9      Q.   Would you feel safe if you were incarcerated

10  at Trousdale?

11     A.   Did I feel unsafe as the warden of that

12  facility, the answer is no, I did not feel unsafe.

13     Q.   Right, but if you were being incarcerated,

14  would you feel safe being incarcerated at Trousdale?

15     A.   I can't answer that question because I have

16  never been incarcerated and I can't tell you how I would

17  feel -- presume how I would feel.

18     Q.   Do you think that the prisoners in Trousdale

19  feel safe?

20     A.   I think some, yes.  There's going to be

21  others that say, no, that they don't feel safe.

22     Q.   Have you gotten complaints from prisoners

23  while you were warden at Trousdale that said they did

24  not feel safe?

25     A.   Yes, and I've gotten complaints at every

```
 1    institution I've ever worked at.

 2         Q.    Okay.

 3         A.    I'm sorry.  The fire alarms are sounding.  Is

 4    that coming across to you guys?

 5         Q.    I can hear it.  Is there a fire?

 6         A.    No, ma'am.  They're running a drill.  They

 7    shut it off.  So I just wanted to make sure that it

 8    wasn't interfering.  Sorry.

 9         Q.    It's not interfering.  You got to hear my

10    e-mail, I got to hear your smoke alarm.

11               Do you know if Trousdale ever eliminated any

12    posts because CoreCivic couldn't find employees to fill

13    those posts?

14         A.    Eliminated them as far as the staffing

15    pattern?

16         Q.    Yes, sir.

17         A.    Not that I recall, no.

18         Q.    Do you know if any inmate programming at

19    Trousdale was ever cut or reduced due to a lack of

20    staff?

21         A.    No, not that I recall.  I mean, you would

22    have had, you know, maybe a class that wasn't provided

23    while we were actively recruiting to hire somebody if we

24    didn't have a substitute.  But as far as cutting it and

25    saying it's no longer going to be available, I can't
```

 1    think of any, no.

 2         Q.    Would you agree that inmate programming can

 3    reduce violence inside of a prison?

 4         A.    Yes.

 5         Q.    Do you know what the maximum salary is for an

 6    unstaffed position at Trousdale while you were there?

 7         A.    Maximum salary for what?

 8         Q.    Let me back up, that wasn't a very good

 9    question.  Unstaffed positions that you would have

10    because they weren't filled, what was the highest level

11    of an unstaffed position that you had at Trousdale?

12         A.    Like the highest level salary?

13         Q.    Yes, sir.

14         A.    I mean, it would vary from time to time.  I

15    mean, I would have an assistant warden, you know, maybe

16    there was a vacancy in between an assistant warden.

17    That would probably be the highest next in line when

18    there would be a vacancy.  That would probably be the

19    highest level position.

20         Q.    When you had vacancies at Trousdale while you

21    were warden, were most of those vacancies for

22    corrections officers or were there other positions?

23         A.    There was other positions, but again, by

24    shear numbers, the percentage of officers versus -- that

25    was the highest number of one specific job

1    classification that we had.  So number-wise, it would

2    always be the correctional officers.

3        Q.    Do you understand there to be a relationship

4    between safety of a prisoner and staffing?

5        A.    Yes, as previously stated.

6        Q.    Do you agree that an understaffed prison

7    would have less oversight of inmates?

8        A.    An understaffed prison would have less

9    oversight, is that what the question is?

10       Q.    Yes, sir.

11       A.    Yes.  I mean, fewer people is going to result

12   in less...

13             MR. AUMANN:  Can we take a break?

14             MS. HERZFELD:  One more question and then I'm

15   done with this section.

16   BY MS. HERZFELD:

17       Q.    Do you know if Trousdale, while you were the

18   warden, had an inmate-to-officer ratio?  Did you have

19   anything like that, that you had to take into

20   consideration?

21       A.    The staffing pattern provided the ratio, but

22   I don't remember what it was.  I would have to review

23   the staffing pattern.

24             MS. HERZFELD:  Okay, let's take a break.

25             (Recess observed.)

 1  BY MS. HERZFELD:

 2      Q.    Okay, Mr. Washburn.  We're coming back after

 3  a lunch break.  Did you have a chance to get something

 4  to eat?

 5      A.    I did.

 6      Q.    Good.  Now we can settle in for the remainder

 7  of your deposition.  How many --

 8            MR. AUMANN:  Sorry, Tricia, I should have

 9  mentioned to you.  I have to leave for a meeting at two

10  o'clock, so Nikki is going to take over in case the TDOC

11  defendants have any depositions from 2:00 to maybe about

12  three o'clock.  Sorry for interrupting you.

13            MS. HERZFELD:  Great.

14  BY MS. HERZFELD:

15      Q.    Okay, Mr. Washburn, do you know how many beds

16  Trousdale has?

17      A.    Right at 2600 total beds.

18      Q.    During the time that you were warden, was

19  Trousdale ever over capacity?

20      A.    No.

21      Q.    Were you right at full or were you less than

22  capacity?

23      A.    More often than not, below capacity.

24      Q.    About how much would you say you were below

25  capacity by?

```
 1        A.    I would say typically anywhere from three to
 2   four hundred beds below.
 3        Q.    During the time that you were warden at
 4   Trousdale or in the period of time after you left
 5   Trousdale, did you ever hear anything about shift
 6   records being falsified?
 7        A.    No.
 8        Q.    You've never heard of anyone saying that
 9   shift records were falsified at Trousdale?
10        A.    In what context?  I mean, from like the
11   comptroller's, it had initially indicated that there was
12   some concern, some rosters that weren't provided to them
13   during the first audit.  Those were later found in a
14   warehouse and then given to them.  If that's the context
15   you are talking about, then yes.
16        Q.    What about people falsifying the number of
17   hours that they worked?
18        A.    No.
19        Q.    Who do you report to directly at CoreCivic?
20        A.    The managing director.
21        Q.    That was who?
22        A.    Jason Medlin to start.  Stacey Stone.  And to
23   end was Charles Keating.
24        Q.    Did you have regular meetings with those
25   individuals?
```

```
 1      A.    Regular conversations, I wouldn't necessarily
 2  say meetings.
 3      Q.    So there is not like a standing quarterly
 4  meeting you have with them?
 5      A.    No.
 6      Q.    You just call as needed?
 7      A.    Yes.
 8      Q.    Are Trousdale employees permitted to call 911
 9  to request an ambulance to the prison?
10      A.    Yes.
11      Q.    Have you ever known that to happen while you
12  were warden at Trousdale?
13      A.    Yes.
14      Q.    Roughly how often?
15      A.    It varies.  I mean, to give you a number, I
16  would be just making up a number.  It happened whenever
17  there was a need.
18      Q.    And can Trousdale employees call 911 if there
19  is a violent incident at the prison?
20      A.    If there is a need for 911, yes.
21      Q.    Do you know if Trousdale employees, during
22  your tenure at Trousdale, if any Trousdale employees
23  ever called 911 for a violent incident?
24      A.    Yes, if it required medical assistance, yes.
25      Q.    What about -- I guess, here's my question:
```

Page 169

1    You have security forces inside the prison to deal with

2    some sort of violent outbreak or fight or riot; is that

3    right?

4         A.    That's correct, yes.

5         Q.    And if things were to get kind of beyond the

6    control of what it is that your folks were able to do if

7    there was some sort of a violent uprising at the prison,

8    what is the next step?  What happens after that?

9         A.    There would be direction given to call for

10   outside resources or assistance.

11        Q.    Outside resources or assistance would be law

12   enforcement, the county sheriff, police department,

13   something like that?

14        A.    TDOC, all of the above.

15        Q.    Who would make that call?  Would that be you

16   or is any individual permitted to do that?

17        A.    Typically the central control operator.

18        Q.    What is a central control operator?

19        A.    It's the person's -- or persons, because that

20   was a multi-post, two-person post.  They control all of

21   the doors, monitor cameras, issue keys, equipment, those

22   types of things all from a central location.

23        Q.    During the time that you were warden, do you

24   know if either of the people in that post ever had to

25   make a call to bring in outside resources because of an

 1   incident?

 2        A.    That was non-medical related?

 3        Q.    Yes, sir.

 4        A.    Not that I am aware of, no.

 5        Q.    Do you know of anybody ever calling for

 6   outside resources while you were warden of Trousdale

 7   that was not a medical incident?

 8        A.    No.

 9        Q.    And when you say medical incident, medical

10   incident includes people who were hurt because of a

11   fight or something like that; is that right?

12        A.    Yeah, needing EMS or it could have just been

13   a medical episode, a heart attack, yes.

14        Q.    Would you agree that at certain times while

15   you were warden at Trousdale, that inmates had access to

16   weapons?

17        A.    Fashioned weapons, the homemade weapons, yes.

18        Q.    What about traditional weapons?

19        A.    No.

20        Q.    You had a protective custody unit at

21   Trousdale?

22        A.    We did.  Well, let me say this:  No, we

23   didn't actually have a designated protective custody

24   unit.  We had inmates that were approved for protective

25   custody and would be pending transfer to a protective --

 1    a facility that has a protective custody unit.

 2         Q.    So I want to make sure that I understand

 3    this.  So if you are a prisoner at Trousdale while you

 4    were warden and someone felt concerned for their safety

 5    for whatever reason, then they would raise their hand or

 6    fill something out and say I need protective custody; is

 7    that right?

 8         A.    That's correct.

 9         Q.    What would happen to that individual once you

10    get that notification that they request protective

11    custody?

12         A.    They would be placed into alpha unit, which

13    is the restrictive housing unit.  An internal

14    investigation would be conducted to determine whether or

15    not there was cause or things that could be validated to

16    support the protection need.  And if so, they were

17    approved for protective custody, placed on protective

18    custody until they were transferred from the facility or

19    whatever the concern was moved or went away.

20         Q.    If someone is in protective custody, how long

21    do they normally stay in that?  Did you call it alpha?

22         A.    Yes, it's A-unit.  Alpha unit, yes, ma'am.

23    It varied.  We didn't have the authority to move people

24    out.  Central office made that determination when and

25    where they would move to, so it varied in length of

1    time.

2         Q.    While you were warden, did you ever have any

3    inmates request protective custody but be denied the

4    ability to go into protective custody?

5         A.    Yes.

6         Q.    What types of circumstances were those?

7         A.    It varied.  You know, if a person -- the

8    information that they provided was not able to be

9    validated or, quite frankly, was able to be

10   unsubstantiated in the threat or if they made an

11   allegation that they were in fear of a specific person

12   that was no longer at the facility, then they would be

13   denied.  It would go through an investigative process to

14   make that determination.

15        Q.    Are they placed in alpha unit while that

16   investigative process is going forward?

17        A.    Yes.

18        Q.    Every time?

19        A.    I can't think of a time we did a protective

20   custody investigation where a person didn't go into

21   alpha unit.

22        Q.    Have you ever had any prisoners that were

23   injured while in protective custody?

24        A.    Yes.

25        Q.    Like fights with other inmates?

1        A.    Yes.

2        Q.    When they're in protective custody, what is

3   different than being in the regular population?

4        A.    So they don't go to the chow hall.  Their

5   meals are satellite-fed to them in their designated

6   area.  They're in there with similarly situated

7   population.  They're actually now confined -- they were

8   confined to their cells, so they're limited contact as

9   far as even in the day room.  So it was more about

10  taking away the day-to-day contact with other inmates.

11       Q.    Did they have an individual cell or are they

12  doubled up when they're in protective custody while you

13  were there?

14       A.    Probably some of both.  There would have been

15  some that were single cell, there would be some that

16  were a two-man cell.

17       Q.    Were the individuals that were in alpha unit

18  for protective custody -- were there additional staff

19  assigned to that unit to pay more attention to them

20  because of security threats, or typically not?

21       A.    The staffing pattern actually only called for

22  one officer, but we routinely staffed it with two in

23  alpha.  So context goes, it's alpha unit, but alpha was

24  the area that we primarily kept the inmates that were

25  pending protective investigations.

```
 1        Q.    And that normally had one or two people
 2   watching over it?
 3        A.    The contract staffing pattern called for one,
 4   but we routinely staffed it with two.
 5        Q.    What is a lockdown?
 6        A.    In what context?
 7        Q.    Do you know if I said there was a lockdown at
 8   Trousdale, do you know that is?
 9        A.    Yes, there is a lockdown, meaning the
10   restrictive housing that those inmates are there for
11   either protective, disciplinary.  A lockdown of the
12   entire institution is just that, all inmates are
13   confined to their cells or bunks if they're in the open
14   bay.
15        Q.    Is there a policy that governs lockdowns at
16   Trousdale?
17        A.    I don't think there is an actual specific
18   policy, no.
19        Q.    Is that just something that is known within
20   the industry?
21        A.    Yes, ma'am.  And then, of course, there's an
22   operational plan that's developed if we are going to be
23   locked down for a period of time as to certify how we're
24   going to do showers, how we're going to do phone calls,
25   how we're going to do feeding processes, all of those
```

 1    things.  It's an operational order.

 2         Q.    Were there facility-wide lockdowns while you

 3    were warden at Trousdale?

 4         A.    Yes, ma'am, there was.  And, obviously, we

 5    did that for various reasons.  And always it was for

 6    security and safety of the institution.

 7         Q.    What was the longest institutional lockdown

 8    that you had while you were warden?

 9         A.    Length of time, 30 days, maybe.  Maybe a

10    little longer.

11         Q.    When you're on lockdown, everyone is confined

12    to their cell?

13         A.    Yes.

14         Q.    Is there chow hall, or everyone stays in

15    their cell?

16         A.    Again, it depends on the reason for lockdown.

17    Sometimes we did take the inmates in a controlled

18    fashion, one pod at a time.  Go to the chow hall, go

19    back, lock up.  Other times, we would bring the meals to

20    them inside of their particular assigned housing area

21    and go cell to cell.  It just depended on the purpose

22    and the reason for the lockdown.

23         Q.    How many times would you say that the

24    facility was on lockdown while you were the warden?

25         A.    It would be a pure guess.  I couldn't give

 1    you a number.

 2         Q.    Would you say it was more often on lockdown

 3    than it was not?

 4         A.    No.

 5         Q.    Would you say it was on lockdown

 6    approximately a quarter of the time that you were

 7    warden?

 8         A.    Again, without going back and looking, I

 9    don't know.  I can't just give you a guess.

10         Q.    Where would I find the records that would

11    indicate how often the facility was on lockdown?

12         A.    Honestly, I don't know.  I don't know that

13    there is a record unless it would be an incident related

14    where there was an actual 5-1 report generated.

15         Q.    So is there any paperwork that is filled out

16    when the facility goes on lockdown?

17         A.    Yeah, it would be in those incident reports.

18    For example, if we lock down for a facility-wide

19    shakedown, it would have the lockdown plus the facility-

20    wide shakedown results.  If we were locked down due to

21    an incident, the incident that drove the lockdown would

22    have -- would be in that particular report.

23         Q.    What about when the lockdown is lifted, where

24    would that be recorded?

25         A.    That, I don't know if there is any formal --

1    I mean, we make notification through to the central

2    communication center, which is with TDOC, both for lock-

3    down and for release of lockdown.  So it should be there

4    as well.

5         Q.    So I want to get that straight.  So it did

6    seem like you probably have to -- you have to report to

7    someone when you put the entire facility on lockdown; is

8    that right?

9         A.    Correct, yes, ma'am.  And that's TDOC.  We

10   follow that particular guideline, not CoreCivic's

11   guideline to that.

12        Q.    So I'm going to back up just a little bit.

13   So when you put an entire facility on lockdown, you have

14   to notify someone at TDOC?

15        A.    Yes, ma'am.  My apologies, yes.

16        Q.    That's okay because we're working through

17   this.  And then when you take the facility off of lock-

18   down, you also notify TDOC of that information?

19        A.    That's correct.

20        Q.    Okay, so if I were to want to know for the,

21   you know, past five years or whatever it is, how often

22   and for how long Trousdale, as a facility, was under

23   lockdown, I could get that information from TDOC?

24        A.    Yes.  I can't speak for their retention

25   periods and how long they have documentation.  But yes,

1    that's where that information would have been reported

2    to both on and off.

3        Q.    Did you report that information to any place

4    else?

5        A.    No.  Other than, like I said, referenced into

6    our incident reports when we went on lockdown for

7    whatever the reason was.

8        Q.    Were you ever evaluated on how often the

9    facility was on lockdown?  Was that ever something that

10   was discussed with you?

11       A.    I think during the comptroller audit they

12   asked -- they were asking about the lockdowns and the

13   length of time.  And a lot of that was driven from media

14   stories or complaints that the families may have

15   generated.

16       Q.    What about CoreCivic, did you ever speak to

17   someone at CoreCivic about the frequency that Trousdale

18   was on lockdown?

19       A.    Not specifically.  I mean, because

20   ultimately, the decisions were typically discussed prior

21   to making that decision.  They were part of that

22   discussion in the decision making process.

23       Q.    So before you would put the facility on

24   lockdown, you would talk to somebody at CoreCivic?

25       A.    I wouldn't say I would -- you know,

Page 179

1    obviously, if there was an immediate need for me to put

2    them on lockdown for security and safety concerns, I

3    would make that decision and then immediately follow up

4    that with a conversation with both TDOC as well as my

5    leadership.

6         Q.    And then would your leadership and TDOC both

7    be involved in the decision to take the facility off of

8    lockdown?

9         A.    Yes.

10        Q.    Who at TDOC would you talk to about that?

11        A.    Typically, the correctional administrator and

12   the contract monitor.  Correctional administrator was

13   John Fisher.

14        Q.    Who would you speak to about those lockdown

15   issues at CoreCivic, your boss?

16        A.    My boss.  So it would be -- depending on the

17   time frame, it would have been Jason Medlin, Stacey

18   Stone or Charles Keating.

19        Q.    Has anybody ever expressed concern to you

20   about the frequency of lockdowns or the duration of

21   lockdowns at Trousdale?

22        A.    Not that I can recall.  I mean, there was

23   always -- obviously, our initiative, as well as anyone

24   else's, was to resume back to normal operations as

25   quickly and as safely as possible.

1          Q.     Have you ever heard reports that Trousdale

2     prisoners have had access to TOMIS codes?

3          A.     TOMIS codes or to TOMIS?

4          Q.     To TOMIS.

5          A.     Yeah, there was -- I believe there was an

6     allegation out of the education at one point.  I believe

7     OIC conducted that investigation.  I cannot recall what

8     the conclusion was, but I believe the investigation was

9     actually handled by TDOC.

10         Q.     And why is TOMIS kept from prisoners?  Why do

11    they not have access to that?

12         A.     It's the offender management system.  I mean,

13    it contains all of their information with regards to STG

14    affiliations, criminal charges, program classification,

15    disciplinary, all of the above.  Nothing medical that

16    they would have access to, but a lot of other records

17    that other inmates shouldn't have about other inmates.

18         Q.     Why would some inmates not need to have that

19    information about other inmates?

20         A.     They shouldn't have it, I mean, because

21    there's a lot of things that they could do with it that

22    would be inappropriate.

23         Q.     Could it create a dangerous situation for

24    some inmates?

25         A.     It could.

Case 3:22-cv-00093   Document 33-7   Filed 05/04/22   Page 180 of 226 PageID #: 1276

1      Q.    Do you do exit interviews for employees when

2  they terminate or when they leave employment at

3  Trousdale?

4      A.    We try to.  Not always is everybody

5  responsive, but we try.

6      Q.    Who conducts those exit interviews?

7      A.    Typically, the human resource department.

8      Q.    Who is the person at human resources

9  department that I could talk to about exit interviews?

10      A.    Peaches Poole is the human resource manager.

11  And I do believe they were doing a mail-out from our

12  corporate office for written.  But I don't know whether

13  or not they received responses back from that or not.

14  But I believe they were doing some type of mail-out type

15  of thing as well.

16      Q.    Have you ever heard of former employees

17  complaining about Trousdale being dangerous?

18      A.    Have I ever heard about it?

19      Q.    Yes, sir.

20      A.    I have heard about it.

21      Q.    In what context?

22      A.    Just what you just indicated.  That they felt

23  that it was dangerous, you know, for whatever reasons

24  that they were saying that they felt that way.

25      Q.    Are you aware of any Trousdale employees that

Page 182

1    have been assaulted by prisoners?

2         A.    Yes.

3         Q.    Are you aware of any Trousdale employees that

4    have been stabbed by prisoners?

5         A.    I am.

6         Q.    During your tenure?

7         A.    Yes.

8         Q.    What about any Trousdale employees that have

9    been sexually assaulted by prisoners during your tenure,

10   are you aware of that?

11        A.    Yes.

12        Q.    What about rapes by prisoners, are you aware

13   of any employees being raped by prisoners at Trousdale

14   during your tenure?

15        A.    Yes.

16        Q.    How many?

17        A.    One that I am aware of.

18        Q.    How many sexual assaults?

19        A.    Only the one that I am aware of.

20        Q.    And how many stabbings by inmates of

21   employees are you aware of during your tenure?

22        A.    Three, I believe.

23        Q.    What about, are you aware of Trousdale

24   employees being seriously injured by prisoners during

25   your tenure?

 1        A.    Yes.

 2        Q.    How many serious injuries of employees by

 3   prisoners do you recall during your tenure?

 4        A.    I would say the three that I referenced.

 5        Q.    Are you aware of an employee who lost an eye?

 6        A.    I am.

 7        Q.    Is that one of the serious injuries that

 8   you're thinking of?

 9        A.    Yes.

10        Q.    Is that the same employee that was sexually

11   assaulted?

12        A.    Yes.

13        Q.    Are you aware of any incidents at Trousdale

14   when you were warden in which officers considered --

15   used what you considered to be excessive force?

16        A.    Yes.

17        Q.    How many incidents?

18        A.    One that I am aware of.

19        Q.    And could you describe the one for me,

20   please?

21        A.    It was following the events with the

22   individual who lost her eye and was sexually assaulted.

23   The staff member made the decision to act out of emotion

24   and assaulted the inmate who was alleged to have

25   committed that infraction and ultimately was terminated

Page 184

 1   and has either been prosecuted or is still in criminal

 2   proceedings for his conduct.

 3        Q.    Do you know if any litigation, other than a

 4   criminal prosecution, came out of that incident?

 5        A.    I am not aware of any, no.

 6        Q.    Are you aware if the former employee filed

 7   any lawsuits against CoreCivic or Trousdale?

 8        A.    I do not believe she has.

 9        Q.    Do you know how long the prisoner was alone

10   with the woman who lost the eye?

11        A.    It was, I believe less than a minute.

12        Q.    And so this was the same person who was also

13   raped by the prisoner?

14        A.    Yes.

15        Q.    And so is it your understanding that she lost

16   an eye and was raped in less than a minute, or was there

17   someone else present?

18        A.    I watched it on video so I know that the only

19   person that was in there was that individual.

20        Q.    So that individual and the woman who was

21   raped and lost an eye, and your understanding is they

22   were alone for a minute?

23        A.    Yes.

24        Q.    And it's on videotape you said?

25        A.    Yes.

1        Q.    Are you aware of any allegations while you

2    were warden at Trousdale that pod and cellmate

3    assignments had been made to punish other prisoners?

4        A.    No, I am not aware of that.

5        Q.    Is something like that permitted?

6        A.    No.

7        Q.    Is there any situation, when you were warden

8    at Trousdale, where a prisoner would be allowed to walk

9    in a different pod that they're not assigned to?

10       A.    I mean, there are intermixing of populations

11   that occurred, whether going to the school, education,

12   you know, crossing of paths of to and from the chow

13   hall, I mean, going to rec yards.  There would be

14   incremental contact on the sidewalks going to and from

15   various locations.

16       Q.    But if you had a prisoner that was assigned

17   to B pod -- I'm just making up letters.  And so they're

18   assigned to B pod and then there's also prisoners that

19   are assigned to C pod, you're saying those folks might

20   like intermix when they're at chow or when they're in

21   the yard or whatever.  But I guess my question is, is

22   there ever a situation where someone who's assigned to B

23   pod could get up and just decide to walk into C pod and,

24   you know, check out everybody's cells and do whatever?

25       A.    They should not be, no.

1        Q.    Is there something to prevent that from

2   happening, like physical barriers?

3        A.    There's doors in between the pods and then

4   there's staff at the doors, you know, that are in those

5   designated posts.

6        Q.    Are those considered critical staffing posts?

7        A.    Yes.

8        Q.    Do you know of any times where prisoners have

9   gone from one pod into, like inside another pod that

10   they were not assigned to?

11        A.    Yes.

12        Q.    How was that able to happen?

13        A.    Returning back large groups, coming back from

14   wherever it is that they were out of their pod at,

15   whether it be the chow hall, whether it be recreation,

16   education, and then the staff member not performing the

17   checks and balances as prescribed.  And then ultimately,

18   if that was the case and we had staff deviate, then the

19   accountability would be applied to them.

20        Q.    Did that end in up in reports at some point?

21        A.    Typically, it would be.  If it was employee

22   conduct, it would be a disciplinary on the inmate and

23   then potentially a disciplinary on the employee if the

24   employee did not follow the policies that were

25   established.

Page 187

1        Q.    When you were warden at Trousdale, did you

2    ever hear any allegations that locks on some of the

3    doors didn't work?

4        A.    Yes.

5        Q.    What, if anything, did you do in response to

6    those allegations?

7        A.    We did a lot of things.  We, obviously,

8    trained additional staff on processes for fixing the

9    locks, so that was the first and foremost.  We took --

10   we held inmates accountable for tampering with their

11   locking devices.  We practiced the lock-in lock-out

12   protocols so when it was appropriate tier time, we would

13   then take the inmates, they could come out of their

14   cells, the doors to be secured so they didn't have

15   access or they had limited access to the locking

16   mechanisms to lessen those opportunities for them to

17   tamper with the locking devices.

18            We developed lock check protocols for the

19   assigned officers to, throughout the course of their

20   shift, to physically test the locking mechanism to make

21   sure that it was functioning in the way that it was

22   designed to function.  And then we -- if they could not

23   remedy the lock working, then the cell would be vacated

24   and it would be what we call red-lined until maintenance

25   could actually fix the actual locking mechanism itself.

Page 188

```
 1        Q.    And how did you find out about the issue with

 2    the locks not working?

 3        A.    Honestly, I don't know specifically whether I

 4    just found a lock that wasn't working, whether staff

 5    reported it or whether inmates reported it.  Probably

 6    all of the above, if there was issues with it.  But

 7    yeah, we took a lot of stances and steps to limit those

 8    opportunities.  You'll never completely do away with it,

 9    but we took a lot of steps to limit those opportunities.

10        Q.    When you heard this issue about the locks,

11    are we talking like one lock or two locks, or it was

12    like a systemic locking concern?

13        A.    At the early onset, it was a systemic locking

14    concern.  There were significant improvements when the

15    locking mechanism protocols were put into place.  You

16    know, again, you're never going to be able to resolve

17    all of those issues, but there was a significant

18    reduction.

19        Q.    Do you know when the locking mechanism

20    protocols were put into place?

21        A.    It was shortly after my arrival, but to give

22    you a date, I don't know.

23        Q.    Is there something in writing someplace that

24    might indicate that for me?

25        A.    I believe there was an instructive memorandum
```

1    that was generated with the protocols for checking --

2    how to check the locks and all of those processes.

3         Q.    And that would be one of the memos that's in

4    your memo book?

5         A.    Yes.

6         Q.    Great.  Do you know how long the video

7    footage is maintained at Trousdale?

8         A.    It varies.  With the milestone system, I

9    believe up to 100, 120 days total.  You're talking about

10   -- I am assuming you're talking about the facility-wide

11   camera system.  But if there is a lot of movement in one

12   area, it may be a little less than that.  But I would

13   say on average anywhere from 100 to 120 days is what is

14   pretty customary.

15        Q.    Do you know if there is a policy at CoreCivic

16   for how long that the video footage must be maintained?

17        A.    On the facility camera system, I don't

18   believe there is a policy.  Now, if there is an incident

19   where there was a handheld videotape, then our

20   administrative policy, I think it's 115, would tell us

21   how long we would keep that particular footage.

22        Q.    When you say handheld, that's almost like the

23   precursor to body cams, right?  Somebody would come in

24   with the video camera and watch, like they'd video tape

25   an extraction of a cell or whatever's happening; is that

1   right?

2       A.    Yeah, the system-wide system, I mean, it

3   self-writes over it based on the -- and again, I am not

4   an IT guy -- by the amount of footage is there and then

5   it will start rewriting over it.  But the average time

6   that we found was 100, 120 days.

7       Q.    While you were warden of Trousdale, did you

8   ever hear any allegations that the staff were using gang

9   members to police the prisoners?

10      A.    Did you say to release?

11      Q.    To police.

12      A.    Oh, police.  Yes, I heard those allegations,

13  but if we did it -- hear those allegations, each one

14  were investigated.  And if there was a fact that a staff

15  member was found doing something of that nature or even

16  that would suggest of giving the person the perception

17  that they had any level of authority over another

18  inmate, then that person would be held accountable.

19      Q.    Do you know if any of those allegations were

20  sustained against any employees while you were warden at

21  Trousdale?

22      A.    I think there was one.  And I can't remember

23  the circumstances around it.  There was a female

24  employee that I believe -- again, I would have to go

25  back and do the research on it.  But I do believe that

1    there was one where an employee was found that they were

2    acting inappropriate similar to that nature of

3    allegation.

4         Q.    And if I was looking for that specific

5    information, do you know where I could look, what

6    documents I could look to find it?

7         A.    It would have to be through a staff

8    correction problem solving notice, which is in that

9    system that I referred to, the automated system.

10        Q.    And it was a female employee?

11        A.    If memory serves me right, it was a female

12   employee.  But I do believe that there was some

13   discipline around something of that nature.

14        Q.    Do you know what the details are of what she

15   was found to have done?

16        A.    I don't recall specifically, no.

17        Q.    Do you recall what year it was?

18        A.    No, I don't.

19        Q.    Did you have to report that information to

20   your supervisor?

21        A.    Yes, that is something I would have reported.

22        Q.    Would that report have been in writing or

23   over the phone?

24        A.    Over the phone.

25        Q.    Do you know if any information about that

1    discipline ended up in any of the audit reports that

2    were done of Trousdale while you were there?

3        A.    I don't recall.

4        Q.    Do you know if the information about the

5    disciplinary action taken against that employee was

6    handed over to the Tennessee comptroller?

7        A.    I don't know.

8        Q.    Are you aware of any allegations of Trousdale

9    or CoreCivic strategically assigning gang members to

10   certain units or pods to control the violence?

11       A.    No.

12       Q.    Do you know if any such allegations were

13   investigated?

14       A.    No.

15       Q.    While you were at Trousdale, do you know if

16   any ongoing training was provided to employees?

17       A.    Was the question ongoing training?

18       Q.    Yes, sir.

19       A.    Yes, we follow ACA standards as well as

20   CoreCivic policy.  Every employee is to receive 40

21   hours, a minimum of 40 hours per year.

22       Q.    And is that, whatever classes they've taken

23   or whatever training they've received, would that be

24   indicated in the employee's personnel file?

25       A.    In their training file.

1      Q.    In their training file, okay.  Does Trousdale
2   have a critical incident stress management team?
3      A.    Not Trousdale specifically.  Our company has
4   the CISM team that would be deployed at the direction of
5   leadership at our headquarters.
6      Q.    What is a critical incident stress management
7   team?
8      A.    It's a group professionals that are
9   professionally trained to come to facilities whenever
10  there is a significant type of incident that may have an
11  impact to both the population as well as staff, as an
12  opportunity to talk with them and help them work and
13  cope through whatever the incident may be.
14     Q.    And you did not have that team at Trousdale?
15     A.    No, they're not assigned to any specific
16  facility.  Now, the team members may be at facilities,
17  but they're dispatched and sent to the facilities that
18  are in need across our entire company.
19     Q.    Did you ever have the critical incident
20  stress management team come to Trousdale while you were
21  warden?
22     A.    I did.
23     Q.    How many times?
24     A.    Two times, I believe.
25     Q.    What was it for?

 1        A.    It was following two of the three incidents

 2    that I referenced with the employees.

 3        Q.    I think I'm going a little slow and it might

 4    just be the after-lunch haze.  Which incidents?  Was one

 5    of them the woman who lost the eye?

 6        A.    Yes.  And the other was the male staff member

 7    -- actually, you know, it might have been -- it was for

 8    all three, I take that back, that they were dispatched

 9    for all three of those incidents where the employees

10    were severely hurt.

11        Q.    And so we know about the one where the female

12    employee was sexually assaulted and lost an eye.  What

13    were the other two?

14        A.    Yeah, the male officer who was stabbed by an

15    offender.  And then you also had another female who was

16    attacked by an inmate that required her to go out to the

17    hospital.

18        Q.    And when you say attacked, you mean

19    physically attacked --

20        A.    Yes.

21        Q.    -- not sexually attacked?

22        A.    No, there was no sexual that was discovered

23    during the investigation.

24              MS. HERZFELD:  If you could just give me one

25    minute, please.

1                  (Pause in the deposition.)

2    BY MS. HERZFELD:

3        Q.    Just a couple more questions for you.  You've

4    been very patient with us today.  Did you ever draft any

5    memos concerning the rate of violence at Trousdale?

6        A.    No, not that I can recall.

7        Q.    Do you know if you ever drafted any memos

8    about the three attacks, the three violent incidents

9    that you just discussed?  Did you ever draft any memos

10   on those?

11       A.    No, not that I can recall.

12       Q.    Are there times when inmates have submitted

13   grievances and they have not been responded to when you

14   were at Trousdale?

15       A.    As previously stated, with administrative

16   error, I'm sure there was occasions.

17       Q.    Do you know how many?  Do you have any idea

18   how often that happened?

19       A.    I don't.

20       Q.    Is there a place that grievances are stored

21   at Trousdale?

22       A.    Yes, they go to the grievance coordinator.

23       Q.    Is the grievance coordinator a CoreCivic

24   employee or a TDOC employee?

25       A.    A CoreCivic employee.

1      Q.    Do you know if those records are kept in hard

2  copy or if they're kept electronically or both?

3      A.    I believe it's both.  I think that they also

4  enter the data into the TDOC system as well.

5      Q.    During the time that you were warden at

6  Trousdale, how many grievance coordinators did you have?

7      A.    I believe two or three through the duration

8  of the time that I was there.

9      Q.    Is it one position but you had two or three

10  different people fill it?

11      A.    That's correct.

12      Q.    And how were the performance evaluations of

13  those three employees who were the grievance

14  coordinators?

15      A.    I don't recall specifically.  I would have to

16  see the employees and then I could pull it up.  But I

17  don't recall what their specific outcome of each of

18  their evals were.  They would have been completed by

19  their supervisor.

20      Q.    Do you know if any of those grievance

21  coordinators were ever disciplined or fired?

22      A.    I don't believe so.

23      Q.    Do you know of any concerns about the

24  performance of any of those grievance coordinators?

25      A.    Not right off memory, no.

```
 1              MS. HERZFELD:  Give me just one second,
 2  please.
 3              (Off-the-record discussion.)
 4              MS. HERZFELD:  I don't think I have any more
 5  questions for you today, Mr. Washburn.  Thank you so
 6  much.  You've been a very cooperative witness.
 7              THE WITNESS:  You're welcome.
 8              MR. WELBORN:  Give me about five minutes.
 9              (Recess observed.)
10              MR. WELBORN:  I don't have any questions
11  today.
12              MS. HASHEMIAN:  The State doesn't have any
13  questions, either.
14              MS. HERZFELD:  All right, Mr. Washburn, thank
15  you very much.  You're free to go to.  Enjoy the rest of
16  your day.
17              THE WITNESS:  Thank you.
18              MS. HERZFELD:  I meant to mark an exhibit,
19  Exhibit 1.  It's the only exhibit in the whole thing.
20              (Exhibit 1 was marked.)
21              FURTHER DEPONENT SAITH NOT.
22
23
24
25
```

1                          CERTIFICATE

2

     STATE OF TENNESSEE        )
3                             )    SS.
     COUNTY OF DAVIDSON        )
4

5               I, CAROLE K. BRIGGS, Licensed Court Reporter

6     within and for the State of Tennessee, do hereby certify

7     that the above deposition was reported by me and that

8     the foregoing pages of the transcript is a true and

9     accurate record to the best of my knowledge, skills, and

10    ability.

11              I further certify that I am not a relative,

12    counsel or attorney of either party nor employed by any

13    of the parties in this case or otherwise interested in

14    the event of this action.

15              IN WITNESS WHEREOF, I have hereunto affixed my

16    official hand on this 20th day of April 2021.

17    _____

18    CAROLE K. BRIGGS

19    Shorthand Reporter

20    Tennessee License No. 345

21

22

23

24

25

## Exhibits

**Exhibit 1** 197:19,20

## $

**$1500** 155:5

**$750** 155:9

## 0

**03** 10:18 17:6

**04** 10:18

## 1

**1** 197:19,20

**10** 9:25 46:6 50:23 94:12

**100** 189:9,13 190:6

**10:00** 147:5

**115** 189:20

**12** 79:16,20 137:2,14 146:19

**12-hour** 137:19,22 138:7,14

**120** 189:9,13 190:6

**125-man** 52:2

**128** 52:17

**13** 11:12

**130** 140:15

**14** 11:12

**16** 156:10

**18** 136:24

**19** 136:24

**1996** 17:13

**1997** 11:2 17:5

**1st** 6:15

## 2

**2000** 17:16

**2006** 10:1

**2010** 10:2

**2017** 7:18 76:1

**2019** 104:4,23

**2020** 6:15 7:18 76:1

**2021** 5:4

**24** 136:23 156:9

**24/7** 124:18

**2400** 15:6

**2600** 148:3 166:17

**2:00** 166:11

## 3

**30** 52:14 123:17 175:9

**36** 138:3 140:6

**36-hour** 137:23

## 4

**40** 123:17 137:15 139:14,19 140:5
192:20,21

**400** 134:7

**48** 137:22,25 138:3,10 140:5

**4:00** 147:5

**4:30** 147:25

## 5

**5** 5:4

**5-1** 116:25 117:6,22,23 118:2
132:2,3 176:14

**5/15/1977** 6:6

**50** 9:10 79:21 102:12 139:9,11,15,
21 140:6,9,10,11,14 141:10,13,21
142:10 145:7,11,13,24

**50-hour** 141:25 142:15 145:15,
20

**5:30** 147:12

## 6

**60** 52:1,2,14 142:24

**65** 140:18

**6:30** 147:22

## 7

**70** 8:24 142:24

**7:00** 147:10

## 8

**80** 139:15 140:13 142:25 145:10,
19

**80-hour** 139:21

**8:00** 147:11

## 9

**9/11** 93:3,15,23 94:7

**911** 168:8,18,20,23

**9:08** 5:2,4

## A

**A-UNIT** 171:22

**a.m.** 5:2,4 147:5

**abilities** 47:16

**ability** 37:23 118:10 125:9
133:13 159:11 172:4

**Absolutely** 159:19,21

**ACA** 27:19,23 133:18,23 134:4,5,
9 192:19

**academy** 10:23 74:19,20 156:13,
14

**access** 36:2 37:5 86:25 131:25
132:18 133:12 170:15 180:2,11,
16 187:15

**accidentally** 66:19 67:11,12
68:8 69:1

**accommodate** 58:23

**accommodations** 33:24

**account** 91:23,25 92:6,19

**accountability** 186:19

**accountable** 187:10 190:18

accredited 134:8

accurate 109:23

achieve 109:3

achieving 109:4

act 183:23

acted 28:12 156:23

acting 191:2

action 81:5,8 192:5

actions 92:23,25

actively 7:3 155:14 163:23

actual 47:8 53:7 72:16 84:23
96:7 112:15 128:1 138:1 155:12
159:2 174:17 176:14 187:25

add 30:14 111:20

added 76:12

additional 48:1 101:21 111:24
112:5,6,7,10,11 141:6 142:7
145:10,21 173:18 187:8

address 26:19 28:13,16

addressed 134:16

adequate 14:10 113:8,11,23

adhere 95:8,12

adhered 95:19 145:8

administration 19:11 24:22
49:5 127:7,10

administrative 29:4 31:7 58:1
119:16 128:22 146:25 189:20
195:15

administrator 129:4 179:11,12

advance 151:25

advanced 17:13

advertising 112:11 158:19 159:5

advice 33:2

affects 149:17,18

affiliated 23:7

affiliation 114:10,17

affiliations 180:14

after-lunch 194:4

agal 49:14

age 50:24

aggregate 118:4,21

agree 5:6 148:7 159:10 161:5
164:2 165:6 170:14

agrees 80:15

ahead 13:18 132:9

alarm 163:10

alarms 163:3

alert 25:4 143:16 148:24

alerting 25:18

allegation 14:11 30:21 172:11
180:6 191:3

allegations 14:2,3,7 15:20,24
16:1,12 30:23 185:1 187:2,6
190:8,12,13,19 192:8,12

alleged 183:24

alleviate 142:11

allocated 98:19

allowable 44:4 49:24

allowed 16:4 37:14 41:21 43:12,
25 50:2 53:23 55:4 63:25 64:18
68:14 73:4,5 151:21 185:8

alpha 51:10 52:10 171:12,21,22
172:15,21 173:17,23

Amber 31:25

ambulance 168:9

amend 59:11

amended 66:11,17

Amendment 74:18

American 27:18

amount 139:5 142:22 144:11
146:3,8 190:4

and/or 107:14

annually 158:14

answering 11:7,8

anticipated 153:17

anymore 130:21

anytime 42:24

apologies 13:23 177:15

apologize 14:1 55:19

applicable 132:20 141:19
150:10

applicants 101:1,5 104:13

application 35:14,19

applied 186:19

approach 80:14

appropriately 53:1

approval 44:11 62:8 128:9

approve 70:22

approved 44:6,9,10,13 50:4,6
58:12 59:1,11 61:13 62:11 64:1
70:19 80:16 97:25 170:24 171:17

approving 97:3

approximate 11:11

approximately 17:3,23 176:6

April 5:4 6:15

area 20:8 24:22 29:10 34:8 37:4,
22 38:6 51:9 54:1 64:15 66:7 74:8
116:12 125:7 126:16 132:17
150:2 173:6,24 175:20 189:12

areas 38:5 54:13 56:7 106:12
119:22 127:15

argument 143:2

arm 26:14,15,18,24

arms 49:18

arose 145:2

arrival 137:4 188:21

arrive 47:21

arrived 24:3 29:16 115:15

article 42:25

aspect 21:7 29:20

assaulted 182:1,9 183:11,22,24
194:12

assaults 115:10 120:12,13
121:7,8,10 182:18

assign 57:3 127:15

assigned 118:15 124:12 173:19
175:20 185:9,16,18,19,22 186:10
187:19 193:15

assigning 192:9

assignment 124:8,10 146:25

assignments 128:5,10 134:22
185:3

assist 35:2 62:12 107:7

assistance 30:7,14 31:6 101:23
168:24 169:10,11

assistant 10:11 17:6 18:1,3
40:15,24 56:17 67:6 70:3 73:9
78:19,20,25 81:12,19 98:21 118:8
119:17,18 123:23 128:24 164:15,
16

assisting 105:22

Association 27:18

assuming 57:16 76:10 148:24
189:10

assurance 27:12,13,15,25 28:4
29:10 66:6

attack 170:13

attacked 92:22 194:16,18,19,21

attacks 195:8

attends 85:2

attention 67:16 71:23 150:1
173:19

attire 54:2,3,17,18,22

attires 54:21

attorneys 14:23,25

Atwood 27:14

audit 27:21,23 135:5,15 167:13
178:11 192:1

audited 133:15,22

auditing 133:20

auditors 133:19

audits 134:1,12,15,24 135:5,8,9,
12

augment 100:22 106:13

augmented 107:6

August 104:5,23

Aumann 5:14 26:5 37:16 46:5
70:20 161:1 165:13 166:8

authority 171:23 190:17

authorize 142:8

authorized 55:4 64:13 66:15

authorizing 73:14

automated 116:24 132:4,5,7
191:9

automatic 137:17

automatically 137:16

average 15:6 189:13 190:5

AW 72:22 73:7,23

aware 15:20 18:16 21:24 26:24
58:6,7 75:8 80:9 82:9 85:12 87:23
88:11,20,23 170:4 181:25 182:3,
10,12,17,19,21,23 183:5,13,18
184:5,6 185:1,4 192:8

awareness 149:4,11

---

## B

back 10:1 11:3 12:5,20 13:18
17:4,5 18:2,25 20:10 21:1 28:8,
13,22 31:17 36:23,24 42:23 43:8
46:9 48:7 56:16,19 57:21 59:25
67:10 68:24 69:12,13 70:25 80:25
86:15 94:16 98:13 101:17 104:23
107:11 109:18,23 112:13 115:6,
11,14 122:25 123:3,6 128:1 129:8
137:19 139:19,25 141:16,17
145:24 150:25 159:3 164:8 166:2
175:19 176:8 177:12 179:24
181:13 186:13 190:25 194:8

backed 131:19

background 10:21 35:10,11
155:3 156:12

backwards 145:5

balance 155:8

balances 186:17

ban 67:24 88:24 89:4

band 26:15

bands 26:18,24

bank 151:6

banned 67:3,8 68:9 70:10,16
71:16 76:2 89:11

banning 66:9 68:18,21 69:21
71:4,11 72:12,24 73:19 74:5
75:12 89:21

barriers 186:2

base 143:16

based 42:1 50:20 63:9,10 73:8
129:7 151:22 190:3

basically 139:2

basis 48:17 89:22,25 90:16 118:5

battery 134:23

bay 14:19 15:1,10 174:14

bays 52:16,17

beds 52:17 166:15,17 167:2

began 5:2 137:3

beginning 17:9

behave 86:5

beliefs 159:20,22

belittle 82:21

bell 60:11

belt 44:22,24,25 45:2,3,6,17,21,
22

belts 44:15,17 45:2,7,10,13

Beverly 27:14

Bible 75:3 77:19 81:24 82:2,7,14
83:1,10,13

Bibles 43:22 65:8,10,13

Biblically 63:8

big 7:25 36:13 79:6

bigger 154:3

biggest 154:4

binder 130:5,7

birth 6:5

bit 23:5 115:14 129:19 177:12

blank 12:11 13:22

blessed 62:1

blessing 8:6

Bloods 120:19

blue-jean-style 52:25

board 98:19

Bob 44:16 45:13

bodies 30:8

**body** 45:19 189:23

**bonus** 108:24 109:12,15,17,24, 25 110:3,4,5,12 111:10,19,21,25 155:7,16

**bonus-eligible** 108:22

**bonused** 111:11

**bonuses** 110:9 154:25 155:1,11

**bonusing** 111:18

**book** 42:10,12 66:5 67:1 69:18 149:21 189:4

**books** 64:19,21 65:4

**boot** 47:9

**boots** 46:22 47:7

**born** 7:21

**boss** 78:23 79:6 118:8 122:7 179:15,16

**boxers** 53:13

**boy** 8:1,2

**brainstormed** 156:22

**bravo** 52:9

**breach** 42:2

**break** 12:13 46:2,10,14 94:11,17, 18 165:13,24 166:3

**breakdown** 29:24

**bring** 44:3,16 142:7,11 152:21 156:18 158:19 169:25 175:19

**bringing** 106:11 111:23 155:19, 24

**broad** 55:22

**broke** 32:19

**broken** 29:19

**brought** 30:2 44:9 62:2 64:7 71:23 72:1,22 74:11 107:7,15

**Brun** 22:17 23:25 24:4,5 25:4 27:7 70:11,12,15,18 71:5,10

**Buck** 79:2

**buckle** 45:3

**budget** 96:25 97:4,5,9,21 98:4,8, 25 99:8,15,23 100:1,2,9 111:5,6, 13 112:4,6,7,10,14 158:18,20 159:1,4

**budgetary** 111:8

**budgets** 159:7,8

**building** 34:18 35:23 36:3

**built** 135:6,14 138:1

**built-in** 137:16

**bulk** 40:21

**bunch** 121:18

**bunks** 174:13

**burnout** 148:8

**business** 48:25 49:1,2,3,6

**button** 53:3

**button-style** 53:4

**buy** 52:22

**bylaws** 121:22

**C**

**cake** 64:4

**call** 24:22 32:10 33:1 84:19 110:6 128:23 132:15 138:19 152:19 168:6,8,18 169:9,15,25 171:21 187:24

**call-in** 125:24 145:1

**call-ins** 125:10,14 138:19 151:24

**called** 41:4 55:20 60:12 62:15 116:25 135:9 150:13 152:9 168:23 173:21 174:3

**calling** 95:25 152:12 170:5

**calls** 103:11 174:24

**caloric** 59:2

**camera** 189:11,17,24

**cameras** 169:21

**cams** 189:23

**canvas** 47:5

**cap** 141:11,25 142:15 145:16

**cap's** 64:15

**capability** 91:2 131:8

**capacity** 52:15 131:1 166:19,22, 23,25

**capital** 158:12,14

**captain** 127:14 128:14,21 152:20

**captains** 118:3 127:2 144:25

**car** 139:1

**cards** 63:4

**care** 14:5 23:10 146:11

**career** 11:3 18:8 74:15 77:3,10 78:4 95:5 155:18

**careful** 14:22

**carry** 53:11

**carrying** 38:18

**case** 11:22,24 12:1,6,14 13:1,20 14:1,2,13,18 15:14,21 16:5 18:11 28:10 46:11,16 94:19,25 97:2 166:10 186:18

**cases** 11:13 153:19

**categorized** 123:2

**Catholic** 20:15

**caused** 104:18 149:12

**CCA** 129:12

**CDR** 26:23 134:17

**CDRS** 25:23 101:15

**cell** 37:21 38:1,2 43:13,18 51:20, 23 54:5,7,10,19,23 173:11,15,16 175:12,15,21 187:23 189:25

**celled** 51:20

**cellmate** 185:2

**cells** 38:17 51:25 52:2,13,14 173:8 174:13 185:24 187:14

**center** 7:12 8:9 17:19 59:15 109:8 112:9 117:25 159:9 177:2

**central** 8:23 169:17,18,22 171:24 177:1

**certificate** 17:5

**certification** 10:24 11:1

**certifications** 85:7

**certify** 174:23

**chairs** 36:5 148:19

**challenged** 101:2,3

**challenges** 116:11

**challenging** 34:12

**chance** 120:7 166:3

**change** 71:24 72:3,8 96:22 97:1 119:21 128:4,8,9,11 137:5 157:19,22

**changed** 66:18 89:2 104:9,12

**changing** 68:23

**chapel** 34:19 35:24,25 36:3,4,8, 10 37:8 38:18

**chaplain** 18:17,20 19:7,22 22:5, 10,11 33:14 34:19,24 35:19,20 37:1,13 42:19 44:2,10 56:17 61:1 64:14,15 65:3,6 66:6,16 67:4,19, 21,23 68:25 69:11,21 71:25 72:2, 7,11 73:7,23 74:9 75:24 76:8,9,24 78:12,16,18,24 79:9,13,23 80:1,4, 7,19 81:7,21 82:1,7 83:16,19,22 84:1,10,19,21,24 85:10,16,20 86:5,9,14,21,23 87:3 93:14,21 94:6

**chaplain's** 62:8

**chaplaincy** 32:13

**character** 36:17

**charges** 50:23 180:14

**Charles** 167:23 179:18

**charlie** 52:9

**chart** 134:13

**check** 38:6 185:24 187:18 189:2

**checking** 36:8 149:20 189:1

**checkpoint** 44:12

**checks** 186:17

**chief** 17:19,23,25 40:14,16,17,18, 21,22,25 73:9 128:24

**chiefs** 118:8 119:18

**choir** 36:6

**chose** 42:1 139:3

**chow** 173:4 175:14,18 185:12,20 186:15

**Chris** 22:17 23:25 24:3,5 27:7 70:11,12,15,18 71:5,10

**Christian** 20:14 36:9 63:13 80:2 83:1 84:5

**Christianity** 75:3 81:22 88:10,17

**Christians** 77:17,20 80:8

**Christmas** 64:8 138:25

**church** 77:25 84:22 85:2

**circumstance** 84:12

**circumstances** 172:6 190:23

**CISM** 193:4

**cited** 69:6

**Citrus** 8:8,11,21,22 9:4,9 18:5

**civil** 6:19 7:6 123:20

**clarification** 33:11

**clarify** 81:9

**class** 44:5 153:14 163:22

**classes** 81:24 192:22

**classification** 50:21 51:3,4,12 114:15 162:5 165:1 180:14

**classified** 38:22,24 50:13

**classroom** 156:9

**clean** 38:7

**clear** 23:6 101:6

**clock** 83:12

**close** 9:1 25:6 51:8 129:7

**closer** 7:20,24

**clothing** 42:25 53:10

**clue** 45:15

**clustered** 151:6

**code** 117:10,12

**codes** 180:2,3

**coexist** 51:14,16

**cold** 54:6

**college** 10:25

**comfort** 94:11

**commence** 34:8

**comment** 87:7

**commenting** 88:6

**commingle** 51:14,16

**commissary** 48:5,6,11,16,22 49:7 50:4 52:21 53:10

**commission** 40:1,8

**commit** 154:5,7

**committed** 162:4 183:25

**common** 54:12 120:10 134:14

**commonly** 34:11

**communicating** 103:21 121:2

**communication** 70:23 130:9 177:2

**communications** 102:14 103:14

**community** 43:4 106:11 159:21

**company** 61:22 116:15 193:3,18

**compare** 68:15 98:13 115:22

**compensation** 111:4 137:24

**complain** 142:9

**complaining** 181:17

**complaint** 14:9 15:14 18:13

**complaints** 86:8 162:22,25 178:14

**complete** 61:20

**completed** 31:19 196:18

**completely** 13:19,22 149:17 188:8

**compliance** 22:24 25:5,20 26:1 27:18,20,21 28:25 29:20,21 106:20 135:18,22

**compliant** 25:3

**component** 132:7

**compromise** 112:2

**comptroller** 134:15 160:17 178:11 192:6

**comptroller's** 133:23 159:25 160:3,6,24 167:11

**comptrollers** 133:18

**computer** 131:18 132:18

**conceal** 45:3

**conceptions** 159:23

**concern** 40:7 42:3 45:5 56:8 142:11 167:12 171:19 179:19 188:12,14

**concerned** 171:4

**concerns** 45:1,23 50:8 71:11
74:5,11 87:18 126:10 146:6 179:2
196:23

**concisely** 11:8

**conclusion** 9:18 147:19 155:8
180:8

**condition** 149:15

**conduct** 25:1 30:6 51:1 147:2
184:2 186:22

**conducted** 25:12 171:14 180:7

**conducting** 25:10 31:15

**conducts** 181:6

**confined** 52:13 173:7,8 174:13
175:11

**confirmed** 122:23

**confuse** 17:10

**conglomerate** 104:21

**congratulations** 8:4

**conjunction** 19:14

**connect** 63:2 131:5

**connected** 78:8 121:9,11

**connection** 78:9

**consent** 5:10,13,15

**consideration** 41:14 50:22
165:20

**considered** 50:14,15 65:20
115:15 125:25 154:17 183:14,15
186:6

**consisted** 59:24 60:18 119:17

**consistent** 22:23

**constitute** 64:23

**constrictions** 111:8

**consult** 22:5,8,15

**consulted** 22:18

**contact** 173:8,10 185:14

**contained** 99:23

**context** 38:16 77:1 95:22,23
167:10,14 173:23 174:6 181:21

**continue** 90:10

**contraband** 45:4

**contract** 22:6,7,17,20,24,25
23:3,7,11,18,19,22 24:23 25:18,
24 26:2,3,7 27:2 28:3,9,14,17,19,
20,25 29:11,14 30:2 31:14 32:3
58:19 70:11 71:5 95:15,17,23
96:2,20,23,24,25 97:10,17,18,25
98:1,5,9,22,23,24 101:11,16
105:17 106:1,21,22,24 107:4,17,
20,21,24 113:2 122:8 124:16
128:8,9 129:3,6,14,18 134:19
135:14,16,22 155:25 174:3
179:12

**contracted** 97:7 98:15,21 157:20

**contracts** 8:13 27:20 95:9 96:6

**control** 23:10 162:6 169:6,17,18,
20 192:10

**controlled** 45:5 175:17

**conversation** 33:17,20,21 69:4,
5 78:12 85:20 116:6,9 128:22
179:4

**conversationed** 33:4

**conversations** 14:23,24 15:5
16:8,20,21 33:5,19 79:11,12
85:19 101:18,24 102:7 103:13
122:7 130:18 168:1

**convert** 81:22 88:9,17

**convicted** 8:16 10:8 114:2

**cooperative** 197:6

**coordinate** 144:22

**coordinated** 82:4 122:11

**Coordinates** 19:9

**coordination** 51:11

**coordinator** 57:3,7,11 195:22,23

**coordinators** 196:6,14,21,24

**cope** 193:13

**copied** 135:25

**copies** 159:7

**cops** 92:24

**copy** 18:13 27:3,5,7,8 42:7,15
49:11 58:20 66:21,23 69:16 136:2
196:2

**Corecivic** 5:13 6:8 8:17 9:6
11:14,18 18:7 21:11,12,14,15

23:7,12,15,20 24:5 27:23 28:1,2,5
32:2 33:11 44:11 49:3 57:12,14
88:22 91:4,8 95:4,8,12 96:2
97:19,22,24 99:16 101:19,25
102:15,24 103:4,11,22 105:4
106:10 107:6,15 111:13,17
112:16 117:7,8,24 119:14 120:25
123:25 126:25 128:4 129:12
131:15 132:18 133:8,18,23
134:25 136:6,10 137:10 140:24
142:7 144:15 145:9 154:24
156:14 157:9,25 158:5,11,17
163:12 167:19 178:16,17,24
179:15 184:7 189:15 192:9,20
195:23,25

**Corecivic's** 22:22 119:3 177:10

**corporate** 58:19 59:13 99:2
109:9,10 110:10 118:9 119:1
181:12

**corporation** 23:13

**correct** 7:9 16:3,9 23:9,13,17,21
39:16 41:2 74:16 82:12 83:6,14
85:22 89:7 98:10 99:19 113:6
117:12 118:15 130:7 138:4,6,9,12
139:13,17 140:8,17 141:3 149:24
150:4 160:5 169:4 171:8 177:9,19
196:11

**corrected** 13:25 74:12

**correction** 156:12 191:8

**correctional** 7:12 10:5,23 17:13,
25 27:18 59:9 106:12 124:6 127:2
129:4 153:6 160:15 165:2 179:11,
12

**corrections** 23:2,4,11 25:23
27:22 28:10 30:8,13,24 48:14
52:25 74:14,19,20 96:9 97:3
105:11 149:7,10 153:9 155:19
164:22

**corrective** 81:5,7

**correctly** 40:23 41:1 52:18 55:12
107:8 130:6 141:2

**cost** 141:4 156:24

**costly** 141:7

**cotton-style** 47:19

**counsel** 5:5 16:2,20,24 17:1

**country** 105:5

**counts** 134:13,14

**county** 8:8,11,12,20,21,22 9:4,6, 8,9,12,13 10:13 17:12,14,20,21 18:2,4 169:12

**couple** 13:12 18:19 29:9 46:11 94:19 101:16 195:3

**court** 5:3 95:1

**cover** 45:19,20 96:15 125:9,22, 23 129:1 138:18,21 144:7 147:1

**covered** 124:17,19,23 125:2,4, 12,13 129:11

**coverings** 55:3,24

**covers** 49:18 56:7

**cracks** 57:25

**create** 37:4 56:8 113:9 180:23

**created** 37:13 41:14 67:2

**credentialing** 35:11 132:18

**credit** 121:24

**crime** 162:4

**crimes** 114:3,5

**criminal** 6:20,22,24,25 7:1,2,7 17:19 31:2,4,13 50:22,23 180:14 184:1,4

**criminals** 8:10

**Crips** 120:19 121:15,21,24 122:2, 5

**criteria** 155:3

**critical** 124:13,15,22 125:2,3,25 126:1,4 128:18,19 129:2,7,10 144:8 186:6 193:2,6,19

**cross** 36:14 55:7

**crossing** 185:12

**current** 6:9 18:6 50:22 99:14

**custody** 23:10 50:12,16,17 51:8, 13 170:20,23,25 171:1,6,11,17, 18,20 172:3,4,20,23 173:2,12,18

**customary** 189:14

**customer** 97:2

**customer's** 157:20

**cut** 156:24 163:19

**cutting** 163:24

## D

**daily** 24:25

**dangerous** 87:25 88:3 91:14 114:21 115:3,16,18,19 180:23 181:17,23

**dangerousness** 116:1

**dash** 116:25

**data** 115:6 117:9 118:21 119:9 123:7 134:18 196:4

**database** 117:15 118:2

**databases** 131:24 132:1

**date** 6:5 74:12 104:8 188:22

**daughter** 7:20

**David** 17:18

**day** 15:19 16:23 24:11,23,24 37:15 53:14 54:23 100:10,11 129:17 146:16,17 150:24 151:21 152:10 173:9 197:16

**day-to-day** 173:10

**days** 71:20 83:2 123:17 144:23 147:1 175:9 189:9,13 190:6

**deal** 169:1

**deaths** 122:25 123:4,13

**decide** 185:23

**decision** 40:12,24 41:4 42:1 128:19 162:3 178:21,22 179:3,7 183:23

**decisions** 178:20

**decline** 115:7,8

**decreased** 87:15

**deemed** 162:6

**defeat** 40:1,2

**defendant** 18:10

**defendants** 5:15 166:11

**deficiencies** 133:24 134:1,5,25 135:2 136:5

**deficiency** 25:24 26:4 27:2 28:3, 9,14,17,19 29:1 32:4 101:16 106:23,25 107:20,21 135:22

**deficient** 100:8

**deficit** 100:12

**define** 20:10 115:18

**defined** 133:3

**degrade** 82:20

**degree** 10:25

**delivering** 106:15

**delta** 52:9

**denial** 41:14 62:8

**denials** 59:23,24

**denied** 41:6,9,10,11 70:19 89:11 151:14 157:9,12 158:1,5,11,15 172:3,13

**denomination** 19:24

**deny** 151:24

**department** 23:2,4,11 25:22 27:22 28:10 30:8,13,24 48:14,25 52:25 90:20,22 97:2 99:6 108:11 110:11 169:12 181:7,9

**departure** 17:15,16 24:2

**depend** 151:11

**depended** 175:21

**dependent** 111:7

**depending** 56:6 119:22 179:16

**depends** 73:6 151:12 175:16

**deployed** 193:4

**DEPONENT** 197:21

**deportation** 7:3

**deposed** 5:19 11:4,10 13:11

**deposing** 13:3

**deposition** 5:1,7,11,16 11:16 12:22 15:16 16:19,24 46:11 60:2 166:7 195:1

**depositions** 166:11

**describe** 36:4 53:5 55:1 183:19

**description** 19:6 29:23 108:19 118:17

**descriptions** 108:6,12 124:6

**designated** 25:12 38:20 39:3 57:1,2,21 96:13 124:20 136:15 152:4 170:23 173:5 186:5

**designed** 31:16 40:6 187:22

**desk** 119:11

**detail** 158:2

**details** 86:11,15 191:14

**detainee** 14:4 56:16

**detainees** 6:19,22 7:7 9:16 125:15,16

**detention** 6:12,17 7:6 8:9 123:17,18

**determination** 40:13 171:24 172:14

**determine** 31:17 50:7 59:7 120:6 158:14 171:14

**developed** 174:22 187:18

**deviate** 186:18

**devices** 187:11,17

**diem** 157:22

**dietitian** 58:11,22 59:1

**difference** 7:25 45:16 47:11 48:11 56:21 106:7 157:5

**differences** 56:24

**difficult** 114:18

**dinner** 147:17,19,20,25

**dinnertime** 147:16

**direct** 129:5

**direction** 169:9 193:4

**directive** 91:4

**directly** 135:23 167:19

**director** 102:1,3 116:8 167:20

**directors** 142:3

**disagrees** 80:15

**Disciples** 120:18

**disciplinary** 90:23 174:11 180:15 186:22,23 192:5

**discipline** 80:18 81:6 90:14 132:4 191:13 192:1

**disciplined** 80:19,22,24 196:21

**discouraged** 87:21

**discovered** 194:22

**discretion** 151:8

**discretionary** 110:6

**discriminated** 90:15

**discuss** 79:8 80:1 91:7 119:18

**discussed** 178:10,20 195:9

**discussing** 93:22 94:6

**discussion** 5:24 26:11 41:12 66:16 67:19 68:17,25 76:11,24 142:6 178:22 197:3

**discussions** 157:21

**dispatched** 193:17 194:8

**disseminate** 119:19

**doctor's** 152:21

**document** 31:18,21 56:19 72:16

**documentation** 20:2 177:25

**documented** 25:20 134:21

**documenting** 25:11

**documents** 25:2 43:22 119:8 131:14,16 191:6

**donate** 63:24 64:19,25 65:2,8

**donated** 64:7 65:10

**donates** 65:12

**donating** 65:16

**donations** 64:20

**door** 24:19

**doors** 24:18 169:21 186:3,4 187:3,14

**dorm** 52:17

**double** 119:2 136:18,21

**doubled** 173:12

**downward** 104:13,14

**dozen** 102:10 123:8

**draft** 129:21 130:1 195:4,9

**drafted** 66:14 67:5 72:23 73:15, 19 129:20 130:2 195:7

**drafting** 73:12

**drafts** 73:3

**draw** 25:16 33:20

**drawing** 13:22 26:25 104:4

**dress** 49:16,18 55:13,21

**drill** 163:6

**drive** 132:14,15,16

**driven** 111:23 138:19 178:13

**driver's** 63:4

**drove** 176:21

**due** 125:9 144:7 163:19 176:20

**duly** 5:19

**duration** 124:17 179:20 196:7

**durations** 25:11

**duties** 29:19 126:18 138:20

**duty** 119:17 128:22 129:3 145:1 146:25 152:8

## E

**e-mail** 27:6 42:18 102:21 103:16 119:10 130:12,17 131:5 136:2 163:10

**e-mailed** 42:14

**e-mails** 102:23

**early** 122:6 147:14,25 188:13

**easier** 17:8

**Easter** 64:8

**eat** 166:4

**echo** 52:9

**education** 35:23 36:3 50:25 64:16 65:4,5 108:8 127:7 180:6 185:11 186:16

**educational** 10:21 34:18

**effectively** 113:24

**efficient** 141:4

**effort** 67:5 122:5,11 156:24

**efforts** 105:5 111:23 116:14 129:8 156:25 158:21

**Eid** 58:4 60:8,10,15

**elder** 35:5

**electronic** 42:15,17 57:19 90:23 118:6 130:12 131:23,24,25

**electronically** 49:9 72:21 196:2

**element** 143:8 146:12

**elevated** 158:21

**eliminated** 163:11,14

**else's** 179:24

**emergency** 19:15 113:22

**emotion** 183:23

**emotional** 149:12

**employed** 6:7,8 9:5,20,23 23:15, 24 28:1

**employee** 8:17 18:7 24:5,6,7 28:5 30:10 32:1 49:4 57:12,13,14, 22 81:4 83:12 87:24 88:8,16 90:15 126:24 132:4 133:8 137:20 141:6,8,9 148:8 151:11,12 152:18 155:12,13,14 183:5,10 184:6 186:21,23,24 190:24 191:1,10,12 192:5,20 194:12 195:24,25

**employee's** 192:24

**employees** 88:5,13,22 101:7 105:23 107:6 113:5,17,20 126:25 127:5 130:15 131:6 132:7 133:10 136:6,10 137:9,10,11,13 140:15, 25 141:5 144:1,4,15 145:9 150:5, 20 151:1,2,4,14 155:20 159:12 163:12 168:8,18,21,22 181:1,16, 25 182:3,8,13,21,24 183:2 190:20 192:16 194:2,9 196:13,16

**employment** 35:15 63:3 181:2

**EMS** 170:12

**encountered** 63:18

**encourage** 80:7

**encouraging** 88:9

**end** 7:18 60:10,13,16 61:19 119:10 167:23 186:20

**ended** 68:8 192:1

**energy** 149:13

**enforced** 23:20

**enforcement** 10:23 30:9 153:25 169:12

**Enjoy** 197:15

**ensure** 19:11 22:22 25:2 27:17, 19 28:15 35:10,16 43:5 57:4 59:1 106:10

**enter** 62:16 119:2,4 196:4

**entered** 57:4 118:14

**entering** 66:9

**entire** 18:8 19:4 58:10 74:14 77:10 95:4 98:7 100:6 105:20 106:2,19 125:1 144:11,15 174:12 177:7,13 193:18

**entries** 148:20

**episode** 170:13

**equal** 43:4

**equipment** 36:6 169:21

**Erin** 5:12

**error** 42:25 58:1 66:11 195:16

**escalated** 31:2

**escape** 40:2,8 43:5 113:12

**escort** 125:5,7

**established** 109:2 110:2 122:14 124:5 128:3 186:25

**estimate** 109:19

**evals** 196:18

**evaluate** 49:22 59:7,16 119:16 120:1 121:4

**evaluated** 50:7 111:12 120:5 178:8

**evaluating** 97:3

**evaluation** 70:13 110:13,14,17, 20 119:9 160:1

**evaluations** 110:24 196:12

**evenly** 142:19

**event** 25:25

**events** 183:21

**everybody's** 46:3 185:24

**exact** 15:19

**EXAMINATION** 5:21

**examined** 5:19

**examples** 26:11 52:23 126:11

**exceed** 98:4 139:9,11

**exceeded** 98:8,11 109:25 152:2

**exceeds** 98:1 111:2

**exception** 137:11

**excessive** 148:7 183:15

**executive** 24:21

**exercise** 53:24

**exert** 149:12

**exhaustion** 148:13

**exhibit** 197:18,19,20

**exist** 50:8 62:6 64:12 66:24 114:11

**existed** 41:16

**exists** 42:11 144:7

**exit** 26:16 181:1,6,9

**expected** 153:17

**expects** 154:6,8

**expenditure** 158:12

**expenditures** 158:14

**experience** 108:8 154:14 155:18

**experiences** 42:2

**expertise** 74:9

**explain** 38:2 48:10 117:4

**express** 79:23 81:21 87:17

**expressed** 179:19

**extent** 15:25

**extra** 138:25 142:11

**extraction** 189:25

**eye** 183:5,22 184:10,16,21 194:5, 12

**F**

**fabric** 45:8

**face-to-face** 130:17

**Facebook** 91:21,23 149:20

**facial** 56:7

**facilitate** 80:17

**facilitated** 107:24

**facilitates** 19:13

**facilities** 18:21,23 47:24 100:21 101:22 105:4,22 106:13 107:7,16

112:17 115:20 116:16 120:16
121:3 123:12,15,16 142:8 155:20,
24 156:3 160:18 193:9,16,17

**facility** 6:11,12,17 7:4,6 8:11,18
9:14 10:5,7,16 11:17 17:22,25
19:12 22:18,22 25:1 29:11,25
30:4,7 31:3,8,9,24 35:2,17 36:18
38:5 40:3,9 43:6 44:14 48:7,16,25
50:9,12 51:12,15,17 58:16,18
59:10,15 62:2,16 63:17,18 64:1,3,
21 65:2,8,16 73:4 75:13 83:5,7,11
86:17 93:22 95:19 98:20 99:3,4,5,
14,17 103:17 109:2,8 112:3,9
113:9 114:8,20 115:1,16,23
116:12,16 117:8,12,25 121:2
122:9,10,15 123:14,15,18,19
126:5,9,14 127:16,20 130:14
131:11 132:21 135:7 136:10
143:24 147:2,6 148:5 154:16
156:20 157:9 158:9,10 159:8
160:15,25 161:6,21 162:5,12
171:1,18 172:12 175:24 176:11,
16 177:7,13,17,22 178:9,23 179:7
189:17 193:16

**facility-** 176:19

**facility-wide** 175:2 176:18
189:10

**facing** 56:7

**fact** 13:24 16:13 28:16 87:10,13
105:23 151:20 152:21 190:14

**factor** 152:5

**factors** 50:21 111:11 153:7

**fair** 37:1 88:24 142:21,23 144:10

**faith** 20:5 34:17 35:12 37:20
62:22 77:24 78:3,7,8,14 79:8,13,
24 82:19,22,23 83:1 85:17,21,24
87:22 88:6 91:5,8

**faiths** 20:6 35:1 37:6

**false** 159:20

**falsified** 167:6,9

**falsifying** 167:16

**familiar** 14:13 91:1 96:4

**familiarize** 60:1

**families** 178:14

**family** 19:16 61:17 161:11,13,15,
23

**Fantastic** 13:25

**fashion** 131:19 156:24 175:18

**Fashioned** 170:17

**favorable** 154:22 160:7,10

**favorably** 111:18

**favored** 74:24

**fear** 172:11

**feasible** 59:11

**feast** 58:5,6 60:8,9,10,14,16,17

**federal** 95:1

**feeding** 148:3 174:25

**feel** 14:9 85:13 100:19 130:23
161:24 162:9,11,12,14,17,19,21,
24

**feeling** 152:13

**feet** 148:16

**fell** 111:1

**felons** 10:8

**felt** 104:22 171:4 181:22,24

**female** 10:8 13:7 190:23 191:10,
11 194:11,15

**fence** 40:4,5

**fewer** 143:15 146:19 165:11

**fewest** 145:3,5

**fight** 118:13 169:2 170:11

**fights** 115:10 120:12,13 121:9,11
172:25

**figure** 94:18 131:23

**figures** 112:15

**file** 56:20 62:7 81:4 85:4,8,9
132:23 133:6,11 192:24,25 193:1

**filed** 27:9 28:5,11 86:13 87:1
94:25 184:6

**fill** 35:14 129:8 140:25 163:12
171:6 196:10

**filled** 99:24 100:9 132:24 164:10
176:15

**filling** 56:21,22

**final** 7:2

**financial** 111:22 112:1 157:11
158:4

**financially** 158:10

**find** 34:12 42:7 44:8 48:21 66:2
73:11 81:2 86:16 99:1 101:1
110:8 117:21 149:11 157:1 159:7
163:12 176:10 188:1 191:6

**finding** 104:17

**findings** 135:4

**fine** 16:6 17:11 79:19

**finish** 147:22

**fire** 163:3,5

**fired** 196:21

**Fisher** 129:5 179:13

**fit** 153:15 154:4

**fits** 153:15

**fix** 187:25

**fixed** 28:19 68:13

**fixing** 187:8

**flickered** 32:21

**floor** 148:21

**Florida** 7:23 8:9,20,23 10:6,9,24,
25

**foam** 47:1,2

**folks** 59:13 103:22 107:15 111:24
112:5,16 136:16 138:13 141:21,
25 142:24 143:5,19 144:20
145:13 148:11,15 149:2 152:7
154:25 169:6 185:19

**follow** 21:10 26:7 28:15 121:23
177:10 179:3 186:24 192:19

**food** 58:20 59:18 60:16 63:24,25

**foods** 58:4,10 60:5 64:3

**footage** 189:7,16,21 190:4

**for-profit** 23:12

**force** 183:15

**forces** 169:1

**foregoing** 5:1

**foremost** 122:15 187:9

**forget** 23:25 29:13 49:4 105:7
127:25

forgetting 132:6

form 26:5 37:16 56:15,22 61:20
68:1,11 69:23 70:20 71:7,13
72:14,25 73:21 74:7 75:14,21
76:3 88:25 89:6,14 92:20 93:4,10,
16,24 94:8 102:17,25 112:21
115:21 117:17 123:10 131:7
132:20,22 161:1,7,18 162:1

formal 176:25

formalized 22:2

forms 132:24

forward 72:1,22 74:11 172:16

found 25:25 133:24 134:2,10,25
167:13 188:4 190:6,15 191:1,15

fox 52:9

frame 12:25 17:17 179:17

frames 57:6

frankly 172:9

free 197:15

freedom 74:21

freezing 150:13

frequency 101:17 146:1 178:17
179:20

frequent 114:25 121:6

Friday 16:22,23 17:2 153:19,20

front 12:9

frozen 150:6,14,18

FSC 59:14

full 16:16 54:15 107:10,11 113:4
136:23 166:21

full- 140:24

full-time 22:8 100:20 101:1,7
105:23 106:8,14,20 107:4,14
141:5

fully 60:18 100:3,5,7 101:6 113:1

function 34:24 187:22

functioning 187:21

funded 97:6 99:19

future 90:5 120:7

G

G-E-N-N-O-E 94:21

Gadsden 10:5,15,19 17:6,24
18:1

gang 114:10,17 190:8 192:9

gangs 114:11 121:19

Gangster 120:18

gaps 141:1

gather 46:15

gave 12:23 46:11 136:2 158:17
161:9

gear 43:7

general 38:11 41:19,25 56:25
63:13 65:4 113:7 156:11

generally 137:10 138:16

generated 25:24 28:24 68:3
84:16 176:14 178:15 189:1

Gennoe 94:21

gentleman's 18:20 24:1

Georgia 6:13 7:13,22

Gideon's 65:12

girl 8:1

gist 14:9

give 13:17 26:11 29:24 42:23
52:7,23 61:3 94:12 108:3 109:23
118:17 121:24 126:11 152:3
158:2 168:15 175:25 176:9
188:21 194:24 197:1,8

giving 82:22 119:9 190:16

gloves 47:14

goals 109:2,3,4,5 110:2,4,7

good 5:3,22,23 11:9 12:12 20:15
28:20 46:2,4,5 94:13 120:25
143:3 159:14 164:8 166:6

govern 21:6

governing 121:22

government- 61:21

governs 174:15

grab 45:20

graduated 10:22

graduation 64:17

graduations 64:2

grandson 7:21 8:3

great 13:17 19:21 90:12 121:2
166:13 189:6

grievance 56:22 57:1,2,7,11,15,
19,20,23 86:11,12,15,18 87:2
195:22,23 196:6,13,20,24

grievances 57:16 86:10,13,16
87:4 195:13,20

grieving 86:20

gripping 47:16

group 36:7 38:21,23,25 39:3 65:9
121:17,25 144:12,13 193:8

groups 63:23 64:8,18 65:1,7
105:6 114:16 120:14,16 186:13

grow 87:13

growing 87:8,11

guard 138:24 149:19

guess 11:12 36:13 45:22 47:19
61:23 71:22 78:11 79:14 102:9
121:22 130:18 150:23 152:11
168:25 175:25 176:9 185:21

guessing 47:24 79:18,19 109:22
123:7

guidance 19:8,16 74:10

guide 19:10

guideline 177:10,11

guidelines 82:24

guy 131:2 190:4

guys 117:4 121:18 132:12 163:4

gym 53:19,25 54:1,3,16

H

halal 58:4,9 59:18 60:4

half 155:7

hall 173:4 175:14,18 185:13
186:15

hand 171:5

**handed** 192:6

**handheld** 189:19,22

**handle** 35:18

**handled** 30:12 31:5 180:9

**hands** 45:20 47:14

**hanging** 149:21

**happen** 44:19 46:10 141:15 168:11 171:9 186:12

**happened** 59:21 139:24 140:1, 21 152:15 168:16 195:18

**happening** 186:2 189:25

**hard** 49:11 92:23 104:17 132:25 136:2 151:24 196:1

**harm's** 113:22

**Hartsville** 7:13

**Hashemian** 5:14 197:12

**haze** 194:4

**head** 21:2 32:13 55:3,24 65:17

**headdress** 55:21

**headquarters** 22:9 32:11 33:1 59:14 91:4,8 103:5 127:24 193:5

**health** 14:10 125:17

**hear** 87:10,17,24 88:2,5 89:16 111:15 159:22 163:5,9,10 167:5 187:2 190:8,13

**heard** 39:7 61:8 75:11 76:15,17, 19,20,22,25 77:2,25 135:11,15 150:5,15,17 151:2 167:8 180:1 181:16,18,20 188:10 190:12

**heart** 170:13

**heavy** 47:9

**heightened** 149:4,11

**held** 7:5,6 8:11 52:14 187:10 190:18

**helped** 140:25

**henceforth** 131:3

**Hernando** 9:6,8,12 10:1,3,13,20 17:12,14 18:2,4

**Herzfeld** 5:8,9,21,25 12:7 16:4, 10 26:9 32:24 37:17 46:1,6,8 61:5 68:4,12 69:25 70:24 71:9,15 72:18 73:2,25 74:13 75:16,23

76:6 89:3,9,16,19,23 90:2,8,12,13 93:1,7,12,19,25 94:10,15 102:20 103:3 112:24 115:24 117:20 123:11 161:4,10,22 162:8 165:14, 16,24 166:1,13,14 194:24 195:2 197:1,4,14,18

**hey** 31:20 41:20 75:17 152:12 157:4

**hierarchy** 121:18

**high** 10:22 148:24 154:11

**higher** 97:6,10 98:14,16,17,18 103:11 111:19 153:4

**higher-ups** 141:24

**highest** 164:10,12,17,19,25

**hire** 99:20 101:6 141:5 163:23

**hired** 100:3 106:8 154:25

**hires** 156:11

**hiring** 105:7 132:6

**historically** 27:7

**history** 7:2,8 11:3 17:4 50:23

**hit** 109:25

**holidays** 153:22

**home** 142:18 143:17

**homemade** 170:17

**homicide** 123:2

**homicides** 122:23

**honestly** 12:5 14:8 34:9 36:15 67:4 77:2 131:12 176:12 188:3

**honor** 59:10

**hospital** 125:14,16,21,23 128:17 138:20 145:1 194:17

**hotel** 112:19

**hour** 46:2

**hourly** 137:11,13,24

**hours** 7:24 13:12 17:3 136:23,24 137:2,14,22 138:1,11 139:9,11, 14,15,19,22 140:5,6,9,10,11,13, 14,15,18 141:10,13,21 142:10,25 143:3,15 144:18 145:4,6,7,10,11, 13,19 146:10,14,18 147:5 151:7 156:9 167:17 192:21

**housed** 6:16 9:11 17:20,21 29:3

51:7,18 114:7 161:12,14

**housing** 51:9,19,21 52:11,15 53:20 54:13 63:3 78:3 114:2 125:8 134:22 148:18 171:13 174:10 175:20

**HR** 110:11 132:7

**Huggins** 40:22

**human** 29:9 42:25 85:7 90:20,21 99:6 108:11 143:8 181:7,8,10

**hundred** 45:9 61:14 94:23 109:20,21 119:6 167:2

**hundreds** 21:13

**hurt** 170:10 194:10

---

**I**

**iconography** 36:10 84:2

**idea** 129:23 195:17

**ideas** 156:22

**identifications** 53:2

**identified** 66:11

**identifying** 56:9

**ill** 152:7

**image** 92:18

**imagine** 37:3 59:9

**imam** 35:5 62:2

**immediately** 26:19 179:3

**immigrants** 8:10

**immigration** 6:18 9:16 123:19

**impact** 113:15,18 126:9 154:12 159:11 193:11

**impacts** 149:16,18

**implement** 22:1 33:16

**implementation** 33:2

**implementations** 32:9

**implemented** 22:4 32:18

**imply** 121:23

**important** 63:5 112:25 113:4

**improve** 160:14

**improvement** 160:16

**improvements** 188:14

**in-person** 70:5

**inadequate** 106:7

**inappropriate** 90:4,7,9 180:22
191:2

**inappropriately** 86:6

**incarcerated** 51:2 161:14,16,17,
21,24 162:9,13,14,16

**Incentives** 116:16

**incident** 16:16 113:25 117:2,3,14
118:15,16 119:25 120:5,10
168:19,23 170:1,7,9,10 176:13,
17,21 178:6 184:4 189:18 193:2,
6,10,13,19

**incidents** 16:17 114:24 118:6
119:4,24 120:1 121:1 122:6
183:13,17 194:1,4,9 195:8

**include** 77:17 154:9

**included** 60:19 98:23

**includes** 170:10

**including** 107:11

**increase** 104:13 105:13

**increased** 29:17 105:5 153:8

**incremental** 185:14

**increments** 155:10

**independent** 14:25 28:1

**indicating** 31:15

**indicators** 135:13

**individual** 54:19 57:12 78:21
92:12,14,16 128:19 133:10,19
137:9 138:24 139:6 169:16 171:9
173:11 183:22 184:19,20

**individually** 37:15

**individuals** 30:25 35:1 51:11
80:2 105:12 125:22 126:18 127:3
142:17,23 156:2 157:2 167:25
173:17

**industry** 153:13,24 174:20

**inevitable** 154:18

**informal** 81:10,17,19

**information** 12:6 28:4 46:16
60:20,24,25 67:5 70:23 71:8

72:17 81:18 95:3 99:5 110:8
118:2,4 120:4 172:8 177:18,23
178:1,3 180:13,19 191:5,19,25
192:4

**infraction** 183:25

**initial** 73:11 74:10

**initially** 167:11

**initiative** 179:23

**injured** 172:23 182:24

**injuries** 183:2,7

**inmate** 19:9 26:14 30:9 53:2
56:14,16,19,20,22 57:20 62:7
90:16 115:10 123:13 163:18
164:2 183:24 186:22 190:18
194:16

**inmate-to-officer** 165:18

**inmates** 9:14 17:21 23:10 26:17
38:6 62:21 63:24 80:8 81:22
85:11 86:6,9,20 87:21 88:9 89:12
91:5,7,11 106:11 122:12 165:7
170:15,24 172:3,25 173:10,24
174:10,12 175:17 180:17,18,19,
24 182:20 187:10,13 188:5
195:12

**inmates'** 11:15 21:7

**inputted** 117:14

**inputting** 118:1

**inside** 31:7 35:16 44:13 50:9
51:14,21 54:5 59:9 120:16 132:21
164:3 169:1 175:20 186:9

**inspecting** 25:1,2

**inspection** 38:4

**inspections** 38:1,3

**instant** 130:24 131:1,4,7

**institution** 121:5 126:3 163:1
174:12 175:6

**institutional** 175:7

**instructive** 130:7 188:25

**instrument** 135:6

**insulator** 40:4

**intake** 44:12

**intense** 130:13

**interfering** 163:8,9

**intermix** 185:20

**intermixing** 185:10

**internal** 30:6 48:15 131:13,15,17
171:13

**internally** 30:10,11

**International** 65:12

**internet** 32:21

**interpretation** 100:17

**interrupting** 166:12

**interval** 155:6

**interviews** 105:12 181:1,6,9

**intranet** 133:7,9

**introduce** 5:5 42:24

**investigate** 30:9,10 31:22

**investigated** 30:24 120:6 190:14
192:13

**investigates** 31:10

**investigating** 31:11

**investigation** 30:15,20 31:3,13
32:7 160:25 171:14 172:20 180:7,
8 194:23

**investigations** 30:6,17 31:7
173:25

**investigative** 30:8 172:13,16

**investigator** 29:11 30:4 31:3,4,
10,16,24

**investigators** 30:14

**involved** 32:4 68:20 108:16
118:17 119:25 179:7

**involving** 11:17

**IRD** 116:25 117:6 132:2,3

**Islam** 87:8,25

**Islamic** 49:16,18 61:7,8,10 62:1
79:8,13,24 85:17 87:21 88:6 91:5,
8

**Islands** 8:15

**issue** 32:3 74:12 114:18 121:7
135:17,18 152:19 169:21 188:1,
10

**issued** 47:20 52:21

**issues** 30:10 32:23 113:14,16,20 116:3 121:5 135:22 179:15 188:6, 17

**item** 50:9 55:17 64:13 67:14,24 69:7 158:21,25 159:3

**items** 43:20 44:4,7,9,13 45:4 48:14,16 49:24 50:3,4,6 58:7 61:14,19,20 64:4,25 66:15,18 67:9 69:21 70:10,16 71:4,12,17 72:5,13,24 73:4,20

**J**

**jacket** 53:9

**jail** 8:12 9:6,12,13 10:13 17:12, 14,20 18:2,4

**jails** 77:10 123:22

**Janna** 5:9

**January** 104:4 110:19

**Jason** 102:5 103:15 116:7,9 122:7 142:4 167:22 179:17

**jewelry** 55:6

**Jewish** 20:18

**Jim** 118:13

**job** 19:5 27:15 43:3 81:8 83:4 85:14 108:6,7,12,18 121:2 124:5 146:4,8 164:25

**jobs** 104:17

**Joe** 5:12

**John** 118:13 129:5 179:13

**join** 105:10

**joining** 87:21

**JT** 92:2,9

**judge** 92:22

**judging** 92:24

**jumbled** 94:4

**jurisdiction** 90:3

**jury** 23:6

**Justice** 17:19

**K**

**K-I-R-O-S** 63:21

**kaffiyeh** 49:12

**Keating** 167:23 179:18

**keeping** 130:8

**keffiyeh** 55:11,12,20,21

**Keith** 40:22

**keys** 169:21

**khuffein** 39:5,8,14 41:4

**kind** 29:6 32:21 47:14 55:22 60:9 91:3 92:23 94:4 112:17 120:3 132:24 134:16 142:21 149:20 151:23 159:16 169:5

**kinds** 64:5

**Kiros** 63:20

**knew** 15:3 78:8 136:4

**knowledge** 26:21 39:4 44:20 55:15 59:17 61:15 62:18 64:6 66:8 68:5 102:24 124:1 128:4 154:14 155:22

**Koran** 65:16,20,23 66:9 68:5,8, 14,18,21,24 69:21 71:4,11,17 72:12,24 73:19 74:5 75:5,8,11,12, 13,17 76:2,7,15,18,19,21,22,23, 25 77:2,3,6 78:7,13 88:24 89:4, 10,22

**Korans** 65:15

**L**

**labeled** 159:6

**lack** 53:5 101:19 102:15,24 103:23 141:1 155:22 163:19

**large** 29:24 36:5 146:10 153:16 186:13

**largely** 111:23

**larger** 45:19

**lateral** 17:24 18:2

**law** 10:23 30:9 153:25 169:11

**lawsuit** 16:12

**lawsuits** 11:15 184:7

**lawyer** 13:3,5,6

**lead** 30:15 148:8

**leadership** 135:23 179:5,6 193:5

**lean** 74:9

**learn** 76:7 88:10 103:10

**learned** 95:7 103:9

**leather** 39:23,25 45:10,14,17 47:10,11,12,13

**leather-type** 39:15

**leave** 7:19 54:10 150:8 151:1,3,4, 7,8 152:22 166:9 181:2

**leaving** 18:1 54:14

**Lecanto** 8:9,23

**led** 153:8

**left** 7:18 9:18,25 10:2 24:3 27:14 40:18 92:22 167:4

**legal** 16:20

**legs** 49:19

**length** 124:19 171:25 175:9 178:13

**lessen** 120:7 122:15 187:16

**letters** 185:17

**letting** 144:23

**level** 32:6 37:5 50:10 115:25 117:2,19 122:9 145:25 149:4,11 154:6,8,15 164:10,12,19 190:17

**levels** 104:19,22 117:21

**library** 65:4

**license** 63:4

**licensures** 85:6

**lieutenants** 127:3

**life** 50:8 112:2 125:20 126:9

**life-long** 155:18

**lifted** 176:23

**limit** 188:7,9

**limitation** 64:24

**limited** 173:8 187:15

**limits** 139:5,8

**lines** 55:7

linking 78:13

list 33:23 44:8 48:8 50:1 65:1 67:2,9,24 68:3,6 69:2 70:10 71:12 72:6 145:5

listed 160:11,12

listing 48:21

literature 43:23

litigation 184:3

live 105:12

living 37:22

local 30:8

located 7:11 24:16 36:3 108:10 117:23

location 34:8,17,19,20 35:22 56:9,10 125:7 169:22

locations 35:25 38:18 43:2 53:12 54:2 62:9 185:15

lock 175:19 176:18 187:18,23 188:4,11

lock- 177:2,17

lock-in 187:11

lock-out 187:11

lockdown 174:5,7,9,11 175:7,11, 16,22,24 176:2,5,11,16,19,21,23 177:3,7,13,23 178:6,9,18,24 179:2,8,14

lockdowns 174:15 175:2 178:12 179:20,21

locked 174:23 176:20

locking 187:11,15,17,20,25 188:12,13,15,19

locks 187:2,9 188:2,10,11 189:2

log 148:20

logged 57:24 127:22

long 6:14 7:16 8:25 9:20 10:15 13:11 17:1 30:2 49:18 64:21 71:16 76:2 82:23 117:18 122:9,13 136:12 156:8,13,22 171:20 177:22,25 184:9 189:6,16,21

long- 55:12,20

longer 32:14 163:25 172:12 175:10

longest 175:7

longevity 151:13

looked 50:24 70:15 111:18 122:16

lost 57:24 183:5,22 184:10,15,21 194:5,12

lot 50:21 121:8,21 123:13 133:2 134:17 143:6,10 148:15,16 153:1, 18 156:20 178:13 180:16,21 187:7 188:7,9 189:11

low 50:11,13,15,19 51:5,13

lowest 104:16

lucrative 112:14

Lumpkin 6:12

lunch 13:13 166:3

lying 15:7 20:8

M

made 33:24 34:1 40:24 42:1 45:7, 10,14 46:23 47:4 89:8 104:10,17 111:22 155:6 157:5,14 158:4 171:24 172:10 183:23 185:3

mail 29:13

mail-out 181:11,14

mailbox 130:19

maintain 128:3

maintained 42:9,13 56:20 66:5 127:25 159:8 189:7,16

maintenance 187:24

majority 19:3 24:2 120:5 121:10 147:18

make 11:23 23:5,19 35:7 38:7 41:4 68:3 76:13 77:9 95:18 97:13 105:25 106:18 117:4 126:5,15 137:18 138:22,25 140:3 142:16, 19 143:1 152:24 157:13 158:10 163:7 169:15,25 171:2 172:14 177:1 179:3 187:20

make-up 52:11

makes 7:25 40:12 128:18

making 74:23 86:24 111:21 144:7 148:19 159:23 168:16 178:21,22 185:17

male 13:6,8 194:6,14

man 77:24

manage 113:24

managed 48:13

management 137:11 180:12 193:2,6,20

manager 17:15 27:13,16,25 29:10 42:18 49:3,6 66:6 152:20 181:10

manager's 27:12

managers 118:3

managing 102:1,3 116:8 142:3 167:20

mandated 97:25 145:14

mandatory 144:8,14,18,20,24 145:15,20,22 150:9,12,13,20 153:23 154:9

mangled 50:14

Maples 5:10

March 7:18 76:1

mark 197:18

marked 53:1 197:20

Marley 44:16 45:13

Marshal 8:14 9:15

Marshals 17:22

masks 47:14

master 127:20 128:14 144:22

material 47:3,9 56:6

materials 36:7 64:19 65:2,6

matter 71:20 153:10

maximum 140:9 145:7 164:5,7

meal 58:24,25 59:4 147:18,19,20

meals 64:7 86:25 173:5 175:19

meaning 21:10 22:21 34:23 53:18 125:15 140:12 155:1 174:9

means 7:1 51:18 67:13 82:20 100:24 106:16

meant 150:18 197:18

measure 134:7

**mechanism** 30:25 73:16 119:2
187:20,25 188:15,19

**mechanisms** 187:16

**media** 93:18 159:23 161:8,9
178:13

**medias** 131:3

**medical** 14:5,11 29:21,22 127:8,
9 134:12 168:24 170:7,9,13
180:15

**medium** 50:12,13,16,17 51:6,13

**Medlin** 102:5 103:15 116:7,9
122:7 142:4 167:22 179:17

**meet** 21:7 70:9 105:17 106:1,5
107:4,17 112:3 124:5 138:23

**meeting** 68:20 69:10,20,22 70:2,
6,12 72:11,16 166:9 168:4

**meetings** 63:13 72:7 103:4
105:11 167:24 168:2

**meets** 59:2 111:3 117:2

**member** 57:1 161:23 183:23
186:16 190:15 194:6

**members** 19:16 122:10 126:16
161:11,13,15 190:9 192:9 193:16

**memo** 42:12 66:19,20,21,23,25
67:1,3,8,10,24 68:23 69:14,16,18
70:13,16,19 71:3,16,24 72:12,23
73:12,19 75:12 82:11 189:4

**memorandum** 41:17,20,25 42:8,
10 66:5,9,14,17 69:8,9 73:14
130:7 188:25

**memorandum-based** 66:4

**memorandums** 42:4 73:3 79:5

**memory** 10:17 15:10 20:12
25:17 26:25 28:22 33:7 52:17
76:11 102:19 104:4,7 191:11
196:25

**memos** 71:2,19 129:20,21,23
130:6,11 189:3 195:5,7,9

**men** 62:15,18 63:8,14,18 105:9

**mental** 14:10 125:17

**mentioned** 134:20 166:9

**mentor** 62:19,20

**mentoring** 63:6

**menu** 58:7 59:10,12

**menus** 58:15,16 60:19 61:2

**messages** 130:15

**messaging** 84:2 85:11

**messenger** 130:24 131:1,4,7

**met** 110:1,4,7 117:18 138:22

**met all** 155:3

**metric** 111:25

**metrics** 111:22 112:1

**middle** 54:6

**miles** 8:24 9:10

**milestone** 189:8

**military** 105:10 157:2,3

**mind** 46:15 47:12 57:9 100:12

**minimal** 126:9 155:25

**minimize** 122:2,4

**minimum** 108:8 192:21

**minus** 64:2 106:22

**minute** 11:4 32:22 150:2 184:11,
16,22 194:25

**minutes** 46:6 94:13 197:8

**mirror** 135:6

**misconception** 159:19

**Misleading** 90:6

**missed** 25:10 29:12

**mistake** 68:3

**mistakenly** 76:11

**misunderstood** 78:11

**moderate** 50:11,15

**modification** 108:16

**modified** 108:14

**Monday** 147:1 153:19

**money** 111:17 138:25

**monitor** 22:6,18,20 24:23 25:18
26:7 28:15,20 30:2 31:14 70:11
71:6 95:18 107:25 122:8 129:6,18
134:19 169:21 179:12

**monitors** 22:7,21 23:18,22
29:12,15 129:14 135:16

**month** 58:10 59:18 99:10 100:10
120:18

**monthly** 37:2 118:25 119:13
135:21,25

**months** 71:21 155:8

**morning** 5:3,22,23 38:4 147:13

**Moss** 17:19

**motivational** 84:7

**move** 51:11 122:12,17 171:23,25

**moved** 122:14 171:19

**movement** 189:11

**moving** 56:9

**multi-post** 169:20

**multiple** 8:13 17:14 37:3

**murders** 122:19

**musical** 150:19

**Muslim** 20:14 33:25 34:3,10,15
36:2,20 37:14,25 39:6,12,13
55:13 78:3,7,14 85:11,21,24 86:6,
9,20 87:11,13 88:9,17 89:12
90:16 91:5,7,10

**Muslims** 38:20 39:2 75:6 77:7
83:20 86:14 87:1,18 88:3,21
91:14,16,19 92:23 93:2,9,15,23
94:7

## N

**names** 54:21,25 55:1,5

**Nashville** 22:9 32:11 33:1

**nature** 31:4 39:11 64:23 84:5
86:12 105:13 113:22 121:20
123:14 125:10 135:7 148:20
190:15 191:2,13

**necessarily** 14:11 31:15 47:15
70:22 143:16 146:11 168:1

**necklace** 43:15

**needed** 19:17 22:1 71:24 76:12
84:15 168:6

**needing** 170:12

**needle** 134:13

**neglect** 31:18

**neighboring** 9:9

**networking** 120:25

**Nevada** 18:24

**newly** 7:21

**night** 54:7 147:4,6

**Nikki** 5:14 166:10

**non-** 156:2

**non-christian** 83:24

**Non-criminal** 31:12

**non-critical** 126:7

**non-issued** 45:5

**non-mandatory** 134:9

**non-medical** 170:2

**noncompliant** 134:10

**nondenominational** 19:8,25
62:22 82:18 93:14 94:6

**nonreligious** 64:21

**normal** 143:20 179:24

**north** 8:24 9:10

**note** 12:10 130:19 152:21

**notes** 12:8

**notice** 149:16 191:8

**notification** 25:22 171:10 177:1

**notifications** 19:15

**notified** 15:16,18 28:19

**notify** 177:14,18

**number** 20:15 21:2 47:20,24
57:3 79:17 96:14 98:19,20 100:15
102:9 105:13 118:16 123:7 140:1
141:18 143:3 144:19 145:3,6
146:10 151:21,22 152:2,3 153:6,
16 158:22 164:25 167:16 168:15,
16 176:1

**number-wise** 165:1

**numbers** 98:14,15 113:23
119:24 122:16 150:24 157:20
164:24

**nursing** 134:14

**O**

**O'DELL** 32:12,14,15,16 33:1,4

**object** 37:16 68:1,11 69:23 71:7,
13 72:14,25 73:21 74:7 75:14,21
76:3 88:25 89:6,14 90:8,11 92:20
93:4,10,16,24 94:8 102:17,25
112:21 115:21 117:17 123:10
161:18 162:1

**objection** 15:25 26:5 70:20
89:22,24 90:1 161:1,7

**objections** 71:10 90:3 94:4

**objectives** 112:3

**obligated** 59:8

**obligation** 147:2

**observation** 125:18 145:2

**observations** 125:17

**observed** 46:7 94:14 165:25
197:9

**obstructive** 82:22

**obtained** 10:24 51:4

**occasion** 136:19

**occasionally** 146:23

**occasions** 195:16

**occur** 125:19 126:17,19 136:19
145:25

**occurred** 135:5 145:23 150:24
185:11

**occurrence** 136:25 141:20
145:18,22

**occurrences** 120:8

**occurring** 123:4

**off-site** 105:11

**off-the-record** 5:24 197:3

**offender** 180:12 194:15

**offenders** 43:5 125:7

**offer** 154:24

**offered** 154:24 155:1

**office** 24:8,10,16 27:12 29:4
42:20 49:1,2 58:19 62:8 84:2,4,9,
13 86:18 99:2 109:9,10 110:10

118:9 119:1 132:10 133:23
171:24 181:12

**officer** 17:13 124:11 125:6
128:23 129:3 136:12 146:25
149:7,10 153:9 156:8 173:22
194:14

**officers** 124:6 125:6 127:2
148:21 153:6 164:22,24 165:2
183:14 187:19

**offices** 29:10

**official** 84:20

**officially** 155:4

**officials** 22:6,14,16

**OIC** 180:7

**oil** 61:7,8,10 62:1

**Oklahoma** 17:18

**on-the-job** 156:5,10

**onboarding** 156:1

**one-on-one** 125:17

**ongoing** 192:16,17

**online** 130:25

**onset** 188:13

**open** 52:16 126:4 159:16 174:13

**open-ended** 112:22

**operate** 21:6

**operating** 27:17,19,20

**operation** 22:22 95:25 108:17

**operational** 29:20 174:22 175:1

**operations** 22:21 40:15 73:10
95:21 108:2,5,13 154:21 179:24

**operator** 169:17,18

**opinion** 79:24 94:5 154:11,22

**opportunities** 62:24 119:21
160:14 187:16 188:8,9

**opportunity** 15:13 34:7 36:21
37:21 82:23 94:20 96:1 115:18
120:7 138:16 139:2 160:11,12,16
193:12

**opposed** 144:12

**ordained** 84:25 85:5

**order** 7:2 19:13 48:8,12 61:19 91:4 101:6 110:3 127:15 158:18 175:1

**ordering** 41:24

**organization** 62:15 106:13

**organizations** 157:1

**organized** 38:8

**original** 72:6,12,23 73:12

**originally** 66:10,12,19

**originated** 157:17

**outbreak** 169:2

**outcome** 196:17

**outfit** 105:8

**outlets** 78:1

**over-** 137:16 141:7 145:15

**overseeing** 78:3

**oversight** 165:7,9

**overtime** 136:16 137:14 138:1, 11,13 139:3,5,16,22 140:10,11, 14,24 141:5,10,13,21,25 142:10, 15,20,22,24 143:6,10,20 144:1,5, 11,14,18,21,24 145:8,11,14,15, 21,22 146:3,8 148:7,11 150:9,21 153:23,24 154:9 156:25

**P**

**p.m.** 147:5

**packages** 61:18

**pad** 12:10

**paid** 83:12 112:19 137:24 155:9, 11,12,13 157:24

**pair** 47:15

**pairs** 47:20,23

**pants** 53:1

**paper** 57:17 130:10,11,13

**paperback** 64:22

**paperwork** 28:24 176:15

**parameters** 109:1

**part** 34:23 41:12 111:6 112:1 128:7 149:15 153:23 178:21

**participate** 62:23 82:7

**participated** 51:1 63:16 82:2,3 83:17,20,23

**participating** 82:14 83:10,13

**particulars** 134:6

**partner** 28:9,13 155:21

**partner's** 128:8

**partnered** 105:6,8

**pass** 71:5

**past** 177:21

**paths** 185:12

**patient** 195:4

**pattern** 84:24 96:9,12,13,16,24, 25 97:1,4,5,7,9,10,18,22 98:4,5,8, 9,22,24,25 99:8,16,23,25 100:1,9, 22 101:11 105:17 106:2,21 107:5, 18 108:7 128:7,9 163:15 165:21, 23 173:21 174:3

**patterns** 128:5

**pause** 195:1

**paused** 150:17

**pausing** 94:4

**pay** 139:9,11,16 140:1,10,12,21 141:18,22 142:15 157:14 173:19

**paying** 150:1 157:1

**payment** 139:1

**Peaches** 181:10

**pending** 48:18 170:25 173:25

**people** 19:22 32:10 35:7 48:11 50:2 52:19 65:1 77:14 99:17 105:9 113:22 114:2 118:9 130:21, 25 132:20 133:20 139:3 140:2 141:18 142:9,11 145:3,18 149:2,3 151:21,22 152:3 159:18 165:11 167:16 169:24 170:10 171:23 174:1 196:10

**percent** 45:9 61:14 94:24 119:7

**percentage** 109:4 154:20 164:24

**perception** 190:16

**performance** 109:25 110:14,17, 20,23 111:3 146:4,8 196:12,24

**performing** 186:16

**period** 9:17 100:4 101:9 104:3,9, 17,19 105:24 110:7 115:12 122:20 124:20 127:23 128:2 131:20 134:11 139:10,12,16 140:1,4,10,12,22 141:18 142:15 145:10 147:4 149:23 153:14 161:14 167:4 174:23

**periodic** 118:20,24

**Periodically** 125:8

**periods** 106:4 141:22 177:25

**permanently** 106:8

**permitted** 39:13 44:3 49:21 55:16 56:4 60:5 61:11 65:2,8,20, 24 168:8 169:16 185:5

**person** 40:2,5 49:4 50:24,25 56:9 62:22 63:2,5 67:23 98:17 131:10, 12 132:17 142:19,20 143:2,3,4, 12,13,14,15 146:10 149:18 152:19 155:5 172:7,11,20 181:8 184:12,19 190:16,18

**person's** 50:22,23 51:4 169:19

**personal** 79:24 91:10 146:12 151:5

**personally** 20:2 77:24 82:3 84:17 103:6 146:9 149:14,16

**personnel** 85:8 192:24

**persons** 169:19

**perspective** 119:20

**persuade** 82:20

**phasing** 53:3

**phone** 70:8 103:16 152:24 174:24 191:23,24

**phonetic** 19:18

**physical** 148:13 149:12 186:2

**physically** 31:20 103:6 124:12 187:20 194:19

**pick** 35:13 64:4

**picture** 92:8,11

**pitched** 156:22

**place** 24:4 28:16 49:4 64:16 71:16 73:16 75:20 96:16 116:17 178:3 188:15,20 195:20

**places** 38:19

**plaintiff** 5:10

**plan** 95:21,25 99:17 108:2,5,10, 14,17 125:19 174:22

**planned** 145:1

**Pleasant** 14:19 15:1,10

**Pleasant-bey** 14:18

**Plemmons** 14:12,13,15

**pod** 51:19,25 54:13,14 175:18 185:2,9,17,18,19,23 186:9,14

**podium** 36:6

**pods** 52:3,8 125:9 186:3 192:10

**point** 64:15 119:11 137:5 149:8 152:17 180:6 186:20

**police** 169:12 190:9,11,12

**policies** 20:10 21:10,13,14,15, 16,17,18,21 22:1 32:9,17 33:15 133:5 135:6 155:23 186:24

**policy** 20:9,25 21:3,4,6,13 22:4 25:3,5 26:1,2,3,7 33:3,6,11 40:10 43:25 44:11,12 75:19 82:11,24 117:22,23,24 128:1 133:9 135:9, 12,14,15 155:25 174:15,18 189:15,18,20 192:20

**Polly** 5:12 11:24

**Poole** 181:10

**populated** 118:10,12

**population** 8:14,15 9:11 15:6 19:9,10 35:3 37:10 41:18 42:5 51:14 87:11,13 173:3,7 193:11

**populations** 185:10

**portion** 45:19 70:23

**portions** 160:9

**pose** 39:20

**position** 6:9 9:2 10:10 17:15 18:6 76:14 80:17 82:18 84:23 96:13 108:6,22 129:9 148:23 150:1 155:15 164:6,11,19 196:9

**positions** 29:3 96:14 99:22 100:8 112:11 124:7 149:22 153:1, 3,5,9 164:9,22,23

**positive** 80:22

**positively** 56:8

**post** 124:8,10,11,13,15,16,19,22 125:23 126:7,8 128:5,10,12,18,20 129:2,7,11 144:25 145:2 156:4,7 169:20,24

**posted** 37:9

**posters** 84:3,4

**posts** 125:2,3,14,25 126:4 144:8 163:12,13 186:5,6

**potential** 140:14

**potentially** 121:4 157:22 186:23

**practice** 16:14 25:2 28:15 34:17 37:20 80:15 82:19,23 85:24 95:19

**practiced** 187:11

**practices** 135:7

**practicing** 82:21

**pray** 35:6 37:12,14,15

**prayer** 38:13,14 39:5,6,13,22,23 41:5 43:21 61:7,8,10 62:1

**prayers** 63:13

**praying** 37:25 38:9

**PREA** 13:20 14:1,2 30:21,23

**preallegation** 14:6

**preclude** 82:10

**precursor** 189:23

**preestablished** 117:3

**preference** 143:19

**prepare** 16:18,24

**prescribed** 186:17

**present** 31:24 70:1 107:17 184:17

**presented** 72:16,19

**presume** 162:17

**pretrial** 8:13,14 9:12,13

**pretty** 33:4 53:6 96:4 105:20 112:14,22 130:13 189:14

**prevent** 40:5 186:1

**previous** 123:15,16

**previously** 34:24 71:25 72:9 76:4 95:20 103:24 107:19 141:12 160:20 165:5 195:15

**primarily** 11:14 21:17 36:1 127:9 130:10 173:24

**primary** 20:20 23:25 27:24 29:18 75:5 77:19

**printed** 27:8

**prior** 6:24,25 7:7 17:15 18:1 60:2 78:12 123:21 178:20

**priority** 117:2,18,21

**prison** 36:17 64:19 112:20,25 113:14 114:1,21 115:17,18 120:22 123:20 148:24 154:12 164:3 165:6,8 168:9,19 169:1,7

**prison's** 159:10,11

**prisoner** 13:1,4 42:22 57:17 88:18 165:4 171:3 184:9,13 185:8,16

**prisoners** 6:16 20:21,22 30:18 33:25 34:3 36:20 37:14,25 38:9, 13 39:12 43:12 46:19 47:17 51:22 53:14 58:9 77:14 78:3 82:8,14 83:11,14 84:9 113:5 114:7 122:19 162:18,22 172:22 180:2,10 182:1, 4,9,12,13,24 183:3 185:3,18 186:8 190:9

**prisons** 77:11 87:8 114:4 120:21, 22

**private** 61:22,23

**problem** 191:8

**problematic** 121:14 122:13,17

**procedure** 32:5

**proceedings** 184:2

**process** 28:8 32:5 35:10,15 41:14 57:4 59:3 133:9 134:17 172:13,16 178:22

**processed** 59:22

**processes** 105:7,13 134:22 174:25 187:8 189:2

**processing** 35:18

**profession** 149:15 153:11,12,16 154:5,6,8

**professional** 146:13

**professionally** 193:9

**professionals** 193:8

**program** 62:19,20,21 63:1,6 82:4
180:14

**programming** 163:18 164:2

**programs** 51:1 56:17 67:6 70:4
72:22 73:8,24 78:19,20 81:20

**progress** 63:17

**progression** 18:4

**prominently** 20:16

**promoted** 17:25 18:3

**promotion** 17:19

**prompted** 157:21 160:24 161:3

**prompting** 142:6

**properly** 40:6

**prosecuted** 184:1

**prosecution** 184:4

**protect** 40:2

**protection** 171:16

**protective** 170:20,23,24,25
171:1,6,10,17,20 172:3,4,19,23
173:2,12,18,25 174:11

**protocols** 187:12,18 188:15,20
189:1

**provide** 19:9 20:1,4 23:9 27:7
30:7 31:6 34:2,13 58:14,24 59:5,8
62:23 74:9 101:22 116:15 123:25
125:20 156:3

**provided** 18:15 29:23 30:14
34:7,16 35:22 58:9,11,13 60:15,
21,22 61:2 64:5 111:13 156:5
163:22 165:21 167:12 172:8
192:16

**providing** 19:22 35:2 44:5 99:17

**provision** 58:3

**PTO** 151:5,10,15

**public** 43:4 113:7 153:25

**publicly** 93:23 94:7

**pull** 18:25 125:22 128:19 132:21
196:16

**pulled** 126:8 128:18

**pulling** 136:21 142:21

**pullover** 53:2,4

**punish** 185:3

**purchase** 39:13 48:1,4,15,17,19,
22 52:20 53:9 61:18

**purchasing** 61:16 132:5

**pure** 11:12 150:23 175:25

**purpose** 95:17 142:14 175:21

**purposes** 44:10 64:14 71:8

**pushed** 158:15

**put** 28:16 42:3 47:13 54:7 67:11,
12,14,15,17,23 79:17 100:21
113:22 116:17 117:1 130:19
145:15 156:4 177:7,13 178:23
179:1 188:15,20

## Q

**QA** 42:18

**qualifications** 108:12,19

**qualified** 110:5 152:22

**quality** 27:11,13,15,25 28:4
29:10 66:6 159:12

**quarter** 176:6

**quarterly** 48:19 119:5,7,8 168:3

**question** 21:21 22:3 32:19,25
33:8 36:13 85:16,18,23 88:16
90:5,9 97:14 98:2 100:18 107:12
112:23 125:11 146:5 157:13
162:15 164:9 165:9,14 168:25
185:21 192:17

**questioning** 90:10 161:20

**questions** 11:8 22:15 32:8,17
33:2,15 71:1 90:6 96:8 195:3
197:5,10,13

**quickly** 179:25

**Quincy** 10:6

**quote** 85:10 119:6

## R

**R-U-S-S-E-L-L** 6:3

**raise** 71:10 171:5

**raised** 51:8

**Ramadan** 58:4,10 59:18 60:5,10,
13,16

**ran** 116:15

**range** 104:8

**ranking** 124:7

**ranks** 17:14

**raped** 182:13 184:13,16,21

**rapes** 182:12

**Rastafarians** 44:16

**rate** 87:8 104:14,15 154:11 195:5

**rates** 104:16

**ratio** 165:18,21

**razor** 40:3

**re-enter** 62:25

**re-entry** 62:20 63:6

**reach** 32:13 129:3 152:23

**reaching** 32:16

**read** 15:13 18:13 74:1,4 84:4
92:19,24

**reading** 149:21

**real** 121:18 144:9

**realize** 60:12 78:6

**reallocate** 126:17

**reason** 129:8 150:17 152:22
171:5 175:16,22 178:7

**reasonable** 143:14

**reasons** 84:18 129:2 151:17
153:10 175:5 181:23

**reassign** 126:17

**rec** 54:10 185:13

**recall** 14:8 18:22,25 20:11,13
26:12 28:18,21 32:16 33:5,10
34:11 36:15,18 40:19 41:8 44:1,
21 49:20 55:9,10,14 56:2 57:10
60:18 62:3 67:4 68:17 71:14 72:4,
22 75:19 84:6,8 85:25 86:4,12,19,
22 87:3,19 88:4 90:17 91:6,9
102:19 103:7 108:20 123:4 135:2
142:12 144:19 157:10,22 158:8
163:17,21 179:22 180:7 183:3
191:16,17 192:3 195:6,11 196:15,
17

**receive** 11:1 27:3,5 57:15 86:8
91:3 108:24 109:12,15,25 110:20

111:19 192:20

**received** 22:2 26:23 106:22,24
107:20 110:5,25 111:2,21,25
119:8,13 181:13 192:23

**receiving** 119:15

**recess** 46:7 94:14 165:25 197:9

**recognize** 20:1 92:14

**recognized** 20:4,6,12 80:16

**recognizing** 82:21

**recollection** 14:25 61:25

**recommendation** 155:7

**recommended** 155:15

**record** 5:4 6:2 46:9 59:25 61:4
64:11 66:1 81:1,2 94:16 127:22
129:11 176:13

**recorded** 176:24

**records** 49:8 60:22 62:5,6 64:12
90:18 130:8 140:1 141:16 167:6,9
176:10 180:16 196:1

**recreation** 53:19 54:1 186:15

**recruit** 34:25 100:24 116:17
159:11

**recruited** 155:2

**recruiting** 34:10,15,21 35:4
116:11 163:23

**recruitment** 105:5 111:23 112:5
155:1,11 156:25 159:2

**red-lined** 187:24

**reduce** 119:21 164:3

**reduced** 163:19

**reduction** 115:13 188:18

**refer** 20:10 21:4 36:23 59:14
67:10 69:12,13 87:25 101:17

**reference** 63:12 93:8

**referenced** 178:5 183:4 194:2

**referencing** 11:23 13:20 93:2,6

**referral** 155:16

**referred** 135:12,15 150:15 191:9

**referring** 20:24,25 36:25 108:4,
18 115:9 141:17 158:3

**reflected** 119:22 129:17

**refrain** 90:4

**regular** 33:5 135:18 136:25
139:21 140:13 141:20 146:17
167:24 168:1 173:3

**regularly** 33:19

**regurgitated** 134:17

**relate** 155:23

**related** 33:6 122:6 134:22 146:3
170:2 176:13

**relates** 16:17 156:25

**relation** 24:16

**relationship** 165:3

**relaxing** 149:21

**release** 7:3 177:3 190:10

**released** 63:2

**relief** 152:4

**religion** 12:17 20:18,20,21 21:15,
19 32:9 33:12 35:5 61:2 62:22
74:21,24 80:5,16 84:22 87:25
90:16

**religions** 20:1,11 75:2 77:15,17
80:14

**religious** 16:14 19:12,23 20:5,6
21:3,4,7 22:8 32:10,17 33:3,15,23
35:3 36:7 37:5 38:25 42:23 43:7,
20 44:10 54:17,18,21,22 55:6
58:12,22,24 59:15 62:13 64:14,20
71:4,17 73:19 74:5 75:2 83:17,23
84:1 85:10 89:11

**religious-based** 65:5 73:6 84:7

**remainder** 166:6

**Remained** 17:22

**remaining** 155:8

**remedy** 187:23

**remember** 12:4,14,18,24 13:6,9,
20 15:7 18:20 19:2 46:10 48:7
52:11 65:10 69:3 70:7,8 86:11
112:15 134:3,4,6,9 136:1 148:2
165:22 190:22

**remembering** 69:5

**remind** 12:1

**removed** 76:12

**reopen** 129:9

**repeat** 32:19

**rephrase** 71:1

**replace** 150:7

**replacement** 150:8

**report** 27:3 28:3 32:4 78:16,18,
21 118:20 119:22 120:5 129:6
167:19 176:14,22 177:6 178:3
191:19,22

**reported** 136:4 178:1 188:5
191:21

**REPORTER** 5:3

**reports** 14:6 25:24 26:4 28:9,22,
23 101:16 106:23,25 107:20,21
117:3 118:19,24 119:13 120:2
135:19,21,25 160:3,6,17 176:17
178:6 180:1 186:20 192:1

**represent** 5:6 39:10

**representing** 136:9

**reprimand** 90:14

**reputation** 159:10,14 161:5

**request** 49:17 55:11 56:12,13,14,
15,19,22,25 59:10,16 61:24 62:1,
5 84:16,17 157:7,20 158:3,4
168:9 171:10 172:3

**requesting** 59:4

**requests** 59:17,21 157:11,12,14,
24,25 158:10,12

**require** 28:7 83:1 144:9

**required** 26:18 32:6 35:12 53:21
54:15 59:8 86:3 101:10 113:1
123:25 138:23 144:1 145:9
168:24 194:16

**requirement** 108:8 144:4,7,9

**requirements** 19:12 21:8 22:24
58:12 59:2 98:1 101:6 107:17

**requires** 26:15

**research** 190:25

**resecured** 105:3

**resolve** 188:16

**resolved** 87:5

**resource** 29:9 85:8 90:20 99:6
108:11 181:7,10

**resources** 19:8 31:6 90:22
106:12 169:10,11,25 170:6 181:8

**respond** 28:8,13 56:19 113:21

**responded** 56:15 57:5 195:13

**response** 41:23 56:13 57:21
105:1 109:23 113:21 119:14
187:5

**responses** 181:13

**responsibility** 38:7 108:7

**responsible** 77:14 78:2 118:1
162:4

**responsive** 181:5

**rest** 197:15

**restrict** 67:14

**restrictions** 42:5 66:3

**restrictive** 51:9 52:10,15 134:22
171:13 174:10

**result** 165:11

**resulted** 101:21

**results** 110:23 176:20

**resume** 179:24

**retain** 100:24 116:17 159:11

**retaining** 116:11

**retention** 128:2 154:24 159:3
177:24

**retired** 32:14

**Returning** 186:13

**review** 19:6 36:8 60:1 96:1 130:3
133:9 165:22

**reviewed** 57:4 64:1 118:4,6

**reviewing** 31:17 87:6 96:6

**revised** 99:12,13

**revision** 89:8

**rewriting** 190:5

**Ricky** 94:23

**rights** 16:14

**ring** 60:11

**riot** 169:2

**riser** 147:14

**risk** 39:20,24 42:25 64:23 113:9,
12

**risks** 155:19

**Risper** 40:17,20

**rivaling** 120:17

**roam** 125:6

**role** 27:24 30:23

**room** 29:13 36:5 173:9

**rooms** 54:23

**rosaries** 43:12

**rosary** 43:11,14

**roster** 127:11,13,14 129:16

**rosters** 128:2 129:17 150:25
167:12

**roughly** 9:23 103:18 140:19
168:14

**round** 148:4

**rounds** 25:1,9,10,12 31:19 38:12
134:21 147:2

**routine** 145:18,22

**routinely** 97:6 148:19 152:18
173:22 174:4

**Rubber** 46:24 47:1,5

**Ruben** 40:17

**rugs** 38:13,14 43:21

**rules** 121:22

**run** 61:22 125:23

**running** 8:18 163:6

**Russell** 5:18 6:3

---

**S**

**safe** 126:5 161:24 162:9,14,19,
21,24

**safely** 179:25

**safer** 143:23

**safety** 42:2 50:8 106:10 112:2
113:5,9,14,16,20 126:2,10 153:25
154:12 165:4 171:4 175:6 179:2

**safety-wise** 114:18

**SAITH** 197:21

**sal** 55:11

**salary** 111:4,9 164:5,7,12

**sanction** 121:23

**satellite-fed** 173:5

**Saturday** 147:3 153:20

**save** 132:9,11,12,25 133:10

**saved** 111:17

**schedular** 128:14

**schedule** 36:24,25 37:2,4,13
127:21 144:23 147:9

**scheduled** 144:24 145:19
153:24

**scheduler** 144:22

**schedules** 19:13 37:7 137:21
154:1

**school** 10:22 185:11

**score** 50:20 51:3,8 134:4

**screen** 91:22

**screening** 35:10

**scrub** 53:6

**search** 90:24

**seats** 148:17

**secretary** 29:5 42:10 66:5 147:9

**section** 165:15

**secure** 49:23

**secured** 187:14

**securing** 50:6 63:3 101:5

**security** 17:20,23,25 19:14
38:21,22 39:3,20,24 40:14,16,18,
22,25 42:2 44:23 45:16 50:8,10
51:6 56:8 63:4 64:23 73:8,9 87:17
91:16 112:3 114:14,15 120:16
123:25 124:3 125:21 126:2,10,20,
23 127:4,6,8 128:24 136:20,21
146:7,13 148:15,23 149:19 150:1
169:1 173:20 175:6 179:2

**segregation** 25:9,12 134:20

**self-writes** 190:3

**send** 61:19,20 102:23 125:21 130:15

**sending** 130:11

**sense** 126:15

**separating** 132:7

**sergeants** 127:3

**series** 96:7

**serve** 43:5

**served** 147:20

**server** 131:13,15,17,21 132:10, 11

**serves** 19:10 52:17 191:11

**service** 34:13 35:3 42:23 44:5 58:20,22 82:4 106:15

**services** 19:10,14,22 20:1,15 23:9 29:21,22 32:13 33:24 34:2,9, 10 35:1,23 36:22 37:2 43:8 44:2 62:13 67:6 83:17,20,23 127:7,10

**session** 63:16

**set** 99:16

**sets** 21:10 31:19

**settle** 166:6

**severely** 194:10

**severity** 119:25

**sexual** 182:18 194:22

**sexually** 182:9 183:10,22 194:12,21

**shakedown** 176:19,20

**share** 132:14,15,16,23 133:6,11 142:21

**sharp** 143:9

**shear** 153:6 164:24

**sheet** 50:20,21 51:3

**sheriff** 169:12

**shift** 98:17 118:3 124:18 127:2,14 128:2,14,21 129:16,17 137:17,21 139:21 144:24 147:4,6 149:25 150:3,6,25 152:4,19 153:21 167:5,9 187:20

**shifts** 96:14 136:12,14,18,21 137:2,19,22 138:7,8,14 143:20 154:2

**shirts** 53:4

**shoe** 47:5,10

**shoes** 46:18,21 47:3,4,12,15

**Shonebarger** 18:19 19:2 22:11 66:16 67:20,21,23 71:25 72:2,8 79:9,13,23 80:1,7,19 81:7,21 82:1,7 83:16,19,22 84:1,19 85:10, 16,20 86:5,9,14,21,23,24 87:3 92:2,4,5,6,9,17

**Shonebarger's** 19:5 80:4

**short** 46:9 81:5 94:16 106:14 123:16 138:17 152:14

**shortly** 24:1 188:21

**show** 12:11

**shower** 46:21,23

**showers** 174:24

**shows** 138:20

**shut** 163:7

**shy** 7:17 103:20

**sick** 125:15 151:1,3,4,7,24 152:8, 10,12,22

**side** 146:12,13 153:13

**sidewalks** 185:14

**sign** 62:21 73:14 129:21 132:19

**signature** 79:6 130:3

**signed** 73:22 74:1,2 75:12 129:24

**significant** 100:12,13,14,16 146:8 188:14,17 193:10

**signs** 79:5

**silly** 86:2

**similar** 121:5 135:4,7 191:2

**similarly** 173:6

**simply** 30:14 31:18

**single** 59:10 137:16 139:9 142:20 173:15

**sir** 21:23 43:16 52:5 59:6 81:11 83:14 91:21 110:16 128:13 157:16 158:7 163:16 164:13 165:10 170:3 181:19 192:18

**sit** 15:9 60:4 73:18 126:16 148:18,19

**site** 22:7

**sites** 136:8

**situated** 173:6

**situation** 26:19,20 44:19 88:20 152:6,15 180:23 185:7,22

**situations** 30:11 31:11

**Sivak** 19:18 22:11

**size** 123:14

**skills** 62:24

**sleeve** 49:18 55:13,21

**slide** 46:21

**slides** 46:20,23

**slipped** 57:24

**slipping** 43:2

**slow** 194:3

**smaller** 144:12

**smoke** 163:10

**social** 63:4 93:18 131:3

**society** 62:25

**sock** 39:10

**socks** 39:5,6,13,15,22,23 41:5,20 42:21,22 45:17 47:12,13,17,19,21 48:2 53:13

**sold** 48:6 50:4

**soles** 47:6

**solicit** 34:25

**solicited** 105:3,9

**solving** 191:8

**somebody's** 30:19

**someplace** 25:20 27:10 42:15 58:15 109:5 127:17 161:17 188:23

**sort** 38:24 81:7 117:13 130:25 131:13 132:8 169:2,7

**sound** 14:13 148:1

**sounding** 163:3

**Sounds** 46:5

**Southern** 18:24

**space** 34:17 35:22 36:21 94:13

142:19

**speak**  17:1 106:25 130:25 142:2
177:24 178:16 179:14

**speaking**  89:19,24 90:3 159:16

**specific**  14:3 15:7,10 16:17
21:14,18,21 25:8 26:7,24 28:14
33:5,21 35:12 36:12 38:5 41:23
44:4 55:5 58:7,24 59:9,24 61:1,2
66:15,18 78:9 85:6 86:11,15,23,
25 100:15 104:11 105:6 109:1,3
110:15 112:4 117:7,9 119:22
124:17 127:15 144:19 155:22
157:4 158:25 164:25 172:11
174:17 191:4 193:15 196:17

**specifically**  14:7 33:7 34:14
36:18 41:10 45:3,20 56:3 73:15
76:23 77:3,4,8 87:2 90:21 97:14
98:23 104:18 108:18 121:1 122:2
134:18 161:2 178:19 188:3
191:16 193:3 196:15

**specifications**  108:4

**specifics**  14:8 16:15 25:17 33:20
34:5 43:10 44:1 58:13 72:4 75:10
79:10 81:14 104:11 149:16
158:16

**speculate**  93:5

**spell**  6:1

**spend**  147:6

**spent**  77:10

**spike**  121:1

**spoke**  16:23

**spoken**  94:17

**sporadic**  121:25

**spots**  101:2

**spread**  142:22 144:10

**stabbed**  182:4 194:14

**stabbings**  182:20

**Stacey**  102:6 103:14,15 142:3
167:22 179:17

**staff**  19:14,17 22:8 25:10 31:10,
11,15,18 32:10 37:11 41:18 42:4,
17 49:6 57:1 59:15 64:4 98:19
100:20,21,24 101:19,22 105:14,
17,21 106:1,8,11,14,20 107:4,11,
14,16 113:8 115:10 116:11,15,17
119:17 124:5 126:15,21,23

127:15 134:14 136:20,21,24
139:18,20 142:7 144:9 146:7
147:6 148:15 150:16 155:6 156:5,
17,18 158:19 163:20 173:18
183:23 186:4,16,18 187:8 188:4
190:8,14 191:7 193:11 194:6

**staffed**  100:5,7 113:1 138:17
152:14 173:22 174:4

**staffing**  84:23 96:9,12,13,16,24,
25 97:4,5,7,9,17,21 98:4,5,8,9,22,
24,25 99:8,15,23,25 100:1,9,22
101:10,11 102:16,24 103:5,12,23
104:19,22 105:17 106:1,7,21
107:4,18 108:7 113:4,11 116:4
127:11,13 128:5,7,9 134:16,20
141:1 156:25 157:8,11,20 163:14
165:4,21,23 173:21 174:3 186:6

**stagnant**  96:22

**stances**  188:7

**stand**  20:16

**standard**  44:24,25 47:5 52:24
53:6,12,22

**standard-issue**  53:15

**standards**  27:19,21,23 95:8,11,
14,18 134:7,10 135:13 156:23
192:19

**standing**  168:3

**start**  5:7 17:9 73:7,8 107:12
108:1 133:22 145:5 167:22 190:5

**started**  17:12 155:4

**starting**  106:17

**state**  6:1 10:9,23,24 11:25 101:1
115:20 197:12

**stated**  71:25 72:9 76:4 95:20
103:24 107:19 141:12 165:5
195:15

**statement**  16:9 86:24

**station**  148:17

**statistical**  115:6 117:9 119:9
123:7

**statistics**  115:12 116:19,23

**stay**  103:16 112:18 123:17
147:16 150:6 171:21

**stayed**  111:8,12

**staying**  106:9

**stays**  123:16 175:14

**stem**  120:20

**stems**  120:21

**step**  169:8

**steps**  106:10 188:7,9

**Stewart**  6:12,14,17,23 7:5,10
18:6 123:18

**STG**  121:1,7,9,11 122:6,9,10
180:13

**STGS**  121:13 122:12

**stock**  48:18

**stole**  30:19

**Stone**  102:6 103:14,15 142:3
167:22 179:18

**stools**  148:18

**stopping**  37:25 94:13

**stops**  79:2

**store-bought**  64:3

**stored**  27:10,11 37:7,8 56:13
130:5 195:20

**stories**  159:23 178:14

**straight**  177:5

**strategically**  192:9

**street**  35:6,13

**streets**  120:21,22

**strength**  20:9

**stress**  148:10 193:2,6,20

**stretch**  131:2

**stretching**  10:17 57:9

**structure**  121:19,20

**struggled**  100:20,23

**struggling**  55:1

**study**  81:24 82:2,7,14 83:1,10,13

**stuff**  43:23,24 52:20,22 130:9
132:5

**stun**  40:4,5

**style**  47:10 52:17 62:20

**submitted**  118:7 195:12

subordinates 119:20

subsequently 10:19

substance 86:19

substitute 163:24

success 112:1

successful 34:9,15

sufficient 105:17

suggest 87:20 190:16

suicide 125:18,23 128:17 145:2

suite 24:21

suits 11:15

Sunday 147:3 153:20

supervised 49:6

supervision 78:25

supervisor 129:5 191:20 196:19

supplemental 158:18

supply 48:8,9,12,13,15,18,20
50:5 52:23 53:10 61:16,21

support 19:17 30:25 59:15 105:3
109:8 111:24 112:9 117:25
125:21 127:7 152:21 158:21
159:9 171:16

supported 30:22

supportive 80:14

supposed 82:17 141:11

surprise 136:4

sustained 190:20

sway 154:20

sweat 53:9

sweats 53:9,16,17,24 54:7,12

switch 53:23

switched 130:11

sworn 5:19

system 57:5 90:23 91:1 116:25
117:1 119:3 160:15 180:12 189:8,
11,17 190:2 191:9 196:4

system-wide 190:2

systemic 188:12,13

---

### T

t-shirts 53:13

T.V. 77:25

taking 116:14 146:11 152:19
173:10

talk 24:25 30:17 35:4 71:2 74:20,
23 75:1 81:5 84:15 87:10 88:2
110:14 141:24 178:24 179:10
181:9 193:12

talked 22:10 116:10 129:19
132:1

talking 23:1,6 30:16,18 43:14
54:11 71:2 81:10 106:7 117:5
128:15 135:8 150:19 167:15
188:11 189:9,10

Tampa 8:24 9:10

tamper 187:17

tampering 187:10

tape 189:24

tasked 31:17

TDOC 5:15 20:9,24,25 21:5,10,
12,17,21,25 22:6,14,16 23:8,16,
19,22 24:5,7 28:1 32:1 33:11
43:24 45:6,7,10 51:11 57:5,12
70:9 107:23 119:1,3,4,5,8 120:24
122:11 133:18,22 134:13 135:5,6,
23 157:12,14 166:10 169:14
177:2,9,14,18,23 179:4,6,10
180:9 195:24 196:4

TDOC-ISSUED 44:24,25 50:3

teach 62:23

team 193:2,4,7,14,16,20

technical 5:24 32:23

technology 20:3

telephone 103:11

telephonic 70:5

telling 49:5

temporarily 112:17

temporary 116:15 155:20

ten 109:20,22

tenet 85:24

---

tenets 85:17

Tennessee 7:13 23:2,4,10 25:22
27:22 28:10 30:7,13,23 48:13
52:24 97:2 104:16 115:20,23
155:23,24 156:3 160:18,25 192:6

tennis 46:21 47:3,4,5

tenure 9:19 101:14 103:22
105:21 115:4 116:20 122:3 123:2
168:22 182:6,9,14,21,25 183:3

term 122:24 150:11

terminate 181:2

terminated 183:25

terminology 96:8

terms 23:19

terrorists 91:19

test 153:14 187:20

testified 11:16 94:19

testimony 40:23 97:17

text 63:13 65:20 74:6 75:6 77:20
89:11 90:24

texts 75:2

Thanksgiving 64:8

thermals 53:8

thing 157:4 158:13 181:15
197:19

things 22:23 25:15 43:2,24 44:3
51:2 63:5 64:5 67:2,8 68:13 69:1
93:15 104:21 118:18 119:20
120:1,20 121:20 125:10,18
130:11 131:23 132:12,23 133:1,2,
11 134:15,23 138:21,22 148:20
149:3 151:23 154:4 157:24
160:10 169:5,22 171:15 175:1
180:21 187:7

thinking 55:2,20 80:23 183:8

thousand 109:19,20,21

threat 38:21,22 39:3 44:23 91:17
114:16 120:16 172:10

threats 45:17 114:14 173:20

three-month 155:6

Thursday 153:20

tic 104:14

**tied** 111:4

**tier** 187:12

**Tim** 32:12,15

**time** 5:5 9:17,21,24 10:12 12:25 15:10 17:17 19:3,4 23:23 24:2,3, 13 25:8 28:18 32:12 33:9,10,22 37:12,24 38:10 40:16,21 41:3 42:9 46:2,10 48:23 55:10 57:6,8, 23 58:8 60:6 61:11 64:2 65:23 71:11 73:17 74:17 75:8,11,13 76:13,14,17 77:13 78:2,6 80:20 81:6,14,20 83:12 85:23 87:14 89:10 95:7 97:8 98:2,3,7 99:21 100:2,4,6 101:8,9 102:2,4 103:21 104:3,9,18,19 105:15,16,24 106:2,5,19 107:10,12,13 110:7, 13,18 111:1 115:12 116:7 117:13 118:13 120:9,17 122:7,13,20 124:19,21 125:1 127:23 128:3 131:20 133:14 136:11 137:2,6,17 138:2 139:20 140:13,25 141:8,9 142:12 144:15 145:9,16 147:4,6, 19,20 148:25 151:5,15 162:2,5 164:14 166:18 167:3,4 169:23 172:1,18,19 174:23 175:9,18 176:6 178:13 179:17 187:12 190:5 196:5,8

**times** 11:10,12,20 25:13 37:14 79:15 83:2 99:13 101:14 106:22 107:3,5 125:2 141:15 170:14 175:19,23 186:8 193:23,24 195:12

**tired** 143:5

**title** 84:20,21 108:7

**today** 5:4 15:9,17 24:20 42:11 60:4 73:18 153:18 195:4 197:5,11

**today's** 16:18 60:2

**told** 89:25 92:22 142:12,18

**Tom** 5:14 19:18

**TOMIS** 180:2,3,4,10

**top** 21:2 53:6 65:17 140:7

**topic** 33:20

**topics** 33:19

**total** 47:24 52:4,14 98:14,19,20 105:13 140:6 166:17 189:9

**totally** 50:14 159:18

**tour** 147:4

**tours** 31:16

**towel** 55:22

**towers** 92:21 93:3,9

**track** 130:8

**tracking** 116:24

**traditional** 47:19 49:16,18 58:4 170:18

**trained** 74:17 187:8 193:9

**training** 17:15 21:25 22:2 85:9 151:23 156:1,3,5,8,10 192:16,17, 23,25 193:1

**transfer** 17:24 18:2 170:25

**transferred** 10:19 18:21,24 171:18

**transport** 126:17,18

**transportation** 126:12,13

**treated** 88:21

**treatment** 14:11

**Tricia** 5:9 166:8

**Trinity** 58:19,20 59:12 60:20,23

**Trousdale** 7:12,16 8:7 11:17 15:4,11 18:5,17 19:23 20:7 21:9, 17,18,22 23:3,23 24:3,8,10,14 29:17,24 33:10,22,24 34:14 36:19 37:24 38:21 39:2,12 41:5,9 42:17 44:20 46:19 47:18,23 48:23 50:10 51:5,10 52:3 53:15 55:16,23 56:5 57:8 58:9 59:19 60:5,15,24 61:11 62:16 63:24 65:21,24 66:9 68:9 75:25 76:2 80:20 81:24 84:2,20 85:11 86:6,9 87:7,14,18,20,24 88:5,8,9,12,16,20 90:15 91:3 93:14 95:12 96:2,17 97:9,18 98:3, 8 99:22 100:19,25 101:7,9,20,23 102:16 103:5,23 105:14,16,23 106:2,9,14,19 107:5,13,14 108:2, 21,25 109:13 110:1,3,9,21 112:5, 12,17 114:11,19 115:3,4,15 116:1,4 117:7,11 120:9 121:6,11, 14 122:1,16,20 123:5,21 124:1,22 127:6 129:20 130:9,10,13 131:6, 14,25 132:14,16,19 133:5,15,21, 22 136:10,12 137:3 139:3,21 144:2,5,16,21 146:15 147:21 150:11 151:1,4 152:7 153:2,8 154:23 156:17 157:8 158:5,23 159:14,19 160:1,8,25 161:5,9,12, 17,25 162:10,14,18,23 163:11,19 164:6,11,20 165:17 166:16,19 167:4,5,9 168:8,12,18,21,22 170:6,15,21 171:3 174:8,16 175:3 177:22 178:17 179:21 180:1 181:3,17,25 182:3,8,13,23 183:13 184:7 185:2,8 187:1 189:7 190:7, 21 192:2,8,15 193:1,3,14,20 195:5,14,21 196:6

**Trousdale's** 108:13,17 111:5

**true** 45:11 89:15,18,22

**Tulsa** 17:18,21

**turn** 104:14,15 138:22

**turned** 156:6

**Turner** 7:12 100:25 101:7,9 106:9 159:19

**turning** 33:22

**turnover** 153:1,4,8 154:11,15,17, 19,21

**tweet** 93:9,17

**tweeting** 93:14

**twelve-hour** 136:14 137:17

**twin** 92:21 93:3,8

**Twitter** 91:25 92:6,19

**two-and-a-half** 79:15

**two-man** 173:16

**two-person** 169:20

**two-week** 139:10,11,16 140:4,10 141:22 142:15 145:10,20

**type** 6:16 9:11 10:7 26:19,20 30:11,19 31:7 42:24 43:14,23 46:18 47:5,10 52:25 62:19,20 63:6 64:3,25 120:10 124:3 158:3 181:14 193:10

**types** 11:13 31:10 45:4 47:17 50:18 63:4 113:19 118:18 120:1 121:5 125:3,8 127:5 131:16 138:20 151:23 169:22 172:6

**typical** 147:8

**typically** 27:6 40:14 41:17 42:16 50:24 51:22,25 56:18 73:3,7 110:2,19 118:25 119:14 125:5 130:2 136:3 137:20 142:6 146:19 147:10,12 167:1 169:17 173:20 178:20 179:11 181:7 186:21

**U**

**U.S.** 8:14,15 9:14 17:21

**ultimately** 43:2 78:23 114:1 119:19 134:8 135:13 162:3 178:20 183:25 186:17

**unacceptable** 154:15,18

**unbiased** 80:13

**uncertainty** 154:1

**undergarments** 53:12

**understaffed** 100:19 112:20 165:6,8

**understaffing** 114:22,25 115:4

**understand** 18:10 19:11 35:7 40:25 77:9 85:18 95:24 97:13 105:25 106:17 107:8 112:23 117:4 130:6 140:4 141:1 146:5 161:19 165:3 171:2

**understanding** 15:23 16:1,7,11, 13,15,16 21:20 70:18 78:13 106:6 157:13 184:15,21

**understood** 40:23 42:5 49:25 76:14 97:16 137:18

**unemployment** 104:14,15,16

**unfairly** 88:21

**unfavorable** 160:7

**unfortunate** 153:13

**uniform** 52:21,24 53:7,15,22 54:15 55:8 127:1,4,6,8,9

**uniformed** 126:24

**uniforms** 50:3

**union** 48:7,9,12,13,15,18,20 50:5 52:23 53:10 61:16,21 136:9

**unionized** 136:7

**unique** 100:25 118:16

**unit** 26:16 51:10,19,21 52:6,8,10, 14 54:11,12,13 118:3 170:20,24 171:1,12,13,22 172:15,21 173:17, 19,23

**units** 37:9 52:2,9,12,13 53:21 54:24 125:8 148:18 192:10

**unlimited** 139:2,4

**unorganized** 121:17

**unsafe** 162:11,12

**unstaffed** 164:6,9,11

**unsubstantiated** 172:10

**uploaded** 118:7

**uprising** 169:7

**ups** 103:11

**upward** 104:14

**utility** 125:6

**utilize** 151:6

**utilizing** 107:14 152:22

**V**

**vacancies** 100:22 106:14 111:24 138:18,21 164:20,21

**vacancy** 164:16,18

**vacated** 187:23

**vacation** 151:8

**validated** 171:15 172:9

**validity** 88:6

**Valor** 62:16,18 63:8,14,18

**variance** 100:14

**varied** 21:20 120:15 151:19 171:23,25 172:7

**varies** 100:10 120:20,23 124:18 143:12 168:15 189:8

**variety** 77:15

**vary** 31:12 164:14

**venues** 50:6

**verbal** 25:22 26:11

**verified** 35:9 58:25

**versus** 76:12 104:20 143:3,13 164:24

**vetted** 35:9 58:25 59:1

**video** 31:17 184:18 189:6,16,24

**videotape** 184:24 189:19

**view** 159:17

**views** 80:2 91:10

**violate** 82:15

**violence** 12:18 116:20 122:2 164:3 192:10 195:5

**violent** 16:16,17 114:5,8,24 117:14 122:6 161:6 168:19,23 169:2,7 195:8

**Virgin** 8:15

**virtually** 155:25

**vision** 161:9

**volunteer** 34:16 44:10

**volunteers** 19:9 20:3 34:10,12, 21,25 35:4 62:12

**W**

**W-A-S-H-B-U-R-N** 6:4

**W-UNIT** 36:1 52:15

**waiting** 126:16

**walk** 17:7 26:14 148:21 185:8,23

**walking** 26:13 53:15 148:16

**wanted** 81:22 130:15 138:25 163:7

**wanting** 154:5,9

**warden** 6:10,11 8:8 9:3,7 10:11, 12 15:4 17:6 18:1,3 21:9 24:13 26:17 33:9,23 37:24 39:22 40:15, 25 48:23 56:17 58:8 61:12 67:6 70:4 73:9 75:25 78:19,20 79:1,7 81:13,19 91:13 93:22 94:5 97:8 98:3,7 99:21 101:8 103:18 106:19 107:13 108:21,25 109:13 114:18 120:9 122:1,21 123:5,20,23 124:22 128:25 129:20,21,24 146:15,18 147:8 151:15 152:16 153:8 156:17 157:8 158:5,23 159:15 162:11,23 164:15,16,21 165:18 166:18 167:3 168:12 169:23 170:6,15 171:4 172:2 175:3,8,24 176:7 183:14 185:2,7 187:1 190:7,20 193:21 196:5

**warden's** 29:5

**wardens** 98:21 118:8 119:17

**warehouse** 167:14

**Washburn** 5:18,22 6:3,7 11:5 91:13 166:2,15 197:5,14

**watch**  31:16 128:17 189:24

**watched**  128:17 184:18

**watching**  174:2

**ways**  146:2

**weapons**  170:16,17,18

**wear**  46:19 47:17 49:17 50:1,2
52:19 53:8,21 54:1,12,15 55:5,11
127:3,5

**wearing**  26:18 54:4 55:23

**week**  15:18 83:2 120:19 128:23
137:16,19,22,23,24,25 138:5,10,
14 139:14 140:5,6,7,11,19 142:25
143:7,11 145:4,20 146:14,17
147:1 150:21,22

**weekend**  146:22,24

**weekends**  146:20,23 153:22

**weekly**  48:17

**weeks**  12:24 46:12 71:21 94:19
139:22 140:12,16 156:13

**weighted**  51:2

**Welborn**  5:12 12:3 15:25 16:6
46:4 68:1,11 69:23 71:7,13 72:14,
25 73:21 74:7 75:14,21 76:3
88:25 89:6,14,17,21,23,25 90:6,
11 92:20 93:4,10,16,24 94:8
102:17,25 112:21 115:21 117:17
123:10 161:7,18 162:1 197:8,10

**well-being**  38:6

**whatever's**  189:25

**whichever**  162:5

**wide**  45:22 117:7,8 176:20

**width**  45:18

**winter**  53:8

**wire**  40:3

**woman**  184:10,20 194:5

**women**  105:9

**wondering**  147:9

**Woods**  31:25 32:1,4

**word**  90:25 150:16

**work**  8:25 17:4,9 29:6 40:6 47:9
59:3 83:8 124:12 136:16 137:15,
20,22 138:3,13 139:3,6 140:7

141:5,21 143:13 144:1,5 145:5,9,
20 146:14,20,22,23 147:12
148:17 152:24 153:15,19,21,22
154:9 155:3 157:3 187:3 193:12

**worked**  17:7 123:13 137:13,21,
25 138:10 139:18,21 141:10,13
143:2,3,15 156:12,21 163:1
167:17

**workforce**  144:11 153:18

**working**  18:18 40:6 77:10,14
105:15 128:12 130:10 133:14
139:14 140:15,25 141:25 142:10,
24 143:6,10,20 144:16,21 145:13
146:7,10 148:11 149:25 152:7
177:16 187:23 188:2,4

**works**  146:3

**world**  96:9

**Worldox**  132:11

**worn**  54:18,22 55:4

**worse**  116:20

**write**  12:11 72:3 130:18

**writes**  57:17

**writing**  41:13,16 42:3 57:16
81:16 102:14 188:23 191:22

**written**  26:21 40:10 57:20,21
107:22 108:6 109:5,7 110:8
181:12

**wrongly**  11:25

---

**Y**

**yard**  53:17,19 185:21

**yards**  185:13

**year**  11:1 17:23 42:12 75:19 96:5
99:10,13 104:5 109:16 110:12,21
111:8 112:10,11 158:15,22
191:17 192:21

**year-and-a-half**  30:3

**years**  7:17 9:1,22,23 25:6,7,16
30:3 50:24 71:21 75:25 79:15
103:18 109:15 177:21

**young**  121:18

---

**Z**

**Zoom**  5:7,11,16 13:15 103:8,9,10