```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE MIDDLE DISTRICT OF TENNESSEE
 2                     NASHVILLE DIVISION

 3

 4   BOZA PLEASANT-BEY,             )
                                   )
 5      Plaintiff,                 )
                                   )   Case No. 3:19-cv-00486
 6   VS.                           )   JUDGE TRAUGER
                                   )   JURY DEMAND
 7   STATE OF TENNESSEE, et al,    )
                                   )
 8      Defendants.                )
     _____X
 9

10

11

12

13   _____

14

15        DEPOSITION OF JON THOMAS SHONEBARGER, JR.

16                  TAKEN ON MAY 6, 2021

17

18   _____

19

20

21

22
     Prepared by:
23   Carole K. Briggs, LCR #345
     Briggs & Associates
24   222 Second Avenue, North, Suite 340M
     Nashville, Tennessee  37201
25   Briggscourtreporting@hotmail.com
```

```
 1                              APPEARANCES:

 2

 3

 4    FOR THE PLAINTIFF:

 5

 6    JANNA MAPLES, ESQUIRE
      Branstetter, Stranch & Jennings, PLLC
 7    The Freedom Center
      223 Rosa L. Parks Avenue
 8    Suite 200
      Nashville, Tennessee  37203
 9    triciah@bsjfirm.com
      jannam@bsjfirm.com
10

11
      FOR THE DEFENDANT, STATE OF TENNESSEE:
12

13
      NIKKI N. HASHEMIAN, ESQUIRE
14    Tennessee Attorney General's Office
      P.O. Box 20207
15    Nashville, Tennessee  37202-0207
      thomas.aumann@ag.tn.gov
16    Nikki.hashemian@ag.tn.gov

17

18    FOR THE DEFENDANT, CORECIVIC:

19

20    JOSEPH F. WELBORN, ESQUIRE
      ERIN PALMER POLLY, ESQUIRE
21    K&L Gates, LLP
      222 Second Avenue South
22    Suite 1700
      Nashville, Tennessee  37201
23    joe.welborn@klgates.com
      Erin.polly@klgates.com
24

25
```

```
 1                       TABLE OF CONTENTS

 2

 3   Witness                                            Page

 4

 5
     JON THOMAS SHONEBARGER, JR.
 6
     Examination by Ms. Maples                             5
 7

 8

 9

10

11                       LIST OF EXHIBITS

12
```

```
13   Number      Description                           Page

14

15   1           Union Supply memo No. 18-043           42

16   2           Ramadan 2019 guidelines, dated         69
                 March 2019
17
     3           Ramadan plan for 2018                  72
18
     4           Affidavit of Mr. Pleasant-Bey          83
19
     5           Jon Shonebarger's affidavit,          117
20               Re: Eid feast

21   6           e-mail chain with Shonebarger         124
                 and Darnell
22
     7           documents concerning requests         132
23               From a Jewish inmate

24   8           Affidavit of Aaron Williams           142

25
```

```
 1                    S T I P U L A T I O N

 2

 3

 4           The deposition of Jon Thomas Shonebarger, Jr.,

 5    taken on behalf of the plaintiff, remotely via Zoom, by

 6    agreement of parties, on May 6, 2021, for all purposes

 7    allowed under the Federal Rules of Civil Procedure.

 8           It is agreed that Carole K. Briggs, licensed

 9    court reporter for the State of Tennessee, may swear the

10    witness, take his deposition, and afterwards reduce same

11    to typewritten form, and that the reading and signing of

12    the completed deposition by the witness is not waived.

13           All formalities as to notice, caption,

14    certificate, et cetera, are expressly waived. All

15    objections, except as to the form of the question, are

16    reserved to the hearing.

17

18    (Unless previously provided, all names are spelled
      phonetically, to the best of the court reporter's
19    ability.)

20

21

22

23

24

25
```

```
 1                (Whereupon, the foregoing deposition

 2                began at 9:12 a.m.)

 3                THE COURT REPORTER:  We are on the record on

 4   May 6, 2021 at 9:12 a.m.  At this time, would each

 5   attorney please introduce yourself, who you represent

 6   and that you agree to this deposition being done

 7   virtually by Zoom.

 8                MS. MAPLES:  Janna Maples with Branstetter,

 9   Stranch and Jennings for the plaintiffs.  And I agree.

10                MR. WELBORN:  Joe Welborn and Erin Polly for

11   CoreCivic.  And we agree.

12                MS. HASHEMIAN:  Nikki Hashemian with the

13   State of Tennessee.  And we agree.

14   Whereupon,

15                   JON THOMAS SHONEBARGER, JR.,

16   having been first duly sworn, was examined and deposed

17   as follows:

18   EXAMINATION BY MS. MAPLES:

19        Q.    Please state your name for the record.

20        A.    Jon Thomas Shonebarger, Jr.

21        Q.    Where are you currently employed?

22        A.    CoreCivic.  Trousdale Turner Correctional

23   Center, Hartsville, Tennessee.

24        Q.    What is your job title there?

25        A.    Chaplain.
```

1       Q.     How long have you been there?

2       A.     I've been there over four years, beginning

3    November of 2016 in -- at Trousdale.

4       Q.     Is there any reason that you can't testify

5    honestly and truthfully today?

6       A.     No reason.

7       Q.     What is your job description as chaplain at

8    Trousdale?

9       A.     Well, fundamentally, it's to provide

10   religious facilitation for 93 different religions that

11   is recognized by Tennessee Department of Corrections.

12   To assist inmates with pastoral counseling.  Provide

13   emergency notifications and spiritual counseling,

14   pastoral care.  To have relationships with groups that

15   would assist in facilitating the needs of the inmates.

16   I also recruit and train and supervise volunteers in the

17   fulfillment of religious services.  That's fundamentally

18   what I do.

19      Q.     You said something about emergency

20   notifications.  What did you mean by that?

21      A.     When we get called by family that a next of

22   kin has passed away, I will verify the fact of the

23   matter and notify the inmate.  And provide consolation,

24   brief counseling, virtual care and enable the inmate to

25   be able to call his family and deal with the situation.

1       Q.     I think you just mentioned recruit, train and

2    supervise volunteers.

3       A.     That's correct.

4       Q.     What goes into that?

5       A.     As we have inmates that are interested in

6    having a group, I do a chaplain sort of thing that they

7    can, to be able to find those that are, you know, are

8    familiar with a particular faith, whether it be

9    spiritual leaders, members of a congregation that are

10   willing to go through Tennessee Department of

11   Corrections certification, a federal background check.

12   And to be able to bring services at no compensation to

13   themselves with the intention of helping, assisting,

14   mentoring inmates.

15      Q.     Does Trousdale have a local volunteer

16   advisory board?

17      A.     Yes, by Policy 115.01, we have a local

18   community resource board.

19      Q.     What did you say that board was called again?

20   Can you repeat that?

21      A.     Tennessee Department of Correction Policy

22   115.01.

23      Q.     I'm sorry, the name of the board?

24      A.     Local community resource board.

25      Q.     And that's the board that serves as the local

```
 1   volunteer advisory board?

 2        A.    That's correct.

 3        Q.    And do you work with them?

 4        A.    I do.  By policy, it is the warden's board,

 5   but it's consisted of volunteers associated with the

 6   local facility.

 7        Q.    Which contract monitor at Trousdale, if any,

 8   is involved in overseeing religious accommodations and

 9   religious services at Trousdale?

10        A.    In my four-and-a-half-year tenure at

11   Trousdale, Chris Brun and Jon Walton have been involved

12   with overseeing religious services.

13        Q.    And in what sense do they oversee the area of

14   religion?

15        A.    They perform periodic audits.  They -- yet in

16   doing so, they will go through our audit tool, Tennessee

17   Department of Correction audit tool, to ensure that we

18   are following those particular points satisfactorily.

19   They'll ensure that they have received certification

20   training, PREA training and received a federal

21   background check.  They also are involved with

22   addressing any concerns, questions, recommendations from

23   inmates via fulfillment of the religious services

24   component of the prison.

25        Q.    Is there a TDOC audit tool specifically
```

1    geared toward religion?

2         A.    Yes, there is.  And there is also an audit

3    tool for volunteer services.

4         Q.    Can you explain a little bit more about the

5    role that Chris Brun and Jon Walton have had in

6    addressing requests or issues concerning religion that

7    have been raised by inmates?

8         A.    I think more than anything else, as they

9    interact, they will come to my office and check my audit

10   tool.  They'll check the volunteer fund.  Obviously,

11   they're involved with dealing with the central office

12   auditing.  They will advise the warden and the assistant

13   warden of treatment of issues and questions.  They will

14   reach out to me with a question, asking me to answer the

15   inmate, provide them an answer.  So it's a very active

16   relationship, virtually every day we have conversations

17   on how things are going.  And you know, as I said, in

18   touch with.

19        Q.    So you mentioned that they would come in and

20   check your audit tool.  I'm asking a bit more about

21   their role outside of the audit tool.  So if you could

22   explain a little bit more about how they're -- Jon

23   Walton and Chris Brun are involved in inmate requests or

24   requests for accommodation or grievances concerning

25   religion.

1        A.    They have visibility through, you know,

2   through our EDO staff of anything that would be a formal

3   grievance.  They have visibility of that.  Basically, my

4   relationship is just casual conversation, head's up, you

5   know, what's going on.  But there will be times of

6   formal interaction.  As I said, they come to the office

7   and they want to check the things that I'm responsible

8   for overseeing.

9        Q.    Well, do they check in on your handling of

10  specific requests or grievances concerning religion in a

11  formal way?

12       A.    With every religious accommodation, they

13  provide input.  And in that process, you know, the

14  inmate would, and the inmates associated with a group

15  request, put down their particular request.  They're

16  reviewed by myself as chaplain in consultation with the

17  assistant warden of treatment, as well as, you know, a

18  conversation with the contract monitor.

19            My recommendations are then elevated to the

20  assistant warden of treatment for their evaluation, and

21  then go to the warden for evaluation.  Now, what I, you

22  know, cannot speak to is the interaction that the senior

23  leaders of the facility, whether it be the assistant

24  warden or the warden, would have with the contract

25  monitors concerning those things.

Page 11

1        Q.    Well, it sounds like, at least in terms of

2    your involvement with religious requests from inmates,

3    the contract monitors don't play any kind of formal role

4    in handling or --

5        A.    That's correct.

6        Q.    Okay.  You may have conversations with them,

7    but there is no specified role for them in that --

8        A.    That's correct.

9        Q.    -- process?

10       A.    That's correct.

11             MR. WELBORN:  Let her finish the questions

12   before you answer.

13   BY MS. MAPLES:

14       Q.    How often would you say that you informally

15   involve the contract monitors in religious requests from

16   inmates?

17       A.    Can you clarify when you say religious

18   requests, please?

19       Q.    Well, any request from an inmate for

20   religious property items, religious services or

21   religious accommodations.

22       A.    Okay, those are things that, you know, a

23   chaplain should be trained in knowing what the property

24   -- the Tennessee Policy 118.01, the religious memo

25   concerning property.  That would be something that at a,

1    you know, at a facility level would be considered a

2    subject matter expert in conjunction with the oversight

3    of my assistant warden of treatment.  So on routine

4    matters of daily business, they would not be approached

5    or whatever, asked their opinion.  That's why you have a

6    chaplain to be able to do that.

7          Q.    What about the other one, religious

8    accommodation requests?

9          A.    There have been a few in my tenure.  And, of

10   course, you know, what we're here discussing,

11   Mr. Pleasant-Bey, and obviously he's come to mind.  I've

12   only had probably just a couple that I can think of, two

13   or three in my tenure.

14         Q.    A couple of what in your tenure?

15         A.    A religious accommodation request.

16         Q.    I'm sorry, I don't know that I am

17   understanding.  Are you saying that you've only had a

18   couple of religious accommodation requests from inmates

19   at Trousdale since you have been there?

20         A.    There have been few, very few.  You know, the

21   key is, with 93 recognized religions in the state, any

22   religion that is not currently in a -- participating in

23   a group setting, the inmates of that particular faith

24   could formally request recognition and accommodation of

25   certain things.  Time, space, holidays, things of that

1   nature that would be reviewed.  So as I said, there's

2   been very few, very few in my tenure.

3        Q.    Do you draft memos on religious issues in

4   your role as chaplain at Trousdale?

5        A.    Yes, I do draft them.

6        Q.    What do you do with those memos after you've

7   drafted them?

8        A.    I submit them to my superior, which would be

9   the assistant warden of treatment, for agreement -- for

10  approval.

11       Q.    Who is the assistant warden of treatment?

12       A.    Brandon Wattwood.

13       Q.    And how long has he been in that role?

14       A.    I am not certain.  I would project somewhere

15  around March of 2020.

16       Q.    Who was his predecessor?

17       A.    Predecessor was Denise Davidson.

18       Q.    So you submit the memos to the assistant

19  warden of treatment for approval.  And then what happens

20  to them?

21       A.    Okay, be specific on what kind of memo you're

22  talking about.

23       Q.    Well, how many different kinds are there?

24       A.    Any kind of action potentially coming from

25  the -- from a chapel, from one of the services

Page 14

1    department, would require an approval through the chain

2    of command, beginning with my assistant warden of

3    treatment.  So it could be anything with a movement,

4    call out of inmates for a program.  It could have to do

5    with basically any issue dealing with our operation.  So

6    that would be drafted and submitted for approval.

7         Q.    How many memos would you say you've drafted

8    since you've been at Trousdale?

9         A.    I don't know.

10        Q.    More than 20?

11        A.    You know, I can't say.

12        Q.    More than 200.

13        A.    I would have to say there are not that many,

14   but I can't give you...

15        Q.    So somewhere less than 200?

16        A.    I would -- I would say that's accurate.

17        Q.    Do you keep copies of all of those memos?

18        A.    There should be a file.  You know, I would --

19   things that are required by policy would be kept.  Would

20   be kept.  Other routine matters of, we want a call out

21   at 2:30 in the afternoon, is insignificant.  So after it

22   would be performed, it wouldn't be necessary to...

23              MS. MAPLES:  Is anybody else's screen a

24   little frozen?

25              (Off-the-record discussion.)

```
 1   BY MS. MAPLES:

 2        Q.    So some are saved, but not all of your memos

 3   are saved?

 4        A.    As I said, something that, like a religious

 5   accommodation memo that would be submitted, would be

 6   kept.  It's a matter of record per an audit.  So that

 7   would be kept.

 8        Q.    Where are those memos stored?

 9        A.    At least in the chaplain's office.  I can't

10   speak for central office or anyone else that may be of

11   interest.

12        Q.    So you have copies of the memos?

13        A.    As I said, I have copies of the memos

14   pertinent to an audit, like a religious accommodation.

15        Q.    Do you have copies of some of the other

16   memos, you know, on your computer maybe, just where

17   you'd saved them after drafting them?

18        A.    I would need for you to be specific on what

19   kind of memos you're talking about.

20        Q.    Well, I mean, I am not asking about any

21   specific memo.  I'm just asking if, other than the memos

22   you would save that might be relevant to an audit, might

23   you have other memos saved on your computer?

24        A.    Potentially.

25        Q.    Can you describe the ways in which an inmate
```

Case 3:22-cv-00093   Document 33-9   Filed 03/04/22   Page 15 of 177 PageID #: 1338

1    goes about requesting something related to religion?

2         A.    There are a multitude of things that they

3    could talk to about religion.  Anything from a chaplain,

4    counseling, consultation.  An inquiry about faith

5    tenets.  About houses of worship as they release that

6    they could possibly attend.  Wanting to attend a

7    service.  There are an innumerable amount of requests

8    that an inmate could make.

9         Q.    Okay, what about an inmate who wants

10   something related to his religion that is not currently

11   available at Trousdale, how would that inmate go about

12   doing that?

13        A.    Can you give me a type of item, a type of

14   request?  Not the request, but what kind of item are you

15   talking about?

16        Q.    No, because I want to know all of the

17   different ways in which an inmate might do that for

18   anything related to religion.

19        A.    It would say -- they would say that they want

20   to know if they could have a particular item.  There

21   would be conversation with them on whether that is a

22   component of their particular faith.  They have -- there

23   is something that is documented within Tennessee policy

24   that is something that's authorized, then we have a

25   responsibility to do everything we can to facilitate

1    that.

2        Q.    So you're describing that first, there might

3    be an informal discussion with the inmate about a

4    certain item?

5        A.    Correct.

6        Q.    What -- how does that process then become

7    formal?

8              MR. WELBORN:  Object to the form.  You can

9    answer if you can.

10             THE WITNESS:  Beg your pardon?

11             MR. WELBORN:  You can answer.

12             THE WITNESS:  Repeat the question, please.

13   BY MS. MAPLES:

14       Q.    You've described having conversations with

15   inmates in an informal way about certain requests.

16       A.    Correct.

17       Q.    I'm asking if there is also a formal way for

18   inmates to make those requests?

19       A.    There's two mechanisms by which they can do

20   it.  According to Policy 118.01, there is an individual

21   accommodation request that they would submit that would

22   be reviewed, beginning with myself.  I would give a

23   point of view, per policy, for faith need and submit

24   that through my assistant warden.  Then the warden.  And

25   submit it to central office for approval.

1            If it is a group request or is a group of

2    inmates that are in that particular faith and they are

3    seeking accommodation for their group, whether it be a

4    piece of property or -- I think we're talking -- you're

5    talking property more than anything else.  It's the same

6    basic process.  The difference is the amount of people

7    that are doing it.  Obviously the key term, individual

8    versus group.

9            But to the best of my ability as chaplain and

10   a local subject matter expert, we're going to give a

11   recommendation on it.  I am not the final authority.

12   You know, I am not the final authority.  I'm the point

13   of entry.  And it goes up the chain of command.  And

14   hypothetically, you know, I could have a different point

15   of view, but central office can say they disagree with

16   that and this is the way it's going to be.  And we

17   follow the direction from our customer.  You know, we're

18   CoreCivic, from our customer, Tennessee Department of

19   Correction.

20       Q.   Is the group religious accommodation request

21   governed by a different policy than the individual?

22       A.   No.

23       Q.   They're both 118.01?

24       A.   That's correct.

25       Q.   And when you testified earlier that you've

 1    gotten a few of these since you've been chaplain at

 2    Trousdale, how many would you say you've gotten?

 3         A.    I'd say five or less.

 4         Q.    Just to be clear, you've gotten five or less

 5    requests for accommodation under TDOC Policy 118.01?

 6         A.    Group accommodation, that's correct.

 7         Q.    How about individual accommodation under

 8    181.01?

 9         A.    I've had none.

10         Q.    How many chaplains are there at Trousdale?

11         A.    We're a staff of two chaplains.

12         Q.    How many are there right now?

13         A.    Two chaplains.

14         Q.    Who is the other chaplain?

15         A.    Quinten Fletcher.

16         Q.    How long as he been there?

17         A.    Approximately October of last year.

18         Q.    Who was there before him?

19         A.    Aaron Bellar.

20         Q.    How long was he there?

21         A.    Five or six months.

22         Q.    Who was there before Aaron Bellar?

23         A.    Tom Simic.

24         Q.    What was his tenure?

25         A.    From approximately March of '17 through

```
 1   November of '19.

 2         Q.    How many depositions have you given?

 3         A.    This is my maiden voyage.

 4         Q.    Okay, so we've talked about three mechanisms

 5   for inmates to make religious requests.  That they could

 6   come to you informally and just have a conversation with

 7   you about what they're seeking.  They could also submit

 8   an accommodation request pursuant to TDOC Policy 118.01;

 9   is that right?

10         A.    Yes, ma'am.

11         Q.    What about inmates who submit grievances

12   concerning your handling of certain religious requests,

13   what is your role in those?

14         A.    To give a review of what the inmate's point

15   of view is, to give an answer on how it was handled and

16   why it was handled the way it was handled.

17         Q.    Do inmate grievances concerning religious

18   matters ever act as requests in and of themselves?

19         A.    They haven't to date that I can remember.

20   Potentially they could, if it is determined that there

21   has been -- you know, the inmate has a grievance, they

22   got a point of view that something was mishandled.  So

23   hypothetically, there could be an action as a result of

24   it.

25         Q.    So you're saying it could work out that way,
```

```
 1   but it just hasn't in practice?

 2       A.    It hasn't.

 3       Q.    How many inmates are currently at Trousdale?

 4       A.    The last I heard, we were approximately

 5   within 100 of federal capacity.

 6       Q.    So how many is that?

 7       A.    I believe our bed capacity is 2550.

 8       Q.    And do you have a sense of what percentage of

 9   those inmates are Muslim?

10       A.    I can't give you a percentage.  We have -- we

11   have approximately 200.

12       Q.    How many Christian inmates are there?

13       A.    As a result of 93 recognized religions, I --

14   there are any number of categories of Christian within

15   the TDOC recognition.  For example, you can be Christian

16   and be Methodist, Lutheran, Baptist, Church of Christ.

17   So and then there are just Christian, or it's called

18   Christian faith.  Some non-denomination.  So there -- I

19   would approximate 1800 approximately Christian inmates.

20       Q.    And do you have a total number of the

21   different categories within Christian that there are?

22       A.    I don't have that at my disposal.  Every -- I

23   will say every month, central office, the IT department,

24   sends me a list of everyone that is assigned to

25   Trousdale.  That was per my request.
```

Page 22

```
 1        Q.    How many different designations are there
 2   within the Islamic faith?
 3        A.    I believe there's five.
 4        Q.    How many group services are there for
 5   Christian inmates every week?
 6        A.    Are we talking COVID or pre-COVID?
 7        Q.    Well, let's do both.
 8        A.    I need to answer that according to Tennessee
 9   Policy 118.01.  Any inmate can go to any program.  In
10   other words, we don't screen inmates at the door saying
11   you're Muslim, you can't step into this Christian
12   service.  So we can have different religious programs on
13   the calendar, but the opportunity for inmates to come of
14   different religions is always available to them.
15        We have volunteers through Men of Valor, which is
16   headquartered here in Nashville, that is fundamentally
17   re-entry.  Re-entry providing opportunities for inmates
18   of any faith to go to their program.  During COVID,
19   there was some opportunity, limited opportunity of about
20   ten inmates, to be able to go to a particular program.
21   And there were a few of those.
22             During COVID, there has been two Muslim
23   services.  There has been a Taleem service and a Friday
24   service.  And by religious tenet, it cannot be Jummah on
25   a Friday because it has to be open to the entire
```

Page 23

1    population.  We rotated -- we rotated inmates and tried

2    to give as many as possible an opportunity, within the

3    scope of COVID protocol, to attend.  Let me also mention

4    that the number of services for Muslims, excluding --

5    let me rephrase it --

6        Q.    Hang on, Mr. Shonebarger, this is turning

7    into a bit of a lengthy answer that -- my question is

8    how many services a week are there for Christian

9    inmates.  So we're going to talk about Muslim inmates --

10            MR. WELBORN:  You can finish your answer as

11   you were answering.  Don't interrupt the witness, Janna.

12            MS. MAPLES:  Joe, he can't talk for four

13   pages on the record about something nonresponsive to the

14   question.  I am certainly allowed to say, sir, can you

15   please address my question.

16            MR. WELBORN:  He is allowed to finish his

17   answer.  Don't interrupt him.

18            THE WITNESS:  As I was saying, during COVID

19   protocols, there has been three Muslim services.  Two

20   Sunni and one Nation of Islam.  Let me retract that.

21   There's been two Sunni and two Nation of Islam services

22   during COVID.  In the same protocol as pre-COVID.  The

23   amount of services for Nation of Islam and Sunni have

24   not changed, whether we were operational or in COVID

25   protocol.

Page 24

```
 1                   Christian services during COVID was in the

 2    chapel.  I believe there was only one Christian service.

 3    And in pods, there was one service.  We operated by

 4    request of the inmate during COVID.  There is no way to

 5    fairly facilitate 1800 approximately Christians, so it's

 6    very much like a, you know, lockdown.  But religious

 7    rights continue through the availability of Bibles.

 8    Religious literature, religious property, and authorized

 9    mail.  And inmates are free to pray and to meet in small

10    groups, according to COVID protocol.  So formal

11    programs, as I said, there was one extended to -- of the

12    current -- of the last COVID protocol.

13    BY MS. MAPLES:

14         Q.    What about pre-COVID Christian services per

15    week?

16         A.    I would like to go to -- have a calendar.

17    Have you been -- is that something that has been

18    submitted to you?  I can give you a rough number.  Let

19    me just think through this.  There would be four.

20         Q.    What were those services?

21         A.    A Christian faith Sunday worship service.

22    Monday morning Men of Valor programming.  However, it is

23    -- I facilitated it for the benefit of re-entry.  Anyone

24    can come.  There was a Christian sermon that would be

25    offered.  So that's my second.  Church of Christ on
```

Page 25

1    Thursday.  Baptist on Friday.

2         Q.    And these are all services, it sounds like,

3    right?

4         A.    Yes.  There was a Catholic service on Tuesday

5    afternoon.

6         Q.    Well, are there any more?

7         A.    Christian?

8         Q.    Yes.

9         A.    That's what I would categorize as Christian.

10        Q.    I mean, is it up for debate?  Are there any

11   on the line that you might not categorize as Christian,

12   but some might?

13        A.    Some may consider Seventh Day Adventist or

14   Jehovah's Witness, but I would not.  I consider those

15   separate.

16        Q.    When you describe a Christian service, what

17   is it about the event that makes it a service as opposed

18   to, say, a Bible study?

19        A.    Our services would include music.  We have an

20   inmate choir that would play.  And a service would have

21   an individual bringing forth a sermon; whereas, a study

22   would be typically in an informal circle with

23   interaction from the facilitator who participates.

24        Q.    Okay.  So it sounds like religious events,

25   I'm going to call them, are in two categories.  A sermon

 1    -- or services, which include a sermon, and studies; is

 2    that fair?  Or is there a more --

 3         A.    Yes, that's fair.

 4         Q.    Okay.  So how many Christian studies are

 5    there a week?

 6         A.    There's been, depending on the month,

 7    somewhere around three or four.  However --

 8         Q.    Per week or per month?

 9         A.    Let me continue.  For example, Celebrate

10    Recovery is available to anyone who requests.  The

11    Christians Against Substance Abuse -- the term Christian

12    is there, however, any inmate can participate.  Anger

13    Resolution, any inmate can participate.  So there are

14    components of Christianity, but moreover, they are

15    teachings that apply across any line and inmates would

16    feel comfortable in attending if they would.

17         Q.    Just to clarify, you said depending on the

18    month, there are three or four.  Did you mean three or

19    four a month or three or four a week?

20         A.    When we were operational, there was that many

21    a week.

22         Q.    Okay, so the examples you've given are Anger

23    Resolution, which is Christian-based, Christians Against

24    Substance Abuse, and Celebrate Recovery.  What other

25    ones?

1          A.      Anger Resolution.

2          Q.      I got that one.  What else?

3          A.      The Men of Valor discipleship groups.  It's

4     Wednesday night.  And we have different -- men of

5     different faiths that are involved with that.  The key

6     -- you know, it's important to recognize that Men of

7     Valor is a re-entry component for the Tennessee

8     Department of Correction, as well as CoreCivic in the --

9     you know, throughout the state, fundamentally within the

10    Middle Tennessee area.  But with the key on re-entry.

11    You know, there's a line there.  It's Christian-based,

12    however, the principles of manhood, citizenship,

13    employment, personal growth are all part and parcel of

14    their presentation in their discipleship groups.

15         Q.      So how is the discipleship group different

16    than the Men of Valor service on Monday?

17         A.      Men of Valor volunteer would preach the

18    Christian message.  You know, an umbrella across

19    denominational lines.  Just a central message applying

20    to the tenets of Christianity.  This is an opportunity

21    for inmates to meet the Men of Valor director.

22         Q.      Is that on Monday?

23         A.      That is correct.  That is correct.  And

24    during COVID, that was done for a small, just a fraction

25    of men on Mondays by Zoom.  Two different programs.  And

Case 3:22-cv-00093   Document 33-9   Filed 03/04/22   Page 27 of 177 PageID #: 1350

1    then we did the discipleship group three times in the

2    Wednesday evening.

3         Q.    So still, the question I'm asking is, what is

4    the difference between the service and the discipleship

5    group?  Is that the discipleship group is a study?

6         A.    Yes, it is.  The inmates would be assigned a

7    certain portion of a text with the questions to answer.

8    And then in an informal circle, they go around the

9    circle and share their points of view.

10        Q.    And do you lead the discipleship group?

11        A.    I do not.  It's my responsibility as chaplain

12   to supervise the volunteers.  And to provide presence,

13   you know, from a chaplain's standpoint, security

14   standpoint to be there.  But anyway...

15        Q.    So in the Men of Valor discipleship group,

16   people are assigned portions of text.  When you say

17   text, do you mean the Bible?

18        A.    Correct.

19        Q.    Do you lead a Bible study at all at

20   Trousdale?

21        A.    During COVID, I began a theology class on

22   Sunday morning.

23        Q.    Okay.  So a theology class, would you put

24   that in the category of a study?

25        A.    Correct.  There were opportunities to do

1    informal.  Go into a living unit, to a pod, and just,

2    you know, the chaplain's here.  And the guys would

3    gather together and, you know, I would just, you know,

4    encourage, pray with the inmates.  Whoever wanted to

5    come see me.

6         Q.    Is that something you've done during COVID,

7    before COVID or both?

8         A.    Throughout.  You know, a chaplain is

9    responsible to do rounds.  I do rounds, you know,

10   throughout the year and throughout the facility, you

11   know, to make myself available.  And when you have

12   approximately 2500 inmates and you can only have ten in

13   a COVID service, there were limitations.  The emphasis,

14   obviously, was, again, facilitating and assisting

15   inmates in their personal practice while in this

16   lockdown.  And you know, getting back to what I said at

17   the top of our conversation, provide materials of all

18   faiths, all religions to the inmates.  Passing them out,

19   answering requests.  Being available for consultation,

20   for prayer, so forth.

21        Q.    So other than the theology class, have you

22   ever led a study at Trousdale, any other kind?

23        A.    I have done Sunday morning worship service.

24        Q.    Well, that's a service.  I'm trying to keep

25   it in these two categories.

```
 1        A.    I -- I honestly cannot remember.  In four-
 2   and-a-half years, yeah, I certainly would love, you
 3   know, to be able to make myself available as
 4   possibilities.  But also, you know, we have volunteers.
 5   You know, my -- the policy makes it clear that the
 6   chaplain is allowed to lead a service within his faith
 7   tenet.  So that's where I come from on a Sunday morning.
 8   Typically, volunteers aren't available on Sundays.  But
 9   in four-and-a-half years, other than what I've done in
10   COVID with a theology class, I can't remember.  Although
11   -- you know, I just can't -- I can't recollect.
12        Q.    Okay.  So other than, I guess -- strike that.
13   We've discussed, I think, five different weekly studies
14   for the Christian religion.  Other than those, can you
15   think of any other ones?
16        A.    No.  And I -- we need to clarify that those
17   are on a rotating basis, you know, the availability of
18   the volunteer.  So you know, sometimes they want a break
19   between subject matter.  Sometimes they're going to be
20   gone for a while.  What I have submitted to you are the
21   ones throughout the course of time that we have done.
22             You know, we are challenged with time and
23   space.  Time on the calendar.  You know, we have count.
24   We have chow time.  We have lockdowns.  We have any and
25   sundry different things within a prison.  And there's
```

1    only small windows of opportunity for religious

2    programs.  And so the ones that I have shared with you

3    are the ones within my tenure at Trousdale that have

4    been offered and facilitated.

5              You know, there is another -- if I can

6    mention here.  When you have 2500 inmates and

7    approximately 1800 Christians and approximately 200

8    Muslims, obviously, in order to try to facilitate

9    opportunities for all of the population, you would have

10   more services for the higher population.

11             (Whereupon, the court reporter asks for a

12             partial repetition of response.)

13             THE WITNESS:  As I was saying, as a chaplain,

14   you're responsible for scheduling.  And when you have

15   1800 Christians of various denominations and trying to

16   facilitate opportunities for them, there would obviously

17   be more opportunities on a calendar than a small group.

18   We can potentially have all of the -- we could have all

19   of the Jehovah's Witnesses out in one service.  We could

20   have all of the Catholics out in one service.  We could

21   have all of the Rastafarians out in one service.  By the

22   way, we provided two services for Rastafarians.  And

23   you've heard, you know, what we have afforded the Muslim

24   community.  So every effort to be fair and equitable to

25   the population drives the scheduling.

Case 3:22-cv-00093  Document 33-9  Filed 03/04/22  Page 31 of 177 PageID #: 1354

1   BY MS. MAPLES:

2        Q.    Is there a Hebrew Greek Bible study?

3        A.    There is.  There was while we were

4   operational.  So there has not been one in 14 months.

5        Q.    But that's not in the list we just went over

6   of the, you know, all of the studies we know of, right?

7        A.    That was not included, no.

8        Q.    Are there any other studies that you may have

9   forgotten that are similar to the Hebrew Greek Bible

10  study?

11       A.    I want to correct your language if I may,

12  ma'am.

13       Q.    Sure.

14       A.    That is not a Hebrew Greek Bible study.  That

15  is a Hebrew Greek language study.  It is not a Bible

16  study.  And it's inmate led.  So I do not categorize it

17  as such.  There was a decision to have that class made

18  -- facilitated.  And we followed the direction.

19       Q.    When they're doing their language study, what

20  texts do they use?

21       A.    They use a handout from the inmate leader

22  that he makes of any number of subjects that, you know,

23  he translates into Hebrew and Greek.

24       Q.    Do they ever use the Bible?

25       A.    Not as much as you would think.  Limited, I

```
 1   would use the terminology of limited.

 2        Q.    What is the purpose of the Hebrew Greek

 3   language study?

 4        A.    To try to teach inmates Hebrew and Greek.

 5        Q.    Is that for the purpose of being able to read

 6   the Bible in Hebrew and Greek?

 7        A.    There is any number of literature and other

 8   texts, so forth like that, in Hebrew and Greek, that it

 9   would be -- you know, that particular learning apparatus

10   could be applied to any number of different areas.

11        Q.    Is there an Arabic language study group?

12        A.    Yes.

13        Q.    Who teaches that?

14        A.    Daniel Villers, inmate Daniel Villers.  As a

15   matter of fact, they had it two days ago.

16        Q.    How long has that been operational?

17        A.    My direction to the inmates was this:  They

18   have -- Sunnis have two services a week, even during

19   COVID.  They have an opportunity for the regular-

20   scheduled service, plus the opportunity to not return to

21   their cell during prison count, stay in the chapel and

22   continue their programming.

23             So they have a window of four hours twice a

24   week that they can pray, which is a short amount of

25   time.  And then they have the balance of the time to do
```

1    whatever they want to be able to study, discuss, within

2    the parameters of their faith.  And I've made it very

3    clear to them, there is not a need to schedule a

4    separate service, because you've got eight hours of

5    potential programming a week in which you can interject

6    that.  And that has -- that's what they're doing.

7         Q.    When did this four-hour time period go into

8    effect?

9         A.    This is historical.  I mean, this is -- that

10   window of opportunity has been since the prison opened.

11        Q.    What is a Taleem service?

12        A.    It's a teaching service.

13        Q.    Is it targeted for a certain group of

14   inmates?  A certain group of Muslims?

15        A.    We have two different Taleem services.  We

16   have a Nation of Islam and we have Sunni.  Anybody can

17   come.  So we don't card you based on your faith.

18   Christians can go to a Taleem service.  There have been

19   some that go just because they want to be able to hear

20   Arabic.

21        Q.    I'm happy for you to continue giving me

22   information that I am not asking you about, it's just

23   going to make the whole thing take a lot longer.  I've

24   got all day, but I'm asking you kind of specific

25   questions, okay?  So these two Taleem services a week,

 1    are they both in that four-hour period?

 2         A.    They have a regular program with the

 3    capability of staying there in the chapel on an out

 4    count.  Rather than returning to their cell to get

 5    counted, they can stay in the chapel and be counted and

 6    continue their programming.

 7         Q.    What day is the Taleem service?

 8         A.    One service for Sunni inmates is on a

 9    Tuesday.  Tuesday afternoon.  The Nation of Islam is on

10    Wednesday morning.

11         Q.    Are you saying that the Sunni service is four

12    hours and then the Nation of Islam is a separate four

13    hours?

14         A.    No, ma'am.  I'm not saying it's four hours at

15    all.  You've misunderstood me.  A program will be called

16    potentially.  Everything is going to depend on when

17    count clears, when movement operations within a

18    facility.  So when we are in a position to call inmates,

19    they come.  The service length can be different within a

20    few minutes.  But then at the end of the service, they

21    are called to leave.  They have to return to their

22    housing unit.

23         They have the availability to request from the

24    chaplain to stay for out count and continue their

25    programming.  That would add up to about four hours.

1      Q.     Okay.  The four hours that includes and

2   extends beyond the Taleem services, is there four hours

3   for Sunni Muslims and four hours for Nation of Islam?

4      A.     If they request it.

5      Q.     And if they request to remain in the chapel

6   after these Taleem services have ended, they can do what

7   in the chapel?

8      A.     Just continue.

9      Q.     Continue what?

10     A.     We don't stop them in the middle of a

11  sentence to say it's time to move.  Their request to say

12  we would like to be able to stay for an out count today

13  is done at the beginning -- is done at the beginning of

14  the service.  We have paperwork we need to fill out to

15  inmates' things and submit it to our count wheels, so

16  they are properly accounted for.

17            The program is called -- supposed to be

18  called at seven o'clock.  Sometimes it could be 7:30.

19  So from 7:30 until 9:00 is an hour-and-a-half.  Count is

20  anywhere from two, two-and-a-half hours.  There is the

21  approximation of four hours that they could stay and do

22  programming.  But most guys don't want to do that, but

23  it is available to them.  And consider, I am in there --

24  I am in my office right where they are monitoring the

25  program and doing all of the other responsibilities that

Page 37

1   I have.  So it's no problem for me to facilitate them.

2       Q.    What I'm trying to figure out is if inmates

3   who are in a Taleem service ask to stay over, through

4   the outcount.  You've testified that they can continue

5   with the programming.

6       A.    That's correct.

7       Q.    Can they do whatever they want or do they

8   need to continue with the Taleem service?  Can they

9   break off into smaller groups and sit in different areas

10  of the chapel?  What is their option?

11      A.    They can do -- as long as they're orderly and

12  within their faith, discussing their faith, interacting

13  with one with another, there is no limitation.

14  Absolutely no limitations.  I don't put a litmus test on

15  what they're talking about.  I think they have the

16  freedom of religion.  And they can discuss their faith,

17  their own opinion, their own point of view from texts or

18  the Koran as they wish.  There is no -- you know,

19  stopping that on my part or anyone else's part.

20      Q.    Have you ever received a request for the

21  equivalent of a Bible study for Muslims?

22      A.    You know, Mr. Pleasant-Bey had requested an

23  independent Arabic class where I had advised him of the

24  ample time in two services to be able to introduce that.

25  And as I have mentioned a few moments ago, that is going

Case 3:22-cv-00093   Document 33-9   Filed 05/04/22   Page 37 of 177 PageID #: 1360

Page 38

1    on.  That is going on right now with no conflict.  No

2    running out of time.  Everything is happy and

3    satisfactory.

4         Q.    Well, what if an inmate wanted to come to the

5    programming that takes place after the -- or excuse me,

6    strike that.  If an inmate wants to attend the

7    programming that occurs after the Taleem service, but

8    not the Taleem service, could an inmate do that?

9         A.    Okay, we need to clarify.  It would be just a

10   continuation of the Taleem service.  It's a

11   continuation.  So it's all Taleem.  The Taleem is very

12   broad.  It's just their opportunity to learn about their

13   faith.  In whatever format they wish to pursue, as long

14   as they are peaceable, they're free to do it.  Now, they

15   cannot come when we're at count.  Everyone is locked

16   down.  If they came at the beginning of the service at

17   the original call out, first thing in the morning, and

18   they wanted to stay, as I have stated, they can stay.

19        Q.    Who leads the Taleem service?

20        A.    Various inmates have in the history of the

21   facility.  I have a -- there are a few that are involved

22   in it.  It is -- according to our policy, there is no

23   one that is designated.  Inmates are not to have power

24   or influence over another inmate.  There have been

25   various Islamic inmates that have led and taught.

1       Q.   It sounds like for Muslims, if you want to

2   experience the programming that occurs after the

3   regularly scheduled Taleem service, you've got to commit

4   to being there for four hours total; is that right?

5       A.    That is not right.  When it's time to move

6   back to your housing unit, inmates who want to move can

7   go.  They can go back to their housing unit.  They don't

8   have to stay the entire time.  And that is the way it is

9   in all programming, not just Taleem.  Any service that

10  they have an out count after it, inmates are free to

11  leave after the original service and go back to their

12  housing unit.  It's their option.

13      Q.   I think you misunderstood my question.  I'm

14  asking for the inmates who want to attend, not the

15  regularly scheduled Taleem service, but the whatever

16  Bible study equivalent occurs afterward, they have to

17  come to the Taleem service, they can't just show up for

18  the second part of it?

19           MR. WELBORN:  Object to the form.  Go ahead.

20           THE WITNESS:  Ma'am, your misunderstanding is

21  this:  There is not something within the Muslim group

22  that would be different from what they're originally

23  doing.  They may run out of thoughts about a particular

24  subject and move on to the next subject, but it's all a

25  carry-over of what the original is.  So there is not a

1    different -- shifting gears into a brand new realm or a

2    brand new topic in that second -- in the out count.

3    BY MS. MAPLES:

4         Q.    Well, I think we might be running into

5    different definitions of terms here.  It sounds like

6    what you're saying is that if it occurs on Tuesday for

7    the Sunnis, then it's Taleem.  The inmates, the Muslim

8    inmates may not agree with you.  They might have a

9    specific definition for what constitutes Taleem.  So I

10   mean, you're saying that the Koranic studies occurs on

11   Tuesday.  Well, are you saying that is also Taleem just

12   because it happens on Tuesday?

13              MR. WELBORN:  Object to the form.

14              THE WITNESS:  Any service, ma'am, that they

15   gather together, they have the liberty to be able to

16   have the service as they desire, within -- you know,

17   they agree.  There's never been a disagreement.  And

18   they practice their faith accordingly.

19              MR. WELBORN:  Can we take a break?

20              MS. MAPLES:  Sure.  What would you all think

21   about doing lunch at 1:00?  Is that too late for

22   everyone?  We can go off the record.

23              (Recess observed.)

24   BY MS. MAPLES:

25        Q.    Mr. Shonebarger, have you ever become aware

 1    of a situation in which Trousdale inmates were

 2    instructed that they were not permitted to purchase the

 3    Koran from Union Supply?

 4         A.    That was brought to my attention.

 5         Q.    When you say it was brought to your

 6    attention, what do you mean?

 7         A.    Inmates showed it to me.

 8         Q.    When was that?

 9         A.    I can't remember, ma'am.

10         Q.    When you say that inmates showed it to you,

11    do you mean that you had no role in crafting that memo

12    or policy?

13         A.    I did not have a voice.  I was -- I had no

14    voice in it.

15         Q.    Who would have crafted the policy about

16    purchasing religious texts, if not you?

17         A.    I would presume that came from the assistant

18    to the warden.  Potentially, the warden's secretary.

19         Q.    Did you have conversations with anyone at

20    Trousdale about this inability for Muslim inmates to

21    purchase the Koran?

22         A.    Immediately.

23               MS. MAPLES:  I'm going to put a document on

24    the screen and also in the chat feature for the other

25    attorneys.

```
 1                  (Exhibit 1 was marked.)

 2   BY MS. MAPLES:

 3        Q.    Mr. Shonebarger, do you recognize this

 4   document in front of you as the memo that we've been

 5   discussing?

 6        A.    Can you scroll down, please?  I am familiar

 7   with it.

 8        Q.    And do you see that at the top, it is

 9   described as memorandum No. 18-043?

10        A.    I see that.

11        Q.    What is No. 18-043?

12        A.    I would estimate that's 2018, the '18 is

13   2018, 43 happened to be an official memorandum from the

14   warden.

15        Q.    Is it fair to say that these official

16   memoranda from the warden are given internal

17   identification numbers like this?

18        A.    That's correct.  That's my understanding.

19        Q.    And you see that the date on this memo is

20   April 12th of 2018?

21        A.    I see that.

22        Q.    And if we scroll down, do you see that it

23   states:  The following items cannot be ordered, although

24   you may check them out of the library?

25        A.    Yes, ma'am.
```

                                                        Page 43
```
 1        Q.    And do you see that underneath that sentence,

 2    there are a series of religious texts?

 3        A.    I see that.

 4        Q.    Do you see that one of them is the Bhagavad

 5    Gita?

 6        A.    Repeat what you're identifying, please.

 7        Q.    The third bullet down, the Bhagavad Gita.

 8        A.    Yes, correct.

 9        Q.    Do you see that the Torah is included?

10        A.    Correct.

11        Q.    And the Koran translation?

12        A.    I see that.

13        Q.    Do you see that the Bible is not included?

14        A.    Correct.

15        Q.    So inmates could purchase the Bible from

16    Union Supply, but they could not purchase other

17    religious texts from Union Supply?

18              MR. WELBORN:  Object to the form.

19              THE WITNESS:  It's important for me to

20    identify that ample supplies of Korans were donated to

21    the chaplain's office for free for the inmates, whoever

22    wanted to come and get them, an ample supply, as well as

23    Bibles.  The Hindu text that you identified, several

24    copies were in possession at that time with an emphasis

25    on, there were only two inmates practicing that faith at
```

1    Trousdale who had their own texts.

2    BY MS. MAPLES:

3        Q.    Mr. Shonebarger, you know that's not what I

4    asked, right?

5        A.    Okay.

6        Q.    Do you remember what I asked?

7        A.    You asked if they could buy a Bible but not

8    buy the other items; is that what you asked?

9        Q.    Yes.

10       A.    That's correct.

11       Q.    When this was brought to your attention, what

12   did you do?

13       A.    I called the warden's secretary and said

14   we've got a problem.

15       Q.    Did anyone explain to you the rationale for

16   this memo?

17       A.    No.

18       Q.    You didn't ask?

19       A.    What I -- no, I did not ask.  I don't

20   recollect asking that question.

21       Q.    You weren't curious as to what the thought

22   process was behind banning all -- banning purchase of

23   all religious texts except the Bible?

24       A.    Overall, yes, but I had a more pertinent

25   concern that I wanted to talk to them about.

Page 45

```
 1        Q.    So you may have asked why they did this, you

 2   just don't remember?

 3              MR. WELBORN:  That's what he said.

 4              THE WITNESS:  Yes, ma'am.

 5   BY MS. MAPLES:

 6        Q.    Who was involved in those conversations that

 7   I could ask if they remember?

 8        A.    We have a former employee that was named Ms.

 9   Atwood who was in the role of the warden's assistant,

10   also known as a secretary, Beverly Atwood.

11        Q.    Is she the only person you spoke to about

12   this memo?

13        A.    I cannot remember everyone I spoke to about

14   it.

15        Q.    Well, I am not asking everybody.  I'm asking

16   if there is more than one person?

17        A.    I'm confident that I spoke to the assistant

18   warden about it.

19        Q.    Who was the assistant warden?

20        A.    Yolanda Pittman.

21        Q.    Was she involved in the drafting of the memo?

22        A.    Uncertain.

23        Q.    Did you speak to the warden about it?

24        A.    I did not.

25        Q.    Did you speak to anyone else about the memo?
```

1      A.    Repeat your question, please.

2      Q.    Did you speak to anyone else about the memo?

3      A.    I answered inmate's questions about it.

4      Q.    Which inmate's?  Do you remember?

5      A.    I do not.

6      Q.    Are there other CoreCivic employees that you

7   spoke to about this memo?

8      A.    I do not remember talking to any other staff

9   about it.

10      Q.    Did you speak to anyone at TDOC about this

11   memo?

12      A.    I believe I spoke to Director Darnell about

13   it.

14      Q.    What did Director Darnell say about it?

15      A.    It would need to be -- it would need to be

16   remedied.

17      Q.    So he, like you, agreed that it was a

18   problem?

19      A.    Absolutely.

20      Q.    What did the Muslim inmates who brought this

21   to your attention say about it?

22      A.    Well, they knew two things.  Number one, they

23   know I have a storeroom full of Korans that they can

24   come and anyone can ask for one.  And you don't have to

25   be a Muslim.  Any inmate, Christian, Muslim, whatever

1   who wanted a copy of the Koran, we did not separate.  So

2   they know that.  And then number two, obviously, they

3   felt discriminated against.

4        Q.    Do you remember what I asked?

5        A.    You asked about what did I talk to the

6   inmates about.

7        Q.    I said what did the inmates say about this,

8   not what you think they knew.  I'm asking what they

9   said?

10       A.    They said that they felt that it was an

11  injustice to have it not available.

12       Q.    And did you agree with them?

13       A.    I did agree with them.

14       Q.    Can you say for sure if at this point time,

15  in April of 2018, there were copies of the Koran in the

16  library?

17       A.    Absolutely.  In the general library?

18       Q.    Yes.

19       A.    I do not know.  I don't know for a fact.

20       Q.    Do you ever make announcements of any kind of

21  to the full inmate population?

22       A.    You're asking about 2500 inmates?

23       Q.    Yes.

24       A.    Are you asking formally or through the

25  correspondence?  Are you talking about verbally before

1    them or in correspondence.

2        Q.    Either.

3        A.    A religious calendar would be considered

4    correspondence, which is posted throughout the facility.

5        Q.    Are there any others?

6        A.    Advisements of sign-ups, for example,

7    Ramadan.  So there would be potential announcements

8    about an upcoming program.

9        Q.    What else?

10       A.    I think that pretty well covers it.  I will

11   speak to a faith group of those that are in attendance

12   and answer questions and give updates.

13       Q.    Have you ever spoken to the Muslim faith

14   group?

15       A.    Yes, all the time.

16       Q.    Have you ever called a meeting or spoken at a

17   Muslim service and apologized to members of the Muslim

18   faith group?

19            MR. WELBORN:  Object to the form.

20            THE WITNESS:  In my tenure at Trousdale, one

21   of the inmate workers has always been one of the inmate

22   facilitators of the faith group.  So they have constant

23   access to me.  If there is an advisement of things going

24   on within that particular faith, that would be shared

25   with others of that faith.  So I've had that access in

1   my four-and-a-half years.  I have stood before a group

2   that has been called out, like for Taleem or Jummah, and

3   advised of things that they would need to know

4   pertaining to their faith.  I don't frame things in

5   terms of apology.  If there is something that is

6   incorrect, we're going to make things right.

7   BY MS. MAPLES:

8      Q.   So you're saying you haven't apologized,

9   meaning --

10     A.   No.

11     Q.   You haven't said I'm sorry, but you have

12  perhaps admitted to some kind of wrongdoing or some sort

13  of situation that perhaps shouldn't have happened?

14          MR. WELBORN:  Object to the form.

15          THE WITNESS:  In administrative oversight,

16  human error is always a possibility.  And as a result of

17  that, to make things correct in compliance as, you know,

18  on a professional level.

19  BY MS. MAPLES:

20     Q.   So you have had those discussions with

21  inmates of the Muslim faith?

22          MS. MAPLES:  Object to the form.

23          THE WITNESS:  I clarified that this would be

24  rectified.

25  BY MS. MAPLES:

Page 50

```
 1        Q.    How many times have you made announcements to

 2   or spoken to the Muslim faith group or members of the

 3   Muslim faith group about human error on the part of

 4   CoreCivic employees?

 5        A.    This would be the only one that I can ever

 6   remember.

 7        Q.    How many times have you been accused of

 8   discriminating against Muslim inmates?

 9              MR. WELBORN:  Object to the form.

10              THE WITNESS:  I'm not clear on what you're

11   getting at, ma'am.  I'm not clear on the question.

12   BY MS. MAPLES:

13        Q.    How many times has a Trousdale inmate, who is

14   a member of the Muslim faith, accused you of

15   preferential treatment of the Christian religion or

16   discriminating against members of the Muslim faith?

17              MR. WELBORN:  Object to the form.

18              THE WITNESS:  I feel that is very vague.  Are

19   you talking about walking by and saying something to me

20   or are you talking about a grievance or a litigation?

21   I'm not clear.

22   BY MS. MAPLES:

23        Q.    All three.

24              MR. WELBORN:  Object to the form.

25              THE WITNESS:  I don't keep a record.  I know
```

1    that obviously this case -- I know this case in

2    particular with Mr. Pleasant-Bey is, you know, the very

3    heart of the suit feeling like I discriminated or the

4    company or TDOC did.  But otherwise, you know, guys can

5    be upset momentarily about something.  But for the most

6    part, people realize I'm at the very bottom of the food

7    chain and there are layers of administrators and

8    leadership above me that are the final decision makers.

9    I am very carefully scrutinized, both by supervisors, by

10   audit tools, by contract monitors, by the chief chaplain

11   at CoreCivic and the director at Tennessee Department of

12   Corrections.  So things are monitored accordingly.

13   BY MS. MAPLES:

14        Q.    Well, back to my question, which was how many

15   times would you say that in passing, through grievances

16   or through lawsuits, members of the Muslim faith have

17   accused you of discriminating against them or of giving

18   preferential treatment to Christian inmates?

19             MR. WELBORN:  Object to the form.

20             THE WITNESS:  I would say minimal.

21   BY MS. MAPLES:

22        Q.    You would say minimal?

23        A.    Correct.

24        Q.    Would you say more than ten times?

25        A.    No.  I don't know.

Page 52

```
 1        Q.    Well, don't you become aware of complaints
 2   about you that are filed in grievances?
 3        A.    It depends on who answers them.  There's been
 4   some that I have been asked to assist in an answer.
 5        Q.    Well, have there been more than ten or less
 6   than ten?
 7        A.    Ma'am, I honestly can't tell you.  I am not
 8   trying to evade the question.  I honestly can't say.
 9        Q.    Well, how many lawsuits have accused you of
10   preferential treatment for the Christian religion or
11   discrimination against members of the Muslim faith?
12              MR. WELBORN:  Object to the form.
13              THE WITNESS:  This is the only one.
14   BY MS. MAPLES:
15        Q.    This is the only one?
16        A.    The only one.
17        Q.    How about in passing?
18        A.    And they are saying what to me now?
19        Q.    They are accusing you of preferential
20   treatment of the Christian religion or discrimination
21   against members of the Muslim faith.
22              MR. WELBORN:  Object to the form.
23              THE WITNESS:  I need to clarify.
24              MR. WELBORN:  Ask her.  I'm just objecting to
25   the form.  You can answer the question if you can.
```

1                THE WITNESS:  Inmates of 2500 can be very

2   angry.  Something that can be said snarly or something

3   like that is part of the life of any staff member.  I

4   honestly believe that with the Muslim inmates that have

5   been long-term, understand that something like this

6   memo, which was an administrative mistake and was not

7   generated from me, that I am not taking the blame.  Put

8   it this way:  They would look to me as being a problem

9   solver, go ahead and get things fixed as I did.  So how

10  many inmates are angry with me or would say something to

11  me, I maintain my answer as minimal.

12  BY MS. MAPLES:

13      Q.   What do you mean by minimal?  I don't know

14  what that means.  That's not a number.

15      A.   That means few, very few inmates.  It --

16      Q.   So you can say --

17      A.   There's not many.

18      Q.   Well, I mean, how can you -- do you consider

19  ten minimal or do you consider ten a lot?

20               MR. WELBORN:  Object to the form.

21               THE WITNESS:  Rephrase the question, ma'am.

22  BY MS. MAPLES:

23      Q.   Well, you're telling me that you can't tell

24  me.  You have no idea if there's more than ten or less

25  than ten, but you know enough to say minimal.  So I'm

1    just trying to figure out what minimal means to you.

2         A.    There is not any kind of complaint requiring

3    action on my part.  Guys can whine and complain or have

4    any number of attitudes.  I don't internalize them, I

5    don't dwell on them.  I move forward with policy and

6    procedure and giving everything I have to religious

7    rights and respond accordingly.

8         Q.    Do you think that goes a long way to explain

9    what minimal means to you?

10        A.    Yes.

11        Q.    Okay, could you put it in maybe numeric

12   terms, like a number?

13             MR. WELBORN:  She's trying to get you to

14   guess and you don't have to guess.  If you don't know,

15   tell her you don't know.

16             THE WITNESS:  I don't know, ma'am.

17             MS. MAPLES:  I am sorry, if we could keep

18   this to objecting to the form, Joe, I'd appreciate it.

19   That's improper under the federal rules.

20             MR. WELBORN:  He's told you about five times

21   he doesn't know.  He doesn't --

22             MS. MAPLES:  Joe, I am not arguing with you

23   on the record, but if he can say minimal, then he can

24   translate that into what it means in numerical terms.

25             MR. WELBORN:  No, that's just not right.

1            MS. MAPLES:  Joe, this is an improper

2    speaking objection and you need to limit it to the form.

3    Unless you are instructing the witness not to answer, in

4    which case we can talk about that.

5            MR. WELBORN:  Trying to make a witness guess

6    when he's told you repeatedly he does not know is

7    improper.

8            MS. MAPLES:  I am going to keep asking my

9    questions, Joe.

10   BY MS. MAPLES:

11       Q.   Is it your testimony that, Mr. Shonebarger,

12   that you have absolutely no sense of the number of

13   complaints against you by members of the Muslim faith?

14           MR. WELBORN:  Object to the form.

15           THE WITNESS:  Like I said, you know, chatter,

16   discussion amongst inmates, is just -- that's what it

17   is.  Things that are presented to me in a formal

18   capacity are responded to in a fair, firm and consistent

19   way according to policy, and with oversight from the

20   many layers of supervision that I have.

21   BY MS. MAPLES:

22       Q.   Am I correct in thinking that your religious

23   faith personally is Christian?

24       A.   That's correct.

25       Q.   Do you have an opinion about the Muslim

 1  faith, about its tenets?

 2      A.    You know, I'm a trained professional and I'm

 3  there for the inmates.  I'm there for their personal

 4  needs, Muslim through all of the other.  Everyone has a

 5  right to believe as they wish and I am committed to

 6  facilitating their faith within the parameters of safety

 7  and security, the laws of the land.

 8      Q.    Do you have an opinion about the tenets of

 9  the Muslim faith?

10      A.    I'm not clear on what you mean by opinion of

11  their tenets.

12      Q.    Do you know what the tenets of the Muslim

13  faith are?

14      A.    I am not a scholar in the Muslim faith.

15      Q.    Does that mean you don't know what they are?

16      A.    I'm not thoroughly ignorant about Islam, but

17  I don't know everything about the tenets of their faith.

18  Can you be specific about what tenet?

19      Q.    No.  So here's what I'm asking:  I am asking

20  if you know anything about them and you are telling me

21  you don't know everything about them.  I'm just asking

22  if you know anything.  So it sounds like you know

23  something about the tenets of Islam.

24      A.    I know the basics.

25      Q.    Okay.  Do you have an opinion about them?

Page 57

```
 1       A.    They're fine.  They're good.

 2       Q.    That's your only opinion?

 3       A.    I don't know what more you're asking me,

 4  ma'am.  It's a venerated faith that I respect and I am

 5  committed to being a professional to ensure these guys'

 6  religious freedoms or rights are fulfilled.

 7       Q.    Have you ever heard inmates make statements

 8  about your assessment of Islam?

 9       A.    No.

10       Q.    Have you ever made statements about

11  Christianity being the one true religion or the only

12  religion that you support at Trousdale?

13       A.    Negative.

14       Q.    So if inmates were making those statements

15  about you, would you say they're confused or just wrong?

16             MR. WELBORN:  Object to the form.

17             THE WITNESS:  Rephrase your question, ma'am.

18  BY MS. MAPLES:

19       Q.    If inmates are making statements about things

20  you've said in the past that I've just described, are

21  they just mistaken or confused?

22             MR. WELBORN:  Object to the form.

23             THE WITNESS:  I'm not a judge of their

24  motives or their thinking.

25             MS. MAPLES:  Hey Joe, could you get back on
```

Page 58

1   camera.

2           MR. WELBORN:  No.

3           MS. MAPLES:  Well, I mean, I would like to

4   have at least one of the people in the room with the

5   witness on camera.  I think that's pretty standard.  I

6   haven't made a big deal about how many people are in the

7   room, you know, but it's inappropriate to not be able to

8   see counsel that's in the room with the witness.  Hello?

9           MR. WELBORN:  I don't have a response, Janna.

10  If you've got questions to ask, I can get up and walk

11  around this room as much as I want.

12          MS. MAPLES:  Well, I've never had counsel in

13  the room with the witness refuse to get on camera

14  before.

15          MR. WELBORN:  I can take my myself off the

16  camera.  Janna, I've done that in deposition before with

17  you.

18          MS. MAPLES:  Not where you're in the room

19  with the witness physically.

20          MR. WELBORN:  Do you have questions for the

21  witness?  If you do, ask them and quit wasting time.

22  BY MS. MAPLES:

23      Q.    What meals are provided for Muslim inmates at

24  Ramadan?

25      A.    They have a predawn meal, then they have a

 1    double meal after sundown.

 2         Q.   What is a predawn meal?

 3         A.   It's what is on the menu approved by the

 4    company.  It's basically the same meal as they would

 5    have during the year.

 6         Q.   I'm asking what does it consist of?

 7         A.   I'm not certain what it is.  It's approved by

 8    a dietitian to meet all of the standards of a diet.

 9         Q.   Is it specifically for Muslims?

10         A.   No, it's not specifically for Muslim.

11         Q.   What about the double meal after?

12         A.   The same thing applies.

13         Q.   Do you know what halal foods are?

14         A.   I do.

15         Q.   What are they?

16         A.   Halal means approved.  They have standards

17    for slaughter.  There are things that Muslims believe

18    they can't eat.  And our diet at Trousdale suffices in

19    meeting that.

20         Q.   What do you mean your diet at Trousdale

21    suffices to meet that?

22         A.   The menu that we have at CoreCivic Trousdale

23    is halal.

24         Q.   In what way?

25         A.   We have an alternative tray that is available

Page 60

```
 1   for inmates to choose that meets all of the standards of

 2   the halal diet.

 3       Q.    When you say all of the standards of a halal

 4   diet, is that a vegetarian meal?

 5       A.    It's a fleshless tray.

 6       Q.    I am sorry, I didn't catch that?

 7       A.    It's a fleshless tray.

 8       Q.    What does that mean?

 9       A.    That means there would not be meat.

10       Q.    Are there food service vendors that offer

11   halal meat?

12       A.    Unknown.

13       Q.    You've never asked if there are?

14       A.    Our company, in its contract with the state

15   and with the proper dietary authorities, collaborate on

16   the meals, the diet -- or on the trays of the inmates.

17   And I follow the protocol that's laid out by the

18   leadership above.

19       Q.    Have you ever asked if there is a food

20   service vendor that has halal meat available?

21       A.    No, I have not.

22       Q.    Do you know if anyone at CoreCivic has asked

23   if there is a food service vendor that has halal meat?

24       A.    I don't know.  I don't know if there would be

25   or not.  Those decisions are made at our corporate
```

Page 61

1    office, ma'am.

2          Q.    Are there food items that can be purchased

3    through Union Supply?

4          A.    There is food that is available through Union

5    Supply.

6          Q.    What kind?

7          A.    I'm uncertain.  I know that there are kosher

8    and halal items, but I am not at all -- keep visibility

9    on those.

10          Q.    I guess I'm asking something a little bit

11    more general.  Is it primarily packaged food that is

12    available through Union Supply?

13          A.    That's correct.

14          Q.    Who is the food service vendor for Trousdale?

15          A.    Trinity.

16          Q.    Is there an exclusivity with Trinity?

17          A.    Explain what you mean by that.  I need

18    clarification.

19          Q.    Can CoreCivic purchase food items from other

20    vendors or is it limited to only using Trinity?

21          A.    I don't know.  That's way above my pay grade.

22    I have no idea.

23          Q.    Do inmates come to you with requests for

24    feasts?

25          A.    Yes.

1        Q.    How do you go about answering their

2    questions?

3        A.    Depends on what the question is.

4        Q.    Well, I mean, inmates have approached you

5    about halal meat after Ramadan, haven't they?

6        A.    They have.

7        Q.    What did you tell them?

8        A.    We told them that they had a tray that is

9    available for their consumption.

10       Q.    Does Trousdale do a Christmas meal?

11       A.    There are meals that are done throughout the

12   year for the general population.

13       Q.    Do you remember what I asked?

14       A.    I think you just asked me if there is a

15   Christmas meal.

16       Q.    Yes.

17       A.    There is -- my confusion lies here.  There

18   are numerous observances of different religions at that

19   time frame.  I don't recollect it being called a

20   Christmas meal.  I think it's more of a seasonal meal.

21       Q.    Do inmates get a printed menu?

22       A.    I believe upon request, they are allowed to

23   have one.

24       Q.    Did the printed menu on Christmas day say

25   Christmas meal on it?

Page 63

```
 1        A.      Unknown.

 2        Q.      Who would know the answer to that?

 3        A.      The assistant warden over food service.

 4        Q.      Who is that?

 5        A.      I think we have a vacancy.  Assistant Warden

 6   Ponds is now at South Central.  I think that he was over

 7   food service.

 8        Q.      So there is a vacancy, but Ponds is covering

 9   it?

10        A.      Ponds just left.  It could be Assistant

11   Warden Vantell.

12        Q.      Who is the current warden today at Trousdale?

13        A.      Interim Warden Upton.

14        Q.      Is he new to Trousdale or does he have

15   another position at Trousdale?

16        A.      No, he currently is the interim warden.  He

17   had been with us a couple of years ago as an assistant

18   warden.

19        Q.      How long has Mr. Upton been interim warden?

20        A.      Approximately six weeks, I suppose.

21        Q.      Let's say there was a menu on Christmas day

22   with the title Christmas meal or something similar.  Was

23   there meat on that menu?

24        A.      You faded out on me.  Is there what meat?

25   Repeat the question.
```

Page 64

1        Q.    Let's say there was a menu that had the word

2    Christmas meal or something similar printed on the top.

3    Did that meal contain meat?

4                MR. WELBORN:  Object to the form.

5                THE WITNESS:  It would be like any other day.

6    There is an alternative tray and there is a regular

7    tray.  And regular trays oftentimes contain meat; the

8    alternative tray does not.

9    BY MS. MAPLES:

10       Q.    So you're saying that for Christmas,

11   Trousdale didn't do anything out of the ordinary?

12       A.    I think that the difference is maybe an

13   addition of a food item.

14       Q.    What food item?

15       A.    I'm uncertain of the menu, ma'am.

16       Q.    Well, then how do you know there was an

17   addition of a food item?

18       A.    That's historically what prisons do.  They

19   would add a special dessert, something along that line.

20       Q.    Okay, for Ramadan, what's the special

21   dessert?

22       A.    There has been -- the way we have operated

23   the Eid for Ramadan is an additional entree.

24       Q.    What was the additional entree?

25       A.    I believe it has been a sausage for the other

Page 65

```
 1    tray, regular tray.  And whatever the main entree on the

 2    alternative tray, it would be enlarged.

 3         Q.    Is the sausage slaughtered according to

 4    halal's requirements -- or not the sausage, I guess

 5    whatever became the sausage, slaughtered according to

 6    halal requirements?

 7         A.    The sausage is not.

 8         Q.    But that's the additional food tray that

 9    Muslims are given for Ramadan?

10         A.    They have the capability of getting an

11    alternative.  It's also, to answer that question, some

12    Muslims don't hold to that faith tenet.  They've got a

13    different faith tenet when it comes to meat.  So some

14    adhere, some do not.

15         Q.    Does Trinity food services offer halal meat?

16         A.    They do not.

17         Q.    Is there an Easter meal at Trousdale?

18         A.    As stated earlier, there are seasonal meals.

19    Seasonal meals.  And from a chaplain perspective,

20    whatever faith you practice, that would be considered

21    your special meal.  But they're more seasonal.

22         Q.    So there are special seasonal meals that

23    occur around December 25th and the beginning of April?

24         A.    That's accurate.

25         Q.    And those dates correlate roughly to
```

Case 3:22-cv-00093  Document 33-9  Filed 05/04/22  Page 65 of 177 PageID #: 1388

1    Christmas and Easter?

2         A.    Yes, you know, Passover.  I mean, there's an

3    innumerable number of religions in our world.  And I

4    said 93 are in our state that are recognized.

5         Q.    And these seasonal meals, the menu may or may

6    not say Christmas meal, Easter meals?

7         A.    As I stated, I have no visibility of what the

8    menus say.  I don't seek it.  It's not important in my

9    work to be able to do that.

10        Q.    Well, might it be important to individuals

11   who are not Christians, whether or not they're being

12   handed a menu that says Christmas meal or Easter meal on

13   it?

14        A.    It's never been brought to my attention,

15   ma'am.

16        Q.    That's not what I am asking.

17        A.    It could or could not.  I can't answer that.

18        Q.    Does TDOC have a policy that outside

19   organizations are unable to donate food items?

20        A.    That is correct.

21        Q.    How long has that policy been in effect?

22        A.    I'd say about two years, possibly three

23   years.

24        Q.    What is the rationale behind that policy?

25        A.    The rationale is, is that the foods, we are

Page 67

1   uncertain who prepared the food, whether the food is

2   spoiled, whether the food is laced with drugs, whether

3   it could have -- contain contraband.  With the

4   uncertainty of certification of the food, they do not

5   want made food, prepared food coming in the front door.

6       Q.    Do inmates get care packages?

7       A.    Clarify what you mean by a care package.

8       Q.    Well, what do you understand a care package

9   to be?

10      A.    Something mom put together and sent it in.

11      Q.    Okay, do inmates ever get packages from any

12  other organization not from a family member?

13      A.    Union supply.

14      Q.    Do inmates ever get care packages from

15  religious organizations?

16      A.    No.

17      Q.    Do inmates ever get care packages that are

18  sponsored by religious organizations?

19      A.    Let me retract the previous answer.  There

20  was, for the general population, twice over the last 12

21  months, an organization that provided goodies, so to

22  speak, chips and M&M's of that type, to the entire

23  population.  I guess I would classify that as care

24  package.

25      Q.    So it contained food items?

```
 1         A.     Yes.

 2         Q.     Who donated it?  What organization?

 3         A.     Forgive me.  I can't remember the

 4   organization.

 5         Q.     Was it a religious organization?

 6         A.     It is a faith-based organization.

 7         Q.     So twice within the last 12 months a

 8   faith-based organization has sent the inmates care

 9   packages containing food, which is donated?

10         A.     Correct.

11         Q.     Is there religious literature in the care

12   packets as well?  Pamphlets, flyers, anything like that,

13   Bible verses?

14         A.     Yes, ma'am.

15         Q.     Do you remember the specific food items that

16   were in there?  I think you mentioned M&M's.

17         A.     I think there was a bag of marshmallows.

18   Goodies.  Junk food.  Comfort food.  However you want to

19   designate it.

20         Q.     Did that go through you as the chaplain?

21         A.     It went through the other chaplain.

22         Q.     I'm going to put another document on the

23   screen for you.  Do you see that this is a memo dated

24   March of 2019 with the subject Ramadan 2019 guidelines?

25         A.     I see the document.
```

Page 69

1       Q.     Are you familiar with this memo?

2       A.     I am.

3              MS. MAPLES:  So this is a collective exhibit.

4    It actually contains several different memos.

5              (Exhibit 2 was marked.)

6    BY MS. MAPLES:

7       Q.     So I am going to scroll through and let you

8    see that.  This is 2019 here.  And then we have 2018.

9    Do you see that?

10      A.     I do.

11      Q.     And then do you see the third one, I guess is

12   also dated 2019?

13      A.     I think this is dated -- the one in front of

14   me is dated 2020.

15      Q.     Oh, okay.  That's a typo on the third one,

16   then?

17      A.     Yes.

18      Q.     Can you describe these Ramadan guidelines

19   that are described in these memos?

20      A.     Which one in particular, ma'am?

21      Q.     Are they different?

22      A.     Are they different from what?

23      Q.     Each other.

24      A.     I would have to have them side by side to

25   examine them.

1      Q.    Well, let's look at the one for 2018.  Could

2   you describe the guidelines in the 2018 memo?

3      A.    Can I explain the guidelines?  Is that what

4   you are asking me, can I explain the guidelines?

5      Q.    Yes.

6      A.    I mean, give a commentary on each number?

7      Q.    Well, I mean, did CoreCivic comply with these

8   guidelines that are listed here in 2018?

9      A.    Central office understands that CoreCivic

10  Tennessee does not have religious diets.  They

11  understand that.

12     Q.    What do you mean by does not have religious

13  diets?

14     A.    We don't have kosher and halal diet.  They

15  understand that.  I mean, they've contracted with us

16  accordingly.

17     Q.    Well, I thought you said you do offer a halal

18  diet?

19     A.    The alternative tray is halal.  The

20  alternative tray is halal.

21     Q.    So what do you mean by TDOC or central office

22  understands we do not offer religious diets?

23     A.    When it comes to the Eid feast, talk about

24  having a halal, halal meat, whatever, they know that we

25  have an alternative tray.  We don't have their same

 1   menu.  We don't have their same food server.

 2        Q.    Who does TDOC use?

 3        A.    Aramark, I believe.

 4        Q.    Does Aramark offer halal meat?

 5        A.    They offer a kosher diet, I believe.  This is

 6   what I want to have understood:  The relationship

 7   between TDOC and CoreCivic Tennessee is such that we

 8   don't have kosher or halal as a religious diet.  We have

 9   an alternative tray that meets the religious needs of

10   Muslims.  So the offerings between the TDOC prison

11   versus the CoreCivic would be different.  As you notice,

12   No. 2, to answer your previous question.

13        Q.    Uh-huh.  Do you see that it says:  No outside

14   food items will be allowed from certified volunteers?

15        A.    That's correct.  That was your question.

16        Q.    Can a Muslim be denied participation in the

17   Ramadan feast?

18        A.    No.

19        Q.    What if that inmate isn't fasting?

20        A.    If they are not fasting, there has never been

21   a situation when they're not fasting that they have

22   requested to participate, to my memory.

23        Q.    If an inmate is not fasting, can that inmate

24   still participate in the Ramadan feast?

25        A.    I think you rephrased the previous question,

Page 72

1    ma'am.  And I don't remember in my experience that being

2    addressed as needing a response, an inmate.  I don't

3    remember an inmate ever asking me that.

4         Q.    Well, I am not asking if an inmate has ever

5    asked it.  I am asking if there is any kind of policy

6    governing whether you have to fast in order to

7    participate in Ramadan?

8         A.    I'm not sure.  I would have to research it at

9    the time to be able to come up with the correct answer.

10              MS. MAPLES:  I am going to put another

11   document on the screen.  It will be Exhibit 3 to your

12   deposition.

13              (Exhibit 3 was marked.)

14   BY MS. MAPLES:

15        Q.    Do you recognize this document?

16        A.    Yes.

17        Q.    What is it?

18        A.    Basically the Ramadan plan for 2018.

19        Q.    And did you author it?

20        A.    I would say that I co-authored it.

21        Q.    Who would you have co-authored it with?

22        A.    The other chaplain and our assistant warden.

23   This is basically an echo of what came down from central

24   office, but put in, framed within the operational time

25   frames of our facility.

1        Q.    What is a hot pink religious pass?

2        A.    There was never a hot pink religious pass

3    that was submitted.  This particular memo was an initial

4    draft -- was an initial draft.  As you notice, it

5    doesn't say -- it didn't say memo or anything at the

6    top.  Anyway, the pass would be, to answer your direct

7    question, would be a recognition.  A pass made that the

8    inmate's stay in the housing unit and Tennessee

9    identification number to enable an inmate to participate

10   in a service.

11       Q.    So there was no such thing as a hot pink

12   religious pass?

13       A.    We changed colors.  There was an objection

14   before we went to press, so to speak.  There was an

15   objection on the color.  And I don't make the passes.  I

16   tell my inmate workers, here is the list, make the

17   passes.  And they had made it in, probably an unwise

18   choice that would be an offense to some, on the color.

19   And we immediately did a cease and desist and went to

20   another color for the pass.

21       Q.    So you had nothing to do with the choice of

22   color, it was somebody else?

23       A.    That is correct.

24       Q.    Was this memo ever released to inmates?

25       A.    My recollection is this:  I had mentioned to

1   you earlier, I've always had a Muslim inmate work for

2   me.  And in this draft, I think he took it and shared it

3   before we went live with it.  And it caused some

4   controversy among some.  The thinking of some, from what

5   I have been told, was they felt that they were -- I was

6   suggesting that Muslims were gay.  And in that

7   fluorescent color, depending on the eye of the

8   interpreter -- I wouldn't clarify it as pink.  But

9   nonetheless, in the bright pink, some took offense.  And

10  we immediately ceased operation of producing that and

11  went to another color.

12       Q.   Did you write the memo, this draft of the

13  memo?

14       A.   Yes, as I said, I co-authored it.  But I was

15  oblivious to any kind of objection to the color and what

16  it meant to some people.  So once being sensitive to the

17  fact that some would take offense, the decision was made

18  to change it.

19       Q.   Do you see that No. 10 says:  Inmates who are

20  participating in the fast shall not enter the chow hall

21  for lunch or receive a tray during remote feeding.

22  Anyone seen by staff breaking the fast during the day or

23  receiving a lunch tray will be removed from the Ramadan

24  2018 list.

25       A.   That's correct.

1      Q.    Can you explain that?

2      A.    Yeah, there is insincerity in their faith

3   practice.  Faith practice is you fast from sunrise to

4   sunset.  There are some inmates that want four meals a

5   day.  So they will take advantage of the mechanism of

6   Ramadan by which they can now sneak in and get a lunch

7   tray and have their fourth meal of the day.  So that's

8   an insincere demonstration of their faith and they would

9   be removed from the predawn and double tray at sunset.

10     Q.    What do you do to evaluate the sincerity of

11  Christians' faith?

12     A.    Typically, you measure sincerity by

13  insincerity.  And there is not anything within the

14  operations of Trousdale that that application would need

15  to be applied.

16     Q.    So there is no need to evaluate the

17  insincerity of Christians, but there is a need to

18  evaluate the insincerity of Muslims?

19     A.    What the inmates are telling us by going and

20  getting a lunch tray is that they're not fasting.  So if

21  you're not fasting, that is all that -- that's a very

22  central value of Ramadan is the fasting.  So there is no

23  need to continue in that practice by their obvious

24  demonstration of not partaking.  So they will get their

25  three meals a day delivered in another format.

1        Q.    Is that based on any recommendation from an

2    actual Muslim?

3        A.    Is what -- is what a recommendation?

4        Q.    Well, I mean, are individual practicing

5    Muslims outside of Trousdale, if they break the fast,

6    are they just ostracized and excluded from the rest of

7    the community during the Ramadan feast, or is this your

8    own feeling about what should happen?

9             MR. WELBORN:  Object to the form.

10            THE WITNESS:  There is no ostracizing.  It's

11   -- that is absolutely not at all what is going on.

12   BY MS. MAPLES:

13       Q.    Well, I'm asking you, what is your basis for

14   No. 10?

15       A.    My basis is they are testifying by taking a

16   tray they are not participating in the fast.

17       Q.    Is there any situation in which you take

18   Christians' testimony to determine what they're allowed

19   to participate in at Trousdale?

20            MR. WELBORN:  Object to the form.

21            THE WITNESS:  Ma'am, I've already answered

22   that question.  There is nothing -- there is no

23   operation or practice or observance or anything like

24   that, that there would need to be.

25   BY MS. MAPLES:

Case 3:22-cv-00093   Document 33-9   Filed 05/04/22   Page 76 of 177 PageID #: 1399

1         Q.    Right, well, I'm asking if, outside of

2    Trousdale, if a Muslim breaks a fast, they are excluded

3    from Ramadan meals?  Do you know?

4         A.    They're not going to get their tray predawn

5    or sunset.

6         Q.    That's not what I asked.

7         A.    Because -- well, I mean, okay.  Rephrase the

8    question, please.

9         Q.    What I asked is, if you know whether inmates

10   who break a fast during Ramadan are excluded from the

11   feast?

12        A.    Not that I am aware of.

13        Q.    But you just do it because you think it's

14   important to evaluate the insincerity of Muslims?

15        A.    No, negative.  What I'm saying is, is that

16   during the 30 days of Ramadan, if they violate their

17   fast during that 30 days, they will have to walk and get

18   their food submitted to them, given to them during

19   normal food service operation.  Now, I have said a

20   couple of times that I am not aware of any inmate that

21   was then not able to participate.

22             The operation that we have had is the food

23   trays for the Eid is given to the entire population.

24   It's given to the entire population.  We are --

25   Tennessee Department of Correction has had policy called

Page 78

1   116.08, which says religious diets and religious feasts.

2   We are not governed by 116.08.  We do not have it.  We

3   are not bound by it.  However, with Eid and it's timing,

4   our company has directed us to provide a double entree

5   for the population to also be enjoyed by the Muslims.

6          Q.    Did you talk to any Muslim in formulating

7   this rule, No. 10?

8          A.    Have I talked to Muslims?  I mean, my entire

9   career.  This is a tenet of their faith.  You fast

10  during the day.

11         Q.    That's not what I asked.

12         A.    Certainly, I have.  I've talked from, you

13  know, imams to inmates, inmates within the faith.

14  Everyone agrees.  I mean, that's the program.  That's

15  the religious tenet.  That's how it's observed and

16  practiced.  And if you're not serious about it, we're

17  going to remove you from it.

18         Q.    So the imams --

19         A.    This is the way it shakes out:  If an inmate

20  comes to lunch and gets a lunch tray, he is eating four

21  times a day.  He is not authorized to eat four times a

22  day.  He is authorized to eat three times a day.

23         Q.    I'm just asking if, in formulating No. 10 on

24  the memo that you co-authored, you consulted a Muslim in

25  writing it?

 1         A.     The consultation would have come from those

 2    above me, in the ordinary practices of the faith.  Those

 3    above me would be the warden, would be CoreCivic, would

 4    be TDOC and all of the religious experts in the faith.

 5         Q.     So No. 10, you didn't write that, somebody

 6    above you told you to write that?

 7         A.     I'm the one -- I'm not clear on what you're

 8    saying.  Am I echoing a standard within the faith?  Yes.

 9    Yes.  It's something I've learned.  It's something that

10    is practiced.  It's something in my expertise.  And I

11    sent it to the population.

12         Q.     Well, you testified earlier that you don't

13    know if individuals who are Muslims that break the fast

14    are then excluded from a Ramadan feast.

15         A.     Okay.

16         Q.     So I understand that you are saying the

17    standard is that one should fast.  I'm asking where you

18    got this idea that for individuals who don't fast, they

19    can't have the feast?

20               MR. WELBORN:  Object to the form.

21               THE WITNESS:  Ma'am, Tennessee Policy 118.07,

22    religious diets and feasts.  Trousdale Turner

23    Correctional Center it not bound by that policy.

24    Translated, we don't have feasts.  As a result of an Eid

25    at the end of Ramadan, what our company has decided to

Case 3:22-cv-00093  Document 33-9  Filed 05/04/22  Page 79 of 177 PageID #: 1402

1   do is to facilitate this for the entire population.

2   There is not a feast.  It is a double portion entree.

3   Everybody gets it, whether you violated a fast because

4   you're Muslim or whether you are a satanist or Wicca or

5   Baptist.  So it doesn't apply.  It doesn't apply.

6            In my history as a chaplain in my 20th year,

7   those that have violated in jurisdictions outside of

8   Tennessee, I never forbade anybody from participating in

9   an Eid.  But that does not apply to CoreCivic Tennessee

10  Trousdale Turner Correctional Center.

11  BY MS. MAPLES:

12       Q.   So any inmate can get the double portion for

13  Ramadan; is that right?

14       A.   The entire population, if they choose to eat

15  that day, receive it.

16       Q.   So you would go to breakfast, go to lunch and

17  then get a double portion for dinner; is that right?

18       A.   The double portion component -- Ramadan is

19  over.  The double portion at night is over, okay?  We

20  have provided a double entree for the entire population

21  at, you know, one of the meals, whether it be lunch or

22  dinner.

23       Q.   Okay, so everybody can get the double

24  portion, even inmates who are not Muslim?

25       A.   That's correct.

Page 81

1      Q.    But Muslim inmates who violate their fast are

2   removed from the Ramadan list?

3      A.    Ramadan is a period of 30 days.  The general

4   population is after the 30 days.  That meal is after the

5   30 days.  Ramadan is over.  We do not give inmates four

6   meals a day.  We give inmates three meals a day.  If an

7   inmate says, I have signed up for Ramadan to get one

8   meal predawn, two after sunset, that's three meals.

9   There will be no lunch meal because they are fasting.

10          So if they testify to us through the receipt,

11   their willful receipt of the tray, they are not

12   participating, we will take them off so they will

13   receive their meals accordingly.  They are not at all

14   forbidden from praying during a Ramadan prayer.  They

15   are not at all forbidden from reading the Koran.  They

16   are not at all forbidden from taking advantage of

17   whatever programming or operational mode may be.  There

18   is prohibition.

19          I will also mention that there are Muslim

20   inmates, because of diabetics or other medical needs,

21   that cannot follow that protocol and will eat during the

22   day, but they are still sincere in their faith.

23      Q.    Well, do inmates who are allowed this double

24   portion at the end of the day, do they have to abstain

25   from lunch?

Case 3:22-cv-00093   Document 33-9   Filed 05/04/22   Page 81 of 177 PageID #: 1404

1          A.    Yes.

2          Q.    How do you track that?  They can't be Ramadan

3     list because you have to be one of the six Islamic

4     religions, right?

5          A.    That's correct, we have a list.  We have a

6     list of inmates that have signed up for Ramadan.  And

7     staff monitors the allocation of the trays.  And if an

8     inmate has taken a lunch tray, it is reported and the

9     inmate would be taken off.

10         Q.    I mean, I'm trying to figure out how this

11    would be available to all inmates if all inmates can't

12    be on the Ramadan list?

13         A.    Because there is no feast.  There is no

14    feast.

15         Q.    That's not what I asked.  I'm asking -- you

16    said all inmates are allowed a double portion at dinner,

17    that it's available to all inmates.  But you're --

18         A.    I said inmates that are signed up for

19    Ramadan.  The Muslim inmates that are signed up for

20    Ramadan will get the double portion at night because

21    they don't get a lunch.  They get a breakfast, no lunch,

22    two dinner.

23         Q.    So it's not available to all inmates, the

24    double portion?

25         A.    No.

Page 83

1              MR. WELBORN:  Can we take a break?

2              MS. MAPLES:  Sure.

3              (Recess observed.)

4    BY MS. MAPLES:

5        Q.    Mr. Shonebarger, before the break, you will

6    recall we've been talking about the feast surrounding --

7    or excuse me, the meals surrounding Ramadan.  I'm going

8    to show you another document.

9              (Exhibit 4 was marked.)

10   BY MS. MAPLES:

11       Q.    Do you see that the title of this document is

12   affidavit?  Oh, I'm sorry, I don't have it up there.

13       A.    I see it.

14       Q.    Have you ever see this document before?

15       A.    Can you scroll through the entire document,

16   please?  Scroll back to the top, please.  I'm not

17   positive that I've seen this.

18       Q.    Okay, well, if you'll look with me, do you

19   see that the first three paragraphs concern food during

20   Ramadan?

21       A.    Scroll down so I can see the third paragraph

22   in whole, please.  Okay.

23       Q.    Okay, can you see that the first three

24   paragraphs of this affidavit concern food during

25   Ramadan?

```
 1        A.    I can see that.

 2        Q.    Do you see that Mr. Pleasant-Bey has repeated

 3   a statement by you in there?  I will read it.  It says:

 4   I spoke to the legal counsel for CoreCivic America and

 5   they said absent a court order demanding that we have to

 6   give you traditional halal food at the Eid al-Fitr and

 7   Eid al-Adha feasts, we're not going to give it to you

 8   because it's not important to the court.

 9        A.    Repeat your question, ma'am.

10        Q.    Do you see that he has restated or repeated a

11   line from you that I just read?

12              MR. WELBORN:  Object to the form.

13              THE WITNESS:  I see what is written down,

14   ma'am.

15   BY MS. MAPLES:

16        Q.    Do you recall having discussions with Mr.

17   Pleasant-Bey?

18        A.    That is a false statement, ma'am.  That's a

19   fault quote.

20        Q.    That's not what I asked.  I asked, do you

21   recall having discussions with Mr. Pleasant-Bey?

22        A.    I don't.

23        Q.    You've never had discussions with Mr.

24   Pleasant-Bey about halal foods?

25        A.    Not in this context.
```

1        Q.     In any context?

2        A.     I suppose I have.

3        Q.     How many times?

4        A.     Not about court systems in the response to

5    halal food.

6        Q.     How many times have you had discussions with

7    Mr. Pleasant-Bey about halal foods?

8        A.     I think upon his introduction into the

9    facility, I advised him of the CoreCivic Tennessee

10   standard on policy and the absence of Policy 116.08

11   dealing with religious diets and feasts.

12       Q.     How many times have you had discussions with

13   Mr. Pleasant-Bey about halal foods?

14       A.     Probably once.

15       Q.     That's the only time?

16       A.     Correct, that I can recall.  Once that I can

17   recall.

18       Q.     So when he says that these discussions

19   happened in 2018 and 2019, that may have happened, you

20   just don't remember?

21       A.     No.  I never said anything like that.  Once

22   he began his grievance process in his litigation, he

23   quit talking to me.  Which is, you know -- he quit

24   talking to me.  So there are -- like I've stated

25   repeatedly, there is a Muslim inmate clerk that works

1    for me.  And discussions about operations and protocols

2    and so forth like that, could have been repeated out of

3    context or whatever from them or from another Muslim.

4    But I want to emphasize, once Mr. Pleasant-Bey entered

5    into his grievance litigation process, conversation with

6    me was over.

7         Q.    I guess my question still is, how many

8    conversations have there been with Mr. Pleasant-Bey

9    concerning halal foods or foods for Muslims around

10   Ramadan?

11        A.    Only one that I can recall.

12        Q.    Okay, so there may have been more, you just

13   don't remember?

14        A.    That's probably an accurate statement.

15        Q.    The conversation that you can remember is the

16   one that occurred in 2018 upon his entry into the

17   facility; is that right?

18        A.    I would have to verify when he entered the

19   facility.  That sounds accurate.  And of course, there

20   were many subjects discussed with him upon his entry

21   into the facility to include that.

22        Q.    Have you had offers to donate food by Islamic

23   groups?

24        A.    No.

25        Q.    So in No. 2, where Mr. Pleasant-Bey states

Page 87

1    that the facility would not allow foods to be donated,

2    you're saying that he is not referring to any specific

3    offer to donate that you are aware of?

4         A.    There were zero offers.

5         Q.    Do you see where he says:  They allow Men of

6    Valor and Kairos to donate food and religious items to

7    Christian inmates every year?

8         A.    Kairos has never set foot at Trousdale Turner

9    Correctional Center.  Men of Valor has not donated food

10   in the history of the prison.

11        Q.    What are the plans for food during Ramadan

12   this year?

13        A.    I think you asked that question earlier.  We

14   follow the menu that is submitted by Trinity with the

15   agreement of our company.

16        Q.    Well, I don't recall asking about 2021.  I

17   think we've been discussing '18, '19 and '20.  So are

18   you saying that it's the same this year, there is no

19   change to it?

20        A.    One of the things that's happened in 2021 is

21   the second chaplain, Quinten Fletcher, is running point

22   on Ramadan.  And we have divided oversight.  So I can't

23   say that I am completely up-to-date on every detail of

24   the Ramadan plan.  If I needed to be asked, I would

25   query him or the assistant warden to get an answer.

 1        Q.    Are you aware of anything?  And if you're

 2   not, that's okay.  Are you aware of anything, though,

 3   that is different?

 4        A.    I am not.

 5        Q.    Okay.

 6        A.    I am not aware.

 7        Q.    Do you see No. 9?  I will let you read it.

 8        A.    What is your question, ma'am?

 9        Q.    Is Mr. Pleasant-Bey's recitation of what's

10   occurred accurate?

11        A.    Thoroughly inaccurate.

12        Q.    What word did you use?  What inaccurate?

13        A.    Thoroughly.

14        Q.    Okay, tell me which part is inaccurate.

15        A.    When he requested his Arabic studies, his

16   language component, that did not include a pod.  That

17   did not include having a pod.  The religious

18   accommodation would reflect that.  On a separate

19   inquiry, in an informal presentation, he said that he

20   wanted to run a program in a pod like what Men of Valor

21   has.

22              There's many things to say about this and I

23   want to be as concise as I can.  Number one, Men of

24   Valor has volunteered to do mentoring re-entry

25   programming for inmates.  There are zero Muslim groups

 1   submitting an offer to have inmates together for

 2   programming.  In addition, I can't even get volunteers,

 3   and I am required by policy to recruit, and I have, but

 4   we can't even get volunteers.

 5              So what that means is, Mr. Pleasant-Bey

 6   wanted to write his own program, his own curriculum, and

 7   be the oversight of that particular Islamic group.

 8   Inmates cannot have power over other inmates.  It's not

 9   a recognized -- there wasn't anything that was formally

10   requested for consideration.  One of the things in the

11   religious accommodation are volunteers that are willing

12   to facilitate a program.  He had none.  He wanted to run

13   it himself.

14              So his inquiry, just a verbal or maybe just

15   on an inmate request form, not any formal documentation,

16   I think may have found its way to the Assistant Warden

17   Pittman.  And, you know, the answer is obvious.  Inmates

18   don't run programs, don't oversee men in a pod.  So

19   that's thoroughly inaccurate.

20              I want to continue.  There was his original

21   religious accommodation.  Central office, there was a

22   delay.  There was a delay in response.  Not -- not long,

23   but there was a delay.  I cannot explain why there was a

24   delay from Reverend Darnell.  I can't speak for him.

25      Q.    Do you know how long the delay was?

Page 90

1      A.    I would say maybe six weeks, two months of a

2   delay.  Now, with that formal request remained the

3   answer that you're free to include Arabic language study

4   in your programming, your existing programming, that you

5   and I have spent the first part of the day discussing

6   the opportunities up to four hours twice a week.

7           Let me continue.  Okay, Chaplain Simic making

8   a statement that he was aware that they earned a class,

9   was denied as a stand-alone program would be accurate,

10  as a stand alone program.  Where it says TTCC has a

11  Hebrew Greek Bible study for Christians, but my request

12  for a Koranic Arabic studies group was denied.  Let me

13  pause there.

14          When I arrived in November of '16, an inmate

15  named Song, S-O-N-G, a Korean inmate who had done this

16  class at a TDOC prison.  Accommodations do not transfer

17  from one prison to the other.  Every prison has a right

18  to entertain the religious accommodation request by the

19  inmate.  Mr. Song submitted a religious accommodation

20  for this class.  I recommended disapproval because it's

21  in violation of policy.

22          The policy says, in 118.01, that programming

23  must be a religion.  This class was not a religion.

24  It's not Baptist, Lutheran, Muslim, Satanist, Wiccan.

25  It's not a religion.  It's a class.  So as a result of

1    it being a class, it did not meet the criteria of the

2    policy.  I recommended denial.  It went up through -- my

3    assistant warden agreed.  My warden agreed.  It was sent

4    to central office.  The director at the time was Deborah

5    Thompson.  Deborah Thompson approved it.  It doesn't

6    matter what my opinion is, she is the chief chaplain.

7              So the class went into effect.  It is not

8    religious.  It is not a religion -- let me clarify.  It

9    is not a religion.  There are many -- there were many

10   Nation of Islam and Muslim inmates that attended that

11   class.  It was open for anybody.  So there was no

12   accommodations, other than time and space.  In other

13   words, they got a day, Thursday afternoon on the

14   calendar, to have their class.  There was no request for

15   audio visuals, for laptop, for T.V., for writing

16   materials.  Nothing.  There was no request.  There was

17   nothing.

18             So the inmate created his own curriculum and

19   I would ask just to review that it wasn't a violation of

20   safety and security, trying to incite, you know, a mob

21   or a group, anything like that.  So on those very loose

22   perimeters, it was tough.

23             Now, in like manner, I told Mr. Pleasant-Bey

24   that your Arabic is not a religion.  However, you want

25   to be able to teach the Koran in Arabic and you want men

Case 3:22-cv-00093  Document 33-3  Filed 03/04/22  Page 91 of 177 PageID #: 1414

1    to learn Arabic.  It's a higher standard within the

2    tenets of Islam.  I said, you can do that either in

3    Taleem or after prayer in Jummah.  And you have up to

4    four hours in each program, total of eight hours a week,

5    that you can offer this.

6              So when the religious activities committee

7    reviewed his request that I recommended this

8    disapproval, assistant warden agreed disproval, the

9    warden agreed disapproval.  It went to a TDOC central

10   office and chief Chaplain Darnell agreed disapproval.

11             Let's see here.  He said that I should bunch

12   it together and that is not my terminology whatsoever.

13   And ma'am, I want to emphasize, for many months now,

14   they've been teaching Arabic.  This is a dated set of

15   documents and circumstances.  We have -- they have moved

16   far past this and are doing the Arabic class with no

17   objections by Chaplain Shonebarger or the

18   administration.  That's all the more I have to say about

19   it.

20        Q.    Is the chapel currently fully booked?

21        A.    We're still in COVID protocol.

22        Q.    Before the COVID protocol began, was the

23   chapel fully booked?

24        A.    I would have to go back and verify it.

25        Q.    You don't know?

1      A.    The only potential opportunity I would have

2   would be to open up evening programming.  But the

3   wardens had concerns about movement in the dark.  And

4   because of that, that falls within the loop of concerns.

5   So there wasn't evening programming.  You know, for a

6   period of time there was no evening programming.

7      Q.    During COVID protocols, is the chapel fully

8   booked?

9      A.    No.

10      Q.    So could there be more gatherings or events

11   in the chapel than there currently are?

12      A.    Certainly.

13      Q.    Someone would just need to submit a request?

14      A.    I'm the point of entry, that's correct.

15      Q.    So if a Muslim inmate said, I want the

16   equivalent of a Bible study that is separate and apart

17   from Jummah or Taleem, would that request for time in

18   the chapel be approved or denied?

19      A.    They are group accommodations.  If he's

20   asking for a group, it would be an evaluation:  We

21   already have a group, why do we need a new group?  So

22   then I would ask what is not being facilitated in the

23   potentially eight hours of the week that you have that

24   you could not study, look at, examine, this particular

25   topic, at least on a rotating basis, if necessary.

Page 94

1        Q.    I mean, you've described the difference

2    between, you know, a service and a study, right?

3        A.    What I'm saying is for 200 inmates -- for 200

4    inmates to have two programs a week with up to four

5    hours each is sufficient to be able to address, study,

6    discuss, the subjects that they want.  If there was ever

7    a concern that the volume of material surpasses meeting

8    opportunities, we would take a look at that.  That has

9    never been addressed to me.

10       Q.    Are you familiar with any Muslim or Islam-

11   based vendors?

12       A.    I am.

13       Q.    And what are those?

14       A.    Probably the most recognized is Halalco.

15       Q.    Okay, have you ever purchased or known of

16   anyone at Trousdale to purchase things from Halalco?

17       A.    Through the mechanism of the chaplain

18   department, not that I remember.

19       Q.    No, through any mechanism?

20       A.    Unclear.  Unsure.  I don't have visibility.

21   Let me explain it this way:  If an inmate happens to get

22   a catalogue or a family who advise a particular item, an

23   inmate could submit a trust fund withdrawal to a

24   particular organization saying, I want this money sent

25   to this organization for the procurement of this

 1    particular item.

 2            That would be outside the protocol, the

 3    policy.  Now, has that happened?  I can't say with

 4    certainty.  I would probably have a fear of that

 5    bypassing end run around the system probably.  Probably

 6    has happened.  I'm done.  That's the end of my

 7    statement.

 8        Q.    When you say you're familiar with Halalco, in

 9    what sense are you familiar with it?

10        A.    As I said, I've been a chaplain 20 years, so

11    in other jurisdictions, I've had visibility of them.

12        Q.    What about Medina?

13        A.    Yes, I'm familiar with Medina.

14        Q.    What about the Islamic Book Store?

15        A.    Yes, I'm familiar with them.

16        Q.    Are there any others?

17        A.    I am sure there are.  I didn't come prepared

18    to quote them all to you.

19        Q.    Are there any situations in which inmates or

20    that you, through the chaplain's office, purchased items

21    from any of those three vendors?

22        A.    There has not been a need to do that.  And

23    the biggest reason from a department standpoint, is I

24    think I do a superior job in acquiring donations.  I'm

25    good at it.  I'm good at begging.  So we've got a lot of

Case 3:22-cv-00093   Document 33-9   Filed 05/04/22   Page 95 of 177 PageID #: 1418

Page 96

1    religious organizations, Muslim religious organizations

2    that are willing to help with costs.  And I've been able

3    to get a number of things that has been beneficial, you

4    know, for our Muslim population.

5         Q.    What Islamic organizations have been willing

6    to donate?

7         A.    AMANA is one.  I don't have the list.

8    There's been several.  I have it in my office.  We all

9    have a very cordial, professional relationship.  They

10   especially appreciate my desire to expand the faith and

11   to facilitate the requests of the inmates.

12        Q.    Are any of those vendors that I just

13   mentioned TDOC approved?

14        A.    Our authorized vendor by Tennessee Department

15   of Correction is Union Supply.

16        Q.    Well, I mean, I guess that's not entirely

17   what I'm asking.  I'm asking if TDOC has approved any of

18   these other vendors in any context that you are aware

19   of?

20        A.    No.  The answer is, it's Union Supply.  Now,

21   as with 93 religions within the state, and through the

22   mechanism of an individual accommodation request or a

23   group of accommodation requests, if an individual faith

24   item or a group, faith group item is not available

25   through Union Supply, then our policy, Tennessee policy

Case 3:22-cv-00093  Document 33-3  Filed 03/04/22  Page 96 of 177 PageID #: 1419

Page 97

```
 1   says that the chaplain is then to explore opportunities

 2   for facilitation.  I would find the facilitation.  I

 3   would then submit it up my chain of command, assistant

 4   warden of treatment, to the warden, to get approval for

 5   procurement.

 6        Q.   So they can be approved, and by they --

 7   strike that.  So Halalco, Medina and the Islamic Book

 8   Store could be approved on a case-by-case basis, but

 9   you're not sure if they are -- or receive any kind of

10   blanket approval --

11        A.   They don't.

12        Q.   -- from TDOC?

13        A.   They don't.  Not to my knowledge, no.  I'll

14   repeat, Union Supply is the vendor.

15             MS. MAPLES:  Joe, are you ready to do a

16   lunch?

17             MR. WELBORN:  That's good with me.

18             (Luncheon recess observed.)

19   BY MS. MAPLES:

20        Q.   Mr. Shonebarger, at any time since you've

21   been at Trousdale, has Trinity been able to purchase

22   halal foods from a separate Islamic vendor?

23        A.   I have no idea.

24        Q.   Since you've been at Trousdale, have halal

25   meats ever been served?
```

 1        A.     Served to who?  Served under what

 2   circumstances?  I'm confused about that.

 3        Q.     Any circumstances.

 4        A.     I think possibly the first year that I was

 5   there, in violation of policy, there may have been.

 6        Q.     In violation of what policy?

 7        A.     CoreCivic TDOC policy.

 8        Q.     In what manner in violation of policy?

 9        A.     Well, if I remember right, I think that food

10   service director at the time had brought some food items

11   in for the Muslim inmates.

12        Q.     Okay.  So the food service director brought

13   food items in for Muslim inmates; is that right?

14        A.     I don't know that for certain.  I think that

15   could have been a possibility.  She has long since been

16   moved on.

17        Q.     Well, I mean, you say in violation of policy,

18   but I thought you said that the policy about bringing in

19   outside food items has only been around for two or three

20   years?

21        A.     That's correct.  That's correct.  So when I

22   talk about the violation -- I beg your pardon for

23   interrupting, was your statement complete?

24        Q.     When you say in violation of policy, what

25   policy were you referring to, then?

1        A.    I'm referring to -- we are not bound by

2    Policy 116.08, religious diets and feasts.

3        Q.    So you have a policy, but you're not bound by

4    the policy?

5        A.    We're not bound by that policy.  We don't do

6    religious feasts or religious diet.  And you know, we

7    spent those questions this morning, you know, talking

8    about that.  So the food service director had brought in

9    some items.  I think it would have been five Ramadans

10   ago by now.  And I can't remember what it was.

11       Q.    So you all have a policy of not following

12   TDOC policy?

13       A.    Well --

14             MR. WELBORN:  Object to the form.

15             THE WITNESS:  No, what I said was, is that

16   CoreCivic Tennessee is not bound by Policy 116.08,

17   religious diets and feasts.  So there was something

18   facilitated by the food service director that -- you

19   know, that didn't need to be done because we're not

20   bound by that policy.

21   BY MS. MAPLES:

22       Q.    So you also said that her bringing in food,

23   halal foods for the Muslims, was a violation of policy.

24   So I'm trying to figure out what policy that is.  I

25   understand that it's your position that you don't have

```
 1   to follow TDOC policy, but what policy was violated?

 2              MR. WELBORN:  Object to the form.

 3              THE WITNESS:  That's the one I'm referring

 4   to.

 5   BY MS. MAPLES:

 6        Q.   How does it violate if it doesn't apply to

 7   you?

 8        A.   Okay, I can stand corrected on my choice of

 9   words, violating.

10        Q.   Okay, so then what did she do if she didn't

11   violate policy?

12        A.   She acted independently.  She acted

13   independently outside of the religious service

14   department and board.

15        Q.   And you don't know anything about the

16   mechanism by which she was able to bring in outside

17   food?

18        A.   As far as I know, she could have brought just

19   in person.  I do not know.  And I was not present at the

20   serving of that food.

21        Q.   Do you all ever do things that you're not

22   required to do by a policy?

23        A.   Not that I am aware of.

24        Q.   Well, I mean, are you required by policy to

25   have a Christmas meal?
```

```
 1        A.     No.

 2        Q.     But you all do a Christmas meal, right?

 3        A.     Ma'am, I had mentioned earlier that I don't

 4   have visibility of how the menu is printed.  And there

 5   are many religions in that time frame of December, you

 6   know, the November, December, January time frame.  And

 7   that what does get served is typically periodical, with

 8   an addition of a food item or a dessert or something

 9   like that.

10        Q.     Is that the winter solstice meal?

11        A.     Why not?

12        Q.     Do you have Bible verses in your office?

13        A.     Do I have Bible verses?

14        Q.     Yeah.

15        A.     Well, I've got Bibles.

16        Q.     Do you have Bible verse like on a poster or

17   written on a plaque on your desk?

18        A.     I have one on my desk.

19        Q.     Have you ever pointed to it or gestured to it

20   while speaking to a Muslim inmate?

21        A.     Not to my recollection.

22        Q.     Is it possible that you did?

23        A.     I don't believe so.

24        Q.     But you don't remember?

25        A.     I would say I didn't do it.  That's not the
```

 1   way that I operate.

 2        Q.    Have you ever quoted Bible verses to Muslim

 3   inmates?

 4        A.    No.  It's not my position to proselytize to

 5   legitimize one faith over another.  I am all business.

 6   I am there to represent 93 religions.  I care about

 7   every single individual, every single man, his family,

 8   his religion and to facilitate it within the scope of

 9   policy, practice and the law.

10        Q.    Do you know anything about the contract

11   between Trinity and CoreCivic?

12        A.    I do not.

13        Q.    Are you familiar with special socks or

14   slippers called the kuffain?

15        A.    I really don't know.

16        Q.    Do you know what I'm referring to if I use

17   the word kuffain?

18        A.    Vaguely.

19        Q.    Okay, explain to me what your understanding

20   of kuffain are.

21        A.    It would be something that would be worn

22   during prayer.

23        Q.    By which individual?

24        A.    I beg your pardon.

25        Q.    By which individual?

1       A.    I don't know what you mean by what

2    individual, ma'am.

3       Q.    Well, I mean, do Christians wear kuffain or

4    are they specific to Muslims?

5       A.    Well, you know, according to RLUIPA, if you

6    have a sincerely held belief, any religion can wear

7    anything they want.

8       Q.    Do you think that's what I mean?

9       A.    I do.

10       Q.    Okay, well, what I'm asking is, as chaplain,

11    the person who is in charge of handling religious

12    accommodation requests at Trousdale, what your

13    understanding is of which faith group at Trousdale has

14    requested the kuffain?

15       A.    I know Mr. Pleasant-Bey did.

16       Q.    Okay, so is it your understanding that they

17    are somehow related to the Islamic faith?

18       A.    Can be.

19       Q.    Do you know of them to be associated with any

20    other faith?

21       A.    Ma'am, I'm not an expert on every faith

22    tenet.  I have to do research and consult subject matter

23    experts.

24       Q.    Well, I mean, you got a request about the

25    kuffain, so what research did you do?

1       A.     It was not on the individual faith item or

2    the group accommodation recognized by Tennessee

3    Department of Correction.

4       Q.     So you didn't do any other research other

5    than that?

6       A.     I mean, that's policy.  That's all the more I

7    need to do.  The request was made.  And I am not the

8    final authority on it.  I am the point of entry.  I

9    elevate it to those in Tennessee Religious Activity

10   Committee who is comprised of experts who consult imams.

11   So I am the point of entry.  I did not see it as

12   authorized property.  And as a result of not seeing it,

13   I think my recommendation was no.  It went through our

14   facility.  And the religious activity committee acted

15   and decided upon.

16      Q.     Do you have the ability to approve inmate

17   personal property items that are not listed on what is

18   permitted by the TDOC religious property item memo?

19      A.     I do not have that authority.

20      Q.     Does anyone at CoreCivic have that authority?

21      A.     No one has that authority.  We are bound by

22   contract to our customer.

23      Q.     What about prayer oil?  Do have any authority

24   in terms of prayer oil, or is that all determined by

25   TDOC policy?

1        A.      It's all predetermined by TDOC policy.

2        Q.      If you received a request concerning prayer

3   oil or the kuffain that was made by a group of inmates

4   as opposed to an individual inmate, let's say that they

5   used these items just during a service, do you have

6   authority to grant those requests, or is that determined

7   by TDOC policy?

8        A.      Okay, develop the question again about the

9   prayer room.

10       Q.      So items like the kuffain and the prayer oil,

11  which you have testified for inmates personal property

12  are determined by TDOC policy.  If a faith group came to

13  you and said, well, we went want to use these items just

14  during our service in the chapel, do you have the

15  authority to grant those requests or would that be

16  determined by TDOC policy as well?

17       A.      They do use prayer oil during their services.

18  Prayer oil is available through Union supply,

19  Tennessee's vendor.  They do use prayer oil.  The other

20  item, since it's not on the authorized religious

21  property, their option would be to file a grievance,

22  state their case on why or litigation on why they need

23  it and to be able to justify it.

24       Q.      I'm just trying to figure out who has the

25  power over certain situations, right?  Any religious

1    item that is not permitted on the inmate personal

2    property list, you know, for religious items, but a

3    group wants to purchase for use during a service, do you

4    have the authority to grant the purchase of that item

5    during a service?

6         A.    Okay, first of all, I want to mention that

7    when it comes to a group property, the facility has a

8    responsibility to facilitate it, to procure it.  It's

9    not an individual's responsibility to purchase for the

10   group.  That is our responsibility to facilitate it for

11   procurement.

12            Now, an individual item is an individual.  If

13   there is something that is not on the individual

14   property list, the point of entry would be an

15   individual, a religious accommodation request.  It would

16   be submitted to me as the chaplain, would be reviewed,

17   would go to the assistant warden for input.  That's not

18   the final decision.  They could say no.  I could say no.

19   They could say no.  It goes to the warden, he could say

20   no.  Then it goes to the religious activities committee

21   and they make a decision on whether they want to modify

22   the standing policy or deny.

23        Q.    So you can, in your own authority, approve an

24   item for use by a certain faith group during their

25   services that is not on the inmate religious items

1    personal property list?

2         A.    If something would be brought in that they

3    have that may not be on the list, that I'm not cognizant

4    of, I guess they would use it.  Technically, it would be

5    considered religious contraband because it's not

6    authorized.  So I cannot testify to what the property is

7    of every inmate in his cell, in his property box.  I

8    have no visibility of that.  And if something is brought

9    out and it's passed -- it's gone through security into

10   the building and they didn't catch it and I didn't

11   notice it, I guess they're using it.

12            But as far as, Chaplain Shonebarger, can we

13   get this and do it in our service when it's not on the

14   religious policy memo, I don't have the authority to say

15   yes or no.  It has to be properly screened, submitted

16   and decided upon.

17        Q.    If you say yes and the people above you at

18   CoreCivic all say yes, does it automatically then go to

19   TDOC?

20        A.    The only CoreCivic employees that have a say

21   is the chaplain, assistant warden of treatment and the

22   warden.  They could all say no, submit it to TDOC, TDOC

23   says yes, and it's the law.

24        Q.    I just asked if everyone said yes.  I mean,

25   if you don't want to answer my questions, don't, but

1   we're going to be here the rest of the day.  I mean, I

2   can let you out early or we can stay until 6:00.  I

3   mean, it's up to you guys.  I'm asking if everyone says

4   yes, does it then go to TDOC?

5       A.    Yes.

6       Q.    So does it go to TDOC for ratification and

7   you're allowed to put it into practice after CoreCivic

8   approves it or does it have to be approved by TDOC

9   first?

10      A.    CoreCivic does not have a part of it.  The

11  chaplain, the assistant warden and the warden speaks on

12  behalf of CoreCivic.  Then it is submitted to the

13  religious activity committee at Tennessee Department of

14  Correction.  And they round table it, vetting it with

15  subject matter experts in faith tenets and make the

16  decision.  And then they advise the facility, the

17  warden, they advise the warden what that decision is.  I

18  usually get copied on the reply.

19      Q.    Are inmates permitted to have CD players?

20      A.    With the warden approval, I believe so.

21      Q.    Okay.  Do any inmates at Trousdale have CD

22  players?

23      A.    I don't know.

24      Q.    Have any inmates ever come to you requesting

25  that they be permitted to purchase CD players?

 1        A.    For themselves?

 2        Q.    Yes.

 3        A.    It could be a possibility, but I would

 4   redirect them to the warden.  It has to be submitted to

 5   the warden.

 6        Q.    Well, can you think of any reasons why an

 7   inmate might want to have a CD player in connection with

 8   his religion?

 9        A.    For the obvious reasons, to be able to

10   receive education.

11        Q.    Do you support individual inmates being able

12   to have CD players for religious education?

13        A.    Our policy says that -- our mail room policy

14   says that when there is an educational process going on

15   from an educational source or a school, that they would

16   be authorized with the warden or his designee's

17   approval.

18        Q.    Have you ever been a part of the denial of CD

19   players for individual inmates?

20        A.    I can't say that I remember.  I can't say

21   that I remember doing that.  I may have said, I can't

22   approve it, you have to take it to the warden.

23        Q.    Do Muslim inmates ever request to use the

24   chapel's CD player?

25        A.    Yes.

 1        Q.    Are Muslim inmates permitted to purchase

 2   educational materials related to the Islamic faith?

 3        A.    There are authorized publishers that they can

 4   order from.

 5        Q.    Which are those?

 6        A.    I don't have a list.  Any -- you know,

 7   virtually any book with an international book number,

 8   you can go to mom and pop and order that book.  There is

 9   a list in the mail room that they can inquire in the

10   mail room where they can order a book.

11        Q.    The Islamic --

12        A.    I want to revisit a point that I made earlier

13   about donations.

14        Q.    I'm sorry.  I'm going to have to object.

15   This isn't responsive to the question I just asked.  We

16   can't clarify previous answers whenever we feel like it.

17             MR. WELBORN:  He absolutely can do that.

18             MS. MAPLES:  Well, I am going to move to

19   strike everything he says, Joe, because it's not related

20   to the question I just asked.

21             MR. WELBORN:  Well, move away, Janna, but he

22   can absolutely do that.  If he remembers something in

23   the deposition and wants to correct it, he can

24   absolutely do that.  So if you want to do that, go

25   ahead.

Case 3:22-cv-00093   Document 33-9   Filed 05/04/22   Page 110 of 177 PageID #: 1433

     1                 THE WITNESS:  And I don't want to correct

     2      anything I said.  I want to highlight something I said.

     3      The highlight is I've got a good relationship with

     4      Muslim organizations.  And if there is an educational

     5      piece that is beneficial to the group, I'm not bashful

     6      to ask.  And we've had a tremendous relationship and

     7      success record in being able to facilitate what the

     8      inmates ask me to ask them.

     9                 MS. MAPLES:  Move to strike.  Nonresponsive

    10      to the question.

    11      BY MS. MAPLES:

    12           Q.    Which Islamic-based vendors are inmates

    13      permitted to purchase educational materials from?

    14           A.    The list of authorized sources is listed in

    15      the mail room.

    16           Q.    Is it your testimony that you don't know any

    17      of them?

    18           A.    My testimony is that we do a pretty good job

    19      of getting donations for those requests.  If it's an

    20      independent issue, the inmates all know that they could

    21      communicate with the mail room, get a name and follow

    22      through that way.

    23           Q.    Is it your testimony that you don't know a

    24      single Islamic vendor from which Muslim inmates can

    25      purchase educational materials?

Case 3:22-cv-00093   Document 33-9   Filed 05/04/22   Page 111 of 177 PageID #: 1434

```
 1       A.    I'm saying I can't recall.

 2       Q.    You don't know any of them?

 3       A.    I didn't say I didn't know, I said I can't

 4  recall.

 5       Q.    What about the Islamic Book Store?

 6       A.    I strongly believe that is one.

 7       Q.    Well, I think you testified earlier that it

 8  was one.  So does that mean that it is one or you just

 9  strongly believe it is?

10       A.    I believe they can get correspondence and

11  educational material through them.

12       Q.    So inmates can purchase educational material

13  from the Islamic Book Store, but not food items from the

14  Islamic book store?

15       A.    They can buy food items through Tennessee's

16  vendor, which is Union Supply.

17       Q.    If an inmate wants to purchase educational

18  materials from the Islamic Book Store, do they have to

19  get your permission first?

20       A.    What they need to get permission from me

21  about would be property.  For example, there are prayer

22  rugs available through our vendor.  But if they say they

23  wanted a certain color and they know that Medina has it,

24  proper procedure is, if you're not going to use -- or

25  it's not available through Union Supply, you would go to
```

 1    the chaplain and get the approval, with the assistant

 2    warden and the warden's approval.  Ma'am, I am not asked

 3    about food items.

 4        Q.    If an inmate wants to purchase educational

 5    materials through an Islamic vendor, do they have to get

 6    your permission?

 7        A.    You're talking about college?  What kind of

 8    educational material, ma'am?

 9        Q.    Any.

10        A.    Well, there's different kinds of education.

11    If it's a school by which you're getting a degree, there

12    are certain steps in approval with the education

13    department and the warden that would require approval.

14    And maybe the acquisition of a CD player and so forth.

15    Maybe even the need of a proctor to be assigned.

16              For a single book, which I would deem

17    educational, there are any number of places.  You don't

18    have to go to an Islamic vendor.  I mean, you can go to

19    Barnes and Noble and get something.  So if they want to

20    be able to get a book through one of the book stores,

21    they can do it.

22        Q.    Do they need your permission to do it?

23        A.    No.

24        Q.    Is there anything that an inmate can purchase

25    from an Islamic vendor that does not need your approval?

1       A.    All property items, prayer oil bottle, a

2   religious rug, a kouffi, is a property item that would

3   have to be individual authorized items.  If they were

4   not available through our vendor, the policy tells me to

5   find a vendor, get the appropriate senior leadership

6   approval and the inmate can then procure.

7       Q.    Have you ever spoken to any member of

8   CoreCivic leadership about halal foods during and after

9   Ramadan?

10      A.    It's a conversation piece for every chaplain

11  serving in a prison.  Sure.  I mean, chaplain's

12  meetings, conference call, sure.

13      Q.    Who did you talk to?

14      A.    What do you mean, ma'am?

15      Q.    Well, have you talked to -- does CoreCivic

16  have a head chaplain?

17      A.    Yes, Mr. Darnell was chief chaplain until, I

18  don't know, August or something like that.

19      Q.    Was Mr. Darnell chief chaplain with CoreCivic

20  or with TDOC?

21      A.    Both.  He was at TDOC first and then he went

22  to CoreCivic.

23      Q.    Did you have conversations with him about

24  halal foods?

25      A.    I'm sure I did.  I'm sure I have.

 1        Q.    Do you recall the content of those

 2   discussions?

 3        A.    I think one of the -- probably one of the

 4   more key points is talking about CoreCivic Tennessee and

 5   our relationship with TDOC.  And although he was on at

 6   TDOC, he would review each state and how things are

 7   done.

 8        Q.    What specifically did he say about halal

 9   foods?

10        A.    I can't recall what he said.  I mean, you

11   would have to specific.

12        Q.    Well, I'm asking for everything you recall.

13        A.    What I recall is, is that there is a clear

14   practice of an alternative tray to be used by religious

15   inmates.  It's a law.  So we are in compliance.

16             MS. MAPLES:  Joe, you're going to have to be

17   on camera.

18             MR. WELBORN:  Why?

19             MS. MAPLES:  Because that's how this works.

20   The witness is turning in his chair, looking at you.

21   You are not on camera.  There are people in the room

22   with the witness.  I mean, come on.

23             MR. WELBORN:  Janna, what are you accusing me

24   of?

25             MS. MAPLES:  Nothing.  I'm just saying it's

1   absolutely standard for people in the room --

2            MR. WELBORN:  Our setup here, because it is

3   Zoom, I'm about two feet from him now.  I'm out of the

4   picture to give the witness room.  So ask your

5   questions.

6            MS. MAPLES:  Joe, you have two different

7   computers set up.  All you would have to do is angle the

8   computer about an inch one way or the other.  Come on.

9   I mean, don't be ridiculous.  You would have to move the

10  computer very slightly.  You're refusing to put an

11  attorney on the camera which would be very easy to do?

12           MR. WELBORN:  No, Janna, I am sitting where I

13  am sitting.  I am not doing anything other than sitting

14  here.  Ask your questions and quit worrying about this

15  stuff.

16           MS. MAPLES:  This is standard practice, Joe.

17  I mean, this would be a stupid thing to have to do

18  motion practice on because you won't put objecting

19  attorneys in the room with the witness on camera.  I'd

20  hate to have to do all of these in person because you

21  don't want to put your face on camera.  Is that where we

22  are?

23           MR. WELBORN:  Here I am.

24           MS. MAPLES:  Okay, I guess we'll do them all

25  in person.

Case 3:22-cv-00093   Document 33-9   Filed 05/04/22   Page 116 of 177 PageID #: 1439

```
 1              MR. WELBORN:  What is your problem?  What are

 2    you worried about?

 3              MS. MAPLES:  Joe, it's really just --

 4              MR. WELBORN:  Answer the question, what are

 5    you worried about?

 6              MS. MAPLES:  I am not going to have lengthy

 7    discussions about this with you on the record.  I've

 8    asked multiple times to just...

 9              MR. WELBORN:  Let's go off the record.

10              (Off-the-record discussion.)

11              MS. MAPLES:  I'm going to put another

12    document in front of you.

13              (Exhibit 5 was marked.)

14    BY MS. MAPLES:

15        Q.   Mr. Shonebarger, do you recognize this

16    document?

17        A.   Can you continue to scroll down, please?  I

18    do recognize it.

19        Q.   Okay, in what context was this affidavit

20    created?

21        A.   Um, there was some kind of a legal action.

22    Emergency action I think.  I certainly don't know all of

23    the legal components.  But basically, I was asked to

24    make a statement in reference to the Eid feast, if I

25    remember correctly, from a couple of years ago.
```

```
 1      Q.    Okay, and do you see No. 8?

 2      A.    I'm looking at it, ma'am, yes.

 3      Q.    Do you need a second to read it?

 4      A.    No, I've got it.

 5      Q.    Is this the description that you gave of the

 6  rationale for the change in TDOC and CoreCivic policy

 7  regarding donated food?

 8      A.    Yes.

 9      Q.    Is this an accurate statement of the

10  rationale behind those policies?

11      A.    That's a true statement.

12      Q.    Is it a complete rationale for the policies

13  concerning donated food items?

14      A.    I can't remember, without reading the entire

15  document, whether there was other features.

16      Q.    Well, I am going to give you control of the

17  document and you can read it.

18      A.    Restate your question.

19      Q.    I was asking if No. 8 provides a complete

20  rationale behind the policy concerning donating food

21  items?

22      A.    That was my understanding.

23      Q.    And Nos. 11 and 12, when you're referring to

24  halal food items available to Muslim inmates, are the

25  only halal food items vegetarian options, as referenced
```

 1    in No. 12?

 2         A.      Restate the question, please.

 3         Q.      In this affidavit, you reference halal food

 4    items that are available to Muslim inmates.

 5         A.      Correct.

 6         Q.      Are the only halal food items available to

 7    Muslim inmates vegetarian options?

 8         A.      Yes.  Let me strike that.  The only non-halal

 9    on the regular tray would be the meat.  The alternative

10    tray is 100 percent halal.

11         Q.      I'm not trying to trick you.  I'm just making

12    sure that the only halal items, food items offered to

13    inmates are vegetarian; is that right?

14         A.      No.  The regular tray is halal, with the

15    exception of the meat.  The alternative tray, call it

16    vegetarian if you wish, is 100 percent halal.

17         Q.      What halal items do you have that are meat?

18         A.      We don't have any.

19         Q.      Okay.  Are you drawing a distinction between

20    vegetarian and non-meat?

21         A.      Not being a dietitian, I don't know.  I don't

22    want to misstate what a vegetarian diet is.  I am not an

23    expert on anything that makes up a vegetarian diet.  I

24    like, personally, to use the term fleshless, whether it

25    be beef or chicken or whatever.  You know, certainly not

1    pork.  But that's where I am coming from.

2         Q.    Okay.  Can Muslim centers or organizations

3    donate packaged foods?

4         A.    If they volunteer to.  We haven't had that

5    luxury.

6         Q.    Do you attend the Taleem and Jummah services?

7         A.    I am outside -- I am in an office with my

8    door open and they are right outside in the chapel.  I

9    will clarify.  The fact that I am off, my regular day

10   off is Friday.  So I would not be witness to Jummah.

11   There have been Jummahs in my four-and-a-half-year

12   tenure that I have witnessed.  But as a manner of

13   observing my calendar, I'm not there on Friday.  So I do

14   observe the Taleem service.  And remember, we have two

15   chapels.

16        Q.    Have you received a request that inmates get

17   prayer oil purchased from an Islamic vendor?

18        A.    Early on in my tenure there was.

19        Q.    And was that something that you just had to

20   refer to TDOC, you didn't have authority over it?

21        A.    I quoted the policy.  I mean, TDOC had

22   already spoken.  Their statement was made in the policy.

23   So if there was any quarrel with the policy, they could

24   grieve it.

25        Q.    Are you aware that Muslim women are permitted

 1    to wear a hijab?

 2              MR. WELBORN:  Object to the form.

 3              THE WITNESS:  Ma'am, I don't.  I've never

 4    been a chaplain at a women's prison.

 5    BY MS. MAPLES:

 6       Q.    Have you received requests concerning the way

 7    that Muslim male inmates dress?

 8       A.    I -- I'm trying to think about Mr.

 9    Pleasant-Bey's accommodation that could have been --

10    other than the prayer sandals, there could have been

11    something that addressed that.

12       Q.    Would all requests go through TDOC or would

13    you have any authority over that?

14       A.    All goes through TDOC.  Unless there is a

15    stated position against it -- you know, if it's against

16    it, they can always grieve it or litigate it.  But the

17    process, the mechanism for consideration and

18    facilitation is done the same way.

19       Q.    If there is a certain accommodation that has

20    been permitted at a different facility, how much weight

21    do you give that accommodation when it's requested by an

22    inmate at Trousdale?

23       A.    The only example in my Tennessee chaplaincy

24    was Mr. Pleasant-Bey with the Arabic class and the

25    Hebrew class with Mr. Song.  Those two.  Those two.

1          Q.    Are you saying that the Koranic studies class

2    was available at a different facility?

3          A.    It was denied at another facility.  I believe

4    it was denied.  But it's a moot point because every

5    facility evaluates according to their point of view.

6    And as was answered by Mr. Darnell and Mr. Pleasant-Bey,

7    they don't carry over from facility to facility.

8          Q.    I understand.  That's why I'm asking how much

9    weight you give a decision that's been made by another

10   facility.  If another facility says it's okay and we

11   think it's a good idea, do you take that into

12   consideration or do you just ignore that?

13         A.    Oh, sure, I consider it.  You also have to

14   consider, you know, those that we're a part of it and so

15   forth like that.  I mean, are they still -- was it ten

16   years ago and there's a policy change.  Safety

17   consideration.  There's any number of factors within the

18   framework of corrections that needs to be evaluated into

19   realtime.  So all of these mechanisms are laid out.  All

20   of these thought processes are laid out.  All of the

21   options are laid out.

22              You know, I'm not, as a chaplain, looking for

23   reasons for denial.  I am looking for reasons for

24   facilitation.  And if there's reasons why it must be

25   denied, I need to be diligent and do my due diligence

```
 1   and be honest.

 2        Q.    How often do you have discussions with the

 3   warden at Trousdale?

 4        A.    Minimal.

 5        Q.    How often do you have conversations with

 6   CoreCivic executives?

 7        A.    Please define executives.

 8        Q.    Vice president, president, chief operating

 9   officer, chief executive officer.

10        A.    Rarely to the managing director.  And rarely

11   with the vice president.  The vice president used to be

12   the managing director.  And at most, it's chit-chat,

13   talking football or something like that.  It is not

14   talking about the policy or about pertaining to

15   religion.

16        Q.    Who do you report to?

17        A.    We're very -- I am held accountable with the

18   exception to go through my chain of command.  CoreCivic

19   is a very chain-of-command-oriented organization.  And

20   my constant conversation throughout the day is with my

21   assistant warden.

22        Q.    Who do you report to?

23        A.    Assistant Warden Wattwood.

24              MS. MAPLES:  I'm going to put another

25   document in front of you.
```

1               (Exhibit 6 was marked.)

2    BY MS. MAPLES:

3         Q.    Do you see that this is an e-mail chain

4    between you and Brian Darnell?

5         A.    Yes.

6         Q.    And I recall you earlier mentioning that

7    there was a situation in which Mr. Pleasant-Bey received

8    a delayed response from Mr. Darnell.  Is this the

9    situation you were referring to?

10        A.    I think so, but let me...

11        Q.    Go ahead.

12        A.    Mr. Pleasant-Bey, several times would bypass

13   me and directly -- and direct his correspondence to the

14   central office.

15        Q.    Let me know when you get done.

16        A.    What is your question, ma'am?

17        Q.    My question was, is this the e-mail chain and

18   correspondence that you referred to earlier when you

19   said that there was an accommodation request that it

20   took several months for Mr. Pleasant-Bey to receive a

21   response to?

22        A.    The religious activity committee has, I

23   believe, a few months to respond.  Mr. Darnell, Reverend

24   Darnell, chairs the religious activity committee.  And

25   he was late.

1       Q.    How long does the religious activity

2   committee have to respond?

3       A.    I believe they have -- they want it submitted

4   by the -- it's quarterly.  They want it received like at

5   the end of the quarter.  And they have -- I don't have

6   the policy in front of me.  And I'll restate.  I've had

7   so few religious activity -- religious accommodation

8   requests that I'm a little foggy on that right now.  And

9   certainly, if I was to receive one today, I would retune

10  my memory on what their timeline is.

11      Q.    Well, it looks like, based on your e-mail

12  here, that you're saying, on November 24th on 2018:  I

13  am following up on the religious accommodation request

14  from Boaz Pleasant-Bey 473110 -- I'm sorry, can you stop

15  scrolling while I'm trying to read?

16      A.    I beg your pardon.  I didn't realize.

17      Q.    Strike that.  Do you see that on October 24th

18  of 2018, you have written:  I am following up on the

19  religious accommodation request from Boaz Pleasant-Bey

20  473110.  Our TTCC submission to the RAC was in May.

21  Please advise.  Thanks.

22      A.    Yes, ma'am.  What is your question?

23      Q.    My question was did you see it?

24      A.    Yes, ma'am.

25      Q.    My next question is, do you see that you

Page 126

```
 1   submitted it to TDOC in May?

 2        A.    Yes, ma'am.

 3        Q.    Right?

 4        A.    Yes, ma'am.

 5        Q.    You followed up on it in October; is that

 6   right?

 7        A.    Yes, ma'am.

 8        Q.    And it looks like he responds on October

 9   24th, right?

10        A.    Yes, ma'am.

11        Q.    But then it looks like you don't get an

12   answer until January of 2019; is that right?

13        A.    What Mr. Pleasant-Bey had done is transfer

14   facilities and had been denied at his previous facility.

15   Now he comes to Trousdale and is asking for the same

16   thing at a different facility.  Mr. Darnell is telling

17   Mr. Pleasant-Bey, you keep asking the same question.

18        Q.    Well, you said every facility is independent

19   and they all can evaluate the request and make their own

20   assessment and completely independent from each other,

21   so why wouldn't --

22             MR. WELBORN:  Object to the form.

23   BY MS. MAPLES:

24        Q.    Go ahead.

25        A.    Go ahead, ma'am.
```

1      Q.     That was my question.

2      A.     I'm not privy to the correspondence that he,

3  Darnell had with Mr. Pleasant-Bey in the past, previous

4  to Trousdale.

5      Q.     Well, this exhibit is all Trousdale

6  correspondence.  So I am asking about it.  I am asking

7  you if you submitted a request to the religious activity

8  committee in May, asked for a follow-up in October and

9  then got an answer in January of 2019, if that's your

10  understanding of what is going on in this exhibit?

11      A.     Okay, this document I have in front of me is

12  from Darnell to Pleasant-Bey.  And I can't see down

13  below.  I obviously was copied on it.  Yeah, I was

14  copied on it.  In the second paragraph is referenced the

15  religious accommodation that was submitted by --

16  initiated with me through my chain of command to the

17  religious activity committee.  Mr. Darnell states that

18  continuing independent inquiries by Mr. Pleasant-Bey

19  outside of the proper channels is not helpful.

20      Q.     Well, I mean, if he hasn't received a

21  response for seven months, do you think it's reasonable

22  that he try something else, or do you think he should

23  just keep waiting?

24      A.     No, I think he should come to me.  There was

25  no evidence that I had -- you know, let me say this:

1   Obviously, my eye is on the ball.  Let me go back to the

2   original submission -- let's see here.  I had -- I had

3   said that there got to be a point where Mr. Pleasant-Bey

4   wasn't coming to me, whether it be through grievances or

5   litigation or other decisions.  And certainly, my eye is

6   on the ball.  I want to be able to have timely responses

7   from the central office, just so I can do my due

8   diligence and answer the inmate.

9          But I don't have, you know, a copy of any of

10  the correspondences between central office and Mr.

11  Pleasant-Bey.  That would be, you know, them.  I wasn't

12  included, obviously.

13       Q.   So you're saying, obviously, you were on the

14  ball because you submitted it in May and then you sent a

15  follow-up e-mail five months later in October.  So

16  obviously, you were on the ball?

17       A.   One of the observations in this e-mail chain

18  was Mr. Darnell's comment that he was on the road.  I

19  was making phone messages to him.  I had followed up

20  verbally without response.  And I finally got an answer,

21  but...

22       Q.   Well, it says, let's see:  Forgive my prior

23  lack of response during my year end travel extravaganza

24  for departmental programming improvement.  Is that what

25  you're referring to as him being on the road?

1      A.    It is.

2      Q.    So in addition to this e-mail exchange,

3 you're saying you also tried multiple times by phone to

4 get a response?

5      A.    I did.

6      Q.    Do you often have a difficult time getting a

7 response from TDOC on religious issues?

8      A.    I have a contract monitor on site, that when

9 I need answers, I can always seek them out.  When it

10 comes to the religious activity committee, my contract

11 monitor can make an inquiry.  I do have access, as I

12 stated, with Mr. Brun and Mr. Walton.

13     Q.    Do you often have a difficult time getting

14 responses from Brian Darnell on religious issues?

15     A.    Well, you know, Mr. Darnell is no longer an

16 employee of TDOC or CoreCivic, so whatever may have

17 happened in the past is, you know, historical.

18     Q.    Is it your understanding that I am not

19 allowed to ask you about anything historical?

20     A.    I beg your pardon?  Repeat, ma'am.

21     Q.    When Mr. Darnell was employed at TDOC, did

22 you often have trouble getting a response from Mr.

23 Darnell concerning religious issues?

24     A.    Well, I think the correspondence demonstrates

25 that.

```
 1        Q.    Well, it indicates that it happened one time

 2   for sure.  I'm asking if this was something that

 3   happened many times?

 4        A.    I can't recollect that.

 5        Q.    You don't know the responsiveness of Mr.

 6   Darnell?

 7        A.    I can't remember.  You know, I consider this

 8   a priority.  And Mr. Darnell stated that there were

 9   conflicts with his work load.

10        Q.    With his travel extravaganzas, you mean?

11              MR. WELBORN:  Object to the form.

12              THE WITNESS:  Whatever it may be.  You know,

13   he's obviously not reportable to me about his schedule.

14   BY MS. MAPLES:

15        Q.    Have you often had trouble getting timely

16   responses from the religious activities committee at

17   TDOC?

18        A.    I've only had two.  So the first one, no, I

19   had no problem.  That had to do with the Hebrew and

20   Greek class when the director was Deborah Thompson.  And

21   then the one we're talking about now with Mr. Darnell.

22        Q.    Do you keep records of all of the religious

23   accommodation requests that you receive?

24        A.    I do.

25        Q.    And you have copies of those?
```

Page 131

```
 1        A.    My attorney has that.

 2        Q.    It just -- it seems strange that there's only

 3   two of them.  Are you certain that you haven't received

 4   additional ones?

 5        A.    I have not had any since Mr. Pleasant-Bey.

 6   That's the last one I received.

 7        Q.    Well, are they going to the other chaplain or

 8   do all of them come to you?

 9        A.    Well, I am not aware -- I am not aware of

10   any.  He came onboard in October.  I don't know of any

11   that have been submitted.

12        Q.    Well, I'm talking about other chaplains since

13   you've been there.

14        A.    None.

15        Q.    Do you find it shocking that you've only had

16   two religious accommodation requests since 2016?

17        A.    No.

18        Q.    Why not?

19        A.    I think our population has a large piece to

20   that.  Our guys are, I had stated, approximately 1800

21   Christians.  You know, to be able to have a chapel

22   service or a discussion group doesn't require anything

23   out of the norm above and beyond something that has been

24   newly discovered that needs to be approved or

25   disapproved.  And the same thing with the other faiths.
```

Page 132

```
1    You know, the faiths are established.  Practices are in

2    place.  Guys know what they can do.  And we're following

3    -- you know, we take care of them.

4         Q.    I'm going to share another document.

5               MR. WELBORN:  Before you do that, Janna, I've

6    got to turn this over to Erin.  We may need to take a

7    break so she can come over.

8               MS. MAPLES:  Okay, whatever you all need to

9    do.  Do you want to go off the record?

10              MR. WELBORN:  Yes.

11              (Recess observed.)

12   BY MS. MAPLES:

13        Q.    Mr. Shonebarger, I'm about to show you

14   another document.  This is a series of documents that

15   have been combined into one collective exhibit.

16              (Exhibit 7 was marked.)

17   BY MS. MAPLES:

18        Q.    I'm going to give you control so that you can

19   scroll through.  You can go ahead and scroll through and

20   let me know when you get done.

21        A.    Okay, ma'am, go ahead and proceed.

22        Q.    Okay, do you see that this collective exhibit

23   involves some requests from a Jewish inmate?

24        A.    Yes.

25        Q.    And do you see that this e-mail from you
```

1    dated November 28th of 2017 states:  Be aware that when

2    I spoke to Director Thompson about the lack of a group

3    of inmates, she directed me not to query the TTCC

4    population for interested inmates.

5         A.    I see that.

6         Q.    Do you recall the event?

7         A.    I do.

8         Q.    And why would the director tell you not to

9    determine if there are additional Jewish inmates that

10   want a group service?

11        A.    Because if an inmate has a sincerely held

12   belief concerning his faith, he would pursue that with

13   the point of entry, which is the chaplain.  There had

14   been no other inquiries about the Jewish faith, other

15   than Inmate Steakley.  Number two, the director made it

16   very clear to me, I cannot proselytize on behalf of

17   another religion.

18        Q.    What do you mean the director made it clear

19   to you you cannot proselytize?

20        A.    That means I cannot go into living units, I

21   cannot go into pods and say, do you want to be Jewish?

22   Do you want to be Jewish?  Do you want to be Jewish?  Do

23   you want to be Jewish?  If an inmate has a sincerely

24   held belief, they will pursue the practice of their

25   sincerely held belief and will receive satisfaction

1    through the chaplain's office.  It's the inmate's

2    responsibility to pursue his faith, not the chaplain to

3    chase after inmates.

4        Q.   Do you see at the bottom of this collective

5    exhibit, the last page is Bates stamped in the bottom

6    right-hand corner CCI 00097 -- strike that.  Do you see

7    that on the last page of this collective exhibit, there

8    is a document that is Bates stamped in the bottom

9    right-hand corner CCI 000792?

10       A.   I do see that.

11       Q.   Do you see that this is a memo that you've

12   written or co-authored with Chaplain Tom Simic to Warden

13   Russell Washburn?

14       A.   Through my assistant warden for the religious

15   accommodation as is directed within Policy 118.01.

16       Q.   Now, is this one of the two religious

17   accommodations you've received or is this perhaps a

18   third?

19       A.   Yeah, I had forgotten about this one.

20       Q.   And do you see that the Nation of Islam faith

21   is requesting certain accommodations concerning DVDs,

22   CDs and texts?

23       A.   In this particular graph here on this

24   particular letter -- memo?

25       Q.   Yes.

```
 1       A.    Which paragraph are you referring to, ma'am?

 2       Q.    Paragraph 2.

 3       A.    Okay.  I was thinking we were still on Mr.

 4  Steakley.  Give me just a moment.  What is your

 5  question, ma'am?

 6       Q.    Well, the question is, if this is a Nation of

 7  Islam request that they be permitted to receive and

 8  purchase DVDs, CDs, and texts?

 9       A.    Okay, continue.  I don't know what you're

10  asking me.

11       Q.    I'm asking if you see that this memo concerns

12  --

13       A.    I do.  Yes, ma'am.  I see.

14       Q.    Okay.

15       A.    Thank you.

16       Q.    And it looks like in Paragraph 4, you state

17  to answer 7B:  I recommend we submit this reply to the

18  TDOC slash RAC.  Approval with modification.  The Nation

19  of Islam faith group may request religious program

20  materials in writing to the religious services

21  department at Trousdale Turner Correctional Center.

22  Upon review and approval, procurement of group faith

23  material will be acquired from vendors at the discretion

24  of the facility.  The assistant warden of treatment

25  approves all purchases.  Inmates are prohibited by TDOC
```

 1    policy 507.02 Section 6E to purchase electronic media

 2    themselves.

 3         A.    Correct.

 4         Q.    Do you recall this?

 5         A.    Yes.

 6         Q.    So is this a case that all requests for

 7    religious texts and electronic media come through you?

 8         A.    When it's educational, as has been stated, it

 9    would be approved through the warden for a faith group.

10    Faith group supplies property as mandated for the

11    facility for purchase.  The Nation of Islam does not

12    have that.  There was nothing mandated by Tennessee for

13    us to buy.  So any interest that they may have in

14    studying a particular subject should be submitted, a

15    request submitted for consideration.  It would be

16    evaluated and recommended by the chaplain, the assistant

17    warden.  If approved, it would then be procured.

18         Q.    Have you received any written requests for

19    religious program materials?

20         A.    From who?  From the Nation of Islam?

21         Q.    From any Muslim inmates.

22         A.    I have been able to get religious donations,

23    educational materials for the Sunni inmates.  It may be

24    important for you to understand, at the time of this

25    writing, Final Call -- at the time of this writing,

Page 137

1    Final Call was not authorized as a vendor in the State

2    of Tennessee.  I appealed -- I appealed to the assistant

3    commissioner, Vicki Freeman, and identified my concern

4    that we can't blanket -- this approved a single vendor.

5    And it has to stand-alone on its own merit.

6              That saying, final call is now authorized in

7    the State of Tennessee, but would be filtered against

8    mail room policies concerning hate speech, gang

9    activity, pornography, things of that nature.

10      Q.    Have you received any written request for

11   religious program materials from Muslim inmates?

12      A.    I would say there probably was from the

13   Nation of Islam.

14      Q.    How about from the Sunni Muslims?

15      A.    I can't recall any.  And as I repeated, you

16   know, through the day, the things that they're looking

17   for, I have always been able to get a donation.  So we

18   haven't had to buy it.

19      Q.    All I'm asking is have you received written

20   requests from Sunni Muslims concerning religious program

21   material?

22      A.    And I'm saying I don't recall any Sunni

23   Muslim request.  I do not recall any.

24      Q.    Okay.

25      A.    Now, there could be verbal, but not written.

1      Q.    Okay.  I'm going to show you another set of

2    documents.  I'm going to allow you to control the screen

3    so you can scroll through those.

4      A.    Okay, ma'am.

5      Q.    Okay, do you see that there is a series of

6    exchanges concerning the Koranic Arabic studies class?

7      A.    Yes.

8      Q.    And do you see that, as you previously

9    stated, you recommended that that not be approved?

10     A.    As a stand alone program, that is correct.

11     Q.    And do you see that you state:  The

12   opportunity to learn Arabic can be accomplished in the

13   weekly Sunni Taleem religious program?

14     A.    Yes, ma'am, that's been my historical

15   position.

16     Q.    Well, didn't you also say earlier that you

17   didn't approve this program because it's not a religious

18   program?

19          MS. POLLY:  Object to the form.  You can

20   answer.

21          THE WITNESS:  When we talked about Mr. Song's

22   religious accommodation coming from Northeast, he had

23   taught it there.  When I came on board in 2016, he

24   submitted a request that the prison, that our

25   leadership, beginning with myself through the warden,

1  disapproved.  Recommended disapproval.  Recommended to

2  the religious activity committee disapproval because it

3  was not a religion.

4          Deborah Thompson, who was director at the

5  time, disagreed and authorized the facilitation of the

6  Hebrew Greek study class.  Mr. Tarver was the precursor

7  to Mr. Pleasant-Bey in the request of a stand-alone

8  class.  My position has historically been, there is up

9  to four hours twice a week, eight hours, including out

10  counts, to include Arabic language study.

11  BY MS. MAPLES:

12      Q.    Are you done with your answer?

13      A.    Yes, ma'am.

14      Q.    Here's what I'm asking:  I'm asking if, in

15  your opinion, an Arabic study class is religious or not

16  religious?

17      A.    Not religious.

18      Q.    So you're saying --

19      A.    It has to be a religion.  The policy says it

20  has to be a religion.  Not religious, a religion.  A

21  recognized religion, one of the 93.  Arabic Greek or

22  Arabic is not a religion recognized by the State of

23  Tennessee.  Hebrew Greek is not a religion recognized by

24  the State of Tennessee.

25      Q.    Well, it says Koranic Arabic studies, right?

1       A.    Their ultimate desire would be able to

2   translate Arabic for the Koran or other application.  So

3   it would be a perfect fit for their Taleem and Jummah

4   services.

5       Q.    Well, and that's kind of what I am a little

6   bit confused about because you're saying it's not a

7   religion, not related to religion, but you're also

8   saying that they need to address it during their

9   religious service.

10              MS. POLLY:  Object to the form.  You can

11   answer.

12   BY MS. MAPLES:

13       Q.    Well, let me finish the question.  So do you

14   see that there is a little bit of dissonance there?

15              MS. POLLY:  Object to the form.

16              THE WITNESS:  No, not at all.  I have stated

17   earlier today that I'm not going to stand in judgment of

18   their religious service.  If they are peaceable and want

19   to discuss anything amongst themselves as a community,

20   they can do that.  To include introduction of an Arabic

21   language or an article from a magazine.  Anything they

22   wish.  So if they're going to meet together, it's going

23   to be during one of those two services.

24   BY MS. MAPLES:

25       Q.    Why don't Christians just get two four-hour

1    blocks, then?  Why do Christians --

2         A.    Well, if the --

3         Q.    I am sorry, let me finish my question.  Why

4    don't -- why do Christians get a class taught by you, a

5    service taught by somebody else, a discipleship study?

6    You know, why doesn't everybody just get two four-hour

7    blocks a week where they have to cram everything in?

8              MS. POLLY:  Object to the form.

9              THE WITNESS:  Ma'am, the fact of the matter

10   is, their requests for spending time during the out

11   count, not going back to their housing unit is rare.

12   It's rare.  They have that available.  They have it

13   available on request.  They don't -- they usually don't

14   even ask.  They're not cramming anything.  They're

15   usually trying to determine on how to fill up their

16   time.

17             Now, as far as how the schedule is made, as I

18   said earlier today, it has to do with the population of

19   the facility.  When I have 1800 inmates, in order to try

20   to facilitate opportunities for the population, with

21   that ratio, there is going to be more Christian

22   services.

23   BY MS. MAPLES:

24        Q.    Do you often sit in religious services for

25   four hours?

1       A.   I am right outside the door.

2       Q.   No, that's not what I mean.  I mean, do you

3   personally, in your observance of your own faith,

4   regularly sit in four-hour long religious services?

5       A.   In the course of my chaplaincy, yes.

6       Q.   No, I am talking about you personally.

7       A.   I'm talking about me personally.  Yeah, I

8   mean, there's seminars.  There's all -- any number of

9   things potentially through programming and special

10  programming that would require my facilitation, my

11  coordination with volunteers with my presence and so

12  forth.  The answer is yes.

13      Q.   Well, all of that sounds professional, not

14  personal.  I am asking you if, in the observance of your

15  personal faith as a Christian, you regularly sit in

16  services that last four hours?

17      A.   I don't.

18      Q.   Right.  And is that because sitting for four

19  hours twice a week could be somewhat inconvenient?

20      A.   Well, probably --

21           MS. POLLY:  Object to the form.

22           THE WITNESS:  The person offering the

23  services didn't want to go that long, probably.

24           MS. MAPLES:  That makes a lot of sense.

25           (Exhibit 8 was marked.)

 1   BY MS. MAPLES:

 2        Q.    Do you see you have in front of you an

 3   affidavit by an individual named Aaron Williams?

 4        A.    I see it.

 5        Q.    Do you know who Aaron Williams is?

 6        A.    I do.

 7        Q.    He was a chaplain's aid; is that right?

 8        A.    For a time.

 9        Q.    Well, in the affidavit it says from 2016

10   through December of 2019; is that right?

11        A.    That sounds about right.

12        Q.    So you say for a time.  So for like three

13   years, right?

14        A.    Yeah, he was.  He was fired by the warden.

15        Q.    That's non-responsive to my question.  What

16   I'm asking you is --

17        A.    During that tenure, yes.  He was there during

18   that tenure.

19        Q.    So three years, right?  I am sorry, are you

20   going to answer my question?

21             MS. POLLY:  He said yes three times now.

22             THE WITNESS:  Ma'am, I've said yes.

23   BY MS. MAPLES:

24        Q.    Do you see that he's typed up a number of

25   things here and signed it concerning you and your

1    performance as chaplain?

2        A.    I see it.

3        Q.    Now, a couple of them, we've already

4    discussed.  Do you see that No. 10 says:  There are

5    several Islamic sponsors who would accompany me at every

6    prison I am transferred to, who would, in parenthesis,

7    mysteriously never be able to come to TTCC at any time

8    when Mr. Shonebarger called them to schedule time for

9    them to come to TTCC for the Islamic community to give

10   speeches.

11       A.    I see that statement.

12       Q.    Do you see that Mr. Williams is stating that

13   you had been unable to bring in Islamic sponsors to

14   speak to the Islamic community?

15       A.    I see that.

16       Q.    Did Mr. Williams ever give you the names of

17   any individuals from the Islamic community that he

18   recommended would be willing to come to Trousdale to

19   speak?

20       A.    Yeah, not only did he do that, but he also

21   gave me the names of ones that he considered not

22   appropriate.

23       Q.    Did you reach out to the ones that were

24   recommended by Mr. Williams?

25       A.    My course of action in the active pursuit of

Page 145

1   volunteers, as Trousdale's volunteer coordinator, is to

2   talk to central office, beginning with central office

3   chief chaplain, talk about who may be recognized, may be

4   volunteering across the state.  There's documentation

5   showing that I made every attempt to recruit.

6          The key word is volunteer.  And Hartsville,

7   Tennessee is a part of Middle Tennessee.  And there are

8   numerous prison opportunities within the greater

9   Nashville area.  I haven't found anybody that is

10  interested that wants to come to Trousdale, take up

11  their time, their money, their gas, et cetera.  I

12  haven't found any.

13         I was given referrals by Riverbend and I

14  reached out to those Islamic volunteers.  And I had been

15  told they're not even active anymore, but they told me

16  they were not interested.  I had consulted with the

17  Islamic -- the Nashville Islamic Center resident scholar

18  and imam a year ago.  Met with him in person.  And he

19  said he doesn't even have men capable of leading studies

20  for the children at his own mosque.  And by the way,

21  that would be one individual that the inmates said that

22  if you bring him, we're not showing up.

23         So I certainly want to facilitate programming

24  for all faith groups.  I ask other chaplains who they

25  have.  And this isn't just a Trousdale problem.  This is

 1   a Tennessee problem.  And quite obviously, we are in the

 2   middle of the belt buckle of the Bible belt.  And

 3   there's not some of these face -- though there can be

 4   some places, that doesn't mean they're going to drop

 5   what they're doing and volunteer and drive three hours

 6   back and forth and spend the time inside the facility.

 7             So this is an inaccurate statement.  The

 8   inmate, I do not report to the inmate.  I don't report

 9   to him.  I report to the auditors.  I report to the

10   warden.  I report to central office and to the chief

11   chaplain of the company.  And they have found that I

12   have done my due diligence in recruiting and are

13   satisfied with my efforts.

14       Q.   I am going to move to strike that as

15   non-responsive to my question.

16             MS. MAPLES:  Carole, can I get my question

17   read back?

18             (Whereupon, the court reporter reads back the

19             question.)

20             THE WITNESS:  Did Mr. Williams submit those

21   in writing?

22   BY MS. MAPLES:

23       Q.   Mr. Shonebarger, please answer the question.

24       A.   I pursued recognized houses of worship in

25   Tennessee to include some that Mr. Williams had made

1    mention of.  I don't remember the names.  If there is a

2    document where he wrote me and I responded, it would

3    enhance my memory.

4         Q.    So you may have reached out to some that he

5    recommended, but it sounds like, at least with some of

6    them, you made a judgment call and did not reach out to

7    those individuals; is that right?

8              MS. POLLY:  Object to the form.

9              THE WITNESS:  Ma'am, I don't work for the

10   inmate.

11             MS. MAPLES:  Move to strike as nonresponsive.

12   BY MS. MAPLES:

13        Q.    Mr. Shonebarger, it sounds like based on your

14   testimony, there were at least some individuals

15   recommended to you by Mr. Williams as potential

16   volunteers from the Islamic faith that you did not reach

17   out to; is that correct?

18             MS. POLLY:  Object to the form.

19             THE WITNESS:  Who are they?

20   BY MS. MAPLES:

21        Q.    Mr. Shonebarger, do I need to keep repeating

22   the same question?

23        A.    I don't know how to answer other than what

24   I'm answering.  I'm willing to chase -- I'm willing to

25   follow up on any referral.  I have nothing to prohibit

1    that.  For the sake of accuracy, I would like to know

2    the names.

3         Q.    Based on your testimony, it sounds like there

4    are some volunteers or potential volunteers recommended

5    to you by Mr. Williams that you did not reach out to for

6    whatever reason.

7         A.    That's false.

8         Q.    That's false?

9               MS. POLLY:  Object to the form.

10   BY MS. MAPLES:

11        Q.    Okay, you're saying that's not true.

12        A.    Not true.

13        Q.    Well, you just said you couldn't remember all

14   of them that he told you.  So how do you know?

15        A.    I'm willing to call anyone, any name that I'm

16   able to come in contact with.

17        Q.    Well, I am not asking if you are willing to,

18   I am asking if you did.  And if you don't remember

19   whether you did or didn't, then how can you say that

20   what I'm asking you is false?  Do you recall whether you

21   reached out to the individuals that Mr. Williams

22   proposed to you as potential volunteers?

23        A.    I don't remember who he asked me to call.

24        Q.    Do you remember whether or not you reached

25   out to all of the individuals he requested, regardless

Case 3:22-cv-00093   Document 35-9   Filed 05/04/22   Page 148 of 177 PageID #: 1471

 1    of their identity?

 2         A.    Certainly.

 3         Q.    Certainly what?

 4         A.    Certainly, yes.

 5         Q.    So you don't know who they are, but you

 6    recall reaching out to all of them?

 7         A.    This is what I know --

 8               MS. POLLY:  Object to the form.  Go ahead.

 9               THE WITNESS:  This is what I know about my

10    mode of operation, ma'am.  I am very pro-active in

11    trying to facilitate the progress and advancement of a

12    faith within a facility.  Any kind of positive

13    recommendation, I am willing to chase it.  I am willing

14    to make a call.  I am willing to call someone who may

15    know the person that isn't answering their phone on the

16    other end.  I have regular conversations with chaplains

17    and chief chaplains about the subject of volunteers.  So

18    it's a constant pursuit.

19               MS. MAPLES:  Move to strike as nonresponsive.

20    BY MS. MAPLES:

21         Q.    Do you see No. 9?

22         A.    I see No. 9.

23         Q.    Do you see that Mr. Williams claims that he

24    made religious requests to you for years concerning the

25    Islamic community and that for these requests, you would

1    either deny it, postpone it indefinitely or just never

2    respond?

3         A.    That's false.

4         Q.    Do you see that that's what he says, though?

5         A.    I would agree that's what it sounds like.

6         Q.    But you're saying that's false?

7         A.    It is false.  And throughout the course of

8    the day, I have made mention of the tremendous success

9    that I've had with Islamic donations.  And it's Mr.

10   Williams that has provided me those points of contact

11   that I have been successful in acquiring material.

12        Q.    Well, I mean, acquiring donations isn't

13   necessarily responsive.  He is talking about certain

14   requests he submitted to you, that were either denied,

15   postponed indefinitely or just didn't get a response.

16        A.    I said earlier, ma'am, that's false.

17        Q.    Okay.  Is it false because you never received

18   any requests?

19        A.    That's correct.

20        Q.    So he's just fabricating that, then?

21        A.    Well, looking at this entire document,

22   there's a number of fabrications.

23        Q.    Because you've only ever had three formal

24   religious accommodation requests, right?

25        A.    I would have to go back and count them.

1      Q.    Well, we've been counting them all day.

2   First, you --

3      A.    Okay, I think we have Mr. --

4            MS. POLLY:  Let her ask you a question.

5            THE WITNESS:  Go ahead, ma'am.

6   BY MS. MAPLES:

7      Q.    First, you said there were two.  And then we

8   reminded you of the Nation of Islam one.  And then you

9   said, oh, okay, now there is three, right?

10     A.    I think that's what I said.

11     Q.    Okay.  What about this striking your chest,

12  shouting brother, brother, brother?  Do you know

13  anything about that?

14     A.    There may have been a patting of chest.  It's

15  brother, brother, brother, I have no idea.  I have no

16  idea what it is.  This inmate tried to suggest that I

17  was giving a Hitler salute, which was formally

18  investigated by the facility and found to be nonsense.

19           MS. MAPLES:  Do you all want to take a quick

20  break?

21           MS. POLLY:  Sure.

22           (Recess observed.)

23           MS. MAPLES:  I've got no further questions

24  for the witness.

25           MS. POLLY:  I don't have any questions for

1    the witness.

2              MS. HASHEMIAN:  I don't have any questions

3    for the witness.

4              MS. MAPLES:  Thank you, Mr. Shonebarger, I

5    appreciate your time.

6              THE WITNESS:  Thank you.

7              FURTHER DEPONENT SAITH NOT.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                       CERTIFICATE

 2

     STATE OF TENNESSEE      )
 3                           )    SS.
     COUNTY OF DAVIDSON       )
 4

 5            I, CAROLE K. BRIGGS, Licensed Court Reporter

 6    within and for the State of Tennessee, do hereby certify

 7    that the above deposition was reported by me and that

 8    the foregoing pages of the transcript is a true and

 9    accurate record to the best of my knowledge, skills, and

10    ability.

11            I further certify that I am not a relative,

12    counsel or attorney of either party nor employed by any

13    of the parties in this case or otherwise interested in

14    the event of this action.

15            IN WITNESS WHEREOF, I have hereunto affixed my

16    official hand on this 18th day of May 2021.

17    _____

18    CAROLE K. BRIGGS

19    Shorthand Reporter

20    Tennessee License No. 345

21

22

23

24

25
```

## Exhibits

**Exhibit 1** 42:1

**Exhibit 2** 69:5

**Exhibit 3** 72:11,13

**Exhibit 4** 83:9

**Exhibit 5** 117:13

**Exhibit 6** 124:1

**Exhibit 7** 132:16

**Exhibit 8** 142:25

## 0

**000792** 134:9

**00097** 134:6

## 1

**1** 42:1

**10** 74:19 76:14 78:7,23 79:5 144:4

**100** 21:5 119:10,16

**11** 118:23

**115.01** 7:17,22

**116.08** 78:1,2 85:10 99:2,16

**118.01** 11:24 17:20 18:23 19:5
20:8 22:9 90:22 134:15

**118.07** 79:21

**12** 67:20 68:7 118:23 119:1

**12th** 42:20

**14** 32:4

**16** 90:14

**17** 19:25

**18** 42:12 87:17

**18-043** 42:9,11

**1800** 21:19 24:5 31:7,15 131:20
141:19

**181.01** 19:8

**19** 20:1 87:17

**1:00** 40:21

## 2

**2** 69:5 71:12 86:25 135:2

**20** 14:10 87:17 95:10

**200** 14:12,15 21:11 31:7 94:3

**2016** 6:3 131:16 138:23 143:9

**2017** 133:1

**2018** 42:12,13,20 47:15 69:8
70:1,2,8 72:18 74:24 85:19 86:16
125:12,18

**2019** 68:24 69:8,12 85:19 126:12
127:9 143:10

**2020** 13:15 69:14

**2021** 5:4 87:16,20

**20th** 80:6

**24th** 125:12,17 126:9

**2500** 29:12 31:6 47:22 53:1

**2550** 21:7

**25th** 65:23

**28th** 133:1

**2:30** 14:21

## 3

**3** 72:11,13

**30** 77:16,17 81:3,4,5

## 4

**4** 83:9 135:16

**43** 42:13

**473110** 125:14,20

## 5

**5** 117:13

**507.02** 136:1

## 6

**6** 5:4 124:1

**6:00** 108:2

**6E** 136:1

## 7

**7** 132:16

**7:30** 36:18,19

**7B** 135:17

## 8

**8** 118:1,19 142:25

## 9

**9** 88:7 149:21,22

**93** 6:10 12:21 21:13 66:4 96:21
102:6 139:21

**9:00** 36:19

**9:12** 5:2,4

## A

**a.m.** 5:2,4

**Aaron** 19:19,22 143:3,5

**ability** 18:9 104:16

**absence** 85:10

**absent** 84:5

**absolutely** 37:14 46:19 47:17
55:12 76:11 110:17,22,24 116:1

**abstain** 81:24

**Abuse** 26:11,24

**access** 48:23,25 129:11

**accommodation** 9:24 10:12
12:8,15,18,24 15:5,14 17:21 18:3,
20 19:5,6,7 20:8 88:18 89:11,21
90:18,19 96:22,23 103:12 104:2
106:15 121:9,19,21 124:19 125:7,
13,19 127:15 130:23 131:16
134:15 138:22 150:24

**accommodations** 8:8 11:21
90:16 91:12 93:19 134:17,21

**accompany** 144:5

**accomplished** 138:12

**accountable** 123:17

**accounted** 36:16

**accuracy** 148:1

**accurate** 14:16 65:24 86:14,19
88:10 90:9 118:9

**accused** 50:7,14 51:17 52:9

**accusing** 52:19 115:23

**acquired** 135:23

**acquiring** 95:24 150:11,12

**acquisition** 113:14

**act** 20:18

**acted** 100:12 104:14

**action** 13:24 20:23 54:3 117:21,
22 144:25

**active** 9:15 144:25 145:15

**activities** 92:6 106:20 130:16

**activity** 104:9,14 108:13 124:22,
24 125:1,7 127:7,17 129:10 137:9
139:2

**actual** 76:2

**add** 35:25 64:19

**addition** 64:13,17 89:2 101:8
129:2

**additional** 64:23,24 65:8 131:4
133:9

**address** 23:15 94:5 140:8

**addressed** 72:2 94:9 121:11

**addressing** 8:22 9:6

**adhere** 65:14

**administration** 92:18

**administrative** 49:15 53:6

**administrators** 51:7

**admitted** 49:12

**advancement** 149:11

**advantage** 75:5 81:16

**Adventist** 25:13

**advise** 9:12 94:22 108:16,17
125:21

**advised** 37:23 49:3 85:9

**advisement** 48:23

**Advisements** 48:6

**advisory** 7:16 8:1

**affidavit** 83:12,24 117:19 119:3
143:3,9

**afforded** 31:23

**afternoon** 14:21 25:5 35:9 91:13

**afterward** 39:16

**agree** 5:6,9,11,13 40:8,17 47:12,
13 150:5

**agreed** 46:17 91:3 92:8,9,10

**agreement** 13:9 87:15

**agrees** 78:14

**ahead** 39:19 53:9 110:25 124:11
126:24,25 132:19,21 149:8 151:5

**aid** 143:7

**al-adha** 84:7

**al-fitr** 84:6

**allocation** 82:7

**allowed** 23:14,16 30:6 62:22
71:14 76:18 81:23 82:16 108:7
129:19

**alternative** 59:25 64:6,8 65:2,11
70:19,20,25 71:9 115:14 119:9,15

**AMANA** 96:7

**America** 84:4

**amount** 16:7 18:6 23:23 33:24

**ample** 37:24 43:20,22

**Anger** 26:12,22 27:1

**angle** 116:7

**angry** 53:2,10

**announcements** 47:20 48:7
50:1

**answering** 23:11 29:19 62:1
147:24 149:15

**answers** 52:3 110:16 129:9

**anymore** 145:15

**apologized** 48:17 49:8

**apology** 49:5

**apparatus** 33:9

**appealed** 137:2

**application** 75:14 140:2

**applied** 33:10 75:15

**applies** 59:12

**apply** 26:15 80:5,9 100:6

**applying** 27:19

**approached** 12:4 62:4

**approval** 13:10,19 14:1,6 17:25
97:4,10 108:20 109:17 113:1,2,
12,13,25 114:6 135:18,22

**approve** 104:16 106:23 109:22
138:17

**approved** 59:3,7,16 91:5 93:18
96:13,17 97:6,8 108:8 131:24
136:9,17 137:4 138:9

**approves** 108:8 135:25

**approximate** 21:19

**approximately** 19:17,25 21:4,
11,19 24:5 29:12 31:7 63:20
131:20

**approximation** 36:21

**April** 42:20 47:15 65:23

**Arabic** 33:11 34:20 37:23 88:15
90:3,12 91:24,25 92:1,14,16
121:24 138:6,12 139:10,15,21,22,
25 140:2,20

**Aramark** 71:3,4

**area** 8:13 27:10 145:9

**areas** 33:10 37:9

**arguing** 54:22

**arrived** 90:14

**article** 140:21

**asks** 31:11

**assessment** 57:8 126:20

**assigned** 21:24 28:6,16 113:15

**assist** 6:12,15 52:4

**assistant** 9:12 10:17,20,23 12:3
13:9,11,18 14:2 17:24 41:17 45:9,

17,19 63:3,5,10,17 72:22 87:25
89:16 91:3 92:8 97:3 106:17
107:21 108:11 113:1 123:21,23
134:14 135:24 136:16 137:2

**assisting** 7:13 29:14

**attempt** 145:5

**attend** 16:6 23:3 38:6 39:14
120:6

**attendance** 48:11

**attended** 91:10

**attending** 26:16

**attention** 41:4,6 44:11 46:21
66:14

**attitudes** 54:4

**attorney** 5:5 116:11 131:1

**attorneys** 41:25 116:19

**Atwood** 45:9,10

**audio** 91:15

**audit** 8:16,17,25 9:2,9,20,21
15:6,14,22 51:10

**auditing** 9:12

**auditors** 146:9

**audits** 8:15

**August** 114:18

**author** 72:19

**authorities** 60:15

**authority** 18:11,12 104:8,19,20,
21,23 105:6,15 106:4,23 107:14
120:20 121:13

**authorized** 16:24 24:8 78:21,22
96:14 104:12 105:20 107:6
109:16 110:3 111:14 114:3 137:1,
6 139:5

**automatically** 107:18

**availability** 24:7 30:17 35:23

**aware** 40:25 52:1 77:12,20 87:3
88:1,2,6 90:8 96:18 100:23
120:25 131:9 133:1

**B**

**back** 29:16 39:6,7,11 51:14 57:25
83:16 92:24 128:1 141:11 146:6,

17,18 150:25

**background** 7:11 8:21

**bag** 68:17

**balance** 33:25

**ball** 128:1,6,14,16

**banning** 44:22

**Baptist** 21:16 25:1 80:5 90:24

**Barnes** 113:19

**based** 34:17 76:1 94:11 125:11
147:13 148:3

**bashful** 111:5

**basic** 18:6

**basically** 10:3 14:5 59:4 72:18,
23 117:23

**basics** 56:24

**basis** 30:17 76:13,15 93:25 97:8

**Bates** 134:5,8

**bed** 21:7

**beef** 119:25

**beg** 17:10 98:2 102:24 125:16
129:20

**began** 5:2 28:21 85:22 92:22

**begging** 95:25

**beginning** 6:2 14:2 17:22 36:13
38:16 65:23 138:25 145:2

**behalf** 108:12 133:16

**belief** 103:6 133:12,24,25

**Bellar** 19:19,22

**belt** 146:2

**beneficial** 96:3 111:5

**benefit** 24:23

**Beverly** 45:10

**Bhagavad** 43:4,7

**Bible** 25:18 28:17,19 32:2,9,14,
15,24 33:6 37:21 39:16 43:13,15
44:7,23 68:13 90:11 93:16
101:12,13,16 102:2 146:2

**Bibles** 24:7 43:23 101:15

**big** 58:6

**biggest** 95:23

**bit** 9:4,20,22 23:7 61:10 140:6,14

**blame** 53:7

**blanket** 97:10 137:4

**blocks** 141:1,7

**board** 7:16,18,19,23,24,25 8:1,4
100:14 138:23

**Boaz** 125:14,19

**book** 95:14 97:7 110:7,8,10
112:5,13,14,18 113:16,20

**booked** 92:20,23 93:8

**bottle** 114:1

**bottom** 51:6 134:4,5,8

**bound** 78:3 79:23 99:1,3,5,16,20
104:21

**box** 107:7

**brand** 40:1,2

**Brandon** 13:12

**Branstetter** 5:8

**break** 30:18 37:9 40:19 76:5
77:10 79:13 83:1,5 132:7 151:20

**breakfast** 80:16 82:21

**breaking** 74:22

**breaks** 77:2

**Brian** 124:4 129:14

**bright** 74:9

**bring** 7:12 100:16 144:13 145:22

**bringing** 25:21 98:18 99:22

**broad** 38:12

**brother** 151:12,15

**brought** 41:4,5 44:11 46:20
66:14 98:10,12 99:8 100:18
107:2,8

**Brun** 8:11 9:5,23 129:12

**buckle** 146:2

**building** 107:10

**bullet** 43:7

**bunch** 92:11

**business** 12:4 102:5

**buy** 44:7,8 112:15 136:13 137:18

**bypass** 124:12

**bypassing** 95:5

---

**C**

---

**calendar** 22:13 24:16 30:23 31:17 48:3 91:14 120:13

**call** 6:25 14:4,20 25:25 35:18 38:17 114:12 119:15 136:25 137:1,6 147:6 148:15,23 149:14

**called** 6:21 7:19 21:17 35:15,21 36:17,18 44:13 48:16 49:2 62:19 77:25 102:14 144:8

**camera** 58:1,5,13,16 115:17,21 116:11,19,21

**capability** 35:3 65:10

**capable** 145:19

**capacity** 21:5,7 55:18

**card** 34:17

**care** 6:14,24 67:6,7,8,14,17,23 68:8,11 102:6 132:3

**career** 78:9

**carefully** 51:9

**Carole** 146:16

**carry** 122:7

**carry-over** 39:25

**case** 51:1 55:4 105:22 136:6

**case-by-case** 97:8

**casual** 10:4

**catalogue** 94:22

**catch** 60:6 107:10

**categories** 21:14,21 25:25 29:25

**categorize** 25:9,11 32:16

**category** 28:24

**Catholic** 25:4

**Catholics** 31:20

**caused** 74:3

**CCI** 134:6,9

**CD** 108:19,21,25 109:7,12,18,24 113:14

**CDS** 134:22 135:8

**cease** 73:19

**ceased** 74:10

**Celebrate** 26:9,24

**cell** 33:21 35:4 107:7

**Center** 5:23 79:23 80:10 87:9 135:21 145:17

**centers** 120:2

**central** 9:11 15:10 17:25 18:15 21:23 27:19 63:6 70:9,21 72:23 75:22 89:21 91:4 92:9 124:14 128:7,10 145:2 146:10

**certainty** 95:4

**certification** 7:11 8:19 67:4

**certified** 71:14

**cetera** 145:11

**chain** 14:1 18:13 51:7 97:3 123:18 124:3,17 127:16 128:17

**chain-of-command-oriented** 123:19

**chair** 115:20

**chairs** 124:24

**challenged** 30:22

**change** 74:18 87:19 118:6 122:16

**changed** 23:24 73:13

**channels** 127:19

**chapel** 13:25 24:2 33:21 35:3,5 36:5,7 37:10 92:20,23 93:7,11,18 105:14 120:8 131:21

**chapel's** 109:24

**chapels** 120:15

**chaplain** 5:25 6:7 7:6 10:16 11:23 12:6 13:4 16:3 18:9 19:1,14 28:11 29:8 30:6 31:13 35:24 51:10 65:19 68:20,21 72:22 80:6 87:21 90:7 91:6 92:10,17 94:17 95:10 97:1 103:10 106:16 107:12, 21 108:11 113:1 114:10,16,17,19 121:4 122:22 131:7 133:13 134:2, 12 136:16 144:1 145:3 146:11

**chaplain's** 15:9 28:13 29:2 43:21 95:20 114:11 134:1 143:7

**chaplaincy** 121:23 142:5

**chaplains** 19:10,11,13 131:12 145:24 149:16,17

**charge** 103:11

**chase** 134:3 147:24 149:13

**chat** 41:24

**chatter** 55:15

**check** 7:11 8:21 9:9,10,20 10:7,9 42:24

**chest** 151:11,14

**chicken** 119:25

**chief** 51:10 91:6 92:10 114:17,19 123:8,9 145:3 146:10 149:17

**children** 145:20

**chips** 67:22

**chit-chat** 123:12

**choice** 73:18,21 100:8

**choir** 25:20

**choose** 60:1 80:14

**chow** 30:24 74:20

**Chris** 8:11 9:5,23

**Christ** 21:16 24:25

**Christian** 21:12,14,15,17,18,19, 21 22:5,11 23:8 24:1,2,14,21,24 25:7,9,11,16 26:4,11 27:18 30:14 46:25 50:15 51:18 52:10,20 55:23 87:7 141:21 142:15

**Christian-based** 26:23 27:11

**Christianity** 26:14 27:20 57:11

**Christians** 24:5 26:11,23 31:7, 15 34:18 66:11 75:17 90:11 103:3 131:21 140:25 141:1,4

**Christians'** 75:11 76:18

**Christmas** 62:10,15,20,24,25 63:21,22 64:2,10 66:1,6,12 100:25 101:2

**Church** 21:16 24:25

**circle** 25:22 28:8,9

**circumstances** 92:15 98:2,3

**citizenship** 27:12

**claims** 149:23

**clarification** 61:18

**clarified** 49:23

**clarify** 11:17 26:17 30:16 38:9
52:23 67:7 74:8 91:8 110:16
120:9

**class** 28:21,23 29:21 30:10 32:17
37:23 90:8,16,20,23,25 91:1,7,11,
14 92:16 121:24,25 122:1 130:20
138:6 139:6,8,15 141:4

**classify** 67:23

**clear** 19:4 30:5 34:3 50:10,11,21
56:10 79:7 115:13 133:16,18

**clears** 35:17

**clerk** 85:25

**co-authored** 72:20,21 74:14
78:24 134:12

**cognizant** 107:3

**collaborate** 60:15

**collective** 69:3 132:15,22 134:4,
7

**college** 113:7

**color** 73:15,18,20,22 74:7,11,15
112:23

**colors** 73:13

**combined** 132:15

**Comfort** 68:18

**comfortable** 26:16

**command** 14:2 18:13 97:3
123:18 127:16

**comment** 128:18

**commentary** 70:6

**commissioner** 137:3

**commit** 39:3

**committed** 56:5 57:5

**committee** 92:6 104:10,14
106:20 108:13 124:22,24 125:2
127:8,17 129:10 130:16 139:2

**communicate** 111:21

**community** 7:18,24 31:24 76:7
140:19 144:9,14,17 149:25

**company** 51:4 59:4 60:14 78:4
79:25 87:15 146:11

**compensation** 7:12

**complain** 54:3

**complaint** 54:2

**complaints** 52:1 55:13

**complete** 98:23 118:12,19

**completely** 87:23 126:20

**compliance** 49:17 115:15

**comply** 70:7

**component** 8:24 16:22 27:7
80:18 88:16

**components** 26:14 117:23

**comprised** 104:10

**computer** 15:16,23 116:8,10

**computers** 116:7

**concern** 44:25 83:19,24 94:7
137:3

**concerns** 8:22 93:3,4 135:11

**concise** 88:23

**conference** 114:12

**confident** 45:17

**conflict** 38:1

**conflicts** 130:9

**confused** 57:15,21 98:2 140:6

**confusion** 62:17

**congregation** 7:9

**conjunction** 12:2

**connection** 109:7

**consideration** 89:10 121:17
122:12,17 136:15

**considered** 12:1 48:3 65:20
107:5 144:21

**consist** 59:6

**consisted** 8:5

**consistent** 55:18

**consolation** 6:23

**constant** 48:22 123:20 149:18

**constitutes** 40:9

**consult** 103:22 104:10

**consultation** 10:16 16:4 29:19
79:1

**consulted** 78:24 145:16

**consumption** 62:9

**contact** 148:16 150:10

**contained** 67:25

**content** 115:1

**context** 84:25 85:1 86:3 96:18
117:19

**continuation** 38:10,11

**continue** 24:7 26:9 33:22 34:21
35:6,24 36:8,9 37:4,8 75:23 89:20
90:7 117:17 135:9

**continuing** 127:18

**contraband** 67:3 107:5

**contract** 8:7 10:18,24 11:3,15
51:10 60:14 102:10 104:22 129:8,
10

**contracted** 70:15

**control** 118:16 132:18 138:2

**controversy** 74:4

**conversation** 10:4,18 16:21
20:6 29:17 86:5,15 114:10 123:20

**conversations** 9:16 11:6 17:14
41:19 45:6 86:8 114:23 123:5
149:16

**coordination** 142:11

**coordinator** 145:1

**copied** 108:18 127:13,14

**copies** 14:17 15:12,13,15 43:24
47:15 130:25

**copy** 47:1 128:9

**cordial** 96:9

**Corecivic** 5:11,22 18:18 27:8
46:6 50:4 51:11 59:22 60:22
61:19 70:7,9 71:7,11 79:3 80:9
84:4 85:9 98:7 99:16 102:11
104:20 107:18,20 108:7,10,12
114:8,15,19,22 115:4 118:6
123:6,18 129:16

**corner** 134:6,9

**corporate** 60:25

**correct** 7:3 8:2 11:5,8,10 17:5,16 18:24 19:6 27:23 28:18,25 32:11 37:6 42:18 43:8,10,14 44:10 49:17 51:23 55:22,24 61:13 66:20 68:10 71:15 72:9 73:23 74:25 80:25 82:5 85:16 93:14 98:21 110:23 111:1 119:5 136:3 138:10 147:17 150:19

**corrected** 100:8

**Correction** 7:21 8:17 18:19 27:8 77:25 96:15 104:3 108:14

**Correctional** 5:22 79:23 80:10 87:9 135:21

**corrections** 6:11 7:11 51:12 122:18

**correctly** 117:25

**correlate** 65:25

**correspondence** 47:25 48:1,4 112:10 124:13,18 127:2,6 129:24

**correspondences** 128:10

**costs** 96:2

**counsel** 58:8,12 84:4

**counseling** 6:12,13,24 16:4

**count** 30:23 33:21 35:4,17,24 36:12,15,19 38:15 39:10 40:2 141:11 150:25

**counted** 35:5

**counting** 151:1

**counts** 139:10

**couple** 12:12,14,18 63:17 77:20 117:25 144:3

**court** 5:3 31:11 84:5,8 85:4 146:18

**covering** 63:8

**covers** 48:10

**COVID** 22:6,18,22 23:3,18,22,24 24:1,4,10,12 27:24 28:21 29:6,7, 13 30:10 33:19 92:21,22 93:7

**crafted** 41:15

**crafting** 41:11

**cram** 141:7

**cramming** 141:14

**created** 91:18 117:20

**criteria** 91:1

**curious** 44:21

**current** 24:12 63:12

**curriculum** 89:6 91:18

**customer** 18:17,18 104:22

---

**D**

**daily** 12:4

**Daniel** 33:14

**dark** 93:3

**Darnell** 46:12,14 89:24 92:10 114:17,19 122:6 124:4,8,23,24 126:16 127:3,12,17 129:14,15,21, 23 130:6,8,21

**Darnell's** 128:18

**date** 20:19 42:19

**dated** 68:23 69:12,13,14 92:14 133:1

**dates** 65:25

**Davidson** 13:17

**day** 9:16 25:13 34:24 35:7 62:24 63:21 64:5 74:22 75:5,7,25 78:10, 21,22 80:15 81:6,22,24 90:5 91:13 108:1 120:9 123:20 137:16 150:8 151:1

**days** 33:15 77:16,17 81:3,4,5

**deal** 6:25 58:6

**dealing** 9:11 14:5 85:11

**debate** 25:10

**Deborah** 91:4,5 130:20 139:4

**December** 65:23 101:5,6 143:10

**decided** 79:25 104:15 107:16

**decision** 32:17 51:8 74:17 106:18,21 108:16,17 122:9

**decisions** 60:25 128:5

**deem** 113:16

**define** 123:7

**definition** 40:9

**definitions** 40:5

**degree** 113:11

**delay** 89:22,23,24,25 90:2

**delayed** 124:8

**delivered** 75:25

**demanding** 84:5

**demonstrates** 129:24

**demonstration** 75:8,24

**denial** 91:2 109:18 122:23

**denied** 71:16 90:9,12 93:18 122:3,4,25 126:14 150:14

**Denise** 13:17

**denominational** 27:19

**denominations** 31:15

**deny** 106:22 150:1

**department** 6:11 7:10,21 8:17 14:1 18:18 21:23 27:8 51:11 77:25 94:18 95:23 96:14 100:14 104:3 108:13 113:13 135:21

**departmental** 128:24

**depend** 35:16

**depending** 26:6,17 74:7

**depends** 52:3 62:3

**DEPONENT** 152:7

**deposed** 5:16

**deposition** 5:1,6 58:16 72:12 110:23

**depositions** 20:2

**describe** 15:25 25:16 69:18 70:2

**describing** 17:2

**description** 6:7 118:5

**designate** 68:19

**designated** 38:23

**designations** 22:1

**designee's** 109:16

**desire** 40:16 96:10 140:1

**desist** 73:19

**desk** 101:17,18

**dessert** 64:19,21 101:8

**detail** 87:23

**determine** 76:18 133:9 141:15

**determined** 20:20 104:24 105:6, 12,16

**develop** 105:8

**diabetics** 81:20

**diet** 59:8,18,20 60:2,4,16 70:14, 18 71:5,8 99:6 119:22,23

**dietary** 60:15

**dietitian** 59:8 119:21

**diets** 70:10,13,22 78:1 79:22 85:11 99:2,17

**difference** 18:6 28:4 64:12 94:1

**difficult** 129:6,13

**diligence** 122:25 128:8 146:12

**diligent** 122:25

**dinner** 80:17,22 82:16,22

**direct** 73:6 124:13

**directed** 78:4 133:3 134:15

**direction** 18:17 32:18 33:17

**directly** 124:13

**director** 27:21 46:12,14 51:11 91:4 98:10,12 99:8,18 123:10,12 130:20 133:2,8,15,18 139:4

**disagree** 18:15

**disagreed** 139:5

**disagreement** 40:17

**disapproval** 90:20 92:8,9,10 139:1,2

**disapproved** 131:25 139:1

**discipleship** 27:3,14,15 28:1,4, 5,10,15 141:5

**discovered** 131:24

**discretion** 135:23

**discriminated** 47:3 51:3

**discriminating** 50:8,16 51:17

**discrimination** 52:11,20

**discuss** 34:1 37:16 94:6 140:19

**discussed** 30:13 86:20 144:4

**discussing** 12:10 37:12 42:5 87:17 90:5

**discussion** 14:25 17:3 55:16 117:10 131:22

**discussions** 49:20 84:16,21,23 85:6,12,18 86:1 115:2 117:7 123:2

**disposal** 21:22

**disproval** 92:8

**dissonance** 140:14

**distinction** 119:19

**divided** 87:22

**document** 41:23 42:4 68:22,25 72:11,15 83:8,11,14,15 117:12,16 118:15,17 123:25 127:11 132:4, 14 134:8 147:2 150:21

**documentation** 89:15 145:4

**documented** 16:23

**documents** 92:15 132:14 138:2

**donate** 66:19 86:22 87:3,6 96:6 120:3

**donated** 43:20 68:2,9 87:1,9 118:7,13

**donating** 118:20

**donation** 137:17

**donations** 95:24 110:13 111:19 136:22 150:9,12

**door** 22:10 67:5 120:8 142:1

**double** 59:1,11 75:9 78:4 80:2, 12,17,18,19,20,23 81:23 82:16, 20,24

**draft** 13:3,5 73:4 74:2,12

**drafted** 13:7 14:6,7

**drafting** 15:17 45:21

**drawing** 119:19

**dress** 121:7

**drive** 146:5

**drives** 31:25

**drop** 146:4

**drugs** 67:2

**due** 122:25 128:7 146:12

**duly** 5:16

**DVDS** 134:21 135:8

**dwell** 54:5

**E**

**e-mail** 124:3,17 125:11 128:15, 17 129:2 132:25

**earlier** 18:25 65:18 74:1 79:12 87:13 101:3 110:12 112:7 124:6, 18 138:16 140:17 141:18 150:16

**early** 108:2 120:18

**earned** 90:8

**Easter** 65:17 66:1,6,12

**easy** 116:11

**eat** 59:18 78:21,22 80:14 81:21

**eating** 78:20

**echo** 72:23

**echoing** 79:8

**EDO** 10:2

**education** 109:10,12 113:10,12

**educational** 109:14,15 110:2 111:4,13,25 112:11,12,17 113:4, 8,17 136:8,23

**effect** 34:8 66:21 91:7

**effort** 31:24

**efforts** 146:13

**Eid** 64:23 70:23 77:23 78:3 79:24 80:9 84:6,7 117:24

**electronic** 136:1,7

**elevate** 104:9

**elevated** 10:19

**else's** 14:23 37:19

**emergency** 6:13,19 117:22

**emphasis** 29:13 43:24

**emphasize** 86:4 92:13

**employed** 5:21 129:21

**employee** 45:8 129:16

**employees**  46:6 50:4 107:20

**employment**  27:13

**enable**  6:24 73:9

**encourage**  29:4

**end**  35:20 79:25 81:24 95:5,6 125:5 128:23 149:16

**ended**  36:6

**enhance**  147:3

**enjoyed**  78:5

**enlarged**  65:2

**ensure**  8:17,19 57:5

**enter**  74:20

**entered**  86:4,18

**entertain**  90:18

**entire**  22:25 39:8 67:22 77:23,24 78:8 80:1,14,20 83:15 118:14 150:21

**entree**  64:23,24 65:1 78:4 80:2, 20

**entry**  18:13 86:16,20 93:14 104:8,11 106:14 133:13

**equitable**  31:24

**equivalent**  37:21 39:16 93:16

**Erin**  5:10 132:6

**error**  49:16 50:3

**established**  132:1

**estimate**  42:12

**evade**  52:8

**evaluate**  75:10,16,18 77:14 126:19

**evaluated**  122:18 136:16

**evaluates**  122:5

**evaluation**  10:20,21 93:20

**evening**  28:2 93:2,5,6

**event**  25:17 133:6

**events**  25:24 93:10

**evidence**  127:25

**EXAMINATION**  5:18

**examine**  69:25 93:24

**examined**  5:16

**examples**  26:22

**exception**  119:15 123:18

**exchange**  129:2

**exchanges**  138:6

**excluded**  76:6 77:2,10 79:14

**excluding**  23:4

**exclusivity**  61:16

**excuse**  38:5 83:7

**executive**  123:9

**executives**  123:6,7

**exhibit**  42:1 69:3,5 72:11,13 83:9 117:13 124:1 127:5,10 132:15,16, 22 134:5,7 142:25

**existing**  90:4

**expand**  96:10

**experience**  39:2 72:1

**expert**  12:2 18:10 103:21 119:23

**expertise**  79:10

**experts**  79:4 103:23 104:10 108:15

**explain**  9:4,22 44:15 54:8 61:17 70:3,4 75:1 89:23 94:21 102:19

**explore**  97:1

**extended**  24:11

**extends**  36:2

**extravaganza**  128:23

**extravaganzas**  130:10

**eye**  74:7 128:1,5

---

**F**

**fabricating**  150:20

**fabrications**  150:22

**face**  116:21 146:3

**facilitate**  16:25 24:5 31:8,16 37:1 80:1 89:12 96:11 102:8 106:8,10 111:7 141:20 145:23 149:11

**facilitated**  24:23 31:4 32:18 93:22 99:18

**facilitating**  6:15 29:14 56:6

**facilitation**  6:10 97:2 121:18 122:24 139:5 142:10

**facilitator**  25:23

**facilitators**  48:22

**facilities**  126:14

**facility**  8:6 10:23 12:1 29:10 35:18 38:21 48:4 72:25 85:9 86:17,19,21 87:1 104:14 106:7 108:16 121:20 122:2,3,5,7,10 126:14,16,18 135:24 136:11 141:19 146:6 149:12 151:18

**fact**  6:22 33:15 47:19 74:17 120:9 141:9

**factors**  122:17

**faded**  63:24

**fair**  26:2,3 31:24 42:15 55:18

**fairly**  24:5

**faith**  7:8 12:23 16:4,22 17:23 18:2 21:18 22:2,18 24:21 30:6 34:2,17 37:12,16 38:13 40:18 43:25 48:11,13,18,22,24,25 49:4,21 50:2,3,14,16 51:16 52:11,21 55:13,23 56:1,6,9,13,14,17 57:4 65:12,13,20 75:2,3,8,11 78:9,13 79:2,4,8 81:22 96:10,23,24 102:5 103:13,17,20,21 104:1 105:12 106:24 108:15 110:2 133:12,14 134:2,20 135:19,22 136:9,10 142:3,15 145:24 147:16 149:12

**faith-based**  68:6,8

**faiths**  27:5 29:18 131:25 132:1

**falls**  93:4

**false**  84:18 148:7,8,20 150:3,6,7, 16,17

**familiar**  7:8 42:6 69:1 94:10 95:8, 9,13,15 102:13

**family**  6:21,25 67:12 94:22 102:7

**fast**  72:6 74:20,22 75:3 76:5,16 77:2,10,17 78:9 79:13,17,18 80:3 81:1

**fasting**  71:19,20,21,23 75:20,21, 22 81:9

**fault**  84:19

**fear**  95:4

**feast** 70:23 71:17,24 76:7 77:11 79:14,19 80:2 82:13,14 83:6 117:24

**feasts** 61:24 78:1 79:22,24 84:7 85:11 99:2,6,17

**feature** 41:24

**features** 118:15

**federal** 7:11 8:20 21:5 54:19

**feeding** 74:21

**feel** 26:16 50:18 110:16

**feeling** 51:3 76:8

**feet** 116:3

**felt** 47:3,10 74:5

**figure** 37:2 54:1 82:10 99:24 105:24

**file** 14:18 105:21

**filed** 52:2

**fill** 36:14 141:15

**filtered** 137:7

**final** 18:11,12 51:8 104:8 106:18 136:25 137:1,6

**finally** 128:20

**find** 7:7 97:2 114:5 131:15

**fine** 57:1

**finish** 11:11 23:10,16 140:13 141:3

**fired** 143:14

**firm** 55:18

**fit** 140:3

**fixed** 53:9

**fleshless** 60:5,7 119:24

**Fletcher** 19:15 87:21

**fluorescent** 74:7

**flyers** 68:12

**foggy** 125:8

**follow** 18:17 60:17 81:21 87:14 100:1 111:21 147:25

**follow-up** 127:8 128:15

**food** 51:6 60:10,19,23 61:2,4,11, 14,19 63:3,7 64:13,14,17 65:8,15

**foods** 59:13 66:25 84:24 85:7,13 86:9 87:1 97:22 99:23 114:8,24 115:9 120:3

**foot** 87:8

**football** 123:13

**forbade** 80:8

**forbidden** 81:14,15,16

**foregoing** 5:1

**Forgive** 68:3 128:22

**forgotten** 32:9 134:19

**form** 17:8 39:19 40:13 43:18 48:19 49:14,22 50:9,17,24 51:19 52:12,22,25 53:20 54:18 55:2,14 57:16,22 64:4 76:9,20 79:20 84:12 89:15 99:14 100:2 121:2 126:22 130:11 138:19 140:10,15 141:8 142:21 147:8,18 148:9 149:8

**formal** 10:2,6,11 11:3 17:7,17 24:10 55:17 89:15 90:2 150:23

**formally** 12:24 47:24 89:9 151:17

**format** 38:13 75:25

**formulating** 78:6,23

**forward** 54:5

**found** 89:16 145:9,12 146:11 151:18

**four-** 30:1

**four-and-a-half** 30:9 49:1

**four-and-a-half-year** 8:10 120:11

**four-hour** 34:7 35:1 140:25 141:6 142:4

**fourth** 75:7

**fraction** 27:24

**frame** 49:4 62:19 101:5,6

**framed** 72:24

**frames** 72:25

**framework** 122:18

**free** 24:9 38:14 39:10 43:21 90:3

**freedom** 37:16

**freedoms** 57:6

**Freeman** 137:3

**Friday** 22:23,25 25:1 120:10,13

**front** 42:4 67:5 69:13 117:12 123:25 125:6 127:11 143:2

**frozen** 14:24

**fulfilled** 57:6

**fulfillment** 6:17 8:23

**full** 46:23 47:21

**fully** 92:20,23 93:7

**fund** 9:10 94:23

**fundamentally** 6:9,17 22:16 27:9

**G**

**gang** 137:8

**gas** 145:11

**gather** 29:3 40:15

**gatherings** 93:10

**gave** 118:5 144:21

**gay** 74:6

**geared** 9:1

**gears** 40:1

**general** 47:17 61:11 62:12 67:20 81:3

**generated** 53:7

**gestured** 101:19

**Gita** 43:5,7

**give** 14:14 16:13 17:22 18:10 20:14,15 21:10 23:2 24:18 48:12 70:6 81:5,6 84:6,7 116:4 118:16 121:21 122:9 132:18 135:4 144:9, 16

**giving** 34:21 51:17 54:6 151:17

**good** 57:1 95:25 97:17 111:3,18 122:11

**goodies** 67:21 68:18

**governed** 18:21 78:2

**governing** 72:6

**grade** 61:21

**grant** 105:6,15 106:4

**graph** 134:23

**greater** 145:8

**Greek** 32:2,9,14,15,23 33:2,4,6,8
90:11 130:20 139:6,21,23

**grievance** 10:3 20:21 50:20
85:22 86:5 105:21

**grievances** 9:24 10:10 20:11,17
51:15 52:2 128:4

**grieve** 120:24 121:16

**group** 7:6 10:14 12:23 18:1,3,8,
20 19:6 22:4 27:15 28:1,5,10,15
31:17 33:11 34:13,14 39:21
48:11,14,18,22 49:1 50:2,3 89:7
90:12 91:21 93:19,20,21 96:23,24
103:13 104:2 105:3,12 106:3,7,
10,24 111:5 131:22 133:2,10
135:19,22 136:9,10

**groups** 6:14 24:10 27:3,14 37:9
86:23 88:25 145:24

**growth** 27:13

**guess** 30:12 54:14 55:5 61:10
65:4 67:23 69:11 86:7 96:16
107:4,11 116:24

**guidelines** 68:24 69:18 70:2,3,4,
8

**guys** 29:2 36:22 51:4 54:3 108:3
131:20 132:2

**guys'** 57:5

**H**

**halal** 59:13,16,23 60:2,3,11,20,23
61:8 62:5 65:6,15 70:14,17,19,20,
24 71:4,8 84:6,24 85:5,7,13 86:9
97:22,24 99:23 114:8,24 115:8
118:24,25 119:3,6,10,12,14,16,17

**halal's** 65:4

**Halalco** 94:14,16 95:8 97:7

**hall** 74:20

**handed** 66:12

**handled** 20:15,16

**handling** 10:9 11:4 20:12 103:11

**handout** 32:21

**Hang** 23:6

**happen** 76:8

**happened** 42:13 49:13 85:19
87:20 95:3,6 129:17 130:1,3

**happy** 34:21 38:2

**Hartsville** 5:23 145:6

**Hashemian** 5:12 152:2

**hate** 116:20 137:8

**head** 114:16

**head's** 10:4

**headquartered** 22:16

**hear** 34:19

**heard** 21:4 31:23 57:7

**heart** 51:3

**Hebrew** 32:2,9,14,15,23 33:2,4,6,
8 90:11 121:25 130:19 139:6,23

**held** 103:6 123:17 133:11,24,25

**helpful** 127:19

**helping** 7:13

**Hey** 57:25

**higher** 31:10 92:1

**highlight** 111:2,3

**hijab** 121:1

**Hindu** 43:23

**historical** 34:9 129:17,19 138:14

**historically** 64:18 139:8

**history** 38:20 80:6 87:10

**Hitler** 151:17

**hold** 65:12

**holidays** 12:25

**honest** 123:1

**honestly** 6:5 30:1 52:7,8 53:4

**hot** 73:1,2,11

**hour-and-a-half** 36:19

**hours** 33:23 34:4 35:12,13,14,25
36:1,2,3,20,21 39:4 90:6 92:4
93:23 94:5 139:9 141:25 142:16,
19 146:5

**houses** 16:5 146:24

**housing** 35:22 39:6,7,12 73:8
141:11

**human** 49:16 50:3

**hypothetically** 18:14 20:23

**I**

**idea** 53:24 61:22 79:18 97:23
122:11 151:15,16

**identification** 42:17 73:9

**identified** 43:23 137:3

**identify** 43:20

**identifying** 43:6

**identity** 149:1

**ignorant** 56:16

**ignore** 122:12

**imam** 145:18

**imams** 78:13,18 104:10

**immediately** 41:22 73:19 74:10

**important** 27:6 43:19 66:8,10
77:14 84:8 136:24

**improper** 54:19 55:1,7

**improvement** 128:24

**inability** 41:20

**inaccurate** 88:11,12,14 89:19
146:7

**inappropriate** 58:7

**inch** 116:8

**incite** 91:20

**include** 25:19 26:1 86:21 88:16,
17 90:3 139:10 140:20 146:25

**included** 32:7 43:9,13 128:12

**includes** 36:1

**including** 139:9

**inconvenient** 142:19

**incorrect** 49:6

**indefinitely** 150:1,15

**independent** 37:23 111:20 126:18,20 127:18

**independently** 100:12,13

**individual** 17:20 18:7,21 19:7 25:21 76:4 96:22,23 102:7,23,25 103:2 104:1 105:4 106:12,13,15 109:11,19 114:3 143:3 145:21

**individual's** 106:9

**individuals** 66:10 79:13,18 144:17 147:7,14 148:21,25

**influence** 38:24

**informal** 17:3,15 25:22 28:8 29:1 88:19

**informally** 11:14 20:6

**information** 34:22

**initial** 73:3,4

**initiated** 127:16

**injustice** 47:11

**inmate** 6:23,24 9:15,23 10:14 11:19 15:25 16:8,9,11,17 17:3 20:17,21 22:9 24:4 25:20 26:12, 13 32:16,21 33:14 38:4,6,8,24 46:25 47:21 48:21 50:13 71:19,23 72:2,3,4 73:9,16 74:1 77:20 78:19 80:12 81:7 82:8,9 85:25 89:15 90:14,15,19 91:18 93:15 94:21,23 101:20 104:16 105:4 106:1,25 107:7 109:7 112:17 113:4,24 114:6 121:22 128:8 132:23 133:11,15,23 146:8 147:10 151:16

**inmate's** 20:14 46:3,4 73:8 134:1

**inmates** 6:12,15 7:5,14 8:23 9:7 10:14 11:2,16 12:18,23 14:4 17:15,18 18:2 20:5,11 21:3,9,12, 19 22:5,10,13,17,20 23:1,9 24:9 26:15 27:21 28:6 29:4,12,15,18 31:6 33:4,17 34:14 35:8,18 37:2 38:20,23,25 39:6,10,14 40:7,8 41:1,7,10,20 43:15,21,25 46:20 47:6,7,22 49:21 50:8 51:18 53:1, 4,10,15 55:16 56:3 57:7,14,19 58:23 60:1,16 61:23 62:4,21 67:6, 11,14,17 68:8 73:24 74:19 75:4,
19 77:9 78:13 80:24 81:1,5,6,20, 23 82:6,11,16,17,18,19,23 87:7 88:25 89:1,8,17 91:10 94:3,4 95:19 96:11 98:11,13 102:3 105:3,11 108:19,21,24 109:11,19, 23 110:1 111:8,12,20,24 112:12 115:15 118:24 119:4,7,13 120:16 121:7 133:3,4,9 134:3 135:25 136:21,23 137:11 141:19 145:21

**inmates'** 36:15

**innumerable** 16:7 66:3

**input** 10:13 106:17

**inquire** 110:9

**inquiries** 127:18 133:14

**inquiry** 16:4 88:19 89:14 129:11

**inside** 146:6

**insignificant** 14:21

**insincere** 75:8

**insincerity** 75:2,13,17,18 77:14

**instructed** 41:2

**instructing** 55:3

**intention** 7:13

**interact** 9:9

**interacting** 37:12

**interaction** 10:6,22 25:23

**interest** 15:11 136:13

**interested** 7:5 133:4 145:10,16

**interim** 63:13,16,19

**interject** 34:5

**internal** 42:16

**internalize** 54:4

**international** 110:7

**interpreter** 74:8

**interrupt** 23:11,17

**interrupting** 98:23

**introduce** 5:5 37:24

**introduction** 85:8 140:20

**investigated** 151:18

**involve** 11:15

**involved** 8:8,11,21 9:11,23 27:5 38:21 45:6,21

**involvement** 11:2

**involves** 132:23

**Islam** 23:20,21,23 34:16 35:9,12 36:3 56:16,23 57:8 91:10 92:2 134:20 135:7,19 136:11,20 137:13 151:8

**Islam-** 94:10

**Islamic** 22:2 38:25 82:3 86:22 89:7 95:14 96:5 97:7,22 103:17 110:2,11 111:24 112:5,13,14,18 113:5,18,25 120:17 144:5,9,13, 14,17 145:14,17 147:16 149:25 150:9

**Islamic-based** 111:12

**issue** 14:5 111:20

**issues** 9:6,13 13:3 129:7,14,23

**item** 16:13,14,20 17:4 64:13,14, 17 94:22 95:1 96:24 101:8 104:1, 18 105:20 106:1,4,12,24 114:2

**items** 11:20 42:23 44:8 61:2,8,19 66:19 67:25 68:15 71:14 87:6 95:20 98:10,13,19 99:9 104:17 105:5,10,13 106:2,25 112:13,15 113:3 114:1,3 118:13,21,24,25 119:4,6,12,17

---

**J**

**Janna** 5:8 23:11 58:9,16 110:21 115:23 116:12 132:5

**January** 101:6 126:12 127:9

**Jehovah's** 25:14 31:19

**Jennings** 5:9

**Jewish** 132:23 133:9,14,21,22,23

**job** 5:24 6:7 95:24 111:18

**Joe** 5:10 23:12 54:18,22 55:1,9 57:25 97:15 110:19 115:16 116:6, 16 117:3

**Jon** 5:15,20 8:11 9:5,22

**Jr** 5:15,20

**judge** 57:23

**judgment** 140:17 147:6

**Jummah** 22:24 49:2 92:3 93:17 120:6,10 140:3

**Jummahs** 120:11

**Junk** 68:18

**jurisdictions** 80:7 95:11

**justify** 105:23

### K

**Kairos** 87:6,8

**key** 12:21 18:7 27:5,10 115:4 145:6

**kin** 6:22

**kind** 11:3 13:21,24 15:19 16:14 29:22 34:24 47:20 49:12 54:2 61:6 72:5 74:15 97:9 113:7 117:21 140:5 149:12

**kinds** 13:23 113:10

**knew** 46:22 47:8

**knowing** 11:23

**knowledge** 97:13

**Koran** 37:18 41:3,21 43:11 47:1, 15 81:15 91:25 140:2

**Koranic** 40:10 90:12 122:1 138:6 139:25

**Korans** 43:20 46:23

**Korean** 90:15

**kosher** 61:7 70:14 71:5,8

**kouffi** 114:2

**kuffain** 102:14,17,20 103:3,14,25 105:3,10

### L

**laced** 67:2

**lack** 128:23 133:2

**laid** 60:17 122:19,20,21

**land** 56:7

**language** 32:11,15,19 33:3,11 88:16 90:3 139:10 140:21

**laptop** 91:15

**large** 131:19

**late** 40:21 124:25

**law** 102:9 107:23 115:15

**laws** 56:7

**lawsuits** 51:16 52:9

**layers** 51:7 55:20

**lead** 28:10,19 30:6

**leader** 32:21

**leaders** 7:9 10:23

**leadership** 51:8 60:18 114:5,8 138:25

**leading** 145:19

**leads** 38:19

**learn** 38:12 92:1 138:12

**learned** 79:9

**learning** 33:9

**leave** 35:21 39:11

**led** 29:22 32:16 38:25

**left** 63:10

**legal** 84:4 117:21,23

**legitimize** 102:5

**length** 35:19

**lengthy** 23:7 117:6

**letter** 134:24

**level** 12:1 49:18

**liberty** 40:15

**library** 42:24 47:16,17

**lies** 62:17

**life** 53:3

**limit** 55:2

**limitation** 37:13

**limitations** 29:13 37:14

**limited** 22:19 32:25 33:1 61:20

**lines** 27:19

**list** 21:24 32:5 73:16 74:24 81:2 82:3,5,6,12 96:7 106:2,14 107:1,3 110:6,9 111:14

**listed** 70:8 104:17 111:14

**literature** 24:8 33:7 68:11

**litigate** 121:16

**litigation** 50:20 85:22 86:5 105:22 128:5

**litmus** 37:14

**live** 74:3

**living** 29:1 133:20

**load** 130:9

**local** 7:15,17,24,25 8:6 18:10

**lockdown** 24:6 29:16

**lockdowns** 30:24

**locked** 38:15

**long** 6:1 13:13 19:16,20 33:16 37:11 38:13 54:8 63:19 66:21 89:22,25 98:15 125:1 142:4,23

**long-term** 53:5

**longer** 34:23 129:15

**loop** 93:4

**loose** 91:21

**lot** 34:23 53:19 95:25 142:24

**love** 30:2

**lunch** 40:21 74:21,23 75:6,20 78:20 80:16,21 81:9,25 82:8,21 97:16

**luncheon** 97:18

**Lutheran** 21:16 90:24

**luxury** 120:5

### M

**M&m's** 67:22 68:16

**made** 32:17 34:2 50:1 57:10 58:6 60:25 67:5 73:7,17 74:17 104:7 105:3 110:12 120:22 122:9 133:15,18 141:17 145:5 146:25 147:6 149:24 150:8

**magazine** 140:21

**maiden** 20:3

**mail** 24:9 109:13 110:9,10 111:15,21 137:8

**main** 65:1

**maintain** 53:11

**make** 16:8 17:18 20:5 29:11 30:3
34:23 47:20 49:6,17 55:5 57:7
73:15,16 106:21 108:15 117:24
126:19 129:11 149:14

**makers** 51:8

**makes** 25:17 30:5 32:22 119:23
142:24

**making** 57:14,19 90:7 119:11
128:19

**male** 121:7

**man** 102:7

**managing** 123:10,12

**mandated** 136:10,12

**manhood** 27:12

**manner** 91:23 98:8 120:12

**Maples** 5:8,18 11:13 14:23 15:1
17:13 23:12 24:13 32:1 40:3,20,
24 41:23 42:2 44:2 45:5 49:7,19,
22,25 50:10,22 51:13,21 52:14
53:12,22 54:17,22 55:1,8,10,21
57:18,25 58:3,12,18,22 64:9 69:3,
6 72:10,14 76:12,25 80:11 83:2,4,
10 84:15 97:15,19 99:21 100:5
110:18 111:9,11 115:16,19,25
116:6,16,24 117:3,6,11,14 121:5
123:24 124:2 126:23 130:14
132:8,12,17 139:11 140:12,24
141:23 142:24 143:1,23 146:16,
22 147:11,12,20 148:10 149:19,
20 151:6,19,23 152:4

**March** 13:15 19:25 68:24

**marked** 42:1 69:5 72:13 83:9
117:13 124:1 132:16 142:25

**marshmallows** 68:17

**material** 94:7 112:11,12 113:8
135:23 137:21 150:11

**materials** 29:17 91:16 110:2
111:13,25 112:18 113:5 135:20
136:19,23 137:11

**matter** 6:23 12:2 15:6 18:10
30:19 33:15 91:6 103:22 108:15
141:9

**matters** 12:4 14:20 20:18

**meal** 58:25 59:1,2,4,11 60:4
62:10,15,20,25 63:22 64:2,3

65:17,21 66:6,12 75:7 81:4,8,9
100:25 101:2,10

**meals** 58:23 60:16 62:11 65:18,
19,22 66:5,6 75:4,25 77:3 80:21
81:6,8,13 83:7

**meaning** 49:9

**means** 53:14,15 54:1,9,24 59:16
60:9 89:5 133:20

**meant** 74:16

**measure** 75:12

**meat** 60:9,11,20,23 62:5 63:23,24
64:3,7 65:13,15 70:24 71:4 119:9,
15,17

**meats** 97:25

**mechanism** 75:5 94:17,19 96:22
100:16 121:17

**mechanisms** 17:19 20:4 122:19

**media** 136:1,7

**medical** 81:20

**Medina** 95:12,13 97:7 112:23

**meet** 24:9 27:21 59:21 91:1
140:22

**meet all** 59:8

**meeting** 48:16 59:19 94:7

**meetings** 114:12

**meets** 60:1 71:9

**member** 50:14 53:3 67:12 114:7

**members** 7:9 48:17 50:2,16
51:16 52:11,21 55:13

**memo** 11:24 13:21 15:5,21 41:11
42:4,19 44:16 45:12,21,25 46:2,7,
11 53:6 68:23 69:1 70:2 73:3,5,24
74:12,13 78:24 104:18 107:14
134:11,24 135:11

**memoranda** 42:16

**memorandum** 42:9,13

**memory** 71:22 125:10 147:3

**memos** 13:3,6,18 14:7,17 15:2,8,
12,13,16,19,21,23 69:4,19

**men** 22:15 24:22 27:3,4,6,16,17,
21,25 28:15 87:5,9 88:20,23
89:18 91:25 145:19

**mention** 23:3 31:6 81:19 106:6
147:1 150:8

**mentioned** 7:1 9:19 37:25 68:16
73:25 96:13 101:3

**mentioning** 124:6

**mentoring** 7:14 88:24

**menu** 59:3,22 62:21,24 63:21,23
64:1,15 66:5,12 71:1 87:14 101:4

**menus** 66:8

**merit** 137:5

**message** 27:18,19

**messages** 128:19

**Met** 145:18

**Methodist** 21:16

**middle** 27:10 36:10 145:7 146:2

**mind** 12:11

**minimal** 51:20,22 53:11,13,19,25
54:1,9,23 123:4

**minutes** 35:20

**mishandled** 20:22

**misstate** 119:22

**mistake** 53:6

**mistaken** 57:21

**misunderstanding** 39:20

**misunderstood** 35:15 39:13

**mob** 91:20

**mode** 81:17 149:10

**modification** 135:18

**modify** 106:21

**mom** 67:10 110:8

**moment** 135:4

**momentarily** 51:5

**moments** 37:25

**Monday** 24:22 27:16,22

**Mondays** 27:25

**money** 94:24 145:11

**monitor** 8:7 10:18 129:8,11

**monitored** 51:12

**monitoring** 36:24

**monitors** 10:25 11:3,15 51:10
82:7

**month** 21:23 26:6,8,18,19

**months** 19:21 32:4 67:21 68:7
90:1 92:13 124:20,23 127:21
128:15

**moot** 122:4

**morning** 24:22 28:22 29:23 30:7
35:10 38:17 99:7

**mosque** 145:20

**motion** 116:18

**motives** 57:24

**move** 36:11 39:5,6,24 54:5
110:18,21 111:9 116:9 146:14
147:11 149:19

**moved** 92:15 98:16

**movement** 14:3 35:17 93:3

**multiple** 117:8 129:3

**multitude** 16:2

**music** 25:19

**Muslim** 21:9 22:11,22 23:9,19
31:23 39:21 40:7 41:20 46:20,25
48:13,17 49:21 50:2,3,8,14,16
51:16 52:11,21 53:4 55:13,25
56:4,9,12,14 58:23 59:10 71:16
74:1 76:2 77:2 78:6,24 80:4,24
81:1,19 82:19 85:25 86:3 88:25
90:24 91:10 93:15 94:10 96:1,4
98:11,13 101:20 102:2 109:23
110:1 111:4,24 118:24 119:4,7
120:2,25 121:7 136:21 137:11,23

**Muslims** 23:4 31:8 34:14 36:3
37:21 39:1 59:9,17 65:9,12 71:10
74:6 75:18 76:5 77:14 78:5,8
79:13 86:9 99:23 103:4 137:14,20

**mysteriously** 144:7

---

### N

**named** 45:8 90:15 143:3

**names** 144:16,21 147:1 148:2

**Nashville** 22:16 145:9,17

**Nation** 23:20,21,23 34:16 35:9,12
36:3 91:10 134:20 135:6,18

136:11,20 137:13 151:8

**nature** 13:1 137:9

**necessarily** 150:13

**needed** 87:24

**needing** 72:2

**negative** 57:13 77:15

**newly** 131:24

**night** 27:4 80:19 82:20

**Nikki** 5:12

**Noble** 113:19

**non-denomination** 21:18

**non-halal** 119:8

**non-meat** 119:20

**non-responsive** 143:15 146:15

**nonetheless** 74:9

**nonresponsive** 23:13 111:9
147:11 149:19

**nonsense** 151:18

**norm** 131:23

**normal** 77:19

**Northeast** 138:22

**Nos** 118:23

**notice** 71:11 73:4 107:11

**notifications** 6:13,20

**notify** 6:23

**November** 6:3 20:1 90:14 101:6
125:12 133:1

**number** 21:14,20 23:4 24:18
32:22 33:7,10 46:22 47:2 53:14
54:4,12 55:12 66:3 70:6 73:9
88:23 96:3 110:7 113:17 122:17
133:15 142:8 143:24 150:22

**numbers** 42:17

**numeric** 54:11

**numerical** 54:24

**numerous** 62:18 145:8

---

### O

**object** 17:8 39:19 40:13 43:18

48:19 49:14,22 50:9,17,24 51:19
52:12,22 53:20 55:14 57:16,22
64:4 76:9,20 79:20 84:12 99:14
100:2 110:14 121:2 126:22
130:11 138:19 140:10,15 141:8
142:21 147:8,18 148:9 149:8

**objecting** 52:24 54:18 116:18

**objection** 55:2 73:13,15 74:15

**objections** 92:17

**oblivious** 74:15

**observance** 76:23 142:3,14

**observances** 62:18

**observations** 128:17

**observe** 120:14

**observed** 40:23 78:15 83:3
97:18 132:11 151:22

**observing** 120:13

**obvious** 75:23 89:17 109:9

**occur** 65:23

**occurred** 86:16 88:10

**occurs** 38:7 39:2,16 40:6,10

**October** 19:17 125:17 126:5,8
127:8 128:15 131:10

**off-the-record** 14:25 117:10

**offense** 73:18 74:9,17

**offer** 60:10 65:15 70:17,22 71:4,5
87:3 89:1 92:5

**offered** 24:25 31:4 119:12

**offering** 142:22

**offerings** 71:10

**offers** 86:22 87:4

**office** 9:9,11 10:6 15:9,10 17:25
18:15 21:23 36:24 43:21 61:1
70:9,21 72:24 89:21 91:4 92:10
95:20 96:8 101:12 120:7 124:14
128:7,10 134:1 145:2 146:10

**officer** 123:9

**official** 42:13,15

**oftentimes** 64:7

**oil** 104:23,24 105:3,10,17,18,19
114:1 120:17

onboard 131:10

open 22:25 91:11 93:2 120:8

opened 34:10

operate 102:1

operated 24:3 64:22

operating 123:8

operation 14:5 74:10 76:23
77:19,22 149:10

operational 23:24 26:20 32:4
33:16 72:24 81:17

operations 35:17 75:14 86:1

opinion 12:5 37:17 55:25 56:8,
10,25 57:2 91:6 139:15

opportunities 22:17 28:25 31:9,
16,17 90:6 94:8 97:1 141:20
145:8

opportunity 22:13,19 23:2 27:20
31:1 33:19,20 34:10 38:12 93:1
138:12

opposed 25:17 105:4

option 37:10 39:12 105:21

options 118:25 119:7 122:21

order 31:8 72:6 84:5 110:4,8,10
141:19

ordered 42:23

orderly 37:11

ordinary 64:11 79:2

organization 67:12,21 68:2,4,5,
6,8 94:24,25 123:19

organizations 66:19 67:15,18
96:1,5 111:4 120:2

original 38:17 39:11,25 89:20
128:2

originally 39:22

ostracized 76:6

ostracizing 76:10

outcount 37:4

oversee 8:13 89:18

overseeing 8:8,12 10:8

oversight 12:2 49:15 55:19
87:22 89:7

**P**

package 67:7,8,24

packaged 61:11 120:3

packages 67:6,11,14,17 68:9

packets 68:12

pages 23:13

Pamphlets 68:12

paperwork 36:14

paragraph 83:21 127:14 135:1,
2,16

paragraphs 83:19,24

parameters 34:2 56:6

parcel 27:13

pardon 17:10 98:22 102:24
125:16 129:20

parenthesis 144:6

part 27:13 37:19 39:18 50:3 51:6
53:3 54:3 88:14 90:5 108:10
109:18 122:14 145:7

partaking 75:24

partial 31:12

participate 26:12,13 71:22,24
72:7 73:9 76:19 77:21

participates 25:23

participating 12:22 74:20 76:16
80:8 81:12

participation 71:16

pass 73:1,2,6,7,12,20

passed 6:22 107:9

passes 73:15,17

passing 29:18 51:15 52:17

Passover 66:2

past 57:20 92:16 127:3 129:17

pastoral 6:12,14

patting 151:14

pause 90:13

pay 61:21

peaceable 38:14 140:18

people 18:6 28:16 51:6 58:4,6
74:16 107:17 115:21 116:1

percent 119:10,16

percentage 21:8,10

perfect 140:3

perform 8:15

performance 144:1

performed 14:22

perimeters 91:22

period 34:7 35:1 81:3 93:6

periodic 8:15

periodical 101:7

permission 112:19,20 113:6,22

permitted 41:2 104:18 106:1
108:19,25 110:1 111:13 120:25
121:20 135:7

person 45:11,16 100:19 103:11
116:20,25 142:22 145:18 149:15

personal 27:13 29:15 56:3
104:17 105:11 106:1 107:1
142:14,15

personally 55:23 119:24 142:3,
6,7

perspective 65:19

pertaining 49:4 123:14

pertinent 15:14 44:24

phone 128:19 129:3 149:15

physically 58:19

picture 116:4

piece 18:4 111:5 114:10 131:19

pink 73:1,2,11 74:8,9

Pittman 45:20 89:17

place 38:5 132:2

places 113:17 146:4

plaintiffs 5:9

plan 72:18 87:24

plans 87:11

plaque 101:17

play 11:3 25:20

**player** 109:7,24 113:14

**players** 108:19,22,25 109:12,19

**Pleasant-bey** 12:11 37:22 51:2
84:2,17,21,24 85:7,13 86:4,8,25
89:5 91:23 103:15 121:24 122:6
124:7,12,20 125:14,19 126:13,17
127:3,12,18 128:3,11 131:5 139:7

**Pleasant-bey's** 88:9 121:9

**pod** 29:1 88:16,17,20 89:18

**pods** 24:3 133:21

**point** 17:23 18:12,14 20:14,22
37:17 47:14 87:21 93:14 104:8,11
106:14 110:12 122:4,5 128:3
133:13

**pointed** 101:19

**points** 8:18 28:9 115:4 150:10

**policies** 118:10,12 137:8

**policy** 7:17,21 8:4 11:24 14:19
16:23 17:20,23 18:21 19:5 20:8
22:9 30:5 38:22 41:12,15 54:5
55:19 66:18,21,24 72:5 77:25
79:21,23 85:10 89:3 90:21,22
91:2 95:3 96:25 98:5,6,7,8,17,18,
24,25 99:2,3,4,5,11,12,16,20,23,
24 100:1,11,22,24 102:9 104:6,25
105:1,7,12,16 106:22 107:14
109:13 114:4 118:6,20 120:21,22,
23 122:16 123:14 125:6 134:15
136:1 139:19

**Polly** 5:10 138:19 140:10,15
141:8 142:21 143:21 147:8,18
148:9 149:8 151:4,21,25

**Ponds** 63:6,8,10

**pop** 110:8

**population** 23:1 31:9,10,25
47:21 62:12 67:20,23 77:23,24
78:5 79:11 80:1,14,20 81:4 96:4
131:19 133:4 141:18,20

**pork** 120:1

**pornography** 137:9

**portion** 28:7 80:2,12,17,18,19,24
81:24 82:16,20,24

**portions** 28:16

**position** 35:18 63:15 99:25
102:4 121:15 138:15 139:8

**positive** 83:17 149:12

**possession** 43:24

**possibilities** 30:4

**possibility** 49:16 98:15 109:3

**possibly** 16:6 66:22 98:4

**posted** 48:4

**poster** 101:16

**postpone** 150:1

**postponed** 150:15

**potential** 34:5 48:7 93:1 147:15
148:4,22

**potentially** 13:24 15:24 20:20
31:18 35:16 41:18 93:23 142:9

**power** 38:23 89:8 105:25

**practice** 21:1 29:15 40:18 65:20
75:3,23 76:23 102:9 108:7 115:14
116:16,18 133:24

**practiced** 78:16 79:10

**practices** 79:2 132:1

**practicing** 43:25 76:4

**pray** 24:9 29:4 33:24

**prayer** 29:20 81:14 92:3 102:22
104:23,24 105:2,9,10,17,18,19
112:21 114:1 120:17 121:10

**praying** 81:14

**pre-covid** 22:6 23:22 24:14

**PREA** 8:20

**preach** 27:17

**precursor** 139:6

**predawn** 58:25 59:2 75:9 77:4
81:8

**predecessor** 13:16,17

**predetermined** 105:1

**preferential** 50:15 51:18 52:10,
19

**prepared** 67:1,5 95:17

**presence** 28:12 142:11

**present** 100:19

**presentation** 27:14 88:19

**presented** 55:17

**president** 123:8,11

**press** 73:14

**presume** 41:17

**pretty** 48:10 58:5 111:18

**previous** 67:19 71:12,25 110:16
126:14 127:3

**previously** 138:8

**primarily** 61:11

**principles** 27:12

**printed** 62:21,24 64:2 101:4

**prior** 128:22

**priority** 130:8

**prison** 8:24 30:25 33:21 34:10
71:10 87:10 90:16,17 114:11
121:4 138:24 144:6 145:8

**prisons** 64:18

**privy** 127:2

**pro-active** 149:10

**problem** 37:1 44:14 46:18 53:8
117:1 130:19 145:25 146:1

**procedure** 54:6 112:24

**proceed** 132:21

**process** 10:13 11:9 17:6 18:6
44:22 85:22 86:5 109:14 121:17

**processes** 122:20

**proctor** 113:15

**procure** 106:8 114:6

**procured** 136:17

**procurement** 94:25 97:5 106:11
135:22

**producing** 74:10

**professional** 49:18 56:2 57:5
96:9 142:13

**program** 14:4 22:9,18,20 35:2,15
36:17,25 48:8 78:14 88:20 89:6,
12 90:9,10 92:4 135:19 136:19
137:11,20 138:10,13,17,18

**programming** 24:22 33:22 34:5
35:6,25 36:22 37:5 38:5,7 39:2,9
81:17 88:25 89:2 90:4,22 93:2,5,6

128:24 142:9,10 145:23

**programs** 22:12 24:11 27:25 31:2 89:18 94:4

**progress** 149:11

**prohibit** 147:25

**prohibited** 135:25

**prohibition** 81:18

**project** 13:14

**proper** 60:15 112:24 127:19

**properly** 36:16 107:15

**property** 11:20,23,25 18:4,5 24:8 104:12,17,18 105:11,21 106:2,7,14 107:1,6,7 112:21 114:1,2 136:10

**proposed** 148:22

**proselytize** 102:4 133:16,19

**protocol** 23:3,22,25 24:10,12 60:17 81:21 92:21,22 95:2

**protocols** 23:19 86:1 93:7

**provide** 6:9,12,23 9:15 10:13 28:12 29:17 78:4

**provided** 31:22 58:23 67:21 80:20 150:10

**providing** 22:17

**publishers** 110:3

**purchase** 41:2,21 43:15,16 44:22 61:19 94:16 97:21 106:3,4,9 108:25 110:1 111:13,25 112:12,17 113:4,24 135:8 136:1,11

**purchased** 61:2 94:15 95:20 120:17

**purchases** 135:25

**purchasing** 41:16

**purpose** 33:2,5

**pursuant** 20:8

**pursue** 38:13 133:12,24 134:2

**pursued** 146:24

**pursuit** 144:25 149:18

**put** 10:15 28:23 37:14 41:23 53:7 54:11 67:10 68:22 72:10,24 108:7 116:10,18,21 117:11 123:24

## Q

**quarrel** 120:23

**quarter** 125:5

**quarterly** 125:4

**query** 87:25 133:3

**question** 9:14 17:12 23:7,14,15 28:3 39:13 44:20 46:1 50:11 51:14 52:8,25 53:21 57:17 62:3 63:25 65:11 71:12,15,25 73:7 76:22 77:8 84:9 86:7 87:13 88:8 105:8 110:15,20 111:10 117:4 118:18 119:2 124:16,17 125:22, 23,25 126:17 127:1 135:5,6 140:13 141:3 143:15,20 146:15, 16,19,23 147:22 151:4

**questions** 8:22 9:13 11:11 28:7 34:25 46:3 48:12 55:9 58:10,20 62:2 99:7 107:25 116:5,14 151:23,25 152:2

**quick** 151:19

**Quinten** 19:15 87:21

**quit** 58:21 85:23 116:14

**quote** 84:19 95:18

**quoted** 102:2 120:21

## R

**RAC** 125:20 135:18

**raised** 9:7

**Ramadan** 48:7 58:24 62:5 64:20, 23 65:9 68:24 69:18 71:17,24 72:7,18 74:23 75:6,22 76:7 77:3, 10,16 79:14,25 80:13,18 81:2,3,5, 7,14 82:2,6,12,19,20 83:7,20,25 86:10 87:11,22,24 114:9

**Ramadans** 99:9

**rare** 141:11,12

**rarely** 123:10

**Rastafarians** 31:21,22

**ratification** 108:6

**ratio** 141:21

**rationale** 44:15 66:24,25 118:6, 10,12,20

**re-entry** 22:17 24:23 27:7,10 88:24

**reach** 9:14 144:23 147:6,16 148:5

**reached** 145:14 147:4 148:21,24

**reaching** 149:6

**read** 33:5 84:3,11 88:7 118:3,17 125:15 146:17

**reading** 81:15 118:14

**reads** 146:18

**ready** 97:15

**realize** 51:6 125:16

**realm** 40:1

**realtime** 122:19

**reason** 6:4,6 95:23 148:6

**reasonable** 127:21

**reasons** 109:6,9 122:23,24

**recall** 83:6 84:16,21 85:16,17 86:11 87:16 112:1,4 115:1,10,12, 13 124:6 133:6 136:4 137:15,22, 23 148:20 149:6

**receipt** 81:10,11

**receive** 74:21 80:15 81:13 97:9 109:10 124:20 125:9 130:23 133:25 135:7

**received** 8:19,20 37:20 105:2 120:16 121:6 124:7 125:4 127:20 131:3,6 134:17 136:18 137:10,19 150:17

**receiving** 74:23

**recess** 40:23 83:3 97:18 132:11 151:22

**recitation** 88:9

**recognition** 12:24 21:15 73:7

**recognize** 27:6 42:3 72:15 117:15,18

**recognized** 6:11 12:21 21:13 66:4 89:9 94:14 104:2 139:21,22, 23 145:3 146:24

**recollect** 30:11 44:20 62:19 130:4

**recollection** 73:25 101:21

**recommend** 135:17

**recommendation** 18:11 76:1,3
104:13 149:13

**recommendations** 8:22 10:19

**recommended** 90:20 91:2 92:7
136:16 138:9 139:1 144:18,24
147:5,15 148:4

**record** 5:3,19 15:6 23:13 40:22
50:25 54:23 111:7 117:7,9 132:9

**records** 130:22

**Recovery** 26:10,24

**recruit** 6:16 7:1 89:3 145:5

**recruiting** 146:12

**rectified** 49:24

**redirect** 109:4

**refer** 120:20

**reference** 117:24 119:3

**referenced** 118:25 127:14

**referral** 147:25

**referrals** 145:13

**referred** 124:18

**referring** 87:2 98:25 99:1 100:3
102:16 118:23 124:9 128:25
135:1

**reflect** 88:18

**refuse** 58:13

**refusing** 116:10

**regular** 35:2 64:6,7 65:1 119:9,
14 120:9 149:16

**regular-** 33:19

**regularly** 39:3,15 142:4,15

**related** 16:1,10,18 103:17 110:2,
19 140:7

**relationship** 9:16 10:4 71:6 96:9
111:3,6 115:5

**relationships** 6:14

**release** 16:5

**released** 73:24

**relevant** 15:22

**religion** 8:14 9:1,6,25 10:10

12:22 16:1,3,10,18 30:14 37:16
50:15 52:10,20 57:11,12 90:23,25
91:8,9,24 102:8 103:6 109:8
123:15 133:17 139:3,19,20,21,22,
23 140:7

**religions** 6:10 12:21 21:13 22:14
29:18 62:18 66:3 82:4 96:21
101:5 102:6

**religious** 6:10,17 8:8,9,12,23
10:12 11:2,15,17,20,21,24 12:7,
15,18 13:3 15:4,14 18:20 20:5,12,
17 22:12,24 24:6,8 25:24 31:1
41:16 43:2,17 44:23 48:3 54:6
55:22 57:6 67:15,18 68:5,11
70:10,12,22 71:8,9 73:1,2,12
78:1,15 79:4,22 85:11 87:6 88:17
89:11,21 90:18,19 91:8 92:6 96:1
99:2,6,17 100:13 103:11 104:9,
14,18 105:20,25 106:2,15,20,25
107:5,14 108:13 109:12 114:2
115:14 124:22,24 125:1,7,13,19
127:7,15,17 129:7,10,14,23
130:16,22 131:16 134:14,16
135:19,20 136:7,19,22 137:11,20
138:13,17,22 139:2,15,16,17,20
140:9,18 141:24 142:4 149:24
150:24

**remain** 36:5

**remained** 90:2

**remedied** 46:16

**remember** 20:19 30:1,10 41:9
44:6 45:2,7,13 46:4,8 47:4 50:6
62:13 68:3,15 72:1,3 85:20 86:13,
15 94:18 98:9 99:10 101:24
109:20,21 117:25 118:14 120:14
130:7 147:1 148:13,18,23,24

**remembers** 110:22

**reminded** 151:8

**remote** 74:21

**remove** 78:17

**removed** 74:23 75:9 81:2

**repeat** 7:20 17:12 43:6 46:1
63:25 84:9 97:14 129:20

**repeated** 84:2,10 86:2 137:15

**repeatedly** 55:6 85:25

**repeating** 147:21

**repetition** 31:12

**rephrase** 23:5 53:21 57:17 77:7

**rephrased** 71:25

**reply** 108:18 135:17

**report** 123:16,22 146:8,9,10

**reportable** 130:13

**reported** 82:8

**reporter** 5:3 31:11 146:18

**represent** 5:5 102:6

**request** 10:15 11:19 12:15,24
16:14 17:21 18:1,20 20:8 21:25
24:4 35:23 36:4,5,11 37:20 62:22
89:15 90:2,11,18 91:14,16 92:7
93:13,17 96:22 103:24 104:7
105:2 106:15 109:23 120:16
124:19 125:13,19 126:19 127:7
135:7,19 136:15 137:10,23
138:24 139:7 141:13

**requested** 37:22 71:22 88:15
89:10 103:14 121:21 148:25

**requesting** 16:1 108:24 134:21

**requests** 9:6,23,24 10:10 11:2,
15,18 12:8,18 16:7 17:15,18 19:5
20:5,12,18 26:10 29:19 61:23
96:11,23 103:12 105:6,15 111:19
121:6,12 125:8 130:23 131:16
132:23 136:6,18 137:20 141:10
149:24,25 150:14,18,24

**require** 14:1 113:13 131:22
142:10

**required** 14:19 89:3 100:22,24

**requirements** 65:4,6

**requiring** 54:2

**research** 72:8 103:22,25 104:4

**resident** 145:17

**Resolution** 26:13,23 27:1

**resource** 7:18,24

**respect** 57:4

**respond** 54:7 124:23 125:2
150:2

**responded** 55:18 147:2

**responds** 126:8

**response** 31:12 58:9 72:2 85:4
89:22 124:8,21 127:21 128:20,23

129:4,7,22 150:15

**responses** 128:6 129:14 130:16

**responsibilities** 36:25

**responsibility** 16:25 28:11 106:8,9,10 134:2

**responsible** 10:7 29:9 31:14

**responsive** 110:15 150:13

**responsiveness** 130:5

**rest** 76:6 108:1

**restate** 118:18 119:2 125:6

**restated** 84:10

**result** 20:23 21:13 49:16 79:24 90:25 104:12

**retract** 23:20 67:19

**retune** 125:9

**return** 33:20 35:21

**returning** 35:4

**Reverend** 89:24 124:23

**review** 20:14 91:19 115:6 135:22

**reviewed** 10:16 13:1 17:22 92:7 106:16

**revisit** 110:12

**ridiculous** 116:9

**right-hand** 134:6,9

**rights** 24:7 54:7 57:6

**Riverbend** 145:13

**RLUIPA** 103:5

**road** 128:18,25

**role** 9:5,21 11:3,7 13:4,13 20:13 41:11 45:9

**room** 58:4,7,8,11,13,18 105:9 109:13 110:9,10 111:15,21 115:21 116:1,4,19 137:8

**rotated** 23:1

**rotating** 30:17 93:25

**rough** 24:18

**roughly** 65:25

**round** 108:14

**rounds** 29:9

**routine** 12:3 14:20

**rug** 114:2

**rugs** 112:22

**rule** 78:7

**rules** 54:19

**run** 39:23 88:20 89:12,18 95:5

**running** 38:2 40:4 87:21

**Russell** 134:13

---

**S**

**S-O-N-G** 90:15

**safety** 56:6 91:20 122:16

**SAITH** 152:7

**sake** 148:1

**salute** 151:17

**sandals** 121:10

**satanist** 80:4 90:24

**satisfaction** 133:25

**satisfactorily** 8:18

**satisfactory** 38:3

**satisfied** 146:13

**sausage** 64:25 65:3,4,5,7

**save** 15:22

**saved** 15:2,3,17,23

**schedule** 34:3 130:13 141:17 144:8

**scheduled** 33:20 39:3,15

**scheduling** 31:14,25

**scholar** 56:14 145:17

**school** 109:15 113:11

**scope** 23:3 102:8

**screen** 14:23 22:10 41:24 68:23 72:11 138:2

**screened** 107:15

**scroll** 42:6,22 69:7 83:15,16,21 117:17 132:19 138:3

**scrolling** 125:15

**scrutinized** 51:9

**seasonal** 62:20 65:18,19,21,22 66:5

**secretary** 41:18 44:13 45:10

**Section** 136:1

**security** 28:13 56:7 91:20 107:9

**seek** 66:8 129:9

**seeking** 18:3 20:7

**seminars** 142:8

**sends** 21:24

**senior** 10:22 114:5

**sense** 8:13 21:8 55:12 95:9 142:24

**sensitive** 74:16

**sentence** 36:11 43:1

**separate** 25:15 34:4 35:12 47:1 88:18 93:16 97:22

**series** 43:2 132:14 138:5

**sermon** 24:24 25:21,25 26:1

**served** 97:25 98:1 101:7

**server** 71:1

**serves** 7:25

**service** 16:7 22:12,23,24 24:2,3, 21 25:4,16,17,20 27:16 28:4 29:13,23,24 30:6 31:19,20,21 33:20 34:4,11,12,18 35:7,8,11,19, 20 36:14 37:3,8 38:7,8,10,16,19 39:3,9,11,15,17 40:14,16 48:17 60:10,20,23 61:14 63:3,7 73:10 77:19 94:2 98:10,12 99:8,18 100:13 105:5,14 106:3,5 107:13 120:14 131:22 133:10 140:9,18 141:5

**services** 6:17 7:12 8:9,12,23 9:3 11:20 13:25 22:4,23 23:4,8,19,21, 23 24:1,14,20 25:2,19 26:1 31:10, 22 33:18 34:15,25 36:2,6 37:24 65:15 105:17 106:25 120:6 135:20 140:4,23 141:22,24 142:4, 16,23

**serving** 100:20 114:11

**set** 87:8 92:14 116:7 138:1

**setting** 12:23

**setup** 116:2

**Seventh** 25:13

**shakes** 78:19

**share** 28:9 132:4

**shared** 31:2 48:24 74:2

**shifting** 40:1

**shocking** 131:15

**Shonebarger** 5:15,20 23:6
40:25 42:3 44:3 55:11 83:5 92:17
97:20 107:12 117:15 132:13
144:8 146:23 147:13,21 152:4

**short** 33:24

**shouting** 151:12

**show** 39:17 83:8 132:13 138:1

**showed** 41:7,10

**showing** 145:5,22

**side** 69:24

**sign-ups** 48:6

**signed** 81:7 82:6,18,19 143:25

**Simic** 19:23 90:7 134:12

**similar** 32:9 63:22 64:2

**sincere** 81:22

**sincerely** 103:6 133:11,23,25

**sincerity** 75:10,12

**single** 102:7 111:24 113:16
137:4

**sir** 23:14

**sit** 37:9 141:24 142:4,15

**site** 129:8

**sitting** 116:12,13 142:18

**situation** 6:25 41:1 49:13 71:21
76:17 124:7,9

**situations** 95:19 105:25

**slash** 135:18

**slaughter** 59:17

**slaughtered** 65:3,5

**slightly** 116:10

**slippers** 102:14

**small** 24:9 27:24 31:1,17

**smaller** 37:9

**snarly** 53:2

**sneak** 75:6

**socks** 102:13

**solstice** 101:10

**solver** 53:9

**Song** 90:15,19 121:25

**Song's** 138:21

**sort** 7:6 49:12

**sounds** 11:1 25:2,24 39:1 40:5
56:22 86:19 142:13 143:11 147:5,
13 148:3 150:5

**source** 109:15

**sources** 111:14

**South** 63:6

**space** 12:25 30:23 91:12

**speak** 10:22 15:10 45:23,25 46:2,
10 48:11 67:22 73:14 89:24
144:14,19

**speaking** 55:2 101:20

**speaks** 108:11

**special** 64:19,20 65:21,22
102:13 142:9

**specific** 10:10 13:21 15:18,21
34:24 40:9 56:18 68:15 87:2
103:4 115:11

**specifically** 8:25 59:9,10 115:8

**speech** 137:8

**speeches** 144:10

**spend** 146:6

**spending** 141:10

**spent** 90:5 99:7

**spiritual** 6:13 7:9

**spoiled** 67:2

**spoke** 45:11,13,17 46:7,12 84:4
133:2

**spoken** 48:13,16 50:2 114:7
120:22

**sponsored** 67:18

**sponsors** 144:5,13

**staff** 10:2 19:11 46:8 53:3 74:22
82:7

**stamped** 134:5,8

**stand** 90:10 100:8 138:10 140:17

**stand-alone** 90:9 137:5 139:7

**standard** 58:5 79:8,17 85:10
92:1 116:1,16

**standards** 59:8,16 60:1,3

**standing** 106:22

**standpoint** 28:13,14 95:23

**state** 5:13,19 12:21 27:9 60:14
66:4 96:21 105:22 115:6 135:16
137:1,7 138:11 139:22,24 145:4

**stated** 38:18 65:18 66:7 85:24
121:15 129:12 130:8 131:20
136:8 138:9 140:16

**statement** 84:3,18 86:14 90:8
95:7 98:23 117:24 118:9,11
120:22 144:11 146:7

**statements** 57:7,10,14,19

**states** 42:23 86:25 127:17 133:1

**stating** 144:12

**stay** 33:21 35:5,24 36:12,21 37:3
38:18 39:8 73:8 108:2

**staying** 35:3

**Steakley** 133:15 135:4

**step** 22:11

**steps** 113:12

**stood** 49:1

**stop** 36:10 125:14

**stopping** 37:19

**store** 95:14 97:8 112:5,13,14,18

**stored** 15:8

**storeroom** 46:23

**stores** 113:20

**Stranch** 5:9

**strange** 131:2

**strike** 30:12 38:6 97:7 110:19
111:9 119:8 125:17 134:6 146:14
147:11 149:19

**striking** 151:11

**strongly** 112:6,9

**studies** 26:1,4 30:13 32:6,8 40:10 88:15 90:12 122:1 138:6 139:25 145:19

**study** 25:18,21 28:5,19,24 29:22 32:2,10,14,15,16,19 33:3,11 34:1 37:21 39:16 90:3,11 93:16,24 94:2,5 139:6,10,15 141:5

**studying** 136:14

**stuff** 116:15

**stupid** 116:17

**subject** 12:2 18:10 30:19 39:24 68:24 103:22 108:15 136:14 149:17

**subjects** 32:22 86:20 94:6

**submission** 125:20 128:2

**submit** 13:8,18 17:21,23,25 20:7, 11 36:15 93:13 94:23 97:3 107:22 135:17 146:20

**submitted** 14:6 15:5 24:18 30:20 73:3 77:18 87:14 90:19 106:16 107:15 108:12 109:4 125:3 126:1 127:7,15 128:14 131:11 136:14, 15 138:24 150:14

**submitting** 89:1

**Substance** 26:11,24

**success** 111:7 150:8

**successful** 150:11

**suffices** 59:18,21

**sufficient** 94:5

**suggest** 151:16

**suggesting** 74:6

**suit** 51:3

**Sunday** 24:21 28:22 29:23 30:7

**Sundays** 30:8

**sundown** 59:1

**sundry** 30:25

**Sunni** 23:20,21,23 34:16 35:8,11 36:3 136:23 137:14,20,22 138:13

**Sunnis** 33:18 40:7

**sunrise** 75:3

**sunset** 75:4,9 77:5 81:8

**superior** 13:8 95:24

**supervise** 6:16 7:2 28:12

**supervision** 55:20

**supervisors** 51:9

**supplies** 43:20 136:10

**supply** 41:3 43:16,17,22 61:3,5, 12 67:13 96:15,20,25 97:14 105:18 112:16,25

**support** 57:12 109:11

**suppose** 63:20 85:2

**supposed** 36:17

**surpasses** 94:7

**surrounding** 83:6,7

**sworn** 5:16

**system** 95:5

**systems** 85:4

---

## T

**T.V.** 91:15

**table** 108:14

**takes** 38:5

**taking** 53:7 76:15 81:16

**Taleem** 22:23 34:11,15,18,25 35:7 36:2,6 37:3,8 38:7,8,10,11, 19 39:3,9,15,17 40:7,9,11 49:2 92:3 93:17 120:6,14 138:13 140:3

**talk** 16:3 23:9,12 44:25 47:5 55:4 70:23 78:6 98:22 114:13 145:2,3

**talked** 20:4 78:8,12 114:15 138:21

**talking** 13:22 15:19 16:15 18:4,5 22:6 37:15 46:8 47:25 50:19,20 83:6 85:23,24 99:7 113:7 115:4 123:13,14 130:21 131:12 142:6,7 150:13

**targeted** 34:13

**Tarver** 139:6

**taught** 38:25 138:23 141:4,5

**TDOC** 8:25 19:5 20:8 21:15 46:10 51:4 66:18 70:21 71:2,7,10 79:4 90:16 92:9 96:13,17 97:12 98:7 99:12 100:1 104:18,25 105:1,7, 12,16 107:19,22 108:4,6,8 114:20,21 115:5,6 118:6 120:20, 21 121:12,14 126:1 129:7,16,21 130:17 135:18,25

**teach** 33:4 91:25

**teaches** 33:13

**teaching** 34:12 92:14

**teachings** 26:15

**Technically** 107:4

**telling** 53:23 56:20 75:19 126:16

**tells** 114:4

**ten** 22:20 29:12 51:24 52:5,6 53:19,24,25 122:15

**tenet** 22:24 30:7 56:18 65:12,13 78:9,15 103:22

**tenets** 16:5 27:20 56:1,8,11,12, 17,23 92:2 108:15

**Tennessee** 5:13,23 6:11 7:10,21 8:16 11:24 16:23 18:18 22:8 27:7, 10 51:11 70:10 71:7 73:8 77:25 79:21 80:8,9 85:9 96:14,25 99:16 104:2,9 108:13 115:4 121:23 136:12 137:2,7 139:23,24 145:7 146:1,25

**Tennessee's** 105:19 112:15

**tenure** 8:10 12:9,13,14 13:2 19:24 31:3 48:20 120:12,18 143:17,18

**term** 18:7 26:11 119:24

**terminology** 33:1 92:12

**terms** 11:1 40:5 49:5 54:12,24 104:24

**test** 37:14

**testified** 18:25 37:4 79:12 105:11 112:7

**testify** 6:4 81:10 107:6

**testifying** 76:15

**testimony** 55:11 76:18 111:16, 18,23 147:14 148:3

**text** 28:7,16,17 43:23

**texts** 32:20 33:8 37:17 41:16
43:2,17 44:1,23 134:22 135:8
136:7

**theology** 28:21,23 29:21 30:10

**thing** 7:6 34:23 38:17 59:12
73:11 116:17 126:16 131:25

**things** 9:17 10:7,25 11:22 12:25
14:19 16:2 30:25 36:15 46:22
48:23 49:3,4,6,17 51:12 53:9
55:17 57:19 59:17 87:20 88:22
89:10 94:16 96:3 100:21 115:6
137:9,16 142:9 143:25

**thinking** 55:22 57:24 74:4 135:3

**Thomas** 5:15,20

**Thompson** 91:5 130:20 133:2
139:4

**thought** 44:21 70:17 98:18
122:20

**thoughts** 39:23

**Thursday** 25:1 91:13

**time** 5:4 12:25 30:21,22,23,24
33:25 34:7 36:11 37:24 38:2 39:5,
8 43:24 47:14 48:15 58:21 62:19
72:9,24 85:15 91:4,12 93:6,17
97:20 98:10 101:5,6 129:6,13
130:1 136:24,25 139:5 141:10,16
143:8,12 144:7,8 145:11 146:6
152:5

**timeline** 125:10

**timely** 128:6 130:15

**times** 10:5 28:1 50:1,7,13 51:15,
24 54:20 77:20 78:21,22 85:3,6,
12 117:8 124:12 129:3 130:3
143:21

**timing** 78:3

**title** 5:24 63:22 83:11

**today** 6:5 36:12 63:12 125:9
140:17 141:18

**told** 54:20 55:6 62:8 74:5 79:6
91:23 145:15 148:14

**Tom** 19:23 134:12

**tool** 8:16,17,25 9:3,10,20,21

**tools** 51:10

**top** 29:17 42:8 64:2 73:6 83:16

**topic** 40:2 93:25

**Torah** 43:9

**total** 21:20 39:4 92:4

**touch** 9:18

**tough** 91:22

**track** 82:2

**traditional** 84:6

**train** 6:16 7:1

**trained** 11:23 56:2

**training** 8:20

**transfer** 90:16 126:13

**transferred** 144:6

**translate** 54:24 140:2

**Translated** 79:24

**translates** 32:23

**translation** 43:11

**travel** 128:23 130:10

**tray** 59:25 60:5,7 62:8 64:6,7,8
65:1,2,8 70:19,20,25 71:9 74:21,
23 75:7,9,20 76:16 77:4 78:20
81:11 82:8 115:14 119:9,10,14,15

**trays** 60:16 64:7 77:23 82:7

**treatment** 9:13 10:17,20 12:3
13:9,11,19 14:3 50:15 51:18
52:10,20 97:4 107:21 135:24

**tremendous** 111:6 150:8

**trick** 119:11

**Trinity** 61:15,16,20 65:15 87:14
97:21 102:11

**trouble** 129:22 130:15

**Trousdale** 5:22 6:3,8 7:15 8:7,9,
11 12:19 13:4 14:8 16:11 19:2,10
21:3,25 28:20 29:22 31:3 41:1,20
44:1 48:20 50:13 57:12 59:18,20,
22 61:14 62:10 63:12,14,15 64:11
65:17 75:14 76:5,19 77:2 79:22
80:10 87:8 94:16 97:21,24
103:12,13 108:21 121:22 123:3
126:15 127:4,5 135:21 144:18
145:10,25

**Trousdale's** 145:1

**true** 57:11 118:11 148:11,12

**trust** 94:23

**truthfully** 6:5

**TTCC** 90:10 125:20 133:3 144:7,
9

**Tuesday** 25:4 35:9 40:6,11,12

**turn** 132:6

**Turner** 5:22 79:22 80:10 87:8
135:21

**turning** 23:6 115:20

**two-and-a-half** 36:20

**type** 16:13 67:22

**typed** 143:24

**typically** 25:22 30:8 75:12 101:7

**typo** 69:15

**U**

**Uh-huh** 71:13

**ultimate** 140:1

**umbrella** 27:18

**unable** 66:19 144:13

**uncertain** 45:22 61:7 64:15 67:1

**uncertainty** 67:4

**Unclear** 94:20

**underneath** 43:1

**understand** 53:5 67:8 70:11,15
79:16 99:25 122:8 136:24

**understanding** 12:17 42:18
102:19 103:13,16 118:22 127:10
129:18

**understands** 70:9,22

**understood** 71:6

**Union** 41:3 43:16,17 61:3,4,12
67:13 96:15,20,25 97:14 105:18
112:16,25

**unit** 29:1 35:22 39:6,7,12 73:8
141:11

**units** 133:20

**Unknown** 60:12 63:1

**Unsure** 94:20

unwise 73:17

up-to-date 87:23

upcoming 48:8

updates 48:12

upset 51:5

Upton 63:13,19

**V**

vacancy 63:5,8

vague 50:18

Vaguely 102:18

Valor 22:15 24:22 27:3,7,16,17,
21 28:15 87:6,9 88:20,24

Vantell 63:11

vegetarian 60:4 118:25 119:7,
13,16,20,22,23

vendor 60:20,23 61:14 96:14
97:14,22 105:19 111:24 112:16,
22 113:5,18,25 114:4,5 120:17
137:1,4

vendors 60:10 61:20 94:11
95:21 96:12,18 111:12 135:23

venerated 57:4

verbal 89:14 137:25

verbally 47:25 128:20

verify 6:22 86:18 92:24

verse 101:16

verses 68:13 101:12,13 102:2

versus 18:8 71:11

vetting 108:14

vice 123:8,11

Vicki 137:3

view 17:23 18:15 20:15,22 28:9
37:17 122:5

Villers 33:14

violate 77:16 81:1 100:6,11

violated 80:3,7 100:1

violating 100:9

violation 90:21 91:19 98:5,6,8,
17,22,24 99:23

virtual 6:24

virtually 5:7 9:16 110:7

visibility 10:1,3 61:8 66:7 94:20
95:11 101:4 107:8

visuals 91:15

voice 41:13,14

volume 94:7

volunteer 7:15 8:1 9:3,10 27:17
30:18 120:4 145:1,6 146:5

volunteered 88:24

volunteering 145:4

volunteers 6:16 7:2 8:5 22:15
28:12 30:4,8 71:14 89:2,4,11
142:11 145:1,14 147:16 148:4,22
149:17

voyage 20:3

**W**

waiting 127:23

walk 58:10 77:17

walking 50:19

Walton 8:11 9:5,23 129:12

wanted 29:4 38:4,18 43:22 44:25
47:1 88:20 89:6,12 112:23

Wanting 16:6

warden 9:12,13 10:17,20,21,24
12:3 13:9,11,19 14:2 17:24 41:18
42:14,16 45:18,19,23 63:3,5,11,
12,13,16,18,19 72:22 79:3 87:25
89:16 91:3 92:8,9 97:4 106:17,19
107:21,22 108:11,17,20 109:4,5,
16,22 113:2,13 123:3,21,23
134:12,14 135:24 136:9,17
138:25 143:14 146:10

warden's 8:4 41:18 44:13 45:9
113:2

wardens 93:3

Washburn 134:13

wasting 58:21

Wattwood 13:12 123:23

ways 15:25 16:17

wear 103:3,6 121:1

Wednesday 27:4 28:2 35:10

week 22:5 23:8 24:15 26:5,8,19,
21 33:18,24 34:5,25 90:6 92:4
93:23 94:4 139:9 141:7 142:19

weekly 30:13 138:13

weeks 63:20 90:1

weight 121:20 122:9

Welborn 5:10 11:11 17:8,11
23:10,16 39:19 40:13,19 43:18
45:3 48:19 49:14 50:9,17,24
51:19 52:12,22,24 53:20 54:13,
20,25 55:5,14 57:16,22 58:2,9,15,
20 64:4 76:9,20 79:20 83:1 84:12
97:17 99:14 100:2 110:17,21
115:18,23 116:2,12,23 117:1,4,9
121:2 126:22 130:11 132:5,10

whatsoever 92:12

wheels 36:15

whine 54:3

Wicca 80:4

Wiccan 90:24

willful 81:11

Williams 143:3,5 144:12,16,24
146:20,25 147:15 148:5,21
149:23 150:10

window 33:23 34:10

windows 31:1

winter 101:10

withdrawal 94:23

witnessed 120:12

Witnesses 31:19

women 120:25

women's 121:4

word 64:1 88:12 102:17 145:6

words 22:10 91:13 100:9

work 8:3 20:25 66:9 74:1 130:9
147:9

workers 48:21 73:16

works 85:25 115:19

world 66:3

worn 102:21

**worried** 117:2,5

**worrying** 116:14

**worship** 16:5 24:21 29:23 146:24

**write** 74:12 79:5,6 89:6

**writing** 78:25 91:15 135:20
136:25 146:21

**written** 84:13 101:17 125:18
134:12 136:18 137:10,19,25

**wrong** 57:15

**wrongdoing** 49:12

**wrote** 147:2

---

Y

---

**year** 19:17 29:10 59:5 62:12 80:6
87:7,12,18 98:4 128:23 145:18

**years** 6:2 30:2,9 49:1 63:17
66:22,23 95:10 98:20 117:25
122:16 143:13,19 149:24

**Yolanda** 45:20

---

Z

---

**Zoom** 5:7 27:25 116:3