```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE MIDDLE DISTRICT OF TENNESSEE
 2                    NASHVILLE DIVISION

 3

 4   BOAZ PLEASANT-BEY,           )
                                  )
 5      Plaintiff,                )
                                  )   Case No. 3:19-cv-00486
 6   VS.                          )   JUDGE TRAUGER
                                  )   JURY DEMAND
 7   STATE OF TENNESSEE, et al,   )
                                  )
 8      Defendants.               )
     _____X
 9

10

11

12

13   _____

14

15              DEPOSITION OF DANIEL KNIGHT

16             TAKEN ON NOVEMBER 17, 2021

17

18   _____

19

20

21

22
     Prepared by:
23   Carole K. Briggs, LCR #345
     Briggs & Associates
24   222 Second Avenue, North, Suite 340M
     Nashville, Tennessee  37201
25   Briggscourtreporting@hotmail.com
```

```
 1                         APPEARANCES:

 2


 3


 4     FOR THE PLAINTIFF:

 5
       MATTHEW JACOBS, ESQUIRE
 6     Branstetter, Stranch & Jennings, PLLC
       The Freedom Center
 7     223 Rosa L. Parks Avenue, Suite 200
       Nashville, Tennessee  37203
 8     mjacobs@bsjfirm.com

 9
       FOR THE DEFENDANT, STATE OF TENNESSEE:
10

11     ERIC ANDREW FULLER, ESQUIRE
       Tennessee Attorney General's Office
12     P.O. Box 20207
       Nashville, Tennessee  37202-0207
13     Eric.fuller@ag.tn.gov

14

15     FOR THE DEFENDANT, CORECIVIC:

16
       ERIN PALMER POLLY, ESQUIRE
17     K&L Gates, LLP
       222 Second Avenue South, Suite 1700
18     Nashville, Tennessee  37201
       joe.welborn@klgates.com
19     Erin.polly@klgates.com

20

21

22

23
```

1                          TABLE OF CONTENTS

2

3    Witness                                              Page

4

5
     DANIEL KNIGHT
6
     Examination by Mr. Jacobs                             5
7    Examination by Ms. Polly                             71

8

9

10

11                          LIST OF EXHIBITS

12

13
     Number      Description                             Page
14

15
     Exhibit 1    Notice of deposition                    6
16
     Exhibit 2    Memorandum opinion                      20
17               Re: Ricky Oliver case

18   Exhibit 3    2nd supplemental initial                27
                  disclosures
19
     Exhibit 4    Audit, October 29-31, 2018              33
20
     Exhibit 5    Noncompliance items                     37
21
     Exhibit 8    Report Re: Clyde Hubbard                49
22
     Exhibit 10   Incident report Re: Tyler Corbitt       56
23
     Exhibit 11   Cell search investigation               63
24               Re: Greene

25

```
 1                    S T I P U L A T I O N

 2

 3

 4

 5            The deposition of Daniel Knight, taken on

 6    behalf of the plaintiff, remotely via Zoom, by agreement

 7    of parties, on November 17, 2021, for all purposes

 8    allowed under the Federal Rules of Civil Procedure.

 9            It is agreed that Carole K. Briggs, licensed

10    court reporter for the State of Tennessee, may swear the

11    witness, take his deposition, and afterwards reduce same

12    to typewritten form, and that the reading and signing of

13    the completed deposition by the witness is not waived.

14

15

16

17    (Unless name spellings are provided, all names are

18    spelled phonetically to the best of the court reporter's

19    ability.)

20

21

22

23

24

25
```

1            (Whereupon, the foregoing deposition

2            began at 1:07 a.m.)

3            THE COURT REPORTER:  We are on the record.

4   Today is November 17, 2021, at 1:07 p.m.  At this time,

5   would each attorney please introduce yourself, who you

6   represent and that you agree to take this deposition by

7   Zoom.  And we'll start with Mr. Jacobs.

8            MR. JACOBS:  Good afternoon.  I'm Mr. Matthew

9   Jacobs.  I am representing Mr. Pleasant-Bey in this

10  matter.  And I have agreed to take this via Zoom.

11           MS. POLLY:  Erin Palmer Polly.  I represent

12  the CoreCivic defendants.  And I agree to take this

13  deposition by Zoom and am fine with it being recorded.

14           GENERAL:  Good morning.  I am Senior

15  Assistant Attorney General, Eric Fuller.  I represent

16  the TDOC defendants here.  And I also have no

17  objections.

18  Whereupon,

19                     DANIEL KNIGHT,

20  having been first duly sworn, was examined and deposed

21  as follows:

22  EXAMINATION BY MR. JACOBS:

23      Q.   All right.  Good afternoon.  Could you

24  please, sir, state your full name for the record.

25      A.   My name is Daniel Knight.  Gordon is my

Page 6

1    middle name.  I'm sorry.  Daniel Gordon Knight.

2          Q.    Do you understand why you are here doing this

3    Zoom meeting?

4          A.    Yes, sir.

5          Q.    And why are you here with us today?

6          A.    To testify on behalf of the company and the

7    happenings at the facility.

8          Q.    All right.  I'm going to share something with

9    the group here.

10               MR. JACOBS:  We're going to start with this

11   and enter it as Exhibit 1.

12               (Exhibit 1 was marked.)

13               MR. JACOBS:  Does everybody see that in the

14   chat?

15               THE WITNESS:  I just have the attachment, I

16   have to, I guess --

17               MR. JACOBS:  Well, I'm going to screen share.

18   I just want to make sure that it was in the chat.

19               THE WITNESS:  Okay.  Yeah.

20               MR. JACOBS:  Ms. Briggs, I think it says that

21   I'm disabled from screen sharing?

22               (Off the record discussion.)

23   BY MR. JACOBS:

24         Q.    Mr. Knight, do you see underneath Exhibit 1,

25   going to Page 2, do you see where it says notice of

 1    deposition of Daniel Knight?

 2         A.    Yes, I do.

 3         Q.    Have you seen this document before?

 4         A.    I don't think so.

 5         Q.    You have not?

 6         A.    If I have, it was sent to me when we first

 7    started the phone calls.  I don't remember if I have it

 8    or if it was up front with the warden's secretary and

 9    the warden.  I knew that I was taking part in this, I

10    just didn't know -- I am not sure if I actually received

11    this to my e-mail or if it was filed up front with the

12    warden's secretary.

13         Q.    Do you see where it says, you are hereby

14    notified that on the 17th day of November, 2021,

15    beginning at 1:00 p.m., by way of Zoom --

16         A.    Yes.

17         Q.    -- counsel for plaintiff will proceed to take

18    your deposition?

19         A.    Yes, I do.

20         Q.    Do you understand that that is the deposition

21    that you are a part of at this moment?

22         A.    Yes, sir.

23         Q.    Have you ever taken a deposition before prior

24    to this?

25         A.    I believe so.  That was a deposition, right,

Case 3:22-cv-00093   Document 83-12   Filed 05/04/22   Page 7 of 87 PageID #: 1587

1    Ms. Polly?  I was with the other case.  It was a grand

2    jury deposition, I believe.

3         Q.    You said with another case.  Do you remember

4    the name of that case?

5         A.    I don't remember the name.  I know the person

6    involved.  I don't know what it was.  Officer Lister, at

7    the time.

8         Q.    Do you remember if that was a civil or

9    criminal matter?

10        A.    I don't.  I don't know what it was filed as.

11        Q.    Do you remember if that involved CoreCivic?

12        A.    I don't think so.  I mean, I was there, but I

13   don't know what the terms of the deposition was or what

14   they were indicting on.

15        Q.    And you said you didn't remember what it was

16   about?

17        A.    It was to do with an officer and a use of

18   force, I believe.

19        Q.    An officer that used force.  Okay, do you

20   remember why you were called to be involved in that?

21        A.    Yeah, I had had a conversation, I believe,

22   with him.  And I do training here at the facility, so

23   they spoke with me about some of the training that comes

24   through and different procedures that we go through

25   here, what is taught in the training and things of that

1   nature.

2        Q.   What is your official job title here at

3   CoreCivic?

4        A.   I am the lead field training officer at

5   Trousdale Turner.

6        Q.   How long have you been in that position?

7        A.   I've been in this position for a little over

8   a year -- or right under a year.  January will be a

9   year, I'm sorry.

10       Q.   And what was your position before that?

11       A.   Investigative sergeant.

12       Q.   Was that also with CoreCivic?

13       A.   Yes, sir.

14       Q.   How long were you in that position?

15       A.   About a year, give or take a month or so.

16       Q.   About a year?

17       A.   Uh-huh.

18       Q.   Have you had any other positions with

19   CoreCivic?

20       A.   Yes, I have.

21       Q.   What were they?

22       A.   I had the -- I was the transportation

23   coordinator before I was -- I am sorry.  I was the

24   armory sergeant before I was the investigative sergeant.

25   And I was in that position for approximately two years,

1    give or take a couple of months there.  And then before

2    that, I was the transportation coordinator, which is a

3    senior correctional officer position.  I was over the

4    transportation teams at the facility, coordinating when

5    the teams would go in and out.  And also taking part of

6    those transportations.  And then that was the job I had

7    out of class since I've been here.  That was my first

8    position.

9         Q.    Are you currently working at the Trousdale

10   correctional facility?

11        A.    Yes, sir, I've been here my entire time.

12        Q.    When you say your entire time, what do you

13   mean by your entire time?

14        A.    Six years with the company.  I have been at

15   this facility since -- all six years.

16        Q.    For all six years that you've been with

17   CoreCivic?

18        A.    Yes, and in corrections, yes.

19        Q.    So you've been with CoreCivic the entirety of

20   your correctional career?

21        A.    Yes, sir.

22        Q.    What does your current position at CoreCivic,

23   what does to job entail?

24        A.    So I am the lead field training officer.  I

25   have a team of seven guys that are under me.  We assist

1    in training of the staff as they come through their

2    initial course that they have before they become a

3    correctional officer, whether it's security training or

4    the initial training for some of our other -- the

5    foundational stuff, the basic first two weeks that

6    everybody gets.  And then there's the other four weeks

7    worth of security training that they receive.  So we

8    assist in that.

9              And then we make daily contacts on the

10   officers as a program to make sure they know what

11   they're doing everyday, that we can respond if they're

12   having any issues.  We can teach them.  We can do

13   correction on them.  And then we can report those

14   findings.  The guys, my team, they give me those

15   findings or the issues that they have throughout the

16   day, and they report them back to me.  And then I can

17   share whatever I feel is necessary, as needed, with the

18   at ADO staff, the wardens, the chiefs, the AWs, and the

19   captains and lieutenants.

20             And then they can request from us, if there

21   is a need for us to focus on something to help the

22   officers, they see a common trend that they need or

23   something improved on, or if they know of an officer who

24   is struggling, they can request us to go spend some time

25   with them.  And I can schedule one of my guys to spend

1  multiple hours of their day maybe with that one officer,

2  things like that.

3      Q.    You said prior to that, you were an armory

4  sergeant?

5      A.    Prior to that, I was the investigative

6  sergeant.  And then prior to that I was the armory

7  sergeant.

8      Q.    What did your job encompass as the

9  investigative sergeant?

10     A.    As investigative sergeant, I was there to

11  assist the main investigator.  She was my supervisor and

12  any type of incident regarding staff that may not be

13  correct or they're doing the wrong thing, what we call

14  dirty staff.  Investigations into affairs and happenings

15  on the facility, whether it be assault, whether it be

16  contraband that we found, anything like that.

17            Looking into staff talkings and dealings.

18  Really, whatever the warden assigns for us to

19  investigate that maybe we needed to look at and have

20  more details on.  If a staff member was assaulted, then

21  we would review that staff assault, interview those

22  inmates, talk about that.  Help manage the affiliations

23  at the prison.  Things of that nature.

24     Q.    And then you said you were armory sergeant.

25  What did your job encompass as that?

1       A.      So I was in charge of all of the security

2    equipment and accountability of all of the security

3    equipment for the facility.  Tracking, adding, all of

4    the firearms, the munitions, the ammunition.  All of the

5    munitions that we use and security equipment that we

6    have.  It was my responsibility to make sure they were

7    serviced, cleaned, accounted for.  Monthly reports on

8    anything that had to do with our inventory, whether it

9    changed, went up, went down.  I ordered munitions as

10   needed or equipment as needed.  And then was in charge

11   of tracking those in the facility monthly.

12       Q.      So in your efforts as an investigative

13   sergeant, you kept track of various incidents,

14   contraband and things of that, right?

15       A.      Yes.

16       Q.      So you kept -- you would have put records,

17   some type of written records somewhere for that when you

18   logged those?

19       A.      So for me I was the -- underneath the main

20   investigator, so if I had to go interview an inmate or

21   we recovered evidence from somewhere, then yes, we would

22   document the evidence or conduct the interview.  I would

23   send my synopsis of my interview to her for submission

24   if it needed to be submitted or put into a record.  I

25   didn't handle the records, the actual official records

1    of it, but I would give her the documentation and she

2    would file it officially, as far as any type of

3    contraband or item recovered.  If I -- we would empty

4    the evidence box or we would have the item, and the

5    investigation department was in control of the evidence

6    side, yes.

7         Q.    But there would be some records somewhere of

8    these incidents, right?

9         A.    Yes.

10             MS. POLLY:  Object to the form.  You can go

11   ahead and answer, Mr. Knight.

12             THE WITNESS:  When you say incidents, like

13   what incidents?  Like every happening or --

14   BY MR. JACOBS:

15        Q.    Well, everything that you investigated, as an

16   investigative sergeant?

17        A.    It would be everything, yes.

18             MS. POLLY:  Object to the form.  Go ahead.

19             THE WITNESS:  If I was a part of the

20   investigation, then it would get sent to her and -- my

21   boss, and then she would document it.  So yes, I mean,

22   if there was an official investigation, there should be

23   a record of it.

24   BY MR. JACOBS:

25        Q.    Okay, thank you.  And I'll ask the same thing

1    regarding your position as an armory sergeant.  You said

2    you kept track of all of the documents -- that you

3    documented or kept track of all of the equipment that

4    you were in charge of, and so there would be records of

5    that as well?

6         A.   Yes, sir, the monthly reports were filed

7    monthly.  And they'll be on -- they're on file for the

8    monthly reports, my signature and the warden's.

9         Q.   Did you do anything to prepare for today's

10   deposition?

11        A.   Just the predeposition with Ms. Polly

12   yesterday, just to kind of go over how it would go, make

13   sure I was set up for the Zoom meeting and kind of a

14   brief of how it would--

15             MS. POLLY:  Mr. Knight, I am going to

16   instruct you not to answer there.  Mr. Jacobs can't know

17   what we discussed.

18   BY MR. JACOBS:

19        Q.   Yes, sir.  Don't tell me anything that you

20   discussed with your attorney/client privilege.  I just

21   wanted to know what you did.  So you spoke with your

22   attorney, you stated?

23        A.   Yes.

24        Q.   Did you review any documents in preparation

25   for today's deposition?

```
 1       A.    I did not.

 2       Q.    To what extent are you familiar with the

 3    details of this litigation?

 4       A.    Just from what I could tell from the original

 5    one I looked up when I found out that I was going to be

 6    a part of it.  Some of the, I guess claims by Mr. Boaz.

 7    Other than that, I don't know every little thing that's

 8    going on, I just know the general that he's claiming.

 9       Q.    Are you familiar with any of the allegations

10    that are being made in this case?

11       A.    Yeah.

12       Q.    Which ones?

13       A.    I believe -- I don't know them specifically,

14    I just know that some of them are religious-based over

15    some religious items that he would -- or freedoms, I

16    guess, that he would like to have here inside of the

17    facility.  And maybe some claims of his safety and

18    security.

19       Q.    Regarding the religious claims, what

20    specifically do you know in regards to that?

21       A.    I don't know specifically all of them.  I

22    don't know what he's requesting.

23       Q.    That's fine.  Just, you can share what you do

24    know.

25       A.    I don't.  I just know that he's requesting
```

1   something to do with his religious -- I believe he is

2   Muslim.  And I don't know those items, or what they are,

3   or even how they function for his religion.  It's not in

4   my department, as far as security.  I don't have to deal

5   with it a whole lot.

6          MS. POLLY:  Mr. Knight, to the extent that

7   any of the questions that Mr. Jacobs is asking you, to

8   the extent the answers that you give are based on

9   communications that you and I had, I am going to

10  instruct you not to answer.  To the extent they're based

11  on other things you looked at or the things that you

12  know, you're perfectly fine to answer those.

13         THE WITNESS:  Yeah.

14  BY MR. JACOBS:

15     Q.   You also mentioned that some of the

16  allegations were regarding safety.  Are you familiar

17  with those details?

18     A.   I don't know what his details are, what his

19  claims are exactly.  I just know, I think in there,

20  there were some issues with being understaffed or

21  something in the deposition or the thing that I read.

22  But I don't know exactly what he's referring to.

23     Q.   And you said that you reviewed some -- how

24  did you come to this level of knowledge regarding the

25  lawsuit?

1      A.    Just between the facility providing me with

2   the deposition and then letting me know I was part of

3   it.  And then when I found out it was from Boaz, is the

4   name that was on it, I looked up the deposition.  I just

5   slightly reviewed it to see if I could make sense of it.

6   I'm not a -- I don't do lawyer speak very well, so I

7   don't understand everything that's in there.

8      Q.    You said you looked up the deposition, which

9   deposition?

10     A.    The one that he had filed, I guess.

11     Q.    Do you mean the complaint?

12     A.    I am not sure what it is.  I just know it had

13  -- I went online and typed up Boaz Pleasant-Bey in the

14  United States -- or in court or something, and this is

15  what popped up.  And I noticed that that was -- looked

16  like it was pertaining to what we'd be talking about.

17  And this was before I was even scheduled for the

18  deposition or to actually be spoken to by you.

19     Q.    Did anybody at CoreCivic speak to you about

20  the allegations of the case?

21     A.    No, no.  I mean, I know there's a few people

22  that are part of being -- I don't know what the word is.

23  They're having a deposition also, but we haven't talked

24  about any of that.

25     Q.    So you haven't had any conversations with a

1    anybody about the allegations -- anybody at CoreCivic

2    about the allegations?

3         A.    I am not even sure what the exact allegations

4    are, so...

5         Q.    Okay.  Mr. Knight, have you ever been

6    involved in any prior lawsuits pertaining to inmates?

7         A.    I know that somebody had filed one.  I don't

8    know if it officially went through, but I believe so.

9    There was one.  Avery, I think, was that inmate's name.

10        Q.    I'm sorry, could you say that one more time?

11        A.    Inmate Avery, I believe.  I don't know that

12   it ever went past being filed.  I don't really know

13   officially when it becomes a lawsuit.

14        Q.    Inmate Avery.  Do you not remember Inmate

15   Avery's first name?

16        A.    I don't.

17        Q.    Do you recall any of the allegations that he

18   was making in regards to?

19        A.    I don't know the exact allegations.  I just

20   know it came in, so I gave it to the warden's secretary

21   in case we actually was pursued, and that way we would

22   have the information.  I don't even know what it was

23   exactly about.

24        Q.    Was that against you specifically, or was

25   that against CoreCivic?

Page 20

```
 1        A.    I know I was named in it, but there was more

 2   than just me named in it.  So I am not for sure if it

 3   was more than that.

 4        Q.    Are there any other lawsuits that you can

 5   think of?

 6        A.    No, not that I am aware of.

 7        Q.    Are you familiar with the name Ricky Oliver?

 8        A.    I'm not.

 9        Q.    You're not?

10        A.    No.

11        Q.    So you don't recall being involved in a

12   lawsuit with an inmate named Ricky Oliver?

13        A.    I've never had, to my knowledge, that I can

14   remember, had any -- had to testify, or talk, or give a

15   statement about -- I mean, there's a lot of inmates with

16   a lot of last names, but nothing that stands out,

17   Oliver.  I don't know.  I mean, if there is one, then

18   something may jog my memory, but I don't know of being

19   involved in any other lawsuit that I've had to testify

20   or talk about with anyone.

21              MR. JACOBS:  I am going to stop the screen

22   share right now and I'm going to add what will be put in

23   as Exhibit 2.

24              (Exhibit 2 was marked.)

25              MR. JACOBS:  Do we have that in the chat?  I
```

1    am going to go ahead and share the screen, but I will

2    wait until you get it through e-mail.

3              THE WITNESS:  I believe I have it now.  Go

4    ahead.  I've got it pulled up.

5    BY MR. JACOBS:

6         Q.   Do you see on what is Page 2 of the document,

7    that which is labeled as Page 1 of the filing, do you

8    see where it says at the top, Ricky Oliver versus Daniel

9    Knight?

10        A.   Uh-huh.

11        Q.   Is that you?

12        A.    It's my name.  I am assuming it's me.  I'm

13   not -- yeah.

14        Q.   Do you remember -- does this jog your memory

15   and do you remember being named in this lawsuit?

16        A.   I don't remember that I was named.  But --

17   sorry, I'm reading the rest of it.  What year was this?

18        Q.   This memorandum it says was filed on January

19   13 of 2020.

20        A.   Oh, 2020.

21        Q.   I'm going to go down to Page 3, to what is

22   Page 3 of the filing document.  Do you see where it says

23   allegations and claims?

24        A.   Yeah, that's the part I'm reading right now,

25   I believe.

Page 22

```
 1        Q.    Do you see where it says:  Plaintiff claims

 2   that the defendant, correctional officer Daniel Knight,

 3   was deliberately indifferent to plaintiff's safety in

 4   violation of his 8th Amendment rights?

 5        A.    Where is this at?

 6        Q.    First line after allegations and claims.

 7        A.    Yeah, I see that.

 8        Q.    Would you have any reason to disagree with

 9   that being the nature of the allegations made in this --

10   in that particular lawsuit?

11        A.    Yes, I disagree.

12              MS. POLLY:  Object to the form.

13   BY MR. JACOBS:

14        Q.    You said you disagree?

15        A.    Yeah, I remember this now.  I didn't

16   recognize the first name, but I recognize the incident,

17   I guess is how you would say.

18        Q.    Okay, so you say you remember the incident?

19        A.    Uh-huh.

20        Q.    Could you describe for me in your own words

21   the particulars of the incident?

22        A.    I believe I had gone down to the kitchen to

23   verify out-counts with someone because there was a count

24   number that was wrong.  And then while we were verifying

25   the out-count, there were inmates in the kitchen that
```

1    were roughhousing, I guess.  I didn't see it.  I was in

2    the room with it.  I just heard a thud.  And when I

3    heard a thud, I turned around and Oliver -- that's what

4    I knew him as, I didn't know him by his first name.

5    Oliver was on the ground, it looked like he was having a

6    seizure.

7                So when I turned around and saw it, I

8    immediately called for medical code.  And when the code

9    happened, we called, got medical in there.  He was awake

10   and alert when they got there.  They didn't have to do

11   any kind of compression.  They almost didn't send him --

12   even send him out.  And to my -- I walked into medical,

13   I believe.  I walked him out of the kitchen with the

14   nurse, awake and everything.  And then afterwards, I

15   found out they had to send him out to the hospital

16   because he had swelling on his brain.

17               After it had happened and they ran the

18   milestone back, you could tell and see that an inmate

19   was -- they had been -- it looked like they were just

20   roughhousing, wrestling, you know, playing with each

21   other, poking and prodding.  But then you can see at one

22   point, the inmate, I don't even remember the guy's name,

23   puts his arm around his neck and squeezes real hard real

24   fast, and then the dude just falls out to the floor.

25   And that's when I heard the noise, and turned around,

Case 3:22-cv-00093   Document 33-12   Filed 05/04/22   Page 23 of 87 PageID #: 1603

 1    and called the code.  But I didn't see anything happen

 2    before that.

 3         Q.    Are fights like that between inmates common

 4    at Trousdale?

 5         A.    I didn't know it was a fight.  I didn't know

 6    that it was an assault, or a fight, or anything at that

 7    point.

 8         Q.    Would you characterize that now as a fight or

 9    as a violent interaction?

10         A.    I mean, looking back at it -- looking at it

11    then, I thought it was just guys being guys,

12    roughhousing.  That's the truth.  I've seen inmates play

13    and, you know, come up behind each other.  Grab each

14    other.  Give a hug.  Grab each other behind, just like

15    guys do at the house.  And looking back, when it first

16    happened, that's what I thought had happened and they

17    just got carried away.  You know, the results of it was

18    really bad, but I don't even know if it got classified

19    as an assault or not.  I remember Mr. Oliver coming back

20    and having some issues because of it.  But at the time,

21    I didn't know it was an assault.

22         Q.    Okay.

23         A.    But as far as assaults at the prison, I mean,

24    they happen.  I just don't think that they're any more

25    or less -- what is the word?  They're as sporadic as

1   anywhere.  All prisons have issues, and assaults, and

2   inmates that fight each other or fight with the staff.

3   I don't know of it to be any more regular or irregular

4   than any other prison.

5        Q.   Have you worked in any other prisons?

6        A.   I've been to other prisons.  I've worked only

7   at this one.  But I have been on deployment as sort of a

8   member my first three years.  And I've traveled and

9   trained at other facilities in the state and in

10  Kentucky, also.

11       Q.   Is that the basis of how you are aware that

12  this is a common practice in other prisons?

13            MS. POLLY:  Object to the form.

14            THE WITNESS:  I'm sorry?

15            MS. POLLY:  I was objecting, Mr. Knight.  You

16  can answer.

17            THE WITNESS:  Can you repeat the question?

18  BY MR. JACOBS:

19       Q.   Sure.  I was asking if that was the basis of

20  your knowledge as to whether such interactions were

21  common between inmates?

22       A.   Yeah, I -- you know, we all have the same

23  job.  I have friends that work at those facilities, and

24  I hear about what happens at those.  I mean, we

25  transport and travel to other state facilities, TDOC-ran

 1    facilities.  You know, those issues are the same at a

 2    lot of prisons.  You know, you can go onto -- and see

 3    the incidents at other facilities.  I mean, it's a

 4    common thing for -- it's not what we want, but it's

 5    common for inmates to have issues.  You put a bunch of

 6    people together that aren't of the same -- I mean,

 7    they're in prison for a reason.  Sometimes people are

 8    bad people that are in prison.  It's our job to help try

 9    to keep people safe from those.

10        Q.    If you haven't worked at any other prisons

11    other than Trousdale, how can you say for certain that

12    Trousdale is the same as any other?

13        A.    I didn't say they were the same.  I said I

14    think it's very similar.  From what I hear, the same

15    things that happen here happen at other facilities.

16        Q.    What is the basis regarding that, when it

17    comes to violence?

18        A.    I mean, all you have to do is look up the

19    incidents and see the reports, talk to the other people

20    that work at the other facilities and they can say, we

21    had an assault on staff today, or hey, we had two

22    inmates fighting today.  The same things that happen

23    here happen at other prisons in the state.

24        Q.    Have you reviewed any documents to that

25    effect, to the effect that, you know, regarding the

1   normality of Trousdale compared to other facilities?

2              MS. POLLY:  Object to the form.

3              THE WITNESS:  I don't know the statistics on

4   the statistics page that is listed.  I don't go every

5   day and look at every incident at every facility that

6   happens.

7   BY MR. JACOBS:

8        Q.    Have you conducted any studies regarding

9   this?

10       A.    No.

11       Q.    So is this based on only the things that

12  you've been hearing from other people?

13       A.    And things that I have seen.  There is a

14  TOMIS incident screen.  So if I hear about an event, I

15  can look it up, the other facility, and see what's

16  happened at a state facility or another CoreCivic

17  facility inside Tennessee.  I haven't reviewed that --

18             MR. JACOBS:  Oh, I think we lost him.  Let's

19  pause the record.

20             (Off the record.)

21             (Exhibit 3 was marked.)

22  BY MR. JACOBS:

23       Q.    All right, Mr. Knight, so I am going to go

24  ahead and share the next document.

25       A.    Okay.

Page 28

1      Q.    I am going to go ahead and share the screen.

2      A.    Okay, I see.  I don't know if I got the

3  e-mail yet.  Hang on.

4      Q.    Okay.

5      A.    I have the e-mail.

6      Q.    Did you say you have it?

7      A.    I do.  Exhibit 3, correct?

8      Q.    Yes.  Okay, do you see at the top of the

9  document, Page 2 of the document, Page 1 of the actual

10  disclosure here.  Do you see at the top of the document,

11  this is regarding Boaz Pleasant-Bey versus State of

12  Tennessee, various defendants, including CoreCivic?

13      A.    I do.

14      Q.    Do you see where it says second supplemental

15  initial disclosures?

16      A.    I see it, yes.

17      Q.    Have you ever seen this document before?

18      A.    No, I haven't.

19      Q.    I am going to scroll down to Page 2 of this

20  document.  Do you see Page 2, Paragraph F of this

21  document, starting with your name, Daniel Knight?

22      A.    I see it.

23      Q.    Do you see where it says, Daniel Knight has

24  knowledge regarding Pleasant-Bey's incarceration at

25  Trousdale?

1        A.    Yes.

2        Q.    The customs, policies, education and training

3   at Trousdale and the allegations in this lawsuit?

4        A.    Yes, I see it.

5        Q.    Would you say that this statement accurately

6   encompasses your knowledge regarding this lawsuit?

7        A.    I guess.  I don't know why he is

8   incarcerated.  I know he's here and I am familiar with

9   the customs and policies, education and training here at

10  Trousdale.  I don't know the exact allegations, so I

11  don't know that I have knowledge of it.  And yeah, maybe

12  -- that last statement, yeah.

13       Q.    So you say you didn't -- you don't have,

14  necessarily, knowledge regarding the allegations, and

15  partial knowledge regarding Pleasant-Bey's

16  incarceration?

17            MS. POLLY:  Object to the form.

18            THE WITNESS:  I'm sorry?

19  BY MR. JACOBS:

20       Q.    I was saying, so are you saying that you

21  don't have a lot of knowledge regarding the allegations

22  in this lawsuit, and you have limited knowledge

23  regarding Pleasant-Bey's incarceration?

24            MS. POLLY:  Object to the form.

25  BY MR. JACOBS:

Case 3:22-cv-00093   Document 33-12   Filed 05/04/22   Page 29 of 87 PageID #: 1609

 1          Q.    You can go ahead and answer.

 2          A.    I know the policies and procedures, and I

 3    know the training here at the facility.  I know that he

 4    is incarcerated here.  I don't know why he is

 5    incarcerated.  I don't know what his charge is.  I don't

 6    know what the allegations of that lawsuit is

 7    particularly about.

 8          Q.    Okay.  Have you ever met Pleasant-Bey?

 9          A.    Yes, I have.

10          Q.    When was this?

11          A.    I don't know the exact date or what year it

12    was, I just know that I've met him.  I worked in

13    transportation.  He used to work at intake.  And so we

14    crossed paths.  I know his face, and his name, and all

15    of that.

16          Q.    How often have you interacted with

17    Pleasant-Bey?

18          A.    Recently or in general?

19          Q.    In general.

20          A.    I probably haven't seen him and actually

21    spoke with him in over a year, that I can remember.  I

22    mean, I may have said hello walking down the street --

23    or not the street, I'm sorry, walking down the walk.

24    And just, you know, good morning to the guys.  But I do

25    that to a lot of the inmates.  So you know, if he was

1    working in intake and I was in there, I would speak to

2    him, say hello.  You know, if there was something going

3    on in that area that pertained to something that I

4    needed that he assisted with, as far as the intake of

5    property or cleaning up in the intake area, you know, I

6    would ask him.  But not a whole lot of just personal

7    conversations.

8         Q.    Do you recall having any personal

9    conversations with Mr. Pleasant-Bey?

10         A.    We may have talked about football, or we may

11   have talked about something like that, but I don't

12   usually talk to the inmates about my personal life.  If

13   he had said something about his personal life, he may

14   have, but I don't recall now.

15         Q.    What else do you recall regarding your

16   interactions with Pleasant-Bey?

17         A.    He seemed generally happy, always in a good

18   mood.  Easy guy to talk to.  A good, quote unquote,

19   inmate.  I don't mean to make it sound like they're,

20   kids, but he was well behaved.  Did his job well.

21   Wasn't hard to get along with or cause issues for

22   anyone, that I know of.  You know, just a generally good

23   inmate that did what he was supposed to do.

24         Q.    Mr. Knight, are you aware of CoreCivic's

25   agreement with the Tennessee Department of Corrections

 1    regarding the Trousdale facility?

 2         A.    I am not sure what you mean by agreement.

 3         Q.    So are you aware that CoreCivic has a

 4    contract with Tennessee Department of Corrections

 5    regarding the Trousdale facility?

 6         A.    Yes.  Our contract is to house their inmates

 7    for them and provide for their care.

 8         Q.    Do you know what a compliance audit is?

 9         A.    I mean, I am not sure which audit you are

10    speaking of.  But yes, I know that we have audits.

11         Q.    What do you know about the audits?

12         A.    Whether it's a TDOC audit, which is an audit

13    by our contractor, or we're their contractor.  They can

14    come in and audit our happenings, what we're doing as a

15    facility, what we can provide as documentation as what

16    we're doing as a facility to meet their standards.

17    There's also an ACA audit, which American Correctional

18    Association audit where they come in and audit us to

19    make sure we're accredited and we're functioning in the

20    standards that we're supposed to have to be a prison.

21              And then also the CoreCivic internal audit is

22    the same type of audit, but where we self-audit ourself

23    to make sure that we're up to our own standards and our

24    own policies and procedures, while at the same time

25    being the same standard that our partner requires for

Case 3:22-cv-00093  Document 33-12  Filed 05/04/22  Page 32 of 87 PageID #: 1612

```
 1   us, that being TDOC, in this case.

 2            MR. JACOBS:  I am going to stop the screen

 3   share and I am going to go onto the next document, which

 4   we will be entering as Exhibit 4.

 5            (Exhibit 4 was marked.)

 6   BY MR. JACOBS:

 7        Q.   Let me know when you get that document.

 8        A.   I have it.

 9        Q.   You see Page 2 of the shared document, which

10   is Page 1 of what looks to be -- do you see where it

11   says at the top of Page 1 of this document, says

12   commission on accreditation for correction standards

13   compliance initial audit?  Do you see the year, it says

14   October 29th through the 31st of 2018?

15        A.   Uh-huh.

16        Q.   And you see this is regarding to CoreCivic

17   Trousdale Turner Correction Center in Hartsville,

18   Tennessee?

19        A.   Yes.

20        Q.   Okay.  Have you ever seen this document

21   before?

22        A.   I don't believe I've seen it.

23        Q.   Have you ever seen anything like this

24   document before?

25        A.   I've seen the results or they were
```

```
 1   communicated, the results of the audit to us back in

 2   2018, but I am not familiar with -- I don't think I've

 3   seen a document like this.  No, this looks like a

 4   minutes top version of the audit and how it went.  I've

 5   never really seen this before.

 6             MR. JACOBS:  Hold on, am I sharing this,

 7   guys?  Did I forget to share this?

 8             THE COURT REPORTER:  It's not shared.

 9             MR. JACOBS:  Okay, I'm sorry.  Let me make

10   sure I do that so that everybody can see what I'm

11   talking about.  Okay, is everybody seeing this now?

12   BY MR. JACOBS:

13        Q.   All right, Mr. Knight, if we could look at

14   Page 16 of the document.  That would be Bates No.

15   CC2200.

16        A.   Page 16, okay.

17        Q.   Do you see the numbered Paragraph 3,

18   departmental visits?

19        A.   Yes, sir.

20        Q.   And then underneath it says:  Team members

21   revisited the following departments to review conditions

22   relating to the departmental policy and operations.

23        A.   Yes.

24        Q.   Do you see further down where it says, for

25   the department, visited armory, and then it says
```

 1    Sergeant Daniel Knight, is that you?

 2        A.    Yes, sir.

 3        Q.    Do you recall being revisited regarding the

 4    audit or an audit in 2018 around this time?

 5        A.    If I was revisited, then there was probably

 6    some type of finding within the area that either needed

 7    to be checked on and fixed, if it was something that

 8    needed to be fixed, or needed to be going forward,

 9    something put into place.  I am not sure what that was

10    in 2018.

11        Q.    What is a revisit?

12        A.    I don't really know when you call it a

13    revisit...

14        Q.    Well, in the sentence above, it says:  Team

15    members revisited the following departments.

16        A.    I don't know -- I mean, I don't know if there

17    was something wrong and they came back.  I don't know, I

18    am not familiar with the term revisit.  They may have

19    had questions about something in the area or they needed

20    more documentation so they came back.  I don't know what

21    the revisit was.  Is that the same day or is that later

22    on in the audit?  I don't recall without knowing exactly

23    if it was a finding or just they needed to come back and

24    look at it again.

25        Q.    So toward the top where it says department

1    visited, and right next to, in the category where your

2    name is listed, it says persons contacted.  So do you

3    remember ever being contacted in relation to an audit in

4    2018, or in the fall of 2018?

5         A.    Any audit that we have, if you're in that

6    department and you get contacted, they come to your

7    area, and they ask for documentation, and ask you to

8    show the area and how it runs.  And they give you

9    specific audit items they're looking for, inspection-

10   type things.  And then you provide them the

11   documentation, or you provide them the information, or

12   the policy and procedure, or the picture of the item, or

13   whatever it is that they ask for, so...

14        Q.    Do you remember being contacted in regards to

15   the armory?

16        A.    Yeah.

17        Q.    You do?

18        A.    I don't remember the specifics, but I

19   remember that we were audited and I was the one in there

20   during the audit.

21        Q.    Would there have been any documentation in

22   regards to this contact?

23        A.    Yeah, I mean, whatever -- there's an audit

24   tool that they use, and that's what they would have used

25   to do the audit.  And whatever they would have asked

1    for, monthly reports, inspection reports, cleaning

2    reports, chemical reports, whatever it is, you know,

3    they would have asked for it and I would have provided

4    whatever I had.

5         Q.    And when you say ask, was that via e-mail or

6    was that in person-to-person conversation?

7         A.    Typically, it's person to person.  Sometimes

8    they may be in the room and ask for more documentation

9    and not bring it to them.  Typically, they come to the

10   armory and they look at the armory.  And they inventory

11   the items that are in their count.  And they count and

12   make sure that, you know, there's supposed to be the

13   right things there, that all of the firearms are present

14   and accounted for and things of that nature.

15              MR. JACOBS:  I am going to stop the share

16   screen and we're going to go onto the next exhibit,

17   Exhibit 5.

18              (Exhibit 5 was marked.)

19   BY MR. JACOBS:

20        Q.    Once again, just let me know when you get it.

21   I'm going to go ahead and share the screen.

22        A.    It's on the share screen, and I see it in the

23   e-mail now.  Let me pull it up.

24        Q.    Okay.  Do you see what is Page 2 of the

25   shared document and the first page of the exhibit, where

Page 38

1    it says, location, Trousdale Turner Correctional Center,

2    at the top?

3          A.    Uh-huh.

4          Q.    Do you see the date, it says January 31,

5    2020?

6          A.    January what?

7          Q.    I'm sorry.  January 31, 2020.

8          A.    Yes.

9          Q.    We're going down to what is Bates No. 001381.

10         A.    I don't know what that means.

11         Q.    When parties exchange documents, what we do

12   to keep track is we put a label on the corners of them

13   that basically, that's just our way of keeping track of

14   what pages are what.  So if you see at the top left-hand

15   corner here, there's the Bates number that says TDOC

16   001381?

17         A.    Yes.

18         Q.    So yeah, sometimes we just Bates number for

19   us.  So do you see No. 001381?

20         A.    Is that what page I need to be on?

21         Q.    Yes.

22         A.    There we go, yes.

23         Q.    Okay.  Do you see about mid page where it

24   says noncompliance item No. 2?

25         A.    Yes, I do.

1      Q.    Have you ever seen a document like this

2   before?

3      A.    I have.  I saw this -- I don't know if I saw

4   this document, but I know of this noncompliance issue.

5      Q.    What are these documents, I am sorry?

6      A.    This is showing that they had a repeat

7   finding with this issue.  I have to read what the exact

8   finding is.  Expiration dates (inaudible mumble)

9   employees have qualified over the last 12 months.  So

10  it's a repeat finding during some audit.  I am not sure

11  which audit this was a part of, but a repeat finding of

12  this happening.

13     Q.    So you see where it says noncompliance issue,

14  Sergeant Flatt was issued an Mk4 OC canister?

15     A.    Uh-huh.

16     Q.    What is an Mk4 OC canister?

17     A.    Mk4 stands for Mark 4, I believe that's their

18  model number for the OC.  OC stands for oleoresin

19  capsicum.  It's an inflammatory agent, so it would be

20  their can of OC, or their can of inflammatory agents.

21     Q.    And it says, the next -- same line:  Flatt's

22  certification for OC expired in 7/2 of 2019.

23     A.    Yes.

24     Q.    Are sergeants supposed to be certified to

25  handle such equipment?

1          A.    If they're using it.  They're not required,

2    no.  But for certain issues, they are.  If they're going

3    to be issued it, then they have to be certified.

4          Q.    Do you see a couple of lines underneath, it

5    says:  Action taken by TDOC contract monitor, armory

6    Sergeant Knight.  Is that you?

7          A.    Uh-huh.

8          Q.    Do you recall -- and it says that you were

9    notified on --

10         A.    I believe this was an audit that Mr. Walton

11   conducted.  He has a quarterly check or something like

12   that, that he comes in and audits us from time to time

13   off the instrument.  And I believe when he came down to

14   go through it with me, we discovered the violation or

15   the mishap, it being issued out when he wasn't.  And we

16   talked with Warden Washburn, the three of us together.

17         Q.    So you do recall the details of this

18   incident?

19         A.    Fairly well.  I mean, not every letter of it,

20   but it's familiar, yes.

21         Q.    Is there any reason that you would have to

22   disagree with the statement, the noncompliance issue in

23   that it was regarding Sergeant Flatt?

24         A.    No, I don't have any reason to disagree.

25         Q.    If we can turn to TDOC Bates No. 001382.  And

Page 41

```
 1   we're at looking noncompliance item No. 3.  And it says
 2   right here:  Noncompliance issue on December 9, 2019,
 3   the CM inspected and determined jump bag No. 5 was
 4   missing six 38 caliber rounds of ammunition.  Facility
 5   leadership is aware and actively conducting searches.
 6   Do you see that?
 7        A.    I do.
 8        Q.    And do you see a couple of sentences down
 9   where it says actions taken by TDOC contract monitor,
10   and it lists armory Sergeant Knight?
11        A.    Uh-huh.
12        Q.    Is that you?
13        A.    It is.
14        Q.    Do you recall the details of this particular
15   issue?
16        A.    I do.
17        Q.    Do you recall the missing 38 caliber rounds?
18        A.    Yes, I do.
19        Q.    Do you recall how this was resolved?
20        A.    I discovered -- I found the rounds.  There
21   was -- I don't remember exactly what it was.  But after
22   a team had gotten done with the hospital post, they put
23   their equipment and everything in a bag.  Evidently, it
24   was after hours, not while I was here.  And they had
25   return of the equipment to the armory.  And when
```

Case 3:22-cv-00093   Document 33-12   Filed 05/04/22   Page 41 of 87 PageID #: 1621

Page 42

1    whoever, I don't even know who received it, received it

2    and put it back in the armory in our -- it's an

3    emergency box where it has the equipment that somebody

4    would need quickly to go out on a trip that had to be

5    armed.  When they put it back, evidently, they didn't

6    verify that all of the equipment was in there.

7              So when I came in that morning, like I do

8    most mornings, and I go through everything and I make

9    sure everything is signed back in correctly.  Or if it's

10   signed out incorrectly, I notify someone if they didn't

11   sign something out correctly.  Then when I did my

12   inventory, it was missing.  I am the one that notified

13   the shift supervisor and the chief of security there.

14   So immediately after I discovered it and I couldn't

15   figure out what was going on, after contacting, I

16   notified them.

17             And then after a search of the vehicle that

18   the staff had used the night before, it was found that

19   it had fell between the seats.  Evidently, it had rolled

20   out of the bag and they didn't know it.  So that was it,

21   after, you know, discovering and locating the

22   ammunition, it was put back in the armory.  And our

23   numbers were what they were supposed to be at that

24   point.

25        Q.    Where did you say that the ammunition was

Case 3:22-cv-00093   Document 33-12   Filed 05/04/22   Page 42 of 87 PageID #: 1622

Page 43

1    discovered?

2        A.    In the vehicle, the facility van, between the

3    seats.

4        Q.    Are inmates transported in that facility van?

5        A.    Not in the same area as that would be at all.

6        Q.    But they are transported in that van?

7        A.    Yes, they are.  But at that time, it was

8    discovered before there had been another transport.

9        Q.    Okay.  We can turn to Bates No. 001462.  Do

10   you see where it says noncompliance issue in the middle

11   of the page?

12       A.    I do.

13       Q.    Do you see where it says on February 19,

14   2020, J. Cude was issued an Mk4 OC canister for

15   transport detail?  Mr. Cude's certification for OC

16   expired, it says 6/18/19?

17       A.    Yes, sir.

18       Q.    Do you see in the red writing where it says

19   per the monitoring instrument for security equipment

20   Item 3 has been determined to be an essential monitoring

21   item which may result in a notification of breach?

22       A.    Yes.

23       Q.    Do you see right after that, it says,

24   liquidated damages were assessed on 3/16/2020 for the

25   NCR?

1          A.     Yes.

2          Q.     Do you see a couple of lines down where it

3     says, action taken by TDOC contract monitor?

4          A.     Uh-huh.

5          Q.     And do you see it says, armory Sergeant

6     Knight was notified?

7          A.     Yes, I believe this was another audit that we

8     had done together.

9          Q.     Do you have any reason to disagree with these

10    statements that are presented here in this document

11    regarding this issue?

12         A.     I'm reading the details of the after action,

13    hang on one second, please.  Yeah.  I agree.  I mean, is

14    it important to note that these are not -- I'm not sure.

15    This is not -- it doesn't list who actually issued the

16    items out in the document.  So the way that it works is,

17    is that they have an armory, and in the armory, if I'm

18    not there or even if they go to central control and

19    where I make sure that there's OC canisters available

20    for the staff, it's -- it could be somebody different

21    either issuing it or signing it in or out.

22                So if another staff member is the one to do

23    that, it falls underneath my area and the chief of

24    security's area, which is who I reported to at that

25    time, to come up with some sort of a procedure -- or

Page 45

1   actually, the chief and them will, you know, decide on a

2   disciplinary and all of that.  But I just wanted to make

3   sure that that's, you know, clear.  That it's not -- it

4   doesn't list who issued it to him.  It would have been

5   -- you can say it was the facility, but...

6       Q.   But do you have any reason to disagree with

7   the statements as they are written here regarding this

8   particular noncompliance issue?

9       A.   No, no.

10      Q.   Moving to Bates No. TDOC 2402.  Do you see in

11  the middle of the page where it says noncompliance No.

12  1?

13      A.   You said 2402?

14      Q.   Yes.

15      A.   Sorry, it's just bigger when I look at it in

16  the e-mail.  I can't see it good on the share screen.

17  2402, all right.

18      Q.   Do you see where it says noncompliance No. 1?

19      A.   I do.

20      Q.   Do you see where it says, underneath

21  noncompliance issue:  On 9/28/20, the contract monitor

22  audited the standards and identified senior correctional

23  officer Daniel Knight was listed on the list of all

24  individuals qualified to carry weapons.  Do you see that

25  part?

1        A.    I do.

2        Q.    Is that you?

3        A.    It is.

4        Q.    Going down slightly below, with the sentence

5    stating:  Upon checking.  Do you see that sentence?

6    Just one line down.  Upon checking.

7        A.    Hold on, I got lost.  Which one?

8    Noncompliance issue, 9/28/2020, The contract monitor --

9    that one?

10       Q.    Yes.  Same paragraph, noncompliance issue,

11   that we were on.  The next sentence, it says:  Upon

12   checking SCO Knight's training.  Do you see that

13   sentence?

14       A.    Oh, there it is in the middle.  Yes.

15       Q.    Do you see where it says:  Upon checking SCO

16   Knight's training, filed the most current firearm

17   certification on file was dated 5/2/2019?

18       A.    Uh-huh.

19       Q.    It says:  In addition, the facility was

20   educated that firearm qualifications are annual

21   requirements and no user should have an expiration date

22   that extends beyond 12 months from the date of review.

23       A.    Yes, I see that.

24       Q.    Do you remember the details of this incident?

25       A.    I do.  There was some type of confusion on

Case 3:22-cv-00093   Document 33-12   Filed 05/04/22   Page 46 of 87 PageID #: 1626

1    the standard.  I am a firearms instructor, actually, for

2    the facility.  And I have an instruction license through

3    the NRA and have taught multiple, multiple, multiple

4    classes since 2018, I guess.  And I guess the issue was,

5    is that somewhere in the L and D, they didn't file where

6    I had signed a 42A as the instructor and shot.  They

7    didn't know that it wasn't on there.  So they had to go

8    back and look at it and see how it was supposed to be

9    because, by our standard at the time, I believe it was,

10   if you were an instructor, and you instruct the class,

11   and you're a repeated instructor in speciality courses,

12   then you are certified as a user.

13            And I guess when they looked into it, they

14   wanted documentation beyond what me just teaching the

15   classes that I had -- that by teaching the classes, it

16   made me certified.  They needed some kind of a

17   documentation of that.  So when they looked at the last

18   time that I actually took the class, not as an

19   instructor, it was more than a year.  So somebody in the

20   L and D, I think, had not put in the credit for me

21   teaching the class.  If you teach the class multiple

22   times, then you're certified as a user.  And I think

23   that was the issue that they were trying to work through

24   after that.  I don't know what the results of that was,

25   but yeah.

1      Q.    So your testimony is that someone forgot to

2   put in your accreditation regarding your ability to

3   carry a weapon?

4      A.    Yes.  I mean, I had taught the class --

5   basically, you would come and I would be an instructor

6   for the class.  And so by me teaching the class, it's

7   supposed to be given credit for as doing it, you know,

8   because you're teaching someone something that you're

9   proficient in.  As long as you teach the course and you

10  stay up to it and document that you are the instructor,

11  it's supposed to give credit in the system.  So

12  evidently what happened is, it didn't go into the

13  system, and they wanted something to show me more so as

14  it.  So I don't know for sure exactly what they decided

15  after that point, but yes.

16     Q.    Have you ever experienced any other occasions

17  where certifications regarding the carrying of weapons

18  have not been properly put into the system?

19     A.    Sometimes there's a delay once it gets put

20  in.  So, you know, you could take the class today, it

21  may take tomorrow, or the next day, or the day after for

22  it to get put into the system.

23     Q.    Do you see the line right after that written

24  in red, where it says:  Note per the monitoring

25  instrument for security equipment item No. 2 has been

Page 49

1    determined to be an essential monitoring item which will

2    result in a notification of breach?

3        A.    Uh-huh.

4        Q.    Okay, do you see the next line, which

5    continues to the next page, but also what is written in

6    red on that line:  A liquidated damages letter was

7    issued on 6/3/20 for NCR.  Do you see that?

8        A.    I do.

9        Q.    Do you have any reason to disagree with the

10   details set out in this report?

11       A.    No.

12            MR. JACOBS:  I think we're going to take a

13   little break, three minutes.  And we'll be back right

14   after that.

15            (Recess observed.)

16            MR. JACOBS:  So we're going to go a little

17   bit out of order here.  I am going to go ahead and share

18   the next exhibit.  And we have this marked as Exhibit 8.

19            (Exhibit 8 was marked.)

20   BY MR. JACOBS:

21       Q.    Just let me know when you get it.

22       A.    Okay.  I see it, Exhibit 8.

23       Q.    Do you recognize this document?

24       A.    Give me just a second.  It looks to be some

25   type of notice.  I don't recognize it specifically, no.

Case 3:22-cv-00093   Document 33-12   Filed 05/04/22   Page 49 of 87 PageID #: 1629

```
 1        Q.    Have you ever seen this type of document
 2  before in any other medium?
 3        A.    It looks like one of Investigator Woods'
 4  investigation synopsis sent to the warden.  I believe
 5  that's what it is, for sure, I just haven't seen this
 6  document.
 7        Q.    Do you see the subject line that says
 8  regarding Hubbard, Clyde, at the top?
 9        A.    Yes.
10        Q.    Do you see the date, January 28, 2021?
11        A.    I do.
12        Q.    Looking at the first page of the document,
13  Bates No. CCI 7483.  If we could look at the second-to-
14  last paragraph, where it starts off by saying response.
15  Do you see that?
16        A.    The last response before the page ends?
17        Q.    Yes.
18        A.    I see it.
19        Q.    Do you see where it says:  On September 1st,
20  2020, investigative sergeant Daniel Knight conducted a
21  search of Delta Charlie No. 205 housing inmate Hubbard
22  Clyde.  Do you see that?
23        A.    Yes.
24        Q.    Is this you, Mr. Daniel Knight?
25        A.    It is.
```

Page 51

1        Q.    Do you see the very next line underneath, it

2    says:  Where a six-inch piece of metal was found

3    sharpened to a point?

4        A.    I see it.

5        Q.    Okay, do you recall this incident?

6        A.    I remember searching this cell.  I remember

7    finding something.  I didn't -- if you had asked me what

8    I found, I couldn't have told you, but I do remember,

9    now that it's up there, searching this cell and finding

10   something in the cell.

11       Q.    If you could turn to Page 5 of the exhibit.

12   Bates No. CCI 7490.

13       A.    Okay.

14       Q.    Do you see what looks to be a webpage?

15       A.    It's a TOMIS page, yes.

16       Q.    Are you familiar with this website?

17       A.    Yeah, it's the system that is used to track

18   things for the inmates.  A lot of things.  It's the

19   department of corrections, actually, site.

20       Q.    What does E TOMIS stand for?

21       A.    I don't know exactly what it stands for.

22   That's a really good question.  I don't know.  I just

23   know it's the system that Tennessee uses to input

24   everything, incidents, disciplinary, housing, trust

25   funds, case notes.  It's their system that we use to

Page 52

1    officially enter things for TDOC.

2         Q.    Have you ever used this website before?

3         A.    I have.

4         Q.    Have you entered incidents?

5         A.    I have.

6         Q.    Violent incidents regarding inmates and/or

7    staff?

8         A.    Usually not staff.  I don't think I had any

9    staff, but inmates, yes.

10        Q.    Did you enter this incident that is shown

11   here?

12        A.    It looks like I did.

13        Q.    Do you recall doing that?

14        A.    I've entered so many disciplinaries and

15   incidents, I don't recall this one specifically.  But it

16   has my staff I.D. and stuff on there, so I am assuming

17   it was me.

18        Q.    You enter a lot?

19        A.    I did, especially when I was in

20   investigation.  Not as much now, but I did.

21        Q.    If we go down to the next page, which is

22   listed Bates No. CCI 7491.

23        A.    Uh-huh.

24        Q.    Do you see the description section?

25        A.    What page number?  It was just the next page

                                                                   Page 53

 1   down, right?

 2        Q.    Yes, CCI 7491.

 3        A.    Okay, yeah.

 4        Q.    Do you see where it says incidents at the

 5   top?

 6        A.    Yes.

 7        Q.    And then underneath that, it says

 8   description?

 9        A.    Uh-huh.

10        Q.    And in the description, it says:

11   Investigator Knight was assisting with cell searches in

12   Delta Charlie.  While searching cell which housed inmate

13   Hubbard, inmate McCauley found one six-inch homemade

14   weapon hidden in the cell.  Do you see that?

15        A.    I do.

16        Q.    Did you input this description?

17        A.    I did.

18        Q.    Is it your understanding that this is the

19   same incident that is referred to above in the other

20   document?

21        A.    I believe so.

22        Q.    If we can scroll down to the next page, which

23   is Bates stamped CCI 7493.

24        A.    Uh-huh.

25        Q.    Do you see that?

1         A.      I do.

2         Q.      What is that an image of?

3         A.      It's an image of the item found in the cell,

4    it looks like, sharpened metal object to a point.  I

5    can't see the whole picture, it's sideways on me.  I'm

6    sorry if I look funny turning my head.

7         Q.      Is that a picture of a knife, or a homemade

8    knife?

9         A.      Yeah, that's what we would call a homemade

10   weapon, or a knife, or a shank.  People call it a lot of

11   things.

12        Q.      Is that a ruler that's next to it?

13        A.      It's a ruler sheet.  So it's a photocopied

14   ruler paper, so it's there for reference.

15        Q.      Do you guy keep ruler sheets at the facility?

16   Is that standard paperwork?

17        A.      It's not standard.  We use it as a reference

18   point.  It's just something so that you would have kind

19   of a visual on size reference.  That's not a required

20   document right there, we just use it to help make it

21   easy when you take pictures just to keep up with

22   information.  Sometimes people don't have them

23   available, depending on where they find it.

24               If we're in a cell or somewhere, we're having

25   to process and we don't have it.  But we just use a

1   sheet of paper with a -- with the same information.  We

2   would write, you know, what cell it was in, and where it

3   was found, and what it looks like, and something to

4   reference the size.

5        Q.    But is it a sheet that is commonly used?

6        A.    Yes, yes.

7        Q.    Did you fill out the details on this sheet?

8        A.    I did not.

9        Q.    You did not?

10       A.    Huh-uh.

11       Q.    Do you know who would have?

12       A.    I don't.  I just know that's not my

13  handwriting.

14       Q.    Do you see next to -- do you see on the ruler

15  sheet, can you make out the length of the weapon?

16       A.    It looks like six inches.  I think that's a

17  six.  I can't see the numbers, but if those are all

18  inches, then I believe it is.  It's six inches.

19       Q.    Is that the typical length of weapons that

20  you find at the facility?

21       A.    They're various.

22             MS. POLLY:  Object to the form.

23  BY MR. JACOBS:

24       Q.    You can go ahead and answer.

25       A.    There's various types of different lengths

1    and different materials.

2         Q.    Like what?  What types of materials?

3         A.    I mean, metal.  A tooth brush.  You know,

4    before we got rid of soda pop cans, cans.  Bunk metal.

5    Different items like that.  I mean, there was a time

6    they would use plastic totes to try to sharpen an end

7    to.

8         Q.    In your time as investigative sergeant, did

9    you find a lot of these type of weapons?

10        A.    The type in the picture?

11        Q.    Yes.

12        A.    I would say I might have found the same as

13   when I wasn't an investigator.  I mean, I've always been

14   a part of response teams, and search teams, and stuff

15   like that, even before.  So I've found plenty of

16   weapons, yes.

17        Q.    I am going to stop the share.  And we're

18   going to pull up the next document on the list.  We're

19   going a little bit out of order, but this is what we

20   have listed as Exhibit 10.

21             (Exhibit 10 was marked.)

22   BY MR. JACOBS:

23        Q.    I'm going to go ahead and share the document

24   and just let me know when you get it.

25        A.    Okay, I have it.

1      Q.    Okay, do you see the second page of the

2    exhibit, which is the first page of the actual document,

3    listed CCI 53407 Bates No.  Do you see that?

4      A.    What is the number again?

5      Q.    CCI 53407.

6      A.    Yes.

7      Q.    Do you recognize this type of document?

8      A.    I do.

9      Q.    And what type of document is this?

10      A.    It looks to be a synopsis sent from either a

11    shift supervisor or assistant shift supervisor over

12    something that had happened at the facility, sent to

13    either the -- let me see.  Looks likes the AW.  Sent to

14    the AW, then, so they can notify that there was a

15    physical handling.

16      Q.    Is this the typical way that these type of

17    reports are sent, via e-mail?

18      A.    Yes, I mean, sometimes it's just a quick

19    synopsis until an official report can be done, or

20    official synopsis can be done.  And then, I believe this

21    might be entered into the 5-1 system.  This is typically

22    how the flow of information goes.

23      Q.    I'm sorry, you said entered into the what

24    system?

25      A.    The incident system.  So they have to put it

1    into the 5-1 in the TOMIS system.  It may not be the

2    exact wording, when you look at it in TOMIS.  Sometimes

3    these are done quickly right after a situation, and

4    other details come up, but yeah.

5         Q.    Is the 5-1 system and the E TOMIS, the one

6    that we discussed earlier, are those the same systems?

7         A.    The 5-1 is our system for reporting and the E

8    TOMIS is TDOC's.

9         Q.    So am I correct in that you are stating that

10   the 5-1 system is the CoreCivic system where incidents

11   are reported, and the E TOMIS is the Tennessee

12   Department of Corrections system where incidents are

13   reported?

14        A.    Yes.

15        Q.    And do you input the same material into both

16   systems?  That is to say, the descriptions and the

17   details, are those the same in both system?

18        A.    I have not had to enter into 5-1 but once, so

19   I am not a hundred percent sure on how that works.  But

20   to my knowledge, is that they're very similar, we just

21   have to have for our tracking purposes and TDOC requires

22   us to use theirs.  I don't think that you upload

23   pictures and things like that inside of the TOMIS

24   system, but we have that capacity so that we can keep up

25   with the pictures to the 5-1.

1          Q.    And you said that you remember putting

2    something in the 5-1 system once.  Do you recall what

3    that was regarding?

4          A.    I don't.  Typically, I would give any

5    findings, when I was the investigative sergeant, to my

6    boss investigator.  And she would put those incidents in

7    if it was something.  If we had a fight or, you know,

8    like the weapon that you saw earlier, you know, that is

9    stuff that gets put into the system.  But typically, the

10   captain, the lieutenant and the investigator would put

11   those in.

12         Q.    So is it fair to say that anything entered

13   into the E TOMIS system should have a matching input in

14   the 5-1 system?

15         A.    I guess it depends on the level of the

16   incident.

17         Q.    So not all of the incidents that are shared

18   in the 5-1 are also put in the E TOMIS system?

19         A.    I can't say for certain.  I would think that

20   they are, but I can't say for certain.

21         Q.    Looking back, turning back to the document,

22   do you see where it says:  Subject use of force,

23   physical handling?

24         A.    Yes.

25         Q.    Do you see underneath, with the date and time

1    of the incident, March 8th, 2021?

2        A.    I do.

3        Q.    Going down to where it says:  Staff involved,

4    correctional officer Adam Wilson, senior correctional

5    officer Daniel Knight.  Is that you?

6        A.    It is.

7        Q.    Going down to the brief description of the

8    incident.  It states:  On March 8th, 2021, inmate

9    Corbitt, Tyler AE 206 lock was compromised due to him

10   popping the lock with string made from his bed sheets.

11   Do you recall this incident?

12       A.    I do recall this incident.

13       Q.    Okay, what happened in this indent?

14       A.    For me, there was a call that there was

15   resistance in Alpha unit.  And so when I came -- I think

16   my office was in Alpha at this point.  I came out and

17   responded to the area.  And when I came out, there was

18   an inmate trying to assault another inmate with a

19   weapon.  I didn't know that's what was going on, I just

20   saw them running down the stairs.  The door was open and

21   they came out the door to the rotunda where I was at.

22   And realized that they were fighting, one was trying to

23   get the other one.

24              So I tackled both of them.  Once I tackled

25   both of them, and had them -- I was in between them on

Page 61

1    top of one and pushing the other one away.  I noticed

2    that one of them had a weapon.  So I took the weapon

3    from the inmate and separated the inmates.  And then

4    Wilson -- I don't even know if it was Wilson and I, but

5    another officer who responded put them -- made sure they

6    were in restraints, and separated, and seen by medical.

7         Q.    Do you see the next sentence right after the

8    one we were talking about, where it starts by saying:

9    Upon the lock being taken apart.  Do you see that

10   sentence?

11        A.    Yes:  Upon the lock being taken apart, there

12   was nothing in the lock that compromised it and

13   maintenance came to evaluate the lock.

14        Q.    Yes.  And do you also see right after where

15   it says that everything was in working order with the

16   lock?

17        A.    I see that, yes.

18        Q.    Is that concerning to you?

19        A.    I don't know.  I mean, yes and no, it just

20   depends -- I don't know what the situation was.

21   Evidently, there was nothing wrong with the lock.  It's

22   not a good thing for them to be able to shim their locks

23   or shim their doors that way.  But I do believe that

24   after this incident, they were looking to address and

25   figure out a solution to it.

Page 62

```
 1        Q.    So I guess what I'm asking is, as someone who

 2   works there, as a sergeant, as someone who, I suppose,

 3   has to look after the care of various staff members, as

 4   well as the inmates, is it concerning to you that a lock

 5   that is supposedly in perfect working order can be

 6   opened, popped open by an inmate?  Is that concerning to

 7   you?

 8        A.    Yeah.

 9        Q.    It is?

10        A.    It could be.  I mean, we're around them

11   everyday, not behind a locked door.  So at any moment,

12   you know, something could happen, whether behind a

13   locked door or not.  So I have never heard of it, you

14   know, being a housing unit door or a pod door.  But you

15   know, we're around 128, 300 inmates in the chow hall

16   everyday.  So when you say, is it concerning, from a

17   standpoint of if I needed that person to stay behind the

18   door for sure, then yeah, that's the idea of the door

19   and the reason that it's there.

20              But we're around these guys everyday.  And I

21   feel like it's very controlled.  And so -- sorry

22   somebody was knocking on my door.  I know it looked

23   funny, probably, there.  But yeah, it can be concerning,

24   but at the same time, you know, we're used to being

25   around inmates, you know.
```

Case 3:22-cv-00093  Document 33-12  Filed 03/04/22  Page 62 of 87 PageID #: 1642

Page 63

1       Q.    But that's not the way it should typically

2   operate, right?  A door should not be --

3       A.    Oh, yes, yes, for sure.

4             MR. JACOBS:  I am going to stop the screen

5   share and I'm going to go to next --

6             THE WITNESS:  Just one second, please.

7             MR. JACOBS:  Yeah.  Let's go off the record.

8             (Off the record.)

9             (Exhibit 11 was marked.)

10            MR. JACOBS:  I'm going to be sharing Exhibit

11  11, what has been marked as Exhibit 11.  And now I'm

12  going to share the screen.

13  BY MR. JACOBS:

14      Q.    Let me know when you get it.

15      A.    Okay.  Exhibit 11.

16      Q.    Yes, so looking at Page 2 of the exhibit,

17  which is officially the first page of the actual

18  document, which is Bates numbered CCI 48594.  Do you see

19  this document?

20      A.    I do.

21      Q.    What is this document?

22      A.    It's the synopsis of a cell search and

23  investigation that myself and I guess Cassada.

24      Q.    Do you see at the top where it says:  This is

25  from Knight, Daniel.  Is that you?

Page 64

1      A.      It is.

2      Q.      Do you see the date, December 3rd, 2020?

3      A.      Yep.

4      Q.      Going on into the body paragraph, the first

5    line.  It says:  I, investigative Sergeant Knight, was

6    informed by K9 Cassada that he had spoken to an inmate

7    informant.  The informant stated that he knew an inmate

8    that had a blue CoreCivic uniform shirt.  Do you see

9    that?

10     A.      I do.

11     Q.      K9 Cassada, what does canine stand for?

12     A.      K9 Cassada, so he's a handler.  That actually

13   should probably be K9 officer Cassada.  He is the

14   officer that is in charge of the K9 dog here that is

15   used for searches.

16     Q.      And it says that he had spoken with an inmate

17   informant?

18     A.      Uh-huh.

19     Q.      Do you have a lot of inmate informants at

20   Trousdale?

21     A.      I mean, there's a lot of inmates that will

22   tell a lot of things if they think it's to their

23   advantage and they can get something from it.  Sometimes

24   they need help, and sometimes they just want to get

25   somebody in trouble.  So sometimes people just tell on

1     somebody else because they can.

2          Q.    Do you make it to their advantage?

3          A.    If we can help them with a situation, then

4     yeah.  I mean, if somebody helps us out, we have no

5     problem helping, if it's something that's reasonable

6     within a scope; not special privileges or things of that

7     nature.  But if the guy was like, you know, I would like

8     to move to another housing unit, you know, I have this

9     information.  Let me see if I can make that happen.  If

10    he lines up with that and he's got the right

11    qualifications to live in that housing unit, then there

12    is no reason not to.

13         Q.    Do you find your informants to be helpful?

14         A.    Some are.  Some are not telling the truth.  I

15    mean, it's just -- it's random.  You know, you can't run

16    down every lead.  You know, if an inmate makes another

17    inmate upset about something, we can get a random letter

18    in our in-house mail that the inmate doesn't identify

19    himself, who he is, and say, you know, cell DC202 has a

20    phone in it, or a weapon, or something that doesn't

21    belong.  And then we go search that cell and there's

22    nothing there.  I mean, that's more likely to happen

23    than actually the information to be true.

24         Q.    Is it your desire that these inmates or

25    informants be kept safe?

1      A.    Yeah.  And anonymous, if need be.  If it's

2    their preference.  Some of them don't ask to be.

3      Q.    Be safe from other inmates?

4      A.    Yes, be safe in general, yes.  A lot of

5    people, they don't ask for any moving of housing or

6    anything, they are fine.  They just talk to us and tell

7    us.  And then if they have an issue or a problem, then

8    yeah, we'll take care of it.  I mean, that's our job, is

9    to keep them safe.  It's not always an issue for an

10   inmate to tell something to another inmate.

11     Q.    Going to that -- following that sentence, the

12   next line, we already read it, but saying:  He knew of

13   an inmate that had a blue CoreCivic uniform shirt.  Did

14   you guys find that shirt?

15     A.    We did.

16     Q.    Was an investigation done regarding this

17   shirt that was a CoreCivic uniform shirt?

18     A.    I mean, this is my synopsis of that night and

19   turned over to the investigator and the ADO staff.  So

20   they interviewed him and he was interviewed by other

21   ones.  I believe he was interviewed by TDOC, but I can't

22   quote that for sure.  I am not sure what the

23   investigation was.

24     Q.    Do you know if it was ever discovered how he

25   got possession of the shirt?

Case 3:22-cv-00093  Document 33-12  Filed 05/04/22  Page 66 of 87 PageID #: 1646

Page 67

```
 1        A.    No, the story he told me is that -- the first
 2  story he told me was that he found it in a trash can.
 3  And then another story that he told me is that he got it
 4  from another inmate.  To my belief, I think somebody had
 5  changed their shirt and left it, and somebody picked it
 6  up and didn't report it.  And then this is just us
 7  finding it later.
 8        Q.    So you weren't able to confirm or conclude
 9  where he was able to get the shirt?
10        A.    I wasn't.  And I am unaware if they further
11  reviewed it, if the main investigator further reviewed
12  it and have an answer.  This document right here is just
13  my e-mail notification of that night.  It's not a final
14  investigative synopsis.  Does that make sense?
15        Q.    Uh-huh.  Is it concerning to you at all that
16  an inmate was able to get their hands on a CoreCivic
17  uniform shirt?
18        A.    Oh, yeah, definitely.
19        Q.    Is it concerning to you that there seems to
20  be no conclusion as to how he was able to get his hands
21  on the shirt?
22        A.    Like I said, I don't know if there was or was
23  not a conclusion to it.
24        Q.    Is it concerning to you that this shirt went
25  missing and it wasn't reported by staff?
```

 1      A.    Yeah, if the staff member was missing it,

 2   that is concerning that they wouldn't report it.

 3      Q.    Would that sort of thing be of a safety

 4   concern for both the staff and the inmates?

 5      A.    Yes, of course.

 6            MR. JACOBS:  I'm going to pause.  Go off the

 7   record really quick.

 8            (Off the record.)

 9   BY MR. JACOBS:

10      Q.    Mr. Knight, we're just about done here.  I

11   just have a few closing questions that I just wanted to

12   address.  So if you remember back toward the beginning

13   of the deposition, we pulled up the disclosures that

14   talked about the things that you would be knowledgeable

15   about to testify.  So I just want to make sure that

16   we've covered everything that you will be -- that you

17   have knowledge of and you will be testifying about if

18   this should go to trial.

19      A.    Okay.

20      Q.    So based on what we've discussed, have we

21   discussed everything you know regarding Pleasant-Bey and

22   his incarceration?  Have we discussed all of your

23   knowledge regarding that?

24            MS. POLLY:  Object to the form.

25   BY MR. JACOBS:

1        Q.    You can answer.

2        A.    We haven't talked about why he was

3    incarcerated or his issues with me.  I am not sure what

4    the question is asking.

5        Q.    I am asking if we've discussed everything

6    that you have knowledge of regarding Pleasant-Bey and

7    his incarceration?

8        A.    Oh, that I have knowledge of.  I believe so,

9    yes.

10       Q.    So we discussed everything that you would be

11   able to testify at trial, regarding Pleasant-Bey and his

12   incarceration?

13             MS. POLLY:  Object to the form.

14   BY MR. JACOBS:

15       Q.    You can answer.

16       A.    Yeah, I mean, there may be other details that

17   weren't brought out that I could testify, depending on

18   the questions.

19       Q.    You said that there were other details?  What

20   other details?

21       A.    I don't know that there are or there isn't.

22   I don't -- if this is the only questions I was to be

23   asked at court, then yes.  But if there were other

24   knowledge, hey, did you, you know, see Mr. Pleasant-Bey

25   on the 15th, and I remember having an interaction, I

1    could, if you ask me about it.  But I don't have it

2    right there right now.

3        Q.    Have we discussed everything you know

4    regarding what is stated to be the customs, policies,

5    education and training at Trousdale?  Have we discussed

6    everything you know regarding that?

7              MS. POLLY:  Object to the form.

8              THE WITNESS:  We haven't discussed

9    everything.  I mean, we didn't really talk about the

10   training, what I do as a trainer or training process, if

11   that's what you're asking.

12   BY MR. JACOBS:

13       Q.    And what do you do in the training process?

14       A.    I mean, the classes come in and we go through

15   the curriculum as it's provided by the facility and the

16   state.  And we make sure that they have that and that

17   they get their training and what they're required to

18   have.  And then we spend time with them, provide time

19   with them on the floor daily with training to make sure

20   that they're still at the same standard on a daily

21   basis, weekly basis.  Spot checks and inspections.  A

22   lot of books.  And looking at their performance and

23   making corrections and reporting quarterly.

24       Q.    Anything else?

25       A.    No, I mean, I think we're -- I don't think I

Page 71

```
 1   am understanding where the questions are going.  I'm not

 2   sure what --

 3        Q.    I'm just covering to make sure that we

 4   covered everything that counsel has stated that you have

 5   knowledge on as far as a witness is concerned.

 6        A.    Oh.

 7        Q.    That's all.  Okay.  Have we discussed

 8   everything that you know of regarding the allegations of

 9   this lawsuit?

10             MS. POLLY:  Object to the form.

11   BY MR. JACOBS:

12        Q.    You can answer.

13        A.    I believe so.  Like I said, I don't know

14   every detail of the lawsuit.

15        Q.    Right, but other than what we've discussed,

16   that encompasses the knowledge of what you have

17   regarding the allegations?

18        A.    Yes.

19             MS. POLLY:  Object to the form.

20             MR. JACOBS:  All right.  Nothing further.

21             MS. POLLY:

22   EXAMINATION BY MS. POLLY:

23        Q.    I have just a few questions for you, Mr.

24   Knight.

25        A.    Okay.
```

1        Q.     When did you start working at Trousdale,

2   again?

3        A.     Six years ago this month, November.  It's

4   right at six years, so 2015, I believe.

5        Q.     November of 2015?

6        A.     Yes.

7        Q.     Are you aware that there are policies that

8   govern the operation of the Trousdale Turner

9   Correctional Center?

10       A.     I am.

11       Q.     And if we put those policies on the ground

12   and stack them up, they come pretty close to the

13   ceiling, don't they?

14       A.     It's huge.

15       Q.     You are aware that there are training

16   materials and training procedures that are implemented

17   there at Trousdale, correct?

18       A.     Yes.

19       Q.     Those are robust, are they not?

20       A.     They are.

21       Q.     And then there are all kinds of things that

22   go on at Trousdale.  There are security practices and

23   procedures, correct?

24       A.     Yes, things that aren't policy, but are

25   procedures, are SOPs, standard operating, the way we do

 1    things on a day to day.

 2        Q.    That's everything from perimeter checks, to

 3    cell checks, to checking the inmates, correct?

 4        A.    Yes, ma'am.

 5        Q.    You have not discussed all of that today,

 6    have you?

 7        A.    I have not.

 8        Q.    Probably not even possible to discuss in two

 9    hours, is it?

10        A.    No, I mean, there's a lot that we do day to

11    day.

12        Q.    But you have knowledge of all of that and

13    would come to trial prepared to testify about that, if

14    asked?

15        A.    Yes, ma'am.

16              MS. POLLY:  Thank you.  I don't have any

17    further questions.

18              MR. JACOBS:  No follow-up.

19              FURTHER DEPONENT SAITH NOT.

20

21

22

23

24

25

Page 74

1                        CERTIFICATE

2

     STATE OF TENNESSEE      )
3                            )    SS.
     COUNTY OF DAVIDSON      )
4

5            I, CAROLE K. BRIGGS, Licensed Court Reporter

6    within and for the State of Tennessee, do hereby certify

7    that the above deposition was reported by me and that

8    the foregoing pages of the transcript is a true and

9    accurate record to the best of my knowledge, skills, and

10   ability.

11           I further certify that I am not a relative,

12   counsel or attorney of either party nor employed by any

13   of the parties in this case or otherwise interested in

14   the event of this action.

15           IN WITNESS WHEREOF, I have hereunto affixed my

16   official hand on this 6th day of December 2021.

17

18

19   _Carole K. Briggs_

20   _____

21   CAROLE K. BRIGGS

22   Shorthand Reporter

23   Tennessee License No. 345

24

25

**Exhibits**

**Exhibit 1** 3:15 6:11,12,24

**Exhibit 2** 3:16 20:23,24

**Exhibit 3** 3:18 27:21 28:7

**Exhibit 4** 3:19 33:4,5

**Exhibit 5** 3:20 37:17,18

**Exhibit 8** 3:21 49:18,19,22

**Exhibit 10** 3:22 56:20,21

**Exhibit 11** 3:23 63:9,10,11,15

---

**0**

**001381** 38:9,16,19

**001382** 40:25

**001462** 43:9

---

**1**

**1** 6:11,12,24 21:7 28:9 33:10,11
45:12,18

**10** 56:20,21

**11** 63:9,11,15

**12** 39:9 46:22

**128** 62:15

**13** 21:19

**15th** 69:25

**16** 34:14,16

**17** 5:4

**17th** 7:14

**19** 43:13

**1:00** 7:15

**1:07** 5:2,4

**1st** 50:19

---

**2**

**2** 6:25 20:23,24 21:6 28:9,19,20
33:9 37:24 38:24 48:25 63:16

**2015** 72:4,5

**2018** 33:14 34:2 35:4,10 36:4
47:4

**2019** 39:22 41:2

**2020** 21:19,20 38:5,7 43:14 50:20
64:2

**2021** 5:4 7:14 50:10 60:1,8

**205** 50:21

**206** 60:9

**2402** 45:10,13,17

**28** 50:10

**29th** 33:14

---

**3**

**3** 21:21,22 27:21 28:7 34:17 41:1
43:20

**3/16/2020** 43:24

**300** 62:15

**31** 38:4,7

**31st** 33:14

**38** 41:4,17

**3rd** 64:2

---

**4**

**4** 33:4,5 39:17

**42A** 47:6

**48594** 63:18

---

**5**

**5** 37:17,18 41:3 51:11

**5-1** 57:21 58:1,5,7,10,18,25 59:2,
14,18

**5/2/2019** 46:17

**53407** 57:3,5

---

**6**

**6/18/19** 43:16

**6/3/20** 49:7

---

**7**

**7/2** 39:22

**7483** 50:13

**7490** 51:12

**7491** 52:22 53:2

**7493** 53:23

---

**8**

**8** 49:18,19,22

**8th** 22:4 60:1,8

---

**9**

**9** 41:2

**9/28/20** 45:21

**9/28/2020** 46:8

---

**A**

**a.m.** 5:2

**ability** 48:2

**ACA** 32:17

**accountability** 13:2

**accounted** 13:7 37:14

**accreditation** 33:12 48:2

**accredited** 32:19

**accurately** 29:5

**action** 40:5 44:3,12

**actions** 41:9

**actively** 41:5

**actual** 13:25 28:9 57:2 63:17

**Adam** 60:4

**add** 20:22

**adding** 13:3

**addition** 46:19

**address** 61:24 68:12

**ADO** 11:18 66:19

**advantage** 64:23 65:2

**AE** 60:9

**affairs** 12:14

**affiliations** 12:22

**afternoon** 5:8,23

**agent** 39:19

**agents** 39:20

**agree** 5:6,12 44:13

**agreed** 5:10

**agreement** 31:25 32:2

**ahead** 14:11,18 21:1,4 27:24
28:1 30:1 37:21 49:17 55:24
56:23

**alert** 23:10

**allegations** 16:9 17:16 18:20
19:1,2,3,17,19 21:23 22:6,9 29:3,
10,14,21 30:6 71:8,17

**Alpha** 60:15,16

**Amendment** 22:4

**American** 32:17

**ammunition** 13:4 41:4 42:22,25

**and/or** 52:6

**annual** 46:20

**anonymous** 66:1

**answers** 17:8

**approximately** 9:25

**area** 31:3,5 35:6,19 36:7,8 43:5
44:23,24 60:17

**arm** 23:23

**armed** 42:5

**armory** 9:24 12:3,6,24 15:1
34:25 36:15 37:10 40:5 41:10,25
42:2,22 44:5,17

**assault** 12:15,21 24:6,19,21
26:21 60:18

**assaulted** 12:20

**assaults** 24:23 25:1

**assessed** 43:24

**assigns** 12:18

**assist** 10:25 11:8 12:11

**assistant** 5:15 57:11

**assisted** 31:4

**assisting** 53:11

**Association** 32:18

**assuming** 21:12 52:16

**attachment** 6:15

**attorney** 5:5,15 15:22

**attorney/client** 15:20

**audit** 32:8,9,12,14,17,18,21,22
33:13 34:1,4 35:4,22 36:3,5,9,20,
23,25 39:10,11 40:10 44:7

**audited** 36:19 45:22

**audits** 32:10,11 40:12

**Avery** 19:9,11,14

**Avery's** 19:15

**AW** 57:13,14

**awake** 23:9,14

**aware** 20:6 25:11 31:24 32:3 41:5
72:7,15

**AWS** 11:18

---

**B**

**back** 11:16 23:18 24:10,15,19
34:1 35:17,20,23 42:2,5,9,22 47:8
49:13 59:21 68:12

**bad** 24:18 26:8

**bag** 41:3,23 42:20

**based** 17:8,10 27:11 68:20

**basic** 11:5

**basically** 38:13 48:5

**basis** 25:11,19 26:16 70:21

**Bates** 34:14 38:9,15,18 40:25
43:9 45:10 50:13 51:12 52:22
53:23 57:3 63:18

**bed** 60:10

**began** 5:2

**beginning** 7:15 68:12

**behalf** 6:6

**behaved** 31:20

**belief** 67:4

**belong** 65:21

**bigger** 45:15

**bit** 49:17 56:19

**blue** 64:8 66:13

**Boaz** 16:6 18:3,13 28:11

**body** 64:4

**books** 70:22

**boss** 14:21 59:6

**box** 14:4 42:3

**brain** 23:16

**breach** 43:21 49:2

**break** 49:13

**Briggs** 6:20

**bring** 37:9

**brought** 69:17

**brush** 56:3

**bunch** 26:5

**Bunk** 56:4

---

**C**

**caliber** 41:4,17

**call** 12:13 35:12 54:9,10 60:14

**called** 8:20 23:8,9 24:1

**calls** 7:7

**canine** 64:11

**canister** 39:14,16 43:14

**canisters** 44:19

**cans** 56:4

**capacity** 58:24

**capsicum** 39:19

**captain** 59:10

**captains** 11:19

**care** 32:7 62:3 66:8

**career** 10:20

**carried** 24:17

**carry** 45:24 48:3

**carrying** 48:17

**case** 8:1,3,4 16:10 18:20 19:21
33:1 51:25

**Cassada** 63:23 64:6,11,12,13

**category** 36:1

**CC2200** 34:15

**CCI** 50:13 51:12 52:22 53:2,23
57:3,5 63:18

**ceiling** 72:13

**cell** 51:6,9,10 53:11,12,14 54:3,
24 55:2 63:22 65:19,21 73:3

**Center** 33:17 38:1 72:9

**central** 44:18

**certification** 39:22 43:15 46:17

**certifications** 48:17

**certified** 39:24 40:3 47:12,16,22

**changed** 13:9 67:5

**characterize** 24:8

**charge** 13:1,10 15:4 30:5 64:14

**Charlie** 50:21 53:12

**chat** 6:14,18 20:25

**check** 40:11

**checked** 35:7

**checking** 46:5,6,12,15 73:3

**checks** 70:21 73:2,3

**chemical** 37:2

**chief** 42:13 44:23 45:1

**chiefs** 11:18

**chow** 62:15

**civil** 8:8

**claiming** 16:8

**claims** 16:6,17,19 17:19 21:23
22:1,6

**class** 10:7 47:10,18,21 48:4,6,20

**classes** 47:4,15 70:14

**classified** 24:18

**cleaned** 13:7

**cleaning** 31:5 37:1

**clear** 45:3

**close** 72:12

**closing** 68:11

**Clyde** 50:8,22

**CM** 41:3

**code** 23:8 24:1

**commission** 33:12

**common** 11:22 24:3 25:12,21
26:4,5

**commonly** 55:5

**communicated** 34:1

**communications** 17:9

**company** 6:6 10:14

**compared** 27:1

**complaint** 18:11

**compliance** 32:8 33:13

**compression** 23:11

**compromised** 60:9 61:12

**concern** 68:4

**concerned** 71:5

**conclude** 67:8

**conclusion** 67:20,23

**conditions** 34:21

**conduct** 13:22

**conducted** 27:8 40:11 50:20

**conducting** 41:5

**confirm** 67:8

**confusion** 46:25

**contact** 36:22

**contacted** 36:2,3,6,14

**contacting** 42:15

**contacts** 11:9

**continues** 49:5

**contraband** 12:16 13:14 14:3

**contract** 32:4,6 40:5 41:9 44:3
45:21 46:8

**contractor** 32:13

**control** 14:5 44:18

**controlled** 62:21

**conversation** 8:21 37:6

**conversations** 18:25 31:7,9

**coordinating** 10:4

**coordinator** 9:23 10:2

**Corbitt** 60:9

**Corecivic** 5:12 8:11 9:3,12,19
10:17,19,22 18:19 19:1,25 27:16
28:12 32:3,21 33:16 58:10 64:8
66:13,17 67:16

**Corecivic's** 31:24

**corner** 38:15

**corners** 38:12

**correct** 12:13 28:7 58:9 72:17,23
73:3

**correction** 11:13 33:12,17

**correctional** 10:3,10,20 11:3
22:2 32:17 38:1 45:22 60:4 72:9

**corrections** 10:18 31:25 32:4
51:19 58:12 70:23

**correctly** 42:9,11

**counsel** 7:17 71:4

**count** 22:23 37:11

**couple** 10:1 40:4 41:8 44:2

**courses** 47:11

**court** 5:3 18:14 34:8 69:23

**covered** 68:16 71:4

**covering** 71:3

**credit** 47:20 48:7,11

**criminal** 8:9

**crossed** 30:14

**Cude** 43:14

**Cude's** 43:15

**current** 10:22 46:16

**curriculum** 70:15

**customs** 29:2,9 70:4

## D

**daily** 11:9 70:19,20

**damages** 43:24 49:6

**Daniel** 5:19,25 6:1 7:1 21:8 22:2 28:21,23 35:1 45:23 50:20,24 60:5 63:25

**date** 30:11 38:4 46:21,22 50:10 59:25 64:2

**dated** 46:17

**dates** 39:8

**day** 7:14 11:16 12:1 27:5 35:21 48:21 73:1,10,11

**DC202** 65:19

**deal** 17:4

**dealings** 12:17

**December** 41:2 64:2

**decide** 45:1

**decided** 48:14

**defendant** 22:2

**defendants** 5:12,16 28:12

**delay** 48:19

**deliberately** 22:3

**Delta** 50:21 53:12

**department** 14:5 17:4 31:25 32:4 34:25 35:25 36:6 51:19 58:12

**departmental** 34:18,22

**departments** 34:21 35:15

**depending** 54:23 69:17

**depends** 59:15 61:20

**deployment** 25:7

**DEPONENT** 73:19

**deposed** 5:20

**deposition** 5:1,6,13 7:1,18,20, 23,25 8:2,13 15:10,25 17:21 18:2, 4,8,9,18,23 68:13

**describe** 22:20

**description** 52:24 53:8,10,16 60:7

**descriptions** 58:16

**desire** 65:24

**detail** 43:15 71:14

**details** 12:20 16:3 17:17,18 40:17 41:14 44:12 46:24 49:10 55:7 58:4,17 69:16,19,20

**determined** 41:3 43:20 49:1

**dirty** 12:14

**disabled** 6:21

**disagree** 22:8,11,14 40:22,24 44:9 45:6 49:9

**disciplinaries** 52:14

**disciplinary** 45:2 51:24

**disclosure** 28:10

**disclosures** 28:15 68:13

**discovered** 40:14 41:20 42:14 43:1,8 66:24

**discovering** 42:21

**discuss** 73:8

**discussed** 15:17,20 58:6 68:20, 21,22 69:5,10 70:3,5,8 71:7,15 73:5

**discussion** 6:22

**document** 7:3 13:22 14:21 21:6, 22 27:24 28:9,10,17,20,21 33:3,7, 9,11,20,24 34:3,14 37:25 39:1,4 44:10,16 48:10 49:23 50:1,6,12 53:20 54:20 56:18,23 57:2,7,9 59:21 63:18,19,21 67:12

**documentation** 14:1 32:15 35:20 36:7,11,21 37:8 47:14,17

**documented** 15:3

**documents** 15:2,24 26:24 38:11 39:5

**dog** 64:14

**door** 60:20,21 62:11,13,14,18,22 63:2

**doors** 61:23

**dude** 23:24

**due** 60:9

**duly** 5:20

## E

**e-mail** 7:11 21:2 28:3,5 37:5,23 45:16 57:17 67:13

**earlier** 58:6 59:8

**easy** 31:18 54:21

**educated** 46:20

**education** 29:2,9 70:5

**effect** 26:25

**efforts** 13:12

**emergency** 42:3

**employees** 39:9

**empty** 14:3

**encompass** 12:8,25

**encompasses** 29:6 71:16

**end** 56:6

**ends** 50:16

**entail** 10:23

**enter** 6:11 52:1,10,18 58:18

**entered** 52:4,14 57:21,23 59:12

**entering** 33:4

**entire** 10:11,12,13

**entirety** 10:19

**equipment** 13:2,3,5,10 15:3 39:25 41:23,25 42:3,6 43:19 48:25

**Eric** 5:15

**Erin** 5:11

**essential** 43:20 49:1

**evaluate** 61:13

**event** 27:14

**everyday** 11:11 62:11,16,20

**evidence** 13:21,22 14:4,5

**evidently** 41:23 42:5,19 48:12 61:21

**exact** 19:3,19 29:10 30:11 39:7 58:2

**EXAMINATION** 5:22 71:22

examined 5:20

exchange 38:11

exhibit 6:11,12,24 20:23,24
27:21 28:7 33:4,5 37:16,17,18,25
49:18,19,22 51:11 56:20,21 57:2
63:9,10,11,15,16

experienced 48:16

expiration 39:8 46:21

expired 39:22 43:16

extends 46:22

extent 16:2 17:6,8,10

**F**

face 30:14

facilities 25:9,23,25 26:1,3,15,20
27:1

facility 6:7 8:22 10:4,10,15 12:15
13:3,11 16:17 18:1 27:5,15,16,17
30:3 32:1,5,15,16 41:4 43:2,4
45:5 46:19 47:2 54:15 55:20
57:12 70:15

fair 59:12

Fairly 40:19

fall 36:4

falls 23:24 44:23

familiar 16:2,9 17:16 20:7 29:8
34:2 35:18 40:20 51:16

fast 23:24

February 43:13

feel 11:17 62:21

fell 42:19

field 9:4 10:24

fight 24:5,6,8 25:2 59:7

fighting 26:22 60:22

fights 24:3

figure 42:15 61:25

file 14:2 15:7 46:17 47:5

filed 7:11 8:10 15:6 18:10 19:7,12
21:18 46:16

filing 21:7,22

fill 55:7

final 67:13

find 54:23 55:20 56:9 65:13 66:14

finding 35:6,23 39:7,8,10,11
51:7,9 67:7

findings 11:14,15 59:5

fine 5:13 16:23 17:12 66:6

firearm 46:16,20

firearms 13:4 37:13 47:1

fixed 35:7,8

Flatt 39:14 40:23

Flatt's 39:21

floor 23:24 70:19

flow 57:22

focus 11:21

follow-up 73:18

football 31:10

force 8:18,19 59:22

foregoing 5:1

forget 34:7

forgot 48:1

form 14:10,18 22:12 25:13 27:2
29:17,24 55:22 68:24 69:13 70:7
71:10,19

forward 35:8

found 12:16 16:5 18:3 23:15
41:20 42:18 51:2,8 53:13 54:3
55:3 56:12,15 67:2

foundational 11:5

freedoms 16:15

friends 25:23

front 7:8,11

full 5:24

Fuller 5:15

function 17:3

functioning 32:19

funds 51:25

funny 54:6 62:23

**G**

gave 19:20

general 5:14,15 16:8 30:18,19
66:4

generally 31:17,22

get along 31:21

give 9:15 10:1 11:14 14:1 17:8
20:14 24:14 36:8 48:11 49:24
59:4

good 5:8,14,23 30:24 31:17,18,
22 45:16 51:22 61:22

Gordon 5:25 6:1

govern 72:8

Grab 24:13,14

grand 8:1

ground 23:5 72:11

group 6:9

guess 6:16 16:6,16 18:10 22:17
23:1 29:7 47:4,13 59:15 62:1
63:23

guy 31:18 54:15 65:7

guy's 23:22

guys 10:25 11:14,25 24:11,15
30:24 34:7 62:20 66:14

**H**

hall 62:15

handle 13:25 39:25

handler 64:12

handling 57:15 59:23

hands 67:16,20

handwriting 55:13

hang 28:3 44:13

happen 24:1,24 26:15,22,23
62:12 65:9,22

happened 23:9,17 24:16 27:16
48:12 57:12 60:13

happening 14:13 39:12

**happenings**  6:7 12:14 32:14

**happy**  31:17

**hard**  23:23 31:21

**Hartsville**  33:17

**head**  54:6

**hear**  25:24 26:14 27:14

**heard**  23:2,3,25 62:13

**hearing**  27:12

**helpful**  65:13

**helping**  65:5

**helps**  65:4

**hey**  26:21 69:24

**hidden**  53:14

**Hold**  34:6 46:7

**homemade**  53:13 54:7,9

**hospital**  23:15 41:22

**hours**  12:1 41:24 73:9

**house**  24:15 32:6

**housed**  53:12

**housing**  50:21 51:24 62:14 65:8,
11 66:5

**Hubbard**  50:8,21 53:13

**hug**  24:14

**huge**  72:14

**Huh-uh**  55:10

**hundred**  58:19

---

                          I

**I.D.**  52:16

**idea**  62:18

**identified**  45:22

**identify**  65:18

**image**  54:2,3

**immediately**  23:8 42:14

**implemented**  72:16

**important**  44:14

**improved**  11:23

**in-house**  65:18

**inaudible**  39:8

**incarcerated**  29:8 30:4,5 69:3

**incarceration**  28:24 29:16,23
68:22 69:7,12

**inches**  55:16,18

**incident**  12:12 22:16,18,21 27:5,
14 40:18 46:24 51:5 52:10 53:19
57:25 59:16 60:1,8,11,12 61:24

**incidents**  13:13 14:8,12,13 26:3,
19 51:24 52:4,6,15 53:4 58:10,12
59:6,17

**including**  28:12

**incorrectly**  42:10

**indent**  60:13

**indicting**  8:14

**indifferent**  22:3

**individuals**  45:24

**inflammatory**  39:19,20

**informant**  64:7,17

**informants**  64:19 65:13,25

**information**  19:22 36:11 54:22
55:1 57:22 65:9,23

**informed**  64:6

**initial**  11:2,4 28:15 33:13

**inmate**  13:20 19:11,14 20:12
23:18,22 31:19,23 50:21 53:12,13
60:8,18 61:3 62:6 64:6,7,16,19
65:16,17,18 66:10,13 67:4,16

**inmate's**  19:9

**inmates**  12:22 19:6 20:15 22:25
24:3,12 25:2,21 26:5,22 30:25
31:12 32:6 43:4 51:18 52:6,9 61:3
62:4,15,25 64:21 65:24 66:3 68:4
73:3

**input**  51:23 53:16 58:15 59:13

**inside**  16:16 27:17 58:23

**inspected**  41:3

**inspection**  37:1

**inspection-**  36:9

**inspections**  70:21

**instruct**  15:16 17:10 47:10

**instruction**  47:2

**instructor**  47:1,6,10,11,19 48:5,
10

**instrument**  40:13 43:19 48:25

**intake**  30:13 31:1,4,5

**interacted**  30:16

**interaction**  24:9 69:25

**interactions**  25:20 31:16

**internal**  32:21

**interview**  12:21 13:20,22,23

**interviewed**  66:20,21

**introduce**  5:5

**inventory**  13:8 37:10 42:12

**investigate**  12:19

**investigated**  14:15

**investigation**  14:5,20,22 50:4
52:20 63:23 66:16,23

**Investigations**  12:14

**investigative**  9:11,24 12:5,9,10
13:12 14:16 50:20 56:8 59:5 64:5
67:14

**investigator**  12:11 13:20 50:3
53:11 56:13 59:6,10 66:19 67:11

**involved**  8:6,11,20 19:6 20:11,19
60:3

**irregular**  25:3

**issue**  39:4,7,13 40:22 41:2,15
43:10 44:11 45:8,21 46:8,10 47:4,
23 66:7,9

**issued**  39:14 40:3,15 43:14
44:15 45:4 49:7

**issues**  11:12,15 17:20 24:20 25:1
26:1,5 31:21 40:2 69:3

**issuing**  44:21

**item**  14:3,4 36:12 38:24 41:1
43:20,21 48:25 49:1 54:3

**items**  16:15 17:2 36:9 37:11
44:16 56:5

## J

**Jacobs** 5:7,8,9,22 6:10,13,17,20,
23 14:14,24 15:16,18 17:7,14
20:21,25 21:5 22:13 25:18 27:7,
18,22 29:19,25 33:2,6 34:6,9,12
37:15,19 49:12,16,20 55:23 56:22
63:4,7,10,13 68:6,9,25 69:14
70:12 71:11,20 73:18

**January** 9:8 21:18 38:4,6,7 50:10

**job** 9:2 10:6,23 12:8,25 25:23
26:8 31:20 66:8

**jog** 20:18 21:14

**jump** 41:3

**jury** 8:2

## K

**K9** 64:6,11,12,13,14

**keeping** 38:13

**Kentucky** 25:10

**kids** 31:20

**kind** 15:12,13 23:11 47:16 54:18

**kinds** 72:21

**kitchen** 22:22,25 23:13

**knew** 7:9 23:4 64:7 66:12

**knife** 54:7,8,10

**Knight** 5:19,25 6:1,24 7:1 14:11
15:15 17:6 19:5 21:9 22:2 25:15
27:23 28:21,23 31:24 34:13 35:1
40:6 41:10 44:6 45:23 50:20,24
53:11 60:5 63:25 64:5 68:10
71:24

**Knight's** 46:12,16

**knocking** 62:22

**knowing** 35:22

**knowledge** 17:24 20:13 25:20
28:24 29:6,11,14,15,21,22 58:20
68:17,23 69:6,8,24 71:5,16 73:12

**knowledgeable** 68:14

## L

**label** 38:12

**labeled** 21:7

**lawsuit** 17:25 19:13 20:12,19
21:15 22:10 29:3,6,22 30:6 71:9,
14

**lawsuits** 19:6 20:4

**lawyer** 18:6

**lead** 9:4 10:24 65:16

**leadership** 41:5

**left** 67:5

**left-hand** 38:14

**length** 55:15,19

**lengths** 55:25

**letter** 40:19 49:6 65:17

**letting** 18:2

**level** 17:24 59:15

**license** 47:2

**lieutenant** 59:10

**lieutenants** 11:19

**life** 31:12,13

**likes** 57:13

**limited** 29:22

**lines** 40:4 44:2 65:10

**liquidated** 43:24 49:6

**list** 44:15 45:4,23 56:18

**listed** 27:4 36:2 45:23 52:22
56:20 57:3

**Lister** 8:6

**lists** 41:10

**litigation** 16:3

**live** 65:11

**locating** 42:21

**location** 38:1

**lock** 60:9,10 61:9,11,12,13,16,21
62:4

**locked** 62:11,13

**locks** 61:22

**logged** 13:18

**long** 9:6,14 48:9

**looked** 16:5 17:11 18:4,8,15
23:5,19 47:13,17 62:22

**lost** 27:18 46:7

**lot** 17:5 20:15,16 26:2 29:21
30:25 31:6 51:18 52:18 54:10
56:9 64:19,21,22 66:4 70:22
73:10

## M

**made** 16:10 22:9 47:16 60:10
61:5

**mail** 65:18

**main** 12:11 13:19 67:11

**maintenance** 61:13

**make** 6:18 11:9,10 13:6 15:12
18:5 31:19 32:19,23 34:9 37:12
42:8 44:19 45:2 54:20 55:15 65:2,
9 67:14 68:15 70:16,19 71:3

**makes** 65:16

**making** 19:18 70:23

**manage** 12:22

**March** 60:1,8

**Mark** 39:17

**marked** 6:12 20:24 27:21 33:5
37:18 49:18,19 56:21 63:9,11

**matching** 59:13

**material** 58:15

**materials** 56:1,2 72:16

**matter** 5:10 8:9

**Matthew** 5:8

**Mccauley** 53:13

**means** 38:10

**medical** 23:8,9,12 61:6

**medium** 50:2

**meet** 32:16

**meeting** 6:3 15:13

**member** 12:20 25:8 44:22 68:1

**members** 34:20 35:15 62:3

**memorandum** 21:18

**memory** 20:18 21:14

**mentioned** 17:15

**met** 30:8,12

**metal** 51:2 54:4 56:3,4

**mid** 38:23

**middle** 6:1 43:10 45:11 46:14

**milestone** 23:18

**minutes** 34:4 49:13

**mishap** 40:15

**missing** 41:4,17 42:12 67:25 68:1

**Mk4** 39:14,16,17 43:14

**model** 39:18

**moment** 7:21 62:11

**monitor** 40:5 41:9 44:3 45:21 46:8

**monitoring** 43:19,20 48:24 49:1

**month** 9:15 72:3

**monthly** 13:7,11 15:6,7,8 37:1

**months** 10:1 39:9 46:22

**mood** 31:18

**morning** 5:14 30:24 42:7

**mornings** 42:8

**move** 65:8

**moving** 45:10 66:5

**multiple** 12:1 47:3,21

**mumble** 39:8

**munitions** 13:4,5,9

**Muslim** 17:2

**N**

**named** 20:1,2,12 21:15,16

**names** 20:16

**nature** 9:1 12:23 22:9 37:14 65:7

**NCR** 43:25 49:7

**necessarily** 29:14

**neck** 23:23

**needed** 11:17 12:19 13:10,24 31:4 35:6,8,19,23 47:16 62:17

**night** 42:18 66:18 67:13

**noise** 23:25

**noncompliance** 38:24 39:4,13 40:22 41:1,2 43:10 45:8,11,18,21 46:8,10

**normality** 27:1

**note** 44:14 48:24

**notes** 51:25

**notice** 6:25 49:25

**noticed** 18:15 61:1

**notification** 43:21 49:2 67:13

**notified** 7:14 40:9 42:12,16 44:6

**notify** 42:10 57:14

**November** 5:4 7:14 72:3,5

**NRA** 47:3

**number** 22:24 38:15,18 39:18 52:25 57:4

**numbered** 34:17 63:18

**numbers** 42:23 55:17

**nurse** 23:14

**O**

**object** 14:10,18 22:12 25:13 27:2 29:17,24 54:4 55:22 68:24 69:13 70:7 71:10,19

**objecting** 25:15

**objections** 5:17

**observed** 49:15

**OC** 39:14,16,18,20,22 43:14,15 44:19

**occasions** 48:16

**October** 33:14

**office** 60:16

**officer** 8:6,17,19 9:4 10:3,24 11:3,23 12:1 22:2 45:23 60:4,5 61:5 64:13,14

**officers** 11:10,22

**official** 9:2 13:25 14:22 57:19,20

**officially** 14:2 19:8,13 52:1 63:17

**oleoresin** 39:18

**Oliver** 20:7,12,17 21:8 23:3,5 24:19

**online** 18:13

**open** 60:20 62:6

**opened** 62:6

**operate** 63:2

**operating** 72:25

**operation** 72:8

**operations** 34:22

**order** 49:17 56:19 61:15 62:5

**ordered** 13:9

**original** 16:4

**ourself** 32:22

**out-count** 22:25

**out-counts** 22:23

**P**

**p.m.** 5:4 7:15

**pages** 38:14

**Palmer** 5:11

**paper** 54:14 55:1

**paperwork** 54:16

**paragraph** 28:20 34:17 46:10 50:14 64:4

**part** 7:9,21 10:5 14:19 16:6 18:2, 22 21:24 39:11 45:25 56:14

**partial** 29:15

**particulars** 22:21

**parties** 38:11

**partner** 32:25

**past** 19:12

**paths** 30:14

**pause** 27:19 68:6

**people** 18:21 26:6,7,8,9,19 27:12

54:10,22 64:25 66:5

**percent** 58:19

**perfect** 62:5

**perfectly** 17:12

**performance** 70:22

**perimeter** 73:2

**person** 8:5 37:7 62:17

**person-to-person** 37:6

**personal** 31:6,8,12,13

**persons** 36:2

**pertained** 31:3

**pertaining** 18:16 19:6

**phone** 7:7 65:20

**photocopied** 54:13

**physical** 57:15 59:23

**picked** 67:5

**picture** 36:12 54:5,7 56:10

**pictures** 54:21 58:23,25

**piece** 51:2

**place** 35:9

**plaintiff** 7:17 22:1

**plaintiff's** 22:3

**plastic** 56:6

**play** 24:12

**playing** 23:20

**Pleasant-bey** 5:9 18:13 28:11
30:8,17 31:9,16 68:21 69:6,11,24

**Pleasant-bey's** 28:24 29:15,23

**plenty** 56:15

**pod** 62:14

**point** 23:22 24:7 42:24 48:15
51:3 54:4,18 60:16

**poking** 23:21

**policies** 29:2,9 30:2 32:24 70:4
72:7,11

**policy** 34:22 36:12 72:24

**Polly** 5:11 8:1 14:10,18 15:11,15
17:6 22:12 25:13,15 27:2 29:17,
24 55:22 68:24 69:13 70:7 71:10,

19,21,22 73:16

**pop** 56:4

**popped** 18:15 62:6

**popping** 60:10

**position** 9:6,7,10,14,25 10:3,8,
22 15:1

**positions** 9:18

**possession** 66:25

**post** 41:22

**practice** 25:12

**practices** 72:22

**predeposition** 15:11

**preference** 66:2

**preparation** 15:24

**prepare** 15:9

**prepared** 73:13

**present** 37:13

**presented** 44:10

**pretty** 72:12

**prior** 7:23 12:3,5,6 19:6

**prison** 12:23 24:23 25:4 26:7,8
32:20

**prisons** 25:1,5,6,12 26:2,10,23

**privilege** 15:20

**privileges** 65:6

**problem** 65:5 66:7

**procedure** 36:12 44:25

**procedures** 8:24 30:2 32:24
72:16,23,25

**proceed** 7:17

**process** 54:25 70:10,13

**prodding** 23:21

**proficient** 48:9

**program** 11:10

**properly** 48:18

**property** 31:5

**provide** 32:7,15 36:10,11 70:18

**provided** 37:3 70:15

**providing** 18:1

**pull** 37:23 56:18

**pulled** 21:4 68:13

**purposes** 58:21

**pursued** 19:21

**pushing** 61:1

**put** 13:16,24 20:22 26:5 35:9
38:12 41:22 42:2,5,22 47:20 48:2,
18,19,22 57:25 59:6,9,10,18 61:5
72:11

**puts** 23:23

**putting** 59:1

**Q**

**qualifications** 46:20 65:11

**qualified** 39:9 45:24

**quarterly** 40:11 70:23

**question** 25:17 51:22 69:4

**questions** 17:7 35:19 68:11
69:18,22 71:1,23 73:17

**quick** 57:18 68:7

**quickly** 42:4 58:3

**quote** 31:18 66:22

**R**

**ran** 23:17

**random** 65:15,17

**read** 17:21 39:7 66:12

**reading** 21:17,24 44:12

**real** 23:23

**realized** 60:22

**reason** 22:8 26:7 40:21,24 44:9
45:6 49:9 62:19 65:12

**reasonable** 65:5

**recall** 19:17 20:11 31:8,14,15
35:3,22 40:8,17 41:14,17,19 51:5
52:13,15 59:2 60:11,12

**receive** 11:7

**received** 7:10 42:1

**Recently**  30:18

**recess**  49:15

**recognize**  22:16 49:23,25 57:7

**record**  5:3,24 6:22 13:24 14:23 27:19,20 63:7,8 68:7,8

**recorded**  5:13

**records**  13:16,17,25 14:7 15:4

**recovered**  13:21 14:3

**red**  43:18 48:24 49:6

**reference**  54:14,17,19 55:4

**referred**  53:19

**referring**  17:22

**regular**  25:3

**relating**  34:22

**relation**  36:3

**religion**  17:3

**religious**  16:15,19 17:1

**religious-based**  16:14

**remember**  7:7 8:3,5,8,11,15,20 19:14 20:14 21:14,15,16 22:15,18 23:22 24:19 30:21 36:3,14,18,19 41:21 46:24 51:6,8 59:1 68:12 69:25

**repeat**  25:17 39:6,10,11

**repeated**  47:11

**report**  11:13,16 49:10 57:19 67:6 68:2

**reported**  44:24 58:11,13 67:25

**REPORTER**  5:3 34:8

**reporting**  58:7 70:23

**reports**  13:7 15:6,8 26:19 37:1,2 57:17

**represent**  5:6,11,15

**representing**  5:9

**request**  11:20,24

**requesting**  16:22,25

**required**  40:1 54:19 70:17

**requirements**  46:21

**requires**  32:25 58:21

**resistance**  60:15

**resolved**  41:19

**respond**  11:11

**responded**  60:17 61:5

**response**  50:14,16 56:14

**responsibility**  13:6

**rest**  21:17

**restraints**  61:6

**result**  43:21 49:2

**results**  24:17 33:25 34:1 47:24

**return**  41:25

**review**  12:21 15:24 34:21 46:22

**reviewed**  17:23 18:5 26:24 27:17 67:11

**revisit**  35:11,13,18,21

**revisited**  34:21 35:3,5,15

**Ricky**  20:7,12 21:8

**rid**  56:4

**rights**  22:4

**robust**  72:19

**rolled**  42:19

**room**  23:2 37:8

**rotunda**  60:21

**roughhousing**  23:1,20 24:12

**rounds**  41:4,17,20

**ruler**  54:12,13,14,15 55:14

**run**  65:15

**running**  60:20

**runs**  36:8

_____

**S**

**safe**  26:9 65:25 66:3,4,9

**safety**  16:17 17:16 22:3 68:3

**SAITH**  73:19

**schedule**  11:25

**scheduled**  18:17

**SCO**  46:12,15

**scope**  65:6

**screen**  6:17,21 20:21 21:1 27:14 28:1 33:2 37:16,21,22 45:16 63:4, 12

**scroll**  28:19 53:22

**search**  42:17 50:21 56:14 63:22 65:21

**searches**  41:5 53:11 64:15

**searching**  51:6,9 53:12

**seats**  42:19 43:3

**second-to-**  50:13

**secretary**  7:8,12 19:20

**section**  52:24

**security**  11:3,7 13:1,2,5 16:18 17:4 42:13 43:19 48:25 72:22

**security's**  44:24

**seizure**  23:6

**self-audit**  32:22

**send**  13:23 23:11,12,15

**senior**  5:14 10:3 45:22 60:4

**sense**  18:5 67:14

**sentence**  35:14 46:4,5,11,13 61:7,10 66:11

**sentences**  41:8

**separated**  61:3,6

**September**  50:19

**sergeant**  9:11,24 12:4,6,7,9,10, 24 13:13 14:16 15:1 35:1 39:14 40:6,23 41:10 44:5 50:20 56:8 59:5 62:2 64:5

**sergeants**  39:24

**serviced**  13:7

**set**  15:13 49:10

**shank**  54:10

**share**  6:8,17 11:17 16:23 20:22 21:1 27:24 28:1 33:3 34:7 37:15, 21,22 45:16 49:17 56:17,23 63:5, 12

**shared**  33:9 34:8 37:25 59:17

**sharing**  6:21 34:6 63:10

Case 3:22-cv-00093   Document 33-12   Filed 05/04/22   Page 84 of 87 PageID #: 1664

**sharpen** 56:6

**sharpened** 51:3 54:4

**sheet** 54:13 55:1,5,7,15

**sheets** 54:15 60:10

**shift** 42:13 57:11

**shim** 61:22,23

**shirt** 64:8 66:13,14,17,25 67:5,9, 17,21,24

**shot** 47:6

**show** 36:8 48:13

**showing** 39:6

**shown** 52:10

**side** 14:6

**sideways** 54:5

**sign** 42:11

**signature** 15:8

**signed** 42:9,10 47:6

**signing** 44:21

**similar** 26:14 58:20

**sir** 5:24 6:4 7:22 9:13 10:11,21 15:6,19 34:19 35:2 43:17

**site** 51:19

**situation** 58:3 61:20 65:3

**six-inch** 51:2 53:13

**size** 54:19 55:4

**slightly** 18:5 46:4

**soda** 56:4

**solution** 61:25

**SOPS** 72:25

**sort** 25:7 44:25 68:3

**sound** 31:19

**speak** 18:6,19 31:1

**speaking** 32:10

**special** 65:6

**speciality** 47:11

**specific** 36:9

**specifically** 16:13,20,21 19:24 49:25 52:15

**specifics** 36:18

**spend** 11:24,25 70:18

**spoke** 8:23 15:21 30:21

**spoken** 18:18 64:6,16

**sporadic** 24:25

**Spot** 70:21

**squeezes** 23:23

**stack** 72:12

**staff** 11:1,18 12:12,14,17,20,21 25:2 26:21 42:18 44:20,22 52:7,8, 9,16 60:3 62:3 66:19 67:25 68:1,4

**stairs** 60:20

**stamped** 53:23

**stand** 51:20 64:11

**standard** 32:25 47:1,9 54:16,17 70:20 72:25

**standards** 32:16,20,23 33:12 45:22

**standpoint** 62:17

**stands** 20:16 39:17,18 51:21

**start** 5:7 6:10 72:1

**started** 7:7

**starting** 28:21

**starts** 50:14 61:8

**state** 5:24 25:9,25 26:23 27:16 28:11 70:16

**stated** 15:22 64:7 70:4 71:4

**statement** 20:15 29:5,12 40:22

**statements** 44:10 45:7

**states** 18:14 60:8

**stating** 46:5 58:9

**statistics** 27:3,4

**stay** 48:10 62:17

**stop** 20:21 33:2 37:15 56:17 63:4

**story** 67:1,2,3

**street** 30:22,23

**string** 60:10

**struggling** 11:24

**studies** 27:8

**stuff** 11:5 52:16 56:14 59:9

**subject** 50:7 59:22

**submission** 13:23

**submitted** 13:24

**supervisor** 12:11 42:13 57:11

**supplemental** 28:14

**suppose** 62:2

**supposed** 31:23 32:20 37:12 39:24 42:23 47:8 48:7,11

**supposedly** 62:5

**swelling** 23:16

**sworn** 5:20

**synopsis** 13:23 50:4 57:10,19,20 63:22 66:18 67:14

**system** 48:11,13,18,22 51:17,23, 25 57:21,24,25 58:1,5,7,10,12,17, 24 59:2,9,13,14,18

**systems** 58:6,16

—————

**T**

**tackled** 60:24

**taking** 7:9 10:5

**talk** 12:22 20:14,20 26:19 31:12, 18 66:6 70:9

**talked** 18:23 31:10,11 40:16 68:14 69:2

**talking** 18:16 34:11 61:8

**talkings** 12:17

**taught** 8:25 47:3 48:4

**TDOC** 5:16 32:12 33:1 38:15 40:5,25 41:9 44:3 45:10 52:1 58:21 66:21

**TDOC's** 58:8

**TDOC-RAN** 25:25

**teach** 11:12 47:21 48:9

**teaching** 47:14,15,21 48:6,8

**team** 10:25 11:14 34:20 35:14 41:22

**teams** 10:4,5 56:14

telling 65:14

Tennessee 27:17 28:12 31:25 32:4 33:18 51:23 58:11

term 35:18

terms 8:13

testify 6:6 20:14,19 68:15 69:11, 17 73:13

testifying 68:17

testimony 48:1

thing 12:13 14:25 16:7 17:21 26:4 61:22 68:3

things 8:25 12:2,23 13:14 17:11 26:15,22 27:11,13 36:10 37:13,14 51:18 52:1 54:11 58:23 64:22 65:6 68:14 72:21,24 73:1

thought 24:11,16

thud 23:2,3

time 5:4 8:7 10:11,12,13 11:24 19:10 24:20 32:24 35:4 40:12 43:7 44:25 47:9,18 56:5,8 59:25 62:24 70:18

times 47:22

title 9:2

today 5:4 6:5 26:21,22 48:20 73:5

today's 15:9,25

told 51:8 67:1,2,3

TOMIS 27:14 51:15,20 58:1,2,5, 8,11,23 59:13,18

tomorrow 48:21

tool 36:24

tooth 56:3

top 21:8 28:8,10 33:11 34:4 35:25 38:2,14 50:8 53:5 61:1 63:24

totes 56:6

track 13:13 15:2,3 38:12,13 51:17

tracking 13:3,11 58:21

trained 25:9

trainer 70:10

training 8:22,23,25 9:4 10:24 11:1,3,4,7 29:2,9 30:3 46:12,16

70:5,10,13,17,19 72:15,16

transport 25:25 43:8,15

transportation 9:22 10:2,4 30:13

transportations 10:6

transported 43:4,6

trash 67:2

travel 25:25

traveled 25:8

trend 11:22

trial 68:18 69:11 73:13

trip 42:4

trouble 64:25

Trousdale 9:5 10:9 24:4 26:11, 12 27:1 28:25 29:3,10 32:1,5 33:17 38:1 64:20 70:5 72:1,8,17, 22

true 65:23

trust 51:24

truth 24:12 65:14

turn 40:25 43:9 51:11

turned 23:3,7,25 66:19

Turner 9:5 33:17 38:1 72:8

turning 54:6 59:21

Tyler 60:9

type 12:12 13:17 14:2 32:22 35:6 36:10 46:25 49:25 50:1 56:9,10 57:7,9,16

typed 18:13

types 55:25 56:2

typical 55:19 57:16

typically 37:7,9 57:21 59:4,9 63:1

### U

Uh-huh 9:17 21:10 22:19 33:15 38:3 39:15 40:7 41:11 44:4 46:18 49:3 52:23 53:9,24 64:18 67:15

unaware 67:10

underneath 6:24 13:19 34:20

40:4 44:23 45:20 51:1 53:7 59:25

understaffed 17:20

understand 6:2 7:20 18:7

understanding 53:18 71:1

uniform 64:8 66:13,17 67:17

unit 60:15 62:14 65:8,11

United 18:14

unquote 31:18

upload 58:22

upset 65:17

user 46:21 47:12,22

### V

van 43:2,4,6

vehicle 42:17 43:2

verify 22:23 42:6

verifying 22:24

version 34:4

versus 21:8 28:11

violation 22:4 40:14

violence 26:17

violent 24:9 52:6

visited 34:25 36:1

visits 34:18

visual 54:19

### W

wait 21:2

walk 30:23

walked 23:12,13

walking 30:22,23

Walton 40:10

wanted 15:21 45:2 47:14 48:13 68:11

warden 7:9 12:18 40:16 50:4

warden's 7:8,12 15:8 19:20

wardens 11:18

**Washburn**  40:16

**weapon**  48:3 53:14 54:10 55:15
  59:8 60:19 61:2 65:20

**weapons**  45:24 48:17 55:19
  56:9,16

**webpage**  51:14

**website**  51:16 52:2

**weekly**  70:21

**weeks**  11:5,6

**Wilson**  60:4 61:4

**Woods'**  50:3

**word**  18:22 24:25

**wording**  58:2

**words**  22:20

**work**  25:23 26:20 30:13 47:23

**worked**  25:5,6 26:10 30:12

**working**  10:9 31:1 61:15 62:5
  72:1

**works**  44:16 58:19 62:2

**worth**  11:7

**would--**  15:14

**wrestling**  23:20

**write**  55:2

**writing**  43:18

**written**  13:17 45:7 48:23 49:5

**wrong**  12:13 22:24 35:17 61:21

—————————————————
                    Y
—————————————————

**year**  9:8,9,15,16 21:17 30:11,21
  33:13 47:19

**years**  9:25 10:14,15,16 25:8 72:3,
  4

**yesterday**  15:12

—————————————————
                    Z
—————————————————

**Zoom**  5:7,10,13 6:3 7:15 15:13