**Infectious Disease Control**

We are all concerned about infectious disease control in an institutional setting. Trousdale Turner Correctional Center has an infectious disease control program. In order to assist, be sure to report any and all incidents that result in body fluid spills to your unit housing officer or nearest staff member. There are special clean-up kits available throughout the facility for use in cleaning up body fluid spills. Inmates are required to have a Tuberculosis screening yearly.

*WHAT IS AIDS?*

AIDS stands for **Acquired Immune Deficiency Syndrome.** A virus called HIV causes AIDS. A person with AIDS can get sick with many illnesses that healthy people do not usually get. Some of these diseases can be fatal. There is no cure for AIDS. A milder form of AIDS is called AIDS Related Complex (ARC).

AIDS has afflicted people mostly from these groups:
1. People who shoot up or skin-pop drugs.
2. People who receive blood or blood products, which had the virus.
3. Gay and bi-sexual men.
4. People who had sex with any of the above people.
5. Babies born to parents with the virus.

**How do I know if I have the virus?**
There is a test. The nurse or doctor takes one tube of blood from your arm and sends it to the lab to be checked for the virus. Talk to a nurse or doctor in the medical unit or infirmary to find out more about the test.

**How does AIDS spread?**
The HIV virus is carried in blood, semen, and vaginal fluid. The blood, semen, or vaginal fluid from an infected person must go directly into another person. Infected semen can spread the virus during vaginal, anal, or oral sex. Sharing needles during drug use also spreads the virus because there is always a tiny amount of blood left on or in the needle.

**You cannot get AIDS from:**
1. Using plates, glasses, or forks after a person infected with the virus.
2. Breathing the same air as someone infected.
3. Doing the laundry of an infected person.
4. Hugging or shaking the hands of an infected person.
5. Delivering mail to or from an infected person.
6. Cleaning the cell or the bathroom after a person infected with the virus has been there or from toilet seats or water fountains.
7. Being beside or near an infected person when he coughs, sneezes, or spits.

Case 3:22-cv-00093   Document 33-17   Filed 05/04/22   Page 1 of 198 PageID #: 604

TTCC 000604

8. Sharing a cell with an infected person.
9. Swimming pools.
10. Mosquito bites.
11. Food.

HIV IS NOT IN THE AIR. HIV IS SPREAD THROUGH BLOOD, SHARING NEEDLES, SEXUAL CONTACT, AND INFECTION OF UNBORN BABIES DURING PREGNANCY.

Kissing does not spread HIV. In fact, some studies show that saliva actually kills the virus. However, if someone who is infected has a sore or cut in the mouth and blood mixes with saliva, the blood could possibly spread the virus.

**High Risk Behavior**
1. Having sex (anal, vaginal, or oral) with someone infected with HIV
2. Sharing needles used to shoot drugs (including steroids).
3. An infected pregnant woman can pass HIV on to her unborn baby.
4. Through injection of infected blood or blood products
5. Sharing tattoo needles.

**Early Symptoms of AIDS**
1. Tiredness, lightheadedness, continuous headaches.
2. Severe weight loss.
3. Prolonged unexplained diarrhea.
4. Unexplained fever, chills, or night sweats.
5. Swollen glands in the armpits, neck, or groin.
6. Discolored bruises which may be flat or raised.
7. White spots in mouth or on tongue.
8. Heavy persistent cough.

Remember, other illnesses can have the same symptoms. However, if symptoms continue to get worse, contact a doctor.

**How do I avoid HIV?**
1. Say "NO" to sex.
2. Do not share razors or other instruments that could become contaminated with blood.

**Inmate Information on AIDS/HIV**
Brochures are available upon admission to TTCC and during sick call, and are located in the entrance to the clinic. Inmates have access to all educational material on an "as requested" basis.

Formal AIDS education classes will be held annually in the education classroom and will be conducted by a health professional or mental health employee. The time and date of this class

Case 3:22-cv-00093   Document 33-17   Filed 05/04/22   Page 2 of 198 PageID #: 0602

CoreCivic 000602

will be posted one (1) week prior to the class on the housing unit bulletin boards. This class will be rotated on an annual basis to include all inmates in the segregation and protective custody units.

If you have questions or concerns related to AIDS put in a request for sick call. As your reason, you may write, "health education information," or any reason you choose. You will be scheduled for sick call. All sick call visits are held in private. Tell the nurse you want information on AIDS. Discuss your concerns. If the nurse cannot give you enough information, you will be referred to the mid-level or the doctor. You may be referred to mental health services or you may choose to go there yourself. Regular AIDS education updates will be offered to enable you to receive information no less than once a year.

## CHAPTER 8
## LEGAL, SENTENCE AND RELEASE INFORMATION

### *Legal Services*
Notary services are available through the library, chaplain and unit management. If you have a legal deadline and need to go to the library or if you need a notary for your legal work there are approved notaries and library schedules located on the bulletin boards inside of the sally port and/or housing areas. You need to best manage your legal research according to these schedules.

To ensure access to the courts, CORECIVIC provides Lexis Nexis to the entire population. All appointments will be completed according to the library pass system.

Inmate legal assistants are also available to assist you in filing legal request forms and questions. The names of these assistants are also posted in the housing units and in the library.

You may submit a confidential request for attorney conference form, or you may fill out an inmate request form addressed to the facility attorney/lawyer and place it in the mailbox. The forms and envelopes are available in the library or from the unit management team. Access to legal reference materials can be made through the Librarian.

### *Sentence Information*
Sentence Credits are awarded according to adherence to the specific job descriptions. Each inmate who is assigned has the opportunity to earn up to six (6) program credits per month. This does not include any "behavior credits" or "bonus credits" which are awarded by TDOC.

Program credits for the current month are entered on TOMIS no later than the 5th workday of the following month. The program and behavior credits post at midnight on the fifth (5th)

Case 3:22-cv-00093   Document 33-17   Filed 05/04/22   Page 3 of 198 PageID #: 603

workday of each month. If convicted of a class "A" disciplinary offense, no program and behavior, including bonus behavior credits, will be awarded for that month. Additional information can be found in TDOC Policy 505.01.

Any questions regarding your sentence and/or release should be referred to your case manager.

### *Release Procedures*
After TTCC receives release authorization from Tennessee Department of Corrections, you will be called to the intake & discharge area. You will be allowed to make a phone call to arrange for pick up.

### *Probation/Parole Procedures*
The Tennessee Parole Board has institutional probation/parole officers (IPPO) assigned to TTCC. She/he is on-site at the institution on a weekly basis and meets with inmates regarding parole and/or determinate probation on an individual basis as needed. The IPPO is employed by the State of Tennessee, not CORECIVIC. Parole hearings will be conducted at TTCC for eligible inmates. Address any questions you have to your unit manager, case manager or directly to the IPPO.

**CHAPTER 9**
**SECURITY PROCEDURES**

### *Counts*
For the safety and security of the facility TTCC has established designated times to conduct facility counts. Facility counts are extremely important and adherence to facility procedures, policies, and directives are required by the inmate population.

Standards for count: television off, headphones off, no microwave usage, proper uniform, and all inmates will go to their bunk/cell and remain until the facility count is clear. Inmates are **prohibited** from moving from place to place during any count unless directed to do so by a staff member. Any act which intentionally disrupts the facility count will be treated as a threat to the safety and security of the facility.

Formal Counts at Trousdale Turner Correctional Center is as follows:

| 0115 | **Standing Count** |
| 0515 | **Standing Count** |
| 1000 | **Standing Count** |
| 1500 | **Standing Count** |
| 2100 | **Standing Count** |
| 2230 | **Standing Count** |

**Note: Prep for count is 30 minutes prior to all Standing Counts**

### *Searches*
All persons, places and property are subject to search at any time, by any staff member in the performance of their duties. All property may be searched for contraband. Each inmate is

Case 3:22-cv-00093   Document 33-17   Filed 05/04/22   Page 4 of 198 PageID #: 0604

responsible for all items within their assigned bunk, work area, or on their person. All suspicious items will be confiscated for evaluation as evidence and the shift supervisor will determine final disposition of confiscated property. When a search is conducted of any area inside or outside the facility, inmate(s) will not observe, view, stand or pass by the search area.

### *Contraband*
Introducing or possessing contraband into the facility is a serious offense which will result in disciplinary action. Additionally you may be charged with **CONTRABAND IN A PENAL INSTITUTION** is a Class C Felony, which carries a maximum sentence of six years and a fine of $100,000.00.

### *Drug Testing*
The Tennessee Department of Correction and Trousdale Turner Correctional Center are committed to a policy of zero tolerance of inmate drug/alcohol use within the facilities. All adult inmates incarcerated in a State funded correctional facility shall be subject to urinalysis testing at any time during their incarceration.

**Inmates will be subject to disciplinary action for the following:**
1. Failure to submit to testing or provide a urine sample within two (2) hours of the request.
2. Tampering or attempting to tamper with the specimen or test results.
3. Receiving a positive test result for which there is no satisfactory explanation.

In all instances where an inmate is convicted of the charges of "Drug-Possession," "Drug-Selling," "Intoxicated Drugs," "Positive Drug Screen," "Refusal of Drug/Alcohol Screen," "Intoxicants-Possession," "Intoxicated-Alcohol," "Intoxicants-Use," or "Inhalants," or the inmate is in possession of or has ingested any controlled drug not specifically prescribed, or the inmate is found attempting to alter, contaminate, or adulterate the test sample in any way, in addition to the appropriate disciplinary sanctions, the warden shall modify the inmate's visitation according to the following:

a. First Offense: * Visitation shall be suspended for three (3) months.
b. Subsequent Offenses: *Visitation shall be suspended for three (3) months.
c. Attorney and minister visitation are not affected by this section.

**\*Inmates are notified by the disciplinary board chairman, informing them of the suspension and dates effective.**

Inmates convicted of a positive drug test, after the positive confirmation test, shall be required to incur the cost of the confirmation test in addition to any other sanction imposed by the disciplinary committee.

Drug/Intoxicant testing of inmates may be conducted as follows:

Case 3:22-cv-00093   Document 33-17   Filed 05/04/22   Page 5 of 198 PageID #: 605
CCA 000605

1. When facility staff has a reasonable suspicion that an inmate has used Drugs/Intoxicants.
2. When the inmate is found to be in possession of suspected drugs/ intoxicants, or when suspected drugs/ intoxicants are detected or found in an area controlled, occupied or inhabited by the inmate.
3. When the inmate is observed to be in possession of or using drugs/ intoxicants, but facility staff is unable to obtain a sample of the substance.
4. On a routine basis when inmates return from:
   a. A furlough (including before),
   b. A work-release program or other temporary release program,
   c. An outside work detail.
5. On a random basis, utilizing an appropriate random testing procedure that is approved by the warden, the entire inmate population of the facility, any identifiable program area, or any identifiable classification of inmates may be tested. A random testing program will not be used for the purpose or have the effect of harassing or intimidating any inmate or group of inmates.

### Lockdown Status

There are times your housing unit or the facility may be placed on lockdown status. During this time inmates must remain on their bunk or in their cell. Lockdown status is used to regain control after a disturbance, assist in an investigation, or to restore the unit to normal working procedures. Lockdown status is a temporary situation and is not to be used as punishment. During lockdown status the facility's normal operations are stopped. Inmates should be aware that procedures and/or time schedules for pill call, medical appointments, chow hall, showers etc. may be altered/revised, to fit the needs of the facility.

The housing unit or facility will resume normal operations once the Warden of Trousdale Turner Correctional Center authorizes the end of the lockdown.

### Security Threat Groups

It is the practice of TTCC to manage security threat groups (Gangs) through zero-tolerance and suppression of all STG related activity. Inmates are prohibited from participating in gang related activity and will not be allowed to intimidate and control other inmates, staff or the public while at this facility. If an inmate is found to be participating in gang activity, displaying gang hand signs, or found in possession of gang related and or gang suggestive material, that inmate will be subject to disciplinary action. Any questions or concerns regarding STG's/gangs should be referred to the security threat group office.

### Emergencies

This institution has emergency plans for fire, power outages and other emergencies. Generally, you will be called on to evacuate your area or will be directed as to what action to take. You should familiarize yourself with the posted evacuation routes so you will know them if an emergency arises.

Case 3:22-cv-00093   Document 33-17   Filed 05/04/22   Page 6 of 198 PageID #: 606
TTCC 000606

Evacuation/fire drills are held periodically to help you familiarize yourself with CORECIVIC-TTCC evacuation procedures. It is your responsibility to participate in these drills as directed.

As part of our safety program, you are not allowed to store flammable materials in your housing area or to accumulate materials that may become a safety hazard. You may not use paper sacks for trash bags. There are trashcans available in the dayrooms.

Setting a fire with paper or other materials is a violation of safety rules and rules of inmate conduct. Setting a fire will result in disciplinary action and may result in restitution for damages, and/or prosecution. Also, you may lose the privilege of having paper materials in your personal property.

Each inmate is responsible for quickly and quietly following the instructions given by staff during an emergency.

Every effort is made to provide a safe environment for each inmate throughout the facility. Inmates are provided with training and equipment to remain safe as they carry out their daily job/program assignments. It is the responsibility of each inmate to use the safety equipment and follow the instructions given to him in the performance of his work to prevent injury and/or health hazards.

Newspapers, packaging from commissary items, and other trash will be disposed of daily. You are advised that setting or causing a fire of any kind is a violation of safety rules and rules of inmate conduct and will result in disciplinary action and can result in criminal prosecution. Tampering with or damaging fire equipment such as fire extinguishers, evacuation routes, smoke detectors, sprinkler heads, alarm devices, alarm panels, door closers, and/or blocking exit doors is a serious violation and will result in loss of employment disciplinary action and can result in criminal prosecution

Inmates must immediately report any safety hazards to their work supervisors. Also, inmates are encouraged to discuss safety-related questions or issues with their work supervisors, case managers, correctional counselors, and unit managers.

**CHAPTER 10**
**DISCIPLINE AND OFFENSES**

### *Disciplinary Policy and Procedures*

It is the policy of CoreCivic to ensure that facility rules and regulations are enforced and that the due process rights of inmates are protected throughout the entire disciplinary process. This handbook contains important information pertaining to the rules and regulations of TTCC. Read the handbook carefully. All staff members are authorized to initiate the disciplinary process and to bring charges, when appropriate, against an inmate.

**Disciplinary procedures are governed by TDOC Policies 502.02 and 502.01.** The central disciplinary panel at Trousdale Turner Correctional Center is a fair and impartial board

Case 3:22-cv-00093   Document 33-17   Filed 05/04/22   Page 7 of 198 PageID #: 6607

CoreCivic 000607

comprised of at least one (1) ranking correctional officer and two (2) other staff members from departments other than security. This body is impaneled to hear all class "A" disciplinary offenses and class "A" and "B" offenses for which accumulated sentence credits may be taken. The hearing officer may hear all other class "B" offenses and all class "C" offenses. Previous disciplinary in the inmate institutional file are considered by the board in punitive actions when an inmate is found guilty of an infraction.

Class A and B disciplinary may be referred, at the warden's discretion and the Commissioner's Designee's approval, to the local district attorney for further prosecution. An inmate found guilty of a Class A or B infraction may be reviewed by his assigned counselor to determine if he needs to meet the reclassification board for an increase in custody level.

If an inmate receives a disciplinary while at TTCC, there are advisors available to assist in his case preparation and hearing on his behalf. These include both inmates and staff members who have been trained in disciplinary procedures at this institution. The disciplinary board chairperson can provide you with a list of inmate and staff advisors.

Depending upon the seriousness of the offense, an inmate may receive up to thirty (30) days punitive segregation per charge, if convicted, depending upon his past institutional behavior. If convicted of a disciplinary infraction, the inmate has the right to appeal. Inmate advisors are trained and available to assist all inmates in this area.

All inmates that are found guilty of Refusal to Participate (RTP) the following sanctions will be imposed per Policy 502.02.When an inmate is convicted of the charge of "Refusal to Participate" and the job coordinator determines that a job/program dismissal is warranted, in addition to any other punishment imposed, the inmate's television, radio, and tape player/compact disc player, or any other recreational electronic devices will be removed, commissary purchases will be will be restricted to basic hygiene items and visitation privileges will be limited to attorneys and ministers only. These restrictions will remain in effect for 30 days after accepting new job/program assignment. In instances where inmates have been convicted and are permitted to remain in the same job/program, these restriction will remain in effect for 30 days. An inmate will not be paid for the day of the incident if he is found guilty of Refusing to Participate (RTP).

In all cases in which an inmate is found guilty, or pleads guilty to a disciplinary offense, he may be assessed a fee in accordance to TDOC Policy 502.02.

Prohibited Acts and Range of Penalties
The disciplinary offenses defined in TDOC Policy 502.05, Definitions of Disciplinary Offenses are classified as either Class A (most serious), B or C (less serious). Punishment imposed for the commission of a disciplinary offense should be related to the seriousness of the offense and uniform in the application through the system. Disciplinary action may include, but not be limited to, any of the following:

Case 3:22-cv-00093   Document 33-17   Filed 05/04/22   Page 8 of 198 PageID #: 608   CoreCivic 000608

1. Dismissal of charges or probation/suspended sentence
2. Verbal warning
3. Written warning
4. Restriction of privileges
5. Punitive segregation
6. Referral to the district attorney for criminal prosecution
7. Recommendation for reclassification to higher custody level
8. Recommend change in job/program assignment or removal from job/program
9. Loss of sentence credits
10. Reduction in pay scale
11. Assignment of extra duties
12. Fee assessed
13. Any combination of the above.

### *VISITATION RESTRICTIONS*
In addition to any sanctions imposed by the disciplinary hearing officer, all incidents involving contraband or violence will result in the suspension of all visitation for three months, followed by six months of non-contact visitation. Additionally any violation of visitation rules will result in the suspension of visitation privileges as determined by the Warden or his designee. Visitation privileges are solely determined by the Warden or his designee.

## CHAPTER 11
## INMATE SERVICES

A variety of programs and services exists at CORECIVIC-TTCC for your welfare and convenience. Feel free to ask your unit manager and unit management staff any questions you may have about programs and services. Also, you are welcome to ask specific department heads or supervisors about the programs and services for which they are responsible. During your incarceration you may also communicate with department heads and supervisors through inmate request forms.

### *Hair Care Services*
There are barber shops located in designated areas of each the housing unit buildings and operated by the institution with inmate barbers to meet your hair care need.

The barber shops are open Monday-Friday for regular haircuts. Inmates have been approved to wear certain hairstyles that do not conflict with the intuitions safety, security and hygiene. Refer to posted barber shop procedures and schedules located in the housing buildings. No more than two (2) inmates are allowed in the barber shop at a time, including the barber. No more than one (1) barber is allowed in the barber shop at a time. The barber shop will be closed during count and chow time, 30 minutes prior to shift change and during shift change.

The following procedures outline the barber shop operation:

1. Inmates are assigned through the inmate job selection process as barbers on an "as needed" basis.
2. Inmates may receive hair care weekly.
3. Inmates who are not designated as barbers and/or stylists will not handle any hair care equipment nor perform hair care services on any inmate.
4. Inmates must sign up with officer to be placed on hair care list. Inmates may not loiter in designated hair care areas. Inmates who are waiting for hair care services, but leave the housing unit before they receive services, will lose their turn for that day. . If you are not receiving hair care services you are not authorized to be in the designated barber shop areas.
5. Only "standard" haircuts; no box cuts, flat tops, fades, mohawks, bowl cuts, ducktails, razor cuts designs, weave etc. will be allowed in the facility.
6. All inmates will adhere to the established rules of designated hair care area or will not receive hair care service
8. Items such as commissary, Walkman radios, personal grooming equipment/supplies, etc. are not permitted in the designated hair care area.

*Chaplain Services*

It is the intention of Trousdale Turner Correctional Center to meet the religious needs of the inmate population. The institution and chaplaincy staff will provide worship, religious instruction, and spiritual guidance/counseling for inmates on a voluntary basis. Free literature, if available, will be provided upon request including various religious materials, bibles, devotional material, Bible studies, etc. Regular and special worship services and religious study activity schedules will be posted in each housing unit.

Through the use of religious service volunteers, every effort will be made to meet the needs of all recognized religions.

Inmates may receive visits from the clergy. Names of the approved clergy and the inmates they are allowed to visit shall be provided by the chaplain and remain at the visitor entrance. Approved clergy may schedule appointments to visit with inmates no less than 24 hours in advance of the intended visit.

Any individual has the right to complete form CR3118 and submit to the Chaplain for request of religious property or preference items. Religious headgear representing the inmate's faith group in compliance with the TDOC Religious Property List may be worn throughout the facility. Inmates may submit form CR3118 for approval from the Chaplain/Warden to wear additional religious items during their worship service. Inmates are allowed to wear religious pendants representing their religious preference as along it doesn't pose a security threat or STG affiliation. When in the hallways and others areas of the facility excluding the designated religious area, pendants, beads, rosary, crucifix and crosses must be worn inside of uniform shirts. Inmate pins of religious symbols may be worn in the hallways. They must be pinned on an undershirt and not on the state issued uniform blue shirt.

Case 3:22-cv-00093   Document 33-17   Filed 05/04/22   Page 10 of 198 PageID #: 6296

CCIP 000640

The approved religious property/material vendor for this facility is Union Supply. Religious property is not exempt from all space requirements. A listing of all approved religious property can be retrieved from the chaplain.

Religious programs shall be open to all inmates unless such participation is limited to maintain the order and security of the institution. Inmate attendance is voluntary.

There are weekly services and a variety of religious activities available. Schedules are posted throughout the institution. Inmates are encouraged to declare a religious preference during the classification process.

**Death Notification/Funeral home visits-** If you find out there has been a death in your family, notify a TTCC unit management staff member to inform the chaplain of your family member's death. The chaplain will verify the required information and initiate the documentation to submit to the warden and/or designee approval for visitation. If the unit management team is unavailable notify the Shift Supervisor of the information.

### *Commissary*

The commissary is available for the purchase of different types of food items, personal hygiene items, pens/paper, etc. Commissary order guides/order forms are available in housing units listing the items available and the cost to you plus tax on taxable items. Commissary items will be delivered to you in your assigned housing unit. It is your responsibility to submit a properly filled out commissary order form using either black ink pen or a #2 pencil.

Inmates will be allowed to order commissary one time per week and may order up to $75.00 per order **(with the exception of special orders).** Commissary will be held twice a day and no one will be allowed to leave work or school assignment to receive commissary. The commissary schedule is posted in the housing units. **Inmates that move from one unit to another unit will receive commissary with their newly assigned housing unit.**

You will only receive commissary per posted schedule. Inmates will be notified of changes per memo.

Items that may be purchased from the commissary may not be purchased from any other source.

All purchases must be for you. Inmates are not permitted to make purchases for other inmates. Failure to abide by this rule can result in disciplinary action and loss of commissary privileges. All commissary sales are final. You are responsible for checking your merchandise before you sign the receipt.

It is recommended that if you know you are going to be released prior to your delivery day that you NOT order commissary for that week. If you do submit an order and are released prior to your commissary day your funds will be refunded the following Sunday.

Case 3:22-cv-00093   Document 33-17   Filed 05/04/22   Page 11 of 198   PageID #: 2294   CCPI 000611

Problems with the commissary should be referred to the correctional counselor who will contact the commissary staff and attempt to work out the issues.

## Inmate Trust Fund

All inmate funds must be done electronically by the family and friends. TTCC does not handle any cash, checks, money orders or deposits for inmates. Cash is considered contraband for the inmate population and if found on your person or among your possessions will result in disciplinary actions.

Money orders along with a Money Order Deposit Slip (JPay) can be mailed to JPay, P. O. Box 279010, Miramar, FL 33027. Funds can also be sent three easy ways:

- Online at www.JPay.com
- By phone 1(800)574-5729
- At any MoneyGram – including Walmart and CVS

For withdrawals other than those mandated by statute or policy, the inmate shall submit a request in writing by using a personal withdrawal request or commissary order form. After the personal withdrawal request has been completed and approved, it will be forwarded to the trust fund office where it will be entered into TOMIS for processing. TDOC central trust fund will then issue a check in the self-addressed stamped envelope, which is provided by the inmate. This process will take up to fourteen (14) days. Credit is not available; you must have the funds available in your account at time of purchase.

If you wish to know your current account balance, ask your case manager.

### Indigent Services

If you do not have money on your account you may be eligible for indigent services. Indigent inmates are those who have an account balance of $6.00 or less for the 30 days preceding their requests. Upon intake CORECIVIC provides the basic hygiene indigent supplies. If you have been incarcerated here for 30 days after your intake date fill out an inmate request forms and forward to your Unit Team to address your hygiene indigent needs. Per your request an indigent inmate will receive eight stamped envelopes, twelve sheets of paper, four razors, one pen, two shampoos, one deodorant, one tube of toothpaste, and three bars of soap monthly.

To get an enveloped mailed out of the institution, the envelope must include the indigent inmate's name, Tomis number, and housing assignment and return address.

| Address and Travel Information | |
|---|---|
| Physical Address (ONLY) | Mailing Address (ONLY) |
| | |

Case 3:22-cv-00093   Document 33-17   Filed 05/04/22   Page 12 of 198 PageID #: 2295   CCPI 000642

| Trousdale Turner Correctional Center | Inmates Name: |
| 140 Macon Way | TOMIS Number |
| Hartsville, Tennessee 37047 | Trousdale Turner Correctional Center |
| (615) 808-0400 | 140 Macon Way |
| | Hartsville, Tennessee 37047 |

Mail not addressed as indicated above may result in the mail being returned to sender.

No forms of cash or checks are to be mailed in and will be returned to the sender.

Trousdale Turner Correctional Center is located approximately 17 miles from both Gallatin and Lebanon, Tennessee.

From Gallatin, Tennessee - travel East Main Street /TN 25 East to Hartsville, Tennessee. Take East Main Street/ TN 25 to Jim Goins Ln, take first right to Trousdale Way turn slight right to Macon Way. 140 Macon Way is on the right.

From Lebanon, Tennessee - travel North Cumberland St. / TN 10 / TN 25, turn right onto TN 10 / TN 25 East to Hartsville, Tennessee. Take TN 25 to Jim Goins Ln, take first right to Trousdale Way turn slight right to Macon Way. 140 Macon Way is on the right.

Mail not addressed as indicated above may result in the mail being returned to sender.

No forms of cash or checks are to be mailed in and will be returned to the sender.

### Library
Trousdale Turner Correctional Center maintains a library for inmate use. The library is operated as part of the education program and is under the direction of a full-time professional librarian. Certain policies and procedures for TTCC are available to you and are located in the inmate library. It is important that you take the opportunity to read them because it is your responsibility to comply with the institution's rules and regulations.

A wide variety of services are available through the library program. They include:

1.    Leisure reading book loaner program
2.    A wide selection of weekly/monthly magazines
3.    Typewriter availability
4.    Legal research publications and references
5.    TDOC and institutional policies for review
6.    Grievance and disciplinary appeal forms
7.    Legal aids to assist inmates with legal research
8.    Notary services

A library schedule is posted in the housing units. Scheduling changes will also be posted. In order for an inmate to receive library services, he must have an inmate ID card to check out

Case 3:22-cv-00093   Document 33-17   Filed 05/04/22   Page 13 of 198   PageID #: 2226
CCFP 000616

library materials. All inmates are expected to comply with designated rules and procedures of the library. Failure to do so can result in suspension of library privileges, disciplinary action, and compelled repayment for lost/stolen materials.

Books and magazines must be requested in advance.

The librarian will collect request forms from inmates in segregation on a weekly basis. The requested materials will be delivered within 48 hours. Punitive segregation inmates shall only be permitted to access legal or religious study library materials.

TTCC Library operates on a pass system. In order to obtain a pass to visit the Library, inmates must complete a Library Attendance Form that requires the following:
➢ Date
➢ Work/Class Assignment
➢ Name
➢ TDOC #
➢ Housing Assignment
➢ Work/Class Supervisor
➢ Services Needed: i.e.: Book Checkout/Check – in, Notary, Magazine, Newspaper, typewriter, access to Law books, Citations, Consult with an assigned legal Aide, Photo Copies
Upon completion, the library Attendance will be dropped in the institutional mailbox. Upon receipt in the library, a pass will be forwarded to the inmate with the inmate's scheduled time listed.

Inmates will be afforded access to equipment (tables, chairs, and typewriters), office supplies, and photocopy services to enable them to prepare legal documents. Inmates on punitive segregation, mental health seclusion, and certain medical status are prohibited from possessing personal typewriters.

Copies may be made of the law books and certain legal documents contained in the library. The charge for copies will be posted in accordance with CORECIVIC Policy 14-8, Access to Courts. If an inmate qualifies as indigent, a maximum amount of ten pages may be copied from law books and documents. Case law will not be copied for indigent inmates, as it is only necessary to provide the citation to the court.

Procedures for photocopying at Trousdale Turner Correctional Center are as follows:
A.    Photocopying request form must be filled out.
B.    The request form, the legal material to be copied, and a completed withdrawal form must be left at the circulation desk.
C.    The staff person will have the photocopying completed within a reasonable time frame.
D.    The cost will be charged to the inmate's account.

Appointments are required for access to the legal research collection and typewriters. The typewriters are provided for "legal purposes" only (correspondence with your attorney,

Case 3:22-cv-00093   Document 33-17   Filed 05/04/22   Page 14 of 198 PageID #: 2297   CCII 000614

motions to be filed in court, etc.). Also, a photocopy service is available for "legal paperwork" at 25 cents per page.

Reference materials (including legal research collection), newspapers, and designated magazines are available for use in the library only.

Fiction and non-fiction books are available. In order to check out library books an inmate must present his/her I.D. card. Each inmate is responsible for the books he/she checks out. Also, the inmate can be subject to disciplinary action and loss of library privileges for violating library rules. The inmate will reimburse the library for damaged or lost books.

Inmates may have access to the media. A copy of the facility policy and procedures is located in the facility library or information may be obtained from your unit management team.

Inmates are welcome to visit the library as scheduled and learn about the materials and services available.

### _Mailroom_

We will make every effort to process your mail in a timely manner. For this to occur, all mail sent to or from you must include your commitment name, your TOMIS number and the mailing address for CORECIVIC/TTCC. Your commitment name is the name that Tennessee Department of Corrections has you incarcerated with. This is the name in the computer and needs to be the name on your mail or it will be returned to sender.

Incoming mail will be opened and inspected for contraband and enclosures such as money orders. Personal checks, cash and stamps are not permitted and will be returned to sender if received. Cash will be processed as contraband.

No forms of cash or checks are to be mailed in and will be returned to the sender.

General correspondence mail will be distributed to the inmate population by unit staff on a daily basis Monday through Friday, excluding state holidays. A mailbox is located in front of each chow hall for you to drop your letters in. Inmates in restrictive housing areas have access to mailboxes in their housing units.

Inmates are prohibited from receiving and or having in their possession any type subscriptions, books and/or magazines containing any type of nudity or sexually explicit material. Below are the definitions outlined in TDOC Policy 507.02:

- ♦ **Features:** Containing depictions of nudity or sexually explicit conduct on a routine or regular basis or promotes itself based upon such depictions in the case of individual one-time issues. Publications containing nudity illustrative of medical, educational, or anthropological content may be excluded from this definition.

CCPL 000645

- ◆ **Nudity:** A pictorial depiction where genitalia or female breast are exposed. Publications containing nudity illustrative of medical, educational, or anthropological content may be excluded from this definition.
- ◆ **Sexually Explicit:** A pictorial depiction of actual or simulated sexual acts including sexual intercourse, and or oral sex, or masturbation or material which promotes itself based upon such descriptions on a routine or regular basis or in individual one-time issues.

Mail is defined as correspondence, printed material, or packages sent to and from an inmate by the postal service.

The mailroom is open five (5) days per week, Monday through Friday, excluding State holidays. Mail will be collected Monday through Friday by 8:00 a.m. from the inmate mailboxes and processed for the postal carrier. Inmates are not to bring any general mail to the mailroom window once mail has been collected from the boxes each morning. All inmates will be responsible for the contents and control of their outgoing mail. All outgoing mail will be stamped indicating that it is from an inmate in the TDOC. Inmates must pay all postage costs.

In accordance with TDOC Policy 507.02, all incoming mail (including packages) must bear the inmate's full committed name, TDOC number, and correct institutional address.

Government and retirement checks shall be made out to the inmate and not to Trousdale Turner Correctional Center. The inmate's TDOC number should also be indicated on the check. Checks made out to Trousdale Turner Correctional Center cannot be processed and will be returned to the sender. Cash and personal checks may not be received and will be returned to the sender.

Per TDOC Policy 507.02, "Inmates not personally known by staff who receive mail or who sign receipts for mail shall be required to present an institutional ID card".

Legal/Privileged Mail
Legal/privileged mail will be opened and searched in the presence of the inmate in the designated housing unit area. Each inmate must produce his ID card prior to receiving any legal/privileged mail.

All incoming mail must have your commitment name and TOMIS number in order to be processed properly. Mail without your commitment name and TOMIS number will be returned to the sender at your expense. Incoming mail postage will be removed prior to distribution.

Incoming mail from lawyers/attorneys and judges will be opened only in your presence. This mail is considered "privileged correspondence" and comes from courts, judges, court clerks, attorneys, elected officials, correctional and law enforcement administrators and parole authorities. You are required to sign for privileged correspondence.

Case 3:22-cv-00093   Document 33-17   Filed 05/04/22   Page 16 of 198 PageID #: 2298   CCII 000648

Outgoing legal privileged correspondence will not be opened unless there exists a reason to warrant inspection for safety and/or security reasons. If legal privileged correspondence is suspected of containing unauthorized items the mail will be opened and searched in the inmate's presence. Any misuse or criminal activity involving mail will result in disciplinary action. Additionally any criminal activity involving mail is a federal offense and appropriate authorities will be notified.
 If this event occurs the reasons and the inspection of legal privileged correspondence will be documented.

Publications such as books and periodicals must come from a facility-approved publisher. No hard back books will be accepted. You may feel that it takes a long time to receive mail compared to people who live on the outside. The mail time is only a day or so longer than if they were on the streets, but usually it takes the same amount of time. We do not hold mail unless you are under investigation for some reason. Excluding weekends and holidays or emergency situations, incoming and outgoing letters are held for no more than 48 hours and packages (if allowed) are held no more than 72 hours.

Trousdale Turner Correctional Center Policy 16-1, entitled Resident Mail, is available for you to read in the inmate library. Any unauthorized use of mail will be confiscated and you may receive disciplinary actions.

<u>Packages</u>
Packages will be processed through the mail room. Only items on the approved property list will be allowed. Any item sold in the institutional commissary will not be allowed to be received in packages. The number of items must conform to property inventory limits. All packages are inspected for contraband. All items listed on the property list must be mailed to the inmate and received during his respective package month.

Inmates are afforded the opportunity to order from mail order catalogs. **Packages may only be received from facility approved vendors**. The approved vendors are Union Supply and Amazon.

The content of all packages received shall be subject to the following limitations:
• Per TDOC Policy 507.02, "Packages may only be received by an inmate directly from a retailer or manufacturer. Individuals on the inmates approved visitors list may also purchase items or packages from a retailer or manufacturer, according to the guidelines in section VI. (G) (3) (a-e), and according to TDOC Policy 504.01. All items ordered must meet the specifications listed on the inmate personal property list, i.e., clear plastic t.v., etc...."

Inmates will only order from the approved vendor catalogs, located in the library, and unit team's offices.

Case 3:22-cv-00093   Document 33-17   Filed 05/04/22   Page 17 of 198 PageID #: 2302   CCI 000617

Minimum and Medium custody inmates are permitted to order one (1) package every three (3) months. Close custody and maximum custody inmates are permitted to order one (1) package every six- (6) months.

Inmates convicted of a disciplinary offense, excluding verbal warnings, will not receive packages, except for clothing which are listed on the personal property memorandum. (Items # 1-10), according to the below schedule:

- Class A disciplinary – twelve (12) months restriction from conviction date
- Class B disciplinary – nine (9) months restriction from conviction date
- Class C disciplinary – six (6) months from conviction date

**The procedure for ordering from a vendor is located in the housing units. You <u>MUST</u> complete a withdrawal form, and attach a stamped addresses envelope,** then forward the form to your Case Manager to complete for processing. The case manager will verify your disciplinary and eligibility status to receive a package. If you are not eligible, the form will be denied and returned. If it is your scheduled month to receive a package, you may order the package during the last week of the month prior to your receiving month. For example, if your package month is June, you may give your order to your case manager the last week of May.

Individuals on your approved visitors list may also purchase items or packages from the approved vendors list. The package must be shipped directly from the vendor. You must be eligible to receive a package, i.e. disciplinary status and eligible month (only one package per eligibility period may be received)

**The property room and mailroom schedule:**

| PACKAGE MAIL OUT |
|---|

**Tuesday**
8:00 a.m. - 9:30 a.m.
A, B, E Units
1:00 p.m. – 3:00 p.m.
C, D, F, W Units
**Thursday**
8:00 a.m. – 9:30 a.m.
C, D, F & W Units
1:00 p.m. – 3:00 p.m.
A, B, E Units
*All inmates will give packages to be mailed out to the Unit Manager the day prior to packages being delivered to the mailroom for inspection*
*All packages will be delivered to the mailroom by unit staff*

PC & SEG UNITS: Packages will be picked up by mailroom staff on Tuesdays and Thursdays.

| LEGAL/CERTIFIED MAIL PICK – UP |
|---|

Monday - Friday
10:30 a.m. - 3:00 p.m.

Case 3:22-cv-00093    Document 33-17    Filed 05/04/22    Page 18 of 198    PageID 6308
CCPl 000618

*All legal and certified mail will be picked up from the mailroom opened and delivered to inmates in their presence*

**LEGAL/CERTIFIED MAIL OUT**
Monday - Friday
7:40 a.m. - 8:20 a.m.

**PACKAGE DELIVERY**
Monday - Friday (times may vary)
***No packages will be distributed during chain processing.

Only inmates called for packages should come to the Unit Manager's office. Packages to restrictive housing and protective custody inmates will be delivered to the respective unit.

**\*Note:** Changes to the above schedules may be made as deemed necessary by the property/mail room supervisor (i.e. holidays, etc.) must be approved by the Warden or designee.

**ALL INCOMING AND OUTGOING MAIL IS SUBJECT TO BE OPENED, SEARCHED, READ/REVIEWED AND/OR CONFISCATED FOR SAFTEY AND/OR SECURITY REASONS**

**Chapter 12**
**JOBS AND EDUCATION**

<u>Work and Job Procedures</u>
Upon arrival, inmates assigned to TTCC go through orientation where TDOC form CR-3051 (Request for Placement on Job Register) is completed by an inmate and he is then placed on a job waiting list. Job assignments will not be made on the basis of race, color, creed or national origin. Inmates will be assigned job as they become available and according to their classification status. Job selection based on inmate history, facility need, and facility Safety will be determined by members of the classification committee and unit management teams.

All able-bodied inmates are expected to work or participate in an academic or vocational program. Inmates do not have the right to refuse any job/class assignment with the exception of mental health programs. Proof of prior education shall be shown, with experience being the main consideration in assigning a job.

There are three (3) different job skill levels at TTCC:

|  |  |
|---|---|
| Level 1 | $0.17 - $0.34 per hour |
| Level 2 | $0.25 - $0.42 per hour |
| Level 3 | $0.34 - $0.50 per hour |

Examples of each level include:

|  |  |
|---|---|
| Level 1 | ABE and Commercial Cleaners |
| Level 2 | Various Construction Helpers; Cook Helper |
| Level 3 | Cook; Carpenter |

Medical restrictions do affect job placement and limit the number of jobs available to an inmate.

If an inmate wants to request a different job, he must fill out TDOC form CR-3051 and forward it to the job coordinator. Qualified applicants are placed on registers according to the date the request is received. If an inmate has any problems complying with his job descriptions, he should see his supervisor who then can relay that information to the job coordinator. **Questions can be addressed directly to the job coordinator by completing an Inmate Information Request Form.**

When an inmate is assigned a job, he must remain in the position for ninety (90) days before being granted a voluntary job change. Job change is reviewed by utilizing the job register.

There are two (2) types of job dismissals: disciplinary and non-disciplinary. A disciplinary dismissal is recommended by the disciplinary board when an inmate receives a conviction for a disciplinary infraction committed while the inmate is scheduled to be at his assigned work area. Inmates who become unassigned due to a disciplinary dismissal shall begin at pay step one (1) of the appropriate skill/pay level for their next assignment. Any time accrued at the previous assignment at the same step shall be lost in determining time eligibility for pay raises. A non-disciplinary dismissal may be made by the job coordinator with the approval of the Warden/designee. Reasons for any non-disciplinary dismissals may be found in TDOC Policy 505.07.

### Job Terminations
Inmates may be removed from a job for several reasons. If one or more of the following events occur, the inmate may be dropped or transferred to a different position.

- Change in housing unit/pod
- Absence from the facility for thirty (30) days or longer
- Placement in Segregation for thirty (30) days or longer
- D-Board sanction affecting the inmate's eligibility or suitability for an area.
- Request of supervisor based on poor performance, behavior problem, etc.
- Re-assignment to a different job based on the needs of the facility and the availability of job positions.

During your incarceration you are required to work when assigned to a job. You are required to participate in assigned programs. Refusal to work/program is a violation of facility rules and you will be subject to disciplinary action as well as sentence recalculation.

### Educational Programs
Trousdale Turner Correctional Center offers a comprehensive educational program to include: HISET prep, Career Management for Success, correspondence courses, and vocational training. Staff consists of a principal, instructor supervisor, educational counselor, academic and

CCHTTC 000620

vocational instructors, Career Management for Success instructor and a life skills instructor. An inmate can obtain a HISET and/or vocational certifications, by completing the appropriate program. Academic programs are structured to accommodate any level of learning from kindergarten through passing the HISET. Adult Basic Education (ABE) classes are available for inmates on a lower level to prepare them for HISET work. To enroll in one of the vocational programs, an inmate must first acquire a HISET or have a high school diploma. Any inmate wishing to enter an educational/vocational program may do so by forwarding an Inmate Request Form to the Educational Counselor or Jobs Coordinator.

Vocational programs available to inmates include the following: Woodworking, Electrical Maintenance and Career Management for Success/Release for Success.

A complete and detailed description of all aspects of the education department is available to any interested inmate can forward an Inmate request form to the education department.

Inmates may be placed in academic/vocational programs based on their treatment needs along with institutional needs, and will be required to remain in the program until completion. Inmates enrolled in educational programs must adhere to program rules or be subject to disciplinary action. Instructors may request dismissal of inmates through the inmate job coordinator from any program when behavior warrants such action. Inmates may apply for re-admittance six (6) months after such dismissal occurs.

Upon completion of programs, students will be awarded the appropriate certificates. Official HISET tests are given and diplomas issued by the State Department of Education.

Testing is a mandatory prerequisite for admittance to the education program. A limited number of positions are available in these programs, **therefore, the final decision regarding placement rests with the education department through the inmate job coordinator.** The Job Coordinator will assign eligible inmates according to the test scores and skill level.

The education department has some general guidelines you need to know before getting into one of these classes.

a.  Students will be in class except when excused for such reasons as a visit to Medical or with a lawyer. Proper attendance includes arriving in class on time.
b.  Students will bring whatever tools are necessary for each scheduled classroom attendance.
c.  When a student has been absent from class it is the student's responsibility to provide a written excuse and to present it to the teacher whose class you were absent.
d.  When a student has been absent from work it is the student's responsibility to find out what work was missed and what needs to be completed.
e.  If a student accumulates a total of five excused absences or three unexcused absences in any one module the student will be liable to expulsion from the class. Any exceptions to this rule will be decided by the teacher involved and the department head.

Case 3:22-cv-00093   Document 33-17   Filed 05/04/22   Page 21 of 198   PageID 6304
CCPL 000621

**CLASS WORK**

a.  Students will turn in assigned work on the day it is due unless he/she has an excuse which the teacher accepts for delay in the due date. The teacher has the right to lower a grade on any assignment for lateness.

b.  Students must be quiet and attentive in class and defer conversations or outside reading or writing to a later time.

c.  Students will accept the teacher's assessment of his/her work. If the student has a question about the grade his work receives, he will speak to the teacher about it privately, before or after class, rather than during class time.

d.  Students must limit his language to that appropriate to a classroom.

e.  Students cannot eat, sleep or rest their heads on the desk/table during class.

**CONDUCT**

a.  Eating and drinking are not allowed in the education area/classrooms.

b.  Disruptive or loud behavior is not permitted.

c.  No headgear (i.e., bandannas, caps or sunglasses) will be worn in the education area/classrooms.

d.  Inmates may not leave any function in the education area/classroom once the function has begun.

e.  Inmates will remain in class except for authorized break time.

f.  Education rules are available in each classroom.

**Substance Use Programs**

At Trousdale Turner Correctional Center, addiction treatment for substance use as well as for behavior modification is conducted in the Residential Drug Abuse Program (RDAP) and provided at no charge upon request of the inmate.

The program addresses alcohol/drug abuse or dependency issues as well as actions of clinical behavior. The RDAP program is based on completing treatment objectives and is a minimum of nine months. Any inmate may enter RDAP but admission priority placement is given to inmates who are court ordered or required to complete the program by the Board of Probation/Parole.

RDAP is a nine to twelve month program, which deals with substance use and substance dependence in a holistic manner. An inmate may contact either his Case Manager or the addiction treatment department for more information.

The criteria to enter the RDAP program are as follows:

➢ History of substance use dependency
➢ History of criminal behavior
➢ Medium or Minimum custody
➢ Random drug screens for entire stay in the program
➢ Mandate by the Parole Board or recommendation of the disciplinary board

Case 3:22-cv-00093   Document 33-17   Filed 05/04/22   Page 22 of 198 PageID #: 635   CCI 000622

**Self-Help Activities**

Self-help activities such as Alcoholics/Narcotics Anonymous are offered on a weekly basis to all inmates not housed in the segregation unit.

<u>**Programs**</u>

There are a variety of programs offered at Trousdale Turner Correctional Center. You may contact a member of your Unit Team, Chief of Unit Management or the Assistant Warden of Treatment to obtain information concerning the programs available.

<u>**Halfway Houses**</u>

A comprehensive list of halfway houses throughout the state of Tennessee is available from your Unit Team.

<u>**Inmate Organizations**</u>

Trousdale Turner Correctional Center will permit inmate organizations. Requests for inmate organizations will be reviewed and approved/disapproved by the Chief of Unit Management in coordination with the Associate Warden of Programs. Inmate organizations will not be allowed to establish a trust fund account, conduct financial business or transactions, or have banquets or other social events. To be approved, an organization must have both an outside volunteer leader/sponsor and a Trousdale Turner Correctional Center staff member who serves as the institutional coordinator. All organization meetings require the attendance of the outside sponsor and the institutional coordinator.

**CONCLUSION**

The intent of this inmate handbook is to provide you with information about the institution and to explain our general expectations of you. It is not possible to cover every issue or answer every question. You are encouraged to ask staff questions and to make recommendations about additions to the inmate handbook.

<u>**Glossary**</u>

**Administrative Segregation** - A form of separation from the general population administered by the classification committee when the continued presence of the inmate in general population would pose a serious threat to life, property, self, staff, or other inmates or to the security or orderly running of the facility.

**Contraband**-Any item possessed by confined inmates or found within the facility that is illegal or expressly prohibited by those legally charged with the administration and operation of the facility.

**Indigent**-An inmate whose account balance is less than $6.00 for a period of 30 days.

**Protective Custody**-A type of care to protect a person from harm, either from outside sources or other offenders.

**Re-entry Specialist-**The reception & orientation unit is set up to receive all new intakes and provide them with programmatic information within the facility as well as a thorough screening and assessment. The inmates will receive a copy of the institution's rules and regulations and services and how to access all programs and services. The daily program in the reception & orientation unit (R & O) will include interviews, tests, and other admissions-related activities.

**Sallyport-**An enclosure situated in the perimeter wall or fence containing gates and doors at both ends, only one of which opens at one time.

**Special Needs Inmates-** Inmates with mental and or physical conditions that may limit or require special housing accommodations. These may include but are not limited to the chronically ill, pregnant, frail or elderly, terminally ill, developmentally disabled or those with serious communicable diseases ho are physically disabled, or who have some serious mental health needs.

**Unit Manager-**The unit manager supervises his/her assigned staff and all activities inside or related to the unit. She/he must evaluate the unit team on the performance of their duties, communication of responsibilities, their ability to provide leadership, and their efforts to ensure accountability.
- She/he must maintain daily contact with staff as this is essential for the safety, security, and sanitation of the unit.
- Offenders are assigned to a unit according to classification, job assignment, or other program needs.
- The unit management team members are responsible for the continuous monitoring of an offender's progress.
- Correctional counselors and case managers report directly to the unit manager and assist in the unit programs, assessment of offender needs, and provision of recommendations.
- Perform liaison functions throughout the facility
- The unit manager must make recommendations concerning personnel matters to include post assignments, promotions, and staff discipline.
- Delegate problem solving to correctional counselor and case manager.
- Makes daily rounds through the unit evaluating operations, talks with staff and inmates, and makes rounds through other areas in the facility where unit inmates may be temporarily housed, programmed or work.

## GENERAL RULES
1. Inmates may not buy, borrow, loan, sell, or trade any items or personal property to another inmate. Violation of this rule will result in disciplinary action against those inmates involved and the items will be confiscated.
2. Inmates are not permitted in any utility area or staff office within the unit unless accompanied and supervised by unit staff.
3. Any new rules or concerns will be posted on the bulletin board in each pod. You will be held accountable for knowing the changes, so read the bulletin board daily.

Case 3:22-cv-00093   Document 33-17   Filed 05/04/22   Page 24 of 198 PageID 6327   CCI 000624

4. Interior walls are not to be used as a foot prop.
5. No food items or utensils are allowed to be taken from the kitchen and dining hall.
6. No furniture other than that issued or authorized by the institution shall be allowed in any cell.
7. Mattresses and pillows shall not be removed from the cell or unit without authorization of unit staff. No bedding shall be placed on the floor, or linens to be used as rugs.
8. Only an authorized number of issued mattresses (unless authorization by medical), blankets, and linens shall be present in each cell.
9. Loud and unruly conduct may result in the termination of a game.

Refer to the unit's bulletin board for the schedules of classes, religious services, mail, laundry, recreation, phone calls, medical services, barber shop hours, commissary schedule, and the disciplinary process.

## UNIT DESCRIPTION
## SEGREGATION
### Restrictive Housing/Segregation

- The segregation unit is designated for the offenders who have behavior problems in general population unit. The unit is designated to house admin max, youthful offenders, protective custody and special needs offenders who can't be housed in general population units. Offenders may be released back into general population after they have completed their disciplinary time, or when the segregation review committee meets.
- The special management team has the following responsibilities for admin max, youthful offenders, protective custody and special need offenders that are housed in segregation:
  - provide programs
  - conduct weekly meetings by the segregation review committee
  - Conduct monthly meetings with the special management team.
  - Keep the unit clean and neat by doing sanitation and security checks.
  - Keep the line of communication open. The unit manager, case manager and other supervisory staff will make rounds daily.

Segregation unit is designed in a tri-pod setting. Each cell has a tray slot available on the door for access to the cell in a secured manner. The unit contains three separate pods with each pod holding up to 45 inmates. Pod (3) contains a handicap shower. The unit is staffed with one control booth officer and one floor officer in each pod. The segregation unit also has two recreation officers who control the recreation in all three pods. The unit has a disciplinary officer who conducts all disciplinary hearings for the facility.

The inmates will receive a copy of the institution's rules and regulations and services and how to access all programs and services. The daily program in the reception & orientation unit (R & O) will include interviews, tests, and other admissions related activities.

## SAFETY & SANITATION

Case 3:22-cv-00093   Document 33-17   Filed 05/04/22   Page 25 of 198   PageID #6225
CCR 000625

**Common Living Area**

All inmates assigned to a unit are responsible for maintaining the common living area in a clean and sanitary manner. The officer assigned to that unit will see that all materials needed to carry out this cleaning assignment are provided. If additional materials are needed, the officer will contact the correctional counselor.

- Trash will not be thrown anywhere except in the trash containers provided in each unit.
- Inmate workers will be assigned to each area on a permanent basis to perform the daily cleaning routine of the common area.
- Sufficient workers will be allowed for each shift to provide coverage 7 days a week, 24 hours a day.
- Work details necessary for the sanitation of the unit will be assigned to the worker(s).
- Duties to be performed by inmate workers:
- All trash will be removed daily.
- All floors will be swept and wet mopped daily, and as required during the day. Offices closed on weekends and holidays are not included.
- All toilet bowls, sinks, and showers will be thoroughly cleaned and scrubbed daily.
- Furniture is to be wiped off daily.
- Any other condition that the unit officer feels needs to be corrected in order to maintain good sanitary conditions can be assigned.
- The pod officer will be responsible for inspecting twice daily and logging in the time of his or her inspection in the unit logbook which will be reviewed by the correctional counselor and sanitation officer. The unit manager may get approval from the administrative duty officer (ADO) to place your unit on institutional lockdown if your unit does not pass inspection.
- The correctional officer for each unit is responsible for all evaluations of the unit orderlies and yard crew.

**Private Living Areas**

All inmates are responsible for maintaining their assigned living area in a clean and sanitary manner.

- No trash will be allowed to accumulate in cells.
- Hazardous and combustible materials such as boxes, newspapers and magazines will not be allowed to accumulate within the cells.
- All personal belongings must be kept in a neat and orderly manner and must fit in the storage space provided.
- Windows in each cell will remain completely free of any material.
- There will be no writing on the walls.
- Cell inspections will be done daily M-F 8:00 a.m. to ensure inmates are following all rules. These are done by the unit team and additional staff as necessary.

**Inspection Guidelines for Other Areas**

The following should be used as guidelines in assuring that good housekeeping practices are met.

- All areas will be clean and orderly.
- Lighting, heating and ventilation equipment will function properly.
- No fire or health hazards will be allowed to exist.
- All plumbing equipment including toilet, bathing, washing and laundry facilities should operate properly.
- The floors will be clean, dry and free of hazardous substance.

**Vermin and Pest Control**
- Inmates will not be allowed to store any perishable foods or other items which entice vermin or produce unsanitary conditions in their living units unless stored in approved sealed containers.
- A service contract with a licensed pest control organization provides for regularly scheduled spraying of the facility. In event of an infestation, the service will be called immediately.
- Monthly reports by the professional pest control contractor are submitted to the safety supervisor who submits copies to the warden and assistant warden.

**ANY REVISIONS TO THE INMATE HANDBOOK WILL BE IN THE INMATE HANDBOOK BINDER IN THE HOUSING UNIT AND/OR THE INMATE LIBRARY, OR POSTED IN THE HOUSING UNIT**

CCH 000627



Reverend Brian Darnell
Director, Religious Programs
320 6th Avenue North
Rachel Jackson Building
Nashville, TN 37243-0465
Thursday, ~~June~~ may 24, 2018

Dear Reverend Darnell,

The attached Tennessee Department of Correction Group Accommodations Request (CR-3735) is submitted from Trousdale-Turner Correctional Center for your action per TDOC policy 118.01.

After a review of the attached Sunni group submission, Warden Washburn, AWT Pittman and I recommend disapproval of all the requested accommodations, as stated in our in-house MEMO and on the CR-3735.

We will await the decision of the Religious Activities Committee.

Sincerely,

Chaplain Jon T. Shonebarger, Jr.
Trousdale-Turner Correctional Center
Hartsville



## MEMORANDUM

TO: Russell Washburn, Warden; Yolanda Pittman, Assistant Warden Treatment
FM: Jon Shonebarger, Chaplain
RE: TDOC Religious Accommodations Request CR-3735

May 22, 2018

The attached **CR-3735** is submitted for your review per TDOC policy 118.01.

This request is submitted by Sunni Muslim inmates requesting a new Quranic Arabic Studies Group, separate from the two (2) religious programs already scheduled for Sunni Muslims. <u>The same class was previously *requested and disapproved* by the *Tennessee Department of Correction Religious Activities Committee (RAC)*, February 14, 2018, TP-17-822; #18-001. (See attachment).</u>

This submission includes the same requests, with several new additions. The submission does not list TDOC Volunteers available to visit nor sufficient explanation of the group's teachings, beliefs and practices. In addition, complaints of another religious program within the facility is addressed.

I recommend disapproval by Trousdale-Turner Correctional Center to the TDOC RAC for each accommodation requested.  Our recommendation to the Religious Activities Committee follows:

**First Accommodation**: Disapproval of two banquets every year. CoreCivic Tennessee is not governed by TDOC policy *116.08, Religious Diet Programs and Feasts.*

**Second Accommodation**: Disapproval. The inmates presume upon the addition of a new program with time/space, which is not approved. *They may utilize their Taleem or Jum'ah (2) services to teach Arabic or any other faith subject.* A CD player is available for all chapel programs.

**Third Accommodation**: Disapproval. Special accommodation is not made by religious designation when TDOC inmates order from Union Supply.

**Fourth Accommodation**: Disapproval. Halalaco and Medina are not authorized TDOC vendors. Inmates must utilize Union Supply.

**Fifth Accommodation**: Disapproval. Religious headwear can be purchased from Union Supply.

**Sixth Accommodation**: Disapproval. This is not a mandated faith group property item requiring the local prison to purchase it. The Religious Services Department is willing to seek a donation.

**Seventh Accommodation**: Disapproval. The inmates presume upon the addition of a new program with time/space, which is not approved. Dry markers and white board is available for all existing religious programs.

**Eighth Accommodation**. Disapproval. Islamic emblems are not listed in the May 22, 2017 *Inmate Religious Property Memo* from Commissioner Tony C. Parker.

**Ninth Accommodation**. Disapproval. Pray oil can be purchased from Union Supply.

Upon your review and signature, we will forward our decision via letter to the Religious Activities Committee.

Trousdale Turner Correctional Center|140 Macon Way | Hartsville, TN 37074

CCI 000629



TENNESSEE DEPARTMENT OF CORRECTION
GROUP RELIGIOUS ACCOMMODATIONS REQUEST

(COMPLETE pages 1 & 2; submit to Chaplain; See Policy # 118.01)

Date Submitted to Chaplain: May 15th 2018

Boaz Pleasant-Bey                                    473110
_____
Inmate Name                                          TDOC#

Estimated Number of Inmates in the Group:    12

1. Official name of the group:

The Quranic Arabic Studies Group

2. Names and contact information of the group's leaders:

Boaz Pleasant-Bey #473110; Lymus Brown #446512; Michael Tarrer #401478; Daniel Villers #113480,

3. The group's teachings, beliefs, and practices:

We believe that Allah (Almighty God) revealed the Quran in Arabic and we must learn the Arabic Quran to know what Allah revealed to us. See Quran 43:3 We also believe that we have a right to equally have a Quranic Arabic Studies Group as the Christians have a Hebrew / Greek Bible Study Group. We believe that The Religious Land Use And Institutionalized Persons Act ("RLUIPA") prohibits discrimination of religion and demands the equal opportunity for Muslims to have a Quranic Arabic Studies Group here at T.T.C.C. just as the Hebrew / Greek Bible Study Group is here at T.T.C.C. We teach and learn the Arabic Quran and we believe that the Quran in Arabic teaches us to be peaceful and to live a peaceful way of life. See 42 U.S.C. § 2000cc (b)(2) (Prohibiting Religious Discrimination), Quran 25:63

4. Titles of the group's basic text(s):

The Arabic Quran; The Word-For-Word Quran in Arabic.

5. Other information helpful in researching the group:

See Attached Approved Religious Activities Committee Request #15-010 (Quranic Arabic Studies at NECX). Contact Chaplin Weidner at NECX to confirm.

CR-3735 (Rev. 06-10)          Duplicate as Needed                                1

Case 3:22-cv-00093   Document 33-17   Filed 05/04/22   Page 30 of 198 PageID #: 636   CCI 000630

6. Names of outside clergy or volunteers available to visit the institution:

Imam Al Haj Hussien Karoub and Iman Al Haj Muhammad A. H. Karoub, American Arab Message 248-288-2160 (They provide Word-For-Word Arabic Qurans for the Quranic Arabic Studies Group)

7. DETAILED description of the accommodation(s) requested:

a. First Accommodation

2 banquets every year

b. Second Accommodation

CD/cassette player to play Arabic Quran for all participants in the Quranic Arabic Studies Group who learn how to read the Quran in Arabic.

c. Third Accommodation

To be able to purchase all Halal Foods sold by Union Supply. Muslims are supposed to only eat Halal Meats and Foods and they are not currently available on commissary. This request also includes Celestial Teas sold by Union Supply as well.

d. Fourth Accommodation

To be able to purchase Halal soaps and cosmetic and Halal Hygiene products sold by Haladaco Books. Union Supply does not sell these Halal products. These products are sold by Madina as well. The current soaps, hygiene and cosmetic products are not Halal and have animal products and Haraam chemicals.

e. Fifth Accommodation

To be able to purchase a kefiya (head scarve) similar to the one worn by Jesus Christ (like a religious head towel). Traditional Islamic head wear for Quranic reciters and devoted believers in Arabic Quran

If more than five accommodations are requested, please add additional pages showing Sixth Accommodation, Seventh Accommodation, etc.

CR-3735 (Rev. 06-10)    Duplicate as Needed    2

CCI 000631

f.) sixth accommodation:

Digital Arabic Quranic reciter. These devices pronounce the Quran in Arabic, spanish, french and english. This device will aid in translating the Quran from Arabic to other languages for students of this group who speak other languages. Available at Halalaco Books and The Islamic Bookstore.

g.) Dry erase markers with Board and esal (esal). This makes teaching Arabic alphabets, vocabulary from the Quran and lessons easy for both the teacher and students.

h.) Islamic emblems. Union Supply offers Christian, Jewish and other faiths' emblems, but does not offer Islamic Emblems to Muslim inmates. Islamic emblems are sold at Halalaco Books and The Islamic Bookstore and Madina.

I.) Traditional Islamic Oils. Union Supply does not sell traditional Islamic Oils that are made and sold to Muslims traditionally. Madina has traditional Islamic Oils available.

CCR 000632

**Shonebarger Jr, Jon**

| | |
|---|---|
| **From:** | Brian K. Darnell <Brian.K.Darnell@tn.gov> |
| **Sent:** | Wednesday, June 27, 2018 12:47 PM |
| **To:** | Cynthia Sword |
| **Cc:** | Shonebarger Jr, Jon; Maurice L. Widener |
| **Subject:** | Pleasant-Bey |
| **Attachments:** | 1162_001 (2).pdf |

*** This is an EXTERNAL email. Please exercise caution. DO NOT open attachments or click links from unknown senders or unexpected email. ***

Chaplains:

Good afternoon.

This letter is being sent as a courtesy copy to you, so that we are in the loop on the response. Basically, "no" on leather socks. "No" on transferring RAC accommodations between facilities.

FYI

Rev.



TENNESSEE DEPARTMENT OF CORRECTION
GROUP RELIGIOUS ACCOMMODATIONS REQUEST

(COMPLETE pages 1 & 2; submit to Chaplain; See Policy # 118.01)

Date Submitted to Chaplain: _May 15th 2018_

_Boaz Pleasant-Bey_                                    _473110_
Inmate Name                                              TDOC#

Estimated Number of Inmates in the Group: _12_

1. Official name of the group:

_The Quranic Arabic Studies Group_

2. Names and contact information of the group's leaders:

_Boaz Pleasant-Bey #473110; Lymus Brown #446512,_
_Michael Tarver #401478; Daniel Villers #113480_

3. The group's teachings, beliefs, and practices:

_We believe that Allah (Almighty God) revealed the Quran in_
_Arabic and we must learn the Arabic Quran to know what_
_Allah revealed to us. See Quran 43:3 We also believe that_
_we have a right to equally have a Quranic Arabic Studies_
_Group as the Christians have a Hebrew/Greek Bible Study_
_Group. We believe that The Religious Land Use And Institutionalized_
_Persons Act ("RLUIPA") prohibits discrimination of religion_
_and demands the equal opportunity for Muslims to have_
_a Quranic Arabic Studies Group here at T.T.C.C. just as_
_the Hebrew/Greek Bible Study Group is here at T.T.C.C._
_We teach and learn the Arabic Quran and we believe_
_that the Quran in Arabic teaches us to be peaceful and_
_to live a peaceful way of life. See 42 U.S.C. § 2000cc (b)(2)_
_(Prohibiting Religious Discrimination), Quran 25:63_

4. Titles of the group's basic text(s):

_The Arabic Quran; The Word-For-Word Quran in Arabic._

5. Other information helpful in researching the group:

_See Attached Approved Religious Activities Committee_
_Request #15-010 (Quranic Arabic Studies at NECX)._
_Contact Chaplin Weidner at NECX to confirm._

CR-3735 (Rev. 06-10)                   Duplicate as Needed                                    1

Case 3:22-cv-00093   Document 33-17   Filed 05/04/22   Page 34 of 198   PageID #: 634
CCFI 000634

f.) sixth accommodation:

Digital Arabic Quranic reciter. These devices pronounce the Quran in Arabic, spanish, french and english. This device will aid in translating the Quran from Arabic to other languages for students of this group who speak other languages. Available at Halalco Books and The Islamic Bookstore.

g.) Dry erase markers with Board and **esal** (esal). This makes teaching Arabic alphabets, vocabulary from the Quran and lessons easy for both the teacher and students.

h.) Islamic emblems. Union Supply offers Christian, Jewish and other faiths' emblems, but does not offer Islamic Emblems to Muslim inmates. Islamic emblems are sold at Halalco Books and The Islamic Bookstore and Madina.

I.) Traditional Islamic Oils. Union Supply does not sell traditional Islamic Oils that are made and sold to muslims traditionally. Madina has traditional Islamic Oils available.

6. Names of outside clergy or volunteers available to visit the institution:

Imam Al Haj Hussien Karoub and Imam Al Haj
Muhammad A.H. Karoub, American Arab Message 348-288-2160
(They provide Word-For-Word Arabic Qurans for the
Quranic Arabic Studies Group)

7. DETAILED description of the accommodation(s) requested:

a. First Accommodation

2 banquets every year

b. Second Accommodation

CD/cassette player to play Arabic Quran for all
participants in the Quranic Arabic Studies Group who
learn how to read the Quran in Arabic.

c. Third Accommodation

To be able to purchase all Halal Foods sold by Union
Supply. Muslims are supposed to only eat Halal Meats
and Foods and they are not currently available on
commissary. This request also includes Celestial Teas
sold by Union Supply as well.

d. Fourth Accommodation

To be able to purchase Halal soaps and cosmetic and
Halal Hygiene products sold by Halalaco Books. Union
Supply does not sell these Halal products. These
products are sold by Madina as well. The current
soaps, hygiene and cosmetic products are not Halal
and have animal products and Haram chemicals.

e. Fifth Accommodation

To be able to purchase a kefiya (head scarve) similar
to the one worn by Jesus Christ (like a religious head
towel). Traditional Islamic head wear for Quranic
reciters and devoted believers in Arabic Quran

If more than five accommodations are requested, please add additional pages showing Sixth Accommodation, Seventh Accommodation, etc.

CR-3735 (Rev. 06-10)          Duplicate as Needed                                    2

CCI 000636

6. Names of outside clergy or volunteers available to visit the institution:

Iman Al Haj Hussien Karoub and Iman Al Haj Muhammad A.H. Karoub, American Arab Message 248-288-2160 (They provide Word-For-Word Arabic Qurans for the Quranic Arabic Studies Group)

7. DETAILED description of the accommodation(s) requested:

a. First Accommodation

2 banquets every year

b. Second Accommodation

CD/cassette player to play Arabic Quran for all participants in the Quranic Arabic Studies Group who learn how to read the Quran in Arabic.

c. Third Accommodation

To be able to purchase all Halal Foods sold by Union Supply. Muslims are supposed to only eat Halal Meats and Foods and they are not currently available on commissary. This request also includes Celestial Teas sold by Union Supply as well.

d. Fourth Accommodation

To be able to purchase Halal soaps and cosmetic and Halal Hygiene products sold by Halalco Books. Union Supply does not sell these Halal products. These products are sold by Madina as well. The current soaps, hygiene and cosmetic products are not halal and have animal products and Haraam chemicals.

e. Fifth Accommodation

To be able to purchase a kefiya (head scarve) similar to the one worn by Jesus Christ (like a religious head towel). Traditional Islamic head wear for Quranic reciters and devoted believers in Arabic Quran

If more than five accommodations are requested, please add additional pages showing Sixth Accommodation, Seventh Accommodation, etc.

CR-3735 (Rev. 06-10)          Duplicate as Needed          2

CCF 000637



**TN** Department of
**Correction**

27 June 2018

Boaz Pleasant-Bey TDOC #473110, EA205 A
c/o TTCC
140 Macon Way
Hartsville, TN 37074

Re:     TP-17-814 (Khuffain)
        TP-18-196 (Group Religious Accommodation)

Boaz Pleasant-Bey:

I am writing in response to your two letters regarding khuffain (leather socks) and correspondence about a group accommodation from NECX.

Regarding khuffain, it has been determined that these leather socks are not an essential tenet of the practice of Islam. Under advisement of an Imam, the wearing of khuffain is not mandated as a requirement for an individual to be a faithful Muslim, asserting that if he's wrong "there is no sin on you, and he will have to answer for it in front of Allah." The wearing of khuffain is a matter of convenience. To imply that only leather socks may be worn as an obligatory action required by Islam is incorrect. Your request is denied.

Regarding requests for a Group Religious Accommodation, please be advised that it is expressly understood that group accommodations are specific to institutions. Since you have been transferred from NECX, then to TCIX, and now recently to TTCC, authorized administrators at TTCC would need to re-evaluate the request to see if it can be accommodated there. You are advised to begin the dialogue about this process with the TTCC Chaplain(s). Simply request a new CR-3735 via Inmate Request. At this time, your request to transfer the terms of a group religious accommodation made specifically at another facility is denied.

Should you have any further questions or concerns regarding religious accommodations, please feel free to contact our office.

Sincerely,

The Rev. B. Darnell, M.Div
Director of Religious & Volunteer Services

Cc:     TTCC Chaplain Jon Shonebarger, Jr.
        NECX Chaplain Maurice Widener
        File

Case 3:22-cv-00093   Document 33-17   Filed 05/04/22   Page 38 of 198 PageID #: 2638
CCI 000638



Department of
**Correction**

17 January 2019

Boaz Pleasant-Bey TDOC #473110
c/o TTCC
140 Macon Way
Hartsville, TN 37074

Re:     Quranic Arabic Class

Boaz Pleasant-Bey:

I am writing in response to your multiple request(s) at TTCC for matters already disapproved by the RAC, such as TP-18.015 and TP-18.047 in February 2018, a voting decision in June, and your recent letter dated 1/11/19 and logged as TP-19-038.

The Religious Activities Committee (RAC) *concurs with the accommodation disapprovals already made* by Warden Washburn and AWT Pittman and the recommendations made by CH Shonebarger, who offers access to a CD player and time during the existing Taleem or Jum'ah services for you to engage in more extensive learning of Arabic. Your request for separate services, apart from those already offered, is denied.

Be advised that recurring, repeated requests after disapprovals are not helpful. Furthermore, please understand that any RAC decision approval made at one facility, such as when you were housed at NECX, may be subsequently denied at any other facility.

Should you have any further questions or concerns regarding religious accommodations, please feel free to contact our office.

Sincerely,

The Rev. B. Darnell, M.Div
Director of Religious & Volunteer Services

Cc:     TTCC Warden Washburn
        TTCC AWT Pittman
        TTCC Chaplain Jon Shonebarger, Jr.
        File

• Sixth Floor Rachel Jackson Building • 320 Sixth Avenue North • Nashville, TN 37243
• Tel: 615-253-8144 • Fax: 615-532-8281 • tn.gov/correction

Case 3:22-cv-00093    Document 33-17    Filed 05/04/22    Page 39 of 198 PageID #: 839

CCPI 000633

## Shonebarger Jr, Jon

| | |
|---|---|
| **From:** | Brian K. Darnell <Brian.K.Darnell@tn.gov> |
| **Sent:** | Thursday, January 17, 2019 11:58 AM |
| **To:** | Shonebarger Jr, Jon |
| **Cc:** | Cynthia Sword |
| **Subject:** | Pleasant-Bey #473110 |
| **Attachments:** | 0393_001.pdf |

*** This is an EXTERNAL email. Please exercise caution. DO NOT open attachments or click links from unknown senders or unexpected email. ***

Shoney:

Good morning.

I was in Central Office today for a meeting on the Sixth Floor and am in receipt of (yet) another request from P-B. In the essence of time, I have responded to his most recent letter, as well as a follow-up to the RAC decision(s) made earlier in the year, June and in February.

Feel free to FWD this email to your Warden(s). Forgive my prior lack of response during my year-end travel extravaganzas for Departmental programming improvements.

Thank you for your attention to detail in this matter.

Regards!

Rev.

**The Reverend Fr. Brian Darnell, M. Div.**
Director of Religious & Volunteer Services

**From:** NoReply@tn.gov [mailto:NoReply@tn.gov]
**Sent:** Thursday, January 17, 2019 12:06 PM
**To:** Brian K. Darnell
**Subject:** Attached Image

1

CCI 000640

## Shonebarger Jr, Jon

| | |
|---|---|
| **From:** | Brian K. Darnell <Brian.K.Darnell@tn.gov> |
| **Sent:** | Wednesday, October 24, 2018 9:33 AM |
| **To:** | Shonebarger Jr, Jon |
| **Subject:** | RE: Follow-up on RAC Submission |

\*\*\* This is an EXTERNAL email. Please exercise caution. DO NOT open attachments or click links from unknown senders or unexpected email. \*\*\*

I'll let you know on Monday. I am working remotely and Cindy is offsite.

---

**From:** Shonebarger Jr, Jon [mailto:Jon.ShonebargerJr@corecivic.com]
**Sent:** Wednesday, October 24, 2018 8:11 AM
**To:** Brian K. Darnell
**Subject:** Follow-up on RAC Submission

\*\*\* This is an EXTERNAL email. Please exercise caution. DO NOT open attachments or click links from unknown senders or unexpected email - STS-Security. \*\*\*

Good moning Rev.,

I am following up on the Religious Accommodation request from Boaz Pleasant-Bey, 473110. Our TTCC submission to the RAC was in May.
Please advise. Thanks.

Chaplain Jon T. Shonebarger, Jr.
Critical Incident Stress Mgt. Response Team
Ethics Liaison // Volunteer Coordinator
CoreCivic //TTCC
140 Macon Way
Hartsville, Tennessee 37074
615.808.0573



(i) This e-mail and any files transmitted with it are confidential and intended solely for the use of the intended recipient(s). If you have received this e-mail in error, please notify the sender immediately and delete this e-mail and any associated files from your system. (ii) Views or opinions presented in this e-mail are solely those of the author and do not necessarily represent those of CoreCivic. (iii) The recipient should check this e-mail and any attachments for the presence of viruses. The company accepts no liability for errors or omissions caused by e-mail transmission or any damage caused by any virus transmitted by or with this e-mail. This email has been scanned for content and viruses by the Barracuda Email Security System.

Case 3:22-cv-00093   Document 33-17   Filed 05/04/22   Page 41 of 198 PageID #: 2324

CCI 000641

Name: Boaz Pleasant-Bey #473120                    12/27/17
        NECX, P.O. Box #5000
        Mountain City, Tenn. 37683

Subject: Religious Accomodations Request Submitted

Addressed To: Deborah Thompson
              Director of Religious Services
              Rachel Jackson Bldg.
              320 Sixth Avenue North
              Nashville, Tenn. 37243



REHABILITATIVE SERVICES
JAN 0 8 2018
TP-18-015
RECEIVED

Dear Ms. Thompson,
                    I find it important to inform you of the
fact that I have submitted several Memorandums and inmate
request forms requesting for the attached Religious Accomodation
Requests since November of 2016 to NECX Chaplin Weidner,
etc. It has been over a year of procrastination (for some
reason). I reciently submitted a religious accomodations
request to Chaplin Weidner about 2 (two) months ago and
it "mysteriously disappeared". I can't help but feel like
my requests are being "avoided for some reason".
                    I decided to write you this letter to inform
you of our struggles to have these accomodations addressed
(i.e. the attached requests). You have assisted us in establishing
our Arabic Class here at NECX and I appreciate your assistance
in that regard. I kindly request (if it is not an inconvience
for you) to expedite this request I have just submitted to
Chaplin Weidner. Hopefully it doesn't "mysteriously disappear"
causing me to have to resubmit another request.
                    Thank you for your assistance! I sincerely
appreciate the past approvals of our requests in the past.
                                    Sincerely Written,
                                    Boaz Pleasant-Bey

P.S. I wonder, if the Religious Committee in Nashville agrees on an accomodation, but the NECX Administration denies the accomodation, do the NECX Admin. have the authority to deny the request (approved by Nashville) anyway? It happens sometimes. I was wondering.

CCH 000643

TP-PP-038

REHABILITATIVE SERVICES
JAN 1 7 2019
RECEIVED

1/11/19

Name: Boaz Pleasant-Bey #473110
T.T.C.C.
140 Macon Way
Hartsville, Tenn. 37074

Subject: Quranic Arabic Class For T.T.C.C.
Religious Accommodations Request

Addressed To: The Religious Director
Tenn. Dept. of Corr.
6th Floor, Rachel Jackson Bldg.
320 Sixth Avenue North
Nashville, Tenn. 37243

Dear Director of Religious Services,
I have not received the Religious Activities Committee's decision on the Quranic Arabic Class. I submitted the request to begin the class last year about 7 months ago. Chaplain Jon Shoneburger told me that he inquired about it 2 weeks ago through email. I'm taking the initiative to write because I have not been informed if the class has been granted and what requests were granted with it. The Sunni Muslim Community is asking about the group for Quranic Arabic Studies. Can you forward me all paperwork (copy) concerning the Quranic Arabic Studies Group? Thank you.

Sincerely,
B. Pleasant-Bey #473110



**TENNESSEE DEPARTMENT OF CORRECTION**
**GROUP RELIGIOUS ACCOMMODATIONS REQUEST**

(COMPLETE pages 1 & 2; submit to Chaplain; See Policy # 118.01)

Date Submitted to Chaplain: December 27th 2017

BoAz Pleasant-Bey _____ 473110
_____ Inmate Name _____ TDOC#

Estimated Number of Inmates in the Group: 15

1. Official name of the group:
   Quranic Arabic Studies Class

2. Names and contact information of the group's leaders:
   BoAz Pleasant-Bey #473110 (Arabic Teacher)
   Ronnie Wilson #345653 (Senior Student) Senior)

3. The group's teachings, beliefs, and practices:
   We believe that the Angel Gabriel, by the Order
   of Almighty God (Allah) revealed the Arabic (Quran
   (unchanged) to Prophet Muhammad (PBUH) 1400
   years ago. We believe the Arabic Quran is the
   literal Word of God and the final Revelation
   from God to humanity after the Gospel of Christ
   (son of Mary). We believe that the Quran
   confirms the bible stories, revelations and prophicies
   and the Torah. We believe that there is but One
   God (Allah) and We believe in following the
   example of Prophet Muhammad (PBUH) We wore
   a turban, and headress, ate only Halal foods
   and took care of his health.

4. Titles of the group's basic text(s):
   Quran, Sahih Bukhari, Sahih Muslim

5. Other information helpful in researching the group:
   Imam Karoub of The American Arab Message
   Phone no: 248-288-2160
   email: ckaroub@aol.com

   Imam Karoub provides free Arabic Word For Word Quran
   for our Arabic Class.

CR-3735 (Rev. 06-10)          Duplicate as Needed          1

Case 3:22-cv-00093   Document 33-17   Filed 05/04/22   Page 45 of 198 PageID #: 625
CCR 000645

6. Names of outside clergy or volunteers available to visit the institution:

Taneem Aziz

7. **DETAILED** description of the accommodation(s) requested:

a. First Accommodation

Turbans and Agals from Halalaco or Islamic Bookstore. Prophet Muhammad (PBUH) Wore these head dresses when he recited the Arabic Quran.

b. Second Accommodation

Halal certified food items (i.e. Meats, snacks, soups, teas, etc.) from Union Supply, Halalaco, The Islamic Bookstore and Celestial Seasonings. We believe in eatting Halal food items (only) and we don't have halal food options. Halal foods are pure and we must eat them to follow Islam.

c. Third Accommodation

Halal Soaps, deoderants and loations from Halalaco, and the Islamic Bookstore (and Halal toothpaste). We do not have access to these Halal items. Currently the cosmetics available have Many harraam (unlawful) ingredients in them and we have no access to halal items.

d. Fourth Accommodation

Islamic Emblems (Arabic). Union Supply sells other religious emblems and rings, But do not sell Islamic emblems and rings. He should be able to order them from Islamic vendors (i.e. Halalaco, Islamic bookstore).

e. Fifth Accommodation

A portable CD or tape player or a radio with CD/cassettee player for each housing unit that houses Arabic class students. One radio for the class is not enough to meet the groups needs. Each pod should have access to a CD/tape player to hear the Arabic Quran.

If more than five accommodations are requested, please add additional pages showing Sixth Accommodation, Seventh Accommodation, etc.

CR-3735 (Rev. 06-10)　　　　　Duplicate as Needed　　　　　2

Case 3:22-cv-00093   Document 33-17   Filed 05/04/22   Page 46 of 198   CCP 000646

f.) Sixth Accomodation Request:

Khufain Socks (worn by Prophet Muhammad (PBUH)).
NECX Administration has presented a "irrational theory" that
the khufain Socks (Leather socks) are a security threat
(or risk). I was informed that the this material used to
make the khufain Socks could be used to make gloves to climb
over the gate with? Inmates are allowed to wear leather shoes
which could be used to make a more durable pair of gloves.
If that were the case. Both leather socks (khufain) and
leather shoes are worn on the feet. The allowance of one
and disapproval of the other is a violation of 42 U.S.C. §
2000cc (b)(1). RLUIPA prohibits NECX from treating
a non-religious assembly (of inmates) on greater terms
that the Arabic Class assembly of inmates. They are socks
used for religious purposes. Halalaco Books and the Islamic
Bookstore sells them (Khufain Socks).

g.) Seventh Accomodation Request:

That the Qurawic Arabic Class be placed on the
outcount sheet to ensure. that the students of the class
can be counted in class if there is a fog count due
to essecive fog at NECX as other religious Services.

Note: This is not intended to cause any problems or to get anyone into any sort of trouble. I simply want equal and fair process as other religions.

– Boag Pleasant-Bey #473110

Thanks Mr. Thompson

CCR 000648



**TENNESSEE DEPARTMENT OF CORRECTION**
**GROUP RELIGIOUS ACCOMMODATIONS REQUEST**

(COMPLETE pages 1 & 2; submit to Chaplain; See Policy # 118.01)



REHABILITATIVE SERVICES
JAN 2 3 2018
TP-18-047
RECEIVED

Date Submitted to Chaplain: _December 27th 2017_

Inmate Name: _BoAz Pleasant-Bey_     TDOC#: _473110_     NECX

Estimated Number of Inmates in the Group: _15_

1. Official name of the group:
_Quranic Arabic Studies Class_

2. Names and contact information of the group's leaders:
_BoAz Pleasant-Bey #473110 (Arabic Teacher)_
_Ronnie Wilson #345653 (Senior Student) (Senior)_

3. The group's teachings, beliefs, and practices:
_We believe that the Angel Gabriel, by the Order of Almighty God (Allah) revealed the Arabic (Quran (unchanged)) to Prophet Muhammad (PBUH) 1400 years ago. We believe the Arabic Quran is the literal Word of God and the final Revelation from God to humanity after the Gospel of Christ (Son of Mary). We believe that the Quran confirms the bible stories, revelations and prophicies and the Torah. We believe that there is but One God (Allah) and We believe in following the example of Prophet Muhammad (PBUH) He wore a turban, and headress, ate only Halal foods and took care of his health._

4. Titles of the group's basic text(s):
_Quran, Sahih Bukhari, Sahih Muslim_

5. Other information helpful in researching the group:
_Imam Karoub of The American Arab Message_
_Phone No: 248-288-2160_
_email: ckaroub@aol.com_

_Imam Karoub provides free Arabic Word For Word Qurans for our Arabic Class._

CR-3735 (Rev. 06-10)     Duplicate as Needed     1

Case 3:22-cv-00093   Document 33-17   Filed 05/04/22   Page 49 of 198   PageID #: 6283     CCR 000649

6. Names of outside clergy or volunteers available to visit the institution:

Taneem Aziz

7. DETAILED description of the accommodation(s) requested:

a. First Accommodation

Turbans and Aquals from Halalaco or Islamic Bookstore. Prophet Muhammad (PBUH) Wore these head dresses when he recited the Arabic Quran.

b. Second Accommodation

Halal certified food items (i.e. Meats, snacks, soups, teas, etc.) from Union Supply, Halalaco, the Islamic Bookstore and Celestial Seasonings. We believe in eating Halal food items only, and we don't have Halal food options. Halal foods are pure and we must eat them to follow Islam.

c. Third Accommodation

Halal Soaps, deoderants and loctions from Halalaco, and the Islamic Bookstore (and Halal Toothpaste). We do not have access to these Halal items. Currently the cosmetics available have many harnam (unlawful) ingredients in them and we have no access to halal items.

d. Fourth Accommodation

Islamic Emblems (Arabic). Union Supply sells other religious emblems and rings, but do not sell Islamic emblems and rings. he should be able to order them from Islamic vendors (i.e. Halalaco, Islamic bookstore).

e. Fifth Accommodation

A portable CD or tape player or a radio with CD/casettee player for each housing unit that houses Arabic Class students. One radio for the class is not enough to meet the groups needs. Each pod should have access to a CD/tape player to hear the Arabic Quran.

If more than five accommodations are requested, please add additional pages showing Sixth Accommodation, Seventh Accommodation, etc.

CR-3735 (Rev. 06-10)          Duplicate as Needed                                    2

Case 3:22-cv-00093   Document 33-17   Filed 05/04/22   Page 50 of 198   CCPL 000650

f.) Sixth Accomodation Request:

Khufain Socks (worn by Prophet Muhammad (PBUH)).
NECX Administration has presented a "irrational theory" that
the khufain Socks (Leather socks) are a security threat
(or risk). I was informed that the this material used to
make the khufain Socks could be used to make gloves to climb
over the gate with? Inmates are allowed to wear leather shoes
which could be used to make a more durable pair of gloves.
If that were the case. Both leather socks (khufain) and
leather shoes are worn on the feet. The allowance of one
and disapproval of the other is a violation of 42 U.S.C. §
2000cc (b)(1). RLUIPA prohibits NECX from treating
a non-religious assembly (of inmates) on greater terms
that the Arabic Class assembly of inmates. They are socks
used for religious purposes. Halalaco Books and the Islamic
Bookstore, sells them (Khufain Socks).

g.) Seventh Accomodation Request:

That the (Quranic Arabic Class be placed on the
outcount sheet to ensure that the students of the class
can be counted in class if there is a fog count due
to esseccive fog at NECX as other religious Services.

CCI 000651

8. **Recommendations by the Warden and the Chaplain**

Date Sent to the Religious Activities Committee: _____

a. First Accommodation -- Recommendation: _____ Approval ✓ Disapproval
Reason: _Security Reasons_ _____

_____

_____

_____

b. Second Accommodation -- Recommendation: ✓ Approval _____ Disapproval
Reason: _Approved only Through Union Supply Stock Through Chaplains office_

_____

_____

_____

c. Third Accommodation -- Recommendation: ✓ Approval _____ Disapproval
Reason: _Special order Through local vendor Through Chaplains office_

_____

_____

_____

d. Fourth Accommodation -- Recommendation: ✓ Approval _____ Disapproval
Reason: _Jewelry / Emblems only_ _____

_____

_____

_____

e. Fifth Accommodation -- Recommendation: ✓ Approval _____ Disapproval
Reason: _One Radio per group only_ _____

_____

_____

_____

Case 3:22-cv-00093   Document 33-17   Filed 05/04/22   Page 52 of 198   PageID #6352
CCP 000652

Hccom
#6    Denied -
          Security Risk


#7    Denied
          Class is scheduled from 8 A.M. To 10 A.M.
          Outcounts are not needed and would extend Their Class
          longer Than others are allotted!

CCII 000656

9. **Approval or Disapproval by the Religious Activities Committee**

Date of Approval or Disapproval: _____

a. First Accommodation: _____ Disapproved _____ Approved

_____
_____
_____
_____
_____
_____

b. Second Accommodation: _____ Disapproved _____ Approved – subject to conditions:

_____
_____
_____
_____
_____
_____

c. Third Accommodation: _____ Disapproved _____ Approved

_____
_____
_____
_____
_____
_____

d. Fourth Accommodation: _____ Disapproved _____ Approved

_____
_____
_____
_____
_____
_____

e. Fifth Accommodation: _____ Disapproved _____ Approved

_____
_____
_____
_____
_____
_____

Case 3:22-cv-00093   Document 33-17   Filed 05/04/22   Page 54 of 198 PageID #: 2387

CCP I 000654

 Department of
**Correction**

Memorandum

To: Religious Activities Committee
From: Deborah Thompson, Director of Religious, Volunteer, and Victim Services
Date: January 23, 2018
Subject: RAC #18-002 (TP-18-047) (TP-18-015)

Attached is a Request for Group Religious Accommodations dated January 23, 2018 submitted by Boaz Pleasant Bey, #473110 on behalf of the Quranic Arabic Studies Class at NECX.

**We will consider this request at our meeting on January 25, 2018.**

The inmate has requested:

1. Turbans and Agals from Halalaco or Islamic Bookstore. Prophet Muhammad (PBUH) wore these head dresses when he recited the Arabic Quran.
2. Halal certified food items (i.e. meats, snacks, soups, teas, etc.) from Union Supply, Halalaco, the Islamic Bookstore and Celestial Seasonings. We believe in eating Halal food items (only) and we don't have halal food options. Halal foods are pure and we must eat them to follow Islam.
3. Halal Soaps, deodorants and lotions from Halalaco, and the Islamic Bookstore (and Halal toothpaste. We do not have access to these Halal items. Currently the cosmetics available have many haraam (unlawful) ingredients in there and we have no access to hatal items.
4. Islamic Emblems (Arabic). Union Supply sells other religious emblems and rings, but do not sell Islamic emblems and rings. We should be able to order them from Islamic vendors (i.e. Halalaco, Islamic bookstore).
5. A portable CD or tape player or a radio with CD/cassette player for each housing unit that houses Arabic Class students. One radio for the class is not enough to meet the group needs. Each pod should have access to a CD/tape player to hear the Arabic Quran
6. Khufain socks (worn by Prophet Muhammad (PBUH) ). NSECX Administration has presented "a irrational" theory that the khufain socks (Leather socks) are a security threat (or risk). I was informed that the thin material used to make the khufain socks could be used to make gloves to climb over the gate with? Inmates are allowed to wear leather shoes which could be used to make a more durable pair of gloves. If that were the case, both leather socks (khufain) and leather shoes are worn on the feet. The allowance of one and disapproval of the other is a violation of 42u.s.c.((b) (1). RLUIPA prohibits NECX from treating a non-religious assembly of inmates. They are socks used for religious purposes. Halalaco Books and the Islamic Bookstore sells them (khufain socks)
7. That the Quranic Arabic Class be placed on the out count sheet to ensure that the students of the class can be counted in class if there is a fog count due to esseccive fox at NECX as other religious services.

Case 3:22-cv-00093   Document 33-17   Filed 05/04/22   Page 55 of 198 PageID #: 655


Department of
**Correction**

The Warden and the Chaplain recommended:

1. **Disapprove** – Security Reasons.
2. **Approve** - Approve only through Union Supply Stock through Chaplain's office.
3. **Approve** – Special order through local vendor through Chaplain's office.
4. **Approve** – Jewelry/Emblems only.
5. **Approve** – One radio per group only.
6. **Disapprove** – Security Risk.
7. **Disapprove** – Class is scheduled from 8:00 a.m. to 10:00 a.m. Outcounts are not needed and would extend their class longer than others are allotted.

My recommendations are:

1. **Disapprove** – Security Reasons.
2. **Approve** - Approve only through Union Supply Stock through Chaplain's office.
3. **Approve** – Special order through local vendor through Chaplain's office.
4. **Approve** – Jewelry/Emblems only.
5. **Approve** – One radio per group only.
6. **Disapprove** – Security Risk.
7. **Disapprove** – Class is scheduled from 8:00 a.m. to 10:00 a.m. Outcounts are not needed and would extend their class longer than others are allotted.

Communication Department · Sixth Floor Rachel Jackson Building · 320 Sixth
Avenue North · Nashville, TN 37243 · Tel: 615-253-8144 · Fax: 615-532-8281 ·
tn.gov/correction



**TN Department of Correction**

February 14, 2018

Re:     Religious Activities Committee Request #18-002 (TP-18-015) (TP-18-047)

Mr. Boaz Pleasant-Bey, #473110
NECX
P.O. Box 5000
Mountain City, TN 37683-5000

Dear Mr. Pleasant-Bey,

I received your Request for Group Accommodations submitted on behalf of, the Quranic Arabic Studies Class, and the recommendations of the Warden and the Chaplain. The Religious Activities Committee (the "Committee") has reviewed your request and voted in the following way:

1. **Disapprove** – Security Reasons.
2. **Approve** - Approve only through Union Supply Stock through Chaplain's office.
3. **Approve** – Special order through local vendor through Chaplain's office.
4. **Approve** – Jewelry/Emblems only.
5. **Approve** – One radio per group only.
6. **Disapprove** – Security Risk.
7. **Disapprove** – Class is scheduled from 8:00 a.m. to 10:00 a.m. Outcounts are not needed and would extend their class longer than others are allotted.

Sincerely,


Eric Qualls
Director

cc:     TP-18-015
        TP-18-047
        Warden Randy Lee
        Chaplain Maurice Widener

Case 3:22-cv-00093   Document 33-17   Filed 05/04/22   Page 57 of 198 PageID #: 6559   CCI 000657



Department of
**Correction**

Communication Department • Sixth Floor Rachel Jackson Building • 320 Sixth
Avenue North • Nashville, TN 37243 • Tel: 615-253-8144 • Fax: 615-532-8281 •
tn.gov/correction



# MEMO

To: Institutional Wardens, Chaplains, and Food Services Supervisors
From: Ed Welch, Assistant Commissioner of Rehabilitative Services
Date: 01 March 2019
Re: Ramadan 2019 Guidelines

The observance of Ramadan 2019 should begin at sunset on Monday, 06 May and should end at sunset on Monday, 03 June. An institutionally-provided Eid Al-Fitr meal should be served after sunset 04 June 2019.

Approved Ramadan participants will be served a pre-dawn sack breakfast tray daily beginning 06 May and a post-sunset dinner meal daily, concluding at sunset on 03 June 2019.

For the observance of Ramadan and the Eid Al-Fitr feast, the following guidelines will apply:

1. Only individuals that are designated in TOMIS as "Islamic," "Mohammedan," "Black Muslim," "Muslim-Nation of Islam," "Muslim-Sunni," or "Muslim-not NOI or Sunni" will be approved to participate in Ramadan. Any individuals that are classified into TDOC and designated accordingly in TOMIS after the beginning of Ramadan need only to fast from the date they are classified into TDOC in order to participate in Ramadan.

2. All food items will be prepared through Food Services supervisors/ Food Services vendors at each institution. No outside food items will be allowed from certified volunteers.

3. In order to secure sufficient quantities of menu items through Food Services, the deadline to sign-up and to notify the Chaplain's office of the desire to participate in Ramadan is Friday, 15 March 2019. Feast food items are to be eaten at the feast and may not be taken back to any housing unit.

4. Individuals housed in segregation units and/or under maximum security supervision should receive their meals and feast items individually in their assigned cells. No one is to be denied religious meals or feast items due to disciplinary write-ups.

The goal of these guidelines is to balance the religious rights of the incarcerated with the safety and security of each institution.

Cc: Assistant Commissioner, Bobby Straughter
Assistant Commissioner, Lee Dotson
Correctional Administrators
Director of Food Services
Legal Department

· Sixth Floor Rachel Jackson Building · 320 Sixth Avenue North · Nashville, TN 37243
· Tel: 615-253-8144 · Fax: 615-532-8281 · tn.gov/correction

CCF 000659



Department of
**Correction**

# MEMO

| To: | Institutional Wardens, Chaplains, and Food Services Supervisors |
| From: | Ed Welch, Assistant Commissioner of Rehabilitation Services |
| | Bobby Straughter, Assistant Commissioner of Operational Support |
| Date: | 19 March 2018 |
| Re: | Ramadan 2018 Guidelines |

The observance of Ramadan 2018 begins at sunset on Wednesday, 16 May and ends at sunset on Thursday, 14 June. An institutionally-provided Eid Al-Fitr meal should be served at sunset on 15 June or at sunset within three days of 15 June 2018. The chaplains shall be responsible for coordinating Ramadan to ensure all guidelines are properly followed.

Approved Ramadan participants will be served a pre-dawn sack breakfast tray daily beginning Thursday, 17 May and a post-sunset dinner meal daily, concluding at sunset on Friday, 15 June.

For the observance of Ramadan and the Eid Al-Fitr feast, the following guidelines will apply:

1. Only offenders that are designated in TOMIS as "Islamic," "Mohammedan," "Black Muslim," "Muslim-Nation of Islam," "Muslim-Sunni," or "Muslim-not NOI or Sunni" will be approved to participate in Ramadan. Offenders that are classified into TDOC and designated accordingly in TOMIS after the beginning of Ramadan need only to fast from the date they are classified into TDOC in order to participate in Ramadan.

2. All food items will be prepared through the Food Services vendors (e.g. Aramark/Trinity) at each institution. No outside food items will be allowed from certified volunteers.

3. In order to secure sufficient quantities of menu items through Food Services, the deadline to sign-up and to notify the Chaplain's office of the desire to participate in Ramadan is Friday, 27 April 2018. Food items are to be eaten at the feast and may not be taken back to any housing unit.

4. Offenders in segregation units and/or under maximum security supervision should receive their meals and feast items individually in their assigned cells. Offenders should not be denied religious meals or feast items due to disciplinary write-ups.

The goal of these guidelines is to balance offenders' religious rights with safety and security at each institution.

| Cc: | Correctional Administrators |
| | Associate Wardens |
| | Director of Food Services |
| | Legal Department |

Case 3:22-cv-00093   Document 33-17   Filed 05/04/22   Page 60 of 198 PageID #: 2340   CCPI 000660



# MEMO

| | |
|---|---|
| To: | Institutional Wardens, Chaplains, and Food Services Supervisors |
| From: | Vicki Freeman, Acting Assistant Commissioner of Rehabilitative Services |
| Date: | March 19, 2020 |
| Re: | **Ramadan 2019 Guidelines** |

The observance of Ramadan 2020 should begin at sunset on Thursday, April 23, 2020 and should end at sunset on Saturday, May 23, 2020. An institutionally provided Eid Al-Fitr meal shall be served after sunset May 24, 2020.

Approved Ramadan participants will be served a pre-down sack breakfast tray daily beginning Thursday, April 23, 2020 and a post-sunset dinner meal daily, concluding at sunset on May 24, 2020.

For the observance of Ramadan and the Eid Al-Fitr feast, the following guidelines will apply:

1. Only individuals that are designated in TOMIS as "Islamic", "Mohammedan", "Black Muslim", "Muslim-Nation of Islam", "Muslim-Sunni", or "Muslim-not NOI or Sunni" will be approved to participate in Ramadan. Any individuals that are classified into TDOC and designated accordingly in TOMIS after the beginning of Ramadan need only to fast from the date they are classified into TDOC in order to participate in Ramadan.

2. All food items will be prepared through Food Services supervisors/Food Service vendors at each institution. No outside food items will be allowed from certified volunteers.

3. In order to secure sufficient quantities of menu items through Food Services, the deadline to sign-up and notify the Chaplain's office of the desire to participate in the Ramadan is Tuesday, March 31, 2020.

4. The General Population Eid Al-Fitr meal provided by the institution may not be taken back to any housing unit.

5. Individuals housed in segregation units and/or under maximum security supervision should receive their meals individually in their assigned cells. No one is to be denied religious meals due to disciplinary write-ups.

The goal of these guidelines is to balance the religious rights of individuals with the safety and security at each institution.

Thank you!

| | |
|---|---|
| Cc: | Assistant Commissioner, Bobby Straughter |
| | Assistant Commissioner, Lee Dotson |
| | Correctional Administrators |
| | Director of Food Services |
| | Legal Department |

Department of Correction • Fifth Floor Rachel Jackson Building • 320 Sixth Avenue North • Nashville, TN 37243 • Tel: 615-253-8196 • Fax: 615-741-1055 • tn.gov/correction



# M E M O R A N D U M #18-043

**TO:** ALL Inmate Population

**FROM:** Russell Washburn, Warden

**DATE:** April 12, 2018

**SUBJECT:** UNION SUPPLY CATALOG

The following is a list of items not allowed at TTCC as designated through TDOC of our in-house policy:

- Page 5     Item # 1055013     Shower Sandal
- Page 5     Item # 1055009     Shower Slippers
- Page 6     All Insoles
- Page 14     Item # 5040001     Wristband
- Page 15     Item # 2506005     Handkerchief
- Page 19     Item # 4001123     Clear Tunes Antenna
- Page 24     Item # 7520063     Wide Tooth Comb
- Page 24     Item # 7520083     9" Comb
- Page 24     Item # 7505004     Vented Brush
- Page 24     Item # 7099025     Body Puff
- Page 24     Item # 7515110     Toe Nail Clipper (No File)
- Page 26     Item # 6070070     Abalone Shell
- Page 26     Item # 6070169     Turkey Feather
- Page 26     Item # 6070126     Drum Kit
- Page 27     Item # 6070039     Modern Tallit w/Matching Kipa, Tallit Bag
- Page 28     Item # 6070210     Brass Cauldron 3'

Nothing from the Women's section pages 29-33. Allowable items on page 33 are as follows:

- Page 33     Item # 7520205     Jumbo Ouchless Ponytail Holders
- Page 33     Item # 7520201     Ouchless Ponytail Holder
- Page 33     Item # 7520067     Super Stretch Rubber Band

The following items cannot be ordered, although you may check them out of the library:

- Page 27     Item # 6599942     Torah
- Page 27     Item # 6599938     The Prose Edda-The Tale from Norse Mythology
- Page 27     Item # 6599943     Bhagavad Gita
- Page 27     Item # 6599939     The Poetic Edda-The Mythological Poems
- Page 28     Item # 6070010     The Qur'an Translation

CC: TDOC

Case 3:22-cv-00093 Document 33-17 Filed 05/04/22 Page 62 of 198 PageID #: 2342

CCI 000662

53337289.v1

Trousdale Turner Correctional Center

2



# M E M O R A N D U M          #18-043A

**TO:**       ALL Inmate Population

**FROM:**    Russell Washburn, Warden

**DATE:**    August 2, 2018

**SUBJECT:**  UNION SUPPLY CATALOG

---

The following is a list of items not allowed at TTCC as designated through TDOC of our in-house policy:

- Page 5       Item # 1055013        Shower Sandal
- Page 5       Item # 1055009        Shower Slippers
- Page 6                             All Insoles
- Page 14      Item # 5040001        Wristband
- Page 15      Item # 2506005        Handkerchief
- Page 19      Item # 4001123        Clear Tunes Antenna
- Page 24      Item # 7520063        Wide Tooth Comb
- Page 24      Item # 7520083        9" Comb
- Page 24      Item # 7505004        Vented Brush
- Page 24      Item # 7099025        Body Puff
- Page 24      Item # 7515110        Toe Nail Clipper (No File)
- Page 26      Item # 6070070        Abalone Shell
- Page 26      Item # 6070169        Turkey Feather
- Page 26      Item # 6070126        Drum Kit
- Page 27      Item # 6070039        Modern Tallit w/Matching Kipa, Tallit Bag
- Page 28      Item # 6070210        Brass Cauldron 3'

Nothing from the Women's section pages 29-33. Allowable items on page 33 are as follows:

- Page 33      Item # 7520205        Jumbo Ouchless Ponytail Holders
- Page 33      Item # 7520201        Ouchless Ponytail Holder
- Page 33      Item # 7520067        Super Stretch Rubber Band

CC: TDOC

140 Macon Way · Hartsville, TN  37074          Phone (615) 808-0400 · Fax (615) 808-0499          www.corecivic.com

CCI 000664



**TROUSDALE TURNER CORRECTIONAL CENTER**

# M E M O R A N D U M        #18-043B

**TO:**         ALL Inmate Population

**FROM:**     Russell Washburn, Warden

**DATE:**      September 20, 2018

**SUBJECT:**   UNION SUPPLY CATALOG

---

The following is a list of items not allowed at TTCC as designated through TDOC of our in-house policy:

- Page 5        Item # 1055013        Shower Sandal
- Page 5        Item # 1055009        Shower Slippers
- Page 6                             All Insoles
- Page 14       Item # 5040001        Wristband
- Page 15       Item # 2506005        Handkerchief
- Page 19       Item # 4001123        Clear Tunes Antenna
- Page 24       Item # 7520063        Wide Tooth Comb
- Page 24       Item # 7520083        9" Comb
- Page 24       Item # 7505004        Vented Brush
- Page 24       Item # 7099025        Body Puff
- Page 24       Item # 7515110        Toe Nail Clipper (No File)
- Page 24       Item # 7515010        Trim Nail Clipper
- Page 24       Item # 4034239        Level 10 Battery Shaver
- Page 26       Item # 6070070        Abalone Shell
- Page 26       Item # 6070169        Turkey Feather
- Page 26       Item # 6070126        Drum Kit
- Page 27       Item # 6070039        Modern Tallit w/Matching Kipa, Tallit Bag
- Page 28       Item # 6070210        Brass Cauldron 3'

Nothing from the Women's section pages 29-33. Allowable items on page 33 are as follows:

- Page 33       Item # 7520205        Jumbo Ouchless Ponytail Holders
- Page 33       Item # 7520201        Ouchless Ponytail Holder
- Page 33       Item # 7520067        Super Stretch Rubber Band

CCI 000665

CC: TDOC

Trousdale Turner Correctional Center

2

CCI 000666

## Shonebarger Jr, Jon

| | |
|---|---|
| **From:** | Ossama Bahloul <sheikhosama@gmail.com> |
| **Sent:** | Thursday, February 13, 2020 8:34 AM |
| **To:** | Shonebarger Jr, Jon |
| **Subject:** | Re: Our meeting February 14th |

*** This is an EXTERNAL email. Please exercise caution. DO NOT open attachments or click links from unknown senders or unexpected email. ***

Confirmed. See you tomorrow.

Sincerely,
Imam Ossama Bahloul PhD
Resident Scholar of ICN


On Thu, Feb 13, 2020, 7:34 AM Shonebarger Jr, Jon <Jon.ShonebargerJr@corecivic.com> wrote:

> **Good morning,**
>
> **I am confirming our meeting for tomorrow. Thank you.**
>
>
>
> **Kind regards,**
>
> **Chaplain Shonebarger**
> **Trousdale-Turner Correctional Center**
>
> **615.808.0573**
>
>
>
> **From:** Ossama Bahloul <sheikhosama@gmail.com>
> **Sent:** Tuesday, January 14, 2020 10:50 AM
> **To:** Shonebarger Jr, Jon <Jon.ShonebargerJr@corecivic.com>
> **Subject:** Our meeting February 14th
>
>
>
> *** This is an EXTERNAL email. Please exercise caution. DO NOT open attachments or click links from unknown senders or unexpected email. ***
>
> Good day,
>
>
>
> It was wonderful speaking with you.   Thank you for all of your service.

1

As discussed, we will meet at the Islamic Center at 2515 12th Ave S., Nashville, TN 37204 at 10:30 on February 14th.


--

*Sincerely,*
*Imam Ossama Bahloul PhD*

*Resident Scholar of ICN*
*www.islamin500.org*




(i) This e-mail and any files transmitted with it are confidential and intended solely for the use of the intended recipient(s). If you have received this e-mail in error, please notify the sender immediately and delete this e-mail and any associated files from your system. (ii) Views or opinions presented in this e-mail are solely those of the author and do not necessarily represent those of CoreCivic. (iii) The recipient should check this e-mail and any attachments for the presence of viruses. The company accepts no liability for errors or omissions caused by e-mail transmission or any damage caused by any virus transmitted by or with this e-mail. This email has been scanned for content and viruses by the Barracuda Email Security System.

CCI 000668

## Shonebarger Jr, Jon

| | |
|---|---|
| **From:** | Ossama Bahloul <sheikhosama@gmail.com> |
| **Sent:** | Tuesday, January 14, 2020 10:50 AM |
| **To:** | Shonebarger Jr, Jon |
| **Subject:** | Our meeting February 14th |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

*** This is an EXTERNAL email. Please exercise caution. DO NOT open attachments or click links from unknown senders or unexpected email. ***

Good day,

It was wonderful speaking with you.   Thank you for all of your service.

As discussed, we will meet at the Islamic Center at 2515 12th Ave S., Nashville, TN 37204 at 10:30 on February 14th.

--
*Sincerely,*
*Imam Ossama Bahloul PhD*
*Resident Scholar of ICN*
*www.islamin500.org*

1

CCPI 000669

## Shonebarger Jr, Jon

| | |
|---|---|
| **From:** | Akirah <akirahchaney@gmail.com> |
| **Sent:** | Saturday, January 4, 2020 11:40 AM |
| **To:** | Shonebarger Jr, Jon |
| **Subject:** | Re: You got an Enquiry! |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

*** This is an EXTERNAL email. Please exercise caution. DO NOT open attachments or click links from unknown senders or unexpected email. ***

Hello,
I would need more details before I can give an exact answer.
please feel free to contact me at 6159563434

thanks,

On Sat, Jan 4, 2020 at 11:04 AM Shonebarger Jr, Jon <Jon.ShonebargerJr@corecivic.com> wrote:

> Greetings,
>
>
> I'm wanting to follow-up on our correspondence. Is there an event we could plan at Trousdale-Turner?
>
> Please advise.
>
>
> Chaplain Shonebarger
> 615.808.0573
>
>
>
> **From:** Outreach @ ICM TN <outreach@icmtn.org>
> **Sent:** Monday, November 25, 2019 4:39 PM
> **To:** Shonebarger Jr, Jon <Jon.ShonebargerJr@corecivic.com>
> **Cc:** Akirah Chaney <akirahchaney@gmail.com>; Sheikh Osama <sheikhosama@gmail.com>
> **Subject:** RE: You got an Enquiry!
>
> Dear Chaplain Shonebarger,
>
>
> Thank you for reaching out to us. I am copying Imam Akirah and Imam Ossama to see if they can help you with your request.
>
>
> Regards, Saleh

1

CCI 000670

*Dr. Saleh M. Sbenaty, Professor*

*Outreach @ ICM TN*

*615-890-1551*

(i) This e-mail and any files transmitted with it are confidential and intended solely for the use of the intended recipient(s). If you have received this e-mail in error, please notify the sender immediately and delete this e-mail and any associated files from your system. (ii) Views or opinions presented in this e-mail are solely those of the author and do not necessarily represent those of CoreCivic. (iii) The recipient should check this e-mail and any attachments for the presence of viruses. The company accepts no liability for errors or omissions caused by e-mail transmission or any damage caused by any virus transmitted by or with this e-mail. This email has been scanned for content and viruses by the Barracuda Email Security System.

2

CCI 0006774

| From: | Shonebarger Jr, Jon |
|-------|---------------------|
| Sent: | Monday, March 18, 2019 11:17 AM |
| To: | 'sheikhosama@gmail.com' |
| Subject: | Volunteers for Trousdale-Turner Correctional Center |

Hello Imam Ossama Bahloul,

I want to follow-up with you about volunteers for our Sunni inmates here at Trousdale-Turner Correctional Center in Hartsville,
Our inmate faith group is growing. We have a need for spiritual teaching for these men.

Please advise of candidates and opportunities. Your assistance is deeply appreciated.

Kind regards,

*Chaplain Jon Thomas Shonebarger, Jr.*
*CISM Response Team / Ethics Liaison*
*Volunteer Coordinator*
*CoreCivic/TTCC*
*615.808.0573*

1

CCI 000672

Minister Abdulla
Nation of Islam Prison Reform Ministries
National Center
7351 Stony Island Avenue
Chicago, IL 60649

Tuesday, May 15, 2018

Greetings Minister Abdulla,

I am chaplain/volunteer coordinator at Tennessee's newest and largest state prison, Trousdale-Turner Correctional Center. We have a population of 2500 inmates, with a growing Nation of Islam faith group. I am asking your assistance in finding volunteers for our inmate programs. We are located approximately an hour northeast of Nashville.

In addition, your assistance with donations would be greatly appreciated. Teaching materials, books, DVDs, the Nation flag, are a few items that would be beneficial. Your generosity would be appreciated.

If you know of prospective volunteers, please have them contact me.

Chaplain Jon T. Shonebarger, Jr
Trousdale-Turner Correctional Center
140 Macon Way
Hartsville, TN 37074
615.808.0573

## Shonebarger Jr, Jon

**From:** Shonebarger Jr, Jon
**Sent:** Monday, September 11, 2017 10:04 AM
**To:** 'sheikhosama@gmail.com'
**Subject:** Volunteers for Trousdale-Turner Correctional Center

Good day sir,

I met you at the TDOC Chaplain's Conference in May. I wanted to reach out to you concerning volunteers and our need here at Trousdale-Turner Correctional Center.
Are there candidates or current TDOC volunteers that could minister to the men here? Please advise.

Kind regards,

**Chaplain Jon T. Shonebarger, Jr.**
**Volunteer Coordinator**
**Trousdale-Turner Correctional Center**
**140 Macon Way**
**Hartsville, TN 37074**
**615.808.0573**

1

**Shonebarger Jr, Jon**

| | |
|---|---|
| **To:** | operationsdirector@icntn.org |
| **Subject:** | Prison Volunteer Recruitment |

Greetings,

Allow me to introduce myself. I am the Chaplain and Volunteer Coordinator for Tennessee's newest state prison, Trousdale-Turner Correctional Center in Hartsville. Our population is approximately 2600 men.
We need Volunteers/Spiritual mentors for our **Sunn**i inmates. I kindly request you advise your community of such a significant opportunity. Any interested individuals may contact me. Your assistance is appreciated.

Kind regards,

**Chaplain Jon T. Shonebarger, Jr.**
**Volunteer Coordinator // Ethics & Compliance Liaison**
Trousdale-Turner Correctional Center
140 Macon Way
Hartsville, Tennessee 37074
**615.808.0573**
jon.shonebargerjr@corecivic.com



1

CCI 000675

**Shonebarger Jr, Jon**

| | |
|---|---|
| **From:** | Sheikh Osama <sheikhosama@gmail.com> |
| **Sent:** | Thursday, September 28, 2017 9:05 AM |
| **To:** | Shonebarger Jr, Jon |
| **Subject:** | Re: Volunteers for Trousdale-Turner Correctional Center |

*** This is an EXTERNAL email. Please exercise caution. DO NOT open attachments or click links from unknown senders or unexpected email. ***

Good morning Chaplain,

I am sorry about my delay in reply. I have been trying to work on finding a volunteer. It is a struggle simply because many locations have made requests and we have a shortage of volunteers. I had hoped that I would have a better reply however I am still working on finding someone.

--
*Sincerely,*
*Imam Ossama Bahloul PhD*
*Resident Scholar of ICN*

On Mon, Sep 11, 2017 at 10:04 AM, Shonebarger Jr, Jon <Jon.ShonebargerJr@corecivic.com> wrote:

Good day sir,

I met you at the TDOC Chaplain's Conference in May. I wanted to reach out to you concerning volunteers and our need here at Trousdale-Turner Correctional Center.

Are there candidates or current TDOC volunteers that could minister to the men here? Please advise.

Kind regards,

**Chaplain Jon T. Shonebarger, Jr.**
**Volunteer Coordinator**
**Trousdale-Turner Correctional Center**

140 Macon Way
Hartsville, TN 37074

615.808.0573

1

Close this Window    (Hide)
Compare to Previous

# Chaplaincy and Religious Services

Version: Policy
Publish Date: Apr 13, 2020



## 20-4 Chaplaincy and Religious Services

| | |
|---|---|
| **AUTHORITY:** | **CORECIVIC COMPANY POLICY** |
| **FSC EFFECTIVE DATE:** | **Apr 13, 2020** |
| **FSC SUPERSEDES DATE:** | **DECEMBER 18, 2018; PCN 20-4(01) FEBRUARY 20, 2019** |
| **FACILITY:** | |
| **FACILITY SUPERSEDES DATE:** | |
| **FACILITY EFFECTIVE DATE:** | |

**POLICY:**

CoreCivic facilities shall ensure that all inmates/detainees have the opportunity to participate in the practice of his/her faith regardless of race, religion, national origin, sex, disability, or political views **(5-ACI-3D-04)**.  Such participation includes access to religious publications, religious symbols, religious counseling, religious study classes, and congregational religious services. **(4-ALDF-5A-01; 4-ALDF-6B-02)**

Inmates/detainees have the opportunity to participate in practices of their religious faith, limited only by documentation showing threat to the safety of persons involved in such activity itself or disruption of order in the facility **(5-ACI-7F-05; 4-ALDF-5C-17)**.  Religious activities and programs are voluntary. No inmate/detainee shall be required to attend religious services or programs.

**DEFINITIONS:**

Chaplaincy Staff – Full-time and part-time employees designated as Chaplains or Program Facilitators assigned to a facility faith-based program(s).

Employee – Any person employed by CoreCivic and working in a full-time or part-time position, including PRN (as needed), that is designated as such in the authorized staffing pattern.

Facility Religious Center (FRC) – A space(s) within the confines of the facility designated for use as a religious service/worship/study area, also referred to as a chapel. At some facilities, the FRC is a multi-purpose space utilized for non-religious classes or meetings in addition to being utilized for religious services.

Facility Support Center (FSC) – CoreCivic's corporate headquarters where employees provide support, direction and oversight in the management and operation of the company's correction, detention, residential, and community corrections facilities.

Pastoral Care – The ministry of care and counseling to persons of all faiths, and those who express no faith tradition or personal belief system, within a correctional setting. Such care may include professional counseling where the Chaplain is appropriately credentialed to provide these services. Spiritual counsel, typically understood to be an avenue of Pastoral Care, addresses issues of faith and is limited to the particular credentials of the Chaplain providing such counsel.  In a correctional setting, Pastoral Care may include serious illness and death notifications, grief counseling, preparation for marriage, and counseling in or assistance with other similar life circumstances.

Qualified Chaplain – An individual who can demonstrate that they possess clinical pastoral education or equivalent specialized training, endorsement by an appropriate religious certifying body, and meets the minimum qualifications outlined in the Chaplain job description. **(5-ACI-7F-01; 4-ALDF-5C-19)** All candidates should demonstrate that they possess documentation of Ecclesiastical Endorsement, or eligibility of endorsement, board-affiliation as a Chaplain from a credentialing agency, or the recommendation for chaplaincy from within a recognized faith practice or tradition.

- Preferred Qualified Chaplain candidates should demonstrate that they possess a Master's level degree of education in religious or theological studies or divinity from an accredited seminary, school, or university, including field education experience or volunteer service in a correctional setting.
- Candidates for Chaplaincy from alternative religious traditions should demonstrate that they possess a Master's level degree of education, hold endorsement from an established religious group, accredited credentialing agency, University-sponsored organization, or chaplaincy board, and have at least three years of supervised chaplaincy experience within a correctional setting.

Case 3:22-cv-00093   Document 33-17   Filed 05/04/22   Page 77 of 198 PageID #: 2322

CCI 000677

- Candidates with a Bachelor's degree should have a minimum of seven years of full-time professional experience in ministry leadership or pastoral care and counseling that includes at least one year of verifiable work or volunteer service in a correctional setting.

Religious Diet – A specific diet, prepared and served in accordance with a particular religion's dietary restrictions or guidelines, that meets the requirements and religious dietary laws of a given faith.

Religious Items – Items given specific significance within a particular faith and held as required, or set apart, for the practice of the faith.

Religious Practice – The observable manifestation of religious belief including, but not limited to:

- Participating in congregational services, classes, or meetings;
- Engaging in rituals and ceremonies;
- Praying, chanting, singing (individually or corporately);
- Wearing specific articles of clothing, jewelry, symbols, hairstyles, etc.;
- Adhering to special diets or dietary restrictions;
- Participating in specific religious activities (holidays, fast days, work proscription days, etc.) peculiar to a particular faith; and
- Any exercise of religion, whether or not compelled by, or central to, a system of religious belief that is a sincerely held belief of the individual practitioner.

Religious Volunteer – An individual who is not an employee of the facility that is affiliated with a non-profit entity performing service(s) to inmate/detainee populations for civic, charitable, religious, or humanitarian reasons without promise, expectation, or receipt of compensation for the service(s) rendered.

**PROCEDURES INDEX:**

A. **CHAPLAIN**
B. **RELIGIOUS LEADERS**
C. **ACCESS, SPACE, AND EQUIPMENT**
D. **DONATIONS**
E. **DECLARATION OF RELIGIOUS BELIEF**
F. **INMATE/DETAINEE REQUESTS**
G. **PROHIBITED PRACTICES**
H. **RELIGIOUS DIETS**
I. **REPORTING REQUIREMENTS**

**PROCEDURES:**

A. **CHAPLAIN**

1. Staffing

    a. A full-time Chaplain shall be provided at each facility having an average daily inmate/detainee population of 500 or more *(5-ACI-7F-02)*. The Chaplain's primary role is:

        i. The provision of pastoral care;
        ii. Religious counseling;
        iii. Administration of religious services;
        iv. Facilitation of access to various faith groups: and
        v. In consultation with and approval from facility administration, the Chaplain(s) will plan, direct, and coordinate all aspects of the religious program, including approval and training of both lay and clergy volunteers from faiths represented by the inmate population. *(5-ACI-7F-03; 4-ALDF-5C-20)* (Refer to CoreCivic Policy 22-1 Volunteer Services and Management and/or the contractually-required agency policy pertaining to volunteers.)

    b. In facilities with an average daily inmate/detainee population of less than 500, adequate religious staffing is available. Chaplaincy services shall be provided utilizing part-time or contract Chaplains, or by assigning oversight of religious programing to a full-time employee as an ancillary responsibility *(5-ACI-7F-02)*.

    c. Every effort should be made to ensure that staffing is adequate to meet the Chaplaincy needs of a facility's inmate/detainee population. The staffing requirements for personnel are determined on an ongoing basis to ensure that inmates/detainees have access to staff, programs, and services *(5-ACI-1C-03)*. Chaplaincy staff for religious programs should not exceed a ratio of 1000:1.

    d. At those facilities having two or more Chaplains, one of the Chaplains shall be designated as the Supervisory Chaplain. Selection of the Supervisory Chaplain shall be made in consultation with, and the approval of, the FSC Senior Director, Reentry Services, or designee. The Supervisory Chaplain's responsibilities include:

        i. Supervision of Chaplains and the Chaplaincy-at-large;

Case 3:22-cv-00093    Document 33-17    Filed 05/04/22    Page 78 of 198 PageID #: 2331

CCFP 000678

     ii.   Coordinating training of Chaplains and volunteers;
     iii.  Scheduling;
     iv.  Verification of credentials; and
     v.   Related activities.

    e.   ***Any additional contractual requirements pertaining to the staffing of Chaplaincy programs shall be added to this policy, where applicable, as an "At this Facility" (ATF) procedure.***

2.   Selection

    a.   The selection of candidates to fill the role of a facility Chaplain shall be subject to the approval of the FSC Senior Director, Reentry Services, or designee. Prior to interviews being conducted, documents such as applications, resumes, transcripts, and other relevant credentials shall be submitted to the FSC Director, Chaplaincy and Volunteer Services, for review and approval.

    b.   Unless circumstances prohibit, the FSC Director, Chaplaincy and Volunteer Services, shall participate in interviews conducted for Chaplains and Program Facilitator's assigned to religious or faith-based programs.

3.   Training Requirements

    a.   Chaplains will complete facility orientation and annual in-service training **(5-ACI-1D-10, 5-ACI-1D-15)** as required by CoreCivic Policy 4-1 Learning and Development (and/or the contractually-required contracting agency policy).

    b.   Chaplains shall attend additional Chaplaincy-specific training as required by the FSC Vice President, Correctional Programs, or designee and the Chaplain's Endorsing Agency. Chaplains shall be permitted to attend Endorsing Agency required annual meetings as a function of their duties, not to exceed five days per year.

    c.   ***Any additional contractual requirements pertaining to Chaplaincy training shall be added to this policy, where applicable, as an "At this Facility" (ATF) procedure.***

4.   Responsibilities

The Chaplain assures equal status and protection for all religions **(5-ACI-7F-01; 4-ALDF-5C-19)**. The Chaplain is responsible for:

    a.   Coordinating and facilitating the various faith practices represented within the facility's inmate/detainee population;

    b.   Coordinating the scheduling of all religious programming, to include publishing a current religious services schedule (refer to 20-4AA Facility Religious Center Monthly Schedule [SAMPLE]) for distribution within the facility to ensure all inmates/detainees and staff are aware of the various religious programming opportunities and the times those programs are scheduled. Alternate schedules may be developed to address particular facility needs;

    c.   Visiting all inmates/detainees housed in Restrictive Housing Units and Medical Observation on a regular basis, but not less than once weekly;

    d.   Supervising any Chaplaincy students/interns approved to serve in the facility;

    e.   Identifying and supervising qualified volunteers in providing religious instruction, facilitating worship services, and/or providing religious guidance to the inmate/detainee population regardless of their faith;

    f.   Establishing, participating in, and maintaining working relationships with community ministerial associations and organizations, churches, mosques, synagogues, civil organizations, volunteer organizations, and individuals whose participation and support may improve Chaplaincy and Religious Services programs and activities, and enhance faith community relations; **(5-ACI-7F-04)**

    g.   Publishing a current list of all eligible Religious Volunteers scheduled to participate in the facility's religious programs;

    h.   Reviewing, updating, and approving/disapproving requests for religious articles, diets, events or services, in consultation with the Warden/Facility Administrator or designee;

    i.   Monitoring compliance with the Religious Diet Program as outlined in Section H. Religious Diets; and

    j.   Providing Pastoral Care for both the inmate/detainee population and facility staff.

Case 3:22-cv-00093   Document 33-17   Filed 05/04/22   Page 79 of 198 PageID #: 2383

CCI 000673

**B. RELIGIOUS LEADERS**

The Warden/Facility Administrator designates a staff member or contractor to coordinate religious activities for inmates/detainees *(4-ALDF-5C-18)*.

1.    Religious Services shall be conducted by a Chaplain or other staff member having knowledge and appropriate training in the particular religious expression to conduct services, classes, or activities commensurate with the requirements of a particular faith group.

2.    When a religious leader of an inmate/detainee's faith is not represented through the Chaplaincy staff or volunteers, the religious coordinator and Chaplain assist the inmate/detainee in contacting such a person.  That person must have the appropriate credentials from the faith judicatory and may minister to the inmate/detainee under the supervision of the religious coordinator or Chaplain. *(5-ACI-7F-06, 4-ALDF-5C-22)*

3.    In the absence of a representative from a given faith group being represented within the facility population, inmates/detainees may, on a rotating or group basis, participate in the practice(s), ceremony (ies), or activity(ies) of their particular faith under the direct supervision of a facility staff member.

4.    Under no circumstances will an inmate/detainee be recognized as the leader or official representative of any faith group.

**C. ACCESS, SPACE AND EQUIPMENT**

1.    Religious programs and services are accessible to inmates/detainees with disabilities who reside in the facility *(5-ACI-2C-11)*.  Discrimination to religious programs based on a disability is prohibited *(5-ACI-5E-02; 4-ALDF-6B-02)*.

2.    Consistent with facility safety and security, Chaplains and/or religious staff are permitted physical access to all areas of the facility to minister to inmates/detainees and staff and to perform Chaplaincy responsibilities *(5-ACI-7F-02; 4-ALDF-5C-21)*.

3.    Program space and equipment shall be provided adequate for the conduct and administration of religious programs, classes, activities, practices, ceremonies, and/or services commensurate with the facility inmate/detainee population(s) and the faith groups represented therein, and in keeping with sound correctional practice regarding safety and security. The facility provides for the availability of non-inmate/detainee clerical staff for confidential materials and to assist with administrative duties, such as entering data for quarterly and annual program metrics *(5-ACI-7F-07; 4-ALDF-5C-23)*.

4.    Congregate worship items shall be stored in the Facility Religious Center in a manner consistent with the facility's security policies and in coordination with the Warden/Facility Administrator or designee.

**D. DONATIONS**

1.    The Chaplaincy Program may accept items for use in religious programs and activities from faith groups, local or national ministries, churches, mosques, synagogues, civil groups and organizations, as well as individuals, subject to the approval of the Warden/Facility Administrator *(5-ACI-7F-08; 4-ALDF-5C-24)*.

2.    The items shall be inventoried (excluding religious publications, books, magazines, tracts, brochures, posters, and similar items intended to be distributed to the inmate/detainee population) at the time of receipt.  A copy of the inventory and all records shall be provided to the facility Business Manager who will maintain a detailed account of items received and disposed.

3.    Monetary donations will not be accepted.

**E. DECLARATION OF RELIGIOUS BELIEF**

1.    Each arriving inmate/detainee shall be given the opportunity to declare his/her religious preference, if any, at intake. For the purpose of entry into the Offender Management System (OMS), and/or similar contracting agency systems, the inmate/detainee may select his/her faith group from the list provided in 20-4BB Known Religious Expressions for OMS Entry. The staff member making the data entry shall confirm the selection in the field for accuracy.

2.    Each inmate/detainee may request a change of religious preference by submitting to the Chaplain a 20-4C Declaration of Religious Preference form.

**F. INMATE/DETAINEE REQUESTS**

1.    Inmates/detainees may request religious clothing, symbols, and other items required for the practice of a particular faith by completing and submitting a 20-4A Religious Article Authorization Request to the

Case 3:22-cv-00093   Document 33-17   Filed 05/04/22   Page 80 of 198 PageID #: 2380

CCI 000680

Chaplain. The Chaplain or designee will meet with the inmate/detainee requesting the item within ten working days of receipt of the request to determine approval/disapproval.

    a.   ***Any additional contractual requirements pertaining to allowable religious property/items shall be added to this policy, where applicable, as an "At this Facility" (ATF) procedure.***

2.   Inmates/detainees may request religious publications. The Chaplain, in consultation with the Warden/Facility Administrator or designee, shall review and approve religious publications, books, magazines, tracts, brochures, posters, etc. delivered to the facility at-large (i.e. not addressed to a specific inmate/detainee) prior to these documents being circulated within the facility. Restrictions on such correspondence shall be in accordance with CoreCivic Policy 16-1 Correspondence Procedures and 14-6 Inmate/Detainee Property (and/or the contractually-required contracting agency policy).

3.   If a religious practice or ritual is not in place at the facility, an inmate/detainee may request to add it by submitting a 20-4B Religious Practice Authorization Request to the Chaplain. The Chaplain or designee will meet with the inmate/detainee making the request within ten working days of receipt and gather sufficient information to objectively consider approval.

4.   Inmates/detainees may request a special religious service or ceremony by submitting a 20-4E Request for Special Service/Ceremony to the Chaplain at least 60 days in advance of the requested date of the service/ceremony.

5.   The inmate/detainee making the request should provide documentation and/or references concerning the requirement of his/her faith for the requested service/ceremony and how the service/ceremony can be reasonably put in place within the facility.

6.   The request must not pose a threat to the participants or the safety and security of the facility.

7.   The Chaplain, in consultation with the Warden/Facility Administrator or designee, shall determine if the request is in keeping with established standards for religious services or ceremonies.

**G.   PROHIBITED PRACTICES**

1.   Prohibited practices and behaviors include, but are not limited to:

    a.   Animal sacrifice;
    b.   Language or behavior that may be reasonably understood to be a threat to the safety, security, or orderly operation of the facility;
    c.   Nudity;
    d.   Self-mutilation;
    e.   Use or possession of weapons or items that appear to be or may be used as weapons;
    f.   Paramilitary exercises;
    g.   Self-defense training (e.g. martial arts);
    h.   Sexual acts;
    i.   Consumption or ingestion of alcohol or other intoxicant by an inmate/detainee; and
    j.   Disparaging or attacking the practice of other religions.

2.   ***Any additional contractual requirements pertaining to prohibited practices shall be added to this policy, where applicable, as an "At this Facility" (ATF) procedure.***

**H.   RELIGIOUS DIETS**

Religious diets shall be provided for inmates/detainees whose religious beliefs require adherence to religious dietary laws *(5-ACI-5C-07; 4-ALDF-4A-10)*. Religious diets will be provided in accordance with CoreCivic Policy 11-1 Food Service Operations (and/or the contractually-required contracting agency policy).

1.   Religious diets shall be approved by the Chaplain. In the absence of a full-time Chaplain, the Warden/Facility Administrator may authorize a qualified individual to approve religious diets *(4-ALDF-4A-10)*. The Chaplain will consult with the Warden/Facility Administrator or designee, and the Food Service Manager, to approve/disapprove requests in a timely manner. Religious diets should also meet the dietary requirements established by the Dietitian.

2.   Inmates/detainees may request a special religious diet by completing and submitting to the Chaplain a 20-4D Request for Religious Diet. The written request must clearly identify why the current facility diet is insufficient in allowing the practice of the inmate/detainee's faith.

3.   Inmates/detainees who participate in the Religious Diet Program will sign a 20-4J Religious Diet Agreement in recognition of their understanding of the Religious Diet Program, expectations, requirements, and conditions for removal and reinstatement.

4.   The Chaplain will periodically monitor compliance with the Religious Diet Program by observing meals and reviewing the commissary lists of a percentage of the program's participants.

Case 3:22-cv-00093    Document 33-17    Filed 05/04/22    Page 81 of 198 PageID #: 2854

CCBP 000681

5.    In accordance with CoreCivic Policy 11-1 Food Service Operations, the Chaplain will review and update the 11-1M Religious Diet List by the 5th day of each month and email a copy to the Food Service Manager.  When an inmate/detainee has been placed on a religious diet, the 11-1M shall be updated.

6.    Religious ceremonial meals, feasts, etc. shall not be funded by private sources, the Chaplaincy Fund, or community organizations. If ceremonial meals are held, all menus for ceremonial meals will be developed in advance of the meal and approved by the FSC Senior Director, Food Service, and the Warden/Facility Administrator or designee.

7.    ***Any additional contractual requirements pertaining to religious diets shall be added to this policy, where applicable, as an "At this Facility" (ATF) procedure.***

I.    **REPORTING REQUIREMENTS**

1.    Quarterly Chaplaincy Activity Report

On or before the 5th of the first month of the new quarter, the Warden/Facility Administrator, or designee, shall submit a complete report of the Chaplaincy and Religious Services activities for the preceding month using the 20-4F Quarterly Chaplaincy Activity Report.  The 20-4F shall be completed in its entirety, leaving no blank fields, and submitted in electronic form to the FSC Director, Chaplaincy and Volunteer Services.

2.    Annual Reports

a.    Annual Chaplaincy Program Self-Evaluation *(5-ACI-5E-04)*

The 20-4G Annual Chaplaincy Program Self-Evaluation shall be conducted by the Chaplain annually on or before February 1st for the preceding year. The completed 20-4G shall be provided to the Warden/Facility Administrator and submitted, in electronic form, to the FSC Director, Chaplaincy and Volunteer Services.

b.    Annual Religious Preferences/Needs Survey *(5-ACI-5E-04)*
The 20-4H Annual Religious Preferences/Needs Survey shall be prepared by the Chaplain annually, on or before February 1st of each year, in consultation with the facility's administrative staff.  The completed 20-4 shall be submitted in electronic form to the FSC Director, Chaplaincy and Volunteer Services.

**REVIEW:**

This policy shall be reviewed annually by the FSC Senior Director, Reentry Services, or designee.

**APPLICABILITY:**

All CoreCivic Safety Facilities

**APPENDICES:**

| | |
|---|---|
| 20-4AA | Facility Religious Center Monthly Schedule (SAMPLE) |
| 20-4BB | Known Religious Expressions for OMS Entry |

**ATTACHMENTS:**

| | |
|---|---|
| 20-4A | Religious Article Authorization Request |
| 20-4B | Religious Practice Authorization Request |
| 20-4C | Declaration of Religious Preference |
| 20-4D | Request for Religious Diet |
| 20-4E | Request for Special Service/Ceremony |
| 20-4F | Quarterly Chaplaincy Activity Report |
| 20-4G | Annual Chaplaincy Program Self-Evaluation |
| 20-4H | Annual Religious Preferences/Needs Survey |
| 20-4I | Interview Record |
| 20-4J | Religious Diet Agreement |
| 11-1M | Religious Diet List |

**REFERENCES:**

CoreCivic Policy 4-1 Learning and Development
CoreCivic Policy 11-1 Food Service Operations
CoreCivic Policy 14-6 Inmate/Detainee Property
CoreCivic Policy 16-1 Correspondence Procedures

Case 3:22-cv-00093    Document 33-17    Filed 05/04/22    Page 82 of 198 PageID #: 682

CCI 000682

CoreCivic Policy 22-1 Volunteer Services and Management

Religious Freedom Restoration Act, Public Law No. 103-141, 107 Stat. 1488

Religious Land Use and Institutionalized Persons Act, Pub.L. 106–274

American Correctional Association (ACA) Standards for Adult Correctional Institutions (ACI) and Adult Local Detention Facilities (ALDF):

5-ACI-1C-03
5-ACI-1D-10
5-ACI-1D-15
5-ACI-2C-11
5-ACI-3D-04
5-ACI-5C-07/4-ALDF-4A-10
5-ACI-5E-02
5-ACI-5E-04
5-ACI-7F-01/4-ALDF-5C-19
5-ACI-7F-02
5-ACI-7F-03/4-ALDF-5C-20
5-ACI-7F-04
5-ACI-7F-05
5-ACI-7F-06/4-ALDF-5C-22
5-ACI-7F-07/4-ALDF-5C-23
5-ACI-7F-08/4-ALDF-5C-24
4-ADLF-5A-01
4-ALDF-5C-17
4-ALDF-5C-18
4-ALDF-5C-21
4-ALDF-6B-02

Proprietary Information – Not for Distribution – Copyrighted – Property of CoreCivic

|  ADMINISTRATIVE POLICIES AND PROCEDURES<br>State of Tennessee<br>Department of Correction | Index #: 116.08 | | Page 1 of 11 |
| --- | --- | --- | --- |
| | Effective Date: January 1, 2016 | | |
| | Distribution: A | | |
| | Supersedes: 116.08 (9/1/14)<br>PCN 15-5 (6/1/15) | | |
| Approved by: Derrick D. Schofield | | | |
| Subject: RELIGIOUS DIET PROGRAMS AND FEASTS | | | |

I.  **AUTHORITY:** TCA 4-3-603, TCA 4-3-606, the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. 2000cc, et seq.

II.  **PURPOSE:** To establish procedures for the Tennessee Department of Correction (TDOC) facilities to provide religious diet requirements to inmates while maintaining the safety, security, and order of each institution.

III.  **APPLICATION:** Wardens, Dietitians, Fiscal Directors, Food Services Director, Food Services Managers, Procurement Officers, Warehouse Supervisors, Chaplains, inmates, Unit Management staff, and Counselors.

IV.  **DEFINITIONS:**

    A.  Chaplain: A staff member who is an ordained or endorsed minister in his/her faith group and who remains in good standing and meets the requirements established by the Department of Human Resources for employment as a chaplain. This individual is responsible for providing pastoral care and religious leadership within an institution.

    B.  Common Fare Menu: Menu implemented with common meals served to accommodate Kosher, Halal, and House of Yahweh diets.

    C.  Inmate Religious Diet Program: A program in which inmates can apply to obtain religious dietary items to comply with their religious tenets.

    D.  Religious Activities Committee: A group established by the Director of Religious Services with approval of the Commissioner responsible for review and approval of religious accommodation requests.

    E.  Religious Advisor: Individuals of various faith groups that partner with TDOC to provide religious diet consultation and approval of procurement services and menus offered by TDOC.

    F.  Religious Diet: Specific foods and/or food preparation techniques that satisfy religious dietary requirements.

V.  **POLICY:** The Department shall provide opportunities for inmates to voluntarily practice their religious diet needs during incarceration.

VI.  **PROCEDURES:**

    A.  Religious diet requirements shall be met as follows:

CCPI 000684

    1.    Religious dietary needs not addressed by the vegan or vegetarian menu shall be addressed as provided in Section VI.(B) below. Religious dietary needs addressed by the vegan or vegetarian menu shall be addressed as provided in Policy #116.01.

    2.    Kosher, Halal, and House of Yahweh meals shall be provided in accordance with the common fare menu developed by the Food Services Director, TDOC Dietician, and in consultation and approval by a qualified religious advisor to ensure adherence to religious requirements and to ensure nutritional adequacy.

    3.    All food for additional religious holiday feasts shall be prepared by institutional food service staff in consultation with a qualified religious advisor to ensure and adhere to religious requirements. Volunteer groups may participate in the activities only as provided in Policy #118.01.

B.    <u>Religious Dietary Requirements Outside the Routine Menu:</u>

    1.    <u>Request Process:</u> Inmates who are members of faith groups with religious diet tenets may request approval to participate in the Inmate Religious Diet Program when their religious dietary needs cannot otherwise be met with dietary alternatives provided within the Standardized Menu. Such request must be submitted to the Chaplain in writing and articulate the specific religious motivation for participation in the program.

    2.    <u>Approval Process:</u>

        a.    Upon receiving an inmate's request to participate in the Inmate Religious Diet Program, the Chaplain will interview the inmate to ascertain the inmate's faith. The inmate shall also be required to complete the Religious Diet Participation Agreement, CR-3814. Within ten days of receipt, the Chaplain will forward a copy of the request with his/her recommendations to the Warden for his/her approval or disapproval.

        b.    If the Warden approves the request, the Director of Religious Services shall be informed of the decision and the information will be provided to the Food Service Manager at the facility. If the Warden disapproves, the request shall be sent to the Director of Religious Services. Within 30 days, the Warden and the Director of Religious Services shall work together to agree on the approval or disapproval of the request.

        c.    If the Warden and Director of Religious Services do not agree on the disposition of the request, the Director of Religious Services shall submit the request to the Religious Activities Committee to be approved or disapproved in the same manner as a request for group accommodations. The Chaplain shall notify the inmate of the decision regarding the request.

        d.    Any inmate who has been ordered a specific therapeutic diet is responsible for informing the ordering physician of the inmate's religious diet requirements. Efforts shall be made to coordinate with Food Service to resolve any diet conflicts.

    3.    <u>Documentation</u>

CCH 000685

a. Upon inmate transfer to another facility, the person doing orientation shall inquire whether the inmate has a current approved Religious Diet. Verification will be made by checking the inmate file and contacting the sending facility. Notification will be made to the food services manager/designee by telephone immediately and a copy will be forwarded to the food service manager and Chaplain of the receiving facility. If there is a question as to whether the diet is approved, the inmate will be given the religious diet meal until the verification of the religious diet approval from the sending facility can be made by the receiving facility staff.

b. The completed request for Religious Diet Program Participation and Agreement, CR-3814, shall be placed in the Inmate's Institutional Record. A copy shall be retained by the Chaplain and a copy forwarded to the Food Service Manager and the Warden. To participate in the Religious Diet Program, an inmate must sign a new CR-3814 whenever the form is revised. Failure to do so within 30 days of a revision will result in termination from the program until the current form is signed. The Chaplain is responsible for notifying participants when a new form must be signed.

4. Termination, Suspension, and/or Reinstatement to/from the Inmate Religious Diet Program

a. An inmate may request that their religious diet be cancelled. The request shall be in writing, using the Religious Diet Cancellation Request, CR-3813, and will be effective immediately. When an inmate cancels his religious diet, food service staff should be notified immediately by phone. A copy will be given to the Chaplain, Warden, and Food Service Manager.

b. Inmates wishing to engage in personal religious fasts must provide written notice of the starting time and date, the intended duration of the fast, and the ending time and date to the correctional facility chaplain and food services manager at least seven calendar days in advance of the fast.

c. In order to preserve the integrity and orderly operation of the Inmate Religious Diet Program and to prevent fraud, inmates who withdraw may not be immediately reinstated back into the program. The process of reapproving a religious diet for an inmate who voluntarily withdraws may extend up to 30 days. Repeated withdrawals, however, may result in inmates being subjected to a waiting period of up 90 days, unless a change of religious affiliation is approved per Policy #118.01.

d. If an inmate is found in violation of the religious diet agreement the Warden has discretion to suspend and or terminate the inmate from the program. The first violation shall result in a suspension from the program. Repeated violations may result in termination from the program.

e. If an inmate is found in violation of the religious feast guidelines provided by Central Office, the inmate will not be allowed to participate in the feast.

C.    Food Service Operations

    1.    Food services staff shall prepare and serve approved religious diets.

    2.    Common fare menu's utensils shall be stored in designated locked microwave cage in the main kitchen of each facility.

    3.    The Kosher microwave cage shall contain the following:

        a.    Approved stockpot, lid, measuring cup, and serving ladle for lunch and dinner daily services

        b.    Disposable tray and disposable silverware

        c.    Inmate name and inmate number will be written on their disposable tray

        d.    Cage shall be clearly marked, "This cage is for religious dietary items only"

    4.    The complete rice meals shall be stored in secured, locked dry storage area when received in the kitchen.

    5.    Common fare meals shall be prepared according to religious practices to include not preparing meals with pork or with alcohol. Surfaces shall be cleaned and sanitized appropriately to avoid cross-contamination.

    6.    Food service staff and inmates that prepare and/or serve religious diets shall be appropriately trained in the preparation, handling, and delivery of meals. The Food Service Department is not required to purchase or use separate equipment or utensils for the preparation and service of religious meals other than the designated microwave and religious diet cage.

    7.    The Food Service Manager shall keep a monthly log of the type and number of the religious diets ordered and served as outlined in Policy #116.01 by providing a sign-in sheet for each meal to verify that the inmate has picked up his/her religious diet with the exception of the segregated units and Health Center (DSNF.) This information will be forwarded to the Chaplain and the Fiscal Director. The Fiscal Director shall email this information in a spread sheet to the Food Service Director in conjunction with the Food Service Report, CR-3854.

D.    Religious/Holiday Feast Menu Program

    1.    If the religious feast is not covered by the standardized menu program feast menu, the Chaplain shall initiate the process and determine the number of inmates requesting participation at least 60 days in advance. The Warden shall determine by their designation whether to approve utilizing the special events memo and standardized menu pre-order process for provision of the feast in accordance with Policy #118.01 or whether the institution will provide the food.

    a.    The Fiscal Director shall submit a proposal to the Warden in the form of an emailed routing slip that includes date of service, quantity, unit of measure, approximate cost, number of people to be served, food items to be purchased and the total cost.

    b.    Any such additional food requests must have the Warden's approval. Any purchase in excess of $500.00 shall be submitted for approval to the TDOC Director of Food Service. The TDOC Director of Food Service will obtain the approval of the Director of Budget and Fiscal Services, the Deputy Commissioner of Operations, and the Deputy Commissioner of Administration or designee. The final approval must be attached and uploaded to the requisition. The Director of Food Service will notify the institution regarding the status of the request.

    c.    Special Event Food items will be purchased under Department 329XX00150 for inmate food purchases and 329XX00100 for staff food purchases; Account Code 70903000. XX is the last two digits of the business unit, for example 32945. Such purchases will not be included in the Food Service Report, CR-3854.

    d.    Any purchase in addition to the Standardized Menu Kit must be pre-approved by the TDOC Director of Food Service, the Executive Assistant to the Deputy Commissioner of Administration, and the Director of Budget and Fiscal Services. The proposal should be in the form of an emailed routing slip that includes date of service, quantity, unit of measure, approximate cost, number of people to be served, food items to be purchased and the total cost.

    e.    These purchases will be coded to Department 329XX00150 for all inmate food purchases and 329XX00100 for staff meal purchases; Account Code 70903000. XX is the last two digits of your business unit, for example 32945. Such purchases will be included in the Food Service Report, CR-3854. The TDOC Director of Food Service will notify the institution regarding the status of the request.

2.    TDOC will serve a special meal through food service provided to all population for the following feasts to be observed:

    a.    Christian (Christmas and Easter)

    b.    Muslim (Ramadan and the Feast of Abraham)

3.    Inmates are permitted to participate in two feasts per year for other religious groups which can be requested in accordance with Policy #118.01 regarding group requests.

VII.    ACA STANDARDS: None.

VIII.    EXPIRATION DATE: January 1, 2019.

| | | |
|---|---|---|
|  **ADMINISTRATIVE POLICIES AND PROCEDURES** State of Tennessee Department of Correction | Index #: 118.01 | Page 1 of 18 |
| | Effective Date: February 15, 2014 | |
| | Distribution: A | |
| | Supersedes: 118.01 (1/1/11) PCN 13-2 (2/1/13) PCN 12-2 (1/1/12) | |
| Approved by: Derrick D. Schofield | | |
| Subject: RELIGIOUS PROGRAMS | | |

I. **AUTHORITY:** TCA 4-3-603, TCA 4-3-606, the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. 2000cc, et seq., the Omnibus Crime Control and Safe Streets Act of 1968, 42 U.S.C. 3789d, and the Prison Litigation Reform Act of 1995.

II. **PURPOSE:** To ensure access to religious resources for all inmates.

III. **APPLICATION:** To all Tennessee Department of Correction (TDOC) staff, volunteers who are involved in the operation of religious programming, all inmates, and employees of privately managed institutions.

IV. **DEFINITIONS:**

A. **Chaplain:** A staff member who is an ordained or endorsed minister in his/her faith group and who remains in good standing and meets the requirements established by the Department of Human Resources for employment as a chaplain. This individual is responsible for providing pastoral care and religious leadership within an institution.

B. **Director of Religious Services:** Designated staff person who is an ordained or endorsed minister in his/her faith group and who remains in good standing responsible for overseeing and evaluating all religious activities within the Department.

C. **Faith Group:** A group whose sole purpose is to conduct a religious activity or religious exercise.

D. **Outside Clergy:** Ordained clergypersons who come into TDOC institutions for the purpose of ministering to inmates.

E. **Religious Activity:** An activity or program conducted by or under the supervision of the chaplain or under the supervision of trained staff or approved volunteers. This activity is designed specifically for worship, religious education, spiritual guidance, counseling or other religious service.

F. **Religious Activities Committee:** A group established by the Director of Religious Services with approval of the Commissioner responsible for review and approval of religious accommodation requests.

G. **Religious Exercise:** Study, prayer, worship, and other liturgical activities, usually directed toward a god or gods, to achieve benefits in this life and/or eternity.

H. **Religious Volunteer:** A volunteer who participates in or leads religious services, religious activities, and/or religious exercises.

I.    Security Threat Group (STG): Any group, organization, or association of individuals who possess common characteristics which serve to distinguish them from other individuals or groups who have been determined to be acting in concert, so as to pose a threat or potential threat to staff, other inmates, the institution, or the community.

J.    Volunteer Chaplain: Religious or faith-based volunteer appointed by the Warden or designee to assist the chaplain in performing his or her duties.

V.    POLICY: The Department shall provide opportunities for inmates to voluntarily practice their religion and receive appropriate pastoral care during incarceration.

VI.    PROCEDURES:

A.    Security Threat Groups (STG): Inmate possession of STG type materials or symbols is prohibited. First Amendment free exercise protection applies to religious ideas and symbols by faith groups whose only purpose is religious but it does not extend to STG's use of religious ideas and symbols.

B.    Religious Staff

1.    Institutional Chaplains

a.    The institutional chaplain shall be responsible for planning, leading, administering, and coordinating religious activities and developing community resources to meet the religious needs of inmates within the guidelines set by policy with the approval of the Warden. The Warden may delegate approval authority for specific actions to the chaplain or other designee.

b.    In institutions without a chaplain, the Warden shall appoint one or more staff members to perform the chaplain's duties.

c.    Volunteers for religious assignments and religious program interns shall work under the supervision of the chaplain or other designated staff member.

d.    The chaplain shall be responsible for initiating programs, drafting budget requests, and submitting reports. The chaplain shall attend appropriate staff meetings and work with other staff for the well-being of the inmates and the institution.

e.    The chaplain shall have access to all areas of the institution, all staff, and all inmates.

f.    Chaplains shall be available to provide counseling to inmates in areas of religious concerns, personal matters, crisis or high anxiety situations, and/or family problems upon request from inmates. An appropriate private area should be made available for the chaplain to counsel persons without interruption.

g.    Inmates who are in segregation shall have the opportunity to see the chaplain or a volunteer chaplain for crisis situations and at least weekly for routine matters.

h.   Chaplains shall remain in good standing with their faith group and retain their endorsed or ordained status. Chaplains shall be permitted to attend events of their faith group when participation is expected of all persons in their position.  The expense for attendance shall be paid by the chaplain, but he/she shall be granted administrative leave for up to five days per year for such required attendance.

i.   The chaplain may be asked to visit and/or counsel with staff or meet with staff's families in hospitals or funeral homes, and he/she may be granted administrative leave by the Warden for such visits and meetings.

j.   The Department shall not impose upon the chaplain or any volunteer chaplain, any duties that are in conflict with the chaplain's faith group, i.e., marriage, baptism, communion.  When a conflict exists, the chaplain shall make a reasonable effort to assist inmates in locating another TDOC chaplain, outside clergy or volunteer chaplain, or a community religious leader to fulfill the request.

k.   The chaplain shall avoid proselytizing for his/her particular faith.

l.   The chaplain may, with the Warden's approval, develop training opportunities for clergy and theological students and/or supervise field training for theology students where such programs can provide a valuable supplement to the religious programming at the institution.

m.   The Warden may appoint volunteer chaplains as needed.

n.   The chaplain shall document inmates changing their religious preference on eTOMIS (LCLA).  The chaplain will also document this on eTOMIS contact note screen (LCDG) using contact code "RECH" indicating a reason for the change.  Indication of religious preference by an inmate does not constitute approval by TDOC of the accommodations requested by the indicated group.  To permit processing of records, inmates may change their religious preference no more frequently than quarterly.  The inmate's religious property specific to his/her former religious preference must be sent home or otherwise disposed of within 30 days after changing religious preference.

o.   Chaplains shall execute their duties relating to inmate marriages as described within Policy #503.07.  Neither Chaplains nor volunteer Chaplains in TDOC or privately managed facilities shall receive a fee or solicit donations to charities in exchange for performing marriages or premarital counseling services.  Qualified outside persons may receive such fees as negotiated and agreed to by the inmate.

2.   Outside Clergy, Volunteer Chaplains, and Religious Volunteers

a.   Inmates may receive visits from outside clergy, volunteer chaplains, and religious volunteers.  Their names and the names of inmates they are allowed to visit shall be provided by the chaplain or designated religious leader and maintained at checkpoint.

b.   All volunteer chaplains and religious volunteers must comply with policies in the #115 series (Volunteer Services).

c. Outside clergy, volunteer chaplains, and religious volunteers should be recruited to assist in meeting the religious needs of all represented faith groups in the institution.

d. Individuals or groups aspiring to be volunteers have no First Amendment right to minister in prison.

e. Religion may be a factor in selecting volunteers, either to maintain balance between faith groups or to recruit a leader for a specific faith group.

f. Volunteer chaplains and religious volunteers may be required to be inclusive as they lead groups and failure to do so may result in their dismissal.

g. Outside clergy, volunteer chaplains, and religious volunteers may speak positively about their own faith but may not speak negatively about other faiths.

h. Volunteers shall not provide any personal contact information such as phone numbers, e-mail address, or street address to inmates but volunteers may provide contact information of their sponsoring organizations.

i. Volunteer chaplains are TDOC-certified volunteers who work either part-time or full-time assisting the chaplain. Duties are assigned according to differing skill levels, abilities, and time commitments to the institution. In the absence of the chaplain, a volunteer chaplain may fill in and assume the chaplain's responsibilities, subject to approval by the Warden. Volunteer chaplains are recommended by the chaplain, appointed by the Warden, and may be required to attend training specific to their required duties.

j. Outside clergy need not be placed on the approved visitor's list and do not need to become certified volunteers in order to visit. However, inmates may elect to place outside clergy on their visitor's list and outside clergy may elect to become certified volunteers. All outside clergy must complete an Outside Clergy Application, CR-3347, and have the approval of the chaplain in consultation with the Director of Religious Services. They must acquaint themselves with the rules of the institution and agree to abide by them. Outside clergy visits are scheduled by the chaplain. The chaplain shall also maintain a list of approved outside clergy. The list shall contain the clergyperson's name, address, telephone number, and e-mail address (if there is one); the name of the faith group; and the name of the inmate(s) the clergyperson is approved to visit. The chaplain shall maintain a file evidencing the qualifications of all approved outside clergy.

k. Religious volunteers work under the supervision of, and provide assistance to, the chaplain. Each religious volunteer must comply with Policy #115.01 and complete all required screening, training, orientation, and reference and background checks.

l. All outside clergy (except those approved by the Warden for one-time emergency visits) must receive an acceptable NCIC Criminal History Report which must be updated at least every five years. If an outside clergy has been away from the facility for more than 12 months, he/she shall be processed as a new outside clergy.

m. The chaplain or another staff member designated by the Warden shall submit a NCIC Criminal History Request, CR-3552, within ten working days of receipt of the application for all persons seeking to be approved as new outside clergy. Results of the criminal history report shall be provided to the appropriate staff in accordance with Policy #301.04. If the report discloses evidence of previously undisclosed offenses, the Warden shall take appropriate action in the same manner as provided in Policy #115.01.

n. Volunteers will be allowed to bring in outside food, paper goods, plastic utensils, beverages, and necessary serving items at the discretion of the Warden for special events such as but not limited to graduations, holidays, meetings and family days. An itemized list of all requested items must be submitted to the Chaplain and approved by the Warden 21 days prior to the event, such as graduations, holidays, meetings and family days. All food, beverage(s) and paper goods items will be cleared by security before being allowed entry into the facility. Volunteers are responsible for providing all supplies necessary for the serving of their food items and cleaning up after the event. All beverages must be in sealed plastic containers. At the conclusion of the event, offenders will not be allowed to return to their units with any food items.

C. Individual Religious Practices

1. Religious Diets: Inmates may request to participate in the Religious Diet Program per Policy #116.08 and may contact the Chaplain to complete the Request for Religious Diet Program Participation and Agreement, CR-3814.

2. Religious Literature: Inmates may receive religious literature, materials, books, CDs, DVDs, video tapes and tape recordings about religion or religious teaching in accordance with Policies #504.01 and #507.02. Chaplains will make donated religious literature available to inmates. Reasonable access to CD players, DVD players, video tape players and tape players will be made available to inmates in the chapel, the library or another area designated by the Warden. Misuse or tampering with such players may result in disciplinary action. Inmates may not possess such players in their cells unless they are authorized to do so per Policy #504.01 and the #504.01 Personal Property Memo.

3. Religious Objects: Inmates may possess objects of religious significance in accordance with policy and the approved religious property memo. Religious objects are not excluded from the volume limit. All objects are subject to security search and certain objects may be prohibited if they are identified as security threat material under Policy #506.25. Such objects may be donated to indigent inmates by volunteers, Outside Clergy or outside organizations.

4. <u>Religious Property Memo</u>: By July 1 of each year, the Commissioner shall publish a list of religious property that inmates are permitted to have in their possession, and/or in approved group religious gatherings. Items shown on the list shall not count against the maximum number of packages an inmate may receive, and the existence of a disciplinary package restriction shall not prohibit the receipt of such property, unless the Warden determines on a case by case basis that receipt of such property by the inmate will jeopardize institutional safety and security. The list may be revised as frequently as needed and may include restrictions on such property. All inmates and inmate groups are required to be in compliance with the list.

5. Any material, having a concentration of 1% or more of any ingredient for which a CAS number is listed in section two of the Material Safety Data Sheet or specifically identified as hazardous by the ACA or by the fire safety officer shall be controlled (i.e., prayer oils).

6. Inmates may wear headgear which is in keeping with the security practices of the institution. All religious clothing or other accessories are subject to respectful search at any time for security purposes. (See Policies #506.25 and #504.01)

7. Inmate Organizations: Religious preference or affiliation shall not be the basis for an inmate organization, fund raising by sales or activities, or trust fund accounts. (See Policy #503.01)

8. Inmates may use non-flammable, non-alcoholic sacramental oil in modest amounts for religious purposes. Inmates may purchase three ounces of such oil from vendors approved by the TDOC and in accordance with Policy #507.02; provided, however, sacramental oil for religious use shall not count against the maximum number of packages that an inmate may receive and the existence of a disciplinary package restriction shall not prohibit the receipt of sacramental oil for religious use. Inmates may keep such oil in their cells in its original container in an amount not to exceed three ounces. Any use of such oil for non-religious purposes shall result in a disciplinary action.

9. Inmates may engage in prayer as an individual religious exercise during periods of recreation (while in their cell or bed assignment and during non-work or programming times). Corporate or group prayer shall be reserved for scheduled religious activities.

10. In Catholic worship services, the priest (but no inmates) may consume small amounts of consecrated wine, subject to the following restrictions: No more than one half ounce may be brought into the institution by the priest per service, provided the empty container and any unused wine shall be taken out by the priest after each visit. An accurate record of all wine which comes in and out shall be maintained at checkpoint. No staff member, chaplain, volunteer chaplain, or religious volunteer shall be permitted to bring wine into the institution.

11. Abuse or misuse of religious rights and privileges (for example, an inmate using a religious item for non-religious purposes or an inmate with permission to be excused from a job or program assignment to attend a religious gathering failing to attend without a valid excuse such as illness), may result in appropriate disciplinary action.

D.  Group Worship and Study:

    1.  The chaplain shall schedule appropriate group worship and study opportunities to meet the needs of inmates. The groups shall be inclusive and be led by the chaplain, outside clergy, or religious volunteers. The leaders must agree to teach the central and inclusive doctrines common to the major faith group without degrading or impacting upon the tradition of others in a negative way. Individual inmate needs or traditions specific to a particular faith group may be met by individual visits with outside clergy of each inmate's denomination.

    2.  Except as stated in this paragraph, inmates will not be placed in a position of religious leadership or authority over other inmates. Group religious activities shall be video taped and/or monitored by staff. If the chaplain or a volunteer is not available to lead a group, the following may occur:

        a.  CDs, DVDs, video tapes, or tape recordings of sermons or religious lessons which comply with policy, including but not limited to Policy #507.02, may be made available to the group.

        b.  An inmate may be authorized by the Warden to lead the service. Inmates may ONLY lead religious services in the presence of staff.

    3.  The chaplain shall develop and maintain an up to date religious activity schedule and shall ensure that information about various opportunities for religious activities shall be available to all inmates. Group worship and study shall be conducted only in the designated places and times.

    4.  The chaplain shall conduct an annual religious and pastoral care needs review or survey and adjusts religious programming accordingly. The survey may be included as part of the annual social services survey. The completed review or survey shall be submitted to the Warden and a copy sent to the Director of Religious Services by the due date of the annual social services survey.

    5.  Religious worship and study groups shall be open to all inmates unless such participation is limited to maintain the order and security of the institution. Inmate attendance shall be voluntary.

    6.  The integrity of worship space shall be maintained at all times. The chapel has been designated as a place of worship and should not be used for searching or detaining inmates except in emergency situations. Inmates who attend religious services shall show proper respect to that particular faith group. Loud talking and disturbing others will result in a disciplinary action, (See Policy #502.05). Any act, whether spoken, visual, or written, which would tend to degrade a particular person, group, or ideology will not be tolerated and will result in a disciplinary action.

    7.  Outside clergy and volunteer chaplains may wear their religious vestments and/or insignia, except in those cases where potential danger may be present to the safety and/or security of the participants or institution.

    8.  Inmates may carry their personal property rugs to religious services for use as prayer rugs.

9. With the approval of the Warden memorial services may be conducted for deceased inmates or staff and shall be coordinated by the chaplain.

10. Extra worship services and group gatherings may be scheduled to accent special observances, religious holidays, and feasts. These activities may be conducted by the chaplain or volunteers. These activities must be requested in writing at least 15 days prior to the event and conducted in accordance with guidelines approved by the Assistant Commissioner of Rehabilitative Services.

11. Inmates in administrative or punitive segregation may not participate in religious group worship and study group activities. Compatible inmates in protective custody may participate in religious worship and study groups with other protective custody inmates if approved by the Warden/designee. (See Policy #506.16) All segregated inmates may receive visits from the chaplain, outside clergy, and religious volunteers. Segregated inmates may possess religious literature and objects in accordance with this policy.

12. A non-smoking, group religious pipe ceremony for Native Americans shall be permitted and shall not constitute a violation of Policy #112.11, provided:

   a. The pipe may only be used in group gatherings at times and places approved by the Warden.

   b. No material whatever will be placed in the bowl of the pipe and the pipe will not be lighted.

   c. The pipe must be used for religious purposes only, and any other use may result in disciplinary action.

   d. The pipe must be brought in by volunteers or Outside Clergy and taken out each time, OR stored in a designated area in or near the chapel, as determined by the Warden.

   e. The pipe must not be a risk to the safety and security of the institution, as determined by the Warden.

   f. The pipe must not contain STG or STG-related markings or insignia.

   g. The pipe is subject to inspection and search at all times.

E. Requests for Religious Accommodations

   1. Individual Requests: Accommodations for individual requests pertaining to religious matters shall be submitted in writing using the Inmate Inquiry Information Request, CR-3118.

      a. The inmate shall submit the form to the Chaplain for consideration. Within ten days of receipt, the Chaplain shall send a copy of the request (with his/her recommendations) to the Warden for his/her approval or disapproval.

b.  If the Warden approves the request, the Director of Religious Services shall be informed of the decision.  If the disapproval(s) is based on a policy or prior decision of the Religious Activities Committee the request does not have to be sent to the Director of Religious Services or Religious Activities Committee. If the decision of the request is not based on policy or prior decision of Religious Activities Committee, then within 60 days the Warden and the Director of Religious Services shall work together to agree on the approval or disapproval of the request.

c.  If the Warden and the Director of Religious Services do not agree on the disposition of the request, the Director of Religious Services shall submit the request to the Religious Activities Committee to be approved or disapproved in the same manner as a request for group religious accommodations.  The chaplain shall notify the inmate of the decision regarding the request.

2.  Group Requests:  Accommodations for group worship services and other group activities will only be made for faith groups which comply with the following procedure:

a.  Inmates may request accommodation by submitting a written request to the Chaplain on Request for Group Religious Accommodations, CR-3735.  Pages one and two shall be completed by the inmate(s).  Inmates shall be advised that an incomplete request can cause the request to be returned.

b.  The request must include:

(1)  The name and TDOC number of the inmate(s) submitting the request and an estimate of the number of inmates in the group.

(2)  The official name of the group, including names and contact information of the group's leaders.

(3)  Information on the group's teachings, beliefs, and practices including titles of the group's basic texts and other information helpful in researching the group.

(4)  Names of outside clergy or volunteers available to visit the institution.

(5)  A detailed description of the accommodation requested.

c.  Within 30 days of receipt, the Chaplain will consult with the Warden and complete page three of the Request for Group Religious Accommodations, CR-3735.  The entire request will then be sent to the Director of Religious Services with recommendations from the Warden and Chaplain.

d.  Within 60 days after receipt of the request, the Director of Religious Services, will send the request to the Religious Activities Committee.

e.   The Religious Activities Committee will meet in person on a quarterly basis to consider requests received by the Director of Religious Services. At the discretion of the Director of Religious Services, the Committee may consider requests via e-mail at any time.

f.   By majority vote, the Religious Activities Committee will recommend that the Commissioner disapprove the request, if it is determined that any of the following conditions have been met:

   (1)   The group is an STG

   (2)   The group is a bona fide faith group with beliefs and practices adequately represented by an existing faith group for which similar accommodations have been made

   (3)   The accommodation will jeopardize the security and safety of the institution

g.   The Director of Religious Services will send the recommendations of the Religious Activities Committee to the Commissioner. The Commissioner will subsequently approve or disapprove the request.

h.   The Director of Religious Services will notify the inmate, the Warden, and the Chaplain of the decision by the Commissioner.

i.   Inmates who disagree with the determination of the Commissioner will have the right to appeal in accordance with Section VI.(H) below.

j.   Groups which are currently being accommodated as of the effective date of this policy will be exempt from the procedure outlined above. However, failure to comply with the any provision of this policy may result in revocation of their accommodation in the manner set out above.

k.   After a group religious accommodation has been approved at one institution, the Director of Religious Services shall have the authority to approve the same request for group accommodations at another institution, unless the Warden at the other institution recommends against such accommodation, in which case the request shall be processed in the manner set out above and the Warden shall be invited to attend the meeting of the Religious Activities Committee.

F.   <u>Religious Activities Committee</u>:

   1.   <u>The Religious Activities Committee shall be composed of</u>:

      a.   The Director of Religious Services (Chair)
      b.   One representative from the General Counsel's office
      c.   One representative from the Deputy Commissioner of Operations
      d.   One representative from the Deputy Commissioner of Administrative Services
      e.   One Warden selected by the Director of Religious Services
      f.   Two Institutional Chaplains selected by the Director of Religious Services

    2.    The Religious Activities Committee shall be responsible for the following:

        a.    Review and approval of all requests for accommodations for religious practices filed under Section VI. (E)(2) above.

        b.    To perform such other duties as the Assistant Commissioner of Rehabilitative Services may require.

G.    The Director of Religious Services shall:

    1.    Be responsible for policy development regarding religious activities on a department-wide basis.

    2.    Develop and deliver training for line staff regarding religious policy and procedure.

    3.    Monitor religious services within various institutions to ensure policy compliance.

    4.    Develop knowledge of STG issues as it relates to religious functions within the TDOC.

    5.    Develop a working relationship with the Office of Investigations and Compliance (OIC) and TDOC STG coordinator regarding religious activities within TDOC.

    6.    Serve as the central point of contact for all religious activity and practice within the TDOC.

    7.    Work closely with internal TDOC security regarding religious activities.

    8.    Stays informed through research about religious issues (both legally and operationally) and advise senior management accordingly. Subject to the supervision of the Assistant Commissioner of Rehabilitative Services, the Director of Religious Services may serve as a resource to the Department's General Counsel and to the Attorney General as needed.

    9.    Have a working knowledge of comparative religions and utilize such in the administration of religious policy and procedure.

    10.    Send copies of all final decisions on Requests for Group Religious Accommodations to all wardens and chaplains.

H.    Inmate Grievance Procedures and Review

    1.    Inmates shall utilize the inmate grievance procedures set forth in Policy #501.01 for review of issues affecting the inmate regarding religious activity or religious exercise.

    2.    Grievances must be filed utilizing Inmate Grievance, CR-1394, and must provide sufficient information regarding and describing the inmate's specific religious activity or religious exercise which the inmate is grieving. The grievance must also set forth and describe how the inmate's religious exercise has been substantially burdened by the action(s) of the institution.

3. The review of the grievance (See Policy #501.01) shall examine and document whether the burden on the inmate's specific religious exercise furthers a compelling governmental interest.

4. If it is determined, upon review, that the burden on the inmate's specific religious exercise furthers a compelling governmental interest, the review must determine and document if the burden on the inmate's religious exercise is the least restrictive means of achieving the compelling government interest.

VII. ACA STANDARDS: 4-4319 and 4-4512 through 4-4521.

VIII. EXPIRATION DATE: February 15, 2017.



**STATE OF TENNESSEE**
**DEPRARMENT OF CORRECTION**
**OUTSIDE CLERGY APPLICATION**

_____
INSTITUTION

_____
DATE

Dear Clergy Person:

Thank you for your interest in visiting an inmate at _____ as an Outside Clergy person in accordance with TDOC Policy # 118.01. Each inmate is entitled to receive visits from one outside clergyperson without the visit counting against his/her other visiting privileges.

Please answer all questions below and return this Application *with evidence of your ordination* to:

_____

_____

_____

_____

All information provided is confidential.

We will conduct an NCIC Background check as required by Policy #118.01.

Only approved Outside Clergy may schedule a visit, and they must call us at least (7) days prior to an intended visit, except in cases of emergency. Visits generally last about 1 hour.

Name: _____ D.O.B. _____

Drivers License # and State: _____ / _____ SSN: _____

Other States you have lived/resided/worked in: _____, _____, _____, _____, _____, _____, _____, _____, _____

Aliases: _____, _____, _____, _____

Home Address: _____ State: _____ ZIP: _____

Home Phone: (_____) _____

E-mail: _____

Race: _____

Denomination/Church/Mosque/Temple: _____

Street Address: _____

Mail Address: _____ City: _____ State: _____

Phone Number: (_____) _____

Cr-3347 (Rev. 07-10)    ***DUPLICATE AS NEEDED***    RDA

Please give two references (Name, Address, and Phone) of individuals who can confirm your status as an ordained clergy person:

_____

_____

"Clergy / Pastoral Visit" privileges are extended to ordained clergy only. Others are encouraged to ask the inmate that they be placed on the normal visiting list of family and friends.

Are you the Pastor / Leader of your church/mosque/temple? Yes: _____ No: _____

If "No" to the above,

1) What is your religious office/ordination?_____

2) What is your religious relationship to this inmate? _____

3) Are you trained and authorized to perform all of the duties of the pastor / leader? Yes _____, with the exception / restriction of _____

Name of Inmate: _____ TDOC # _____

How long have you known this inmate? _____

Have you ever been convicted of a felony?  Yes _____ No _____

If so, please provide details: _____

I agree that I am familiar with all policies and procedures governing visitation with inmates and that I will abide by the same, as they may be amended from time to time.

Your Signature: _____ Date: _____

*Please attach evidence of your ordination*

Cr-3347 (Rev. 07-10)        ***DUPLICATE AS NEEDED***                    RDA



# TENNESSEE DEPARTMENT OF CORRECTION
## NATIONAL CRIME INFORMATION CENTER (NCIC)
## CRIMINAL HISTORY REQUEST

Date: _____

**SECTION I** - *To be completed by volunteer/employee. (PLEASE PRINT CLEARLY)*

Name: _____
          Last                              First                              Middle

DOB: _____        SSN: ___ - ___ - _____

SEX: _____        RACE: _____

DRIVER LICENSE #: _____        ISSUE DATE: _____

List *All* Other States Where Person Has Resided or Worked:

1) _____  2) _____  3) _____  4) _____  5) _____  6) _____  7) _____  8) _____

List *All* Aliases/Maiden/Legal Names Used:

1) _____

2) _____

3) _____

4) _____

5) _____

6) _____

7) _____

8) _____

*********************************************************************************

**SECTION II** - *To be completed by Volunteer Coordinator and signed by Warden or Designee*

Purpose: New Volunteer/New Employee

Site: _____        Contact Person: _____

Telephone  ( ___ ) ___ - ___ Ext. ___        Fax Number: ( ___ ) ___ - ___

Authorizing Signature: _____        Title: _Warden/Designee_

*********************************************************************************

**SECTION III** - *To be completed by Volunteer Coordinator. (Warden/Designee for employee)*

Synopsis of Information Obtained: _____
_____
_____
_____

FBI# (if known): _____        SID# (if known): _____

CR-3552 (Rev. 06-12)                    *Duplicate as Needed*                    RDA S470-2



**TENNESSEE DEPARTMENT OF CORRECTION**

**REQUEST FOR RELIGIOUS DIET PROGRAM PARTICIPATION AND AGREEMENT**

_____
INSTITUTION

I, _____ , _____ ,
INMATE NAME *(PLEASE PRINT)*                           INMATE NUMBER

would like to participate in the Religious Diet Program. I understand that in order for me to be served a religious diet, special foods may have to be procured for me, and special preparation practices must be used. Therefore, I agree to abide by the following conditions:

1. I understand that if I voluntarily request that my religious diet be cancelled, I must do so in writing *(Religious Diet Cancellation Request – CR3813)* and I must wait for a period of thirty (30) days before requesting that my diet be reinstated or requesting a new religious diet.

2. During meals I will eat and possess on my food tray only those food items served as a part of the Religious Diet Program.

3. I will not purchase, possess, or consume any food items that are not permitted under my religious diet.

4. I will not eat foods from the general facility diet that are in conflict with my religious diet.

5. I will follow all facility policies for dining in my facility.

6. I will not provide all portions of my specially-prepared meal to other inmates.

7. I will not collect religious food items (or unauthorized amounts of Commissary items) in my cell/room.

By my signature below, I acknowledge that I have read and/or discussed, with a staff person, the contents of this agreement. I further agree that if permitted to participate in the Religious Diet Program *I will abide by the conditions of participation set forth above in this agreement*.

_____          _____
INMATE SIGNATURE                                                DATE

APPROVED: ☐          DISAPPROVED: ☐          TYPE OF DIET: _____

_____
CHAPLAIN PRINTED NAME

_____          _____
CHAPLAIN SIGNATURE                                             DATE

APPROVED: ☐          DISAPPROVED: ☐

_____          _____
WARDEN SIGNATURE                                             DATE

_____          _____
REASON FOR DISAPPROVAL                               INMATE SIGNATURE

**Original:** Inmate File          **Copy:** Food Service Manager          Warden          Chaplain

CR-3814 (Rev 12-13)          *Duplicate as Needed*          RDA 1458



**TENNESSEE DEPARTMENT OF CORRECTION**
**GROUP RELIGIOUS ACCOMMODATIONS REQUEST**

**(COMPLETE pages 1 & 2; submit to Chaplain; See Policy # 118.01)**

Date Submitted to Chaplain: _____

_____    _____
             Inmate Name                                                  TDOC#

Estimated Number of Inmates in the Group: _____

1.   Official name of the group:

     _____
     _____
     _____

2.   Names and contact information of the group's leaders:

     _____
     _____
     _____
     _____
     _____

3.   The group's teachings, beliefs, and practices:

     _____
     _____
     _____
     _____
     _____
     _____
     _____
     _____
     _____
     _____
     _____
     _____

4.   Titles of the group's basic text(s):

     _____
     _____
     _____

5.   Other information helpful in researching the group:

     _____
     _____
     _____
     _____

CR-3735 (Rev. 06-10)           Duplicate as Needed                 1

6. Names of outside clergy or volunteers available to visit the institution:

_____
_____
_____
_____
_____
_____

7. **DETAILED** description of the accommodation(s) requested:
   a. First Accommodation

   _____
   _____
   _____
   _____
   _____
   _____

   b. Second Accommodation

   _____
   _____
   _____
   _____
   _____
   _____

   c. Third Accommodation

   _____
   _____
   _____
   _____
   _____
   _____

   d. Fourth Accommodation

   _____
   _____
   _____
   _____
   _____
   _____

   e. Fifth Accommodation

   _____
   _____
   _____
   _____
   _____

If more than five accommodations are requested, please add additional pages showing Sixth Accommodation, Seventh Accommodation, etc.

CR-3735 (Rev. 06-10)          Duplicate as Needed                                    2

8.  **Recommendations by the Warden and the Chaplain**

Date Sent to the Religious Activities Committee: _____

a.  First Accommodation -- Recommendation: _____ Approval _____ Disapproval

Reason: _____

_____

_____

_____

_____

_____

b.  Second Accommodation -- Recommendation: _____ Approval _____ Disapproval

Reason: _____

_____

_____

_____

_____

_____

c.  Third Accommodation -- Recommendation: _____ Approval _____ Disapproval

Reason: _____

_____

_____

_____

_____

_____

d.  Fourth Accommodation -- Recommendation: _____ Approval _____ Disapproval

Reason: _____

_____

_____

_____

_____

_____

e.  Fifth Accommodation -- Recommendation: _____ Approval _____ Disapproval

Reason: _____

_____

_____

_____

_____

_____

CR-3735 (Rev. 06-10)            Duplicate as Needed                                   3

9. **Approval or Disapproval by the Religious Activities Committee**

Date of Approval or Disapproval: _____

a. First Accommodation: _____ Disapproved _____ Approved

_____
_____
_____
_____
_____
_____
_____

b. Second Accommodation: _____ Disapproved _____ Approved – subject to conditions:

_____
_____
_____
_____
_____
_____
_____

c. Third Accommodation: _____ Disapproved _____ Approved

_____
_____
_____
_____
_____
_____
_____

d. Fourth Accommodation: _____ Disapproved _____ Approved

_____
_____
_____
_____
_____
_____
_____

e. Fifth Accommodation: _____ Disapproved _____ Approved

_____
_____
_____
_____
_____
_____
_____

CR-3735 (Rev. 06-10)　　　　　　　Duplicate as Needed　　　　　　　　　　4



# TENNESSEE DEPARTMENT OF CORRECTION
## INMATE GRIEVANCE

_____          _____          _____
NAME                                    NUMBER                        INSTITUTION & UNIT

DESCRIPTION OF PROBLEM: _____

_____

_____

REQUESTED SOLUTION: _____

_____

_____

_____                    _____
Signature of Grievant                                        Date

*TO BE COMPLETED BY GRIEVANCE CLERK*

_____          _____          _____
Grievance Number                      Date Received                   Signature Of Grievance Clerk

INMATE GRIEVANCE COMMITTEE'S RESPONSE DUE DATE: _____

AUTHORIZED EXTENSION: _____          _____
                                         New Due Date                         Signature of Grievant

### INMATE GRIEVANCE RESPONSE

Summary of Supervisor's Response/Evidence: _____

_____

_____

Chairperson's Response and Reason(s): _____

_____

_____

DATE: _____          CHAIRPERSON: _____

Do you wish to appeal this response?          _____  YES          _____  NO

If yes:    Sign, date, and return to chairman for processing within five (5) days of receipt of first-level response.

_____          _____          _____
GRIEVANT                                    DATE                           WITNESS

Distribution Upon Final Resolution:
        White - Inmate Grievant      Canary – Warden      Pink – Grievance Committee      Goldenrod – Commissioner (if applicable)

CR-1394 (Rev. 3-00)                              Page 1 of 2                              RDA 2244



**TENNESSEE DEPARTMENT OF CORRECTION**

**INMATE GRIEVANCE**      **(continuation sheet)**

DESCRIPTION OF PROBLEM: _____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____



**MEMO**

**TO**: Wardens, Superintendents, and Chaplains

FROM: Tony C. Parker

**DATE**: September 11, 2017

**SUBJECT**: Inmate Religious Property

In accordance with Tennessee Department of Correction Policy #118.01, the following is a listing of religious property that inmates may possess within the six cubic feet limit other than exceptions. In addition, inmates may continue to possess religious property in their possession on the date of this memo, even though such property is not listed below. Such property (i) must be used for religious purposes only, and any other use may result in disciplinary action, (ii) may be purchased by inmates from an approved vendor, OR purchased by volunteers, Outside Clergy or outside organizations from an approved vendor and donated through the Chaplain, (iii) may not be purchased but must be donated if indicated below, (iv) must not be a risk to the safety and security of the institution, as determined by the Warden, (v) must not contain STG or STG-related markings or insignia, (vi) unless otherwise noted, may be taken to group religious gatherings, and (vii) are subject to inspection and search at all times.

With the warden's or superintendent's approval, the chaplain may contact the volunteer/clergy/outside organization, in order to try to obtain the TDOC approved individual or group items not sold by the approved vendor. The donating organization must make prior arrangements with the Chaplain for delivery to the institution warehouse. The chaplain will notify the warehouse manager in advance of the scheduled delivery. The warehouse staff will deliver the item(s) to the Chaplain's office. The Chaplain will ensure items are stored or given to the inmate as outlined below. If approved item is to be mailed to the facility and the Chaplain will notify the mailroom/property room in advance to inform them of upcoming delivery. All religious necklaces must be worn inside the shirt.

<u>INDIVIDUAL RELIGIOUS PROPERTY LIST</u>

ALL INMATES
1. Herbal teas on commissary.
2. Necklace (one) religious jewelry includes medallion or plain necklace not to exceed 24 inches with a maximum replacement value of $30.00.
3. Prayer oil (maximum of three ounces) must be kept in the cell at all times and may not be taken to group gatherings. <u>Prayer/religious oil, can only be purchased from approved TDOC vendor (s). Oils must remain in the original bottles purchased from approved TDOC vendor(s). Outside oils from any other vendors are not allowed due to safety/security concerns. Outside oils may not be donated, sent in, or brought in by volunteers.</u>
4. Prayer shawl (one) white. Must be kept in the cell at all times and may not be taken to group gatherings.

Department of Correction · 6th Floor Rachel Jackson Building · 320 Sixth Avenue North · Nashville, TN 37243 · Tel: 615-253-8139 · Fax: 615-532-8281 · tn.gov/Correction

 **MEMO**

BUDDHISTS
1. Plastic prayer beads (one) solid color.
2. Scapular (Traditional image inside a plastic casing)
3. Polar fleece prayer rug (one) no larger than 30 x 40 inches, does not require a fire retardant label attached; the rug may be used exclusively for prayer and placed on the floor only during prayer.
4. Yoga Mat (must be donated and kept in the Recreation Office). Used for religious gatherings only.

CATHOLICS
1. Plastic rosary with crucifix (one), solid color.
2. Scapular

JEWISH, HOUSE OF YAHWEH, AND HEBREW ISRAELITES
1. Yarmulke or kippah (two), solid black, white or gray.
2. Prayer Shawl (tallit) may have TZITZIT.
3. Tefilin (Phylactery).

MUSLIMS
1. Hijab (two) solid white head covering (female Muslims).
2. Kufi (two), solid white, black or gray.
3. Miswak sticks, up to 10 sticks.
4. Plastic prayer beads (one), solid color.
5. Prayer rug (one), no larger than 27 inches x 44 inches, does not require a fire retardant label attached; the rug must be used exclusively for prayer and placed on the floor only during prayer.

NATIVE AMERICANS
1. Bone choker (one), with up to four strands.
2. Dream catcher kit (one).
3. Flat stone (one) up to 1 x 1 inch which may have a hole in the center. Must be donated.
4. Headband (two), solid white, black, or gray.
5. Medicine bag (one), no larger than 3 inches x 3 inches to be worn around the neck.
6. Polar fleece prayer rug (one) no larger than 30 x 40 inches, does not require a fire retardant label attached; the rug may be used exclusively for prayer and placed on the floor only during prayer.
7. Sacred feather (one), uncut, no more than 8 inches in length. Must be kept in the cell and removed only for group gatherings.
8. Sea shell (one) up to 1 x 1 inch. Must be donated.

RASTAFARIANS
1. Belt depicting Bob Marley (one). Must be donated.
2. Belt depicting Haile Selassie (one). Must be donated.
3. Belt depicting the Lion of Judah (one). Must be donated.
4. Black and white photo up to 8 x 10 inches of Haile Selassie (one). Must be donated. Must be kept in the cell and removed only for group gatherings.
5. Black and white button depicting Haile Selassie (one). Must be donated. Must be kept in the cell and removed only for group gatherings.

Department of Correction • 6th Floor Rachel Jackson Building • 320 Sixth Avenue North •
Nashville, TN 37243 • Tel: 615-253-8139 • Fax: 615-532-8281 • tn.gov/Correction


6. Black and white photo up to 8 x 10 inches of Bob Marley (one). Must be donated. Must be kept in the cell and removed only for group gatherings.
7. Black & White button depicting Bob Marley (one). Must be donated. Must be kept in the cell and removed only for group gatherings.
8. Black and white photo up to 8 x 10 inches of the Lion of Judah (one). Must be donated. Must be kept in the cell and removed only for group gatherings.
9. Black and white button depicting the Lion of Judah (one). Must be donated. Must be kept in the cell and removed only for group gatherings.
10. Black & White photo up to 8 ½ x11 inches of the Ethiopian flag (one). Must be donated.
11. Ankh pendant (one).
12. Tam/crown (two), solid white, black, or gray.
13. Prayer rug (one) no larger than 27" x 44", does not require a fire retardant label attached; the rug must be used exclusively for prayer and placed on the floor only during prayer.

WICCANS/PAGANS

1. Triquetra pendant (one).
2. Tarot cards, must comply with all policies, including but not limited to Policy 507.02.
3. Chakra bracelet of seven (one) with a maximum replacement value of $30.00.
4. Necklace (one) pentagram/five-point star enclosed in a circle, and not an open star, with a maximum replacement value of $30.00.
5. Earth/soil (up to one tablespoon).
6. Tap water (up to one-quarter cup).
7. Flat stone (one) up to 1 x 1 inch which may have a hole in the center.
8. Book of shadows/personal journal (one).
9. Ring (one) with a maximum replacement value of $25.00.
10. Oak Sacred feather (one), uncut, no more than 8 inches in length. Must be kept in the cell and removed only for group gatherings.

ASATRU/ODINIC

1. Literature, publications, books, magazines, and other written material related to the Asatru/Odinic religion, to include rune cards. Must be kept in the cell and be in compliance with all other property restrictions.
2. Individual runes, assuming said runes are no larger than one inch square. Runes may be composed of plastic or wood material. Must be kept in the cell and be in compliance with all other property restrictions.
3. Individual miniature Thor's hammer amulets, assuming said amulets are no larger than two inches in length, and are made of plastic or wood material. Must be kept in the cell and be in compliance with all other property restrictions.

ALL: Single battery powered plastic candle.

 Department of **Correction**

MEMO

<u>GROUP RELIGIOUS PROPERTY LIST</u>

In accordance with Tennessee Department of Correction Policy #118.01, the following is a listing of religious property that inmates may use in group religious gatherings. In addition, inmate groups may continue to use religious property used on the date of this memo, even though such property is not listed below. Articles shown in the Individual Religious Property List above may be taken to group gatherings unless noted otherwise above, but must be returned to the cell immediately following the gathering. Such property (i) must only be used in group gatherings, (ii) must be used for religious purposes only, and any other use may result in disciplinary action, (iii) must be brought in by volunteers or Outside Clergy and taken out each time, OR donated to the group by volunteers or Outside Clergy and stored in a designated area in or near the chapel, as determined by the Warden, (iv) must not be a risk to the safety and security of the institution, as determined by the Warden, (v) must not contain STG or STG-related markings or insignia, and (vi) are subject to inspection and search at all times.

ALL: CDs/DVDs.

JEWISH, HOUSE OF YAHWEH, HEBREW ISRAELITES
1. Menorah (must be donated and kept in Chaplain's office/chapel).
2. Candles (Chaplain or Volunteer must supervise the lighting of candles and control the matches at all times).

CATHOLIC
1. Statue of the Sacred Heart of Jesus, plastic stone resin up to 12 inches tall (one per group).
2. Statue of the Immaculate Heart of Mary, plastic stone resin up to 12 inches tall (one per group).

NATIVE AMERICAN
1. Abalone shell (one per group).
2. Bowl, wooden (one per group).
3. Dance whistle, wooden or metal (one per group).
4. Drums (up to three per group) with an open bottom up to eight inches in diameter
5. Flute, wooden up to 24 inches in length (one per group).
6. Rattles (up to three per group).
7. Sacred Peace Pipe (to be kept in the Chaplain's Office).

RASTAFARIAN
1. Bongo drums (up to two sets per group).

WICCANS
1. Altar cloth (one per group).
2. Altar plate, wooden (one per group).
3. Altar, wooden up to12 inches wide, 12 inches high, and 18 inches long, (one per group).
4. Battery-powered, plastic, scent-free candles, up to six inches in each in height (up to three per group).
5. Bell, metal (one per group).

Department of Correction • 6th Floor Rachel Jackson Building • 320 Sixth Avenue North • Nashville, TN 37243 • Tel: 615-253-8139 • Fax: 615-532-8281 • tn.gov/Correction


6. Cauldron, metal (one per group).
7. Chalice, metal or wooden (one per group).
8. Drums (up to three per group) with an open bottom up to eight inches in diameter.
9. Flute, wooden up to 24 inches in length (one per group).
10. Rattles (up to three per group).
11. Salt (up to one-half cup per group).
12. Statues, wooden (up to two per group), each not to exceed 12 inches in height.
13. Wand, wooden up to 16 inches in length (one per group).
14. Ouija board up to 12 x 20 inches. Must be donated to the group and kept in the gym.

ASATRU/ODINIC

1. Replica Thor's Hammer, up to 12 inches in height, and made of either plastic or hollow wooden material. Must be kept in the chapel and maintained by the Chaplain, and utilized by practitioners of the Asatru/Odinic religion during approved periods of group worship and under the supervision of the Chaplain.

2. A rune staff, similar to a length of wood, designed to hold individual runes, made of wooden or plastic material and no longer than 15 inches in length. Must be kept in the chapel and maintained by the Chaplain, and utilized by practitioners of the Asatru/Odinic religion during approved periods of group worship and under the supervision of the Chaplain.

3. An alter cloth of cotton or similar fibrous material, no larger than two feet in length and one foot in width. Must be kept in the chapel and maintained by the Chaplain, and utilized by practitioners of the Asatru/Odinic religion during approved periods of group worship and under the supervision of the Chaplain.

4. A small oak bowl made of wooden material, no larger than five inches in diameter. Must be kept in the chapel and maintained by the Chaplain, and utilized by practitioners of the Asatru/Odinic religion during approved periods of group worship and under the supervision of the Chaplain.

5. A small Mead Horn or small cup, made of either plastic or wooden material, no more than three inches in height. Must be kept in the chapel and maintained by the Chaplain, and utilized by practitioners of the Asatru/Odinic religion during approved periods of group worship and under the supervision of the Chaplain.

6. A wooden prayer ring no more than 12 inches in diameter. Must be kept in the chapel and maintained by the Chaplain, and utilized by practitioners of the Asatru/Odinic religion during approved periods of group worship and under the supervision of the Chaplain.

TP:DT

pc: Debbie Inglis, Deputy Commissioner, Administration/General Counsel
Wes Landers, Chief Financial Officer
Chuck Taylor, Deputy Commissioner/Chief of Staff
Alisha James, Assistant Commissioner, Community Supervision
Bobby Straughter, Assistant Commissioner, Prisons
Edward Welch, Assistant Commissioner, Rehabilitative Services



Kristy Carroll-Grimes, Director of Accreditation/Compliance
Ron Whitmore, Academy Superintendent
Terence Davis, Director of Training
Cile Crowder, Policy Development Manager
Central Office Directors
Historical File #118.01 and #504.01
Correctional Administrators



ADMINISTRATIVE POLICIES
AND PROCEDURES
State of Tennessee
Department of Correction

| Index #: 501.01 | Page 1 of 11 |
| --- | --- |
| Effective Date: May 1, 2018 | |
| Distribution: B | |
| Supersedes: 501.01 (8/12/14) PCN 15-14 (5/15/14) | |

Approved by: Tony Parker

Subject: INMATE GRIEVANCE PROCEDURES

I. <u>AUTHORITY</u>: TCA 4-3-603, TCA 4-3-606, and TCA 41-24-110 and Title 28 CFR 115; and Prison Rape Elimination Act of 2003 standard 115.52(b)(1), (e)(1), and (3).

II. <u>PURPOSE</u>: To establish a standard procedure for the expression and resolution of inmate complaints.

III. <u>APPLICATION</u>: To Tennessee Rehabilitation Initiative in Correction (TRICOR) employees, employees and inmates of the Tennessee Department of Correction (TDOC), and privately managed facilities, except those offenders assigned to and actively participating in a Special Alternative Incarceration Unit (SAIU) program.

IV. <u>DEFINITIONS</u>:

A. <u>Advocate</u>: An inmate who is selected by a grievant from his/her peers or from those appointed by the Warden/Superintendent to assist in the filing and/or appeal of a grievance.

B. <u>Calendar Days</u>: A time limit that begins to run at 12:01 a.m. on the day following the date of the triggering event. Example: if an inmate files a grievance and the alleged triggering event occurred on April 1st, the seven calendar day's time limit for filing grievances set by Section VI.(C)(1) below would begin to run at 12:01 a.m. April 2nd, and end at 11:59 p.m. on April 8th.

C. <u>Central Office Review</u>: Review of Title VI allegations by the Central Office Title VI Coordinator.

D. <u>Central Office Title VI Coordinator</u>: The TDOC employee appointed to adjudicate Title VI allegations and monitor compliance for the Department.

E. <u>Contract Monitor of Compliance (CMC)</u>: TDOC employee(s) authorized by the Commissioner to monitor contract compliance at privately managed facilities.

F. <u>Contract Monitor of Operations (CMO)</u>: TDOC employee(s) authorized by the Commissioner to serve as the approving authority for specific actions occurring at privately managed facilities. In the absence of the CMO, the contract monitor of compliance (CMC) assigned to that facility will serve that function. In the absence of both the CMO and CMC at privately managed facilities, the necessary notification/request for authorization will be made by telephone to the CA. If the CMO is not reachable via phone, the CMC will be contacted. If both the CMO and CMC are unavailable by telephone, the CA shall be contacted for required authorizations or notifications.

G. <u>Emergency Grievance</u>: The resolution of a grievance that if subjected to the normal time limits could cause the grievant substantial risk of personal injury or irreparable harm.

H. <u>Grievance</u>: A written complaint concerning the substance or application of a written or unwritten policy or practice, any single behavior or action toward an inmate by staff or other inmates, or any condition or incident within the Department or institution which personal affects the inmate complainant.

I. **Grievance Chairperson:** The individual assigned by the Warden/Superintendent to supervise the inmate grievance process within the TDOC and privately managed facilities.

J. **Grievance Committee:** A committee composed of a staff chairperson appointed by the Warden/Superintendent and members consisting of elected staff and inmates. This committee provides a forum in which an inmate may resolve a grievance at Level II of the inmate grievance process.

K. **Prison Rape Elimination Act (PREA):** A federal law establishing a standard of zero tolerance for incidents related to sexual assault and rape on inmates and/or offenders.

L. **Reprisal:** Any action or threat of action against anyone for the good faith use of or good faith participation in the grievance procedure.

M. **Title VI Site Coordinator:** The Associate Warden of Treatment (AWT) and Deputy Superintendent (DS) at TDOC facilities and the Assistant Warden of Programs at privately managed facilities.

V. **POLICY:** The TDOC shall ensure that every inmate has the right to utilize the grievance procedure without fear of reprisal. All grievances shall be considered in a fair and impartial manner and resolved at the lowest possible level in the grievance procedure.

VI. **PROCEDURES:**

A. A handbook entitled *TDOC Inmate Grievance Procedures* shall provide detailed instructions for the filing and processing of inmate grievances and appeals, and for the election, appointment, and removal of grievance committee members. Copies of the handbook and any current departmental and institutional policies concerning inmate grievances will be available to inmates in the institutional legal library. Access to copies of the handbook shall be provided to all grievance committee members and alternates. All living units for housing segregated inmates shall also be provided with a copy of the handbook and policies regarding inmate grievances.

B. **Access to the grievance procedure:** Inmate Grievance, CR-1394, and locked grievance depositories shall be made available for use by all inmates. Inmates shall have unimpeded access to these grievance forms. For general population inmates, the grievance forms shall be openly available for pickup without the need for a request to staff. If required to ask staff for the form (i.e., an inmate in segregation), an inmate shall be given the form without question or discussion. All inmates will be informed of grievance procedures during orientation.

C. **Grievance Review Process:** Except as otherwise provided in VI.(K) and (L), inmate grievances shall follow the following process:

1. **First Level:** Grievances must be filed utilizing CR-1394 within seven calendar days of the occurrence or the most recent occurrences giving rise to the grievance. The chairperson shall review all grievances received and logged them as received and enter them on Grievance screen (LIBG).

All copies of the form must be legible and intact. Grievance forms which are improperly completed or contain insufficient information for processing shall be returned to the inmate with instructions as to proper completion. It should not be logged as received (which starts the deadline times running) until the corrected version is submitted.

If more than one inmate files a grievance on the same incident, the hearing and responses may be consolidated. This shall be noted on the grievance response forms and on Grievance (LIBG) on the Description Detail Screen.

The chairperson's response shall be written on CR-1394 following the chairperson's receipt and review of the supervisor's response. The supervisor shall return his/her signed response to the chairperson within five working days of receipt. There will be a seven working-day time limit at Level I beginning on the day the grievance begins to be processed. If a grievant accepts the supervisor's response, the supervisor shall document on Response of Supervisor of Grieved Employee or Department, CR-3148. The grievance chairperson shall enter the approval on Grievance (LIBG).

2. <u>Second Level</u>: Within five calendar days of being notified of the Level I response, the grievant may appeal the response to the grievance committee and Warden/Superintendent. A hearing shall be held within five working days of an appeal's filing. Within five working days of the hearing, the committee's proposed response shall be documented on the Inmate Grievance Response, CR-1393, and forwarded to the Warden. Within seven working days of receipt, the Warden/Superintendent shall forward his/her decision to the chairperson. Within five working days of receiving the Warden's response, the chairperson will allow the grievant to review the grievance materials and responses. If grievant accepts the Level II response, the grievance chairperson shall enter the approval on Grievance (LIBG). The failure of staff to comply with a directive by the Warden/Superintendent as a result of the Warden/Superintendent's review of the grievance may result in disciplinary action. If the Warden agrees to the grievant's requested solution, the grievant shall not have the right to appeal to Level III.

Grievances concerning TRICOR, over which the Warden/Superintendent has no line authority, shall be forwarded from the committee to the Warden/Superintendent for any comments. The grievance then proceeds to Level III of the process. The Assistant Commissioner of Prisons/designee shall review and, if necessary, may forward the grievance for review/response to TRICOR's Chief Executive Officer.

3. <u>Third Level</u>: A grievant may appeal the Level II response within five calendar days of receipt of that response. The chairperson shall forward one legible copy of the grievance and all documentation to the Assistant Commissioner of Prisons/designee. The Level III response shall be sent to the grievance chairperson for distribution within 25 working days of the date the appeal was received. The chairperson shall enter the final decision on Grievance (LIBG). This response is final and is not subject to appeal. Failure of staff at TDOC managed facilities to comply with a directive by the Deputy Commissioner of Operations or the Assistant Commissioner of Rehabilitative Services as a result of the Level III review may result in disciplinary action. (At privately managed facilities, the Assistant Commissioner of Prisons will make a determination as to the appropriate action to be initiated.) The CMO at privately managed institutions shall receive a copy of all directives issued by the Assistant Commissioner of Prisons or the Assistant Commissioner of Rehabilitative Services.

D. If a time limit expires at any stage of the process without the required response, the grievant may move the grievance to the next stage of the process, unless the inmate agrees in writing to a fixed extension of the time limit for response.

E. Committee election and hearing procedures shall be developed at each institution and shall be forwarded to the Assistant Commissioner of Prisons for review.

F. Any subsequent revisions to said procedures shall also be forwarded to the Assistant Commissioner of Prisons for approval. The Warden/Superintendent/designee shall enter elected committee members' names on Board/Committee Members (LIBM).

G. The good faith use of, or good faith participation in, the grievance process will not result in formal or informal reprisals against an inmate. An inmate shall be entitled to pursue, through the grievance procedure, a complaint that a reprisal occurred as the result of the filing of a prior grievance.

H. Matters Inappropriate to the Grievance Procedure: If the chairperson determines a matter to be non-grievable, the grievant may appeal that decision as outlined in the handbook *TDOC Inmate Grievance Procedures*. Inappropriate grievance notification, CR-3689, shall be used to inform the inmate of an inappropriate grievance. The grievance process is inappropriate for:

1. Appealing or seeking review of procedures or punishment imposed under established disciplinary procedures of the TDOC. These issues may be appealed pursuant to Policy #502.01. When this determination is made, the chairperson shall cite the incident number associated with the disciplinary report.

2. Appealing decisions or actions of the Board of Parole or any other agency, other than TRICOR, outside the TDOC.

3. Addressing classification matters such as institutional placement and custody level, which may be appealed through other avenues outlined in the #400 policy series, except where policy violations are alleged. Cell assignments not due to a classification or reclassification are grievable.

4. Appealing or seeking review of any decision regarding the awarding of sentence credits. Sentence credit procedures shall be as provided in Policy #505.01.

5. Seeking monetary compensation for injuries or property loss. Monetary claims against the TDOC or its employees based upon negligent care of persons or personal property should be filed with the Tennessee Claims Commission pursuant to TCA 9-8-101 et seq. Monetary claims by inmates against employees of privately managed facilities shall be filed with the managing company in accordance with TDOC approved contract vendor policy.

6. Addressing questions regarding sentence structures. Such problems should be addressed to the counselor, institutional records office and Sentence Information Services (SIS) through established inmate inquiry procedures.

7. Any visitor's behavior resulting in disciplinary action is not grievable by an inmate.

8. Diagnoses by medical professionals, medical co-payments where Policy #113.15 has been adhered to, and requirements of substance use therapeutic programs.

Case 3:22-cv-00093   Document 33-17   Filed 05/04/22   Page 120 of 198 PageID #: 203   CCI-000720

9. Mail rejection, which may be appealed as described in Policy #507.02.

I. Abuse of the Grievance Procedure

1. Inmates shall not be permitted to submit more than one grievance arising out of the same or similar incident.

2. Inmates shall not be permitted to have more than one grievance pending at the first level of review.

3. Profanity, insults, and racial slurs, unless an alleged direct quote of another party, shall not be permitted in grievances. Threats may result in disciplinary action.

J. Emergency Grievances

1. Grievances deemed to be emergencies shall be expedited. The grievance chairperson or designee shall immediately bring emergency grievances to the attention of the appropriate person by whom corrective action may be taken. The action taken on any emergency grievance may be appealed through expedited emergency grievance procedures, as outlined in the handbook.

2. The determination that a grievance is not an emergency may be appealed through normal grievance procedures.

K. Additional Procedures Applicable to Title VI Grievances:

1. All Title VI complaints must be filed within 180 days of the occurrence of an alleged discriminatory act (See Policy #103.10).

2. The grievance person shall review all grievances received and enter those listed as Title VI on Grievance screen (LIBG) with a flag indicating Title VI if the grievant alleges discrimination on the basis of race, color, or national origin. The chairperson shall then forward the grievance to the Title VI Site Coordinator for review and investigation; all findings from an investigation related to a Title VI grievance shall be documented on the Title VI Complaint Investigation, CR-3886. The investigation should begin within 24 hours and completed with five working days.

3. Upon completion of the investigation, the Title VI Site Coordinator shall notify the Grievance Chairperson of the results of his/her findings within 24 hours.

4. The Grievance Chairperson shall then forward the complaint to the Central Office Title VI Coordinator, electronically, within ten working days of their decision.

5. The Central Office Title VI Coordinator shall enter all Title VI complaints into a database and assign each complaint a tracking number. Only one Title VI allegation received from a complainant will be processed at a time.

6. The Central Office title VI Coordinator shall review and make a determination based on the findings of the investigation conducted by the Title VI Site Coordinator and shall notify the Title VI Site Coordinator of a response and/or decision within 25 working days.

7. If the Central Office Title VI Coordinator determines that the allegation is not a Title VI violation, the Title VI Site Coordinator shall be notified to make the appropriate notations on OMS screen LIBG. This shall be done within one working day of receipt of such notification by the Grievance Chairperson.

8. If the Central Office Title VI Coordinator determines that the allegation is a Title VI violation, the Title VI Site Coordinator shall be notified to seek a remedy to redress the violation immediately. Once a remedy is identified, the Title VI Site Coordinator shall notify the Central Office Title VI Coordinator who shall concur or not concur. The remedy and/or plan of action shall be entered on OMS screen LIBG.

9. Appeals may be appealed to the Assistant Commissioner of Prisons. All appeals must be submitted within five working days upon notification; the inmate shall specify the reason for the appeal. The grievance number must be included on all documentation submitted to Central Office for review of an appeal.

10. The decision of the Assistant Commissioner of Prisons shall be final.

L. Additional Procedures Applicable to PREA Grievances:

1. An inmate may submit a grievance alleging sexual abuse at any time. Applicable time limits shall apply to any portion of a grievance that does not allege an incident of sexual abuse. Inmates shall not be required to use any informal grievance process, or to otherwise attempt to resolve with staff, an alleged incident of sexual abuse.

2. An inmate who alleges sexual abuse may submit a grievance without submitting it to a staff member who is the subject of the compliant and such grievance shall not be referred to a staff member who is the subject of the complaint.

3. A final decision on the merits of any portion of a grievance alleging sexual abuse shall be issued by the Associate Warden of Treatment (AWT) and Deputy Superintendent (DS) within 90 days of the initial filing of the grievance. Computation of the 90-day time period shall not include time used by inmates in preparing the grievance. TDOC may claim an extension of time to respond, up to 70 days, if the normal time period for response is insufficient to make an appropriate decision. The inmate shall be notified in writing by the AWT/DS of any such extension and be provided a date by which a decision will be made. At any level of the grievance, including final level, if the inmate does not receive a response within the time allotted to reply, including any properly noticed extension, the inmate may consider the absence of a response to be a denial at that level. (See subsection (5) below regarding emergency PREA grievances).

4. Third parties (including fellow inmates, staff members, family members, attorneys, and outside advocates) shall be permitted to assist inmates in filing grievances related to allegations of sexual abuse, and shall also be permitted to file such grievances on behalf of inmates. If a third party files such a grievance on behalf of an inmate, that inmate shall agree to have the grievance filed on their behalf and document such on the Inmate Grievance, CR-1394. The inmate shall be required to personally pursue any subsequent steps in the grievance process. If the inmate declines to have the grievance processed on his/her behalf, the inmate's decision shall be documented on the original Inmate Grievance, CR-1394, and signed by the inmate.

5. After receiving an emergency grievance alleging that an inmate is subject to a substantial risk of imminent sexual abuse, the grievance chairperson shall immediately forward the grievance (or any portion thereof that alleges the substantial risk of imminent sexual abuse) to the AWT/DS so that any required immediate corrective action may be taken. The grievance chairperson shall provide an initial response within 48 hours and shall issue a final decision with five calendar days. The initial response and final decision provided within the PREA Allegation System (PAS) shall document the facility's determination as to whether the inmate is in substantial risk of imminent sexual abuse and the action taken in response to the emergency grievance. Timeframes in (3) above still apply after any immediate corrective action has been implemented.

6. An inmate may be disciplined for filing a grievance related to alleged sexual abuse only when it is demonstrated that the inmate filed the grievance in bad faith."

M. Records

1. Records concerning inmate grievances shall be kept confidential. Only the chairperson shall process grievances after they have been answered by the Warden/Superintendent. Grievance (LIBG) should be available only to employees who have a need for access because of their assigned duties.

2. Records shall be kept regarding inmate grievances as detailed in the handbook, *TDOC Inmate Grievance Procedures*.

3. Upon resolution, grievances shall be distributed as indicated on Inmate Grievance Response, CR-1393, and entered on Grievance (LIBG). An extra copy of health-related grievances shall be supplied to the institutional health administrator by the chairperson.

N. Each institution will submit an annual evaluation of the grievance procedures as outlined in the handbook, *TDOC Inmate Grievance Procedures*. Staff preparing these reports may review actual grievances.

O. Documentary Evidence: Any TDOC policy referred to in any description of problem or response shall be cited by number, paragraph and section. Copies of any institutional policies, post orders, or documents referred to, will accompany all grievances to the third level. The grievant shall be furnished with a copy of all documentation unless deemed inappropriate by the chairperson for security reasons.

VII. ACA STANDARDS: 4-4016, 4-4180, 4-4284, 4-4344, 4-ACRS-6A-10, 4-ACRS-6A-11, 4-ACRS-6A-12, 4-ACRS-6A-13, 4-ACRS-6B-01,4-ACRS-6B-02, 4-ACRS-6B-03, 4-APPFS-2G-01, and 4-APPFS-2G-02.

VIII. EXPIRATION DATE: May 1, 2021.



# TENNESSEE DEPARTMENT OF CORRECTION

## <u>INMATE GRIEVANCE</u>

_____     _____     _____
         NAME                        NUMBER              INSTITUTION & UNIT

DESCRIPTION OF PROBLEM: _____

_____

_____

REQUESTED SOLUTION: _____

_____

_____

_____     _____
        Signature of Grievant                       Date

_____

*TO BE COMPLETED BY GRIEVANCE CLERK*

_____     _____     _____
Grievance Number         Date Received        Signature Of Grievance Clerk

INMATE GRIEVANCE COMMITTEE'S RESPONSE DUE DATE: _____

AUTHORIZED EXTENSION: _____     _____
                              New Due Date                  Signature of Grievant

_____

### INMATE GRIEVANCE RESPONSE

Summary of Supervisor's Response/Evidence: _____

_____

_____

Chairperson's Response and Reason(s): _____

_____

_____

DATE: _____     CHAIRPERSON: _____

Do you wish to appeal this response?        _____ YES        _____ NO

If yes:   Sign, date, and return to chairman for processing within five (5) days of receipt of first-level response.

_____     _____     _____
       GRIEVANT                     DATE                    WITNESS

Distribution Upon Final Resolution:
        White - Inmate Grievant   Canary – Warden   Pink – Grievance Committee   Goldenrod – Commissioner (if applicable)

Case 3:22-cv-00093   Document 33-17   Filed 05/04/22   Page 124 of 198 PageID #: 1247   CCJ 000724



**TENNESSEE DEPARTMENT OF CORRECTION**

<u>**INMATE GRIEVANCE**</u>          <u>**(continuation sheet)**</u>

DESCRIPTION OF PROBLEM: _____

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

Distribution Upon Final Resolution:
White - Inmate Grievant     Canary – Warden     Pink – Grievance Committee     Goldenrod – Commissioner (if applicable)
CR-1394 (Rev. 3-00)                                    Page 2 of 2                                    RDA 2244

Case 3:22-cv-00093   Document 33-17   Filed 05/04/22   Page 125 of 198 PageID #: 723   CCI 000726



# TENNESSEE DEPARTMENT OF CORRECTION

## RESPONSE OF SUPERVISOR OF GRIEVED EMPLOYEE OR DEPARTMENT

DATE: _____

Please respond to the attached grievance, indicating any action taken.

Date Due: _____

_____  
Grievance Number

_____  
Inmate Name

_____  
Inmate Number

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

_____  
SIGNATURE

_____  
DATE

White - Inmate Grievant    Canary – Warden    Pink – Grievance Committee    Goldenrod – Commissioner

CR-3148 (Rev. 3-00)

RDA 2244

CCI 000726



# TENNESSEE DEPARTMENT OF CORRECTION

## INMATE GRIEVANCE RESPONSE

| NAME | NUMBER | INSTITUTION & UNIT | GRIEVANCE NUMBER |
|---|---|---|---|

Summary of Evidence and Testimony Presented to Committee _____

_____

_____

Inmate Grievance Committee's Response and Reasons _____

_____

_____

| DATE | CHAIRMAN | MEMBER |
|---|---|---|

| MEMBER | MEMBER | MEMBER |
|---|---|---|

Warden's Response:     Agrees with Proposed Response     ☐

Disagrees with Proposed Response     ☐

If Disagrees, Reason(s) for Disagreement _____

_____

_____

Action Taken: _____

DATE: _____     WARDEN'S SIGNATURE: _____

Do you wish to appeal this response?     _____ YES     _____ NO

If yes:     Sign, date, and return to chairman for processing.  Grievant may attach supplemental clarification of issues or rebuttal/reaction to previous responses if so desired.

| GRIEVANT | DATE | WITNESS |
|---|---|---|

Commissioner's Response and Reason(s): _____

_____

_____

| DATE | SIGNATURE |
|---|---|

Distribution Upon Final Resolution:

     White - Inmate Grievant     Canary – Warden     Pink – Grievance Committee     Goldenrod - Commissioner

CR-1393 (Rev. 3-00)

RDA 2244

CGL 000727



**TENNESSEE DEPARTMENT OF CORRECTION**

**Title VI Complaint Investigation Form**

Date Complaint Received: _____

Complainant's Name (and TDOC number, if applicable), Facility and/or Address:

_____

_____

_____

_____

Facility/Site Involved in Complaint: _____

Nature of Complaint: _____

_____

_____

_____

_____

_____

Date of Interview with Complainant: _____

Interview via:  ☐ Telephone   ☐ In-Person   ☐ Other (specify) _____

Summary of Interview with Complainant: _____

_____

_____

_____

_____

_____

_____

Other Interviews Conducted:

Date: _____

Case 3:22-cv-00093   Document 33-17   Filed 05/04/22   Page 128 of 198 PageID #: 1281   CCI-000728



**TENNESSEE DEPARTMENT OF CORRECTION**

**Title VI Complaint Investigation Form**

Interviewee's Address and Telephone Number: _____

_____

_____

_____

_____

Interviewer's Name and Position: _____

Interview via:  ☐ Telephone  ☐ In-Person  ☐ Other (specify) _____

Summary of Interview:

_____

_____

_____

_____

_____

_____

_____

_____

Resolution/Action Taken (include dates, names, etc.): _____

_____

_____

_____

_____

_____

_____

Please attach copies of the complaint, statements of involved parties and witnesses, and response to complainant, etc.

*Note: If the offender is no longer at the institution that the Title VI complaint originated, please contact the Title VI Site Coordinator to schedule an interview by phone at his/her current location. If the offender is no longer on community supervision, please contact the Title VI Site Coordinator to schedule an interview by phone. Indicate the Title VI Site Coordinator's name on the document.*

### *Attach Additional Sheets if Necessary*

Case 3:22-cv-00093   Document 33-17   Filed 05/04/22   Page 129 of 198 PageID #: 2292

CDOC 000729



TENNESSEE DEPARTMENT OF CORRECTION

**INAPPROPRIATE GRIEVANCE NOTIFICATION**

TO: _____    _____    _____
                    INMATE NAME (Printed)                          TDOC NUMBER                         HOUSING UNIT

FROM: _____ ,    Grievance Chairperson    _____
                                                                                                            Inmate TDOC Grievance Number

DATE: _____

SUBJECT: _____

**THIS GRIEVANCE IS INAPPROPRIATE TO THE GRIEVANCE PROCEDURE**.  Your Grievance is being returned to you due to the following reason(s):

1. Disciplinary matters are inappropriate to the Grievance Procedure.  [Policy #501.01 VI.(H)(1)]

2. Appealing decisions or actions of any agency outside the Tennessee Department of Correction (TDOC) is inappropriate to Grievance Procedure. [Policy #501.01 VI.(H)(2)]

3. Classification matters/institutional placement are inappropriate to Grievance Procedure. [Policy #501.01 VI.(H)(3)]

4. Appealing or seeking review of sentence credits. [Policy #501.01 VI.(H)(4)]

5. Grievance Procedure cannot award monetary compensation for injuries or property loss. [Policy #501.01 VI.(H)(5)]

6. Addressing questions regarding sentence structures. [Policy #501.01 VI.(H)(6)]

7. Visitor's behavior which results in disciplinary action. [Policy #501.01 VI.(H)(7)]

8. A diagnosis by medical professionals and medical co-pay is inappropriate. [Policy #501.01 VI.(H)(8)]

9. Security Threat Group (STG) Placement. [Policy #501.01 VI.(H)(9)]

10. Mail rejection. [Policy #501.01 VI.(H)(10)]

11. You have already filed a grievance on this issue.  Inmates shall not be permitted to submit more than one grievance arising out of the same or similar incident. [Policy #501.01 VI.(I)(1)]

12. Abuse of Grievance Procedure. You can only have one grievance pending at Level 1 for review. [Policy #501.01 VI.(I)(2)]

13. Profanity, insults, and racial slurs, unless an alleged direct quote of another party, shall not be permitted.  Threats may result in disciplinary action. [Policy #501.01 VI.(I)(3)]

14. Grievances must be filed within seven calendar days of the occurrence giving rise to the grievance.  A complaint shall not address multiple issues. [Policy #501.01 VI.(C)(1)]

**THIS GRIEVANCE IS UNABLE TO BE PROCESSED DUE TO YOU NOT FOLLOWING POLICY**.  Grievance forms not properly completed or contain insufficient information for processing shall be returned to the Inmate with instructions as to proper completion. [Policy #501.01 VI.(C)(1)]  Your grievance is being returned to you due to the following reason(s):

1. No specific details, i.e. dates, times, names of persons involved as mandated in *Inmate Grievance Handbook*, Page 7, First Level of Review.

2. You did not: a)  Sign and date, and/or b)  state your "Requested Solution"

3. Grievance shall be submitted on Form CR-1394 pages 1 and 2.  All copies must be legible and in tact. [Policy #501.01 VI.(C)(1)]

4. _____

    _____

    _____

*Reminder:*    *You have **SEVEN CALENDAR DAYS <u>FROM THE DATE THE INCIDENT OCCURRED</u>** to submit a grievance.  If you are still interested in filing this grievance, please make the necessary corrections and return to the Grievance Office for further processing immediately.  If you would like to appeal this response, sign the bottom of your grievance, check "yes" then date it and place (with this coversheet) back in the grievance box.*

_____
Grievance Chairperson



STATE OF TENNESSEE
**DEPARTMENT OF CORRECTION**
5TH FLOOR RACHEL JACKSON BUILDING
320 SIXTH AVENUE NORTH
NASHVILLE, TENNESSEE 37243-0465
OFFICE (615) 253-8171 FAX (615) 253-1668

**MEMORANDUM**

**TO:**        Wardens/Superintendents (except Tennessee Correctional Academy)

**FROM:**    Lee Dotson, Assistant Commissioner of Prisons

**DATE:**     November 1, 2019

**SUBJECT:**  Inmate Personal Property

In accordance with Tennessee Department of Correction Policy #504.01, the following is a complete listing of personal property that inmates may possess within the six cubic feet limit other than exceptions. Restrictions or modifications to this list may be effected by institutional Wardens/Superintendent as outlined in Policy #504.01. Articles of State-issued property must comply with the provisions outlined in Policy #504.05. Articles of clothing for inmates diagnosed with Gender Dysphoria can be found in Policy #113.37.

<u>INMATE PERSONAL PROPERTY LIST</u>

<u>Clothing and Accessories</u> (Limitations are provided for the number of each item an inmate may possess at any given time. Clothing, jewelry, and linens shall not have pictures, designs, symbols, or messages affiliated with security threat or ethnic groups).

1.  Socks (12 pairs) (white or gray only or any combination of white and gray), colored socks to be retained until worn out
2.  Shoes - 3 pairs, not including state-issued, athletic-1 pair solid white, black, or gray; colored brand logos and stitching may be allowed, [(x) shower-1 pair], other-1 pair (includes house shoes, dress shoes, or boots (black or brown only; 12" total height, heel no more than 2", no steel toes except state issued, no buckles (those currently in inmate's possession may be retained) maximum value of $25 each) Inmates assigned to a segregation unit or SMU will be issued one (1) pair of "croc-style" rubberized shoes in lieu of boots.
3.  T-shirts (12), solid white or gray only (no tank tops or muscle shirts)
4.  Undershorts (12) (white or gray only), (bras and panties (12), female only), Thermal Underwear (2 sets, 2 tops and 2 bottoms).
5.  Pajamas (2 pairs) - must not be transparent and must have the appearance of sleepwear
6.  Bathrobe (1) - must not be transparent
7. #  Gloves - work (1 pair); no leather allowed. Inmates admitted prior to January 15, 2002, may retain their leather gloves until they are worn out or discarded. They may not be replaced.
8. =  Belt (2), limited to 3" in width, buckle not to exceed 3", except for weight belt as approved by the Warden/Superintendent
9.  Handkerchiefs, white only (8)
10.  Shoestrings (1 extra pair) (white or black only)
11.  Billfold (1) (no chains may be attached to the billfold)

12. =    Recreational clothing (2 sets) -- white or gray only, sweatshirt, sweatpants or shorts (no hoods or turtlenecks) (shorts must be a minimum of 4" length from crotch, Spandex or similar materials not allowed)

13.      Cap/toboggan (no more than 2 and no ski masks,) solid white or gray only. Orange allowed for outside work crews only (Warden's/Superintendent's discretion for max custody)

14.      State-issued clothing -- jacket (1), pants (4), shirts (4)

15.      Vinyl Poncho Rain Gear (1) (transparent vinyl only)

### Jewelry

16.      Watch and band (1), maximum replacement value is $10. Rings (2), maximum replacement value is no more than $25 each

17.      Necklace (1) religious jewelry, includes medallion or plain necklace not to exceed 24", maximum replacement value is $30

18.      Earrings (females only), 2 pairs, stud type (no dangling), maximum replacement value no more than $15 per pair

### Linen

19.      Sheets and pillowcases, 2 sets, white only

20.      Towels and washcloths, 4 each, white only

21.      Blankets, 2 (state issue only)

### Grooming and Toilet Articles

22. x    Toothbrush (non-electric) (2) and toothbrush holder (2) (plastic only)

23. x    Combs, brushes, hair picks (2) (includes Afro combs, plastic, and wood), no sharp pointed ends or metal

24.      Disposable safety razors (maximum limit 10 - If allowed by Policy #506.16)

25. x    Plastic cup w/lid - non-insulated (1)

26. x    Soap dish (1) (plastic only)

27.      Shower caps (limit 3)

28.      Hair rollers/clips -- [female only] (20)

29.      Ponytail bands/holders, black/brown

30.      Tweezers, round or square (1)

### Reading and Writing Materials

31. # =   Typewriter (1), portable, battery, electric, or manual, standard size, may possess word processing capability, may not include capability for removable storage media (floppy disk, USB flash drive, or tape), no modems, attachments, or removable parts such as monitors or displays; maximum replacement value is $25

32.      Writing paper, stamps (maximum of 40), and envelopes

33.      Reading material (includes books and magazines in compliance with Policies #112.05 and #507.02)

34.      Pencils and ballpoint ink pens (purchased from commissary only) Quantity limited at Warden/Superintendent discretion

35.      Legal materials in the amount specified in Policy #504.01

### Appliances

36. c Battery-operated or electric razor/beard trimmer (1) (at the Warden's/Superintendent's discretion). If trimmers are disallowed, inmates shall be afforded the appropriate trimming services provided through the institutional barber and/or cosmetology programs on a routine basis.
37. c TV (1) up to 15", (15" applies to flat screen TV only) must have earphone and jack for earphone (wireless headphones prohibited), no built-in VCR, cable box for TV (at institutions where applicable), maximum replacement value is $50. TV antennas only at facilities with approved policy exemptions (one converter box if needed).
38. Remote control (1)
39. TV splitter (1)
40. Cable adapter (1)
41. Coax cable (1) (maximum length – 9 feet)
42. *+= Radio (1) - AM and FM only, not to exceed 18" x 24" in size, must have jack for earphone, non-detachable speakers, maximum replacement value $25
43. *+= Tape player/recorder (1) - not to exceed 18" x 24" in size, must have jack for earphone, internal microphone only, maximum replacement value is $25
44. *+= Compact disc player (1) - not to exceed 18" x 24" in size, must have jack for earphone, non-detachable speakers, remote control allowed, maximum replacement value is $25
45. += Compact disc player, AM/FM radio, cassette combination (1) - not to exceed 18" x 24" in size, must have jack for earphone, internal microphones only, non-detachable speakers, remote control allowed, maximum replacement value is $25
46. =c Radio (1) - "Walkman" type only (with headphone or one-piece unit), no cassette, may not be taken to work site except by certain TRICOR programs approved by the Warden/Superintendent (Maximum custody excluded unless approved by the Warden).
47. +– Tape/compact disc case (1) and a maximum combined number of 20 compact disc/audio cassettes including those used for voice mail (only clear plastic covers which can be seen through)
48. c Headphones - to be used for items 37, 42, 43, 44, 45, and 46
49. c Fan (1) 15" maximum, plastic housing and blades, and non-removable grill
50. = Electric curling iron or rollers (female only)
51. =c Hand-held electric hair dryer (1,500 watts or lower)
52. Vendor Approved Tablets and Charger (1) where approved

### Miscellaneous

53. Table game(s) non-electronic (2), no dice
54. Photo album (1), no metal parts (maximum size 9 x 12)
55. Photographs - no Polaroid-type pictures may be mailed to inmates
56. Musical instrument (1) replacement value $25.00, (may be approved by the Warden/Superintendent during assignment to that specific facility only), the item cannot have the capability for removable storage media (floppy disk, tapes, scandisk etc.) no modems, attachments, or removable parts such as monitors or displays: Instruments with metallic strings may only be approved for inmates classified medium custody or below. Instruments with non-metallic strings may be approved by the Warden/Superintendent for inmates classified to any custody.
57. = Batteries (rechargeable batteries are not permitted);
58. = Sewing needle, 2" or less, and thread (as sold in commissary only)
59. x Nail clippers (1) no file, 3" maximum length
60. = Sunglasses, mirror lens not allowed, may be worn outdoors only unless medically required
61. Floor rug (1) no larger than 3' x 5', fire-retardant label with non-skid back
62. =c Surge suppressor (1) (limit 6 outlets)
63. Mesh bags (2)
64. x Bowl, cereal and lid (plastic) (1)
65. Ice chest (maximum size – 2 gallon) (No Styrofoam at TDOC facilities) (limit 1 per inmate)

66.    Shoe polish, paste (1 of each neutral, white, or black) (non-toxic and non-flammable)
67.    Clear reading lamp and/or light bulb (1)
68.    Clear container (1) per inmate from the approved catalog (Tupperware style)
69.    Address book (1)
70.    Clear calculator, small handheld
71.    Items sold by the commissary may not be received through the mail
72.    Approved personal item (1) generated from within the institution as a result of vocational, recreational, or arts and crafts programs, as well as items permitted as a result of an incentive, honor, grade level, work, educational or religious program, may be permitted by the Warden, provided none constitutes a safety or security hazard and provided the six cubic feet limit is not exceeded. Any item in that section may be authorized only with the understanding that when the inmate is transferred to another institution, these items must be disposed of in accordance with Policy #504.02, if not allowed at the receiving institution.
73.    Clear collapsible storage container for under bunk storage (size sold in catalog)
74.    Sweatbands (2), white only (at Warden's/Superintendent's discretion)
75.    Du-rags (2) black only (not to be worn outside the housing unit)

\*    Inmates may possess two of the three, and if those selections are made, #46 is not allowed.
\+    Inmates admitted to TDOC prior to August 1, 1998, may possess these items only until they are released, or the items become inoperable.
=    These items shall be taken when an inmate is placed on administrative segregation and then removed from the institution, except batteries for TV remote control.
\#    Inmates admitted to TDOC prior to January 15, 2002, may possess these items only until they are released or until the item becomes inoperative.
c    Items purchased after January 15, 2002, must have transparent plastic cover/housing.
x    Items that can be sold by the commissary and purchased through the approved catalog.

LRD:LG

pc:    Tony Parker, Commissioner
      Chuck Taylor, Deputy Commissioner/Chief of Staff
      Debbie Inglis, Deputy Commissioner/General Counsel
      Lee Dotson, Assistant Commissioner of Prisons
      Bobby Straughter, Assistant Commissioner of Operational Support
      Edward Welch, Assistant Commissioner of Rehabilitative Services
      Lisa Helton, Acting Assistant Commissioner of Community Supervision
      Central Office Directors
      Ronald Whitmore, Superintendent TCA
      Cile Crowder, Policy Development Manager
      Historical File #504.01


Approved by: Tony Parker

Subject: INMATE PERSONAL PROPERTY

---

I.  **AUTHORITY**: TCA 4-3-603 and TCA 4-3-606.

II.  **PURPOSE**: To standardize the acquisition and control of personal property of inmates and establish uniform procedures for the removal/and disposition of certain property.

III.  **APPLICATION**: To institutional employees and inmates, excluding any offender assigned to and actively participating in a Specialized Alternative Incarceration Unit (SAIU) program, and to employees and inmates of privately managed facilities.

IV.  **DEFINITIONS**: <u>Personal Property</u>: Items authorized by the Tennessee Department of Correction (TDOC) for possession by inmates, including personally owned property and certain state-issued articles.

V.  **POLICY**: The TDOC shall maintain a comprehensive standardized list of personal property items that inmates are permitted to have in their possession.

VI.  **PROCEDURES**:

A.  Policy #504.02 shall govern the recording and accounting of all inmate personal property.

B.  Items in the personal possession of an inmate shall not occupy more than six cubic feet collectively in his/her individual room, cell, or dormitory housing unit and shall conform to fire-safety regulations. This size box shall be standard use for cell or room searches, routine property checks, and transportation requirements. Property that will not fit inside the box shall be considered excess and removed to the property room until the disposition of the excess items can be accomplished in accordance with Policy #504.02. An item is considered to be excess if it does not fit within the six cubic foot limitations, even though that item may appear on the approved property list. The total amount of legal materials that an inmate may have in his/her possession will not exceed a space delineated by 1.5' x 1' x 1'. Legal materials that exceed this space allocation may be stored in another area of the facility approved by the Warden/Superintendent. The inmate will be allowed reasonable access to any stored legal materials. The Warden/Superintendent will develop an institutional policy specifying the storage location, methods and process whereby the inmate may have emergency access to stored legal materials.

C.  <u>Exceptions to the six cubic foot requirements are</u>:

1.  Legal material (does not include personal law books and reference material)

2.  Prescribed medical equipment

3.  Television

4.     Fan

5.     Approved musical instruments (does not include radio)

6.     Linen (state-issued)

7.     Approved Third Party Vendor Tablet, charger and flexible keyboard (where Applicable)

D.     By July 1 of each year, the Commissioner/Designee shall publish a list of personal property that inmates are permitted to have in their possession. This list may be revised as frequently as needed. All inmates are required to be in compliance with the approved property list. Televisions, radios, tape players, typewriters, fans, and musical instruments shall be engraved with the inmate's TDOC number. These items shall be properly recorded so that they may accompany the inmate through the system. Inmates returning to the TDOC as parole violators, escapees, etc., who maintain their current TDOC number shall be allowed to receive their original property if the items show evidence of prior possession (i.e., are engraved with the TDOC identification number) without any modifications. Property which has a modification of its identification, serial number, or any other aspect, will not be allowed and will be disposed of in accordance with Policy #504.02. Inmates are prohibited from exchanging property with other inmates directly or indirectly through third parties. The Warden/Superintendent may permit inmates to transfer personal property to other inmates if they are immediate family members and this relationship can be verified.

E.     Individual jewelry items must be listed on Offender Property (LIBN), screen printed, and signed by the inmate verifying that the jewelry does not exceed the value established within this policy. The signed forms shall be kept on file in the property room with a copy given to the inmate.

F.     Each Warden/Superintendent may further restrict this list according to the institution's individual security or treatment requirements. Inmates sentenced to death may receive items that are unique to that particular group. The Warden/Superintendent shall issue an institutional policy which addresses restriction of personal property and defines storage requirements. Inmates may grieve denial of a particular piece of property through the grievance process.

G.     Provisions shall be made for any inmate who has a medical problem or a physical handicap requiring special equipment, as verified by the institutional physician and meeting the security needs of the institution. This property shall be listed on Offender Property (LIBN). (See Policy #504.02)

H.     Inmates may possess state-issue items in accordance with Policy #504.05 and items received in accordance with the December special package list as approved by the Commissioner in accordance with Policy #507.02.

I.     All items on the approved property list which are available from the institutional commissary shall not be received from any other source. All items which are a part of state-issue may be restricted by the Warden/Superintendent as being the only source from which those items may be received.

J.    Inmates who were admitted to a TDOC institution prior to June 15, 1980, who have in their possession excluded items as designated by this policy [such as television(s), radio(s), tape player(s), fan(s), musical instrument(s), or typewriter(s)] which are not in compliance with this policy either by size or value, have received a dispensation for those items only for as long as they remain in the system.  They must, however, comply in number, as only one of each of these items is allowed.  These items have been marked with an engraver to ensure that they are properly identified so that they may remain with the individual for dispensation and the TDOC number of the inmate.  Example:  D-000000.  This item shall be properly recorded on the inmate's property list on Offender Property (LIBN) and shall move with him/her through the system.  When the inmate is released, the items for which he/she has received the dispensation <u>must</u> go with them or be disposed of.  These items shall never remain with TDOC as the result of a transfer of property from one inmate to another.

K.    Inmates admitted to TDOC prior to August 1, 1998, who have in their possession excluded items as designated by this policy, (i.e., AM and FM radio not to exceed 18"x 24", audio cassette tape player, compact disc player and case, compact discs, etc.) may retain these items as they move through the system.  When released, these items must go with them and may not be transferred to another inmate.  These items currently in possession for whatever reason may not be sent out for repair or replacement.  The institution education supervisor and/or chaplain will provide access to tape players for those inmates who receive authorized tapes, i.e., educational, religious, legal, and do not possess a tape player.

L.    All property room personnel will familiarize themselves with the OMS Offender Property (LIBN) for documenting and tracking offender property.

VII.    <u>ACA STANDARDS</u>:  4-4292 through 4-4294.

VIII.    <u>EXPIRATION DATE</u>:  November 1, 2022.

|  ADMINISTRATIVE POLICIES AND PROCEDURES State of Tennessee Department of Correction | Index #: 507.02 | Page 1 of 15 |
| | Effective Date: December 15, 2020 | |
| | Distribution: B | |
| | Supersedes: 507.02 (11/15/17) PCN 20-12 (3/1/20) PCN 20-43 (11/4/20) | |
| Approved by: Tony Parker | | |
| Subject: INMATE MAIL | | |

I.     <u>AUTHORITY</u>: TCA 4-3-603 and TCA 4-3-606.

II.     <u>PURPOSE</u>: To establish the procedures governing collection, distribution, and inspection of mail in an institutional mail room, and the sending and receiving of inmate mail.

III.     <u>APPLICATION</u>: Assistant Commissioner of Prisons, Tennessee Department of Correction (TDOC) employees, privately managed facilities, and inmates.

IV.     <u>DEFINITIONS</u>:

    A.     <u>Bulk Rate Mail</u>: Mail, correspondence, or printed material that is not marked first or second class.

    B.     <u>Cassette Tapes</u>: Audio or video magnetic/recording tape devices used to record voice or video transmissions contained in transparent plastic containers commonly used in audio and video cassette recorders.

    C.     <u>Censorship</u>: The entire withholding or deletion of parts of inmate correspondence.

    D.     <u>Contraband</u>: Any item which is not permitted by law or which is either prohibited or not specifically authorized by TDOC or institutional policy.

    E.     <u>Correspondence</u>: Written communication to or from inmates (e.g., letters, post cards, greeting cards) that is delivered by a postal service.

    F.     <u>E-Mail</u>: An electronic transfer of messages from a sending party to a receiving party via an intermediate telecommunication system through a device approved by TDOC.

    G.     <u>Features</u>: Containing depictions of nudity or sexually explicit conduct on a routine or regular basis or promotes itself based upon such depictions in the case of individual one-time issues. Publications containing nudity illustrative of medical, educational, or anthropological content may be excluded from this definition.

    H.     <u>Government Officials</u>: Any person holding an elected or appointed position at the city, county, state, or federal level.

    I.     <u>Inmate Personal Property</u>: The items and amounts of clothing, equipment, mail, or supplies which an inmate is allowed to have in his/her immediate possession.

    J.     <u>Mail</u>: Correspondence, printed or other material (including pictures or packages) and the contents of envelopes and packages sent to or from inmates by means of a postal service or such items sent or received in conjunction with official business of staff.

    K.     <u>Mail Clerk</u>: Staff assigned to the institutional mail room.

L.     Nudity: Any depictions where genitalia or female breasts are exposed. Publications containing nudity illustrative of medical, educational, or anthropological content may be excluded from this definition.

M.     Printed Materials: Books, publications, magazines, newspapers, periodicals, circulars, catalogues, or clippings which are portions of same, delivered by a postal service.

N.     Privileged Mail: Correspondence clearly addressed to or from attorneys; law students on behalf of attorneys; courts; court clerks; legal aid clinics; or law schools operating such clinics; recognized legal defense funds; and governmental officials or agencies, including the Tennessee Claims Commission, provided such correspondence bears the appropriate name and title of the sender/receiver.

O.     Reasonable Suspicion: Rational inferences which a reasonably prudent person could make from specific objective facts.

P.     Restrictive Housing: The purposeful separation of inmates from the general inmate population in confinement or housing where measures are taken to provide maximum security and/or to control their circumstances or circumscribe their freedom. This general status is for either punitive or administrative reasons and is subject to inmates remaining in their cells up to 22 hours each day.

Q.     Security Threat Group (STG): Group of individuals possessing common characteristics which serve to distinguish them from other groups who have been determined to be acting in concert so as to pose a threat or potential threat to staff, other inmates, the institution, or the community.

R.     Sexually Explicit: Any depictions of actual or simulated sexual acts including sexual intercourse, oral sex, or masturbation, or material which promotes itself based upon such depictions on a routine or regular basis or in individual one-time issues.

V.     POLICY: Each institution shall maintain a mail room for the sending, receipt, and distribution of staff and inmate mail. Inmates may exchange mail, other than packages, with any person and in any language, including braille, and e-mail where applicable, provided that it does not jeopardize the safety, security, or operation of the institution or the safety of persons within or outside the institution.

VI.     PROCEDURES:

A.     Each institution shall designate a mail room.

B.     All mail addressed to inmates shall be delivered to the mail room, and all outgoing mail shall be collected at and posted from the mail room. Excluding weekends and holidays, correspondence shall be delivered to inmates within 24 hours of receipt. All incoming mail, excluding privileged mail, will be opened and inspected for contraband and may **be** read by staff. Approved packages should be delivered within 48 hours, excluding weekend and holidays, to the inmate.

1. Designated staff should collect outgoing mail at least once each regular working day from all locked mailboxes. Such boxes are to be located in areas designated by the Warden/Superintendent and be accessible to all inmates.

2. Disposition of mail and packages addressed to transferred, paroled/discharged, and deceased inmates will be as follows:

   a. Mail addressed to inmates who have been transferred to another facility within the TDOC will be forwarded to that institution. Mail addressed to deceased inmates will be returned to the sender. Mail addressed to inmates who have been discharged or paroled will be forwarded to the address provided by the inmate prior to release. The address should be available from the offender management system (OMS) (LPDF or LCLA). All mail that meets the above-mentioned criteria shall be forwarded within 48 hours, excluding holidays and weekends.

   b. Packages addressed to inmates who have been transferred to another facility will be sent to that inmate by the Central Transportation System (chain bus) within five working days. Packages addressed to inmates who have paroled or discharged will be held at the facility for a period of 30 days. A letter will be sent to the inmate informing them of the receipt of the package and that they have 30 days to retrieve the package or make arrangements for shipment to his/her address. Packages addressed to deceased inmates will be held in the property room for 30 days and the next of kin notified to make arrangements to retrieve the package. If the 30-day time period has elapsed and all attempts to notify next of kin have not been successful, the property will be disposed of in accordance with Policy #504.02, Inmate Personal Property Accounting System.

   c. Inmates who are in the temporary custody of a local jurisdiction may request, in writing, that their mail be retained in the mail room for a maximum of 30 days. After 30 days, it will be mailed to the inmate.

3. Mail shall be held, stored, and handled in a secure manner which is intended to prevent theft, tampering, delay, or other interference. Staff shall wear personal protective gear to include face mask/shield, and gloves when opening mail and packages.

4. A staff person shall deliver incoming mail to the inmate(s) to whom it is addressed. At no time shall mail be distributed by an inmate or be accessible to any inmate other than the addressee.

5. Inmates shall not be allowed to use the state messenger mail service to send any mail.

6. No correspondence, printed material, inmate personal property, or money may be hand delivered to inmates by visitors. The Warden/Superintendent or his/her designees may allow attorneys of record to hand deliver privileged mail directly to the inmate, subject to examination for contraband.

7.  All staff mail received at an institution shall be checked for contraband by mail room staff utilizing the fluoroscope prior to release from the mail room to the intended recipient.

8.  Approved emails received through the contract vendor shall be released to the inmate within two business days of receipt.

C.  Incoming mail shall be handled as follows:

1.  Incoming privileged mail shall be opened only by a staff member in the presence of the inmate addressee in order to examine the contents for contraband, and then documented.  Any mail which has papers which are bound together by metal clips shall be disassembled by removing the metal clip.  The staff members shall not read the privileged mail or listen to legal tapes unless the Warden/Superintendent has, on the basis of reasonable suspicion, determined that privileged mail or tapes may contain information relating to criminal activity.  The privileged mail/tape may be read or listened to outside the presence of the inmate if doing so is necessary to avoid compromising an on-going criminal investigation.  A bound ledger shall be maintained by mail room staff that lists each of privileged mail received/sent, the date inspected and delivered, and recipient's signature.  Mail relating to the implementation of Policy #511.05 is not considered privileged mail.

2.  All incoming inmate privileged mail, staff mail, and packages shall be fluoroscoped for contraband prior to leaving the mail room.

3.  Incoming mail may be determined to be a threat to the security of the institution and returned to the sender if, in the opinion of the Warden/Superintendent, it could reasonably be considered to:

    a.  Be an attempt to incite violence based on race, religion, sex, creed, or nationality.

    b.  Advocate, facilitate, or otherwise present a risk of lawlessness, violence, anarchy, or rebellion against government authority, prison staff, and/or other inmates.

    c.  Be an attempt to incite disobedience toward law enforcement officials or prison staff.

    d.  Be an attempt to give instructions for the manufacturing or use of intoxicants, weapons, explosives, drugs, drug paraphernalia, other unlawful articles or substances, or any other items deemed as contraband.

    e.  Contain plans to escape, unauthorized entry into the institution, or information or maps which might aid an escape attempt.

    f.  Contain information relating to security threat group activity or use of codes and/or symbols associated with security threat groups.

g. Sexually explicit material or material which features nudity which by its nature or content poses a threat to the security, good order, or discipline of the institution, or facilitates criminal activity.

4. Incoming correspondence may include only photographs (no Polaroid-type pictures allowed) and clippings from printed materials. No personal checks, certified checks, money orders, or cash will be accepted. Homemade items, layered greeting cards, cards with additional decorations, and music cards are prohibited.

5. Printed materials may be received by inmates in an unlimited amount, provided they are mailed directly from the publisher(s) or recognized commercial distributor. Persons ordering printed materials for inmates should be careful to accurately identify the seller. Some materials offered on the website of recognized commercial distributors are listed for sale by third-party sellers, and when purchased will be mailed from the third-party seller who is not a recognized commercial distributor.

D. Books, magazines, and newspapers received directly from the publisher or a recognized distributor are assumed to have been purchased; therefore, when sent into the institution as bulk rate mail, these items will be accepted unless the printed material is denied by the Warden/Superintendent under the provisions outlined in Section VI.(C)(3) above. These items will not be considered packages. All other bulk rate mail will not be processed by institutional mail room staff. Unauthorized items sent by bulk rate with guaranteed postage paid if returned shall be returned to the sender. Other undelivered bulk rate mail shall be destroyed. Inmates who want to receive other items that are normally sent bulk rate mail must prepay first or second class postage for the material to be delivered by TDOC staff.

E. Video cassette tapes, microcassettes, compact discs (CDs), and digital video discs (DVDs) are not permitted.

F. Audio cassette tapes may be received in accordance with Policy #504.01, Inmate Personal Property, and under the following circumstances:

1. Inmates with a disability or other condition that prevents the inmate from being able to engage in written correspondence may receive communication tapes. Special approval is required by the Warden/Superintendent via the inmate's counselor.

2. Religious/educational tapes may be received from recognized religious groups. (See Policy #118.01)

3. Inmates participating in an approved educational correspondence course may receive audio cassette tapes mailed directly from the educational facility providing the course. (See Policy #117.02)

4. Legal tapes, CDs, and DVDs may be received from attorneys of record.

5. Musical tapes may not be received.

G. All incoming mail must bear the inmate's committed name, TDOC identification number, and the correct institutional address of the inmate recipient. Aliases may be included when such have been legally changed through the court. Exception to the TDOC identification

number requirement is allowed for incoming Form 1099s, which are issued by the federal government to indicate the inmate's earned wages. In this instance, the inmate's Social Security number has been indicated and will serve as proper identification. Every effort shall be made to deliver inmate mail; however, when neither the correct identity of the inmate recipient nor the sender can be determined, the mail/package in question shall be returned to the USPS as "undeliverable mail". Incoming mail that has been opened must be resealed and returned with postage paid by the facility.

1. Inmates may correspond with others who are incarcerated. Inmates will not be permitted to enclose stamps in correspondence to other inmates.

2. Inmates in segregation or restrictive housing may write and receive letters on the same basis as inmates in the general population.

H. Packages may only be received by an inmate directly from the approved contract vendor(s). Individuals on the inmate's approved visitor list may also purchase items or packages from the approved contract vendor(s) according to the guidelines below and according to Policy #504.01. All items ordered must meet the specifications listed on the Inmate Personal Property List, i.e., clear plastic TV, etc.

1. The number of packages which an inmate may receive is determined by the inmate's custody designation.

    a. Inmates classified as maximum or close custody may receive no more than one package every six months. The Commissioner will designate the number of package(s) allowed in December. Wardens/Superintendents may designate months to level workload of staff.

    b. Inmates classified as medium or minimum custody may receive no more than one package every three months. The Commissioner will designate the number of package(s) allowed in December.

    c. Inmates who are still confined to a diagnostic center in excess of ninety days and are awaiting transfer shall be allowed to order an approved package containing only the following items; a television, walkman style radio, socks, underwear, toboggan, pair of jersey gloves and one pair of shoes, provided they are otherwise eligible to receive packages. Inmate still confined to the diagnostic center for more than 180 days may request to order one additional item from the approved property list if requested and approved by the facility Warden. Newly committed inmates may order grooming and toilet articles (Items 22- 31 of the Inmate Personal Property Memo) at the discretion of the Warden/Superintendent.

2. Printed materials, or approved arts and crafts material which are not otherwise prohibited, shall not count against the maximum number of packages per month permitted to be received.

3. Inmates convicted of a disciplinary offense, excluding verbal warnings, shall not be eligible to receive any packages, except for clothing items (#1-#10) which are listed

on the personal property memorandum during the number of consecutive months listed below:

Class C disciplinary – six months restriction

Class B disciplinary – nine months restriction

Class A disciplinary – 12 months restriction

4. The disciplinary committee may impose the following escalating sanctions for all convictions on cellular telephone or drug related charges:

First Offense - no packages for six consecutive months

Second Offense (within 18 months of first offense) - no packages for nine consecutive months

Subsequent Offenses (within 24 months of second offense) - no packages for 12 consecutive months

Inmates that are assigned to a substance abuse treatment program who test positive shall also be subject to these escalating sanctions

I. The content of packages received shall be subject to the following limitations:

1. Items, excluding shower shoes, brushes, and combs, which are the same as or similar to items available through the institutional commissary may not be received from the vendor.

2. Clothing, equipment, and supplies permitted by policy will be acceptable subject to restrictions and provisions.

3. Personal property packages received from the approved contract vendor will be subject to the imposed package limit.

J. All incoming packages delivered by postal services shall be received in the mail room.  They shall be checked and recorded by appropriate staff.  Institutions with a security designation of Level II or higher shall fluoroscope all packages for contraband prior to entry into the compound.  Packages exceeding two feet in height and two feet in length by one to one and one half (1 - 1½) feet in width will not be accepted unless specifically approved by the Warden/Superintendent.  Packages shall be opened by mail clerks or property room staff only in the presence of the inmate addressee.  A physical barrier should separate staff from the inmate when packages are opened for inspection.

1. Packages for segregated inmates should be delivered within 48 hours, excluding weekends and holidays, of receipt at the institution.  At such time, the package shall be opened in the inmate's presence by appropriate staff.

2. All other inmates should be called to a designated area within 48 hours, excluding weekends and holidays, of the package's delivery to the institution. At such time, the package shall be opened in the inmate's presence by appropriate staff.

3. Packages not accepted will be disposed of in accordance with the policy governing inmate personal property. (See Policy #504.02)

K. Outgoing Mail:

1. Inmates shall be responsible for the contents of their outgoing mail. Correspondence should not contain any threats to the institution, staff, victims, victim families, inmates, or the public, or contain offensive material/items, language, photographs, or drawings. Coded mail shall not be allowed. All outgoing mail must bear the committed name, TDOC identification number, and the institutional address of the sender. Inmates may include an alias when the name has been legally changed through the court.

2. Indigent inmates assigned to diagnostic centers may be provided with a maximum of four postage stamps. All other indigent inmates may receive two postage stamps per pay period through the Chaplain's office, upon written request. The Warden/Superintendent/Designee. shall provide indigent inmates desiring to submit an IRS Inmate Economic Impact Payment Form, a U.S. Postage stamp after the inmate completes a trust fund account personal withdrawal request, CR-2727 in advance. The cost of the postage stamp shall be deducted from the inmate's trust fund account when the inmate has a deposit

3. Except as otherwise provided herein, when the inmate bears the cost of mailing, there is no limit to the number of letters the inmate can send or receive, or to the length, language, or content of mail. First class postage for outgoing legal mail shall be provided by the institution only for mail being sent by indigent inmates to the attorney, court, or offices involved in the inmates' legal matters. Indigent inmates assigned to diagnostic centers may be provided with a maximum of four postage stamps prior to the inmate receiving funds as defined in Policy #112.08.

4. Outgoing privileged mail shall have the envelope date stamped immediately upon its receipt by a designated employee, who will also make an entry in the log for privileged mail. The mail must be identified as privileged by the inmate, who may write "privileged" on the front of the envelope or who may inform the mail room staff. This requirement shall apply for all inmates, including those in segregation or protective custody status.

5. After the envelope has been date stamped, it shall not be returned to the inmate under any circumstances. The inmate will be notified when an envelope does not have the required amount of postage. The inmate will have two working days to provide the additional postage. The envelope will not be returned to the inmate. Remaining envelopes with insufficient funds will be disposed of after three working days.

6. Outgoing mail, excluding privileged mail, shall be opened for examination upon an order of the Warden/Superintendent when reasonable suspicion exists that the security, order, or programs of the institution are threatened or that it contains

information relating to criminal activity. The inmate sender shall be present whenever outgoing mail is opened, unless the mail is being opened as part of an ongoing criminal investigation and so doing would compromise the investigation. All requests to open outgoing mail as part of a criminal investigation, whether the request is made by another agency or the TDOC, shall be approved by the Director of the Office of Investigations and Conduct (OIC), who will maintain documentation of the requestor, the nature of the investigation, a case number (if applicable), a begin date, and an end date. Should the investigation require that the mail be opened for a period that extends beyond 30 days, a new request must be submitted.

7. Privileged mail may only be opened and/or read with the written permission of the Assistant Commissioner of Prisons/designee. A written request stating the reason for this action must be submitted by the Warden/Superintendent/designee to the Assistant Commissioner of Prisons/designee for approval. Excluding weekends and holidays, approval must be obtained within 24 hours of the mailrooms receipt of the outgoing correspondence.

8. The Warden/Superintendent will have stamped on the back of each envelope "THE DEPARTMENT OF CORRECTION HAS NEITHER INSPECTED NOR CENSORED AND IS NOT RESPONSIBLE FOR THE CONTENTS".

L. Mail rejected by the Warden/Superintendent will be handled as follows:

1. If the Warden/Superintendent determines that mail sent to an inmate could reasonably present a threat to the security, order, or programs of the institution, he/she shall notify both the inmate recipient and sender of his/her intent to reject the mail and return it to the sender, except bulk rate mail covered in Section VI.(D). This notice shall be in writing, dated, and include:

   a. The name and address of the sender

   b. The name of the inmate recipient

   c. The date the mail was received at the institution

   d. The reason the Warden/Superintendent intends to reject the mail

   e. A statement that either the recipient or sender may appeal this decision to the Assistant Commissioner of Prisons within 14 working days and that a failure to appeal will result in rejection of the mail and its return to the sender.

   f. The name and address of the Assistant Commissioner of Prisons to whom an appeal may be sent.

   g. Rejection notices regarding magazines or similar publications must contain information to identify the specific issues or items being rejected (example, picture on page 7 is pornographic; article on page 8 contains information on weapons manufacture, etc.).

2. If the Warden/Superintendent orders the examination of outgoing mail, which will include, but not be limited to, privileged mail as set forth in Section (K)(6) and (7)

above, an entry will be made in the ledger entitled "record of censored mail" as provided for in Section VI.(Q)(4)(a)(1-7), and the provisions outlined in (L)(1) (e-f) above will apply. The mail may be returned to the inmate or retained pending the resolution of a disciplinary report or a criminal investigation/hearing.

M.  If a timely appeal is received by the Assistant Commissioner of Prisons, he/she shall notify the Warden/Superintendent of the appeal, examine the mail in question, and consider the Warden/Superintendent's reasons for rejecting it.  If the inmate elects to appeal the rejection, he/she shall send a copy of the appeal to the Warden/Superintendent at the time the original is sent to the Assistant Commissioner of Prisons.

N.  If the Assistant Commissioner of Prisons agrees with the Warden/Superintendent's decision, he/she shall notify the Warden/Superintendent, sender, and inmate recipient, in writing, and the mail shall be returned to the sender.  If the Assistant Commissioner of Prisons determines that the mail should not be rejected, he/she shall notify the Warden/Superintendent, sender, and inmate recipient, in writing, and the mail shall be delivered to the inmate.  The Assistant Commissioner of Prisons should make his/her decision within 14 days of receipt of the appeal.

O.  Rejected mail may not be returned to the sender until either the time to appeal the Warden/Superintendent's decision has expired or the Assistant Commissioner of Prisons has upheld the Warden/Superintendent's decision.

P.  Contraband which is discovered in mail shall be handled as follows:

  1.  Cash Money

    a.  Cash money, checks, and money orders shall be returned to the sender by certified mail, with an explanatory letter, at the expense of the institution.

    b.  Cash money which was obviously hidden in the mail or property shall be deposited to the general fund.  (See Policy #208.06) In those cases, a detailed description and photograph of the method used to conceal the money shall be made, and an explanatory letter will be provided to the sender and inmate involved.

  2.  Items which appear to be in violation of law or policy may be held for evidentiary purposes.

  3.  Disposition of information obtained from censored mail, both incoming and outgoing, shall be the responsibility of the Warden/Superintendent.

  4.  With the exception of cash money, and illegal items, mail shall be marked "Refused" and "Return to Sender" if it is:

    a.  A package the inmate is ineligible to receive

    b.  Refused delivery on the basis of content by authority of the Warden/Superintendent.

5.     All property items that are clearly prohibited or not specifically permitted by policy, but are not otherwise illegal, may be marked "Refused - Return to Sender" or disposed of in accordance with the policy governing inmate personal property. (See Policy #504.01)

6.     In all instances, the intended inmate recipient shall be notified, in writing, of the refusal, return, and/or disposition of such items.

7.     For items identified in Section VI.(O), the notice shall indicate why the items are prohibited and that the inmate has 14 days to request an opinion from the Assistant Commissioner of Prisons that the item(s) in question is permitted by policy. The Assistant Commissioner of Prisons shall respond to such inquiries within 14 days of receipt.

Q.     Organization and Record Keeping:

1.     The mail room staff is responsible for the receipt and distribution of all incoming mail, and for the sending of all outgoing mail, including that received and sent by state messenger service.

     a.     Secure depositories for outgoing mail shall be maintained.

     b.     Inmates or unauthorized staff shall never be permitted access to the mail, the mail room, or mail depositories.

2.     Rubber stamps shall be maintained to mark:

     a.     The date and time when each item of mail was received.

     b.     "REFUSED"; "REFUSED DUE TO CONTENT"; "RETURN TO SENDER"; each with a signature line for the mail clerk.

3.     A system of index cards shall be maintained for each inmate who is in the total assigned population of the institution

     a.     The format shall be:

           Custody
           NAME:_____ TDOC ID #_____ Level :_____
           (inmate)
           Record of Packages Received
           Date     Name of Sender              Signature of Employee
           _____
           _____
           _____

     b.     When a card is completely filled in or an inmate is transferred or released, the card shall be removed from the file and forwarded to the property room for inclusion with the inmate's property room documents.

4.     A permanently bound ledger(s) titled "RECORD OF CENSORED MAIL" shall be maintained and shall contain the following entries:

    a.     <u>Regarding mail which the Warden/Superintendent ordered to be read:</u>

        (1)     Inmate name and TDOC ID

        (2)     Name and address of sender/addressee

        (3)     Description of the item

        (4)     Date the item was received by the mail room

        (5)     Date the item was read

        (6)     Signature of staff who read the item

        (7)     Approving signature of Warden/Superintendent

    b.     <u>Regarding mail or items removed from the mail, other than prohibited bulk rate mail</u>:

        (1)     Inmate name and TDOC ID

        (2)     Name and address of sender/addressee

        (3)     Description of the item

        (4)     Date the item was received by the mail room

        (5)     Date the item was removed from the mail

        (6)     Disposition of the item (i.e. returned to sender; to property room; to Warden/Superintendent as illegal contraband, etc.)

        (7)     Signature of mail clerk

        (8)     Signature of Warden/Superintendent, if applicable regarding illegal contraband

5.     <u>The following forms and letters shall be utilized as specified:</u>

    a.     A form letter on institutional letterhead with CR-2782 will be completed and mailed to senders of cash monies. The cash shall be enclosed and returned. A copy shall be sent to the inmate addressee and a copy shall be filed in the mail room.

    b.     Personal Property Notification, CR-1415, will be completed and given to an inmate indicating the removal of contraband items from mail, and specifying the disposition which has been or is to be made. A copy shall be filed in the mail room.

      c.     A supply of rules governing inmate receipt and sending of mail shall be copied onto institutional letterhead, dated as revised, and kept in sufficient supply to ensure that any inmate requesting a copy will receive one.  Inmates shall be encouraged to send this to correspondents.

    6.    <u>A bound ledger shall be maintained to record the following</u>:

      a.     Privileged mail sent or received

      b.     Certified or registered mail sent and/or received

R.    <u>Receiving Mail</u>:  Inmates not personally known by staff who receive mail or who sign receipts for mail shall be required to present an institutional identification card.

VII.    <u>ACA STANDARDS</u>:  5-ACI-3D-01, 5-ACI-3D-01, and 5-ACI-7D-01 through 5-ACI-7D-10, 4CRS-6A-01, 4-ACRS-6A-06, 4-ACRS-6A08, and 4-ACRS-6A-09.

VIII.    <u>EXPIRATION DATE</u>:  December 15, 2023

(INSTITUTION LETTERHEAD)

**MEMORANDUM**

**TO:**

_____
(TDOC ID)

_____
(Name of Sender)

_____
(Sender's Address)

_____

**FROM:**   Mailroom Clerk

**DATE:**   _____

**SUBJECT:**   Monies

The enclosed money was found in mail addressed to inmate:

Name: _____   TDOC ID _____

By Department of Correction Policy #507.02, No monies in any form may be accepted. (cash, checks or money orders) Any monies found in the mail or property shall be returned to the sender.

Sincerely,

Mailroom Clerk

_____
Institution

Enclosure:

☐   Green Money          $ _____   Amount

☐   Money Order / Check   $ _____   Amount

Money Order / Check Number   _____

Date Mailed Out: _____

CR-2782 (Rev. 08.2020)          *Duplicate as Needed*          RDA 1100

CCI 000751

TENNESSEE DEPARTMENT OF CORRECTION

**PERSONAL PROPERTY NOTIFICATION**

INMATE NAME: _____    TDOC ID: _____    DATE: _____

The below listed property was received for delivery to you. The items designated "Pick-Up" are to be held at _____ and may be picked up at _____ (time). Those items designated as "In-Storage" are items which you are not permitted to possess. It is your responsibility to dispose of those items within 30 days or the Department will dispose of them.

You may request an opinion from the Associate Warden as to whether or not the item(s) are permitted by policy. If the Associate Warden concurs with your request, the item(s) will be returned to you.

| QUANTITY | ITEM | VISITOR SIGNATURE | PICK-UP | IN-STORAGE | PROPERTY TAG # | PICK UP DATE | INMATE SIGNATURE |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

_____
Staff Signature (Witness)

_____
Staff Signature

CR-1415 (Rev. 08.2020)                                                                                      RDA 11085



**TN** Department of
**Correction**

February 13, 2017

Re:    Religious Activities Committee Request #17-002

Mr. Young Bok Song #379747
TTCC
140 Mason Way
Hartsville, TN 37074

Dear Mr. Song:

I received your Request for Group Accommodations submitted on behalf of the Hebrew-Greek at TTCC, and the recommendations of the Warden and the Chaplain. The Religious Activities Committee (the "Committee") has reviewed your request and voted in the following way:

1.  **Approval** – Per policy 118.01, this group was recognized at NECX.  Failure to provide proof of denial at your facility.
2.  **Approval** – This group was recognized at NECX.

Sincerely,

Deborah Thompson
Director of Religious, Volunteer & Religious Services

cc:    TP-17-028
       TP-17-027
       Blair Leibach, Warden
       Jon Shonebarger, Chaplain ✓

Department of Correction • 6th Floor Rachel Jackson Building • 320 6th Avenue North •
Nashville, TN 37243 • Tel: 615-741-1000 • Fax: 615-532-8281 • tn.gov/Correction


**TN** Department of
**Correction**

February 13, 2017

Re:     Religious Activities Committee Request #17-002

Mr. Young Bok Song #379747
TTCC
140 Mason Way
Hartsville, TN 37074

Dear Mr. Song:

I received your Request for Group Accommodations submitted on behalf of the Hebrew-Greek at TTCC, and the recommendations of the Warden and the Chaplain. The Religious Activities Committee (the "Committee") has reviewed your request and voted in the following way:

1. **Approval** – Per policy 118.01, this group was recognized at NECX.  Failure to provide proof of denial at your facility.
2. **Approval** – This group was recognized at NECX.

Sincerely,

Deborah Thompson
Director of Religious, Volunteer & Religious Services

cc:     TP-17-028
        TP-17-027
        Blair Leibach, Warden ✓
        Jon Shonebarger, Chaplain

Rev. Deborah Thompson
5th Floor Rachel Jackson Building
320 6th Avenue North
Nashville, TN 37243

January 6, 2017

Dear Director,

Attached is a Group Religious Accommodations Request from inmate Young Bok Song, 379747. After review from our facility, both the First and Second Accusations are recommended for disapproval. We will await the decision from the Religious Activities Committee.


Respectfully submitted,


Chaplain Jon T. Shonebarger, Jr.
CoreCivic/TTCC
140 Macon Way
Hartsville, TN

Core 000755

TO: Warden Leibach; AW Pittman
FM: Chaplain Shonebarger
RE: Group Religious Accommodations Request; CR-3735 Inmate Song

While Chaplain Leek was with me a few weeks back, we reviewed this request from inmate Song. He had submitted this directly to Director Thompson at TDOC, bypassing us at the facility level.

Our recommendation for Disapproval is on page 3. This must be submitted to Director Thompson by January 10th. Be aware I will be in Nashville next week for De-escalation training. Request your decision by Friday so I can submit to TDOC.

Thx.



**TENNESSEE DEPARTMENT OF CORRECTION**
**GROUP RELIGIOUS ACCOMMODATIONS REQUEST**

(COMPLETE pages 1 & 2; submit to Chaplain; See Policy # 118.01)

Date Submitted to Chaplain: _12/13/2016_

_Young Bok Song_                              _# 379747_
　　　　Inmate Name　　　　　　　　　　　　　　TDOC#

Estimated Number of Inmates in the Group: _20 - 40_

1.  Official name of the group:

    _TTCC Hebrew - Greek Bible Study Group_

2.  Names and contact information of the group's leaders:

    _Young Bok Song # 379747, CC-232_

3.  The group's teachings, beliefs, and practices:

    _We study the Word of God in it's Original Languages (Hebrew & Greek)_
    _We believe that the Word of God is the Light of our life_
    _We practice the traditional ways in reading Scriptures, praying, singing hymns,_
    _and out-reaching to the needy and poor._
    _We study the Arabic and Latin as a reference sources._

4.  Titles of the group's basic text(s):
    _Hebrew: Heb. Grammar Book, Masoretic-Text, Heb. Lexicon_
    _Greek: Grk. Grammar Book, MT-Text and Nestle Text, Grk. Lexicon_
    _Arabic: Arabic Grammar Book, First Arabic Translation Bible, Arabic Dictionary_
    _Latin: Latin Grammar Book, Latin Vulgata Bible, Latin Dictionary_

5.  Other information helpful in researching the group:
    _We started at NECX in 2009, moved to NWCX and approved at Both Facility (-ies)_
    _by the Chaplains, Wardens and TDOC Religious Activity Committee._
    _We have been studying that the Humble-Heart is the Key in receiving Grace from_
    _God and `mən. (* we mean `human-being)_

6. Names of outside clergy or volunteers available to visit the institution:

- Head Elder, Young Soo Kim, Nashville Korean Presbyterian Church, Nashville, Tennessee
- Pastor Stephen, NKPC Nashville, TN
- Pastors, Rick Allen & Richard Jennings, Harvest Prison Ministry Mt. Juliet, TN
- Chaplain, Rick Ingram, Miracle Lake (Christian Training Center), Etowah, TN

7. **DETAILED** description of the accommodation(s) requested:

   a. First Accommodation
   - We need a place to meet for our class.
   - We need 2 hours weekly basis for our class.

   b. Second Accommodation
   - We need banquet twice per year (Christmas and Easter) (or once per year at/around Christmas)
   - (If this request is already available, please disregard this request).

   c. Third Accommodation

   d. Fourth Accommodation

   e. Fifth Accommodation

If more than five accommodations are requested, please add additional pages showing Sixth Accommodation, Seventh Accommodation, etc.

Case 3:22-cv-00093   Document 33-17   Filed 05/04/22   Page 158 of 198 PageID #: 741

8. **Recommendations by the Warden and the Chaplain**

Date Sent to the Religious Activities Committee: _____

a. First Accommodation -- Recommendation: _____ Approval _____ Disapproval

Reason: *Disapproved per policy 118.01, This is not a recognized religion. Trousdale Turner Correctional Center does not have time or space. There are other faith groups meeting similar to this request.*

b. Second Accommodation -- Recommendation: _____ Approval _____ Disapproval

Reason: *This is not a recognized religious group by TDOC.*

c. Third Accommodation -- Recommendation: _____ Approval _____ Disapproval

Reason: _____

d. Fourth Accommodation -- Recommendation: _____ Approval _____ Disapproval

Reason: _____

e. Fifth Accommodation -- Recommendation: _____ Approval _____ Disapproval

Reason: _____

Case 3:22-cv-00093   Document 33-17   Filed 05/04/22   Page 159 of 198 PageID #: 742   Coqe 000759

9. **Approval or Disapproval by the Religious Activities Committee**

Date of Approval or Disapproval: _____

a. First Accommodation: _____ Disapproved _____ Approved

_____
_____
_____
_____
_____
_____
_____

b. Second Accommodation: _____ Disapproved _____ Approved – subject to conditions:

_____
_____
_____
_____
_____
_____

c. Third Accommodation: _____ Disapproved _____ Approved

_____
_____
_____
_____
_____
_____

d. Fourth Accommodation: _____ Disapproved _____ Approved

_____
_____
_____
_____
_____
_____

e. Fifth Accommodation: _____ Disapproved _____ Approved

_____
_____
_____
_____
_____
_____

CR-3735 (Rev. 06-10)                Duplicate as Needed                                    4



Department of
**Correction**

November 29, 2017

Re:     Religious Activities Committee Request #17-016 (TP-17-590) (TP-17-616)

Mr. Willie Pegues, #202296
TTCC
140 Mason Way
Hartsville, TN  37074

Dear Mr. Pegues,

I received your Request for Group Accommodations submitted on behalf of, the Nation of Islam, and the recommendations of the Warden and the Chaplain.  The Religious Activities Committee (the "Committee") has reviewed your request and voted in the following way:

1.  **Approval** -This is already being observed in place here at TTCC.
2.  **Disapproval** - Requests the group be authorized to receive and purchase DVDs, CDs, and text from "*Final Call*" the official media arm of the Nation of Islam.  Our issue as a facility is that inmates are prohibited from purchasing "Video cassette tapes, microcassettes, compact disc (CDs) and DVDs...(TDOC 507.02.VI.E).
    **Approval with modifications** - "The Nation of Islam faith group may request religious program materials, in writing, to the Religious Services Department at TTCC.  Upon review and approval, procurement of group faith material will be acquired from vendors at the discretion of the facility.  The Assistant Warden of Treatment approves all purchases. Inmates are prohibited by TDOC policy 507.02 VI.E. to purchase electronic media themselves."
3.  **Approval** - TTCC is already being observed and in place here.  Chaplain recommended they are in compliance with their faith tenants.

Sincerely,

*Deborah Thompson*

Deborah Thompson
Director of Religious, Volunteer & Victim Services

cc:     TP-17-590
        TP-17-616
        Warden Russell Washburn
        Chaplain Jon Shonebarger ✓

Case 3:22-cv-00093   Document 33-17   Filed 05/04/22   Page 161 of 198 PageID #: 764



*Better the public good.*

Reverend Deborah Thompson
Director, Religious Programs TDOC
320 6th Avenue North
Rachel Jackson Building
Nashville, TN 37243-0465

Sunday, September 17, 2017

Dear Reverend Thompson and the Religious Activities Committee,

The attached Tennessee Department of Correction Group Accommodations Request (CR-3735) is submitted for your action per TDOC policy 118.01.

After review of the request from the Nation of Islam inmate, Warden Washburn, AWT Pittman, Chaplain Simic and I recommend approval of items **7a.** and **7c.**

To answer **7b.** we recommend this for the TDOC/RAC: <u>Approval, with modifications</u>. *"The Nation of Islam faith group may request religious program materials, in writing, to the Religious Services Department at Trousdale-Turner Correctional Center. Upon review and approval, procurement of group faith material will be acquired from vendors at the discretion of the facility. The Assistant Warden of Treatment approves all purchases. Inmates are prohibited by TDOC policy 507.02.VI.E. to purchase electronic media themselves."*

We will await the decision of the RAC and submit to your directives.

Sincerely,

Chaplain Jon T. Shonebarger, Jr.
Trousdale-Turner Correctional Center

CoreCivic 000762



**TENNESSEE DEPARTMENT OF CORRECTION**
**GROUP RELIGIOUS ACCOMMODATIONS REQUEST**

**(COMPLETE pages 1 & 2; submit to Chaplain; See Policy # 118.01)**

Date Submitted to Chaplain:   August 8, 2017

Willie X (Pegues)                                    202296
_____                    _____
Inmate Name                                             TDOC#

Estimated Number of Inmates in the Group:          10

1.  Official name of the group:
    Nation of Islam Study Group

2.  Names and contact information of the group's leaders:
    Bro. Andre' Muhammad
    Muhammad Mosque #60
    Nashville, TN 37203
    Telephone: (615)255-1441

3.  The group's teachings, beliefs, and practices:
    Teachings of the Nation of Islam, Oneness of Allah(God), Zakat, Prayer,Fasting
    (Especially during the Holy Month of Ramadan), and Hajj

4.  Titles of the group's basic text(s):
    Holy Qu'ran, Holy Bible, Torah, Nation of Islam Text by the Most Honorable Elijah
    Muhammad and Honorable Minister Louis Farrakhan,and Final Call Newspapers

5.  Other information helpful in researching the group:
    Watching DVD's and listening to CD's of the Nation of Islam

CR-3735 (Rev. 06-10)              Duplicate as Needed                              1

6. Names of outside clergy or volunteers available to visit the institution:
   Brother Andrew Muhammad
   Brother Robert Muhammad
   Brother Eric Muhammad

7. DETAILED description of the accommodation(s) requested:
   a. First Accommodation
   That we be able to practice our Islamic Religious Brief according to the teachings of Most Honorable Elijah Muhammad and Honorable Minister Louis Farrakhan of the Nation of Islam pursuant to TDOC Policy #118.01 and RLUIPA.

   b. Second Accommodation
   That we be able to receive and purchase Nation of Islam DVD's, CD's and Text Material, which to include the Final Call Newspaper pursuant to TDOC Policy #118.01 and #507.02, and RLUIPA.

   c. Third Accommodation
   That we be able to observe Savior Day which is celebrated by the Nation of Islam on 26th day of February, and the Holy Month of Ramadan pursuant to TDOC Policy #118.01 and RLUIPA.

   d. Fourth Accommodation

   e. Fifth Accommodation

If more than five accommodations are requested, please add additional pages showing Sixth Accommodation, Seventh Accommodation, etc.

CR-3735 (Rev. 06-10)          Duplicate as Needed                                    2

8. **Recommendations by the Warden and the Chaplain**

Date Sent to the Religious Activities Committee: *Sept 17, 2017*

a. First Accommodation -- Recommendation: ✓ Approval _____ Disapproval

Reason: *See attached TTCC letter, 9/17/17*

b. Second Accommodation -- Recommendation: ✓ Approval *with modifications* Disapproval

Reason: *See attached TTCC letter, 9/7/17*

c. Third Accommodation -- Recommendation: ✓ Approval _____ Disapproval

Reason: *See attached TTCC letter, 9/7/17*

d. Fourth Accommodation -- Recommendation: _____ Approval _____ Disapproval

Reason: _____

e. Fifth Accommodation -- Recommendation: _____ Approval _____ Disapproval

Reason: _____

Case 3:22-cv-00093   Document 33-17   Filed 05/04/22   Page 165 of 198 PageID #: 1443    CCJC 000765



**CoreCivic**

*Better the public good.*

## MEMORANDUM

TO: Warden Russell Washburn
FM: Chaplain Jon Shonebarger, Chaplain Tom Simic
THRU: AWT Yolanda Pittman
RE: Tennessee Department of Correction Group Religious Accommodations Request (CR-3735),
    Nation of Islam

Wednesday, September 13, 2017

**The attached CR-3735 is submitted for your action.**

The Nation of Islam faith group is requesting three accommodations in their faith practice here at Trousdale-Turner Correctional Center that we need to address, then submit to the Religious Activities Committee at TDOC. Items **7a.** and **7c.** are already being observed and in place here at TTCC (see attachment). I recommend we approve those; they are in compliance with their faith tenants.

**Item 7b**. *requests the group be authorized to receive and purchase DVDs, CDs and text from "Final Call,"* the official media arm of the Nation of Islam. Our issue as a facility is that inmates are prohibited from purchasing *"Video cassette tapes, microcassettes, compact discs (CDs) and DVDs..."* (TDOC 507.02. VI.E).
The policy is attached.

In addition, CoreCivic facilities have had difficulties with *Final Call* publications. Materials, both printed and electronic, often contain language that incites violence based on race, religion, sex, creed or nationality. This is forbidden (TDOC 507.02.C.3.). As a facility, RLUIPA states we would have a compelling governmental reason to deny media for institutional safety and security.

To answer **7b**. I recommend we submit this reply to the TDOC/RAC: Approval, with modifications. *"The Nation of Islam faith group may request religious program materials, in writing, to the Religious Services Department at Trousdale-Turner Correctional Center. Upon review and approval, procurement of group faith material will be acquired from vendors at the discretion of the facility. The Assistant Warden of Treatment approves all purchases. Inmates are prohibited by TDOC policy 507.02.VI.E. to purchase electronic media themselves."*

AWT and Warden agreement/approval of my recommendations only requires your signature on this MEMO; I will submit our reply to TDOC/RAC. If you do not concur, please advise. Possibly a meeting is in order. --JS

Core 000766

reasonable suspicion, determined that privileged mail or tapes may contain information relating to criminal activity. The privileged mail/tape may be read or listened to outside the presence of the inmate if doing so is necessary to avoid compromising an on-going criminal investigation. A bound ledger shall be maintained by mail room staff that lists each of privileged mail received/sent, the date inspected and delivered, and recipient's signature. Mail relating to the implementation of Policy #511.05 (Identification for Post Release) is not considered privileged mail.

2. All incoming inmate privileged mail, staff mail, and packages shall be fluoroscoped for contraband prior to leaving the mail room.

3. Incoming mail may be determined to be a threat to the security of the institution and returned to the sender if, in the opinion of the Warden, it could reasonably be considered to:

   a. Be an attempt to incite violence based on race, religion, sex, creed, or nationality.

   b. Advocate, facilitate, or otherwise present a risk of lawlessness, violence, anarchy, or rebellion against government authority, prison staff, and/or other inmates.

   c. Be an attempt to incite disobedience toward law enforcement officials or prison staff.

   d. Be an attempt to give instructions for the manufacturing or use of intoxicants, weapons, explosives, drugs, drug paraphernalia, other unlawful articles or substances, or any other items deemed as contraband.

   e. Contain plans to escape, unauthorized entry into the institution, or information or maps which might aid an escape attempt.

   f. Contain information relating to security threat group activity or use of codes and/or symbols associated with security threat groups.

   g. Sexually explicit material or material which features nudity which by its nature or content poses a threat to the security, good order, or discipline of the institution, or facilitates criminal activity.

4. Incoming correspondence may include only photographs (no Polaroid-type pictures allowed) and clippings from printed materials. No personal checks, certified checks, money orders, or cash will be accepted.

5. Printed materials may be received by inmates in an unlimited amount, provided they are mailed directly from the publisher(s) or recognized commercial distributor. Persons ordering printed materials for inmates should be careful to accurately identify the seller. Some materials offered on the website of recognized commercial distributors are listed for sale by third-party sellers, and when purchased will be mailed from the third-party seller who is not a recognized commercial distributor.

D.    Books, magazines, and newspapers received directly from the publisher or a recognized distributor are assumed to have been purchased; therefore, when sent into the institution as bulk rate mail, these items will be accepted unless the printed material is denied by the Warden under the provisions outlined in Section VI.(C)(3) above. These items will not be considered packages. All other bulk rate mail will not be processed by institutional mail room staff. Unauthorized items sent by bulk rate with guaranteed postage paid if returned shall be returned to the sender. Other undelivered bulk rate mail shall be destroyed. Inmates who want to receive other items that are normally sent bulk rate mail must prepay first or second class postage for the material to be delivered by TDOC staff.

E.    Video cassette tapes, microcassettes, compact discs (CDs), and DVDs are not permitted.

F.    Audio cassette tapes may be received in accordance with Policy #504.01, Inmate Personal Property, and under the following circumstances:

    1.    Inmates with a disability or other condition that prevents the inmate from being able to engage in written correspondence may receive communication tapes. Special approval is required by the Warden via the inmate's counselor.

    2.    Religious/educational tapes may be received from recognized religious groups. (See Policy #118.01)

    3.    Inmates participating in an approved educational correspondence course may receive audio cassette tapes mailed directly from the educational facility providing the course. (See Policy #117.02)

    4.    Legal tapes, CDs, and DVDs may be received from attorneys of record.

    5.    Musical tapes may not be received.

G.    All incoming mail must bear the inmate's committed name, TDOC identification number, and the correct institutional address of the inmate recipient. Aliases may be included when such have been legally changed through the court. Exception to the TDOC identification number requirement is allowed for incoming Form 1099s, which are issued by the federal government to indicate the inmate's earned wages. In this instance, the inmate's Social Security number has been indicated and will serve as proper identification. Every effort shall be made to deliver inmate mail; however, when neither the correct identity of the inmate recipient nor the sender can be determined, the mail/package in question shall be returned to the USPS as "undeliverable mail". Incoming mail that has been opened must be resealed and returned with postage paid by the facility.

    1.    Inmates may correspond with others who are incarcerated. Inmates will not be permitted to enclose stamps in correspondence to other inmates.

    2.    Inmates in segregation may write and receive letters on the same basis as inmates in the general population.

Corel 000763



Reverend Deborah Thompson
Director, Religious Programs TDOC
320 6th Avenue North
Rachel Jackson Building
Nashville, TN 37243-0465

Sunday, September 17, 2017

Dear Reverend Thompson and the Religious Activities Committee,

The attached Tennessee Department of Correction Group Accommodations Request (CR-3735) is submitted for your action per TDOC policy 118.01.

After review of the request from the Nation of Islam inmate, Warden Washburn, AWT Pittman, Chaplain Simic and I recommend approval of items **7a.** and **7c.**

To answer **7b.** we recommend this for the TDOC/RAC: <u>Approval, with modifications</u>. *"The Nation of Islam faith group may request religious program materials, in writing, to the Religious Services Department at Trousdale-Turner Correctional Center. Upon review and approval, procurement of group faith material will be acquired from vendors at the discretion of the facility. The Assistant Warden of Treatment approves all purchases. Inmates are prohibited by TDOC policy 507.02.VI.E. to purchase electronic media themselves."*

We will await the decision of the RAC and submit to your directives.

Sincerely,

Chaplain Jon T. Shonebarger, Jr.
Trousdale-Turner Correctional Center

CCA 000769

*spare*



**Correction**

February 14, 2018

Re:     Religious Activities Committee Request #18-001 (TP-17-822)

Mr. Michael Tarver, #401478
TTCC
140 Mason Way
Hartsville, TN 37074

Dear Mr. Tarver,

I received your Request for Group Accommodations submitted on behalf of the Sunni Muslim Community Quranic Arabic Studies Class, and the recommendations of the Warden and the Chaplain. The Religious Activities Committee (the "Committee") has reviewed your request and voted in the following way:

1. **Disapprove** - A special meal will not be facilitated. Inmates will receive religious feasts according to their individual faith/religious affiliation.
2. **Disapprove** - A special meal will not be facilitated. Inmates will receive religious feasts according to their individual faith/religious affiliation.
3. **Disapprove** - The inmates will not be granted authorization to purchase individual CD players. A CD player is available in the chapel for religious programs. In addition, a separate Arabic class will not be established. The opportunity to learn Arabic can be accomplished in the weekly Sunni Taleem religious programs.

Sincerely,

Eric Qualls
Director

cc:     TP-17-822
        Warden Russell Washburn
        Chaplain Jon Shonebarger

Communication Department · Sixth Floor Rachel Jackson Building · 320 Sixth
Avenue North · Nashville, TN 37243 · Tel. 615-253-8144 · Fax 615-532-8281 ·
tn.gov/correction

Reverend Deborah Thompson
Director, Religious Programs
320 6th Avenue North
Rachel Jackson Building
Nashville, TN 37243-0465

Wednesday, December 06, 2017

Dear Reverend Thompson and the Religious Activities Committee,

The attached Tennessee Department of Correction Group Accommodations Request (CR-3735) is submitted for your action per TDOC policy 118.01.

After review of the Trousdale-Turner inmate group submission, Warden Washburn, AWT Pittman and I recommend disapproval of all three (3) Accommodations, as stated in the CR-3735.

We will await the decision of the RAC and will submit to your directives.

Sincerely,

Chaplain Jon T. Shonebarger, Jr.
CoreCivic/TTCC



**CoreCivic**
*Better the public good®*

Trousdale Turner Correctional Center
140 Macon Way
Hartsville, TN 37074

---

### *MEMORANDUM*

TO: Warden Russell Washburn

FROM: Chaplain Jon Shonebarger

THRU: AWT Yolanda Pittman

RE: TDOC Religious Accommodations Request (CR-3735), Arabic Class

DATE: November 28, 2017

**The attached CR-3735 is submitted for your action.**

The attached Tennessee Department of Correction Group Accommodations Request (CR-3735) is submitted for your action per TDOC policy 118.01.

The request was submitted by three Sunni Muslim inmates. They are seeking three things: A special meal for regular program attendees. A special meal for program graduates, and the authorization for each inmate to purchase a CD player.

Be advised, an Arabic Class does not exist at Trousdale-Turner Correctional Center. The inmates are assuming that with this CR-3735 submission a class will be started. The specific request to begin a class is not mention in this submission.

I recommend disapproval of all three requested accommodations, as answered in the attached CR-3735. It is my position that Arabic studies can be accomplished in the Sunni Taleem study each week, if they choose.

AWT and Warden agreement/approval of my recommendations only requires your signature on this MEMO; I will submit our reply to the TDOC Religious Accommodations Board.



**TENNESSEE DEPARTMENT OF CORRECTION**
**GROUP RELIGIOUS ACCOMMODATIONS REQUEST**

(COMPLETE pages 1 & 2; submit to Chaplain; See Policy # 118.01)

Date Submitted to Chaplain: __10-6-17__

Michael Tarver                              401478
Inmate Name                                TDOC#

Estimated Number of Inmates in the Group: __12__

1. Official name of the group:

   Al Taqwa Sunni Muslim Community Quranic
   Arabic Studies Class

2. Names and contact information of the group's leaders:

   Michael Tarver #401478   DA 208
   Lymer Brown #446512
   Wayford Demonbreun #245840   CC 120

3. The group's teachings, beliefs, and practices:

   Our teachings beliefs and practices consist of the belief
   in One God, Allah and the belief that we do not worship
   any man or any creation of God. We believe that the Arabic
   Quran is the Word of God revealed to the Prophet
   Muhammad (PBUH) by the Angel Gabriel as Gods final
   revelation after the Gospel brought by Jesus (PBUH). We
   teach our Muslim community and non-muslims that Islam
   is not extremeism and Islam is not terrorism. we believe
   that the killing of innocent people is against the Quran
   and Sunnah. Prophet Muhammad (PBUH) never taught Muslims
   to kill innocent people and he never taught to kill people
   because they are not Muslim. We practice Islam and we practice
   a peaceful way of life and we believe in freedom of religion.
   This class is needed to educate muslims to prevent extremism in America.

4. Titles of the group's basic text(s):

   Our basic text is the Arabic Quran which has never
   been altered or changed in Arabic. English translations of
   the Arabic Quran are not the Arabic Quran. We also have
   Sahih Al-Beikhari and Sahih Muslim Hadith books.

5. Other information helpful in researching the group:

   The Religious Activities Committee approved the Quranic
   Arabic Studies class at NECX on 9/3/15. After a
   few months of practice and studies, it is apparent that
   all students of the class have a personal tape/CD player
   to assist them with their religious studies. This request is
   submitted pursuant of the needs of the class and its progress.

CR-3735 (Rev. 06-10)                   Duplicate as Needed                          1

Coll 000773

6. Names of outside clergy or volunteers available to visit the institution:

Ta'Naeem Aziz

7. DETAILED description of the accommodation(s) requested:

   a. First Accommodation

   A yearly banquet for all Arabic Class participants who regularly attend the arabic studies class.

   b. Second Accommodation

   A yearly banquet for all graduates who learn (memorize) the Arabic Alphabet, complete Arabic Scriptuel Tests and homework assignments.

   c. Third Accommodation

   For all Quranic Arabic Class Participants who learned the Arabic Alphabet and basic Arabic Grammar requisite to pronounce arabic words, to be able to purchase a tape player/CD player or a portable tape or CD player (portable) for the purposes of listening to Arabic recitation of the Quran and Hadith to assure accurate pronunciation.

   d. Fourth Accommodation

   e. Fifth Accommodation

If more than five accommodations are requested, please add additional pages showing Sixth Accommodation, Seventh Accommodation, etc.

CR-3735 (Rev. 06-10)          Duplicate as Needed          2

8. **Recommendations by the Warden and the Chaplain**

Date Sent to the Religious Activities Committee: _____

a. First Accommodation -- Recommendation: _____ Approval __X__ Disapproval

Reason: A special meal will not be facilitated. Inmates will receive religious feasts according to their individual faith/religious affiliation.

b. Second Accommodation -- Recommendation: _____ Approval __X__ Disapproval

Reason: A special meal will not be facilitated. Inmates will receive religious feasts according to their individual faith/religious affiliation.

c. Third Accommodation -- Recommendation: _____ Approval __X__ Disapproval

Reason: The inmates will not be granted authorization to purchase individual CD players. A CD player is available in the Chapel for religious programs. In addition, a seperate Arabic class will Not be established. The opportunity to learn Arabic can be accomplished in the weekly Sunni Taleem religious program.

d. Fourth Accommodation -- Recommendation: _____ Approval _____ Disapproval

Reason: _____

e. Fifth Accommodation -- Recommendation: _____ Approval _____ Disapproval

Reason: _____

Case 3:22-cv-00093   Document 33-17   Filed 05/04/22   Page 175 of 198   PageID #: 775



Department of
**Correction**

September 7, 2017

Edwin Steakley #312255
TTCC
140 Macon Way
Hartsville, TN 37074

Dear Mr. Steakley,

We received your letter regarding the status of your group accommodations request and policy 116.08. Your letter was mailed regarding the Religious Activity Committee decision. We are enclosing a copy of the letter in the event you haven't received the letter and a copy of policy 116.08. Feel free to contact our office if you have any other questions or concerns.

Sincerely,

Deborah Thompson
Director of Religious, Volunteer & Victim Services

TP-17-566
Chaplain Jon Shonebarger, Jr.
Warden Russell Washburn

 **CoreCivic**

*Better the public good.*

August 31, 2017

RE: Religious Activities Group Accommodation
TO: Edwin Steakley #312255, FA-110L
FM: Chaplain Shonebarger, Religious Services Department

Mr. Steakley,

Ms. Thompson, Director of Religious, Volunteer & Victim Services has provided me a copy of the *corrected* Religious Activities Committee Request #17-011. This was your **Group Accommodation Request** for the Orthodox Jewish faith group. The corrected reply is attached for your records.

Be aware there has not been any other Orthodox Jewish inmates seeking to meet. Until a **group** is formed, we encourage you to continue to practice your faith individually, within the bounds of policy, and seek our assistance in your faith practice. We are here to support you and all TTCC inmates with their faith.

We have also solicited donations from Jewish organizations that can benefit all our Jewish inmates. If you have questions, please come to the Chaplain's Office.



**TN** Department of
**Correction**

August 8, 2017

Re:     Religious Activities Committee Request # 17-011

Mr. Edwin Lee Steakley #312255
TTCC
140 Macon Way
Hartsville, TN  37074

Dear Mr. Steakley:

I received your Request for Group Accommodations submitted on behalf of the Jewish Worship (Judaism) at TTCC and the recommendations of the Warden and the Chaplain.  The Religious Activities Committee ("the Committee") has reviewed your request and voted in the following way:

1.  **Approval with modifications** – High holy days will be facilitated for inmates registered Jewish in TOMISs. Ceremonial items: kosher grape juice, and matzo will be provided.  Religious Group property will be in compliance with TDOC policy.  Program times will be scheduled in accordance with safety and security of TTCC. Inmates will eat the diet they are registered for at TTCC.
2.  **Approval with modifications** – Seder services will be facilitated for inmates registered Jewish in TOMIS.  The items required on the Seder tray will be provided, as well as kosher for Passover grape juice and matzo.  Inmates will eat the diet they are registered for at TTCC.
3.  **Approval with modifications** – There are not outside religious ceremonies at TTCC due to security parameter and safety/security considerations.  As a result, a sukkot will not be built nor will inmates spend the night outside a secure cell.  TTCC will facilitate an indoor evening program with ceremonial kosher grape juice and matzo.  Inmates will eat the diet they are registered for.
4.  **Approval with modifications** - A battery operated menorah will be provided for the ceremony as a result of safety.  While kosher donuts, potato cakes and dredles are not tradition, they are not mandated by policy and will not be facilitated.  Inmates will eat the diet they are registered for at TTCC.
5.  **Approval with modifications** – The Saturday sabbeth service will be scheduled and facilitated.  Battery operated candles will be provided as well as kosher grape juice for the Kiddush.  A Torah Scroll will not be provided.

Sincerely,

*[signature]*
Deborah Thompson
Director of Religious, Volunteer, & Victim Services

cc:     TP-17-377
        TP-17-294
        TP-17-492
        Blair Leibach, Warden
        Jon Shonebarger Jr., Chaplain

Communication Department • Sixth Floor Rachel Jackson Building • 320 Sixth Avenue North • Nashville, TN 37243 • Tel: 615-253-8144 • Fax: 615-532-8281 • tn.gov/correction

**Shonebarger Jr, Jon**

| | |
|---|---|
| **From:** | Cynthia Sword <Cynthia.Sword@tn.gov> |
| **Sent:** | Thursday, August 31, 2017 9:31 AM |
| **To:** | Shonebarger Jr, Jon |
| **Subject:** | FW: Attached Image |
| **Attachments:** | 3507_001.pdf |

*** This is an EXTERNAL email. Please exercise caution. DO NOT open attachments or click links from unknown senders or unexpected email. ***

**From:** Cynthia Sword
**Sent:** Thursday, August 31, 2017 9:14 AM
**To:** 'jonshonebargerjr@corecivic.com'; 'Blair.Leibach@corecivic.com'; 'yolanda.pittman@corecivic.com'
**Cc:** Deborah Thompson
**Subject:** FW: Attached Image

Chaplain,

I apologize that Mr. Edwin Steakley's #312255 letter was incorrect. The letter that went to the RAC was correct; however when I mailed the letter out I failed to type the 5th recommendation. Attached is a corrected copy of the letter. Would you please see that Mr. Steakley gets a copy of the corrected letter?

Thank you in advance for your cooperation in this matter.

Cindy

**From:** noreply@tn.gov [mailto:noreply@tn.gov]
**Sent:** Wednesday, August 30, 2017 1:19 PM
**To:** Cynthia Sword
**Subject:** Attached Image

Reverend Deborah Thompson
Director Religious Services TDOC
320 6th Avenue North
Rachel Jackson Building
Nashville TN 37243-0465

Monday, June 12, 2017


Reverend Thompson and the Religious Activities Committee,

The attached Tennessee Department of Correction Group Accommodations Request (CR-3735), is submitted for your action per TDOC policy 118.01. After review of the request from the Jewish inmate, Warden Washburn, AWT Pittman and Chaplain Shonebarger have approved each accommodation with modifications.

We will await the decision of the RAC and submit to your directives.


Sincerely,

Rev. Jon T. Shonebarger, Jr.
Chaplain, CoreCivic/TTCC
140 Macon Road
Hartsville, TN 37074

CoreCivic 000780



**CoreCivic**

*Better the public good.*

## MEMORANDUM

TO: Warden Washburn
Thru: AW Pittman
FM: Chaplain Shonebarger
RE: Tennessee Department of Correction Group Religious Accommodations Request (CR-3735)

Thursday, June 08, 2017

The attached CR-3735 is submitted to you for review and approval.

This is a request for the establishment of a Jewish faith group and observations of holy days. The inmates requesting the establishment of the religion and its practices are all registered Jewish in TOMIS. I do not consider them knowledgeable of the faith, however, they do have the right to request their faith be facilitated here at TTCC.

I have extensive experience with Jewish inmates, prison programming, required faith tenets and their security/safety applications in a correctional setting.

I have answered the Accommodations Request for the prison on the attached form; however, I have copies of the request and will modify, correct and/or change anything as directed by the AW or Warden. I recommend the approval of each Accommodation, "Subject to conditions."

Please notice my response to the kosher meal request. I answered each inmate will receive the diet he is assigned here at TTCC, being cognizant that CoreCivic is not offering kosher meals. It could be interesting what Director Thompson and the TDOC Religious Activities Committee rules in reference to the inmate's request.

We must submit to TDOC, Director Thompson and the Religious Activities Committee by June 18th.

AWT and Warden agreement/approval of my answers only requires an ok on this Memo. Otherwise, please advise of modifications. Possibly a meeting is in order. Thx.

CoreCivic 000784



**TENNESSEE DEPARTMENT OF CORRECTION**
**GROUP RELIGIOUS ACCOMMODATIONS REQUEST**

(COMPLETE pages 1 & 2; submit to Chaplain; See Policy # 118.01)

Date Submitted to Chaplain: _May 18, 2017_

_Edwin Lee Scrabley Jr._        _CN 312255_
Inmate Name                                    TDOC#

Estimated Number of Inmates in the Group: _10+_

1. Official name of the group:
_Jewish Worship_

2. Names and contact information of the group's leaders:
_Edwin Lee Scrabley Jr.    CR-218_

3. The group's teachings, beliefs, and practices:
_Faith in 1 God. Teaches that God is good and demands righteous conduct of his people and ethical conduct is this world and that all men deserve to be treated with dignity and respect. Our Sabbath begins on sun set Friday and ends sun set Saturday. Jewish thought stresses the important of freedom and mans rights come from God. Also teachs that all righteous have there part is the world to come. We follow our religious dietary laws as a sign of faith and bringing holiness to what is eaten and most important God's Laws. We pray 3 times a day and always to the east._
_Holy Days = Rosh Hashanah / Yom Kippur / Succos / Passover Shavuos / Chanukah / Purim / Tisha B'av / Fast of Tevet Fast of Esther / Fast of Tammuz / Fast of Gedaliah / etc._

4. Titles of the group's basic text(s):
_Torah, Talmud, Siddur, Torah Scroll, Scroll of Esther, Hagadah, Halacha, Havdalah, English, Yiddish, Megillah Mishnah, etc._

5. Other information helpful in researching the group:
_With Perfect Faith (D. J. Bleich), To Be a Jew: To Pray as a Jew (H. H. Donin), The Faith of Judaism (I. Epstein), Emet is the Torah: Man is not alone (A. J. Heschel) A History of the Jews (P. Johnson) This is My God: The Jewish way of life (H. Wouk)._

Case 3:22-cv-00093   Document 33-17   Filed 05/04/22   Page 182 of 198   PageID #: 782

6. Names of outside clergy or volunteers available to visit the institution:

_____
_____
_____
_____
_____
_____

7. **DETAILED** description of the accommodation(s) requested:
   a. First Accommodation

   *Rosh Hashavah*

   Shofar (Rams Horn), Mikvah (Ritual immersion) Kosher meals and grape juice, Matzo (unleavened bread) honey, apple slices, Time in the Chapel at Dawn for prayer, Siddur Books

   _____

   b. Second Accommodation

   *Passover*

   Kosher Meals, Matzah (unleavened bread), No leavened bread, rice, corn, peanuts, kosher grape juice, prayer service Shmurah Matzah (Special hand made bread) Ceremonial plate egg, Shank Bone, Charoses (A thick mixture of finely chopped apples, walnuts, horse radish, cinamon, Time in the Chapel

   c. Third Accommodation

   *Succos*

   Kosher meals and grape juice, Matzah (unleavened bread) Meals to be eaten in the Succah, Being able to stay at night in the Succah, Materials used to build a Succah palm branchs, 3 myrtle branchs, 2 willow branchs and etsog.

   d. Fourth Accommodation

   *Chanukah*

   A menorah, candles, Time in the Chapel, Dreidle (small spinning top), Kosher donuts, Potato Cakes, Kosher meals

   _____

   e. Fifth Accommodation

   *Sabbath*

   Saturday Service, Torah Scroll, ~~xxxxxxxx~~, grape Juice Candles.

If more than five accommodations are requested, please add additional pages showing Sixth Accommodation, Seventh Accommodation, etc.

Case 3:22-cv-00093   Document 33-17   Filed 05/04/22   Page 183 of 198   PageID 786

8. **Recommendations by the Warden and the Chaplain** June 18, 2017

Date Sent to the Religious Activities Committee: Approval with modifications

a. First Accommodation -- Recommendation: ✓ Approval _____ Disapproval

Reason: High holy days will be facilitated for inmates registered in Tomis. Ceremonial items: kosher grape juice and matzo will be provided. Religious group property will be in compliance with TDOC policy. Program times will be scheduled in accordance with safety + security at TTCC. Inmates will eat the diet they are registered for at TTCC.

b. Second Accommodation -- Recommendation: ✓ Approval _____ Disapproval

Reason: Seder services will be facilitated for inmates registered in Tomis as Jewish. The items required on the Seder tray will be provided, as well as kosher for Passover grape juice and matzo. Inmates will eat the diet they are registered for at TTCC.

c. Third Accommodation -- Recommendation: ✓ Approval _____ Disapproval

Reason: There are not outside religious ceremonies at TTCC due to security perimeter and safety/security considerations. As a result, a Sukkot will not be built nor will inmates spend the night outside a secure cell. TTCC will facilitate an indoor evening program with ceremonial kosher grape juice and matza. Inmates will eat the diet they are registered for.

d. Fourth Accommodation -- Recommendation: ✓ Approval _____ Disapproval

Reason: A battery operated menorah will be provided for the ceremony as a result of safety. While kosher donuts, potato cakes and shekels are traditions. They are not mandated by policy and will not be facilitated. Inmates will eat the diet they are registered for at TTCC.

e. Fifth Accommodation -- Recommendation: _____ Approval _____ Disapproval

Reason: The Saturday sabbath service will be scheduled and facilitated. Battery operated candles will be provided as well as kosher grape juice for the kiddish. A braid will not be provided.

Case 3:22-cv-00093   Document 33-17   Filed 05/04/22   Page 184 of 198   PageID #: 784

9. **Approval or Disapproval by the Religious Activities Committee**

Date of Approval or Disapproval: _____

a. First Accommodation: _____ Disapproved _____ Approved

_____
_____
_____
_____
_____
_____
_____

b. Second Accommodation: _____ Disapproved _____ Approved – subject to conditions:

_____
_____
_____
_____
_____
_____

c. Third Accommodation: _____ Disapproved _____ Approved

_____
_____
_____
_____
_____
_____
_____

d. Fourth Accommodation: _____ Disapproved _____ Approved

_____
_____
_____
_____
_____
_____

e. Fifth Accommodation: _____ Disapproved _____ Approved

_____
_____
_____
_____
_____
_____

Case 3:22-cv-00093   Document 33-17   Filed 05/04/22   Page 185 of 198 PageID #: 788   COC 000785

Jewish Inmates

| TDOC # | Name | |
|--------|------|--|
| 101442 | George W. Matthews | Jew/orth |
| 377955 | Bryan Ray Phillips | Jew/orth |
| 396069 | Erick Bryan Shoemake | Jew/orth |
| 475124 | Daniel O'Sicky | Jew/orth |
| 513886 | Logan Miguel Kennedy | no pref |
| 558062 | Anthony Dean Blackwell | Jew/orth |
| 212287 | James R Sanders | Jew/Ref |
| 312255 | Edwin L Stuckley | Jew/orth |
| 212808 | Terry W Wright | Jew/Ref |
| 293148 | Michael C Copeland | Jew Ref |



**TN** Department of
Correction

June 29. 2017

Edwin Lee Steakley, Jr. #312255
TTCC
140 Mason Way
Hartsville TN 37074

Dear Mr. Steakley, Jr.

We received your group accommodation request, however, you need to submit this request
to the Chaplain and Warden for their recommendations per policy. The Chaplain will submit
to us. Thank you and if you have any further questions, feel free to contact our office.

Sincerely,

Deborah Thompson
Director of Religious, Volunteer & Victim Services

Cc: TP-17-294
Chaplain Jon Shonebarger
Warden Russell Washburn





**Correction**

June 29, 2017

Edwin Lee Steakley, Jr. #312255
TTCC
140 Mason Way
Hartsville TN 37074

Dear Mr. Steakley, Jr.

We received your group accommodation request, however, you need to submit this request to the Chaplain and Warden for their recommendations per policy. The Chaplain will submit to us. Thank you and if you have any further questions, feel free to contact our office.

Sincerely,

Deborah Thompson
Director of Religious, Volunteer & Victim Services

Cc: TP-17-294
Chaplain Jon Shonebarger
Warden Russell Washburn

**Shonebarger Jr, Jon**

| | |
|---|---|
| **From:** | Shonebarger Jr, Jon |
| **Sent:** | Tuesday, November 28, 2017 12:48 PM |
| **To:** | 'Christopher Brun'; Washburn, Russell; Pittman, Yolanda |
| **Cc:** | 'Deborah D. Thompson' |
| **Subject:** | RE: Chris Brun Inquiry |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Chris,

I have reviewed the attachments from inmate Steakley. There was an approval from TDOC on a "Group Accommodation". However, there is no group (any other inmates) seeking to have an organized program. Inmate Steakley is alone. We will respect his faith and assist in his <u>independent worship</u> and faith practice. His faith is not being denied. In addition, we have acquired donated books for his, and other inmates spiritual studies.

Be aware that when I spoke to Director Thompson about the lack of a group of inmates, she directed me to <u>NOT QUERY</u> the TTCC population for interested inmates. She stated that is each inmate's personal responsibility. Be aware I was out on 6 weeks FMLA, but Chaplain Simic did not receive any request from any other Jewish inmate. It is apparent to me that inmate Steakley is pressing to <u>merge other faith groups</u> in hopes of gaining time and space in the Chapel for whoever shows up. This is not acceptable.

Please advise if you need additional information.

Chaplain Shonebarger

**From:** Christopher Brun [mailto:Christopher.Brun@tn.gov]
**Sent:** Tuesday, November 28, 2017 12:12 PM
**To:** Washburn, Russell <Russell.Washburn@corecivic.com>; Pittman, Yolanda <Yolanda.Pittman@corecivic.com>; Shonebarger Jr, Jon <Jon.ShonebargerJr@corecivic.com>
**Subject:** FW: Attached Image

*** This is an EXTERNAL email. Please exercise caution. DO NOT open attachments or click links from unknown senders or unexpected email. ***

Attached is documentation along with a grievance inmate Steakley gave me in f unit today. He keeps copies of Director Thompsons letter on him at all times and he will probably attempt to stop any of our visitors tomorrow as well with his ongoing religious issues. I want as all to be on the same page with his issue.

 Correction

CHRIS BRUN
TDOC LIAISON TROUSDALE TURNER CORRECTIONAL CENTER

1



**Better the public good.**

Monday, December 11, 2017

Dear Mr. Edwin Steakley (312255),

We are responding to your inquiry with Tennessee Department of Correction concerning a kosher diet and the Religious Group Accommodations Request for the Jewish Faith Group.

As Trousdale Turner Correctional Center administration has previously advised you, CoreCivic TDOC prisons are not regulated by TDOC policy 116.08 and do not provide kosher diets. Any inmate may request an "Alternative" diet if they do not want to consume a "Regular" diet. In addition, the Religious Services Department does not prescribe diets based on medical needs. You must consult with our Medical Department for health concerns.

In addition, the Religious Activities Committee Reply #17-011 for your **Group** Accommodations Request (CR-3735), was approved on August 8, 2017. However, as previously conveyed to you, you are the only inmate seeking to participate in group activities. There is no "group" here at Trousdale Turner Correctional Center. It is the responsibility of every inmate to communicate with the Chaplaincy Department on matters of their faith and practice. There has been no interest by the Jewish inmate population to start group religious programs. As a result, we will continue to assist you in your personal faith and practice until a group can be formed. Finally, TDOC recognizes 90 different religions; not all of those religions have formed into groups.

The religious rights of every inmate continues to be our commitment. Please come to the Chaplain's Office to further discuss your questions of faith and practice.

Sincerely,

Chaplain Jon Shonebarger
CoreCivic/TTCC

Case 000790

**Shonebarger Jr, Jon**

| | |
|---|---|
| **From:** | Patricia Aldridge <Patricia.Aldridge@tn.gov> |
| **Sent:** | Tuesday, December 12, 2017 6:24 AM |
| **To:** | Shonebarger Jr, Jon |
| **Subject:** | Edwin Steakley #312255 response letter approved |
| **Attachments:** | Edwin Steakley #312255 response letter approved.docx |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

*** This is an EXTERNAL email. Please exercise caution. DO NOT open attachments or click links from unknown senders or unexpected email. ***

Good morning,

The attached response letter has been approved. I have removed my name from the response. Please forward a copy of the attached response letter to the inmate. Thank you for your response.

1



## MEMORANDUM

TO: Warden Russell Washburn
FM: Chaplain Jon Shonebarger; Chaplain Tom Simic
THRU: AWT Yolanda Pittman
RE: Tennessee Department of Correction Group Religious Accommodations Request (CR-3735),
    Nation of Islam

Wednesday, September 13, 2017

**The attached CR-3735 is submitted for your action.**

The Nation of Islam faith group is requesting three accommodations in their faith practice here at Trousdale-Turner Correctional Center that we need to address, then submit to the Religious Activities Committee at TDOC. Items **7a. and 7c.** are already being observed and in place here at TTCC (see attachment). I recommend we approve those; they are in compliance with their faith tenents.

**Item 7b**. requests the group be authorized to receive and purchase DVDs, CDs and text from *"Final Call,"* the official media arm of the Nation of Islam. Our issue as a facility is that inmates are prohibited from purchasing *"Video cassette tapes, microcassettes, compact discs (CDs) and DVDs..."* (TDOC 507.02. VI.E).
The policy is attached.

In addition, CoreCivic facilities have had difficulties with *Final Call* publications. Materials, both printed and electronic, often contain language that incites violence based on race, religion, sex, creed or nationality. This is forbidden (TDOC 507.02.C.3.). As a facility, RLUIPA states we would have a compelling governmental reason to deny media for institutional safety and security.

To answer **7b**. I recommend we submit this reply to the TDOC/RAC: <u>Approval, with modifications</u>. *"The Nation of Islam faith group may request religious program materials, in writing, to the Religious Services Department at Trousdale-Turner Correctional Center. Upon review and approval, procurement of group faith material will be acquired from vendors at the discretion of the facility. The Assistant Warden of Treatment approves all purchases. Inmates are prohibited by TDOC policy 507.02.VI.E. to purchase electronic media themselves."*

AWT and Warden agreement/approval of my recommendations only requires your signature on this MEMO; I will submit our reply to TDOC/RAC. If you do not concur, please advise. Possibly a meeting is in order. --JS

6.  Names of outside clergy or volunteers available to visit the institution:

    Brother Andrew Muhammad

    Brother Robert Muhammad

    Brother Eric Muhammad

7.  **DETAILED** description of the accommodation(s) requested:

    a. First Accommodation

    That we be able to practice our Islamic Religious Brief according to the teachings of
    Most Honorable Elijah Muhammad and Honorable Minister Louis Farrakhan of the
    Nation of Islam pursuant to TDOC Policy #118.01 and RLUIPA.

    b. Second Accommodation

    That we be able to receive and purchase Nation of Islam DVD's, CD's and Text
    Material, which to include the Final Call Newspaper pursuant to TDOC Policy
    #118.01 and #507.02, and RLUIPA.

    c. Third Accommodation

    That we be able to observe Savior Day which is celebrated by the Nation of Islam
    on 26th day of February, and the Holy Month of Ramadan pursuant to TDOC Policy
    #118.01 and RLUIPA.

    d. Fourth Accommodation

    e. Fifth Accommodation

If more than five accommodations are requested, please add additional pages showing Sixth
Accommodation, Seventh Accommodation, etc.

CR-3735 (Rev. 06-10)          Duplicate as Needed                              2

CR-000793

reasonable suspicion, determined that privileged mail or tapes may contain information relating to criminal activity. The privileged mail/tape may be read or listened to outside the presence of the inmate if doing so is necessary to avoid compromising an on-going criminal investigation. A bound ledger shall be maintained by mail room staff that lists each of privileged mail received/sent, the date inspected and delivered, and recipient's signature. Mail relating to the implementation of Policy #511.05 (Identification for Post Release) is not considered privileged mail.

2. All incoming inmate privileged mail, staff mail, and packages shall be fluoroscoped for contraband prior to leaving the mail room.

3. Incoming mail may be determined to be a threat to the security of the institution and returned to the sender if, in the opinion of the Warden, it could reasonably be considered to:

    a. Be an attempt to incite violence based on race, religion, sex, creed, or nationality.

    b. Advocate, facilitate, or otherwise present a risk of lawlessness, violence, anarchy, or rebellion against government authority, prison staff, and/or other inmates.

    c. Be an attempt to incite disobedience toward law enforcement officials or prison staff.

    d. Be an attempt to give instructions for the manufacturing or use of intoxicants, weapons, explosives, drugs, drug paraphernalia, other unlawful articles or substances, or any other items deemed as contraband.

    e. Contain plans to escape, unauthorized entry into the institution, or information or maps which might aid an escape attempt.

    f. Contain information relating to security threat group activity or use of codes and/or symbols associated with security threat groups.

    g. Sexually explicit material or material which features nudity which by its nature or content poses a threat to the security, good order, or discipline of the institution, or facilitates criminal activity.

4. Incoming correspondence may include only photographs (no Polaroid-type pictures allowed) and clippings from printed materials. No personal checks, certified checks, money orders, or cash will be accepted.

5. Printed materials may be received by inmates in an unlimited amount, provided they are mailed directly from the publisher(s) or recognized commercial distributor. Persons ordering printed materials for inmates should be careful to accurately identify the seller. Some materials offered on the website of recognized commercial distributors are listed for sale by third-party sellers, and when purchased will be mailed from the third-party seller who is not a recognized commercial distributor.

D.  Books, magazines, and newspapers received directly from the publisher or a recognized distributor are assumed to have been purchased; therefore, when sent into the institution as bulk rate mail, these items will be accepted unless the printed material is denied by the Warden under the provisions outlined in Section VI.(C)(3) above. These items will not be considered packages. All other bulk rate mail will not be processed by institutional mail room staff. Unauthorized items sent by bulk rate with guaranteed postage paid if returned shall be returned to the sender. Other undelivered bulk rate mail shall be destroyed. Inmates who want to receive other items that are normally sent bulk rate mail must prepay first or second class postage for the material to be delivered by TDOC staff.

E.  Video cassette tapes, microcassettes, compact discs (CDs), and DVDs are not permitted.

F.  Audio cassette tapes may be received in accordance with Policy #504.01, Inmate Personal Property, and under the following circumstances:

1.  Inmates with a disability or other condition that prevents the inmate from being able to engage in written correspondence may receive communication tapes. Special approval is required by the Warden via the inmate's counselor.

2.  Religious/educational tapes may be received from recognized religious groups. (See Policy #118.01)

3.  Inmates participating in an approved educational correspondence course may receive audio cassette tapes mailed directly from the educational facility providing the course. (See Policy #117.02)

4.  Legal tapes, CDs, and DVDs may be received from attorneys of record.

5.  Musical tapes may not be received.

G.  All incoming mail must bear the inmate's committed name, TDOC identification number, and the correct institutional address of the inmate recipient. Aliases may be included when such have been legally changed through the court. Exception to the TDOC identification number requirement is allowed for incoming Form 1099s, which are issued by the federal government to indicate the inmate's earned wages. In this instance, the inmate's Social Security number has been indicated and will serve as proper identification. Every effort shall be made to deliver inmate mail; however, when neither the correct identity of the inmate recipient nor the sender can be determined, the mail/package in question shall be returned to the USPS as "undeliverable mail". Incoming mail that has been opened must be resealed and returned with postage paid by the facility.

1.  Inmates may correspond with others who are incarcerated. Inmates will not be permitted to enclose stamps in correspondence to other inmates.

2.  Inmates in segregation may write and receive letters on the same basis as inmates in the general population.

 **CoreCivic**

# M E M O R A N D U M                    #18-043

**TO:**         ALL Inmate Population

**FROM:**     Russell Washburn, Warden

**DATE:**     April 12, 2018

**SUBJECT:  UNION SUPPLY CATALOG**

The following is a list of items not allowed at TTCC as designated through TDOC of our in-house policy:

- Page 5       Item # 1055013       Shower Sandal
- Page 5       Item # 1055009       Shower Slippers
- Page 6                                  All Insoles
- Page 14     Item # 5040001       Wristband
- Page 15     Item # 2506005       Handkerchief
- Page 19     Item # 4001123       Clear Tunes Antenna
- Page 24     Item # 7520063       Wide Tooth Comb
- Page 24     Item # 7520083       9" Comb
- Page 24     Item # 7505004       Vented Brush
- Page 24     Item # 7099025       Body Puff
- Page 24     Item # 7515110       Toe Nail Clipper (No File)
- Page 26     Item # 6070070       Abalone Shell
- Page 26     Item # 6070169       Turkey Feather
- Page 26     Item # 6070126       Drum Kit
- Page 27     Item # 6070039       Modern Tallit w/Matching Kipa, Tallit Bag
- Page 28     Item # 6070210       Brass Cauldron 3'

Nothing from the Women's section pages 29-33. Allowable items on page 33 are as follows:

- Page 33     Item # 7520205       Jumbo Ouchless Ponytail Holders
- Page 33     Item # 7520201       Ouchless Ponytail Holder
- Page 33     Item # 7520067       Super Stretch Rubber Band

The following items cannot be ordered, although you may check them out of the library:

- Page 27     Item # 6599942       Torah
- Page 27     Item # 6599938       The Prose Edda-The Tale from Norse Mythology
- Page 27     Item # 6599943       Bhagavad Gita
- Page 27     Item # 6599939       The Poetic Edda-The Mythological Poems
- Page 28     Item # 6070010       The Qur'an Translation

CC: TDOC

140 Macon Way · Hartsville, TN  37074          Phone (615) 808-0400 · Fax (615) 808-0499          www.corecivic.com



# MEMORANDUM                #18-043A

**TO:**        ALL Inmate Population

**FROM:**      Russell Washburn, Warden

**DATE:**      August 2, 2018

**SUBJECT:  UNION SUPPLY CATALOG**

The following is a list of items not allowed at TTCC as designated through TDOC of our in-house policy:

- Page 5        Item # 1055013        Shower Sandal
- Page 5        Item # 1055009        Shower Slippers
- Page 6                                All Insoles
- Page 14       Item # 5040001        Wristband
- Page 15       Item # 2506005        Handkerchief
- Page 19       Item # 4001123        Clear Tunes Antenna
- Page 24       Item # 7520063        Wide Tooth Comb
- Page 24       Item # 7520083        9" Comb
- Page 24       Item # 7505004        Vented Brush
- Page 24       Item # 7099025        Body Puff
- Page 24       Item # 7515110        Toe Nail Clipper (No File)
- Page 26       Item # 6070070        Abalone Shell
- Page 26       Item # 6070169        Turkey Feather
- Page 26       Item # 6070126        Drum Kit
- Page 27       Item # 6070039        Modern Tallit w/Matching Kipa, Tallit Bag
- Page 28       Item # 6070210        Brass Cauldron 3'

Nothing from the Women's section pages 29-33. Allowable items on page 33 are as follows:

- Page 33       Item # 7520205        Jumbo Ouchless Ponytail Holders
- Page 33       Item # 7520201        Ouchless Ponytail Holder
- Page 33       Item # 7520067        Super Stretch Rubber Band

CC: TDOC

Corel000797



**TROUSDALE TURNER CORRECTIONAL CENTER**

# MEMORANDUM               #18-043B

**TO:**        ALL Inmate Population

**FROM:**    Russell Washburn, Warden

**DATE:**    September 20, 2018

**SUBJECT:  UNION SUPPLY CATALOG**

The following is a list of items not allowed at TTCC as designated through TDOC of our in-house policy:

| | | | |
|---|---|---|---|
| • | Page 5 | Item # 1055013 | Shower Sandal |
| • | Page 5 | Item # 1055009 | Shower Slippers |
| • | Page 6 | | All Insoles |
| • | Page 14 | Item # 5040001 | Wristband |
| • | Page 15 | Item # 2506005 | Handkerchief |
| • | Page 19 | Item # 4001123 | Clear Tunes Antenna |
| • | Page 24 | Item # 7520063 | Wide Tooth Comb |
| • | Page 24 | Item # 7520083 | 9" Comb |
| • | Page 24 | Item # 7505004 | Vented Brush |
| • | Page 24 | Item # 7099025 | Body Puff |
| • | Page 24 | Item # 7515110 | Toe Nail Clipper (No File) |
| • | Page 24 | Item # 7515010 | Trim Nail Clipper |
| • | Page 24 | Item # 4034239 | Level 10 Battery Shaver |
| • | Page 26 | Item # 6070070 | Abalone Shell |
| • | Page 26 | Item # 6070169 | Turkey Feather |
| • | Page 26 | Item # 6070126 | Drum Kit |
| • | Page 27 | Item # 6070039 | Modern Tallit w/Matching Kipa, Tallit Bag |
| • | Page 28 | Item # 6070210 | Brass Cauldron 3' |

Nothing from the Women's section pages 29-33. Allowable items on page 33 are as follows:

| | | | |
|---|---|---|---|
| • | Page 33 | Item # 7520205 | Jumbo Ouchless Ponytail Holders |
| • | Page 33 | Item # 7520201 | Ouchless Ponytail Holder |
| • | Page 33 | Item # 7520067 | Super Stretch Rubber Band |