| | | |
|---|---|---|
| **BOAZ PLEASANT-BEY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action Number 3:19-CV-486** |
| | ) | **District Judge Aleta A. Trauger** |
| **STATE OF TENNESSEE,** | ) | **Jury Demand** |
| **TENNESSEE DEPARTMENT** | ) | |
| **OF CORRECTIONS, REVEREND** | ) | |
| **BRIAN DARNELL, TONY** | ) | |
| **PARKER, CORECIVIC, INC.,** | ) | |
| **JON SHONEBARGER, TOM SIMIC,** | ) | |
| **and RUSSELL WASHBURN,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## DEFENDANTS' EXPERT DISCLOSURES

Pursuant to Federal Rule of Civil Procedure 26(a)(2), Defendants CoreCivic, Inc., Jon Shonebarger, and Russell Washburn submit the Expert Disclosures of Khaleel Mohammed, Ph.D., and James R. Upchurch.

**Khaleel Mohammed, Ph.D.**
**Department of Religious Studies**
**San Diego State University**
**5500 Campanile Drive**
**San Diego, California 92120**

**James R. Upchurch**
**1387 Devonshire Drive**
**Tallahassee, Florida 32317**

Attached hereto is an Expert Disclosure for each expert witness along with a Curriculum Vitae for each expert witness. The information that is required to be disclosed pursuant to Federal Rule of Civil Procedure 26(a)(2) is contained in the Expert Disclosure and Curriculum Vitae of each expert witness with the exception of Khaleel Mohammed, Ph.D.'s rate for review, which is $550 an hour.

Respectfully submitted,

*(signature)*

Joseph F. Welborn, III (#15076)
joe.welborn@klgates.com
Erin Palmer Polly (#22221)
erin.polly@klgates.com
Terrence M. McKelvey (#36531)
terrence.mckelvey@klgates.com
K&L Gates LLP
222 Second Avenue, South
Suite 1700
Nashville, Tennessee 37201
(615) 780-6733

*Counsel for Defendants CoreCivic, Inc., Jon Shonebarger, and Russell Washburn*

## CERTIFICATE OF SERVICE

I certify that a true and exact copy of the foregoing has been served via U. S. Mail, first-class postage prepaid, this September 27, 2021, on the following:

Tricia Herzfeld
Branstetter, Stranch & Jennings, PLLC
223 Rosa L. Parks Avenue, Suite 200
Nashville, Tennessee 37203

Thomas J. Aumann
Nikki N. Hashemian
Assistant Attorney General
P.O. Box 20207
Nashville, Tennessee 37202

*(signature)*

2

**Expert Witness Report in the Matter of *Boaz Pleasant-Bey v. State of Tennessee, Tennessee Department of Correction, et al.***

Prepared by: Khaleel Mohammed, Ph.D., Professor, Department for the Study of Religion; Director, Center for Islamic and Arabic Studies, San Diego State University, 5500 Campanile Drive, San Diego, CA 92120

 The following report is prepared based upon the request of Attorneys Savannah Darnall and Erin Polly who have forwarded me the relevant documents. I will provide an analysis of the Plaintiff, Mr. Boaz Pleasant-Bey's petitions from the perspective of Islamic Law.

 I read Islamic law at the Imam Muhammad Bin Saud University (Riyadh, Saudi Arabia), and have also done Islamic studies in Mauritania, Yemen, and Syria. I hold a doctorate in Islamic Law from McGill University (Montreal, Canada) and have been a professor at San Diego State University in the Department for the Study of Religion since July 2003. In 2012, I was promoted to Full Professor, and, as of May 2020, I am also Director of the University's Center for Islamic and Arabic Studies. I have provided expert testimony before in cases pertaining to matters of Islamic law and beliefs. The last such case was the matter of BAHRAM YAHYAVI and SOODABEH YAHYAVI (Plaintiffs) versus SERVICE CORPORATION INTERNATIONAL, A Texas Corporation; STEWART ENTERPRISES, INC., a Louisiana Corporation; S.E. ACQUISITION OF CALIFORNIA, INC., a California corporation doing business as EL CAMINO MEMORIAL (Defendants), Case Number 37-2017-0050011-CU-BC-CTL, Superior Court of the State of California, County of San Diego, before the Honorable Judge Timothy Taylor, trial date, April 26, 2019. I was retained by Attorney John Mason (of the firm Gurney & Mason & Forestiere), on behalf of the defendants, and provided a deposition on March 8, 2019. This is the only case in which I have testified through deposition or trial over the last four years.

 I would like to point out that I am a Muslim, belonging therefore to the same faith that the Plaintiff follows. As an observant Muslim, and a scholar, I base my conduct on the following verses of the Qur'an, Islam's scripture.

(a) Chapter 4, verse 135, states: O believers! Stand firm for justice as witnesses for God even if it is against yourselves, your parents, or close relatives…

(b) Chapter 5, verse 8: O believers! Stand firm for God and bear true testimony. Do not let the hatred of a people lead you to injustice. Be just! That is closer to righteousness. And be mindful of God. Surely God is All-Aware of what you do.

(c) Chapter 2, verse 177 informs its believers that: Righteousness is not that you turn your faces towards the east or the west. Rather, the righteous are those who believe in God the Last Day, the angels, the Books, and the prophets; who give charity out of their cherished wealth to relatives, orphans, the poor, the wayfarer, those who ask, and for freeing captives; who establish prayer, pay alms-tax, and honor their oaths; and who are patient in times of

suffering, adversity, and in periods of panic. It is they who are true in faith, and it is they who are God-conscious.

Based on the above verses as cited in (a) and (b), especially since this is a matter pertaining to religion, I have to speak the truth. The underlined section in item (c) is to indicate that, based upon my citizenship oath and as a Muslim, I am compelled to provide true testimony.

While I do not normally, as an academic, use the abbreviation "PBUH" (Peace be Upon Him) when mentioning the Prophet of Islam, I will in this document, out of deference to the Plaintiff's devotion to the normative Muslim protocol of respect, use the term "the Prophet Muhammad."

Islam, like Judaism, is deemed more a religion of practice (praxis), and from its very inception, focused on the aspect of obtaining proper knowledge. Indeed, the Qur'an polemizes against those who claim to follow a scripture while not even knowing its proper meaning, as indicated by Chapter 2:78, "And there are among them illiterates, who know not the Book, except by whim, and they do nothing but conjecture." Along this line, the Qur'an asks the rhetorical question, Chapter 39:9 "Are those who know equal to those who don't know?" It is for this reason that within Islam, interpretation of scripture and law has been the forte of the scholar.

When Plaintiff refers to differences of opinion about issues, as he occasionally does in his deposition—those differences would come from scholars, not laypersons. The reliance upon scholars is extremely important in lands where Arabic is not spoken since many Muslims, while they may be able to read the Arabic script, do not understand the language itself.

There are some definitions and explanations that I would like to provide at this time as they are very important for properly analyzing the Plaintiff's statements. Muslims rely on two major sources for their beliefs and practices, the Qur'an and the Hadith/Sunna. The definitions and explanations of those terms are as follows:

(1) **The Qur'an**: Muslims see it as the actual words of God, unchangeably transmitted from the Prophet Muhammad to our present time. What Muslims may differ upon is the interpretation of words. For example, in a verse advising when one is to perform ceremonial ablution, the term *"lamastum al nisaa"* (Qur'an 4:43) is used. Muslim scholars agree that the literal understanding is "you have touched women." They differ, however, on if the expression is a euphemism for sexual intercourse, or if it has to be taken literally.

(2) **The Hadith**: This is defined as "that which is imputed to the Prophet Muhammad in terms of speech, action or tacit approval." The language here is significant. For scholars, the passive indicates lack of certainty, and we cannot generally prove beyond the shadow of a doubt that a hadith is truly from the Prophet Muhammad. There are many classifications for hadith, among them, "authentic," "weak," "false," "fabricated," etc. In fact, there are some Muslims who do NOT accept the Hadith (although they are a miniscule minority). Certain denominations will reject some hadith because the reporters were seen as

problematic. The Plaintiff, for example, requested two Hadith collections: *al Bukhari* and *Muslim*. That indicates that he belongs to the Sunni denomination of Islam, for if he were a Shia, he would have NOT accepted those texts as truly indicative of The Prophet Muhammad's sayings and actions.

**(3)** In classical Islam, the Hadith was seen as the domain of the scholar. The proliferation and translation of this genre of literature now means that non-scholars have easy access to those texts. Without a knowledge of hadith sciences, and how to compare one narration against another, untrained readers often make wrong extrapolations.

**(4) The Sunna:** This term is often interchangeably used with "Hadith." However, it is also used to refer to something that is recommended, but NOT obligatory. A Sunna can never be obligatory.

All human behavior, according to Islamic law, is classified into five categories (*al-ahkam al-khamsah*):

*Wājib* or *Fard*: Obligatory and required. One who neglects such an act without a valid excuse is deemed blameworthy. An example is the prayer in the case of the Muslim who has reached the age of discernment.

*Harām* or *Mahzūr*: Proscribed or Prohibited. One committing such an act without a valid excuse is deemed blameworthy. An example would be taking someone else's property, over which one does not have any rights, by force.

*Mandūb* or *Mustahab*: These are acts that are commendable, and sometimes recommended, but not required. This means that if a person does NOT do these, s/he is not considered blameworthy. An example would be the returning of a greeting better than which one is greeted with. This act is not blameworthy if NOT done, but if done, it merits reward from God.

*Makruh*: Discouraged or Odious: An act that ought not to be done, but if done, does not make one blameworthy. If avoided, however, they render the person liable for reward from God. This is often perspectival, since the governing rule in Islam is that of permissibility. If something is forbidden, it has to be by clear Divine writ (Qur'an 6:119: He has clearly detailed what is forbidden unto you . . . ). For many jurists, if they feel that something is not clearly prohibited by the Qur'an or other authorized source, perhaps because it was unknown to the Prophet and his contemporaries, but they opine strongly against its use, they would say it is *makruh*. This is also not to play God and arrogate to themselves the authority that seems to clash with verse 6:119 already cited in this paragraph. An example would be the wearing of clean, although foul-smelling clothes when going to congregational prayer.

*Mubāh*: Permitted. This category refers to acts that are without moral consequence, and merit neither reward nor punishment. An example would be the simple eating of celery: since it is permitted in Islam, the simple act of eating it does not come with the idea of reward or blameworthiness.

With the development of the judiciary in Islam, Muslim jurists adopted the coinage of legal maxims (much like their western counterparts), and in cases such as the one here, would use those maxims rather than resort to specific verses of the Qur'an or traditions from the Hadith to issue rulings regarding the five categories of actions above.

The Qur'an's edicts are addressed to sane adult persons who are in free society, i.e. not constrained by circumstances. In some cases of duress, the Qur'an explains how some of its rulings may be interpreted in a non-normative manner. An example would be in a life or death situation where no other food but that which is normally forbidden is available -- in which case the Qur'an allows the Muslim to eat forbidden food.

The Plaintiff is in a prison, in the custody of correctional authorities. There are several practices therefore that, while he may have the choice of following were he not in custody, he may not be allowed to do for security or other reasons. The prison authorities are deemed "wulaat al amr," -- the Arabic Islamic legal reference for those placed in charge over him, and the Plaintiff must, by Islamic law, respect their authority and obey the rules and regulations of the prison. There is no difference of opinion about this among jurists. If any directive is deemed to be one that threatens his religious rights, then a petition process has to be followed, in which the appointed authorities will issue a ruling.

The above information will now be applied to analyzing the Plaintiff's petitions, as copied and pasted from the material on file, with some entries omitted since they were not part of the lawsuit:

TN Department of Correction
Memorandum
To: Religious Activities Committee
From: Deborah Thompson, Director of Religious, Volunteer, and Victim Services

Date: January 23, 2018

Subject: RAC #18-002 (TP-18-047) (TP-18-015)

Attached is a Request for Group Religious Accommodations dated January 23, 2018 submitted by Boaz
Pleasant Bey, #473110 on behalf of the Quranic Arabic Studies Class at NECX.
**We will consider this request at our meeting on January 25, 2018.**
The inmate has requested:
1. Turbans and Agals from Halalaco (sic) or Islamic Bookstore. Prophet Muhammad (PBUH) wore these head dresses when he recited the Arabic Quran.
2. Halal certified food items (i.e. meats, snacks, soups, teas, etc.) from Union Supply, Halalaco, the Islamic Bookstore and Celestial Seasonings. We believe in eating Halal food items (only) and we don't have halal food options. Halal foods are pure and we must eat them to follow Islam.
3. Halal Soaps, deodorants and lotions from Halalaco, and the Islamic Bookstore (and Halal toothpaste. We do not have access to these Halal items. Currently the cosmetics available have many haraam (unlawful) ingredients in there and we have no access to halal items.

6. Khufain socks (worn by Prophet Muhammad (PBUH)). NSECX Administration has presented "a irrational" theory that the khufain socks (Leather socks) are a security threat (or risk). I was informed that the thin material used to make the khufain socks could be used to make gloves to climb over the gate with? Inmates are allowed to wear leather shoes which could be used to make a more durable pair of gloves. If that were the case, both leather socks (khufain) and leather shoes are worn on the feet. The allowance of one and disapproval of the other is a violation of 42u.s.c.((b) (1). RLUIPA prohibits NECX from treating a non-religious assembly of inmates. They are socks used for religious purposes. Halalco Books and the Islamic Bookstore sells them (khufain socks)

7. That the Quranic Arabic Class be placed on the out count sheet to ensure that the students of the class can be counted in class if there is a fog count due to esseccive [sic]fox at NECX as other religious
services.

I will deal with each of the relevant items under a self-explanatory heading. The first heading will be dealt with at great length since some of its rulings will apply to the other issues of the Plaintiff's requests.

## Turbans and Agals

The Plaintiff makes a very direct statement of claim that the Prophet wore these when reciting the Qur'an. There are several hadith showing that the Prophet wore a turban; there is none showing that he ever wore an "agal." The word "agal" is also incorrect -- the proper rendition would be "iqaal." I will only elucidate more on this point if specifically requested. An Islamic legal maxim, which has its equivalent in Western law is that the onus of proof is upon the claimant. The Plaintiff therefore has the burden of providing proof for his claim about the wearing of the Iqaal by the Prophet Muhammad. It should be noted that in Saudi Arabian jails, inmates are not allowed to have iqaals because they are a most dangerous weapon that can be used to strangle or inflict terrible injury. The iqaal is also now used as a political emblem. In Saudi Arabia, for example, most scholars of religion pointedly do NOT wear iqaals since they deem them as indicating arrogance and material status. Their contention would also be, as early stated, that the Prophet Muhammad never wore the item.

The Prophet Muhammad did wear a turban because it was considered part of proper dress for an Arab man. Jurists, while recognizing the Prophet Muhammad as a prophet, also note that he was an Arab and therefore dressed, spoke, and comported himself as one. The wearing of the turban comes under this category, i.e. following the custom of his people. The turban consists of either one or two pieces. It has a skullcap (which some refer to as a *kufi*), and is wrapped in cloth that may measure one or several yards long. Sometimes the cloth is wrapped without the use of the skullcap. The cloth that is used to wrap that turban can be used by someone to hang himself or to strangle another person, or to scale a wall or descend from it. It may be used to tie someone up—indeed one of the ways nobles were arrested was to have their hands tied with their turbans.

Most Islamic law manuals outline the conditions of prayer under what they term *shurut al salat* -- The conditions for prayer. A *shart* or condition is defined as that without which one cannot perform an obligation. A *shart*, therefore, is what is deemed essential to carry out an obligation. For prayer, the conditions are generally listed as nine, thus:

1. One must be Muslim.
2. One must be sane.
3. One must be deemed as being mature enough to make decisions.
4. The removal of *hadath* (impurity), and there are lesser and greater forms of hadath. These include menstruation, or intercourse that can be purified by a bath. The lesser form includes things like the passing of wind which can be purified by Wudhu, a form of ritual purification that only requires washing or wiping wet hands over specific parts of the body.
5. The removal of impurities from one's body, clothing, and place of prayer (different from clause 4 which refers to that which comes from within the person).
6. Covering of one's nakedness.
7. The prescribed time for worship.
8. Facing the *Qiblah* in Mecca.
9. Intention to Pray.

There is no mention of a head covering in the foregoing list of *shurut*. The Plaintiff's view that this is something he would love to follow in order to emulate The Prophet Muhammad is seen as his right if he were in open society, and falls under the classification of Mustahab (in the categories of action mentioned earlier). But he is not in open society; rather he is in a confined environment under the control of correctional staff. As noted earlier, both a turban and an iqaal may be used to inflict injury. Even if the Plaintiff feels that he is being slighted, the Islamic law maxim that governs this situation comes under the maxim "Private tribulation is endured to prevent a public tribulation" (*yutahmmal al darar al khaas li daf' al darar al 'aam*"). This means if, in the greater safety interests of the general prison population, as well as of his own person, the prison authorities have the right to forbid this act that would under ideal circumstances be allowed to the Plaintiff. Another fiqh maxim states that "prevention of harm takes priority over the realization of benefit" (*dar al mafasid yuqaddam ala jalb al masalih*). This means that a Muslim has to agree that a supererogatory act is praiseworthy under normal circumstances, but the prevention of harm to the general prison population is prioritized over this act(ion).

The *Keffiyah*, often referred to as *shumagh* or *ghutrah* is the piece of cloth that is often worn with or without the iqaal. The Prophet Muhammad is reported to have worn it at times, but since it is NOT part of the *shurut* of prayer, it falls into the category of the iqaal and turban. The Keffiyah is also a political symbol. The black and white chequered ones are mostly specific to Palestinians, while the red and white ones are normally worn by some Saudi Arabians.

Many Muslims pray at the two most prominent mosques in Islam -- in Mecca and Medina -- without covering the head. If it were a condition for prayer, the authorities at these two mosques would not have allowed them to pray thus. In fact, one of the rituals of the hajj/umra rituals in Islam REQUIRES that the head be uncovered while the devotee is in prayer. One of Islam's most famous jurists, Abu Ishaq al-Shatibi (d. 1388 CE), has opined thus, in his *Al-Muwafaqat* on the matter of head coverings for men:

> "[Customs] change matters from something praiseworthy to something blameworthy, and vice versa. For example, uncovering the head, is an issue that varies from place to place. In Eastern lands, it is something frowned upon for people of stature [muru'a], while in Western lands, it is not. Therefore, the Islamic ruling on it changes from place to place, and in Eastern lands, it would be taken into account for considering someone not worthy, while this would not be the case in Western lands."

In Islamic law -- as in almost any legal or philosophical system -- the argument is also examined in terms of its logical consistency. Plaintiff says, in reference to a head covering, on page 148 of his deposition that: "It is fard for me, which is obligatory." On page 149, however, he states: "You can still pray without them." Something is either fard (obligatory) or it is not: it cannot be both. In Islamic law, no individual Muslim can make something obligatory upon himself while admitting that it is not. He may do so as a personal choice, but has no right to insist on his view being catered to when it is inconsistent with the consensus of jurists.

## Halal Food Certified Items

Halal means "that which is allowable." There is a huge difference of opinion among later Muslim scholars (this seems to have started around 1979) as to if a Muslim may eat meat that is slaughtered by a non-Muslim. The Qur'an specifically allows Muslims to eat of the food of "the people of the book" -- a reference, in the most conservative outlook, restricted to Jews and Christians (Qur'an Chapter 5: Verses 1-5). Yet, despite this clear allowance, many Muslims insist on having meat killed by their fellow Muslims. Outside of the prison system, this is obviously the right of any citizen. However, over and above the issue of such insistence, there is consensus of opinion among Muslim jurists that there is no obligation to eat meat. The Qur'an allows it, but does not make its consumption a commandment. By the consensus of scholars, vegetables are also halal. The Plaintiff claims that the Prophet Muhammad and his companions regularly ate meat: the onus is upon him to provide proof of this because while there is no doubt that they did eat goat, lamb, and camel meat, there is no proof that this was seen as a law that they took upon themselves. The straitened circumstances in which the often lived meant that they more often ate lentils and vegetables In fact, there are traditions that show the Prophet Muhammad counselled against too much meat. Since the Plaintiff is in a correctional institution then the final decision rests with the

authorities of that institution, along with the consideration of the problems they may face in getting the so-called "halaal" meat.

The Plaintiff states that "halaal foods are pure and we must eat them to follow Islam." The statement is not incorrect, but to insist that such foods must contain meat is problematic. Vegetarian and fish dishes are also halaal and subsumed by the Plaintiff's declaration. As earlier noted, there is no injunction in the Qur'an to eat meat. When the Qur'an mentions meat and/or animals, it is meant that the meat/animals are allowable for consumption, not that there is an injunction or duty to eat meat. Rather, the mention of meat/animals in the Qur'an are evidence reflection of God's bounty, very similar to the way that the Bible references God's creation of what is on Earth, including "the fish of the sea and the fowl of the air." These references are not seen as a directive to the followers of Islam or Christianity that they must eat meat.

The requirements for special foods on the Eid commemoration days, such as goat, lamb, dates, etc., are not in keeping with Islamic law. It is certainly true that Muslims on these days, if they are not in prison, may seek such foods. The Plaintiff also states that meats have to be slaughtered 24 hours before the feast. This may occur, but the onus is upon him to provide proof of this, for he seems to be confusing the burial ritual requirements with slaughter requirements. Muslims from lands outside of Arabia may seek other meats. I, for example, am a Muslim from the Caribbean. On the day of Eid, some of us may eat beef or lamb, but it was the norm in my home to have chicken. There are some Muslims who will eat vegetarian food. This is because of the fiqh maxim "Custom has the weight of law" (*al aada muhakkamah*). Muslims in North America, Europe, and the Middle East may make traditional desserts or purchase what North American dishes are available. To insist on a particular type of cuisine makes Islam into a regional faith, something that is rejected by scholarly consensus among Muslim savants.

One of the arguments now among Muslim scholars is regarding switching to a vegan diet for ethical reasons. I mention this because the general position for those who OPPOSE veganism is thus: The vegan diet is obviously allowed. BUT to deny oneself meat is to reject the bounty of God, and it is as if a worshipper were tossing away the munificence of the Creator." Note that they are not claiming that Muslims are ordered to eat meat. The Plaintiff's contention seems to be transforming an allowance into an obligation. This is simply not permissible in Islam. To elaborate, to insist that the Eid necessitates the eating of meat is to bring into being a law that is NOT in the Qur'an and never has been a part of any Islamic jurisprudence that I have known in my forty years of experience in the field. The onus is upon the Plaintiff to provide a scriptural proof for this position. I may reiterate that the Plaintiff is within the confines of a correctional center and that he must observe the regulations of that center. When the Qur'an states that "God wants that which is easy for you," the initial understanding is that the worshipper/Muslim should not make things difficult for him/herself. HOWEVER, the extended understanding is that the Muslim should also be aware of the situation and circumstances and not make the observance of his/her faith something that presents unnecessary difficulties for those who are in charge of affairs. The request for specific

foods, especially if they are NOT normally carried by American food suppliers is an unnecessary and taxing demand.

## Halal Soaps, deodorants and lotions from Halalco

The Qur'an does prohibit pork and alcohol. However, the overwhelming majority of jurists see such prohibition as covering that which is ingested, not that which is used in soaps or deodorants and lotions. Added to this is the chemical process of *istihlaal* -- the process that chemically transforms the material from its original state. Muslim majority countries, under the rulings of religious bodies, import soaps, deodorant, lotions, and perfumes from countries around the world without the requirement that such material not contain pork or alcohol-based derivatives.

The Plaintiff also claims that he needs to have prayer oil that is obtained from only Muslim vendors, stating that oil purchased from certain vendors will be "Christian" oil. (Pleasant-Bey Deposition at 39). He then goes further on page 87, alleging that the purchase of prayer oil from only Muslim vendors has been done this way "since the foundation of Islam."

In the first place, by reference to the conditions of prayer already listed above, prayer oil ... by which I assume he means scented body oil/perfume is NOT listed. There is no doubt that the Prophet Muhammad did use this, but it never was an order, and this again, was in his capacity as a Prophet and a free person -- a situation quite different from being in a correctional institution under restrictions for security and safety. Insofar as security goes, I can testify that even in public, when one uses certain oils, one may encounter folks who perceive such smells as being somehow indicative of "terrorism" or some form of anti-American tradition. This, in a correctional institution, may be tantamount to exposing himself to attack. This goes against the Qur'anic directive, Chapter 2, verse 195 "Do not, by your own hands, throw yourselves to destruction."

The claim that oil was purchased from only Muslim vendors since the foundation of Islam is patently untrue. The Muslims traded with Christian and Jewish tribes, and used their oils as such scents were common to the region. There is no stipulation that such oil may be supplied only by Muslim vendors. In fact, this goes against the very concept of good citizenry and leads to bias and bigotry, given that the Qur'an orders Muslims to "exhort to that which is right and prohibit that which is bad." Chapter 5, verses 1-5 speaks of Muslim men being expressly allowed to marry women of the people of the book, seen as Jews and Christians (in conservative groups). If one can have a Christian or Jewish wife who may presumably bear children after a rather intimate biological process, it seems illogical to even make this stipulation about vendors being Muslim. In this case, the onus of proof is again upon the Plaintiff since from an Islamic and logical perspective, "proof" would be in terms of a verse from the Qur'an or a bona fide religious authority with supporting evidence/arguments. This is because in Islam, the rule is "Provide your proof if you are telling the truth."

**Khufain socks**

The Prophet Muhammad and his companions did SOMETIMES wear khuffain since this practice was known among Arabs. According to the nine conditions for prayers already mentioned, however, there is no condition that the validity of one's prayer is contingent upon wearing khuffain. In fact, the two collections of hadith literature that the Plaintiff has requested contain traditions indicating that the wearing of shoes was more of the norm of the Prophet Muhammad. I should note that the Plaintiff refers to "khuffain" and I have retained this term. It is however incorrect. Khuffain is, to use parsing terminology, in the accusative case, and is a dual. The term literally translated, in context, would be "two khuffain." The actual plural would be "khifaaf." I make this point because the Plaintiff has petitioned to want to learn Qur'anic Arabic. This is impossible if one does not have a basic command of standard Arabic.

I cite here a fatwa issued by the Egyptian Commission for Fatwas that outlines the matter in details that are applicable in this case:

It is important for Muslims worldwide to know that fatwas differ according to different times, places, people and circumstances. This means that rulings that have been appropriate under certain circumstances, times and conditions cannot be applied to other contexts.

As for the issue in question, generally speaking, praying in shoes is something that Islamic law permits. The Prophet (peace and blessings be upon him) and his Companions used to pray in their shoes due to the nature of mosques back then. Praying in shoes inside the mosque was acceptable at that time because the floors were nothing but sand and pebbles. In this context, the Prophet (peace and blessings be upon him) commanded his Companions to check their shoes before entering the mosque lest they have dirt on them.

It was reported in the Prophetic tradition that once while the Prophet (peace be upon him) was leading the Companions in prayer, he took off his shoes and placed them to his left. When the people saw this, they followed suit. When the Messenger of God ended the prayer, he asked, "What made you take off your shoes?" They replied, "We saw you take off your shoes, so we followed suit." The Messenger said, "Gabriel (peace be upon him) came and told me that there was some dirt on my shoes." He continued, "When one of you comes to the mosque, let him check his shoes, and if he sees any dirt on them, let him wipe it and pray in them. . ."

Nowadays, mosques are carpeted and entering with shoes on may lead to soiling them with dirt. If every Muslim were allowed to pray in their shoes in mosques, we would need dozens of workers to clean the mosques after every prayer, not just every day. We do not think that anyone who accepts this would like to pray on a dusty or dirty carpet.

(Reference: https://www.dar-alifta.org/Foreign/ViewFatwa.aspx?ID=8355; accessed Sept. 16, 2021)

Another similar ruling from the Higher Council of Saudi Arabian scholars (*Fatawa ulama al balad al haram* compiled Khalid Abd al Rahman al Juraisi. 4th edition 2007. King Fahd's National Press. Riyadh, p.715) states that:

Prayer in shoes is mandated. Because the prophet used to pray in his shoes.

In another collection of authoritative rulings (fatawa), Al Fataawa al Lajnah al-Daimah (the Permanent Council of Issuing Authoritative Rulings), Volume 5, page 396, the scholars in Saudi Arabia wrote thus:

It says in Fataawa al-Lajnah ad-Daaimah (5/396):

The one who does wudoo' may wipe over his sock only, or wipe over his shoe only, if it covers the ankles and the skin of the feet cannot be seen beneath it.

If it does not cover the ankles, he may wipe over it if it is worn over socks that do cover the ankles, and also wipe over what appears of the socks above the area that is to be washed in wudoo', and he may pray wearing both of them.

Shaykh Ibn Baaz, who was the official tasked with issuing such rulings in Saudi Arabia ruled thus: With regard to the shoe, it is like the sandal:

If it does not cover the foot plus the ankles, then if he wipes over the shoes with the socks, the ruling applies to both, and if he limits it to wiping over the socks only, that is sufficient. In that case is permissible for him to take off the shoes whenever he wants, and his wudoo' remains valid, because the ruling of wiping is connected to the socks only.

We would like to point out that the rulings having to do with the khuffayn are applicable to socks and shoes/boots that cover (the feet plus the ankle), because the ruling on both is the same, according to the more correct view ((Majmoo 'Fataawa Ibn Baaz (29/73).

The above rulings are supported by tradition #386 from al-Bukhari and al Muslim 555 thus:

Narrated Abu Maslama: Sa`id bin Yazid Al-Azdi: I asked Anas bin Malik whether the Prophet had ever, prayed with his shoes on. He replied Yes.

From all of the above, it is clear that the Plaintiff is allowed to pray in prison-issued sneakers or any other footwear. The Plaintiff argues that the prison's reason for rejection of his request based on security reasons is not an acceptable excuse. Apart from the fact that I have already shown that khuffain are not required for the validity of prayer, I do not see any

justification for me to offer any opinion on this aspect of his complaint since it is outside the ambit of Islamic law, and rather to be dealt with according the norms of what are seen as security threats in prisons.

If one were to argue that even if the Prophet Muhammad prayed while wearing shoes, but that this does not indicate he made the wudu (ritual purification) while wearing shoes, the answer would be thus:

> From the relevant part of hadith #742 reported thus in Sahih al-Bukhari, a book that the Plaintiff has requested for Islamic learning:

> Narrated from Sa'id al Maqburi: . . . I saw the Prophet performing ablution while wearing his shoes.

## Arabic Classes

There are approximately 2 billion Muslims in the world. Of this amount, only about 300 million speak Arabic, and even those that speak the language, generally agree that the Qur'anic language is ancient. As such they rely on exegetes and translations. Arabic is NOT a holy language. The Qur'an makes this clear by stating that it is an Arabic document so that the Prophet Muhammad's people might have a language with which they were familiar. It is the general practice of Muslims, nonetheless, to pray in Arabic since it is seen as the language of liturgy. It is similar to the situation in the Catholic Church before the 1967 Vatican Council ruling, or the Church in general before Martin Luther's Protestant movement where the mass was in Latin. Although Latin was by this time a dead language, the liturgy was still conducted in that tongue. Most of the people did not understand it.

Trying to attain fluency in Arabic is seen by Muslim scholars as a commendable undertaking. It is NOT however a requirement, and especially after 9/11 where all governments -- including those in Muslim majority countries -- are careful about access, and facilities for such classes are extremely controlled. In many cases, it comes under the classification of "language study" and not a part of religion. If this is the position of the prison, in addition to the problem of ensuring security, then, from an Islamic legal perspective, one has to defer to the position taken by the prison authorities.

Hadith #69 in Al-Bukhari has the Prophet Muhammad to make things easy for people and not to impose difficulties. An Islamic law maxim states that "The basic right is freedom from obligation." This means that one does not self-impose difficulties, especially since the Qur'an also states "God does not want that which is difficult for you." Jurists also agree that those issuing religious opinions that they deem weighty ought to have training, indicated by a "rukhsa"(a formal certificate of competence issued by a recognized authority) or, in the modern world, by the conferring of a degree from a recognized academy of Islamic studies (in much the same way a person may not practice law in the United States without recognition by the State of the requisite

training and certification). As noted, some of the positions claimed by the Plaintiff are without basis, or inapplicable in the present situation.

In order to issue definitive rulings on what is allowed or forbidden in Islam, and to do so with due consideration of all the factors that apply, Muslim scholars agree that one has to have requisite training to be considered at least a "faqih" (legist) or a mujtahid (functionally, a jurisconsult who can apply all the advanced forms of extrapolation to offer a scholarly solution). The norms about requests, as mentioned earlier, is that if one is claiming that something is essential for the practice of Islam, one has to provide proof from the Qur'an. The Plaintiff has not done this and as such, in every item of petition, still bears the onus of providing a scriptural writ.

Prepared by Khaleel Mohammed, Ph. D.
Professor, Department for the Study of Religion
Director, Center for Islamic and Arabic Studies
San Diego State University
5500 Campanile Drive
San Diego, CA 92181-6062.

September 26, 2021.

# CURRICULUM VITAE

**Khaleel Mohammed**
Department of Religious Studies
San Diego State University
MC 6062
San Diego, CA 92182-6062
Tel.: (619) 301-9553; Fax: (619) 594-1004
khaleel@sdsu.edu

## EDUCATION

Ph.D.   2001, McGill University, Montreal, Canada
        Major Field: Islamic Law

        Dissertation: Development of an Archetype: Studies in the Shurayḥ Traditions
        Dissertation Supervisor: Professor Wael Hallaq

M.A.    1997, Concordia University, Montreal, Canada
        Major Field: History and Philosophy of Religions

B.A.    1988, Imam Muhammad Bin Saud University, Riyadh, Saudi Arabia
        Major Field: Islamic Law

B.A.    1976, Inter American University, Saltillo, Mexico
        Major Fields: Religion and Psychology

## TEACHING POSITIONS AND RANKS HELD

| Institution | Rank | Date |
|---|---|---|
| SDSU | Full Professor | August 2014-Present |
| SDSU | Associate Professor | 2006-July 2014 |
| SDSU | Assistant Professor | 2003-2006 |
| Brandeis University | Kraft-Hiatt Postdoctoral Fellow and Lecturer | 2001-2003 |
| Hebrew College, Newton, MA | Visiting Professor | 2002-2003 |
| McGill University | Lecturer in Arabic | 2000-2001 |
| Sana'a University, Yemen | Visiting Professor | Summer 1999 |
| Al-Hawza al-'Ilmiyya, Damascus, Syria | Visiting Professor | Summer 1998 |

**DIRECTORSHIPS**
Director, Center for Islamic and Arabic Studies, SDSU: May 2020-Present.

**TEACHING EFFECTIVENESS**
**Awards**
 2010 Outstanding Faculty Award, Religious Studies
 *Phi Eta Sigma* Certificate of Appreciation for Dedication to Freshman Excellence, 2007

**Course Readers Produced for University Classes**
 Exploring the Qur'an reader  REL S 102
 Religious Violence and non-Violence in World Religions REL S 379
 Islamic Philosophy PHIL 600
 Abrahamic Religions REL S 330
 Sex and Gender in Islam, REL S 581

**Work in Progress**
A Lexicon of Hadith Terminology.

**Work Submitted and Pending Acceptance**
"Al-Razi's Interpretation of Q4:15" Book Chapter for LGBTQ Publication, Ed. Huma Ghosh, Women's Studies, SDSU

**Book**
 *Islam and Violence.* Cambridge University Press. January 2019. ISBN 978-1-108-72823-2

 *David in the Muslim Tradition: The Bathsheba Affair*. Lexington Press, December 2014. ISBN 978-0-7391-9715-8

**Edited Volume**
 *Introduction to World Religions*. Polymath Learning, June 2014, 2016 (Second edition).

**Co-edited Volume**
 Khaleel Mohammed and Andrew Rippin. *Coming to Terms with the Qu'ran*. Islamic Publications International, 2008.

**Translated Volume**
 Khaleel Mohammed, tr. *The World of Our Youth*, by Husayn Fadlallah, Montreal, Damascus and Beirut: Organization for the Advancement of Islamic Knowledge, 1998.

**Refereed Journal Articles**
 "When the Victims are not so Innocent," *Crosscurrents* 65, Fall 2015 (September): 380-390.

 "Reflections on the Wroxton Gathering" *Journal of Interreligious Studies* 14, Spring 2014:16-18.

"David's Test: An Exploration into Exegetical Metamorphosis on Q38: 21-25" American Journal of Islamic Social Sciences. Pending Final Editor's review.

"Between Creed and Qur'ān: 'Iṣmah in Light of Q48:1, 2," *American Journal of Islamic Social Sciences* 29 (2), Spring 2012: 112-28.

"The Case of the Overlooked Fatwa," *Journal of Ecumenical Studies* 46 (3), Summer 2011, 378-88.

**Refereed Journal Articles (continued)**

"Wissenschaft des Judentums as a Paradigm for New Muslim Approaches to the Study of Islam," *American Journal of Islamic Social Sciences* 28 (2), Spring 2011: 143-59.

 "The Case of the Overlooked Fatwa," *Inter-Civilizational Dialogue: Insight from Azerbaijan Conference Papers*, Baku, November 11-12, 2009. Government Publications Division, Azerbaijan.

"The Art of Heeding," *Journal of Ecumenical Studies* 43 (2), Spring 2008: 75-86.

"Why End Fundamentalism," *Kasarinlan*, Volume 22(2) 2007: 124-8.

"The Islamic Law Maxims," *Occasional Papers (#62), Islamic Research Institute*, International Islamic University, Karachi, Pakistan.  May 2006.

"The Islamic Law Maxims," *Islamic Studies* (2), Summer 2005:191-208.

"Zionism, the Qur'an and the Hadith," *Judaism* 213/214 (54), Winter-Spring 2005: 79-93.

"Assessing English Translations of the Qur'an," *Middle East Quarterly* 12 (2), Spring 2005: 59-72.

"Revisiting Tyan on the issue of the Early Islamic Judicature" *Islamic Studies* (3)*,* Autumn 2004: 447-455.

"Muslim Exegesis, the Hadith and the Jews" *Judaism* 209/210 (53) Winter-Spring 2004: 3-11.

"A Muslim Perspective on Human Rights," *Social Science and Modern Society* 41 (2), January/February 2004: 29-35.

"Probing the Identity of the Sacrificial Son in the Qur'an," *Journal of Religion and Culture* (13), 1999, Concordia University: 125-138.

"The Foundations of the Muslim Prayer," *Medieval Encounters* (5), March 1999: 17-28.

"Demonizing the Jew: Examining the Antichrist Traditions in the Sahihayn." Co-author: Professor Kadir Baksh. *Journal of Religion and Culture* (12) 1998, Concordia University: 151-164.

"Abraham Geiger and Heinrich Graetz: A Comparison of their Different Perspectives on Jewish History," *Journal of Religion and Culture* (11) 1997, Concordia University: 141-160.

"The Concept of Abrogation in the Qur'an." Published under pseudonym, Abu Yousuf al-Corentini. *Journal of Religion and Culture* (10) 1996, Concordia University: 63-76.

**Refereed Book Chapters**

"Interreligious Dialogue as Lay, Institutional and Academic: Muslim Perpectives," Contemporary Muslim-Christian Encounters," edited by Paul Hedges. London and New York: Bloomsbury Academic, 2015: 51-66.

"9/11 Mosque Controversy," *Controversies in Contemporary Religion*, Part of "Issues in Tradition," edited by Paul Hedges. Oxford, England; Denver, CO; Santa Barbara, CA: Praeger Publishers, 2014. 3:125-144.

"When Certainty Becomes Immaterial," *Encountering the Stranger: A Jewish, Christian, Muslim Trialogue*, ed. Leonard Grob and John Roth. Seattle and London: University of Washington Press, 2012: 232-44.

"Dialogical Interaction or Post-Honor Confrontation" *Trialogue and Terror, Judaism, Christianity and Islam after 9/11,* ed. Alan Berger. Eugene, OR: Cascade Books, 2012: 166-184.

"The Art of Heeding" in *Interfaith Dialogue at the Grass Roots,* ed. Rebecca Kratz-Mays. Ecumenical Press, PA., July 2008: 75-86.

"The Identity of the Qur'an's Ahl al-Dhikr," *Coming to Terms with the Qur'an*, ed. Andrew Rippin and Khaleel Mohammed. Islamic Publications International, April 2008, 33-46.

"Islam and Human Rights," in *Religion and Human Rights*, ed. Adam Seligman. Interreligious Center on Public Life, Hollis Publishing. 2004: 55-68.

**Refereed Encyclopedia Articles**

"Is God Necessary: An Islamic Viewpoint," ABC CLIO "Enduring Questions" *World Religions: Belief, Culture, and Controversy* database. Accessible via password.

"Family in Islam," ABC CLIO *Encyclopedia of Religion*.

"Women in Islam," ABC CLIO *Encyclopedia of Religion*.

"Divorce" in *Encyclopedia of Love*, ed. Yudit Greenberg. ABC-CLIO, November 2007, 1: 171-2.

"Fatherhood" in *Encyclopedia of Love*, ed. Yudit Greenberg. ABC-CLIO, November 2007, 1: 198-9.

"Marriage" in *Encyclopedia of Love*, ed. Yudit Greenberg. ABC-CLIO, November 2007, 2:396-7.

"Motherhood" in *Encyclopedia of Love*, ed. Yudit Greenberg. ABC-CLIO, November 2007, 2:424-5.

**Refereed Encyclopedia Articles (continued)**
"Qur'an" in *Encyclopedia of Love*, ed. Yudit Greenberg. ABC-CLIO, November 2007, 2:493-5.

"Sex, Sexuality and Family in the Qur'an," Blackwell Encyclopedia of the Qur'an, ed. Andrew Rippin. November 2006.

**Refereed Presentations**
"The Changing Fiqh of Islam on Sexuality and Marriage," Center for the Study of Religion Ohio State University, Columbus, Symposium on Religion and Sex, Post-Obergefell. October 21, 2016.

"The Midrashic David and Solomon of the Qur'an," Western Jewish Studies Association, Annual Conference, University of British Columbia. May 13-14, 2015.

"Revisiting the Qur'anic Verses Used for Prohibition of Same-Sex Relationships", AAR Annual Conference, San Diego. December, November 22-25, 2014.

"Othering: When the Victims are not so Innocent," *Muslims and Jews: Challenging the Dynamics of Hate Symposium*, Martin Spring Institute, North Arizona University, Flagstaff, AZ. October 5-7, 2014.

"Isma as Doctrine and its Repercussions on Shared Biblical and Qu'rānic Narrative," The Qu'rānic Weltanschaaung Conference, Muhammad League of Scholars, Rabat, Morocco. June 3-5, 2014.

"Islam and Democracy," at *Engaging Democracy Conference*, Shalom Hartman Institute, Jerusalem, February 24-March 1, 2012.

"David and Batsheva- Analysis of a Shared Narrative," Western Jewish Studies Association Conference, San Diego. April 10, 2011.

"The Narrative of David and Uriah: An Examination of Selected Classical Exegetes" Summer Conference, International Institute of Islamic Thought, VA. July 22, 2010.

"Encountering the Stranger" 40th Annual Scholars Conference, St. Joseph's University, PA. March 8, 2010.

"Between Creed and Creative Interpretation: An Analysis of Q48: 1, 2 in Light of the Concept of 'Ismah." Summer Conference, Institute of Islamic Thought, VA, July 22-August 03, 2009.

"A Muslim Approach to Western Studies of Islam", Summer Conference International Institute of Islamic Thought, VA. July 13-August 15, 2008.

**Refereed Presentations (continued)**

"Revisiting Abraham Geiger: What did Muhammad take from the Jews" "*Islam Through Jewish Eyes, Judaism Through Muslim Eyes.* Conference: University of Munich/UC Berkeley in Schloss Elmau, Germany. June 26, 27, 2007.

"The Hajj and the Retelling of Jewish History," Western Jewish Studies Association Annual Conference, Arizona State University. March 12-14, 2005.

"The Fiqh Maxims," Middle Eastern Studies Association Annual Conference, San Francisco. November 20-23, 2004.

"Guyanese Responses and Reactions to Jonestown," Society for the Scientific Study of Religion, Annual Conference, Norfolk, VA. October 23-26, 2003.

"Q2:223: Your Wives are a Tilth for you . . ." American Academy of Religion Annual Conference, Toronto, Canada, November 23-26, 2002.

"Islam and Zionism: the Trajectory from the Qur'an to the Hadith," Association for Israeli Studies Conference, Vail, Colorado, May 26-28, 2002.

"Arabic Language as the Barrier between Exegesis and Eisegesis," Annual Conference of the Department of Religion, Concordia University, May 1999.

"Demonizing the Jews in the Sahihayn," Annual Conference of the Department of Religion, Concordia University, May 1998.

"The Foundations of the Muslim Prayer," Avoda and 'Ibada: Liturgy and Ritual in Islamic and Judaic Traditions Conference, University of Denver, March 1998.

"Taking the Veil off the Hijab Issue," Annual Conference of the Department of Religion, Concordia University, May 1997.

"Towards a Methodology for Extrapolating the Social Situation to which the Qur'anic Legislation Concerning Women is Addressed." Annual Conference of the Department of Religion, Concordia University, 1996.

**Non-Refereed Book Chapters/Prologues/Blurbs**

"Foreword" in *Bridging our Faiths.* San Diego: The Interreligious Council of San Diego, 2010.

"Foreword" in *Muhammad, Prophet of God*. By Daniel Peterson. New York: Eerdmans, 2007.

"Prologue," in *The Trouble With Islam* Today. By Irshad Manji. New York: St. Martin's Griffin. 2005: ix-xi.

**Non-Refereed Journal Articles/Internet Postings**

"Guyanese Perspectives on Jonestown" March 2004. http://jonestown.sdsu.edu/

"For Whom the Holy Land: A Qur'anic Answer." November 2004. At
http://www.jerusalemsummit.org/eng/full.php?id=153&speaker=238&summit=31

**Non-Refereed Academic Presentations**

"Some Truths about Extremism." Conference: Trialouge in the Age of Extremism, Promise and Peril. Florida Atlantic University. January 27, 2019.

"Virtues and Limits of Hospitality." Symposium: Strangers or Neighbors? Jewish, Muslim and Christian Perspectives on Refugees. Martin Springer Institute, Northern Arizona University, October 15-17, 2017.

"King David in the Muslim Tradition," Osher Institute, University of California at San Diego. February 7, 2017.

"The Strange Case of David ben Jesse: Intertexuality between Tafsir, Midrash, and Miqra" Abrahamic Religions: Challenges and Cooperation in the Age of Extremism Conference, Manhattan College, New York. February 28-March 1, 2016.

"From Harmony to Disharmony: A Look at the Early History of Islam and Other Abrahamic Faiths," Abrahamic Religions: Challenges and Cooperation in the Age of Extremism Conference, Manhattan College, New York. February 28-March 1, 2016.

"Liberty and Revelation in the Qur'an," The Liberty Fund, Tucson, AZ. September 24-27, 2015.

"Affirming Theological Responses to Sexual Orientation and Gender Identity," The Inner Circle Annual Retreat, Cape Town, South Africa, September 13-18, 2015.

"On Being a Muslim Academic," Mesa College, San Diego. March 23, 2015.

"Islam, Gender and Sexuality," The Inner Circle Annual Retreat, Cape Town, South Africa. September 12-19, 2014.

**Non-Refereed Academic Presentations (continued)**

Respondent to "The Role of Education and Religion in Human Rights and Global Ethics," Third Western Studies Institute/SDSU Symposium, San Diego State University, August 10-12, 2014.

"The (Mis)Application of Prophet Religion Terminology to other Religions," Second Western Studies Institute/SDSU Symposium, San Diego State University, August 8-10, 2014.

"The Geiger Paradigm on Approaches to Islamic Studies," First Western Studies Institute/SDSU Symposium, San Diego State University, June 10-12, 2014.

Panelist, "Teaching the Holocaust in a Multi-Religious World: Fostering New Conversations," United States Holocaust Memorial Museum, Washington, D.C. May 19-20, 2014.

"The Freedom of the Church: A Foundational Liberty," Panelist, Colorado College, CO, June 6- 9, 2013.

"Issues in Islamic Sexuality," Annual Retreat, The Inner Circle Organization, Capetown, South Africa, May 2-6, 2013.

"What is a Civilizational Struggle: The Work of Samuel Huntington." Panelist, Sixth Annual Carl B. Menges Colloquium, The Alexander Hamilton Institute for the Study of Western Civilization, Clinton, U.S.A. April 18-20, 2013.

"Forgiveness" Shalom Hartman Institute Conference, Jerusalem, Israel. February 15-22, 2013.

"Can Muslim Women marry non-Muslim Men" at Loyola Marymount University. June 14, 2012.

"Responsibility and Liberty in Genesis 4: Cain and Abel" The Liberty Fund, Indianapolis, IN. June 7-9, 2012.

"Responsibility of World Religions in an Age of Genocide," Foundation for Interfaith Understanding, Aspen, CO., Jun 4, 2012.

"Islam and Liberty" 50th Anniversary Conference, the Liberty Fund, Washington DC, May 19-23, 2010.

"Interfaith Dialogue" 40th Organization of Islamic Cooperation Conference, Baku Azerbaijan, November 8-13, 2009.

**Non-Refereed Academic Presentations (continued)**
"Lay, Academic, and Institutional Approaches to Interfaith Dialogue" Interfaith Dialogue in Modernity and Post-Modernity Conference, University of Winchester, UK, September 9-11, 2008.

"Islam and Business," International Scholars Abrahamic Trialogue, Amman, Jordan, May 23-30, 2008.

"Islam and Reproductive Choice" at *From Abortion Rights to Social Justice Conference*, Hampshire College, MA (Project of Civil Liberties and Public Policy Program). April 4-6, 2008.

 "When Certainty Becomes Immaterial," *Encountering the Stranger* Conference, United States Holocaust Museum, DC. October 28-31, 2007.
 "Permanent Text: Impermanent Interpretations" Chautauqua Conference., NY. August 2, 2007.

"Jews and Judaica: From Qur'an to Hadith." Annual McMartin Lecture, Carleton University, Ottawa. February 6, 2007.

"The Qur'an, Judaism and Islam," Orange County Jewish Community Center, Irvine. April 3, 2005.

"Origins and History of Islam," (for International Relations in the Middle East Class, INR 3274), Florida International University. March 30, 2005.

"Islam and Politics," for Religion and World Politics Class, CPO 3761) Florida Atlantic University. March 28, 2005.

"Medieval Islam and the Demonization of Jews," Agency for Jewish Education, Coronado Library, San Diego. March 16, 2005.

"Genesis of Islam and the Abrahamic Message," Agency for Jewish Education, Coronado Library, San Diego. February 16, 2005.

"For Whom the Land? A Qur'anic Answer," Jerusalem Summit, Israel. November 27-30, 2004.

"Understanding Judaism and Islam," University of Massachusetts at Dartmouth. October 21, 2004.

"Strange Bedfellows: How Jewish and Islamic Law Impacted Upon Each Other," Loyola Law School. October 13, 2004.

"Jesus: From Qur'anic Pacifist to Hadith Warrior," Fuller Seminary. September 20, 2004.

**Non-Refereed Academic Presentations (continued)**
"Judaism, Christianity and Islam: Is there Opportunity for Religious Pluralism?" Claremont Graduate School. Panel Presentation with Dr. Reuven Firestone, Dr. Michael Najim. March 23, 2004.

"Combating the New Anti-Semitism," Concluding roundtable panel presentation, International Conference on the Global Dimensions of Anti-Semitism, Montreal. March 16, 2004.

"Anti-Semitism in Contemporary Islamic Literature," International Conference on the Global Dimensions of Anti-Semitism, Montreal. March 15, 2004.

"Outreach in Early Islam: The Ritual Prayer as Shared Rite between Jews, Christians and Muslims," Workshop on Ritual, Identity and Boundaries, Boston University, May 21-22, 2003.

"The Qur'an and Israel," Program in Judaic Studies, Clark University, April 22, 2003.

"Texts in Context: Dealing with Difficult Passages in the Torah and Qur'an," Second Annual Conference on Conflict Resolution, Cathedral of St. John the Divine, New York, March 29-30, 2003.

"Perspectives on the War in Iraq," Department of Political Science Panel, Siena College, March 26, 2003.

"Defining a Common Moral Ground in Bioethics: A Muslim Perspective," Interreligious Center for Public Life Conference, Hebrew College, March 10, 2003.

"An Islamic Scholar's Perspective," Panel presentations on: Bloodshed in the Current Intifada," Harvard University Hillel, October 20, 2003.

"Human Rights: An Islamic Perspective," Interreligious Center for Public Life/Pew Forum Conference, Hebrew College, October 6, 2002.

"The Qur'an and Israel," Program in Religion, Brandeis University, May 2002.

"Alternative Voices," Dept. of Continuing Education, University of Judaism, April 2002.

"Fostering Mutualism between Muslim and Jew: Understanding the Qur'an through the Talmud and Midrash," Fourth International Conference on Conflict Resolution, Institute of Advanced Theology, Bard College, April 2002.

"Islam and the Current Global Situation" Brandeis Adult Learning Institute, April 2002.

"Love and Sex in the Qur'an" Dept. of Sociology, Brandeis University, March 2002.

**Non-Refereed Academic Presentations (continued)**
"Judaism and Islam: The Conflict in the Middle East Through the Eyes of Jews and Muslims," Inaugural conference of Brandeis University and The Commission for Jewish Education of the Palm Beaches, Fl., February 3, 2002. (co-speaker: Prof. Reuven Kimelman).

"Focus on Islam" Hornstein Program in Jewish Communal Service, Brandeis University, January 2002.

"Islam in Focus," Brandeis Adult Learning Institute, October 2001.

"The Messiah in Islamic Eschatology," San'a University, June 1999.

"The Hidden Message of Jesus in the Qur'an," Concordia University, March 1998.

"Towards a New Islamwissenschaft," Dartmouth College, February 1997.

"Applying Forensics to the study of 'Ilal in Muslim Hadith Science," McGill, January, 1997.

**Plenary and Keynote Addresses**
"Religion and Violence," World Affairs Council, Rancho Bernardo Country Club. June 2, 2016.

"Saudi Arabia and Its Influence in Religion and Politics of the Middle East," Continuing Education Center, Rancho Bernardo. January 7, 2016.

"Saudi Arabia and Its Influence in religion and politics of the Middle East," North County World Affairs Council, The Remington Residence, San Diego. October 15, 2015.

"The Academic Teaching of Religion," Symposium on Theology and the Teaching of Religion, SDSU, Sponsored by SDSU and Western Studies Institute, Saudi Arabia. June 10-12, 2014.

"Islam and Science" University of California at Berkeley. October 30, 2013.

"Interfaith Dialogue," Abraham Festival, Peterborough, ON, Canada, March 2, 2008.

"Layering of Scripture: Exegetical Traditions in Judaism and Islam on the "other' in the Holy Land." At "Is there room at the Inn" Academic Seminar, Florida International University, March 7, 2007.

"Christianity, Islam and Judaism after 9/11" First Shemin Trialogue Seminar, Florida Atlantic University, February 12, 2007.

"The Qur'an, Militant Islam and Israel," Israel 2005 Conference, Stanford University Graduate School of Business, April 10, 2005.

**Plenary and Keynote Addresses (continued)**
"The Apocalyptic Image in Islam" 35th Annual Scholars Conference, St. Joseph's University, Philadelphia. March 5-8, 2005.

"Post-Arafat: A Muslim View from Israel" American-Israel Public Affairs Committee, Palm Springs. January 11, 2005.

"Future of the Middle East Conflict" Yom Kippur Issues Forum, East County Performing Arts Center, El Cajon. Sept 25, 2004.

"Can American Jews and Muslims Get Along?" Keynote Address, American Jewish Committee, San Diego Chapter. July 22, 2004.

"People of the Book: Islamic Perspectives on Jews and Judaism," University of California: Santa Cruz. April 22, 2004.

"The Anti-Christ Theme in Islam," Plenary Address, Western Jewish Studies Association 10th Anniversary Conference, San Diego. March 28, 2004.

"Judaism and Islam—A Unique Pro-Israel Perspective" United Jewish Federation, Fairbanks Ranch Country Club, Rancho Santa Fe. February 25, 2004.

"Islam, Zionism and the Jews," University of California: Santa Cruz. April 21, 2004.

"The Protozionist Views of Early Muslim Exegetes," Interfaith Alliance at Harvard University Law School. November 24, 2003.

"Arabs and Jews Throughout the Ages" Keynote Address at the Annual Meeting of the San Diego Anti-Defamation League. Beth Israel Synagogue. November 20, 2003.

"The Qur'an and Israel," Thomas P. Johnson Distinguished Visiting Scholar Program, Jewish Studies Program/Department of Religion & Philosophy Presentation, Rollins College, Fl., November 13, 2003.

"The Use of Names, Symbols, Places: Problems of Instruction in Schools with Focus on the Arab-Israeli Issue as seen in California Schools," La Costa Canyon High School, San Dieguito Union High School District, CA. August 26, 2003.

**Book Reviews**
"In Ishmael's House" by Sir Martin Gilbert. *Journal of World History* 23:1 (March 2012)

"The Jew is not my Enemy" by Tarek Fatah. Journal for the Study of Anti-Semitism 3(1), July 2011.

**Book Reviews (continued)**

"Islam and the Everyday World" Ed. Sohrab Behdad and Farhad Nomani. Middle East Quarterly 15 (3) Summer 2008: 87-8.

"Journey into Islam" by Akbar Ahmed. *Islamic Studies*. Autumn 2007 (46): 457-61.

"The Jihad next Door" by Dina Temple-Raston. San Diego Union Tribune, Section E5, September 16, 2007.
"Journey into Islam" by Akbar Ahmed. Toronto Star, Section AA2. June 30, 2007.

"Muslims and Others in Early Islamic Society" ed. Robert Hoyland. Middle Eastern Stud-ies Bulletin, 39 (2), December 2005: 204-206.

"Sarajevo Rose," by Stephen Schwartz. Islamic Studies, Summer 2005 (2):285-288.

"Civil Democratic Islam: Partners, Resources, and Strategies," by Cheryl Benard. *Middle East Quarterly* 12 (3), Summer 2005: 89-90.

"A New Introduction to Islam," by Daniel Brown. Middle Eastern Studies Bulletin, 38 (1), June 2004: 78-79.

"An Introduction to Islam," by David Waines. *Middle East Quarterly*, XI (3), Summer 2004: 86.

"Islam Under Siege," by Akbar Ahmed. In Islamic Studies, Spring 2004 (1): 132-135.

"Excellence and Precedence," by Asma Afsaruddin. H-Mideast-Medieval, H-Net Reviews, 2004. Available at: http://www.h-net.org/reviews/showrev.cgi?path=115521084744533

"The Qur'an-A Contemporary Translation," by Ahmed Ali. Middle East Studies Association Bulletin, Volume. XXXVI (1) Summer 2002: 47. Article also available online at: fp.arizona.edu/mesassoc/Bulletin/ 36-1/36-1EarlyIslam.htm

"The Koran: A Very Short Introduction," by Michael Cook. H-Mideast-Medieval, H-Net Reviews, February 2003. Available also available online at: http://www.h-net.msu.edu/reviews/showrev.cgi?path=84711047327614.

**Op-eds**

"Does Islamic Scripture Justice Justify Jihad Violence?" San Diego Union Tribune. December 20,2015.Online version: http://www.sandiegouniontribune.com/news/2015/dec/19/quran-hadith/

"Killing in the name of God must end," San Diego Union Tribune. December 25, 2014. Online at http://www.utsandiego.com/news/2014/dec/25/killing-in-the-name-of-god-must-end/ Editorial reference to article on http://www.utsandiego.com/news/2015/jan/07/islam-can-only-reform-from-within/

**Op-eds (continued)**
 "The Cost of King's Hearings," The Daily.com. March 13, 2011. Online at http://bit.ly/gtzfxI

 "We are our own Enemies," Ottawa Citizen, Ontario. March 6, 2007.

 "Muslim meets Crucifix," Peterborough Examiner, Ontario Canada March 19, 2008

**Scholarly Awards**
- Kraft-Hiatt Postdoctoral Fellowship, Brandeis University, 2001-2003.
- Fonds pour la formation de Chercheurs et l'aide à la Récherche (FCAR), Government of Quebec, for Ph.D. program at McGill University, 1997-2001.
- Saudi Arabian Government Scholarship, 1982-1989.

**Research Grants**
- University Grants Program (Islam and Pluralism), January 1-2009-June 30, 2010.
- National Endowment for the Humanities grant for "The History of War and Peace in Judaism, Christianity and Islam. Co-participant with Professors Moore, Begler and Meltzer. $29982.00, Spring 2008.
- College of Arts and Letters Microgrant for Hadith Research, November 2006.
- Course Release, Hadith Research, Spring 2006.
- Tel Aviv University Workshop Award, June 12-29, 2006.
- Fred Hansen Institute of Peace Project for Guyana. $34500.00, 2006-2007.
- Institute of Islamic Studies Fellowships, McGill University, 1998, 1999, 2000-2001.
- McGill University Graduate Studies Travel Grant, 1998.
- Muhammad b. Saud University Travel Grants, 1984-1988.
- St. Francis Xavier Scholarship for study in Mexico, 1973-1976.

.

**DEFENDANTS' EXPERT WITNESS SUMMARY**
**JAMES R. UPCHURCH**
**Boaz Pleasant-Bey, Plaintiff vs State of Tennessee Department of Correction, Reverend Brian Darnell, Tony Parker, CoreCivic, Inc., Jon Shonebarger, and Russell Washburn, Defendants; Civil Action No: 3:19-cv-486, United States District Court for the Middle District of Tennessee, Nashville Division.**

The opinions stated in this report are based on my forty-four (44) years of operations, supervisory, managerial, administrative, and professional experience in the field of corrections. I am thoroughly knowledgeable of contemporary and professionally accepted correctional procedures, policies, standards, and practices.

During my career, I have served as both an institutional and corrections system manager at various levels, culminating as the administrator responsible for the institutions division of the third largest state prison system in the country. My corrections career includes service in three (3) Department of Corrections agencies: Mississippi Department of Corrections from 1968 – 1969 and 1972 – 1981; Arizona Department of Corrections from 1982 – 1995; and Florida Department of Corrections from 1996 – 2015.

Additionally, I have consulted and/or provided instruction for the last twenty (20) years in various areas of institutional operations, both in jails and prisons in thirty-five (35) states including: Alabama; Arizona; Arkansas; California; Colorado; Connecticut; Delaware; District of Columbia; Florida; Georgia; Hawaii; Illinois; Iowa; Kansas; Kentucky; Louisiana; Maine; Maryland; Massachusetts; Michigan; Mississippi; Missouri; New Hampshire; New Jersey; New York; North Carolina; Ohio; Oklahoma; Oregon; Pennsylvania; Rhode Island; South Carolina; South Dakota; Tennessee; and Washington.

I have also provided classroom instruction to participants from these and a variety of other state and local prison/jail jurisdictions as an instructor for the National Institute of Corrections. My resume is attached, further describing my work history and other involvement in the field of corrections and is incorporated herein.

The majority of the consulting events in which I have been involved included in-depth, week-long assessments of institutional operations with an emphasis on security procedures and practices as they pertain to all areas of operations at corrections facilities within these various jurisdictions. I have toured literally hundreds of prison facilities across the country and conducted these detailed assessments in a significant number of them. I have had the distinct opportunity to evaluate numerous and varied approaches to institutional management at the ground level through direct interaction with both

**Page 1 of 22**

inmates and staff as well as observation of the character and functionality of their interaction with one another.

I have contributed significantly to several publications recognized as "best practice" references for institutional security practices by corrections professionals across the country. These publications include *Guidelines for the Development of a Security Program* (American Correctional Association); *The Security Audit Program* (National Institute of Corrections); and *Prison Staffing Analysis* (National Institute of Corrections). Working and interacting with some of the premier corrections experts from around the country in the development of these publications has opened the door for in-depth discussions and identification of the critical elements of a sound security program that facilitates a safe and secure institutional environment for staff and inmates and for the protection of the public.

As described in my attached resume, I have served as the warden for multiple correctional facilities during my career including institutions ranging in inmate population from as little as two hundred (200) to as large as three thousand, two hundred (3,200) inmates. These institutions housed inmates in a variety of custodies and classifications including administrative segregation (restrictive housing), maximum custody, death row, close custody, minimum–medium custody, female, juvenile, reception/diagnostic, forensic psychiatric, and protective management. The facilities ranged in age from the Arizona State Prison Complex which opened in 1908 to Florida's Franklin Correctional Institution which opened in 2005. Design and operational characteristics and subsequent management strategies varied significantly in these facilities. My operational experience as the warden managing these numerous, diverse prisons/correctional institutions in three different state correctional systems encompasses some sixteen years of my career and provides a unique perspective as to how to best manage institutions facing a variety of different challenges.

## **I have reviewed the following documents in preparation for providing this report:**

- Amended Complaint in this case (filed December 21, 2020);
- Answer to Amended Complaint;
- Prison Rape Elimination Act (PREA) Standards;
- American Correctional Association (ACA), Standards for Adult Correctional Institutions –Fourth Edition;
- ACA Accreditation Report, January 14, 2019;
- PREA Compliance Report;

- Boaz Pleasant-Bey Deposition, March 26, 2021;
- Russell Washburn Deposition, April 5, 2021;
- Numerous Grievances file by Pleasant-Bey at Trousdale Turner Correctional Facility (TTCF);
- Group Accommodation Requests by Pleasant-Bey;
- Institutional file of Pleasant-Bey;
- Various Religious Accommodation Requests by Pleasant-Bey;
- Religious Advisory Committee Responses to Pleasant-Bey;
- Tennessee Department of Correction (TDOC) 2018, 2019, and 2020 Ramadan memos;
- Union Supply Catalog #18-043, #18-043A, and #18-043B Memos;
- Volunteer Recruitment Communications and donation request for teaching materials, books, DVDs, and Nation Flag from Chaplain Shonebarger on various dates;
- TDOC Policy 118.01, Religious Programs, effective date February 15, 2014;
- CoreCivic policy 20-4 Chaplaincy and Religious Services, effective date April 13, 2020;
- Tony Parker Deposition, April 21, 2021;
- Chris Brun Deposition, April 8, 2021;
- Jon Walton Deposition, April 8, 2021;
- Raymond Byrd Deposition, May 7, 2021;
- Tennessee Comptroller of the Treasury, Performance Audit Report, Department of Corrections, January 2020, (in part).

Along with this, I spoke to Warden Martin Frink, Daniel Knight, and Warden Russell Washburn by telephone.

## Brief Issue Description Summary:

Plaintiff Boaz Pleasant-Bey alleges that he is a Sunni Muslim who has been unable to "exercise his religious beliefs by being denied certain religious accommodations while incarcerated at the Trousdale Turner Correctional Center (TTCF)" in violation of his rights under the United States Constitution including those associated with the Religious Land Use and Institutionalized Persons Act (RLUIPA). Additionally, he alleges that the "totality" of certain conditions at TTCF during his incarceration there represent a threat to his safety in violation of his rights as protected by the Eighth Amendment of the Constitution.

I have been asked to provide expert commentary and opinions on the institutional operational/security elements implicated in these allegations and will do so in the remainder of this report.


## Considerations for Opinions Offered:

**Staffing/Operational Impact of Facility Classification -** A correction system's custody level determination for a facility's assigned inmate population significantly contributes to the level of custody/security staff supervision required in that facility. When appropriately determined, the custody level of the inmate population assigned to a facility determines the necessary level of procedural restrictiveness, supervision, and control measures necessary in the environment. A medium/minimum custody level designation such as that assigned to the TTCF population generally requires less custody/security staff supervision in all phases of routine operations, including housing area management and inmate movement within the facility than that found in the higher custody levels such as close, maximum, and segregation. Either an initial classification determination, based on a variety of predictive behavioral information, or the inmate's classification determined progression over time to lessor custody levels, i.e., from maximum to close, close to medium, medium to minimum, etc., may result in the assignment of an inmate to one of these lower custody levels. Inmates in medium/minimum custody levels frequently move relatively independently within a correctional facility from one location to another without the staff escort requirements/supervision found in higher custody facilities. They may also be granted access to more privileges to incentivize the positive behavior found and expected of such inmates assigned at such reduced custody level facilities.

The less restrictive environment found in medium/minimum custody facilities serves several important purposes. As custody levels are lessened, a reduction to the cost to taxpayers for providing the more expensive level of additional staffing required is realized. Additionally, the more independently a given inmate population can be allowed to function and the more responsibility they assume for their own activities within a facility, the less the impact of "institutionalization" is experienced by the population. In many cases, the environment can be moved more toward that found on a college campus where inmates are made aware of schedules and associated requirements and are expected to comply accordingly with only a relatively moderate level of monitoring and supervision by custody staff. The management of facilities that are staffed, designed, and programmed for lesser custody level inmate populations becomes problematic when significant numbers of inmates who are not suitable for such a classification are assigned.

**TTCF Staffing Issues -** There is no question that TTCF has had challenges with fully staffing the facility since its opening in January of 2016. Some such staffing issues are not unusual when opening any new facility when attempting to hire to fill significant numbers of newly created facility positions. To some extent these difficulties have continued at TTCF due to a variety of factors. The rural location of the facility has proven to be problematic both in identifying potential employees in the area but also in enticing potential employees from other areas to relocate to the area proximate to the facility. More recently hiring difficulties have been exacerbated with the onset in early 2020 of the Covid 19 pandemic which has plagued employment efforts in a wide variety of industries across the country.

These difficulties have persisted in spite of efforts by CoreCivic to address these shortages that equal or exceed those efforts in many local, state, and federal corrections systems/facilities. These efforts include extensive advertising in the facility's extended geographical area; recruitment participation in job fairs in the area; and offering referral bonuses, signing bonuses, and retention bonuses. Additionally, the starting salary has been raised significantly, pay for experience offered, and relocation bonuses and payment of moving expenses offered to prospective employees. Efforts implemented to ensure sufficient staff coverage also include the provision for paid overtime compensation to existing staff at one and one-half times the normal hourly rate and the temporary relocation of employees from other CoreCivic facilities at a higher pay rate with the additional provision of per diem for associated living expenses.

Such efforts to address staffing issues are not without additional cost when compared with being able to recruit and retain staff through the normal employment processes. It is certainly difficult to believe that a staffing shortage of the degree requiring such measures and associated expense would be intentionally implemented by CoreCivic as appears to be intimated by some of its detractors.

Recruiting desirable employees to work in a correctional facility environment has never been an easy task. Working in such facilities is inherently stressful due to the constant heightened level of awareness necessary while in the environment to best ensure employee safety in this volatile, potentially violent environment. Staffing shortages in correctional facilities over the past several years resulting from difficulty in recruiting new employees and subsequently retaining them are certainly not unique to TTCF. In fact, it has been, and is today, a pervasive issue in almost all corrections jurisdictions with which I am familiar. Over the same time period in which TTCF has experienced this difficulty, numerous state systems including Florida, Georgia, North Carolina, South Carolina, Mississippi, Colorado, Arizona, Ohio, New Jersey, Wisconsin, and Alabama, just to name a few, have experienced similar, if not even more significant, difficulties. Just recently, the

Governors of West Virginia, Montana, and Kansas declared a state of emergency in response to the staff shortages in those states' corrections systems in order to augment staffing in West Virginia and Montana prisons with National Guard troops. The Federal Bureau of Prisons is one of the largest and best salaried systems in the country for its employees and offers an exceptional benefit package, and yet it reported recently that fully a third of their correctional officer positions are vacant forcing the use of teachers and other non-security staff to cover posts normally only covered by uniformed security staff.

There are a variety of causes cited by different sources for these staffing problems. The competitive efforts of a myriad of varied industries and businesses across the country to fill the numerous vacancies that they are experiencing certainly contributes significantly. This competition benefits in that many, if not most of the employment opportunities offered do not include the inherent danger and difficulties associated with working inside a correctional institution.

Severe staffing shortages can impact the safe and secure operation of any correctional facility. It is possible to mitigate to some degree the impact of staffing shortages which may remain even after all of the efforts discussed previously by CoreCivic in this regard have been implemented. As discussed earlier, ensuring that the inmates assigned to the facility are appropriately classified to the custody level intended for the facility's designated inmate custody level relative to its physical plant design and mission is very important.

Of significance in assessing the impact of these staffing issues is the modern design and security features found at TTCF. The living areas are designed to provide clear sight lines for staff from the central viewing area and camera coverage from strategically placed cameras provides archived recordings of the vast majority of the dormitory areas. Strategically placed mirrors serve to enhance this capability and address any potential blind spots. The living wings of each housing unit are staffed by an officer on each wing providing direct supervision of the inmates housed there. The presence of strategically located compound containment fences and gates as well as a sophisticated, state of the art electronic perimeter security system allows for available staffing to be concentrated in those areas where inmates need to be more directly supervised. These facility perimeter system features not only result in reduced staffing requirements in this critical area, but also have enabled the facility to have not sustained any inmate escapes since its opening in 2016.

Also, of significance in assessing the staffing levels at TTCF is the presence of a significant cadre of Unit Management staff most of whom are directly involved in

interaction with the inmate population in the living areas as a key component of the facility's inmate management strategy. The presence of these staff significantly augments the effectiveness of the assigned custody staff. Their availability to resolve inmate concerns and problems and to help guide the inmates through their incarceration period is invaluable in maintaining a positive environment and reducing tension in the population. A Unit Manager is assigned to each housing unit as well as a case manager for each pod and three sergeants. Case managers meet with offenders on their caseload at least monthly and more frequently if needed or requested. The unit management program is under the direction of the facility's Chief of Unit Management.

It is also important to consider that a significant number of the inmate population at TTCF is assigned to some type of rehabilitative program. Not only do such programs address rehabilitative and re-entry needs of the population and thus assist in the reduction of victimization of the public when the inmates are released; but, from an inmate management perspective, they serve to effectively address the issue of inmate idleness, which has proven historically to be very problematic and is credited with being a significant contributing cause for disturbances and riots in other jurisdictions. Such involvement in constructive self-improvement activities frequently gives purpose and meaning to incarceration and serves to occupy the inmate population who participate in a positive manner as opposed to the disruptive and dangerous activities that grow from a population left idle to seek their own diversions for the boredom that results. The relatively program dense environment at TTCF certainly has a mitigating impact on the effect of staffing shortages. Offender programs include, Adult Basic Education, Career Management for Success, Academic, and Vocational classes, Cognitive Behavior Intervention Program, Library services, religious services, recreation services, AMVETS Chapter (Veteran's Service program), and a Residential Drug and Alcohol program.

It is essential to remember that in attempting to gauge the degree of the impact of staffing issues and/or other operational factors on the frequency of such incidents as staff and inmate assaults and other seriously violent, disruptive incidents, it is certainly not enough to simply count the frequency of such incidents in a specific time period and compare/chart that frequency relative to the number of such incidents in other facilities in prison system. The comparative frequency of such events may be an indicator of the presence of a variety of different contributing, underlying factors, and that these possible factors need to be included in the investigation/assessment of the incident to determine definitively how and why the incident occurred. As a prison system manager, it quickly became clear to me that comparative data reports for various types of incidents only serve to indicate a possible need for further investigation in most cases to arrive at an accurate determination of the contributing causative factors. Violent acts by members of the inmate population against both staff and other inmates can and do occur in even the best

managed and staffed prisons. The point is that a lot of what occurs may or may not be attributable to the warden's leadership and/or the provision of resources, including staffing, available to him/her to prevent its occurrence.

As just a few of many possible examples, I recall an incident in an Arizona facility where an inmate was stabbed seriously just a few feet away from the facility warden and several ranking security staff. Immediately following the assault, the perpetrator simply dropped the weapon and laid face down on the ground waiting to be restrained. This assault occurred so quickly that the staff who were present had no time to react before it was over and there was no deterrence factor evident because of their presence. In other cases, inmates plan and coordinate assaults in such a manner that they would not be discovered even in fully staffed facilities until after they have occurred. One example is the murder of a cell mate in which the perpetrator waits until just after an assigned officer makes his required routine cell security check to assault, or in some cases murder his cellmate. Fist fights (unarmed assaults) between inmates, frequently in a facility with a significant population of gang members such as TTCF, involve inmates whose allegiances and responsibility to the gang to which they are affiliated takes precedence over any punitive measure available to prison staff to sanction and deter such behavior.

I could continue with numerous examples of similar such incidents wherein the level of staffing does not prevent/deter the occurrence of violent acts by inmates. There is no prison of the literally hundreds that I have visited across the country over the years that has the staffing capability to maintain constant supervision of all of the inmates housed within it and react immediately in order to prevent violent acts. It is important to remember that security staff in even the best staffed facilities are always outnumbered significantly, especially and by design, in lessor custody medium/minimum facilities such as TTCF.

It is also important to understand the significance of reported/charted numbers of contraband discovery incidents for comparison with other institutions in a corrections system, including such items as cell phones, drugs, and homemade weapons. Again, these charts can possibly suggest a problem in a particular facility based simply on the number of occurrences, but this determination is far from definitive. For example, the amount of contraband discovered in a facility is also indicative of how hard the facility is looking for these items. A facility reporting a relatively low number of weapons discoveries can, in fact, be the result of doing fewer and less thorough searches thus producing fewer discoveries; whereas a facility with a higher number of reported discoveries of such items could be the result of doing more frequent and more thorough searches.

Lastly, it appears from various monitoring and audit reports that TTCF at times has been noted to be deficient in timely and accurately providing reports and computer system

entries in various areas as required by their contract and TDOC policies. This particularly is noted in the report of the Tennessee Comptroller of the Treasury. Although I am in no way attempting to contend that these deficient requirements are not important, from my experience with managing facilities as a warden and as a system administrator that were significantly understaffed due to vacant positions, I did expect, and to a certain extent condone, some such deficiencies in these areas in recognition that struggling managers and facility supervisors were being forced to prioritize fundamental security supervision practices directly impacting the maintenance of good order, security, and discipline ahead of some other reporting, etc. requirements. Frequently, in my experience, staff assigned to perform various administrative reporting and support activities are pulled to cover more critical posts/assignments and perform other duties that are again fundamental to efforts to maintain of good order, security, and discipline within the facility(s).

Significant staffing shortages, especially in the custody ranks of correctional institutions, have become over the past several years the rule rather than the exception in many jurisdictions across the country. It is certainly possible that shortages can reach such an extreme level that even the best strategies by prison managers to mitigate violent behavior by inmates are no longer sufficiently effective. If this determination is to be reached it cannot be achieved by simply drawing superficial conclusions from incident data comparisons between institutions; missing, late, or inaccurate administrative reporting by a facility; and/or relying on the most serious violent events recounted in press reports that may have occurred at a given facility.

**Impact of Staffing Issues on the Plaintiff – Boaz Pleasant-Bey** – Based on a review of the institutional file of Mr. Pleasant-Bey, I was unable to confirm the existence of any violent act being perpetrated against him during his approximate three-year assignment to TTCF. He alleges in his deposition that a relatively minor altercation occurred early in his assignment to the facility but alleges no such incidents before or since that time. It is important to note that there is no documented record of the brief unarmed altercation that he alleges consisted of approximately three punches, one of which he blocked and the other two were described as punches to the body. Pleasant-Bey admits that he did not report the incident, nor did he seek or require medical care of any kind as a result.

At no point during this alleged assault does he contend that he called out to or otherwise attempted to alert staff that he was being attacked and required assistance. His description of the alleged incident would have very likely lasted for a very brief period of time, measured in seconds as opposed to minutes. Such incidents between inmates as he describes occurring in prison housing units, particularly occurring in celled housing units as opposed to open barracks style housing, would very likely not be immediately observed by staff in even the most generously staffed prison facility. Although minor, such

**Page 9 of 22**

alleged assaults would likely not be reported by many inmates, it is possible that, had he been fearful of additional or more serious altercations/assaults at TTCF, he could have reported the alleged incident to staff as being an assault. A review of archived video recordings of the area could possibly have assisted in confirming the identity of the alleged perpetrator in support of his allegation. Such video evidence along with the reported allegation of assault by Pleasant-Bey and a medical report in support of a claim of injury could have well supported formal disciplinary action and other sanctions against the perpetrator.

Although many inmates do not choose to avail themselves of the protective management/custody status available to them should they have a documented and approved justification for seeking such a status, it is an available option in all prison settings/systems with which I am familiar. Inmates may select not to choose this option because of their concern about the risk of being labeled a "snitch" and the negative connotation that this label carries in the general prison population should they be returned to general population status. Many inmates, however, who legitimately fear for their physical safety do choose this option. It is my understanding that TTCF does not include long-term protective management/custody inmate housing and that assignment to that status would result in a facility transfer. Coincidentally, assuming that this alleged altercation/assault could have been related, or at least possibly attributed to the fact that his conviction offense is for the rape of a child, any request for approval for protective custody/management status would be bolstered by this fact. It is commonly known in the corrections field that those inmates known to be convicted of sex offenses involving children are more likely to be victims of assault by other inmates. I did not note in any of the documents provided to me that Pleasant-Boaz has sought protective custody/management status during his assignment to TTCF.

It is also important to note that TTCF managers have included as part of their operational plan the operational procedures relative to individual housing units/buildings at the facility that require inmates in these units to be kept virtually separated from inmates in other housing units/buildings within this large facility. Movements of relatively large numbers of inmates to such activities as dining and recreation, occur by individual unit/building wherein inmates from different units/buildings have little, if any, access to one another. This significantly reduces the frequency with which an individual inmate must come in potentially at-risk contact with a large percentage of the total facility population, and specifically with inmates housed in other units/buildings.

**American Correctional Association (ACA) Accreditation** – TTCF received full ACA Accreditation on January 14, 2019, following an onsite audit on October 29 - December 31, 2018, by achieving 100% compliance with all sixty (60) mandatory standards and

98.8% compliance with the remaining non-mandatory four hundred and fifteen (415) standards.

ACA is the premier national organization for corrections professionals in the United States. The organization sets some four hundred and seventy-five (475) professional operational standards for corrections facilities and systems and conducts detailed performance audits to assess compliance attainment. Accreditation by the ACA is considered to be a significant achievement identifying the institution/agency as among the best in the country by being adjudged compliant with rigorous standards drawn from contemporary best practices, legal precedence, and procedural requirements identified/defined by nationally recognized experts in the corrections field. The ACA standards include sixty (60) mandatory requirements that must all be met without exception to achieve Accreditation. Of these sixty (60), thirty (30) directly relate to the provision of health care. CoreCivic facilities, including TTCF, are managed in accordance with policy and procedures that reference and require compliance with ACA standards in order to achieve accreditation.

Perhaps ACA's greatest influence has been the development of the national standards and the accreditation process. ACA standards address services, programs, and operations essential to effective correctional management. Through accreditation, an agency is able to maintain a balance between protecting the public and providing an environment that safeguards the life, health, and safety of staff and offenders.

The standards establish clear goals and objectives critical to the provision of constitutional and humane correctional programs and services. The standards include the requirement for practices to promote sound administration and fiscal controls, an adequate physical plant, adherence to legal criteria, and the provision of basic services. Basic services called for by the standards include the establishment of a functional physical plant, training of staff, adoption of sanitation and safety minimums, and the provision of a safe and secure living environment. In offering specific guidelines for facility and program operations, the manuals of standards address due process and discipline, including access to the courts, mail and visitation, searches, and conditions of confinement of special management offenders.

The standards are systematically revised to keep pace with the evolution of different correctional practices, case law, and after careful examination of experiences, applying them over a period of time and circumstances.

**Compliance with the Prison Rape Elimination Act (PREA) -** The PREA statute was passed in 2003 by the United States Congress and stands as significant recognition of

the magnitude of the issue of sexual rape/abuse in prisons in the United States, over its history. The PREA specifically requires a "commitment to zero tolerance of sexual abuse which includes a recognition that sexual abuse in prisons is unacceptable under any circumstances and as dangerous a threat to institutional security as an escape or homicide. Agencies must demonstrate zero tolerance not merely by words and written policy, but through their actions, including what they do to prevent sexual abuse and their response when it occurs."

Compliance audits by federally certified PREA auditors external to the facility are conducted every three years and address some forty-three (43) standards, each of which has various component requirements impacting numerous areas of facility operations and management. These standards are divided into general areas of applicability including prevention planning, response planning, training and education, screening for risk of sexual victimization and abusiveness, reporting, official response following a report, investigations, discipline, medical and mental care and finally, data collection and review.

Compliance with PREA standards is a requirement of the contract for TTCF and an operational requirement instituted by CoreCivic. An initial compliance audit by a federally certified PREA auditor external to the facility on July 31 – August 1, 2017, revealed only relatively minor issues to be resolved to achieve full PREA standards compliance. Revisits by the PREA auditor to confirm corrective action plan completion on November 27, 2017, and February 5, 2018, resulted in full PREA Compliance being awarded March 12, 2018.

TTCF was subsequently audited again on February 1 – 3, 2021, by a federally certified PREA auditor external to the facility resulting in an interim report issued on February 25, 2021, and final full compliance being awarded on August 11, 2021. Significant, in terms of actual staffing within the facility, were the findings reported in both PREA Compliance awards of TTCF's compliance with Standard 115.13, Supervision and Monitoring. This standard in the PREA context is intended to ensure that staffing levels and inmate population monitoring/supervision is sufficient to "protect inmates against sexual abuse." The implications for this adequacy determination at TTCF, when combined with the existing camera system capabilities, facility design, etc. is a significant indicator of operational effectiveness despite the staffing recruitment and retention issues the facility has faced. It also strongly supports the commitment of CoreCivic and TTCF management to comply with initiatives that enhance the protection and wellbeing of the inmates assigned to their care, and their willingness to take the steps necessary to meet this commitment.

**Contract Requirements and Monitoring -** The Tennessee Department of Correction (TDOC) contractually requires extensive reporting on numerous critical operation areas at TTCF including, but not be limited to weekly, monthly, and/or quarterly reports on the following subjects: inmate jobs and education, incident reports, disciplinary reports, inmate grievances, staff turnover and vacancies, staff training, employee grievances, employee discipline, health care access, reclassifications, transfers, furloughs, releases, media contacts, lawsuits, volunteers, drug audits, cell searches, visitation, and maintenance. It is only reasonable that CoreCivic is certainly aware of this relatively intense monitoring and makes every effort to meet the expectations of their contract and to avoid deficiencies that result in significant financial penalties being assessed against them.

These reporting requirements are augmented and monitored by two full-time, on-site monitors who, along with other operational areas, monitor staffing numbers and how existing staff are being utilized. The current staffing plan and daily shift rosters indicating critical posts are approved by both the facility warden and the TDOC agency head.

**Monitoring and Control of Inmate Group Activities/Organizations -** It is imperative that all inmate groups, whether clubs, recreation teams, religious groups, etc. be carefully monitored and supervised. This is particularly true of those groups whose membership is comprised along racial lines. Prison gangs (Security Threat Groups (STGs)) are frequently formed and exist along racial lines. Abuse by such groups to achieve ends other than that espoused to the facility administration has not been an uncommon occurrence over the many years of my correctional experience. While it is certainly not true with all such beneficial activities, nor does it categorically preclude the existence of such groups and organizations, experienced facility administrators recognize this potential, as well as the very serious implications associated with it, and attempt to address these concerns. The TDOC Religious Programs Policy (118.01) references this concern in addressing Security Threat Groups (STG/gangs) and the potential abuse of such groups by prohibiting them from "using religious ideas and symbols" in their activities.  I am personally aware of such occurrences and have had to manage the outcome of the failure of prison managers to recognize and address such issues.

One of these was the origin of the Warrior Society prison gang in the Arizona Department of Corrections (ADC) which arose from the Native American Brotherhood (NAB) religious group. The NAB is a group which united the Native Americans inside the prison system to pursue their religious practices and ceremonial beliefs. Although reportedly the Warrior Society gang was an off shoot of the NAB formed by younger, more violent members of the NAB for protection from other gangs and predatory groups, it subsequently engaged in the same violent, disruptive activities as other prison gangs including extortion,

contraband introduction, and sale, etc. During my fourteen years as a facility warden in the ADC this gang was one we were careful to monitor for illicit and violent activities and for its misuse and abuse of various religious program allowances and activities to further their nefarious objectives. The Warrior Society formed within the associations developed within permitted group meetings and allowed group religious practices.

The extremely violent and dangerous Aryan Brotherhood (AB) prison gang associated itself in various corrections jurisdictions with the Christian Identity religious groups, including the Church of Jesus Christ Christian and its political arm, the Aryan Nations, in order to seek consideration for group meetings, communication among members both inside and outside the prisons, and other special privilege accommodations as an affiliated religious organization.

One of the deadliest prison riots in recent history occurred at the Southern Ohio Correctional Facility located in Lucasville, Ohio, on April 11, 1993. There were nine prisoners and one correctional officer murdered by the rioters, eight officers taken hostage, and forty million dollars in facility damage. Following a thorough investigation, it was determined that the riot resulted from a belief among Muslim inmates that they would be forced to submit to a Tuberculosis test involving the use of alcohol on the skin prior to the skin test. The Muslim inmates were also angered by a federal court decision requiring the integration of all two-man cells at the facility. The leaders of the riot were Muslim inmates with these same inmate leaders serving as the negotiators with authorities during the protracted, eleven-day negotiations during which staff and inmates were murdered.

**Religious Programming at TTCF -** The facility employs two full time chaplains and has a dedicated chapel area to serve the religious needs of the inmate population of approximately 2,400. A chaplain visits the segregation area weekly and an extended time on Sundays. Chaplains are also available upon request from individual inmates to minister to their individual needs. The chaplain also is responsible for notifying inmates of deaths of family members and significant others and other crisis events that may occur involving these individuals. There are several faiths represented among the offender population. These religions include, but are not limited to:

Nation of Islam
Christian
Non-Denominational
Native American
Wicca
Spanish Protestant
Baptist

**Page 14 of 22**

Lutheran
Catholic
Jehovah Witness
Sunni Muslim
Odinism

The chapel has a capacity for 150 attendees. There are worship services offered at various points throughout the week. The facility also has a choir. Offenders may participate in communion and baptism. Inmates may possess approved religious medallions, head coverings, prayer oils, prayer rugs, etc. in accordance with a listing provided by the TDOC Commissioner. The listing from the Commissioner also includes a listing of other items permitted for various religious groups. Although a religious diet menu is not offered, all meals are pork free, and a vegetarian or fleshless alternative is also available. Although I am not an expert on religions, it is my understanding these diet options provide for a diet that is not "haraam" (forbidden or proscribed by Islamic law) to those adherents to the Muslim faith. The chaplain supervises the volunteer program which consists of approximately sixty-eight (68) active volunteers. The programs provided by the volunteers include:

A Purpose Driven Life
Bible studies
Attitudes and Behaviors
Celebrate Recovery
Basic Life Skills
Men of Valor Discipleship
Anger Resolution
Christians Against Substance Abuse
Courage to Conquer
Christians Against Sexual Addictions

The religious program at TTCF is managed under the policy and procedure guidelines found in TDOC Policy 118.01, Religious Programs, effective date February 15, 2014, and CoreCivic Policy 20-4 Chaplaincy and Religious Services, effective date April 13, 2020. The intent of these policies is as stated in part in CoreCivic 20-4 that "all inmates/detainees have the opportunity to participate in the practice of his/her faith regardless of race, religion, national origin, sex, disability, or political views. Such participation includes access to religious publications, religious symbols, religious counseling, religious study classes and congregational religious services."

Further this Policy states that "inmates/detainees have the opportunity to participate in practices of their religious faith, limited only by documentation showing a threat to the safety of persons involved in such an activity itself or disruption of order in the facility."

Additionally, both policies make clear reference to the *Religious Land Use and Institutionalized Persons Act* provisions which include that the burden on an inmate's specific religious must further a compelling governmental interest and must be the least restrictive means of achieving the compelling governmental interest.

The process for submission and review for approval consideration of religious program accommodations is clearly defined in TDOC Policy 118.01, Religious Programs, and in each case when Pleasant-Bey submitted for such accommodations, it appears to have been followed as prescribed. Recommendations by the institutional staff including the Chaplain, Associate Warden of Treatment, and the Warden were transmitted to the TDOC Director of Religious Services for referral and consideration by the TDOC Religious Activities Committee (RAC) and finally approval or disapproval by the Commissioner.

Mr. Pleasant-Bey's responses primarily stem from decisions made during this process which provides for multiple reviews by numerous individuals at various levels and from various disciplines within the institution and agency to consider the requests in accordance with the policy and procedure guidelines. Such a process would have significantly diminished the impact of any individual process member's personal bias or influence should such an individual bias have existed regarding Mr. Pleasant-Bey's requests. Again, multiple perspectives from multiple disciplines offer significant assurance against any possibly inappropriate decisions based on personal inappropriate, possibly discriminatory bias, should there be any such bias among the group's membership.

**Discussion of specific Religious Complaints (First Amended Complaint) -**

<u>Purchase and possess Khuffain</u> (prayer socks) – These leather socks were requested to be worn at TTCF during various, relatively frequent prayers and subsequently "all day" by Mr. Pleasant-Bey. This request was submitted through the TDOC process I have described previously. The recommendations of the TTCF Warden and Chaplain, as well as the submitting Director were to "Disapprove – Security Reasons." The RAC agreed with these recommendations and disapproved the request for the reasons recommended.

The security reasons for this decision include that such leather "socks" can be worn on the hands with sufficient flexibility to assist an inmate in climbing/penetrating the razor wire perimeter barrier should he attempt to escape. These leather "socks" can also be worn on the hands as insulation in order to climb or otherwise penetrate the electro-shock "Stun Fence" perimeter barrier system, again in order to affect an escape from the facility. Additionally, it is not uncommon for inmates to "pad up" when preparing for an assault with additional clothing, etc. These "socks" can be worn on the hands in a manner much as boxers wear gloves to protect their hands and prevent injury to them. When attempting to identify inmate perpetrators in a fight or assault, officers frequently ask possible suspects to show their hands in order to see if they have any cuts, abrasions, etc. on their

knuckles, etc. These "socks" can be used to prevent such evidentiary injuries. It is important to remember that if allowed to be possessed by Mr. Pleasant-Bey inside the facility that they can possibly be obtained by any other inmate through theft, loan, etc. for use as described.

<u>Purchase, possess and wear Keffiyeh (turban) and Agal During Prayer</u> – These items are designed to cover arms, neck, shoulders, back, and other areas of the body. This request was submitted by the TDOC Director of Religious Services to the TDOC Religious Activities Committee (RAC) in accordance with the TDOC process previously outlined. The recommendations of the TTCF Warden and Chaplain, as well as the submitting Director were to "Disapprove – Security Reasons." The RAC agreed with these recommendations and disapproved the request for the reasons recommended.

It is important to note that TDOC Commissioner Tony Parker specifies in his memorandum to all Wardens, Superintendents, and Chaplains entitled Inmate Religious Property (dated September 11, 2017) what religious property is allowed both for individual inmates, as well as religious groups. This list includes for individual possession by male Muslim inmates a "Kufi (two), solid white, black or gray."  The Kufi is best described as a fitted skull cap which by its design does not afford a significant opportunity for the wearer to hide contraband items and does not in any way impede the quick identification of the inmate wearer as is necessary in a prison environment. The color restrictions are to guard against the practice of some prominent prison and street gangs (STGS) of showing their colors as an announcement of their particular affiliation to others. The Keffiyeh is described as a larger, in some cases flowing head and upper body cover that does implicate contraband and identification issues not associated with the Kufi. The Agal is a band type object used to secure the Keffiyeh on the wearer's head. While it may be argued that staff can direct the inmate wearer to remove the Keffiyeh for search, this process is time consuming when searching large numbers of inmates during, for example, the inmate group movement process and serves to distract the officer's attention from the other inmates in the search process thus allowing them to pass items around the searching officer and/or to slip around the search themselves during the distraction. Additionally, an officer requesting the removal of the Keffiyeh and subsequently searching it, even when this is done professionally/respectfully, can result in confrontation in the volatile prison environment. The ability to visually search the Kufi without its removal and at some distance for many contraband items such as weapons provides some significant security benefit. During my consulting and training work in numerous jurisdictions across the country, the Kufi has been observed to be the predominant head covering authorized for Muslim inmates. I have not observed the Keffiyeh (turban) and Agal being worn in any of these locations. These items were also not authorized for wear in any institution or

system in which I worked during my career. The security implications described here clearly impacted these restrictions.

<u>Traditional Halal Foods to be provided during Ramadan and Id Feasts</u> – the "traditional" Halal [lawful] food being requested by Mr. Pleasant-Bey during Ramadan, both before and after fasting each day, and for the Id UI Fitr Feast and the Id UI Adah [Feast of Sacrifice] consists of "dates, whole milk, honey, Halal meats [lamb, beef, and fish] with vegetables and natural fruits [not processed foods]. In a grievance complaint Mr. Pleasant-Bey submitted concerning the meal he received on August 12, 2019, for the Id UI Adah [Feast of Sacrifice], he asserted that in addition to the items mentioned, he was not provided Baklava and Islamic Danishes.    It is my understanding that TTCF has provided special meals that consist of food that is not "haraam" (forbidden or proscribed by Islamic law), but not that specifically defined by Mr. Pleasant-Bey as consistent with his "traditionalist" preference. I am not qualified to comment or opine on this inconsistency in terms of its religious significance as a requirement for following and practicing the Muslim faith, but I can confidently assert on the significant operational issues that could be implicated should any inmate professing any of many possible faiths be allowed to determine, based on his/her personal preferences, which historical/traditional dietary practices occurring throughout history that they would prefer to follow.

<u>Access to prayer oil from an Islamic vendor</u> – It appears that Pleasant-Bey's only specific asserted complaint about the prayer oil available for purchase at TTCF through Union Supply is that it could not be purchased from an Islamic vendor. There is no specific complaint about the prayer oil itself. Corrections systems across the country have contracted with Union Supply and other such vendors who specialize in providing products to inmates in a secure manner to prevent the potential of unauthorized items and/or contraband from being introduced into the facility. I have personally visited distribution sites in the vetting process for such vendors to observe and preview the security precautions in place. As the Security Bureau Chief for the Florida Department of Corrections, I chaired a committee of Department staff who reviewed and evaluated each product to be sold by such a vendor to ensure it posed only a minimal security risk, the quantity sold was reasonable, and that it was priced comparably in a fair manner for inmate purchase in accordance with the reasonable market price. We also reviewed products to be sold for other considerations such as to guard against items that might contain pork or pork by products in consideration of the Muslim population in our facilities. This vetting process is very important.

I did note that some very specialized products can be granted as an exception for purchase through the facility staff such as the Chaplain, but only when this is exception is warranted. Assuming that the prayer oil sold by Union Supply is produced and labeled

<b>Page 18 of 22</b>

appropriately for use by Muslim inmates, it appears highly questionable whether such a special order by-passing the vetted vendor is justified solely in order to purchase it from an Islamic vendor.

<u>Remove Restrictions on Donations of Islamic Religious Items</u> – It is my understanding from reviewing the documents provided to me to include the affidavit filed by Chaplain Shonebarger on May 20, 2019, that the practice of allowing volunteer groups to bring in food items was disallowed in 2018 in both TDOC and CoreCivic Policies. According to the Chaplain Shonebarger, this change resulted from complaints that "some religious groups (i.e., Christians) receiving more food at feasts due to a higher number of volunteers bringing in food, while other religions, with fewer to no volunteers, were not receiving the same amount of food." He also states that "Muslim inmates have available to them Halal food items." He further emphatically states that "no Muslim inmates at Turner Trousdale Corrections Facility, has ever or will ever be required to eat meat items that are Haraam or forbidden under Muslim dietary restrictions."

In the documents provided to me are several pieces of communication wherein Chaplain Shonebarger has solicited Muslim faith representatives in the Nashville, Tennessee, area for donations of various Muslim religious items and asked on several occasions for assistance in finding willing Muslims volunteers to come to Trousdale to minister and work with the Muslim population there.

<u>Quranic Arabic Class Group Meetings</u> – This class was addressed by the TDOC Director of Religious Services, Rev. B. Darnell, in his letter to Mr. Pleasant-Bey dated January 17, 2019. He advised that the Religious Advisory Committee (RAC) concurred with the disapprovals already made by Warden Washburn and AWT Pittman and the recommendations made by Chaplain Shonebarger who offered access to a CD player and time during the existing Taleem or Jum'ah services for him to engage in more extensive learning of Arabic.

The question would appear to be if studying a foreign language in which a particular religion's most important text was originally written and for which widely accepted scholarly English translations exist and are available for purchase or use, is a reasonable justification for allowing a class about this language to be led by an inmate who has no credentials confirming his ability to adequately perform this role. It is a well-recognized fact in the prison management field that inmates being assigned or allowed to assume a leadership role and/or some position of authority over other inmates can be a risky proposition. This leadership role can easily become misdirected toward activities not connected with it original intent. Such a program would require careful monitoring either by the Chaplaincy staff, custody staff or possibly by carefully vetted religious volunteers.

As indicated elsewhere in this report, securing Muslim volunteers has proven unsuccessful despite efforts to do so. Does studying this language without a qualified instructor in order to possibly eventually read from a text that has been fully translated by scholars of both the religion and the language, justify the risk of inmate leadership, commitment of limited staff resources for monitoring, and utilization of space dedicated to serve the religious needs of numerous religions for an inmate population exceeding 2,000 inmates. It appears to me that the denial of this request is appropriate.

Ban on Qur'an – The ban on inmates at TTCF purchasing the Qur'an from the Union Supply Catalogue has been explained by the Chaplain and the Warden as a mistake in excluding several religious texts associated with several faiths in a Warden's memorandum issued on April 12, 2018, and subsequently corrected in Warden Washburn's memorandum of August 2, 2018. This error was clearly not intended to solely prevent the purchase of the Qur'an translation prejudicially toward the Muslim population since texts from several faiths were mistakenly excluded from purchase. It is significant that Pleasant-Bey has admitted having his own personal copy of the Qur'an during this time period and others were available for inmate use at the facility.

## Opinions:

It is my opinion that the restrictions and limitations applied in regard to Mr. Pleasant-Bey's religious accommodation requests are adequately supported and justified by the identified compelling governmental interests discussed previously in this report as they implicate and relate to the maintenance of good order, security, and discipline, consistent with reasonable and realistic consideration of costs and limited resources.

Further, it is my opinion, again consistent with reasonable and realistic consideration of costs and limited resources, that these limitations and restrictions are the least restrictive means of effectively addressing these compelling governmental interests.

In terms of Mr. Pleasant-Bey's contention that the staffing issues faced by the TTCF have created an environment that in its totality poses a serious threat to his personal safety, I did not discover any real evidence in the documents provided for my review that this is in fact true.

There are certainly staffing vacancy concerns at TTCF as there are in many, if not most jurisdictions across the country; but I cannot conclude with any degree of certainty based on the allegations and information in the complaint and the information that has been made available for my review that Mr. Pleasant-Bey is in any more serious risk of harm at TTCF than that risk normally found in any similar prison environment.

It is important to consider when addressing inmate safety in any prison facility that violence in some form or another exists in nearly every such correctional facility. This violence comes about largely because you have people locked away in a place where they don't want to be, having to listen to people who they don't want to listen to, and frequently having to do what they don't want to do. The obvious overarching reality in all of this is that many of these people were violent in the free world and thus continue their violent behavior in prison as well.

CoreCivic and its employees at TTCF do a great deal to try to curb violence. Among many other things, they appropriately house inmates, they search for weapons, they punish inmates who engage in wrongdoing, they provide rehabilitation programs, they provide education classes, they provide religious opportunities, they provide mental health medications to people who need them, they provide counseling to people who need it, etc.

There is no way that violence can completely be eradicated from the prison environment. And, when you have a population that includes a large STG membership, it makes it much more difficult. There is no question or doubt in my mind that CoreCivic's operational emphases in every aspect of institutional management go toward the ultimate goal of operating secure facilities that are safe for both the staff who work in them and the inmate population that inhabit them, and to provide for the protection of the public by keeping the inmate population securely confined in compliance with lawful requirements.

I reserve the right to amend this report and/or my opinion at any point in these proceedings should additional documents/reports or other information be provided to me that is of factually verifiable import to prompt such amendment.

## Compensation

I am being compensated at the rate of $200.00 per hour for document review and report preparation. Site tour/inspection, deposition, mediation, and/or testimony are compensated at a rate of $350.00 per hour.

## Style of case and name of court in cases in which the expert has previously testified at trial or by deposition (within past 4 (four) years):

- Reiyn Keohane, Plaintiff v. Julie Jones, et al., Defendants Case No. 4:16-cv-511-MW-CAS (N.D. Fl.); and

- R.W. v. Bruce A. Kiser, Jr., Case No.: 5:16-CW-00045-WTH-PRL, United States District Court, Middle District of Florida.

**Page 21 of 22**

- Brandie Melton on behalf of Daniel Christian Melton, Plaintiff, vs Sid J. Gautreaux, III, Sheriff of East Baton Rouge Parish, et al, Defendants, Nineteenth Judicial Court, State of Louisiana.

- Jessica N. Rogers, as personal representative of the Estate of Jose F. Escano-Reyes, Plaintiff, vs Sheriff Bob Johnson, et.al., Case No:3:18-cv-571-RV-EMT, Northern District of Florida, Pensacola Division.

- Durrell Sims, Plaintiff v. Julie Jones, Defendant, Case No: 4:16-cv-00049-WS-CAS, Northern District of Florida, Tallahassee Division.

- Douglas B. Stalley, as Personal Representative of the Estate of Jose Gregory Villegas and on behalf of ZV and DV, minor children of the deceased, Plaintiff v Florida Department of Corrections, Defendant Case No.: 5:19-cv-00280-JSM-PRL, Middle District of Florida Ocala Division.

- Anthony Tellis and Bruce Charles, on behalf of themselves and all other similarly situated prisoners at David Wade Correctional Center, and The Advocacy Center of Louisiana, PLAINTIFFS, vs. James M. Leblanc, Secretary of the Louisiana Department of Public Safety and Corrections, et. al., DEFENDANTS, Case No. 5:18-cv-00541-EEF-MLH in The United States District Court Middle District of Louisiana.

_____  
James R. Upchurch

$\dfrac{9/23/2021}{\text{Date}}$

Case 3:22-cv-00093   Document 33-29   Filed 05/04/22   Page 51 of 63 PageID #: 2801

# *Curriculum Vitae*

**NAME:** James R. Upchurch          **CONTACT:**          1387 Devonshire Dr.
Tallahassee, Florida 32317
Home (850) 877-4157
Cell (850) 544-6839
jrupchurch@comcast.net

**INTRODUCTION AND CAREER HIGHLIGHTS:**

Senior correctional manager known to be creative, analytical and to have a sound understanding of how correctional systems/institutions are successfully managed and operated. Twenty-five (25) years of hands-on experience involving all aspects of institutional operation and management and an additional nineteen (19) years of experience with statewide, management level system responsibilities with emphasis on institutional security and operations. Highlights include:

➢ Serving as the Assistant Secretary for Institutions for the third largest corrections agency in the United States – the Florida Department of Corrections.

➢ Managing the development and implementation of the Florida Department of Corrections security program resulting in a dramatic decrease in escapes, assaults and serious incidents during my fifteen-year tenure as Security Operations Chief.

➢ Serving fifteen years as warden/superintendent for correctional institution populations in the Arizona Department of Corrections including administrative segregation, maximum custody, death row, close custody, minimum–medium custody, female, juvenile, reception center, forensic psychiatric and protective management.

➢ Having a leadership role in the design, program development and start-up operation of three major institutions, including one of the first "super-maximum" custody facilities in the United States. Member of the design team responsible for the prototypical design of all new correctional facilities in the Florida Department of Corrections.

➢ Providing extensive consultative and technical assistance services both privately and for the National Institute of Corrections by performing security assessments/audits of both jails and prisons, staffing analyses, critical incident assessments (including hostage situations, disturbances, inmate escapes and homicides of inmates and staff members) and emergency team evaluations in thirty-eight (38) states.

   ➤  Serving as an instructor for the National Institute of Corrections, teaching in such areas as the development of security standards and audit programs, staffing analysis and effective staff utilization and the security audit process.

   ➤  Serving as a guest lecturer and speaker at various colleges and universities, public forums and civic organizations and conferences of various technical and professional organizations including the American Correctional Association at its annual conference.

**EDUCATIONAL BACKGROUND:**

Bachelor of Science, 1974, Delta State University/Cleveland, MS
Master of Science, 1975, Delta State University/Cleveland, MS
Additional Graduate Work, 1976-1981, Delta State University/Cleveland, MS
Continuing Education, 1982, University of Southern California
"Institute for Public Executives," Certification, Arizona State University, 1994

**PROFESSIONAL DEVELOPMENT:**

- "Annual Conference", Southern States Correctional Association, 1977, 1978 and 1997
- "Annual Conference", American Correctional Association, 1979, 1980, 1988, 1995, 1999, 2006, 2007 and 2014
- "Conflict Prevention and Conflict Resolution," Institute for Mediation and Conflict Resolution
- "Response to Hostage Situations," Harper & Row
- "Management of Stress in Corrections," National Institute of Corrections
- "Management Development Program for Correctional Administrators," the National Institute of Corrections, Department of Justice
- "Management Strategies for Disturbances and Gang/Organized Groups," National Institute of Corrections, Department of Justice
- "Management of Maximum Security Disruptive Inmates," National Academy of Corrections

**CONSULTANT/EXPERT WITNESS SERVICES:**

1997 through present: National Institute of Corrections Instructor/Technical Resource Provider and Private Consulting/Expert Witness Services:

   ➤  Jail security standards development and auditing – instruction;
   ➤  Technical assistance and on-site comprehensive and issue specific security audits in both jails and prisons;
   ➤  Analysis of prison staffing – Instruction and on-site technical assistance;
   ➤  Prison security auditing methodology and practice;

➢ Institutional Emergency Response Teams evaluation;
➢ After incident assessments following institutional escapes, disturbances, staff and/or inmate homicides, hostage situations;
➢ Use of Force in jail and prison settings;
➢ Management/operation of corrections systems and institutions.

**MEMBER:**

- American Correctional Association
- Florida Council on Crime and Delinquency
- Southern States Correctional Association

**ADVISORY BOARD** (past and present)**:**

- National Law Enforcement and Corrections Technology Advisory Committee (LECTAC) – N.I.J.
- Florida Joint Task Force for Statewide Law Enforcement Radio System (JTF – SLERS)
- National Technology Working Group for Corrections – N.I.J.

**BOARD OF DIRECTORS –** Prison Rehabilitative Industries and Diversified Enterprises, Inc. State of Florida, November 4, 2015, Executive Appointment

**PRESENTER:**

- American Correctional Association 1999 Annual Conference, "Security Standards Development and a Model Assessment Program"
- Florida Council on Crime & Delinquency 1998 Annual Conference, "Strategies for Sound Decision Making in Disturbances"
- American Society of Industrial Security Seminar, panel on "Privatization of Security Services"
- Northeast Technology and Product Assessment Committee, November, 2002- "Technology and Product Advances for Institutional Security"
- Technologies for Public Safety in Critical Incident Response Conference (N.I.J.) – "Technology Evaluation Process"
- Arizona State University, Florida State University, Tallahassee Community College, Rio Salado Community College, San Juan College – various occasions as guest lecturer
- 2005 Correctional Security Conference – "Managing Risks and Resources – A Model Security Audit Process", September, 2005
- American Correctional Association 136th Congress of Correction, 2006, "Conducting Prison Security Audits"
- American Correctional Association 136th Congress of Correction, 2006, "Experienced Based Evolution of a Model Application for Corrections Emergency Management"
- American Correctional Association – Winter Conference, 2014, "Why Good Officers Do Bad Things"

**CONTRIBUTOR:**

- *Corrections Today* (American Correctional Association);
- *Southern Concourse* (Southern States Correctional Association);
- Guidelines for the Development of a Security Program (American Correctional Association);
- Understanding Correctional Violence, Fearn & Ruddell, Newgate Press;
- The Security Audit Program, National Institute of Corrections
- Prison Staffing Analysis, National Institute of Corrections

**CERTIFICATIONS:**

- Certified Corrections Trainer, Florida and Arizona Department of Corrections
- Certified Chemical Agents, Specialty Impact Weapons and Distraction Device Master Instructor
- Certified Incident Command System for Corrections Instructor

**Consultant/Expert Witness:**

Henderson v. Terry et al., Case No. USDCAZ, CIV 83-2414, PHX, EHC. (MS);

Chandler v. Moore et al., Case No. 3:00-CV-900-J-21C;

Osterback et al., v. Moore, Case No. 97-2806-CIV- Huck;

Komar et al. v. Singletary, et al., Case No. 98-14294-CIV- Graham;

O'Bryant v. Crosby, Case No. 3:01CV74/RH;

Anstadt v. Moore et al., Case No. 2:01-CV-537-FTM-290NF;

Estate of Ellis Kennedy v. Vance Everett, et al., Case No. 02-CV-026-B;

Prison Legal News v. James V. Crosby, et al., Case No. 3:04-CIV-14-J-16TEM;

Joy Perry v. Secretary, Florida Department of Corrections, 664 F. 3d 1359 (11th Cir. 2011);

Prison Legal News etc. v. The GEO Group, Inc. etc., et al, Case No. 4:12 cv 239-MW/CAS;

United States of America vs. Secretary, Florida Department of Corrections, Case No. 12-22958-CIV-Seitz/Simonton, United States District Court, Southern District of Florida;

Jacob Perry Johnsey vs Corrections Corporation of America, Inc., Erica Perkins, Officer Quinn, Officer Henry King, Mississippi Department of Corrections and John Does 1-10: Cause No. 5:13-CV-00075-DCB-MTD;

Citation and Notification of Penalty (10/7/2014) - Corrections Corporation of America by the Tennessee Division of Occupational Safety and Health;

Michelle Burks v. Oregon Department of Corrections, Washington County Case No. C074207CV;

Mika Rae Nelson vs Corrections Corporation of America and Warden Barry Goodrich and John Jane Does 1-25; Civil Action No. 1:13 – CV – 02615 – DCN;

William G. Dotson v. Warden Brigham F. Sloan, et al. Case No. 1:14-cv-02491-DCN;

The Estate of Richard Giles Flor V. Corrections Corporation of America, Shelby Prison, Case No. CV-15-47-BLG-SPW-CSO;

Ronnie Daniels, Plaintiff V. Barry Reddish, Mark Taylor, Herbert McCloud, Casey Clark, William Bennett, Jay Groves, Douglas Eunice, and Nurse Jane Doe, individually, Defendants, Civil Action No.:3:15-CV-719-J-34-MCR;

Stalley, as Personal Representative of the Estate of Jerry Washington, deceased, et.al. V. Julie Jones, in her capacity as Secretary of the Florida Department of Corrections, et.al. Case No. 4:16-cv-00041-RH-CAS;

Jeremiah Tatum, Plaintiff vs. William S. Churchwell, Defendant Case # 5:16-cv-00171-MW-GRJ;

Reiyn Keohane, Plaintiff v. Julie Jones, et al., Defendants Case No. 4:16-cv-511-MW-CAS (N.D. Fl.);

Pernell C. Jackson, Plaintiff v. District of Columbia, Defendant Case No. 2015 CA 010117B;

Ferreira v. Arpaio, et al. / USDC - Arizona / Case Number 2:15-cv-01845;

R.W. v. Bruce A. Kiser, Jr., Case No.: 5:16-CW-00045-WTH-PRL, United States District Court, Middle District of Florida;

Jaqueline Smith v. Harris County, 4:15 - CV – 2226 (S.D. Texas, 2015);

Melissa Johnson, et al. vs Rutherford County, Tn., et al., Case No. 3:15 - cv – 1495, Middle District Tn., Nashville;

Steven A. Ciccone v. Corrections Corporation of America and Warden Christopher J. Larose, et al.,16 –CV – 3061, Court of Common Pleas, Mahoning County Ohio;

Douglas Dodson, Richard Little and Jasper Vick v. CoreCivic, Inc., The Tennessee Department of Correction and Commissioner Tony Parker, United States District Court for Middle District; No. 3:17-CV-48;

Brandie Melton on behalf of Daniel Christian Melton, Plaintiff, vs Sid J. Gautreaux, III, Sheriff of East Baton Rouge Parish, et al, Defendants, Nineteenth Judicial Court, State of Louisiana;

Russell K. Scarbaugher, as the Personal Representative of the Estate of Ricky Dean Martin, Plaintiff v. John C. Beaudry, Jacob R. Denmon, Ricky J. Dufrene, Freddy     L. Johnson, Jeffrey M. Smith, Jeffery T. Beasley, Kenneth S. Tucker and     Richard L. Scott, Defendants; Case No. 3:16-CV-126, United States District Court for the Northern District of Florida (Pensacola);

Edgar Mhoon v. Metropolitan Government of Nashville and Davidson County, et al., US District Court for the Middle District of Tennessee, No.: 3:16-cv-01751;

Samuel Jonathan Salada vs CoreCivic of Tennessee, LLC, et al., US District Court for the Middle District of Tennessee, Case No. 3:18-cv-00455;

Jody Higgins, Plaintiff v. CoreCivic, Inc., CoreCivic of Tennessee, LLC, Correct Care Solutions, and Hamilton County Tennessee, Defendants, Civil Action No. 18C599, Circuit Court for Hamilton County, Tennessee;

Gregory Blander, Plaintiff v. Northeast Ohio Correctional Center, et.al., Defendants, Case No. 2017 CV01834, Court of Common Pleas, Mahoning County, Ohio;

Jessica N. Rogers, as personal representative of the Estate of Jose F. Escano-Reyes vs Sheriff Bob Johnson, et.al., Case No:3:18-cv-571-RV-EMT, Northern District of Florida, Pensacola Division;

Ramon Steybe, II, as Personal Representative of the Estate of Austin Lane Steybe, on behalf of the Estate, and on behalf of his survivors, Ramon Steybe, II and Katina Simmons, Plaintiffs, vs. David Looney, individually; and Terrance Haynes, individually, Defendants; Case No:3:19-cv-00494-TJC-MCR, Middle District of Florida, Jacksonville Division;

Amanda Valdivia, As Mother and Next Friend of R.F., a minor, and Virginia Flores, Individually, and on behalf of all of the Heirs of Ricardo Flores-Ramos, Plaintiffs, vs. The State of Kanas, Rex Pryor, Gina Deamicis, Carl Foraker, and Ryon Karpierez, Defendants, Case No. 2017-CV-000195, District Court of Leavenworth County, Kansas Civil Department;

Durrell Sims, Plaintiff v. Julie Jones, Defendant Case No.: 4:16-cv-00049-WS-CAS, United States District Court, Northern District of Florida, Tallahassee Division;

DOUGLAS B. STALLEY, as Personal Representative of the Estate of JOSE GREGORY VILLEGAS and on behalf of ZV and DV, minor children of the deceased, Plaintiff, v. THE FLORIDA DEPARTMENT OF CORRECTIONS, Sheila Cumbie, Milton Gass, Anthony Key, Henry Fender, Scott Ake, Anildat Amrit, Brent McBride, William Smith, Dalton Tifft, Alan Perrotta, Donald Foster, James Disano, and Shawn Lee, Michael Mashburn, individually, Defendants, Case No.: 5:19-cv-00280-JSM-PRL, UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF FLORIDA, OCALA DIVISION;

PROPHET PAULCIN, Plaintiff, vs JULIE JONES, as Secretary of DOC, WEXFORD HEALTH SOURCES, INC., JOHN D. WILLIS, KARA WILLIAMS, JAMES LICATA, JONATHAN REID, J. BRUSSELL, JELANI POLICARD, STEPHEN MATHEWSON, KAREN BLANKENSHIP, ANDRES OZUAL, CAROLYN NIES, and C. JOHNSON, Defendants, Case No.: 2:17-cv-232-SPC-MRM, UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF FLORIDA FT. MYERS DIVISION.

**Military:** United States Army, Honorable Discharge – February, 1972

**EMPLOYMENT HISTORY:**

### 4/1/15 to Present: Semi-Retired/Self-Employed (Upchurch Consulting LLC, 4/13/17):

Providing professional consulting services including serving as an expert witness in a variety of different jurisdictions including both federal and state courts and involving a broad range of correctional issues focusing primarily on institutional operations. I have provided these services to both defendants and plaintiffs both in jail and prison cases. My extensive corrections background, spanning some fifty (50) years of experience in practically every aspect of this field, allow me to consult and opine with confidence based on proven expertise in both operational issues and related policy development.

### 01/13 to 3/31/15 (retired FDC):
Employer-           Florida Department of Corrections (FDC), 501 South Calhoun, Tallahassee, Fl. 32399

Job Title-           **Assistant Secretary for Institutions and Re-entry**

Responsible for the overall administration and management of the Department's Office of Institutions consisting of one hundred and forty-five (145) correctional facilities including secure major institutions, institutional annexes, work camps, work release centers, road prisons, and residential treatment centers. These facilities house over 100,000 inmates and employ 19,256 staff. The annual budget of the Office of Institutions is $1.5 billion. This position also has responsibility for the management of the department's priority inmate re-entry initiatives as we strive to reduce recidivism and subsequently victimization to provide for a safer Florida. Supervision is provided for a Deputy Assistant Secretary for Re-entry, Deputy Assistant Secretary for Institutions, three Region Directors for Institutions and forty-nine major institution Wardens.

### 01/2012 to 01/2013:
Employer-           Florida Department of Corrections, 501 South Calhoun, Tallahassee, Fl. 32399

Job Title -          **Director of Operations and Support (Deputy Assistant Secretary)**

Responsible for the direct supervision of the Chiefs of the Bureau of Security Operations, Bureau of Institutional Support, Bureau of Classification & Central Records, Bureau of Facilities Services and Bureau of Admission and Release. This position also is responsible for the Department's emergency management responses – both internally and externally and reports directly to the Assistant Secretary of Institutions. During my tenure in this position we accomplished the closure

of seventeen facilities and the consolidation of approximately 10,000 inmates into other existing institutions. We have also developed and implemented a twelve hour shift staffing plan for a certified security staff totaling approximately 17,000. Both of these initiatives resulted in significant budgetary savings for the Department. My primary goal in this office was to support and assist institutional managers and supervisors in effectively and efficiently providing safe and secure institutional environments where re-entry efforts could be successfully implemented and allowed to thrive as we move toward our goal of reduced victimization in our state.

**08/2011 to 01/2012:**

Employer -          Florida Department of Corrections, 501 South Calhoun, Tallahassee, Fl. 32399

Job Title -          **Warden, Franklin Correctional Institution**

Responsible for management and operation of a1500 bed multi-custody, adult male institution and a 284 bed Work Camp (Bay City) with a staff complement of approximately 300. During my brief tenure we were able to enhance security practices at these facilities and enrich the program offerings provided to inmates despite difficult budgetary limitations. We were also able to increase the general inmate activities level to address inmate idleness. This brief institutional assignment served to reinvigorate my corrections career, refresh my appreciation for the issues involved in managing a correction institution and solidify my commitment to the staff who work daily in this difficult and dangerous environment.

**01/1996 to 08/2011:**

Employer -          Florida Department of Corrections, 2601 Blair Stone Road, Tallahassee, Fl. 32399-2500

Job Title -          **Chief, Bureau of Security Operations**

Responsible for coordinating the department's security program on a statewide basis. It is the function of this bureau to develop all security procedures, standardized post orders and practices to provide uniform security, inmate control and discipline in all state corrections institutions. Staffing plans, post charts and master rosters are developed and continually reviewed and assessed to monitor and intervene as necessary to insure optimum security staff assignment and utilization. This bureau is also represented on the facilities committee for the department to review and approve all plans for new construction and renovation of state correctional facilities. The Attorney General's Office and the department's legal staff are frequently advised on pending litigation concerning institutional operations and assisted by serving as agency representative(s) and/or providing expert testimony and consultation as necessary. I served as chairman of the department's technology review committee evaluating new technology and products in the security and operations area. The specific security related functions of institutional security audits and assessments, emergency management of critical incidents including response team organization and training, security equipment standardization and procurement, statewide security operations oversight, and the central office duty officer service are managed by this office. Legislative budget requests related to all of these areas are prepared and submitted for consideration. The highlight of my tenure was the opportunity to contribute to a significant

reduction in inmate escapes and to facilitate standardization of institutional security operations throughout the state system.

**10/1992 to 1/1996:**
Employer -          Arizona Department of Corrections
Job Title -         **Complex Warden, Arizona State Prison Complex – Florence**

Responsible for the management of a six (6) institution prison complex with an operating capacity of 3,200 multi-custody inmates with 1,100 staff and a budget in excess of $40,000,000. Numerous security enhancements were accomplished, and a comprehensive preventive maintenance program was implemented, resulting in significant physical plant improvements. The vehicle fleet size was reduced, per capita food cost was maintained at the lowest level in the department, and budget control was improved through expanded cost center management.  A comprehensive internal security audit process was implemented for the Complex which was eventually adopted statewide.

**01/1992 to 10/1992:**
Employer -          Arizona Department of Corrections
Job Title -         **Southern Region Operations Officer**

Working directly for the Assistant Director for Institutions,  responsibilities included staff inspections of any and all aspects of the operations of five (5) major adult institution complexes providing recommendations for change based on on-site diagnostic assessments of institutional operations.  Additionally, areas of inconsistency of operation across the region were identified for standardization.  Input was provided to those responsible for developing departmental policy in areas impacting institutional operations.  Served on various task forces and committees; served as Certified Department Trainer and as Subject Matter Expert in curriculum development; provided institutional expertise as an advisor to various Central Office staff and served as Acting Assistant Director in his absence.  Highlights of my tenure included the development of the current inmate access to the courts policy and a more streamlined, efficient inmate disciplinary system.

**01/1991 TO 01/1992:**
Employer -          Arizona Department of Corrections
Job Title -         **Unit Warden - Alhambra/Flamenco Unit**
                    Arizona State Prison Complex- Phoenix

Responsible for the management and operation of the 250-bed, maximum-security reception and diagnostic center for all male adult inmates received into the Department.  Initial custody classification, in and out-processing and assessment testing for program needs were accomplished.  Additional responsibilities included the supervision of a 50-bed licensed psychiatric hospital component and a 125-bed licensed intermediate care facility for the mentally ill, ensuring operational and security management elements worked cooperatively and effectively with medical/mental health staff.

**12/1986 to 01/1991:**
Employer -                Arizona Department of Corrections
Job Title -                **Unit Warden – ASPC-Florence Special Management Unit**,
                          Arizona State Prison Complex-Eyman

Responsible for the opening and subsequent operation of this 960-bed, maximum security, "super max" unit.  Activities included the selection and hiring of over 300 staff and the development of a complete operating procedure manual and post orders.  Plans were developed for programming and methodology of operation.  The institution housed the most difficult and dangerous inmates in the department, including death row and severe disciplinary and management problems requiring a highly structured, secure environment.  The operational program proved successful in managing this difficult population with no serious assaults, inmate suicides or serious injuries to staff or inmates during my tenure.

**01/1986 to 12/1986:**
Employer -                Arizona Department of Corrections
Job Title -                **Superintendent, Catalina Mountain Juvenile Institution**

Managed security, program and support staff of 128 in this secure juvenile facility housing 180-200 juveniles. Management responsibilities included all support services necessary to provide for the health, well-being and security of juvenile offenders. A facility treatment program was developed during my tenure emphasizing each individual juvenile's personal involvement and subsequent buy-in with his treatment plan.  A secure environment was maintained for the most serious and dangerous juvenile offenders in Arizona while simultaneously providing a structured environment suitable for the implementation of treatment and behavioral change programs for the juvenile offenders.

**06/1982 to 01/1986:**
Employer -                Arizona Department of Corrections
Job Title -                **Unit Warden, Santa Cruz, Arizona State Prison Complex-Perryville**

Responsible for a 576 inmate, medium custody institution with a staff of approximately 160.  The Santa Cruz unit was a modern, prototypical institution emphasizing program opportunities for inmates in a physical plant designed to provide an open, yet secure, environment.  Successfully implemented functional unit management during my tenure.

**12/1979 to 06/1982:**
Employer -                Mississippi Department of Corrections
Job Title -                **Deputy/Unit Warden, Mississippi State Penitentiary**

Operational responsibilities for the 2,200 inmate Mississippi State Penitentiary.  This facility housed all classifications of inmates divided into 22 separate housing units and spread over 16,000 acres.  Over 600 employees were assigned to this fully independent facility.  Duties included involvement in all phases and areas of institutional management with emphasis on security operations and inmate management.  In October 1981, accepted responsibility for the

opening of a 1,500-bed close custody facility (Unit 29) and subsequent hiring of 287 staff, including custody, treatment, and support personnel. Developed a successful "performance ladder" program for offender management and the policies and procedures and necessary training programs for its effective implementation at this new facility.

**12/1975 to 12/1979**:
Employer -           Mississippi Department of Corrections
Job Title -          **Associate Warden, Mississippi State Penitentiary**

Operational management of one-third of the Mississippi State Penitentiary including eight (8) separate inmate housing units with a combined inmate population of 1,100. Staff assigned included 200 security supervisors and officers, as well as program and administrative positions. Included in this assignment was management responsibility for a 40-bed medical facility with a staff of 22 medical professionals and 25 correctional staff. Responsibilities included the provision of in-patient and out-patient medical and dental care for 2,100 inmates. Significant improvements in quality of care were accomplished during my tenure with the acquisition of better equipment and more qualified staff. Significant security improvements were accomplished in the secure housing units, including the establishment of post orders and operating standards.

**12/1968 to 12/1969; 1972 to 1975**:
Employer -           Mississippi Department of Corrections
Job Title -          **Correctional Security Officer/Physician's Assistant**

Worked as a tower officer, perimeter officer and inmate housing unit officer at various security levels/units. Following military service and honorable discharge worked as Physician's Assistant providing medical care to inmate population. Simultaneous to these periods of employment I pursued and achieved my degrees at the University of Mississippi and Delta State University.

## FEE SCHEDULE

Upchurch Consulting, LLC

James R. Upchurch – Consultant/Expert Witness

1387 Devonshire Drive, Tallahassee, Florida 32317

My fee schedule is as follows:

Retainer (up-front) - $2000 (applied to hourly fees for review of case related documents)

Hourly rate for document review and/or report preparation - $200/hr.

Hourly rate for site tour/inspection, deposition and/or trial testimony - $350/hr. (minimum 4 hours)

Travel days - $500/day (does not include trial prep, additional document review, consultation at $200/hour, etc. while awaiting testimony)

Travel Expenses - air fare, rental car, hotel invoiced with receipts. Personal vehicle use for travel invoiced at GAO mileage rate. Meals and incidentals invoiced at GAO per diem rate.

Invoices for services rendered, etc. may be submitted on a monthly basis with <u>payment due within thirty days of invoice date</u>.