```
1              IN THE UNITED STATES DISTRICT COURT
               FOR THE MIDDLE DISTRICT OF TENNESSEE
2                      NASHVILLE DIVISION

3

4    BOZA PLEASANT-BEY,           )
                                  )
5       Plaintiff,                )
                                  )    Case No. 3:19-cv-00486
6    VS.                          )    JUDGE TRAUGER
                                  )    JURY DEMAND
7    STATE OF TENNESSEE, et al,   )
                                  )
8       Defendants.               )
     ─────────────────────────────X
9

10

11

12

13   _____

14

15               DEPOSITION OF JON WALTON

16               TAKEN ON APRIL 8, 2021

17

18   _____

19

20

21

22
     Prepared by:
23   Carole K. Briggs, LCR #345
     Briggs & Associates
24   222 Second Avenue, North, Suite 340M
     Nashville, Tennessee  37201
25   Briggscourtreporting@hotmail.com
```

```
 1                          APPEARANCES:

 2


 3


 4    FOR THE PLAINTIFF:


 5


 6    JANNA MAPLES, ESQUIRE
      Branstetter, Stranch & Jennings, PLLC
 7    The Freedom Center
      223 Rosa L. Parks Avenue
 8    Suite 200
      Nashville, Tennessee  37203
 9    jannam@bsjfirm.com


10


11    FOR THE DEFENDANT, STATE OF TENNESSEE:


12


13    THOMAS J. AUMANN, ESQUIRE
      NIKKI N. HASHEMIAN, ESQUIRE
14    Tennessee Attorney General's Office
      P.O. Box 20207
15    Nashville, Tennessee  37202-0207
      thomas.aumann@ag.tn.gov
16    Nikki.hashemian@ag.tn.gov


17


18    FOR THE DEFENDANT, CORECIVIC:


19


20    JOSEPH F. WELBORN, ESQUIRE
      ERIN PALMER POLLY, ESQUIRE
21    K&L Gates, LLP
      222 Second Avenue South
22    Suite 1700
      Nashville, Tennessee  37201
23    joe.welborn@klgates.com
      Erin.polly@klgates.com
24


25
```

```
 1                    TABLE OF CONTENTS

 2

 3   Witness                                          Page

 4

 5

     JON WALTON
 6
     Examination by Ms. Maples                          7
 7   Examination by Mr. Welborn                        126

 8

 9

10

11                     LIST OF EXHIBITS

12

13   Number      Description                          Page

14

15   1*          Mr. Walton's cheat sheet              13
                 (late-filed)
16
     2           Noncompliance reports, collective     23
17
     3           Policy No. 501.01, inmate             50
18               grievance procedures

19   4           Contract for the Trousdale            53
                 facility
20
     5           non-compliant reports starting       73
21               with Bates 002291

22   6           final summary, starting at Bates    102
                 No. 003537
23
     7           quarterly reports, starting at      108
24               Bates No. 003709

25
```

Page 4

| 1  | 8   | noncompliant reports starting at Bates No. 002260 | 113 |
| 2  |     |                                                   |     |
|    | 9*  | E-mail, noncompliance reports to contractor (late-filed) | 117 |
| 3  |     |                                                   |     |
| 4  | 10  | TDOC Policy 205.03                                | 122 |
| 5  | 11  | Comptroller's performance audit report, 1/2020   | 122 |
| 6  |     |                                                   |     |
| 7  |     |                                                   |     |
| 8  | (* designates late-filed exhibits) |                  |     |
| 9  |     |                                                   |     |
| 10 |     |                                                   |     |
| 11 |     |                                                   |     |
| 12 |     |                                                   |     |
| 13 |     |                                                   |     |
| 14 |     |                                                   |     |
| 15 |     |                                                   |     |
| 16 |     |                                                   |     |
| 17 |     |                                                   |     |
| 18 |     |                                                   |     |
| 19 |     |                                                   |     |
| 20 |     |                                                   |     |
| 21 |     |                                                   |     |
| 22 |     |                                                   |     |
| 23 |     |                                                   |     |
| 24 |     |                                                   |     |
| 25 |     |                                                   |     |

1          S T I P U L A T I O N

2

3

4          The deposition of Jon Walton, taken on behalf

5     of the plaintiff, remotely via Zoom, by agreement of

6     parties, on April 8, 2021, for all purposes allowed

7     under the Federal Rules of Civil Procedure.

8          It is agreed that Carole K. Briggs, licensed

9     court reporter for the State of Tennessee, may swear the

10    witness, take his deposition, and afterwards reduce same

11    to typewritten form, and that the reading and signing of

12    the completed deposition by the witness is not waived.

13          All formalities as to notice, caption,

14    certificate, et cetera, are expressly waived. All

15    objections, except as to the form of the question, are

16    reserved to the hearing.

17

18    (Unless previously provided, all names are spelled
      phonetically, to the best of the court reporter's
19    ability.)

20

21

22

23

24

25

1          (Whereupon, the foregoing deposition

2          began at 8:06 a.m.)

3          THE COURT REPORTER:  Today is April 8, 2021

4    at 8:06 a.m.  We are here for depositions.  At this

5    time, would each attorney introduce yourself, who you

6    represent and that you agree to take this deposition via

7    Zoom.  We will start with the plaintiff's attorney and

8    work our way through the defense.

9          MS. MAPLES:  Janna Maples and Tricia Herzfeld

10   with Branstetter Stranch & Jennings for the plaintiff.

11   And we agree.

12         MR. AUMANN:  This is Tom Aumann and Nikki

13   Hashemian representing defendant Tennessee Department of

14   Correction, State of Tennessee, commissioner Tony Parker

15   and the director of religious and volunteer services.

16   And we agree.

17         MR. WELBORN:  Joe Welborn and Erin Polly.  We

18   represent CoreCivic.

19         THE COURT REPORTER:  And do you agree to take

20   the deposition via Zoom?

21         MR. WELBORN:  We do.

22   Whereupon,

23                  JON WALTON,

24   having been first duly sworn, was examined and deposed

25   as follows:

Page 7

```
 1    EXAMINATION BY MS. MAPLES:

 2         Q.    Please state your name for the record.

 3         A.    Jon Walton.

 4         Q.    What is your current job title?

 5         A.    I am a contract monitor.

 6         Q.    Where is your office located?

 7         A.    140 Macon Way, Hartsville, Tennessee at the

 8    Trousdale Turner Correctional Center.

 9         Q.    And you said your job title is contract

10    monitor.  Are you the contract monitor of operations or

11    the contract monitor of compliance?

12         A.    Contract monitor of compliance.

13         Q.    How long have you been in that position at

14    Trousdale?

15         A.    Approximately 16 months.

16         Q.    Since what date?

17         A.    November 2019.

18         Q.    What are the job responsibilities of the

19    contract monitor of compliance?

20         A.    To review and ensure that the facility is

21    abiding by the contractual standards set forth by the

22    Tennessee Department of Corrections.

23         Q.    Do you work with Trousdale's warden at all?

24         A.    I do.

25         Q.    How regularly?
```

1          A.      Daily.

2          Q.      Who is the current warden of Trousdale?

3          A.      The current warden is Raymond Byrd.

4          Q.      Has Mr. Byrd ever been placed on

5    administrative leave at Trousdale?

6          A.      I'm not aware of anything formally, no.

7          Q.      Are you aware of anything informally?

8          A.      I am aware that Mr. Byrd is currently on

9    leave, but I'm not certain as to the facts surrounding

10   that.

11         Q.      What have you been told about the reasons

12   that Mr. Byrd is currently on leave?

13         A.      I have not been told.

14         Q.      Has Warden Byrd ever been disciplined since

15   he's been warden at Trousdale?

16         A.      Not that I am aware.

17         Q.      How long has Mr. Byrd been on leave from

18   Trousdale?

19         A.      I want to say approximately four weeks.

20         Q.      Was an assistant warden named as acting

21   warden during this time?

22         A.      Yes.

23         Q.      Which one?

24         A.      Vincent Vantell.

25         Q.      And do you have any understanding at all as

1     to why Mr. Byrd is currently on leave?

2          A.     No, ma'am.

3                 MR. AUMANN:   Objection to form.   You can go

4     ahead.

5     BY MS. MAPLES:

6          Q.     Do you know whether Warden Byrd will soon be

7     reassigned?

8          A.     I do not.

9          Q.     Have there been discussions at Trousdale

10    concerning Warden Byrd being reassigned?

11         A.     I'm -- not that has involved me, no.

12         Q.     Are you aware of conversations about Warden

13    Byrd being reassigned that have occurred between others?

14         A.     Yes.

15         Q.     Who are those others that have had

16    conversations about Warden Byrd being reassigned?

17         A.      It would be the executive leadership team

18    between the Tennessee Department of Corrections and

19    CoreCivic.

20         Q.     Which individuals are part of the executive

21    leadership between TDOC and CoreCivic?

22         A.      To my knowledge, that would be TDOC

23    commissioner, Tony Parker; assistant commissioner of

24    operations; Lee Dotson; and, the CoreCivic VP I know is

25    Mr. Medlin.   And there's one other.   I can't recall his

 1    name right off the top of my head.

 2         Q.    Is it your understanding that the discussions

 3    about reassigning Warden Byrd are related to the reason

 4    that Warden Byrd is currently on an informal leave?

 5         A.    Could you repeat that question, I'm sorry.

 6         Q.    Is it your understanding that discussions

 7    about the reassignment of Warden Byrd are related to the

 8    reason for him being on an informal leave at present?

 9         A.    I'm really not certain of anything to do with

10    Mr. Byrd's employment.  That's not something that I

11    would oversee.

12         Q.    Have you heard any rumors about why he is

13    currently on administrative leave?

14         A.    I really can't speak to a rumor.  I'm not

15    sure.

16         Q.    Well, I'm not asking you what the rumors are,

17    I'm just asking if you've heard any rumors?

18         A.    I have not.

19         Q.    You mentioned a Jason Medlin earlier who's a

20    -- I think you said is a VP at CoreCivic.  Has he

21    visited Trousdale recently?

22         A.    Yes, ma'am.

23         Q.    Why did he visit Trousdale?

24         A.    It's routine.  The managing director and

25    several others are on site regularly.

```
 1        Q.    Has he been at Trousdale more frequently due

 2   to the fact that the warden is currently on some kind of

 3   administrative leave?

 4        A.    Not that I am aware.  No more than usual.

 5        Q.    Has Jason Medlin assumed any kind of control

 6   over the Trousdale facility that is outside of what is

 7   routine?

 8        A.    Not that I am aware.

 9        Q.    Have you been in meetings with Jason Medlin

10   at Trousdale?

11        A.    No, ma'am.

12        Q.    Have you ever discussed conditions inside the

13   prison with Jason Medlin?

14        A.    No, ma'am.

15        Q.    Do you know any other CoreCivic executives?

16        A.    Chuck Keeton.

17        Q.    And what is his job title?

18        A.    He's the managing director.

19        Q.    Does he visit Trousdale?

20        A.    He does.

21        Q.    How often?

22        A.    I would say more frequently than Mr. Medlin.

23        Q.    When was the last time Chuck Keeton visited

24   the facility?

25        A.    I believe he was here yesterday and he's also
```

```
 1   scheduled to be on site today.

 2        Q.    Do you know any other CoreCivic executives?

 3        A.    I do not, no.

 4        Q.    Do you know who the CEO of CoreCivic is?

 5        A.    I do not, no.

 6        Q.    Do you know where CoreCivic headquarters is

 7   located?

 8        A.    I have been told it's in Brentwood, but I

 9   don't know that for certain.

10        Q.    What are some of the areas that you oversee

11   at CoreCivic as contract monitor of compliance?

12             MR. AUMANN:  Objection to the form.  You can

13   go ahead.  You can go ahead and answer the question.

14             THE WITNESS:  Oh, I'm sorry.  We oversee a

15   detailed list of items to include.  My area of

16   concentration is clothing and hygiene.  Sanitation of

17   facility.  Staffing, and that would include staffing

18   levels and employee vacancies.  Facility and property.

19   Grievance procedures.  Commissary.  Inmate jobs.  Inmate

20   personal property.  The release procedures.  Security

21   equipment.  Food services.  And policy and procedure.

22   BY MS. MAPLES:

23        Q.    Mr. Walton, I can see that you're looking --

24   you seem to be looking at something to your left.  Do

25   you have some kind of list of your job title or job
```

```
 1    descriptions somewhere in your office?

 2         A.    I don't have it in my office.  What I'm

 3    looking at is a list.  What we have are ten separate

 4    instruments that we review as contract monitors.  It's

 5    my responsibility to review half of those.  And the

 6    contract of operations reviews the opposing half.  And

 7    then I'll file and keep all of them stored in my office.

 8    And I just wanted to ensure that I was giving you a very

 9    succinct and precise list of areas that I review as the

10    contract monitor of compliance.

11         Q.    I appreciate that.  What did you say that

12    that list is called, the ten separate instruments?

13         A.    It's called my cheat sheet.

14         Q.    Is that something that you could send over to

15    us during a break or after the deposition?

16         A.    Absolutely.  Be happy to.

17               MS. MAPLES:  We would like to make that

18    late-filed Exhibit 1 to Mr. Walton's deposition.

19               (Exhibit 1 was marked late-filed.)

20    BY MS. MAPLES:

21         Q.    What is your interaction with the grievance

22    process at Trousdale?

23         A.    What I'll do is I'll take my grievance

24    instrument, which has a series of detailed items to

25    observe to ensure that responses are met within policy
```

Page 14

1    standards.  Those responses would include to ensure that

2    the grievance chairperson is responding to the grievant

3    within a certain amount of time, that the level reviews

4    are completed within appropriate dates and that

5    everything is being maintained in an orderly fashion.

6    Essentially to ensure that the grievance procedures are

7    being followed by TDOC policy.

8        Q.    You mentioned a grievance instrument.  What

9    do you mean by that?

10       A.    It's a spreadsheet that the contract monitors

11   utilize to review the standards and what we observe --

12   against what we observe.  It's an audit tool.

13       Q.    How regularly do you conduct an audit using

14   the grievance instrument spreadsheet?

15       A.    Both quarterly and biannually.

16       Q.    So you do six every year?

17       A.    We do four.  So we have the quarter -- that's

18   kind of confusing.  It's a quarterly audit tool, but

19   when we do what we consider a biannual, which occurs in

20   January and December, we'll take the previous six months

21   into account.  So it's a quarterly review, but we -- the

22   review periods are quarterly and biannually.  Does that

23   make sense, or did I confuse everybody?

24       Q.    Well, I guess my next question would be for

25   the biannual audit, do you do any kind of independent

Page 15

1    review using the grievance instrument, or are you merely

2    looking back at the quarterly reports?

3         A.    It would be a revisit of the quarterly.

4    There is nothing that changes, no.

5         Q.    Okay, so you're not using any new or

6    additional data for the biannual audit?

7         A.    No, ma'am.  Correct.

8         Q.    And can you describe the audit procedure for

9    these quarterly audits?

10        A.    The procedure that I use is I basically show

11   up.  It's -- we tell the facility it's an open-book test

12   because they're welcome to review what it is that we are

13   looking at.  We want the facility to not be surprised by

14   anything that we are there to look at.  So whenever we

15   go down, we usually do an unannounced visit and we just

16   take the department head over that area.  In this

17   particular case, it would be the grievance chairperson.

18   And we walk through their logs and their paperwork and

19   review each item on the instrument line by line.

20        Q.    Do you get a sampling from the log book or do

21   you just kind of comb through it?

22        A.    I usually take -- what I'll do, like this

23   past order is I took a -- their entire log and I just

24   pulled a sample of 20 from their grievance log.  So --

25        Q.    Is that --

 1      A.    I'm sorry, go on.

 2      Q.    Go ahead, finish your answer.

 3      A.    So it's not something that they pull.  It's

 4   something that I select.

 5      Q.    Is selecting 20 samples a standardized TDOC

 6   procedure or is that just your audit practice?

 7      A.    That's a standard procedure.

 8      Q.    Is it fair to say that your -- or TDOC's,

 9   rather, oversight of the grievance procedure is limited

10   to those 20 samples from the grievance log book which

11   are pulled four times a year?

12          MR. AUMANN:  Objection to form.  You can go

13   ahead.

14          THE WITNESS:  To ensure that I understood

15   correctly, you're asking me do I feel that the -- better

16   yet, could you repeat that question.

17   BY MS. MAPLES:

18      Q.    Okay.  I'm just trying to understand if there

19   is any monitoring of the grievance process other than

20   the 20 samples that are pulled from the log book four

21   times a year?

22      A.    There's not.  You know, the monitoring audit

23   tool that we utilize is fairly specific in what it is

24   that we are to review.  You know, if the reviews aren't

25   being completed within a timely manner, you know, we --

1   ultimately, what we are here to ensure is that whenever

2   a grievant files a grievance, that they are not only

3   being heard, but they're being responded to within an

4   appropriate amount of time.

5          And if they're not in a position that they

6   agree with the response of the chairperson, that they're

7   then given the opportunity to appeal that within an

8   appropriate amount of time.  And essentially, that's all

9   the grievance process involves.

10      Q.    Do you ever speak to Trousdale inmates?

11      A.    Every day.

12      Q.    Do you do that as part of your job or more in

13  passing?

14      A.    Both.

15      Q.    In what way or why do you speak to inmates as

16  part of your job?

17      A.    Well, come to find out, we've learned a lot

18  from holding dialogue with the population.  You know,

19  there may be some things that would steer us into a

20  direction where we need to more attentive to.  Take this

21  conversation, for example, about the grievance process.

22  If the inmate says that -- comes to me and says that he

23  has filed a grievance but he has not had a response to

24  that grievance, then I could take his information and go

25  to the grievance chairperson without utilizing my audit

1    tool and ask them if they have any information on that

2    inmate as far as him having filed a grievance.

3              Depending on what the grievance chairperson

4    tells me at that point, if she says, yes, and we're

5    processing it, then I did my follow-up.  It was just my

6    responsibility to ensure that the grievance landed where

7    it needed to.  If she says, no, I haven't received

8    anything.  Then what I would do is go back to that

9    inmate and let him know that the grievance chairperson

10   is not in receipt of his grievance and he needs to file

11   another grievance so that she can process it.

12        Q.    So inmates can come to you with certain

13   complaints as part of your job description; is that

14   right?

15        A.    Not right.  It's not my job description.

16   It's just my -- the way that I operate.

17        Q.    And have inmates before come to you with

18   questions or concerns about the Trousdale grievance

19   process?

20        A.    I'm sure they have.  I can't think of

21   anything specific right off the top of my head.

22        Q.    Okay, so is it correct to say that other than

23   your audits conducted quarterly and isolated

24   conversations with individual inmates, there's no other

25   oversight of the grievance process at Trousdale by the

 1    contract monitors?

 2        A.    On my behalf as the contract monitor of

 3    compliance.

 4        Q.    Okay.  Do you know if the contract monitor of

 5    operations does anything over and above the things I've

 6    just described to monitor the grievance process?

 7        A.    I'm not aware.

 8        Q.    Are you familiar with TDOC's grievance

 9    procedure?

10        A.    Not as much as the contract monitor of

11    operations.  But I do have some general knowledge, yes.

12        Q.    Are you saying that the contract monitor of

13    operations knows more about how that procedure worked?

14        A.    Yes.  Operations and procedures go hand in

15    hand.  As a compliance monitor, I'm just there to ensure

16    that time frames and paperwork, the technical aspects,

17    you know, are compliant.

18        Q.    You mentioned that there is a grievance log

19    that is maintained by the grievance chairperson, right?

20        A.    Yes.

21        Q.    So is it fair to say that in doing your

22    audits, you're never sampling grievances that weren't

23    entered into the log?

24        A.    Correct.

25        Q.    Have you, since you've been at Trousdale,

 1    ever heard of grievances not being entered into the

 2    grievance log?

 3         A.    Not that I am aware.

 4         Q.    Who is the current grievance chairperson?

 5         A.    Her name is Jannell Holly.

 6         Q.    And how long has she been the grievance

 7    chairperson?

 8         A.    I'm going to say since January.

 9         Q.    Who was the grievance chairperson before

10    that?

11         A.    Elizabeth Lopez.

12         Q.    How long was she the grievance chairperson?

13         A.    She was in that role when I arrived.  I don't

14    really know.

15         Q.    Is there a difference between a grievance

16    chairperson and a grievance coordinator?

17         A.    Not that I am aware.

18         Q.    Do you know who a Sergeant Cockrill is?

19         A.    I do not.

20         Q.    Do you know of a Sergeant Cockrill ever being

21    a grievance chairperson?

22         A.    Not since I've been here, no.

23         Q.    Let me try a first and last name, Lybrunca

24    Cockrill?

25         A.    I know that Ms. Lybrunca Cockrill, that when

Page 21

```
 1    I arrived, was an assistant shift supervisor.  She was

 2    not attached to the grievance process.

 3       Q.    Why -- strike that.  Is Elizabeth Lopez still

 4    employed at Trousdale?

 5       A.    Yes, ma'am.

 6       Q.    Why is Elizabeth Lopez no longer the

 7    grievance chairperson?

 8       A.    Because she was promoted.

 9       Q.    Did her removal as grievance chairperson have

10    anything to do with her job performance as grievance

11    chairperson?

12             MR. AUMANN:  Objection, form.  You can go

13    ahead.

14    BY MS. MAPLES:

15       Q.    Since you have been at Trousdale, have you

16    ever had a grievance chairperson that you determined was

17    not properly performing his or her job as grievance

18    chairperson?

19       A.    No.

20       Q.    For each of the quarterly audits that you do

21    for grievances, do you generate a report?

22       A.    If there are noncompliances identified I do,

23    yes.

24       Q.    So if there are no noncompliances, then you

25    do not generate a report?
```

Page 22

1      A.    Not an official report, no.  The only thing

2   that would be generated is that monitoring instrument

3   that I use during my review.

4      Q.    Do you save copies of the monitoring

5   instrument on your computer?

6      A.    Yes, ma'am.

7      Q.    And you have them for the entire time you've

8   been at Trousdale?

9      A.    I do.

10      Q.    Since you've been at Trousdale starting in

11   November of 2019, have you ever determined that

12   Trousdale's grievance process is fully in compliance

13   during one of these audits?

14      A.    I've identified -- without looking back at my

15   noncompliance reports, I would have to defer to the NCRs

16   that I generate.  But either the process is compliant or

17   a noncompliance report is generated to identify what the

18   noncompliance issues are.

19      Q.    So you're saying you can't remember if there

20   has been a quarter in which Trousdale was fully

21   compliant, you would need to see the audit reports?

22      A.    I would feel more comfortable to refer to the

23   report.  I know that there have been instances since I

24   have been in my position where the grievance process has

25   not been a hundred percent compliant.  But to speak to

1    what exactly those issues were, I would need those

2    reports.

3          Q.    And as contract monitor of compliance do you

4    occasionally review noncompliance reports that were

5    generated by other contract monitors?

6          A.    Not traditionally, no.  That would not be

7    something within my job scope.

8          Q.    Do you ever run across them just in the

9    course of your job at Trousdale?

10         A.    I do, yes, ma'am.

11         Q.    And do you find that you are typically able

12   to read them and interpret them and decide what they

13   mean?

14         A.    Yes, ma'am.

15               MS. MAPLES:  I would like to share my screen

16   now.  I am going to show you a document that is going to

17   be Exhibit 2 to your deposition.

18               (Exhibit 2 was marked.)

19   BY MS. MAPLES:

20         Q.    Do you see the document on your screen?

21         A.    I do.

22         Q.    And Mr. Walton, here's what I'm going to do.

23   If at any time you would like to scroll through and take

24   control of the document, will you just let me know and

25   you would be welcome to do that.  If you want me to

Page 24

1    scroll through for you, just say can you go down to the

2    next page or zoom in, zoom out, whatever you need, okay?

3         A.    Okay.

4         Q.    Do you see that the document that is

5    currently on your screen is 18 pages long?

6         A.    I do.

7         Q.    Would you say that's a little bit longer than

8    your audit reports typically are?

9         A.    They -- if there is a process issue, they can

10   be lengthy.  So I want to say that.  However, that is

11   not uncommon, it can occur depending on what is being

12   documented and in what detail it's being documented.

13              MS. MAPLES:  And for the attorneys, I just

14   put this document in the chat.  So if anyone wants to

15   download independently.

16   BY MS. MAPLES:

17        Q.    Mr. Walton, what I've done here is -- this is

18   actually a collective exhibit.  So I'll scroll through

19   and let you see that I've taken multiple documents and

20   combined them all into one to make things easier for us

21   over Zoom, okay?

22        A.    Sure.

23        Q.    Do you see that the document in front of you

24   has a first bolded header of privately operated facility

25   dash notification of noncompliance?

```
 1        A.     Yes, ma'am.

 2        Q.     Is this a noncompliance report or NCR that

 3   you've been describing this morning?

 4        A.     It is, yes,ma'am.

 5        Q.     Now, I see that this one is dated July 17th

 6   of 2018.  Do you see that?

 7        A.     I do.

 8        Q.     So this one was not generated by you?

 9        A.     It was not, no.

10        Q.     So if we scroll down now to the third page,

11   we have a second noncompliance report.  Do you see that?

12        A.     I do.

13        Q.     Do you see that it's dated January 31st of

14   2019?

15        A.     Yes, ma'am.

16        Q.     And so this one wasn't generated by you

17   either; is that correct?

18        A.     That's correct.

19        Q.     But is it fair to say that both of the two

20   reports we've just looked at in collective Exhibit 2 are

21   noncompliance reports concerning inmate grievance

22   procedures?

23        A.     Yes, ma'am.  And --

24               MS. POLLY:  I apologize for interrupting,

25   what is the Bates number on this?
```

1              MS. MAPLES:  It's in the top right-hand

2    corner.

3    BY MS. MAPLES:

4         Q.    Now, if we go down to the third document in

5    this collective exhibit, do you see that the date is May

6    31st of 2019?

7         A.    Yes, ma'am.

8         Q.    And do you see that this is another

9    noncompliance report concerning inmate grievances?

10        A.    Yes, ma'am.

11        Q.    And then this page with the Bates stamp TDOC

12   001372, do you see that this is a noncompliance report

13   dated January 31st of 2020?

14        A.    Yes, ma'am.

15        Q.    Do you see that this one was generated by

16   you?

17        A.    Yes, ma'am.

18        Q.    And do you see that the audit period is July

19   through December of 2019?

20        A.    I do.

21        Q.    So is this one of your biannual audits, then,

22   as opposed to the quarterly?

23        A.    This would have been one of my first -- one

24   of the first noncompliance reports that I issued the

25   facility.  I'm not sure.  Can you ask that question one

 1    more time?  I want to make sure that I answer your

 2    question.

 3         Q.    You testified earlier that you do quarterly

 4    audits and then you do biannual audits?

 5         A.    Yes, ma'am.

 6         Q.    And this, the audit period listed on this

 7    document is July to December of 2017.  So I am just

 8    asking, is this a biannual audit or a quarterly audit?

 9              MR. AUMANN:  I'm sorry.  Janna, you said 2017

10    when you mentioned the date.

11              MS. MAPLES:  I misspoke, 2019.

12              MR. AUMANN:  Okay.

13    BY MS. MAPLES:

14         Q.    I'll ask that question again, Mr. Walton.

15    I've asked that given the date listed to the right of

16    the words audit period is July to December of 2019.  Is

17    this document a biannual audit report or a quarterly

18    audit report?

19         A.    The grievance instrument itself is actually a

20    biannual report.  So yes, this is a biannual NCR for

21    that time frame.

22         Q.    Do you generate reports for your quarterly

23    audit?

24         A.    Yes.

25         Q.    What are the reports of the grievance --

Page 28

1    strike that.  What are the reports concerning your audit

2    of the grievance process every quarter called?

3         A.    I think to clarify, the -- our instruments

4    are broken down into reporting periods.  So although

5    that we may be reviewing it on a quarterly basis, the

6    reporting period is when the final NCR gets drafted.

7    And that gives the facility sufficient time to be able

8    to review and correct any compliance issues that we

9    find, which may need immediate attention.

10              So the quarterly review is going to be

11   captured in the biannual noncompliance report.  Hence,

12   that's why we're seeing that we've got July through

13   December, but we want to make sure that every quarter,

14   or more frequently as the monitor determines necessary,

15   that we are staying on top of the procedures of the

16   facility to ensure that there's no bad practices that's

17   being -- that's taking place in the middle of that

18   monitoring period.  If that makes sense.

19              So I think to answer your question, there are

20   -- the NCR's are distributed by the contract monitoring

21   director.  The monitoring instruments are -- is a

22   separate process that is reviewed by the monitors at the

23   facility on a quarterly and a biannual basis.  When the

24   formal -- and that's what this is.  This is the formal

25   end report.  When that comes out, that's distributed

Page 29

1    through the contract monitoring director.

2         Q.    Okay.  And I believe you testified that this

3    here Bates stamped TDOC 001372 and dated January 31st of

4    2020 is the first biannual NCR that you were a part of

5    at Trousdale; is that right?

6         A.    Yes, ma'am.  And Janna, I wanted to draw

7    attention to also, one of the first questions that you

8    asked me when this exhibit was presented was to note

9    that it's 18 pages.  I wanted to just let the larger

10   group know that this is over an extenuated period of

11   time.  It wasn't an 18-page report just for one quarter

12   or an 18-page report for a biannual period.  It looks

13   like that we've got multiple biannual periods throughout

14   this exhibit.

15        Q.    I appreciate that, Mr. Walton.  That's

16   exactly why I was trying to point that out that this is

17   not a single report, that this is a collection of

18   multiple reports.

19        A.    Yes, ma'am.

20        Q.    So that we can all be clear, I am just going

21   to continue to scroll down to the beginning of the next

22   report, which is attached to the others.  Do you see

23   that we are looking at a page Bates stamped TDOC 001696?

24        A.    Yes, ma'am.

25        Q.    Do you see that it's dated August 4th of

Page 30

1   2020?

2       A.    Yes, ma'am.

3       Q.    Do you see that the audit period is January

4   through June of 2020?

5       A.    I do.

6       Q.    And were you a part of this biannual

7   noncompliance report?

8       A.    I was the auditor on that report.

9       Q.    Okay, and now I'm going to scroll down to

10  TDOC 002373, which is dated February 1st of 2021.  Do

11  you see that document in front of you?

12      A.    Yes, ma'am.

13      Q.    And do you see that the audit period is July

14  1st of 2020 to December 31st of 2020?

15      A.    I do.

16      Q.    And were you a part of this audit report?

17      A.    Yes, ma'am.

18      Q.    Is this the most recent one that you've done

19  since you've been at Trousdale?

20      A.    Yes, ma'am.

21      Q.    So we're going to scroll back up to the first

22  one, which is dated January 31st of 2020.  Do you see

23  that we're on the screen TDOC 001372?

24      A.    Yes, ma'am.

25      Q.    And do you see that on this page, you have

Page 31

```
 1   written:  Of the 20 grievances contract monitor checked

 2   for this instrument, there were seven instances that

 3   were found that were not compliant?

 4        A.    I do.

 5        Q.    And then do you see that there is a table

 6   there?

 7        A.    I do.

 8        Q.    And can you explain what that table -- what

 9   information that table is providing?

10        A.    Yes, ma'am.  So the information in this table

11   has the inmate's TDOC identification number; the

12   grievance number of the grievance that was attached to

13   the inmate's grievance; the date that the chairperson's

14   response was due; and, the date that the chairperson

15   actually responded.  And then the area of service that

16   the inmate is grieving.  And the finding is the

17   monitor's determination of what was found to be

18   deficient with that particular grievance.

19        Q.    So this report is saying, just to be clear,

20   that of the 20 samples you took, seven of them were not

21   compliant with Tennessee Department of Correction's

22   policy; is that right?

23        A.    That's correct.

24        Q.    And do you see that under the table, there's

25   another paragraph that says:  Prior documentation of
```

1    noncompliance, colon, this was a noncompliant finding on

2    the biannual report NCR issued July 17th of 2018 and

3    January 31st of 2019.  An assessment of liquidated

4    damages letter was sent on April 16th of 2019 for

5    January 31st, 2019 NCR?

6         A.    I do.

7         Q.    And what does that mean?

8         A.    That means that the facility has been found

9    to be noncompliant on a reoccurring basis during the

10   monitor's audit to the point that Tennessee Department

11   of Corrections has issued liquidated damage assessments

12   due to this particular finding.

13        Q.    As contract monitor of compliance, do you

14   have any kind of role in discussing or overseeing any

15   corrective action taken by CoreCivic?

16        A.    Yes.

17        Q.    And can you explain what that role is?

18        A.    The contract monitor of compliance is

19   responsible for documenting the corrective action plan

20   for the noncompliance findings that are issued to the

21   facility and reviewing to ensure that the corrective

22   action plans are implemented.  And to report out to the

23   monitoring director of whether the corrective action

24   plans are actually improving the process, if the issue

25   remains, up to, but not limited to, issuing another

1    finding of noncompliance.

2        Q.    I'm scrolling down to the second page of the

3    January 31st, 2020 NCR.  Do you see that there is a

4    description of the corrective action taken by CoreCivic

5    in response to this NCR?

6        A.    Yes.

7        Q.    Do you recall this specific corrective

8    action?

9        A.    I don't, no.

10       Q.    Do you see that in the second full paragraph,

11   this document states:  As of September 29th, 2019, the

12   staff member responsible for this finding is no longer

13   assigned to the grievance coordinator position.

14   However, appropriate corrective action was taken with

15   the staff member.  A new grievance coordinator was

16   appointed on October 25th of 2019.

17       A.    I do, yes.

18       Q.    Now, the new grievance coordinator that was

19   appointed as of October 25th of 2019, would that be

20   Elizabeth Lopez who was there when you began working at

21   Trousdale?

22       A.    I'm not sure.  I can only assume.  Like I

23   said, my employment in this role began the following

24   month in November.  So I'm not sure if maybe there was

25   someone else in that role and then it changed again

Page 34

1    within a 30-day time.  But when I arrived in November,

2    that's the individual that I recall holding that

3    position.

4        Q.    Well, as the author of this report and having

5    an understanding of what corrective action is, do you

6    see that one of CoreCivic's corrective actions is

7    removing the grievance coordinator, who was Elizabeth

8    Lopez's predecessor?

9             MR. AUMANN:  Objection, form.  You can go

10   ahead.

11            MR. WELBORN:  Same objection.

12   BY MS. MAPLES:

13       Q.    Go ahead.

14       A.    Okay.  What I see is not -- in my

15   understanding, it's not that CoreCivic removed anybody

16   from a role.  It's just saying that, for whatever

17   reason, that person is no longer in that role.  And that

18   could be due to a termination, reassignment, and

19   generally, that's the most common reasons that somebody

20   gets removed from a position.

21            Now, there are instances, obviously, where

22   that person was just underperforming.  I'm not sure,

23   that's -- when it comes to staff performance, that's not

24   something that the contract monitor is a participant in

25   investigating or guiding at the facility.

Page 35

1             This particular paragraph says that the staff

2    member responsible is no longer assigned to this

3    position.  What does that mean?  It just means that the

4    person that was assigned to that role is not assigned to

5    that role as the corrective action plan has been written

6    on this report.

7        Q.    Well, I mean, the first sentence of the

8    paragraph we've been discussing says as of September

9    29th, 2019, the staff member responsible for this

10   finding is no longer assigned to the grievance

11   coordinator position.

12       A.    Yes.

13       Q.    Doesn't it seem like that sentence means that

14   the grievance coordinator who caused the noncompliance

15   you've noted in this NCR was removed as part of the

16   corrective action?

17             MR. AUMANN:  Objection, form.

18             THE WITNESS:  No, ma'am, that would not be my

19   interpretation.

20   BY MS. MAPLES:

21       Q.    So when you wrote this, you didn't ask why

22   that person who was grievance coordinator and

23   responsible for this finding was removed or reassigned?

24       A.    No, ma'am.

25       Q.    Why not?

1          A.     That would not be in my scope of

2     responsibility.  Facility writes a corrective action

3     plan.  Again, it's the contract monitor's position to

4     ensure that the corrective action plan written is

5     working.  When it comes to staff assignment,

6     disciplinary, things of that nature, that's not a matter

7     that the Tennessee Department of Corrections is involved

8     in.

9          Q.     Do you see that the last paragraph under the

10    corrective action plan kind of header states:  Beginning

11    December 10th of 2019, the respective assistant warden

12    will conduct a weekly review of all grievances to

13    monitor compliance.  This review will continue until

14    compliance for three months.  Any noncompliance will be

15    reported to the warden and will result in formal

16    disciplinary action?

17         A.     I do, yes, ma'am.

18         Q.     Do you know if the respective assistant

19    warden conducted weekly reviews of all grievances to

20    monitor compliance?

21         A.     Yes.

22         Q.     And did they?

23         A.     They did.

24         Q.     Did you review those weekly reviews?

25         A.     I did not.

```
 1         Q.     How do you know that they were conducted?

 2         A.     Because conversations with the staff at the

 3    facility and with the compliance managers, as part of

 4    their corrective action plan, they reported that they

 5    were being conducted.

 6         Q.     Did you ever see any documentation for that?

 7         A.     No, ma'am.

 8         Q.     Did you ever request any?

 9         A.     No, ma'am.

10         Q.     Why not?

11         A.     Again, the corrective action plan is a

12    statement by the facility of what they're going to do to

13    improve the monitor's finding.  When we go and we

14    revisit and we review this item for the next monitoring

15    period, that's our follow-up.  That's our point to say,

16    you know, this area was a finding during the last

17    quarter or during the last biannual audit.  Show me

18    where this process is at this point in time.  And that

19    would be our follow-up item whenever we do the next

20    audit.

21              So I guess the short story is we do not

22    participate in the facility's corrective action plan.

23    What we do is review it to ensure that during our next

24    audit, if it continues to be a finding, we continue

25    documenting that it's noncompliant.
```

Page 38

```
 1        Q.    Did you review any of the noncompliance that

 2    would be reported to the warden if it occurred according

 3    to the last sentence in this paragraph?

 4              MR. AUMANN:  Objection, form.

 5              THE WITNESS:  Did I -- can you say that one

 6    more time, ma'am.

 7    BY MS. MAPLES:

 8        Q.    The last sentence of this paragraph states:

 9    Any noncompliance will be reported to the warden and

10    will result in formal disciplinary action.  What I'm

11    asking is, did you review any noncompliance that might

12    have been reported to the warden during this time

13    period?

14        A.    I would have to defer to the NCR for the next

15    monitoring period.

16        Q.    Okay, let's go to that one.

17        A.    Ms. Janna, if you would, can you go back up

18    to that one?

19        Q.    Sure.

20        A.    And what we will be looking for -- do you see

21    where it says Noncompliant Item No. 2?

22        Q.    Yes.

23        A.    The corrective action plan above it applies

24    to Noncompliant Item No. 1.  If you can scroll up to

25    that bold font?
```

1      Q.      Uh-huh.

2      A.      Noncompliant Item No. 1, it's not there on my

3   screen yet.  Noncompliant Item No. 1 is going to be

4   grievance Item No. 1.  So when we look at the next

5   quarter, that would be what we're looking for, grievance

6   Item No. 1 as a finding for the next monitoring period.

7      Q.      Okay, gotcha.  Thank you.

8      A.      Yes, ma'am.

9      Q.      Okay, so we're scrolling down now to the next

10  NCR.  This one is dated August 4th of 2020.  Do you see

11  that?

12     A.      Yes, ma'am.

13     Q.      And do you see that, as you've just pointed

14  out, Noncompliant Item 1 has a bolded red in parenthesis

15  word there that states repeat; do you see that?

16     A.      I do.

17     Q.      What do you take that to mean?

18     A.      That the deficiency remains.  The

19  noncompliant -- or the cap from the previous finding was

20  not effective.

21     Q.      And can you read what the noncompliance issue

22  is there right above the table?

23     A.      There were 10 instances out of 20 grievances

24  reviewed that were determined to be noncompliant.

25     Q.      And then you've written equals 50 percent

1    compliance there, do you see that?

2         A.    I do, yeah.

3         Q.    Was that your way of emphasizing the severity

4    of the noncompliance here?

5         A.    It is, yes, ma'am.

6         Q.    And can you describe what we've got in the

7    table below that?

8         A.    The inmate's assigned TDOC identification

9    number; the grievance number assigned to the inmate's

10   grievance; the date that the responses were due; the

11   date that the actual responses occurred and the areas in

12   which of the grievance applied to, along with the

13   contract monitor's finding specific to that inmate

14   grievance.

15        Q.    Okay, and if we, again, look down under that

16   table, do you see that there's a bolded header reading

17   prior documentation of noncompliance?

18        A.    Yes, ma'am.

19        Q.    And do you see that liquidated damages

20   letters were sent on April 16th of 2019 for January 31st

21   of 2019, and September 18th of 2019 for May 31st of

22   2019, and June 3rd of 2020 for January 31st of 2020?

23        A.    I do.

24        Q.    Okay.  And if we look under that, this is

25   what you were referring to earlier, I think.  Is this

1    the corrective action for grievance Item No. 1?

2         A.    This is a repeat clause.  When an item is a

3    consistent repeat finding deficiency, the facility is

4    then asked to provide a detailed explanation on how

5    their new plan of corrective action is going to be

6    different from their corrective action plan from the

7    previous findings.  So what we see here is the facility

8    detailing their process and how -- whether or not that

9    process has been implemented at the time of their

10   reporting.  And essentially, it's the -- the new CAP.

11   It's the beginning of a new CAP response, corrective

12   action response.

13        Q.    So No. 1 under this more detailed explanation

14   of previous corrective action, do you see that No. 1

15   states provide an explanation as to what was the

16   corrective action taken previously for this item?

17        A.    I do, uh-huh.

18        Q.    Do you see that underneath there is an

19   explanation of a new grievance procedure that was

20   implemented in June of 2019 before you arrived?

21        A.    Yes, ma'am.

22        Q.    And do you see that under No. 3, which states

23   what were the reasons the previous corrective action

24   failed, it states the previous grievance coordinator

25   failed to ensure that the supervisor's response was

Page 42

```
 1    received and entered in a timely manner?

 2         A.    I do.

 3         Q.    And did you write that?

 4         A.    No, ma'am.  That's the facility's response.

 5         Q.    Okay.  And when they're referring to the

 6    previous grievance coordinator, are they referring to

 7    that individual who was in charge before you arrived?

 8         A.    I am to assume.  I'm not sure.

 9         Q.    Well, would you assume that in answer to No.

10    3, they're not talking about Elizabeth Lopez?

11         A.    That would be a good assumption, yes.

12         Q.    Okay.  Do you see that No. 4, if we scroll

13    down to the next page, says:  How will the upcoming plan

14    of corrective action be different and ensure the action

15    is truly corrected?

16         A.    Uh-huh.

17         Q.    Do you see that underneath the facility has

18    written appointment of a new grievance coordinator?

19         A.    I do.

20         Q.    Do you interpret that as the facility saying

21    that the old grievance coordinator was part of the

22    problem?

23         A.    It --

24               MR. AUMANN:  Objection to form.

25               THE WITNESS:  I'm sorry?
```

1            MR. AUMANN:  I just said objection to form.

2    You can go ahead and answer.

3            THE WITNESS:  Yes, sir.  I believe the

4    interpretation could assume that, but I would have to

5    add that that's not always commonly the purpose there.

6    And I say that, you had referenced a Lybrunca Cockrill.

7    If that was the person that held this position prior to

8    Ms. Lopez, Ms. Cockrill was promoted.  And again, it's

9    not in my purview to determine, you know, disciplinary

10   matters of staff here at the CoreCivic facility.  You

11   know, those are HR matters that we do not review.  I

12   just wanted to add that.

13   BY MS. MAPLES:

14       Q.    Well, I mean, No. 4 says:  How will the

15   upcoming plan of corrective action be different and

16   ensure the action is truly corrected?

17       A.    Uh-huh.

18       Q.    And the facility has responded:  Appointment

19   of a new grievance coordinator.

20       A.    Correct.

21       Q.    Doesn't it sound like to you the facility is

22   saying that the appointment of the new grievance

23   coordinator is going to make the new plan of corrective

24   action successful?

25       A.    That -- yes, that is their plan, in that

1    statement.

2        Q.    Okay.  Now underneath that, do you see that

3    you've got a new plan of corrective action in response

4    to this specific NCR?

5        A.    Yes, ma'am.

6        Q.    And do you recall this plan of corrective

7    action that was initiated in the summer of 2020?

8        A.    I believe I do, yes, ma'am.

9        Q.    And do you see that instead of weekly reports

10   to the respective assistant warden, now there are daily

11   grievance reports of noncompliance to a supervisor and

12   the assistant warden?

13       A.    Yes, ma'am.

14       Q.    Okay, now we're scrolling down to the

15   noncompliance report dated February 1st of 2021.  Do you

16   see that?

17       A.    I do.

18       Q.    And do you see noncompliance Item 1 is again

19   repeated?

20       A.    I do, uh-huh.

21       Q.    And what does that mean?

22       A.    That means that the deficiency remains and

23   has been documented previously within this annual

24   monitoring period.

25       Q.    And it also says that out of your review of

Page 45

 1    the 20 inmate grievance samples, you found 8 to be

 2    noncompliant?

 3         A.    Yes, ma'am.

 4         Q.    And do you see that this time you have put

 5    the corrective action plan portion in red?

 6         A.    Yes, ma'am.

 7         Q.    And you've written:  Due to this item

 8    repeating noncompliance, please provide an in-depth

 9    explanation for the following in addition to providing a

10    new plan of corrective action?

11         A.    I do.

12         Q.    So here, again, you're going through what the

13    facility did in response to the August of 2020

14    noncompliance report, right?

15         A.    Yes, ma'am.

16         Q.    And you're assessing whether or not they

17    successfully implemented that corrective action plan?

18              MR. AUMANN:  Objection to form.

19              THE WITNESS:  Actually, that is their

20    response.  The bulletin numbers is the questions

21    presented by -- that was included by myself on behalf of

22    TDOC.  Everything in blue is their response to those

23    questions.

24    BY MS. MAPLES:

25         Q.    Okay, so CoreCivic itself is stating whether

Page 46

1    or not it complied with its own corrective action plan;

2    is that right?

3         A.    That is correct, yes.

4         Q.    And do you see that Item 2 asks was the

5    corrective action actually implemented, and CoreCivic

6    answers partially?

7         A.    Correct, yes.

8         Q.    And do you see that No. 3 asks what were the

9    reasons the previous corrective action failed, and

10   CoreCivic has answered lack of follow-up by supervisory

11   staff to ensure the response was provided to the

12   grievance coordinator on time?

13        A.    I do, yes.

14        Q.    And do you remember this?

15        A.    I do.

16        Q.    And did you have discussions with anyone at

17   CoreCivic about this corrective action plan?

18        A.    I believe I discussed that with the quality

19   manager.

20        Q.    Who is the quality manager?

21        A.    Currently it is Terry Carter and Kari Kaiser.

22        Q.    Can you say that second name again.

23        A.    Kari, K-A-R-I, Kaiser, K-A-I-S-E-R.

24        Q.    What did the quality managers have to say

25   about this continued noncompliance and the corrective

1    action plan?

2         A.    I don't specifically recall.  Any repeat

3    findings is communicated to the quality team.  And

4    they're part of the facility's corrective action plan

5    for ensuring that improvement is achieved.  So to say

6    specifically what somebody said, I'm just not sure.  But

7    we --

8         Q.    Have you had conversations --

9         A.    Go ahead.

10        Q.    Go ahead.

11        A.    That's okay.

12        Q.    Have you had conversations with other TDOC

13   employees concerning the grievance process noncompliance

14   at Trousdale?

15        A.    No, ma'am.

16        Q.    Well, have you had conversations with Carolyn

17   Jordan, the TDOC director of contract monitoring?

18        A.    Yes, that's my supervision.

19        Q.    Okay, and what have you discussed with her

20   about this noncompliance concerning the grievance

21   process?

22        A.    Exactly what is in the noncompliance report.

23   That's about the extent of our discussions surrounding

24   the finding.  Ms. Jordan, as the monitoring director,

25   she reviews the contract monitor's reports for accuracy

Page 48

 1   and formatting to ensure that all of the information is

 2   included that should be.  But as far as actually

 3   discussing the finding, there's not a lot of dialogue

 4   surrounding that.

 5           What we report is what we observe, and the

 6   contract monitoring director just ensures that

 7   everything is formated in the proper format.  If there

 8   is anything that she feels should be modified, she'll do

 9   that prior to issuing the formal report to the

10   contractor.  Did I answer your question?

11       Q.    Yes.  I guess I am still a little confused,

12   though.  So this is a biannual report.  And you've

13   conducted quarterly reviews, but we only have 20 inmate

14   grievance's listed here.  Why is that?

15       A.    Because that's what the instrument specifies.

16       Q.    Well, I guess what I'm asking is that if

17   you're doing quarterly reviews, shouldn't there be 40?

18       A.    At the end of the day, the finding still

19   remains.  And that's what we're documenting.

20       Q.    No, I understand that.  I am asking why, if

21   you are doing quarterly reviews and you look at 20

22   inmate grievances each time, shouldn't there be 40

23   listed?

24       A.    And I think that's where that I am not being

25   clear on my response.  We have biannual instruments and

1    then we have quarterly instruments.  The grievance at

2    this time was a biannual instrument.  And that's the

3    reason you're seeing them being issued on a biannual

4    basis.

5             Now, since then, they've been moved to a

6    quarterly instrument.  And it's still something that we

7    review as part of our quarterly review.  But now it's

8    something that -- you're right, there should be 40, you

9    know, to your response.  But you know, given these

10   reports, you know, what we do is we just take what is on

11   the instrument and that's what we report out.  So we

12   could put 40 on there, but ultimately what we're saying

13   is the finding remains.

14       Q.    So we've just looked at four noncompliance

15   reports dated January 31st of 2020, August 4th of 2020

16   and February 1st of 2021.  And is it fair to say that

17   CoreCivic was not in compliance with TDOC grievance

18   procedure during any of those time periods reflected in

19   those reports?

20             MR. AUMANN:  Objection, form.

21             THE WITNESS:  Yes, ma'am.

22   BY MS. MAPLES:

23       Q.    And is it fair to say that since you've been

24   at Trousdale, CoreCivic has never been in compliance

25   with the grievance procedure?

Page 50

```
 1                 MR. WELBORN:  Objection to the form.

 2                 MR. AUMANN:  Same objection, form.

 3   BY MS. MAPLES:

 4       Q.    Go ahead.

 5       A.    That would be correct, yes.

 6                 MS. MAPLES:  Do you all want to take a quick

 7   break?

 8                 MR. AUMANN:  Sure.

 9                 MS. MAPLES:  Okay, great.  Let's take five,

10   ten minutes.

11                 THE WITNESS:  Just so I know, is that five or

12   ten?  And I don't mean to be facetious, I just --

13                 MS. MAPLES:  Let's say 10.

14                 (Recess observed.)

15   BY MS. MAPLES:

16       Q.    Mr. Walton, do you remember earlier this

17   morning we discussed the TDOC inmate grievance policy?

18       A.    Yes, ma'am.

19       Q.    And I think you said that while you're

20   perhaps not an expert on it, you are familiar with it?

21       A.    I am.

22                 MS. MAPLES:  Everyone, I've just put Exhibit

23   3 to the deposition in the chat.  And I'm about to put

24   it on the screen.

25                 (Exhibit 3 was marked.)
```

 1    BY MS. MAPLES:

 2         Q.    Do you see that in front of you?  You have a

 3    document with a policy No. 501.01?

 4         A.    I do.

 5         Q.    And do you see that the subject is inmate

 6    grievance procedures?

 7         A.    Yes, ma'am.

 8         Q.    And if we scroll down here, do you see that

 9    Section 6N states:  Each institution will submit an

10    annual evaluation of the grievance procedures as

11    outlined in the handbook TDOC inmate grievance

12    procedures.  Staff preparing these reports may review

13    actual grievances?

14         A.    Yes, ma'am.

15         Q.    Now, when it says each institution will

16    submit, is it referring to Trousdale?

17         A.    That would be, yes.

18         Q.    Has Trousdale submitted an annual evaluation

19    of the grievance procedures?

20         A.    I'm certain they have, yes.

21         Q.    That's not something that you created for

22    Trousdale, it's something that CoreCivic created for

23    Trousdale?

24         A.    The latter, correct.

25         Q.    Did you review the annual evaluation?

1       A.      Not in its entirety, no.

2       Q.      Did you review a portion of it?

3       A.      I did, yes.

4       Q.      For what purpose did you review a portion of

5   that annual evaluation?

6       A.      To identify that they were compliant and that

7   they had a process in place, a grievance handbook in

8   place.

9       Q.      Are you familiar with the contract for

10  Trousdale Turner Correctional Facility?

11      A.      I am.

12      Q.      Is it safe to say you've read it?

13      A.      No, I'm not that qualified.

14      Q.      But you've seen it before?

15      A.      Yes.  Now, did you say read it or wrote it?

16      Q.      Read it.

17      A.      Read, yes.  I thought you said did I write

18  it.  I've read the contract.

19      Q.      No, I was asking if you've read it?

20      A.      Yes.

21      Q.      Okay.  Do you see that exhibit -- the

22  document that will be Exhibit 4 to your deposition on

23  the screen is the contract for the Trousdale facility?

24      A.      It appears to be, yes.

25              MS. MAPLES:  And I just placed this document

1  in the chat for everyone.  It should load shortly.

2            (Exhibit 4 was marked.)

3  BY MS. MAPLES:

4      Q.    Mr. Walton, do you see that the document you

5  have in front of you begins with the Bates stamp CCI

6  000933?

7      A.    I do.

8      Q.    I'm going to scroll all of the way to the

9  end.  And do you see that the document ends with the

10  Bates stamp CCI 001018?

11      A.    I don't see that.

12      Q.    At the bottom, bottom right-hand corner.

13      A.    I see 7/3/2014 -- oh, there it is.

14      Q.    Okay, so I'm going to scroll back down for

15  you just to confirm.  Do you see that the bottom states

16  1018?

17      A.    You said at the bottom?

18      Q.    Yeah, bottom right-hand corner.

19      A.    No, I don't see that.  I see a date in the

20  bottom right corner.  I see -- if you scroll up.

21      Q.    Let me zoom out.

22      A.    I'm not sure what I see at this point,

23  everything just got very tiny.

24      Q.    Sorry, let's see what I can do about that.

25      A.    I see at the bottom of the page --

```
 1      Q.    How about now?

 2      A.    There it is, yes.  It's underneath the

 3   7/3/14.

 4      Q.    Okay, and you see that it says CCI 001018?

 5      A.    Yes, ma'am.

 6      Q.    Now, is it your understanding that this

 7   contract sets forth the requirements that CoreCivic has

 8   to adhere to while managing Trousdale?

 9            MR. AUMANN:  Objection, form.

10            THE WITNESS:  Yes.

11   BY MS. MAPLES:

12      Q.    And does this set forth the standards for the

13   Trousdale facility?

14      A.    Yes.

15      Q.    Let's scroll almost all of the way back up.

16   Do you see that on Page 3, there is a header titled

17   contract monitoring?

18      A.    Yes.

19      Q.    Do you see that the second paragraph says:

20   The State shall develop reporting requirements for

21   Trousdale County that shall include, but not be limited

22   to, weekly, monthly, and/or quarterly reports on the

23   following subjects, and then there's a series of items

24   listed after that?

25      A.    Yes, ma'am.
```

1              MR. AUMANN:  Janna, could you just give the

2    Bates stamp number for that page, please.

3              MS. MAPLES:  Sure.  This is Page 3, Bates

4    stamp CCI 000936.

5              MR. AUMANN:  Thank you.

6    BY MS. MAPLES:

7         Q.    Are you familiar with the State's reporting

8    requirements for Trousdale County?

9         A.    Yes.

10        Q.    Who is the recipient for these required

11   reports?

12        A.    TDOC central office.

13        Q.    So you don't receive reports from Trousdale

14   County?

15        A.    No, ma'am.

16        Q.    Do you receive reports prepared by CoreCivic

17   pursuant to this requirement?

18        A.    Yes, ma'am.

19        Q.    And which of these reports that are listed

20   here did you receive?

21        A.    Staffing, turnover and vacancies, staff

22   training, inmate grievances.

23        Q.    Are there any others?

24        A.    Not that they deliver directly, no.  A lot of

25   that is through our TOMIS system or through the --

1      Q.      What is the OMS system?

2      A.      TOMIS.

3      Q.      You said the OMS system or, and then I think

4   I cut you off.  What were you going to say?

5      A.      The comp stat report.  The monthly comp stat.

6      Q.      Can you repeat the name of that report again

7   or maybe spell it or something, I can't quite understand

8   you.

9      A.      Yes, ma'am.  It's C-O-M-P, as in Paul,

10  S-T-A-T.  Comp stat.

11     Q.      Does comp stat stand for something?

12     A.      Not that I am aware.

13     Q.      What kind of information is in the monthly

14  comp stat report?

15     A.      It includes a breakdown by number of the

16  disciplinary reports, the grievances, health care

17  totals, transfers.  And I'm not sure what all else.

18  It's an overview of the facility operations for the

19  month.

20     Q.      Are all of those monthly comp stat reports

21  stored somewhere?

22     A.      Yes.

23     Q.      Are they all, you know, clearly marked and

24  identified in the system they're stored in?

25     A.      Yes.

Case 3:22-cv-00093   Document 37-2   Filed 05/25/22   Page 56 of 162 PageID #: 3038

```
 1        Q.     Are they easy to locate?

 2        A.     They are.

 3        Q.     What is the name of the system where they're

 4   stored?

 5        A.     Well, I have them on file on a hard drive on

 6   my personal laptop.

 7        Q.     If you had to grab them all since November of

 8   2019, how long would it take you?

 9        A.     I would just need to get approval from TDOC.

10   And I could have them the same day.

11        Q.     You mentioned some other reports that you

12   receive independent of the monthly comp stat report.  I

13   think you said staffing turnover and vacancies, staff

14   training and inmate grievances; is that right?

15        A.     Staff turnover and vacancies.  And I'm sorry,

16   that does say employee grievances.  I do not receive

17   employee grievances.  Staff training is kept on site.

18   We can review those at any time, but that's not in the

19   form of a report that's provided on a routine basis.

20        Q.     So you don't receive staffing reports from

21   Trousdale?

22        A.     I receive a staffing report, not staffing

23   training.

24        Q.     I am sorry, I think I may have misunderstood.

25   How often do you receive staffing reports from
```

1   Trousdale?

2       A.      Monthly.

3       Q.      What kind of information is contained in

4   those reports?

5       A.      Position codes; position titles; employee

6   names; start dates; hire dates; days that the position

7   -- total number of days the position has been vacant.

8       Q.      Is that all?

9       A.      And I said hire and termination dates,

10  correct?  Yes, ma'am.

11      Q.      I think you said -- okay.  And do you store

12  those all on your computer?

13      A.      Yes, ma'am.

14      Q.      Does CoreCivic maintain copies?

15      A.      I would be certain of it, yes.

16      Q.      Is it easy for you to identify and locate the

17  monthly staffing reports you received from CoreCivic?

18      A.      Yes, ma'am.

19      Q.      Are they clearly labeled in your computer?

20      A.      They are.

21      Q.      And if you had to grab them all for the time

22  period that you've been employed at Trousdale, how long

23  would it take you?

24      A.      Same day.

25      Q.      Now, you said you don't receive any kind of

1    reporting on inmate grievances; is that right?

2         A.    I receive -- not on a monthly basis, no,

3    ma'am.  The grievances, I receive their quarterly log

4    when I do the review.

5         Q.    Where does the State maintain the reporting

6    requirements that are described in the second paragraph

7    of B1 on the page Bates stamped CCI 000936 of Exhibit 4?

8         A.    Central office.

9         Q.    What would those be called?  Do you know?

10        A.    Comp stat report.

11        Q.    Now, the turnover and vacancies report, is

12   that separate than the staffing report or are they the

13   same thing?

14        A.    It's the same thing.

15        Q.    Do you review the turnover ratio at

16   Trousdale?

17        A.    No, ma'am.

18        Q.    Does anyone?

19        A.    The contract monitoring director looks at the

20   vacancy percentages.  I'm not certain that she looks at

21   the turnover ratio.

22        Q.    When I say turnover ratio, do you know what I

23   mean?

24        A.    Yes, ma'am, I believe I do.

25        Q.    Okay, can you explain what that is?

1       A.    The rate at which a position is vacant,

2    filled and then becomes vacant again.

3       Q.    Is there a certain level of -- strike that.

4    Is there a turnover ratio that is considered

5    unacceptable by TDOC?

6       A.    Not that I am aware.

7       Q.    Just a second.  I am going to scroll down to

8    Page 24.  This page is going to be Bates stamped CCI

9    000957.  Do you see that we're on Page 24?

10      A.    Yes, ma'am.

11      Q.    Do you see that Item 2 on this page states:

12   The contractor shall maintain permanent logs in addition

13   to shift reports that record routine in emergency

14   situations?

15      A.    Yes, ma'am.

16      Q.    Are you familiar with shift reports?

17      A.    No, ma'am.

18      Q.    How about these logs of routine in emergency

19   situations?

20      A.    No, ma'am.  The only thing that --

21      Q.    Okay, do you --

22      A.    The only thing that would involve me of what

23   I review is the daily shift rosters that has that

24   information on it.

25      Q.    What is a daily shift roster?

```
 1         A.    It outlines where each individual staff

 2   member worked to include any emergencies that arise and

 3   staff that had to be posted due to those emergencies.

 4         Q.    Why did you review those?

 5         A.    For critical post closures.

 6         Q.    Do you see that Item 6 on this page states:

 7   The contractor shall prepare and submit to the contract

 8   liaison such reports as are required by the State.

 9   Unless otherwise notified in writing by the contract

10   liaison, these reports include the following, which must

11   be submitted on a monthly basis.  And then there's a

12   series of reports listed underneath, A through G.

13         A.    Yes, ma'am.

14         Q.    Now, it says contract liaison.  Is it your

15   understanding that the contract liaison and contract

16   monitor are the same thing?

17         A.    Yes, ma'am.

18         Q.    Do you receive any of the reports that are

19   listed here under A through G?

20         A.    Yes, ma'am.  Those are also in the comp stat

21   report.

22         Q.    These are all in the comp stat report?

23         A.    Yes, ma'am.

24         Q.    What is a post order?

25         A.    I'm sorry?
```

1        Q.    What is a post order?

2        A.    A post order is a general set of guidelines

3    for a security position within a facility.

4        Q.    Do you review post orders?

5        A.    I review that post orders are available for

6    that post.

7        Q.    I'm going to scroll down to Page 28.  This is

8    Bates stamped CCI 000961.  Do you see that?

9        A.    No, ma'am.  I do see page --

10       Q.    How about now?

11       A.    Yes.

12       Q.    Do you see that there is a header, Section A4

13   titled staffing, slash, employees?

14       A.    Yes.

15       Q.    Does it set forth the requirements for

16   staffing at Trousdale?

17             MR. AUMANN:  Objection, form.  You can go

18   ahead and answer.

19             THE WITNESS:  Can you repeat the question.

20   BY MS. MAPLES:

21       Q.    Does section A4 on Page 28 and then

22   continuing to the following pages set forth the

23   requirements for staffing and employees at Trousdale?

24             MR. AUMANN:  Same objection, form.  You can

25   go ahead and answer.

Page 63

```
 1              THE WITNESS:  No.

 2   BY MS. MAPLES:

 3        Q.    What does Section A4 give us?

 4        A.    A4 appears to be a set of definitions for

 5   each of those bullet items, what is to be considered

 6   personnel, what is to be considered executive officer,

 7   and what is to be considered an independent contractor.

 8        Q.    Well, I mean, let's look at the second

 9   sentence of Section C.  It says:  All vacancies shall be

10   filled in 45 days, provided, however, that during the

11   period of any vacancy, the services associated with that

12   position shall be provided by contractor.  And then the

13   sentence goes on.  But does that supply a requirement

14   for the staffing at Trousdale County -- or excuse me,

15   Trousdale facility?

16        A.    That's a requirement for meeting the

17   contractual obligations of the total staffing pattern.

18        Q.    Do see that the last sentence of that

19   paragraph titled personnel states:  The contractor's

20   staff turnover ratio for security personnel shall not

21   exceed 50 percent annually as of each June 30?

22        A.    I do.

23        Q.    And do you recall a moment ago you testified

24   that you didn't monitor the turnover ratio at Trousdale?

25        A.    Yes, ma'am.
```

Page 64

 1       Q.    If you had to guess, would you -- strike

 2   that.  Based on your review of staffing at Trousdale,

 3   does the turnover ratio for security personnel exceed 50

 4   percent at Trousdale?

 5               MR. AUMANN:  Objection, form.

 6               MR. WELBORN:  Same objection.

 7               THE WITNESS:  I really don't know.

 8   BY MS. MAPLES:

 9       Q.    It's certainly possible that it does, though;

10   would you agree to that?

11               MR. AUMANN:  Objection, form.

12               MR. WELBORN:  Same objection.

13               THE WITNESS:  I'm going to say no, I don't

14   think that's possible.  I don't think it's 50 percent.

15   BY MS. MAPLES:

16       Q.    If we scroll up to Page 27, this page has a

17   Bates stamp CCI 000960.  Do you see that?

18       A.    960, yes.

19       Q.    Do you see that section NN is titled

20   volunteer services?

21       A.    Yes, ma'am.

22       Q.    Do you see that it states in the -- let's

23   see, second sentence:  At a minimum, the contractor

24   shall provide for supervision and monitoring of the

25   program and security background checks for volunteer

1    applicants.  And then the next sentence, contractor

2    shall establish and maintain a local volunteer advisory

3    board.

4        A.    Yes, ma'am.

5        Q.    Does Trousdale have a local volunteer

6    advisory board?

7        A.    Not that I am aware.

8        Q.    Have you ever asked why there is not a local

9    volunteer advisory board?

10            MR. WELBORN:  Object to the form.

11            THE WITNESS:  No, ma'am.  And it could be a

12   verbiage barrier also.  It could be referred to as

13   something different here.  But I don't know of anything

14   called that.

15   BY MS. MAPLES:

16       Q.    Do you know of anything that, you know, might

17   perform the same function as a local volunteer advisory

18   board?

19            MR. AUMANN:  Objection, form.

20            THE WITNESS:  No, ma'am, I do not.

21   BY MS. MAPLES:

22       Q.    Does Trousdale have volunteers?

23       A.    They do, yes, ma'am.

24       Q.    Are you involved with volunteers at all?

25       A.    We, as a contract monitor, review the

 1    background checks and determine whether or not an

 2    individual can be cleared to come onto the property as a

 3    volunteer.

 4          Q.    Is that all?

 5          A.    That's all.

 6          Q.    Are you in any way involved with Trousdale

 7    staff complaints?

 8          A.    No, ma'am.

 9          Q.    Do you know if CoreCivic has a policy or

10    procedure to handle staff complaints at Trousdale?

11          A.    Not that I am involved in, no.

12          Q.    I'm not asking if you're involved in it.  I'm

13    just asking if you know whether or not they have one?

14          A.    I know they have a human resource program.

15          Q.    Is it your understanding that the human

16    resource program handles staff complaints at Trousdale?

17          A.    Yes, ma'am.

18          Q.    I'm going to scroll up to Page 20 of the

19    contract.  This page has the Bates stamp CCI 000953.  Do

20    you see that?

21          A.    I do now, yes.

22          Q.    Do you see that on this page, Item N is

23    titled religious services?

24          A.    Yes.

25          Q.    And do you see that it states:  Contractor

```
 1    will designate adequate staff, volunteers and space

 2    within the facility for religious services and provide

 3    religious programs and religious services in compliance

 4    with departmental policy?

 5         A.    Yes.

 6         Q.    Are you involved in tracking, monitoring or

 7    overseeing Trousdale's treatment of religious services?

 8         A.    No.

 9         Q.    Are you involved in determining whether or

10    not Trousdale has designated adequate staff, volunteers

11    and space for religious services?

12         A.    No.

13         Q.    Are you involved with anything at Trousdale

14    concerning religion?

15         A.    No, ma'am.

16         Q.    Do you oversee or monitor employees, like the

17    chaplain, for instance, who might be involved with

18    religion?

19         A.    Do I monitor or oversee the chaplains, was

20    that the question?

21         Q.    Yes.

22         A.    No, ma'am.

23         Q.    Does the contract monitor of operations

24    oversee Trousdale concerning religious services or

25    religious staffing or anything of that nature?
```

Page 68

```
 1          A.     No, ma'am.  The only thing that we, as a

 2   contract monitor, do with religious services is review

 3   the background checks.  For the chaplains, that would be

 4   the criminal background histories, background reports,

 5   because they are staff assigned to the facility.  And

 6   the volunteers, we approve or deny their entry into the

 7   institution.

 8          Q.     Do you ever review incident reports as

 9   contract monitor of Trousdale?

10          A.     Yes, ma'am.

11          Q.     For what purposes do you review those

12   reports?

13          A.     For accuracy.  To ensure that if it was a

14   Class A incident, that it was reported to the contract

15   monitors.  And that if need be, that it was reported to

16   the central communications center.

17          Q.     What is a Class A incident?

18          A.     Class A incident is what TDOC designates as a

19   serious incident at a facility that could seriously

20   impact the security of the institution, or if it's

21   outside the normal operations of the prison.

22          Q.     So is it fair to say that you don't do

23   anything to monitor Class B or Class C incidents?

24          A.     No, that is correct.

25          Q.     Okay, what do you do to monitor Class B and
```

1    Class C and so on and so forth incidents?

2        A.    We just review to ensure correct entry has

3    been submitted into our TOMIS system.

4        Q.    So explain to me how the treatment for Class

5    A incidents is different than the treatment of the lower

6    classifications of incidents.

7        A.    So what will happen during a Class A event is

8    that the contract says that the contract monitor has to

9    be notified within an hour of occurrence of a Class A

10   incident and also that the central communication center

11   has to be notified of the event.  That is not a

12   requirement for Class B or C related matters.  Also a --

13       Q.    How often is Class A --

14       A.    And also a TOMIS incident has to be entered

15   by the end of shift.

16       Q.    Why is it important that these procedures be

17   followed and that this documentation be created?

18       A.    To ensure if there is any emergent

19   notification or, basically, because that's the

20   commissioner's directive.  You know, if there's any

21   emergency at the facility or any security breach, that's

22   something that TDOC wants to know about first and

23   foremost.

24       Q.    Well, is that because it's important for TDOC

25   to have oversight of what is going on at Trousdale?

 1        A.    Absolutely.  And that would be for any

 2   prison.

 3        Q.    How often do Class A incidents occur at

 4   Trousdale?

 5        A.    I want to say no more routinely than any

 6   other facility.  Class A incidents are matters that do

 7   occur.  To speak to the frequency, I'm really not sure.

 8   We could go a day or two without any, then we could have

 9   a day where we have five.  It just -- it really varies.

10        Q.    But you're notified every time there is one;

11   is that right?

12        A.    Or the contract monitor of operations.

13   Primarily, it's going to be him.  And in his absence or

14   whenever they're not able to contact the operations

15   monitor, then they'll contact me.

16        Q.    Can you give some examples of what

17   constitutes a Class A incident?

18        A.    If there is an inmate assault, a staff

19   assault, a death.  If an inmate has to be transported

20   off the property.  Anything that might be considered a

21   breach of security and use of force -- or rather,

22   chemical use of force, let me clarify.

23        Q.    Do you know how many deaths there have been

24   at Trousdale since you have been there?

25        A.    Since I've been here, I would have to defer

 1    to my notes.  I do have a file of those.

 2         Q.    Do you keep that file on your computer or in

 3    your office?

 4         A.    On my computer.

 5         Q.    What is it called in your computer?

 6         A.    Deceased inmates.

 7         Q.    And it's just your notes on the various

 8    deaths?

 9         A.    It's the -- it's a CR 2592 is the injury

10    report that was documented by the medical team.

11         Q.    Does Trousdale have any pending unexplained

12    deaths or deaths for which it has not yet determined a

13    cause right now?

14         A.    I am not sure.  That's not something that I

15    would even have knowledge about.

16         Q.    So you're not involved in overseeing

17    Trousdale's investigation into inmate deaths?

18         A.    No, ma'am.

19         Q.    Is the contract monitor of operations

20    involved in that?

21         A.    I believe he is.

22         Q.    Do you know how many homicides there have

23    been at Trousdale since you've been there?

24         A.    I do not, no.

25         Q.    Has there been more than one?

1        A.    I'm not sure.  And again, you know, the

2   definition of homicide is anything other than natural

3   and not a suicide.  The final outcome on the death

4   certificate would outline anything or cause of death.

5   And I just don't have access to those and that's not

6   something that I monitor.

7        Q.    How long did you prepare for your deposition

8   today?

9        A.    How long did I prepare today?

10       Q.    How long did you prepare, I'm assuming in

11  advance of today, for your deposition today?

12       A.    I had a phone call last week.  I don't recall

13  exactly what day that was.  I want to say it was last

14  Tuesday, March the 30th, that was maybe an hour.

15       Q.    And who was the phone call with?

16       A.    It was with Mr. Aumann and Ms. Nikki -- I

17  apologize, I am not sure if I know how to pronounce her

18  last name.  It starts with an H.

19       Q.    Those were the only attorneys on that call?

20       A.    Yes, ma'am.

21       Q.    We've talked a lot this morning about

22  noncompliance reports.  Is that the same thing as a

23  contract deficiency report or a CDR?

24       A.    I'm not sure.  I've never heard of a CDR.

25       Q.    Did you do anything other than the phone call

Page 73

```
 1    with Thomas Aumann and Nikki Hashemian to prepare for

 2    your deposition today?

 3        A.    No, ma'am.

 4        Q.    Okay, I'm going to put another document on

 5    the screen.  It will be Exhibit 5 to the deposition.

 6    For convenience, since we're on Zoom, this is going to

 7    be another collective exhibit of a series of documents,

 8    okay?  So we'll just walk through that.  Just to be

 9    clear, so that we all understand, we're talking about

10    multiple documents that have been put together, okay?

11        A.    Yes.

12              (Exhibit 5 was marked.)

13    BY MS. MAPLES:

14        Q.    Okay, do you see the document you have in

15    front of you is Bates stamped at the top left-hand

16    corner TDOC 002291?

17        A.    Yes.

18              MS. POLLY:  Hey, Janna, can you make that

19    available in the chat, please?

20              MS. MAPLES:  Yes, I was doing that as we

21    speak.  It's just going to take me a sec.

22    BY MS. MAPLES:

23        Q.    Okay, do you see that this first document is

24    dated December 31st, 2019?

25        A.    Yes.
```

```
 1        Q.     And were you involved in preparing this

 2   report?

 3        A.     Yes.

 4        Q.     Is this another noncompliance report?

 5        A.     Yes.

 6        Q.     Do you see that the first sentence of it

 7   states:  A review of staffing rosters and staff

 8   vacancies took place for the period of October 1st, 2019

 9   to October 31st, 2019?

10        A.     Yes.

11        Q.     Do you see that it states noncompliance Item

12   1?

13        A.     Yes.

14        Q.     And can you explain what noncompliance Item 1

15   is here in this report?

16        A.     Noncompliance Item 1 covers staffing.  Item

17   2B, which is an essential finding and also a repeat from

18   previous reporting periods.  The instrument directs the

19   auditor to review and ensure that the daily shift

20   rosters for all shifts are reviewed to ensure that all

21   critical posts are staffed as required by contract.

22        Q.     And when you applied staffing instrument 2B,

23   what noncompliance issue did you find for October of

24   2019?

25        A.     That there were eight days in the month of
```

Page 75

1   October that reflected 24 critical posts were not filled

2   on time or the position was left vacant during the

3   shift.

4        Q.    And the table below that paragraph you've

5   just cited, does it describe the specific shifts that

6   were found to be vacant?

7        A.    To include the date and the time of the

8   vacancy, yes.

9        Q.    And do you see here in red there is a note

10  that states:  Per the monitoring instrument for

11  staffing, Item 2B has been determined to be an essential

12  monitoring item, which may result in a notification of

13  breach?

14       A.    Yes.

15       Q.    What is an essential monitoring item?

16       A.    An essential monitoring item is any

17  monitoring item that is required to be a hundred

18  percent.  If there is one deficiency, then it gets

19  documented as a noncompliance.

20       Q.    That's sort of a strict standard.  Is that

21  because that monitoring item is particularly important?

22            MR. AUMANN:  Objection, form.  You can go

23  ahead.

24            THE WITNESS:  That's a security sensitive

25  item, yes.

 1   BY MS. MAPLES:

 2        Q.    And when you say security sensitive item,

 3   what does that mean?

 4        A.    And item -- an area of audit that requires a

 5   hundred percent compliance.

 6        Q.    Well, I think that's a little circular.  I

 7   guess what I'm asking is what does security sensitive

 8   mean?

 9        A.    It's what the department of corrections

10   determines to be something that they cannot give any

11   leniency toward.  So if it's --

12        Q.    I guess what I'm asking is an even simpler

13   question.  It's just -- does security sensitive mean

14   something that could impact the security of the prison?

15        A.    Yes.

16        Q.    Okay.  Do you see on the next page, it

17   states:  Prior documentation of noncompliance?

18        A.    Yes.

19        Q.    And here, did you just go back and track

20   whether there was noncompliance for the previous six

21   months before you drafted this report?

22        A.    Are we speaking to the prior documentation

23   portion?

24        Q.    Yes.

25        A.    Yes.

Page 77

```
 1        Q.    So it's fair to say that before you issued

 2   this report, CoreCivic had been consistently

 3   noncompliant?

 4        A.    Yes.

 5              MR. AUMANN:  Objection, form.  You can go

 6   ahead.

 7              THE WITNESS:  Yes.

 8   BY MS. MAPLES:

 9        Q.    And then as we discussed earlier, your report

10   contains a kind of summary of the previous corrective

11   actions that CoreCivic had taken at Trousdale?

12        A.    The portion of the NCR that I'm looking at

13   right now is the contractor's response.

14        Q.    Okay.  So it says -- you're right:  Response

15   of contractor slash corrective action taken.  So it's

16   both, right?

17        A.    Yes, ma'am.

18        Q.    Okay.  So if we will scroll down, it looks

19   like there is a bunch of dates here.  Is it fair to say

20   that beside the date, there's sort of an explanation by

21   CoreCivic as to what occurred each time there was a

22   deficiency in this report; is that right?

23        A.    Yes.

24        Q.    And then if we scroll down to the next page,

25   in the paragraph beginning with in January 2019, does
```

1    CoreCivic there describe the corrective action that is

2    taken?

3         A.    Yes.

4         Q.    And if we scroll down to noncompliance Item

5    2, it notes that the monitoring instrument is staffing

6    6B.  How is that different than staffing 2B?

7         A.    So staffing 6B is a complete different item

8    that we're reviewing for compliance.  And on this

9    particular line item, we're looking to determine that

10   one, that the staffing report was received on or before

11   the 15th day of each month.  So if it was received on

12   the 16th day or any day thereafter, that could

13   constitute a finding.

14              The next part of this item says that the

15   warden submits a report to the liaison providing the

16   name of each employee who separated service with reason,

17   whether it be voluntary or involuntary, to include the

18   separation date and the position that was vacated.

19              So on this particular finding, in the month

20   of October, the total number of employment actions that

21   resulted in a vacancy on this report, the following

22   position, the vacant position number does not appear on

23   the monthly staffing report for the month of October.

24        Q.    So it sounds like what you're saying is that

25   there was just a -- almost an oversight and someone

Page 79

1   forgot to put in the number?

2        A.    Correct.

3        Q.    So staffing 6B isn't as important as staffing

4   2B; is that right?

5        A.    That would be correct.

6              MR. AUMANN:  Objection, form.

7              MR. WELBORN:  Objection.

8              THE WITNESS:  And if you notice, this

9   particular item is not considered to be an essential

10  finding.

11  BY MS. MAPLES:

12       Q.    Okay.  Now, if we scroll down to

13  noncompliance Item 3, the applicable monitoring

14  instrument Staffing 9.  It is essential, right?

15       A.    Yes.

16       Q.    And what is staffing monitoring Instrument 9?

17       A.    That all vacant positions are filled within

18  45 days of the date in which it became vacant.

19       Q.    And here in October of 2019, CoreCivic was

20  noncompliant again; is that right?

21       A.    Yes, ma'am.

22       Q.    And can you describe the noncompliance?

23       A.    In the month of October, there were 43

24  positions that exceeded a 45-day vacancy.

25       Q.    Is that a lot?  I mean 43 --

 1              MR. AUMANN:  Objection, form.

 2              MR. WELBORN:  Same objection.

 3              THE WITNESS:  I think at this time, it was

 4     probably average for the monitoring period.

 5     BY MS. MAPLES:

 6         Q.    What monitoring period?

 7         A.    For that quarter.  So we're looking at

 8     October 2019.  I'm going to say fourth quarter 2019.

 9         Q.    So when you say average for that monitoring

10     period, you mean average for CoreCivic at Trousdale?

11         A.    Yes.

12         Q.    I am going to continue to scroll down.  Do

13     you see that on this page, which I'm going to show you

14     the Bates number is TDOC 002298, at the bottom, the last

15     sentence on the page reads:  In October 2019, the

16     facility authorized 7,676.34 hours of overtime.  Do you

17     see that?

18         A.    Yes.

19         Q.    Do you consider that to be a lot of overtime?

20              MR. AUMANN:  Objection, form.

21              MR. WELBORN:  Same objection.

22              THE WITNESS:  I really don't have an opinion

23     one way or the other.  I believe that that number is

24     subjective and it would probably need to be reviewed in

25     light of other staffing reports during that monitoring

Case 3:22-cv-00093  Document 37-2  Filed 03/25/22  Page 80 of 162 PageID #: 3062

1    period.

2                You know, again, one of the things I want to

3    draw attention to is that the contractor's response is

4    not particularly something that, as a contract monitor,

5    we do, other than just continue to monitor that

6    instrument item.  The corrective action plan is a

7    process that the facility takes to correct the

8    deficiency and that's something that is theirs and of

9    their own.

10       Q.     Well, is there anyone at CoreCivic -- excuse

11    me, strike that.  Is there anyone at TDOC who doesn't

12    just look at the process, as you do, but actually looks

13    at these things in the aggregate?

14       A.     Yes.

15       Q.     Who is that person?

16       A.     That would be my boss, which is Carolyn

17    Jordan.  My direct supervisor, I guess would be a more

18    professional way to say that.  Ms. Carolyn Jordan and

19    the inspector general's office, Mr. Kelly Young.

20       Q.     How often do you have conversations with

21    Carolyn Jordan about staffing at Trousdale?

22       A.     Routinely.

23       Q.     Once a day?

24       A.     I'm going to say perhaps bimonthly.

25       Q.     How long are those conversations typically?

1      A.    I'm not sure.

2      Q.    Has Carolyn Jordan ever expressed concern

3  about the staffing at Trousdale?

4      A.    Not particularly.  Her concern is to ensure

5  that we're documenting any noncompliance that we

6  identify.

7      Q.    So she's never said anything to indicate

8  displeasure with the way that Trousdale is staffed?

9      A.    Not to me, no.

10     Q.    What has she said to you about the staffing

11 at Trousdale?

12     A.    To continue to monitor and document all of

13 the staffing discrepancies that we identify.  We did

14 talk in great detail around this period about ensuring

15 that all of our documentation was accurate and complete,

16 because we -- that's our role.  That's, you know, as a

17 contract monitor of compliance, to ensure that we have

18 complete and accurate reporting.  And that's been her

19 primary focus.

20     Q.    Have you found that CoreCivic staffing

21 reporting for Trousdale has been accurate and complete?

22     A.    That it has been or has not been?

23     Q.    Well, I'm asking which one?

24     A.    That's what I'm asking, what was your

25 question?

 1        Q.    Have you found CoreCivic's staffing

 2   documentation to be complete and accurate, or incomplete

 3   and inaccurate?

 4        A.    Incomplete --

 5              MR. AUMANN:  Objection, form.

 6              MR. WELBORN:  Same objection.

 7   BY MS. MAPLES:

 8        Q.    Can you say that again?

 9        A.    Incomplete and inaccurate.  Hence, the

10   previous finding on this NCR report.

11        Q.    And has that been true for the entire time

12   you've been at Trousdale?

13        A.    For the majority part, yes.

14        Q.    If we scroll down to the document with the

15   Bates stamp TDOC 002281, do you see that this is another

16   noncompliance report concerning staffing dated December

17   31st, 2019 for the month of November 2019?

18        A.    Yes.

19        Q.    Do you see that staffing monitoring

20   instrument 2B is once again noncompliant?

21        A.    Yes.

22        Q.    And this time, there were 14 days in the

23   month of November for which critical posts were unfilled

24   or left vacant; is that right?

25        A.    Yes.

Page 84

1        Q.     If we go down to noncompliance No. 2, do you

2    see that monitoring instrument staff for staffing 6B was

3    found to be noncompliant again in the warden's monthly

4    staffing report?

5        A.     Yes.

6        Q.     And who was the warden at this time?

7        A.     I believe that would be Warden Washburn.

8        Q.     And here we've got Noncompliant Item 3, it's

9    staffing monitoring Instrument 8.  Can you explain what

10   that is?

11       A.     Yes, ma'am.  Staffing Item 8.  Again, this

12   goes back to speak to the complete and accuracy of the

13   reporting method.  Copies of the staffing report was

14   obtained for the previous month and compared to the

15   month that it was being reported in to identify whether

16   or not the list of employees had been hired and

17   terminated are accurately documented over that time

18   frame.

19            And what we see is that this position became

20   vacant, treatment counselor position became vacant on

21   August the 30th, 2019, but was not listed on the

22   September or October vacancy reports.  The position is

23   then listed as having been filled on a monthly staffing

24   report for November.  So basically, what happened there

25   is they filled a position that was never reported to be

 1    vacant.

 2         Q.    Do you see at the bottom of the page that

 3    monitoring instrument Staffing 9 is again noncompliant

 4    for the month of November 2019?

 5         A.    Yes.

 6         Q.    And that's because they had certain unfilled

 7    positions that had been vacant for more than 45 days?

 8         A.    Yes.

 9         Q.    And if we scroll down to the page Bates

10    stamped TDOC 002288, do you see that the last sentence

11    again calculates the number of hours of overtime worked

12    in November of 2019?

13         A.    Yes.

14         Q.    Do you see the number of hours there is

15    6,103.33?

16         A.    Yes.

17         Q.    Do you see that the next document with Bates

18    stamp TDOC 001432 is the monthly staffing report

19    covering December of 2019?

20         A.    Yes.

21         Q.    Do you see that monitoring instrument

22    staffing 2B is again noncompliant?

23         A.    Yes.

24         Q.    Do you see that Noncompliant Item 2 is

25    monitoring instrument 6A?

1      A.    Yes.

2      Q.    6A is a new one.  What is it?

3      A.    To determine that on or before the fifth day

4   of the -- of each month that the facility submits a

5   report providing the names of those that are hired to

6   include the position and the date that they were hired.

7   So what we see here is that during this monitoring

8   period, there were two separate reports that the

9   facility provided the contract monitor to review to meet

10  the standard.  On one of those reports, it indicated

11  that 34 employees were hired.  But on the secondary

12  report, it indicated that 36 employees were hired.  So

13  those two reports were not consistent with one another.

14  They were not accurate and consistent.

15     Q.    So again, you are getting reporting from the

16  facility that is incomplete and inaccurate, right?

17     A.    Yes.

18     Q.    If we scroll down to Noncompliant Item No. 3,

19  do you see that Staffing Item 9 is, again, noncompliant?

20     A.    Yes.

21     Q.    And do you see that, again, CoreCivic has

22  noted the amount of overtime that was worked in this

23  report?

24     A.    Yes.

25     Q.    And do you see that it's 6,810.34 hours of

 1    overtime?

 2         A.    Yes.

 3         Q.    Do you see that on the document with the

 4    Bates stamp TDOC 001441 dated February 26th of 2020 and

 5    covering January of 2020, item staffing 2B is again

 6    noncompliant?

 7         A.    Yes.

 8         Q.    And can you explain the noncompliance issue

 9    in January of 2020?

10         A.    In January, there were 19 days wherein 16

11    critical posts were not filled on time or were left

12    vacant.

13         Q.    Was Warden Washburn still there at this time?

14         A.    Yes.

15         Q.    Did you try to work with him on staffing?

16              MR. AUMANN:  Objection to form.

17              THE WITNESS:  No.  That would be outside the

18    scope of my responsibility.

19    BY MS. MAPLES:

20         Q.    Does anyone at TDOC have that responsibility?

21         A.    No, that's the contractor's responsibility.

22         Q.    Did you ever provide an evaluation of any

23    kind, verbal or written, to anyone at TDOC concerning

24    Warden Washburn's performance?

25         A.    No.

Page 88

```
 1        Q.     Were you ever asked your opinion about how

 2   Warden Washburn was doing at Trousdale by anyone at

 3   TDOC?

 4        A.     No.

 5        Q.     Did anybody at TDOC ever express an opinion

 6   to you about Warden Washburn's job performance at

 7   Trousdale?

 8        A.     Not that I recall, no.

 9        Q.     If we continue to scroll down, do you see

10   that Noncompliant Item 2 is Staffing 7?

11        A.     I'm sorry?

12        Q.     Do you see that under noncompliant --

13        A.     Staffing 7?

14        Q.     Yes, Staffing 7.

15        A.     Yes.

16        Q.     And is this another instance of incomplete

17   and inaccurate reporting by CoreCivic?

18               MR. AUMANN:  Objection, form.

19               THE WITNESS:  Yes, ma'am.

20   BY MS. MAPLES:

21        Q.     Same thing with Noncompliant Item 3, which is

22   Monitoring Instrument Staffing 8.  Is this another

23   example of incomplete and inaccurate reporting by

24   CoreCivic for January 2020?

25        A.     Yes, ma'am.
```

1        Q.    And noncompliant Item 4, do you see that

2   again it's Staffing Monitoring Instrument No. 9?

3        A.    Yes.

4        Q.    So various vacant positions are unfilled for

5   45 days?

6        A.    Correct.

7        Q.    And moving to the next monthly report, we've

8   got TDOC 001794 dated September 25th of 2015 and

9   covering February of 2020.  Do you see that?

10       A.    Yes.

11       Q.    Do you see Staffing Item 2B is again

12   noncompliant for February of 2020?

13       A.    Yes.

14       Q.    Now, why is the February 2020 report being

15   issued in September?

16       A.    We were working with the facility at the time

17   to help improve their reporting method.  As you have

18   noticed, there was a lot of data entry errors that was

19   contributing to a lot of these findings.  The dates were

20   off, the numbers were wrong.  There was just

21   inconsistent reporting from month to month.

22            So this was a period of time that the

23   contract monitoring director and the contract monitors

24   at the CoreCivic facilities were working in tandem to

25   try to identify best practice in a way to try and

1    improve the reporting standard.  So that, in turn,

2    created a delay in the issuance of the NCR.

3        Q.    Okay, so you're saying that from February

4    1st, 2020, through September of 2020, you were not

5    submitting monthly staffing noncompliance reports,

6    right?

7        A.    Wrong.  I was submitting them on a monthly

8    basis.  My supervisor takes those reports and she

9    reviews them.  And again, we were working with the

10   facility for an extended period of time.  And then when

11   she submitted the report in what you see in front of

12   you, that was the amount of time that had lapsed.  So I

13   report out on a monthly basis.

14       Q.    I see.

15       A.    Yeah.  And then my supervisor is the one that

16   submits these reports formally.

17       Q.    So I guess that means we should probably look

18   at who these reports are being submitted to, because I

19   don't think we've covered that.  Is it your

20   understanding that these reports are going to the

21   Trousdale County attorney?

22       A.    Yes.

23       Q.    And for what purpose?

24       A.    Because the Tennessee Department of

25   Corrections is contracted with Trousdale County, who in

```
 1    turn contracts with CoreCivic.

 2         Q.    Well, I guess the question is, are they being

 3    submitted so that Trousdale County can determine whether

 4    they're going to assess damages?

 5              MR. AUMANN:  Objection to form.  You can go

 6    ahead.

 7              THE WITNESS:  They're being submitted so that

 8    the contractor can have an opportunity to identify the

 9    discrepancies that the monitor has observed, provide a

10    defense, which may result in a redaction of that finding

11    or could result in a liquidated damage assessment if the

12    Tennessee Department of Corrections determines that the

13    corrective action plan is not sufficient.

14    BY MS. MAPLES:

15         Q.    So it seems like from February 1st of 2020

16    until September 25th of 2020, you all had held off on

17    sending these reports to the Trousdale County attorney

18    because you were trying to work with CoreCivic on their

19    data entry and reporting, right?

20         A.    That's correct, yes.

21         Q.    So in September of 2020, did you all just

22    give up?

23         A.    No, ma'am.

24              MS. POLLY:  Objection.

25              THE WITNESS:  We continued.
```

1              MR. AUMANN:  Objection to form.

2    BY MS. MAPLES:

3         Q.    You all decided that you would start sending

4    them to the attorney again?

5         A.    No, ma'am.  They've always gone to the

6    attorney.

7         Q.    Well, but they've typically gone to the

8    attorney in a more timely fashion, right?

9         A.    You are correct.

10        Q.    Okay, so we've already talked about Staffing

11   Item 2B for February of 2020 that was noncompliant.  If

12   we scroll down, do you see Noncompliant Item 2 is

13   Staffing Monitoring Instrument No. 8?

14        A.    Yes.

15        Q.    And that's an incomplete and inaccurate

16   reporting noncompliant item again, right?

17        A.    Yes.

18        Q.    And then Noncompliant Item No. 3 for this

19   month is Staffing Item 9 again, which is vacant

20   positions staying vacant for more than 45 days, right?

21        A.    Yes.

22        Q.    And you said that the fact that these certain

23   staffing items are designated as essential means that

24   TDOC requires a hundred percent compliance.

25        A.    Yes.

1        Q.    Is that right?

2        A.    Yes, ma'am.

3        Q.    Is it safe to say that on the Staffing Items

4    2B and 9, CoreCivic is nowhere close to a hundred

5    percent?

6              MR. AUMANN:  Objection, form.

7    BY MS. MAPLES:

8        Q.    You can answer.

9        A.    Yes, correct.

10       Q.    We're going to keep scrolling to the next

11   month, March 2020, also submitted to the attorney on

12   September 25th of 2020.  And the Bates stamp in the top

13   left-hand corner is TDOC 001760.  Do you see that?

14       A.    Yes.

15       Q.    Do you see that noncompliance Item 1 is again

16   Staffing Item 2B?

17       A.    No.

18       Q.    Oh, apologies.  Do you see that noncompliance

19   Item 1 is Staffing Item 2B again?

20       A.    Yes.

21       Q.    And do you see that under noncompliance

22   issues, you have highlighted the words reflective 96

23   critical posts?

24       A.    Yes.

25       Q.    Why did you highlight that?

Page 94

```
 1              MR. AUMANN:  Objection to form.

 2              THE WITNESS:  I would have to refer back to

 3   my notes, but I believe that that was an indication of a

 4   an uptick.

 5   BY MS. MAPLES:

 6        Q.   Right, because having 25 days of the month

 7   which the shift roster's reflected 96 critical posts

 8   unfilled or left vacant would seem particularly

 9   egregious, right?

10              MR. WELBORN:  Objection to form.

11              MR. AUMANN:  Objection to form.

12              THE WITNESS:  Based on previous months of

13   reporting, that indicated an increase.

14   BY MS. MAPLES:

15        Q.   I'm going to scroll down to the document with

16   the Bates stamp at the top TDOC 001769.  And do you see

17   that noncompliance Item 2, Staffing Item 8, is repeated

18   here?

19        A.   Yes, ma'am.

20        Q.   And that means the hiring and firing report

21   submitted by the warden was wrong again?

22              MR. AUMANN:  Objection to form.

23              THE WITNESS:  Correct.

24   BY MS. MAPLES:

25        Q.   If we go to the next page, do you see that
```

 1      noncompliance Item 3 is again Staffing Item 9?

 2           A.    Yes.

 3           Q.    So from March 2020, you've been doing these

 4      covering a period of six months; is that fair?

 5           A.    Make sure I understood the question.  By

 6      March the 20th, correct, I had covered an approximate

 7      six-month period of staffing reports.

 8           Q.    Because just now, we've taken quite a bit of

 9      time to go through October of 2019 through March of

10      2020, right?

11           A.    Yes, ma'am.

12           Q.    And is it fair to say that for that entire

13      six-month period, your first six months at Trousdale,

14      CoreCivic was noncompliant on Staffing Item 2B and

15      noncompliant on Staffing Item 9?

16           A.    Yes.

17           Q.    And during that six month period of time,

18      CoreCivic was also noncompliant on various monitoring

19      instruments concerning complete and accurate reporting;

20      is that fair?

21                 MR. WELBORN:  Object to form.

22                 MR. AUMANN:  Same objection.

23                 THE WITNESS:  Yes.

24      BY MS. MAPLES:

25           Q.    And when I say various monitoring instrument

 1    items, I'm referring to Numbers 8, 6A and 6B; is that

 2    fair?

 3          A.    Yes.

 4          Q.    Okay, let's keep going.  Do you see on your

 5    screen that we're looking at a document with the Bates

 6    stamp at the top left-hand corner TDOC 001775?

 7          A.    Yes.

 8          Q.    And do you see that this is the staffing

 9    report for April of 2020?

10          A.    Yes.

11          Q.    Do you see that 2B is again noncompliant?

12          A.    Yes.

13          Q.    Now, do you recall that in March of 2020, you

14    highlighted the number of critical posts that were left

15    unfilled, which you characterized as an uptick at a rate

16    of 96?

17                MR. AUMANN:  Objection to form.

18                THE WITNESS:  Yes.

19    BY MS. MAPLES:

20          Q.    And do you see that here, the very next

21    month, the number is 180?

22          A.    Yes.

23          Q.    So 96 was an uptick and then the number

24    doubled for the following month?

25          A.    Correct.

1      Q.    Let's keep scrolling down, TDOC 1789 is this

2   report.  Here we go, 1789.  Do you see that non-

3   compliance 2 is Staffing Item 9 again?

4      A.    Yes.

5      Q.    Now, is that Warden Byrd's first month at

6   Trousdale?

7      A.    I believe that was.

8      Q.    Did you discuss staffing levels with Warden

9   Byrd at Trousdale when he started?

10     A.    I can't recall.  We did have a meeting with

11  the warden when he came onboard.  And we discussed a

12  multitude of items that we had documented and seen.  And

13  basically, it was an onboarding for the new warden to

14  discuss what his expectations were of us and what we

15  expected of the contract as the new person in command.

16  But to speak towards specifically to staffing, I'm sure

17  that that was mentioned, but I cannot swear that that

18  was something that was covered exclusively.

19     Q.    Well, do you think you discussed with him the

20  fact that CoreCivic's reporting of staffing issues had

21  been a long-standing problem?

22           MR. AUMANN:  Objection to form.

23           THE WITNESS:  I'm sure we did, but I don't

24  recall.

25  BY MS. MAPLES:

1      Q.    So I'm prepared to continue going all of the

2   way through all of the rest of these reports, you know,

3   to the extent that I have them.  But is it fair to say

4   that CoreCivic has never been in compliance with

5   Staffing Item 2B?

6             MR. AUMANN:  Objection to form.

7             MR. WELBORN:  Same objection.

8   BY MS. MAPLES:

9      Q.    Since you've been at the facility?

10     A.    That would be fair, yes.

11     Q.    Is it fair to say that CoreCivic has never

12  been in compliance with Staffing Item 9 since you have

13  been at CoreCivic?

14            MR. AUMANN:  Objection to form.

15            THE WITNESS:  Yes.

16            MS. MAPLES:  Do you all want to take a break?

17            THE WITNESS:  Sure, I could use one.

18            MS. MAPLES:  Yeah, since we've been going

19  over an hour.

20            MR. WELBORN:  I need to take a break from

21  noon to 12:30.  Janna, do you have any feel for how much

22  more time you've got?  I'm not trying to limit you.

23            MS. MAPLES:  No, you're fine.  Let's take

24  five and then when I come back I think I will be able to

25  give you a good answer.  I mean, noon to 12:30 would be

 1    fine, we could just take a lunch then.  That's no

 2    problem with me.  Let's take a break for five.

 3              (Recess observed.)

 4    BY MS. MAPLES:

 5         Q.    Mr. Walton, I'm going to return just briefly

 6    to the series of documents that we've been looking at.

 7         A.    Okay.

 8         Q.    Do you see here that we are back on the April

 9    2020 noncompliance report concerning staffing?

10         A.    Yes.

11         Q.    And have we previously discussed that in the

12    section providing CoreCivic's response and plan of

13    corrective action concerning the noncompliance report,

14    CoreCivic has previously noted the number of hours of

15    overtime worked?

16         A.    Yes.

17         Q.    And would you also agree that they have noted

18    the amounts that they have paid to cover that overtime?

19         A.    Yes.

20         Q.    Do you see that if we go down to the page

21    that is Bates stamped TDOC 001792, for April 2020, it

22    states that the facility authorized 6,957.25 hours of

23    overtime for a total cost of $179,705.77?

24         A.    Yes.

25         Q.    So almost $180,000 spent on overtime in April

                                                            Page 100

```
 1   of 2020?

 2        A.    Yes.

 3        Q.    At Trousdale, is overtime sometimes used to

 4   cover those vacant, unfilled positions?

 5        A.    Yes.

 6        Q.    If we scroll back up for the same report to

 7   TDOC 001789 and we look at Noncompliance Item 2,

 8   Staffing Item 9, do you see that in your description of

 9   noncompliant issue, you write:  At the conclusion of the

10   month of April, there were a total of 118 vacant

11   positions at Trousdale, 81 of those positions exceeded

12   45 days?

13        A.    I do.

14        Q.    Now, the overtime is costing $180,000 and

15   there are 118 vacant positions.  Could CoreCivic fill

16   118 vacant positions with $180,000?

17              MR. AUMANN:  Objection to form.

18              MR. WELBORN:  Object to the form.

19              THE WITNESS:  I'm not sure.  I don't know.

20   BY MS. MAPLES:

21        Q.    Well, guess.  I mean, could you pay 118

22   people at the facility for $180,000?

23              MR. AUMANN:  Objection to form.

24              MR. WELBORN:  Same objection.

25              THE WITNESS:  I have no clue.
```

Page 101

 1   BY MS. MAPLES:

 2       Q.    You really don't have a clue at all?

 3       A.    No, ma'am.

 4             MR. AUMANN:  Objection to form.

 5             THE WITNESS:  You have to take salary into

 6   consideration and that's outside the scope of my duties.

 7   BY MS. MAPLES:

 8       Q.    Well, I mean, let's say we've got -- well,

 9   how much do you make?

10       A.    How much do I make?

11       Q.    Yeah.

12             MR. AUMANN:  Objection to form.

13             THE WITNESS:  You want my annual or my

14   hourly?

15             MS. MAPLES:  Annual.

16             THE WITNESS:  $53,200, I believe.  Not a lot.

17   BY MS. MAPLES:

18       Q.    Do you think it's cheaper for CoreCivic to

19   pay overtime than to hire people to fill vacant

20   positions?

21             MR. AUMANN:  Objection to form.

22             MR. WELBORN:  Object to the form.

23             THE WITNESS:  Do I think it's cheaper?

24             MS. MAPLES:  Yes.

25             THE WITNESS:  I'm going to say no, in my

1    opinion.  I don't think paying overtime would be

2    cheaper, no.

3    BY MS. MAPLES:

4         Q.    What is that based on, because you just said

5    you didn't know anything about salary?

6         A.    Well, you wanted my opinion.

7         Q.    Okay, well, what is it based on?

8         A.    That's just my opinion.  I'm sorry?

9         Q.    What is it based on?

10        A.    Well, if you look at working somebody

11   overtime to fill a vacant position, then you're not

12   meeting the contractual obligation set forth by the

13   contract.  So I think, in my opinion, any time that you

14   are not showing compliance with your customer, that is

15   more costly.  So I don't think that you would be coming

16   out ahead by paying overtime because you are not

17   compliant with your customer's expectation.  Just my

18   opinion.

19        Q.    And there's the liquidated damages?

20        A.    Yes.

21             MS. MAPLES:  I am going to put another

22   document on the screen.  And I am also going to drop

23   that into the chat feature.

24             (Exhibit 6 was marked.)

25   BY MS. MAPLES:

Page 103

1          Q.      Mr. Byrd, do you see that in front of you is

2      a document with the Bates stamp -- excuse me, strike

3      that.  Mr. Walton, do you see that in front of you is a

4      document with the Bates stamp TDOC 003537?

5          A.      Yes.

6          Q.      And it's dated August 3rd of 2020 with the

7      subject TTCC compliance audit final summary.  Do you see

8      that?

9          A.      Yes.

10          Q.      Now, I see that you didn't author this

11      document; is that right?

12          A.      Correct.

13          Q.      Are you familiar with compliance audits at

14      Trousdale?

15          A.      Yes.

16          Q.      And in what way are you familiar with them?

17          A.      A lot of the audit items bleed over into what

18      we monitor on a quarterly and a biannual period.  I'm

19      also familiar from having tenure with the department of

20      corrections to know what their expectations are.

21          Q.      Okay.  And are you familiar with this

22      particular compliance audit that is going to be an

23      exhibit to your deposition?

24          A.      No, ma'am.  I'm not.

25          Q.      Is it your understanding that Trousdale has

1    been meeting TDOC's expectations as they are monitored

2    in these compliance audits?

3              MR. AUMANN:  Objection to form.

4              THE WITNESS:  I'd have to defer back to the

5    NCR reports.  Other than what is documented in the NCR

6    reports, I would say that they are meeting the

7    expectation of the department.

8    BY MS. MAPLES:

9         Q.    Other than the noncompliance report?

10        A.    Correct, that's what I -- yeah.  I thought I

11   had said that.  Other than what's documented in the

12   noncompliance reports, I would say that CoreCivic is

13   meeting the expectations of the department.

14        Q.    Well, I mean, that sounds a little bit

15   circular.  I guess what I'm trying to figure out is what

16   is your understanding of whether CoreCivic is meeting

17   TDOC's expectations at Trousdale in the aggregate, not

18   on an itemized list?

19             MR. AUMANN:  Objection to form.

20             MR. WELBORN:  Object to the form.

21             THE WITNESS:  I'm going to say that's

22   probably not my position to speak on behalf of the

23   department.  You know, my position at this facility is

24   to document any noncompliance findings.  It's obvious

25   that there are some areas that need improvement based on

1    the noncompliance reports that we've reviewed.  And

2    that's all that I feel that I've got the authority to

3    speak on.

4    BY MS. MAPLES:

5        Q.    Well, so you're not here to speak on what you

6    think is within your authority, you are here to speak on

7    what you have knowledge of.  So I guess what I'm asking

8    is do you have any knowledge of what the department's

9    position is?

10       A.    No, I don't.

11       Q.    Who is John Fisher?

12       A.    He is the correctional administrator.

13       Q.    What does he do?

14       A.    He oversees all of the CoreCivic facilities

15   from an operations side of the house.

16       Q.    We've used that term a number of times,

17   operations.  What does that mean in the corrections

18   context?

19       A.    Operations is the physical day-to-day

20   activity of each facility.  So if we're looking at the

21   operations, we're looking at everything from how things

22   are done to implementation.  I guess in layman's terms

23   it would just be day-to-day activity.

24       Q.    Would the contract monitor of operations

25   spend more time walking around the facility and

1    interacting with inmates than you do as contract monitor

2    of compliance?

3         A.    Routinely, I would say yes.

4         Q.    You mentioned that these audits sometimes

5    spill over into areas that you cover in your

6    noncompliance report, right?

7         A.    Yes, ma'am.

8         Q.    Is one of those areas the grievance process?

9         A.    Yes, ma'am.

10        Q.    And do you see if we keep scrolling here,

11   that this compliance audit indicated a problem with

12   grievances?

13        A.    Yes.

14        Q.    And do you see underneath Item 5 concerning

15   grievances in this document, there is a corrective

16   action plan?

17        A.    Yes, ma'am.

18        Q.    Can you describe in a little bit more detail

19   what your role is concerning corrective action plans of

20   the facility?

21        A.    My role in corrective action plan is to

22   document and review.

23        Q.    So you don't suggest any particular course of

24   action?

25        A.    No, not in the corrective action plan.

Page 107

```
 1        Q.    You don't conduct meetings with the relevant
 2   CoreCivic staff to check in and see how those corrective
 3   action plans are proceeding?
 4        A.    No, ma'am, I do not.
 5        Q.    Is that something that you would be permitted
 6   to do if you chose to do it?
 7        A.    Probably not.
 8        Q.    Why not?
 9        A.    My position at the facility is to identify
10   and document the error, not correct the error on behalf
11   of the contractor.
12        Q.    Why not?  Is that in your job description
13   that you can't do anything else?
14        A.    No, ma'am, it's not.  It's just not in my job
15   description to do it.  You know, ultimately -- and I may
16   be speaking out of turn and I apologize.  You know, the
17   Tennessee Department of Corrections has contracted with
18   a company to provide a service.  The expectation is that
19   they will provide that service.  If I do anything that
20   interferes with that action, then I could be held
21   liable.
22             MS. MAPLES:  I'm going to put another
23   document on your screen.  Mr. Walton, again, this is a
24   collective exhibit which I'll represent to you contains
25   three different quarterly audits of some kind.
```

Page 108

1              (Exhibit 7 was marked.)

2   BY MS. MAPLES:

3       Q.    I am going to let you describe what kind

4   we're talking about.  Do you see that the first document

5   is Bates stamped TDOC 003709?

6       A.    Yes, ma'am.

7       Q.    What is this document that we're looking at?

8       A.    That is a noncompliance report of formal

9   findings on behalf of the clinical services audit.

10       Q.    Okay, explain what a clinic services audit

11   is.

12       A.    A group of clinicians will come on site and

13   they will do, within a specified amount of time, to

14   review the facility on their clinical standards and

15   outcomes what I would do on a day-to-day basis.  But the

16   only thing that they look at are inmate health charts

17   and documents that surround the clinical services

18   provided at the facility.

19       Q.    So this is dated February 12th of 2020 and it

20   seems to be covering the third quarter of 2019; is that

21   right?

22       A.    Yes, ma'am.

23       Q.    So this is the first one that you were a part

24   of or involved in after you arrived at Trousdale?

25       A.    Yes, ma'am.

Page 109

```
 1          Q.    And this is a noncompliance report, so is it

 2    fair to say Trousdale was found to be noncompliant

 3    concerning its clinical services?

 4          A.    Yes, ma'am.

 5                MR. AUMANN:  Objection to form.

 6                MR. WELBORN:  Same objection.

 7    BY MS. MAPLES:

 8          Q.    Are some of the noncompliance items within

 9    this audit report for the third quarter of 2019

10    essential items?

11          A.    I would have to review the NCR to identify

12    that.

13          Q.    Okay, well, let's scroll down.  Do you see

14    that noncompliance Item 1 is Behavioral Health Item 6

15    and it's noted as essential?

16          A.    Yes, ma'am.

17          Q.    Do you see that Noncompliant Item 2 is

18    Behavioral Health Item 7 and it's also indicated as

19    essential?

20          A.    Yes, ma'am.

21          Q.    And do you see that Noncompliant Item 3 is

22    also -- or it's Behavioral Health Item 8 and is also

23    listed as essential?

24          A.    Yes, ma'am.

25          Q.    Let's scroll down to the page Bates stamped
```

1    TDOC 003793, which is dated October 22nd, 2020.  Do you

2    see this?

3         A.    Yes.

4         Q.    Does this cover the first quarter of 2020?

5         A.    Yes.

6         Q.    And so this is the second time period -- or

7    is this the third time period -- excuse me, third time

8    period you're monitoring as contract monitor?

9         A.    At the time of this NCR, is that the

10   question?

11        Q.    Yes.

12        A.    I think it would be the second.

13        Q.    Okay, so there wasn't a fourth quarter of

14   2019 done?

15        A.    Not that we reviewed at this point that I

16   recall having seen.

17        Q.    So this is the second one, then?

18        A.    Yeah.

19        Q.    And again, is it fair to say that CoreCivic

20   was noncompliant?

21              MR. AUMANN:  Objection to form.

22              THE WITNESS:  Yes.

23   BY MS. MAPLES:

24        Q.    And if we scroll down, is it fair to say that

25   CoreCivic was noncompliant on clinical services

 1    considered essential?

 2         A.    I'm sorry, you broke up.

 3         Q.    If we look at Noncompliance Item 1 covering

 4    Behavioral Health Item 7, do you see that it's

 5    designated as essential?

 6         A.    Yes.

 7         Q.    And do you see the same thing is true of

 8    Noncompliant Item 2 covering Behavioral Health Item No.

 9    9?

10         A.    Yes.

11         Q.    Do you see that Noncompliant Item 3

12    concerning Behavioral Health Item 12 is also considered

13    essential?

14         A.    Yes.

15         Q.    Do you see that the next document in this

16    collective exhibit has a Bates stamp at the top listed

17    as TDOC 003825?

18         A.    Yes.

19         Q.    Do you see that it's dated February 2nd of

20    2021?

21         A.    Yes.

22         Q.    And if we look at audit scope, it seems to

23    cover the second and third quarters of 2020; is that

24    right?

25         A.    Yes.

```
 1        Q.    And this is the third noncompliance audit

 2   you've handled concerning clinic services?

 3              MR. AUMANN:  Objection to form.

 4              THE WITNESS:  Yes.

 5   BY MS. MAPLES:

 6        Q.    And again, CoreCivic is noncompliant?

 7              MR. AUMANN:  Same objection, form.

 8              THE WITNESS:  Yes.

 9   BY MS. MAPLES:

10        Q.    And if we go down to Compliance No. 1

11   covering Behavioral Health Item 7, that's an essential

12   item?

13        A.    Yes.

14        Q.    And noncompliance Item 2, Behavioral Health

15   Item No. 8 is also essential and noncompliant?

16        A.    Yes.

17        Q.    Are these the only three clinical services

18   noncompliant reports you have been a part of since

19   November of 2019?

20        A.    To my knowledge.

21        Q.    Is it fair to say that for the entire period

22   that you've been at Trousdale, CoreCivic has not been in

23   compliance with its clinical services requirement?

24              MR. AUMANN:  Objection to form.

25              MR. WELBORN:  Same objection.
```

1              THE WITNESS:  I really can't say.  There are

2    some areas where they are noncompliant, but to say that

3    they're noncompliant as a department, I can't agree to

4    that.

5    BY MS. MAPLES:

6        Q.    Well, Mr. Walton, you testified that the

7    definition of an essential requirement is that you have

8    to be either 100 percent compliant or you're not

9    compliant, right?

10       A.    For an essential finding.  So if we look at

11   that on a item-by-item basis, Item 8, yeah, they failed

12   that Item 8 standard, but that doesn't mean they failed

13   every standard there was.

14       Q.    Okay, well, is it fair to say that for the

15   entire time you've been an employee with an office

16   located at Trousdale, CoreCivic has failed multiple

17   essential requirements concerning clinical services?

18       A.    That would be fair, yes.

19             MS. MAPLES:  I'm going to put another

20   document in the chat as well.

21             (Exhibit 8 was marked.)

22   BY MS. MAPLES:

23       Q.    Mr. Walton, I will represent to you that this

24   is another collection of similar reports beginning with

25   the Bates stamp TDOC 002260.  Do you see that?

Page 114

```
 1        A.     I do.

 2        Q.     Do you see that the first report here is

 3   dated December 31st of 2019?

 4        A.     Yes.

 5        Q.     And what is this document?

 6        A.     It's a noncompliance report for failure to

 7   meet the records and report standard.

 8        Q.     Now, what does it mean by records and report?

 9        A.     Records and report is a monitoring instrument

10   that the contract monitor utilizes to determine whether

11   or not the contractor is compliant based on the

12   standards set forth in the instrument.

13        Q.     And how often do you evaluate CoreCivic using

14   the records and reports monitoring instrument?

15        A.     Biannually.

16        Q.     And is this first report here dated December

17   31st, 2019, the first one you handled at CoreCivic?

18        A.     Yes.

19        Q.     And do you see that Noncompliant Item 1 is

20   Records and Reports Item 9?

21        A.     Yes.

22        Q.     Do you see that, again, CoreCivic has not

23   submitted complete and accurate reports?

24               MR. AUMANN:  Objection to form.

25               MR. WELBORN:  Same objection.
```

 1                    THE WITNESS:  Yes.

 2     BY MS. MAPLES:

 3          Q.    Do you see that there is a second

 4     noncompliant item, Records and Reports Item 5?

 5          A.    Yes.

 6          Q.    And does this state that CoreCivic has not

 7     provided monthly staffing reports as required again?

 8                    MR. WELBORN:  Object to the form.

 9                    MR. AUMANN:  Same objection.

10                    THE WITNESS:  At the time of this report,

11     this noncompliance report documented that the staffing

12     reports received were not accurate.  It was not that

13     they had not provided a staffing report, but they had

14     not provided accurate staffing reports.

15     BY MS. MAPLES:

16          Q.    Okay, so they submitted something, it just

17     was wrong?

18          A.    Yes, ma'am, and that --

19                    MR. AUMANN:  Objection to form.

20     BY MS. MAPLES:

21          Q.    Go ahead.

22          A.    And that's what the bullets detail below.

23          Q.    Do you see the next document with the Bates

24     stamp TDOC 001405 is dated February 13th of 2020?

25          A.    Yes.

Page 116

```
 1        Q.    Do you see that it covers the audit period

 2   from January through March of 2020?

 3        A.    Yes.

 4        Q.    Do you see that, again, there are

 5   noncompliance items concerning records and reports?

 6        A.    Yes.

 7        Q.    We can continue going through all of these,

 8   but is it fair to say that during every biannual review

 9   you conducted, CoreCivic has in some way had some

10   noncompliance concerning records and reports?

11        A.    I'm going to say no.

12        Q.    No.  Which time period were they not?

13        A.    What time period are we talking about?

14        Q.    The time period you've been at CoreCivic --

15   or excuse me, the time period you've been at Trousdale.

16   Mr. Walton, are you still with me?

17        A.    I am.  I'm going -- I'm looking.

18        Q.    Okay, what are you checking?

19        A.    The noncompliance that were issued to

20   CoreCivic.  There were noncompliances issued on 10 -- go

21   ahead.

22        Q.    Well, I mean, when you say you're looking at

23   it, do you have that in some kind of spreadsheet on your

24   computer?

25        A.    I don't.  I've got the e-mail saved where we
```

```
 1    send the noncompliance reports to the contractor.

 2         Q.    You've got those all saved on your computer

 3    and you're looking at them now?

 4         A.    Yes, ma'am.

 5               MS. MAPLES:  Can we make those a late-filed

 6    exhibit to the deposition if you could get those to us?

 7               THE WITNESS:  Okay.

 8               (Exhibit 9 was marked late-filed.)

 9               (Off-the-record discussion.)

10    BY MS. MAPLES:

11         Q.    Okay, Mr. Walton --

12         A.    It appears I was wrong.  That has been a

13    finding every quarter.  The records and reports has had

14    a finding every quarter.

15         Q.    And when you say a finding, you mean a

16    finding of noncompliance concerning records and reports?

17         A.    Yes.

18               MS. MAPLES:  Okay, that's all.

19               MR. WELBORN:  12:30?

20               MS. MAPLES:  12:30.

21               (Luncheon recess observed.)

22    BY MS. MAPLES:

23         Q.    Mr. Walton, I'm going to put another document

24    on your screen.

25         A.    Okay.
```

Page 118

```
 1        Q.    Do you see that this is a TDOC policy given
 2   the No. 205.03?
 3              MR. AUMANN:  Janna, you've got like a screen
 4   of your files.
 5              MS. MAPLES:  Okay.  Well, then, give me just
 6   a second.
 7   BY MS. MAPLES:
 8        Q.    Mr. Walton, do I have the right thing now?
 9        A.    You do, yes.
10        Q.    Okay, so do you see in front of you a TDOC
11   policy with the No. 205.03?
12        A.    Yes, ma'am.
13        Q.    And do you see that the subject of the policy
14   is contract monitoring of privately managed facilities?
15        A.    Yes, ma'am.
16        Q.    And what does this policy describe?
17        A.    It's a broad overview of what the contract
18   monitor's role is.
19        Q.    And if we look at section Roman numeral 4E,
20   it says:  Contract monitoring instrument; a document
21   used by designated TDOC and staff to measure, evaluate
22   and document contractor performance and compliance with
23   the terms of designated contracts.
24        A.    Yes.
25        Q.    And contract monitoring instrument, is that
```

Page 119

 1    what we've been looking at in your noncompliance report?

 2        A.    That's the end result.  The noncompliance

 3    report is the end result.  The instrument is what I was

 4    looking at on the wall to say what we review on a

 5    quarterly and a biannual basis.

 6        Q.    So every time something said monitoring

 7    instrument Staffing 9, that's what they're referring to,

 8    a contract monitoring instrument as defined in Roman

 9    numeral 4E?

10        A.    Correct.

11        Q.    And 4F states:  Essential instrument items.

12    Actions or responsibilities of contractors indicated on

13    the contract monitoring instruments that have been

14    determined to require 100 percent compliance.  Do you

15    see that?

16        A.    Yes.

17        Q.    And is that referring to the certain

18    essential items we've been discussing throughout your

19    deposition, like contract monitoring instrument Staffing

20    2B or Staffing 9?

21        A.    Yes.

22        Q.    Do you see Section 4J describes summary of

23    noncompliance report slash liquidated damage events, in

24    parenthesis SNR?

25        A.    Yes, ma'am.

1      Q.      What are those?

2      A.      Which part?

3      Q.      Well, what is a summary of noncompliance?

4      A.      So the summary of noncompliance is a

5   spreadsheet pulled that the contract monitor maintains.

6   And it's basically a tracking method on those

7   noncompliance reports where you saw that the finding was

8   a repeat finding.  We track those by using the SNR so

9   that we can document those on the NCR to say when that

10   finding occurred.

11           So the SNR is a tool utilized by our central

12   office team on the compliance side of the house so that

13   they can review what is going on at the facility in a

14   paraphrase narrative instead of having to look at each

15   individual noncompliance report, the NCRs, as we have

16   been doing.  The liquidated damage event is separate of

17   the SNR in that the liquidated damage event is, from

18   where I sit, only pertains to staffing.

19      Q.      So is it fair to say that the summary of

20   noncompliance reports are going to contain some

21   information that will eventually make it into a

22   noncompliance report, but haven't yet because you

23   haven't reached the end of the quarter or the end of the

24   biannual review period?

25      A.      Pretty much the opposite.  If it makes its

1    way onto an NCR, it goes on the SNR report.  So when it

2    becomes an official finding, it will go on that summary

3    of noncompliance report.

4         Q.    Okay.  What about Section 4K, which is titled

5    weekly report of daily activities.  Reports prepared by

6    the monitors detailing their weekly slash daily

7    monitoring activities.  Do you prepare those?

8         A.    Yes.

9         Q.    Who are they submitted to?

10        A.    The contract monitoring director and the

11   correctional administrator.

12        Q.    Is that John Fisher and Carolyn Jordan?

13        A.    Correct.  And that will document like an

14   overview of our week, what we did.  And when I say we,

15   I'm speaking to the contract monitor of compliance and

16   the contract monitor of operations.

17        Q.    Do you ever receive feedback about what

18   you're doing or suggestions for what you might do

19   instead?

20        A.    I do during my interim review process.  I

21   don't on like a daily basis, if that's what you're

22   asking.

23        Q.    How have your interim reviews gone?  Have you

24   gotten good reviews or bad reviews?

25        A.    I've gotten good reviews.  I hope that

Page 122

 1   continues after this call.

 2       Q.    Congratulations.

 3       A.    Thank you.

 4       Q.    Do you see on Page 6, there is a letter F

 5   titled breach of contract process?

 6       A.    Yes, ma'am.

 7       Q.    Have you ever been involved in the breach of

 8   contract process?

 9       A.    No, ma'am.

10       Q.    Has Trousdale ever been in breach of

11   contract?

12             MR. AUMANN:  Objection to form.

13             MR. WELBORN:  Same objection.

14             THE WITNESS:  The only way that I've known

15   the facility to be in breach of contract is when they do

16   not meet their essential monitoring line items that's

17   documented in the noncompliance reports.  Anything

18   beyond that, I really don't have any idea.

19             MS. MAPLES:  Can we mark this as Exhibit 10?

20             (Exhibit 10 was marked.)

21             MS. MAPLES:  I'm going to show you another

22   document.  And I'm going to put it on the chat.

23             (Exhibit 11 was marked.)

24   BY MS. MAPLES:

25       Q.    Do you see the document that is going to be

Page 123

1    Exhibit 11 to your deposition?

2        A.    The comptroller's audit report?

3        Q.    Yes.

4        A.    Yes.

5        Q.    Have you seen this document before?

6        A.    I have not.

7        Q.    You have never reviewed the January 2020

8    comptroller's performance audit report?

9        A.    No, ma'am.

10       Q.    Why not?

11       A.    I did not know it existed.

12       Q.    So you've never heard anyone discussing it?

13       A.    No, ma'am.

14       Q.    You have never worked with CoreCivic to try

15   to remedy issues that might be explored in the audit

16   report?

17       A.    No, ma'am.

18             MR. AUMANN:  Objection to form.

19   BY MS. MAPLES:

20       Q.    Is it fair to say you've never discussed the

21   report with your supervisors at TDOC?

22       A.    That would be correct.

23       Q.    Do you think that the performance audit

24   report dated just three months after you arrived at the

25   facility might be useful to you in performing your job

1    function?

2              MR. AUMANN:  Objection to form.

3              MR. WELBORN:  Object to the form.

4              THE WITNESS:  No, ma'am.

5    BY MS. MAPLES:

6        Q.    Why not?

7        A.    I believe the information contained in that

8    report could have been informational at best, but I do

9    not work for the Tennessee comptroller's office.  My

10   scope of responsibility is clearly defined through my

11   monitoring instruments.  They look at a lot of different

12   things that the contract monitor does not.  So they

13   really get more detailed in a lot of different areas

14   where the contract monitor, that's not our role,

15   responsibility.

16       Q.    Well, how do you know if you've never seen it

17   and didn't know it existed?

18       A.    I do know what the comptroller looks for.  I

19   don't know -- I don't review their reports.

20       Q.    So did you know that the Tennessee

21   comptroller of treasury performed an audit of TDOC

22   facilities, including those managed by CoreCivic?

23       A.    Did I know that they did do those, yes.  Did

24   I know when they did those, no.

25       Q.    So you have an understanding of the fact that

Page 125

```
 1    these audits occurred and you have an understanding of

 2    what they looked for, but you don't think any of that

 3    information would be useful to you in performing your

 4    job as a contract monitor of compliance; is that right?

 5        A.    Correct.

 6              MR. AUMANN:  Objection to form.

 7              MR. WELBORN:  Same objection.

 8    BY MS. MAPLES:

 9        Q.    And no one at TDOC ever suggested that you

10    should read it?

11        A.    No one at TDOC has ever presented this to me

12    for that suggestion.

13              MS. MAPLES:  Okay, I think that's about all I

14    have.  Let me check and see if there's anything else.

15    BY MS. MAPLES:

16        Q.    Is Warden Byrd back at the facility today?

17        A.    No, ma'am.

18        Q.    Is he going to return before his reassignment

19    takes place; do you know?

20        A.    I don't, no.

21        Q.    Do you have an opinion as to Warden Byrd's

22    job performance?

23        A.    I do not, no.

24              MS. MAPLES:  Okay, that's all I have.  Thank

25    you, Mr. Walton.
```

```
 1                    MR. WELBORN:  I've got some questions.

 2    EXAMINATION BY MR. WELBORN:

 3         Q.    Mr. Walton, my name is Joe Welborn, I

 4    represent CoreCivic in this case, along with my partner,

 5    Erin Polly.  We spoke a little bit earlier during a

 6    break.  I want to get some background information on you

 7    if I can.

 8         A.    Sure.

 9         Q.    Tell me where you grew up.

10         A.    West Tennessee.

11         Q.    What part?

12         A.    A little town called Camden located in Benton

13    County.

14         Q.    That's where Patsy Cline met her demise, as I

15    recall.

16         A.    That is correct.

17         Q.    Are you married?

18         A.    I am, yes, sir.

19         Q.    How long have you been married?

20         A.    About nine years now.  I'm married to a

21    nurse.  I've got three children of my own and I've got a

22    stepdaughter.  I've got four grandchildren.  I'll have a

23    fifth one in July, be the first boy of the group.  I

24    started my career in corrections in 1997 as a

25    correctional officer.  I had a lot to learn at that
```

 1    time, as I still do.

 2         Q.    You look too young to have that many

 3    grandkids.  How old are you?

 4         A.    I appreciate that.  I'm sorry?

 5         Q.    How old are you?

 6         A.    I'm 43.

 7         Q.    Tell me about your education after high

 8    school.

 9         A.    I didn't have any after high school.  I

10    joined the military.  I spent six years with the

11    Tennessee Army National Guard.  I started with the

12    Tennessee Department of Corrections when I was 19.  It

13    wasn't until I was age 37, I believe it was when I went

14    back to school to get my undergrad.  And I got a

15    bachelor of science degree in organizational leadership

16    with a concentration in information technology from

17    Bethel University.

18         Q.    What age children do you have?

19         A.    I've got -- my baby is 20.  And then from

20    there it goes 20, 21, 23 and a 24-year-old stepdaughter.

21         Q.    And you said you have five grandchildren?  Or

22    four and one on the way?

23         A.    Yeah.

24         Q.    You started to tell me about this, about your

25    experience in corrections.  You started as a corrections

1    officers.  Kind of, if you can, go through what you did

2    in corrections and where you did it.

3         A.    Okay, from 1997 to 2003, I was a correctional

4    officer at the Turney Center Industrial Prison in Only,

5    Tennessee.  I left in 2003 and left state service.  Went

6    through a divorce at that same time.  And I went to work

7    for a company called U.T.I. Logistics where I was their

8    -- it was basically a shipping and receiving logistics

9    center.  And I was their -- when I left there, I was the

10   safety training and hiring manager.  So I wore a lot of

11   hats in that role.

12        Q.    Where did you go from there?

13        A.    So that was from '03 to '09.  In '09, I went

14   back to work for the state.  And I was at the Riverbend

15   Maximum Security Institution.

16        Q.    What did you do there?

17        A.    I was an officer.  Got promoted to front line

18   supervisor.  I was a corporal.  From that role, I became

19   field training officer.  I was an adjunct academy

20   instructor, where I was really involved with the

21   training curriculum and development for Tennessee

22   Department of Corrections.  And that was until 2014.

23        Q.    Did you get to know the inmates -- any of the

24   inmates at Riverbend?

25        A.    Absolutely.

1      Q.      Ever run across a guy named Ed Zagorski?

2      A.      I sure did.

3      Q.      I represent him years ago in a post-

4  conviction.

5      A.      Yes.  Mr. Zagorski was -- him and all of the

6  guys on death row.  I also served as a supervisor on the

7  death-row unit, so I knew him well.

8      Q.      And where did you go from Riverbend?

9      A.      I went to the private sector and went to work

10 for a company called Centuroin, which currently

11 provisions all of the medical care for the Tennessee

12 Department of Corrections.  So I kind of segued over

13 into the medical side of the house from the security

14 side.  And started off as a records manager, records

15 supervisor in 2014.  And I stayed with them all the way

16 up until 2019.  When I left, I was state-wide health

17 information manager.

18     Q.      Did you go back to work for TDOC after that?

19     A.      I did.

20     Q.      In this role as contract monitor?

21     A.      Yes, sir.

22     Q.      And you've been in that role, I think, since

23 November of 2019?

24     A.      That's correct.

25     Q.      Of the staff at Trousdale, who did you

```
 1   interact with the most?

 2        A.    The staff at Trousdale?

 3        Q.    Yes.  Or who do you interact with the most?

 4        A.    Contract monitor of operations would be the

 5   one that I interact the most with.

 6        Q.    How about the CoreCivic staff?

 7        A.    The quality manager.

 8        Q.    Who is that currently?

 9        A.    Kari Kaiser and Terry Carter.

10        Q.    And I think you mentioned this, you have

11   occasion to interact with the warden?

12        A.    Yes.

13        Q.    Both Warden Byrd now and previously Warden

14   Washburn?

15        A.    Correct.

16        Q.    What other staff do you interact with on a

17   regular basis?

18        A.    The associate wardens.  And the chief of --

19        Q.    Chief of security?

20        A.    Yes.

21        Q.    Can you describe for me your -- the type of

22   relationship, working relationship you have with them?

23        A.    I believe it to be very professional.  Our

24   encounters are for very specific needs.  It's usually

25   because of an issue that we've identified which could
```

1    either result in an area of noncompliance or already has

2    resulted in the area of noncompliance.

3         Q.    Are they responsive to your needs or

4    requests?

5         A.    They are.

6         Q.    Are they cooperative with you?

7         A.    They are.

8         Q.    Do you find them to be professional in how

9    they perform their jobs?

10        A.    I do.

11        Q.    You mentioned in your testimony earlier that

12   you interact with inmates at various times; is that

13   right?

14        A.    Yes.

15        Q.    Tell me about how that comes up.

16        A.    When it comes to my interactions with the

17   inmates?

18        Q.    Right.

19        A.    That generally occurs primarily through my

20   observations while on the property.  So when I'm going

21   through and I'm doing my daily walk-throughs and

22   inspections of the facility or I'm reviewing my

23   monitoring instruments, you know, all of that has to

24   occur on the compound where the inmates reside.  So

25   oftentimes while I'm doing my reviews, the inmates

 1    freely approach me, ask me questions, ask me if there is

 2    anything that I can do to assist them with their needs.

 3              And traditionally, what I try to do is direct

 4    them to the appropriate department lead.  If it's

 5    something that they say they, well, I've already gone

 6    that route and I've gotten no resolution to that, then I

 7    will take their information and then I'll follow up on

 8    it personally.  And that's either by way of e-mail or

 9    speaking to that department head in person.  And

10    typically, after that point, the matter gets resolved.

11        Q.    When you say -- sounds like you all are

12    getting some feedback from me, but hopefully you are

13    understanding my question.  When you say you walk the

14    compound, is the compound where the prisoners are

15    located -- or inmates are located?

16        A.    Yes, sir.

17        Q.    You said you do that on a daily basis?

18        A.    Yes, sir.

19        Q.    Is that more than -- is that multiple times a

20    day?

21        A.    It can be, yes.

22        Q.    When you do walk the compound, are you -- is

23    it just you or do you have anybody with you?

24        A.    Generally, it's just myself.

25        Q.    And you're, I guess I'll say about a year-

Page 133

1    and-a-half in at Trousdale in making your daily walks

2    around the compound.  Do you feel safe when you do that?

3         A.    I do.

4         Q.    Has there ever been a time in your

5    year-and-a-half there that you felt unsafe?

6         A.    No.

7         Q.    In making those rounds, walking the compound,

8    do you recall any instances where you ran across a post,

9    a critical post not being filled at the time?

10        A.    Not that I was aware of, no.

11        Q.    I want to ask you some general questions.

12   Because you were asked a lot of questions about

13   compliance, so I want to ask you some general questions

14   about that.  In the context of your job, when you talk

15   about compliance, that's simply compliance with the

16   contract, right?

17        A.    Correct.

18        Q.    And so if -- and just overall, I think you

19   were asked this question.  Other than what is contained

20   in your noncompliance reports that we've gone through,

21   to your knowledge, CoreCivic is in compliance with all

22   other provisions of the contract, correct?

23        A.    Can you repeat that question.

24        Q.    Yes.  Based on what you know and in your job,

25   other than what is contained in the noncompliance

1    reports that we've gone through or that you prepared

2    since you've been there, CoreCivic is in compliance with

3    the contract?

4         A.    That is correct, yes.

5         Q.    Let's get into the, just the noncompliance

6    reports themselves.  As I understand it, on the

7    essential items in the contract, if -- those require a

8    hundred percent compliance, correct?

9         A.    Yes, sir.

10        Q.    So if CoreCivic is 99 percent compliant with

11   whatever that requirement is, they're still not

12   compliant with the contract if it's an essential item?

13        A.    That's correct.

14        Q.    So even in the ones that we went through, I

15   mean CoreCivic could be 80 percent compliant, 90 percent

16   compliant or whatever percentage, if it's an essential

17   item, the contract, simply the contract requires a

18   hundred percent compliance, correct?

19        A.    Correct.

20        Q.    Other items that aren't essential, they may

21   not have to be.  They're not out of compliance simply

22   because there's some noncompliance; is that accurate?

23        A.    Yes, uh-huh.

24        Q.    Let's talk about staffing a little bit.  A

25   staffing -- under this contract, a staffing requirement

Page 135

```
 1    is different from a post being vacant; is that accurate?

 2         A.    Yes.

 3         Q.    At a particular time; is that accurate?

 4         A.    Yes.

 5         Q.    Okay.  So staffing has to do with a staffing

 6    requirement in the contract that you have these

 7    positions, they need to be filled and if you don't have

 8    those filled you're out of compliance, right?

 9         A.    True.

10         Q.    Now, you've worked at three different, I

11    think, prisons.  The Turney Center in Only, right?

12         A.    Yes.

13         Q.    Riverbend Maximum Security Facility, right?

14         A.    Yes.

15         Q.    And at Trousdale?

16         A.    Correct.

17         Q.    Based on your experience, is staffing,

18    maintaining a full-time staff a challenge in prisons?

19         A.    Make sure I understood.  Your question is, is

20    maintaining staffing a challenge at all prisons; is that

21    what you're asking?

22         Q.    Based on your experience?

23         A.    Yes.

24         Q.    Did you have, for example, at the Turney

25    Center in Only -- I know that's in a rural area of West
```

1    Tennessee.  Did you have problems with maintaining a

2    full staff?

3         A.    Yes.

4         Q.    Did you have -- in order to compensate for

5    that, did you have to have officers and other employees

6    and staff work overtime?

7         A.    Yes.

8         Q.    Was that common?

9         A.    Yes.

10        Q.    When people didn't -- this doesn't relate to

11   staffing necessarily, it relates to posts being filled

12   during a shift or during a day.  At that facility at the

13   Turney Center, did you have staff at times not show up?

14        A.    Yes.

15        Q.    Did you have staff at times get sick?

16        A.    Yes.

17        Q.    Did you have staff at times get called out on

18   emergencies?

19        A.    Yes.

20        Q.    I mean, essentially, did life happen in some

21   form or fashion that caused you to be short on staff?

22        A.    Yes.

23        Q.    And what do you do in those instances to help

24   that, have work overtime?  Is that one thing you do?

25        A.    You improvise and overcome.  You try to get

1   as many people to work overtime as possible.  You begin

2   to close your non-critical posts in order to back fill

3   your critical vacancies.  And traditionally, that's the

4   best way to get the goal accomplished.

5        Q.    Even at the Turney Center, would there be

6   times where you would call in temporary staff from other

7   facilities in the state?

8        A.    No.

9        Q.    Didn't do that at the Turney Center?

10       A.    No.  Not during the time that I was there,

11  no.

12       Q.    But in any event, if you had critical posts

13  or posts that you couldn't fill during the day for

14  whatever reason, as you said, you would improvise and

15  overcome that and make sure that the facility was safe?

16       A.    Correct.

17       Q.    Did the same thing happen along this same

18  line of questions at Riverbend?

19       A.    More so.

20       Q.    So you had staffing, in other words,

21  fulfilling positions there, that was a challenge?

22       A.    Yes.

23       Q.    And you had that staff that either, for

24  whatever happens in life, illness, emergency, they just

25  decide they don't want to work there anymore, not show

1   up?

2        A.    Yes.

3        Q.    And you guys would have to, there, improvise

4   and figure out how to make it work?

5        A.    Correct.

6        Q.    Did you find that the staff at the Trousdale

7   facility did the same thing?

8        A.    Yes.

9        Q.    Kind of describe what you observed in that

10  regard.

11       A.    Trousdale consistently utilizes their staff

12  in overtime positions to try to backfill the vacancies

13  that they have.  You know, throughout the day, what they

14  will do is rotate -- on a housing unit, they'll rotate

15  what pods that they will consider closed.  If you've got

16  three pods, if alpha pod was closed yesterday because of

17  staffing shortage and just say, for example, you still

18  have a staffing shortage today, we'll pull the bravo pod

19  officer instead of having a pod closed back to back day

20  after day.

21            So what I've seen them do is they try to

22  fairly compensate where they are limiting services

23  within a housing area in order to continue operation of

24  the facility.  They do utilize overtime.  They do offer

25  bonuses to their staff for working their days off.  And

1    that seems to be the two largest areas that I've

2    witnessed.

3         Q.    When you say they close a pod, what do you

4    mean by that?

5         A.    They just pull the officers from that post

6    instead of -- if you've got three officers assigned to a

7    housing unit and you're short somewhere else on a

8    compound, they'll pull from A-pod.  They'll pull the

9    officer from A-pod.  And when that happens, the B and

10   the C-pod officers have to compensate for what needs to

11   carry on in the pod that's carrying a vacancy.

12        Q.    Based on your observations of that, what you

13   just described occurring, have they been able to

14   maintain safety and security of the facility in doing

15   that?

16        A.    In my opinion, yes.

17        Q.    Are you familiar with efforts that CoreCivic

18   has made to try to fill all of the staffing positions at

19   Trousdale?

20        A.    I'm not sure I understand the question.

21   Could you repeat that.

22        Q.    I think I saw it somewhere in one of your --

23   in the corrective action measures in your reports.  But

24   I don't want to go back through all of those documents

25   because that technology gets beyond me.  But my question

1    is, are you familiar with some of the efforts that have

2    been made by CoreCivic and the staff out there to hire

3    corrections officers and other staff at the facility?

4         A.    I am.

5         Q.    Describe some of those efforts.

6         A.    I've seen television campaign ads.  I've

7    heard radio ads.  And they have signage posted

8    throughout the administration area of referral bonuses

9    that they offer.

10        Q.    So would it be fair to say that they, based

11   on your observations, that they put forth pretty strong

12   efforts to hire staff out there?

13        A.    They do.

14        Q.    Would it be fair to say that they want to

15   have a full-time -- a full staff?

16        A.    I'm sorry?

17        Q.    Would it be fair to say, based your

18   observations of the efforts made at Trousdale, that they

19   want to have a full staff?

20        A.    Yes.

21        Q.    Do they face the same challenges that you

22   faced in terms of having a full staff at Riverbend and

23   the Turney Center?

24        A.    Yes.

25        Q.    Is it -- in your view, based on your

1    experience, is it any different, the challenges they

2    face on a day-to-day basis in terms of staffing, in

3    terms of people for whatever reason not showing up to

4    work or being called out on an emergency, do they face

5    the same challenges that you faced at Riverbend and the

6    Turney Center?

7        A.    They do.

8              MR. WELBORN:  Let me take a quick break here

9    and I'll be right back to you.

10             THE WITNESS:  Okay.

11             (Recess observed.)

12             MR. WELBORN:  Thank you, Mr. Walton.  I have

13   no further questions.

14             THE WITNESS:  Thank you.

15             MR. AUMANN:  We don't have any questions.

16             MS. MAPLES:  I'm done.  Thank you, Mr.

17   Walton.

18             THE WITNESS:  Thank you all.

19             FURTHER DEPONENT SAITH NOT.

20

21

22

23

24

25

1                        CERTIFICATE

2

    STATE OF TENNESSEE        )
3                             )    SS.
    COUNTY OF DAVIDSON         )
4

5            I, CAROLE K. BRIGGS, Licensed Court Reporter

6    within and for the State of Tennessee, do hereby certify

7    that the above deposition was reported by me and that

8    the foregoing pages of the transcript is a true and

9    accurate record to the best of my knowledge, skills, and

10   ability.

11           I further certify that I am not a relative,

12   counsel or attorney of either party nor employed by any

13   of the parties in this case or otherwise interested in

14   the event of this action.

15           IN WITNESS WHEREOF, I have hereunto affixed my

16   official hand on this 23rd day of April 2021.

17   _____

18   CAROLE K. BRIGGS

19   Shorthand Reporter

20   Tennessee License No. 345

21

22

23

24

25

## Exhibits

**Exhibit 2** 23:17,18 25:20
**Exhibit 3** 50:22,23,25
**Exhibit 4** 52:22 53:2 59:7
**Exhibit 5** 73:5,12
**Exhibit 6** 102:24
**Exhibit 7** 108:1
**Exhibit 8** 113:21
**Exhibit 10** 122:19,20
**Exhibit 11** 122:23 123:1

## $

**$179,705.77** 99:23
**$180,000** 99:25 100:14,16,22
**$53,200** 101:16

## 0

**000933** 53:6
**000936** 55:4 59:7
**000953** 66:19
**000957** 60:9
**000960** 64:17
**000961** 62:8
**001018** 53:10 54:4
**001372** 26:12 29:3 30:23
**001405** 115:24
**001432** 85:18
**001441** 87:4
**001696** 29:23
**001760** 93:13
**001769** 94:16
**001775** 96:6
**001789** 100:7
**001792** 99:21
**001794** 89:8

**002260** 113:25
**002281** 83:15
**002288** 85:10
**002291** 73:16
**002298** 80:14
**002373** 30:10
**003537** 103:4
**003709** 108:5
**003793** 110:1
**003825** 111:17
**03** 128:13
**09** 128:13

## 1

**1** 13:18,19 38:24 39:2,3,4,6,14
41:1,13,14 44:18 74:12,14,16
93:15,19 109:14 111:3 112:10
114:19
**10** 39:23 50:13 116:20 122:19,20
**100** 113:8 119:14
**1018** 53:16
**10th** 36:11
**11** 122:23 123:1
**118** 100:10,15,16,21
**12** 111:12
**12:30** 98:21,25 117:19,20
**12th** 108:19
**13th** 115:24
**14** 83:22
**140** 7:7
**15th** 78:11
**16** 7:15 87:10
**16th** 32:4 40:20 78:12
**1789** 97:1,2
**17th** 25:5 32:2
**18** 24:5 29:9
**18-page** 29:11,12
**180** 96:21

**18th** 40:21
**19** 87:10 127:12
**1997** 126:24 128:3
**1st** 30:10,14 44:15 49:16 74:8
90:4 91:15

## 2

**2** 23:17,18 25:20 38:21 46:4 60:11
78:5 84:1 85:24 88:10 92:12
94:17 97:3 100:7 109:17 111:8
112:14
**20** 15:24 16:5,10,20 31:1,20 39:23
45:1 48:13,21 66:18 127:19,20
**2003** 128:3,5
**2014** 128:22 129:15
**2015** 89:8
**2017** 27:7,9
**2018** 25:6 32:2
**2019** 7:17 22:11 25:14 26:6,19
27:11,16 32:3,4,5 33:11,16,19
35:9 36:11 40:20,21,22 41:20
57:8 73:24 74:8,9,24 77:25 79:19
80:8,15 83:17 84:21 85:4,12,19
95:9 108:20 109:9 110:14 112:19
114:3,17 129:16,23
**2020** 26:13 29:4 30:1,4,14,22
33:3 39:10 40:22 44:7 45:13
49:15 87:4,5,9 88:24 89:9,12,14
90:4 91:15,16,21 92:11 93:11,12
95:3,10 96:9,13 99:9,21 100:1
103:6 108:19 110:1,4 111:23
115:24 116:2 123:7
**2021** 6:3 30:10 44:15 49:16
111:20
**205.03** 118:2,11
**20th** 95:6
**21** 127:20
**22nd** 110:1
**23** 127:20
**24** 60:8,9 75:1
**24-year-old** 127:20
**25** 94:6
**2592** 71:9

**25th** 33:16,19 89:8 91:16 93:12

**26th** 87:4

**27** 64:16

**28** 62:7,21

**29th** 33:11 35:9

**2B** 74:17,22 75:11 78:6 79:4
83:20 85:22 87:5 89:11 92:11
93:4,16,19 95:14 96:11 98:5
119:20

**2nd** 111:19

---

**3**

**3** 41:22 42:10 46:8 50:23,25 54:16
55:3 79:13 84:8 86:18 88:21
92:18 95:1 109:21 111:11

**30** 63:21

**30-day** 34:1

**30th** 72:14 84:21

**31st** 25:13 26:6,13 29:3 30:14,22
32:3,5 33:3 40:20,21,22 49:15
73:24 74:9 83:17 114:3,17

**34** 86:11

**36** 86:12

**37** 127:13

**3rd** 40:22 103:6

---

**4**

**4** 42:12 43:14 52:22 53:2 59:7
89:1

**40** 48:17,22 49:8,12

**43** 79:23,25 127:6

**45** 63:10 79:18 85:7 89:5 92:20
100:12

**45-day** 79:24

**4E** 118:19 119:9

**4F** 119:11

**4J** 119:22

**4K** 121:4

**4th** 29:25 39:10 49:15

---

**5**

**5** 73:5,12 106:14 115:4

**50** 39:25 63:21 64:3,14

**501.01** 51:3

---

**6**

**6** 61:6 102:24 109:14 122:4

**6,103.33** 85:15

**6,810.34** 86:25

**6,957.25** 99:22

**6A** 85:25 86:2 96:1

**6B** 78:6,7 79:3 84:2 96:1

**6N** 51:9

---

**7**

**7** 88:10,13,14 108:1 109:18 111:4
112:11

**7,676.34** 80:16

**7/3/14** 54:3

**7/3/2014** 53:13

---

**8**

**8** 6:3 45:1 84:9,11 88:22 92:13
94:17 96:1 109:22 112:15 113:11,
12,21

**80** 134:15

**81** 100:11

**8:06** 6:2,4

---

**9**

**9** 79:14,16 85:3 86:19 89:2 92:19
93:4 95:1,15 97:3 98:12 100:8
111:9 114:20 117:8 119:7,20

**90** 134:15

**96** 93:22 94:7 96:16,23

**960** 64:18

**99** 134:10

---

**A**

**A-POD** 139:8,9

**a.m.** 6:2,4

**A4** 62:12,21 63:3,4

**abiding** 7:21

**absence** 70:13

**Absolutely** 13:16 70:1 128:25

**academy** 128:19

**access** 72:5

**accomplished** 137:4

**account** 14:21

**accuracy** 47:25 68:13 84:12

**accurate** 82:15,18,21 83:2 86:14
95:19 114:23 115:12,14 134:22
135:1,3

**accurately** 84:17

**achieved** 47:5

**acting** 8:20

**action** 32:15,19,22,23 33:4,8,14
34:5 35:5,16 36:2,4,10,16 37:4,
11,22 38:10,23 41:1,5,6,12,14,16,
23 42:14 43:15,16,24 44:3,7 45:5,
10,17 46:1,5,9,17 47:1,4 77:15
78:1 81:6 91:13 99:13 106:16,19,
21,24,25 107:3,20 139:23

**actions** 34:6 77:11 78:20 119:12

**activities** 121:5,7

**activity** 105:20,23

**actual** 40:11 51:13

**add** 43:5,12

**addition** 45:9 60:12

**additional** 15:6

**adequate** 67:1,10

**adhere** 54:8

**adjunct** 128:19

**administration** 140:8

**administrative** 8:5 10:13 11:3

**administrator** 105:12 121:11

**ads** 140:6,7

**advance** 72:11

**advisory** 65:2,6,9,17

**age** 127:13,18

**aggregate** 81:13 104:17

**agree** 6:6,11,16,19 17:6 64:10 99:17 113:3

**ahead** 9:4 12:13 16:2,13 21:13 34:10,13 43:2 47:9,10 50:4 62:18, 25 75:23 77:6 91:6 102:16 115:21 116:21

**alpha** 138:16

**amount** 14:3 17:4,8 86:22 90:12 108:13

**amounts** 99:18

**and-a-half** 133:1

**and/or** 54:22

**annual** 44:23 51:10,18,25 52:5 101:13,15

**annually** 63:21

**answers** 46:6

**anymore** 137:25

**apologies** 93:18

**apologize** 25:24 72:17 107:16

**appeal** 17:7

**appears** 52:24 63:4 117:12

**applicable** 79:13

**applicants** 65:1

**applied** 40:12 74:22

**applies** 38:23

**appointed** 33:16,19

**appointment** 42:18 43:18,22

**approach** 132:1

**approval** 57:9

**approve** 68:6

**approximate** 95:6

**approximately** 7:15 8:19

**April** 6:3 32:4 40:20 96:9 99:8,21, 25 100:10

**area** 12:15 15:16 31:15 37:16 76:4 131:1,2 135:25 138:23 140:8

**areas** 12:10 13:9 40:11 104:25 106:5,8 113:2 124:13 139:1

**arise** 61:2

**Army** 127:11

**arrived** 20:13 21:1 34:1 41:20 42:7 108:24 123:24

**asks** 46:4,8

**aspects** 19:16

**assault** 70:18,19

**assess** 91:4

**assessing** 45:16

**assessment** 32:3 91:11

**assessments** 32:11

**assigned** 33:13 35:2,4,10 40:8,9 68:5 139:6

**assignment** 36:5

**assist** 132:2

**assistant** 8:20 9:23 21:1 36:11, 18 44:10,12

**associate** 130:18

**assume** 33:22 42:8,9 43:4

**assumed** 11:5

**assuming** 72:10

**assumption** 42:11

**attached** 21:2 29:22 31:12

**attention** 28:9 29:7 81:3

**attentive** 17:20

**attorney** 6:5,7 90:21 91:17 92:4, 6,8 93:11

**attorneys** 24:13 72:19

**audit** 14:12,13,18,25 15:6,8 16:6, 22 17:25 22:21 24:8 26:18 27:6,8, 16,17,18,23 28:1 30:3,13,16 32:10 37:17,20,24 76:4 103:7,17, 22 106:11 108:9,10 109:9 111:22 112:1 116:1 123:2,8,15,23 124:21

**auditor** 30:8 74:19

**audits** 15:9 18:23 19:22 21:20 22:13 26:21 27:4 103:13 104:2

106:4 107:25 125:1

**August** 29:25 39:10 45:13 49:15 84:21 103:6

**Aumann** 6:12 9:3 12:12 16:12 21:12 27:9,12 34:9 35:17 38:4 42:24 43:1 45:18 49:20 50:2,8 54:9 55:1,5 62:17,24 64:5,11 65:19 72:16 73:1 75:22 77:5 79:6 80:1,20 83:5 87:16 88:18 91:5 92:1 93:6 94:1,11,22 95:22 96:17 97:22 98:6,14 100:17,23 101:4, 12,21 104:3,19 109:5 110:21 112:3,7,24 114:24 115:9,19 118:3 122:12 123:18 124:2 125:6 141:15

**author** 34:4 103:10

**authority** 105:2,6

**authorized** 80:16 99:22

**average** 80:4,9,10

**aware** 8:6,7,8,16 9:12 11:4,8 19:7 20:3,17 56:12 60:6 65:7 133:10

---

## B

**B1** 59:7

**baby** 127:19

**bachelor** 127:15

**back** 15:2 18:8 22:14 30:21 38:17 53:14 54:15 76:19 84:12 94:2 98:24 99:8 100:6 104:4 125:16 127:14 128:14 129:18 137:2 138:19 139:24 141:9

**backfill** 138:12

**background** 64:25 66:1 68:3,4 126:6

**bad** 28:16 121:24

**barrier** 65:12

**based** 64:2 94:12 102:4,7,9 104:25 114:11 133:24 135:17,22 139:12 140:10,17,25

**basically** 15:10 69:19 84:24 97:13 120:6 128:8

**basis** 28:5,23 32:9 49:4 57:19 59:2 61:11 90:8,13 108:15 113:11 119:5 121:21 130:17 132:17 141:2

**Bates** 25:25 26:11 29:3,23 53:5, 10 55:2,3 59:7 60:8 62:8 64:17 66:19 73:15 80:14 83:15 85:9,17 87:4 93:12 94:16 96:5 99:21 103:2,4 108:5 109:25 111:16 113:25 115:23

**began** 6:2 33:20,23

**begin** 137:1

**beginning** 29:21 36:10 41:11 77:25 113:24

**begins** 53:5

**behalf** 19:2 45:21 104:22 107:10 108:9

**Behavioral** 109:14,18,22 111:4, 8,12 112:11,14

**Benton** 126:12

**Bethel** 127:17

**biannual** 14:19,25 15:6 26:21 27:4,8,17,20 28:11,23 29:4,12,13 30:6 32:2 37:17 48:12,25 49:2,3 103:18 116:8 119:5 120:24

**biannually** 14:15,22 114:15

**bimonthly** 81:24

**bit** 24:7 95:8 104:14 106:18 126:5 134:24

**bleed** 103:17

**blue** 45:22

**board** 65:3,6,9,18

**bold** 38:25

**bolded** 24:24 39:14 40:16

**bonuses** 138:25 140:8

**book** 15:20 16:10,20

**boss** 81:16

**bottom** 53:12,15,17,18,20,25 80:14 85:2

**boy** 126:23

**Branstetter** 6:10

**bravo** 138:18

**breach** 69:21 70:21 75:13 122:5, 7,10,15

**break** 13:15 50:7 98:16,20 99:2 126:6 141:8

**breakdown** 56:15

**Brentwood** 12:8

**briefly** 99:5

**broad** 118:17

**broke** 111:2

**broken** 28:4

**bullet** 63:5

**bulletin** 45:20

**bullets** 115:22

**bunch** 77:19

**Byrd** 8:3,4,8,12,14,17 9:1,6,10, 13,16 10:3,4,7 97:9 103:1 125:16 130:13

**Byrd's** 10:10 97:5 125:21

**C**

**C-O-M-P** 56:9

**C-POD** 139:10

**calculates** 85:11

**call** 72:12,15,19,25 122:1 137:6

**called** 13:12,13 28:2 59:9 65:14 71:5 126:12 128:7 129:10 136:17 141:4

**Camden** 126:12

**campaign** 140:6

**cap** 39:19 41:10,11

**captured** 28:11

**care** 56:16 129:11

**career** 126:24

**Carolyn** 47:16 81:16,18,21 82:2 121:12

**carry** 139:11

**carrying** 139:11

**Carter** 46:21 130:9

**case** 15:17 126:4

**caused** 35:14 136:21

**CCI** 53:5,10 54:4 55:4 59:7 60:8 62:8 64:17 66:19

**CDR** 72:23,24

**center** 7:8 68:16 69:10 128:4,9 135:11,25 136:13 137:5,9 140:23 141:6

**central** 55:12 59:8 68:16 69:10 120:11

**Centurioin** 129:10

**CEO** 12:4

**certificate** 72:4

**chairperson** 14:2 15:17 17:6,25 18:3,9 19:19 20:4,7,9,12,16,21 21:7,9,11,16,18 31:14

**chairperson's** 31:13

**challenge** 135:18,20 137:21

**challenges** 140:21 141:1,5

**changed** 33:25

**chaplain** 67:17

**chaplains** 67:19 68:3

**characterized** 96:15

**charge** 42:7

**charts** 108:16

**chat** 24:14 50:23 53:1 73:19 102:23 113:20 122:22

**cheaper** 101:18,23 102:2

**cheat** 13:13

**check** 107:2 125:14

**checked** 31:1

**checking** 116:18

**checks** 64:25 66:1 68:3

**chemical** 70:22

**chief** 130:18,19

**children** 126:21 127:18

**chose** 107:6

**Chuck** 11:16,23

**circular** 76:6 104:15

**cited** 75:5

**clarify** 28:3 70:22

**Class** 68:14,17,18,23,25 69:1,4, 7,9,12,13 70:3,6,17

**classifications** 69:6

**clause** 41:2

**clear** 29:20 31:19 48:25 73:9

**cleared** 66:2

**Cline** 126:14

**clinic** 108:10 112:2

**clinical** 108:9,14,17 109:3 110:25 112:17,23 113:17

**clinicians** 108:12

**close** 93:4 137:2 139:3

**closed** 138:15,16,19

**closures** 61:5

**clothing** 12:16

**clue** 100:25 101:2

**Cockrill** 20:18,20,24,25 43:6,8

**codes** 58:5

**collection** 29:17 113:24

**collective** 24:18 25:20 26:5 73:7 107:24 111:16

**colon** 32:1

**comb** 15:21

**combined** 24:20

**comfortable** 22:22

**command** 97:15

**Commissary** 12:19

**commissioner** 6:14 9:23

**commissioner's** 69:20

**common** 34:19 136:8

**commonly** 43:5

**communicated** 47:3

**communication** 69:10

**communications** 68:16

**comp** 56:5,10,11,14,20 57:12 59:10 61:20,22

**company** 107:18 128:7 129:10

**compared** 84:14

**compensate** 136:4 138:22 139:10

**complaints** 18:13 66:7,10,16

**complete** 78:7 82:15,18,21 83:2 84:12 95:19 114:23

**completed** 14:4 16:25

**compliance** 7:11,12,19 12:11 13:10 19:3,15 22:12 23:3 28:8 32:13,18 36:13,14,20 37:3 40:1 49:17,24 67:3 76:5 78:8 82:17 92:24 97:3 98:4,12 102:14 103:7, 13,22 104:2 106:2,11 112:10,23 118:22 119:14 120:12 121:15 125:4 133:13,15,21 134:2,8,18,21 135:8

**compliant** 19:17 22:16,21,25 31:3,21 52:6 102:17 113:8,9 114:11 134:10,12,15,16

**complied** 46:1

**compound** 131:24 132:14,22 133:2,7 139:8

**comptroller** 124:18,21

**comptroller's** 123:2,8 124:9

**computer** 22:5 58:12,19 71:2,4,5 116:24 117:2

**concentration** 12:16 127:16

**concern** 82:2,4

**concerns** 18:18

**conclusion** 100:9

**conditions** 11:12

**conduct** 14:13 36:12 107:1

**conducted** 18:23 36:19 37:1,5 48:13 116:9

**confirm** 53:15

**confuse** 14:23

**confused** 48:11

**confusing** 14:18

**Congratulations** 122:2

**consideration** 101:6

**considered** 60:4 63:5,6,7 70:20 79:9 111:1,12

**consistent** 41:3 86:13,14

**consistently** 77:2 138:11

**constitute** 78:13

**constitutes** 70:17

**contact** 70:14,15

**contained** 58:3 124:7 133:19,25

**context** 105:18 133:14

**continue** 29:21 36:13 37:24 80:12 81:5 82:12 88:9 98:1 116:7 138:23

**continued** 46:25 91:25

**continues** 37:24 122:1

**continuing** 62:22

**contract** 7:5,9,10,11,12,19 12:11 13:4,6,10 14:10 19:1,2,4,10,12 23:3,5 28:20 29:1 31:1 32:13,18 34:24 36:3 40:13 47:17,25 48:6 52:9,18,23 54:7,17 59:19 61:7,9, 14,15 65:25 66:19 67:23 68:2,9, 14 69:8 70:12 71:19 72:23 74:21 81:4 82:17 86:9 89:23 97:15 102:13 105:24 106:1 110:8 114:10 118:14,17,20,25 119:8,13, 19 120:5 121:10,15,16 122:5,8, 11,15 124:12,14 125:4 129:20 130:4 133:16,22 134:3,7,12,17,25 135:6

**contracted** 90:25 107:17

**contractor** 48:10 60:12 61:7 63:7,12 64:23 65:1 66:25 77:15 91:8 107:11 114:11 117:1 118:22

**contractor's** 63:19 77:13 81:3 87:21

**contractors** 119:12

**contracts** 91:1 118:23

**contractual** 7:21 63:17 102:12

**contributing** 89:19

**control** 11:5 23:24

**convenience** 73:6

**conversation** 17:21

**conversations** 9:12,16 18:24 37:2 47:8,12,16 81:20,25

**conviction** 129:4

**cooperative** 131:6

**coordinator** 20:16 33:13,15,18 34:7 35:11,14,22 41:24 42:6,18, 21 43:19,23 46:12

**copies** 22:4 58:14 84:13

**Corecivic** 6:18 9:19,21,24 10:20
11:15 12:2,4,6,11 32:15 33:4
34:15 43:10 45:25 46:5,10,17
49:17,24 51:22 54:7 55:16 58:14,
17 66:9 77:2,11,21 78:1 79:19
80:10 81:10 82:20 86:21 88:17,24
89:24 91:1,18 93:4 95:14,18 98:4,
11,13 99:14 100:15 101:18
104:12,16 105:14 107:2 110:19,
25 112:6,22 113:16 114:13,17,22
115:6 116:9,14,20 123:14 124:22
126:4 130:6 133:21 134:2,10,15
139:17 140:2

**Corecivic's** 34:6 83:1 97:20
99:12

**corner** 26:2 53:12,18,20 73:16
93:13 96:6

**corporal** 128:18

**correct** 15:7 18:22 19:24 25:17,
18 28:8 31:23 43:20 46:3,7 50:5
51:24 58:10 68:24 69:2 79:2,5
81:7 89:6 91:20 92:9 93:9 94:23
95:6 96:25 103:12 104:10 107:10
119:10 121:13 123:22 125:5
126:16 129:24 130:15 133:17,22
134:4,8,13,18,19 135:16 137:16
138:5

**corrected** 42:15 43:16

**Correction** 6:14

**Correction's** 31:21

**correctional** 7:8 52:10 105:12
121:11 126:25 128:3

**corrections** 7:22 9:18 32:11
36:7 76:9 90:25 91:12 103:20
105:17 107:17 126:24 127:12,25
128:2,22 129:12 140:3

**corrective** 32:15,19,21,23 33:4,
7,14 34:5,6 35:5,16 36:2,4,10
37:4,11,22 38:23 41:1,5,6,11,14,
16,23 42:14 43:15,23 44:3,6 45:5,
10,17 46:1,5,9,17,25 47:4 77:10,
15 78:1 81:6 91:13 99:13 106:15,
19,21,25 107:2 139:23

**correctly** 16:15

**cost** 99:23

**costing** 100:14

**costly** 102:15

**counselor** 84:20

**County** 54:21 55:8,14 63:14
90:21,25 91:3,17 126:13

**COURT** 6:3,19

**cover** 99:18 100:4 106:5 110:4
111:23

**covered** 90:19 95:6 97:18

**covering** 85:19 87:5 89:9 95:4
108:20 111:3,8 112:11

**covers** 74:16 116:1

**CR** 71:9

**created** 51:21,22 69:17 90:2

**criminal** 68:4

**critical** 61:5 74:21 75:1 83:23
87:11 93:23 94:7 96:14 133:9
137:3,12

**current** 7:4 8:2,3 20:4

**curriculum** 128:21

**customer** 102:14

**customer's** 102:17

**cut** 56:4

---

**D**

**daily** 8:1 44:10 60:23,25 74:19
121:5,6,21 131:21 132:17 133:1

**damage** 32:11 91:11 119:23
120:16,17

**damages** 32:4 40:19 91:4 102:19

**dash** 24:25

**data** 15:6 89:18 91:19

**date** 7:16 26:5 27:10,15 31:13,14
40:10,11 53:19 75:7 77:20 78:18
79:18 86:6

**dated** 25:5,13 26:13 29:3,25
30:10,22 39:10 44:15 49:15 73:24
83:16 87:4 89:8 103:6 108:19
110:1 111:19 114:3,16 115:24
123:24

**dates** 14:4 58:6,9 77:19 89:19

**day** 17:11 48:18 57:10 58:24
70:8,9 72:13 78:11,12 81:23 86:3
132:20 136:12 137:13 138:13,19,
20

**day-to-day** 105:19,23 108:15
141:2

**days** 58:6,7 63:10 74:25 79:18
83:22 85:7 87:10 89:5 92:20 94:6
100:12 138:25

**death** 70:19 72:3,4 129:6

**death-row** 129:7

**deaths** 70:23 71:8,12,17

**Deceased** 71:6

**December** 14:20 26:19 27:7,16
28:13 30:14 36:11 73:24 83:16
85:19 114:3,16

**decide** 23:12 137:25

**decided** 92:3

**defendant** 6:13

**defense** 6:8 91:10

**defer** 22:15 38:14 70:25 104:4

**deficiency** 39:18 41:3 44:22
72:23 75:18 77:22 81:8

**deficient** 31:18

**defined** 119:8 124:10

**definition** 72:2 113:7

**definitions** 63:4

**degree** 127:15

**delay** 90:2

**deliver** 55:24

**demise** 126:14

**deny** 68:6

**department** 6:13 7:22 9:18
15:16 31:21 32:10 36:7 76:9
90:24 91:12 103:19 104:7,13,23
107:17 113:3 127:12 128:22
129:12 132:4,9

**department's** 105:8

**departmental** 67:4

**depending** 18:3 24:11

**DEPONENT** 141:19

**deposed** 6:24

**deposition** 6:1,6,20 13:15,18
23:17 50:23 52:22 72:7,11 73:2,5
103:23 117:6 119:19 123:1

**depositions** 6:4

**describe** 15:8 40:6 75:5 78:1 79:22 106:18 108:3 118:16 130:21 138:9 140:5

**describes** 119:22

**describing** 25:3

**description** 18:13,15 33:4 100:8 107:12,15

**descriptions** 13:1

**designate** 67:1

**designated** 67:10 92:23 111:5 118:21,23

**designates** 68:18

**detail** 24:12 82:14 106:18 115:22

**detailed** 12:15 13:24 41:4,13 124:13

**detailing** 41:8 121:6

**determination** 31:17

**determine** 43:9 66:1 78:9 86:3 91:3 114:10

**determined** 21:16 22:11 39:24 71:12 75:11 119:14

**determines** 28:14 76:10 91:12

**determining** 67:9

**develop** 54:20

**development** 128:21

**dialogue** 17:18 48:3

**difference** 20:15

**direct** 81:17 132:3

**direction** 17:20

**directive** 69:20

**directly** 55:24

**director** 6:15 10:24 11:18 28:21 29:1 32:23 47:17,24 48:6 59:19 89:23 121:10

**directs** 74:18

**disciplinary** 36:6,16 38:10 43:9 56:16

**disciplined** 8:14

**discrepancies** 82:13 91:9

**discuss** 97:8,14

**discussed** 11:12 46:18 47:19 50:17 77:9 97:11,19 99:11 123:20

**discussing** 32:14 35:8 48:3 119:18 123:12

**discussion** 117:9

**discussions** 9:9 10:2,6 46:16 47:23

**displeasure** 82:8

**distributed** 28:20,25

**divorce** 128:6

**document** 23:16,20,24 24:4,14, 23 26:4 27:7,17 30:11 33:11 51:3 52:22,25 53:4,9 73:4,14,23 82:12 83:14 85:17 87:3 94:15 96:5 102:22 103:2,4,11 104:24 106:15, 22 107:10,23 108:4,7 111:15 113:20 114:5 115:23 117:23 118:20,22 120:9 121:13 122:22, 25 123:5

**documentation** 31:25 37:6 40:17 69:17 76:17,22 82:15 83:2

**documented** 24:12 44:23 71:10 75:19 84:17 97:12 104:5,11 115:11 122:17

**documenting** 32:19 37:25 48:19 82:5

**documents** 24:19 73:7,10 99:6 108:17 139:24

**Dotson** 9:24

**doubled** 96:24

**download** 24:15

**drafted** 28:6 76:21

**draw** 29:6 81:3

**drive** 57:5

**drop** 102:22

**due** 11:1 31:14 32:12 34:18 40:10 45:7 61:3

**duly** 6:24

**duties** 101:6

— **E** —

**e-mail** 116:25 132:8

**earlier** 10:19 27:3 40:25 50:16 77:9 126:5 131:11

**easier** 24:20

**easy** 57:1 58:16

**Ed** 129:1

**education** 127:7

**effective** 39:20

**efforts** 139:17 140:1,5,12,18

**egregious** 94:9

**Elizabeth** 20:11 21:3,6 33:20 34:7 42:10

**emergencies** 61:2,3 136:18

**emergency** 60:13,18 69:21 137:24 141:4

**emergent** 69:18

**emphasizing** 40:3

**employed** 21:4 58:22

**employee** 12:18 57:16,17 58:5 78:16 113:15

**employees** 47:13 62:13,23 67:16 84:16 86:11,12 136:5

**employment** 10:10 33:23 78:20

**encounters** 130:24

**end** 28:25 48:18 53:9 69:15 119:2,3 120:23

**ends** 53:9

**ensure** 7:20 13:8,25 14:1,6 16:14 17:1 18:6 19:15 28:16 32:21 36:4 37:23 41:25 42:14 43:16 46:11 48:1 68:13 69:2,18 74:19,20 82:4, 17

**ensures** 48:6

**ensuring** 47:5 82:14

**entered** 19:23 20:1 42:1 69:14

**entire** 15:23 22:7 83:11 95:12 112:21 113:15

**entirety** 52:1

**entry** 68:6 69:2 89:18 91:19

**equals** 39:25

**equipment** 12:21

**Erin** 6:17 126:5

**error** 107:10

**errors** 89:18

**essential** 74:17 75:11,15,16
79:9,14 92:23 109:10,15,19,23
111:1,5,13 112:11,15 113:7,10,17
119:11,18 122:16 134:7,12,16,20

**essentially** 14:6 17:8 41:10
136:20

**establish** 65:2

**evaluate** 114:13 118:21

**evaluation** 51:10,18,25 52:5
87:22

**event** 69:7,11 120:16,17 137:12

**events** 119:23

**eventually** 120:21

**EXAMINATION** 7:1 126:2

**examined** 6:24

**examples** 70:16

**exceed** 63:21 64:3

**exceeded** 79:24 100:11

**exclusively** 97:18

**excuse** 63:14 81:10 103:2 110:7
116:15

**executive** 9:17,20 63:6

**executives** 11:15 12:2

**exhibit** 13:18,19 23:17,18 24:18
25:20 26:5 29:8,14 50:22,25
52:21,22 53:2 59:7 73:5,7,12
102:24 103:23 107:24 108:1
111:16 113:21 117:6,8 122:19,20,
23 123:1

**existed** 123:11 124:17

**expectation** 102:17 104:7
107:18

**expectations** 97:14 103:20
104:1,13,17

**expected** 97:15

**experience** 127:25 135:17,22
141:1

**expert** 50:20

**explain** 31:8 32:17 59:25 69:4
74:14 84:9 87:8 108:10

**explanation** 41:4,13,15,19 45:9
77:20

**explored** 123:15

**express** 88:5

**expressed** 82:2

**extended** 90:10

**extent** 47:23 98:3

**extenuated** 29:10

---

**F**

**face** 140:21 141:2,4

**faced** 140:22 141:5

**facetious** 50:12

**facilities** 89:24 105:14 118:14
124:22 137:7

**facility** 7:20 11:6,24 12:17,18
15:11,13 24:24 26:25 28:7,16,23
32:8,21 34:25 36:2 37:3,12 41:3,7
42:17,20 43:10,18,21 45:13
52:10,23 54:13 56:18 62:3 63:15
67:2 68:5,19 69:21 70:6 80:16
81:7 86:4,9,16 89:16 90:10 98:9
99:22 100:22 104:23 105:20,25
106:20 107:9 108:14,18 120:13
122:15 123:25 125:16 131:22
135:13 136:12 137:15 138:7,24
139:14 140:3

**facility's** 37:22 42:4 47:4

**fact** 11:2 92:22 97:20 124:25

**facts** 8:9

**failed** 41:24,25 46:9 113:11,12,16

**failure** 114:6

**fair** 16:8 19:21 25:19 49:16,23
68:22 77:1,19 95:4,12,20 96:2
98:3,10,11 109:2 110:19,24
112:21 113:14,18 116:8 120:19
123:20 140:10,14,17

**fairly** 16:23 138:22

**familiar** 19:8 50:20 52:9 55:7
60:16 103:13,16,19,21 139:17
140:1

**fashion** 14:5 92:8 136:21

**feature** 102:23

**February** 30:10 44:15 49:16 87:4
89:9,12,14 90:3 91:15 92:11
108:19 111:19 115:24

**feedback** 121:17 132:12

**feel** 16:15 22:22 98:21 105:2
133:2

**feels** 48:8

**felt** 133:5

**field** 128:19

**figure** 104:15 138:4

**file** 13:7 18:10 57:5 71:1,2

**filed** 17:23 18:2

**files** 17:2 118:4

**fill** 100:15 101:19 102:11 137:2,
13 139:18

**filled** 60:2 63:10 75:1 79:17
84:23,25 87:11 133:9 135:7,8
136:11

**final** 28:6 72:3 103:7

**find** 17:17 23:11 28:9 74:23 131:8
138:6

**finding** 31:16 32:1,12 33:1,12
35:10,23 37:13,16,24 39:6,19
40:13 41:3 47:24 48:3,18 49:13
74:17 78:13,19 79:10 83:10 91:10
113:10 117:13,14,15,16 120:7,8,
10 121:2

**findings** 32:20 41:7 47:3 89:19
104:24 108:9

**fine** 98:23 99:1

**finish** 16:2

**firing** 94:20

**Fisher** 105:11 121:12

**focus** 82:19

**follow** 132:7

**follow-up** 18:5 37:15,19 46:10

**font** 38:25

**Food** 12:21

**force** 70:21,22

**foregoing** 6:1

**foremost** 69:23

**forgot** 79:1

**form** 9:3 12:12 16:12 21:12 34:9 35:17 38:4 42:24 43:1 45:18 49:20 50:1,2 54:9 57:19 62:17,24 64:5,11 65:10,19 75:22 77:5 79:6 80:1,20 83:5 87:16 88:18 91:5 92:1 93:6 94:1,10,11,22 95:21 96:17 97:22 98:6,14 100:17,18,23 101:4,12,21,22 104:3,19,20 109:5 110:21 112:3,7,24 114:24 115:8,19 122:12 123:18 124:2,3 125:6 136:21

**formal** 28:24 36:15 38:10 48:9 108:8

**formally** 8:6 90:16

**format** 48:7

**formated** 48:7

**formatting** 48:1

**found** 31:3,17 32:8 45:1 75:6 82:20 83:1 84:3 109:2

**fourth** 80:8 110:13

**frame** 27:21 84:18

**frames** 19:16

**freely** 132:1

**frequency** 70:7

**frequently** 11:1,22 28:14

**front** 24:23 30:11 51:2 53:5 73:15 90:11 103:1,3 118:10 128:17

**fulfilling** 137:21

**full** 33:10 136:2 140:15,19,22

**full-time** 135:18 140:15

**fully** 22:12,20

**function** 65:17 124:1

---

### G

**general** 19:11 62:2 133:11,13

**general's** 81:19

**generally** 34:19 131:19 132:24

**generate** 21:21,25 22:16 27:22

**generated** 22:2,17 23:5 25:8,16 26:15

**give** 55:1 63:3 70:16 76:10 91:22 98:25 118:5

**giving** 13:8

**goal** 137:4

**good** 42:11 98:25 121:24,25

**gotcha** 39:7

**grab** 57:7 58:21

**grandchildren** 126:22 127:21

**grandkids** 127:3

**great** 50:9 82:14

**grew** 126:9

**grievance** 12:19 13:21,23 14:2, 6,8,14 15:1,17,24 16:9,10,19 17:2,9,21,23,24,25 18:2,3,6,9,10, 11,18,25 19:6,8,18,19 20:2,4,6,9, 12,15,16,21 21:2,7,9,10,16,17 22:12,24 25:21 27:19,25 28:2 31:12,13,18 33:13,15,18 34:7 35:10,14,22 39:4,5 40:9,10,12,14 41:1,19,24 42:6,18,21 43:19,22 44:11 45:1 46:12 47:13,20 49:1, 17,25 50:17 51:6,10,11,19 52:7 106:8

**grievance's** 48:14

**grievances** 19:22 20:1 21:21 26:9 31:1 36:12,19 39:23 48:22 51:13 55:22 56:16 57:14,16,17 59:1,3 106:12,15

**grievant** 14:2 17:2

**grieving** 31:16

**group** 29:10 108:12 126:23

**Guard** 127:11

**guess** 14:24 37:21 48:11,16 64:1 76:7,12 81:17 90:17 91:2 100:21 104:15 105:7,22 132:25

**guidelines** 62:2

**guiding** 34:25

**guy** 129:1

**guys** 129:6 138:3

---

### H

**half** 13:5,6

**hand** 19:14,15

**handbook** 51:11 52:7

**handle** 66:10

**handled** 112:2 114:17

**handles** 66:16

**happen** 69:7 136:20 137:17

**happened** 84:24

**happy** 13:16

**hard** 57:5

**Hartsville** 7:7

**Hashemian** 6:13 73:1

**hats** 128:11

**head** 10:1 15:16 18:21 132:9

**header** 24:24 36:10 40:16 54:16 62:12

**headquarters** 12:6

**health** 56:16 108:16 109:14,18, 22 111:4,8,12 112:11,14 129:16

**heard** 10:12,17 17:3 20:1 72:24 123:12 140:7

**held** 43:7 91:16 107:20

**Herzfeld** 6:9

**Hey** 73:18

**high** 127:7,9

**highlight** 93:25

**highlighted** 93:22 96:14

**hire** 58:6,9 101:19 140:2,12

**hired** 84:16 86:5,6,11,12

**hiring** 94:20 128:10

**histories** 68:4

**holding** 17:18 34:2

**Holly** 20:5

**homicide** 72:2

**homicides** 71:22

**hope** 121:25

**hour** 69:9 72:14 98:19

**hourly** 101:14

**hours** 80:16 85:11,14 86:25 99:14,22

**house** 105:15 120:12 129:13

**housing** 138:14,23 139:7

**HR** 43:11

**human** 66:14,15

**hundred** 22:25 75:17 76:5 92:24 93:4 134:8,18

**hygiene** 12:16

---

**I**

**idea** 122:18

**identification** 31:11 40:8

**identified** 21:22 22:14 56:24 130:25

**identify** 22:17 52:6 58:16 82:6,13 84:15 89:25 91:8 107:9 109:11

**illness** 137:24

**impact** 68:20 76:14

**implementation** 105:22

**implemented** 32:22 41:9,20 45:17 46:5

**important** 69:16,24 75:21 79:3

**improve** 37:13 89:17 90:1

**improvement** 47:5 104:25

**improving** 32:24

**improvise** 136:25 137:14 138:3

**in-depth** 45:8

**inaccurate** 83:3,9 86:16 88:17, 23 92:15

**incident** 68:8,14,17,18,19 69:10, 14 70:17

**incidents** 68:23 69:1,5,6 70:3,6

**include** 12:15,17 14:1 54:21 61:2,10 75:7 78:17 86:6

**included** 45:21 48:2

**includes** 56:15

**including** 124:22

**incomplete** 83:2,4,9 86:16 88:16,23 92:15

**inconsistent** 89:21

**increase** 94:13

**independent** 14:25 57:12 63:7

**independently** 24:15

**indication** 94:3

**individual** 18:24 34:2 42:7 61:1 66:2 120:15

**individuals** 9:20

**Industrial** 128:4

**informal** 10:4,8

**informally** 8:7

**information** 17:24 18:1 31:9,10 48:1 56:13 58:3 60:24 120:21 124:7 125:3 126:6 127:16 129:17 132:7

**informational** 124:8

**initiated** 44:7

**injury** 71:9

**inmate** 12:19 17:22 18:2,9 25:21 26:9 31:16 40:13 45:1 48:13,22 50:17 51:5,11 55:22 57:14 59:1 70:18,19 71:17 108:16

**inmate's** 31:11,13 40:8,9

**inmates** 17:10,15 18:12,17,24 71:6 106:1 128:23,24 131:12,17, 24,25 132:15

**inside** 11:12

**inspections** 131:22

**inspector** 81:19

**instance** 67:17 88:16

**instances** 22:23 31:2 34:21 39:23 133:8 136:23

**institution** 51:9,15 68:7,20 128:15

**instructor** 128:20

**instrument** 13:24 14:8,14 15:1, 19 22:2,5 27:19 31:2 48:15 49:2, 6,11 74:18,22 75:10 78:5 79:14, 16 81:6 83:20 84:2,9 85:3,21,25

**instruments** 13:4,12 28:3,21 48:25 49:1 95:19 119:13 124:11 131:23

**interact** 130:1,3,5,11,16 131:12

**interacting** 106:1

**interaction** 13:21

**interactions** 131:16

**interferes** 107:20

**interim** 121:20,23

**interpret** 23:12 42:20

**interpretation** 35:19 43:4

**interrupting** 25:24

**introduce** 6:5

**investigating** 34:25

**investigation** 71:17

**involuntary** 78:17

**involve** 60:22

**involved** 9:11 36:7 65:24 66:6, 11,12 67:6,9,13,17 71:16,20 74:1 108:24 122:7 128:20

**involves** 17:9

**isolated** 18:23

**issuance** 90:2

**issue** 24:9 32:24 39:21 74:23 87:8 100:9 130:25

**issued** 26:24 32:2,11,20 49:3 77:1 89:15 116:19,20

**issues** 22:18 23:1 28:8 93:22 97:20 123:15

**issuing** 32:25 48:9

**item** 15:19 37:14,19 38:21,24 39:2,3,4,6,14 41:1,2,16 44:18 45:7 46:4 60:11 61:6 66:22 74:11, 14,16 75:11,12,15,16,17,21,25 76:2,4 78:4,7,9,14 79:9,13 81:6 84:8,11 85:24 86:18,19 87:5 88:10,21 89:1,11 92:11,12,16,18, 19 93:15,16,19 94:17 95:1,14,15 97:3 98:5,12 100:7,8 106:14 109:14,17,18,21,22 111:3,4,8,11, 12 112:11,12,14,15 113:11,12

**instrument**

**instruments**

114:19,20 115:4 134:12,17

**item-by-item** 113:11

**itemized** 104:18

**items** 12:15 13:24 54:23 63:5 92:23 93:3 96:1 97:12 103:17 109:8,10 116:5 119:11,18 122:16 134:7,20

---

**J**

**Janna** 6:9 27:9 29:6 38:17 55:1 73:18 98:21 118:3

**Jannell** 20:5

**January** 14:20 20:8 25:13 26:13 29:3 30:3,22 32:3,5 33:3 40:20,22 49:15 77:25 87:5,9,10 88:24 116:2 123:7

**Jason** 10:19 11:5,9,13

**Jennings** 6:10

**job** 7:4,9,18 11:17 12:25 17:12,16 18:13,15 21:10,17 23:7,9 88:6 107:12,14 123:25 125:4,22 133:14,24

**jobs** 12:19 131:9

**Joe** 6:17 126:3

**John** 105:11 121:12

**joined** 127:10

**Jon** 6:23 7:3

**Jordan** 47:17,24 81:17,18,21 82:2 121:12

**July** 25:5 26:18 27:7,16 28:12 30:13 32:2 126:23

**June** 30:4 40:22 41:20 63:21

---

**K**

**K-A-I-S-E-R** 46:23

**K-A-R-I** 46:23

**Kaiser** 46:21,23 130:9

**Kari** 46:21,23 130:9

**Keeton** 11:16,23

**Kelly** 81:19

**kind** 11:2,5 12:25 14:18,25 15:21 32:14 36:10 56:13 58:3,25 77:10 87:23 107:25 108:3 116:23 128:1 129:12 138:9

**knew** 129:7

**knowledge** 9:22 19:11 71:15 105:7,8 112:20 133:21

---

**L**

**labeled** 58:19

**lack** 46:10

**landed** 18:6

**lapsed** 90:12

**laptop** 57:6

**larger** 29:9

**largest** 139:1

**late-filed** 13:18,19 117:5,8

**layman's** 105:22

**lead** 132:4

**leadership** 9:17,21 127:15

**learn** 126:25

**learned** 17:17

**leave** 8:5,9,12,17 9:1 10:4,8,13 11:3

**Lee** 9:24

**left** 12:24 75:2 83:24 87:11 94:8 96:14 128:5,9 129:16

**left-hand** 73:15 93:13 96:6

**lengthy** 24:10

**leniency** 76:11

**letter** 32:4 122:4

**letters** 40:20

**level** 14:3 60:3

**levels** 12:18 97:8

**liable** 107:21

**liaison** 61:8,10,14,15 78:15

**life** 136:20 137:24

**light** 80:25

**limit** 98:22

**limited** 16:9 32:25 54:21

**limiting** 138:22

**liquidated** 32:3,11 40:19 91:11 102:19 119:23 120:16,17

**list** 12:15,25 13:3,9,12 84:16 104:18

**listed** 27:6,15 48:14,23 54:24 55:19 61:12,19 84:21,23 109:23 111:16

**load** 53:1

**local** 65:2,5,8,17

**locate** 57:1 58:16

**located** 7:6 12:7 113:16 126:12 132:15

**log** 15:20,23,24 16:10,20 19:18, 23 20:2 59:3

**logistics** 128:7,8

**logs** 15:18 60:12,18

**long** 7:13 8:17 20:6,12 24:5 57:8 58:22 72:7,9,10 81:25 126:19

**long-standing** 97:21

**longer** 21:6 24:7 33:12 34:17 35:2,10

**looked** 25:20 49:14 125:2

**Lopez** 20:11 21:3,6 33:20 42:10 43:8

**Lopez's** 34:8

**lot** 17:17 48:3 55:24 72:21 79:25 80:19 89:18,19 101:16 103:17 124:11,13 126:25 128:10 133:12

**lower** 69:5

**lunch** 99:1

**luncheon** 117:21

**Lybrunca** 20:23,25 43:6

---

**M**

**Macon** 7:7

**made** 139:18 140:2,18

**maintain** 58:14 59:5 60:12 65:2 139:14

**maintained** 14:5 19:19

**maintaining** 135:18,20 136:1

**maintains** 120:5

**majority** 83:13

**make** 13:17 14:23 24:20 27:1
28:13 43:23 73:18 95:5 101:9,10
117:5 120:21 135:19 137:15
138:4

**makes** 28:18 120:25

**making** 133:1,7

**managed** 118:14 124:22

**manager** 46:19,20 128:10
129:14,17 130:7

**managers** 37:3 46:24

**managing** 10:24 11:18 54:8

**manner** 16:25 42:1

**Maples** 6:9 7:1 9:5 12:22 13:17,
20 16:17 21:14 23:15,19 24:13,16
26:1,3 27:11,13 34:12 35:20 38:7
43:13 45:24 49:22 50:3,6,9,13,15,
22 51:1 52:25 53:3 54:11 55:3,6
62:20 63:2 64:8,15 65:15,21
73:13,20,22 76:1 77:8 79:11 80:5
83:7 87:19 88:20 91:14 92:2 93:7
94:5,14,24 95:24 96:19 97:25
98:8,16,18,23 99:4 100:20 101:1,
7,15,17,24 102:3,21,25 104:8
105:4 107:22 108:2 109:7 110:23
112:5,9 113:5,19,22 115:2,15,20
117:5,10,18,20,22 118:5,7
122:19,21,24 123:19 124:5 125:8,
13,15,24 141:16

**March** 72:14 93:11 95:3,6,9
96:13 116:2

**mark** 122:19

**marked** 13:19 23:18 50:25 53:2
56:23 73:12 102:24 108:1 113:21
117:8 122:20,23

**married** 126:17,19,20

**matter** 36:6 132:10

**matters** 43:10,11 69:12 70:6

**Maximum** 128:15 135:13

**means** 32:8 35:3,13 44:22 90:17
92:23 94:20

**measure** 118:21

**measures** 139:23

**medical** 71:10 129:11,13

**Medlin** 9:25 10:19 11:5,9,13,22

**meet** 86:9 114:7 122:16

**meeting** 63:16 97:10 102:12
104:1,6,13,16

**meetings** 11:9 107:1

**member** 33:12,15 35:2,9 61:2

**mentioned** 10:19 14:8 19:18
27:10 57:11 97:17 106:4 130:10
131:11

**met** 13:25 126:14

**method** 84:13 89:17 120:6

**middle** 28:17

**military** 127:10

**minimum** 64:23

**minutes** 50:10

**misspoke** 27:11

**misunderstood** 57:24

**modified** 48:8

**moment** 63:23

**monitor** 7:5,10,11,12,19 12:11
13:10 19:2,4,6,10,12,15 23:3
28:14 31:1 32:13,18 34:24 36:13,
20 61:16 63:24 65:25 67:16,19,23
68:2,9,23,25 69:8 70:12,15 71:19
72:6 81:4,5 82:12,17 86:9 91:9
103:18 105:24 106:1 110:8
114:10 120:5 121:15,16 124:12,
14 125:4 129:20 130:4

**monitor's** 31:17 32:10 36:3
37:13 40:13 47:25 118:18

**monitored** 104:1

**monitoring** 16:19,22 22:2,4
28:18,20,21 29:1 32:23 37:14
38:15 39:6 44:24 47:17,24 48:6
54:17 59:19 64:24 67:6 75:10,12,
15,16,17,21 78:5 79:13,16 80:4,6,
9,25 83:19 84:2,9 85:3,21,25 86:7
88:22 89:2,23 92:13 95:18,25
110:8 114:9,14 118:14,20,25
119:6,8,13,19 121:7,10 122:16
124:11 131:23

**monitors** 13:4 14:10 19:1 23:5
28:22 68:15 89:23 121:6

**month** 33:24 56:19 74:25 78:11,
19,23 79:23 83:17,23 84:14,15
85:4 86:4 89:21 92:19 93:11 94:6
95:17 96:21,24 97:5 100:10

**monthly** 54:22 56:5,13,20 57:12
58:2,17 59:2 61:11 78:23 84:3,23
85:18 89:7 90:5,7,13 115:7

**months** 7:15 14:20 36:14 76:21
94:12 95:4,13 123:24

**morning** 25:3 50:17 72:21

**moved** 49:5

**moving** 89:7

**multiple** 24:19 29:13,18 73:10
113:16 132:19

**multitude** 97:12

**N**

**named** 8:20 129:1

**names** 58:6 86:5

**narrative** 120:14

**National** 127:11

**natural** 72:2

**nature** 36:6 67:25

**NCR** 25:2 27:20 28:6 29:4 32:2,5
33:3,5 35:15 38:14 39:10 44:4
77:12 83:10 90:2 104:5 109:11
110:9 120:9 121:1

**NCR's** 28:20

**NCRS** 22:15 120:15

**necessarily** 136:11

**needed** 18:7

**Nikki** 6:12 72:16 73:1

**NN** 64:19

**non-** 97:2

**non-critical** 137:2

**noncompliance** 22:15,17,18
23:4 24:25 25:2,11,21 26:9,12,24
28:11 30:7 32:1,20 33:1 35:14
36:14 38:1,9,11 39:21 40:4,17
44:11,15,18 45:8,14 46:25 47:13,
20,22 49:14 72:22 74:4,11,14,16,
23 75:19 76:17,20 78:4 79:13,22
82:5 83:16 84:1 87:8 90:5 93:15,

18,21 94:17 95:1 99:9,13 100:7
104:9,12,24 105:1 106:6 108:8
109:1,8,14 111:3 112:1,14 114:6
115:11 116:5,10,19 117:1,16
119:1,2,23 120:3,4,7,15,20,22
121:3 122:17 131:1,2 133:20,25
134:5,22

**noncompliances** 21:22,24
116:20

**noncompliant** 32:1,9 37:25
38:21,24 39:2,3,14,19,24 45:2
77:3 79:20 83:20 84:3,8 85:3,22,
24 86:18,19 87:6 88:10,12,21
89:1,12 92:11,12,16,18 95:14,15,
18 96:11 100:9 109:2,17,21
110:20,25 111:8,11 112:6,15,18
113:2,3 114:19 115:4

**noon** 98:21,25

**normal** 68:21

**note** 29:8 75:9

**noted** 35:15 86:22 99:14,17
109:15

**notes** 71:1,7 78:5 94:3

**notice** 79:8

**noticed** 89:18

**notification** 24:25 69:19 75:12

**notified** 61:9 69:9,11 70:10

**November** 7:17 22:11 33:24
34:1 57:7 83:17,23 84:24 85:4,12
112:19 129:23

**number** 25:25 31:11,12 40:9
55:2 56:15 58:7 78:20,22 79:1
80:14,23 85:11,14 96:14,21,23
99:14 105:16

**numbers** 45:20 89:20 96:1

**numeral** 118:19 119:9

**nurse** 126:21

---

**O**

**Object** 65:10 95:21 100:18
101:22 104:20 115:8 124:3

**objection** 9:3 12:12 16:12 21:12
34:9,11 35:17 38:4 42:24 43:1
45:18 49:20 50:1,2 54:9 62:17,24
64:5,6,11,12 65:19 75:22 77:5

79:6,7 80:1,2,20,21 83:5,6 87:16
88:18 91:5,24 92:1 93:6 94:1,10,
11,22 95:22 96:17 97:22 98:6,7,
14 100:17,23,24 101:4,12,21
104:3,19 109:5,6 110:21 112:3,7,
24,25 114:24,25 115:9,19 122:12,
13 123:18 124:2 125:6,7

**obligation** 102:12

**obligations** 63:17

**observations** 131:20 139:12
140:11,18

**observe** 13:25 14:11,12 48:5

**observed** 50:14 91:9 99:3
117:21 138:9 141:11

**obtained** 84:14

**obvious** 104:24

**occasion** 130:11

**occasionally** 23:4

**occur** 24:11 70:3,7 131:24

**occurred** 9:13 38:2 40:11 77:21
120:10 125:1

**occurrence** 69:9

**occurring** 139:13

**occurs** 14:19 131:19

**October** 33:16,19 74:8,9,23 75:1
78:20,23 79:19,23 80:8,15 84:22
95:9 110:1

**off-the-record** 117:9

**offer** 138:24 140:9

**office** 7:6 13:1,2,7 55:12 59:8
71:3 81:19 113:15 120:12 124:9

**officer** 63:6 126:25 128:4,17,19
138:19 139:9

**officers** 128:1 136:5 139:5,6,10
140:3

**official** 22:1 121:2

**oftentimes** 131:25

**OMS** 56:1,3

**onboard** 97:11

**onboarding** 97:13

**open-book** 15:11

**operate** 18:16

**operated** 24:24

**operation** 138:23

**operations** 7:10 9:24 13:6 19:5,
11,13,14 56:18 67:23 68:21
70:12,14 71:19 105:15,17,19,21,
24 121:16 130:4

**opinion** 80:22 88:1,5 102:1,6,8,
13,18 125:21 139:16

**opportunity** 17:7 91:8

**opposed** 26:22

**opposing** 13:6

**opposite** 120:25

**order** 15:23 61:24 62:1,2 136:4
137:2 138:23

**orderly** 14:5

**orders** 62:4,5

**organizational** 127:15

**outcome** 72:3

**outcomes** 108:15

**outline** 72:4

**outlined** 51:11

**outlines** 61:1

**overcome** 136:25 137:15

**oversee** 10:11 12:10,14 67:16,
19,24

**overseeing** 32:14 67:7 71:16

**oversees** 105:14

**oversight** 16:9 18:25 69:25
78:25

**overtime** 80:16,19 85:11 86:22
87:1 99:15,18,23,25 100:3,14
101:19 102:1,11,16 136:6,24
137:1 138:12,24

**overview** 56:18 118:17 121:14

---

**P**

**pages** 24:5 29:9 62:22

**paid** 99:18

**paperwork** 15:18 19:16

**paragraph** 31:25 33:10 35:1,8 36:9 38:3,8 54:19 59:6 63:19 75:4 77:25

**paraphrase** 120:14

**parenthesis** 39:14 119:24

**Parker** 6:14 9:23

**part** 9:20 17:12,16 18:13 29:4 30:6,16 35:15 37:3 42:21 47:4 49:7 78:14 83:13 108:23 112:18 120:2 126:11

**partially** 46:6

**participant** 34:24

**participate** 37:22

**partner** 126:4

**passing** 17:13

**past** 15:23

**Patsy** 126:14

**pattern** 63:17

**Paul** 56:9

**pay** 100:21 101:19

**paying** 102:1,16

**pending** 71:11

**people** 100:22 101:19 136:10 137:1 141:3

**percent** 22:25 39:25 63:21 64:4, 14 75:18 76:5 92:24 93:5 113:8 119:14 134:8,10,15,18

**percentage** 134:16

**percentages** 59:20

**perform** 65:17 131:9

**performance** 21:10 34:23 87:24 88:6 118:22 123:8,23 125:22

**performed** 124:21

**performing** 21:17 123:25 125:3

**period** 26:18 27:6,16 28:6,18 29:10,12 30:3,13 37:15 38:13,15 39:6 44:24 58:22 63:11 74:8 80:4, 6,10 81:1 82:14 86:8 89:22 90:10 95:4,7,13,17 103:18 110:6,7,8 112:21 116:1,12,13,14,15 120:24

**periods** 14:22 28:4 29:13 49:18 74:18

**permanent** 60:12

**permitted** 107:5

**person** 34:17,22 35:4,22 43:7 81:15 97:15 132:9

**personal** 12:20 57:6

**personally** 132:8

**personnel** 63:6,19,20 64:3

**pertains** 120:18

**phone** 72:12,15,25

**physical** 105:19

**place** 28:17 52:7,8 74:8 125:19

**plaintiff** 6:10

**plaintiff's** 6:7

**plan** 32:19 35:5 36:3,4,10 37:4, 11,22 38:23 41:5,6 42:13 43:15, 23,25 44:3,6 45:5,10,17 46:1,17 47:1,4 81:6 91:13 99:12 106:16, 21,25

**plans** 32:22,24 106:19 107:3

**pod** 138:16,18,19 139:3,11

**pods** 138:15,16

**point** 18:4 29:16 32:10 37:15,18 53:22 110:15 132:10

**pointed** 39:13

**policy** 12:21 13:25 14:7 31:22 50:17 51:3 66:9 67:4 118:1,11,13, 16

**Polly** 6:17 25:24 73:18 91:24 126:5

**population** 17:18

**portion** 45:5 52:2,4 76:23 77:12

**position** 7:13 17:5 22:24 33:13 34:3,20 35:3,11 36:3 43:7 58:5,6, 7 60:1 62:3 63:12 75:2 78:18,22 84:19,20,22,25 86:6 102:11 104:22,23 105:9 107:9

**positions** 79:17,24 85:7 89:4 92:20 100:4,11,15,16 101:20 135:7 137:21 138:12 139:18

**post** 61:5,24 62:1,2,4,5,6 133:8,9 135:1 139:5

**post-** 129:3

**posted** 61:3 140:7

**posts** 74:21 75:1 83:23 87:11 93:23 94:7 96:14 136:11 137:2, 12,13

**practice** 16:6 89:25

**practices** 28:16

**precise** 13:9

**predecessor** 34:8

**prepare** 61:7 72:7,9,10 73:1 121:7

**prepared** 55:16 98:1 121:5 134:1

**preparing** 51:12 74:1

**present** 10:8

**presented** 29:8 45:21 125:11

**pretty** 120:25 140:11

**previous** 14:20 39:19 41:7,14, 23,24 42:6 46:9 74:18 76:20 77:10 83:10 84:14 94:12

**previously** 41:16 44:23 99:11,14 130:13

**primarily** 70:13 131:19

**primary** 82:19

**prior** 31:25 40:17 43:7 48:9 76:17,22

**prison** 11:13 68:21 70:2 76:14 128:4

**prisoners** 132:14

**prisons** 135:11,18,20

**private** 129:9

**privately** 24:24 118:14

**problem** 42:22 97:21 99:2 106:11

**problems** 136:1

**procedure** 12:21 15:8,10 16:6,7, 9 19:9,13 41:19 49:18,25 66:10

**procedures** 12:19,20 14:6 19:14 25:22 28:15 51:6,10,12,19 69:16

**proceeding** 107:3

**process** 13:22 16:19 17:9,21 18:11,19,25 19:6 21:2 22:12,16, 24 24:9 28:2,22 32:24 37:18 41:8, 9 47:13,21 52:7 81:7,12 106:8

121:20 122:5,8

**processing** 18:5

**professional** 81:18 130:23 131:8

**program** 64:25 66:14,16

**programs** 67:3

**promoted** 21:8 43:8 128:17

**pronounce** 72:17

**proper** 48:7

**properly** 21:17

**property** 12:18,20 66:2 70:20 131:20

**provide** 41:4,15 45:8 64:24 67:2 87:22 91:9 107:18,19

**provided** 46:11 57:19 63:10,12 86:9 108:18 115:7,13,14

**providing** 31:9 45:9 78:15 86:5 99:12

**provisions** 129:11 133:22

**pull** 16:3 138:18 139:5,8

**pulled** 15:24 16:11,20 120:5

**purpose** 43:5 52:4 90:23

**purposes** 68:11

**pursuant** 55:17

**purview** 43:9

**put** 24:14 45:4 49:12 50:22,23 73:4,10 79:1 102:21 107:22 113:19 117:23 122:22 140:11

**Q**

**qualified** 52:13

**quality** 46:18,20,24 47:3 130:7

**quarter** 14:17 22:20 28:2,13 29:11 37:17 39:5 80:7,8 108:20 109:9 110:4,13 117:13,14 120:23

**quarterly** 14:15,18,21,22 15:2,3, 9 18:23 21:20 26:22 27:3,8,17,22 28:5,10,23 48:13,17,21 49:1,6,7 54:22 59:3 103:18 107:25 119:5

**quarters** 111:23

**question** 10:5 12:13 14:24 16:16

26:25 27:2,14 28:19 48:10 62:19 67:20 76:13 82:25 91:2 95:5 110:10 132:13 133:19,23 135:19 139:20,25

**questions** 18:18 29:7 45:20,23 126:1 132:1 133:11,12,13 137:18 141:13,15

**quick** 50:6 141:8

**R**

**radio** 140:7

**ran** 133:8

**rate** 60:1 96:15

**ratio** 59:15,21,22 60:4 63:20,24 64:3

**Raymond** 8:3

**reached** 120:23

**read** 23:12 39:21 52:12,15,16,17, 18,19 125:10

**reading** 40:16

**reads** 80:15

**reason** 10:3,8 34:17 49:3 78:16 137:14 141:3

**reasons** 8:11 34:19 41:23 46:9

**reassigned** 9:7,10,13,16 35:23

**reassigning** 10:3

**reassignment** 10:7 34:18 125:18

**recall** 9:25 33:7 34:2 44:6 47:2 63:23 72:12 88:8 96:13 97:10,24 110:16 126:15 133:8

**receipt** 18:10

**receive** 55:13,16,20 57:12,16,20, 22,25 58:25 59:2,3 61:18 121:17

**received** 18:7 42:1 58:17 78:10, 11 115:12

**receiving** 128:8

**recent** 30:18

**recently** 10:21

**recess** 50:14 99:3 117:21 141:11

**recipient** 55:10

**record** 7:2 60:13

**records** 114:7,8,9,14,20 115:4 116:5,10 117:13,16 129:14

**red** 39:14 45:5 75:9

**redaction** 91:10

**refer** 22:22 94:2

**referenced** 43:6

**referral** 140:8

**referred** 65:12

**referring** 40:25 42:5,6 51:16 96:1 119:7,17

**reflected** 49:18 75:1 94:7

**reflective** 93:22

**regard** 138:10

**regular** 130:17

**regularly** 7:25 10:25 14:13

**relate** 136:10

**related** 10:3,7 69:12

**relates** 136:11

**relationship** 130:22

**release** 12:20

**relevant** 107:1

**religion** 67:14,18

**religious** 6:15 66:23 67:2,3,7,11, 24,25 68:2

**remains** 32:25 39:18 44:22 48:19 49:13

**remedy** 123:15

**remember** 22:19 46:14 50:16

**removal** 21:9

**removed** 34:15,20 35:15,23

**removing** 34:7

**reoccurring** 32:9

**repeat** 10:5 16:16 39:15 41:2,3 47:2 56:6 62:19 74:17 120:8 133:23 139:21

**repeated** 44:19 94:17

**repeating** 45:8

**report** 21:21,25 22:1,17,23 25:2,

11 26:9,12 27:17,18,20 28:11,25
29:11,12,17,22 30:7,8,16 31:19
32:2,22 34:4 35:6 44:15 45:14
47:22 48:5,9,12 49:11 56:5,6,14
57:12,19,22 59:10,11,12 61:21,22
71:10 72:23 74:2,4,15 76:21 77:2,
9,22 78:10,15,21,23 83:10,16
84:4,13,24 85:18 86:5,12,23 89:7,
14 90:11,13 94:20 96:9 97:2 99:9,
13 100:6 104:9 106:6 108:8
109:1,9 114:2,6,7,8,9,16 115:10,
11,13 119:1,3,23 120:15,22
121:1,3,5 123:2,8,16,21,24 124:8

**reported** 36:15 37:4 38:2,9,12
68:14,15 84:15,25

**REPORTER** 6:3,19

**reporting** 28:4,6 41:10 54:20
55:7 59:1,5 74:18 82:18,21 84:13
86:15 88:17,23 89:17,21 90:1
91:19 92:16 94:13 95:19 97:20

**reports** 15:2 22:15,21 23:2,4
24:8 25:20,21 26:24 27:22,25
28:1 29:18 44:9,11 47:25 49:10,
15,19 51:12 54:22 55:11,13,16,19
56:16,20 57:11,20,25 58:4,17
60:13,16 61:3,10,12,18 68:4,8,12
72:22 80:25 84:22 86:8,10,13
90:5,8,16,18,20 91:17 95:7 98:2
104:5,6,12 105:1 112:18 113:24
114:14,20,23 115:4,7,12,14
116:5,10 117:1,13,16 120:7,20
121:5 122:17 124:19 133:20
134:1,6 139:23

**represent** 6:6,18 107:24 113:23
126:4 129:3

**representing** 6:13

**request** 37:8

**requests** 131:4

**require** 119:14 134:7

**required** 55:10 61:8 74:21 75:17
115:7

**requirement** 55:17 63:13,16
69:12 112:23 113:7 134:11,25
135:6

**requirements** 54:7,20 55:8 59:6
62:15,23 113:17

**requires** 76:4 92:24 134:17

**reside** 131:24

**resolution** 132:6

**resolved** 132:10

**resource** 66:14,16

**respective** 36:11,18 44:10

**responded** 17:3 31:15 43:18

**responding** 14:2

**response** 17:6,23 31:14 33:5
41:11,12,25 42:4 44:3 45:13,20,
22 46:11 48:25 49:9 77:13,14
81:3 99:12

**responses** 13:25 14:1 40:10,11

**responsibilities** 7:18 119:12

**responsibility** 13:5 18:6 36:2
87:18,20,21 124:10,15

**responsible** 32:19 33:12 35:2,9,
23

**responsive** 131:3

**rest** 98:2

**result** 36:15 38:10 75:12 91:10,
11 119:2,3 131:1

**resulted** 78:21 131:2

**return** 99:5 125:18

**review** 7:20 13:4,5,9 14:11,21,22
15:1,12,19 16:24 22:3 23:4 28:8,
10 36:12,13,24 37:14,23 38:1,11
43:11 44:25 49:7 51:12,25 52:2,4
57:18 59:4,15 60:23 61:4 62:4,5
64:2 65:25 68:2,8,11 69:2 74:7,19
86:9 106:22 108:14 109:11 116:8
119:4 120:13,24 121:20 124:19

**reviewed** 28:22 39:24 74:20
80:24 105:1 110:15 123:7

**reviewing** 28:5 32:21 78:8
131:22

**reviews** 13:6 14:3 16:24 36:19,
24 47:25 48:13,17,21 90:9
121:23,24,25 131:25

**revisit** 15:3 37:14

**right-hand** 26:1 53:12,18

**Riverbend** 128:14,24 129:8
135:13 137:18 140:22 141:5

**role** 20:13 32:14,17 33:23,25
34:16,17 35:4,5 82:16 106:19,21
118:18 124:14 128:11,18 129:20,

22

**Roman** 118:19 119:8

**roster** 60:25

**roster's** 94:7

**rosters** 60:23 74:7,20

**rotate** 138:14

**rounds** 133:7

**route** 132:6

**routine** 10:24 11:7 57:19 60:13,
18

**routinely** 70:5 81:22 106:3

**row** 129:6

**rumor** 10:14

**rumors** 10:12,16,17

**run** 23:8 129:1

**rural** 135:25

**S**

**S-T-A-T** 56:10

**safe** 52:12 93:3 133:2 137:15

**safety** 128:10 139:14

**SAITH** 141:19

**salary** 101:5 102:5

**sample** 15:24

**samples** 16:5,10,20 31:20 45:1

**sampling** 15:20 19:22

**Sanitation** 12:16

**save** 22:4

**saved** 116:25 117:2

**scheduled** 12:1

**school** 127:8,9,14

**science** 127:15

**scope** 23:7 36:1 87:18 101:6
111:22 124:10

**screen** 23:15,20 24:5 30:23 39:3
50:24 52:23 73:5 96:5 102:22
107:23 117:24 118:3

**scroll** 23:23 24:1,18 25:10 29:21
30:9,21 38:24 42:12 51:8 53:8,14,

20 54:15 60:7 62:7 64:16 66:18 77:18,24 78:4 79:12 80:12 83:14 85:9 86:18 88:9 92:12 94:15 100:6 109:13,25 110:24

**scrolling** 33:2 39:9 44:14 93:10 97:1 106:10

**sec** 73:21

**secondary** 86:11

**section** 51:9 62:12,21 63:3,9 64:19 99:12 118:19 119:22 121:4

**sector** 129:9

**security** 12:20 62:3 63:20 64:3, 25 68:20 69:21 70:21 75:24 76:2, 7,13,14 128:15 129:13 130:19 135:13 139:14

**segued** 129:12

**select** 16:4

**selecting** 16:5

**send** 13:14 117:1

**sending** 91:17 92:3

**sense** 14:23 28:18

**sensitive** 75:24 76:2,7,13

**sentence** 35:7,13 38:3,8 63:9,13, 18 64:23 65:1 74:6 80:15 85:10

**separate** 13:3,12 28:22 59:12 86:8 120:16

**separated** 78:16

**separation** 78:18

**September** 33:11 35:8 40:21 84:22 89:8,15 90:4 91:16,21 93:12

**Sergeant** 20:18,20

**series** 13:24 54:23 61:12 73:7 99:6

**served** 129:6

**service** 31:15 78:16 107:18,19 128:5

**services** 6:15 12:21 63:11 64:20 66:23 67:2,3,7,11,24 68:2 108:9, 10,17 109:3 110:25 112:2,17,23 113:17 138:22

**set** 7:21 54:12 62:2,15,22 63:4 102:12 114:12

**sets** 54:7

**severity** 40:3

**share** 23:15

**she'll** 48:8

**sheet** 13:13

**shift** 21:1 60:13,16,23,25 69:15 74:19 75:3 94:7 136:12

**shifts** 74:20 75:5

**shipping** 128:8

**short** 37:21 136:21 139:7

**shortage** 138:17,18

**shortly** 53:1

**show** 15:10 23:16 37:17 80:13 122:21 136:13 137:25

**showing** 102:14 141:3

**sick** 136:15

**side** 105:15 120:12 129:13,14

**signage** 140:7

**similar** 113:24

**simpler** 76:12

**simply** 133:15 134:17,21

**single** 29:17

**sir** 43:3 126:18 129:21 132:16,18 134:9

**sit** 120:18

**site** 10:25 12:1 57:17 108:12

**situations** 60:14,19

**six-month** 95:7,13

**slash** 62:13 77:15 119:23 121:6

**SNR** 119:24 120:8,11,17 121:1

**sort** 75:20 77:20

**sound** 43:21

**sounds** 78:24 104:14 132:11

**space** 67:1,11

**speak** 10:14 17:10,15 22:25 70:7 73:21 84:12 97:16 104:22 105:3, 5,6

**speaking** 76:22 107:16 121:15 132:9

**specific** 16:23 18:21 33:7 40:13 44:4 75:5 130:24

**specifically** 47:2,6 97:16

**specifies** 48:15

**spell** 56:7

**spend** 105:25

**spent** 99:25 127:10

**spill** 106:5

**spoke** 126:5

**spreadsheet** 14:10,14 116:23 120:5

**staff** 33:12,15 34:23 35:1,9 36:5 37:2 43:10 46:11 51:12 55:21 57:13,15,17 61:1,3 63:20 66:7,10, 16 67:1,10 68:5 70:18 74:7 84:2 107:2 118:21 129:25 130:2,6,16 135:18 136:2,6,13,15,17,21 137:6,23 138:6,11,25 140:2,3,12, 15,19,22

**staffed** 74:21 82:8

**staffing** 12:17 55:21 57:13,20,22, 25 58:17 59:12 62:13,16,23 63:14,17 64:2 67:25 74:7,16,22 75:11 78:5,6,7,10,23 79:3,14,16 80:25 81:21 82:3,10,13,20 83:1, 16,19 84:2,4,9,11,13,23 85:3,18, 22 86:19 87:5,15 88:10,13,14,22 89:2,11 90:5 92:10,13,19,23 93:3, 16,19 94:17 95:1,7,14,15 96:8 97:3,8,16,20 98:5,12 99:9 100:8 115:7,11,13,14 119:7,19,20 120:18 134:24,25 135:5,17,20 136:11 137:20 138:17,18 139:18 141:2

**stamp** 26:11 53:5,10 55:2,4 64:17 66:19 83:15 85:18 87:4 93:12 94:16 96:6 103:2,4 111:16 113:25 115:24

**stamped** 29:3,23 59:7 60:8 62:8 73:15 85:10 99:21 108:5 109:25

**stand** 56:11

**standard** 16:7 75:20 86:10 90:1 113:12,13 114:7

**standardized** 16:5

**standards** 7:21 14:1,11 54:12 108:14 114:12

**start**  6:7 58:6 92:3

**started**  97:9 126:24 127:11,24,25
129:14

**starting**  22:10

**starts**  72:18

**stat**  56:5,10,11,14,20 57:12 59:10
61:20,22

**state**  6:14 7:2 54:20 59:5 61:8
115:6 128:5,14 137:7

**State's**  55:7

**state-wide**  129:16

**statement**  37:12 44:1

**states**  33:11 36:10 38:8 39:15
41:15,22,24 51:9 53:15 60:11
61:6 63:19 64:22 66:25 74:7,11
75:10 76:17 99:22 119:11

**stating**  45:25

**stayed**  129:15

**staying**  28:15 92:20

**steer**  17:19

**stepdaughter**  126:22 127:20

**store**  58:11

**stored**  13:7 56:21,24 57:4

**story**  37:21

**Stranch**  6:10

**strict**  75:20

**strike**  21:3 28:1 60:3 64:1 81:11
103:2

**strong**  140:11

**subject**  51:5 103:7 118:13

**subjective**  80:24

**subjects**  54:23

**submit**  51:9,16 61:7

**submits**  78:15 86:4 90:16

**submitted**  51:18 61:11 69:3
90:11,18 91:3,7 93:11 94:21
114:23 115:16 121:9

**submitting**  90:5,7

**successful**  43:24

**successfully**  45:17

**succinct**  13:9

**sufficient**  28:7 91:13

**suggest**  106:23

**suggested**  125:9

**suggestion**  125:12

**suggestions**  121:18

**suicide**  72:3

**summary**  77:10 103:7 119:22
120:3,4,19 121:2

**summer**  44:7

**supervision**  47:18 64:24

**supervisor**  21:1 44:11 81:17
90:8,15 128:18 129:6,15

**supervisor's**  41:25

**supervisors**  123:21

**supervisory**  46:10

**supply**  63:13

**surprised**  15:13

**surround**  108:17

**surrounding**  8:9 47:23 48:4

**swear**  97:17

**sworn**  6:24

**system**  55:25 56:1,3,24 57:3
69:3

---

**T**

**table**  31:5,8,9,10,24 39:22 40:7,
16 75:4

**takes**  81:7 90:8 125:19

**taking**  28:17

**talk**  82:14 133:14 134:24

**talked**  72:21 92:10

**talking**  42:10 73:9 108:4 116:13

**tandem**  89:24

**TDOC**  9:21,22 14:7 16:5 26:11
29:3,23 30:10,23 31:11 40:8
45:22 47:12,17 49:17 50:17 51:11
55:12 57:9 60:5 68:18 69:22,24
73:16 80:14 81:11 83:15 85:10,18
87:4,20,23 88:3,5 89:8 92:24

93:13 94:16 96:6 97:1 99:21
100:7 103:4 108:5 110:1 111:17
113:25 115:24 118:1,10,21
123:21 124:21 125:9,11 129:18

**TDOC's**  16:8 19:8 104:1,17

**team**  9:17 47:3 71:10 120:12

**technical**  19:16

**technology**  127:16 139:25

**television**  140:6

**tells**  18:4

**temporary**  137:6

**ten**  13:3,12 50:10,12

**Tennessee**  6:13,14 7:7,22 9:18
31:21 32:10 36:7 90:24 91:12
107:17 124:9,20 126:10 127:11,
12 128:5,21 129:11 136:1

**tenure**  103:19

**term**  105:16

**terminated**  84:17

**termination**  34:18 58:9

**terms**  105:22 118:23 140:22
141:2,3

**Terry**  46:21 130:9

**test**  15:11

**testified**  27:3 29:2 63:23 113:6

**testimony**  131:11

**thing**  22:1 59:13,14 60:20,22
61:16 68:1 72:22 88:21 108:16
111:7 118:8 136:24 137:17 138:7

**things**  17:19 19:5 24:20 36:6
81:2,13 105:21 124:12

**Thomas**  73:1

**thought**  52:17 104:10

**time**  6:5 8:21 11:23 14:3 17:4,8
19:16 22:7 23:23 27:1,21 28:7
29:11 34:1 37:18 38:6,12 41:9
45:4 46:12 48:22 49:2,18 57:18
58:21 70:10 75:2,7 77:21 80:3
83:11,22 84:6,17 87:11,13 89:16,
22 90:10,12 95:9,17 98:22 102:13
105:25 108:13 110:6,7,9 113:15
115:10 116:12,13,14,15 119:6
127:1 128:6 133:4,9 135:3 137:10

**timely** 16:25 42:1 92:8

**times** 16:11,21 105:16 131:12
132:19 136:13,15,17 137:6

**tiny** 53:23

**title** 7:4,9 11:17 12:25

**titled** 54:16 62:13 63:19 64:19
66:23 121:4 122:5

**titles** 58:5

**today** 6:3 12:1 72:8,9,11 73:2
125:16 138:18

**told** 8:11,13 12:8

**Tom** 6:12

**TOMIS** 55:25 56:2 69:3,14

**Tony** 6:14 9:23

**tool** 14:12,18 16:23 18:1 120:11

**top** 10:1 18:21 26:1 28:15 73:15
93:12 94:16 96:6 111:16

**total** 58:7 63:17 78:20 99:23
100:10

**totals** 56:17

**town** 126:12

**track** 76:19 120:8

**tracking** 67:6 120:6

**traditionally** 23:6 132:3 137:3

**training** 55:22 57:14,17,23
128:10,19,21

**transfers** 56:17

**transported** 70:19

**treasury** 124:21

**treatment** 67:7 69:4,5 84:20

**Tricia** 6:9

**Trousdale** 7:8,14 8:2,5,15,18 9:9
10:21,23 11:1,6,10,19 13:22
17:10 18:18,25 19:25 21:4,15
22:8,10,20 23:9 29:5 30:19 33:21
47:14 49:24 51:16,18,22,23
52:10,23 54:8,13,21 55:8,13
57:21 58:1,22 59:16 62:16,23
63:14,15,24 64:2,4 65:5,22 66:6,
10,16 67:10,13,24 68:9 69:25
70:4,24 71:11,23 77:11 80:10
81:21 82:3,8,11,21 83:12 88:2,7
90:21,25 91:3,17 95:13 97:6,9

100:3,11 103:14,25 104:17
108:24 109:2 112:22 113:16
116:15 122:10 129:25 130:2
133:1 135:15 138:6,11 139:19
140:18

**Trousdale's** 7:23 22:12 67:7
71:17

**true** 83:11 111:7 135:9

**TTCC** 103:7

**Tuesday** 72:14

**turn** 90:1 91:1 107:16

**Turner** 7:8 52:10

**Turney** 128:4 135:11,24 136:13
137:5,9 140:23 141:6

**turnover** 55:21 57:13,15 59:11,
15,21,22 60:4 63:20,24 64:3

**type** 130:21

**typically** 23:11 24:8 81:25 92:7
132:10

---

**U**

**U.T.I.** 128:7

**uh-huh** 39:1 41:17 42:16 43:17
44:20 134:23

**ultimately** 17:1 49:12 107:15

**unacceptable** 60:5

**unannounced** 15:15

**uncommon** 24:11

**undergrad** 127:14

**underneath** 41:18 42:17 44:2
54:2 61:12 106:14

**underperforming** 34:22

**understand** 16:18 48:20 56:7
73:9 134:6 139:20

**understanding** 8:25 10:2,6
34:5,15 54:6 61:15 66:15 90:20
103:25 104:16 124:25 125:1
132:13

**understood** 16:14 95:5 135:19

**unexplained** 71:11

**unfilled** 83:23 85:6 89:4 94:8
96:15 100:4

**unit** 129:7 138:14 139:7

**University** 127:17

**unsafe** 133:5

**upcoming** 42:13 43:15

**uptick** 94:4 96:15,23

**usual** 11:4

**utilize** 14:11 16:23 138:24

**utilized** 120:11

**utilizes** 114:10 138:11

**utilizing** 17:25

---

**V**

**vacancies** 12:18 55:21 57:13,15
59:11 63:9 74:8 137:3 138:12

**vacancy** 59:20 63:11 75:8 78:21
79:24 84:22 139:11

**vacant** 58:7 60:1,2 75:2,6 78:22
79:17,18 83:24 84:20 85:1,7
87:12 89:4 92:19,20 94:8 100:4,
10,15,16 101:19 102:11 135:1

**vacated** 78:18

**Vantell** 8:24

**varies** 70:9

**verbal** 87:23

**verbiage** 65:12

**view** 140:25

**Vincent** 8:24

**visit** 10:23 11:19 15:15

**visited** 10:21 11:23

**voluntary** 78:17

**volunteer** 6:15 64:20,25 65:2,5,
9,17 66:3

**volunteers** 65:22,24 67:1,10
68:6

**VP** 9:24 10:20

---

**W**

**walk** 15:18 73:8 132:13,22

**walk-throughs** 131:21

walking 105:25 133:7

walks 133:1

wall 119:4

Walton 6:23 7:3 12:23 23:22 24:17 27:14 29:15 50:16 53:4 99:5 103:3 107:23 113:6,23 116:16 117:11,23 118:8 125:25 126:3 141:12,17

Walton's 13:18

wanted 13:8 29:6,9 43:12 102:6

warden 7:23 8:2,3,14,15,20,21 9:6,10,12,16 10:3,4,7 11:2 36:11, 15,19 38:2,9,12 44:10,12 78:15 84:6,7 87:13,24 88:2,6 94:21 97:5,8,11,13 125:16,21 130:11,13

warden's 84:3

wardens 130:18

Washburn 84:7 87:13 88:2 130:14

Washburn's 87:24 88:6

week 72:12 121:14

weekly 36:12,19,24 44:9 54:22 121:5,6

weeks 8:19

Welborn 6:17,21 34:11 50:1 64:6,12 65:10 79:7 80:2,21 83:6 94:10 95:21 98:7,20 100:18,24 101:22 104:20 109:6 112:25 114:25 115:8 117:19 122:13 124:3 125:7 126:1,2,3 141:8,12

West 126:10 135:25

witnessed 139:2

word 39:15

words 27:16 93:22 137:20

wore 128:10

work 6:8 7:23 87:15 91:18 124:9 128:6,14 129:9,18 136:6,24 137:1,25 138:4 141:4

worked 19:13 61:2 85:11 86:22 99:15 123:14 135:10

working 33:20 36:5 89:16,24 90:9 102:10 130:22 138:25

write 42:3 52:17 100:9

writes 36:2

writing 61:9

written 31:1 35:5 36:4 39:25 42:18 45:7 87:23

wrong 89:20 90:7 94:21 115:17 117:12

wrote 35:21 52:15

---

### Y

year 14:16 16:11,21

year- 132:25

year-and-a-half 133:5

years 126:20 127:10 129:3

yes,ma'am 25:4

yesterday 11:25 138:16

young 81:19 127:2

---

### Z

Zagorski 129:1,5

zoom 6:7,20 24:2,21 53:21 73:6