```
1            IN THE UNITED STATES DISTRICT COURT
            FOR THE MIDDLE DISTRICT OF TENNESSEE
2                    NASHVILLE DIVISION

3

4  BOZA PLEASANT-BEY,              )
                                   )
5      Plaintiff,                  )
                                   )     Case No. 3:19-cv-00486
6  VS.                             )     JUDGE TRAUGER
                                   )     JURY DEMAND
7  STATE OF TENNESSEE, et al,      )
                                   )
8      Defendants.                 )
   _____X
9

10

11

12

13  _____

14

15            DEPOSITION OF KELLY YOUNG

16            TAKEN ON JUNE 18, 2021

17

18  _____

19

20

21

22
   Prepared by:
23  Carole K. Briggs, LCR #345
   Briggs & Associates
24  222 Second Avenue, North, Suite 340M
   Nashville, Tennessee  37201
25  Briggscourtreporting@hotmail.com
```

```
 1                    APPEARANCES:

 2


 3


 4     FOR THE PLAINTIFF:


 5

       TRICIA HERZFELD, ESQUIRE
 6     Branstetter, Stranch & Jennings, PLLC
       The Freedom Center
 7     223 Rosa L. Parks Avenue, Suite 200
       Nashville, Tennessee  37203
 8     triciah@bsjfirm.com


 9

10     FOR THE DEFENDANT, STATE OF TENNESSEE:

11

       THOMAS J. AUMANN, ESQUIRE
12     NIKKI N. HASHEMIAN, ESQUIRE
       Tennessee Attorney General's Office
13     P.O. Box 20207
       Nashville, Tennessee  37202-0207
14     thomas.aumann@ag.tn.gov
       Nikki.hashemian@ag.tn.gov
15

16
       FOR THE DEFENDANT, CORECIVIC:
17

18     JOSEPH F. WELBORN, ESQUIRE
       ERIN PALMER POLLY, ESQUIRE
19     K&L Gates, LLP
       222 Second Avenue South, Suite 1700
20     Nashville, Tennessee  37201
       joe.welborn@klgates.com
21     Erin.polly@klgates.com

22

23

24

25
```

```
 1                    TABLE OF CONTENTS

 2

 3   Witness                                      Page

 4

 5
     KELLY YOUNG
 6
     Examination by Ms. Herzfeld                     5
 7

 8

 9

10

11                    LIST OF EXHIBITS

12

13   Number      Description                      Page

14

15   1           30(b)(6) notice                    13

16   2           Collective beginning with          22
                 TDOC 016160
17
     3*          TDOC audit                         31
18
     4*          Enterprise risk management         32
19               evaluation

20   5           TDOC 029720                        43

21

22
     (* Denotes late-filed exhibits)
23

24

25
```

Page 4

```
 1              S T I P U L A T I O N

 2

 3

 4

 5          The deposition of Kelly Young, taken on behalf

 6   of the plaintiff, remotely via Zoom, by agreement of

 7   parties, on June 18, 2021, for all purposes allowed

 8   under the Federal Rules of Civil Procedure.

 9          It is agreed that Carole K. Briggs, licensed

10   court reporter for the State of Tennessee, may swear the

11   witness, take his deposition, and afterwards reduce same

12   to typewritten form, and that the reading and signing of

13   the completed deposition by the witness is not waived.

14

15

16

17   (Unless name spellings are provided, all names are

18   spelled phonetically to the best of the court reporter's

19   ability.)

20

21

22

23

24

25
```

```
 1              (Whereupon, the foregoing deposition

 2              began at 9:04 a.m.)

 3              THE COURT REPORTER:  Good morning.  Today is

 4   June 18, 2021 at 9:04 a.m.  We are here for depositions.

 5   At this time, would each attorney please introduce

 6   yourself, who you represent and that you agree to take

 7   this deposition by Zoom.

 8              MS. HERZFELD:  I am Tricia Herzfeld on behalf

 9   of Mr. Pleasant-Bey.  And I agree to take the deposition

10   by Zoom.

11              MR. WELBORN:  Joe Welborn and Erin Polly on

12   behalf of CoreCivic.  And we agree.

13              MR. AUMANN:  This is Tom Aumann and Nikki

14   Hashemian on behalf of the TDOC defendants.  And we

15   agree as well.

16   Whereupon,

17                       KELLY YOUNG,

18   having been first duly sworn, was examined and deposed

19   as follows:

20   EXAMINATION BY MS. HERZFELD:

21        Q.    Could you state your name and spell it for

22   the record, please.

23        A.    Kelly Young.  K-E-L-L-Y.  Y-O-U-N-G.

24        Q.    Mr. Young, where do you work?

25        A.    I am employed by the Tennessee Department of
```

Page 6

1    Correction.

2        Q.    What is your position there?

3        A.    I am the inspector general.

4        Q.    How long have you been in that position at

5    TDOC?

6        A.    Since mid-March of 2020.

7        Q.    What did you do before that?

8        A.    Prior to that, I was a senior associate

9    counsel with the TDOC office of general counsel.

10       Q.    So you're a lawyer?

11       A.    Yes.

12       Q.    And what year did you graduate law school?

13       A.    2007.

14       Q.    Have you ever been deposed before?

15       A.    No.

16       Q.    Well, welcome.

17       A.    Yeah.  Every lawyer's dream, right?

18       Q.    Right, everybody wants to do it.  It's more

19   comfortable to be on my side than it is on yours, I

20   guarantee it.  So we'll try to make it as painless as

21   possible, okay?

22       A.    No problem.

23       Q.    I am going to assume you know the rules of

24   the road, but just in case you don't, I will remind you.

25   If you need to take a break at any time, let me know.

Page 7

```
 1   It's just like a wedding, you know, it's your day.  So

 2   if you need to get up, if you need to go stretch your

 3   legs or whatever, just let us know and we will do that.

 4   The only thing that I ask is that if I have a question

 5   pending, that you answer the question before you get up,

 6   okay?

 7        A.    Of course.

 8        Q.    Okay, everybody will object, I'm sure.  I'll

 9   have bad questions or questions folks don't like, so

10   you'll hear an awful lot of object to the form.  You can

11   continue to answer the question unless your lawyer

12   instructs you not to answer for some reason, okay?

13        A.    All right.

14        Q.    And you have to answer yes or no; otherwise,

15   Ms. Briggs has a hard time taking it down for the

16   record, okay?

17        A.    I totally understand.

18        Q.    Any questions for me before we start?

19        A.    No.

20        Q.    Are you represented by counsel here today?

21        A.    Yes.

22        Q.    Who are you represented by?

23        A.    The attorney general's office, Thomas Aumann

24   and Nikki Heshemian.  And I probably butchered her last

25   name.
```

Page 8

1       Q.    Did you meet with them in advance of your

2   deposition?

3       A.    Yes.

4       Q.    When and for how long?

5       A.    Now my days are running together.  Monday we

6   met for two hours and this morning we met for an hour.

7       Q.    Was there anybody else present at those

8   meetings?

9       A.    No.

10      Q.    Have you done anything else to prepare for

11  today's meeting?

12      A.    Just reviewing departmental policies.

13      Q.    Which departmental policies did you review?

14      A.    I went over the grievance procedures policy,

15  religious programs policy, religious diet policy,

16  incident reporting.  Oh, goodness, those are the ones

17  that are jumping to my head.  I went over so much, I

18  can't remember specifically all of them.

19      Q.    Have you worked at TDOC since you graduated

20  from law school?

21      A.    No, I've only been with TDOC since 2016.

22      Q.    Where did you work before then?

23      A.    So directly out of law school, August of

24  2007, I started with the district attorney's office here

25  in Nashville as an assistant district attorney.  In

1  April of 2008, I transferred under a federal grant for

2  Project Safe Neighborhood to the U.S. Attorney's Office

3  for the Middle District of Tennessee as a special

4  assistant United States attorney, specifically

5  prosecuting gang crimes and organized crime related to

6  gang activity.  In 2010, at the conclusion of the grant,

7  I transferred back to the D.A.'s office where I worked

8  in the special prosecutions unit doing high-level

9  conspiracy narcotics wiretap cases.

10         In 2012, I went into private practice.  I was

11  a criminal defense attorney for -- in the firm of McGee

12  Ballinger with Rich McGee and Bobby Ballinger.  I did

13  criminal defense in state and federal court here in

14  Middle Tennessee until 2014.  In 2014, I took a position

15  in the general counsel's office for the department of

16  intellectual and developmental disabilities.  And then I

17  made the jump to TDOC in 2016.

18     Q.    So you've been a little busy?

19     A.    Just a little bit.

20     Q.    Well, I'm sure even with your time with Rich,

21  you still didn't have a lot of depositions?

22     A.    No.  And I certainly wasn't on this side of

23  it, that's for sure.

24     Q.    Welcome to the club.  Very good.  And then

25  you started -- when you started the position as the

1    inspector general, what were you told the job

2    responsibilities were?

3         A.    So the position itself was created directly

4    in response to the 2020 comptroller audit.  And so the

5    immediate responsibilities of the office were to take

6    over the compliance section of TDOC, so that section was

7    moved under me.  And the contracts administration

8    section was moved under me.  So that's -- and by

9    contracts administration, I mean the development and

10   administration, setting up and getting into place all

11   departmental contracts for services, vendors, et cetera.

12            Then shortly thereafter, the oversight, the

13   contract monitoring of the CoreCivic facilities moved

14   under me.  And then also contract monitoring of vendors,

15   so like our medical and behavioral health services and

16   food service vendors, those contract monitoring

17   responsibilities moved under me.  So I have four

18   different distinct sections under me.

19        Q.    And you've been doing that for just over a

20   year now?

21        A.    Yeah.

22        Q.    Great.  And you have been made aware, I am

23   assuming by your attorneys, that you are here as a

24   30(b)(6) designee for the department?

25        A.    Yes.

Page 11

1       Q.      And so you know that means that your

2    testimony today isn't really in your personal capacity,

3    you are speaking on behalf of the department?

4       A.      Yes.

5       Q.      Great.  And in that year when you've been the

6    inspector general, who do you report to?

7       A.      Commissioner Parker.

8       Q.      Does Commissioner Parker have the ability to

9    fire you?

10      A.      Yes.

11      Q.      Is there anyone else that you report to

12   within the state government?

13      A.      I guess ultimately the governor, since I am

14   in executive service.

15      Q.      But the inspector general is the position

16   within TDOC, it's not like an independent oversight

17   position?

18      A.      That's correct.

19      Q.      Do you know what this lawsuit is about?

20      A.      I mean, just reading from what I see, it's

21   kind of a mixture of religious accommodation,

22   allegations with regard to both food service and

23   property, and then also Eighth Amendment with regard to

24   conditions at Trousdale.

25      Q.      Have you had an opportunity to read the

1    complaint?

2         A.    I did probably two weeks ago, so you will

3    have to forgive me if I am a little fuzzy on the

4    specific allegations.

5         Q.    That's okay, there won't be a test at the

6    end, I promise.  Now we're going to see my Zoom skills

7    and I'm going to see if I can resurrect them from

8    yesterday and see if we can show you an exhibit here.

9    If you will give me a moment.

10               In front of you, hopefully, you should have a

11   document.  It looks like it has a case caption at the

12   top.  Do you see it?

13        A.    I sure do.

14        Q.    And I'm also going to drop that in the chat.

15   Do you have access to the chat for the Zoom?

16        A.    I hope so, as soon as I figure out how to do

17   it.

18        Q.    It took me a minute yesterday, too, but we

19   will get there.

20               (Technical discussion.)

21        Q.    You can either click on that or you can look

22   at what I've got on your screen, whatever is easiest for

23   you.

24        A.    We'll give it a go with what you have on the

25   screen.

Case 3:22-cv-00093   Document 37-7   Filed 05/23/22   Page 12 of 70 PageID #: 3491

Page 13

1               MS. HERZFELD:  Okay, great.  And everybody

2    else has got it in the chat?  Wave at me if there's a

3    problem.  Okay, great.

4               (Exhibit 1 was marked.)

5    BY MS. HERZFELD:

6       Q.    And so taking a look at what we'll mark here

7    as Exhibit 1.  Do you recognize this as the 30(b)(6)

8    notice that requires your testimony here today on behalf

9    of TDOC?

10      A.    Yes.

11      Q.    And you've had an opportunity to go through

12   -- give me a minute to scroll down -- the attachment

13   which goes through the various notice topics that you're

14   supposed to be testifying on behalf of the department

15   for today?

16      A.    Yes.

17      Q.    Are you prepared to testify today on all of

18   those topics?

19      A.    To the best of my ability.

20      Q.    Good luck.  We should be back to the screen.

21   Do you see me now?

22      A.    Yeah.

23      Q.    And so I just have a few questions for you

24   today, hopefully we're not going to be here for very

25   long.  But you have familiarity with the contract

1    between Trousdale and CoreCivic?

2         A.    Yes.

3         Q.    And that contract is monitored and enforced

4    by TDOC; is that right?

5         A.    That's correct.  I guess I should make a

6    clarification.  This is the lawyer in me.  I guess

7    technically the contract is with Trousdale County.

8    Trousdale County subcontracts with CoreCivic.  So yeah

9    -- but we have oversight of the contract with Trousdale

10   County.

11        Q.    And what is your understanding is the purpose

12   of the contract?

13        A.    For the maintenance and operation of the

14   facility and the housing of TDOC inmates at Trousdale

15   Turner Correctional.

16        Q.    What are some of the terms of the contract?

17        A.    In generally speaking, the requirements are

18   that they house TDOC inmates in beds available at that

19   institution, that they house those inmates in accordance

20   with constitutional federal standards, ACA standards,

21   that they provide programming and care in accordance

22   with TDOC policies, they provide medical services in

23   accordance with TDOC policies, behavioral health

24   services in accordance TDOC policies, conduct risk and

25   needs assessments, classifications, disciplinary

1   procedures, grievance procedures.  The whole gamut of

2   running of a facility in accordance with TDOC policies

3   and ACA standards.

4        Q.    And those policies, standards and

5   constitutional rights are incorporated generally within

6   the contract?

7        A.    Yes.

8        Q.    What is the purpose of making sure that those

9   TDOC standards and constitutional rights are

10  incorporated within the contract?

11       A.    Well, obviously, I mean, when we talk

12  ACA standards and federal standards, constitutional

13  standards, obviously that's for quality of life and to

14  ensure that the inmates are receiving the care and the

15  supervision as required under the law.  TDOC policy, you

16  know, mirrors those standards and then kind of takes

17  them a little bit further with specifics related to just

18  Tennessee and how Tennessee operates.

19            The purpose of them operating in accordance

20  with TDOC policy is, obviously, a big one, being

21  continuity across the board with the way services are

22  rendered and provided so that, you know, if you are in a

23  TDOC facility and you move to a CoreCivic-operated

24  facility, you want there to be a continuity of services

25  and the method of housing the inmates needs to be the

1    same and consistent across the board.

2         Q.    Would you say that one of the other purposes

3    of the contract is to make sure that the taxpayers'

4    money is being spent appropriately?

5              MR. WELBORN:  Object to the form.

6              MS. HERZFELD:  You can answer.

7              THE WITNESS:  I mean, that would be true of

8    any contract, yes.

9    BY MS. HERZFELD:

10        Q.    Great.  When I say liquidated damages in

11   reference to the contract, do you know what I'm talking

12   about?

13        A.    Yes.

14        Q.    What is your understanding of liquidated

15   damages in reference to the contract?

16        A.    Liquidated damages are one piece of a process

17   with regard to monitoring compliance under the contract.

18   And when there are issues of noncompliance that are not

19   cured during that process and they are identified as a

20   liquidated damage event, the department -- and part of

21   the contract, it lays out a rubric or a tool of

22   assessing and determining the amount.  But then the

23   department, based on those noncompliance and the level

24   of the noncompliance, will then assess a liquidated

25   damage, which is a monetary amount that is then withheld

    1      from the payment to CoreCivic for noncompliance.

    2          Q.    Do you know what the amount is for a

    3      violation for the contract of Trousdale for liquidated

    4      damages per violation?

    5          A.    Well, I guess -- so I guess I'm a little

    6      confused.  There is a -- so there is a difference,

    7      there's not just an amount.  There's a, you know, you

    8      have a grid where you figure out, based on what the

    9      noncompliance issue is, you then plug that number in and

   10      that pumps out an amount.  So there's not just an amount

   11      you have to run through a grid.  I hope I am answering

   12      your question correctly.

   13          Q.    No, you are, and you're explaining it very

   14      well.  So when people would reference, for example, a

   15      $250 limit or issue for a liquidated damage issue with

   16      the Trousdale contract, do you know what that is about?

   17          A.    My ear buds, you broke -- you said a $2?

   18          Q.    Two hundred, fifty dollars.

   19          A.    Okay, $250.  That would be, so once again,

   20      that is part of that rubric.  Certain things within the

   21      grid -- and unfortunately, I don't have the rubric in

   22      front of me to quote it.  But some items are $250 and

   23      then there are multipliers within that grid based on

   24      what the noncompliance is.  So then the multipliers

   25      dictate, you know, how much times 250 to come at the

1    final liquidated damage amount.

2         Q.    We'll get back to that in just a little bit.

3    When you talk about noncompliance, how is someone

4    notified of noncompliance?

5         A.    So the contract requires two monitors at all

6    CoreCivic facilities.  At Trousdale, there are two

7    monitors.  There's a contract monitor of operations that

8    reports to the operations side of the department.  Then

9    there's a contract monitor, a CNC for the actual

10   contract compliance.  And that person is my shop, for

11   lack of a better term.  They, you know, daily, weekly,

12   monthly, they're there on site and they monitor the

13   operation of the facility in accordance with the

14   contract.

15            So when they identify an item that is not in

16   compliance with policy or standards, they then will

17   notify the warden of that noncompliance, usually the

18   same day or very shortly thereafter, allow the warden to

19   address it.  Then quarterly, those noncompliances and

20   the entirety of the compliance is looked at.  And then

21   we have a quarterly report, generally quarterly report,

22   that is written up and provided to the warden.  The

23   warden then provides corrective action.  And I think I'm

24   probably getting ahead of where your next question is

25   going, so I will stop there.

Page 19

1      Q.    No, you're doing great.  And so both of those

2   contract monitors that are at the Trousdale facility, do

3   they both -- are they both in your shop?  They both

4   report to you?

5      A.    No.  The contract monitor of operations

6   reports to, ultimately, to the assistant commissioner of

7   prisons.

8      Q.    Do either of them report to you?

9      A.    Yes.  The contract monitor of compliance, I

10  guess the CMC.  So there's CMO, CMC.

11     Q.    Do you know the names of the people at

12  Trousdale right now that are in those positions?

13     A.    Christopher Brun is the CMO, the operations

14  contract monitor.  And John Walton is the CMC.

15     Q.    And at one point, there was only one contract

16  monitor at Trousdale; is that right?

17     A.    I believe so.

18     Q.    Do you know when the second contract monitor

19  joined Trousdale?

20     A.    I -- John.  I think it's been a little over a

21  year or two years.  I'm not a hundred percent certain.

22  That was kind of one of the I inherited things back in

23  March.

24     Q.    And the contract monitors, they office at the

25  facility?

 1      A.    Yes.

 2      Q.    And do they generally live in that area?  In

 3  order to be able to commute, they live near the

 4  facility?

 5      A.    Generally speaking, yes.  Sometimes we -- you

 6  know, a monitor will -- we'll move monitors to different

 7  facilities.  So sometimes they don't necessarily live in

 8  the exact immediate area.  But we generally try to have

 9  people living, you know, within an hour so it's not a

10  terrible commute.

11      Q.    And then they report to people at TDOC, not

12  to people at CoreCivic; is that right?

13      A.    That's correct.

14      Q.    What policies or measures does TDOC put in

15  place in order to ensure that those contract monitors

16  can maintain their independence while working at that

17  facility everyday?

18      A.    Well, just shooting off the top of my head,

19  the contract itself, of course, speaks to the fact that

20  those liaisons, you know, don't answer to CoreCivic,

21  they answer to the department.  Then I think it's Policy

22  205, I can't remember the point whatever number, but

23  there's a policy of contract monitoring for privately

24  managed facilities.  And that kind of lays out the

25  reporting procedures that they answer to the contract

1   monitoring director, which is a TDOC employee.

2        Q.    And then other than having the chain of

3   command being the TDOC chain of command instead of

4   CoreCivic chain of command, are there any other

5   policies, or practices, or anything else that you know

6   the department has put in place in order to ensure their

7   independence while working at the facility?

8        A.    Well, I mean, just the shear operation of

9   what they do.  My contract monitoring director, Carolyn

10  Jordan, is very hands on.  She makes a point of being

11  very active in her communication with the monitors.  On

12  the operation side of things, the correctional

13  administrator over those CoreCivic facilities, John

14  Fisher, has the same practice with his CMOs.  And so

15  they routinely, just as a practice, are in constant

16  communication with them to make sure that they are

17  maintaining that autonomy and keeping an eye on things

18  for the benefit of the department.

19       Q.    And you have spoken before about

20  noncompliance reports that they'll issue if they find

21  some sort of a problem or violation of the contract; is

22  that right?

23       A.    Yes.

24       Q.    I'm going to show what we'll mark here as

25  TDOC Exhibit 2.  Do you see it in front of you?

1          A.    Yes.

2          Q.    Now I'm going to see if I can put it in the

3     chat.  Do you have it in front of you?

4          A.    Yes.

5          Q.    And in the chat?

6          A.    Yeah.  I'm just going off the one in front of

7     me, though, it makes it easier.

8          Q.    Whatever works easiest for you.

9                (Exhibit 2 was marked.)

10    BY MS. HERZFELD:

11         Q.    So this document is a collective exhibit that

12    starts with TDOC 016160 is the first Bates number.  It's

13    a 91-page document.

14               MS. HERZFELD:  And I'll submit to counsel

15    that it's the same document that we used yesterday.  And

16    they're not consecutively numbered, so you know.

17    BY MS. HERZFELD:

18         Q.    So just take an opportunity here with me to

19    look at this first page.  It says privately operated

20    facility notification of noncompliance, Tennessee

21    Department of Correction.  Did I read that correctly?

22         A.    Yes.

23         Q.    And it says:  Location, Trousdale Turner

24    Correctional Center, to Brandon Bellar, the Trousdale

25    County attorney, from Brad Cotham.  I'm not sure if I'm

1    saying that right.  TDOC contract monitor compliance.

2    Did I read that correctly?

3        A.    Yes.

4        Q.    And it's dated January 31st, 2019.  And it's

5    about count procedures from October 2018 through

6    December 2018.  Did I read that correctly?

7        A.    Yes.

8        Q.    Is this an example of one of those

9    notifications of noncompliance you were talking about

10   earlier?

11       A.    Yes.

12       Q.    With this one it says that TDOC employees

13   making the observations -- in this case, it's CMO,

14   Christopher Brun.  That's the gentleman you were

15   speaking about earlier?

16       A.    Yes.

17       Q.    Great.  I am going to take this down to the

18   second page here.  Well, I guess we'll start with the

19   first one.  So on the first page of this first one here,

20   they go through and identify the various policies and

21   issues that are in noncompliance; is that right?

22       A.    Yes.

23       Q.    And then after that goes through your

24   process, right, that is then sent up the chain.  And

25   then you'd said it's given to the warden for them to

1    have an opportunity to correct it.  Did I state that

2    correctly?

3         A.    Yes.

4         Q.    And so then once the warden has had a chance

5    to do it, then they have the ability to issue a

6    response; is that correct?

7         A.    Yes.

8         Q.    And so here on TDOC 016161, is that an

9    example of the response that would have been done by the

10   warden of the facility?

11        A.    Yes.

12        Q.    And in this case, it's from Warden Washburn;

13   is that right?

14        A.    Yes.

15        Q.    Do you know who the current warden of

16   Trousdale is?

17        A.    They just appointed him.  And I honestly

18   cannot remember his name, specifically.  It was a unique

19   name, I just cannot remember what it is.

20        Q.    And the previous warden, was that Warden

21   Byrd?

22        A.    Yes.

23        Q.    And Warden Byrd is -- do you know if he has

24   another position at a different Tennessee facility or

25   he's just left?

Page 25

```
 1        A.    My understanding is he does not work in any

 2   TD -- not TDOC, but Tennessee facility.

 3        Q.    And do you have an understanding as to why

 4   that is?

 5        A.    It's related to an incident that occurred

 6   back in January of this year.

 7        Q.    And that would have been an incident of

 8   excessive force?

 9              MR. WELBORN:  Object to the form.

10              THE WITNESS:  Yes.

11   BY MS. HERZFELD:

12        Q.    If you will just kind of glance with me.  I

13   am not going to make you go through all 91 pages here,

14   but if you look down here, it says PC.  I'm sorry, I'm

15   not familiar with PC instead of CC, I always do carbon

16   copy.  Do you know what PC means?

17        A.    I honestly don't know, because I always do

18   CC, too.  And I don't know what PC means.

19        Q.    Maybe somebody can enlighten us later.  And

20   so in any event, it looks like these are perhaps all of

21   the people who were copied on this particular report of

22   noncompliance and the warden's response; is that right?

23        A.    Yes.

24        Q.    In your position, do you get copies of these

25   things now?
```

1        A.      Now I do, yes.

2        Q.      But this was back before you started and

3    before your position existed?

4        A.      Correct.

5        Q.      Do you take any actions in response to

6    receiving these reports of noncompliance?

7        A.      Other than reviewing them as best I can and

8    trying to remember them, no -- at that point, no.

9        Q.      So when you have a response, for example,

10   from the warden, so we'll just take this one as an

11   example.  There is a report of noncompliance, the warden

12   is notified, the warden issues his response, it gets

13   forwarded to various folks at CoreCivic and the TDOC,

14   and then what happens with that response?  Is there

15   someone -- I mean, really what I'm getting at is, is

16   there someone who is responsible to ensure that what the

17   warden says is happening as the correction actually

18   occurs?

19       A.      So yeah, the warden issues his POCA -- sorry,

20   plan of corrective action.  We call them POCAs.  And

21   then it's on our monitors, both the CMO and CMC, to keep

22   eyes on it going forward to ensure compliance, to

23   continually check up on it.  And if they're not doing

24   it, you know, what you'll see on the next noncompliance

25   report is, it will show up again.  And it will be

1    indicated as a repeat finding.

2        Q.    So do they kind of keep a, for lack of a

3    better term, kind of a checklist of these are the extra

4    things we're looking out for because we've had issues

5    there before, and they kind of keep up with that?

6        A.    Well, I don't know about checklist, because,

7    I mean, you know, these things that they're looking at

8    as far as compliance with the policies, I mean, they're

9    looking at them anyway all the time.  So I mean, the

10   idea is, if this corrective action is working, then

11   they're not going to see a deficiency that would result

12   in a finding.  So as far as like keeping a checklist of

13   looking at something extra, it's not really extra

14   because what they're looking at is, are you now

15   complying with policy and standards.

16       Q.    Okay, that makes sense.  Moving on, one of

17   the topics that we have here today is the contents and

18   findings of all TDOC audits, monitoring reports,

19   noncompliant reports or summaries, risk assessment

20   processes, enterprise risk processes and plans of

21   corrective action concerning Trousdale or its employees.

22   We'll kind of not sit here all day and go through all of

23   them, but let's kind of hit what we can.  Obviously, you

24   are familiar with the 2020 audit, you had already

25   mentioned that earlier, that was issued by the

1    comptroller's office; is that correct?

2         A.    Yes.

3         Q.    And then other than the comptroller's audits

4    that have occurred in the past, are you aware of any

5    other reports or investigations about Trousdale within

6    or outside of the department?

7         A.    So no, not specific to Trousdale.  I mean,

8    other -- I mean, I don't know what you mean by

9    investigations.  But obviously, I am aware we audit

10   them.  And then, you know, ACA audits them.  But beyond

11   that, I am aware that there was a 2017 comptroller

12   audit.  I am not familiar with the -- because that was

13   way before I was in this position, I am not familiar

14   with the specifics of that report.

15        Q.    When ACA or TDOC were to audit the facility,

16   do you get copies of those?

17        A.    Yes.

18        Q.    Do you know when the most recent ACA audit of

19   Trousdale was?

20        A.    Unfortunately, off the top of my head, I do

21   not.  That is something I could find out.

22        Q.    Do you know if any violations or areas of

23   concern were raised in that report?

24        A.    Not that I am aware of.  Nothing that would

25   affect their ACA accreditation.

Page 29

1        Q.    Anything having to do with staffing or level

2   of staffing?

3        A.    Not off the top of my head, not that I am

4   aware of.

5        Q.    And you said TDOC audits.  Has TDOC done an

6   internal audit of the Trousdale facility?

7        A.    Yes.

8        Q.    When was that?

9        A.    Now everything has gone away.  Hang on.

10  Actually, that was one thing I had ready and now it's

11  all gone away.

12            They were -- the preliminary report was from

13  February 5th of this year.  The date of the annual audit

14  was conducted on December 15th through the 17th of 2020.

15            MS. HERZFELD:  Tom, do you know if we have a

16  copy of those?

17            MR. AUMANN:  The ACA audit?

18            MS. HERZFELD:  No, the TDOC audit.

19            MR. AUMANN:  Of Trousdale?

20            MS. HERZFELD:  Yes.

21            MR. AUMANN:  I think they're -- I think you

22  should have the 2020 audit that was done.  I don't know

23  about the 2021 annual audit.  So I may have to obtain

24  that.

25            MS. HERZFELD:  I am not trying to give you

1    homework, I swear.  I appreciate it, thank you.

2    BY MS. HERZFELD:

3        Q.    Mr. Kelly -- Mr. Young, instead of Mr. Kelly.

4    Apologies.  My colleague's last name is Kelly, so I get

5    a little stuck with that.

6              Okay, in the TDOC audits, were there any

7    deficiencies found of the Trousdale facility?

8        A.    Yes.

9        Q.    Do you recall what they were?

10       A.    Findings related to administration, food

11   service, health, behavioral health, safety, security,

12   and treatment.

13       Q.    And safety, security, and treatment, what

14   were the general issues, the general concerns?

15       A.    Documentation on exit drills.  Documentation

16   related to daily inspections.  Physical plant -- there

17   were no lids on a trash can.  An issue with control of

18   non-hazardous cleaning materials.  Dryer vents not being

19   cleaned.  There was an issue of an instance where peer

20   management was not being observed.

21       Q.    I'm going to stop you right there.  You're

22   reading off of a screen, so I am guessing you are

23   reading from the audit itself?

24       A.    Yes.

25             MS. HERZFELD:  If we could just go ahead and

 1   make the audit that he is referring to as Exhibit 3 to

 2   the deposition.

 3                  (Exhibit 3 was marked late-filed.)

 4   BY MS. HERZFELD:

 5       Q.    And perhaps your counsel can help you submit

 6   that to the court reporter after the deposition, okay?

 7       A.    Sure.

 8       Q.    So other than the TDOC audit, which we just

 9   made an exhibit, and the two comptroller audits that we

10   talked about and the ACA audit, what other audits or

11   investigations of Trousdale are you aware of, if any?

12       A.    All right, I want to make sure I'm repeating

13   back what you said correctly.  We touched the ACA

14   audits.  We said the annual audits.  We said, of course,

15   the noncompliance reports, the monitoring by the

16   monitors.  Investigations specifically that I am aware

17   of, we've already referenced the use of force

18   investigation from back in January.  Other than that,

19   those are the only ones that I am aware of.

20       Q.    And the use of force investigation, that

21   would have been regarding Warden Byrd; is that right?

22       A.    Yes.

23       Q.    Do you know what the enterprise risk

24   management process is?

25       A.    It's a process wherein we kind of take a

Page 32

1   40,000-foot view of the department and identify risks

2   related to operations, very generalized risks related to

3   operations, and identify those as low, medium, high.

4   And then have, you know, basically, whatever the risk

5   is, is it acceptable within the practice.  And that's

6   the general idea of what it is.

7        Q.   Has that enterprise risk management

8   evaluation been done regarding Trousdale?

9        A.   It was done -- so it's -- it was done for

10  last year because it gets submitted in December of -- so

11  it would have been submitted December of last year for

12  that previous year.  So it would have been done with

13  relation to, you know, the department as a whole.  I'm

14  sure Trousdale was a factor within that, yeah.

15       Q.   Do you know what the results were regarding

16  Trousdale?

17       A.   Let's see.  Once again all my stuff went

18  away.

19            I'm looking at it now to see if we actually

20  had anything specific to Trousdale.

21            MS. HERZFELD:  And we'll make that Exhibit 4.

22            (Exhibit 4 was marked.)

23            THE WITNESS:  Nothing specific to Trousdale.

24  BY MS. HERZFELD:

25       Q.   And what about risk assessment processes, is

1    that a term of art?

2        A.    So that is a late arrival to the office of

3    inspector general.  And it's attached to our director of

4    contract -- vendor contract monitoring.  So that is

5    somewhat of a term of art.  It's attached to her, so

6    she's in charge of what we were just talking about, the

7    enterprise risk management.  But she is currently in the

8    process of developing methods to, obviously, do a little

9    more frequent and detailed just risk assessments across

10   the board within the department.

11       Q.    Do you know if any of those risk assessments

12   have been done regarding Trousdale?

13       A.    Not that I am aware of.

14       Q.    Do you know if there is any sort of plans of

15   corrective action for any individual employee, or

16   department, or Trousdale in general currently in place?

17       A.    I guess I'm -- I'll need a little bit of

18   clarification.  Do you mean is there any plan of

19   corrective action in place with relation to the most

20   current audit, or are you referring to have we, you

21   know, taken it higher than that and said, you know,

22   something -- I guess I am a little confused by what

23   exactly you're asking.

24       Q.    Thanks for clarification because it wasn't a

25   very good question.  Other than the reports that you

1    filed and followed up to the audit from 2020, kind of

2    separate from that audit process, is there anything else

3    kind of ongoing at Trousdale right now that you all are

4    monitoring closely?

5         A.    Well, we always -- I mean, everything with

6    regard to the performance, we monitor closely.  So I

7    guess nothing outside of what I said, because that would

8    run the gamut of everything they're supposed to do.

9         Q.    Do you know if there's any specific

10   investigations regarding Trousdale right now?

11        A.    None that I am aware of.

12        Q.    What about any employees at Trousdale, do you

13   know if there's any specific investigations regarding

14   the employees of Trousdale?

15        A.    Not that I am aware of.  And those

16   investigations are handled by our office of

17   investigations and conduct.  And so if there are any

18   investigations of that nature, they are kept

19   confidential at the time.  But I'm not aware of any.  I

20   haven't been alerted to any that are currently ongoing.

21        Q.    Thanks so much.  You've been in the position

22   now for about 15 months?

23        A.    Yeah.

24        Q.    And you worked for TDOC for a bit before

25   then?

1        A.      That's correct.

2        Q.      And do you know how much money that CoreCivic

3    has been assessed in liquidated damages because of

4    Trousdale in the last, say, five years?

5        A.      Off the top of my head, I do not.  And I

6    don't have that in front of me or available.  But no, I

7    don't have the figure available right this second.  I

8    know there have been, but I just don't know the total

9    amount.

10       Q.      Are you involved in that?  Are you made aware

11   of that information on a month-to-month basis?

12       A.      So, obviously, before I was in this position,

13   I wasn't a part of that.  So I didn't -- I wasn't

14   involved in that process.  Since I've been in this

15   position, that is something that falls under me, but

16   there haven't been -- you know, basically, I got this

17   position and then COVID showed up.  And so we all went

18   home and the entire world changed with regard to

19   corrections.  So to my knowledge, there have not been

20   any assessments against Trousdale while I've been in

21   this position.

22       Q.      So that would be in the last, say, 15 months?

23       A.      I believe so.  I'm not a hundred percent

24   certain, but I don't think there have been.  And if

25   there were, they were right after I had come on, so I

1    was marginally involved.

2         Q.    So can I take from that, that that means that

3    Trousdale is substantially complying with the contract

4    at this point?

5         A.    The answer to that would be that those

6    assessments for liquidated damages have not been issued,

7    that they are being reviewed and compiled now.

8         Q.    Reviewed and compiled, what do you mean by

9    that?

10        A.    So just because we haven't assessed

11   liquidated damages doesn't mean we haven't been

12   monitoring, and watching, and issuing reports of

13   noncompliance.  So, you know, we finally have gotten to

14   a point where we are kind of coming out of the worst of

15   things, and so we are now going back and reviewing those

16   NCRs and plans of corrective action to see if issues

17   were remedied.  And to the extent they weren't, we are

18   reviewing those for assessment of liquidated damages.

19        Q.    So is it fair to say that the normal process

20   perhaps took a little pause or has been delayed because

21   of Covid?

22        A.    Yeah.  I mean, we didn't stop monitoring them

23   by any means or keeping an eye on things, but the kind

24   of back-end of assessing the liquidated damages did kind

25   of go on hold.

Page 37

1      Q.     When do you think that those liquidated

2   damages assessments will be completed?  I am not holding

3   you to it, it's not a deadline.

4      A.     Good.  Don't tell my boss because when I put

5   deadlines out, I get myself in trouble.

6      Q.     Absolutely not.

7      A.     Within the next couple of weeks.

8      Q.     It looks like my lights just went off in my

9   office.  So if you all will just give me one quick

10  second to turn back on.  We're energy efficient here and

11  I apparently haven't been moving enough.  Give me one

12  second.

13             Besides liquidated damages, is there anything

14  else that the department can do to ensure compliance

15  with terms of the contract with Trousdale?

16     A.     The contract allows for, if there are

17  instances where, I mean, I guess we would call them huge

18  security risks or security issues or huge deficiencies,

19  the commissioner has the authority to, one, demand

20  immediate compliance, which would require an immediate

21  plan of corrective action.  He can then either accept

22  that or decline it or deny it, to which they have to

23  either come up with another plan or we give them a plan

24  to comply with.  Then those instances also allow for the

25  department's discretion, either a full or a partial

1    assumption of control to remedy the issue.  So that

2    would be the other mechanism.

3        Q.    Do you know if the department has ever taken

4    either of those actions against any facility?

5        A.    Not that I am aware of.

6        Q.    That would be a decision that would have to

7    be made by the commissioner or who?

8        A.    The commissioner.

9        Q.    I'm sorry, I might have asked you this

10   question already before, but what is the purpose of

11   liquidated damages?

12       A.    So liquidated damages are to make the

13   department whole for instances of noncompliance.  So

14   there is a -- you know, to the extent that they are not

15   complying and providing the services required by the

16   contract, it is a mechanism to make the department whole

17   to the amount that is, you know, kind of extended in

18   watching, you know, monitoring and going through the

19   process of monitoring and ensuring the corrective

20   actions are taken.

21       Q.    Can liquidated damages also be an incentive

22   for the contractor, in this case CoreCivic, to be in

23   compliance with the contract?

24       A.    Well, I mean, practically speaking, any time

25   -- such a thing would be a motivator.  Nobody wants to

1    receive, you know, a monetary penalty for not complying

2    with a term of a contract.

3         Q.    And would you agree that a higher economic

4    penalty, monetary penalty, is likely to spur more action

5    than a lower one?

6         A.    I mean, just logically, that would make

7    sense.  Of course, I can't speak to what CoreCivic

8    thinks, I'm not them.  But logically, one would think

9    that a higher penalty would garner more attention.

10        Q.    Other than exercise of the liquidated damages

11   clause, do you know any other fines or assessments that

12   have been levied against Trousdale?

13        A.    None that I am aware of.

14        Q.    Other than the noncompliance reports and

15   what's been identified in the various audits that we've

16   talked about, do you know of any other allegations that

17   CoreCivic has breached its contract with Trousdale via

18   TDOC?

19        A.    No, not that I am aware of.

20        Q.    What about other than those things we've

21   already discussed, any other finding that CoreCivic has

22   somehow deviated from or failed to comply with TDOC

23   policies?  Do you have any other knowledge of that?

24        A.    No, nothing other than what we've discussed.

25        Q.    Is TDOC involved in approving, denying, or

```
 1    modifying staffing requirements at the Trousdale

 2    facility?

 3          A.    Yes.  The assistant commissioner of prisons,

 4    so the operations side of things, is responsible for the

 5    review and approval of staffing patterns or staffing

 6    changes.

 7          Q.    Do you have any involvement in that?

 8          A.    I do not.

 9          Q.    And how long has that person, that department

10    been involved in the staffing changes review?

11          A.    Oh, they've always been the point on that.

12          Q.    Who is the person?  Do you know their name?

13          A.    The current assistant commissioner of prisons

14    is Lee Dotson, L-E-E, D-O-T-S-O-N.

15          Q.    And I think maybe I need to understand that

16    just a little bit better.  So when they are approving,

17    say, staffing patterns, that would be the number of

18    people that are supposed to be working in the shifts and

19    where they're supposed to working at; is that right?

20          A.    That's part of it.  So it's the -- I mean,

21    yes.  It's the number and where they're supposed to be

22    staffing a post.  It's also the position itself.  So the

23    number of COs, the number of sergeants, the number of

24    lieutenants, wardens, you know, medical people, et

25    cetera.
```

Page 41

1        Q.    Do they make a determination or assess

2    whether a position is a critical post or a noncritical

3    post?

4        A.    That is something that, yes, the assistant

5    commissioner of prisons and his shop weigh in and review

6    that.

7        Q.    So when those things are set and approved by

8    TDOC, that has the force of, this is the opinion of what

9    is appropriate by TDOC; is that right?

10       A.    Yes.

11       Q.    And if Trousdale is not providing staffing at

12   that level, that would be a violation of the approved

13   plan by TDOC; is that right?

14             MR. WELBORN:  Object to the form.

15             THE WITNESS:  Yes.

16   BY MS. HERZFELD:

17       Q.    And you had said before that your position

18   was created in response to the findings of the 2020

19   comptroller's audit; is that right?

20       A.    Yes.

21       Q.    And then that's when kind of that second

22   contract monitor came into place and that was kind of

23   brought in under your shop?

24       A.    Well, I think that he may have already filled

25   that position because the contract called for two

Page 42

1    contract monitors.  I think we just had a staffing

2    issue, for lack of a better term, of having a second

3    person in there.  So that may have already been filled.

4    I think it was actually filled before that shop moved

5    under me.

6         Q.    What other steps did TDOC take in response to

7    the 2020 audit by the comptroller's office?

8         A.    So there were -- of course, we've already

9    talked about the creation of my position.  The other

10   things related to contracts review, specifically related

11   to what would be, I guess, relevant to Trousdale would

12   be taking a look at incident reporting and the kind of

13   checks and balances with regard to that.  So there were

14   policy updates made to ensure and assist with accurate

15   incident reporting, accurate reporting of inmate deaths.

16   And that's kind of the general description.

17        Q.    Anything else that you can think of?

18        A.    There were some -- there were things with

19   regard to, I mean, there was, I think an STS finding

20   related to access to TOMIS.  So that was -- there was a

21   system put in place just to make sure were reviewing

22   access to TOMIS, which is our offender management

23   system, to ensure that, you know, people that either

24   left the department, left CoreCivic, or left the

25   contractor were not still maintaining access to the

Page 43

1    system.

2         Q.    Seems like that is a little important?

3         A.    Yes.

4         Q.    Can you think of anything else?

5         A.    Off the top of my head without having it

6    pulled up in front of me, no.

7              MS. HERZFELD:  Now, I am going to show you

8    what we will mark as Exhibit 5.  Carole, ignore the

9    numbers that I've got on my pre-marked exhibits.

10             (Exhibit 5 was marked.)

11   BY MS. HERZFELD:

12        Q.    Do you see this document in front of you?

13        A.    Yes.

14        Q.    And do you recognize it?

15        A.    Yes.

16        Q.    What do you recognize it to be?

17        A.    That is our six-month follow-up report to the

18   comptroller's office related to the 2020 comptroller

19   audit.

20        Q.    And those are the actions that the department

21   has said that it is taking or is in the process of

22   taking in order to respond to the report?

23        A.    Yes.

24        Q.    Has there been an update since this was

25   submitted?

Page 44

1          A.     No.  So there's not a -- the requirements are

2     for a six-month follow-up report.  There has not been an

3     updated report submitted to the comptroller's office.

4          Q.     And you're familiar with this document, it's

5     TDOC 029720?

6          A.     Yes.

7          Q.     In your familiarity with that document, do

8     you know if anything has changed since this has been

9     submitted on July 3rd of 2020?

10         A.     Some of the in-progress, the RDA corrective

11    action has -- I think there is a reference to a meeting

12    that was going to take place in the spring or in the

13    late fall.  Those meetings have occurred.  So to the

14    extent that those are part of those POCA, those have

15    been completed.

16                The in-progress with regard to the incident

17    reporting, part of that POCA was that the department was

18    going to go back and review the previous year's

19    incidents to make any corrections that needed to be

20    made.  Also related to that was the republication of the

21    2018 statistical abstract.  Those incident reviews have

22    been completed.  That information has been given to

23    research and planning, who is now in the process of

24    amending to correct and resubmit the 2018 statistical

25    abstract.  I think those are the highlights of the

1    things that happened since this one.

2        Q.    And the stuff that says it's ongoing, that's

3    stuff that is, you know, generally supposed to be

4    monitored on a continual basis, I would assume?

5        A.    Yeah.  So we took the position of -- you

6    know, yeah, we can amend policy, but we took the

7    position of that isn't enough.  So we want to make sure

8    we're doing ongoing, keeping an eye on things to make

9    sure we stay compliant.

10       Q.    Who is responsible for the ongoing nature of

11   the POCA, as you called it?

12       A.    That would be my -- one of my divisions, the

13   compliance division.  They keep an eye on our continued

14   compliance with those items.

15       Q.    And they are doing that as of today?

16       A.    Yes.

17       Q.    Okay, back to seeing my face?

18       A.    Yes.

19       Q.    One of the issues that was identified in one

20   of the audits, I think it was the 2020 audit, was

21   Trousdale having some difficulties with the grievance

22   process.  Do you know what I'm talking about?

23       A.    I believe it was findings related to abiding

24   by the timelines and time deadlines set forth in the

25   policy.

Page 46

1      Q.    What is being done to monitor that that is,

2    indeed, accurately being followed today?

3      A.    So what the CMCs would be doing is -- well,

4    the CMOs, too.  They kind of work in tandem.  But they

5    would be keeping an eye on -- you know, consistently

6    keeping an eye on filed grievances and then following up

7    with CoreCivic staff, the grievance chairperson, and

8    certainly the AWs to ensure that those seven-day, and

9    five-day, and some other deadlines are being met.

10     Q.    How do they do that?  Do they do a random

11   sample, is there a computerized basis, do they talk to

12   inmates, what do they do?

13     A.    All of the above.  You know, tools of the

14   trade with monitoring is to kind of use all of the tools

15   you have in your quiver or arrows in your quiver to make

16   sure you get an accurate view of things.  So they would

17   be able to, on a daily basis, they can look at -- in

18   TOMIS and you can see the grievances filed, you know,

19   within a given time.

20           Generally speaking, you know, as with any

21   audit, they'll take a sample and just use that sample as

22   a representation and look at those items, you know, look

23   at the documentation to make sure those timelines have

24   been met.

25     Q.    What about if grievances are submitted by the

1    prisoner, but are not entered into TOMIS, what is the

2    process to be able to identify that situation?

3         A.    Well, that's -- you know, you kind of brought

4    up the point, that's where the other avenues kind of

5    come in.  That's why they're having contact with the

6    grievance chairperson, AWs, and even to the extent that

7    inmates will reach out to the monitors and make -- bring

8    it to their attention.  That would be another avenue

9    that they have to look into things.

10        Q.    And if a prisoner had submitted a grievance

11   and that was not entered into TOMIS and it was kind of

12   off the radar, how would one know that they're off the

13   radar?

14        A.    So I'll use kind of a scenario example.  So

15   let's say that the CMC or the CMO are on the compound

16   just walking and an inmate comes up and says, hey, I

17   filed a grievance yesterday and I haven't heard anything

18   back, or I filed a grievance four days ago and I haven't

19   heard anything back.  So what the CMC can do, he can go,

20   he can look in TOMIS -- that's kind of first.  Look in

21   TOMIS, see if it's there.  If it's not, okay.

22             Then we talk to the grievance chairperson to

23   see if they've received the grievance.  Then if they

24   haven't and they have no record of the grievance,

25   there's still the question of was it actually submitted

1    in accordance with policy.

2            So then the question maybe comes back to the

3    inmate, who did you actually submit it to?  Do you know

4    who the staff member was?  Then you talk to that staff

5    member.  So you kind of investigate, you go through the

6    processes to find out if, one, if it was submitted; and

7    two, if there was a breakdown in the chain, where did it

8    happen and then address that breakdown.

9        Q.    What about for things that are considered to

10   be nongrievable?  How would those be tracked or

11   reported?

12       A.    Well, of course, they report -- even if it's

13   nongrievable, it's still required to be put into the

14   system and indicated as it was -- because the response

15   to the inmate is that it's nongrievable.  And then, you

16   know, as the handbook kind of sets out and the policy

17   sets out, those items that aren't grievable doesn't mean

18   they don't have an avenue to have it addressed.

19            That avenue is just -- those are in different

20   policies and different procedures.  So you know -- but

21   it's the same kind of thing.  If it's not identified in

22   TOMIS, even if it is nongrievable, that's still a

23   noncompliance because we still need to have a record of

24   that grievance being entered and it being indicated as

25   nongrievable.

1      Q.    How would a prisoner know if they've received

2    something back on their grievance and it says it's

3    nongrievable?  How would they know what their rights to

4    appeal are on a determination that something is

5    nongrievable?  Where would they find that?

6      A.    That would be in the grievance handbook.  And

7    inmates have access to that.  Of course, they have

8    access to all policies and it's something that's covered

9    generally under orientation.

10      Q.    Under orientation, what is the specific

11    process for appealing something if it's been determined

12    to be ungrievable?

13      A.    So it kind of depends on what the thing is.

14    So if it's related to -- you know, one of the things we

15    get a lot -- most of the things we get that are

16    nongrievable is an inmate disagreeing with a medical

17    diagnosis.  I mean, that's obvious.  I mean, no offense,

18    but a CO is not qualified and that process is not

19    appropriate to second guess a doctor.

20            But there -- of course, naturally, an inmate

21    would have to take that up with the physician.  Or, you

22    know, I don't know that this is specifically a

23    procedure, but generally what happens is letters get

24    written to our CMO's office who's here in central office

25    to have that reviewed or looked at.

1        Q.    But is that the actual process or that's

2    typically what happens?

3        A.    That's typically what happens.

4        Q.    Let's use your medical example, you know,

5    just as one.  So say someone says, I don't feel like I'm

6    getting, you know, adequate treatment for my deficiency

7    in my eyesight.  Let's just go with something basic.

8    They submit a grievance on that.  It comes back that

9    this is a nongrievable issue, it's medical, talk to your

10   doctor.  And the person says, no, no, no, I think it

11   actually implicates a constitutional right.  What would

12   they do to appeal that determination of nongrievability?

13       A.    Well, you don't really -- you can't really

14   appeal the fact that it's nongrievable.  You would just

15   address it through the avenues that are in policy.  I

16   don't have that policy pulled up in front of me, but I

17   think it's in the medical policy that sets out how they

18   can have their -- either a diagnosis or a treatment

19   reviewed above the facility level.

20       Q.    So I just want to make sure that I

21   understand.  So if any grievance, medical or not, if

22   somebody submits something and it comes back that this

23   is not on the list of things that are grievable, what is

24   one to do with that determination if they don't agree?

25       A.    Okay.  I see where you're going now.  So, you

1    know, the grievance handbook is very -- it has a list of

2    items that are not grievable.  And that list is fairly

3    specific, I would say.  So you know, if it's one of

4    those, that is a fairly simple thing.  There is really

5    no, I would say discussion on that one.  We've made that

6    very clear.

7             If it is something not on that list, but

8    either, for whatever reason, let's say the response is

9    it's not grievable.  Well, obviously, the inmate -- and

10   it happens, the inmate can appeal that.  I mean, they

11   really can.  What will happen is, is the response will

12   then be, it's not necessarily then a question of the

13   facts, necessarily, of the issue, you know what I'm

14   saying?  It's more they're appealing that this is not

15   grievable.

16            So then what would happen in the appeal is, a

17   determination is it or is it not grievable.  If it's

18   determined that, you know, they made -- the facility

19   made a mistake and it is grievable, then they send it

20   back and the process actually begins fresh.  If it's

21   agreed that it's not grievable, that notification goes

22   back to the inmate.  Of course, they, once again,

23   they'll appeal it up higher.  And the same kind of look

24   at that will happen.

25       Q.   So I just want to make sure I understand

1    then.  So if I understand correctly, then in the inmate

2    handbook, it will be here are the things that are

3    grievable -- or I guess it's the grievance handbook.

4    Here are the things that are grievable.  Here are the

5    things that, you know, are definitely not grievable.

6    And here is your appellate process if it's something

7    that's grievable.  And here is your appellate process if

8    it comes back as not grievable.

9              Is there an actual section that identifies

10   that appellate process for a determination that

11   something is nongrievable?

12       A.    Off the top of my head -- I haven't looked at

13   that and I've slept since then.  I don't know that it

14   specifically says, this is appeals for grievable, this

15   is appeals for nongrievable.  It just says an appeal

16   process.  And the appeal process references, obviously,

17   denials of a grievance.

18             So it's kind of -- it's really, you know, by

19   saying it's nongrievable, it's a denial of a grievance.

20   So they appeal it up from there.  I do know that the

21   handbook, when it lists out those items that are not

22   appealable, it does direct them to, you know, this is

23   not a grievable -- I'm sorry, it's not a grievable item.

24   It does direct them where and what policies to go to and

25   how they can address the issue through the other policy

1    and processes.

2        Q.    Sounds like maybe it's just a little bit

3    vague as to what is grievable and appealable.  So I

4    guess if you are an individual who is not a lawyer and

5    you're a prisoner there and you're reading your

6    grievance handbook to go through it -- I mean, I haven't

7    seen anything, which is legitimately why I am asking.  I

8    didn't see anything that gave a specific kind of, if

9    something comes back as nongrievable, here is how you

10   can appeal it, other than, I think as you said,

11   generally a denial of a grievance, here is your

12   appellate process.  Is that also your understanding?  I

13   just want to make sure I understand your testimony.

14             MR. WELBORN:  Object to the form.

15             THE WITNESS:  Without going back and reading

16   it word for word and, you know, qualifying my answer

17   with the fact that I am not looking at it and reading it

18   word for word, I would say yes.

19   BY MS. HERZFELD:

20       Q.    That's my understanding as well.  I just

21   wanted to make sure I understood your testimony.

22       Moving on to some of our other topics here.  Does

23   your office monitor press reports about incidents at

24   Trousdale?

25       A.    Monitor what?  I'm sorry.

1      Q.    Press reports.

2      A.    No.

3      Q.    Does anybody in your office have a

4   responsibility for setting up a Google alert if anybody

5   is talking about Trousdale in the press?

6      A.    I mean, I don't know about setting up a

7   Google alert, but we have a director of information, a

8   CIO, chief information officer, who is over all of that

9   press-related stuff.

10     Q.    And as the inspector, are you made aware of

11  various issues as they bubble up in the press?

12     A.    Sometimes.  I mean, if it's just a -- you

13  know, I guess if it's something where related to a

14  specific incident, I will be made aware of a story.  But

15  that would be about it.

16     Q.    Since you've been at TDOC, have you ever

17  known of CoreCivic being in violation of any policies

18  that have to do with religion?

19     A.    Not that I am aware of.

20     Q.    What about any violations concerning religion

21  at Trousdale?

22     A.    Not that I am aware of.

23     Q.    Do you know if any employee at any CoreCivic

24  facility has ever been disciplined for violating an

25  inmate's civil rights regarding religion?

1          A.     I don't know.

2          Q.     What about any investigations or complaints

3     about a failure to accommodate religious requests at

4     Trousdale?

5          A.     Nothing specific, though I would assume that

6     the religious activities committee gets requests or

7     complaints related to every facility.

8          Q.     And do you know why it is that halal prayer

9     oil is not permitted at the Trousdale facility?

10         A.     Well, the inmates, per our property memo,

11    have access to prayer oil that meets the requirements of

12    halal.  So they do have access to prayer oil for the

13    practice of their religion.  I'm not aware of any

14    restriction or prohibition at the Trousdale level of

15    access to the same oils that every other inmate has

16    access to.

17         Q.     What is your understanding of how the inmate

18    would get access to that prayer oil at Trousdale?

19         A.     They would order it through the approved

20    vendor.

21         Q.     And the approved vendor at Trousdale is who?

22         A.     It should be -- as far as I know, they use

23    the same vendor that we do, which is Union Supply.

24         Q.     Do you know if Union Supply has halal prayer

25    oil?

1      A.    Yes, they have prayer oil that meets the

2   requirements of the halal and practice of Islam.

3      Q.    How do you know that?

4      A.    It has been -- I know that that has been an

5   issue that has been brought up to the rack before.  And

6   I know that -- I am aware that the rack has made

7   inquiries to Union Supply.  And the information that

8   they have received has confirmed that it does meet the

9   religious requirements for Islam.  As well as I am aware

10  that rack has consulted with an Imam who has also

11  confirmed that it does meet those requirements.

12     Q.    Do you know if any of that information is in

13  writing?

14     A.    I mean, I don't have it here in front of me.

15  It would be -- if it is in writing, it would be

16  something that would have been confirmed or documented

17  by the rack committee, perhaps in a response to a

18  complaint or a request.

19     Q.    Who is it that I would talk to to find out

20  that information of what investigation they did to

21  ensure that the prayer oil is religiously appropriate

22  for a Muslim?

23     A.    The person that oversees the religious

24  committee would be the director of religious services,

25  Robert Hill.

Page 57

```
 1        Q.    So you think Mr. Hill is the one I could ask
 2   those questions to?
 3        A.    That would be -- he would definitely have the
 4   knowledge.
 5        Q.    And what about kuffain prayer socks, do you
 6   have any knowledge about an inmate's access to kuffain
 7   prayer socks?
 8        A.    I'm not aware of any access or denial of
 9   access or requests for them.
10              MS. HERZFELD:  If you will just give me one
11   minute.  If we can go off the record for one second.
12              (Off-the-record discussion.)
13              MS. HERZFELD:  Mr. Young, I'm going to
14   discuss with your counsel taking a further deposition of
15   Mr. Hill to get more information about some of the
16   religious questions.  But so far as you're concerned, I
17   don't have any further questions of you today, so I will
18   pass the witness.
19              MR. WELBORN:  I don't have any questions.
20              MS. HERZFELD:  Nikki, any follow-up?
21              MS. HESHEMIAN:  We don't have any follow-up
22   questions.
23              MS. HERZFELD:  Mr. Young, you're excused.
24              FURTHER DEPONENT SAITH NOT.
25
```

Case 3:22-cv-00093   Document 37-7   Filed 03/23/22   Page 57 of 70 PageID #: 3536

Page 58

1                          CERTIFICATE

2

    STATE OF TENNESSEE        )
3                             )   SS.
    COUNTY OF DAVIDSON         )

4

5              I, CAROLE K. BRIGGS, Licensed Court Reporter

6    within and for the State of Tennessee, do hereby certify

7    that the above deposition was reported by me and that

8    the foregoing pages of the transcript is a true and

9    accurate record to the best of my knowledge, skills, and

10   ability.

11             I further certify that I am not a relative,

12   counsel or attorney of either party nor employed by any

13   of the parties in this case or otherwise interested in

14   the event of this action.

15             IN WITNESS WHEREOF, I have hereunto affixed my

16   official hand on this 8th day of July 2021.

17

18

19

20   CAROLE K. BRIGGS

21   Shorthand Reporter

22   Tennessee License No. 345

23

24

25

**Exhibits**

**Exhibit 1** 13:4,7
**Exhibit 2** 21:25 22:9
**Exhibit 5** 43:8,10

**$**

**$2** 17:17
**$250** 17:15,19,22

**0**

**016160** 22:12
**016161** 24:8
**029720** 44:5

**1**

**1** 13:4,7
**15** 34:22 35:22
**15th** 29:14
**17th** 29:14
**18** 5:4

**2**

**2** 21:25 22:9
**2007** 6:13 8:24
**2008** 9:1
**2010** 9:6
**2012** 9:10
**2014** 9:14
**2016** 8:21 9:17
**2017** 28:11
**2018** 23:5,6 44:21,24
**2019** 23:4
**2020** 6:6 10:4 27:24 29:14,22 34:1 41:18 42:7 43:18 44:9 45:20
**2021** 5:4 29:23

**205** 20:22
**250** 17:25

**3**

**3** 31:1,3
**30(b)(6)** 10:24 13:7
**31st** 23:4
**3rd** 44:9

**4**

**4** 32:21,22
**40,000-foot** 32:1

**5**

**5** 43:8,10
**5th** 29:13

**9**

**91** 25:13
**91-page** 22:13
**9:04** 5:2,4

**A**

**a.m.** 5:2,4
**abiding** 45:23
**ability** 11:8 13:19 24:5
**Absolutely** 37:6
**abstract** 44:21,25
**ACA** 14:20 15:3,12 28:10,15,18, 25 29:17 31:10,13
**accept** 37:21
**acceptable** 32:5
**access** 12:15 42:20,22,25 49:7,8 55:11,12,15,16,18 57:6,8,9
**accommodate** 55:3
**accommodation** 11:21
**accordance** 14:19,21,23,24

15:2,19 18:13 48:1
**accreditation** 28:25
**accurate** 42:14,15 46:16
**accurately** 46:2
**action** 18:23 26:20 27:10,21 33:15,19 36:16 37:21 39:4 44:11
**actions** 26:5 38:4,20 43:20
**active** 21:11
**activities** 55:6
**activity** 9:6
**actual** 18:9 50:1 52:9
**address** 18:19 48:8 50:15 52:25
**addressed** 48:18
**adequate** 50:6
**administration** 10:7,9,10 30:10
**administrator** 21:13
**advance** 8:1
**affect** 28:25
**agree** 5:6,9,12,15 39:3 50:24
**agreed** 51:21
**ahead** 18:24 30:25
**alert** 54:4,7
**alerted** 34:20
**allegations** 11:22 12:4 39:16
**amend** 45:6
**amending** 44:24
**Amendment** 11:23
**amount** 16:22,25 17:2,7,10 18:1 35:9 38:17
**annual** 29:13,23 31:14
**answering** 17:11
**Apologies** 30:4
**apparently** 37:11
**appeal** 49:4 50:12,14 51:10,16, 23 52:15,16,20 53:10
**appealable** 52:22 53:3
**appealing** 49:11 51:14
**appeals** 52:14,15

**appellate** 52:6,7,10 53:12

**appointed** 24:17

**appropriately** 16:4

**approval** 40:5

**approved** 41:7,12 55:19,21

**approving** 39:25 40:16

**April** 9:1

**area** 20:2,8

**areas** 28:22

**arrival** 33:2

**arrows** 46:15

**art** 33:1,5

**assess** 16:24 41:1

**assessed** 35:3 36:10

**assessing** 16:22 36:24

**assessment** 27:19 32:25 36:18

**assessments** 14:25 33:9,11 35:20 36:6 37:2 39:11

**assist** 42:14

**assistant** 8:25 9:4 19:6 40:3,13 41:4

**associate** 6:8

**assume** 6:23 45:4 55:5

**assuming** 10:23

**assumption** 38:1

**attached** 33:3,5

**attachment** 13:12

**attention** 39:9 47:8

**attorney** 5:5 7:23 8:25 9:4,11 22:25

**attorney's** 8:24 9:2

**attorneys** 10:23

**audit** 10:4 27:24 28:9,12,15,18 29:6,13,17,18,22,23 30:23 31:1,8, 10 33:20 34:1,2 41:19 42:7 43:19 45:20 46:21

**audits** 27:18 28:3,10 29:5 30:6 31:9,10,14 39:15 45:20

**August** 8:23

**Aumann** 5:13 7:23 29:17,19,21

**authority** 37:19

**autonomy** 21:17

**avenue** 47:8 48:18,19

**avenues** 47:4 50:15

**aware** 10:22 28:4,9,11,24 29:4 31:11,16,19 33:13 34:11,15,19 35:10 38:5 39:13,19 54:10,14,19, 22 55:13 56:6,9 57:8

**awful** 7:10

**AWS** 46:8 47:6

---

**B**

**back** 9:7 13:20 18:2 19:22 25:6 26:2 31:13,18 36:15 37:10 44:18 45:17 47:18,19 48:2 49:2 50:8,22 51:20,22 52:8 53:9,15

**back-end** 36:24

**bad** 7:9

**balances** 42:13

**Ballinger** 9:12

**based** 16:23 17:8,23

**basic** 50:7

**basically** 32:4 35:16

**basis** 35:11 45:4 46:11,17

**Bates** 22:12

**beds** 14:18

**began** 5:2

**begins** 51:20

**behalf** 5:8,12,14 11:3 13:8,14

**behavioral** 10:15 14:23 30:11

**Bellar** 22:24

**benefit** 21:18

**big** 15:20

**bit** 9:19 15:17 18:2 33:17 34:24 40:16 53:2

**board** 15:21 16:1 33:10

**Bobby** 9:12

**boss** 37:4

**Brad** 22:25

**Brandon** 22:24

**breached** 39:17

**break** 6:25

**breakdown** 48:7,8

**Briggs** 7:15

**bring** 47:7

**broke** 17:17

**brought** 41:23 47:3 56:5

**Brun** 19:13 23:14

**bubble** 54:11

**buds** 17:17

**busy** 9:18

**butchered** 7:24

**Byrd** 24:21,23 31:21

---

**C**

**call** 26:20 37:17

**called** 41:25 45:11

**capacity** 11:2

**caption** 12:11

**carbon** 25:15

**care** 14:21 15:14

**Carole** 43:8

**Carolyn** 21:9

**case** 6:24 12:11 23:13 24:12 38:22

**cases** 9:9

**Center** 22:24

**central** 49:24

**cetera** 10:11 40:25

**chain** 21:2,3,4 23:24 48:7

**chairperson** 46:7 47:6,22

**chance** 24:4

**changed** 35:18 44:8

**charge** 33:6

**chat** 12:14,15 13:2 22:3,5

**check** 26:23

**checklist** 27:3,6,12

**checks** 42:13

**chief** 54:8

**Christopher** 19:13 23:14

**CIO** 54:8

**civil** 54:25

**clarification** 14:6 33:18,24

**classifications** 14:25

**clause** 39:11

**cleaned** 30:19

**cleaning** 30:18

**clear** 51:6

**click** 12:21

**closely** 34:4,6

**club** 9:24

**CMC** 19:10,14 26:21 47:15,19

**CMCS** 46:3

**CMO** 19:10,13 23:13 26:21 47:15

**CMO's** 49:24

**CMOS** 21:14 46:4

**CNC** 18:9

**colleague's** 30:4

**collective** 22:11

**comfortable** 6:19

**command** 21:3,4

**commissioner** 11:7,8 19:6 37:19 38:7,8 40:3,13 41:5

**committee** 55:6 56:17,24

**communication** 21:11,16

**commute** 20:3,10

**compiled** 36:7,8

**complaint** 12:1 56:18

**complaints** 55:2,7

**completed** 37:2 44:15,22

**compliance** 10:6 16:17 18:10, 16,20 19:9 23:1 26:22 27:8 37:14, 20 38:23 45:13,14

**compliant** 45:9

**comply** 37:24 39:22

**complying** 27:15 36:3 38:15 39:1

**compound** 47:15

**comptroller** 10:4 28:11 31:9 43:18

**comptroller's** 28:1,3 41:19 42:7 43:18 44:3

**computerized** 46:11

**concern** 28:23

**concerned** 57:16

**concerns** 30:14

**conclusion** 9:6

**conditions** 11:24

**conduct** 14:24 34:17

**conducted** 29:14

**confidential** 34:19

**confirmed** 56:8,11,16

**confused** 17:6 33:22

**consecutively** 22:16

**considered** 48:9

**consistent** 16:1

**consistently** 46:5

**conspiracy** 9:9

**constant** 21:15

**constitutional** 14:20 15:5,9,12 50:11

**consulted** 56:10

**contact** 47:5

**contents** 27:17

**continual** 45:4

**continually** 26:23

**continue** 7:11

**continued** 45:13

**continuity** 15:21,24

**contract** 10:13,14,16 13:25 14:3, 7,9,12,16 15:6,10 16:3,8,11,15, 17,21 17:3,16 18:5,7,9,10,14

**contractor** 38:22 42:25

**contracts** 10:7,9,11 42:10

**control** 30:17 38:1

**copied** 25:21

**copies** 25:24 28:16

**copy** 25:16 29:16

**Corecivic** 5:12 10:13 14:1,8 17:1 18:6 20:12,20 21:4,13 26:13 35:2 38:22 39:7,17,21 42:24 46:7 54:17,23

**Corecivic-operated** 15:23

**correct** 11:18 14:5 20:13 24:1,6 26:4 28:1 35:1 44:24

**correction** 6:1 22:21 26:17

**correctional** 14:15 21:12 22:24

**corrections** 35:19 44:19

**corrective** 18:23 26:20 27:10,21 33:15,19 36:16 37:21 38:19 44:10

**correctly** 17:12 22:21 23:2,6 24:2 31:13 52:1

**COS** 40:23

**Cotham** 22:25

**counsel** 6:9 7:20 22:14 31:5 57:14

**counsel's** 9:15

**count** 23:5

**County** 14:7,8,10 22:25

**couple** 37:7

**court** 5:3 9:13 31:6

**covered** 49:8

**Covid** 35:17 36:21

**created** 10:3 41:18

**creation** 42:9

**crime** 9:5

**crimes** 9:5

**criminal** 9:11,13

**critical** 41:2

**cured** 16:19

**current** 24:15 33:20 40:13

---

### D

**D-O-T-S-O-N** 40:14

**D.a.'s** 9:7

**daily** 18:11 30:16 46:17

**damage** 16:20,25 17:15 18:1

**damages** 16:10,15,16 17:4 35:3
36:6,11,18,24 37:2,13 38:11,12,
21 39:10

**date** 29:13

**dated** 23:4

**day** 7:1 18:18 27:22

**days** 8:5 47:18

**deadline** 37:3

**deadlines** 37:5 45:24 46:9

**deaths** 42:15

**December** 23:6 29:14 32:10,11

**decision** 38:6

**decline** 37:22

**defendants** 5:14

**defense** 9:11,13

**deficiencies** 30:7 37:18

**deficiency** 27:11 50:6

**delayed** 36:20

**demand** 37:19

**denial** 52:19 53:11 57:8

**denials** 52:17

**deny** 37:22

**denying** 39:25

**department** 5:25 9:15 10:24
11:3 13:14 16:20,23 18:8 20:21
21:6,18 22:21 28:6 32:1,13 33:10,
16 37:14 38:3,13,16 40:9 42:24
43:20 44:17

**department's** 37:25

**departmental** 8:12,13 10:11

**depends** 49:13

**DEPONENT** 57:24

**deposed** 5:18 6:14

**deposition** 5:1,7,9 8:2 31:2,6
57:14

**depositions** 5:4 9:21

**description** 42:16

**designee** 10:24

**detailed** 33:9

**determination** 41:1 49:4 50:12,
24 51:17 52:10

**determined** 49:11 51:18

**determining** 16:22

**developing** 33:8

**development** 10:9

**developmental** 9:16

**deviated** 39:22

**diagnosis** 49:17 50:18

**dictate** 17:25

**diet** 8:15

**difference** 17:6

**difficulties** 45:21

**direct** 52:22,24

**directly** 8:23 10:3

**director** 21:1,9 33:3 54:7 56:24

**disabilities** 9:16

**disagreeing** 49:16

**disciplinary** 14:25

**disciplined** 54:24

**discretion** 37:25

**discuss** 57:14

**discussed** 39:21,24

**discussion** 12:20 51:5 57:12

**distinct** 10:18

**district** 8:24,25 9:3

**division** 45:13

**divisions** 45:12

**doctor** 49:19 50:10

**document** 12:11 22:11,13,15
43:12 44:4,7

**documentation** 30:15 46:23

**documented** 56:16

**dollars** 17:18

**Dotson** 40:14

**dream** 6:17

**drills** 30:15

**drop** 12:14

**Dryer** 30:18

**duly** 5:18

---

### E

**ear** 17:17

**earlier** 23:10,15 27:25

**easier** 22:7

**easiest** 12:22 22:8

**economic** 39:3

**efficient** 37:10

**Eighth** 11:23

**employed** 5:25

**employee** 21:1 33:15 54:23

**employees** 23:12 27:21 34:12,
14

**end** 12:6

**energy** 37:10

**enforced** 14:3

**enlighten** 25:19

**ensure** 15:14 20:15 21:6 26:16,
22 37:14 42:14,23 46:8 56:21

**ensuring** 38:19

**entered** 47:1,11 48:24

**enterprise** 27:20 31:23 32:7 33:7

**entire** 35:18

**entirety** 18:20

**Erin** 5:11

**evaluation** 32:8

**event** 16:20 25:20

**everyday** 20:17

**exact** 20:8

**EXAMINATION** 5:20

**examined** 5:18

**excessive** 25:8

**excused** 57:23

**executive** 11:14

**exercise** 39:10

**exhibit** 12:8 13:4,7 21:25 22:9,11 31:1,3,9 32:21,22 43:8,10

**exhibits** 43:9

**existed** 26:3

**exit** 30:15

**explaining** 17:13

**extended** 38:17

**extent** 36:17 38:14 44:14 47:6

**extra** 27:3,13

**eye** 21:17 36:23 45:8,13 46:5,6

**eyes** 26:22

**eyesight** 50:7

---

### F

**face** 45:17

**facilities** 10:13 18:6 20:7,24 21:13

**facility** 14:14 15:2,23,24 18:13 19:2,25 20:4,17 21:7 22:20 24:10, 24 25:2 28:15 29:6 30:7 38:4 40:2 50:19 51:18 54:24 55:7,9

**fact** 20:19 50:14 53:17

**factor** 32:14

**facts** 51:13

**failed** 39:22

**failure** 55:3

**fair** 36:19

**fairly** 51:2,4

**fall** 44:13

**falls** 35:15

**familiar** 25:15 27:24 28:12,13 44:4

**familiarity** 13:25 44:7

**February** 29:13

**federal** 9:1,13 14:20 15:12

**feel** 50:5

**fifty** 17:18

**figure** 12:16 17:8 35:7

**filed** 34:1 46:6,18 47:17,18

**filled** 41:24 42:3,4

**final** 18:1

**finally** 36:13

**find** 21:20 28:21 48:6 49:5 56:19

**finding** 27:1,12 39:21 42:19

**findings** 27:18 30:10 41:18 45:23

**fines** 39:11

**fire** 11:9

**firm** 9:11

**Fisher** 21:14

**five-day** 46:9

**folks** 7:9 26:13

**follow-up** 43:17 44:2 57:20,21

**food** 10:16 11:22 30:10

**force** 25:8 31:17,20 41:8

**foregoing** 5:1

**forgive** 12:3

**form** 7:10 16:5 25:9 41:14 53:14

**forward** 26:22

**forwarded** 26:13

**found** 30:7

**frequent** 33:9

**fresh** 51:20

**front** 12:10 17:22 21:25 22:3,6 35:6 43:6,12 50:16 56:14

**full** 37:25

**fuzzy** 12:3

---

### G

**gamut** 15:1 34:8

**gang** 9:5,6

**garner** 39:9

**gave** 53:8

**general** 6:3,9 9:15 10:1 11:6,15 30:14 32:6 33:3,16 42:16

**general's** 7:23

**generalized** 32:2

**generally** 14:17 15:5 18:21 20:2, 5,8 45:3 46:20 49:9,23 53:11

**gentleman** 23:14

**give** 12:9,24 13:12 29:25 37:9,11, 23 57:10

**glance** 25:12

**good** 5:3 9:24 13:20 33:25 37:4

**goodness** 8:16

**Google** 54:4,7

**government** 11:12

**governor** 11:13

**graduate** 6:12

**graduated** 8:19

**grant** 9:1,6

**great** 10:22 11:5 13:1,3 16:10 19:1 23:17

**grid** 17:8,11,21,23

**grievable** 48:17 50:23 51:2,9,15, 17,19,21 52:3,4,5,7,8,14,23 53:3

**grievance** 8:14 15:1 45:21 46:7 47:6,10,17,18,22,23,24 48:24 49:2,6 50:8,21 51:1 52:3,17,19 53:6,11

**grievances** 46:6,18,25

**guarantee** 6:20

**guess** 11:13 14:5,6 17:5 19:10 23:18 33:17,22 34:7 37:17 42:11 49:19 52:3 53:4 54:13

**guessing** 30:22

## H

halal  55:8,12,24 56:2

handbook  48:16 49:6 51:1 52:2, 3,21 53:6

handled  34:16

hands  21:10

Hang  29:9

happen  48:8 51:11,16,24

happened  45:1

happening  26:17

hard  7:15

Hashemian  5:14

head  8:17 20:18 28:20 29:3 35:5 43:5 52:12

health  10:15 14:23 30:11

hear  7:10

heard  47:17,19

Herzfeld  5:8,20 13:1,5 16:6,9 22:10,14,17 25:11 29:15,18,20,25 30:2,25 31:4 32:21,24 41:16 43:7, 11 53:19 57:10,13,20,23

Heshemian  7:24 57:21

hey  47:16

high  32:3

high-level  9:8

higher  33:21 39:3,9 51:23

highlights  44:25

Hill  56:25 57:1,15

hit  27:23

hold  36:25

holding  37:2

home  35:18

homework  30:1

honestly  24:17 25:17

hope  12:16 17:11

hour  8:6 20:9

hours  8:6

house  14:18,19

housing  14:14 15:25

huge  37:17,18

hundred  17:18 19:21 35:23

## I

idea  27:10 32:6

identified  16:19 39:15 45:19 48:21

identifies  52:9

identify  18:15 23:20 32:1,3 47:2

ignore  43:8

Imam  56:10

implicates  50:11

important  43:2

in-progress  44:10,16

incentive  38:21

incident  8:16 25:5,7 42:12,15 44:16,21 54:14

incidents  44:19 53:23

incorporated  15:5,10

independence  20:16 21:7

independent  11:16

individual  33:15 53:4

information  35:11 44:22 54:7,8 56:7,12,20 57:15

inherited  19:22

inmate  42:15 47:16 48:3,15 49:16,20 51:9,10,22 52:1 55:15, 17

inmate's  54:25 57:6

inmates  14:14,18,19 15:14,25 46:12 47:7 49:7 55:10

inquiries  56:7

inspections  30:16

inspector  6:3 10:1 11:6,15 33:3 54:10

instance  30:19

instances  37:17,24 38:13

institution  14:19

instructs  7:12

intellectual  9:16

internal  29:6

introduce  5:5

investigate  48:5

investigation  31:18,20 56:20

investigations  28:5,9 31:11,16 34:10,13,16,17,18 55:2

involved  35:10,14 36:1 39:25 40:10

involvement  40:7

Islam  56:2,9

issue  17:9,15 21:20 24:5 30:17, 19 38:1 42:2 50:9 51:13 52:25 56:5

issued  27:25 36:6

issues  16:18 23:21 26:12,19 27:4 30:14 36:16 37:18 45:19 54:11

issuing  36:12

item  18:15 52:23

items  17:22 45:14 46:22 48:17 51:2 52:21

## J

January  23:4 25:6 31:18

job  10:1

Joe  5:11

John  19:14,20 21:13

joined  19:19

Jordan  21:10

July  44:9

jump  9:17

jumping  8:17

June  5:4

## K

K-E-L-L-Y  5:23

**keeping** 21:17 27:12 36:23 45:8 46:5,6

**Kelly** 5:17,23 30:3,4

**kind** 11:21 15:16 19:22 20:24 25:12 27:2,3,5,22,23 31:25 34:1,3 36:14,23,24 38:17 41:21,22 42:12,16 46:4,14 47:3,4,11,14,20 48:5,16,21 49:13 51:23 52:18 53:8

**knowledge** 35:19 39:23 57:4,6

**kuffain** 57:5,6

---

**L**

**L-E-E** 40:14

**lack** 18:11 27:2 42:2

**late** 33:2 44:13

**late-filed** 31:3

**law** 6:12 8:20,23 15:15

**lawsuit** 11:19

**lawyer** 6:10 7:11 14:6 53:4

**lawyer's** 6:17

**lays** 16:21 20:24

**Lee** 40:14

**left** 24:25 42:24

**legitimately** 53:7

**legs** 7:3

**letters** 49:23

**level** 16:23 29:1 41:12 50:19 55:14

**levied** 39:12

**liaisons** 20:20

**lids** 30:17

**lieutenants** 40:24

**life** 15:13

**lights** 37:8

**limit** 17:15

**liquidated** 16:10,14,16,20,24 17:3,15 18:1 35:3 36:6,11,18,24 37:1,13 38:11,12,21 39:10

**list** 50:23 51:1,2,7

**lists** 52:21

**live** 20:2,3,7

**living** 20:9

**Location** 22:23

**logically** 39:6,8

**long** 6:4 8:4 13:25 40:9

**looked** 18:20 49:25 52:12

**lot** 7:10 9:21 49:15

**low** 32:3

**lower** 39:5

**luck** 13:20

---

**M**

**made** 9:17 10:22 31:9 35:10 38:7 42:14 44:20 51:5,18,19 54:10,14 56:6

**maintain** 20:16

**maintaining** 21:17 42:25

**maintenance** 14:13

**make** 6:20 14:5 16:3 21:16 25:13 31:1,12 32:21 38:12,16 39:6 41:1 42:21 44:19 45:7,8 46:15,23 47:7 50:20 51:25 53:13,21

**makes** 21:10 22:7 27:16

**making** 15:8 23:13

**managed** 20:24

**management** 30:20 31:24 32:7 33:7 42:22

**March** 19:23

**marginally** 36:1

**mark** 13:6 21:24 43:8

**marked** 13:4 22:9 31:3 32:22 43:10

**materials** 30:18

**Mcgee** 9:11,12

**means** 11:1 25:16,18 36:2,23

**measures** 20:14

**mechanism** 38:2,16

**medical** 10:15 14:22 40:24 49:16 50:4,9,17,21

**medium** 32:3

**meet** 8:1 56:8,11

**meeting** 8:11 44:11

**meetings** 8:8 44:13

**meets** 55:11 56:1

**member** 48:4,5

**memo** 55:10

**mentioned** 27:25

**met** 8:6 46:9,24

**method** 15:25

**methods** 33:8

**mid-march** 6:6

**Middle** 9:3,14

**minute** 12:18 13:12 57:11

**mirrors** 15:16

**mistake** 51:19

**mixture** 11:21

**modifying** 40:1

**moment** 12:9

**Monday** 8:5

**monetary** 16:25 39:1,4

**money** 16:4 35:2

**monitor** 18:7,9,12 19:5,9,14,16, 18 20:6 23:1 34:6 41:22 46:1 53:23,25

**monitored** 14:3 45:4

**monitoring** 10:13,14,16 16:17 20:23 21:1,9 27:18 31:15 33:4 34:4 36:12,22 38:18,19 46:14

**monitors** 18:5,7 19:2,24 20:6,15 21:11 26:21 31:16 42:1 47:7

**month-to-month** 35:11

**monthly** 18:12

**months** 34:22 35:22

**morning** 5:3 8:6

**motivator** 38:25

**move** 15:23 20:6

**moved** 10:7,8,13,17 42:4

**moving** 27:16 37:11 53:22

**multipliers** 17:23,24

**Muslim** 56:22

---

### N

**names** 19:11

**narcotics** 9:9

**Nashville** 8:25

**naturally** 49:20

**nature** 34:18 45:10

**NCRS** 36:16

**necessarily** 20:7 51:12,13

**needed** 44:19

**Neighborhood** 9:2

**Nikki** 5:13 7:24 57:20

**non-hazardous** 30:18

**noncompliance** 16:18,23,24
17:1,9,24 18:3,4,17 21:20 22:20
23:9,21 25:22 26:6,11,24 31:15
36:13 38:13 39:14 48:23

**noncompliances** 18:19

**noncompliant** 27:19

**noncritical** 41:2

**nongrievability** 50:12

**nongrievable** 48:10,13,15,22,25
49:3,5,16 50:9,14 52:11,15,19
53:9

**normal** 36:19

**notice** 13:8,13

**notification** 22:20 51:21

**notifications** 23:9

**notified** 18:4 26:12

**notify** 18:17

**number** 17:9 20:22 22:12 40:17,
21,23

**numbered** 22:16

**numbers** 43:9

---

### O

**object** 7:8,10 16:5 25:9 41:14
53:14

**observations** 23:13

**observed** 30:20

**obtain** 29:23

**obvious** 49:17

**occurred** 25:5 28:4 44:13

**occurs** 26:18

**October** 23:5

**off-the-record** 57:12

**offender** 42:22

**offense** 49:17

**office** 6:9 7:23 8:24 9:2,7,15 10:5
19:24 28:1 33:2 34:16 37:9 42:7
43:18 44:3 49:24 53:23 54:3

**officer** 54:8

**oil** 55:9,11,12,18,25 56:1,21

**oils** 55:15

**ongoing** 34:3,20 45:2,8,10

**operated** 22:19

**operates** 15:18

**operating** 15:19

**operation** 14:13 18:13 21:8,12

**operations** 18:7,8 19:5,13 32:2,3
40:4

**opinion** 41:8

**opportunity** 11:25 13:11 22:18
24:1

**order** 20:3,15 21:6 43:22 55:19

**organized** 9:5

**orientation** 49:9,10

**oversees** 56:23

**oversight** 10:12 11:16 14:9

---

### P

**pages** 25:13

---

**painless** 6:20

**Parker** 11:7,8

**part** 16:20 17:20 35:13 40:20
44:14,17

**partial** 37:25

**pass** 57:18

**past** 28:4

**patterns** 40:5,17

**pause** 36:20

**payment** 17:1

**PC** 25:14,15,16,18

**peer** 30:19

**penalty** 39:1,4,9

**pending** 7:5

**people** 17:14 19:11 20:9,11,12
25:21 40:18,24 42:23

**percent** 19:21 35:23

**performance** 34:6

**permitted** 55:9

**person** 18:10 40:9,12 42:3 50:10
56:23

**personal** 11:2

**Physical** 30:16

**physician** 49:21

**piece** 16:16

**place** 10:10 20:15 21:6 33:16,19
41:22 42:21 44:12

**plan** 26:20 33:18 37:21,23 41:13

**planning** 44:23

**plans** 27:20 33:14 36:16

**plant** 30:16

**Pleasant-bey** 5:9

**plug** 17:9

**POCA** 26:19 44:14,17 45:11

**POCAS** 26:20

**point** 19:15 20:22 21:10 26:8
36:4,14 40:11 47:4

**policies** 8:12,13 14:22,23,24
15:2,4 20:14 21:5 23:20 27:8

39:23 48:20 49:8 52:24 54:17

**policy** 8:14,15 15:15,20 18:16
20:21,23 27:15 42:14 45:6,25
48:1,16 50:15,16,17 52:25

**Polly** 5:11

**position** 6:2,4 9:14,25 10:3
11:15,17 24:24 25:24 26:3 28:13
34:21 35:12,15,17,21 40:22 41:2,
17,25 42:9 45:5,7

**positions** 19:12

**post** 40:22 41:2,3

**practically** 38:24

**practice** 9:10 21:14,15 32:5
55:13 56:2

**practices** 21:5

**prayer** 55:8,11,12,18,24 56:1,21
57:5,7

**pre-marked** 43:9

**preliminary** 29:12

**prepare** 8:10

**prepared** 13:17

**present** 8:7

**press** 53:23 54:1,5,11

**press-related** 54:9

**previous** 24:20 32:12 44:18

**Prior** 6:8

**prisoner** 47:1,10 49:1 53:5

**prisons** 19:7 40:3,13 41:5

**private** 9:10

**privately** 20:23 22:19

**problem** 6:22 13:3 21:21

**procedure** 49:23

**procedures** 8:14 15:1 20:25
23:5 48:20

**process** 16:16,19 23:24 31:24,25
33:8 34:2 35:14 36:19 38:19
43:21 44:23 45:22 47:2 49:11,18
50:1 51:20 52:6,7,10,16 53:12

**processes** 27:20 32:25 48:6
53:1

**programming** 14:21

**programs** 8:15

**prohibition** 55:14

**Project** 9:2

**promise** 12:6

**property** 11:23 55:10

**prosecuting** 9:5

**prosecutions** 9:8

**provide** 14:21,22

**provided** 15:22 18:22

**providing** 38:15 41:11

**pulled** 43:6 50:16

**pumps** 17:10

**purpose** 14:11 15:8,19 38:10

**purposes** 16:2

**put** 20:14 21:6 22:2 37:4 42:21
48:13

---

## Q

**qualified** 49:18

**qualifying** 53:16

**quality** 15:13

**quarterly** 18:19,21

**question** 7:4,5,11 17:12 18:24
33:25 38:10 47:25 48:2 51:12

**questions** 7:9,18 13:23 57:2,16,
17,19,22

**quick** 37:9

**quiver** 46:15

**quote** 17:22

---

## R

**rack** 56:5,6,10,17

**radar** 47:12,13

**raised** 28:23

**random** 46:10

**RDA** 44:10

**reach** 47:7

**read** 11:25 22:21 23:2,6

**reading** 11:20 30:22,23 53:5,15,
17

**ready** 29:10

**reason** 7:12 51:8

**recall** 30:9

**receive** 39:1

**received** 47:23 49:1 56:8

**receiving** 15:14 26:6

**recent** 28:18

**recognize** 13:7 43:14,16

**record** 5:22 7:16 47:24 48:23
57:11

**reference** 16:11,15 17:14 44:11

**referenced** 31:17

**references** 52:16

**referring** 31:1 33:20

**regard** 11:22,23 16:17 34:6 35:18
42:13,19 44:16

**related** 9:5 15:17 25:5 30:10,16
32:2 42:10,20 43:18 44:20 45:23
49:14 54:13 55:7

**relation** 32:13 33:19

**relevant** 42:11

**religion** 54:18,20,25 55:13

**religious** 8:15 11:21 55:3,6 56:9,
23,24 57:16

**religiously** 56:21

**remedied** 36:17

**remedy** 38:1

**remember** 8:18 20:22 24:18,19
26:8

**remind** 6:24

**rendered** 15:22

**repeat** 27:1

**repeating** 31:12

**report** 11:6,11 18:21 19:4,8
20:11 25:21 26:11,25 28:14,23
29:12 43:17,22 44:2,3 48:12

**reported** 48:11

**reporter** 5:3 31:6

**reporting** 8:16 20:25 42:12,15 44:17

**reports** 18:8 19:6 21:20 26:6 27:18,19 28:5 31:15 33:25 36:12 39:14 53:23 54:1

**represent** 5:6

**representation** 46:22

**represented** 7:20,22

**republication** 44:20

**request** 56:18

**requests** 55:3,6 57:9

**require** 37:20

**required** 15:15 38:15 48:13

**requirements** 14:17 40:1 44:1 55:11 56:2,9,11

**requires** 13:8 18:5

**research** 44:23

**respond** 43:22

**response** 10:4 24:6,9 25:22 26:5,9,12,14 41:18 42:6 48:14 51:8,11 56:17

**responsibilities** 10:2,5,17

**responsibility** 54:4

**responsible** 26:16 40:4 45:10

**restriction** 55:14

**resubmit** 44:24

**result** 27:11

**results** 32:15

**resurrect** 12:7

**review** 8:13 40:5,10 41:5 42:10 44:18

**reviewed** 36:7,8 49:25 50:19

**reviewing** 8:12 26:7 36:15,18 42:21

**reviews** 44:21

**Rich** 9:12,20

**rights** 15:5,9 49:3 54:25

**risk** 14:24 27:19,20 31:23 32:4,7, 25 33:7,9,11

**risks** 32:1,2 37:18

**road** 6:24

**Robert** 56:25

**routinely** 21:15

**rubric** 16:21 17:20,21

**rules** 6:23

**run** 17:11 34:8

**running** 8:5 15:2

---

**S**

**Safe** 9:2

**safety** 30:11,13

**SAITH** 57:24

**sample** 46:11,21

**scenario** 47:14

**school** 6:12 8:20,23

**screen** 12:22,25 13:20 30:22

**scroll** 13:12

**section** 10:6,8 52:9

**sections** 10:18

**security** 30:11,13 37:18

**send** 51:19

**senior** 6:8

**sense** 27:16 39:7

**separate** 34:2

**sergeants** 40:23

**service** 10:16 11:14,22 30:11

**services** 10:11,15 14:22,24 15:21,24 38:15 56:24

**set** 41:7 45:24

**sets** 48:16,17 50:17

**setting** 10:10 54:4,6

**seven-day** 46:8

**shear** 21:8

**shifts** 40:18

**shooting** 20:18

**shop** 18:10 19:3 41:5,23 42:4

**shortly** 10:12 18:18

**show** 12:8 21:24 26:25 43:7

**showed** 35:17

**side** 6:19 9:22 18:8 21:12 40:4

**simple** 51:4

**sit** 27:22

**site** 18:12

**situation** 47:2

**six-month** 43:17 44:2

**skills** 12:6

**slept** 52:13

**socks** 57:5,7

**sort** 21:21 33:14

**Sounds** 53:2

**speak** 39:7

**speaking** 11:3 14:17 20:5 23:15 38:24 46:20

**speaks** 20:19

**special** 9:3,8

**specific** 12:4 28:7 32:20,23 34:9, 13 49:10 51:3 53:8 54:14 55:5

**specifically** 8:18 9:4 24:18 31:16 42:10 49:22 52:14

**specifics** 15:17 28:14

**spell** 5:21

**spent** 16:4

**spoken** 21:19

**spring** 44:12

**spur** 39:4

**staff** 46:7 48:4

**staffing** 29:1,2 40:1,5,10,17,22 41:11 42:1

**standards** 14:20 15:3,4,9,12,13, 16 18:16 27:15

**start** 7:18 23:18

**started** 8:24 9:25 26:2

**starts** 22:12

**state** 5:21 9:13 11:12 24:1

**States** 9:4

**statistical** 44:21,24

**stay** 45:9

**steps** 42:6

**stop** 18:25 30:21 36:22

**story** 54:14

**stretch** 7:2

**STS** 42:19

**stuck** 30:5

**stuff** 32:17 45:2,3 54:9

**subcontracts** 14:8

**submit** 22:14 31:5 48:3 50:8

**submits** 50:22

**submitted** 32:10,11 43:25 44:3,9
46:25 47:10,25 48:6

**substantially** 36:3

**summaries** 27:19

**supervision** 15:15

**Supply** 55:23,24 56:7

**supposed** 13:14 34:8 40:18,19,
21 45:3

**swear** 30:1

**sworn** 5:18

**system** 42:21,23 43:1 48:14

---

**T**

**takes** 15:16

**taking** 7:15 13:6 42:12 43:21,22
57:14

**talk** 15:11 18:3 46:11 47:22 48:4
50:9 56:19

**talked** 31:10 39:16 42:9

**talking** 16:11 23:9 33:6 45:22
54:5

**tandem** 46:4

**taxpayers'** 16:3

**TD** 25:2

**TDOC** 5:14 6:5,9 8:19,21 9:17
10:6 11:16 13:9 14:4,14,18,22,23,
24 15:2,9,15,20,23 20:11,14 21:1,
3,25 22:12 23:1,12 24:8 25:2
26:13 27:18 28:15 29:5,18 30:6
31:8 34:24 39:18,22,25 41:8,9,13
42:6 44:5 54:16

**technical** 12:20

**technically** 14:7

**Tennessee** 5:25 9:3,14 15:18
22:20 24:24 25:2

**term** 18:11 27:3 33:1,5 39:2 42:2

**terms** 14:16 37:15

**terrible** 20:10

**test** 12:5

**testify** 13:17

**testifying** 13:14

**testimony** 11:2 13:8 53:13,21

**thing** 7:4 29:10 38:25 48:21
49:13 51:4

**things** 17:20 19:22 21:12,17
25:25 27:4,7 36:15,23 39:20 40:4
41:7 42:10,18 45:1,8 46:16 47:9
48:9 49:14,15 50:23 52:2,4,5

**thinks** 39:8

**Thomas** 7:23

**time** 5:5 6:25 7:15 9:20 27:9
34:19 38:24 45:24 46:19

**timelines** 45:24 46:23

**times** 17:25

**today** 5:3 7:20 11:2 13:8,15,17,
24 27:17 45:15 46:2 57:17

**today's** 8:11

**told** 10:1

**Tom** 5:13 29:15

**TOMIS** 42:20,22 46:18 47:1,11,
20,21 48:22

**tool** 16:21

**tools** 46:13,14

**top** 12:12 20:18 28:20 29:3 35:5
43:5 52:12

**topics** 13:13,18 27:17 53:22

**total** 35:8

**totally** 7:17

**touched** 31:13

**tracked** 48:10

**trade** 46:14

**transferred** 9:1,7

**trash** 30:17

**treatment** 30:12,13 50:6,18

**Tricia** 5:8

**trouble** 37:5

**Trousdale** 11:24 14:1,7,8,9,14
17:3,16 18:6 19:2,12,16,19 22:23,
24 24:16 27:21 28:5,7,19 29:6,19
30:7 31:11 32:8,14,16,20,23
33:12,16 34:3,10,12,14 35:4,20
36:3 37:15 39:12,17 40:1 41:11
42:11 45:21 53:24 54:5,21 55:4,9,
14,18,21

**true** 16:7

**turn** 37:10

**Turner** 14:15 22:23

**typically** 50:2,3

---

**U**

**U.S.** 9:2

**ultimately** 11:13 19:6

**understand** 7:17 40:15 50:21
51:25 52:1 53:13

**understanding** 14:11 16:14
25:1,3 53:12,20 55:17

**understood** 53:21

**ungrievable** 49:12

**Union** 55:23,24 56:7

**unique** 24:18

**unit** 9:8

**United** 9:4

**update** 43:24

**updated** 44:3

**updates** 42:14

**V**

**vague** 53:3

**vendor** 33:4 55:20,21,23

**vendors** 10:11,14,16

**vents** 30:18

**view** 32:1 46:16

**violating** 54:24

**violation** 17:3,4 21:21 41:12
54:17

**violations** 28:22 54:20

**W**

**walking** 47:16

**Walton** 19:14

**wanted** 53:21

**warden** 18:17,18,22,23 23:25
24:4,10,12,15,20,23 26:10,11,12,
17,19 31:21

**warden's** 25:22

**wardens** 40:24

**Washburn** 24:12

**watching** 36:12 38:18

**Wave** 13:2

**wedding** 7:1

**weekly** 18:11

**weeks** 12:2 37:7

**weigh** 41:5

**Welborn** 5:11 16:5 25:9 41:14
53:14 57:19

**wiretap** 9:9

**withheld** 16:25

**word** 53:16,18

**work** 5:24 8:22 25:1 46:4

**worked** 8:19 9:7 34:24

**working** 20:16 21:7 27:10 40:18,
19

**works** 22:8

**world** 35:18

**worst** 36:14

**writing** 56:13,15

**written** 18:22 49:24

**Y**

**Y-O-U-N-G** 5:23

**year** 6:12 10:20 11:5 19:21 25:6
29:13 32:10,11,12

**year's** 44:18

**years** 19:21 35:4

**yesterday** 12:8,18 22:15 47:17

**Young** 5:17,23,24 30:3 57:13,23

**Z**

**Zoom** 5:7,10 12:6,15