```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE MIDDLE DISTRICT OF TENNESSEE
 2                      NASHVILLE DIVISION

 3

 4   BOZA PLEASANT-BEY,            )
                                  )
 5      Plaintiff,                )
                                  )    Case No. 3:19-cv-00486
 6   VS.                          )    JUDGE TRAUGER
                                  )    JURY DEMAND
 7   STATE OF TENNESSEE, et al,   )
                                  )
 8      Defendants.               )
     ─────────────────────────────X
 9

10

11

12

13   ─────────────────────────────────────────────

14

15            DEPOSITION OF VINCENT FINAMORE

16               TAKEN ON JUNE 17, 2021

17

18   ─────────────────────────────────────────────

19

20

21

22
     Prepared by:
23   Carole K. Briggs, LCR #345
     Briggs & Associates
24   222 Second Avenue, North, Suite 340M
     Nashville, Tennessee  37201
25   Briggscourtreporting@hotmail.com
```

                                                                    Page 2

```
 1                          APPEARANCES:

 2


 3


 4     FOR THE PLAINTIFF:


 5

       TRICIA HERZFELD, ESQUIRE
 6     Branstetter, Stranch & Jennings, PLLC
       The Freedom Center
 7     223 Rosa L. Parks Avenue, Suite 200
       Nashville, Tennessee  37203
 8     triciah@bsjfirm.com


 9


10     FOR THE DEFENDANT, STATE OF TENNESSEE:


11

       THOMAS J. AUMANN, ESQUIRE
12     NIKKI N. HASHEMIAN, ESQUIRE
       Tennessee Attorney General's Office
13     P.O. Box 20207
       Nashville, Tennessee  37202-0207
14     thomas.aumann@ag.tn.gov
       Nikki.hashemian@ag.tn.gov
15


16
       FOR THE DEFENDANT, CORECIVIC:
17


18     JOSEPH F. WELBORN, ESQUIRE
       ERIN PALMER POLLY, ESQUIRE
19     K&L Gates, LLP
       222 Second Avenue South, Suite 1700
20     Nashville, Tennessee  37201
       joe.welborn@klgates.com
21     Erin.polly@klgates.com


22


23     FOR THE DEPONENT:


24

       STEPHANIE MAXWELL, ESQUIRE
25
```

Case 3:22-cv-00093   Document 37-10   Filed 05/23/22   Page 2 of 162 PageID #: 3584

1                          **TABLE OF CONTENTS**

2

3     **Witness**                                          **Page**

4

5

      **VINCENT FINAMORE**
6
      Examination by Ms. Herzfeld                           6
7     Examination by Ms. Polly                             90
      Examination by Mr. Aumann                           140
8

9

10

11

12                          **LIST OF EXHIBITS**

13

14    **Number      Description**                          **Page**

15

16    1*            Witness's notes                         8

17    2             Deposition notice                      11

18    3             November 2017 comptroller report       16

19    4             Comptroller's performance audit        26
                    of TDOC, January 2020
20
      5             Working papers                          42
21
      6             TDOC 012403                             54
22
      7             TDOC 013292                             55
23
      8             TDOC 013524                             58
24
      9             TDOC 014907                             62
25

```
 1   10              TDOC 012355                        65

 2   11              TDOC 015330                        66

 3   12              TDOC 014498                        68

 4   13              TDOC 011758                        70

 5   14              TDOC 012554                        72

 6   15              TDOC 013491                        76

 7   16              TDOC 016008                        77

 8   17              TDOC 013295                        79

 9   18              TDOC 029720                        81

10   19              TDOC 010081                        82

11   20              News articles beginning with       87
                     TDOC 013562
12
     *  (denotes late-filed exhibit)
13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 5

1                    S T I P U L A T I O N

2

3

4            The deposition of Vincent Finamore, taken on

5      behalf of the plaintiff, remotely via Zoom, by agreement

6      of parties, on June 17, 2021, for all purposes allowed

7      under the Federal Rules of Civil Procedure.

8            It is agreed that Carole K. Briggs, licensed

9      court reporter for the State of Tennessee, may swear the

10     witness, take his deposition, and afterwards reduce same

11     to typewritten form, and that the reading and signing of

12     the completed deposition by the witness is not waived.

13           All formalities as to notice, caption,

14     certificate, et cetera, are expressly waived. All

15     objections, except as to the form of the question, are

16     reserved to the hearing.

17

18     (Unless previously provided, all names are spelled
       phonetically, to the best of the court reporter's
19     ability.)

20

21

22

23

24

25

```
 1                 (Whereupon, the foregoing deposition

 2                 began at 9:02 a.m.)

 3                 THE COURT REPORTER:  Good morning.  Today is

 4       June 17, 2021 at 9:02 a.m.  At this time, would each

 5       attorney please introduce yourself, who you represent,

 6       and that you agree to take this deposition by Zoom.

 7                 MS. HERZFELD:  Tricia Herzfeld.  I represent

 8       Mr. Pleasant-Bey.  And I agree to take the deposition by

 9       Zoom.

10                 MR. AUMANN:  This is Tom Aumann for the TDOC

11       defendants.  And I agree to take the deposition by Zoom.

12                 MS. POLLY:  Erin Palmer Polly and Joe Welborn

13       for the CoreCivic defendants.  We agree to take the

14       deposition by Zoom.

15                 MS. MAXWELL:  I'm Stephanie Maxwell on behalf

16       of the comptroller's office and Vince Finamore.  And I

17       agree to take the deposition by Zoom.

18       Whereupon,

19                         VINCENT FINAMORE,

20       having been first duly sworn, was examined and deposed

21       as follows:

22       EXAMINATION BY MS. HERZFELD:

23            Q.    Good morning.

24            A.    Good morning.

25            Q.    Could you state your name and spell it for
```

```
 1   the record, please.

 2        A.     Name is Vincent Finamore.  V-I-N-C-E-N-T,

 3   F-I-N-A-M-O-R-E.

 4        Q.     What is your position, Mr. Finamore?

 5        A.     Legislative performance auditor with the

 6   comptroller's office, State of Tennessee.

 7        Q.     How long have you been in that position?

 8        A.     About 15 years.

 9        Q.     Do you understand you're here for a

10   deposition today?

11        A.     Yeah.

12        Q.     Have you ever given a deposition before?

13        A.     No.

14        Q.     I notice you're looking down at something.

15   What is it that you are looking at?

16        A.     I just have some notes.

17        Q.     Are they notes that you prepared for

18   yourself?

19        A.     Correct.

20        Q.     Could you show me those notes.

21               (Witness complies.)

22        Q.     Okay, great.  And did you prepare those in

23   advance of your deposition today?

24        A.     Correct.

25        Q.     Okay, great.  Did counsel help you prepare
```

 1   those notes at all?

 2        A.    No.

 3              MS. HERZFELD:  If we could go ahead and make

 4   his notes Exhibit A to the deposition.

 5              (Exhibit 1 was marked late-filed.)

 6   BY MS. HERZFELD:

 7        Q.    And today you've been designated as the

 8   individual that is supposed to be testifying on behalf

 9   of the comptroller's office.  Do you understand that to

10   be your role today?

11        A.    Correct.

12              MR. AUMANN:  I'm sorry.  Tricia, did you say

13   Exhibit A as in apple?

14              MS. HERZFELD:  Oh, yeah, or 1.  I guess we

15   can say 1.  One is probably better.  Thanks for the

16   clarification on that.

17              MR. AUMANN:  No problem.

18   BY MS. HERZFELD:

19        Q.    And you understand you're giving testimony

20   today on behalf of the comptroller's office?

21        A.    Correct.

22        Q.    So when you're giving an answer, that is as

23   though the comptroller's office is speaking.  You are

24   speaking on their behalf.  You understand that?

25        A.    Correct.

Page 9

1        Q.      Are you represented by an attorney here

2   today?

3        A.      Ms. Maxwell.

4        Q.      Did you meet with Ms. Maxwell in advance of

5   your deposition today?

6        A.      I guess briefly.

7        Q.      Don't tell me what you talked about, but when

8   did you meet and for how long?

9        A.      I believe on Monday we talked for two hours.

10  And there was another time, I don't remember the exact

11  date on that.

12       Q.      Did you speak with Mr. Aumann at all or

13  anybody from the state attorney general's office in

14  advance of your deposition today?

15       A.      I also spoke with Mr. Aumann as well.

16       Q.      When was that?

17       A.      Also on Monday.

18       Q.      At the same meeting?

19       A.      Same meeting.

20       Q.      Was that in person or was it on the phone or

21  over Zoom?

22       A.      On Zoom.

23       Q.      Was there anyone else present in that

24  meeting?

25       A.      No, ma'am.

```
 1          Q.     Did you speak with anyone about your

 2   preparation for your deposition today, other than Ms.

 3   Maxwell or Mr. Aumann?

 4          A.     No, ma'am.

 5          Q.     Do you have an awareness of what this lawsuit

 6   is about?

 7          A.     Vaguely --

 8          Q.     Okay, and what is your --

 9          A.     -- not specific.  Just what it says in the

10   deposition or the -- yeah, I'm not very familiar with

11   what is it.

12          Q.     Have you read the complaint in the case at

13   all?

14          A.     Just what we -- was provided by the

15   deposition.

16          Q.     So the deposition notice is what you're

17   referring to?

18          A.     Right.

19          Q.     I am going to go ahead and try to screen

20   share.  Which I'm going to admit, normally I have

21   somebody to help me do this, so you all give me a little

22   grace here.  Did it share, can you see it?

23          A.     Uh-huh.

24          Q.     And is that the deposition notice?

25          A.     If you open it, I can be sure that it is.
```

1       Q.    I'm trying.  Give me one second.  It will not

2    share my screen.

3              MS. HERZFELD:  Can we go off the record.

4              (Off-the-record discussion.)

5    BY MS. HERZFELD:

6       Q.    We're back on the record, Mr. Finamore.  I

7    have handed you what we'll mark as Exhibit 2 to the

8    deposition.

9              (Exhibit 2 was marked.)

10   BY MS. HERZFELD:

11      Q.    Is this the notice that you received to

12   attend the deposition today?

13      A.    Correct.

14      Q.    And you've had an opportunity to review it

15   before today's deposition?

16      A.    Correct.

17      Q.    Have you had an opportunity to review the

18   instructions to the 30(b)(6) notice?

19      A.    Correct.

20      Q.    And you've been designated to speak on all

21   topics today, including the first audit of Trousdale,

22   the second audit and report of Trousdale, and then these

23   other topics, three, four, five, six, seven, eight, and

24   then nine; is that correct?

25      A.    Correct.

Page 12

```
 1        Q.     And is there any area that's been designated
 2    in this notice that you do not feel prepared to testify
 3    on today?
 4        A.     I don't believe so.
 5        Q.     Okay.  Great.  Do you see my face now, or do
 6    you still see the document?
 7        A.     I'm not seeing your face.
 8        Q.     Okay, hold on.  You said before that you've
 9    never given testimony before; is that correct?
10        A.     That's correct.
11        Q.     What is your educational background?
12        A.     I have a bachelor's in psychology and a
13    master's of arts in industrial organizational
14    psychology.
15        Q.     Were you involved at all in what we'll call
16    the November 2017 compliance report that was done
17    regarding Trousdale?
18        A.     I was.
19        Q.     What was your role?
20        A.     I was one of the in-charges.
21        Q.     I'm sorry, you were one of the?
22        A.     In-charge, audit in-charges.  A supervisor
23    role.
24        Q.     And what is an audit in-charge?
25        A.     In-charge is basically a front-line
```

 1   supervisor for the audit.

 2        Q.     And how many in-charges were there for this

 3   audit?

 4        A.     There was one other in-charge.

 5        Q.     Who was it?

 6        A.     That was David Wright.

 7        Q.     And is Mr. Wright still employed by the

 8   comptroller's office?

 9        A.     He is.

10        Q.     So an in-charge means you were in a

11   supervisory role; is that right?

12        A.     Correct.

13        Q.     And was there anyone in a supervisory role

14   over you and Mr. Wright?

15        A.     There was a manager.

16        Q.     Who was the manager?

17        A.     Ms. Dena Winningham.

18        Q.     What is her role?

19        A.     She was the manager of the audit.

20        Q.     And there's just one manager?

21        A.     For that audit, correct.

22        Q.     And how many people were you supervising?

23        A.     Two other people.

24        Q.     And who are they?

25        A.     Greg Spradley and Fonda Douglas.  And we have

Page 14

```
 1    one additional auditor that came on in the last month of

 2    the project or so, just to help write up -- when we were

 3    writing the report.

 4         Q.    Who was that?

 5         A.    Jafar Ware.

 6         Q.    Are those three individuals still employed by

 7    the comptroller's office?

 8         A.    They are not.

 9         Q.    Are any of them still employed by the

10    comptroller's office?

11         A.    Of those three, no, ma'am.

12         Q.    Do you know why any of them are no longer

13    employed by the comptroller's office?

14         A.    I do not know specifically why, no.

15         Q.    Was it performance related for any of the

16    three?

17         A.    Not that I'm aware of.  Like I said, I don't

18    -- I do not know the circumstances.

19         Q.    Did they leave at the same time or different

20    times?

21         A.    Different times.

22         Q.    Have you had an opportunity to review the

23    2017 report in advance of your deposition today?

24         A.    Yes, ma'am.

25         Q.    Does the department stand behind the findings
```

 1    and conclusions in that report?

 2         A.     They do.

 3         Q.     And it was accurate at the time that it was

 4    written?

 5         A.     Yes, ma'am.

 6         Q.     Are there any corrections or changes that the

 7    department would make to that report?

 8         A.     Not that I am aware of, no.

 9         Q.     Okay, great.  Do you know if there were any

10    drafts of that report before the final one?

11         A.     Yes, there were several drafts.

12         Q.     And where are those drafts held?  Where are

13    they stored?

14         A.     They should be in the audit, within the

15    working papers.

16         Q.     And when you say within the working papers,

17    what do you mean by that?

18         A.     The information that is in T-Mate in our

19    files, in our -- I guess we have a software program or

20    database that holds our working papers.

21         Q.     Do you know if those working papers were all

22    provided to us in this litigation.

23         A.     As far as I know, they were.

24         Q.     Are the drafts labeled as drafts?

25         A.     Not all of them may be labeled as drafts.

 1    They should have been.  I think so, yeah.

 2         Q.    And so going back into that production, if

 3    it's a draft versus the final, it should very clearly

 4    say that it's a draft?

 5         A.    Correct.

 6         Q.    Do you recall if there were any major

 7    substantive changes that were made in the conclusions of

 8    the report from kind of beginning to end?

 9         A.    I do not remember anything substantial.

10         Q.    I'm going to try to screen share again, so

11    bear with me.  Guaranteed to be a disaster.  Do you see

12    this document?

13         A.    I do.

14         Q.    And is that the November 2017 report that we

15    were just discussing?

16         A.    It is.

17              MS. HERZFELD:  And I will make this Exhibit 2

18    to the deposition.

19              THE COURT REPORTER:  I think that will be

20    Exhibit 3.

21              MS. HERZFELD:  It is because we put in the

22    notice.  You're absolutely right, Exhibit 3.  Thank you.

23              (Exhibit 3 was marked.)

24    BY MS. HERZFELD:

25         Q.    Should be back to me now.  In that report

Page 17

1   there is a reference to the turnover rate.  Do you know

2   what the turnover rate is, what that references in the

3   report?

4        A.    Yes, that was the turnover rate for the State

5   of Tennessee correctional officers.

6        Q.    What about turnover rate regarding Trousdale,

7   do you have any information about that?

8        A.    In that audit, I don't believe we did.

9        Q.    And is there an acceptable or a rate of

10  turnover rate that is acceptable in the corrections

11  industry to your knowledge?

12              MR. AUMANN:  Objection.

13              MS. POLLY:  Object to the form.

14              MS. HERZFELD:  You can answer the question.

15              THE WITNESS:  I'm not aware of the exact

16  turnover rate that is acceptable.

17  BY MS. HERZFELD:

18       Q.    Mr. Finamore, do you think that there is a

19  relationship between safety and staffing inside of a

20  prison?

21              MS. POLLY:  Object to the form.

22              MS. HERZFELD:  You can answer it, sir.

23              THE WITNESS:  I believe that it's related to

24  the safety in some way.

25  BY MS. HERZFELD:

1        Q.    Do you agree that there could be a

2   relationship between understaffing of a facility and

3   inmate violence?

4               MS. POLLY:  Object to the form.

5               MR. AUMANN:  Objection to form.

6               MS. HERZFELD:  You can answer the question.

7   When they object, you can still answer.

8               THE WITNESS:  At some base level, I'm sure

9   there probably could be.

10  BY MS. HERZFELD:

11       Q.    Would you agree that fewer facility searches

12  can result -- I'm sorry, strike that.  Do you agree that

13  if a facility is understaffed, that that understaffed

14  facility would have less searches?

15              MS. POLLY:  Object to the form.

16              MS. HERZFELD:  You can answer it, sir.

17              THE WITNESS:  Obviously, the resources that

18  they have available would probably help dictate the

19  searches that they could do.

20  BY MS. HERZFELD:

21       Q.    And if they have less resources for searches,

22  there is less likelihood that things like drugs or

23  contraband could be found?

24              MS. POLLY:  Object to the form.

25              MS. HERZFELD:  Sir, when they object, you can

1    still answer.

2              THE WITNESS:  Okay.  I guess it's a

3    likelihood of that occurring.  But I can't be sure.

4    BY MS. HERZFELD:

5        Q.    What about if a facility is understaffed,

6    what type of impact do you think that would have on

7    employee stress?

8              MS. POLLY:  Object to the form.

9              THE WITNESS:  Depends on, obviously, where

10   the staff reductions are.  But naturally, if longer

11   hours were needed to be worked, it could increase

12   stress, yeah.

13   BY MS. HERZFELD:

14       Q.    What is the comptroller's job?  What is the

15   purpose of the comptroller doing audits and reports

16   about various facilities within the state?

17       A.    Our job is to do performance audits or

18   reviews of agencies on behalf of the legislature.  In

19   this case, it was -- we were doing an audit on the

20   department of correction.  And it's part of the sunset

21   review process.  Each agency has a cycle that they -- to

22   be renewed every few years.  And when their cycle is up,

23   they come before the legislature, governmental

24   operations committee, and they decide to continue with

25   the department or not.  And they generally like to hear

 1    any performance issues that are going on in that

 2    department.  And our job is to go in and do a

 3    performance audit before the sunset date.

 4         Q.    So when the department does a performance

 5    audit of TDOC, does that include the facilities that are

 6    contracted with private prison service providers?

 7         A.    It does.

 8         Q.    So in this case, that would include CoreCivic

 9    facilities?

10         A.    Correct.

11         Q.    And is Trousdale Turner one of those

12    facilities?

13         A.    It is.

14         Q.    And when an audit is performed on Trousdale,

15    is one of the things that the department is looking at

16    for compliance of the contract?

17         A.    Again, we were auditing the department of

18    correction.  And yes, we would be looking at contract

19    compliance between the facility and the contract with

20    the department.

21         Q.    Why is that?

22         A.    To ensure that the contract is being complied

23    with.  Policies --

24         Q.    Why is that -- I didn't mean to interrupt

25    you.  Go ahead.

1       A.    It's just that's our role, is to look at

2   policies and procedures and to ensure that -- well, part

3   of our job really is that we're evaluating whether the

4   contract monitors and how well they are also looking at

5   maintaining the, I guess the agreement or how well

6   they're monitoring CoreCivic and their adherence to the

7   contract.

8       Q.    Why is that important?

9       A.    Accountability and to ensure that the

10  contracts are being followed.

11      Q.    And do you know why those contracts have

12  certain standards?

13      A.    I guess it's part of a contract to ensure

14  that -- yeah, standards that the policies and procedures

15  for the department of corrections are followed and that

16  a certain standard of operations is adhered to in that.

17      Q.    And is that for the safety of the prisoners?

18      A.    And I would believe both -- yeah, the safety

19  of the prisoners, and the correctional officers, and

20  staff that are operating the prisons.

21      Q.    What about financial accountability?

22      A.    That's also, I guess part of the contract is

23  also, yeah.

24      Q.    And ultimately, the prisons in the State of

25  Tennessee, whether they're contracted through an

Page 22

```
 1    independent private facility or, you know, being run by

 2    TDOC, I mean, that's taxpayer money that is being spent

 3    on those facilities; is that right?

 4        A.    Correct.

 5        Q.    And so is one of the jobs of the department

 6    of the comptroller to ensure that the tax dollars are

 7    being spent appropriately in accordance with the

 8    contracts?

 9        A.    In a broad sense.

10        Q.    Okay.  And you said you have been with the

11    comptroller's office for about 15 years; is that right?

12        A.    Correct.

13        Q.    Have you been in the process of auditing TDOC

14    during the entirety of those 15 years?

15        A.    No, ma'am.

16        Q.    When did you start participating in audits of

17    TDOC?

18        A.    2017.

19        Q.    And what types of audits did you do prior to

20    that?

21        A.    Numerous performance audits.

22        Q.    And different departments within the state?

23        A.    Correct.

24        Q.    And what types of things do you look at when

25    you're doing an audit of TDOC?
```

1      A.     It varies.  Performance audit, we basically

2   look at, during our planning phase, and determine areas

3   of risk.  And we set objectives based on planning and

4   research that we do at the time of the audit.  It can

5   change from audit to audit.  So we will do whatever we

6   identify as an objective or a risk area, then that's

7   what we finally settle down and choose to do in the

8   detailed part of our audit.  So it's not a standardized

9   form.

10      Q.     Could you just go through a little bit of

11   what the methodology is for me?

12      A.     Yes.  When we start a performance audit, we

13   basically have a planning phase and a research phase.

14   It's when we come into the agency -- or we actually

15   don't go to the agency at that point, but we research

16   all of the policies and procedures, statutes, contracts.

17   We review basically any history or any background

18   information that we can collect on the agency that is

19   available at that time and is current at that time.

20          We also interview key management of the

21   department.  And we try to identify areas of potential

22   risks.  And what we mean risks in this area is related

23   to performance or anything that might hinder the

24   department from being able to meet its mission.

25      Q.     And then how does the process work after

 1    you've done that?

 2        A.    After we've done that, we identify several

 3    areas.  We discuss with our management team which areas

 4    will be beneficial or reasonable for us to look at, and

 5    what is important to the general assembly at that time,

 6    the questions that might be most helpful for them in our

 7    review.  And we have to narrow our objectives to what we

 8    can accomplish in the time that we're allotted for the

 9    audit.  So those factors all come into, I guess setting

10    what the audit objectives will be.

11        Q.    And then who ultimately makes the decision on

12    what the audit objectives are?

13        A.    It's signed off by the comptroller.

14        Q.    And then once those objectives are set, then

15    what happens?

16        A.    We notify the department in an engagement

17    letter what our objectives will be.  And we begin the

18    detailed phase of the audit.

19        Q.    And what is the detailed phase of the audit?

20        A.    Basically, that's where we focus on the

21    objectives.  We do test work -- we develop test work.

22    We gather data to perform test work.  And then we also

23    ultimately draw conclusions based on our test work.

24        Q.    And then what do you do after that?

25        A.    After we come to our conclusions, we discuss

Case 3:22-cv-00093  Document 37-10  Filed 05/23/22  Page 24 of 162 PageID #: 3606

1    with management what those conclusions are and if

2    there's any changes that need to be made.  After that,

3    we enter the report writing phase or the draft phase and

4    we begin drafting our report.

5          Q.    And then what happens at that point?

6          A.    We will draft the report, which is writing

7    our findings and conclusions and documenting our

8    evidence.  And once we have a draft, it's an editing

9    process between staff auditors, in-charges, managers,

10   all of the way up through the comptroller.  Once we have

11   a draft that is approved by the comptroller, we send

12   that draft to the department for their review.  And

13   they're allowed to provide management comments.  We also

14   meet with the department to go over any questions or

15   concerns that they have at that time.

16         Q.    And at that point when the department were to

17   give you their management comments, do you ever change

18   the findings of the report based on those, or you issue

19   the report, they do their comments, and then that's --

20   you know, you can do a response and that's the final?

21         A.    Well, in some circumstances, we do make

22   adjustments to the findings.  It depends on evidence or

23   any support or documentation that the department can

24   provide to support their reasoning for making changes.

25   We make an evaluation of that.  In some cases, we make

1    some adjustments to findings before we finalize it.

2        Q.    Do you know if you made any of those

3    adjustments in the November 2017 audit?

4        A.    As I said before, I do not recall any

5    substantial changes.

6        Q.    Is that process that you just described, is

7    it generally the same for all of the audits that you do?

8        A.    It's the same for all of the audits.

9        Q.    So I am now going to try to show you Exhibit

10   4.  Do you see the January 2020 performance audit review

11   for the department of correction on your screen?

12       A.    I do.

13       Q.    Do you recognize that to be the 2020 audit of

14   the TDOC performed by your department?

15       A.    I do.

16             MS. HERZFELD:  We will mark that as Exhibit

17   4.

18             (Exhibit 4 was marked.)

19   BY MS. HERZFELD:

20       Q.    Is this your name here, Vincent Finamore?

21       A.    That is.

22       Q.    You were also an in-charge auditor for this

23   audit?

24       A.    I was.

25       Q.    And did you review this January 2020

Page 27

1    performance audit review of the department of correction

2    before your testimony today?

3         A.    I did.

4         Q.    And do you stand by it?

5         A.    I do.

6         Q.    And is there anything in there that the

7    department would now like to change positions on?

8         A.    No, not at this time.

9         Q.    Do you know if there were any substantial

10   changes to the conclusions in this audit based on new

11   information or responses from the department?

12        A.    I believe there were several adjustments

13   made.  But I, at this time, can't recall all of them.

14        Q.    Which ones can you recall?

15        A.    I think there was some wording on some of the

16   supervision aspects.  There were some general wording on

17   several of the conclusions.

18        Q.    What about the substance of the conclusions,

19   were there any changes to that, the findings?

20        A.    I don't believe there was a major substance

21   -- substantive changes, no.

22        Q.    Was there anything unusual or different from

23   the ordinary about how it is that the comptroller's

24   office performed this particular audit?

25        A.    No, ma'am.

Page 28

1          Q.     And is there anything that stands out in your

2     mind as unusual about this audit in any way?

3          A.     No, ma'am.

4          Q.     Do you feel that the audit was fair?

5          A.     I do.

6          Q.     What is your knowledge of any actions taken

7     by CoreCivic or Trousdale in response to the findings of

8     the two audits we've looked at today?

9          A.     Let's see.  I know the department made some

10    changes.  After the first audit, they added an extra

11    contract monitor to each of their facilities to help

12    with the compliance issues.

13         Q.     Do you know if an extra contract monitor was

14    added at the Trousdale facility?

15         A.     There was, uh-huh.

16         Q.     There were how many before and how many

17    after?

18         A.     During our 2017 audit, there was one contract

19    monitor.  And during the 2020 audit, there were two

20    contract monitors on site.

21         Q.     What other changes do you know that were

22    made?

23         A.     I believe they -- well, we noted that they

24    properly documented their staffing compared to the

25    previous audit.  And our review of the staffing rosters

1    showed that they had critical posts manned.

2        Q.    But those things are reflected in the report;

3    is that right?

4        A.    Those are reflected in the report, correct.

5        Q.    So other than things that are reflected in

6    the report, do you know anything other than that that

7    was done, things that happened subsequently or that were

8    not included in the report?

9        A.    No, ma'am.

10            MS. POLLY:  Object to the form.

11   BY MS. HERZFELD:

12       Q.    I just want to make sure I understand.  So to

13   your understanding of the knowledge of the comptroller's

14   office, the different changes or any changes that were

15   made by CoreCivic regarding Trousdale, or the department

16   regarding Trousdale, those changes are all reflected in

17   the report?

18            MR. AUMANN:  Objection to form.

19   BY MS. HERZFELD:

20       Q.    You can answer it, sir.

21       A.    What's in the report are the observations

22   that we made at the time.  And the focus was looking at

23   changes from the prior audit and have they addressed the

24   findings from that audit.  So I cannot say that every

25   change that CoreCivic has made between the two time

1    periods is in the report, no.  But the changes that

2    offset the prior findings are reflected in the report,

3    as to why they are still a finding or why they are no

4    longer a finding.

5    BY MS. HERZFELD:

6        Q.   But other than the information that is

7    discussed in the report, do you have any knowledge about

8    any other changes that were made by Trousdale or

9    CoreCivic as you sit here today?

10       A.   Not that I can recall, no.

11       Q.   I think we had spoken just a few minutes ago

12   about different changes that TDOC had made in response

13   to the report.  So you said they added another contract

14   monitor, for example, that was one of the changes?

15       A.   Uh-huh.

16       Q.   What about any other changes in regard to

17   oversight of CoreCivic?

18       A.   I believe they required -- started requiring

19   CoreCivic to send in the daily shift rosters to the

20   department or the chief of operations to review -- or

21   the -- the person over the prisons.  I think it's chief

22   of operations.  I can't remember exactly.

23       Q.   What other changes, if any?

24       A.   I'm sure there are several.  I can't recall

25   most of them.  But that is one that stands out to me.

1          Q.     If you think of the others while we're

2     sitting here, you can just interrupt me and tell me, if

3     you don't mind.

4          A.     Uh-huh.

5          Q.     Is that a yes, sir?

6          A.     Yes.

7          Q.     Perfect.  What about any changes to the way

8     that TDOC has CoreCivic report inmate deaths, were there

9     any changes to that, to your knowledge?

10         A.     Can you restate that, please?

11         Q.     Sure.  What about any changes -- do you know

12    of any changes to how TDOC would require CoreCivic to

13    report inmate deaths?

14         A.     Well, at that time, we had not looked at that

15    in the first audit.  So when we did the second audit, we

16    would not be aware of any changes that they made.

17         Q.     What about after the second audit?

18         A.     After the second audit, that would be in

19    their post audit follow-up.  At this time, we've not

20    conducted a follow-up audit, so I would not be entirely

21    aware of their changes.

22         Q.     Tell me about the post audit follow-up

23    process.  How does that work?

24         A.     Basically, after we finish an audit of the

25    department, they have 30 days to send the correction --

 1    well, 30 days from the time that we release our report,

 2    the department is to send in a corrective action plan.

 3    And then after six months, they are to send basically a

 4    progress memo to the comptroller indicating actions that

 5    they are taking in executing that corrective action

 6    plan.

 7         Q.    And you're looking at your notes when you are

 8    telling me that.  Is that one of the things you made

 9    notes about?

10         A.    Yes.

11         Q.    And what do your notes say?  I can't see

12    them.  If I was sitting across from you, I would just

13    ask you to show me.

14         A.    It's the statute, 8-4-109.

15         Q.    Okay.  And you already have done that

16    process, the TDOC post, the 2020 report?

17         A.    Yes.  They, from -- yes, they did turn in the

18    plan of -- their action plan and their progress reports.

19         Q.    Has someone reviewed that?

20         A.    Somebody in the comptroller's office would

21    have reviewed that, yes.

22         Q.    Have there been any additional findings, or

23    was it satisfactory?  What happened with that?  Has

24    there been a conclusion yet?

25         A.    That's just a follow-up by the department

Page 33

1    saying what they are doing.  We have not audited the

2    department since the report.  So we have not gone in to

3    assess or make any judgments on their progress.

4          Q.    And so when that follow-up report is sent,

5    what, if anything, is done with it?

6          A.    It's filed and will be reviewed the next time

7    we do an audit.

8          Q.    But in the meantime, if it says something,

9    there is no one verifying that or doing another

10   investigation?

11         A.    Not this time, no.

12               MS. POLLY:  Object to the form.

13   BY MS. HERZFELD:

14         Q.    How often does is the department audited?

15         A.    The department is audited depending on the

16   sunset dates set by the general assembly.

17         Q.    Do you know if there is another audit

18   scheduled for TDOC?

19         A.    There is another audit scheduled.  Well, the

20   audit will be scheduled shortly, but their sunset date

21   is in '24.

22         Q.    So there will be another audit done before

23   2024?

24         A.    Correct.  Before June 30th, 2024.  That's the

25   sunset date.

1        Q.      Does the comptroller's office have any

2    current investigations or are you looking at TDOC in any

3    way for any purpose?

4        A.      Not that I am aware of at the moment.

5        Q.      Just going back, do you know -- other than

6    what is contained in the 2020 report, do you know of any

7    other changes that TDOC or CoreCivic had made in

8    response to that 2020 report?

9        A.      (Shaking head.)

10       Q.      Is that a no?

11       A.      I'm sorry.  I am not aware of any at this

12   point.  And just, yeah, we won't know until we go back

13   and look in the next audit.

14       Q.      Is that the same for the conditions at

15   Trousdale, all of the information that the department

16   knows about the conditions at Trousdale are contained

17   within that 2020 report?

18               MR. AUMANN:  Object to form.

19               MS. POLLY:  Object to the form.

20   BY MS. HERZFELD:

21       Q.      You can answer it.

22       A.      Again, what's in the report are the

23   significant issues that we audited on and were able to

24   conclude on.

25       Q.      But you don't have any additional information

     1    outside of what is contained in that report about

     2    conditions at Trousdale?

     3         A.    Not that we haven't shared with you or that's

     4    in our working papers.  Nothing significant that we have

     5    not put in the report.

     6              MS. POLLY:  Object to the form on that.

     7    BY MS. HERZFELD:

     8         Q.    And when the comptroller reports are issued,

     9    who are they given to?

    10         A.    They are given to the general assembly.  They

    11    are given to the department.  And I believe there's who

    12    else the department wishes them to have a copy.  It's

    13    also released to the media and made available on our

    14    website, so it's available to the public.

    15         Q.    And does it go to any other governmental

    16    agencies?

    17         A.    I think it goes to -- well, definitely

    18    general assemblies, but it wouldn't go to any other

    19    agency unless it was, you know, requested to for some

    20    reason.

    21         Q.    And the 2020 report, do you know if that went

    22    to anyone other than TDOC, obviously the public, your

    23    website, and the legislature?

    24         A.    I don't have a list in front of me of all

    25    that it went to.

```
 1        Q.    Which -- who does it go to at the

 2   legislature?

 3        A.    The governmental operations committee.

 4        Q.    And is it sent to the chair?

 5        A.    Yes, it would go to the chair.

 6        Q.    And do you know if there were any hearings on

 7   this audit?

 8        A.    There was.

 9        Q.    And when were those hearings?

10        A.    That hearing was, I believe January 27th,

11   2020.

12        Q.    And was your department given any direction

13   from members of the legislature at that hearing of

14   things to do?

15        A.    No.

16        Q.    Did you have any follow-up that the

17   department was required to do as a result of that

18   hearing?

19              MR. AUMANN:  Objection to form.  And Tricia,

20   just if I could ask, when you're saying department, if

21   you could just clarify do you mean department of

22   corrections or are you talking comptroller's office?

23              MS. HERZFELD:  I meant comptroller.  When I'm

24   saying department, I mean comptroller.

25              MR. AUMANN:  Okay, thank you.
```

```
 1              THE WITNESS:  No, we were not given any

 2    further directions from the legislature.

 3    BY MS. HERZFELD:

 4        Q.    And as a result of that hearing, did the

 5    department, the comptroller's department -- I will try

 6    to be super clear on that, Tom.  Did the comptroller's

 7    department make any changes to the report or findings?

 8        A.    No.

 9        Q.    Were those already finalized before the

10    hearing?

11        A.    Yes.

12        Q.    When you have investigators -- well, let me

13    back up.  As a part of your audit process, do you have

14    investigators go to the facility itself?

15        A.    Not our investigators, no.  We have auditors.

16        Q.    Auditors, okay, very good.  I'll make sure I

17    try to use your terminology correctly.  And so did you

18    have auditors go to Trousdale as part of the audit?

19        A.    We did.

20        Q.    How many went?

21        A.    I believe the entire audit staff.  The in-

22    charges and the staff auditors went to Trousdale -- went

23    to each of the facilities in the audit.

24        Q.    And Trousdale is obviously the one I'm most

25    specifically interested in.  Did you personally go?
```

1          A.     I did.

2          Q.     And when you all go and do those personal

3     observations and interviews, do people take notes?

4          A.     Yes.

5                 MS. POLLY:  Object to the form.

6     BY MS. HERZFELD:

7          Q.     Where are those notes kept?

8          A.     They are our working papers.

9          Q.     Is it your policy that when people do

10    interviews they should keep notes?

11         A.     Yes.

12         Q.     Do you know of any notes that would not be

13    contained in the working papers?

14         A.     Anything that is important to the audit are

15    in the working papers.

16         Q.     And did the department receive any input from

17    any outside organizations in forming the opinions in the

18    audit?

19         A.     No.

20         Q.     In talking about the 2020 audit as it has to

21    do with Trousdale, other than the information that shows

22    up in the audit itself, did the department have any

23    conversations with anyone at Trousdale about the

24    findings?

25         A.     No, I don't believe we did.

1      Q.    What about -- and when I say department, I

2    mean the comptroller's department.  What about any

3    conversations that the comptroller's department had with

4    anyone at CoreCivic about the findings with Trousdale,

5    were there any conversations post the 2020 audit?

6      A.    In the 2020 audit, there was not any finding

7    directly related just to Trousdale.  We spoke with the

8    department about the findings that we had in the report

9    and their oversight of their prisons that we had

10   audited.

11     Q.    And so when you say the department, you mean

12   --

13     A.    Department of corrections.

14     Q.    Department of corrections, okay.  So I just

15   want to make sure, now that Tom's pointed this out, that

16   we have that correct.  I guess what I'm trying to figure

17   out is, has there ever been a direct line of

18   communication between the comptroller's department and

19   someone at CoreCivic where they pick up the phone and

20   say, hey, you know, you've done this or you've done that

21   and we're going to kind of -- going to chat offline?

22     A.    Well, as part of our audit process, while

23   we're at the facility, we are in contact with the

24   warden.  And sometimes CoreCivic has sent part of their

25   upper management team, but they're not there all of the

Case 3:22-cv-00093  Document 37-10  Filed 05/23/22  Page 39 of 162 PageID #: 3621

1    time that we're there.  At the end of the week, we did

2    have a meeting.  We debriefed the warden and his staff

3    on any observations or concerns that we found, issues.

4              At that time, we don't have findings.  We

5    don't have anything labeled or decided upon, if it's a

6    finding and observation or so.  At that time, we just

7    make them aware of any issues.  And you know, as we go

8    through our audit process, we do work with the staff,

9    CoreCivic staff if it's a CoreCivic facility, state

10   staff if it's a state facility.  They are aware of what

11   we're looking at and any problems that we find.  And

12   sometimes, you know, they work on trying to fix them.

13        Q.    And all of that would be reflected in the

14   report?

15        A.    Most of it would be, I believe, yeah, or our

16   working papers.

17        Q.    Was there anyone from upper management

18   involved with -- when you all were looking at Trousdale?

19        A.    I remember the warden being there.

20   Obviously, the contract monitor.  I don't remember -- I

21   just don't remember if somebody from -- they might have

22   come the first day, upper management person from

23   CoreCivic may have been there.  I don't recall if they

24   were there or not.

25        Q.    Would that be documented someplace, who was

 1    present?

 2         A.    It may be if our -- if we had documented our

 3    opening meeting with -- we have an opening meeting when

 4    we attend the facility when we first arrive, just to go

 5    over with staff, you know, why we're there and the

 6    process that we're going to be following and answer any

 7    questions they have concerning the audit and the audit

 8    process.

 9         Q.    And when you say someone from upper

10    management, does that mean from CoreCivic corporate,

11    like the Nashville office?

12         A.    Right, correct.

13         Q.    Do you know if anyone has ever had any

14    conversations from your department, from the

15    comptroller's office, with Warden Washburn about the

16    conditions at Trousdale?

17              MS. POLLY:  Object to the form.

18              THE WITNESS:  During our audit process, yes

19    we interacted with Warden Washburn.

20    BY MS. HERZFELD:

21         Q.    And how was his reaction to your inquiries?

22         A.    The warden was very helpful during our audit.

23    He was cooperative.  He provided us any information that

24    we required.  He encouraged his staff to provide the

25    files or, you know, access to the facility, or anything

1    that we needed to complete our audit.

2         Q.    What about after, did anybody from the

3    comptroller's office have any conversations with Warden

4    Washburn after the audit was issued?

5         A.    No.

6         Q.    I pulled some different documents from I

7    think what you classified as your working papers.  I was

8    hoping we could go through and you could tell me if they

9    are part of your working papers and kind of what they

10   are.  If you'll just bear with me, I will put them on

11   the screen.  And I will slowly go -- I can try to give

12   you control, we'll see, but I'll try to kind of slowly

13   go through them and show you what they are.  But if you

14   have any questions, just let me know, okay?

15        A.    Okay.

16              MS. HERZFELD:  We are going to mark this as

17   Exhibit 5.

18              (Exhibit 5 was marked.)

19              MR. AUMANN:  Tricia, I was just going to ask,

20   when you put these up here, could you give us the Bates

21   numbers with them, just so we can pull up our own

22   copies?

23              MS. HERZFELD:  Yeah.  I think this one is

24   probably going to be a little bit more difficult because

25   we put it together as a collective exhibit.

Page 43

```
 1   BY MS. HERZFELD:

 2        Q.    Sir, do you see a document on the screen in

 3   front of you?

 4        A.    I do.

 5        Q.    In the top left-hand corner, does it say TDOC

 6   016160?

 7        A.    It does.

 8              MS. POLLY:  Tricia, before you get into that,

 9   can you either e-mail that around to us or share it in

10   the chat so that we can open it ourselves?

11              MS. HERZFELD:  If I can figure out how to do

12   that, I am happy to do it.

13              MS. POLLY:  Just because there are so many

14   documents, when I try to -- Tom's request was a great

15   one.  It sounds like it doesn't really work here because

16   it's different numbers.  But usually, whenever I try to

17   pull it up, it kind of locks my computer because they're

18   such a big batch of documents.

19              MS. HERZFELD:  Yeah, it was one big giant

20   PDF.  I will try to share it in the chat if I can figure

21   out how to do that.

22              MS. POLLY:  And I'm happy, Tricia, for you to

23   also just e-mail it around to all of us.

24              MS. HERZFELD:  It's pretty large, but I can

25   certainly try.  Let's see if that works.
```

Case 3:22-cv-00093   Document 37-10   Filed 05/23/22   Page 43 of 162 PageID #: 3625

1                    (Technical discussion.)

2    BY MS. HERZFELD:

3         Q.    Sir, do see the document in front of you that

4    says TDOC 016160?

5         A.    I do.

6         Q.    And this appears to be a two-page document.

7         A.    Uh-huh.

8         Q.    Dated January 31st, 2019.  And the title is

9    privately operated facility notification of

10   noncompliance.  Do you know what this document is?

11        A.    It's a noncompliance report.

12        Q.    What is a noncompliance report?

13        A.    It's the -- when contract monitors are aware

14   of an act of noncompliance, they issue a memo, such as

15   this report, documenting the noncompliant item.  And

16   then they make the warden or the assistant warden aware

17   of it.  And an action plan is developed to correct the

18   infraction or the noncompliance.  Basically, it's part

19   of the contract monitor's review of compliance items on

20   a checklist that they do.

21        Q.    Do you receive all of the noncompliance

22   reports about a facility when you're doing an audit?

23        A.    When we do an audit, we ask for the

24   noncompliance reports for the time period under review

25   of the audit.

Page 45

```
 1        Q.    Why do you ask for those?

 2        A.    So that we can have communications on what

 3   problems the contract monitors are noting.

 4        Q.    Do you use those in evaluating your

 5   recommendations for your audit?

 6        A.    We use those as part of the support for the

 7   audit, yes.

 8        Q.    Would all of those be documented within the

 9   audit?

10        A.    Only if it was pertaining to one of our

11   findings, observations, or conclusions.

12        Q.    So looking at this one, for example, the

13   location here is the Trousdale Turner Correctional

14   Center; is that correct?

15        A.    It is.

16        Q.    And here it's sent to Brandon Bellar, who is

17   the Trousdale County attorney.  Is your understanding

18   that Trousdale County has some role within the contract

19   with the facility?

20        A.    Yes.  In actuality, the facility is

21   contracted with the county of Trousdale, and the county

22   of Trousdale contracts with the state.

23        Q.    And then you're auditing the state, and part

24   of that is the compliance of the facility with the

25   various contracts; is that right?
```

```
 1        A.     Correct.

 2        Q.     And this one is dated January 31st, 2019.  It

 3   says that the audit scope here is count procedures,

 4   10/1/18 through 12/31/18.  Did I read that correctly?

 5        A.     Correct.

 6        Q.     And then it says:  The TDOC employees making

 7   observations, CMO Christopher Brun.  Do you know what

 8   CMO stands for?

 9        A.     That's the contract monitor for the

10   department located at Trousdale.

11        Q.     So here they're talking about -- well, why

12   don't you tell me what your understanding is of the

13   noncompliance here.

14        A.     When they do a count of the inmates at that

15   time -- they have a morning count, they have an evening

16   lockdown count.  The count numbers totals are supposed

17   to be entered in TOMIS.  And TOMIS is their inmate

18   management system software for the department of

19   correction.

20        Q.     And in this noncompliance issue, what

21   information is being shared?

22        A.     The total number of the count.  The results

23   of the count, I guess.

24        Q.     And in this case, it was noncompliant?

25        A.     It was not -- yeah.  Apparently, it was not
```

 1    entered in the TOMIS.

 2         Q.    Could that create a safety issue?

 3               MS. POLLY:  Object to form.

 4               MR. AUMANN:  Objection to form.

 5               THE WITNESS:  Not outright, no.  I don't

 6    believe so.

 7    BY MS. HERZFELD:

 8         Q.    Could that be caused by a lack of staffing?

 9               MS. POLLY:  Object to the form.

10               THE WITNESS:  That's hard to say.  I mean,

11    people doing the count get the count and somebody -- you

12    know, there's a person on staff that would enter the

13    count into TOMIS.  It's not clear from this why the

14    count wasn't entered.

15    BY MS. HERZFELD:

16         Q.    Is that something that your department would

17    look at, meaning the comptroller's department, when

18    you're doing an audit?

19         A.    It would be something that we would note, but

20    again, based on the significance of things that we look

21    at, this would not be concerned as a major thing.  A

22    broader issue of just entering information into TOMIS,

23    and I think we touched on some of that in the audit.

24         Q.    And in here you have the response of the

25    contractor, Warden Washburn; is that right?

1       A.      Correct.

2       Q.      And he says that the chief of security will

3    extensively discuss this deficiency and expectations for

4    compliance with the responsible staff member.  Do you

5    know if that was fixed?

6       A.      Again, we did not look at this specifically

7    and verify this, no.

8       Q.      So when those things happen, is it not within

9    the scope of the audit mandate of the department to

10   ensure that the various fixes that have been said that

11   they're going for those noncompliance reports had

12   actually happened?

13      A.      That would be more at a macro level.  We're

14   looking more -- how should I put this?  Our objective at

15   that time was not to look specifically at the count

16   totals.  We were looking more about, I guess at the

17   communication between the contract monitor and

18   Trousdale.  We did not specifically check this item, no.

19   We had broader objectives.

20      Q.      And I guess my broader question is -- and I

21   know that you all have very broad mandates on what it is

22   that you're supposed to look at.  I'm trying to figure

23   out in the process of the world of monitoring these

24   contracts, does anybody look behind an assurance that is

25   given from the facility, like for example, has been done

 1  here to ensure that that is actually happening?

 2      A.    The contract monitor should.  And then the

 3  department has a compliance group themselves that do

 4  internal audits or internal reviews of the facilities.

 5  And they would make note also.

 6      Q.    When you're saying department, you mean TDOC?

 7      A.    Correct, department of correction.

 8      Q.    So that would not be within the scope of what

 9  is done at the comptroller's office?

10      A.    It could be.  Just for this particular audit,

11  it wasn't something we focused on in this area.

12      Q.    I will move to the next one, which is marked

13  TDOC 016162.

14      A.    Correct.

15      Q.    This is another notification of noncompliance

16  dated January 31st, 2019, about drug testing.

17  Noncompliance for drug testing.  It looks like people

18  were not being retested for their drug tests.  Was that

19  something that was within the scope of the audit

20  performed by the comptroller's office?

21      A.    I do believe we included that in the report.

22  At least the part that they were not documenting or not

23  conducting the drug tests, the random drug tests.

24      Q.    And then it says here that Warden Washburn

25  was advised of the noncompliance by the contract

Page 50

1    monitor.  And then if you go with me to the next page,

2    on TDOC 016163, it talks about the response of the

3    contractor or corrective action taken; is that right?

4         A.    Uh-huh.

5               MS. POLLY:  Object to the form.

6    BY MS. HERZFELD:

7         Q.    And then reading here, you have the response

8    of Warden Washburn and how he dealt with that issue; is

9    that correct.

10        A.    Uh-huh.

11        Q.    Is that a yes?

12        A.    Yes.

13        Q.    And going back to ensure that what he says

14   they had changed or they were going to do in the future,

15   that would be the responsibility of the contract monitor

16   to ensure that's correct and --

17        A.    Yes.

18        Q.    -- not the comptroller's office?  Do I

19   understand you correctly?

20        A.    Ultimately --

21              MS. POLLY:  Object to the form.

22              THE WITNESS:  -- it's the responsibility of

23   the contract monitor to ensure that that is taking

24   place, yes.

25   BY MS. HERZFELD:

Case 3:22-cv-00093  Document 37-10  Filed 05/23/22  Page 50 of 162 PageID #: 3632

1       Q.      And would this have been one of the

2    notifications of noncompliance that your office, the

3    comptroller's office, would have looked at in

4    formulating your reports?

5       A.      I can't speak to exactly if we looked at that

6    exact one, but I believe it would have been in a list of

7    other noncompliances, possibly.

8       Q.      And you know that we've received a bunch of

9    documents from your office --

10      A.      Correct.

11      Q.      -- in preparation for today?

12      A.      Uh-huh.

13      Q.      Were you involved at all in the preparation

14   of providing those documents to us?

15      A.      I was, yes.

16      Q.      And those documents, do you know them all to

17   be your working papers, or were there any that were not?

18      A.      I believe we included some information that

19   wasn't in the working papers, but in addition to the

20   working papers.

21      Q.      Do you know what information was in addition

22   to the working papers?

23      A.      I could not comment on all of that.  It was a

24   lot of information that we sent you.

25      Q.      Sure.

Case 3:22-cv-00093   Document 37-10   Filed 05/23/22   Page 51 of 162 PageID #: 3633

Page 52

1              MS. HERZFELD:  Tom, I think this would go a

2     whole lot easier for me if we kind of knew what section

3     of the documents that were produced were the working

4     papers versus the stuff that wasn't.  Is there a way you

5     can deconstruct that?

6              MR. AUMANN:  I'm not entirely sure.  You

7     know, I sent on everything that we received from the

8     comptroller's office.  So that might be hard to do.  I

9     mean, I could try looking on a break, but as I sit here

10    right now, I don't know that I would be able to, other

11    than tell you I sent everything on to you.

12             MS. HERZFELD:  Let's just go off the record

13    for a second.

14             (Off-the-record discussion.)

15             MS. HERZFELD:  Okay, we're back on the record

16    after a semi-quick discussion and break.  It appears

17    that we've agreed that Mr. Aumann and Ms. Maxwell are

18    going to identify, the best they can, what the Bates

19    range is for what would be -- what you consider to be

20    your working papers file.  Does everybody agree that

21    that's the agreement?

22             MR. AUMANN:  Yes.

23             MS. POLLY:  Yes.

24    BY MS. HERZFELD:

25        Q.    So I will just ask you generally then, sir,

1   do you know if these noncompliance reports are typically

2   included within the working paper files that would be

3   reviewed for the preparation of the audits?

4       A.    They would be reviewed as part of our

5   planning work.  They would be in our working papers if

6   it supports our conclusions or any of the test work that

7   we did at the facility or during the audit.  We don't

8   put everything we look at into the working papers,

9   because sometimes it would just be way too many files.

10  But we put into the working papers what we use to

11  support conclusions that we've drawn, the test work that

12  we've done, and basically, you know, which is important

13  to the work that we're doing.

14      Q.    And so I think with that agreement from your

15  counsel, I can dispense with the rest of my questions,

16  then, about this Exhibit 5.

17          MS. HERZFELD:  We've been going an hour.  Do

18  you all want to take a five-minute break?

19          THE WITNESS:  Sure.

20          MS. POLLY:  Fine by me.

21          (Recess observed.)

22  BY MS. HERZFELD:

23      Q.    I am going to show you -- again, if I can

24  figure it out.  Do you see something that is marked TDOC

25  012403 on your screen?

Page 54

1        A.      Uh-huh.

2        Q.      I will let you take a look at that for one

3   second while I figure out how to share it with the

4   others.

5                MS. HERZFELD:  We'll mark this as Exhibit 6.

6                (Exhibit 6 was marked.)

7   BY MS. HERZFELD:

8        Q.      Okay, sir, do you recognize this e-mail?

9        A.      I do.

10       Q.      And it is from Christopher Brun and to

11  Vincent Finamore.  Is that you?

12       A.      It is.

13       Q.      Is this an e-mail that would have been kept

14  in the ordinary course of your business at the

15  comptroller's office?

16       A.      Yes.

17       Q.      I will give you an opportunity to read

18  through this e-mail.  I am going to try to figure out

19  how to let you control the screen.

20       A.      I've downloaded it.

21       Q.      Oh, you have?  Great.  Do you mind taking a

22  look at it for me.  I'll give you a minute to review.

23       A.      Okay.  Okay.

24       Q.      Do you recall what was happening in this

25  e-mail?

Page 55

```
 1        A.    Yes.  I was e-mailing him part of the 2017

 2   audit.  And we were drafting -- we were in the report

 3   writing part of -- phase of it.  We were -- I was

 4   sending him an e-mail just to verify that the instances

 5   of noncompliance with the post, that he agreed that they

 6   were correct.  Basically, I'm e-mailing him, showing him

 7   the evidence that I have and giving him an opportunity

 8   to, if they -- if one of the shifts were filled, you

 9   know, to correct me where I was wrong.

10              And he basically, you know, was saying that

11   those -- what I was saying were the critical posts, he

12   believed were critical posts, and that he addressed the

13   -- his last monitoring noncompliance report.  He's

14   saying that he addressed this issue with CoreCivic and

15   that they're developing a plan of action.  Basically,

16   this was just me communicating with him some of the

17   information that I had and that was -- would be going

18   into the findings.

19        Q.    And ultimately, did that end up in the

20   findings?

21        A.    It did.

22              MS. HERZFELD:  Now I'm going to move you over

23   to what we'll mark as Exhibit 7.

24              (Exhibit 7 was marked.)

25   BY MS. HERZFELD:
```

Case 3:22-cv-00093   Document 37-10   Filed 05/23/22   Page 55 of 162 PageID #: 3637

1        Q.      Do you see the document TDOC 013292.

2        A.      Uh-huh.

3        Q.      I'm going to try to drop it in the chat as

4    well.  Everyone should have it in the chat.  Mr.

5    Finamore, if you will go ahead and take a look at it.

6    This e-mail is dated August 11th, 2017; is that correct?

7        A.      Uh-huh.

8        Q.      And the subject is Trousdale Turner request

9    for staffing pattern revision.  Did I read that

10   correctly?

11       A.      Yes.

12       Q.      And it's from Christopher Brun, who's the

13   contract monitor, to you and Greg Spradley; is that

14   correct?

15       A.      Correct.

16       Q.      Who is Greg Spradley?

17       A.      He was one of my staff auditors.

18       Q.      If you'll go ahead and just take a second to

19   review this e-mail.

20       A.      Uh-huh.

21       Q.      Have you had opportunity?

22       A.      Yes.

23       Q.      Is this an e-mail that would have been kept

24   in the ordinary course of your business at the

25   comptroller's office?

1        A.      Yes, sir.

2        Q.      Do you recall what this e-mail was about?

3        A.      Chris Brun was sending us a copy of a

4    recently approved staffing pattern.  DC Woodall was the

5    chief of operations at the department of correction.  He

6    is the one that was over -- you know, responsible for

7    the prison oversight.  And basically, this is a staffing

8    pattern that he has reviewed and signed off on and has

9    returned back to TTCC.

10              Each time Trousdale is going to make an

11   adjustment to their staffing pattern, they are to have

12   the approval of the department.  So this is a recent

13   change and he was sending us the newly approved staffing

14   pattern.

15              MS. HERZFELD:  And Tom, I don't think when

16   this was produced the PDF that was attached was produced

17   behind it.  If I am wrong, somebody correct me, but I

18   think it was just the e-mail and not the PDF.  So if it

19   has been produced, if somebody could help identify it

20   for me, where the Bates number is after the deposition,

21   I would be greatly appreciative.

22              MR. AUMANN:  Okay, yes, so this is on 13292.

23   Yeah, we will look into that.

24              MS. HERZFELD:  Great.  Thanks so much.

25              THE WITNESS:  Yeah, I believe we did send

Page 58

```
 1    that and it should be in the actual audit itself.  It's

 2    in the working papers.

 3                MS. HERZFELD:  Okay.  Fantastic.  We will now

 4    move on.

 5                (Exhibit 8 was marked.)

 6    BY MS. HERZFELD:

 7        Q.    Okay, you should see in front of you now what

 8    we'll mark as Exhibit 8, TDOC 013524.  Do you see that

 9    document?

10        A.    I don't see the document.  I see your file

11    manager there.

12        Q.    Hold on one second for me.  How about now,

13    TDOC 013524?

14        A.    Uh-huh.

15        Q.    I'm back on a roll, lovely.  And I will put

16    that in the chat for you all.  This is Exhibit 8, TDOC

17    013524, a one-page document.  And this says meeting with

18    Commissioner Parker, dated Thursday, November 8th, 2018.

19    Did I read that correctly?

20        A.    Correct.

21        Q.    And it's from Debra Loveless to you; is that

22    correct?

23        A.    Correct.

24        Q.    And is this an e-mail that would have been

25    kept in the ordinary course of business dealings at the
```

1   comptroller's office?

2        A.    Yes.

3        Q.    In this e-mail, what is happening?  Do you

4   recall it?

5        A.    Yes, this was after the 2017 audit, after it

6   was released and after the hearing.  This was a meeting

7   that Commissioner Parker requested to have with the

8   comptroller.  And it was about -- the contracts were

9   being renegotiated with CoreCivic and there was some

10  question.  They wanted some question -- or to hear what

11  the comptroller had to say about adjusting liquidated

12  damages within the contracts.  The rate that the

13  liquidated damages were set.  And it was, if I recall,

14  pretty steep for Trousdale, as well as Hardeman County.

15            So that was -- Mr. Parker was requesting to

16  have that meeting with the comptroller.  And the

17  comptroller asked me to attend also, and give him some

18  guidance on what was going on.

19       Q.    Do you know what the result of that meeting

20  was?

21       A.    Yes, ma'am.  Basically, the comptroller told

22  him that it's not our place to say what or give advice

23  as to what should be in a contract.  That the rates that

24  were in the contract are what the department agreed to.

25  If they -- you know, they would need to, I guess

Page 60

```
 1    negotiate with CoreCivic to come with different rates if
 2    they wished to do that.
 3              We just ask that if you do make a change,
 4    that you document what those changes are, and that we --
 5    so that we can review them during the next audit or be
 6    aware of the changes.  It wasn't our place to give
 7    advice on how the department should, you know, basically
 8    set the rates in their contracts.
 9        Q.    When you say the department, you mean TDOC?
10        A.    Correct.
11        Q.    Was TDOC taking the position that the
12    contractual fines were too extreme for Trousdale and
13    Hardeman County, that it should be raised or lowered?
14              MS. POLLY:  Object to the form.
15              THE WITNESS:  They were just presenting
16    information that the fines would be rather steep.
17    BY MS. HERZFELD:
18        Q.    And who was it that was presenting that
19    information at the meeting?
20        A.    Wes Landers.
21        Q.    Who is Wes Landers?
22        A.    He was the chief financial officer at the
23    time.
24        Q.    For which department?
25        A.    Department of correction.
```

1         Q.    Was Commissioner Parker at that meeting?

2         A.    Commissioner Parker was at the meeting, yes.

3         Q.    Did Commissioner Parker take a position on

4    the fines?

5         A.    He was -- you know, he was there with Wes

6    Landers.  And together, they were just explaining to us

7    how steep the fines would be based on the rate, and that

8    they had a concern that this would be very detrimental

9    to CoreCivic.  And you know, keeping them as a

10   contractor could influence, you know, I guess the

11   relationship between them.

12              I am not sure I am phrasing that right, but

13   I'm just saying that he had a concern that it was a lot

14   of money.  And in the course of business, that would be

15   a concern to any company that would have fines, you

16   know, levied against them.  And certainly, the

17   department being contracted to CoreCivic, you know, it's

18   in their interest to keep CoreCivic housing prisons and

19   with their contracts.  So they just had a concern that

20   the rate they agreed to would be a lot -- amount to a

21   substantial amount of money.

22        Q.    And the fines, your understanding is, would

23   be levied if there were violations of the contract?

24        A.    Correct.  This was part of the contract

25   called liquidated damages.  And basically, under certain

1    violations, under certain circumstances, if they

2    occurred, they qualify for liquidated damages to be

3    assessed against CoreCivic.

4              (Exhibit 9 was marked.)

5    BY MS. HERZFELD:

6        Q.    I'm going to show you what I'm I've marked as

7    Exhibit 9.  You should see it on your screen, TDOC

8    014907.  Do you see it?

9        A.    I do.

10       Q.    I will put it in the chat.  You can go ahead

11   and take a look at it.  This is marked as Exhibit 9.

12   It's an e-mail dated Thursday, November 8th, 2018 re:

13   CoreCivic contracts from Betty Stanton to Vincent

14   Finamore.  Did I read that correctly?

15       A.    Yes.

16       Q.    And you are Vincent Finamore; is that right?

17       A.    I am.

18       Q.    And Betty Stanton is whom?

19       A.    Secretary for Comptroller Wilson at the time.

20       Q.    Have you had an opportunity to review the

21   e-mail?

22       A.    I have.

23       Q.    Do you recall what this e-mail was about?

24       A.    Yeah, it was giving me a parking space.  She

25   was saying for the meeting that she reserved a parking

1   space for me, because we were meeting in the

2   comptroller's office in the state capitol.

3        Q.    And when you're talking about meeting, is

4   that the meeting we were just discussing, the meeting

5   between TDOC and the comptroller's office?

6        A.    Yes.

7        Q.    And then if you'll switch to the second page,

8   which is marked TDOC 014908.  It looks like you're being

9   forwarded an e-mail between Debbie Inglis, Justin

10  Wilson, and Dwight Tarwater.  Do you see where I am?

11       A.    Uh-huh, I think so.  Tarwater, yes.  I see

12  it, yes.

13       Q.    And who is Mr. Tarwater?

14       A.    I do not remember.  He might have worked for

15  the governor's office.  Maybe Stephanie might know.  I

16  am not sure.

17       Q.    Do you recall if Mr. Tarwater is a lawyer?

18       A.    I do not recall.

19       Q.    And Justin Wilson, who is that?

20       A.    Former comptroller of the State of Tennessee.

21       Q.    Was he comptroller at the time that you were

22  having these conversations?

23       A.    He was.

24       Q.    And then Debbie Inglis, you said, was his

25  assistant?

Page 64

1          A.     No, Debbie Inglis is an attorney with the

2    department of correction.

3          Q.     So this e-mail that's being forwarded says

4    from Debbie Inglis to Justin Wilson and Dwight Tarwater:

5    In preparation for upcoming meeting, I have attached the

6    contracts for the CoreCivic operated facilities.  The

7    liquidated damages schedule is an attachment in each

8    contract.  You will note that in the Trousdale contract,

9    the multiplier is $250, while in the other contracts, it

10   is $25.  Did I read that correctly?

11         A.     You did.

12         Q.     And then Comptroller Wilson forwards that

13   e-mail to you on April 10th, 2018?  Do you see where I

14   am?

15         A.     I do.

16         Q.     And then he says:  I suppose they're going to

17   want us to reapprove any penalty they might assess.

18   Something we ain't about to do.  Did I read that

19   correctly?

20         A.     Correct.

21         Q.     Do you know what Mr. Wilson was referring to

22   in this e-mail?

23         A.     Yes, he was, again, speculating on what the

24   department may be wanting to meet with us about and to

25   ask us.  And he's just stating that that's -- we're not

Page 65

 1    about to give advice on what should be in a contract for

 2    the department of corrections.

 3         Q.    And that's consistent with your conversations

 4    with the comptroller, Mr. Wilson?

 5         A.    Yes.

 6         Q.    Very good.  I am going to show you now what

 7    we will mark as Exhibit 10.  Do you see it in front of

 8    you?

 9         A.    I do.

10         Q.    It says TDOC 012355.  Do you see it on your

11    screen?

12         A.    I see it on the screen, correct.

13               (Exhibit 10 was marked.)

14    BY MS. HERZFELD:

15         Q.    And I will also put it in the chat.  And this

16    is a two-page document.  It says staffing vacancies at

17    Trousdale Turner Correctional Center, reporting from

18    10/1/2018 to 10/31/2018, Attachment G.  Did I read that

19    correctly?

20         A.    I believe so, yes.

21         Q.    And have you ever seen a chart like this

22    before?

23         A.    I have not seen this specific chart, no.

24         Q.    Do you recognize this chart?  Is it a chart

25    that is usually kept anywhere, do you know?

1      A.    It looks like this is a chart kept by the

2  department of correction.

3      Q.    Have you seen any other charts that look like

4  this when you were doing your review of Trousdale?

5      A.    We may have looked at -- I think we have some

6  of these in our current past audit.  But I personally

7  didn't look at them myself.  I believe I know what this

8  is.

9      Q.    And what do you think that it is?

10      A.    It's basically a list of levied liquidated

11  damages for the violations of the positions that were

12  not filled.  There is a 45-day requirement that if a

13  correctional officer position is -- remains unstaffed

14  for over 45 days, then they are allowed to be assessed

15  for liquidated damages.  And the liquidated damages

16  would be the assessment, I guess tally or total that the

17  department is calculating.

18      Q.    Do you know if these are kept monthly or

19  quarterly?

20      A.    I presume that the former financial officer

21  for the department of correction kept these, and I'm not

22  familiar with his process.

23      Q.    Okay.

24            (Exhibit 11 was marked.)

25  BY MS. HERZFELD:

Page 67

```
 1        Q.    I am going to show you what we've marked as

 2   Exhibit 11, TDOC 015330.  It's a two-page document.  I

 3   will also put it in the chat.  Do you recognize this

 4   document, sir?

 5        A.    I do.

 6        Q.    What do you recognize it to be?

 7        A.    My notes of the meeting.

 8        Q.    And it's dated Monday, November 26, 2018; is

 9   that correct?

10        A.    I believe so.

11        Q.    And these are your notes?

12        A.    Correct.  Yeah, these are the typed-up

13   version of my notes.

14        Q.    If you will take a minute just to review it.

15   Let me know when you're finished.

16        A.    Oh, this is a different meeting.  Okay, hold

17   on.  Yeah, I believe this was a different meeting.

18        Q.    Do you recall what that meeting was about?

19        A.    As discussed, it was also a meeting about the

20   contract.

21        Q.    And did you often attend meetings with the

22   commissioner of the department of corrections?

23        A.    Only when asked to by the -- you know, in

24   this case, we were asked to attend by the comptroller.

25        Q.    How many meetings did you have -- did you
```

Page 68

1    attend with the commissioner of TDOC about Trousdale?

2          A.    These are the only two meetings.

3          Q.    And you took these two notes?

4          A.    I took these notes, correct.

5          Q.    Do they accurately reflect what happened in

6    that meeting?

7          A.    I believe so, yeah.

8          Q.    You should have in front of you now what

9    we'll mark as Exhibit 12, TDOC 014498.

10               (Exhibit 12 was marked.)

11               MS. HERZFELD:  And I just put it in the chat.

12   Does everyone have it, Exhibit 12?

13               MS. POLLY:  I do.

14               MR. AUMANN:  Yes.

15   BY MS. HERZFELD:

16         Q.    And if you could take a look at it.  It's an

17   e-mail that says prescope meeting notes, dated December

18   26, 2018; is that correct?

19         A.    Uh-huh.

20         Q.    And it's sent from De'Aundrea Pointer to

21   Melissa Boaz, to you, and to Jaclyn Clute.  Did I read

22   that correctly?

23         A.    Correct.

24         Q.    Who is De'Aundrea Pointer?

25         A.    She was a staff auditor on the 2020

1    performance audit.

2         Q.    And Melissa Boaz?

3         A.    Melissa Boaz and Jaclyn Clute were my

4    co-in-charges on the audit.

5         Q.    What is a prescope meeting?

6         A.    At the end of our planning, basically when

7    we're doing our background research and developing the

8    objectives, items that we are going to consider for the

9    audit to look into, we come up with a -- we have a scope

10   meeting with upper management to discuss the issues that

11   we've identified during the planning.  And we talk about

12   and narrow our focus on the objectives that we want to

13   include in the audit for this time.

14        Q.    It looks like attached to this e-mail is what

15   is called planning notes.  Do you see that?

16        A.    Uh-huh.

17        Q.    Do you know who took those planning notes?

18        A.    I'm thinking I did, but there may have been

19   several of us that kept notes.  Usually that's the case,

20   we -- you know, each of us take some notes and then we

21   compile them together.

22        Q.    Will you take a look at the notes that were

23   attached here and let me know if they're an accurate

24   reflection of the meeting that you had?

25        A.    I am not sure those are the actual meeting

 1   notes.  I think these are ideas.  So the top part where

 2   it says staffing ideas last time we looked at, that's

 3   just some notes that I made about what we did in the

 4   2017 audit.  Possible issue incident reporting.  So

 5   these are coming up with ideas to present to management,

 6   possible things to look at.  So these are not notes of

 7   the actual meeting.

 8        Q.    This is more your brainstorming?

 9        A.    Yeah, this is just brainstorming, thinking

10   out loud.  Just jotting down some notes for myself to

11   possibly bring up during the discussions.

12              (Exhibit 13 was marked.)

13   BY MS. HERZFELD:

14        Q.    Now I'm showing you Exhibit 13, and that is

15   TDOC 011758, and it is a seven-page document if you'll

16   take a look at it.  I will also put it in the chat.  If

17   you'll go ahead and review that and let me know when you

18   get a chance to glance at it.

19              Before you have to read the whole thing, I

20   will ask you, it's dated Monday, January 7th, 2019; is

21   that correct?

22        A.    Correct.

23        Q.    It says that it is the 1/7 staff meeting; is

24   that right?

25        A.    Correct.

Page 71

```
 1        Q.    And do you know if these are meeting minutes

 2   or notes that were taken during that meeting?

 3        A.    These are just my notes of what we covered in

 4   the meeting.

 5        Q.    So you took these notes?

 6        A.    I believe I did, yes.

 7        Q.    Do you have any reason to think that anything

 8   contained within it is not accurate?

 9        A.    I don't believe so.

10              MR. AUMANN:  Hey Tricia?

11              MS. HERZFELD:  Yes.

12              MR. AUMANN:  Just a second.  I just heard

13   from Erin that she's having problems with her computer.

14   She's not on screen.  So I just want to make sure if Joe

15   is -- I see him on screen, if he is available if

16   CoreCivic has any objections.  Okay, I just got an

17   e-mail from her that yeah, Joe is out, so if we could

18   just pause to let --

19              MS. HERZFELD:  Sure.  We'll go off the

20   record.

21              (Off-the-record the court reporter

22              read back testimony.)

23              MS. POLLY:  This is Erin Polly.  My computer

24   shut down and no one on behalf of CoreCivic was

25   participating in the deposition from the time that the
```

Page 72

 1    witness was looking at Exhibit 11 up until now.  Other

 2    counsel did not realize my absence until I notified them

 3    of it through an e-mail on my cell phone.  We have

 4    agreed that we will just lodge an objection to the form

 5    to everything that took place between when the witness

 6    was reviewing Exhibit 11 up until now, so that if an

 7    issue does arise once we receive the transcript later

 8    on, we've made our objection now.

 9            MS. HERZFELD:  And we're in agreement with

10    that.

11    BY MS. HERZFELD:

12        Q.    Okay, moving on, Exhibit 13, you've had an

13    opportunity to review it, sir?

14        A.    Yes.

15        Q.    And I think you had said that you believe

16    these to be your notes; is that correct?

17        A.    Correct.

18        Q.    When you reviewed them, is there anything in

19    these notes that you think is inaccurate?

20        A.    I don't believe so.

21        Q.    And they're an accurate reflection of your

22    recollection of the meeting?

23        A.    Yes.

24            (Exhibit 14 was marked.)

25    BY MS. HERZFELD:

1      Q.    I'm going to show you what we've marked as

2    Exhibit 14.  Do you see that in front of you?

3      A.    Yes.

4      Q.    TDOC 012554.

5      A.    Can we just go back a second?

6      Q.    Sure.

7      A.    The 12 or 13, that's a meeting that we had

8    with our staff, right?

9      Q.    Yes.  Exhibit 13.

10     A.    Yeah, okay.  Yeah, that was the staff at the

11    beginning of the audit.

12     Q.    Did you need to see it again?

13     A.    No, I just wanted to make sure that we

14    weren't thinking it was a different meeting, like a

15    scope meeting.

16     Q.    And so Exhibit 14 should be what is in front

17    of you now, TDOC 012554.  It says comptroller input on

18    preliminary objectives, dated Wednesday, January 30th,

19    2019.  Did I read that correctly?

20     A.    I believe so, yeah.

21     Q.    That's from Dena Winningham?

22     A.    Correct.

23     Q.    And Dena Winningham is who?

24     A.    Manager, audit manager.

25     Q.    And that's sent to you, and Melissa, and

 1    Jaclyn; is that right?

 2         A.    Correct.

 3         Q.    If you'll look down at the last bullet point

 4    on her e-mail.

 5         A.    Uh-huh.

 6         Q.    Do you see what I'm talking about?  Do you

 7    see the part that I've highlighted here in yellow?

 8         A.    I do.  I see it, yeah.

 9         Q.    It says:  The bullet point under contract

10    requirements concerning breach of contract should be

11    deleted.  I know that was a legislative concern in the

12    follow-up correction hearing in December, and Julie also

13    emphasized it at our group meeting before Christmas.

14    But the view is that it is a legal question that we

15    can't address.  Did I read that correctly?

16         A.    Correct.

17         Q.    Do you know what they're talking about there?

18         A.    I do not recall specifically what that is

19    about.  I believe it's about the fact that CoreCivic --

20    that the state is technically -- has by statute only

21    contracted with one private prison.  And that's South

22    Central.  And we were thinking about bringing that to

23    the legislature's attention.  The Trousdale, Hardeman

24    County and Whiteville are all contracted through the

25    counties and not directly through the state.

1               And the way the statute reads right now,

2   technically the state is only allowed to contract with

3   one private prison.  But that -- it was decided that

4   that is a legal question.  It's not something that we

5   can review as performance-wise, so they were going to

6   let that go.

7        Q.    Do you know if it was ever addressed through

8   legal?

9        A.    Beyond this point, we moved on with our audit

10  and I do not know if it was filed with legal or what the

11  status of that question is.

12       Q.    The question about where it says, I know this

13  is a legislative concern in the follow-up hearing.  Do

14  you know what she's talking about there?

15       A.    Yeah, it was mentioned during the hearing,

16  some questions about how the state is contracted with

17  CoreCivic and the nature of the relationships and the

18  agreements.  It was brought up during, I think, one of

19  the hearings.

20       Q.    Sir, do you know who Lee Dotson is?

21       A.    Yeah, he's the department of corrections --

22  he's the one for 2020 that is over the prisons, the

23  assistant commissioner of prisons.

24       Q.    I am putting on your screen what we'll mark

25  as Exhibit 15, TDOC 013491.  It's a two-page document.

1    The subject matter is Lee Dotson.  And it's dated

2    Monday, February 4th, 2019.

3                (Exhibit 15 was marked.)

4    BY MS. HERZFELD:

5        Q.    Do you see where I am?

6        A.    I do.

7        Q.    Are these notes?

8        A.    These are, basically, my notes of questions

9    that we were going to ask Mr. Dotson, I believe.  Yeah,

10   this is a part of the IMOF, which is a standard

11   questionnaire we do with all upper management when we do

12   an audit.

13       Q.    Did you have that meeting with Mr. Dotson?

14       A.    I believe we did, yes.

15       Q.    Did he answer the questions?

16       A.    I'm sure he did.

17       Q.    Do you know if they were ever answered in

18   writing?

19       A.    We would have written them up and put them

20   into -- in T-mate, our working papers.

21       Q.    Do you recall having any concerns based on

22   any of the answers that were given to you by Mr. Dotson?

23       A.    I cannot recall that we had any at the

24   moment.  I would have to look at my notes of the

25   interview.  But whatever information we gained would

1   have been to help us define what we wanted to look at.

2        Q.    Okay, sir, I've now put in front of you what

3   we'll mark as Exhibit 16.  It says weekly sanctions

4   report, TDOC 016008.  It's a two-page document.

5        A.    Okay.

6              (Exhibit 16 was marked.)

7   BY MS. HERZFELD:

8        Q.    Have you ever seen a weekly sanctions report

9   before?

10       A.    I don't recall.

11       Q.    And this is an e-mail that is sent to you?

12       A.    I guess it is, yes.  Oh, yes.  This is a

13   weekly sanctions.  This is dealing with parole officers.

14       Q.    When you say it's dealing with parole

15   officers, do you know what that means?

16       A.    Yes.  They also -- the department of

17   corrections, another half of it, is not just the prisons

18   that they operate, but probation and parole is now under

19   the department of corrections as well.  And their weekly

20   sanctions is basically sanctions that judges can levy on

21   parolees, I believe, when they break -- when they break

22   a rule of their being on parole.

23              So basically, there's -- the department is

24   trying to come up with standardized sanctions that

25   judges can follow in a way, you know, to help be

1    objective on how the sanctions are levied.  But

2    ultimately, right now judges have the ability to decide

3    how to handle when a probationer violates their parole.

4          Q.    So that doesn't have anything to do with the

5    audit at Trousdale?  Well --

6          A.    No.

7          Q.    -- TDOC vis-a-vis Trousdale?  Okay, great.

8    If you will flip with me to the second page.  So if I am

9    understanding you correctly, it sounds like that second

10   page, this is not the attachment, this is just a

11   separate document, TDOC 016009, dated Monday, February

12   4th?

13         A.    These are just notes of, I believe, questions

14   we wanted to discuss with Mr. Landers in our interview

15   with him, his planning interview.

16         Q.    And again, who is Mr. Landers?

17         A.    Mr. Landers was the former chief financial

18   officer for the department of corrections.

19         Q.    How many times did you meet with him in

20   preparation for your audit?

21         A.    At least three times.  And I believe Melissa

22   and Jaclyn met with him several times during the audit

23   to discuss questions.

24         Q.    Should there be notes that reflect what

25   happened in those meetings?

1      A.    Yeah, all of the notes to every interview we

2  had with him will be in the working papers.

3      Q.    Great.  Thank you very much.

4            (Exhibit 17 was marked.)

5  BY MS. HERZFELD:

6      Q.    I'm showing you what we've marked as Exhibit

7  17, TDOC 013295.  Is this an e-mail sent from you to

8  Carolyn Jordan?

9      A.    Yes.

10     Q.    Who is Carolyn Jordan?

11     A.    Carolyn Jordan is the -- she's basically the

12 oversight person for the department of correction for

13 the CoreCivic facilities.  She's the one that supervises

14 or oversees the contract monitors.

15     Q.    So in this e-mail, you're asking Ms. Jordan

16 to have Hardeman and Whiteville facilities provide a

17 report that matches the information in this report from

18 Trousdale; is that right?

19     A.    Correct.

20     Q.    And it looks like the attachment is an Excel

21 spreadsheet that says, close max PC.  Did I read that

22 correctly?

23     A.    Correct.  Yes.

24     Q.    Do you know what type of information is in

25 that Excel spreadsheet?

1        A.    Yes, that was looking for the number of

2   inmates at the facility that are designated as close or

3   max security level.

4        Q.    And that was -- was that a report that you

5   would get routinely from Trousdale?

6              MR. AUMANN:  Objection to form.

7              THE WITNESS:  It's a report that if we were

8   looking into an issue, that we would routinely request,

9   yes.

10  BY MS. HERZFELD:

11       Q.    And do you know how often you would receive a

12  report like that from Trousdale?

13       A.    We would only receive it if we asked for it.

14       Q.    Would those reports be included in your

15  working papers?

16       A.    They are in the working papers, correct.

17       Q.    Okay, great.

18             MS. HERZFELD:  And Tom, again, I don't know

19  that I have located the attachment for this e-mail, so

20  if that's one other thing, we could just figure that

21  out, that would be fantastic.

22             MR. AUMANN:  I'll put it on the to-do list.

23             MS. HERZFELD:  Thanks so much.  It's big

24  production, so I could have missed it or perhaps, you

25  know, it just got overlooked.  Okay, Exhibit 18.

Case 3:22-cv-00093  Document 37-10  Filed 05/23/22  Page 80 of 162 PageID #: 3662

```
 1              (Exhibit 18 was marked.)

 2    BY MS. HERZFELD:

 3        Q.    Sir, I'm going to show you what we have

 4    marked as Exhibit 18, TDOC 029720.  It's a six-page

 5    document.  Do you see that in front of you?

 6        A.    I do.

 7        Q.    This says that it's the Tennessee Department

 8    of Correction corrective action plan six-month follow-up

 9    report submitted July 3rd, 2020.  Did I read that

10    correctly?

11        A.    Correct.

12        Q.    Is that the six-month follow-up report that

13    we talked about earlier in the deposition?

14        A.    Yes.

15        Q.    So this would be the follow-up to the 2020

16    audit; is that correct?

17        A.    Correct.

18        Q.    If I understood your testimony before, this

19    comes -- this six-month follow-up report comes from TDOC

20    to the comptroller's office, and then it's put in a file

21    until there is another audit; is that correct?

22        A.    Until the next audit, yes.

23        Q.    And so there's no follow-up that is done to

24    verify that any of the information in this report that's

25    been reported by TDOC is accurate.  Not by the
```

 1    comptroller's office; is that right?

 2                MS. POLLY:  Object to the form.

 3                THE WITNESS:  Not at the time that we receive

 4    it, no.

 5    BY MS. HERZFELD:

 6        Q.    Okay, great.  Thank you so much, sir.

 7        A.    We would, obviously, when we begin the next

 8    audit, it would possibly -- you know, we would possibly

 9    check into these, if not all of them.  Well, we would,

10    as part of the next audit, we look at the prior findings

11    and conclusions, and we verify that the corrective

12    action has been taken.  So it is part of the audit, it's

13    just we don't do it until we begin the next audit.

14        Q.    Thank you for that.  And then on your screen

15    now, there should be what we'll mark as Exhibit 19, TDOC

16    010081.

17                (Exhibit 19 was marked.)

18    BY MS. HERZFELD:

19        Q.    Do you see that on your screen?

20        A.    Yes.

21        Q.    And it looks like it's a two-page transcript

22    of a chat.  If you will go ahead and take a look at it,

23    I will also drop it into the chat here.

24        A.    Okay.

25        Q.    Do you have a chat function at work?

1        A.      We do.

2        Q.      Is that something that you use with people

3    within the department?

4        A.      With the comptroller's office, amongst

5    ourselves.

6        Q.      Yeah, when I said the department, I'm sorry,

7    I meant the comptroller's office, yes.  Amongst

8    yourselves internally, you use this chat?

9        A.      Uh-huh.

10       Q.      Do you typically archive those chats for open

11   records purposes?

12       A.      I think I kept it for myself.

13       Q.      Who is David Wright?

14       A.      He was the co-in-charge on -- at this time --

15   I don't remember when this was.  When was this?  Is

16   there a date when this was?

17       Q.      I have not seen one.

18       A.      Because I believe this is the 2020 audit.  He

19   was a staff auditor.  But it might have been for the --

20   if it was the 2017 audit, he was a co-in-charge.

21       Q.      It doesn't look like we can tell from this

22   chat which year it's from.

23       A.      I think it's the 2017 audit.

24       Q.      And if we'll go through it, he texted you at

25   8:39:  Hey, Vince, what section have you not done any

Page 84

```
 1    work in so I can help?  Not really sure where to step in

 2    because I do not want to duplicate anything that you may

 3    have done.  Did I read that correctly?

 4         A.    Okay.

 5         Q.    And then you write back and say that you

 6    haven't done certain sections and you kind of talk about

 7    that?

 8         A.    Yeah.  This, I think, was at the beginning of

 9    the audit, so we were starting to work through our

10    planning steps.  And so I had not gotten to those

11    sections yet.  So he was asking which ones could he

12    start working on.

13         Q.    Have you had an opportunity to review the

14    entire chat?

15         A.    No, not yet.

16         Q.    Why don't you just go ahead and review that

17    and then I can ask you some questions about it.

18         A.    Okay.

19         Q.    Did you recall this conversation at all?

20         A.    Vaguely.

21         Q.    What was it about?

22         A.    Basically, like I said, trying to work on the

23    planning steps.  He was asking me some questions about

24    the previous audits.  Obviously, we would be following

25    up, looking to see if they were resolved.  And I think,
```

1    you know, we're just discussing moving forward, getting

2    started on the audit.  He has a daughter.  I gave him a

3    sleeping bag to use because she wanted to go camping.

4    And like I said, just had trouble concentrating a little

5    bit there.

6                 And we're just talking about trying to come

7    up, anything to do with the entrance conference.  So

8    this is basically the very beginning of the audit, and

9    we're just starting to get into the work.  I make a

10   reference, I haven't read it yet.  I just hadn't gotten

11   to reading some of the policies and procedures yet at

12   that time.  Like I said, it's the very beginning of the

13   audit and we're collecting documentation and we're

14   putting it into the audit to review.

15        Q.    Do you know why you saved this particular

16   chat?  Was there anything of significance to it that

17   made you save it?

18        A.    Honestly, I don't remember.  I'm sorry.

19        Q.    It's okay.  You saved this one and it's the

20   only one that I saw.  And so I was just curious if there

21   was a reason why this one was saved.

22        A.    Yeah, I'm trying to figure out why I saved,

23   too.

24        Q.    Great.  It does say right here, if you'll

25   look with me on the screen where I'm highlighting:

1   David seems to say he does not want to confuse any

2   potential future peer review group.  What is a peer

3   review group in the audit process?

4        A.    All of our audits are, as part of -- how

5   should I say this?  It's part of a professional self-

6   check, so to speak.  We do internal peer reviews so we

7   have audit teams within our audit office that will

8   review our audits to ensure that, you know, we've done a

9   good job.  We've done -- that our work is good.  Kind of

10  a quality review check.

11            And we also participate in a national

12  organization where other states -- we go and audit other

13  state's audits to, you know, comment on the quality of

14  their audits.  And we also have peer reviewers come into

15  our office that review our audits.  So when we're

16  documenting our working papers, we like to make sure

17  things are clear so when a peer reviewer comes in, they

18  can understand.

19            We generally like to have working papers

20  that, if anybody opens it up, they will be able to

21  understand what they are.  And just thinking of

22  potential peer review is one way to think that.  So a

23  future peer reviewer could be somebody from Colorado,

24  say, or another state audit's office that comes in and

25  would look at our working papers.

Page 87

1        Q.    Do you know if either of the 2017 or 2020

2    audits were peer reviewed?

3        A.    I believe the 2017 was.  One of them was.  I

4    believe one of them was.  I can't remember if it was the

5    '20 or the 2017.

6        Q.    Do you know who peer reviewed it?

7        A.    I do not recall, no.

8        Q.    I'm putting on the screen what we're going to

9    mark as collective Exhibit No. 20.  It starts with TDOC

10   013562.

11            (Exhibit 20 was marked.)

12   BY MS. HERZFELD:

13       Q.    Do you see that on the screen?

14       A.    I do.

15       Q.    I will put it in chat.  I will submit to you

16   that it is a collection of news articles that were in

17   the production that were produced to us.  You should now

18   have it in the chat as well.

19       A.    Uh-huh.

20       Q.    And it looks like all of those news articles

21   reference Trousdale Turner at some point.  And you can

22   feel free to take a look at them.  But my question is

23   actually kind of basic.  Why is it that I am finding

24   news articles about Trousdale in the production?  Did

25   somebody collect those as part of the audit process?

1          A.     Well, like I said, at the beginning of an

2    audit in our planning, we are doing the background

3    research of the entity and agency.  At that time,

4    Trousdale Turner was in the news and the legislators

5    were aware of it.  It was a big concern.  I guess there

6    were -- you know, a lot of incidents were happening at

7    the facility.  So it was making a lot of press.  We were

8    documenting that and reading the news.  And it's just

9    part of collecting information on an entity that we're

10   auditing.

11               MS. HERZFELD:  Thank you.  I don't think I

12   have any more questions for you.  You've been a very

13   fine witness and thank you for sitting here and dealing

14   with my technical difficulties in the beginning.  But I

15   don't have any more questions, so I'm happy to pass the

16   witness.

17               THE WITNESS:  Okay, thank you.

18               MS. POLLY:  Tom, would you all like to go

19   first?

20               MR. AUMANN:  Feel free to go first.

21               MS. POLLY:  I do have some questions.  I

22   would like to take a restroom break and then I think on

23   our end, we will need to probably take a lunch break for

24   our meeting.  So I am fine to go ahead and take a break

25   now and come back later or start a little bit of what we

Page 89

1    can do, take a lunch break, and then come back.

2              MS. HERZFELD:  How much questioning do you

3    think you have?  How long?

4              MS. POLLY:  Thirty minutes to an hour.

5              MS. HERZFELD:  Tom, how much time do you

6    think you have?

7              MR. AUMANN:  I don't anticipate having much

8    of anything.  I will consult with Nikki.  And I don't

9    imagine that we'll have too much.

10             MS. HERZFELD:  Maybe let's just try to take a

11   five-minute break and push through.  Maybe you can get

12   done before lunch.

13             MS. POLLY:  That's fine.  Tom, while you guys

14   are on the break, do you want to maybe go first just

15   because yours -- sounds like yours might be a little

16   shorter than mine.

17             MR. AUMANN:  I don't know that we will have

18   any questions.  So Nikki and I will consult and if we

19   have any brief ones, we will go ahead.  If not, we will

20   just turn it over to you.

21             MS. POLLY:  Okay, that's great.

22             (Recess observed.)

23             MR. AUMANN:  We don't have any questions on

24   TDOC's end at this time.

25   EXAMINATION BY MS. POLLY:

1        Q.     Mr. Finamore, my name is Erin Polly.  Joe

2   Welborn and I represent the CoreCivic defendants in this

3   case.  I have just a few questions for you.  I just want

4   to get a little bit of background on you.  Can you tell

5   me where are you from originally?

6        A.     Where I'm from, like I was born?

7        Q.     Yeah.  Where did you grow up?

8        A.     I was born in Michigan, Ann Arbor Michigan.

9   And I moved when I was 10 to Columbia, South Carolina.

10       Q.     How long have you been here in Tennessee?

11       A.     Since 1995.

12       Q.     And Ms. Herzfeld asks questions a little bit

13   faster than my hands work, so I've got a few things to

14   go over with you that you previously mentioned, but I

15   just want to make sure I've got them down.  Where did

16   you get your bachelor's degree?

17       A.     My bachelor's degree is from Western Carolina

18   University.

19       Q.     What was that in?

20       A.     Bachelor's of science and psychology.

21       Q.     And then you said that you have a master's as

22   well?

23       A.     Correct.

24       Q.     Where did you get your master's?

25       A.     I got my masters at Middle Tennessee State

1    University.

2         Q.    What was your master's in?

3         A.    Industrial and organizational psychology.

4         Q.    And you previously went through the members

5    of your team when you did the performance audit review

6    of the department of correction, the report being

7    generated in January of 2020.  Can you tell me again who

8    the members of your team were?

9         A.    Certainly, if I can recall it all.  Melissa

10   Boaz, Jaclyn Clute and myself were the in-charges.  And

11   then we have, let's see, De'Aundrea Pointer, De'Aundrea

12   Pointer, Chris Colvard -- do I have it here?  Jackson

13   Wickham, Yolanda Douglas, Michael Deloach, Valeria

14   Stadelman, Chas Taplin, Sarah Vandergriff, David Wright,

15   Heather Murray, and Fonda Douglas, and Mason Ball.

16        Q.    By my count, that's 14 different individuals,

17   15 including you?

18        A.    Correct.

19        Q.    And they all participated in one way or

20   another in the comptroller's audit of the Tennessee

21   Department of Correction?

22        A.    Correct.

23        Q.    Are any of these individuals, including you

24   -- do you have experience in corrections?

25        A.    No.

1      Q.    Have any of these individuals, including you,

2   ever worked in a corrections environment, jail, prison,

3   detention facility, residential re-entry facility?

4      A.    Not to my knowledge.

5      Q.    Did you and your team retain any corrections

6   professionals to help with the audit?

7      A.    No, ma'am.

8      Q.    Did you and your team consult with any

9   corrections professionals in connection with the audit?

10      A.    No, ma'am.

11      Q.    And just so that I can understand kind of the

12   scope of what you all do, do you conduct audits with

13   respect to other areas outside of corrections?

14      A.    Yes.

15      Q.    What are some of those areas?

16      A.    We audit all of the major departments of the

17   State of Tennessee.

18      Q.    What are some of those?

19      A.    Department of safety, department of health,

20   department of agriculture.  TRICOR, we do TRICOR.

21   Basically every major department and/or, in some cases,

22   committees, but -- that fall under the sunset law.

23      Q.    Is it fair to say that part of your job is to

24   find either issues or areas of improvement for the

25   various departments that you audit?

1                    MS. HERZFELD:  Object to the form.

2                    THE WITNESS:  Our role is to go in and see --

3     basically, provide an assessment on how well the

4     department is meeting its mission, following the

5     statutes and policies and procedures in place.  We --

6     some areas that we look at our performance, in terms of

7     efficiency.  You know, how well -- if we identify any

8     problems, obviously that's a focus, but it's usually for

9     improvement.  I mean, if we were to find fraud, that

10    would be a different issue.

11                   But mostly, it's basically to -- the issues

12    that we find are either compliance or in some cases,

13    there might be a statute that is preventing or

14    hindering, you know, the performance of a facility.  So

15    we will present that to the legislature for

16    consideration.

17                   There is a wide purview of what we end up

18    looking at, but our main purpose is to basically make

19    the agency work better and to ensure compliance and that

20    the agency is performing as it should be.

21    BY MS. POLLY:

22        Q.    Have you ever had an instance where you

23    didn't find any issues with an agency's performance?

24        A.    That -- I don't believe so.  We usually find

25    something.

1        Q.      I'm guessing you usually find a lot of

2    things?

3                MS. HERZFELD:  Object to the form.

4                THE WITNESS:  It just depends on the agency

5    and what our objectives are at the time and the data

6    that we find in our review.

7    BY MS. POLLY:

8        Q.      Am I correct that the materials that you

9    reviewed should have been produced to us through your

10   lawyer in connection with the audit?

11       A.      I believe so, yes.

12       Q.      One thing I didn't see in there, I didn't see

13   -- focusing on Trousdale.  I didn't see the

14   accreditation report that they have from the American

15   Corrections Association.  Do you know if you reviewed

16   that?

17       A.      It's in the audit.  Yeah, we looked at that.

18       Q.      For Trousdale?

19       A.      I believe so.  I think we have a copy of it.

20   We retained the accreditation reports for all four

21   facilities.

22       Q.      When you say all four facilities, do you mean

23   all four of the CoreCivic facilities?

24       A.      And we also got some for the state ones, the

25   ones that we looked at, yeah.

```
 1        Q.    Did you review any Tennessee Corrections

 2   Institute documents regarding Trousdale in connection

 3   with the audits?

 4        A.    I can't -- I don't remember for sure.  We

 5   might have.  They would be in our working papers.

 6        Q.    Did you review any PREA reviews or

 7   certifications of Trousdale in connection with the

 8   audit?

 9        A.    We did look at the PREA cases.

10        Q.    Did you look at any certifications that

11   Trousdale received in connection with its PREA -- with

12   its implementation of various PREA protocols?

13        A.    I wasn't the one who actually looked at the

14   PREA.  I'm sure that we probably did.  Like I said, it

15   would be in the working papers on that.  PREA was an

16   area that we did look at, so I believe we would.  And we

17   talked to, you know, the department's PREA coordinator.

18        Q.    You said that you and some of your teammates

19   visited the Trousdale Turner Correctional Center; is

20   that correct?

21        A.    Yes.

22        Q.    How many of you actually went to Trousdale?

23        A.    The whole team.

24        Q.    All 15 of you?

25        A.    Let me make sure.  I believe everybody on the
```

1    team was there, yes, correct.

2         Q.    How long were you all there?

3         A.    Fonda might not have been there.  Fonda

4    Douglas may not have been there, now that I remember.

5    We were there for a week.  And then we made one visit.

6    We had a day trip that was later in the audit, the end,

7    to shore up some additional questions.

8         Q.    When you were there, where did you and your

9    team go within the facility?

10         A.    We went to various locations throughout the

11    facility, depending on the audit issues we were looking

12    at.  We visited several of the inmate pods.  We visited

13    segregation.  We visited the visiting center.  We

14    visited the library, the education area.  We took a tour

15    of the whole facility.  But I believe most of our focus

16    was in those areas.

17              But yeah, we definitely visited several pods.

18    Charlie unit.  Whisky unit.  Bravo unit.  I'm trying to

19    remember others.  Like I said, it would depend on which

20    issue, which area we went to.  But we pretty much

21    covered the facility.

22         Q.    Did you basically have free reign to go

23    wherever you wanted to go?

24         A.    Yes.  If we needed to go somewhere, we would

25    tell the warden or Chris Brun and they would give us

Page 97

1    access.  We went to the control room.  We went to -- I'm

2    trying to think of other areas.  Yeah, we went to most

3    areas of the prison, I believe.

4         Q.   As you went through the various areas of the

5    facility, did you have any concerns about your safety?

6         A.   For the most part, no, but when you're in a

7    facility -- there was one time when we came out of the

8    count room and the warden was leading us out of the

9    room.  And he went out of -- there was another door that

10   led to the outside.  And he got trapped outside just as

11   a line of inmates were crossing in front of us.

12            So Melissa Boaz and myself were caught in the

13   hallway with just us as the inmates went before us.

14   That was a little unnerving.  I think there were some

15   instances where some inmates had said some things to us,

16   but nothing substantial other than that.

17        Q.   And nothing happened as a result of those

18   inmates walking by you when the warden was trapped on

19   the other side of the door?

20        A.   No.

21        Q.   During a break, I'll tell you my favorite

22   thing that an inmate ever said to me when I was in a

23   facility, but we won't do that on the record.

24        A.   Okay.

25        Q.   When you said you were there for a week, is

1   that five days?

2        A.    Yes, the work week.

3        Q.    For what number of hours a day were you

4   generally there?

5        A.    We usually work about 10 hours when we're on

6   site.  So we were there -- I can't remember if it was

7   8:00 to -- or 7:00 to 6:00, something like that.

8        Q.    When you were there, did you find the

9   CoreCivic employees to be helpful in getting you either

10  materials that you needed or access to areas of the

11  facility that you needed?

12       A.    Yes, the employees were very helpful.

13       Q.    Did the warden instruct the employees in any

14  way on how to handle you and your team?

15            MS. HERZFELD:  Object to the form.

16            THE WITNESS:  From our experience, the warden

17  instructed his team to provide us whatever information

18  that we needed, and to assist with any of our questions,

19  and to cooperate with us as best they could.

20  BY MS. POLLY:

21       Q.    Who was the warden at the time?

22       A.    Washburn.

23       Q.    And my questions -- and I should have said

24  this at the beginning, but you have assumed as well.  My

25  questions are going to focus on the most recent audit

1    that the comptroller performed; is that fair?

2        A.    Yes.

3        Q.    In reading through the performance audit

4    report, I saw that the comptroller would make

5    statements, and then it looked as though the Tennessee

6    Department of Correction had an opportunity to respond

7    to some of those findings; is that correct?

8        A.    Yes.

9        Q.    Can you explain that process?

10       A.    When we conclude an audit and we are

11   finishing the writing of the report, we -- before we

12   publish the report and finalize the report, we provide a

13   draft copy to the agency, to the department.  And they

14   are allowed to review the report in its entirety.  And

15   they're also allowed to provide management comments on

16   any of the findings.

17             And in some cases, I think we've done

18   observations as well if they -- if the department wanted

19   to have a comment.  But we allow them to, you know, have

20   their -- make some comments on those and we publish

21   those with the report.  It's a standard procedure that

22   we do with each audit that we do for every department.

23       Q.    Did CoreCivic have any ability to comment on

24   the findings?

25       A.    That would be at the discretion of the

1    department of correction.  We were auditing the

2    department of correction, therefore, our report and the

3    opportunity to respond to those findings went to them.

4    And I guess that would be up to them to decide or pass

5    it along to CoreCivic.

6        Q.    Do you know if the department of correction

7    gave CoreCivic the ability to respond to the 2020 audit

8    findings?

9        A.    I don't -- I can't say exactly for sure, but

10   I believe -- it was our assumption that they did.  We

11   would see no reason why they wouldn't.

12       Q.    Were there some findings that the Tennessee

13   Department of Correction concurred with and then some

14   that they did not concur with, or that they only

15   concurred in part with?

16       A.    I believe that's true, yes.

17       Q.    In other words the department of corrections,

18   in some respects, disagreed with the findings of the

19   comptroller in the 2020 audit?

20       A.    I would have to look specifically at each

21   one.  I would not say as a whole they disagreed, no.

22       Q.    Is it fair to say they disagreed with certain

23   of the findings?

24       A.    Again, I would have to review the audit

25   report to see.  But my understanding is they agreed with

1    the majority of the report, yes.  They concurred.

2              MS. POLLY:  What I want to do now is go

3    through some portions of the audit.  But I think

4    probably it's a smart time to go ahead and take a break

5    for lunch.  Can we go off the record?

6              (Luncheon recess observed.)

7    BY MS. POLLY:

8         Q.    Mr. Finamore, did you have a good break?

9         A.    Sure.

10        Q.    I'm going to -- I had put it in the chat, but

11   I will go ahead and put it in the chat again so that

12   it's the most recent document.  I put in the chat a

13   document Bates stamped TDOC 13203 through 13207.  Do you

14   see that?

15        A.    Uh-huh.

16        Q.    Can you please open that for me?  Take your

17   time and review that.

18        A.    Okay.

19        Q.    And it looks like this starts off as an

20   e-mail from Fonda Douglas to Jeanie.  And her e-mail

21   address is Jeanie dot no exceptions at g-mail dot com;

22   is that correct?

23        A.    I believe so if that's what is listed.

24        Q.    Right up here?

25        A.    Yeah, I see it.

1        Q.      Who is Fonda Douglas?

2        A.      Fonda is a former employee of ours.

3        Q.      And was she involved in the audits of the

4   Tennessee Department of Correction?

5        A.      She was.

6        Q.      Was she involved in both audits, 2017 and

7   2020, or just one of them?

8        A.      She was in both.

9        Q.      And what was her role again?

10        A.      She was a staff auditor.

11        Q.      And as a staff auditor, what was she

12   responsible for with respect to the TDOC audits?

13        A.      I think in the first one, she -- for the

14   detailed audit section, she was working on -- with David

15   with the probation and parole, a review of the two

16   previous findings of probation and parole.  And on the

17   most recent audit, I think she worked on various things,

18   but not one issue completely.  She was helping interpret

19   some information and some communications with follow-up

20   questions.

21        Q.      And in this e-mail from April 11th, 2017, it

22   appears as though Fonda is e-mailing Jeanie and is

23   saying:  Per our conversation earlier, you mentioned

24   interest in talking with us concerning issues and

25   concerns your advocacy group has experienced with the

1    department of corrections.  Did I read that correctly?

2         A.    That's correct.

3         Q.    Would citizens and organizations reach out to

4    you and other representatives of the comptroller to talk

5    about audits that you were performing?

6         A.    We contact advocacy groups that deal with the

7    department of corrections as a routine to discuss their

8    interactions with the department.  So each audit that we

9    do, we will contact a variety of advocacy groups as part

10   of our research and planning steps.

11        Q.    You scroll up a little bit, you'll see an

12   e-mail from Jeanie Alexander to Fonda Douglas dated

13   April 12th, 2017.  Do you see that?

14        A.    Uh-huh.

15        Q.    Yes?

16        A.    Yes.  Sorry, yes.

17        Q.    The reason we do that is just because we need

18   your verbal answer because sometimes the grunts that we

19   do in real life can be interpreted in different ways.

20        A.    Of course.

21        Q.    And in this e-mail, she references Alex

22   Freidman.  Do you see that?

23        A.    Yes, I do.

24        Q.    She says that he is with the Human Rights

25   Defense Center?

Case 3:22-cv-00093   Document 37-10   Filed 03/25/22   Page 103 of 162 PageID #: 3685

1          A.      Yes.

2          Q.      Did anyone from the comptroller's office

3     contact the Human Rights Defense Center?

4          A.      I don't know if we contacted them directly,

5     but -- yeah, I don't remember if we contacted them

6     directly or not, but we did have an interview with them.

7          Q.      Was that in connection with the 2017 audit or

8     the 2018 audit?

9          A.      Just the 2017 audit.

10         Q.      Do you know who Alex Freidman is?

11         A.      At the time, we did not know.  But yes, we

12    learned later who he was.

13         Q.      What did you learn about Alex Freidman?

14         A.      Well, we obviously saw his involvement in

15    some of the hearings.  And I guess he was a former

16    inmate at Trousdale.

17         Q.      Do you know anything else about Alex

18    Freidman?

19         A.      He -- well, at the time, he was an -- I

20    guess, worked for advocacy for prison rights.  But yeah,

21    recently he was arrested.

22         Q.      Do you know why he recently was arrested?

23         A.      Didn't he try to break into the prison over

24    at the sheriff's office or one of the Metro prisons that

25    was being built?  I believe that's my understanding.

1      Q.    Tell me about the conversation with Alex

2  Friedman.

3      A.    Back in 2017, it was -- we were just asking

4  his -- if he had any information, or I guess we were

5  looking for just his interactions with the department

6  and if there was any information that he could give us

7  that would be relevant.  And I don't recall very much.

8  It was a brief interview.

9      Q.    I'm going to ask you to look back at Exhibit

10  4.  It's the 2020 audit.

11     A.    The 2020 audit?

12     Q.    Correct, it's in the chat.  Do you have it

13  there in front of you?

14     A.    I have a copy of it.

15     Q.    Is this what you have in front of you?

16     A.    Uh-huh.  Yes, sorry.

17     Q.    And that's the performance audit report,

18  department of correction, January 2020?

19     A.    Correct.

20     Q.    And this is the document that you and your

21  colleagues authored following your audit of the

22  Tennessee Department of Correction over several months?

23     A.    Correct.

24     Q.    In the audit, there are maybe 15 or so

25  findings.  Explain to me what a finding is intended to

1   convey.

2        A.    A finding is basically a noncompliance, an

3   issue that we find.  Generally, it's significant to the

4   mission or the department able to complete its mission.

5   And it is an issue that we feel needs to be addressed.

6   And that the legislature needs to be aware of that can

7   significantly impact the department's ability to do its

8   mission.  It's basically a noncompliance or a -- of a

9   significant nature.

10        Q.    There are also observations mentioned in the

11   audit report.  What are observations?

12        A.    Observations are basically issues that we

13   identify that don't quite reach the level of a finding,

14   however they could, if not addressed.  And we provide

15   them for sort of, you know, something that to be aware

16   of for the legislature that should be addressed, or it

17   could become a finding.  Usually, it's informational,

18   just to make them aware of the issue that could be

19   developing.

20        Q.    How many facilities did you audit in order to

21   come up with this audit of the Tennessee Department of

22   Correction?

23        A.    We went to six facilities.

24        Q.    Were those the only six facilities that you

25   audited or did you get information from other facilities

1    that played into the audit?

2        A.    Those were the facilities that we audited

3    that we visited directly.  We did visit some other

4    facilities during the planning phase.  But the primary

5    focus of this audit was -- the primary data was from

6    those three -- those six facilities, sorry.

7        Q.    And what were the six facilities?

8        A.    Turney Center, West -- Northwest, Northeast,

9    Trousdale Turner, Hardeman and Whiteville.

10        Q.    And the first three are TDOC facilities and

11    the last three are CoreCivic facilities?

12        A.    That's correct.

13        Q.    Do you have a paper version of this 2020

14    audit in front you?

15        A.    I do.

16        Q.    I'm going to go to certain pages, but I want

17    you to feel free to turn to any page of the audit as

18    we're talking through it.

19        A.    Okay.

20        Q.    Do you see that I'm on Page 11 of the audit?

21        A.    I do.

22        Q.    Finding 1 says:  The department's leadership

23    failed to provide adequate oversight activities of

24    department and correctional facilities management in

25    several areas relating to inmates, correctional staff,

1    and the community, thereby affecting the department's

2    ability to meet its mission.  Did I read that correctly?

3         A.    Correct.

4         Q.    I'd like you to feel free to turn through the

5    pages that follow Finding 1.  Do you see any specific

6    mention of Trousdale?

7         A.    There isn't a specific mention of Trousdale

8    necessarily in this.  This is a finding against the

9    department as a whole.

10        Q.    Is that no, there's no specific mention of

11   Trousdale with respect to this finding?

12             MS. HERZFELD:  Object to the form.

13             THE WITNESS:  Well, Trousdale is mentioned in

14   some of the findings that are referenced within it; but

15   no, the finding itself is not specifically against

16   Trousdale.

17   BY MS. POLLY:

18        Q.    We discussed earlier, sometimes the -- well,

19   am I correct that the Tennessee Department of Correction

20   is permitted to respond to the findings?

21        A.    That is correct.

22        Q.    And sometimes they concur, sometimes they

23   concur in part, and sometimes they disagree?

24        A.    That is correct.

25        Q.    I'm on Page 15 of the audit.  It says

1    management's comments.  Is that the comment of the

2    department of correction?

3        A.    Yes.

4        Q.    And am I correct that it appears as though

5    the -- strike that.  Am I correct that the department of

6    correction does not fully agree with Finding 1 and that

7    the department of correction says that it has

8    demonstrated an unwavering commitment to continual

9    improvements in the process of administering prisons and

10   supervising offenders in the community, well-established

11   and highly developed internal controls, policies and

12   processes are in place to protect the public, and ensure

13   the safe operations of prisons in the delivery of

14   effective community supervision in Tennessee?

15       A.    They agree in part.  And then, yes, it does

16   say that.

17       Q.    Finding 2 is on Page 24.  And it says:  The

18   department's overall annual compliance percentage scores

19   do not provide a clear measure of correctional facility

20   performance.  Did I read that correctly?

21       A.    You did, yes.

22       Q.    Does this finding just kind of focus on how

23   the Tennessee Department of Correction calculates a

24   facility's compliance score?

25             MS. HERZFELD:  Object to the form.

```
 1              THE WITNESS:  Yes, this is pertaining to

 2   their internal review process that they have an -- they

 3   have an internal compliance division within the

 4   department of correction that does their own review of

 5   facilities.  And they create these reports and with

 6   scores on them.  And so our findings pertaining to how

 7   they rate those scores and present the information to

 8   the commissioner.

 9   BY MS. POLLY:

10      Q.    And so am I correct that the finding here by

11   the comptroller was just a critique of how the Tennessee

12   Department of Correction calculated that compliance

13   score that they rendered for every facility?

14      A.    Correct.

15      Q.    What is the range of that compliance score?

16   Is it a one-to-ten type thing?  Is it a one-to-a-hundred

17   type thing?  Is it a percentage?

18      A.    The compliance scores we list there in Table

19   2.  They range in a hundred percent.

20      Q.    Looking at Table 2, do you see that it

21   references the Trousdale Turner Correctional Center?

22      A.    Yes.

23      Q.    And under fiscal year 2017, 85 percent?

24      A.    Yes.

25      Q.    Fiscal year 2018, 96.96 percent, and fiscal
```

1   year 2019, 94.96 percent.  Did I read those percentages

2   correctly?

3       A.    You did.

4       Q.    Is that the -- is that intended to convey the

5   Tennessee Department of Corrections' assessment of the

6   compliance score of Trousdale during those fiscal years?

7       A.    That is to represent the score that their

8   unit gave them on their review of Trousdale, and the

9   other units as well.

10      Q.    So all of the facilities that fall under the

11  umbrella of the department of correction are represented

12  in this table?

13      A.    We list the scores that the internal division

14  gave each of those facilities.  And our problem is that

15  it's very difficult to tell.  We state problems that may

16  or may not exist because a department does not vary very

17  much in their range of scores.  So you could have a

18  number of critical findings, and if a facility still

19  gets 95 percent, 96 percent, it masks that there really

20  could be a potential problem at the facility.

21      Q.    I understand that.  I guess my question is

22  more your findings aside, these are the scores that the

23  Tennessee Department of Correction gave to Trousdale in

24  2017, '18, and '19?

25      A.    Yes, those are the scores that they gave on

```
 1    the -- I think it was the evaluations they made during

 2    those times, yes.

 3         Q.    Finding 3 is on Page 40.  It says:  The

 4    department's ability to provide accurate and complete

 5    information relating to deaths and other serious

 6    incidents is problematic.  Did I read that correctly?

 7         A.    Yes.

 8         Q.    Is the issue here with Finding 3 one of

 9    documentation?

10         A.    Yes.

11         Q.    And is it an issue of documentation

12    specifically in TOMIS?

13         A.    Into TOMIS, yes.

14         Q.    What is TOMIS?

15         A.    TOMIS is the department of correction's

16    information management system.

17         Q.    Do you know what TOMIS stands for?

18         A.    Tennessee Offender Management Information

19    System.

20         Q.    Going to Page 39.

21         A.    Thirty-nine, did you say?

22         Q.    It's 39, yes.  I did see one mention of

23    Trousdale.  Do you see that?

24         A.    Yes.  Uh-huh.

25         Q.    It says that at Trousdale, the health
```

1    services staff had not entered any serious accidents or

2    injuries on the accidents screen in TOMIS?

3         A.    That's right.

4         Q.    Tell me what that means.

5         A.    That means that at Trousdale, during our time

6    at Trousdale in reviewing accidents and injuries, we

7    found that staff did not enter almost a month's worth of

8    accident data into the TOMIS system.  Or it was more

9    than one month, I believe.  We found that they had not,

10   as they're required by the department, entered this

11   information into the information management system.

12        Q.    So the finding related to their -- to

13   Trousdale's failure to put into the accidents screen of

14   TOMIS information on injuries or accidents?

15        A.    The finding was against the department, and

16   Trousdale was one of the facilities that we found a

17   problem at.  We found, you know, several problems at

18   various facilities related to this.  But at specifically

19   Trousdale, we found that staff had not entered serious

20   accident injury information for several months into the

21   system.

22        Q.    And so there -- I did not -- and you can look

23   through it, but I did not see anything about a finding

24   about them not documenting serious accidents or

25   incidents at Trousdale, it was just about them not

Case 3:22-cv-00093   Document 37-10   Filed 05/25/22   Page 113 of 162 PageID #: 3695

 1    placing it into the accidents screen on TOMIS; is that

 2    correct?

 3               MS. HERZFELD:  Object to the form.

 4               THE WITNESS:  The finding isn't directly at

 5    Trousdale that we noted in observation that supports the

 6    conclusion that we drew; whereas, the department did not

 7    ensure that all the facilities were entering information

 8    as required.

 9    BY MS. POLLY:

10        Q.    Was the observation at Trousdale that they

11    didn't enter the information on the TOMIS accident

12    screen or that they didn't do documentation at all of

13    the accident or incident?  In other words, you're not

14    finding they didn't document an incident, you're finding

15    that they didn't document an incident in TOMIS; is that

16    correct?

17               MS. HERZFELD:  Object to the form.

18               THE WITNESS:  Correct.  Yes, they had the

19    paper records on file and they did not enter the

20    information into the Tennessee Offender Management

21    System.

22    BY MS. POLLY:

23        Q.    And if you go to Page 42, your management's

24    comments.  That's a comment from the department of

25    correction?

```
 1        A.     That's correct.

 2        Q.     And they concur in part?

 3        A.     They do.

 4        Q.     And they say:  All deaths in custody have

 5   been reported in accordance with statutory requirements.

 6        A.     They do say that.

 7        Q.     Do you agree with that?

 8        A.     I don't believe that we found all were

 9   reported.  And I think we mentioned that later in the

10   report in another finding.

11        Q.     Finding 4 is on Page 43.

12        A.     Uh-huh, yes.

13        Q.     It says:  The department did not accurately

14   record inmate's causes of death in the Tennessee

15   offender management information system, which impacted

16   the accuracy of the death information in the statistical

17   abstract.  Did I read that correctly?

18        A.     You did.

19        Q.     In Finding 4, do you see any observation

20   regarding Trousdale?

21        A.     I do not believe the incidents we found

22   involved Trousdale.

23        Q.     And in Finding 4, is the issue, again, just

24   one of documentation in TOMIS?

25        A.     Correct.  Well, I guess it's incorrectly --
```

1    correctly and accurately reporting that information in

2    their statistical abstract as well.

3         Q.    And the statistical abstract is something to

4    which the department of correction has access?

5         A.    It's published by the department of

6    correction to provide the public with information on

7    data within prisons.

8         Q.    It is not published by CoreCivic?

9         A.    It is not.

10        Q.    Finding 5 is on Page 46.  And it says:

11   Department management did not ensure state and CoreCivic

12   facility staff followed incident reporting policies,

13   entered incident information accurately into TOMIS and

14   maintained supporting documentation for incidents as

15   required.

16        A.    Correct.

17        Q.    Is the issue here, again, one of entering

18   information into TOMIS in accordance with department of

19   correction policy?

20        A.    It's entering information in TOMIS and it's

21   also accurately capturing information that took place in

22   incidents, actually documenting the incident itself

23   also.  That's the part about maintaining supporting

24   documentation of the incidents.

25        Q.    If you look on Page 47, am I correct that the

1    findings relate to things like not entering an incident

2    within eight hours?

3        A.    Uh-huh.

4        Q.    Not timely holding a disciplinary hearing,

5    and then again, not entering all required information

6    into TOMIS?

7        A.    And it's also not having incidents

8    consistently match descriptions of them.

9        Q.    So is the issue here that there might be a

10   detailed incident report that goes over what happened in

11   a particular incident, and then what is in the incident

12   report and what is entered into TOMIS sometimes do not

13   align?

14       A.    Correct.

15       Q.    Finding 6 is on Page 50.  It says:  The

16   department did not ensure that state and CoreCivic

17   correctional facilities and health services staff

18   entered all serious accidents, injuries, and illnesses

19   in TOMIS in accordance with the department policy.

20       A.    Right.

21       Q.    So here, the issue is not about failing to

22   report incidents, it's about not entering the

23   information in TOMIS; is that correct?

24       A.    Correct.

25       Q.    And when we talk about that TOMIS accidents

Page 118

1    screen, is this it, right here?

2         A.    That is a picture of it, I believe, yes.

3         Q.    Is it just a one-page screen or are there

4    more pages that I'm not seeing?

5         A.    I believe that's the one specific screen that

6    it's talking to, but some of that information may be in

7    other screens as well.  Part of other screens.  But that

8    is the specific screen in TOMIS, yeah.

9         Q.    And do you see here where, under Finding 6,

10   it does contain an observation about Trousdale?

11        A.    Yes.

12        Q.    If you go to the next page, Page 51, it says:

13   Management and staff at both facilities stated they were

14   unaware of the requirement to enter accidents,

15   illnesses, and traumatic injuries into TOMIS.  And it

16   goes on to mention turnover in certain positions?

17        A.    Yes.

18        Q.    Was that your understanding?

19        A.    Yes.

20        Q.    So was it that -- so is it fair to say

21   CoreCivic -- well, let me back up.  Is it fair to say

22   that in your observation of Trousdale, they were

23   reporting incidents, they just weren't putting it into

24   the accident screen in TOMIS, and they said it was due

25   to just a misunderstanding or an error in knowing what

1    they were required to do?

2              MS. HERZFELD:  Object to the form.

3              THE WITNESS:  I believe that was part of it

4    and I believe that some staff had turned over also.

5    BY MS. POLLY:

6        Q.    Were you assured that appropriate people had

7    been educated on entering incidents into TOMIS and that

8    it would be corrected going forward?

9        A.    Yes, we were.

10             MS. HERZFELD:  Object to the form.

11   BY MS. POLLY:

12       Q.    Did you have any reason to disagree with the

13   statement that at Trousdale they weren't doing it

14   because they didn't understand they were supposed to do

15   it?

16       A.    Did I have a disagreement with that?

17       Q.    Yeah, or do you have any reason to disagree

18   or disbelieve what they said, that they didn't

19   understand they were supposed to do it?

20       A.    No, I believe that was part of the case.

21   That's the explanation that they provided us.

22       Q.    Finding 7 is on Page 56.  And it says:  The

23   department of correction and the department of finance

24   and administration strategic technology solutions did

25   not implement effective internal controls in two areas,

1    increasing the risk of errors or data loss.  Did I read

2    that correctly?

3         A.    Correct.

4         Q.    Does this have anything to do with actions by

5    CoreCivic or CoreCivic employees, or is this more

6    directed toward the department of correction and the

7    department of finance and administration?

8         A.    This is between the department and the --

9    yeah, the department of finance and administration and

10   the division of strategic technology solutions.

11        Q.    Finding 8 is on Page 57.  It says:  The

12   department published inaccurate and incomplete inmate

13   incident data in its fiscal year 2018 statistical

14   abstract.  Did I read that correctly?

15        A.    Correct.

16        Q.    In this section there are no observations

17   with respect to Trousdale; is that correct?

18        A.    I believe so, that's correct.

19        Q.    Is the issue that the comptroller is pointing

20   out here one of documentation?

21        A.    This is information that is provided to the

22   public that the department of corrections publishes.

23   And it's about publishing inaccurate information about

24   prisons, which could be misleading to not only the

25   legislature, but to also the public.

Page 121

```
 1        Q.    Was the information published exclusively by
 2   the department of correction and not by CoreCivic?
 3        A.    Correct.
 4        Q.    Is the issue about publication of
 5   information?
 6        A.    It's not accurately reporting data
 7   information.
 8        Q.    So it's a data issue?
 9        A.    It's a data issue, correct.
10        Q.    Finding 9 is on Page 82.
11        A.    Eighty-two, you said?
12        Q.    Yes.  And it says:  Management did not ensure
13   that state and CoreCivic correctional facilities' staff
14   followed policies and procedures for investigating
15   sexual abuse and sexual harassment allegations and
16   documented their results.  Did I read that correctly?
17        A.    You did.
18        Q.    Is the issue here one of documentation?
19              MS. HERZFELD:  Object to the form.
20              THE WITNESS:  I believe, yes.
21   BY MS. POLLY:
22        Q.    And the issue was that PREA allegations
23   weren't entered into a PREA allegation system in a
24   timely way?
25        A.    Let me double-check.  Some of it was a
```

Page 122

 1   misunderstanding or a question about the difference

 2   between unsubstantiated and substantiated cases.  But

 3   yeah, I guess overall, is it documenting the

 4   investigation results and processes and entering

 5   information timely.

 6        Q.    So the finding of the comptroller was about

 7   documentation, and then even more specifically, timely

 8   documentation into a PREA system?

 9        A.    Yeah, into the PREA system correctly.

10        Q.    What is PREA?

11        A.    PREA is the prison -- what is it?  It's the

12   Prison Rape Elimination Act.  It's a federal program.

13        Q.    So are there certain requirements on

14   documenting prison rape allegations?

15        A.    Correct.

16        Q.    Finding 10 is on Page 96.  Does this one have

17   anything to do with CoreCivic?

18        A.    No, this is not to do with CoreCivic.  This

19   is on the department.

20        Q.    Finding 11 is on Page 98.

21        A.    Uh-huh, yes.

22        Q.    This one deals with Century and Corizon; is

23   that correct?

24        A.    That is correct.

25        Q.    Who are they?

 1        A.      Those are the medical providers for -- that

 2    the department contracts with for medical and mental

 3    health.

 4        Q.      Do you know if they have any affiliation at

 5    all with CoreCivic or are they separate from CoreCivic?

 6        A.      I believe they are now separate from

 7    CoreCivic because CoreCivic supplies their own nurses

 8    and medical providers.

 9        Q.      And so Finding 11 doesn't have anything to do

10    with CoreCivic?

11        A.      No, it would not.

12        Q.      Finding 12 is on Page 100.  It says:

13    CoreCivic and state-managed correctional facilities did

14    not ensure that staff placed the required medical and

15    mental health documents in the inmate files or completed

16    the required documents in accordance with department

17    policy.  Did I read that correctly?

18        A.      Yes.

19        Q.      I'm going to Page 101.  I'm looking at Chart

20    22.  Am I right, the issue here on Finding 12 is

21    documentation and documenting things in inmate medical

22    charts?

23        A.      Correct.

24        Q.      Tell me what Chart 22 is.

25        A.      Let's see, this is the items that were

Page 124

1    missing from the medical administration records,

2    documentation of initial drug screenings.  This is also

3    physical and mental health exams; mental health

4    evaluations; physicians orders of medications; health

5    treatment plans; and health classification forms.  These

6    are all supposed to be within the inmate files per

7    inmate and documented.  And this information was not

8    found in the files and documented as it should be.

9         Q.    Do you know how many inmate files you looked

10   at to get the information in Chart 22?

11        A.    We have it in the methodology section, but it

12   looks like we did a random sample of 294 inmates from a

13   total population of 726.  That's overall.

14        Q.    So on Chart 22, where you've got those little

15   dashes, does that mean there were no issues?

16             MS. HERZFELD:  Object to the form.

17             THE WITNESS:  I believe that means there was

18   no information.  Let's see, number of errors of

19   noncompliance type correctional facility.  I guess,

20   yeah, there was no errors, then.

21   BY MS. POLLY:

22        Q.    So just to be clear, on Chart 22, a dash

23   means there were no errors?

24        A.    I believe that's correct, yes.

25        Q.    So in this chart, it shows that Trousdale

Case 3:22-cv-00093  Document 37-10  Filed 05/25/22  Page 124 of 162 PageID #: 3706

1    didn't have any issues in those hundreds of inmate files

2    with respect to documentation on physical and mental

3    health exams, mental health evaluations, physicians

4    orders for medications, mental health treatment plans,

5    and health classification forms?

6              MS. HERZFELD:  Object to the form.

7              THE WITNESS:  Yes.

8    BY MS. POLLY:

9        Q.    And there was one issue in those hundreds of

10   files on a missing initial drug screening?

11             MS. HERZFELD:  Object to the form.

12             THE WITNESS:  There was one.  And there was

13   13 problems with the medical administration records,

14   which is the MARs.

15   BY MS. POLLY:

16       Q.    It says medical administration records.

17   Could that be medication administration records?  Is

18   that intended to show when inmates get their

19   medications, it's supposed to be documented?

20       A.    Yes.  That is the nurse's basic patient

21   record.  And they are to record the actual time, date,

22   each time the inmate gets a medication.

23       Q.    And so Finding 12 is intended to address

24   medical documentation issues?

25       A.    Yes.

```
 1        Q.    So the issue is not that inmates weren't

 2   given their medication, that's not your finding; your

 3   finding is that there were 13 places in these hundreds

 4   of charts where it was not fully completed, the

 5   medication the inmates received?

 6               MS. HERZFELD:  Object to the form.

 7               THE WITNESS:  Yes, incorrectly or did not

 8   note it.  And I will say, if it's not noted, part of the

 9   problem is then we can't verify that the inmate did get

10   their medicine or not.

11   BY MS. POLLY:

12        Q.    Finding 13 is on Page 106.

13               MS. HERZFELD:  Erin, I am going to interrupt

14   you for just a second.  Just so you know, I have a call

15   I have to take at 2:00.

16               MS. POLLY:  I will be done by then, Tricia,

17   but thank you.

18   BY MS. POLLY:

19        Q.    Do you see Finding 13?

20        A.    Okay, it's on Page 106, yes.

21        Q.    Explain this to me.

22        A.    This happened while we were at Hardeman

23   County.  And CoreCivic was -- is beginning an electronic

24   MAR system in storing their inmate records or the nurse

25   records online using an e-MAR, electronic MARs, instead
```

1      of using the paper MARs.  Most of the nursing community

2      these days use electronic MARs.  So they are

3      transitioning to a new system using the electronic MARs.

4                    And the day that we arrived in Hardeman

5      County, they lost access to the internet.  So basically,

6      the system went down and they did not have access to

7      their patient's MARs.  And that would be noted as a

8      serious problem because then they would not be able to

9      access needed records for their inmates.  So this was --

10     I believe it took them several hours to get all the

11     information back online.  And they did not have -- the

12     CoreCivic did not have a backup plan to handle that

13     situation.

14         Q.    So the issue here wasn't inmates getting

15     medications, it was just having a backup for that time

16     when it happens where the electronic medication

17     administration record system goes down?

18                    MS. HERZFELD:  Objection to form.

19                    THE WITNESS:  Well, it is related to giving

20     medication since you need to have the MARs to be able to

21     record it and to know the dosage and to know when to

22     give medications.

23     BY MS. POLLY:

24         Q.    That's fair.  But still, the issue is just

25     one about a backup system for the electronic medical

1    records?

2         A.    Correct, they do not have --

3               MS. HERZFELD:  Object to the form.

4               THE WITNESS:  They do not have a backup

5    system in place or a backup paper file in place to be

6    able to access or get quick access to the MARs.

7    BY MS. POLLY:

8         Q.    I want to ask you about Observation 6.  It's

9    on Page 130.

10        A.    Okay.

11        Q.    So the finding here is --

12        A.    We have an observation -- are you on Page

13   130?

14        Q.    Excuse me, an observation.  Yeah, my

15   apologies.  The observation here is that:  CoreCivic and

16   state-run facilities are operating with minimal staff

17   resulting in increased staff overtime and/or the

18   temporary closure of non-critical posts.  Did I read

19   that correctly?

20        A.    You did.

21        Q.    In doing the audit of the department of

22   correction, what did you learn about staffing in the

23   corrections environment?

24        A.    We learned a lot about it.  What

25   specifically?

1       Q.    Are the facilities in Tennessee overstaffed

2   or understaffed?  Is staffing easy in a corrections

3   environment, challenging in a corrections environment?

4               MS. HERZFELD:  Object to the form.

5               THE WITNESS:  Well, we learned obviously that

6   staffing facilities are difficult.  The majority of the

7   facilities we see are understaffed.

8   BY MS. POLLY:

9       Q.    Going to Page 10 under repeated as

10  observations.  It says:  All of Tennessee's facilities

11  are operating with minimal staff.

12      A.    Yes.

13      Q.    Did I read that one correctly?

14      A.    You did.

15      Q.    And despite those challenges, on Page 12, the

16  comptroller audit says:  While CoreCivic and state

17  correctional facilities ensured that staff covered

18  critical posts, both the CoreCivic and state facilities

19  are experiencing difficulties with hiring a sufficient

20  number of correctional officers.  Did I read that

21  correctly?

22      A.    You did.

23      Q.    Did the comptroller find in the audit that

24  CoreCivic was appropriately covering all critical posts?

25      A.    In the staffing rosters that we did look at,

 1    we did not see critical posts unmanned.  But we did note

 2    significant overtime in the majority of the facilities

 3    that we visited.  And I think we listed that in the

 4    chart.

 5         Q.    We jump ahead to Page 129.  Do you see where

 6    is says CoreCivic had improved its critical posts

 7    staffing?

 8         A.    Yes.

 9         Q.    And then it says:  Both state and CoreCivic

10    facilities covered critical posts.

11         A.    Correct.

12         Q.    So is the take away here that the Tennessee

13    Department of Correction facilities are not fully

14    staffed --

15              MS. HERZFELD:  Object to the form.

16    BY MS. POLLY:

17         Q.    -- but that staffing is challenging and that

18    all critical posts are staffed?

19              MS. HERZFELD:  Objection.

20              THE WITNESS:  I'm not sure.  You're mixing

21    some things here.  So can you restate the question

22    please?

23    BY MS. POLLY:

24         Q.    Sure.  Did the audit conclude that CoreCivic

25    was making efforts to staff all positions?

1              MS. HERZFELD:  Object to the form.

2              THE WITNESS:  The response to the other one

3    is compared to the prior audit where we had a finding

4    and critical posts were not covered.  We did not find

5    the same result this time.  So it appeared, based on the

6    data that we looked at, that the posts were now covered

7    and they provided the rosters and other stuff so they

8    had the information.  They made corrections from the

9    first audit, from a prior audit.

10   BY MS. POLLY:

11       Q.    Thank you for saying that more artfully than

12   I asked it.

13       A.    Okay.  And then we go on to say that, you

14   know, as we've seen the posts that were covered, you

15   know, being understaffed is having an affect in some

16   respects.  They are closing -- having to close other

17   non-critical posts and use staff, pull staff from other

18   positions to ensure they covered -- that critical posts

19   are covered.

20       Q.    There was no finding that any of the

21   Tennessee Department of Correction facilities, and

22   specifically Trousdale, weren't trying to be

23   appropriately staffed?

24              MS. HERZFELD:  Object to the form.

25              THE WITNESS:  There was no finding that said

1    that they were not trying, correct.

2    BY MS. POLLY:

3         Q.    Did you believe they were trying?

4         A.    I do believe they were trying, yes.

5         Q.    Finding 15 is on Page 160.  It says:  State

6    and CoreCivic facility personnel did not perform inmate

7    orientation within three days of arrival at the

8    facility, or did not consistently maintain assigned

9    orientation acknowledgment form in the inmate

10   institutional file.  Explain this one to me, if you

11   would.

12        A.    It is a department of correction policy that

13   as an inmate enters a facility, is transferred from one

14   facility to another facility, that they are to -- the

15   inmate is to be provided an orientation form within

16   three days of arrival, that they are to complete an

17   orientation into the facility within three days.  And

18   they maintain this by having the inmate sign the

19   orientation form and packet.

20             And we -- in the files that we reviewed, we

21   found instances where either the orientation was not

22   done within three days of arriving at the facility or it

23   wasn't clear when the orientation was given.  And that

24   would be also consistently maintaining the signed

25   orientation acknowledgment form.  Without that form in

1    the file, we cannot verify that orientation was provided

2    or that it was provided within the time.

3         Q.    Well, I jumped ahead to Finding 16 and I

4    skipped Finding 15.  So we'll go back to that.  But

5    that's helpful, thank you.  On Finding 16, was there any

6    observation specifically related to Trousdale?

7         A.    It looks like it was not.  Looks like it was

8    Northeast, Northwest, Turney Center and Whiteville.

9         Q.    Back up and go to 15.  It's on Page 160.

10        A.    Yeah.

11        Q.    CoreCivic correctional facility personnel do

12   not consistently administer required inmate screenings

13   that are used to prevent sexual abuse in correctional

14   facilities.  Did I read that properly?

15        A.    Correct.

16        Q.    Tell me about that one.

17        A.    That is a requirement, federal requirement of

18   the Prison Rape Elimination Act.  When an inmate is

19   transferred or brought into a correctional facility,

20   they are to have a PREA screening done within a certain

21   amount of time.  An initial screening and then there is

22   a 30-day follow-up screening.  And this is to identify

23   either a potential rapist or victims, and so that their

24   needs can be met and separated and be addressed.

25        Q.    Go up to Page 158.  You've got some audit

Page 134

1    objectives and audit conclusions.  Do you see those?

2         A.    Correct.

3         Q.    And it looks like at the department of

4    correction facilities, the comptroller found that the

5    facility staff completed the inmate admissions

6    assessment forms?

7         A.    Correct.

8         Q.    The comptroller found that inmates received a

9    classification hearing as required by department policy?

10        A.    Correct.

11        Q.    The comptroller found that in either the

12   inmate institutional files or in TOMIS, the department

13   provided inmates with 48-hour notice of an upcoming

14   hearing?

15        A.    Correct.

16        Q.    And here on No. 4 audit objective, we have an

17   observation regarding Trousdale?

18        A.    Uh-huh, yes.

19        Q.    It says that six offender classification

20   summaries were kept on a shelf rather than in the

21   inmate's institutional file?

22        A.    Correct.

23        Q.    So that's a documentation placement concern?

24        A.    Yes.

25              MS. HERZFELD:  Object to the form.

1    BY MS. POLLY:

2        Q.    The comptroller found that the correctional

3    facility staff placed the risk needs assessments in the

4    inmate institutional files?

5        A.    Correct.

6        Q.    And then here is the concern that you

7    mentioned with PREA screenings not being done within a

8    particular period of time?

9        A.    Correct.

10       Q.    And there's no specific observation regarding

11   Trousdale on that?

12       A.    There are no issues we marked on the 72-hour

13   screenings, but for Trousdale, this is on Page 161, PREA

14   screening not performed.  We found four incidents where

15   it was not performed timely, the 30-day screening.  And

16   we found two incidents that were not performed at all.

17       Q.    I'm going to jump ahead a little bit because

18   I want to be done by 2:00 for Ms. Herzfeld.  Look on

19   Page 167.  Observation 10 discusses Trousdale performing

20   minimally required random drug screenings?

21       A.    Correct.

22       Q.    If you would look at the following page, Page

23   168.  Am I correct that at Trousdale, that observation

24   is related to a period of time in either March or April

25   of 2019?

1        A.      Yes.

2        Q.      Was the issue related to a new employee

3    coming in the position?

4        A.      That's what we were told, yes.

5        Q.      In the audit and the investigation that the

6    comptroller did, did you look into any aspect of the

7    religious life of inmates there at Trousdale?

8        A.      We did not.

9        Q.      Did you look into religious access or

10   religious opportunities for inmates?

11       A.      That was not one of our objectives.

12       Q.      Did you look into religious celebrations or

13   religious meals that were provided to inmates?

14       A.      That was not one of our objectives.

15       Q.      Did you look into religious materials, like

16   books or clothing?

17       A.      That was not part of our objectives.

18       Q.      And am I correct that in the audit, the

19   comptroller didn't look into facility violence at any of

20   the department of correction facilities?

21       A.      We looked into incident reporting in the

22   reporting of violence.

23       Q.      So the issue was one of documentation, but

24   not one of efforts to prevent violence or responses to

25   violence?

Page 137

1              MS. HERZFELD:  Object to the form.

2              THE WITNESS:  The record of their responses

3    to violence is in the incident report.  In that way,

4    it's related.  The purpose of being able -- I mean,

5    that's our way of being able, and basically the

6    department's way to understand what happened and

7    occurred during an incident.  And if the incident isn't

8    properly documented, it's very difficult to get an

9    understanding of what was going on in the violence.

10   BY MS. POLLY:

11       Q.    When the comptroller did this audit, are you

12   all primarily looking at documentation and whether

13   things are documented as they should be pursuant to

14   department of correction policy?

15             MS. HERZFELD:  Object to the form.

16             THE WITNESS:  A good bit of what we look at

17   is how they document things.  But it can be more -- I

18   guess it's not just limited to how they document and are

19   they documented correctly, it's the implications that it

20   may have also, is whether it's important or the level of

21   importance to it.

22   BY MS. POLLY:

23       Q.    Through the audit, did the comptroller

24   examine access to health care at one facility versus

25   another?

```
 1        A.     Yes.

 2        Q.     Was that based on documentation?

 3        A.     It was based on the requirements by the

 4   department of correction policy.  And we observed within

 5   the areas whether or not there was access, free access

 6   to health forms and that the instructions for obtaining

 7   health care were properly posted.

 8        Q.     Was there a finding by the comptroller that

 9   Trousdale did not appropriately handle inmate-on-inmate

10   assaults?

11        A.     I don't recall that we have a specific

12   finding.  No, we don't have a specific finding to

13   Trousdale alone on their handling of assaults, no.

14        Q.     Was there a finding regarding Trousdale's

15   handling of contraband in the facility?

16        A.     No, that was not one of our objectives.

17        Q.     Was there a finding regarding Trousdale's

18   handling of violence in the facility?

19        A.     Again, that was not one of our objectives in

20   that sense.  No, we do not have a finding of that

21   nature, no.

22        Q.     Was there a finding that Trousdale did not

23   investigate incidents of physical violence or assaults?

24        A.     No, there was not.

25        Q.     Was there a finding that Trousdale did not
```

Page 139

1      appropriately provide inmates access to health care?

2           A.    I don't believe there was a finding on that,

3      no.

4           Q.    Was there a finding that Trousdale didn't

5      take steps to protect inmates and employees?

6                MS. HERZFELD:  Object to the form.

7                THE WITNESS:  That was not an objective.  We

8      did not have a specific finding, answering that

9      question, no.

10     BY MS. POLLY:

11          Q.    Was there a finding that CoreCivic didn't

12     take steps to prevent contraband from getting into the

13     facility?

14          A.    No, there was not.

15          Q.    Was there a finding that Trousdale did not

16     take steps to appropriately prevent prison rape?

17                MS. HERZFELD:  Object to the form.

18                THE WITNESS:  Not other than what was in the

19     report, which I don't believe was a finding against

20     Trousdale, no.

21                MS. POLLY:  I don't think I have any more

22     questions.  I am going to check with Joe.  Tricia, I

23     know you need to leave in three minutes, so I will be

24     brief.

25                MS. HERZFELD:  Tom, do you think you're going

 1    to have any questions?

 2              MR. AUMANN:  I think one question, that's it.

 3              MS. POLLY:  I don't have anything further.

 4    Thank you for taking the time to talk to me.  I really

 5    appreciate it.

 6    EXAMINATION BY MR. AUMANN:

 7         Q.    Mr. Finamore, just briefly, did you find that

 8    throughout the audit process in both 2017 and 2020, the

 9    department of correction and its employees were

10    cooperative in answering your auditors' questions and

11    providing them with information and documents you needed

12    to complete the audit?

13         A.    Yes, they were very helpful and cooperative.

14              MR. AUMANN:  That's all I have.

15              MS. HERZFELD:  I don't have any follow-up.

16              MS. POLLY:  Thank you all.

17              MS. HERZFELD:  Thanks.

18              MR. AUMANN:  Thank you.

19              FURTHER DEPONENT SAITH NOT.

20

21

22

23

24

25

1                          CERTIFICATE

2

    STATE OF TENNESSEE        )
3                             )    SS.
    COUNTY OF DAVIDSON         )
4

5              I, CAROLE K. BRIGGS, Licensed Court Reporter

6    within and for the State of Tennessee, do hereby certify

7    that the above deposition was reported by me and that

8    the foregoing pages of the transcript is a true and

9    accurate record to the best of my knowledge, skills, and

10   ability.

11             I further certify that I am not a relative,

12   counsel or attorney of either party nor employed by any

13   of the parties in this case or otherwise interested in

14   the event of this action.

15             IN WITNESS WHEREOF, I have hereunto affixed my

16   official hand on this 6th day of July 2021.

17

18

19   _Carole K. Briggs_

20   _____

21   CAROLE K. BRIGGS

22   Shorthand Reporter

23   Tennessee License No. 345

24

25

**Exhibits**

**Exhibit 2** 11:7,9 16:17

**Exhibit 3** 16:20,22,23

**Exhibit 5** 42:17,18 53:16

**Exhibit 6** 54:5,6

**Exhibit 7** 55:23,24

**Exhibit 8** 58:5,8,16

**Exhibit 9** 62:4,7,11

**Exhibit 10** 65:7,13

**Exhibit 11** 66:24 67:2 72:1,6

**Exhibit 12** 68:9,10,12

**Exhibit 13** 70:12,14 72:12 73:9

**Exhibit 14** 72:24 73:2,16

**Exhibit 15** 75:25 76:3

**Exhibit 16** 77:3,6

**Exhibit 17** 79:4,6,7

**Exhibit 18** 80:25 81:1,4

**Exhibit 19** 82:15,17

**Exhibit 20** 87:9,11

**$**

**$25** 64:10

**$250** 64:9

**0**

**010081** 82:16

**011758** 70:15

**012355** 65:10

**012403** 53:25

**012554** 73:4,17

**013292** 56:1

**013295** 79:7

**013491** 75:25

**013524** 58:8,13,17

**013562** 87:10

**014498** 68:9

**014907** 62:8

**014908** 63:8

**015330** 67:2

**016008** 77:4

**016009** 78:11

**016160** 43:6 44:4

**016162** 49:13

**016163** 50:2

**029720** 81:4

**1**

**1** 8:5,14,15 107:22 108:5 109:6

**1/7** 70:23

**10** 65:7,13 90:9 98:5 122:16 129:9 135:19

**10/1/18** 46:4

**10/1/2018** 65:18

**10/31/2018** 65:18

**100** 123:12

**101** 123:19

**106** 126:12,20

**10th** 64:13

**11** 66:24 67:2 72:1,6 107:20 122:20 123:9

**11th** 56:6 102:21

**12** 68:9,10,12 73:7 123:12,20 125:23 129:15

**12/31/18** 46:4

**129** 130:5

**12th** 103:13

**13** 70:12,14 72:12 73:7,9 125:13 126:3,12,19

**130** 128:9,13

**13203** 101:13

**13207** 101:13

**13292** 57:22

**14** 72:24 73:2,16 91:16

**15** 7:8 22:11,14 75:25 76:3 91:17 95:24 105:24 108:25 132:5 133:4,9

**158** 133:25

**16** 77:3,6 133:3,5

**160** 132:5 133:9

**161** 135:13

**167** 135:19

**168** 135:23

**17** 6:4 79:4,7

**18** 80:25 81:1,4 111:24

**19** 82:15,17 111:24

**1995** 90:11

**2**

**2** 11:7,9 16:17 109:17 110:19,20

**20** 87:5,9,11

**2017** 12:16 14:23 16:14 22:18 26:3 28:18 55:1 56:6 59:5 70:4 83:20,23 87:1,3,5 102:6,21 103:13 104:7,9 105:3 110:23 111:24 140:8

**2018** 58:18 62:12 64:13 67:8 68:18 104:8 110:25 120:13

**2019** 44:8 46:2 49:16 70:20 73:19 76:2 111:1 135:25

**2020** 26:10,13,25 28:19 32:16 34:6,8,17 35:21 36:11 38:20 39:5,6 68:25 75:22 81:9,15 83:18 87:1 91:7 100:7,19 102:7 105:10,11,18 107:13 140:8

**2021** 6:4

**2024** 33:23,24

**22** 123:20,24 124:10,14,22

**24** 33:21 109:17

**26** 67:8 68:18

**27th** 36:10

**294** 124:12

**2:00** 126:15 135:18

**3**

**3** 16:20,22,23 112:3,8

**30** 31:25 32:1

**30(b)(6)** 11:18

**30-day** 133:22 135:15

**30th** 33:24 73:18

**31st** 44:8 46:2 49:16

**39** 112:20,22

**3rd** 81:9

**4**

**4** 26:10,17,18 105:10 115:11,19, 23 134:16

**40** 112:3

**42** 114:23

**43** 115:11

**45** 66:14

**45-day** 66:12

**46** 116:10

**47** 116:25

**48-hour** 134:13

**4th** 76:2 78:12

**5**

**5** 42:17,18 53:16 116:10

**50** 117:15

**51** 118:12

**56** 119:22

**57** 120:11

**6**

**6** 54:5,6 117:15 118:9 128:8

**6:00** 98:7

**7**

**7** 55:23,24 119:22

**72-hour** 135:12

**726** 124:13

**7:00** 98:7

**7th** 70:20

**8**

**8** 58:5,8,16 120:11

**8-4-109** 32:14

**82** 121:10

**85** 110:23

**8:00** 98:7

**8:39** 83:25

**8th** 58:18 62:12

**9**

**9** 62:4,7,11 121:10

**94.96** 111:1

**95** 111:19

**96** 111:19 122:16

**96.96** 110:25

**98** 122:20

**9:02** 6:2,4

**A**

**a.m.** 6:2,4

**ability** 78:2 99:23 100:7 106:7 108:2 112:4

**absence** 72:2

**absolutely** 16:22

**abstract** 115:17 116:2,3 120:14

**abuse** 121:15 133:13

**acceptable** 17:9,10,16

**access** 41:25 97:1 98:10 116:4 127:5,6,9 128:6 136:9 137:24 138:5 139:1

**accident** 113:8,20 114:11,13 118:24

**accidents** 113:1,2,6,13,14,24

**114:1** 117:18,25 118:14

**accomplish** 24:8

**accordance** 22:7 115:5 116:18 117:19 123:16

**accountability** 21:9,21

**accreditation** 94:14,20

**accuracy** 115:16

**accurate** 15:3 69:23 71:8 72:21 81:25 112:4

**accurately** 68:5 115:13 116:1, 13,21 121:6

**acknowledgment** 132:9,25

**act** 44:14 122:12 133:18

**action** 32:2,5,18 44:17 50:3 55:15 81:8 82:12

**actions** 28:6 32:4 120:4

**activities** 107:23

**actual** 58:1 69:25 70:7 125:21

**actuality** 45:20

**added** 28:10,14 30:13

**addition** 51:19,21

**additional** 14:1 32:22 34:25 96:7

**address** 74:15 101:21 125:23

**addressed** 29:23 55:12,14 75:7 106:5,14,16 133:24

**adequate** 107:23

**adhered** 21:16

**adherence** 21:6

**adjusting** 59:11

**adjustment** 57:11

**adjustments** 25:22 26:1,3 27:12

**administer** 133:12

**administering** 109:9

**administration** 119:24 120:7,9 124:1 125:13,16,17 127:17

**admissions** 134:5

**admit** 10:20

**advance** 7:23 9:4,14 14:23

**advice** 59:22 60:7 65:1

**advised** 49:25

**advocacy** 102:25 103:6,9 104:20

**affect** 131:15

**affecting** 108:1

**affiliation** 123:4

**agencies** 19:18 35:16

**agency** 19:21 23:14,15,18 35:19
88:3 93:19,20 94:4 99:13

**agency's** 93:23

**agree** 6:6,8,11,13,17 18:1,11,12
52:20 109:6,15 115:7

**agreed** 52:17 55:5 59:24 61:20
72:4 100:25

**agreement** 21:5 52:21 53:14
72:9

**agreements** 75:18

**agriculture** 92:20

**ahead** 8:3 10:19 20:25 56:5,18
62:10 70:17 82:22 84:16 88:24
89:19 101:4,11 130:5 133:3
135:17

**Alex** 103:21 104:10,13,17 105:1

**Alexander** 103:12

**align** 117:13

**allegation** 121:23

**allegations** 121:15,22 122:14

**allotted** 24:8

**allowed** 25:13 66:14 75:2 99:14,
15

**American** 94:14

**amount** 61:20,21 133:21

**and/or** 92:21 128:17

**Ann** 90:8

**annual** 109:18

**answering** 139:8 140:10

**answers** 76:22

**anticipate** 89:7

**apologies** 128:15

**Apparently** 46:25

**appeared** 131:5

**appears** 44:6 52:16 102:22 109:4

**apple** 8:13

**appreciative** 57:21

**appropriately** 22:7 129:24
131:23 138:9 139:1,16

**approval** 57:12

**approved** 25:11 57:4,13

**April** 64:13 102:21 103:13 135:24

**Arbor** 90:8

**archive** 83:10

**area** 12:1 23:6,22 49:11 95:16
96:14,20

**areas** 23:2,21 24:3 92:13,15,24
93:6 96:16 97:2,3,4 98:10 107:25
119:25 138:5

**arise** 72:7

**arrested** 104:21,22

**arrival** 132:7,16

**arrive** 41:4

**arrived** 127:4

**arriving** 132:22

**artfully** 131:11

**articles** 87:16,20,24

**arts** 12:13

**asks** 90:12

**aspect** 136:6

**aspects** 27:16

**assaults** 138:10,13,23

**assemblies** 35:18

**assembly** 24:5 33:16 35:10

**assess** 33:3 64:17

**assessed** 62:3 66:14

**assessment** 66:16 93:3 111:5
134:6

**assessments** 135:3

**assigned** 132:8

**assist** 98:18

**assistant** 44:16 63:25 75:23

**Association** 94:15

**assumed** 98:24

**assumption** 100:10

**assurance** 48:24

**assured** 119:6

**attached** 57:16 64:5 69:14,23

**attachment** 64:7 65:18 78:10
79:20 80:19

**attend** 11:12 41:4 59:17 67:21,24
68:1

**attention** 74:23

**attorney** 6:5 9:1,13 45:17 64:1

**audit** 11:21,22 12:22,24 13:1,3,
19,21 15:14 17:8 19:19 20:3,5,14
22:25 23:1,4,5,8,12 24:9,10,12,
18,19 26:3,10,13,23 27:1,10,24
28:2,4,10,18,19,25 29:23,24
31:15,17,18,19,20,22,24 33:7,17,
19,20,22 34:13 36:7 37:13,18,21,
23 38:14,18,20,22 39:5,6,22 40:8
41:7,18,22 42:1,4 44:22,23,25
45:5,7,9 46:3 47:18,23 48:9
49:10,19 53:7 55:2 58:1 59:5 60:5
66:6 69:1,4,9,13 70:4 73:11,24
75:9 76:12 78:5,20,22 81:16,21,
22 82:8,10,12,13 83:18,20,23
84:9 85:2,8,13,14 86:3,7,12 87:25
88:2 91:5,20 92:6,9,16,25 94:10,
17 95:8 96:6,11 98:25 99:3,10,22
100:7,19,24 101:3 102:14,17
103:8 104:7,8,9 105:10,11,17,21,
24 106:11,20,21 107:1,5,14,17,20
108:25 128:21 129:16,23 130:24
131:3,9 133:25 134:1,16 136:5,18
137:11,23 140:8,12

**audit's** 86:24

**audited** 33:1,14,15 34:23 39:10
106:25 107:2

**auditing** 20:17 22:13 45:23
88:10 100:1

**auditor** 7:5 14:1 26:22 68:25
83:19 102:10,11

**auditors** 25:9 37:15,16,18,22
56:17

**auditors'** 140:10

**audits** 19:15,17 22:16,19,21 26:7,8 28:8 49:4 53:3 84:24 86:4, 8,13,14,15 87:2 92:12 95:3 102:3, 6,12 103:5

**August** 56:6

**Aumann** 6:10 8:12,17 9:12,15 10:3 17:12 18:5 29:18 34:18 36:19,25 42:19 47:4 52:6,17,22 57:22 68:14 71:10,12 80:6,22 88:20 89:7,17,23 140:2,6,14,18

**authored** 105:21

**aware** 14:17 15:8 17:15 31:16,21 34:4,11 40:7,10 44:13,16 60:6 88:5 106:6,15,18

**awareness** 10:5

___

**B**

___

**bachelor's** 12:12 90:16,17,20

**back** 11:6 16:2,25 34:5,12 37:13 50:13 52:15 57:9 58:15 71:22 73:5 84:5 88:25 89:1 105:3,9 118:21 127:11 133:4,9

**background** 12:11 23:17 69:7 88:2 90:4

**backup** 127:12,15,25 128:4,5

**bag** 85:3

**Ball** 91:15

**base** 18:8

**based** 23:3 24:23 25:18 27:10 47:20 61:7 76:21 131:5 138:2,3

**basic** 87:23 125:20

**basically** 12:25 23:1,13,17 24:20 31:24 32:3 44:18 53:12 55:6,10, 15 57:7 59:21 60:7 61:25 66:10 69:6 76:8 77:20,23 79:11 84:22 85:8 92:21 93:3,11,18 96:22 106:2,8,12 127:5 137:5

**batch** 43:18

**Bates** 42:20 52:18 57:20 101:13

**bear** 16:11 42:10

**began** 6:2

**begin** 24:17 25:4 82:7,13

**beginning** 16:8 73:11 84:8 85:8, 12 88:1,14 98:24 126:23

**behalf** 6:15 8:8,20,24 19:18 71:24

**believed** 55:12

**Bellar** 45:16

**beneficial** 24:4

**Betty** 62:13,18

**big** 43:18,19 80:23 88:5

**bit** 23:10 42:24 85:5 88:25 90:4, 12 103:11 135:17 137:16

**Boaz** 68:21 69:2,3 91:10 97:12

**books** 136:16

**born** 90:6,8

**brainstorming** 70:8,9

**Brandon** 45:16

**Bravo** 96:18

**breach** 74:10

**break** 52:9,16 53:18 77:21 88:22, 23,24 89:1,11,14 97:21 101:4,8 104:23

**briefly** 9:6 140:7

**bring** 70:11

**bringing** 74:22

**broad** 22:9 48:21

**broader** 47:22 48:19,20

**brought** 75:18 133:19

**Brun** 46:7 54:10 56:12 57:3 96:25

**built** 104:25

**bullet** 74:3,9

**bunch** 51:8

**business** 54:14 56:24 58:25 61:14

___

**C**

___

**calculated** 110:12

**calculates** 109:23

**calculating** 66:17

**call** 12:15 126:14

**called** 61:25 69:15

**camping** 85:3

**capitol** 63:2

**capturing** 116:21

**care** 137:24 138:7 139:1

**Carolina** 90:9,17

**Carolyn** 79:8,10,11

**case** 10:12 19:19 20:8 46:24 67:24 69:19 90:3 119:20

**cases** 25:25 92:21 93:12 95:9 99:17 122:2

**caught** 97:12

**caused** 47:8

**celebrations** 136:12

**cell** 72:3

**center** 45:14 65:17 95:19 96:13 103:25 104:3 107:8 110:21 133:8

**Central** 74:22

**Century** 122:22

**certifications** 95:7,10

**chair** 36:4,5

**challenges** 129:15

**challenging** 129:3 130:17

**chance** 70:18

**change** 23:5 25:17 27:7 29:25 57:13 60:3

**changed** 50:14

**charges** 37:22

**Charlie** 96:18

**chart** 65:21,23,24 66:1 123:19,24 124:10,14,22,25 130:4

**charts** 66:3 123:22 126:4

**Chas** 91:14

**chat** 39:21 43:10,20 56:3,4 58:16 62:10 65:15 67:3 68:11 70:16 82:22,23,25 83:8,22 84:14 85:16 87:15,18 101:10,11,12 105:12

**chats** 83:10

**check** 48:18 82:9 86:6,10 139:22

**checklist** 44:20

**chief** 30:20,21 48:2 57:5 60:22 78:17

**choose** 23:7

**Chris** 57:3 91:12 96:25

**Christmas** 74:13

**Christopher** 46:7 54:10 56:12

**circumstances** 14:18 25:21 62:1

**citizens** 103:3

**clarification** 8:16

**clarify** 36:21

**classification** 124:5 125:5 134:9,19

**classified** 42:7

**clear** 37:6 47:13 86:17 109:19 124:22 132:23

**close** 79:21 80:2 131:16

**closing** 131:16

**closure** 128:18

**clothing** 136:16

**Clute** 68:21 69:3 91:10

**CMO** 46:7,8

**co-in-charge** 83:14,20

**co-in-charges** 69:4

**colleagues** 105:21

**collect** 23:18 87:25

**collecting** 85:13 88:9

**collection** 87:16

**collective** 42:25 87:9

**Colorado** 86:23

**Columbia** 90:9

**Colvard** 91:12

**comment** 51:23 86:13 99:19,23 109:1 114:24

**comments** 25:13,17,19 99:15,20 109:1 114:24

**commissioner** 58:18 59:7 61:1, 2,3 67:22 68:1 75:23 110:8

**commitment** 109:8

**committee** 19:24 36:3

**committees** 92:22

**communicating** 55:16

**communication** 39:18 48:17

**communications** 45:2 102:19

**community** 108:1 109:10,14 127:1

**company** 61:15

**compared** 28:24 131:3

**compile** 69:21

**complaint** 10:12

**complete** 42:1 106:4 112:4 132:16 140:12

**completed** 123:15 126:4 134:5

**completely** 102:18

**compliance** 12:16 20:16,19 28:12 44:19 45:24 48:4 49:3 93:12,19 109:18,24 110:3,12,15, 18 111:6

**complied** 20:22

**complies** 7:21

**comptroller** 19:15 22:6 24:13 25:10,11 32:4 35:8 36:23,24 59:8, 11,16,17,21 62:19 63:20,21 64:12 65:4 67:24 73:17 99:1,4 100:19 103:4 110:11 120:19 122:6 129:16,23 134:4,8,11 135:2 136:6,19 137:11,23 138:8

**comptroller's** 6:16 7:6 8:9,20,23 13:8 14:7,10,13 19:14 22:11 27:23 29:13 32:20 34:1 36:22 37:5,6 39:2,3,18 41:15 42:3 47:17 49:9,20 50:18 51:3 52:8 54:15 56:25 59:1 63:2,5 81:20 82:1 83:4,7 91:20 104:2

**computer** 43:17 71:13,23

**concentrating** 85:4

**concern** 61:8,13,15,19 74:11 75:13 88:5 134:23 135:6

**concerned** 47:21

**concerns** 25:15 40:3 76:21 97:5 102:25

**conclude** 34:24 99:10 130:24

**conclusion** 32:24 114:6

**conclusions** 15:1 16:7 24:23,25 25:1,7 27:10,17,18 45:11 53:6,11 82:11 134:1

**concur** 100:14 108:22,23 115:2

**concurred** 100:13,15 101:1

**conditions** 34:14,16 35:2 41:16

**conduct** 92:12

**conducted** 31:20

**conducting** 49:23

**conference** 85:7

**confuse** 86:1

**connection** 92:9 94:10 95:2,7,11 104:7

**consideration** 93:16

**consistent** 65:3

**consistently** 117:8 132:8,24 133:12

**consult** 89:8,18 92:8

**contact** 39:23 103:6,9 104:3

**contacted** 104:4,5

**contained** 34:6,16 35:1 38:13 71:8

**continual** 109:8

**continue** 19:24

**contraband** 18:23 138:15 139:12

**contract** 20:16,18,19,22 21:4,7, 13,22 28:11,13,18,20 30:13 40:20 44:13,19 45:3,18 46:9 48:17 49:2, 25 50:15,23 56:13 59:23,24 61:23,24 64:8 65:1 67:20 74:9,10 75:2 79:14

**contracted** 20:6 21:25 45:21 61:17 74:21,24 75:16

**contractor** 47:25 50:3 61:10

**contracts** 21:10,11 22:8 23:16 45:22,25 48:24 59:8,12 60:8 61:19 62:13 64:6,9 123:2

**contractual** 60:12

**control** 42:12 54:19 97:1

**controls** 109:11 119:25

**conversation** 84:19 102:23
105:1

**conversations** 38:23 39:3,5
41:14 42:3 63:22 65:3

**convey** 106:1 111:4

**cooperate** 98:19

**cooperative** 41:23 140:10,13

**coordinator** 95:17

**copies** 42:22

**copy** 35:12 57:3 94:19 99:13
105:14

**Corecivic** 6:13 20:8 21:6 28:7
29:15,25 30:9,17,19 31:8,12 34:7
39:4,19,24 40:9,23 41:10 55:14
59:9 60:1 61:9,17,18 62:3,13 64:6
71:16,24 74:19 75:17 79:13 90:2
94:23 98:9 99:23 100:5,7 107:11
116:8,11 117:16 118:21 120:5
121:2,13 122:17,18 123:5,7,10,13
126:23 127:12 128:15 129:16,18,
24 130:6,9,24 132:6 133:11
139:11

**Corizon** 122:22

**corner** 43:5

**corporate** 41:10

**correct** 7:19,24 8:11,21,25
11:13,16,19,24,25 12:9,10 13:12,
21 16:5 20:10 22:4,12,23 29:4
33:24 39:16 41:12 44:17 45:14
46:1,5 48:1 49:7,14 50:9,16 51:10
55:6,9 56:6,14,15 57:17 58:20,22,
23 60:10 61:24 64:20 65:12 67:9,
12 68:4,18,23 70:21,22,25 72:16,
17 73:22 74:2,16 79:19,23 80:16
81:11,16,17,21 90:23 91:18,22
94:8 95:20 96:1 99:7 101:22
103:2 105:12,19,23 107:12 108:3,
19,21,24 109:4,5 110:10,14
114:2,16,18 115:1,25 116:16,25
117:14,23,24 120:3,15,17,18
121:3,9 122:15,23,24 123:23
124:24 128:2 130:11 132:1
133:15 134:2,7,10,15,22 135:5,9,
21,23 136:18

**corrected** 119:8

**correction** 19:20 20:18 26:11
27:1 31:25 46:19 49:7 57:5 60:25

64:2 66:2,21 74:12 79:12 81:8
91:6,21 99:6 100:1,2,6,13 102:4
105:18,22 106:22 108:19 109:2,6,
7,23 110:4,12 111:11,23 114:25
116:4,6,19 119:23 120:6 121:2
128:22 130:13 131:21 132:12
134:4 136:20 137:14 138:4 140:9

**correction's** 112:15

**correctional** 17:5 21:19 45:13
65:17 66:13 95:19 107:24,25
109:19 110:21 117:17 121:13
123:13 124:19 129:17,20 133:11,
13,19 135:2

**corrections** 15:6 17:10 21:15
36:22 39:13,14 65:2 67:22 75:21
77:17,19 78:18 91:24 92:2,5,9,13
94:15 95:1 100:17 103:1,7 120:22
128:23 129:2,3 131:8

**Corrections'** 111:5

**corrective** 32:2,5 50:3 81:8
82:11

**correctly** 37:17 46:4 50:19 56:10
58:19 62:14 64:10,19 65:19 68:22
73:19 74:15 78:9 79:22 81:10
84:3 103:1 108:2 109:20 111:2
112:6 115:17 116:1 120:2,14
121:16 122:9 123:17 128:19
129:13,21 137:19

**counsel** 7:25 53:15 72:2

**count** 46:3,14,15,16,22,23 47:11,
13,14 48:15 91:16 97:8

**counties** 74:25

**county** 45:17,18,21 59:14 60:13
74:24 126:23 127:5

**court** 6:3 16:19 71:21

**covered** 71:3 96:21 129:17
130:10 131:4,6,14,18,19

**covering** 129:24

**create** 47:2 110:5

**critical** 29:1 55:11,12 111:18
129:18,24 130:1,6,10,18 131:4,18

**critique** 110:11

**crossing** 97:11

**curious** 85:20

**current** 23:19 34:2 66:6

**custody** 115:4

**cycle** 19:21,22

---

**D**

**daily** 30:19

**damages** 59:12,13 61:25 62:2
64:7 66:11,15

**dash** 124:22

**dashes** 124:15

**data** 24:22 94:5 107:5 113:8
116:7 120:1,13 121:6,8,9 131:6

**database** 15:20

**date** 9:11 20:3 33:20,25 83:16
125:21

**dated** 44:8 46:2 49:16 56:6 58:18
62:12 67:8 68:17 70:20 73:18
76:1 78:11 103:12

**dates** 33:16

**daughter** 85:2

**David** 13:6 83:13 86:1 91:14
102:14

**day** 40:22 96:6 98:3 127:4

**days** 31:25 32:1 66:14 98:1 127:2
132:7,16,17,22

**DC** 57:4

**De'aundrea** 68:20,24 91:11

**deal** 103:6

**dealing** 77:13,14 88:13

**dealings** 58:25

**deals** 122:22

**dealt** 50:8

**death** 115:14,16

**deaths** 31:8,13 112:5 115:4

**Debbie** 63:9,24 64:1,4

**Debra** 58:21

**debriefed** 40:2

**December** 68:17 74:12

**decide** 19:24 78:2 100:4

**decided** 40:5 75:3

**decision** 24:11

**deconstruct** 52:5

**defendants** 6:11,13 90:2

**Defense** 103:25 104:3

**deficiency** 48:3

**define** 77:1

**degree** 90:16,17

**deleted** 74:11

**delivery** 109:13

**Deloach** 91:13

**demonstrated** 109:8

**Dena** 13:17 73:21,23

**department** 14:25 15:7 19:20,25
20:2,4,15,17,20 21:15 22:5 23:21,
24 24:16 25:12,14,16,23 26:11,14
27:1,7,11 28:9 29:15 30:20 31:25
32:2,25 33:2,14,15 34:15 35:11,
12 36:12,17,20,21,24 37:5,7
38:16,22 39:1,2,3,8,11,13,14,18
41:14 46:10,18 47:16,17 48:9
49:3,6,7 57:5,12 59:24 60:7,9,24,
25 61:17 64:2,24 65:2 66:2,17,21
67:22 75:21 77:16,19,23 78:18
79:12 81:7 83:3,6 91:6,21 92:19,
20,21 93:4 99:6,13,18,22 100:1,2,
6,13,17 102:4 103:1,7,8 105:5,18,
22 106:4,21 107:24 108:9,19
109:2,5,7,23 110:4,12 111:5,11,
16,23 112:15 113:10,15 114:6,24
115:13 116:4,5,11,18 117:16,19
119:23 120:6,7,8,9,12,22 121:2
122:19 123:2,16 128:21 130:13
131:21 132:12 134:3,9,12 136:20
137:14 138:4 140:9

**department's** 95:17 106:7
107:22 108:1 109:18 112:4 137:6

**departments** 22:22 92:16,25

**depend** 96:19

**depending** 33:15 96:11

**depends** 19:9 25:22 94:4

**DEPONENT** 140:19

**deposed** 6:20

**deposition** 6:1,6,8,11,14,17
7:10,12,23 8:4 9:5,14 10:2,10,15,
16,24 11:8,12,15 14:23 16:18
57:20 71:25 81:13

**descriptions** 117:8

**designated** 8:7 11:20 12:1 80:2

**detailed** 23:8 24:18,19 102:14
117:10

**detention** 92:3

**determine** 23:2

**detrimental** 61:8

**develop** 24:21

**developed** 44:17 109:11

**developing** 55:15 69:7 106:19

**dictate** 18:18

**difference** 122:1

**difficult** 42:24 111:15 129:6
137:8

**difficulties** 88:14 129:19

**direct** 39:17

**directed** 120:6

**direction** 36:12

**directions** 37:2

**directly** 39:7 74:25 104:4,6 107:3
114:4

**disagree** 108:23 119:12,17

**disagreed** 100:18,21,22

**disagreement** 119:16

**disaster** 16:11

**disbelieve** 119:18

**disciplinary** 117:4

**discretion** 99:25

**discuss** 24:3,25 48:3 69:10
78:14,23 103:7

**discussed** 30:7 67:19 108:18

**discusses** 135:19

**discussing** 16:15 63:4 85:1

**discussion** 11:4 44:1 52:14,16

**discussions** 70:11

**dispense** 53:15

**division** 110:3 111:13 120:10

**document** 12:6 16:12 43:2 44:3,
6,10 56:1 58:9,10,17 60:4 65:16

67:2,4 70:15 75:25 77:4 78:11
81:5 101:12,13 105:20 114:14,15
137:17,18

**documentation** 25:23 85:13
112:9,11 114:12 115:24 116:14,
24 120:20 121:18 122:7,8 123:21
124:2 125:2,24 134:23 136:23
137:12 138:2

**documented** 28:24 40:25 41:2
45:8 121:16 124:7,8 125:19
137:8,13,19

**documenting** 25:7 44:15 49:22
86:16 88:8 113:24 116:22 122:3,
14 123:21

**documents** 42:6 43:14,18 51:9,
14,16 52:3 95:2 123:15,16 140:11

**dollars** 22:6

**door** 97:9,19

**dosage** 127:21

**dot** 101:21

**Dotson** 75:20 76:1,9,13,22

**double-check** 121:25

**Douglas** 13:25 91:13,15 96:4
101:20 102:1 103:12

**downloaded** 54:20

**draft** 16:3,4 25:3,6,8,11,12 99:13

**drafting** 25:4 55:2

**drafts** 15:10,11,12,24,25

**draw** 24:23

**drawn** 53:11

**drew** 114:6

**drop** 56:3 82:23

**drug** 49:16,17,18,23 124:2
125:10 135:20

**drugs** 18:22

**due** 118:24

**duly** 6:20

**duplicate** 84:2

**Dwight** 63:10 64:4

## E

**e-mail** 43:9,23 54:8,13,18,25
55:4 56:6,19,23 57:2,18 58:24
59:3 62:12,21,23 63:9 64:3,13,22
68:17 69:14 71:17 72:3 74:4
77:11 79:7,15 80:19 101:20
102:21 103:12,21

**e-mailing** 55:1,6 102:22

**e-mar** 126:25

**earlier** 81:13 102:23 108:18

**easier** 52:2

**easy** 129:2

**editing** 25:8

**educated** 119:7

**education** 96:14

**educational** 12:11

**effective** 109:14 119:25

**efficiency** 93:7

**efforts** 130:25 136:24

**Eighty-two** 121:11

**electronic** 126:23,25 127:2,3,16,
25

**Elimination** 122:12 133:18

**emphasized** 74:13

**employed** 13:7 14:6,9,13

**employee** 19:7 102:2 136:2

**employees** 46:6 98:9,12,13
120:5 139:5 140:9

**encouraged** 41:24

**end** 16:8 40:1 55:19 69:6 88:23
89:24 93:17 96:6

**engagement** 24:16

**ensure** 20:22 21:2,9,13 22:6
48:10 49:1 50:13,16,23 86:8
93:19 109:12 114:7 116:11
117:16 121:12 123:14 131:18

**ensured** 129:17

**enter** 25:3 47:12 113:7 114:11,19
118:14

**entered** 46:17 47:1,14 113:1,10,
19 116:13 117:12,18 121:23

**entering** 47:22 114:7 116:17,20
117:1,5,22 119:7 122:4

**enters** 132:13

**entire** 37:21 84:14

**entirety** 22:14 99:14

**entity** 88:3,9

**entrance** 85:7

**environment** 92:2 128:23 129:3

**Erin** 6:12 71:13,23 90:1 126:13

**error** 118:25

**errors** 120:1 124:18,20,23

**evaluating** 21:3 45:4

**evaluation** 25:25

**evaluations** 112:1 124:4 125:3

**evening** 46:15

**evidence** 25:8,22 55:7

**exact** 9:10 17:15 51:6

**EXAMINATION** 6:22 89:25
140:6

**examine** 137:24

**examined** 6:20

**exams** 124:3 125:3

**Excel** 79:20,25

**exceptions** 101:21

**exclusively** 121:1

**Excuse** 128:14

**executing** 32:5

**exhibit** 8:4,5,13 11:7,9 16:17,20,
22,23 26:9,16,18 42:17,18,25
53:16 54:5,6 55:23,24 58:5,8,16
62:4,7,11 65:7,13 66:24 67:2
68:9,10,12 70:12,14 72:1,6,12,24
73:2,9,16 75:25 76:3 77:3,6 79:4,
6 80:25 81:1,4 82:15,17 87:9,11
105:9

**exist** 111:16

**expectations** 48:3

**experience** 91:24 98:16

**experienced** 102:25

**experiencing** 129:19

**explain** 99:9 105:25 126:21
132:10

**explaining** 61:6

**explanation** 119:21

**extensively** 48:3

**extra** 28:10,13

**extreme** 60:12

## F

**F-I-N-A-M-O-R-E** 7:3

**face** 12:5,7

**facilities** 19:16 20:5,9,12 22:3
28:11 37:23 49:4 64:6 79:13,16
94:21,22,23 106:20,23,24,25
107:2,4,6,7,10,11,24 110:5
111:10,14 113:16,18 114:7
117:17 118:13 123:13 128:16
129:1,6,7,10,17,18 130:2,10,13
131:21 133:14 134:4 136:20

**facilities'** 121:13

**facility** 18:2,11,13,14 19:5 20:19
22:1 28:14 37:14 39:23 40:9,10
41:4,25 44:9,22 45:19,20,24
48:25 53:7 80:2 88:7 92:3 93:14
96:9,11,15,21 97:5,7,23 98:11
109:19 110:13 111:18,20 116:12
124:19 132:6,8,13,14,17,22
133:11,19 134:5 135:3 136:19
137:24 138:15,18 139:13

**facility's** 109:24

**fact** 74:19

**factors** 24:9

**failed** 107:23

**failing** 117:21

**failure** 113:13

**fair** 28:4 92:23 99:1 100:22
118:20,21 127:24

**fall** 92:22 111:10

**familiar** 10:10 66:22

**fantastic** 58:3 80:21

**faster** 90:13

**favorite** 97:21

**February** 76:2 78:11

**federal** 122:12 133:17

**feel** 12:2 28:4 87:22 88:20 106:5 107:17 108:4

**fewer** 18:11

**figure** 39:16 43:11,20 48:22 53:24 54:3,18 80:20 85:22

**file** 52:20 58:10 81:20 114:19 128:5 132:10 133:1 134:21

**filed** 33:6 75:10

**files** 15:19 41:25 53:2,9 123:15 124:6,8,9 125:1,10 132:20 134:12 135:4

**filled** 55:8 66:12

**final** 15:10 16:3 25:20

**finalize** 26:1 99:12

**finalized** 37:9

**finally** 23:7

**Finamore** 6:16,19 7:2,4 11:6 17:18 26:20 54:11 56:5 62:14,16 90:1 101:8 140:7

**finance** 119:23 120:7,9

**financial** 21:21 60:22 66:20 78:17

**find** 40:11 92:24 93:9,12,23,24 94:1,6 98:8 106:3 129:23 131:4 140:7

**finding** 30:3,4 39:6 40:6 87:23 105:25 106:2,13,17 107:22 108:5, 8,11,15 109:6,17,22 110:10 112:3,8 113:12,15,23 114:4,14 115:10,11,19,23 116:10 117:15 118:9 119:22 120:11 121:10 122:6,16,20 123:9,12,20 125:23 126:2,3,12,19 128:11 131:3,20,25 132:5 133:3,4,5 138:8,12,14,17, 20,22,25 139:2,4,8,11,15,19

**findings** 14:25 25:7,18,22 26:1 27:19 28:7 29:24 30:2 32:22 37:7 38:24 39:4,8 40:4 45:11 55:18,20 82:10 99:7,16,24 100:3,8,12,18, 23 102:16 105:25 108:14,20 110:6 111:18,22 117:1

**fine** 53:20 88:13,24 89:13

**fines** 60:12,16 61:4,7,15,22

**finish** 31:24

**finished** 67:15

**finishing** 99:11

**fiscal** 110:23,25 111:6 120:13

**five-minute** 53:18 89:11

**fix** 40:12

**fixed** 48:5

**fixes** 48:10

**flip** 78:8

**focus** 24:20 29:22 69:12 93:8 96:15 98:25 107:5 109:22

**focused** 49:11

**focusing** 94:13

**follow** 77:25 108:5

**follow-up** 31:19,20,22 32:25 33:4 36:16 74:12 75:13 81:8,12, 15,19,23 102:19 133:22 140:15

**Fonda** 13:25 91:15 96:3 101:20 102:1,2,22 103:12

**foregoing** 6:1

**form** 17:13,21 18:4,5,15,24 19:8 23:9 29:10,18 33:12 34:18,19 35:6 36:19 38:5 41:17 47:3,4,9 50:5,21 60:14 72:4 80:6 82:2 93:1 94:3 98:15 108:12 109:25 114:3, 17 119:2,10 121:19 124:16 125:6, 11 126:6 127:18 128:3 129:4 130:15 131:1,24 132:9,15,19,25 134:25 137:1,15 139:6,17

**forming** 38:17

**forms** 124:5 125:5 134:6 138:6

**formulating** 51:4

**forward** 85:1 119:8

**forwarded** 63:9 64:3

**forwards** 64:12

**found** 18:23 40:3 113:7,9,16,17, 19 115:8,21 124:8 132:21 134:4, 8,11 135:2,14,16

**fraud** 93:9

**free** 87:22 88:20 96:22 107:17 108:4 138:5

**Freidman** 103:22 104:10,13,18

**Friedman** 105:2

**front** 35:24 43:3 44:3 58:7 65:7 68:8 73:2,16 77:2 81:5 97:11 105:13,15 107:14

**front-line** 12:25

**fully** 109:6 126:4 130:13

**function** 82:25

**future** 50:14 86:2,23

---

**G**

**g-mail** 101:21

**gained** 76:25

**gather** 24:22

**gave** 85:2 100:7 111:8,14,23,25

**general** 24:5 27:16 33:16 35:10, 18

**general's** 9:13

**generally** 19:25 26:7 52:25 86:19 98:4 106:3

**generated** 91:7

**get all** 127:10

**giant** 43:19

**give** 10:21 11:1 25:17 42:11,20 54:17,22 59:17,22 60:6 65:1 96:25 105:6 127:22

**giving** 8:19,22 55:7 62:24 127:19

**glance** 70:18

**good** 6:3,23,24 37:16 65:6 86:9 101:8 137:16

**governmental** 19:23 35:15 36:3

**governor's** 63:15

**grace** 10:22

**great** 7:22,25 12:5 15:9 43:14 54:21 57:24 78:7 79:3 80:17 82:6 85:24 89:21

**greatly** 57:21

**Greg** 13:25 56:13,16

**group** 49:3 74:13 86:2,3 102:25

**groups** 103:6,9

**grow** 90:7

**grunts** 103:18

**Guaranteed** 16:11

**guess** 8:14 9:6 15:19 19:2 21:5, 13,22 24:9 39:16 46:23 48:16,20 59:25 61:10 66:16 77:12 88:5 100:4 104:15,20 105:4 111:21 115:25 122:3 124:19 137:18

**guessing** 94:1

**guidance** 59:18

**guys** 89:13

---

### H

**half** 77:17

**hallway** 97:13

**handed** 11:7

**handle** 78:3 98:14 127:12 138:9

**handling** 138:13,15,18

**hands** 90:13

**happen** 48:8

**happened** 29:7 32:23 48:12 68:5 78:25 97:17 117:10 126:22 137:6

**happening** 49:1 54:24 59:3 88:6

**happy** 43:12,22 88:15

**harassment** 121:15

**hard** 47:10 52:8

**Hardeman** 59:14 60:13 74:23 79:16 107:9 126:22 127:4

**head** 34:9

**health** 92:19 112:25 117:17 123:3,15 124:3,4,5 125:3,4,5 137:24 138:6,7 139:1

**hear** 19:25 59:10

**heard** 71:12

**hearing** 36:10,13,18 37:4,10 59:6 74:12 75:13,15 117:4 134:9,14

**hearings** 36:6,9 75:19 104:15

**Heather** 91:15

**held** 15:12

**helpful** 24:6 41:22 98:9,12 133:5

140:13

**helping** 102:18

**Herzfeld** 6:7,22 8:3,6,14,18 11:3, 5,10 16:17,21,24 17:14,17,22,25 18:6,10,16,20,25 19:4,13 26:16, 19 29:11,19 30:5 33:13 34:20 35:7 36:23 37:3 38:6 41:20 42:16, 23 43:1,11,19,24 44:2 47:7,15 50:6,25 52:1,12,15,24 53:17,22 54:5,7 55:22,25 57:15,24 58:3,6 60:17 62:5 65:14 66:25 68:11,15 70:13 71:11,19 72:9,11,25 76:4 77:7 79:5 80:10,18,23 81:2 82:5, 18 87:12 88:11 89:2,5,10 90:12 93:1 94:3 98:15 108:12 109:25 114:3,17 119:2,10 121:19 124:16 125:6,11 126:6,13 127:18 128:3 129:4 130:15,19 131:1,24 134:25 135:18 137:1,15 139:6,17,25 140:15,17

**hey** 39:20 71:10 83:25

**highlighted** 74:7

**highlighting** 85:25

**highly** 109:11

**hinder** 23:23

**hindering** 93:14

**hiring** 129:19

**history** 23:17

**hold** 12:8 58:12 67:16

**holding** 117:4

**holds** 15:20

**Honestly** 85:18

**hoping** 42:8

**hour** 53:17 89:4

**hours** 9:9 19:11 98:3,5 117:2 127:10

**housing** 61:18

**Human** 103:24 104:3

**hundred** 110:19

**hundreds** 125:1,9 126:3

---

### I

**ideas** 70:1,2,5

**identified** 69:11

**identify** 23:6,21 24:2 52:18 57:19 93:7 106:13 133:22

**illnesses** 117:18 118:15

**imagine** 89:9

**IMOF** 76:10

**impact** 19:6 106:7

**impacted** 115:15

**implement** 119:25

**implementation** 95:12

**implications** 137:19

**importance** 137:21

**important** 21:8 24:5 38:14 53:12 137:20

**improved** 130:6

**improvement** 92:24 93:9

**improvements** 109:9

**in-** 37:21

**in-charge** 12:22,24,25 13:4,10 26:22

**in-charges** 12:20,22 13:2 25:9 91:10

**inaccurate** 72:19 120:12,23

**incident** 70:4 114:13,14,15 116:12,13,22 117:1,10,11 120:13 136:21 137:3,7

**incidents** 88:6 112:6 113:25 115:21 116:14,22,24 117:7,22 118:23 119:7 135:14,16 138:23

**include** 20:5,8 69:13

**included** 29:8 49:21 51:18 53:2 80:14

**including** 11:21 91:17,23 92:1

**incomplete** 120:12

**incorrectly** 115:25 126:7

**increase** 19:11

**increased** 128:17

**increasing** 120:1

**independent** 22:1

**indicating** 32:4

**individual** 8:8

**individuals** 14:6 91:16,23 92:1

**industrial** 12:13 91:3

**industry** 17:11

**influence** 61:10

**information** 15:18 17:7 23:18 27:11 30:6 34:15,25 38:21 41:23 46:21 47:22 51:18,21,24 55:17 60:16,19 76:25 79:17,24 81:24 88:9 98:17 102:19 105:4,6 106:25 110:7 112:5,16,18 113:11,14,20 114:7,11,20 115:15,16 116:1,6, 13,18,20,21 117:5,23 118:6 120:21,23 121:1,5,7 122:5 124:7, 10,18 127:11 131:8 140:11

**informational** 106:17

**infraction** 44:18

**Inglis** 63:9,24 64:1,4

**initial** 124:2 125:10 133:21

**injuries** 113:2,6,14 117:18 118:15

**injury** 113:20

**inmate** 18:3 31:8,13 46:17 96:12 97:22 104:16 120:12 123:15,21 124:6,7,9 125:1,22 126:9,24 132:6,9,13,15,18 133:12,18 134:5,12 135:4

**inmate's** 115:14 134:21

**inmate-on-inmate** 138:9

**inmates** 46:14 80:2 97:11,13,15, 18 107:25 124:12 125:18 126:1,5 127:9,14 134:8,13 136:7,10,13 139:1,5

**input** 38:16 73:17

**inquiries** 41:21

**inside** 17:19

**instance** 93:22

**instances** 55:4 97:15 132:21

**Institute** 95:2

**institutional** 132:10 134:12,21 135:4

**instruct** 98:13

**instructed** 98:17

**instructions** 11:18 138:6

**intended** 105:25 111:4 125:18, 23

**interacted** 41:19

**interactions** 103:8 105:5

**interest** 61:18 102:24

**interested** 37:25

**internal** 49:4 86:6 109:11 110:2,3 111:13 119:25

**internally** 83:8

**internet** 127:5

**interpret** 102:18

**interpreted** 103:19

**interrupt** 20:24 31:2 126:13

**interview** 23:20 76:25 78:14,15 79:1 104:6 105:8

**interviews** 38:3,10

**introduce** 6:5

**investigate** 138:23

**investigating** 121:14

**investigation** 33:10 122:4 136:5

**investigations** 34:2

**investigators** 37:12,14,15

**involved** 12:15 40:18 51:13 102:3,6 115:22

**involvement** 104:14

**issue** 25:18 44:14 46:20 47:2,22 50:8 55:14 70:4 72:7 80:8 93:10 96:20 102:18 106:3,5,18 112:8,11 115:23 116:17 117:9,21 120:19 121:4,8,9,18,22 123:20 125:9 126:1 127:14,24 136:2,23

**issued** 35:8 42:4

**issues** 20:1 28:12 34:23 40:3,7 69:10 92:24 93:11,23 96:11 102:24 106:12 124:15 125:1,24 135:12

**item** 44:15 48:18

**items** 44:19 69:8 123:25

### J

**Jackson** 91:12

**Jaclyn** 68:21 69:3 74:1 78:22 91:10

**Jafar** 14:5

**jail** 92:2

**January** 26:10,25 36:10 44:8 46:2 49:16 70:20 73:18 91:7 105:18

**Jeanie** 101:20,21 102:22 103:12

**job** 19:14,17 20:2 21:3 86:9 92:23

**jobs** 22:5

**Joe** 6:12 71:14,17 90:1 139:22

**Jordan** 79:8,10,11,15

**jotting** 70:10

**judges** 77:20,25 78:2

**judgments** 33:3

**Julie** 74:12

**July** 81:9

**jump** 130:5 135:17

**jumped** 133:3

**June** 6:4 33:24

**Justin** 63:9,19 64:4

### K

**keeping** 61:9

**key** 23:20

**kind** 16:8 39:21 42:9,12 43:17 52:2 84:6 86:9 87:23 92:11 109:22

**knew** 52:2

**knowing** 118:25

**knowledge** 17:11 28:6 29:13 30:7 31:9 92:4

### L

**labeled** 15:24,25 40:5

**lack** 47:8

**Landers** 60:20,21 61:6 78:14,16, 17

**large** 43:24

**late-filed** 8:5

**law** 92:22

**lawsuit** 10:5

**lawyer** 63:17 94:10

**leadership** 107:22

**leading** 97:8

**learn** 104:13 128:22

**learned** 104:12 128:24 129:5

**leave** 14:19 139:23

**led** 97:10

**Lee** 75:20 76:1

**left-hand** 43:5

**legal** 74:14 75:4,8,10

**legislative** 7:5 74:11 75:13

**legislators** 88:4

**legislature** 19:18,23 35:23 36:2, 13 37:2 93:15 106:6,16 120:25

**legislature's** 74:23

**letter** 24:17

**level** 18:8 48:13 80:3 106:13 137:20

**levied** 61:16,23 66:10 78:1

**levy** 77:20

**library** 96:14

**life** 103:19 136:7

**likelihood** 18:22 19:3

**limited** 137:18

**liquidated** 59:11,13 61:25 62:2 64:7 66:10,15

**list** 35:24 51:6 66:10 80:22 110:18 111:13

**listed** 101:23 130:3

**litigation** 15:22

**located** 46:10 80:19

**location** 45:13

**locations** 96:10

**lockdown** 46:16

**locks** 43:17

**lodge** 72:4

**long** 7:7 9:8 89:3 90:10 96:2

**longer** 14:12 19:10 30:4

**looked** 28:8 31:14 51:3,5 66:5 70:2 94:17,25 95:13 99:5 124:9 131:6 136:21

**loss** 120:1

**lost** 127:5

**lot** 51:24 52:2 61:13,20 88:6,7 94:1 128:24

**loud** 70:10

**Loveless** 58:21

**lovely** 58:15

**lowered** 60:13

**lunch** 88:23 89:1,12 101:5

**luncheon** 101:6

---

**M**

---

**macro** 48:13

**made** 16:7 25:2 26:2 27:13 28:9, 22 29:15,22,25 30:8,12 31:16 32:8 34:7 35:13 70:3 72:8 85:17 96:5 112:1 131:8

**main** 93:18

**maintain** 132:8,18

**maintained** 116:14

**maintaining** 21:5 116:23 132:24

**major** 16:6 27:20 47:21 92:16,21

**majority** 101:1 129:6 130:2

**make** 8:3 15:7 16:17 25:21,25 29:12 33:3 37:7,16 39:15 40:7 44:16 49:5 57:10 60:3 71:14 73:13 85:9 86:16 90:15 93:18 95:25 99:4,20 106:18

**makes** 24:11

**making** 25:24 46:6 88:7 130:25

**management** 23:20 24:3 25:1, 13,17 39:25 40:17,22 41:10 46:18 69:10 70:5 76:11 99:15 107:24 112:16,18 113:11 114:20 115:15 116:11 118:13 121:12

**management's** 109:1 114:23

**manager** 13:15,16,19,20 58:11 73:24

**managers** 25:9

**mandate** 48:9

**mandates** 48:21

**manned** 29:1

**MAR** 126:24

**March** 135:24

**mark** 11:7 26:16 42:16 54:5 55:23 58:8 65:7 68:9 75:24 77:3 82:15 87:9

**marked** 8:5 11:9 16:23 26:18 42:18 49:12 53:24 54:6 55:24 58:5 62:4,6,11 63:8 65:13 66:24 67:1 68:10 70:12 72:24 73:1 76:3 77:6 79:4,6 81:1,4 82:17 87:11 135:12

**MARS** 125:14 126:25 127:1,2,3, 7,20 128:6

**masks** 111:19

**Mason** 91:15

**master's** 12:13 90:21,24 91:2

**masters** 90:25

**match** 117:8

**matches** 79:17

**materials** 94:8 98:10 136:15

**matter** 76:1

**max** 79:21 80:3

**Maxwell** 6:15 9:3,4 10:3 52:17

**meals** 136:13

**meaning** 47:17

**means** 13:10 77:15 113:4,5 124:17,23

**meant** 36:23 83:7

**meantime** 33:8

**measure** 109:19

**media** 35:13

**medical** 123:1,2,8,14,21 124:1 125:13,16,24 127:25

**medication** 125:17,22 126:2,5 127:16,20

**medications** 124:4 125:4,19 127:15,22

**medicine** 126:10

**meet** 9:4,8 23:24 25:14 64:24 78:19 108:2

**meeting** 9:18,19,24 40:2 41:3 58:17 59:6,16,19 60:19 61:1,2 62:25 63:1,3,4 64:5 67:7,16,17, 18,19 68:6,17 69:5,10,24,25 70:7, 23 71:1,2,4 72:22 73:7,14,15 74:13 76:13 88:24 93:4

**meetings** 67:21,25 68:2 78:25

**Melissa** 68:21 69:2,3 73:25 78:21 91:9 97:12

**member** 48:4

**members** 36:13 91:4,8

**memo** 32:4 44:14

**mental** 123:2,15 124:3 125:2,3,4

**mention** 108:6,7,10 112:22 118:16

**mentioned** 75:15 90:14 102:23 106:10 108:13 115:9 135:7

**met** 78:22 133:24

**methodology** 23:11 124:11

**Metro** 104:24

**Michael** 91:13

**Michigan** 90:8

**Middle** 90:25

**mind** 28:2 31:3 54:21

**mine** 89:16

**minimal** 128:16 129:11

**minimally** 135:20

**minute** 54:22 67:14

**minutes** 30:11 71:1 89:4 139:23

**misleading** 120:24

**missed** 80:24

**missing** 124:1 125:10

**mission** 23:24 93:4 106:4,8 108:2

**misunderstanding** 118:25 122:1

**mixing** 130:20

**moment** 34:4 76:24

**Monday** 9:9,17 67:8 70:20 76:2 78:11

**money** 22:2 61:14,21

**monitor** 28:11,13,19 30:14 40:20 46:9 48:17 49:2 50:1,15,23 56:13

**monitor's** 44:19

**monitoring** 21:6 48:23 55:13

**monitors** 21:4 28:20 44:13 45:3 79:14

**month** 14:1 113:9

**month's** 113:7

**monthly** 66:18

**months** 32:3 105:22 113:20

**morning** 6:3,23,24 46:15

**move** 49:12 55:22 58:4

**moved** 75:9 90:9

**moving** 72:12 85:1

**multiplier** 64:9

**Murray** 91:15

---

## N

**narrow** 24:7 69:12

**Nashville** 41:11

**national** 86:11

**naturally** 19:10

**nature** 75:17 106:9 138:21

**necessarily** 108:8

**needed** 19:11 42:1 96:24 98:10, 11,18 127:9 140:11

**negotiate** 60:1

**newly** 57:13

**news** 87:16,20,24 88:4,8

**Nikki** 89:8,18

**non-critical** 128:18 131:17

**noncompliance** 44:10,11,12,14, 18,21,24 46:13,20 48:11 49:15, 17,25 51:2 53:1 55:5,13 106:2,8 124:19

**noncompliances** 51:7

**noncompliant** 44:15 46:24

**Northeast** 107:8 133:8

**Northwest** 107:8 133:8

**note** 47:19 49:5 64:8 126:8 130:1

**noted** 28:23 114:5 126:8 127:7

**notes** 7:16,17,20 8:1,4 32:7,9,11 38:3,7,10,12 67:7,11,13 68:3,4,17 69:15,17,19,20,22 70:1,3,6,10 71:2,3,5 72:16,19 76:7,8,24 78:13,24 79:1

**notice** 7:14 10:16,24 11:11,18 12:2 16:22 134:13

**notification** 44:9 49:15

**notifications** 51:2

**notified** 72:2

**notify** 24:16

**noting** 45:3

**November** 12:16 16:14 26:3 58:18 62:12 67:8

**number** 46:22 57:20 80:1 98:3 111:18 124:18 129:20

**numbers** 42:21 43:16 46:16

**Numerous** 22:21

**nurse** 126:24

**nurse's** 125:20

**nurses** 123:7

**nursing** 127:1

---

## O

**object** 17:13,21 18:4,7,15,24,25 19:8 29:10 33:12 34:18,19 35:6 38:5 41:17 47:3,9 50:5,21 60:14 82:2 93:1 94:3 98:15 108:12 109:25 114:3,17 119:2,10 121:19

Case 3:22-cv-00093   Document 37-10   Filed 05/25/22   Page 154 of 162 PageID #: 3736

124:16 125:6,11 126:6 128:3
129:4 130:15 131:1,24 134:25
137:1,15 139:6,17

**objection** 17:12 18:5 29:18
36:19 47:4 72:4,8 80:6 127:18
130:19

**objections** 71:16

**objective** 23:6 48:14 78:1 134:16
139:7

**objectives** 23:3 24:7,10,12,14,
17,21 48:19 69:8,12 73:18 94:5
134:1 136:11,14,17 138:16,19

**observation** 40:6 114:5,10
115:19 118:10,22 128:8,12,14,15
133:6 134:17 135:10,19,23

**observations** 29:21 38:3 40:3
45:11 46:7 99:18 106:10,11,12
120:16 129:10

**observed** 53:21 89:22 101:6
138:4

**obtaining** 138:6

**occurred** 62:2 137:7

**occurring** 19:3

**off-the-record** 11:4 52:14 71:21

**offender** 112:18 114:20 115:15
134:19

**offenders** 109:10

**office** 6:16 7:6 8:9,20,23 9:13
13:8 14:7,10,13 22:11 27:24
29:14 32:20 34:1 36:22 41:11,15
42:3 49:9,20 50:18 51:2,3,9 52:8
54:15 56:25 59:1 63:2,5,15 81:20
82:1 83:4,7 86:7,15,24 104:2,24

**officer** 60:22 66:13,20 78:18

**officers** 17:5 21:19 77:13,15
129:20

**offline** 39:21

**offset** 30:2

**one-page** 58:17 118:3

**one-to-a-hundred** 110:16

**one-to-ten** 110:16

**online** 126:25 127:11

**open** 10:25 43:10 83:10 101:16

**opening** 41:3

**opens** 86:20

**operate** 77:18

**operated** 44:9 64:6

**operating** 21:20 128:16 129:11

**operations** 19:24 21:16 30:20,22
36:3 57:5 109:13

**opinions** 38:17

**opportunities** 136:10

**opportunity** 11:14,17 14:22
54:17 55:7 56:21 62:20 72:13
84:13 99:6 100:3

**order** 106:20

**orders** 124:4 125:4

**ordinary** 27:23 54:14 56:24
58:25

**organization** 86:12

**organizational** 12:13 91:3

**organizations** 38:17 103:3

**orientation** 132:7,9,15,17,19,21,
23,25 133:1

**originally** 90:5

**outright** 47:5

**overlooked** 80:25

**oversees** 79:14

**oversight** 30:17 39:9 57:7 79:12
107:23

**overstaffed** 129:1

**overtime** 128:17 130:2

---

**P**

**packet** 132:19

**pages** 107:16 108:5 118:4

**Palmer** 6:12

**paper** 53:2 107:13 114:19 127:1
128:5

**papers** 15:15,16,20,21 35:4 38:8,
13,15 40:16 42:7,9 51:17,19,20,
22 52:4,20 53:5,8,10 58:2 76:20
79:2 80:15,16 86:16,19,25 95:5,
15

**Parker** 58:18 59:7,15 61:1,2,3

**parking** 62:24,25

**parole** 77:13,14,18,22 78:3
102:15,16

**parolees** 77:21

**part** 19:20 21:2,13,22 23:8 37:13,
18 39:22,24 42:9 44:18 45:6,23
49:22 53:4 55:1,3 61:24 70:1 74:7
76:10 82:10,12 86:4,5 87:25 88:9
92:23 97:6 100:15 103:9 108:23
109:15 115:2 116:23 118:7 119:3,
20 126:8 136:17

**participate** 86:11

**participated** 91:19

**participating** 22:16 71:25

**pass** 88:15 100:4

**past** 66:6

**patient** 125:20

**patient's** 127:7

**pattern** 56:9 57:4,8,11,14

**pause** 71:18

**PC** 79:21

**PDF** 43:20 57:16,18

**peer** 86:2,6,14,17,22,23 87:2,6

**penalty** 64:17

**people** 13:22,23 38:3,9 47:11
49:17 83:2 119:6

**percent** 110:19,23,25 111:1,19

**percentage** 109:18 110:17

**percentages** 111:1

**Perfect** 31:7

**perform** 24:22 132:6

**performance** 7:5 14:15 19:17
20:1,3,4 22:21 23:1,12,23 26:10
27:1 69:1 91:5 93:6,14,23 99:3
105:17 109:20

**performance-wise** 75:5

**performed** 20:14 26:14 27:24
49:20 99:1 135:14,15,16

**performing** 93:20 103:5 135:19

**period** 44:24 135:8,24

**periods** 30:1

**permitted** 108:20

**person** 9:20 30:21 40:22 47:12 79:12

**personal** 38:2

**personally** 37:25 66:6

**personnel** 132:6 133:11

**pertaining** 45:10 110:1,6

**phase** 23:2,13 24:18,19 25:3 55:3 107:4

**phone** 9:20 39:19 72:3

**phrasing** 61:12

**physical** 124:3 125:2 138:23

**physicians** 124:4 125:3

**pick** 39:19

**picture** 118:2

**place** 50:24 59:22 60:6 72:5 93:5 109:12 116:21 128:5

**placement** 134:23

**places** 126:3

**placing** 114:1

**plan** 32:2,6,18 44:17 55:15 81:8 127:12

**planning** 23:2,3,13 53:5 69:6,11, 15,17 78:15 84:10,23 88:2 103:10 107:4

**plans** 124:5 125:4

**played** 107:1

**Pleasant-bey** 6:8

**pods** 96:12,17

**point** 23:15 25:5,16 34:12 74:3,9 75:9 87:21

**pointed** 39:15

**Pointer** 68:20,24 91:11,12

**pointing** 120:19

**policies** 20:23 21:2,14 23:16 85:11 93:5 109:11 116:12 121:14

**policy** 38:9 116:19 117:19 123:17 132:12 134:9 137:14 138:4

**Polly** 6:12 17:13,21 18:4,15,24 19:8 29:10 33:12 34:19 35:6 38:5 41:17 43:8,13,22 47:3,9 50:5,21 52:23 53:20 60:14 68:13 71:23 82:2 88:18,21 89:4,13,21,25 90:1 93:21 94:7 98:20 101:2,7 108:17 110:9 114:9,22 119:5,11 121:21 124:21 125:8,15 126:11,16,18 127:23 128:7 129:8 130:16,23 131:10 132:2 135:1 137:10,22 139:10,21 140:3,16

**population** 124:13

**portions** 101:3

**position** 7:4,7 60:11 61:3 66:13 136:3

**positions** 27:7 66:11 118:16 130:25 131:18

**possibly** 51:7 70:11 82:8

**post** 31:19,22 32:16 39:5 55:5

**posted** 138:7

**posts** 29:1 55:11,12 128:18 129:18,24 130:1,6,10,18 131:4,6, 14,17,18

**potential** 23:21 86:2,22 111:20 133:23

**PREA** 95:6,9,11,12,14,15,17 121:22,23 122:8,9,10,11 133:20 135:7,13

**preliminary** 73:18

**preparation** 10:2 51:11,13 53:3 64:5 78:20

**prepare** 7:22,25

**prepared** 7:17 12:2

**prescope** 68:17 69:5

**present** 9:23 41:1 70:5 93:15 110:7

**presenting** 60:15,18

**press** 88:7

**presume** 66:20

**pretty** 43:24 59:14 96:20

**prevent** 133:13 136:24 139:12,16

**preventing** 93:13

**previous** 28:25 84:24 102:16

**previously** 90:14 91:4

**primarily** 137:12

**primary** 107:4,5

**prior** 22:19 29:23 30:2 82:10 131:3,9

**prison** 17:20 20:6 57:7 74:21 75:3 92:2 97:3 104:20,23 122:11, 12,14 133:18 139:16

**prisoners** 21:17,19

**prisons** 21:20,24 30:21 39:9 61:18 75:22,23 77:17 104:24 109:9,13 116:7 120:24

**private** 20:6 22:1 74:21 75:3

**privately** 44:9

**probation** 77:18 102:15,16

**probationer** 78:3

**problem** 8:17 111:14,20 113:17 126:9 127:8

**problematic** 112:6

**problems** 40:11 45:3 71:13 93:8 111:15 113:17 125:13

**procedure** 99:21

**procedures** 21:2,14 23:16 46:3 85:11 93:5 121:14

**process** 19:21 22:13 23:25 25:9 26:6 31:23 32:16 37:13 39:22 40:8 41:6,8,18 48:23 66:22 86:3 87:25 99:9 109:9 110:2 140:8

**processes** 109:12 122:4

**produced** 52:3 57:16,19 87:17 94:9

**production** 16:2 80:24 87:17,24

**professional** 86:5

**professionals** 92:6,9

**program** 15:19 122:12

**progress** 32:4,18 33:3

**project** 14:2

**properly** 28:24 133:14 137:8 138:7

**protect** 109:12 139:5

**protocols** 95:12

Case 3:22-cv-00093   Document 37-10   Filed 05/25/22   Page 156 of 162 PageID #: 3738

**provide** 25:13,24 41:24 79:16
93:3 98:17 99:12,15 106:14
107:23 109:19 112:4 116:6 139:1

**provided** 10:14 15:22 41:23
119:21 120:21 131:7 132:15
133:1,2 134:13 136:13

**providers** 20:6 123:1,8

**providing** 51:14 140:11

**psychology** 12:12,14 90:20 91:3

**public** 35:14,22 109:12 116:6
120:22,25

**publication** 121:4

**publish** 99:12,20

**published** 116:5,8 120:12 121:1

**publishes** 120:22

**publishing** 120:23

**pull** 42:21 43:17 131:17

**pulled** 42:6

**purpose** 19:15 34:3 93:18 137:4

**purposes** 83:11

**pursuant** 137:13

**purview** 93:17

**push** 89:11

**put** 16:21 35:5 42:10,20,25 48:14
53:8,10 58:15 62:10 65:15 67:3
68:11 70:16 76:19 77:2 80:22
81:20 87:15 101:10,11,12 113:13

**putting** 75:24 85:14 87:8 118:23

---

### Q

**qualify** 62:2

**quality** 86:10,13

**quarterly** 66:19

**question** 17:14 18:6 48:20 59:10
74:14 75:4,11,12 87:22 111:21
122:1 130:21 139:9 140:2

**questioning** 89:2

**questionnaire** 76:11

**questions** 24:6 25:14 41:7 42:14
53:15 75:16 76:8,15 78:13,23
84:17,23 88:12,15,21 89:18,23

90:3,12 96:7 98:18,23,25 102:20
139:22 140:1,10

**quick** 128:6

---

### R

**raised** 60:13

**random** 49:23 124:12 135:20

**range** 52:19 110:15,19 111:17

**rape** 122:12,14 133:18 139:16

**rapist** 133:23

**rate** 17:1,2,4,6,9,10,16 59:12
61:7,20 110:7

**rates** 59:23 60:1,8

**re-entry** 92:3

**reach** 103:3 106:13

**reaction** 41:21

**read** 10:12 46:4 54:17 56:9 58:19
62:14 64:10,18 65:18 68:21 70:19
71:22 73:19 74:15 79:21 81:9
84:3 85:10 103:1 108:2 109:20
111:1 112:6 115:17 120:1,14
121:16 123:17 128:18 129:13,20
133:14

**reading** 50:7 85:11 88:8 99:3

**reads** 75:1

**real** 103:19

**realize** 72:2

**reapprove** 64:17

**reason** 35:20 71:7 85:21 100:11
103:17 119:12,17

**reasonable** 24:4

**reasoning** 25:24

**recall** 16:6 26:4 27:13,14 30:10,
24 40:23 54:24 57:2 59:4,13
62:23 63:17,18 67:18 74:18
76:21,23 77:10 84:19 87:7 91:9
105:7 138:11

**receive** 38:16 44:21 72:7 80:11,
13 82:3

**received** 11:11 51:8 52:7 95:11
126:5 134:8

**recent** 57:12 98:25 101:12

102:17

**recently** 57:4 104:21,22

**recess** 53:21 89:22 101:6

**recognize** 26:13 54:8 65:24
67:3,6

**recollection** 72:22

**recommendations** 45:5

**record** 7:1 11:3,6 52:12,15 71:20
97:23 101:5 115:14 125:21
127:17,21 137:2

**records** 83:11 114:19 124:1
125:13,16,17 126:24,25 127:9
128:1

**reductions** 19:10

**reference** 17:1 85:10 87:21

**referenced** 108:14

**references** 17:2 103:21 110:21

**referring** 10:17 64:21

**reflect** 68:5 78:24

**reflected** 29:2,4,5,16 30:2 40:13

**reflection** 69:24 72:21

**regard** 30:16

**reign** 96:22

**relate** 117:1

**related** 14:15 17:23 23:22 39:7
113:12,18 127:19 133:6 135:24
136:2 137:4

**relating** 107:25 112:5

**relationship** 17:19 18:2 61:11

**relationships** 75:17

**release** 32:1

**released** 35:13 59:6

**relevant** 105:7

**religious** 136:7,9,10,12,13,15

**remains** 66:13

**remember** 9:10 16:9 30:22
40:19,20,21 63:14 83:15 85:18
87:4 95:4 96:4,19 98:6 104:5

**rendered** 110:13

**renegotiated** 59:9

**renewed** 19:22

**repeated** 129:9

**report** 11:22 12:16 14:3,23 15:1, 7,10 16:8,14,25 17:3 25:3,4,6,18, 19 29:2,4,6,8,17,21 30:1,2,7,13 31:8,13 32:1,16 33:2,4 34:6,8,17, 22 35:1,5,21 37:7 39:8 40:14 44:11,12,15 49:21 55:2,13 77:4,8 79:17 80:4,7,12 81:9,12,19,24 91:6 94:14 99:4,11,12,14,21 100:2,25 101:1 105:17 106:11 115:10 117:10,12,22 137:3 139:19

**reported** 81:25 115:5,9

**reporter** 6:3 16:19 71:21

**reporting** 65:17 70:4 116:1,12 118:23 121:6 136:21,22

**reports** 19:15 32:18 35:8 44:22, 24 48:11 51:4 53:1 80:14 94:20 110:5

**represent** 6:5,7 90:2 111:7

**representatives** 103:4

**represented** 9:1 111:11

**request** 43:14 56:8 80:8

**requested** 35:19 59:7

**requesting** 59:15

**require** 31:12

**required** 30:18 36:17 41:24 113:10 114:8 116:15 117:5 119:1 123:14,16 133:12 134:9 135:20

**requirement** 66:12 118:14 133:17

**requirements** 74:10 115:5 122:13 138:3

**requiring** 30:18

**research** 23:4,13,15 69:7 88:3 103:10

**reserved** 62:25

**residential** 92:3

**resolved** 84:25

**resources** 18:17,21

**respect** 92:13 102:12 108:11 120:17 125:2

**respects** 100:18 131:16

**respond** 99:6 100:3,7 108:20

**response** 25:20 28:7 30:12 34:8 47:24 50:2,7 131:2

**responses** 27:11 136:24 137:2

**responsibility** 50:15,22

**responsible** 48:4 57:6 102:12

**rest** 53:15

**restate** 31:10 130:21

**restroom** 88:22

**result** 18:12 36:17 37:4 59:19 97:17 131:5

**resulting** 128:17

**results** 46:22 121:16 122:4

**retain** 92:5

**retained** 94:20

**retested** 49:18

**returned** 57:9

**review** 11:14,17 14:22 19:21 23:17 24:7 25:12 26:10,25 27:1 28:25 30:20 44:19,24 54:22 56:19 60:5 62:20 66:4 67:14 70:17 72:13 75:5 84:13,16 85:14 86:2,3, 8,10,15,22 91:5 94:6 95:1,6 99:14 100:24 101:17 102:15 110:2,4 111:8

**reviewed** 32:19,21 33:6 53:3,4 57:8 72:18 87:2,6 94:9,15 132:20

**reviewer** 86:17,23

**reviewers** 86:14

**reviewing** 72:6 113:6

**reviews** 19:18 49:4 86:6 95:6

**revision** 56:9

**rights** 103:24 104:3,20

**risk** 23:3,6 120:1 135:3

**risks** 23:22

**role** 8:10 12:19,23 13:11,13,18 21:1 45:18 93:2 102:9

**roll** 58:15

**room** 97:1,8,9

**rosters** 28:25 30:19 129:25 131:7

**routine** 103:7

**routinely** 80:5,8

**rule** 77:22

**run** 22:1

---

## S

**safe** 109:13

**safety** 17:19,24 21:17,18 47:2 92:19 97:5

**SAITH** 140:19

**sample** 124:12

**sanctions** 77:3,8,13,20,24 78:1

**Sarah** 91:14

**satisfactory** 32:23

**save** 85:17

**saved** 85:15,19,21,22

**schedule** 64:7

**scheduled** 33:18,19,20

**science** 90:20

**scope** 46:3 48:9 49:8,19 69:9 73:15 92:12

**score** 109:24 110:13,15 111:6,7

**scores** 109:18 110:6,7,18 111:13,17,22,25

**screen** 10:19 11:2 16:10 26:11 42:11 43:2 53:25 54:19 62:7 65:11,12 71:14,15 75:24 82:14,19 85:25 87:8,13 113:2,13 114:1,12 118:1,3,5,8,24

**screening** 125:10 133:20,21,22 135:14,15

**screenings** 124:2 133:12 135:7, 13,20

**screens** 118:7

**scroll** 103:11

**searches** 18:11,14,19,21

**Secretary** 62:19

**section** 52:2 83:25 102:14 120:16 124:11

**sections** 84:6,11

**security** 48:2 80:3

**segregation** 96:13

**self-** 86:5

**semi-quick** 52:16

**send** 25:11 30:19 31:25 32:2,3 57:25

**sending** 55:4 57:3,13

**sense** 22:9 138:20

**separate** 78:11 123:5,6

**separated** 133:24

**service** 20:6

**services** 113:1 117:17

**set** 23:3 24:14 33:16 59:13 60:8

**setting** 24:9

**settle** 23:7

**seven-page** 70:15

**sexual** 121:15 133:13

**shaking** 34:9

**share** 10:20,22 11:2 16:10 43:9, 20 54:3

**shared** 35:3 46:21

**shelf** 134:20

**sheriff's** 104:24

**shift** 30:19

**shifts** 55:8

**shore** 96:7

**shorter** 89:16

**shortly** 33:20

**show** 7:20 26:9 32:13 42:13 53:23 62:6 65:6 67:1 73:1 81:3 125:18

**showed** 29:1

**showing** 55:6 70:14 79:6

**shows** 38:21 124:25

**shut** 71:24

**side** 97:19

**sign** 132:18

**signed** 24:13 57:8 132:24

**significance** 47:20 85:16

**significant** 34:23 35:4 106:3,9 130:2

**significantly** 106:7

**sir** 17:22 18:16,25 29:20 31:5 43:2 44:3 52:25 54:8 57:1 67:4 72:13 75:20 77:2 81:3 82:6

**sit** 30:9 52:9

**site** 28:20 98:6

**sitting** 31:2 32:12 88:13

**situation** 127:13

**six-month** 81:8,12,19

**six-page** 81:4

**skipped** 133:4

**sleeping** 85:3

**slowly** 42:11,12

**smart** 101:4

**software** 15:19 46:18

**solutions** 119:24 120:10

**someplace** 40:25

**sort** 106:15

**sounds** 43:15 78:9 89:15

**South** 74:21 90:9

**space** 62:24 63:1

**speak** 9:12 10:1 11:20 51:5 86:6

**speaking** 8:23,24

**specific** 10:9 65:23 108:5,7,10 118:5,8 135:10 138:11,12 139:8

**specifically** 14:14 37:25 48:6, 15,18 74:18 100:20 108:15 112:12 113:18 122:7 128:25 131:22 133:6

**speculating** 64:23

**spell** 6:25

**spent** 22:2,7

**spoke** 9:15 39:7

**spoken** 30:11

**Spradley** 13:25 56:13,16

**spreadsheet** 79:21,25

**Stadelman** 91:14

**staff** 19:10 21:20 25:9 37:21,22 40:2,8,9,10 41:5,24 47:12 48:4 56:17 68:25 70:23 73:8,10 83:19 102:10,11 107:25 113:1,7,19 116:12 117:17 118:13 119:4 121:13 123:14 128:16,17 129:11, 17 130:25 131:17 134:5 135:3

**staffed** 130:14,18 131:23

**staffing** 17:19 28:24,25 47:8 56:9 57:4,7,11,13 65:16 70:2 128:22 129:2,6,25 130:7,17

**stamped** 101:13

**stand** 14:25 27:4

**standard** 21:16 76:10 99:21

**standardized** 23:8 77:24

**standards** 21:12,14

**stands** 28:1 30:25 46:8 112:17

**Stanton** 62:13,18

**start** 22:16 23:12 84:12 88:25

**started** 30:18 85:2

**starting** 84:9 85:9

**starts** 87:9 101:19

**state** 6:25 7:6 9:13 17:4 19:16 21:24 22:22 40:9,10 45:22,23 63:2,20 74:20,25 75:2,16 86:24 90:25 92:17 94:24 111:15 116:11 117:16 121:13 129:16,18 130:9 132:5

**state's** 86:13

**state-managed** 123:13

**state-run** 128:16

**stated** 118:13

**statement** 119:13

**statements** 99:5

**states** 86:12

**stating** 64:25

**statistical** 115:16 116:2,3 120:13

**status** 75:11

**statute** 32:14 74:20 75:1 93:13

**statutes** 23:16 93:5

**statutory** 115:5

**steep** 59:14 60:16 61:7

**step** 84:1

**Stephanie** 6:15 63:15

**steps** 84:10,23 103:10 139:5,12, 16

**stored** 15:13

**storing** 126:24

**strategic** 119:24 120:10

**stress** 19:7,12

**strike** 18:12 109:5

**stuff** 52:4 131:7

**subject** 56:8 76:1

**submit** 87:15

**submitted** 81:9

**subsequently** 29:7

**substance** 27:18,20

**substantial** 16:9 26:5 27:9 61:21 97:16

**substantiated** 122:2

**substantive** 16:7 27:21

**sufficient** 129:19

**summaries** 134:20

**sunset** 19:20 20:3 33:16,20,25 92:22

**super** 37:6

**supervises** 79:13

**supervising** 13:22 109:10

**supervision** 27:16 109:14

**supervisor** 12:22 13:1

**supervisory** 13:11,13

**supplies** 123:7

**support** 25:23,24 45:6 53:11

**supporting** 116:14,23

**supports** 53:6 114:5

**suppose** 64:16

**supposed** 8:8 46:16 48:22

119:14,19 124:6 125:19

**switch** 63:7

**sworn** 6:20

**system** 46:18 112:16,19 113:8, 11,21 114:21 115:15 121:23 122:8,9 126:24 127:3,6,17,25 128:5

**T**

**T-MATE** 15:18 76:20

**table** 110:18,20 111:12

**taking** 32:5 50:23 54:21 60:11 140:4

**talk** 69:11 84:6 103:4 117:25 140:4

**talked** 9:7,9 81:13 95:17

**talking** 36:22 38:20 46:11 63:3 74:6,17 75:14 85:6 102:24 107:18 118:6

**talks** 50:2

**tally** 66:16

**Taplin** 91:14

**Tarwater** 63:10,11,13,17 64:4

**tax** 22:6

**taxpayer** 22:2

**TDOC** 6:10 20:5 22:2,13,17,25 26:14 30:12 31:8,12 32:16 33:18 34:2,7 35:22 43:5 44:4 46:6 49:6, 13 50:2 53:24 56:1 58:8,13,16 60:9,11 62:7 63:5,8 65:10 67:2 68:1,9 70:15 73:4,17 75:25 77:4 78:7,11 79:7 81:4,19,25 82:15 87:9 101:13 102:12 107:10

**TDOC's** 89:24

**team** 24:3 39:25 91:5,8 92:5,8 95:23 96:1,9 98:14,17

**teammates** 95:18

**teams** 86:7

**technical** 44:1 88:14

**technically** 74:20 75:2

**technology** 119:24 120:10

**telling** 32:8

**temporary** 128:18

**Tennessee** 7:6 17:5 21:25 63:20 81:7 90:10,25 91:20 92:17 95:1 99:5 100:12 102:4 105:22 106:21 108:19 109:14,23 110:11 111:5, 23 112:18 114:20 115:14 129:1 130:12 131:21

**Tennessee's** 129:10

**terminology** 37:17

**terms** 93:6

**test** 24:21,22,23 53:6,11

**testify** 12:2

**testifying** 8:8

**testimony** 8:19 12:9 27:2 71:22 81:18

**testing** 49:16,17

**tests** 49:18,23

**texted** 83:24

**thing** 47:21 70:19 80:20 94:12 97:22 110:16,17

**things** 18:22 20:15 22:24 29:2,5, 7 32:8 36:14 47:20 48:8 70:6 86:17 90:13 94:2 97:15 102:17 117:1 123:21 130:21 137:13,17

**thinking** 69:18 70:9 73:14 74:22 86:21

**Thirty** 89:4

**Thirty-nine** 112:21

**Thursday** 58:18 62:12

**time** 6:4 9:10 14:19 15:3 23:4,19 24:5,8 25:15 27:8,13 29:22,25 31:14,19 32:1 33:6,11 40:1,4,6 44:24 46:15 48:15 57:10 60:23 62:19 63:21 69:13 70:2 71:25 82:3 83:14 85:12 88:3 89:5,24 94:5 97:7 98:21 101:4,17 104:11, 19 113:5 125:21,22 127:15 131:5 133:2,21 135:8,24 140:4

**timely** 117:4 121:24 122:5,7 135:15

**times** 14:20,21 78:19,21,22 112:2

**title** 44:8

**to-do** 80:22

**today** 6:3 7:10,23 8:7,10,20 9:2,
5,14 10:2 11:12,21 12:3 14:23
27:2 28:8 30:9 51:11

**today's** 11:15

**told** 59:21 136:4

**Tom** 6:10 37:6 52:1 57:15 80:18
88:18 89:5,13 139:25

**Tom's** 39:15 43:14

**TOMIS** 46:17 47:1,13,22 112:12,
13,14,15,17 113:2,8,14 114:1,11,
15 115:24 116:13,18,20 117:6,12,
19,23,25 118:8,15,24 119:7
134:12

**top** 43:5 70:1

**topics** 11:21,23

**total** 46:22 66:16 124:13

**totals** 46:16 48:16

**touched** 47:23

**tour** 96:14

**transcript** 72:7 82:21

**transferred** 132:13 133:19

**transitioning** 127:3

**trapped** 97:10,18

**traumatic** 118:15

**treatment** 124:5 125:4

**Tricia** 6:7 8:12 36:19 42:19 43:8,
22 71:10 126:16 139:22

**TRICOR** 92:20

**trip** 96:6

**trouble** 85:4

**Trousdale** 11:21,22 12:17 17:6
20:11,14 28:7,14 29:15,16 30:8
34:15,16 35:2 37:18,22,24 38:21,
23 39:4,7 40:18 41:16 45:13,17,
18,21,22 46:10 48:18 56:8 57:10
59:14 60:12 64:8 65:17 66:4 68:1
74:23 78:5,7 79:18 80:5,12 87:21,
24 88:4 94:13,18 95:2,7,11,19,22
104:16 107:9 108:6,7,11,13,16
110:21 111:6,8,23 112:23,25
113:5,6,16,19,25 114:5,10
115:20,22 118:10,22 119:13
120:17 124:25 131:22 133:6
134:17 135:11,13,19,23 136:7

138:9,13,22,25 139:4,15,20

**Trousdale's** 113:13 138:14,17

**true** 100:16

**TTCC** 57:9

**turn** 32:17 89:20 107:17 108:4

**turned** 119:4

**Turner** 20:11 45:13 56:8 65:17
87:21 88:4 95:19 107:9 110:21

**Turney** 107:8 133:8

**turnover** 17:1,2,4,6,10,16 118:16

**two-page** 44:6 65:16 67:2 75:25
77:4 82:21

**type** 19:6 79:24 110:16,17 124:19

**typed-up** 67:12

**types** 22:19,24

**typically** 53:1 83:10

---

**U**

**uh-huh** 10:23 28:15 30:15 31:4
44:7 50:4,10 51:12 54:1 56:2,7,20
58:14 63:11 68:19 69:16 74:5
83:9 87:19 101:15 103:14 105:16
112:24 115:12 117:3 122:21
134:18

**ultimately** 21:24 24:11,23 50:20
55:19 78:2

**umbrella** 111:11

**unaware** 118:14

**understaffed** 18:13 19:5 129:2,7
131:15

**understaffing** 18:2

**understand** 7:9 8:9,19,24 29:12
50:19 86:18,21 92:11 111:21
119:14,19 137:6

**understanding** 29:13 45:17
46:12 61:22 78:9 100:25 104:25
118:18 137:9

**understood** 81:18

**unit** 96:18 111:8

**units** 111:9

**University** 90:18 91:1

**unmanned** 130:1

**unnerving** 97:14

**unstaffed** 66:13

**unsubstantiated** 122:2

**unusual** 27:22 28:2

**unwavering** 109:8

**upcoming** 64:5 134:13

**upper** 39:25 40:17,22 41:9 69:10
76:11

---

**V**

**V-I-N-C-E-N-T** 7:2

**vacancies** 65:16

**Vaguely** 10:7 84:20

**Valeria** 91:13

**Vandergriff** 91:14

**varies** 23:1

**variety** 103:9

**vary** 111:16

**verbal** 103:18

**verify** 48:7 55:4 81:24 82:11
126:9 133:1

**verifying** 33:9

**version** 67:13 107:13

**versus** 16:3 52:4 137:24

**victims** 133:23

**view** 74:14

**Vince** 6:16 83:25

**Vincent** 6:19 7:2 26:20 54:11
62:13,16

**violates** 78:3

**violations** 61:23 62:1 66:11

**violence** 18:3 136:19,22,24,25
137:3,9 138:18,23

**vis-a-vis** 78:7

**visit** 96:5 107:3

**visited** 95:19 96:12,13,14,17
107:3 130:3

**visiting**  96:13

---

**W**

**walking**  97:18

**wanted**  59:10 73:13 77:1 78:14
85:3 96:23 99:18

**wanting**  64:24

**warden**  39:24 40:2,19 41:15,19,
22 42:3 44:16 47:25 49:24 50:8
96:25 97:8,18 98:13,16,21

**Ware**  14:5

**Washburn**  41:15,19 42:4 47:25
49:24 50:8 98:22

**ways**  103:19

**website**  35:14,23

**Wednesday**  73:18

**week**  40:1 96:5 97:25 98:2

**weekly**  77:3,8,13,19

**Welborn**  6:12 90:2

**well-established**  109:10

**Wes**  60:20,21 61:5

**West**  107:8

**Western**  90:17

**Whisky**  96:18

**Whiteville**  74:24 79:16 107:9
133:8

**Wickham**  91:13

**wide**  93:17

**Wilson**  62:19 63:10,19 64:4,12,
21 65:4

**Winningham**  13:17 73:21,23

**wished**  60:2

**wishes**  35:12

**Woodall**  57:4

**wording**  27:15,16

**words**  100:17 114:13

**work**  23:25 24:21,22,23 31:23
40:8,12 43:15 53:5,6,11,13 82:25
84:1,9,22 85:9 86:9 90:13 93:19
98:2,5

**worked**  19:11 63:14 92:2 102:17
104:20

**working**  15:15,16,20,21 35:4
38:8,13,15 40:16 42:7,9 51:17,19,
20,22 52:3,20 53:2,5,8,10 58:2
76:20 79:2 80:15,16 84:12 86:16,
19,25 95:5,15 102:14

**works**  43:25

**world**  48:23

**worth**  113:7

**Wright**  13:6,7,14 83:13 91:14

**write**  14:2 84:5

**writing**  14:3 25:3,6 55:3 76:18
99:11

**written**  15:4 76:19

**wrong**  55:9 57:17

---

**Y**

**year**  83:22 110:23,25 111:1
120:13

**years**  7:8 19:22 22:11,14 111:6

**yellow**  74:7

**Yolanda**  91:13

---

**Z**

**Zoom**  6:6,9,11,14,17 9:21,22