# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| G. MARIE NEWBY, individually, and as Administratrix of THE ESTATE OF TERRY CHILDRESS, | § § § § | |
| *Plaintiffs*, | § § | Case 3:22-cv-00093 |
| v. | § § | JURY DEMANDED |
| CORECIVIC OF TENNESSEE, LLC, *et al.* | § § § | |
| *Defendants*. | § § | |

## PLAINTIFFS' MOTION FOR SPECIAL ORDER PURSUANT TO LOCAL RULE 83.04(b) AND MEMORANDUM IN SUPPORT

## I. INTRODUCTION

Come now the Plaintiffs, through counsel, and respectfully move this Court for a special order pursuant to Local Order 83.04(b). In particular, the Plaintiffs move this Court for an order affirming their and their counsel's First Amendment rights to speak about—and to petition the government for redress regarding—CoreCivic's pervasive non-compliance with constitutional requirements and safety standards at its Tennessee prison facilities. At the same time, in an effort to address CoreCivic's professed concerns about trial publicity, the Plaintiffs seek an order permitting whatever extended voir dire the Defendants deem necessary to ensure an impartial jury if and when this case reaches trial.

## II. FACTS

Defendant CoreCivic is a private prison corporation that generates approximately two billion dollars in annual revenue through the business of caging human beings for

profit. Plaintiff Marie Newby is a grieving mother whose child—Terry Childress—was brutally murdered while he was entrusted to CoreCivic's care at Trousdale Tuner Correctional Center.

Because Mr. Childress's murder came after years of failed audits and extensive reports of deficiencies and fatal misconduct at CoreCivic's Tennessee facilities in general and at Trousdale Turner Correctional Center in particular[1]—deficiencies that regulators

---

[1] *See, e.g.,* Cassandra Stephenson, *Inmate death ruled homicide in a Tennessee CoreCivic prison where rate is twice as high as TDOC's, records show*, JACKSON SUN (Jan. 28, 2020), https://www.jacksonsun.com/story/news/crime/2020/01/28/corecivics-tennessee-prisons-have-twice-homicide-rate-tdocs/2776928001/ ("The corporation's four Tennessee facilities hold roughly 35% of the state's prison population but accounted for about 63% of the state's prison homicides."); Prison Legal News, *CoreCivic Prisons in Tennessee Have Twice as Many Murders, Four Times the Homicide Rate as State-Run Facilities*, PLN (Aug. 6, 2019), https://www.prisonlegalnews.org/news/2019/aug/6/corecivic-prisons-tennessee-have-twice-many-murders-four-times-homicide-rate-state-run-facilities/ ("from 2014 through June 2019, there were twice as many murders in the four Tennessee prisons operated by CoreCivic (formerly Corrections Corporation of America) than in the 10 prisons run by the Tennessee Department of Correction (TDOC). Also, the homicide rate in CoreCivic facilities was over four times higher than the rate for TDOC prisons."); Brinley Hineman, *After Tennessee prison suicide, CoreCivic counselor fabricated health records of treatment: TDOC*, THE TENNESSEAN (Aug. 25, 2020), https://www.tennessean.com/story/news/crime/2020/08/26/after-tennessee-prisoners-suicide-corecivic-worker-faked-health-records/3404186001/; Demetria Kalodimos, *Woman says she paid off gangs to keep son safe in prison*, WSMV (Oct. 5, 2017), https://www.wsmv.com/news/woman-says-she-paid-off-gangs-to-keep-son-safe-in-prison/article_a4e670ea-78be-5087-86e5-a65ecd485475.html; Joseph Wenzel, *Over 1,200 staff, inmates test positive for COVID-19 at Trousdale Turner Correctional Center*, WSMV (May 1, 2020), https://www.wsmv.com/news/over-1-200-staff-inmates-test-positive-for-covid-19-at-trousdale-turner-correctional-center/article_568c03d2-8bde-11ea-a447-4b7eaabeb67b.html; Adam Tamburin, *Tennessee prison inmate dies after fight at Trousdale Turner*, THE TENNESSEAN (Jan. 26, 2020), https://www.tennessean.com/story/news/2020/01/26/tennessee-prison-inmate-dies-after-fight-trousdale-turner-correctional-center/4581013002/; Dave Boucher, *New Tennessee CCA prison stops taking inmates amid 'serious issues,'* THE TENNESSEAN (May 24, 2016), https://www.tennessean.com/story/news/politics/2016/05/24/new-tennessee-private-prison-stops-taking-inmates/84867834/; Chris Conte, *Prisons for profit: Concerns mount about Trousdale Turner Correctional Center, operator CoreCivic*, WTVF (Jun. 13, 2019), https://www.newschannel5.com/longform/prisons-for-profit-concerns-mount-about-trousdale-turner-correctional-center-operator-corecivic; Staff Report, *Scathing state audit slams Tennessee prisons, CoreCivic for staffing, sexual assaults, and deaths in jails*, WTVF (Jan. 10, 2020), https://www.newschannel5.com/news/scathing-state-audit-slams-tennessee-prisons-corecivic-for-staffing-sexual-assaults-and-deaths-in-jails; Jamie McGee, *CoreCivic shareholders granted class action status in fraud lawsuit*, THE TENNESSEAN (May 27, 2019), https://www.tennessean.com/story/money/2019/03/27/corecivic-class-action-securities-fraud-lawsuit/3289913002/; Chris Gregory, *Family seeks answers in loved one's death at Trousdale prison*, LEBANON DEMOCRAT (Jan. 2, 2021), https://www.lebanondemocrat.com/hartsville/family-seeks-answers-in-loved-ones-death-at-trousdale-prison/article_1ffe90f7-0e9f-5021-bb94-9ec1b4d23139.html; Demetria Kalodimos, *Inmates at CoreCivic prisons say they sometimes go months without medical care*, WSMV (Jun. 22, 2017), https://www.wsmv.com/news/inmates-at-corecivic-prisons-say-they-sometimes-go-months-without-medical-care/article_8d28e630-bd12-5f1c-8b68-92b9336553e1.html; Prison Legal News, *Incorrect Cause of Tennessee Prisoner's Death Reported by CoreCivic Employees*, PLN (Jun. 7,

2018), https://www.prisonlegalnews.org/news/2018/jun/7/incorrect-cause-tennessee-prisoners-death-reported-corecivic-employees/; Staff Report, *Private prison company CoreCivic's history of problems in Tennessee*, THE TENNESSEAN (Jan. 16, 2020), https://www.tennessean.com/story/news/local/2020/01/17/private-prison-corecivic-history-problems-tennessee/4470277002/; Stephen Elliott, *State audit criticizes CoreCivic facilities*, THE NASHVILLE POST (Nov. 14, 2017), https://www.nashvillepost.com/business/prison-management/article/20982796/state-audit-criticizes-corecivic-facilities; Matt Blois, *CoreCivic reports $25M in profits as COVID infects 2,500+ inmates*, THE NASHVILLE POST (Jun. 30, 2020), https://www.nashvillepost.com/business/prison-management/article/21138792/corecivic-reports-25m-in-profits-as-covid-infects-2500-inmates; Steven Hale, *Problems Persist at Tennessee's Mismanaged Prisons*, THE NASHVILLE SCENE (Jan. 22, 2020), https://www.nashvillescene.com/news/features/article/21111586/problems-persist-at-tennessees-mismanaged-prisons; Dave Boucher, *CoreCivic investigating ex-officer's allegations of negligent deaths at private prison*, THE TENNESSEAN (Dec. 12, 2017), https://www.tennessean.com/story/news/2017/12/12/corecivic-investigating-ex-officers-allegations-negligent-deaths-private-prison/946196001/; Elizabeth Weill-Greenberg, *'Just Let Him Kick,'* THE APPEAL (Sep. 6, 2018), https://theappeal.org/just-let-him-kick/; Brinley Hineman, *Murfreesboro man charged in prison cellmate's death at Trousdale*, DAILY NEWS JOURNAL (Feb. 20, 2020), https://www.dnj.com/news/2020/02/20/murfreesboro-man-jacob-kado-charged-death-prison-cell-mate-ernest-hill-trousdale-turner/4818354002/; Ethan Illers, *Man killed during inmate-on-inmate altercation at Trousdale Turner prison*, WSMV (Jun. 16, 2019), https://www.wsmv.com/news/man-killed-during-inmate-on-inmate-altercation-at-trousdale-turner-prison/article_8d8b6806-9066-11e9-b749-7b44cac1c002.html; Jeremy Finley, *Recorded conversations reveal life inside prison ravaged by COVID-19*, WSMV (May 6, 2020), https://www.wsmv.com/news/investigations/recorded-conversations-reveal-life-inside-prison-ravaged-by-covid-19/article_91ef5b06-8fe2-11ea-9b75-f36db06e1ab1.html; Demetria Kalodimos, *Gang activity, security a concern at Trousdale Turner facility*, WSMV (Jun. 21, 2017), https://www.wsmv.com/news/gang-activity-security-a-concern-at-trousdale-turner-facility/article_df82a358-7073-552e-b5e4-9feb2e9cf8bc.html; Steven Hale, *Tennessee's Largest Prison Still Appears as Troubled as Ever*, THE NASHVILLE SCENE (Feb. 13, 2019), https://www.nashvillescene.com/news/features/article/21047078/tennessees-largest-prison-still-appears-as-troubled-as-ever; Jessie Williams, *Trousdale Turner Corrections Officer Arrested*, MACON COUNTY CHRONICLE (Feb. 5, 2019), https://www.maconcountychronicle.com/news/5680-trousdale-turner-corrections-officer-arrested; Brett Kelman, *At Tennessee's largest prison, diabetic inmates say they are denied insulin to 'maximize profits'*, THE TENNESSEAN (Aug. 7, 2018), https://www.tennessean.com/story/news/2018/08/07/corecivic-diabetic-inmates-denied-insulin-trousdale-turner/925297002/; Natalie Allison, *Lawmakers hear from prison rape survivor, parents of man who hanged himself in CoreCivic facility*, THE TENNESSEAN (Dec. 19, 2018), https://www.tennessean.com/story/news/politics/2018/12/19/tennessee-legislators-hear-rape-suicide-corecivic-prison/2355556002/; Dave Boucher, *Private prison chief: 'We've got work to do' at Trousdale facility*, THE TENNESSEAN (Dec. 13, 2016), https://www.tennessean.com/story/news/2016/12/13/private-prison-chief-weve-got-work-do-trousdale-facility/95223230/; Demetria Kalodimos, *Former chaplain describes conditions inside TN prison*, WSMV (Jun. 19, 2017), https://www.wsmv.com/news/former-chaplain-describes-conditions-inside-tn-prison/article_9b30af82-8297-5101-b11f-b5fd9270bf18.html; Chris Gregory, *Trousdale Turner employee charged with smuggling contraband*, LEBANON DEMOCRAT (Apr. 23, 2020), https://www.lebanondemocrat.com/hartsville/trousdale-turner-employee-charged-with-smuggling-contraband/article_6b865daf-fbc8-5a59-9a35-e84b61ace2e4.html; Andy Cordan, *Prison corrections officer in Trousdale County arrested carrying drugs*, WKRN (Jan. 20, 2021), https://www.wkrn.com/news/prison-corrections-officer-in-trousdale-county-arrested-carrying-drugs/; Dave Boucher, *Gangs, insufficient staffing plague troubled Tennessee private prison, state audit finds*, THE TENNESSEAN (Nov. 14, 2017), https://www.tennessean.com/story/news/politics/2017/11/14/tennessee-private-prison-operated-by-corecivic-blasted-ongoing-problems-new-state-audit/858884001/; Keith Sharon and Adam Tamburin, *'This is unreal': Family seeks answers in death of Trousdale Turner prison inmate*, THE TENNESSEAN (Feb. 2, 2021), https://www.tennessean.com/story/news/2021/02/03/trousdale-turner-inmate-aaron-blayke-adams-dead-family-wants-answers/4290646001/; Alex Corradetti, *Investigation underway following death of inmate at Trousdale Turner Correctional Center*, WKRN (Sep. 8, 2021),

and the courts have, to date, failed to remedy—this litigation has generated wide publicity within the meaning of Local Rule 83.04(b). *See, e.g.,* Mariah Timms, *Trousdale Turner inmate 'would not be dead' if Corecivic staffed prisons properly, lawsuit claims,* THE TENNESSEAN (Feb. 18, 2022), https://www.tennessean.com/story/news/crime/2022/02/18/lawsuit-seeks-damages-changes-corecivic-following-prison-death-trousdale-turner-terry-childress/6846539001/; Samantha Max, *Lawsuit: Tennessee private prison should improve conditions or be shut down,* WPLN (Feb. 23, 2022), https://wpln.org/post/lawsuit-tennessee-private-prison-should-improve-conditions-or-be-shut-down/; Adam Tamburin, *Lawsuit targets staffing at private prison company Corecivic,* AXIOS Nashville (Feb. 28, 2022), https://www.axios.com/local/nashville/2022/02/28/lawsuit-prison-staffing-tennessee-corecivic; Adam Tamburin, *'They don't care': After another unexplained death at Trousdale Turner prison, family fights for justice,* THE TENNESSEAN (March 18, 2021), https://www.tennessean.com/story/news/crime/2021/03/19/trousdale-turner-prison-tennessee-reports-another-unexplained-death/6887813002/; Caresse Jackman, *News4 Investigates: Former Correctional Officer calls for increased staffing and medical care at Trousdale Turner Correctional Center,* WSMV (Feb. 28, 2022), https://www.wsmv.com/2022/03/01/news4-investigates-former-correctional-officer-calls-increased-staffing-medical-care-trousdale-turner-correctional-center/. That

---

https://www.wkrn.com/news/investigation-underway-following-death-of-inmate-at-trousdale-turner-correctional-center/; Chris Gregory, *Former Trousdale Turner corrections officer indicted,* LEBANON DEMOCRAT (Oct. 7, 2021), https://www.lebanondemocrat.com/hartsville/former-trousdale-turner-corrections-officer-indicted/article_aac20d8d-16e5-5edc-9e7e-d5fd9f8bfd0e.html; Levi Ismail, *NAACP calls for closure of Trousdale Turner Correctional Center, cites 'barbaric treatment' of Black men,* WTVF (Nov. 11, 2021), https://www.newschannel5.com/news/naacp-calls-for-closure-of-trousdale-turner-correctional-center-cites-barbaric-treatment-of-black-men.

publicity, it should be emphasized, also concerns a company that is acting *as the government* when it performs the traditional public function of operating prison facilities. *See, e.g., Friedmann v. Corr. Corp. of Am.*, 310 S.W.3d 366, 379 (Tenn. Ct. App. 2009) ("By operating these facilities, CCA is, nevertheless, providing a governmental function. In short, private entities cannot legally imprison someone. This must be done by the government, whether federal, state, or local. In other words, it is the act of imprisonment that is the governmental function, regardless of whether the inmate is imprisoned pursuant to federal, state, or local laws."). Accordingly, out-of-court speech criticizing CoreCivic regarding its operation of Tennessee's prisons "is more than self-expression; it is the essence of self-government." *Garrison v. Louisiana*, 379 U.S. 64, 74–75, 85 S.Ct. 209, 215–216, 13 L.Ed.2d 125 (1964) ("[S]peech concerning public affairs is more than self-expression; it is the essence of self-government.").

For reasons that matter well beyond this specific case, publicity regarding CoreCivic's operation of its Tennessee prisons is also critical for several vital public interest purposes. Among them:

1. Publicity promotes whistleblowing by individuals—such as CoreCivic's prison guards (*see* Doc. 1-1) and CoreCivic's inmates (*see* Doc. 38-1)—who have personal knowledge of CoreCivic's malfeasance and may be encouraged to come forward with information that enables governmental action and reform efforts. *See, e.g.,* Erwin Chemerinsky, *Silence is not golden: protecting lawyer speech under the First Amendment*, 47 EMORY L.J. 859, 869 (1998), *available at* https://scholarship.law.duke.edu/cgi/viewcontent.cgi?article=1677&context=faculty_scholarship (noting that "attorney speech to the media may help to gather crucial evidence."); *Connick v. Myers*, 461 U.S. 138, 145, 103 S. Ct. 1684, 1689, 75 L. Ed. 2d 708

(1983) ("The First Amendment 'was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.'") (quoting *Roth v. United States*, 354 U.S. 476, 484, 77 S.Ct. 1304, 1308, 1 L.Ed.2d 1498; *New York Times Co. v. Sullivan*, 376 U.S. 254, 269, 84 S.Ct. 710, 720, 11 L.Ed.2d 686 (1964)). *Cf.* Char Adams, *Biden's order terminates federal private prison contracts. Here's what that means.*, NBC NEWS (Jan. 27, 2021), https://www.nbcnews.com/news/nbcblk/biden-s-order-terminates-federal-private-prison-contracts-here-s-n1255776.

2.      Publicity enables other victims whose loved ones have been murdered at CoreCivic facilities to learn of their right to redress and locate counsel, *see, e.g.,* **Ex. 1** (providing records regarding the murder of Marktavious Twilley, who was murdered at Trousdale Turner shortly after this lawsuit was filed).

3.      Publicity helps spur public scrutiny of and change regarding CoreCivic's misbehavior at prison facilities that it operates as a governmental actor, *see, e.g.,* Liam Adams*, Trousdale Turner didn't accommodate Muslim inmates, briefly banned Quran, documents reveal,* THE TENNESSEAN (May 17, 2022), https://www.tennessean.com/story/news/religion/2022/05/18/trousdale-turner-tennessee-prison-muslim-inmates-quran-banned/9735400002/ ("Gustin said in a statement that Shonebarger was no longer employed at CoreCivic as of May 4, which is the same day the depositions and other Pleasant-Bey records became public."). And:

4.      Publicity promotes general transparency in government regarding matters of public concern that CoreCivic has, to date, substantially succeeded in concealing from public view. *See id. See also Connick*, 461 U.S. at 145 ("the Court has frequently reaffirmed that speech on public issues occupies the 'highest rung of the hierarchy of First Amendment values,' and is entitled to special protection." (quoting *NAACP v. Claiborne*

*Hardware Co.*, 102 S.Ct. 3409, 3426, 73 L.Ed.2d 1215 (1982); *Carey v. Brown*, 447 U.S. 455, 467, 100 S.Ct. 2286, 2293, 65 L.Ed.2d 263 (1980)).

Of particular note, the Plaintiffs in this case also are not Plaintiffs' counsel's only clients. To the contrary, the undersigned has several clients who are currently housed in Tennessee's CoreCivic facilities, and he is concerned for their safety every single day. *See, e.g.,* **Ex. 2** (Horwitz email regarding Wayne Potee). As a result, the undersigned has ethical duties to his clients that include petitioning the Tennessee Department of Correction, regulators, prosecutors, and other government officials to address as-yet-unremedied and well-founded concerns about their safety in CoreCivic's facilities.

Significantly, during the course of early discovery in this case, the Plaintiffs came to learn of staggering deficiencies and pervasive and indisputable understaffing and other contractual non-compliance at Trousdale Turner Correctional Center that CoreCivic has made clear it will not address voluntarily. For instance, subpoenaed documents reveal testimony from a recent Trousdale Turner warden that it has never been in compliance with minimum contractual staffing requirements:

```
20   Q.   Okay.  And you understand that there is a contract
21        for minimum staffing requirements; is that right?
22   A.   Yes.
23   Q.   Okay.  How many days since you've been present as
24        the warden at the Trousdale Turner facility has it
25        been in compliance with the contract for minimum
```

Case 3:22-cv-00093   Document 33-11   Filed 05/04/22   Page 35 of 65 PageID #: 1550

36

```
1        staffing requirements?
2   A.   It has not.
```

```
14    Q.    Which is, it's not?  It's never -- you've never

15          been in compliance with the staffing requirements

16          since you've been warden; do I understand you

17          correctly?

18    A.    That is correct.  We have -- That is correct.
```

Doc. 33-11, PageID ##1550–51.

They additionally revealed testimony from another recent Trousdale Turner warden that Trousdale Turner is "never going to be fully staffed." "Never[,]" and that Trousdale Turner left 733 critical posts unstaffed shortly before Mr. Childress's murder:

```
15    staffing up.  That's nothing new.  I mean, that's

16    nothing new to any in every prison I've ever worked at,

17    even as a CO.  It's nothing new.  You're never going to

18    be fully staffed.  Never.  Raymond Byrd has never worked

19    at a prison, from a correctional officer until now, that
```

Doc. 33-2, PageID #696.

```
10          Q.    Okay.  And do you see that here,

11    noncompliance Item 3, under noncompliance issue, Mr.

12    Walton has written:  All critical posts shall be staffed

13    as required.  However, multiple critical posts were not

14    covered during the monitoring period for the month of

15    December.  There were 31 days in the month of December,

16    which the shift rosters reflected 733 critical posts

17    were not filled on time or were left vacant during the

18    security shift?

19          A.    I see that.
```

Doc. 33-2, PageID #737.

They further revealed testimony from Trousdale Turner's on-site TDOC monitors

that CoreCivic has "been consistently noncompliant" has "never been in compliance" with contractual staffing requirements:



BOZA PLEASANT-BEY vs STATE OF TENNESSEE
WALTON, JON on 04/08/2021                                    Page 77

```
                                                            Page 77
  1        Q.    So it's fair to say that before you issued

  2   this report, CoreCivic had been consistently

  3   noncompliant?

  4        A.    Yes.
```

Doc. 37-2, PageID #3059.

BOZA PLEASANT-BEY vs STATE OF TENNESSEE
WALTON, JON on 04/08/2021                                    Page 98

```
                                                            Page 98
  1        Q.    So I'm prepared to continue going all of the

  2   way through all of the rest of these reports, you know,

  3   to the extent that I have them.  But is it fair to say

  4   that CoreCivic has never been in compliance with

  5   Staffing Item 2B?

  6                MR. AUMANN:  Objection to form.

  7                MR. WELBORN:  Same objection.

  8   BY MS. MAPLES:

  9        Q.    Since you've been at the facility?

 10        A.    That would be fair, yes.

 11        Q.    Is it fair to say that CoreCivic has never

 12   been in compliance with Staffing Item 9 since you have

 13   been at CoreCivic?

 14                MR. AUMANN:  Objection to form.

 15                THE WITNESS:  Yes.
```

Doc. 37-2, PageID #3080.

Further still, they revealed testimony that CoreCivic has never been in compliance with the TDOC's inmate grievance procedures:

```
22   BY MS. MAPLES:
23        Q.   And is it fair to say that since you've been
24   at Trousdale, CoreCivic has never been in compliance
25   with the grievance procedure?
```

BOZA PLEASANT-BEY vs STATE OF TENNESSEE
WALTON, JON on 04/08/2021                                    Page 50

```
                                                      Page 50
1              MR. WELBORN:  Objection to the form.
2              MR. AUMANN:  Same objection, form.
3   BY MS. MAPLES:
4        Q.   Go ahead.
5        A.   That would be correct, yes.
```

*See* Doc. 37-2, PageID ## 3031–32.

Further beyond that, they revealed that CoreCivic has repeatedly submitted false staffing records:

```
15        Q.   So again, you are getting reporting from the
16   facility that is incomplete and inaccurate, right?
17        A.   Yes.
18        Q.   If we scroll down to Noncompliant Item No. 3,
19   do you see that Staffing Item 9 is, again, noncompliant?
20        A.   Yes.
21        Q.   And do you see that, again, CoreCivic has
22   noted the amount of overtime that was worked in this
23   report?
24        A.   Yes.
25        Q.   And do you see that it's 6,810.34 hours of
```

*See* Doc. 37-2, PageID #3068.

Early discovery also revealed that the TDOC has assessed "millions of dollars" in liquidated damages penalties against CoreCivic for contract non-compliance at Trousdale Turner:

```
 4        Q.   When you say liquidated damages, what do
 5   you mean by that?
 6        A.   It's a monetary penalty that has to be
 7   paid by the vendor where funds are held back for a
 8   violation that has not been corrected.
 9        Q.   And do you know how much money, if any, in
10   the liquidated damages that CoreCivic has had to pay
11   for the Trousdale facility?
12             MR. AUMANN:  Objection.  Objection to
13   form.  You can go ahead and answer.
14             THE WITNESS:  You know, I do not know.  I
15   couldn't tell you right now exactly how much that
16   is, so for a specific number, I don't have that in
17   front of me.
18   BY MS. HERZFELD:
19        Q.   Do you have an estimate?
20             MR. AUMANN:  Same objection.  Form.  You
21   can go ahead and answer.
22             THE WITNESS:  It's in the millions of
23   dollars, but I don't know the exact number.
24   BY MS. HERZFELD:
25        Q.   Do you know what those liquidated damages
```

Case 3:22-cv-00093   Document 37-12   Filed 05/25/22   Page 20 of 233 PageID #: 3771

*See* Doc. 37-12, PageID #3771.

Case 3:22-cv-00093   Document 41   Filed 05/27/22   Page 11 of 23 PageID #: 4007

It additionally revealed that despite all of the above, the TDOC has never once even had a conversation about canceling CoreCivic's contract at Trousdale Turner and taking over the facility despite its ability to do so:

```
 5          THE WITNESS:  Ultimately, I mean, I think
 6   that, you know, TDOC would come in, we could look at
 7   the possible stepping away from the contractor,
 8   removal of the contract at some point, yes.  That is
 9   another option that we would have.
10   BY MS. HERZFELD:
11        Q.   Could you take over the facility?
12        A.   Well, we could.  There's some language in
13   the contract that will allow us to take over the
14   facility or the management of the facility, yes.
15        Q.   Has TDOC ever had to do that?
16        A.   No, we have not.
17        Q.   Has there ever been a conversation that
18   you're aware of that has explored the possibility of
19   TDOC taking over Trousdale?
20        A.   No, there has not.
21        Q.   What about a partial takeover?
22        A.   No.
23        Q.   Okay.
24             MR. AUMANN:  Object to form.  You can go
25   ahead.
```

*See* Doc. 37-12, PageID #3776.

Remarkably, despite the above testimony and evidence from Trousdale Turner's own wardens, from the TDOC's on-site monitors at Trousdale Turner, from the TDOC's Commissioner, and others conclusively evidencing widespread understaffing problems at

Trousdale Turner, CoreCivic—through counsel—has uniformly and unqualifiedly denied all understaffing allegations in its Answer filed in this case. *See generally* Doc. 31. In general, such "blatant factual misrepresentations" by lawyers defending prisons are also frowned upon. *See, e.g., Friedmann v. Parker*, No. 3:21-CV-00721, 2021 WL 5494522, at *1 n.2 (M.D. Tenn. Nov. 23, 2021) ("In the Answer to the Complaint, Defendants deny that two cells are "known or referred to as … 'iron man' cells," that "Unit 1 has 'iron man' cells," and that Mr. Friedmann's "cell is an 'iron man' cell." (Doc. No. 16 ¶¶ 18, 41). This is remarkable given Defendants' own exhibits contain a TDOC report signed by multiple Defendants that describes Mr. Friedmann's cell as "an iron man cell." (Doc. No. 15-4 at 15). The Court resolves "disputed" facts in Mr. Friedmann's favor where the record contradicts Defendants' denials. **The Court warns Defendants there may be repercussions for future blatant factual misrepresentations presented to it**." *See* Fed. R. Civ. P. 11.") (emphasis added). Rather than correcting its false denials regarding understaffing, though, CoreCivic has instead complained about Plaintiffs' counsel making out-of-court statements about its pervasive understaffing and petitioning the TDOC to remedy Trousdale Turner's serious safety deficiencies. This motion filed.

### III.  ARGUMENT

**A.**  **CoreCivic's professed concerns about out-of-court statements prejudicing the Parties' December 2023 trial lack merit.**

On May 27, 2022—during an unrelated discovery dispute conference—CoreCivic's counsel expressed concerns that tweets from Plaintiffs' counsel regarding CoreCivic and its pervasive understaffing at Trousdale Turner may prejudice CoreCivic's right to a fair trial in this case. Historically, it should be noted, CoreCivic's efforts to leverage the judicial process to suppress truthful information and censor critical commentary

regarding its operations have not been limited to good-faith claims.[2] CoreCivic also appears to have settled—before trial—all cases that were ever at risk of reaching trial in this jurisdiction, obviating any genuine concerns about pre-trial publicity at all. *See, e.g.,* Melissa Brown, *Corecivic settles lawsuit in 2017 Nashville jail scabies outbreak*, THE TENNESSEAN (Dec. 8, 2021), https://www.tennessean.com/story/news/2021/12/08/corecivic-settles-lawsuit-over-nashville-jail-scabies-outbreak/8827935002/; Travis Loller, *Corecivic to settle shareholders lawsuit for $56 million*, THE TENNESSEAN (Apr. 20, 2021), https://www.tennessean.com/story/news/2021/04/20/corecivic-lawsuit-private-prison-operator-settle-56-million/7302711002/.

Given the foregoing, when it comes to *this* case, the Plaintiffs harbor some degree of skepticism about CoreCivic's true motivations for seeking to restrict critical commentary regarding its conduct. In particular, they suspect that CoreCivic's actual interests are grounded in a desire for "state action to punish the publication of truthful information," which "seldom can satisfy constitutional standards." *Smith v. Daily Mail Pub. Co.*, 443 U.S. 97, 102 (1979). *See also Grosjean v. American Press Co.*, 297 U.S. 233, 250 (1936) (holding that government action constituting "a deliberate and calculated device . . . to limit the circulation of information" is unconstitutional). *See also Bartnicki v. Vopper*, 532 U.S. 514, 527–28, 121 S. Ct. 1753, 1761, 149 L. Ed. 2d 787 (2001).

---

[2] *See, e.g.,* Madison Pauly, *How a Private Prison Company's Defamation Suit Against One of Its Critics Backfired*, MOTHERJONES (Dec. 11, 2020), https://www.motherjones.com/crime-justice/2020/12/corecivic-defamation-lawsuit-family-separation-simon/. *See also Grae v. Corr. Corp. of Am.*, 330 F.R.D. 481, 487 n.2 (M.D. Tenn. 2019) ("CoreCivic has argued that its internal responses to BOP scrutiny should be kept under seal because their disclosure could harm CoreCivic in the marketplace. (Docket No. 155 at 6.) The court, however, discerns no serious threat of unfair competition associated with disclosure of the relevant communications. None of the cited internal conversations reveal any confidential CoreCivic strategies, practices, or research and development. The conversations cited may be awkward or embarrassing for CoreCivic to see disclosed, but that, alone, is not enough to justify an unyielding seal in this case.").

Significantly, the Defendants' professed concerns about prejudicial pre-trial publicity also arise in the context of litigation that has barely begun. As this case currently stands, the earliest date that a jury could even theoretically be empaneled is more than a year-and-a-half away. *See* Doc. 30, at 1 ("This case is set for a jury trial on December 12, 2023, beginning at 9:00 a.m., United States Courthouse, Nashville, TN."). Further, when evaluating the potential for prejudice arising from extrajudicial commentary, the timing of a statement is "crucial." *See, e.g., Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1044 (1991) ("as we have held, *see Patton v. Yount*, 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984), [] the timing of a statement [i]s crucial in the assessment of possible prejudice and the Rule's application"). *See also* Michael Downey, Ethical Rules for Litigating in the Court of Public Opinion, ABA SECTION OF LITIGATION ETHICS & PROFESSIONALISM (Jul. 18, 2012) ("the timing of the disclosure relative to the anticipated start of jury selection or other sensitive proceedings should be considered . . . . Information disclosed at the start of a case, long before a jury will be empaneled, will be less likely to result in discipline than the public release of significant information on the eve of or during trial.").

Additionally, the notion that Plaintiffs' counsel would or even could prejudice the Middle District of Tennessee's jury pool by petitioning the TDOC to do something about CoreCivic's pervasive contractual non-compliance and tweeting criticism of CoreCivic—a company that may well be the most reviled corporation in the nation—is conclusory at best. Such "a conclusory representation that publicity might hamper a defendant's right to a fair trial is insufficient to overcome the protections of the First Amendment[,]" though. *See United States v. Noriega*, 917 F.2d 1543, 1549 (11th Cir. 1990) (citing *Press–Enterprise Co. v. Superior Court*, 478 U.S. 1, 15, 106 S.Ct. 2735, 2744, 92 L.Ed.2d 1 (1986) ("The First Amendment right of access cannot be overcome by the conclusory assertion

that publicity might deprive the defendant of [the right to a fair trial]."); *United States v. Columbia Broadcasting Sys., Inc.*, 497 F.2d 102, 104 (5th Cir.1974) ("[B]efore a prior restraint may be imposed by a judge, even in the interest of assuring a fair trial, there must be 'an imminent, not merely a likely, threat to the administration of justice. The danger must not be remote or even probable; it must immediately imperil.'" (quoting *Craig v. Harney,* 331 U.S. 367, 376, 67 S.Ct. 1249, 1255, 91 L.Ed. 1546 (1947))). Further, absent a clear and present threat based on "specific, not general" concerns, CoreCivic's desired restrictions prohibiting out-of-court statements about it would fail constitutional scrutiny. *See United States v. Ford,* 830 F.2d 596, 600 (6th Cir. 1987) ("The order in the instant case is clearly overbroad and fails to meet the clear and present danger standard in the context of a restraint on a defendant in a criminal trial. Such a threat must be specific, not general. It must be much more than a possibility or a 'reasonable likelihood' in the future. It must be a 'serious and imminent threat' of a specific nature, the remedy for which can be narrowly tailored in an injunctive order.") (citing *Carroll v. President and Commissioner of Princess Anne*, 393 U.S. 175, 183, 89 S.Ct. 347, 352, 21 L.Ed.2d 325 (1968) (such an order "must be couched in the narrowest terms that will accomplish the pin-pointed objective permitted by constitutional mandate"); *Chicago Council of Lawyers v. Bauer*, 522 F.2d 242, 251–52 (7th Cir.1975), *cert. denied*, 427 U.S. 912, 96 S.Ct. 3201, 49 L.Ed.2d 1204 (1976)). Indeed, the speech-based prior restraint that CoreCivic has indicated it wants cannot even be justified based on concerns about its right to a fair trial alone. *See, e.g., Procter & Gamble Co. v. Bankers Tr. Co.*, 78 F.3d 219, 226–27 (6th Cir. 1996) ("In the case of a prior restraint on pure speech, the hurdle is substantially higher: publication must threaten an interest more fundamental than the First Amendment itself. Indeed, the Supreme Court has never upheld a prior restraint,

-16-

even faced with the competing interest of national security or the Sixth Amendment right to a fair trial.").

There is also no recognized "professional speech" exception to the First Amendment, even if CoreCivic desires such an exception. *See Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2371–72, 201 L. Ed. 2d 835 (2018) ("this Court has not recognized 'professional speech' as a separate category of speech. Speech is not unprotected merely because it is uttered by 'professionals.'"). *See also Otto v. City of Boca Raton, Fla.*, 981 F.3d 854, 866 (11th Cir. 2020) ("'professional speech' is not a traditional category of speech that falls within an exception to normal First Amendment principles. We have already rejected the suggestion that the government's ability to regulate entry into a profession entitles it to regulate the speech of professionals."); *UPSOLVE, INC., & REV. JOHN UDO-OKON, Plaintiffs, v. LETITIA JAMES, in her official capacity as Att'y Gen. of the State of New York, Defendant.*, No. 22-CV-627 (PAC), 2022 WL 1639554, at *13 (S.D.N.Y. May 24, 2022) ("the Supreme Court recently undermined Justice White's theory that licensing requirements are somehow sui generis under the First Amendment merely because they target professionals."). In fact, even attempting to restrict *knowingly false and derogatory speech*—and to be sure, recounting extensive testimony revealing CoreCivic's pervasive non-compliance with staffing and other requirements certainly is not that—"would be a significant impairment of First Amendment rights" where out-of-court statements are concerned. *See Ramsey v. Bd. of Pro. Resp. of Supreme Ct. of Tennessee*, 771 S.W.2d 116, 122 (Tenn. 1989) (holding, in disciplinary prosecution regarding remarks about a judge and his cases that were "gross, disrespectful, knowingly false, derogatory, and damaging to the legitimacy of, and trust in, the judicial system," that "[t]he remarks made by Appellant were disrespectful and in bad taste; however, we

-17-

agree with the Hearing Panel that the right of free speech is 'broad enough to protect these expressions' made by the Appellant. **Use of the Disciplinary Rules to sanction the remarks made by General Ramsey in this case would be a significant impairment of First Amendment rights**.") (emphasis added).   Consequently, CoreCivic's nebulous claims about this Court's need to restrict critical commentary are woefully insufficient to justify court-ordered censorship prohibiting criticism of a governmental litigant more than 18 months before trial.  *Cf. Greenberg v. Goodrich*, No. CV 20-03822, 2022 WL 874953, at *24 (E.D. Pa. Mar. 24, 2022) ("That nebulous notion of decency, combined with the exceptional authority the state would have if allowed to monitor attorneys outside of judicial proceedings and representation of a client and determine whether they are 'decent' enough causes this Court grave concern.").

## B.    Plaintiff's counsel has affirmative obligations to pursue strategies that promote the best interests of his clients.

In stark contrast to CoreCivic's generalized concerns about publicity affecting a trial that is more than a year-and-a-half away, the undersigned has both affirmative and immediate ethical duties to pursue strategies—including petitioning government officials and engaging in public advocacy—that promote the best interests of his clients right now. As one scholar has noted:

> [E]thical obligations would suggest that an attorney should use the press when advantageous to his or her client to do so. Canon 7 states that 'a lawyer should represent a client zealously within the bounds of the law.' Model Code of Professional Responsibility Canon 7. Further, EC 7-9 states that a 'lawyer should always act in a manner consistent with the best interests of his client.' Model Code of Professional Responsibility EC 7-9. Similarly, comment 1 to Model Rule of Professional Conduct 1.3 states that a lawyer 'may take whatever lawful and ethical measures are required to vindicate a client's cause or endeavor.' While these rules provide limited assistance in actual situations, they do stress that attorneys have a duty to push their clients' causes to the fullest of their abilities.

Debra S. Katz et al., *Extrajudicial Statements: Lawyers' Ethical Obligations in Communicating with the Press*, SH039 ALI-ABA 1015, 1023-1024, n. 6 (2008), *available at* https://www.lexisnexis.com/documents/pdf/20080228100838_large.doc.

Nor is engaging in public advocacy some novel concept. For instance, the undersigned has been honored by the Tennessee Bar Association specifically for executing successful media strategies during litigation against misbehaving governmental litigants. *See* Katharine Heriges, *Harris Gilbert Pro Bono Volunteer of the Year*, Tennessee Bar Journal (Jan. 1, 2018), http://www.tba.org/journal/public-service-award-honorees ("Horwitz didn't just represent Gluzman, whose case ended up in front of the Tennessee Supreme Court. He used every tool in the toolbox to turn a legal matter into a full-blown movement. Horwitz pressed for media coverage, which he received from local and national outlets. . . . Hudson called Horwitz's effort 'Herculean.' For Gluzman, it was life changing."). He is not the only one, either. *Cf. Katz, supra,* at n.6 ("Lopez, like many public interest lawyers, contends that getting media attention for cases and the causes they represent is an important aspect of progressive lawyering.") (citing Gerald P. Lopez, *Rebellious Lawyering: One Chicano's Vision of Progressive Law Practice*). *See also* Chemerinsky, *supra,* at 867 (noting that "there are times that effective representation of a client requires statements to the press" and detailing several).

Indeed, *CoreCivic itself* has devoted substantial attention to recent public advocacy within this jurisdiction that is designed to mislead the public about the safety of Trousdale Turner Correctional Center. *See, e.g.,* Caresse Jackman, *News4 Investigates: Former inmate, NAACP call treatment at Trousdale 'inhumane,'* WSMV (Feb. 16, 2022), https://www.wsmv.com/2022/02/17/news4-investigates-former-inmate-naacp-call-treatment-trousdale-inhumane/ (**Ex. 3**) ("News4 Investigates reached out to Trousdale's

owner and operator, CoreCivic for an on-camera interview. They provided the following

statement: . . . .").[3] Thus, separate and apart from any other matter, CoreCivic's recent

and deliberately misleading statements to a wide local audience would and do both merit

---

[3] CoreCivic's full statement to viewers and prospective jurors within this jurisdiction was as follows:

> Caresse,
>
> Thank you for reaching out to us with your inquiry. Feel free to use the following statement, attributable to me, for your reporting.
>
> CoreCivic has a detailed Human Rights Policy that clearly outlines our commitments regarding inmate rights and treatment, including legal rights, safety and security, healthcare, reentry programming, visitation and standards of living. Every one of our colleagues at CoreCivic are trained on this policy before their first day of work.
>
> In November 2021, the NAACP made claims about Trousdale Turner Correctional Center (TTCC) that were unsubstantiated, inaccurate, and misinformed. We're not aware of any concerns raised by the NAACP regarding TTCC since then, but strongly encourage them to share any specific claims with the facility so that we can properly investigate.
>
> In both policy and practice, CoreCivic respects the dignity of every individual entrusted to our care. We have clear lines of communication for those in our care to make concerns known without fear of repercussions, including in-facility reporting, a company-wide hotline accessible anonymously internally and externally, and direct access to our government partners.
>
> While privacy laws prevent us from discussing an individual's specific medical conditions, we stand by our previous statement that TTCC provides all of those in our care with comprehensive medical and mental health care. Furthermore, TTCC is monitored very closely by our government partners at the Tennessee Department of Correction, who employ two, full-time, on-site contract monitors at TTCC who work to ensure our full compliance with prescribed policies and procedures.
>
> TTCC is also subject to multiple layers of oversight from our government partner and independent third parties like the American Correctional Association (ACA). That oversight includes both scheduled and unscheduled inspections of our operations. We're proud to say TTCC has been recommended for reaccreditation by the ACA following a rigorous, on-site inspection earlier this month in which independent inspectors gave the facility scores of 100% on mandatory standards and 98.4% on non-mandatory standards. The ACA reviews more than 400 standards of correctional management, including healthcare and other services around standards of living and safety.
>
> Very Respectfully,
>
> Matthew Davio
>
> Public Affairs Manager
>
> CoreCivic

*See* **Ex. 3** at 3.

and permit a robust public response by themselves. *See, e.g.,* Local Rule 83.04(a)(3) ("a lawyer may make a statement that a reasonable lawyer would believe is required to protect a client from the substantial undue prejudicial effect of recent publicity not initiated by the lawyer or the lawyer's client.").

## C. Readily available alternatives will promote CoreCivic's professed interests in avoiding undue prejudice.

"No state action that limits protected speech will survive strict scrutiny unless the restriction is narrowly tailored to be the least-restrictive means available to serve a compelling government interest." *Bible Believers v. Wayne Cnty., Mich.*, 805 F.3d 228, 248 (6th Cir. 2015) (citing *United States v. Playboy Entm't Grp.*, 529 U.S. 803, 813, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000)). Here, assuming—for the sake of argument—that CoreCivic's concerns about pre-trial publicity were motivated by genuine fear that the Parties' December 2023 trial may be affected, imposing a restriction on out-of-court statements would not be necessary, because there are readily available and less restrictive alternatives that would fully address CoreCivic's concerns. *See id.* *Cf.* Chemerinsky, *supra*, at 862–67 (noting that pre-trial speech restrictions are content-based and that attorneys' speech about pending cases should be restricted only if strict scrutiny is met).

In particular, if CoreCivic is worried that prospective jurors could be influenced by Plaintiffs' counsel's tweets, then this Court may address CoreCivic's professed concerns by inquiring itself or permitting CoreCivic to inquire into the matter during voir dire. The Plaintiffs have no objection to whatever voir dire CoreCivic desires on the subject and commit themselves to that position for the simple reason that the Plaintiffs, too, desire a fair trial. They also submit that it is the truthful and demonstrable nature of CoreCivic's pervasive and knowingly unremedied understaffing, *see supra* at 7–12—not the Plaintiffs'

discussion of it or efforts to petition TDOC officials who are in a position to remedy it—that will ultimately decide the outcome of this case.

## IV. CONCLUSION

For the foregoing reasons, this Court should enter a special order pursuant to Local Order 83.04(b) affirming the First Amendment rights of the Plaintiffs and their counsel to speak about—and to petition the government for redress regarding—conditions at CoreCivic's Tennessee facilities. At the same time, in an effort to address CoreCivic's professed concerns about trial publicity, this Court should permit whatever extended voir dire the Defendants deem necessary to ensure an impartial jury if and when this case reaches trial.

Respectfully submitted,

/s/ Daniel A. Horwitz
Daniel A. Horwitz, BPR #032176
Lindsay E. Smith, BPR #035937
HORWITZ LAW, PLLC
4016 Westlawn Dr.
Nashville, TN 37209
daniel@horwitz.law
lindsay@horwitz.law
(615) 739-2888

Brice M. Timmons #29582
Craig A. Edgington #38205
DONATI LAW, PLLC
1545 Union Ave.
Memphis, Tennessee 38104
(901) 278-1004 – Telephone
(901) 278-3111 – Facsimile
brice@donatilaw.com
craig@donatilaw.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of May, 2022, a copy of the foregoing and all exhibits and attachments were sent via CM/ECF to:

Joe Welborn
Erin Palmer Polly
Terrence M. McKelvey
222 Second Avenue, South
Suite 1700
Nashville, Tennessee 37201
Joe.Welborn@klgates.com
Erin.Polly@klgates.com
terrence.mckelvey@klgates.com

*Counsel for Defendants*

By:      /s Daniel A. Horwitz