## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## AT NASHVILLE

| | | |
|---|---|---|
| G. MARIE NEWBY, individually, and as Administratrix of THE ESTATE OF TERRY CHILDRESS, | § § § § | |
| *Plaintiffs*, | § § | Case 3:22-cv-00093 |
| v. | § § | JURY DEMANDED |
| CORECIVIC OF TENNESSEE, LLC, *et al.*, | § § § § | |
| *Defendants*. | § | |

## PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR COMPLIANCE WITH LOCAL RULE 83.04 AND TO STRIKE [DOC. 45]

### I. INTRODUCTION

The Defendants seek miscellaneous relief through a filing that they call a "Motion for Compliance With Local Rule 83.04 and to Strike." *See* Doc. 45. The Motion should be called what it really is: a motion "to order Plaintiffs' counsel not to criticize the government, to retract his out-of-court speech criticizing the government, and to hide documents evidencing governmental misconduct that CoreCivic has been misleading the public about for years." Because the First Amendment forbids the relief that the Defendants illicitly seek—and because the Defendants misapprehend the relevant Local Rule upon which they rely, which would be facially unconstitutional as they construe it— the Defendants' motion should be denied.

### II. FACTS

CoreCivic's private prisons are "'an absolute hell hole,'" they are "dangerously

understaffed," and "violence is routine" within them.  *See* Allison Kite, *For-profit federal prison an understaffed 'hell hole' of violence, death and drugs*, Missouri Independent (Oct. 7, 2021), https://missouriindependent.com/2021/10/07/for-profit-federal-prison-an-understaffed-hell-hole-of-violence-death-and-drugs/ (**Ex. 1**).  "The defense bar is aware of it. The prosecutors are aware of it. The United States Marshals are aware of it." *Id*.  According to CoreCivic, though, attorneys who sue CoreCivic are forbidden from talking about the deficient conditions at its facilities.  Instead, CoreCivic imagines that such attorneys are required to apply to this Court for "permission" to criticize CoreCivic's flagrantly deficient operations, *see* Doc. 44 at 2, which have killed several of the undersigned's clients and threaten the safety of his still-living clients on a daily basis.

To be clear: The above characterizations of the hellish conditions at the prisons that CoreCivic operates are not the undersigned's.  Instead, they represent the views of U.S. District Court Judge Julie Robinson shortly before this lawsuit was filed.  *See* **Ex. 1** ("'The only way I could describe it frankly, what's going on at CoreCivic right now is it's an absolute hell hole,' said U.S. District Judge Julie Robinson during a sentencing hearing in September.").  When it comes to Trousdale Turner Correctional Center, specifically, those characterizations would also be generous.  As the Plaintiffs' Complaint details, CoreCivic boasts years of consistently failed audits and extensive reports of deficiencies and fatal misconduct at its Tennessee facilities in general and at Trousdale Turner Correctional Center in particular.[1]  There is also good reason to believe that these reports

---

[1] *See, e.g.,* Cassandra Stephenson, *Inmate death ruled homicide in a Tennessee CoreCivic prison where rate is twice as high as TDOC's, records show*, Jackson Sun (Jan. 28, 2020), https://www.jacksonsun.com/story/news/crime/2020/01/28/corecivics-tennessee-prisons-have-twice-homicide-rate-tdocs/2776928001/ ("The corporation's four Tennessee facilities hold roughly 35% of the state's prison population but accounted for about 63% of the state's prison homicides."); Prison Legal News, *CoreCivic Prisons in Tennessee Have Twice as Many Murders, Four Times the Homicide Rate as State-Run Facilities*, PLN (Aug. 6, 2019), https://www.prisonlegalnews.org/news/2019/aug/6/corecivic-

prisons-tennessee-have-twice-many-murders-four-times-homicide-rate-state-run-facilities/ ("from 2014 through June 2019, there were twice as many murders in the four Tennessee prisons operated by CoreCivic (formerly Corrections Corporation of America) than in the 10 prisons run by the Tennessee Department of Correction (TDOC). Also, the homicide rate in CoreCivic facilities was over four times higher than the rate for TDOC prisons."); Brinley Hineman, *After Tennessee prison suicide, CoreCivic cover fabricated health records of treatment: TDOC*, THE TENNESSEAN (Aug. 25, 2020), https://www.tennessean.com/story/news/crime/2020/08/26/after-tennessee-prisoners-suicide-corecivic-worker-faked-health-records/3404186001/; Demetria Kalodimos, *Woman says she paid off gangs to keep son safe in prison*, WSMV (Oct. 5, 2017), https://www.wsmv.com/news/woman-says-she-paid-off-gangs-to-keep-son-safe-in-prison/article_a4e670ea-78be-5087-86e5-a65ecd485475.html; Joseph Wenzel, *Over 1,200 staff, inmates test positive for COVID-19 at Trousdale Turner Correctional Center*, WSMV (May 1, 2020), https://www.wsmv.com/news/over-1-200-staff-inmates-test-positive-for-covid-19-at-trousdale-turner-correctional-center/article_4b7eaabeb67b.html; Adam Tamburin, *Tennessee prison inmate dies after fight at Trousdale Turner*, THE TENNESSEAN (Jan. 26, 2020), https://www.tennessean.com/story/news/2020/01/26/tennessee-prison-inmate-dies-after-fight-trousdale-turner-correctional-center/4581013002/; Dave Boucher, *New Tennessee CCA prison stops taking inmates amid 'serious issues,'* THE TENNESSEAN (May 24, 2016), https://www.tennessean.com/story/news/politics/2016/05/24/new-tennessee-private-prison-stops-taking-inmates/84867834/; Chris Conte, *Prisons for profit: Concerns mount about Trousdale Turner Correctional Center, operator CoreCivic*, WTVF (Jun. 13, 2019), https://www.newschannel5.com/longform/prisons-for-profit-concerns-mount-about-trousdale-turner-correctional-center-operator-corecivic; Staff Report, *Scathing state audit slams Tennessee prisons, CoreCivic for staffing, sexual assaults, and deaths in jails*, WTVF (Jan. 10, 2020), https://www.newschannel5.com/news/scathing-state-audit-slams-tennessee-prisons-corecivic-for-staffing-sexual-assaults-and-deaths-in-jails; Jamie McGee, *CoreCivic shareholders granted class action status in fraud lawsuit*, THE TENNESSEAN (May 27, 2019), https://www.tennessean.com/story/money/2019/03/27/corecivic-class-action-securities-fraud-lawsuit/3289913002/; Chris Gregory, *Family seeks answers in loved one's death at Trousdale prison*, LEBANON DEMOCRAT (Jan. 2, 2021), https://www.lebanondemocrat.com/hartsville/family-seeks-answers-in-loved-ones-death-at-trousdale-prison/article_1ffe90f7-0e9f-5021-bb94-9ec1b4d23139.html; Demetria Kalodimos, *Inmates at CoreCivic prisons say they sometimes go months without medical care*, WSMV (Jun. 22, 2017), https://www.wsmv.com/news/inmates-at-corecivic-prisons-say-they-sometimes-go-months-without-medical-care/article_8d28e630-bd12-5f1c-8b68-92b9336553e1.html; Prison Legal News, *Incorrect Cause of Tennessee Prisoner's Death Reported by CoreCivic Employees*, PLN (Jun. 7, 2018), https://www.prisonlegalnews.org/news/2018/jun/7/incorrect-cause-tennessee-prisoners-death-reported-corecivic-employees/; Staff Report, *Private prison company CoreCivic's history of problems in Tennessee*, THE TENNESSEAN (Jan. 16, 2020), https://www.tennessean.com/story/news/local/2020/01/17/private-prison-corecivic-history-problems-tennessee/4470277002/; Stephen Elliott, *State audit criticizes CoreCivic facilities*, THE NASHVILLE POST (Nov. 14, 2017), https://www.nashvillepost.com/business/prison-management/article/20982796/state-audit-criticizes-corecivic-facilities; Matt Blois, *CoreCivic reports $25M in profits as COVID infects 2,500+ inmates*, THE NASHVILLE POST (Jun. 30, 2020), https://www.nashvillepost.com/business/prison-management/article/21138792/corecivic-reports-25m-in-profits-as-covid-infects-2500-inmates; Steven Hale, *Problems Persist at Tennessee's Mismanaged Prisons*, THE NASHVILLE SCENE (Jan. 22, 2020), https://www.nashvillescene.com/news/features/article/21111586/problems-persist-at-tennessees-mismanaged-prisons; Dave Boucher, *CoreCivic investigating ex-officer's allegations of negligent deaths at private prison*, THE TENNESSEAN (Dec. 12, 2017), https://www.tennessean.com/story/news/2017/12/12/corecivic-investigating-ex-officers-allegations-negligent-deaths-private-prison/946196001/; Elizabeth Weill-Greenberg, '*Just Let Him Kick,*' THE APPEAL (Sep. 6, 2018), https://theappeal.org/just-let-him-kick/; Brinley Hineman, *Murfreesboro man charged in prison cellmate's death at Trousdale*, DAILY NEWS JOURNAL (Feb. 20, 2020), https://www.dnj.com/story/news/2020/02/20/murfreesboro-man-jacob-kado-charged-death-prison-cell-mate-ernest-hill-trousdale-turner/4818354002/; Ethan Illers, *Man killed during inmate-on-inmate altercation at Trousdale Turner prison*, WSMV (Jun. 16, 2019), https://www.wsmv.com/news/man-killed-during-inmate-on-inmate-altercation-at-trousdale-turner-prison/article_8d8b6806-9066-11e9-

represent just the tip of the iceberg, given the large number of additional inmate deaths—including homicides—at Trousdale Turner that never make the news. *See, e.g.,* Doc. 41-1 (furnishing records regarding the murder of Marktavious Twilley on March 28, 2022, another client of the undersigned who was murdered at Trousdale Turner approximately

b749-7b44cac1c002.html; Jeremy Finley, *Recorded conversations reveal life inside prison ravaged by COVID-19*, WSMV (May 6, 2020), https://www.wsmv.com/news/investigations/recorded-conversations-reveal-life-inside-prison-ravaged-by-covid-19/article_91ef5b06-8fe2-11ea-9b75-f36db06e1ab1.html; Demetria Kalodimos, *Gang activity, security a concern at Trousdale Turner facility*, WSMV (Jun. 21, 2017), https://www.wsmv.com/news/gang-activity-security-a-concern-at-trousdale-turner-facility/article_df82a358-7073-552e-b5e4-9feb2e9cf8bc.html; Steven Hale, *Tennessee's Largest Prison Still Appears as Troubled as Ever*, THE NASHVILLE SCENE (Feb. 13, 2019), https://www.nashvillescene.com/news/features/article/21047078/tennessees-largest-prison-still-appears-as-troubled-as-ever; Jessie Williams, *Trousdale Turner Corrections Officer Arrested*, MACON COUNTY CHRONICLE (Feb. 5, 2019), https://www.maconcountychronicle.com/news/5680-trousdale-turner-corrections-officer-arrested; Brett Kelman, *At Tennessee's largest prison, diabetic inmates say they are denied insulin to 'maximize profits'*, THE TENNESSEAN (Aug. 7, 2018), https://www.tennessean.com/story/news/2018/08/07/corecivic-diabetic-inmates-denied-insulin-trousdale-turner/925297002/; Natalie Allison, *Lawmakers hear from prison rape survivor, parents of man who hanged himself in CoreCivic facility*, THE TENNESSEAN (Dec. 19, 2018), https://www.tennessean.com/story/news/politics/2018/12/19/tennessee-legislators-hear-rape-suicide-corecivic-prison/2355556002/; Dave Boucher, *Private prison chief: 'We've got work to do' at Trousdale facility*, THE TENNESSEAN (Dec. 13, 2016), https://www.tennessean.com/story/news/2016/12/13/private-prison-chief-weve-got-work-do-trousdale-facility/95223230/; Demetria Kalodimos, *Former chaplain describes conditions inside TN prison*, WSMV (Jun. 19, 2017), https://www.wsmv.com/news/former-chaplain-describes-conditions-inside-tn-prison/article_9b30af82-8297-5101-b11f-b5fd9270bf18.html; Chris Gregory, *Trousdale Turner employee charged with smuggling contraband*, LEBANON DEMOCRAT (Apr. 23, 2020), https://www.lebanondemocrat.com/hartsville/trousdale-turner-employee-charged-with-smuggling-contraband/article_6b865daf-fbe8-5a59-9a35-e84b61ace2e4.html; Andy Cordan, *Prison corrections officer in Trousdale County arrested carrying drugs*, WKRN (Jan. 20, 2021), https://www.wkrn.com/news/prison-corrections-officer-in-trousdale-county-arrested-carrying-drugs/; Dave Boucher, *Gangs, insufficient staffing plague troubled Tennessee private prison, state audit finds*, THE TENNESSEAN (Nov. 14, 2017), https://www.tennessean.com/story/news/politics/2017/11/14/tennessee-private-prison-operated-by-corecivic-blasted-ongoing-problems-new-state-audit/858884001/; Keith Sharon and Adam Tamburin, *'This is unreal': Family seeks answers in death of Trousdale Turner prison inmate*, THE TENNESSEAN (Feb. 2, 2021), https://www.tennessean.com/story/news/2021/02/03/trousdale-turner-inmate-aaron-blayke-adams-dead-family-wants-answers/4290646001/; Alex Corradetti, *Investigation underway following death of inmate at Trousdale Turner Correctional Center*, WKRN (Sep. 8, 2021), https://www.wkrn.com/news/investigation-underway-following-death-of-inmate-at-trousdale-turner-correctional-center/; Chris Gregory, *Former Trousdale Turner corrections officer indicted*, LEBANON DEMOCRAT (Oct. 7, 2021), https://www.lebanondemocrat.com/hartsville/former-trousdale-turner-corrections-officer-indicted/article_aac20d8d-16e5-5edc-9e7e-d5fd9f8bfd0e.html; Levi Ismail, *NAACP calls for closure of Trousdale Turner Correctional Center, cites 'barbaric treatment' of Black men*, WTVF (Nov. 11, 2021), https://www.newschannel5.com/news/naacp-calls-for-closure-of-trousdale-turner-correctional-center-cites-barbaric-treatment-of-black-men; Jamie Satterfield, *After eight months, investigation finds Hardeman County inmate was murdered by other inmates,* TENNESSEE LOOKOUT (May 31, 2022), https://tennesseelookout.com/2022/05/31/after-eight-months-investigation-finds-hardeman-county-inmate-was-murdered-by-other-inmates/.

-4-

a month after this lawsuit was filed).

How, specifically, has CoreCivic's Trousdale Turner Correctional Center—a facility that CoreCivic operates for profit—attained the ignominious title of the most dangerous prison facility in Tennessee?  Recent documents produced by non-parties during this litigation shed some light on the answer.  For instance, subpoenaed non-confidential documents reveal testimony from a recent Trousdale Turner warden that the facility has never been in compliance with minimum contractual staffing requirements:

```
20   Q.   Okay.  And you understand that there is a contract
21        for minimum staffing requirements; is that right?
22   A.   Yes.
23   Q.   Okay.  How many days since you've been present as
24        the warden at the Trousdale Turner facility has it
25        been in compliance with the contract for minimum
```

Case 3:22-cv-00093   Document 33-11   Filed 05/04/22   Page 35 of 65 PageID #: 1550

```
                                                        36
1         staffing requirements?
2    A.   It has not.

14   Q.   Which is, it's not?  It's never -- you've never
15        been in compliance with the staffing requirements
16        since you've been warden; do I understand you
17        correctly?
18   A.   That is correct.  We have -- That is correct.
```

Doc. 33-11 at 35:20–36:2; 36:14–18.

They additionally reveal testimony from another recent Trousdale Turner warden to the effect that Trousdale Turner is "never going to be fully staffed." "Never[,]" and that Trousdale Turner left 733 critical posts unstaffed shortly before Mr. Childress's murder:

```
15    staffing up.  That's nothing new.  I mean, that's
16    nothing new to any in every prison I've ever worked at,
17    even as a CO.  It's nothing new.  You're never going to
18    be fully staffed.  Never.  Raymond Byrd has never worked
19    at a prison, from a correctional officer until now, that
```

Doc. 33-2 at 23:17–18.

```
10         Q.    Okay.  And do you see that here,
11    noncompliance Item 3, under noncompliance issue, Mr.
12    Walton has written:  All critical posts shall be staffed
13    as required.  However, multiple critical posts were not
14    covered during the monitoring period for the month of
15    December.  There were 31 days in the month of December,
16    which the shift rosters reflected 733 critical posts
17    were not filled on time or were left vacant during the
18    security shift?
19         A.    I see that.
```

Doc. 33-2 at 64:10–19.

They further reveal testimony from Trousdale Turner's on-site TDOC monitors that CoreCivic has "been consistently noncompliant" and has "never been in compliance" with contractual staffing requirements:

```
BOZA PLEASANT-BEY vs STATE OF TENNESSEE
WALTON, JON on 04/08/2021                              Page 77
                                                      Page 77
1         Q.    So it's fair to say that before you issued
2    this report, CoreCivic had been consistently
3    noncompliant?
4         A.    Yes.
```

Doc. 37-2 at 77:1–4.

BOZA PLEASANT-BEY vs STATE OF TENNESSEE
WALTON, JON on 04/08/2021

Page 98

Page 98

```
 1      Q.    So I'm prepared to continue going all of the
 2   way through all of the rest of these reports, you know,
 3   to the extent that I have them.  But is it fair to say
 4   that CoreCivic has never been in compliance with
 5   Staffing Item 2B?
 6           MR. AUMANN:  Objection to form.
 7           MR. WELBORN:  Same objection.
 8   BY MS. MAPLES:
 9      Q.    Since you've been at the facility?
10      A.    That would be fair, yes.
11      Q.    Is it fair to say that CoreCivic has never
12   been in compliance with Staffing Item 9 since you have
13   been at CoreCivic?
14           MR. AUMANN:  Objection to form.
15           THE WITNESS:  Yes.
```

Doc. 37-2 at 98:1–15.  Further still, they reveal testimony that CoreCivic has never been in compliance with the TDOC's inmate grievance procedures:

```
22   BY MS. MAPLES:
23      Q.    And is it fair to say that since you've been
24   at Trousdale, CoreCivic has never been in compliance
25   with the grievance procedure?
```

*Briggs & Associates 615/482-0037*
*Nashville, Tennessee*

BOZA PLEASANT-BEY vs STATE OF TENNESSEE
WALTON, JON on 04/08/2021

Page 50

Page 50

```
 1           MR. WELBORN:  Objection to the form.
 2           MR. AUMANN:  Same objection, form.
 3   BY MS. MAPLES:
 4      Q.    Go ahead.
 5      A.    That would be correct, yes.
```

*See* Doc. 37-2 at 49:23–50:5.  They also reveal that CoreCivic has repeatedly submitted false staffing records to the TDOC:

-7-

```
15        Q.     So again, you are getting reporting from the
16    facility that is incomplete and inaccurate, right?
17        A.     Yes.
18        Q.     If we scroll down to Noncompliant Item No. 3,
19    do you see that Staffing Item 9 is, again, noncompliant?
20        A.     Yes.
21        Q.     And do you see that, again, CoreCivic has
22    noted the amount of overtime that was worked in this
23    report?
24        A.     Yes.
25        Q.     And do you see that it's 6,810.34 hours of
```

*Briggs & Associates 615/482-0037*
*Nashville, Tennessee*

Doc. 37-2 at 86:15–20. They further reveal that the TDOC has assessed CoreCivic "millions of dollars" in liquidated damages for contract non-compliance at TTCC:

```
 4        Q.     When you say liquidated damages, what do
 5    you mean by that?
 6        A.     It's a monetary penalty that has to be
 7    paid by the vendor where funds are held back for a
 8    violation that has not been corrected.
 9        Q.     And do you know how much money, if any, in
10    the liquidated damages that CoreCivic has had to pay
11    for the Trousdale facility?
12             MR. AUMANN:  Objection.  Objection to
13    form.  You can go ahead and answer.
14             THE WITNESS:  You know, I do not know.  I
15    couldn't tell you right now exactly how much that
16    is, so for a specific number, I don't have that in
17    front of me.
18    BY MS. HERZFELD:
19        Q.     Do you have an estimate?
20             MR. AUMANN:  Same objection.  Form.  You
21    can go ahead and answer.
22             THE WITNESS:  It's in the millions of
23    dollars, but I don't know the exact number.
24    BY MS. HERZFELD:
25        Q.     Do you know what those liquidated damages
```

*See* Doc. 37-12 at 20:4–23.

They additionally reveal that despite all of the above, the TDOC has never even had a conversation about canceling CoreCivic's contract at Trousdale Turner and taking over the facility, notwithstanding its ability to do so:

```
 5          THE WITNESS:  Ultimately, I mean, I think
 6  that, you know, TDOC would come in, we could look at
 7  the possible stepping away from the contractor,
 8  removal of the contract at some point, yes.  That is
 9  another option that we would have.
10  BY MS. HERZFELD:
11      Q.   Could you take over the facility?
12      A.   Well, we could.  There's some language in
13  the contract that will allow us to take over the
14  facility or the management of the facility, yes.
15      Q.   Has TDOC ever had to do that?
16      A.   No, we have not.
17      Q.   Has there ever been a conversation that
18  you're aware of that has explored the possibility of
19  TDOC taking over Trousdale?
20      A.   No, there has not.
21      Q.   What about a partial takeover?
22      A.   No.
23      Q.   Okay.
24          MR. AUMANN:  Object to form.  You can go
25  ahead.
```

Case 3:22-cv-00093   Document 37-12   Filed 05/25/22   Page 25 of 233 PageID #: 3776

*See* Doc. 37-12 at 25:5–22.  Instead, the TDOC's former commissioner—who is now the President of the American Correctional Association (ACA), which exists for the benefit of the private prison industry—lobbied for low liquidated damages penalties for contract violations due to a concern that fines "would be very detrimental to CoreCivic," would cost CoreCivic "a substantial amount of money," and would detrimentally affect CoreCivic's bottom line:

```
                                                              Page 61
 1          Q.     Was Commissioner Parker at that meeting?

 2          A.     Commissioner Parker was at the meeting, yes.

 3          Q.     Did Commissioner Parker take a position on

 4    the fines?

 5          A.     He was -- you know, he was there with Wes

 6    Landers.  And together, they were just explaining to us

 7    how steep the fines would be based on the rate, and that

 8    they had a concern that this would be very detrimental

 9    to CoreCivic.  And you know, keeping them as a

10    contractor could influence, you know, I guess the

11    relationship between them.

12            I am not sure I am phrasing that right, but

13    I'm just saying that he had a concern that it was a lot

14    of money.  And in the course of business, that would be

15    a concern to any company that would have fines, you

16    know, levied against them.  And certainly, the

17    department being contracted to CoreCivic, you know, it's

18    in their interest to keep CoreCivic housing prisons and

19    with their contracts.  So they just had a concern that

20    the rate they agreed to would be a lot -- amount to a

21    substantial amount of money.

22          Q.     And the fines, your understanding is, would

23    be levied if there were violations of the contract?

24          A.     Correct.  This was part of the contract

25    called liquidated damages.  And basically, under certain
```

*See* Doc. 37-10 at 61:1–24.

Because CoreCivic—both in litigation (as in this case) and in the media—routinely denies allegations regarding its understaffing conditions, CoreCivic is upset about the above non-confidential documents (which are properly characterized as public records) becoming public and the undersigned's discussion of them.  Accordingly, CoreCivic has applied to this Court to order, *inter alia*, that the undersigned "cannot disseminate any

public communication" about them; to order "counsel for Newby that they must remove all public communications within their control, including social media posts" about the above documents, or that otherwise criticize CoreCivic's deficient operation of prison facilities in Tennessee; and to "strike all Notices of Filing" that contain the above documents. *See* Doc. 45 at 1. CoreCivic further asserts that counsel requires this Court's advance "permission" to criticize the company outside of court. *See* Doc. 44 at 2.

For its own part, though, CoreCivic employs a fulltime "Public Affairs Manager" and a massive, well-funded public relations apparatus designed to burnish its public-facing image and give the appearance that CoreCivic is not really the "hell hole" that one of this Court's colleagues has recently described it as being. For instance, on February 16, 2022—just five days after this lawsuit was filed—CoreCivic issued the following statement to the Middle District of Tennessee's NBC affiliate stating, in full, as follows:

> Caresse,
>
> Thank you for reaching out to us with your inquiry. Feel free to use the following statement, attributable to me, for your reporting.
>
> CoreCivic has a detailed Human Rights Policy that clearly outlines our commitments regarding inmate rights and treatment, including legal rights, safety and security, healthcare, reentry programming, visitation and standards of living. Every one of our colleagues at CoreCivic are trained on this policy before their first day of work.
>
> In November 2021, the NAACP made claims about Trousdale Turner Correctional Center (TTCC) that were unsubstantiated, inaccurate, and misinformed. We're not aware of any concerns raised by the NAACP regarding TTCC since then, but strongly encourage them to share any specific claims with the facility so that we can properly investigate.
>
> In both policy and practice, CoreCivic respects the dignity of every individual entrusted to our care. We have clear lines of communication for those in our care to make concerns known without fear of repercussions, including in-facility reporting, a company-wide hotline accessible anonymously internally and externally, and direct access to our government partners.

-11-

> While privacy laws prevent us from discussing an individual's specific medical conditions, we stand by our previous statement that TTCC provides all of those in our care with comprehensive medical and mental health care. Furthermore, TTCC is monitored very closely by our government partners at the Tennessee Department of Correction, who employ two, full-time, on-site contract monitors at TTCC who work to ensure our full compliance with prescribed policies and procedures.
>
> TTCC is also subject to multiple layers of oversight from our government partner and independent third parties like the American Correctional Association (ACA). That oversight includes both scheduled and unscheduled inspections of our operations. We're proud to say TTCC has been recommended for reaccreditation by the ACA following a rigorous, on-site inspection earlier this month in which independent inspectors gave the facility scores of 100% on mandatory standards and 98.4% on non-mandatory standards. The ACA reviews more than 400 standards of correctional management, including healthcare and other services around standards of living and safety.
>
> Very Respectfully,
>
> Matthew Davio
>
> Public Affairs Manager
>
> CoreCivic

*See* Doc. 41-3 at 3.

To be sure, though, this statement was—at best—highly disingenuous and deliberately misleading, which was of course the goal. For instance, the notion that the NAACP's reported concerns about understaffing and violence at Trousdale Turner were "unsubstantiated" or "inaccurate" is farcical, *see id.*; to the contrary, it turns out that they were widely acknowledged by both CoreCivic and TDOC witnesses under oath months earlier. The notion that the TDOC's on-site contract monitors "work to ensure" Trousdale Turner's "full compliance with prescribed policies and procedures" was similarly false; instead, the TDOC's on-site monitors themselves testified that it "would be outside the scope of [their] responsibility" to ensure such compliance; that their job was simply to

document it; and that working to ensure compliance is "the contractor's responsibility." *See* Doc. 37-2 at 87:8–21.

While simultaneously defending—and relentlessly exercising (*see, e.g.,* Doc. 41-3, at 3; **Exs. 2–7**)—its <u>own</u> right to discuss its operations publicly, CoreCivic also struggles to identify what, specifically, it believes is prejudicial. Thus, CoreCivic complains—inconsistently—that the deposition excerpts that counsel discussed are "limited portions of documents," *see* Doc. 46 at 6, while also complaining that the complete documents were made available "for public consumption through a publicly accessible Dropbox account" (of note, they are also available publicly on PACER). *See* Doc. 46 at 18.

Regardless, according to the Defendants, CoreCivic itself is permitted to mislead the public about the conditions at its facilities, while Plaintiffs' counsel is forbidden from engaging in counter-speech discussing non-confidential, verbatim deposition testimony that contradicts CoreCivic's false and misleading public claims. The reason, CoreCivic insists, is that only "parties and witnesses"—not attorneys—may make extrajudicial statements about its operations. *See* Doc. 44 at 2. Such a rule would be remarkably convenient for CoreCivic, of course, given that Defendant CoreCivic employs fulltime public relations staff, while Plaintiff Terry Childress is dead and is accordingly left with Plaintiffs' counsel as his advocate. Because the favored/disfavored speaker regime that CoreCivic imagines "would of course" be unconstitutional, though, *see Thomas v. Chicago Park Dist.*, 534 U.S. 316, 325, 122 S. Ct. 775, 781, 151 L. Ed. 2d 783 (2002) ("Granting waivers to favored speakers (or, more precisely, denying them to disfavored speakers) would of course be unconstitutional")—and because CoreCivic's claims both misapprehend the relevant Local Rule and are constitutionally forbidden for multiple overlapping reasons—the Defendants' motion should be denied.

**A.** **CoreCivic has failed to meet its burden of proving prejudice; its view of Local Rule 83.04 violates the First Amendment; and its proposed relief violates the First Amendment.**

CoreCivic purports to be seeking relief from this Court on the basis that it is concerned that the undersigned's tweets will compromise the Parties' scheduled trial approximately 18 months from now. *See generally* Doc. 46. Historically, it should be noted, CoreCivic's efforts to leverage the judicial process to suppress truthful information and censor critical commentary regarding its operations have not been limited to good-faith claims.[2] CoreCivic also appears to have settled—before trial—all cases that were ever at risk of reaching trial in this jurisdiction, obviating any genuine concerns about pre-trial publicity at all. *See, e.g.,* Melissa Brown, *Corecivic settles lawsuit in 2017 Nashville jail scabies outbreak*, THE TENNESSEAN (Dec. 8, 2021), https://www.tennessean.com/story/news/2021/12/08/corecivic-settles-lawsuit-over-nashville-jail-scabies-outbreak/8827935002/; Travis Loller, *Corecivic to settle shareholders lawsuit for $56 million*, THE TENNESSEAN (Apr. 20, 2021), https://www.tennessean.com/story/news/2021/04/20/corecivic-lawsuit-private-prison-operator-settle-56-million/7302711002/. Given the foregoing, the Plaintiffs harbor some degree of skepticism about CoreCivic's true motivations for seeking a broad speech-based prior restraint restricting critical commentary regarding its conduct.

Taking the Defendants' purported motivations at face value, though, the

---

[2] *See, e.g.,* Madison Pauly, *How a Private Prison Company's Defamation Suit Against One of Its Critics Backfired*, MOTHERJONES (Dec. 11, 2020), https://www.motherjones.com/crime-justice/2020/12/corecivic-defamation-lawsuit-family-separation-simon/. *See also Grae v. Corr. Corp. of Am.,* 330 F.R.D. 481, 487 n.2 (M.D. Tenn. 2019) ("CoreCivic has argued that its internal responses to BOP scrutiny should be kept under seal because their disclosure could harm CoreCivic in the marketplace. (Docket No. 155 at 6.) The court, however, discerns no serious threat of unfair competition associated with disclosure of the relevant communications. None of the cited internal conversations reveal any confidential CoreCivic strategies, practices, or research and development. The conversations cited may be awkward or embarrassing for CoreCivic to see disclosed, but that, alone, is not enough to justify an unyielding seal in this case.").

Defendants have failed to meet their burden of demonstrating any substantial concern about pre-trial publicity. They have also failed to justify the need for a vast prior restraint and retraction order. "When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 816, 120 S. Ct. 1878, 1888, 146 L. Ed. 2d 865 (2000) (collecting cases). *See also Tinker v. Des Moines Independent Community School Dist.*, 393 U.S. 503, 509, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) ("In order for the State ... to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint."). Here, however, CoreCivic's requested speech restrictions—which include a vast prior restraint that CoreCivic, which is acting as the government, s*ee, e.g., Friedmann v. Corr. Corp. of Am.*, 310 S.W.3d 366, 379 (Tenn. Ct. App. 2009), not be criticized—are based not on evidence or demonstrated prejudice, but upon exasperated hyperbole about potential prejudice 18 months from now.

Indeed, CoreCivic itself cannot settle on what the supposed risk of harm is, having argued—inconsistently—that counsel's tweets constitute "inappropriate" petitioning activity that is designed to convince regulators to "#EndCoreCivic", *see* Doc. 46 at 12; that the tweets will "potentially" compromise a trial in this matter, *see id.* at 2; that they "have the effect" of prejudicing a trial in this matter, *see id.* at 12; that they are "presumptively prejudicial," *see id.* at 16; that a vast gag order and prior restraint is a "necessary precaution[]" needed "to help alleviate the substantial risk of material prejudice" to a trial, *see id.* at 4; that it is "substantially likely" that counsel's tweets will prejudice a trial, *id.* at 16; that they "create a substantial risk of prejudicing an impartial trial[,]" *id.* at 17; and that they "may" affect the trial of this matter, *see id.* at 18. Actual evidence of unfair

prejudice is also uniformly absent from CoreCivic's motion. CoreCivic has additionally opposed Plaintiffs' invitation for as much extended voir dire as it desires to address the Defendants' professed concerns about juror prejudice, *see* Doc. 44—strong evidence that CoreCivic's true motivation for blanket pre-trial censorship, a retraction order, and an order not to criticize CoreCivic publicly is based on something else entirely.

By contrast to the Defendants' failure to introduce any actual evidence of prejudice, the Plaintiffs observe that there is significant evidence that prejudice to a trial will <u>not</u> result from counsel's constitutionally protected criticism of CoreCivic. For instance, the Plaintiffs note that—statistically—there is approximately a 99% chance that this case will never reach trial at all. *See generally* Jeffrey Q. Smith and Grant R. MacQueen, *Going, Going, But Not Quite Gone: Trials Continue to Decline in Federal and State Courts. Does it Matter?*, JUDICATURE (Winter 2017, Vol. 101, No. 4), at 4 https://judicature.duke.edu/wp-content/uploads/2020/06/JUDICATURE101.4-vanishing.pdf ("In 2016, by contrast, 271,302 civil cases were terminated, but only 2,781 cases (1 percent) ended 'during or after trial' (1,965 jury and 816 nonjury)") (citing Annual Reports of the A.O., tbl.T-1 (9/30/97, 9/30/05, 9/30/16)). Thus, CoreCivic is seeking a vast gag and retraction order forbidding criticism of the government and forbidding discussion of public documents regarding governmental operations based on the statistically minuscule likelihood that a trial will occur. CoreCivic also seeks that prior restraint based on professed fears that counsel's statements on Twitter—a platform that the overwhelming majority of American adults do not use, *see* Meltem Odabas, *10 facts about Americans and Twitter*, PEW RESEARCH CENTER (May 5, 2022), https://www.pewresearch.org/fact-tank/2022/05/05/10-facts-about-americans-and-twitter/—"may" "potentially" affect a trial 18 months from now. *See* Doc. 46 at 2, 18. In

the unlikely event that such a trial did occur and that some prospective juror happens to have seen counsel's tweets, CoreCivic will also be permitted—as it acknowledges—to conduct voir dire and eliminate any resulting prejudice that way. *See* Doc. 44 at 12 (noting that "Defendants already are entitled to conduct voir dire during the trial of this matter").

Put another way: To address CoreCivic's speculation-upon-speculation about "potential" prejudice to a trial 18 months from now that is highly unlikely to occur at all, CoreCivic seeks a vast speech-suppression order that is designed to serve as "prophylaxis-upon-prophylaxis"—an approach that also has the convenient side-effect of imposing a prior restraint against constitutionally protected, truthful speech that is critical of the government. *Cf. Fed. Election Comm'n v. Cruz*, 142 S. Ct. 1638, 1653 (2022) ("a prophylaxis-upon-prophylaxis approach, we have explained, is a significant indicator that the regulation may not be necessary for the interest it seeks to protect."). As noted, CoreCivic also wants to impose that censorship regime upon Plaintiffs' counsel while reserving, for itself, the right *as a party* to disseminate false information on a much wider scale through its professional PR machine, *see* Doc. 44 at 2 (asserting that only "parties and witnesses" may make extrajudicial statements)—a right that Plaintiff Terry Childress cannot himself exercise on account of the fact that he was murdered in CoreCivic's care.

Multiple doctrines prohibit this approach, however, including, without limitation:

1.     First Amendment doctrine prohibiting restraints upon the dissemination of truthful, public information, *see, e.g., Smith v. Daily Mail Pub. Co.*, 443 U.S. 97, 103 (1979) ("once the truthful information was 'publicly revealed' or 'in the public domain' the court could not constitutionally restrain its dissemination.") (quoting *Oklahoma Publ'g Co. v. District Court*, 430 U.S. 308, 311-12 (1977)); *Landmark Commc'ns, Inc. v. Virginia*, 435 U.S. 829, 830-31, 834-42 (1978) (holding unconstitutional a statute that forbade the

news media from disclosing truthful information regarding ethical investigations of judges, even though confidentiality served legitimate state interests); *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 494–95, 95 S. Ct. 1029, 1046, 43 L. Ed. 2d 328 (1975) ("interests in privacy fade when the information involved already appears on the public record."); *The Fla. Star v. B.J.F.*, 491 U.S. 524, 535, 109 S. Ct. 2603, 2610, 105 L. Ed. 2d 443 (1989) ("punishing the press for its dissemination of information which is already publicly available is relatively unlikely to advance the interests in the service of which the State seeks to act.");

2. First Amendment doctrine prohibiting restraints upon the creation of information, *see Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011) (holding that "the creation and dissemination of information are speech within the meaning of the First Amendment."); *Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 792, n.1 (2011) ("Whether government regulation applies to creating, distributing, or consuming speech makes no difference."); *Sandvig v. Sessions*, 315 F. Supp. 3d 1, 15 (D.D.C. 2018) ("The Supreme Court has made a number of recent statements that give full First Amendment application to the gathering and creation of information.") (collecting cases); *Project Veritas v. Ohio Election Comm'n*, 418 F. Supp. 3d 232, 253 (S.D. Ohio 2019) ("The Supreme Court has generally recognized that 'the creation and dissemination of information are speech within the meaning of the First Amendment.'") (quoting *Sorrell*, 564 U.S. at 570*). Cf. Houchins v. KQED, Inc.*, 438 U.S. 1, 11 (1978) ("There is an undoubted right to gather news 'from any source by means within the law'") (quoting *Branzburg v. Hayes*, 408 U.S. 665, 681–82 (1972));

3. First Amendment doctrine that prohibits treating professional speech as a separate category of speech; *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361,

2371–72, 201 L. Ed. 2d 835 (2018) ("this Court has not recognized 'professional speech' as a separate category of speech. Speech is not unprotected merely because it is uttered by 'professionals.'"). *See also Otto v. City of Boca Raton, Fla.*, 981 F.3d 854, 866 (11th Cir. 2020) ("'professional speech' is not a traditional category of speech that falls within an exception to normal First Amendment principles. We have already rejected the suggestion that the government's ability to regulate entry into a profession entitles it to regulate the speech of professionals."); *UPSOLVE, INC., & REV. JOHN UDO-OKON, Plaintiffs, v. LETITIA JAMES, in her official capacity as Att'y Gen. of the State of New York, Defendant.*, No. 22-CV-627 (PAC), 2022 WL 1639554, at *13 (S.D.N.Y. May 24, 2022) ("the Supreme Court recently undermined Justice White's theory that licensing requirements are somehow *sui generis* under the First Amendment merely because they target professionals.");

4.     First Amendment doctrine prohibiting speaker-based discrimination, *see, e.g.*, *Thomas*, 534 U.S. at 325 ("Granting waivers to favored speakers (or, more precisely, denying them to disfavored speakers) would of course be unconstitutional . . . ."); *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 96 (1972); *Citizens United v. F.E.C.*, 558 U.S. 310, 340 (2010) (citing *First Nat'l Bank of Boston*, 435 U.S. 765, 784 (1978)); *City of Madison, Joint Sch. Dist. No. 8 v. Wis. Employment Relations Comm'n*, 429 U.S. 167, 175–76 (1976) (citing *Mosley*, 408 U.S. at 96); *Greater New Orleans Broad. Ass'n v. United States*, 527 U.S. 173, 194 (1999) ("[D]ecisions that select among speakers conveying virtually identical messages are in serious tension with the principles undergirding the First Amendment.");

5.     First Amendment doctrine prohibiting speech about CoreCivic based on the critical viewpoint conveyed, *see Members of City Council v. Taxpayers for Vincent*, 466

U.S. 789, 804 (1984) ("[T]he First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others.") (collecting cases)— "an egregious form of content discrimination" that is presumptively unconstitutional, *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995);

6. Content-based speech restrictions generally, which can only be sustained if they are the least restrictive means necessary to further a compelling state interest, *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) ("[g]overnment regulation of speech is content-based if a law applies to particular speech because of the topic discussed or the idea or message expressed.") (collecting cases); and

7. Powerful prohibitions against prior restraints under nearly any circumstance. *See, e.g., Procter & Gamble Co. v. Bankers Tr. Co.*, 78 F.3d 219, 226–27 (6th Cir. 1996) ("In the case of a prior restraint on pure speech, the hurdle is substantially higher: publication must threaten an interest more fundamental than the First Amendment itself. Indeed, the Supreme Court has never upheld a prior restraint, even faced with the competing interest of national security or the Sixth Amendment right to a fair trial.").

Further, the <u>*remedies*</u> that the Defendants seek—a vast, affirmative prior restraint prohibiting criticism of CoreCivic, combined with a negative injunction requiring counsel to retract past criticism, both of which are premised upon unsupported speculation about potential future prejudice approximately 18 months from now—would be hopelessly unconstitutional in their own right. *See generally* Eugene Volokh, *Overbroad Injunctions Against Speech (Especially in Libel and Harassment Cases)*, 45 Harv. J.L. & Pub. Pol. (2022) at 170, *available at* https://www.harvard-jlpp.com/wp-content/uploads/sites/21/2022/02/VOLOKH_VOL45_ISS1.pdf (noting that such injunctions "enjoin speech that falls outside any existing First Amendment exceptions"

-20-

and "violate the First Amendment, which generally protects the right to criticize people, including private figures."). *See also Org. for a Better Austin v. Keefe*, 402 U.S. 415, 419, 91 S. Ct. 1575, 1578, 29 L. Ed. 2d 1 (1971) ("The claim that the expressions were intended to exercise a coercive impact on respondent does not remove them from the reach of the First Amendment. Petitioners plainly intended to influence respondent's conduct by their activities; this is not fundamentally different from the function of a newspaper. . . . [S]o long as the means are peaceful, the communication need not meet standards of acceptability."); *Kramer v. Thompson*, 947 F.2d 666, 682 (3d Cir. 1991) ("we find no support for the various retractions and withdrawals forced upon Thompson by the district court. Consequently, those orders of the district court compelling such retractions and withdrawals, and the associated contempt citations, must be reversed.").

Put another way: With rare exceptions, "[r]egulations which permit the Government to discriminate on the basis of the content of the message cannot be tolerated under the First Amendment." *Regan v. Time, Inc.*, 468 U.S. 641, 648–49, 104 S. Ct. 3262, 3267, 82 L. Ed. 2d 487 (1984). Speech criticizing a misbehaving governmental contractor engaged in the governmental function of operating prisons also is not among historically recognized First Amendment exceptions. *See id. United States v. Stevens*, 559 U.S. 460, 468–69, 130 S. Ct. 1577, 1584, 176 L. Ed. 2d 435 (2010). On top of this, "[a]ny system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70, 83 S. Ct. 631, 639, 9 L. Ed. 2d 584 (1963) (collecting cases). Non-disparagement orders like the one the Defendants demand do not plausibly satisfy this standard. *See, e.g., Shak v. Shak*, 484 Mass. 658, 658, 144 N.E.3d 274, 276 (2020) ("We conclude that the nondisparagement orders at issue here operate as an impermissible prior restraint on speech."). And that is

particularly true where—as here—the undersigned has affirmative ethical duties to speak out against CoreCivic and petition regulators on behalf of _other_ clients who are currently incarcerated in CoreCivic's facilities and who desperately require urgent governmental action today, tomorrow, and every other day regardless of whether or when this litigation ever reaches trial. _See, e.g.,_ Doc. 41 at 7 (noting that "the undersigned has several clients who are currently housed in Tennessee's CoreCivic facilities, and he is concerned for their safety every single day.") (citing Doc. 41-2). That such advocacy is apparently effective enough that CoreCivic would take the unbelievable approach of asking a federal court to order the undersigned to delete tweets discussing their malfeasance is also a reason to protect it, not forbid it. The Defendants' motion to gag Plaintiffs' counsel and compel counsel to retract critical statements about the government should be denied accordingly.

**B.    CoreCivic's motion should be denied on non-constitutional grounds.**

The undersigned has previously detailed at length why he has ethical duties and affirmative obligations—both on behalf of the Plaintiffs in this case and on behalf of other clients—to speak publicly about and to publicly petition regulators regarding CoreCivic when it comes to the widespread, pervasive deficiencies in its operations that CoreCivic does not want to see discussed. _See generally_ Doc. 41. For those reasons—and for the additional reasons discussed above and in the Plaintiffs' _Motion for Special Order Pursuant to Local Rule 83.04(b)_—the First Amendment also powerfully protects such speech and petitioning activity. Thus, due to the resulting viewpoint-based, content-based, and speaker-based infirmities—and due to the absence of any evidence supporting the Defendants' demand to impose the vast speech-based prior restraint and retraction injunction the Defendants seek—interpreting Local Rule 83.04 in the manner the Defendants propose would violate the Constitution. As a consequence, to the extent that

-22-

the Court adopts the Defendants' view of the matter, the Plaintiffs expressly preserve the claim that Local Rule 83.04 is an unconstitutional and overbroad speech restriction, both facially and as applied to the speech the Defendants seek to restrain in this specific case.

This Court need not make any such constitutional determination, though, because the Defendants' motion may be resolved on two non-constitutional grounds. *See Feed The Child., Inc. v. Metro. Gov't of Nashville & Davidson Cnty.*, 330 F. Supp. 2d 935, 942 (M.D. Tenn. 2002) ("Courts are generally to avoid deciding constitutional issues, instead opting to resolve a motion on nonconstitutional grounds whenever possible.") (citing *Clinton v. Jones*, 520 U.S. 681, 690 & n. 11, 117 S.Ct. 1636, 137 L.Ed.2d 945 (1997)).

*First*, in the unlikely event that this case actually reaches trial, this Court may simply issue a special order affording CoreCivic the opportunity to conduct whatever extended voir dire it desires to address its professed concerns about potential trial prejudice—the only ground identified for the vast speech restrictions that CoreCivic demands. *See generally* Doc. 41. Local Rule 83.04(b) expressly contemplates such special orders in "widely publicized and sensational cases" like this one, *see id.*, and it is a far more narrowly tailored and far less restrictive means of addressing CoreCivic's professed interests than imposing a vast censorship order to address the concerns about pre-trial publicity that the Defendants claim to have.

*Second*, this Court may deny CoreCivic's motion on the basis that Local Rule 83.04(a)(3) expressly permits counter-speech where—as here—CoreCivic has revved up its PR machine and released public statements to a large local audience that are designed to mislead the public about, among other things: (1) CoreCivic's supposed "commitments regarding inmate rights and treatment," (2) "safety and security," (3) "unsubstantiated, inaccurate, and misinformed" criticism of its understaffing conditions, (4) CoreCivic's

claimed "respect[ for] the dignity of every individual entrusted to [its] care," (5) the "comprehensive medical and mental health care" CoreCivic claims to provide, (6) the purported "clear lines of communication for those in [CoreCivic's] care to make concerns known without fear of repercussions, including in-facility reporting," (7) CoreCivic's claim that "TTCC is monitored very closely by [CoreCivic's] government partners at the Tennessee Department of Correction, who employ two, full-time, on-site contract monitors at TTCC who work to ensure our full compliance with prescribed policies and procedures," and (8) the high scores CoreCivic received from (paid) "independent" facility audits, *see* Doc. 41-3 at 3, which just happen to have been conducted by an entity—currently headed by the former Commissioner who lobbied to protect CoreCivic's financial bottom line at the expense of inmate safety while he was employed as a government official—that exists to prop up the private prison industry.

Nearly every statement CoreCivic made in that publication to a wide local audience, many of which bear upon specific issues in this litigation, is false or misleading in some way. CoreCivic also does not have and cannot claim a monopoly on speech about its operations. Nor was CoreCivic's out-of-court speech initiated by or a response to anything the Plaintiffs said. Under these circumstances, Local Rule 83.04(a)(3) permits counter-speech "to mitigate the recent adverse publicity" that CoreCivic chose to initiate.

Nor was that the only occasion when CoreCivic has endeavored to speak to local jurors. Indeed, CoreCivic is constantly engaged in a relentless local marketing campaign that is calculated to portray CoreCivic's operations in a manner other than they actually are. *See, e.g.,* Quinton T. Fletcher, *I am a prison chaplain who urges CoreCivic detractors to rethink their criticism*, THE TENNESSEAN (Dec. 11, 2020), https://www.tennessean.com/story/opinion/2020/12/11/corecivic-detractors-should-

rethink-criticism-prison-chaplains-view/6510184002/ (**Ex. 2**); Michelle Cotter, *Education is the best second chance for many inmates*, THE TENNESSEAN (May 13, 2020), https://www.tennessean.com/story/opinion/2020/05/13/education-key-successful-reentry-many-inmates/3092174001/ (**Ex. 3**); Damon Hininger, *Reentry services are key to a successful exit from prison*, THE TENNESSEAN (Nov. 27, 2019). https://www.tennessean.com/story/opinion/2019/11/27/reducing-prison-recidivism-calls-quality-reentry-programs/4313847002/ (**Ex. 4**); Damon T. Hininger, *CoreCivic can help solve tough government problems*, THE TENNESSEAN (Nov. 2, 2016), https://www.tennessean.com/story/opinion/contributors/2016/11/02/corecivic-can-help-solve-tough-government-problems/93121082/ (**Ex. 5**); Damon Hininger, *Tennessee is setting a new standard on reducing recidivism*, THE TENNESSEAN (May 29, 2019), https://www.tennessean.com/story/opinion/2019/05/29/tennessee-setting-new-standard-reducing-recidivism/1264744001/ (**Ex. 6**); Joe Pryor, *How Tennessee is beating the nation in reducing prison recidivism*, THE TENNESSEAN (Oct. 10, 2018), https://www.tennessean.com/story/opinion/2018/10/10/how-tennessee-beating-nation-reducing-prison-recidivism/674454002/ (**Ex. 7**). CoreCivic's motion may be denied accordingly.

**C.     The Plaintiffs may provide this Court notice of relevant documents.**

CoreCivic also suggests that the Plaintiffs may not file notice of uniformly relevant documents, which they claim were "filed without any proper purpose." *See* Doc. 46 at 19. The purpose is to inform the Court of them, to enable current and future citation to them, and to enable judicial notice of them for Rule 12, Rule 56, and other purposes. The fact that they contain truthful, relevant information that "may be awkward or embarrassing for CoreCivic to see disclosed" is not a basis for hiding them. *Grae*, 330 F.R.D. at 487 n.2.

## IV. CONCLUSION

For the foregoing reasons, the Defendants' *Motion for Compliance With Local Rule 83.04 and to Strike* should be denied.[3]

Respectfully submitted,

/s/ Daniel A. Horwitz
Daniel A. Horwitz, BPR #032176
Lindsay E. Smith, BPR #035937
HORWITZ LAW, PLLC
4016 Westlawn Dr.
Nashville, TN 37209
daniel@horwitz.law
lindsay@horwitz.law
(615) 739-2888

Brice M. Timmons #29582
Craig A. Edgington #38205
DONATI LAW, PLLC
1545 Union Ave.
Memphis, Tennessee 38104
(901) 278-1004 – Telephone
(901) 278-3111 – Facsimile
brice@donatilaw.com
craig@donatilaw.com

*Attorneys for Plaintiffs*

---

[3] To the extent the Court additionally desires a response regarding CoreCivic's various misapprehensions and misrepresentations regarding the application of BPR rules—which are not the subject of CoreCivic's motion, but which CoreCivic intermittently references in the hopes of suppressing criticism of its deficient operations—the Plaintiffs are happy to provide one.

-26-

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of June, 2022, a copy of the foregoing and all exhibits and attachments were sent via CM/ECF to:

Joe Welborn
Erin Palmer Polly
Terrence M. McKelvey
222 Second Avenue, South
Suite 1700
Nashville, Tennessee 37201
Joe.Welborn@klgates.com
Erin.Polly@klgates.com
terrence.mckelvey@klgates.com

*Counsel for Defendants*

By:      /s Daniel A. Horwitz_____