## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| G. MARIE NEWBY, *et al.* | § | |
| | § | |
| *Plaintiffs*, | § | Case 3:22-cv-00093 |
| | § | |
| v. | § | JURY DEMANDED |
| | § | |
| CORECIVIC OF TENNESSEE, LLC, *et al.*, | § | |
| | § | |
| *Defendants*. | § | |

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR REVIEW OF NONDISPOSITIVE ORDER OF MAGISTRATE JUDGE [Doc. 53]

### I. INTRODUCTION

On July 15, 2022, Magistrate Frensley imposed an explicitly content- and speaker-based gag and retraction order against Plaintiffs' counsel. *See* Doc. 53 at 9. Magistrate Frensley's order restricts pure out-of-court speech regarding: (1) a governmental litigant; and (2) non-confidential, public, governmental records of public concern. *Id.* As such, the order is a classic prior restraint. *See Novak v. City of Parma, Ohio*, 33 F.4th 296, 307 (6th Cir. 2022) ("A prior restraint is an administrative or judicial order that forbids certain speech ahead of when that speech is planned to take place.") (citing *Alexander v. United States*, 509 U.S. 544, 550 (1993)). It is also "presumptively void," *see CBS Inc. v. Young*, 522 F.2d 234, 241 (6th Cir. 1975), and it carries a "'heavy presumption'" of unconstitutionality. *Novak*, 33 F.4th at 307 ("Because the right to speak without censorship lies at the core of the First Amendment, prior restraints face a 'heavy presumption against' validity.") (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963)).

For several reasons, Magistrate Frensley's presumptively void, vastly overbroad, content-based, and speaker-based prior restraint cannot overcome this heavy presumption of unconstitutionality. The order's First Amendment analysis—which is limited to just three

-1-

sentences—is grievously flawed. The order applied the wrong evidentiary standard. *See CBS Inc.*, 522 F.2d at 240–41 (requiring "substantial evidence to justify the conclusion that a clear and imminent danger to the fair administration of justice existed"). It also applied the wrong legal standard. *See United States v. Ford*, 830 F.2d 596, 600 (6th Cir. 1987) ("the 'clear and present danger' standard should apply to the District Court's 'no discussion' order"). The order additionally failed to adjudicate multiple claims—both constitutional and non-constitutional—that were raised in the Plaintiffs' Response (Doc. 48). So, too, was Magistrate Frensley's corresponding remedy—the court-ordered retraction of Plaintiffs' counsel's "opinionated statements" regarding CoreCivic and the Tennessee Department of Correction's poor regulatory oversight of Trousdale Turner Correctional Center, *see* Doc. 53 at 4, 9—constitutionally forbidden.

For these reasons—and for the additional reasons detailed below—Magistrate Frensley's order (Doc. 53) should be reversed. Additionally, the Plaintiffs' *Motion for Special Order Pursuant to Local Rule 83.04(b)* (Doc. 41)—which proposed a less restrictive alternative to the unconstitutional prior restraint that CoreCivic sought and obtained—should be granted.

## II. FACTS AND PROCEDURAL HISTORY

CoreCivic's private prisons are "'an absolute hell hole,'" they are "dangerously understaffed," and "violence is routine" within them. *See* Doc. 48-1 at 2. "'The defense bar is aware of it. The prosecutors are aware of it. The United States Marshals are aware of it.'" *Id.* According to CoreCivic, though, attorneys who sue CoreCivic are forbidden from talking about the deficient conditions at its prison facilities if litigation is pending. Instead, CoreCivic imagines that such attorneys are required to apply to this Court for "permission" to criticize CoreCivic's deficient operations, *see* Doc. 44 at 2, which have killed several of the undersigned's clients and constantly threaten the safety of their still-living clients on a daily basis.

To be clear: The above characterizations of the hellish conditions at the prisons that

CoreCivic operates are not Plaintiffs' counsel's. Instead, they represent the views of U.S. District Court Judge Julie Robinson shortly before this lawsuit was filed. *See* Doc. 48-1 at 2 ("'The only way I could describe it frankly, what's going on at CoreCivic right now is it's an absolute hell hole,' said U.S. District Judge Julie Robinson during a sentencing hearing in September."). When it comes to Trousdale Turner Correctional Center, specifically, those characterizations would also be generous. CoreCivic boasts years of consistently failed audits and extensive reports of both deficiencies and fatal misconduct at its Tennessee facilities in general and at Trousdale Turner Correctional Center in particular. *See* Doc. 48 at 2–4, n.1 (collecting extensive media coverage of CoreCivic and Trousdale Turner scandals spanning several years). There is also good reason to believe that these reports represent just the tip of the iceberg, given the large number of additional inmate deaths—including homicides—at Trousdale Turner that never make the news. For instance, on March 13, 2022, another client of the undersigned, Jose Torres, was murdered at Trousdale Turner. Further, on March 28, 2022, yet another client of the undersigned, Marktavious Twilley, was murdered at Trousdale Turner. *See* Doc. 41-1. Neither of these murders—which occurred weeks apart and shortly after this lawsuit was filed—was reported.

How, specifically, has CoreCivic's Trousdale Turner Correctional Center attained the ignominious title of the most dangerous prison facility in Tennessee? Recent documents produced by non-parties during this litigation shed some light on the answer. For instance, subpoenaed non-confidential documents reveal testimony from a recent Trousdale Turner warden that the facility has never been in compliance with minimum contractual staffing requirements. *See* Doc. 33-11 at 35:20–36:2; 36:14–18. They also reveal testimony from another recent Trousdale Turner warden to the effect that Trousdale Turner is "never going to be fully staffed." "Never[,]" Doc. 33-2 at 23:17–18, and that Trousdale Turner left 733 critical posts unstaffed shortly before Mr. Childress's

murder, *id.* at 64:10–19. They further reveal testimony from Trousdale Turner's on-site TDOC monitors that CoreCivic has "been consistently noncompliant" and has "never been in compliance" with contractual staffing requirements. Doc. 37-2 at 77:1–4; Doc. 37-2 at 98:1–15.

The documents also revealed that CoreCivic has never been in compliance with the TDOC's inmate grievance procedures. Doc. 37-2 at 49:23–50:5. They reveal that CoreCivic has repeatedly submitted false staffing records to the TDOC, too. *See* Doc. 37-2 at 86:15–20. They further reveal that the TDOC has assessed CoreCivic "millions of dollars" in liquidated damages for contract non-compliance at TTCC. *See* Doc. 37-12 at 20:4–23. They additionally reveal that despite all of the above, the TDOC has never even had a conversation about canceling CoreCivic's contract at Trousdale Turner and taking over the facility, notwithstanding its ability to do so. *See* Doc. 37-12 at 25:5–22. Instead, the TDOC's former commissioner—who is now the President of the American Correctional Association, which exists for the benefit of the private prison industry—lobbied for low liquidated damages penalties for contract violations due to concerns that fines "would be very detrimental to CoreCivic[,]" would cost CoreCivic "a substantial amount of money[,]" and would detrimentally affect CoreCivic's bottom line. *See* Doc. 37-10 at 61:1–24.

After the above public records were obtained and filed in this case, and based upon them, the undersigned made various "opinionated statements" regarding CoreCivic and the Tennessee Department of Correction's poor regulatory oversight of Trousdale Turner on Twitter. *See* Doc. 53 at 4. The statements at issue are available in their full context at **Ex. 1**.[1] Promptly thereafter, and approximately 18 months before the Parties' civil trial in this matter, CoreCivic—a

---

[1] After CoreCivic's gag attempt, but before Magistrate Frensley's retraction order, the publications at issue were archived by the speech-promoting website TechDirt, so they remain available online. *See* Mike Masnick, *Giant Private Prison Company Goes To Court To Try To Get Lawyer To Stop Tweeting About Them*, TECHDIRT (Jun. 21, 2022), https://www.techdirt.com/2022/06/21/giant-private-prison-company-goes-to-court-to-try-to-get-lawyer-to-stop-tweeting-about-them/. That archive is attached as **Ex. 1**, and it has been filed to enable review of the central publications with which CoreCivic was concerned—which Plaintiffs' counsel was thereafter ordered to delete—in their proper context.

-4-

multibillion dollar prison contractor that is acting as the government within the context of this litigation, *see Friedmann v. Corr. Corp. of Am.*, 310 S.W.3d 366, 379 (Tenn. Ct. App. 2009)—moved for a vast gag and retraction order regarding the above non-confidential, public, and directly relevant records, and it sought to strike them from this Court's docket. *See* Doc. 45. While maintaining—at the same time that it filed its motion—that this entire action should be dismissed *at the pleading stage* for failure to state a claim upon which relief can be granted, *see* Doc. 31 at 1, CoreCivic sought the above relief on the ostensible basis that it was worried that Plaintiffs' counsel's out-of-court statements "would interfere with a fair trial[.]" *See* Doc. 46 at 1.

To support its requested gag order, CoreCivic failed to muster any proof of prejudice. Doc. 46. CoreCivic also insisted that it did not have to do so, *see* Doc. 49 at 2 ("Defendants are not required to prove prejudice under the Local Rule."), even though the Sixth Circuit has held that "substantial evidence" of prejudice is a constitutional requirement. *See CBS Inc.*, 522 F.2d at 240–41 ("We find no substantial evidence to justify the conclusion that a clear and imminent danger to the fair administration of justice existed because of publicity. The presumption against the constitutional validity of the order, in our judgment, has not been met or overcome. We find it necessary, therefore, to conclude that the order is constitutionally impermissible."). CoreCivic itself could not settle on what the supposed risk of harm was, either.[2] It also opposed the Plaintiffs' invitation for as much extended voir dire as it desired as a solution to its professed concerns about potential juror prejudice in December 2023, *see* Doc. 44—strong evidence that CoreCivic's actual

---

[2] In seeking to gag Plaintiffs' counsel, CoreCivic argued—inconsistently—that counsel's tweets constitute "inappropriate" petitioning activity that is designed to convince regulators to "#EndCoreCivic", *see* Doc. 46 at 12; that the tweets will "potentially" compromise a trial in this matter, *see id.* at 2; that they "have the effect" of prejudicing a trial in this matter, *see id.* at 12; that they are "presumptively prejudicial[,]" *see id.* at 16; that a vast gag order and prior restraint is a "necessary precaution[]" needed "to help alleviate the substantial risk of material prejudice" to a trial, *see id.* at 4; that it is "substantially likely" that counsel's tweets will prejudice a trial, *id.* at 16; that they "create a substantial risk of prejudicing an impartial trial[,]" *id.* at 17; and that they "may" affect the trial of this matter, *see id.* at 18. Actual evidence of unfair prejudice was also uniformly absent from CoreCivic's motion.

motivation for seeking to censor Plaintiffs' counsel was based on something else entirely.

Historically, it should be noted, CoreCivic's efforts to leverage the judicial process to suppress truthful information and censor critical commentary regarding its operations have not been limited to good-faith claims.[3] CoreCivic also appears to have settled—before trial—all cases that were ever at risk of reaching trial in this jurisdiction, obviating any genuine concerns about prejudicial pre-trial publicity at all. *See* Doc. 14 at 48 (citing recent examples). For that reason, too, it is fair to conclude that CoreCivic's true motivation for seeking a broad speech-based prior restraint restricting critical commentary about its deficient operations was not actually undergirded by concerns about trial prejudice as CoreCivic claimed.

Of note, through its full-time PR team and "newsroom,"[4] CoreCivic has also exercised—and it continues to exercise—its *own* right to speak publicly about the conditions at Trousdale Turner, including to a much larger audience than the undersigned is capable of reaching through his Twitter account. For instance, on February 16, 2022—just five days after this lawsuit was filed—CoreCivic issued the following statement to Middle Tennessee's NBC affiliate:

> Caresse,
>
> Thank you for reaching out to us with your inquiry. Feel free to use the following statement, attributable to me, for your reporting.
>
> CoreCivic has a detailed Human Rights Policy that clearly outlines our commitments regarding inmate rights and treatment, including legal rights, safety and security,

---

[3] *See, e.g.,* Madison Pauly, *How a Private Prison Company's Defamation Suit Against One of Its Critics Backfired*, MOTHERJONES (Dec. 11, 2020), https://www.motherjones.com/crime-justice/2020/12/corecivic-defamation-lawsuit-family-separation-simon/. *See also Grae v. Corr. Corp. of Am.*, 330 F.R.D. 481, 487 n.2 (M.D. Tenn. 2019) ("CoreCivic has argued that its internal responses to BOP scrutiny should be kept under seal because their disclosure could harm CoreCivic in the marketplace. (Docket No. 155 at 6.) The court, however, discerns no serious threat of unfair competition associated with disclosure of the relevant communications. None of the cited internal conversations reveal any confidential CoreCivic strategies, practices, or research and development. The conversations cited may be awkward or embarrassing for CoreCivic to see disclosed, but that, alone, is not enough to justify an unyielding seal in this case."). *Cf.* Robin Urevich, *Private prison giant under fire for pressuring Georgia to keep immigrant detainee's death report sealed*, FASTCOMPANY (Dec. 10, 2018), https://www.fastcompany.com/90279208/private-prison-giant-under-fire-for-pressuring-georgia-to-keep-immigrant-detainees-death-report-sealed.

[4] *See* CoreCivic Newsroom, https://www.corecivic.com/newsroom (last visited Jul. 22, 2022 at 11:02 p.m. CST).

healthcare, reentry programming, visitation and standards of living. Every one of our colleagues at CoreCivic are trained on this policy before their first day of work.

In November 2021, the NAACP made claims about Trousdale Turner Correctional Center (TTCC) that were unsubstantiated, inaccurate, and misinformed. We're not aware of any concerns raised by the NAACP regarding TTCC since then, but strongly encourage them to share any specific claims with the facility so that we can properly investigate.

In both policy and practice, CoreCivic respects the dignity of every individual entrusted to our care. We have clear lines of communication for those in our care to make concerns known without fear of repercussions, including in-facility reporting, a company-wide hotline accessible anonymously internally and externally, and direct access to our government partners.

While privacy laws prevent us from discussing an individual's specific medical conditions, we stand by our previous statement that TTCC provides all of those in our care with comprehensive medical and mental health care. Furthermore, TTCC is monitored very closely by our government partners at the Tennessee Department of Correction, who employ two, full-time, on-site contract monitors at TTCC who work to ensure our full compliance with prescribed policies and procedures.

TTCC is also subject to multiple layers of oversight from our government partner and independent third parties like the American Correctional Association (ACA). That oversight includes both scheduled and unscheduled inspections of our operations. We're proud to say TTCC has been recommended for reaccreditation by the ACA following a rigorous, on-site inspection earlier this month in which independent inspectors gave the facility scores of 100% on mandatory standards and 98.4% on non-mandatory standards. The ACA reviews more than 400 standards of correctional management, including healthcare and other services around standards of living and safety.

Very Respectfully,

Matthew Davio
Public Affairs Manager
CoreCivic

*See* Doc. 41-3 at 3.

This detailed statement made by CoreCivic during this litigation—a statement that the Plaintiffs emphasized repeatedly in their briefing, *see* Doc. 41 at 19–21; Doc. 48 at 11–13 & 23–24, but which Magistrate Frensley's order does not mention—was highly disingenuous and deliberately misleading. For instance, the notion that the NAACP's reported concerns about understaffing and violence at Trousdale Turner were "unsubstantiated" or "inaccurate" was

farcical, *see id.*; to the contrary, they were acknowledged by both CoreCivic and TDOC witnesses under oath months earlier. *See* Doc. 33-11 at 35:20–36:2; 36:14–18; Doc. 33-2 at 23:17–18; Doc. 33-2 at 64:10–19; Doc. 37-2 at 77:1–4; Doc. 37-2 at 98:1–15. The notion that the TDOC's on-site monitors "work to ensure" Trousdale Turner's "full compliance with prescribed policies and procedures" was similarly false; instead, those monitors testified that it "would be outside the scope of [their] responsibility" to ensure such compliance; that their job was simply to document it; and that ensuring compliance is "the contractor's responsibility." *See* Doc. 37-2 at 87:8–21.

CoreCivic—both in litigation (as in this case) and in the media—routinely denies allegations regarding its understaffing conditions. As a result, it became upset when Plaintiffs' counsel obtained and discussed the damning documents above—public records that CoreCivic had illicitly attempted to prevent the Plaintiffs from receiving—on Twitter. CoreCivic thus applied to the Magistrate to order that Plaintiffs' counsel "cannot disseminate any public communication" about CoreCivic; to order Plaintiffs' counsel to "remove all public communications within their control, including social media posts" about CoreCivic's deficient operation of prison facilities in Tennessee; and to "strike all Notices of Filing" that contained the public records evidencing its pervasive understaffing, all of which CoreCivic hoped to conceal. *See* Doc. 45 at 1.

In response, the Plaintiffs noted several reasons why CoreCivic's desired relief was unlawful, and why the Plaintiffs' less restrictive proposed alternative should be adopted instead.

*First*, the Plaintiffs noted that CoreCivic failed to meet its burden of proving prejudice, *see* Doc. 48 at 14–15, and that "[b]y contrast to the Defendants' failure to introduce any actual evidence of prejudice, the Plaintiffs observe that there is significant evidence that prejudice to a trial will *not* result from counsel's constitutionally protected criticism of CoreCivic." *Id.* at 16. In reply, CoreCivic insisted that "Defendants are not required to prove prejudice under the Local

Rule." *See* Doc. 49 at 2. Thereafter, Magistrate Frensley ruled that *regardless* of whether CoreCivic's professed concerns about prejudice to a distant trial were based on evidence, a vast prior restraint could still be imposed. *See* Doc. 53 at 7 ("despite [Plaintiffs' counsel's] assertions that the present case is unlikely to go to trial, and that voir dire can ensure a neutral jury in the event of a trial, he is still bound by the restrictions on prejudicial speech imposed by LR 83.04.").

*Second*, the Plaintiffs observed that "CoreCivic also wants to impose [its requested] censorship regime upon Plaintiffs' counsel while reserving, for itself, the right *as a party* to disseminate false information on a much wider scale through its professional PR machine[.]" *See* Doc. 48 at 17 (citing Doc. 44 at 2, in which CoreCivic contended that only "parties and witnesses" may make such extrajudicial statements during this litigation). Beyond the fact that—in contrast to CoreCivic's fulltime PR staff—speaking for himself is "a right that Plaintiff Terry Childress cannot himself exercise on account of the fact that he was murdered in CoreCivic's care[,]" *see id.*, the Plaintiffs observed that seven First Amendment doctrines precluded the Defendants' proposed approach to LR 83.04, which would necessarily fail strict scrutiny as the Defendants asked the Court to construe it. *See id.* at 17–20. Thereafter, Magistrate Frensley's Order analyzed none of these issues and none of the Plaintiffs' claims regarding them. The effect of the order is thus to ensure single-sided public commentary regarding Trousdale Turner's conditions.

*Third*, the Plaintiffs observed that "CoreCivic's motion should be denied on [two] non-constitutional grounds." *See* Doc. 48 at 22. In particular, the Plaintiffs observed that "in the unlikely event that this case actually reaches trial, this Court may simply issue a special order affording CoreCivic the opportunity to conduct whatever extended voir dire it desires to address its professed concerns about potential trial prejudice—the only ground identified for the vast speech restrictions that CoreCivic demands." *Id* at 23. Upon review, despite concluding that the

risk of publicity was sufficiently high to justify a vast prior restraint forbidding criticism of the government, Magistrate Frensley concluded that: "[t]he Court does not find that the present case is currently 'widely publicized and sensational'" for L.R. 83.04(b) purposes. *See* Doc. 53 at 6.

Separately, the Plaintiffs observed that: "this Court may deny CoreCivic's motion on the basis that Local Rule 83.04(a)(3) expressly permits counter-speech where—as here—CoreCivic has revved up its PR machine and released public statements to a large local audience that are designed to mislead the public . . . ." *Id.* at 24. The Plaintiffs also observed that CoreCivic "is constantly engaged in a relentless local marketing campaign that is calculated to portray CoreCivic's operations in a manner other than they actually are[,]" *id.* at 24–25 (citing Docs. 48-1 through 48-7). Upon review, Magistrate Frensley did not mention these facts or adjudicate the Plaintiffs' claims on the matter in any respect. Instead, Magistrate Frensley ordered that:

> 1. Plaintiffs' counsel may not disseminate any public communication that would interfere with a fair trial, including commentary regarding this lawsuit or matters at issue in the lawsuit;
>
> 2. Plaintiffs' counsel must remove all public communications within their control, including social media posts, that would interfere with a fair trial, including commentary regarding this lawsuit or matters at issue in this lawsuit;
>
> 3. Plaintiffs' counsel may not make extrajudicial statements of any kind about documents filed in Docket Entries 33, 37, and 38. Plaintiff's counsel is strongly advised against submitting similar Notices of Filing with the Court or otherwise manipulating the scope of the public record in this case.

Doc. 53 at 9. This objection to Magistrate Frensley's prior restraint and retraction order followed.

### III. ARGUMENT

**A.    Magistrate Frensley's cursory First Amendment analysis is erroneous.**

Prior restraints are "presumptively void." *CBS Inc.*, 522 F.2d at 241. In all circumstances, they also carry a "'heavy presumption'" of unconstitutionality. *Novak*, 33 F.4th at 307 (quoting *Bantam Books, Inc.,* 372 U.S. at 70)). To be sustained, a prior restraint "must threaten an interest

-10-

more fundamental than the First Amendment itself." *See Procter & Gamble Co. v. Bankers Tr. Co.*, 78 F.3d 219, 226–27 (6th Cir. 1996) ("In the case of a prior restraint on pure speech, the hurdle is substantially higher: publication must threaten an interest more fundamental than the First Amendment itself. Indeed, the Supreme Court has never upheld a prior restraint, even faced with the competing interest of national security or the Sixth Amendment right to a fair trial."). *Cf. United States v. Columbia Broadcasting Sys., Inc.*, 497 F.2d 102, 104 (5th Cir.1974) ("[B]efore a prior restraint may be imposed by a judge, even in the interest of assuring a fair trial, there must be 'an imminent, not merely a likely, threat to the administration of justice. The danger must not be remote or even probable; it must immediately imperil.'" (quoting *Craig v. Harney,* 331 U.S. 367, 376 (1947))).

With respect to prior restraints regarding pre-trial publicity, two Sixth Circuit cases control the inquiry. _First_, in *CBS Inc. v. Young*, 522 F.2d at 240–41, the Sixth Circuit held that there must be "substantial evidence to justify the conclusion that a clear and imminent danger to the fair administration of justice existed because of publicity" in order to sustain a publicity-based prior restraint. *Id. Second*, in *United States v. Ford*, 830 F.2d 596, 600, the Sixth Circuit held that "the 'clear and present danger' standard should apply" to such restraints. *Id.*

In their briefing before the Magistrate, the Plaintiffs correctly identified this standard. *See* Doc. 41 at 16. The Defendants, by contrast, did not identify the applicable standard—let alone attempt to meet it. *See* Doc. 49. Indeed, the Defendants insisted that they were not required to prove any prejudice at all and could merely rely on a presumption of prejudice instead. *See* Doc. 49 at 2 ("Defendants are not required to prove prejudice under the Local Rule."). The Defendants also insisted, inexplicably, that the First Amendment is subservient to this Court's Local Rule, rather than the other way around. *Id.* at 2–3 (contending that: "The First Amendment does not

-11-

supersede the existence of a clearly-defined Local Rule prohibiting prejudicial attorney speech.").

Despite prior restraints striking at the heart of the First Amendment's free speech guarantee, the First Amendment analysis contained in Magistrate Frensley's prior restraint order is limited to just three sentences. *See* Doc. 53 at 6. In particular, Magistrate Frensley relied upon:

1. A quote that purports to be from *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1063 (1991), but which does not actually appear in that case (it is from a Third Circuit case cited on page three of the Defendants' Reply Brief, *see* Doc. 49 at 3);

2. A quote from *Mezibov v. Allen*, 411 F.3d 712, 717 (6th Cir. 2005), an inapposite Sixth Circuit case that concerns "in-court speech" uttered "'in the courtroom itself,'" *id.* (cleaned up), rather than the out-of-court speech that was the subject of the Defendants' motion; and

3. An unattributed quote that: "[L]awyers are officers of the Court and, as such, may legitimately be subject to ethical precepts that keep them from engaging in what otherwise might be constitutionally protected speech[,]" which is from Judge Moore's concurring and dissenting opinion in *Mezibov* quoting Justice Sandra Day O'Connor's concurrence in *Gentile*.

The analysis set forth in Magistrate Frensley's order fails on multiple levels.

<u>*First*</u>, with respect to *Gentile*: It is true that some courts have suggested that *Gentile* called into doubt the "more stringent" standard that the Sixth Circuit applies in this context. *See, e.g., United States v. Brown*, 218 F.3d 415, 427 (5th Cir. 2000) ("We decline to adopt the more stringent tests advocated by the Sixth, Seventh, and Ninth Circuits because *Gentile* appears to have foreclosed the applicability of those tests to the regulation of speech by trial participants. The cases endorsing some version of the 'clear and present danger' test all predated *Gentile* . . . ."). And perhaps the Sixth Circuit will someday overturn *CBS Inc.* and *Ford* on that basis. Unless and until that happens, though, *CBS Inc.* and *Ford* are binding. *See, e.g., Little v. BP Expl. & Oil Co.*,

265 F.3d 357, 362 (6th Cir. 2001) ("we are bound by Sixth Circuit precedent unless it is overruled by either our court sitting *en banc* or the Supreme Court.") (citing *Turker v. Ohio Dep't of Rehab. & Corr.*, 157 F.3d 453, 460 (6th Cir. 1998)). *CBS Inc.* and *Ford* also settle the matter, given the Defendants' failure to meet—or even attempt to meet—the relevant standard that they established.

There is also strong reason to suspect that, if given the opportunity, the Sixth Circuit would *not* overrule *CBS Inc.* and *Ford* based on the U.S. Supreme Court's holding in *Gentile*. *Gentile* held that the First Amendment precluded <u>bar discipline</u> of an attorney based on statements that he made during a "press conference" held "some six months" before trial. *See Gentile*, 501 U.S. at 1033. As such, *Gentile* was not and did not purport to be a prior restraint case. By contrast, the Sixth Circuit's opinions in *CBS Inc. v. Young*, 522 F.2d at 240–41, and *United States v. Ford*, 830 F.2d 596, 600, are prior restraint cases, and they address the specific issue presented here.

<u>Second</u>, *Mezibov v. Allen*, 411 F.3d 712, has no application here. *Mezibov* was concerned with "in court" speech uttered "in the context of the courtroom proceedings[.]" *Id.* at 720. *Mezibov* accordingly does not and does not purport to control "extrajudicial statements," which are materially distinct and are the sole subject of Magistrate Frensley's order. *Id.* at 4.

<u>Third</u>, reciting that attorneys are officers of the Court is not a substitute for conducting First Amendment analysis. *Cf. Gentile*, 501 U.S. at 1054 (op. of Justice Kennedy) ("our cases recognize that disciplinary rules governing the legal profession cannot punish activity protected by the First Amendment, and that First Amendment protection survives even when the attorney violates a disciplinary rule he swore to obey when admitted to the practice of law.") (citing *In re Primus*, 436 U.S. 412 (1978), *Bates v. State Bar of Arizona*, 433 U.S. 350 (1977)). *See also Martinez v. McGraw*, No. 3:08-0738, 2009 WL 1311018, at *1 (M.D. Tenn. May 7, 2009) ("district courts are bound by First Amendment limitations when restricting parties and participants in litigation from

-13-

disclosing information to the public about the litigation.") (citing *National Polymer Products, Inc. v. Borg–Warner Corp.*, 641 F.2d 418, 423 (6th Cir.1981)). More recently, the Supreme Court even made explicit that it has never recognized any such "professional speech" exception. *See Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2371–72 (2018) ("this Court has not recognized 'professional speech' as a separate category of speech. Speech is not unprotected merely because it is uttered by 'professionals.'").

For all of these reasons, Magistrate Frensley's First Amendment analysis—and the prior restraint issued as a result of it—were wrong. His order should be reversed accordingly.

**B.    CoreCivic failed to meet—and did not attempt to meet—its evidentiary burden.**

Given CoreCivic's failure to introduce any evidence of prejudice, the proper resolution of the Defendants' motion was a simple matter. Here, in lieu of introducing "substantial evidence to justify the conclusion that a clear and imminent danger to the fair administration of justice existed because of publicity[,]" *CBS Inc*, 522 F.2d at 240–41, CoreCivic did not introduce any evidence of prejudice at all. As grounds, CoreCivic insisted that "Defendants are not required to prove prejudice under the Local Rule[,]" Doc. 49 at 2, and they insisted that the First Amendment is subservient to this Court's Local Rule. *See id.* at 2–3 ("The First Amendment does not supersede the existence of a clearly-defined Local Rule prohibiting prejudicial attorney speech.").

This is nonsense. "[T]he Constitution is supreme over other sources of law," *Gamble v. United States*, 139 S. Ct. 1960, 1985 (2019) (Thomas, J., concurring), and to obtain a prior restraint in this context, "a threat must be specific, not general. It must be much more than a possibility or a 'reasonable likelihood' in the future. It must be a 'serious and imminent threat' of a specific nature, the remedy for which can be narrowly tailored in an injunctive order." *Ford*, 830 F.2d at 600. A movant must also make this showing with "substantial evidence." *CBS Inc*, 522 F.2d at

240. The Defendants failed to do so. They also did not attempt to do so, insisting instead that they "are not required to prove prejudice under the Local Rule." *See* Doc. 49 at 2. Thus, having failed to meet—or attempt to meet—the evidentiary burden that the First Amendment requires, the Defendants' motion should have been denied based on analysis akin to the following:

> Defendants allege that Mr. Shelton threatened to contact the media if Defendants failed to submit to Plaintiff's proposed settlement terms. (Defs.' Mot. at 13; citing Ex. 6 (Shelton letter).) Defendants ask me to order Plaintiff and Mr. Shelton not to speak to the media about this lawsuit. I DENY this request because it amounts to a prior restraint of speech, which bears a heavy presumption against constitutional validity. *See, e.g., New York Times v. United States*, 403 U.S. 713 (1971); *Nebraska Press Ass'n v. Stuart*, 427 U.S. 529 (1976). In *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1074 (1991), the Supreme Court held that "the speech of lawyers representing clients in pending cases may be regulated under a less demanding standard than that established for regulation of the press...." The Court upheld a standard prohibiting an attorney from making comments to the media that would have "a substantial likelihood of materially prejudicing an adjudicative proceeding." *Id.* at 1076. In a case pre-dating *Gentile*, the Sixth Circuit asked whether a defendant's public comments would present a "clear and present danger" of prejudice to the trial proceedings. *United States v. Ford*, 830 F.2d 596, 600-02 (6th Cir.1987). *But see United States v. Brown*, 218 F.3d 415, 427 (5th Cir.2000) (questioning whether the Sixth Circuit's approach survives *Gentile*). Using either the *Gentile* or *Ford* standard, Defendants have failed to offer evidence justifying a prior restraint on the speech of participants in this lawsuit. Defendants have not specified what type or degree of harm would allegedly result if Plaintiff or Mr. Shelton were to speak to the press about this case. Absent a showing of material prejudice, Defendants cannot clear the constitutional hurdle barring prior restraints of speech.

*Roney v. Starwood Hotels & Resorts Worldwide, Inc.,* No. CIV. 05-71911, 2005 WL 3592051, at *1 (E.D. Mich. Oct. 31, 2005). *Cf. Martinez*, 2009 WL 1311018, at *2 ("Plaintiff's request for a virtual 'gag' order is a drastic remedy that this Court is not inclined to grant.").

Notably, even under *Gentile*'s reduced standard, the proper resolution of the Defendants' motion would be easy based on timing and circumstances alone. Even the dissenters in *Gentile* observed that one of the "Petitioner's strongest arguments" was "that the statements were made well in advance of trial[.]" *Gentile*, 501 U.S. at 1079 (Rehnquist, C.J., dissenting). In *Gentile*, that time period was "[s]ome six months" before trial. *Gentile*, 501 U.S. at 1033. Here, the

-15-

statements were made "more than a year-and-a-half" before trial. *See* Doc. 41 at 18. Unlike Mr. Gentile's news conference, the bulk of Plaintiffs' counsel's statements were also made on "a platform that the overwhelming majority of American adults do not use," *see* Doc. 48 at 16 (citing Meltem Odabas, *10 facts about Americans and Twitter*, PEW RESEARCH CENTER (May 5, 2022), https://www.pewresearch.org/fact-tank/2022/05/05/10-facts-about-americans-and-twitter/), and they were additionally made with the knowledge that "CoreCivic also appears to have settled—before trial—all cases that were ever at risk of reaching trial in this jurisdiction, obviating any genuine concerns about pre-trial publicity at all." *Id.* at 14.

For all of these reasons, demonstrating an "imminent" threat to the integrity of the Parties' December 2023 trial is not only something that the Defendants failed to do; it is *impossible*. A prior restraint should never have issued as a result. *See CBS Inc.*, 522 F.2d at 240 ("We find the order to be an extreme example of a prior restraint upon freedom of speech and expression and one that cannot escape the proscriptions of the First Amendment, unless it is shown to have been required to obviate serious and imminent threats to the fairness and integrity of the trial."). That *the Defendants themselves* filed—publicly and permanently in this case's record—the statements that they claimed would prejudice their right to a fair trial if they remained public, *see* Doc. 46, should also have been a strong hint that their motion was filed with another objective in mind.

## C. Magistrate Frensley failed to adjudicate several of the Plaintiffs' claims.

In response to the Defendants' motion, the Plaintiffs raised several claims—both constitutional and non-constitutional—that Judge Frensley neither mentioned nor adjudicated. This was error. *Cf. N. Michigan Land & Oil Corp. v. Consumers Power Co.*, 35 F.3d 566 at *2 (6th Cir. 1994) ("a district court must adjudicate the claims within its jurisdiction."). The Plaintiffs accordingly reassert their claims and ask this Court to adjudicate all of them in the first instance.

-16-

For the Court's convenience, though, the Plaintiffs will highlight two of them.

1. <u>Speaker Discrimination</u>:  In response to the Defendants' motion to gag Plaintiffs' counsel, the Plaintiffs observed that Terry Childress is unable to speak for himself on account of that fact that he was murdered in CoreCivic's care, while the Defendants—by contrast—employ full-time PR professionals to speak for them and relentlessly use local media to burnish their public-facing image. *See* Doc. 48 at 13.  Accordingly, the Plaintiffs observed that the relief that the Defendants sought would have the convenient effect of censoring decedent Terry Childress's advocate while enabling CoreCivic to speak to the public freely, *see id.*, as CoreCivic has done through its professional "Public Affairs Manager" during this litigation. *See* Doc. 41-3 at 3.

If Local Rule 83.04 were actually applied in this manner, the Plaintiffs noted, the Rule would necessarily be unconstitutional, because such speaker-based discrimination is "of course" forbidden as a matter of First Amendment law. *See* Doc. 48 at 13. *See also id.* at 19 (citing *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 325 (2002) ("Granting waivers to favored speakers (or, more precisely, denying them to disfavored speakers) would of course be unconstitutional . . . ."); *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 96 (1972); *Citizens United v. F.E.C.*, 558 U.S. 310, 340 (2010) (citing *First Nat'l Bank of Boston*, 435 U.S. 765, 784 (1978)); *City of Madison, Joint Sch. Dist. No. 8 v. Wis. Employment Relations Comm'n*, 429 U.S. 167, 175–76 (1976) (citing *Mosley*, 408 U.S. at 96); *Greater New Orleans Broad. Ass'n v. United States*, 527 U.S. 173, 194 (1999) ("[D]ecisions that select among speakers conveying virtually identical messages are in serious tension with the principles undergirding the First Amendment.")).  Magistrate Frensley's order did not adjudicate or even mention this claim. *See generally* Doc. 53.  His order also did not attempt to address it, for instance, by imposing the same restrictions upon *all* participants in this case—including CoreCivic's professional PR staff.  Instead, Magistrate Frensley imposed a three-part,

explicitly speaker-based prior restraint against "Plaintiffs' counsel" alone. *See id.* at 9.

2. Permissive counter-speech: In response to the Defendants' motion to gag, the Plaintiffs noted that "Local Rule 83.04(a)(3) permits counter-speech 'to mitigate the recent adverse publicity' that CoreCivic chose to initiate." *See* Doc. 48 at 24. The Plaintiffs also observed that CoreCivic had initiated such publicity five days after the Plaintiffs' lawsuit was filed, *see* Doc. 41-3, and that "[n]early every statement CoreCivic made in that publication to a wide local audience, many of which bear upon specific issues in this litigation, is false or misleading in some way." *See* Doc. 48 at 24. Thus, the Plaintiffs noted:

> [T]his Court may deny CoreCivic's motion on the basis that Local Rule 83.04(a)(3) expressly permits counter-speech where—as here—CoreCivic has revved up its PR machine and released public statements to a large local audience that are designed to mislead the public about, among other things: (1) CoreCivic's supposed "commitments regarding inmate rights and treatment," (2) "safety and security," (3) "unsubstantiated, inaccurate, and misinformed" criticism of its understaffing conditions," (4) CoreCivic's claimed "respect[ for] the dignity of every individual entrusted to [its] care," (5) the "comprehensive medical and mental health care" CoreCivic claims to provide, (6) the purported "clear lines of communication for those in [CoreCivic's] care to make concerns known without fear of repercussions, including in-facility reporting," (7) CoreCivic's claim that "TTCC is monitored very closely by [CoreCivic's] government partners at the Tennessee Department of Correction, who employ two, full-time, on-site contract monitors at TTCC who work to ensure our full compliance with prescribed policies and procedures," and (8) the high scores CoreCivic received from (paid) "independent" facility audits, *see* Doc. 41-3 at 3, which just happen to have been conducted by an entity—currently headed by the former Commissioner who lobbied to protect CoreCivic's financial bottom line at the expense of inmate safety while he was employed as a government official—that exists to prop up the private prison industry.

*Id.* at 23–24.

Once again, Magistrate Frensley's order neglected to adjudicate this claim. *See generally* Doc. 53. His order does not mention CoreCivic's own detailed public statements—made to a wide local audience—during this litigation at all. *See id.* Nor does it mention CoreCivic's other demonstrated efforts to burnish its image among local jurors—six additional, non-exhaustive

-18-

examples of which the Plaintiffs appended to their response.  *See* Docs. 48- 2, 3, 4, 5, 6, & 7.[5]

Under these circumstances, counter-speech is permitted by Local Rule 83.04(a)(3).  That fact also provided a dispositive, non-constitutional basis for denying CoreCivic's motion.  *See Feed The Child., Inc. v. Metro. Gov't of Nashville & Davidson Cnty.*, 330 F. Supp. 2d 935, 942 (M.D. Tenn. 2002) ("Courts are generally to avoid deciding constitutional issues, instead opting to resolve a motion on nonconstitutional grounds whenever possible.") (citing *Clinton v. Jones*, 520 U.S. 681, 690 & n. 11 (1997)).  CoreCivic's motion should have been denied as a result.

**D.    Less restrictive means are available to mitigate the risk of trial prejudice**

LR83.04 is a content-based speech regulation, given that it restricts speech "because of the topic discussed[.]"  *See Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).  As a result, it must be the least restrictive means necessary to further a compelling interest to survive review.  *Id.* at 171.

Given its explicitly speaker-based nature and its various carveouts, exceptions, and exceptions to its exceptions, there are strong reasons to believe that Local Rule 83.04 is "both underinclusive and overinclusive[,]" *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 362 (2010), and that it fails strict constitutional scrutiny as a result.  For instance, Magistrate Frensley's order appears to acknowledge that counsel's extrajudicial statements quoting and referencing public records fell within Local Rule 83.04(a)(1)'s exception permitting "quotation from or reference to public records[,]" *see* Doc. 53 at 8.  As such, his order held—it is not clear on what authority—that this exception would "**no longer** apply."  *Id.* (emphasis added).

Critically, though, one of the features of Local Rule 83.04 that potentially rescues it from unconstitutionality is that 83.04(b) enables this Court to issue a "special order" governing highly

---

[5] These examples are far from exhaustive.  For instance, as part of its professional marketing campaigns, CoreCivic runs local television commercials—some of which are available on its YouTube page at https://www.youtube.com/c/CoreCivic/videos—almost exclusively to generate goodwill, given that no member of the public can purchase CoreCivic's services.

-19-

publicized cases—including by issuing an order regarding "any other matters that the Court may deem appropriate" in such cases. *Id.* That authority permits this Court to order a neutral and less restrictive alternative to LR 83.04(a)'s underinclusive and overinclusive speech restrictions, and it enables this Court to use less restrictive means to further the judiciary's interest in impartial trials.

Here, a ready alternative exists. Specifically, to mitigate the "potential" for juror prejudice arising from tweets that—but for the Defendants' remarkable ask and the Magistrate's even more remarkable order—would otherwise have been quickly forgotten, *see* Doc. 53 at 2, in the unlikely event that the Parties' trial actually takes place at the end of next year, this Court may allow extended and "searching" voir dire to ensure that no juror was exposed to them. *See Martinez*, 2009 WL 1311018, at *2 ("There are less restrictive measures available to Plaintiff to insure a fair trial, such as a searching voir dire examination of the jury") (citing *Ford*, 830 F.2d at 599).

Significantly, Magistrate Frensley's order did not find that this less-restrictive alternative would not address the Defendants' professed concerns. Instead, Magistrate Frensley held that:

> The Court interprets this exception to apply to cases where the parties and attorneys have to respond to high levels of uninvited media pressure and influence, rather than being designed to allow attorneys to encourage media attention and public outcry prior to trial. A special order pursuant to L.R. 83.04(b), as requested by Plaintiff's Motion (Docket No. 41) is therefore not appropriate in this case.

Doc. 53 at 6.

To be sure: the text of Local Rule 83.04(b) does not include any of these qualifications. Courts are also restricted from modifying the law under the guise of interpreting it. *Cf. Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009) ("that is not what the statute says."). More importantly, though, the analysis misses the point. The issue, fundamentally, is that in lieu of imposing an unconstitutional, speaker-based prior restraint in order to mitigate *potential* prejudice to a trial a year-and-a-half away that is unlikely to occur at all based on CoreCivic's litigation

-20-

history, a less restrictive alternative exists. This case—which the Plaintiffs correctly observed has achieved substantial publicity, *see* Doc. 41 at 4—also enables this Court to employ that less restrictive alternative. *See id.* Accordingly, to avoid a constitutional conflict, this Court should exercise that authority, and Magistrate Frensley's order failing to do so should be reversed.

**E.      Magistrate Frensley's retraction order is unconstitutional.**

As part of the remedy for his prior restraint, Magistrate Frensley ordered that "Plaintiffs' counsel must remove all public communications within their control, including social media posts, that would interfere with a fair trial, including commentary regarding this lawsuit or matters at issue in this lawsuit[.]" *See* Doc. 53 at 9. It is not clear, however, that courts can *ever* lawfully compel retractions. *See Kramer v. Thompson*, 947 F.2d 666, 682 (3d Cir. 1991) ("we find no support for the various retractions and withdrawals forced upon Thompson by the district court. Consequently, those orders of the district court compelling such retractions and withdrawals, and the associated contempt citations, must be reversed."); *Berman v. Kafka*, No. 3:13-CV-1109-J-JBT, 2015 WL 12940184, at *3 (M.D. Fla. July 10, 2015) (holding that a court-ordered retraction is not "a cognizable form of equitable relief"). *See also Mazur v. Szporer*, No. CIV.A. 03-00042(HHK), 2004 WL 1944849, at *8 n.1 (D.D.C. June 1, 2004). Regardless, courts *certainly* cannot compel retractions of out-of-court speech simply because it is critical of *the government*. *See Rosenblatt v. Baer*, 383 U.S. 75, 85 (1966) ("Criticism of government is at the very center of the constitutionally protected area of free discussion. Criticism of those responsible for government operations must be free, lest criticism of government itself be penalized.").

Magistrate Frensley's Order makes no mention of the authority that purportedly authorized him to issue an order compelling Plaintiffs' counsel to "remove all public communications within their control, including social media posts . . . ." regarding CoreCivic, and none is apparent.

Further, separate from any other matter, a court-ordered retraction made no practical sense under the circumstances—and it furthers no purpose beyond raw censorship—given that *the Defendants themselves* published the statements about which they were complaining in the permanent, public record of this case. *See generally* Doc. 46. Accordingly, Magistrate Frensley's retraction order should be vacated on the basis that it unconstitutionally compels speech and served no practical purpose beyond censoring out-of-court statements that criticized the government.

**F.    Magistrate Frensley's prior restraint is unconstitutionally overbroad.**

A speech restriction "may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *See United States v. Stevens*, 559 U.S. 460, 473 (2010) (cleaned up). Magistrate Frensley's third ordered remedy—that "Plaintiffs' counsel may not make extrajudicial statements of any kind about documents filed in Docket Entries 33, 37, and 38[,]" Doc. 53 at 9—fits that description to a tee.

Notably, this order does not purport to be limited to statements that would be prejudicial to the Parties' December 2023 trial, and courts lack authority to issue vast prior restraints for reasons untethered to some specific and compelling need. Instead, the order applies to any "extrajudicial statements of any kind," *see id.*, and it applies to any of "thousands of pages of information" from non-confidential, governmental, public records regarding CoreCivic, Trousdale Turner, and the TDOC's oversight of each of them. *Id.* This restriction includes, for instance, an outright ban on extrajudicial comments regarding the TDOC's published inmate grievance procedures, *see* Doc. 37-3, and regarding the Tennessee Comptroller's 2020 audit of the TDOC, *see* Doc. 37-6. *See* Doc. 53 at 9. Applied literally, it would also preclude Plaintiffs' counsel from discussing the content of relevant government documents with: (1) their own clients in this case; (2) their other clients; and (3) government officials—including regulators and prosecutors—whom

-22-

the undersigned petitions regularly on behalf of both groups. This Court should invalidate the restriction as unconstitutionally overbroad as a consequence.

## G. Magistrate Frensley's additional, extraneous orders should be vacated.

Beyond the unconstitutional prior restraint and remedies in the challenged order, several additional aspects of Magistrate Frensley's order are also erroneous and warrant reversal.

*First*, the order reflects a deep and inappropriate hostility to proceedings in this Court being made public. *See* Doc. 53 at 4. The Sixth Circuit, however, has instructed that "open proceedings and open records are fundamental to our system of law[,]" *Meyer Goldberg, Inc., of Lorain v. Fisher Foods, Inc.*, 823 F.2d 159, 163 (6th Cir. 1987), and that "'[a]s a general proposition, pretrial discovery must take place in the public unless compelling reasons exist for **denying** the public access to the proceedings." *Id.* (emphasis added) (quoting *American Tel. & Tel. Co. v. Grady*, 594 F.2d 594, 596 (7th Cir. 1978)). *Cf. Mathews v. The Guardian Life Ins. Co. of Am.*, No. 1:98-CV-00106, 2014 WL 1681693, at *1 (N.D. Ohio Apr. 28, 2014) ("This Court operates as a public forum, not as a private dispute resolution service.") (citing *Ford*, 830 F.2d at 599).

Further, despite Magistrate Frensley's gratuitous admonition that counsel's role "is to be an advocate, not an investigative journalist," *see* Doc. 53 at 7, had the Defendants raised such an argument in lieu of Magistrate Frensley weighing in on the matter *sua sponte*, Plaintiffs' counsel would have observed that—as Ms. Newby has expressly stated in parallel litigation—"Ms. Newby's interests extend beyond those of a litigant." *See* **Ex. 2** at 6. Accordingly, Magistrate Frensley's assumption that Ms. Newby is content to privately and quietly litigate a dispute involving a pervasively noncompliant government contractor that allowed her son to be murdered is unwarranted; Plaintiffs' counsel's public advocacy seeks to further their clients' goals, rather than existing apart from them; and courts should not make unsupported assumptions about the

nature of a client's goals anyhow. Publicity has also enabled Ms. Newby's counsel to hear from witnesses and whistleblowers and to generate admissible evidence that she otherwise would not have obtained, *see, e.g.,* Doc. 38-1, all of which significantly benefit her in this litigation.

The undersigned additionally observes that public advocacy is often an affirmative expectation of effective representation. *See, e.g., Gentile*, 501 U.S. at 1043 ("A defense attorney may pursue lawful strategies to obtain dismissal of an indictment or reduction of charges, **including an attempt to demonstrate in the court of public opinion that the client does not deserve to be tried.**") (emphasis added). Many attorneys in this jurisdiction properly engage in public advocacy to further the goals of their clients' representations as a result. *See, e.g.,* **Ex. 3**, Stacey Barchenger, *Mitt Romney tax hoax lands Franklin man 4-year prison term*, THE TENNESSEAN (Aug. 8, 2016), https://www.tennessean.com/story/news/crime/2016/08/08/mitt-romney-tax-hoax-lands-franklin-man-4-year-prison-term/88394186/, at 2 ("Jeffery Frensley, Brown's lawyer, noted that Brown had no other criminal history. 'We're just disappointed with the sentence,' Frensley said after the hearing. 'We'll certainly be preparing issues for an appeal.'").

*Second*, Magistrate Frensley found that Plaintiffs "improperly placed in the public record" various documents by filing notice of them, and he threatened sanctions for further such filings. Doc. 53 at 8. This finding is unsupportable. The documents at issue—all of which are relevant to this case, and many of which were relevant to pending motions—were filed to enable current and future citation to them and judicial notice of them. For instance, the documents filed at Doc. 33 notified the Court "that Defendants' May 4, 2022 Motion to Hold Response to Subpoena Duces Tecum in Abeyance (Doc. 32) is partially moot," given "the Subpoenaed Party's non-confidential subpoena production, set forth in the accompanying attachments." *See* Doc. 33 at 1. Many of the documents were also promptly cited in the Parties' briefing regarding CoreCivic's motion to

-24-

quash. And indeed, after stating that "it is not helpful to either party or to the Court" to have had the documents filed, *see* Doc. 53 at 9, *Magistrate Frensley himself cited and relied upon several of them* a week later when denying CoreCivic's motion to quash. *See* Doc. 58 at 6–7 ("Ms. Newby has demonstrated that some of the documents Ms. Herzfeld already produced in response to the subpoena are indeed relevant, as they mention Mr. Childress by name or pertain to Ms. Newby's allegations about staffing issues at the Trousdale Turner facility."); *id.* at 4 ("Some of the deposition testimony mentions Mr. Childress by name, and there is evidence that the Trousdale Turner facility failed to comply with contractual staffing requirements.").

Further, under Rule 12, a Court may consider "items appearing in the record of the case," at least "so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). Items cannot "appear[] in the record of the case" unless they are filed there, though. *Id.* Accordingly—particularly before the Court's amendment deadline has expired—it is hard to imagine how filing notice of relevant records could be inappropriate at all, let alone merit sanctions. *See id.*

Similarly, under Rule 56, the Plaintiffs' claims for and opposition to summary judgment will have to be based on "evidence in the record[.]" *See Stephenson v. Malloy*, 700 F.3d 265, 271 (6th Cir. 2012) ("Summary judgment is required when the moving party shows, **using evidence in the record**, 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'") (emphasis added) (citing Fed.R.Civ.P. 56(a); *see* Fed.R.Civ.P. 56(c)(1)). With this context in mind, if there is some prohibition on filing evidence in the record as it is received, the undersigned is unaware of it. Certainly, doing so cannot be sanction-worthy, as Magistrate's Frensley's order threatens. Thus, that aspect of the order should be vacated as well.

## IV. CONCLUSION

For the above reasons, Magistrate's Frensley's prior restraint (Doc. 53) should be reversed.

-25-

Respectfully submitted,

/s/ Daniel A. Horwitz
Daniel A. Horwitz, BPR #032176
Lindsay E. Smith, BPR #035937
HORWITZ LAW, PLLC
4016 Westlawn Dr.
Nashville, TN 37209
daniel@horwitz.law
lindsay@horwitz.law
(615) 739-2888

Brice M. Timmons #29582
Craig A. Edgington #38205
DONATI LAW, PLLC
1545 Union Ave.
Memphis, Tennessee 38104
(901) 278-1004 – Telephone
(901) 278-3111 – Facsimile
brice@donatilaw.com
craig@donatilaw.com

*Attorneys for Plaintiffs*

-26-

## CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of July, 2022, a copy of the foregoing and all exhibits and attachments were sent via CM/ECF to:

Joe Welborn
Erin Palmer Polly
Terrence M. McKelvey
222 Second Avenue, South
Suite 1700
Nashville, Tennessee 37201
Joe.Welborn@klgates.com
Erin.Polly@klgates.com
terrence.mckelvey@klgates.com

*Counsel for Defendants*

By:      /s Daniel A. Horwitz_____