**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**AT NASHVILLE**

| | |
|---|---|
| G. MARIE NEWBY, individually and as Administratrix of THE ESTATE OF TERRY CHILDRESS, *Plaintiffs,* and, CHRISTOPHER ADAMS, *Plaintiff-Intervenor,* v. CORECIVIC OF TENNESSEE, LLC, as owner and operator of TROUSDALE TURNER CORRECTIONAL CENTER, DAMON HININGER, STEVE CONRY, RAYMOND BYRD, and SHAWNA CURTIS, *Defendants.* | Case No.: 3:22-cv-00093 JURY DEMANDED Chief Judge Waverly D. Crenshaw Jr. Magistrate Judge Jeffery S. Frensley |

## COMPLAINT IN INTERVENTION

Pursuant to Federal Rules of Civil Procedure 24, Plaintiff Intervenor Christopher Adams (Intervenor Adams) moves the Court to GRANT leave for him to intervene in this action as of right, or alternatively, by permission. The allegations set forth in Plaintiff Marie Newby's (Ms. Newby) complaint are based on the same essential subject matter as those that Intervenor Adams has a claim in relation to. Ms. Newby's allegations are more fully set forth in her Complaint and Intervenor Adams fully incorporates and re-alleges those as though fully alleged herein. [Document 1]

## I. INTRODUCTION

1.      This action arises because of the needless and preventable death of Ms. Newby's son Mr. Terry Childress (Mr. Childress) at the Trousdale Turner Correctional Center (TTCC), which is owned and operated by CoreCivic of Tennessee (formerly Corrections Corporation of America).

His death is attributable to, *inter alia*, CoreCivic's continual severe understaffing of the TTCC and their failure to comply with other security protocols established by the Tennessee Department of Correction's (TDOC) policies. The TDOC's policies are in compliance with generally accepted standards for the operation of prisons. Intervenor Adams has been incarcerated at the TTCC since October 4, 2021 under the same CoreCivic profit-motivated customs, practices, and/or policies that resulted in the death of Mr. Childress in violation of the United States Constitutional Amendment Eight and Tennessee Constitution Article I §32. As a result thereof Intervenor Adams fears for his safety due to the severe understaffing of the TTCC. The TTCC is understaffed with both correction officers and medical staff.

2.      This Court is well aware of and has been asked to previously adjudicate claims in relation to CoreCivic's chronic deliberate indifference to inmate safety at the TTCC in particular;[1] the Court is aware of "inadequate medical staffing that was endemic of broader issues with staffing levels at CoreCivic facilities" in general; it is aware of CoreCivic's "failures to maintain accurate records of medication administrations"; and it is aware of no less than one "inadequate medical emergency response in the case of an inmate who eventually died."[2] The Court also has knowledge of sealed communications between CoreCivic's executives and lobbyists which establish CoreCivic's chronic profit-motivated deliberate indifference to inmate safety.[3]

3.      As a result of CoreCivic's profit-motivated deliberate indifference to inmate safety Tennessee inmates housed within CoreCivic facilities are approximately two times as likely to die and four times more likely to be murdered-despite the fact that CoreCivic houses inmates with disproportionately low security designations.[4]

---

1   *See e.g.,* **Newby Complaint, Exhibit 2;** First Amended Complaint, *Pleasant-Bey v. State of Tennessee, et al.,* Case No.: 3:19-cv-486 (M.D. Tenn. December 21, 2020), ECF NO.: 68 at 9-15,17.

2   *See e.g.,* **Newby Complaint, Exhibit 3;** Memorandum, *Grae v. Corrections Corporation of America*, Case No.: 3:16-cv-02267 (M.D. Tenn. March 26, 2019), ECF No. 165.

3   *See Id.* at 7, n. 2.

4   *See e.g.,* Cassandra Stephenson, *Inmate death ruled homicide in a Tennessee CoreCivic prison where rate is twice as high as TDOC's, records show,* Jackson Sun (January 28, 2020),

4.    In January of 2020 the Tennessee Comptroller of the Treasury (Comptroller) issued a report related to findings made during an audit of the TTCC. The report found that CoreCivic's management failed to "implement or enforce established internal controls to ensure state and CoreCivic correctional facility staff collected and accurately reported incident information" in relation to "inmate deaths, inmate assaults, inmate violence, correctional officers' use of force, and inmate accidents and injuries". Moreover, it found that CoreCivic frequently destroyed records and evidence in violation of state law.[5]

5.    Prior to the January 2020 report another audit found that the TTCC "operated with fewer than approved correctional staff, did not have all staffing rosters, did not follow staffing pattern guidelines, and left critical posts unstaffed"; that "CoreCivic staffing reports at [TTCC] contained numerous errors"; and that TTCC "management's noncompliance with contractural requirements and department policies relating to inmate services challenged the department's ability to effectively monitor the correctional facility."[6]

6.    Moreover, while failing to lawfully collect records and evidence -in addition to destroying records -CoreCivic has been caught *fabricating* evidence in an attempt to avoid legal liability.[7]

_____

https://www.jacksonsun.com/story/news/crime/2020/01/28/corecivics-tennessee-prisons-have-twice-homicide-rate-tdocs/2776928001/ ("The corporation's four Tennessee facilities hold roughly 35% of the state's prison population but account for about 63% of the state's prison homicides."); Prison Legal News, *CoreCivic Prisons in Tennessee Have Twice as Many Murders, Four Times the Homicide Rate as State-Run Facilities,* PLN (August 6, 2019), https://www.prisonlegalnews.org/news/2019/aug/6/corecivic-prisons-tennessee-have-twice-many-murders-four-times-homicide-rate-state-run-facilities/ ("[F]rom2014 through June 2019, there were twice as many murders in the four Tennessee prisons operated by CoreCivic(formerly Corrections Corporation of America) than in the 10 prisons run by the Tennessee Department of Correction (TDOC). Also, the homicide rate in CoreCivic facilities was over four times higher than the rate for TDOC prisons.").

5   *See e.g.,* **Newby Complaint, Exhibit 4;** Tennessee Comptroller of the Treasury, Performance Audit Report, Tennessee Department of Correction (January 2020), available at: https://comptroller.tn.gov/content/dam/col/sa/advanced-search/2020/pal9032.pdf.

6   *See e.g.,* **Newby Complaint, Exhibit 5;** Tennessee Comptroller of the Treasury, Performance Audit Report, Tennessee Department of Correction  (November 2017)

7   *See e.g.,* Brinley Hineman, *After Tennessee prison suicide, CoreCivic counselor fabricated health records of treatment TDOC,* The Tennessean (August 25, 2020), https://www.tennessean.com/story/news/crime/2020/08/26/after-tennessee-prisoners-suicide-corecivic-worker-faked-health-records/3404186001/.

7.    CoreCivic's willingness to conceal and destroy records is not something to be taken lightly. The January 2020 Performance Audit Report put forth by the Comptroller  calls into question the veracity of the TTCC's reporting noting that "health services staff had not entered any serious accidents or injuries on the accidents screen in TOMIS" at the TTCC, which they found "questionable given the nature of the correctional environment". TTCC administrative officials admitted to the findings and pled ignorance; yet CoreCivic has been operating prisons in Tennessee for decades.

8.    Data reported to Tennessee regulators shows that the TTCC has the highest number of Class A incidents out of all Tennessee prisons. The TDOC defines Class A incidents as: "life-threatening matters and breaches of security that are likely to cause serious operational problems," including "escapes and attempted escapes, deaths, assaults, hostage situations, total institutional lockdowns, rapes, certain uses of force, and various weapons". CoreCivic was able to accomplish that extraordinary result in spite of the fact that "CoreCivic correctional facilities staff did not appropriately maintain original documentation of Class A incidents."[8]

9.    Even with all of the foregoing reports of brutality, criminal behavior, neglect, and inmate deaths at CoreCivic's facilities in general, particularly at the TTCC, state regulators have failed to eradicate the TTCC's worst abuses. In May of 2021 the Trousdale County Commission approved a new five year contract with CoreCivic to operate the TTCC in spite of their deliberate indifference to inmate safety and recent unlawful conduct at the prison, including, *inter alia*, constant reports of brutality and murder. Since beginning its operations of the TTCC CoreCivic has continued to fail in its constitutional duty to provide "reasonable safety" to the inmates in its care, thus exhibiting deliberate indifference to the same.[9]

---

8  *See e.g.,* **Newby Complaint, Exhibit 4;** graph appended to Comptroller's 2020 report as Appendix-B-2.
9  *See e.g.,* **Newby Complaint, Exhibit 6;** *See,* Demetria Kalodimos, *Woman says she paid off gangs to keep son safe in prison,* WSMV (October 5, 2017), https://www.wsmv.com/news/woman-says-she-paid-off-gangs-to-keep-son-safe-in-prison/article_a4e670ea-78be-5087-85e5-a65ecd485475.html;  Joseph Wenzel, Over 1,200

10.     In addition to state regulators' inability to control CoreCivic's operation of chronically unsafe prisons within the Middle District of Tennessee this Court has also been unable to compel them to remedy the violations. Inmates in CoreCivic's care die or incur serious bodily injury too frequently. This is in part because of their severe understaffing of correctional facilities for the sake of profit.

---

staff, inmates test positive for COVID-19 at Trousdale Turner Correctional Center, WSMV (May 1, 2020), https://www.wsmv.com/news/over-1-200-staff-inmates-test-positive-for-covid-19-at-trousdale-turnercorrectional-center/article_568c03d2-8bde-11ea-a447-4b7eaabeb67b.html; Adam Tamburin, Tennessee prison inmate dies after fight at Trousdale Turner, THE TENNESSEAN (Jan. 26, 2020), https://www.tennessean.com/story/news/2020/01/26/tennessee-prison-inmate-dies-after-fighttrousdale-turner-correctional-center/4581013002/; Dave Boucher, New Tennessee CCA prison stops taking inmates amid 'serious issues,' THE TENNESSEAN (May 24, 2016), https://www.tennessean.com/story/news/politics/2016/05/24/new-tennessee-private-prison-stopstaking-inmates/84867834/; Chris Conte, Prisons for profit: Concerns mount about Trousdale Turner Correctional Center, operator CoreCivic, WTVF (Jun. 13, 2019), https://www.newschannel5.com/longform/prisons-for-profit-concerns-mount-about-trousdale-turnercorrectional-center-operator-corecivic; Staff Report, Scathing state audit slams Tennessee prisons, CoreCivic for staffing, sexual assaults, and deaths in jails, WTVF (Jan. 10, 2020), https://www.newschannel5.com/news/scathing-state-audit-slams-tennessee-prisons-corecivic-forstaffing-sexual-assaults-and-deaths-in-jails; Jamie McGee, CoreCivic shareholders granted class action status in fraud lawsuit, THE TENNESSEAN (May 27, 2019), https://www.tennessean.com/story/money/2019/03/27/corecivic-class-action-securitiesfraudlawsuit/3289913002/; Chris Gregory, Family seeks answers in loved one's death at Trousdale prison, LEBANON DEMOCRAT (Jan. 2, 2021), https://www.lebanondemocrat.com/hartsville/family-seeks-answersin-loved-ones-death-at-trousdale-prison/article_1ffe90f7-0e9f-5021-bb94-9ec1b4d23139.html; Demetria Kalodimos, Inmates at CoreCivic prisons say they sometimes go months without medical care, WSMV (Jun. 22, 2017), https://www.wsmv.com/news/inmates-at-corecivic-prisons-say-they-sometimes-gomonths-without-medical-care/article_8d28e630-bd12-5f1c-8b68-92b9336553e1.html; Prison Legal News, Incorrect Cause of Tennessee Prisoner's Death Reported by CoreCivic Employees, PLN (Jun. 7, 2018), https://www.prisonlegalnews.org/news/2018/jun/7/incorrect-cause-tennessee-prisoners-deathreported-corecivic-employees/; Staff Report, Private prison company CoreCivic's history of problems in Tennessee, THE TENNESSEAN (Jan. 16, 2020), https://www.tennessean.com/story/news/local/2020/01/17/private-prison-corecivic-history-problemstennessee/4470277002/; Stephen Elliott, State audit criticizes CoreCivic facilities, THE NASHVILLE POST (Nov. 14, 2017), https://www.nashvillepost.com/business/prison-management/article/20982796/stateaudit-criticizes-corecivic-facilities; Matt Blois, CoreCivic reports $25M in profits as COVID infects 2,500+ inmates, THE NASHVILLE POST (Jun. 30, 2020), https://www.nashvillepost.com/business/prisonmanagement/article/21138792/corecivic-reports-25m-in-profits-as-covid-infects-2500-inmates; Steven Hale, Problems Persist at Tennessee's Mismanaged Prisons, THE NASHVILLE SCENE (Jan. 22, 2020), https://www.nashvillescene.com/news/features/article/21111586/problems-persist-at-tennesseesmismanaged-prisons; Dave Boucher, CoreCivic investigating ex-officer's allegations of negligent deaths at private prison, THE TENNESSEAN (Dec. 12, 2017), https://www.tennessean.com/story/news/2017/12/12/corecivic-investigating-ex-officers-allegationsnegligent-deaths-private-prison/946196001/; Elizabeth Weill-Greenberg, 'Just Let Him Kick,' THE APPEAL (Sep. 6, 2018), https://theappeal.org/just-let-him-kick/; Brinley Hineman, Murfreesboro man charged in prison cellmate's death at Trousdale, DAILY NEWS JOURNAL (Feb. 20, 2020), https://www.dnj.com/story/news/2020/02/20/murfreesboro-man-jacob-kado-charged-death-prisoncell-mate-ernest-hill-trousdale-turner/4818354002/; Ethan Illers, Man killed during inmate-on-inmate altercation at Trousdale Turner prison, WSMV (Jun. 16, 2019), https://www.wsmv.com/news/mankilled-during-inmate-on-inmate-altercation-at-trousdale-turner-prison/article_8d8b6806-9066-11e9b749-7b44cac1c002.html; Jeremy Finley, Recorded conversations reveal life inside prison ravaged by COVID-19, WSMV (May 6, 2020), https://www.wsmv.com/news/investigations/recorded-conversationsreveal-life-inside-prison-ravaged-by-covid-

11.     Because of the lack of meaningful regulatory action in relation to their unlawful business practices CoreCivic is of the mindset that it can continue to operate with impunity. They continue to act with deliberate indifference to inmate safety despite their knowledge of the barbaric conditions at their facilities. Conditions where inmates needlessly die. CoreCivic has no fear of any repercussions for their actions, or, lack thereof. They have yet to experience any significant and meaningful legal consequences for their conduct so they feel as though they are above the law.

12.     Intervenor Adams is warehoused in the Whiskey Unit at the TTCC which has four pods

19/article_91ef5b06-8fe2-11ea-9b75-f36db06e1ab1.html; Demetria Kalodimos, Gang activity, security a concern at Trousdale Turner facility, WSMV (Jun. 21, 2017), https://www.wsmv.com/news/gang-activity-security-a-concern-at-trousdale-turner-facility/article_df82a358-7073-552e-b5e4-9feb2e9cf8bc.html; Steven Hale, Tennessee's Largest Prison Still Appears as Troubled as Ever, THE NASHVILLE SCENE (Feb. 13, 2019), https://www.nashvillescene.com/news/features/article/21047078/tennessees-largest-prison-stillappears-as-troubled-as-ever; Jessie Williams, Trousdale Turner Corrections Officer Arrested, MACON COUNTY CHRONICLE (Feb. 5, 2019), https://www.maconcountychronicle.com/news/5680-trousdaleturner-corrections-officer-arrested; Brett Kelman, At Tennessee's largest prison, diabetic inmates say they are denied insulin to 'maximize profits', THE TENNESSEAN (Aug. 7, 2018), https://www.tennessean.com/story/news/2018/08/07/corecivic-diabetic-inmates-denied-insulintrousdale-turner/925297002/; Natalie Allison, Lawmakers hear from prison rape survivor, parents of man who hanged himself in CoreCivic facility, THE TENNESSEAN (Dec. 19, 2018), https://www.tennessean.com/story/news/politics/2018/12/19/tennessee-legislators-hear-rape-suicidecorecivic-prison/2355556002/; Dave Boucher, Private prison chief: 'We've got work to do' at Trousdale facility, THE TENNESSEAN (Dec. 13, 2016), https://www.tennessean.com/story/news/2016/12/13/privateprison-chief-weve-got-work-do-trousdale-facility/95223230/; Demetria Kalodimos, Former chaplain describes conditions inside TN prison, WSMV (Jun. 19, 2017), https://www.wsmv.com/news/formerchaplain-describes-conditions-inside-tn-prison/article_9b30af82-8297-511b-b11f-b5fd9270bf18.html; Chris Gregory, Trousdale Turner employee charged with smuggling contraband, LEBANON DEMOCRAT (Apr. 23, 2020), https://www.lebanondemocrat.com/hartsville/trousdale-turner-employee-charged-withsmuggling-contraband/article_6b865daf-fbc8-5a59-9a35-e84b61ace2e4.html; Andy Cordan, Prison corrections officer in Trousdale County arrested carrying drugs, WKRN (Jan. 20, 2021), https://www.wkrn.com/news/prison-corrections-officer-in-trousdale-county-arrested-carrying-drugs/; Dave Boucher, Gangs, insufficient staffing plague troubled Tennessee private prison, state audit finds, THE TENNESSEAN (Nov. 14, 2017), https://www.tennessean.com/story/news/politics/2017/11/14/tennessee-private-prison-operated-bycorecivic-blasted-ongoing-problems-new-state-audit/858884001/; Keith Sharon and Adam Tamburin, 'This is unreal': Family seeks answers in death of Trousdale Turner prison inmate, THE TENNESSEAN (Feb. 2, 2021), https://www.tennessean.com/story/news/2021/02/03/trousdale-turner-inmate-aaron-blaykeadams-dead-family-wants-answers/4290646001/; Alex Corradetti, Investigation underway following death of inmate at Trousdale Turner Correctional Center, WKRN (Sep. 8, 2021), https://www.wkrn.com/news/investigation-underway-following-death-of-inmate-at-trousdale-turnercorrectional-center/; Chris Gregory, Former Trousdale Turner corrections officer indicted, LEBANON DEMOCRAT (Oct. 7, 2021), https://www.lebanondemocrat.com/hartsville/former-trousdale-turnercorrections-officer-indicted/article_aac20d8d-16e5-5edc-9e7e-d5fd9f8bfd0e.html; Levi Ismail, NAACP calls for closure of Trousdale Turner Correctional Center, cites 'barbaric treatment' of Black men, WTVF (Nov. 11, 2021), https://www.newschannel5.com/news/naacp-calls-for-closure-of-trousdale-turnercorrectional-center-cites-barbaric-treatment-of-black-men .

that are open bay barracks style living quarters. Inmates in the Whiskey Unit are *supposed* to be minimum-restricted custody level but correction officials knowingly house more dangerous medium custody level inmates therein at times. To ensure the safety of inmates in its charge the TDOC has security protocols established to provide "reasonable safety" to its inmates. TTCC correction officials frequently operate completely contrary to the same. The TDOC requires its inmates to wear color coded identification wristbands to prevent inmates from entering pods and buildings where they do not reside. At the TTCC these security protocols are disregarded. Most correction officials allow inmates to move around on the compound and enter other buildings with no identification wristband on at all. Correction officials will even routinely unlock a pod door in the Whiskey Unit and escort an inmate to another pod and let them into the pod they do not live in. Additionally, correction officers rarely do their required security walk-thrus (these are supposed to be done at thirty (30) minute intervals). This routine practice of TTCC correction officials puts inmates' safety at risk and exhibits deliberate indifference to the same in violation of accepted prison security standards established in TDOC policies for the same.

13.     Moreover, correction officials frequently allow inmates to be housed in the Whiskey Unit whom they know to have a drug problem and drug debts. This practice puts inmates housed in the Whiskey Units's safety at risk when these inmates are in a drug induced stupor and when officials let inmates into the pods to collect the drug debt. Inmates who overdose in the Whiskey Unit do not receive disciplinary charges and are allowed to remain therein. As such, officials *know* they have unstable addicts housed in the open bay pods, thus, they do not care about providing reasonable safety to inmates. Officials come into the Delta pod and ask for volunteers to take drug tests to keep the positive test numbers down instead of selecting random subjects to make it look as though they are controlling the drug problem. It looks good on paper but it does not reflect reality.

14.	This Complaint in Intervention filed by Plaintiff Intervenor Christopher Adams has claims that are essentially the same as those already properly before the Court by Ms. Marie Newby in this action, therefore, intervention is warranted so that Intervenor Adams may protect his interest in the application of the relevant laws and it is in the interest of public and judicial economy. In accordance with the claims set forth herein Intervenor Adams requests that this Court **ASSESS** punitive damages against CoreCivic for their knowing, willing, and reckless failure to provide him with "reasonable safety" through adequate staffing of critical posts in compliance with TDOC security protocols, and in accordance with their lawful duty under the Eighth Amendment of the United States Constitution and the Tennessee Constitution sufficient to deter their continued profit-motivated deliberate indifference to inmate safety; **DECLARE** the Trousdale Turner Correctional Center to be operating illegally and unconstitutionally; **ENJOIN** the Trousdale Turner Correctional Center from accepting any new inmates until they are in full compliance with generally accepted standards for prison management and TDOC's policies for the same; **ORDER** Trousdale Turner Correctional Center to reduce its inmate population to a level commensurate to the number of correction officers that it has to ensure that critical posts are filled; and **APPOINT** an independent monitor to audit and ensure that the Trousdale Turner Correctional Center maintains compliance with minimal constitutional standards. In the alternative, the Court should **ENJOIN** the Trousdale Turner Correctional Center from continuing to operate moving forward, or, **ORDER** the TDOC to take control of the Trousdale Turner Correctional Center through a provision in the contract between the TDOC, Trousdale County, and CoreCivic that allows for such.

## II. PARTIES

15.	Plaintiff G. Marie Newby is the mother of decedent Terry Childress, the personal representative of Mr. Childress's estate, and Mr. Childress's next-of-kin.

16.     Plaintiff the Estate of Terry Childress is the estate of decedent Terry Childress.  At all times relevant to this Complaint, Mr. Childress resided at CoreCivic's Trousdale Turner Correctional Facility in Trousdale County, Tennessee.

17.     Plaintiff Intervenor Christopher Adams is an inmate incarcerated at the Trousdale Turner Correctional Center in Trousdale County, Tennessee.

18.     Defendant CoreCivic of Tennessee, LLC owns and operates the Trousdale Turner Correctional Center.  CoreCivic is a citizen of Tennessee with its principal place of business and corporate headquarters located in Brentwood, Tennessee.

19.     Defendant Damon Hininger is the Chief Executive Officer of CoreCivic.

20.     Defendant Steve Conry is CoreCivic's Vice President of Operations Administration.

21.     Defendant Raymond Byrd was the warden of Trousdale Turner Correctional Center at all times relevant to this Complaint. Plaintiff Intervenor Adams does not have any claims against Defendant Raymond Byrd because he has not worked at the TTCC since Plaintiff Intervenor Adams' term of incarceration began there.

22.     Defendant Shawna Curtis was a classification counselor at Trousdale Turner Correctional Center. Plaintiff Intervenor Adams does not have any claims against Defendant Shawna Curtis because she has not worked at the TTCC since Plaintiff Intervenor Adams' term of incarceration began there.

### III. JURISDICTION, VENUE, AND AUTHORITY

23.     This Court has jurisdiction over Plaintiff Intervenor Christopher Adams' federal claims pursuant to 28 U.S.C. § 1331.

24.     This Court has supplemental jurisdiction to adjudicate Plaintiff Intervenor Adams's state law claims in relation to Plaintiff Intervenor Adams' federal claims in this action pursuant to 28 U.S.C. § 1367(a).

25.     The United States District Court for the Middle District of Tennessee is the judicial district where a substantial part of the events or omissions giving rise to Plaintiff Intervenor Adams' claims occurred. Accordingly, venue is proper in this Court pursuant to 28 U.S.C.§ 1391(b)(2). In addition, venue is independently proper in this Court pursuant to 28 U.S.C. § 1391(b)(1).

26.     This Court has jurisdiction to allow Plaintiff Intervenor Adams to intervene in this action pursuant to FRCP 24.

27.     This Court has jurisdiction to grant declaratory relief pursuant to 28 U.S.C.§§ 2201, 2202, and FRCP 57.

28.     This Court has jurisdiction to grant injunctive relief pursuant to FRCP 65.

## IV. FACTUAL ALLEGATIONS

29.     Plaintiff Intervenor Adams incorporates and re-alleges all of the allegations more fully set forth in *Newby et al. v. CoreCivic et al.,* Case No.:3:22-cv-00093, Document 1, as though completely and fully alleged herein in Plaintiff Intervenor Christopher Adams' Complaint in Intervention.

30.     Plaintiff Intervenor Christopher Adams is an inmate in the custody of the Tennessee Department of Correction and is housed at the Trousdale Turner Correctional Center.  Intervenor Adams has been housed thereat since October 4, 2021 in the Whiskey Units Delta Pod.

31.      On February 24, 2021, Terry Childress was brutally murdered in his prison cell at the TTCC.

32.     The cause of Mr. Childress's death was "blunt force injuries of the head," and the manner of death was "homicide." Mr. Childress also suffered two broken ribs as a result of Tymothy Willis's assault.[10]

---

10 *See,* **Newby Complaint, Exhibit 7 ;** Report of Investigation by County Medical Examiner at 5.

33. Video surveillance footage inside TTCC confirms that corrections officers were not making timely rounds at the time of Mr. Childress's murder.

34. The reason why officers were not making timely rounds at the time of Mr. Childress' death was because the TTCC was understaffed. The TTCC has critical posts that must be filled in order to provide adequate reasonable to inmates in accordance with Tennessee Department of Correction policies.

35. Defendants CoreCivic, Hininger, and Conry knew that the TTCC was chronically understaffed and that critical posts routinely went unstaffed at the TTCC because doing so was and remains more profitable.

36. At the time Mr. Childress was murdered, CoreCivic had actual knowledge that Mr. Childress' murderer posed a heightened security risk and was a volatile, dangerous inmate with a history of violence because his information is readily available on the TDOC's Tennessee Offender Management Information System (e-Tomis).[11]

37. Based on generally accepted practices in prison management Mr. Childress and his murderer should not have been housed together. Tymothy Willis had been misclassified by CoreCivic officials and they knew of Mr. Willis's propensity for violence because of his past, and their own records showed as much.[12]

38. At the time of Mr. Childress' death the TTCC was routinely understaffed which resulted in the available correction officers having to do the work of the officers whose posts were unfilled. As a direct result of this understaffing, rounds were not conducted either properly or timely in the Special Housing Unit during the time period leading up to Mr. Childress' murder. Neither were checks conducted with the frequency required by TDOC policy and generally accepted practices in prison management (security checks are supposed to be done at thirty

11 *See,* **Newby Complaint** at ¶¶ 37-38.
12 *See,* **Newby Complaint** at ¶¶ 39-48

minute intervals).

39.     The TTCC Special Housing Unit has five positions that are to be filled as critical posts in accordance with TDOC policy. At the time of Mr. Childress' death only two of the five positions were staffed.

40.     As of December 2020—approximately two months before Mr. Childress's murder—only two of the five positions in TTCC's Special Housing Unit were staffed. The TTCC continued to remain severely understaffed thereafter.

41.     CoreCivic routinely staffs the TTCC with just a single officer per unit, which is woefully insufficient to provide reasonable safety to inmates in the facility. This practice occurred at the time of Mr. Childress' death[13] and continues to this day while Intervenor Adams has been at the TTCC. For example, Plaintiff Intervenor Adams is aware of and/or has personally observed and recorded the following staffing deficiencies in the Whiskey Unit in particular, and/or is aware of acts of violence at the TTCC in general. The facts in relation to how many c/o's are on post refer to the Whiskey Unit in general (these are just a sample of incidents that Adams remembered to record and are by no means exhaustive):

- 4/16/2022 Multiple inmates were stabbed. Some died and were covered with a tarp in intake. There were 3 inmates reported to Plaintiff Intervenor Adams as being dead. That particular day the TTCC was insufficiently staffed and one correction officer (c/o) transported two inmates to the hospital for medical treatment. Sergeant (Sgt.) Mitchell was the only c/o on post in the whiskey Unit and she left the unit to assist in counting other units. Some c/o's who were coming to the TTCC from other facilities to help fill posts quit coming to the TTCC after the aforementioned incident.

- 4/24/2022 The TTCC was short staffed by 126 c/o's. The Whiskey Unit only had one c/o

_____

13 *See,* **Newby Complaint** at ¶¶49-53

on post.

- 4/28/2022 No c/o visible in the Whiskey Unit rotunda all night; except when they came in to count.

- 4/29/2022 One c/o on post for first shift. (ex U.S. Marshal)

- 4/30/2022 One c/o on post for first shift. (ex U.S. Marshal)

- 5/1/2022 One c/o on post for first shift.

- 5/5/2022 Inmate in Whiskey Alpha died.

- 5/11/2022 An inmate in the Delta Unit Bravo Pod was stabbed by inmates from Bravo Unit. There was also an inmate stabbed in the Special Housing Unit (Alpha).

- 5/12/2022 One c/o on post for first shift. Went on lock-down. After the TTCC was already on lock-down a "Code Blue" was called over the c/o's radio announcing that inmates in the Echo Unit had "popped-out" of their cells and stabbed another inmate.

- 5/13/22 One c/o on post for first shift.

- 5/15/2022 One c/o on post for first shift. Sgt. Nichols from Fox Unit helped Sgt. Mitchell (the one c/o) count the Whiskey Unit.

- 5/16/2022 One c/o on post for first shift.

- 5/19/2022 TDOC Commissioner Lisa Helton was at the TTCC. The TTCC brought c/o's in from other prisons that day. The next day they were gone.

- 5/31/2022 Inmate stabbed in the Special Housing Unit. The Tennessee Bureau of Investigation (TBI) and other investigators were here to investigate. Plaintiff Intervenor Adams works in the Special Housing Unit doing maintenance and we avoided going into the building that day to stay out of their way.

- 6/5/2022 Worked maintenance and was out on the compound. There was only one c/o in

almost pods at the TTCC. Whiskey Unit Delta Pod; c/o had an "out of place call-out" for inmates who live in other pods to leave the unit.

- 6/16/2022 Special Housing Unit, Alpha Charlie inmate in cell 108 was stabbed. We went to work on the electricity in his cell and he refused to come out for us to work because of such.

- 6/18/2022 Whiskey Unit Delta Pod; c/o had an "out of place call-out" for inmates who live in other pods to leave the unit.

- 6/24/2022 No c/o visible in the rotunda at 10:35pm.

- 6/26/2022 An inmate complained to c/o Simkins about people moving from one pod to another and coming in from other buildings. Simkins said something to Sgt. Virgil about it which resulted in an altercation between them. (It was alleged that Sgt. Virgil slapped Simkins.)

- 6/27/2022 Simkins went to human resources about incident with Sgt. Virgil.

- 7/2/2022 One c/o on first shift until Simkins showed up around count time and remained for the rest of the day. One c/o on second shift who worked both the Whiskey and Delta Units. The c/o who was working both the Charlie and Fox Unit's helped the c/o assigned to Whiskey and Delta Unit's count throughout the night, thus leaving no c/o at all in the other three units while they were assisting each other with count.

- 7/3/2022 One c/o on first shift (Jones) and one c/o on second shift.

- 7/4/2022 Two c/o's on first shift. Whiskey Unit Delta Pod; c/o had an "out of place call-out" for inmates who live in other pods to leave the unit.

- 7/6/2022 An inmate in Whiskey Alpha Pod died. (Sgt. Noble, Sgt. Christian, and Unit Manager Nichols were seen on the scene). TBI was here to investigate the next day.

- 7/8/2022 Whiskey Charlie Pod had an inmate overdose.

- 7/9/2022 Two c/o's on first shift. One c/o on second shift. Whiskey Unit Delta Pod; c/o had an "out of place call-out" for inmates who live in other pods to leave the unit at 8:15pm.

- 7/10/2022 Two c/o's on first shift. Whiskey Unit Delta Pod; c/o had an "out of place call-out" for inmates who live in other pods to leave the unit at 6:05pm and 8:15pm.

- 7/13/2022 One c/o visible in rotunda on second shift at 1:00am.

- 7/14/2022 Three inmates stabbed in Bravo Unit, one of whom was thrown over the rail from the second tier. Incident was reported on NBC News. Went on lock-down. Two c/o's on first shift. One c/o on second shift.

- 7/15/2022 Two c/o's on first shift. Inmates from other pods in the Whiskey Delta Pod with no identification wristband on at all when Adams returned from the library at about 1:20pm. One c/o on second shift.

- 7/16/2022 Three c/o's on first shift. Whiskey Unit Delta Pod; First shift c/o had an "out of place call-out" for inmates who live in other pods to leave the unit at 6:12pm; c/o stated: "If you do not belong in here you need to go back to your pod." (Yet, he let them in.)

- 7/17/2022 Two c/o's on first shift. Inmates from other pods in and out. One c/o on second who was not visible in the rotunda at 2:58am.

- 7/18/2022 Three c/o's on first. One c/o (Lopez) worked both the Whiskey and Delta Units.

- 7/19/2022 One c/o on first shift with Unit Manager Nichols helping him. Inmates from other pods in and out of Delta pod. One c/o on second shift.

- 7/20/2022 Two c/o's with Unit Manager Nichols helping on first. Inmates from other pods

in and out of Delta pod. One c/o on second shift with none visible in the rotunda at 11:51pm.

- 7/21/2022 One c/o on second shift who was not seen for extended periods throughout the night.

- 7/22/2022 Bravo Bravo Unit had been on lock-down already for at least one day, yet Intervenor Adams heard over Sgt. Noble's radio the Bravo Unit officer call for assistance in getting inmates back into their cells.

42.     TDOC Policy, 506.13, *Identification of Inmates* § VI (E), page 6 of 7, establishes a policy of placing mandatory color-coded identification wristbands on inmates "to enhance security measures of inmates attempting to enter unauthorized areas of the facility, such as housing units to which the inmates are not assigned." In spite of these mandatory security measures TTCC Whiskey Unit c/o's let inmates move from pod to pod on a daily basis. Sometimes they will even open one pod door and escort an inmate to another pod and let him in the pod that they know he does not live in, thereby putting other inmates' safety at risk contrary to TDOC's security measures.[14]

43.     Administrative officials at the TTCC have been put on notice about inmates going from pod to pod and they continue to allow it to go on contrary to TDOC Policy. CoreCivic is contractually obligated to operate under TDOC policy thereby ensuring inmates in their care are accorded reasonable safety.

44.     There is supposed to be a minimum of five (5) correction officers on post in the Whiskey Unit at all times. One of whom should be assigned inside each pod, but is not. During Intervenor Adams' eighteen years spent in TDOC operated facilities there was always a correction officer on post for his pod. Moreover, the TDOC correction officers are inside the pods where they are

---

14 *See,* TDOC Policy, 506.13, *Identification of Inmates* § VI (E), page 6 of 7, available at:
   https://www.tn.gov/correction/about-us/policies-and-procedures.html.

available if needed to diffuse any situations that may arise.

45.     As a result of Defendants failing to staff critical posts Intervenor Adams fears for his current and future safety thereby depriving him of his right to the full enjoyment of the protections provided by the Eighth Amendment of the United States Constitution.

46.     CoreCivic and the TTCC administrative officials are, or must be, aware of generally accepted prison staffing requirements because CoreCivic has been operating prisons for the TDOC for decades.

47.     Intervenor Adams works in the Special Housing Unit (Alpha Unit) at the TTCC doing maintenance. Inmates in the Alpha Unit frequently have their food ports rigged so that they may open them at any time. When caught with their food ports rigged they are not written-up for such. Correction officers just give Intervenor Adams' supervisor a list of food ports that need to be fixed. Oftentimes, the next day the food ports are right back rigged so that they may open them at any time. This enables inmates to be able to potentially "pop out" of their cells and move around freely. Inmates in the Alpha Unit are generally not supposed to be out of their cells without being cuffed and being escorted by a correction officer.

48.     Intervenor Adams is aware that inmates in other units at the TTCC "pop out" of their cells at any time they want all day and throughout the night. Inmates are supposed to be secured in their cells during count times and from around 9:15pm to 6:00am. The c/o's must know this because they are the ones who will not let the inmates out of their cells most of the time if the inmates do not let themselves out, hence, the reason the inmates "pop out". The correction officers must know they did not let the inmates out of their cells after count times and in the mornings, yet they see the inmates out of their cells moving around.

49.     TDOC requires its high level administrative security officials to watch so many hours of video surveillance each week to ensure that security protocols are being adhered to by correction

officers. This is a generally accepted practice for the management of prisons to ensure that correction officers are performing their duties adequately.

50.     CoreCivic has—and it has long had—actual knowledge that the TTCC is severely understaffed. Indeed, TTCC is understaffed deliberately, because paying for sufficient staffing is expensive and understaffing is more profitable.

51.     The less money that CoreCivic spends on staffing the TTCC the more profits it realizes for its shareholders. CoreCivic acts at all times to enhance the profits of its shareholders.

52.     On October 4, 2021 inmate Cayce Wines was transferred from the BCCX to the TTCC with Plaintiff Intervenor Adams and was assigned to the Whiskey Unit Delta Pod with him. At that time his security custody level was medium. In June of 2022 they moved him out of the Whiskey Unit because his security custody level was medium. Roughly a couple months before Mr. Wines was moved out of the Whiskey Unit Delta Pod he overdosed. He was not written up for this infraction and was allowed to remain in the Whiskey Unit Delta Pod until moved out. Intervenor Adams has seen other inmates overdose in his pod and they are still therein to this day. Plaintiff Intervenor Adams has personally heard c/o's come into the Whiskey Unit Delta Pod and ask for volunteers to take drug tests.

53.     TDOC Policy 506.14, *Housing Assignments* § VI (C)(1) sets forth that "[i]nmates in the general population should normally be of the same custody level when double-celled . . .". The open bay barracks style inmate accommodations of the Whiskey Unit would therefore be likened to double-celling on a grand scale. As such, there should only be minimum security inmates housed together in the Whiskey Unit since it is an open environment that may further be likened to a TDOC annex where only minimum direct security inmates or lower are permitted. Placing medium security inmates in the open bay Whiskey Unit exhibits deliberate indifference

to inmate safety because medium security inmates are generally more dangerous.[15]

54.    TTCC administrative officials who are aware of the propensity for violence at the TTCC come into the Whiskey Unit Delta Pod and routinely threaten to move low-risk minimum security level inmates to Bravo and Echo Units where the TTCC houses high-risk violent medium security level inmates. These threats are made in relation to minimal infractions, such as, someone had a wet towel hanging on the hand-rail to dry. It is an infraction, but a very minor one. It does not warrant causing violence to be perpetrated against an inmate by having him moved to a unit that is *known* to be more violent .

55.    Intervenor Adams has personally witnessed c/o's walk off and leave an inmate desiring protective custody and make him *wait* in the pod where he is seeking to be protected from. Sometimes for hours.

56.    Intervenor Adams works for the maintenance department at the TTCC which is right beside intake where inmates enter and leave the TTCC. Intervenor Adams has been watching new inmates continue to arrive at the TTCC since he began work for maintenance in November of 2021.

57.    In addition to being severally understaffed with correction officers the TTCC is routinely understaffed with medical personnel also. It is common practice for the TTCC to only have as few as three nurses on duty on the weekends. With the high rate of overdoses at the TTCC and inmate-on-inmate violence this is woefully insufficient for a prison that houses about 2500 inmates, thereby exacerbating safety concerns.

58.    Plaintiff Newby's counsel sent waiver's for service of summons to Defendants CoreCivic of Tennessee, LLC, Damon Hininger, and Steve Conry on February 24, 2022. The waiver's were returned as executed by G. Marie Newby as to each of these Defendants on March 5, 2022.

---

15  TDOC Policy 506.14, *Housing Assignments* §  VI  (C)(1),  page  4  of  5  available  at:
https://www.tn.gov/correction/about-us/policies-and-procedures.html.

Accordingly, these Defendants were officially on notice of the claims of severe understaffing at the TTCC, at a minimum, on March 5, 2022. [*See*, Docket at 12, 13, and 15]

59. Despite the aforementioned notice Defendants continue to severally understaff the TTCC when it is within their power to provide adequate staff. Defendants have used a private security contractor called "G4S" in the past to staff critical posts at the TTCC. However, having to do so again would require Defendants to pay for their services, which cuts into profits. So, instead of doing this Defendants just operate with severe correctional officer shortages thereby putting Intervenor Adams and other inmates' safety at risk. [*See, ¶41 supra*]

60. As a result of their focus on maximizing profits CoreCivic routinely fails to meet constitutionally adequate safety standards at the TTCC resulting in recurring, preventable, and disproportionately high instances of inmate-on-inmate assaults and deaths.

61. Inmates at Trousdale Turner Correctional Center -including Terry Childress- have died and continue to die needlessly as a result of the TTCC's premeditated and profit-motivated understaffing choices.

62. Plaintiff alleges that, based on the totality of conditions, practices, and incidents that have occurred at the TTCC, the conditions at the TTCC violate the Eighth Amendment, and these violations are pursuant to a pattern or practice of resistance to the full enjoyment of Intervenor Adams' rights protected by the Eighth Amendment.

63. In addition to Mr. Childress' murder, other inmates have been murdered as a result of this understaffing, inmates at the TTCC experience a high level of violence and fear for their future safety.

64. On June 15, 2019, TTCC inmate Ernest Edward Hill was found unconscious by prison officials and life saving measures were attempted. However, Mr. Hill died later at the hospital. After an investigation conducted by the Tennessee Bureau of Investigation Mr. Hill's cellmate

was charged with second-degree murder. [16]

65.     On January 25, 2020, TTCC inmate frank Lundy was found injured at the entrance to a housing unit and was pronounced dead at the hospital. Reports indicate Mr. Lundy had been stabbed in the neck thereby resulting in the fatal injury.[17]

66.     Defendant Hininger, CoreCivic's Chief Executive Officer, has actual knowledge of the TTCC's chronic understaffing. Even so, he has willfully failed to remedy TTCC's deliberate indifference to inmate safety, both because understaffing is more profitable and because he does not care when inmates in CoreCivic's care needlessly die.

67.     Defendant Conry, CoreCivic's Vice President of Operations Administration, also has actual knowledge of the TTCC's endemic understaffing.  Even so, he has similarly failed to remedy the TTCC's understaffing and the heightened risk of fatal inmate-on-inmate violence resulting from it, because understaffing is profitable and because he, too, is unbothered when inmates in CoreCivic's care needlessly die.

68.     There is a provision in the contract between the Tennessee Department of Correction, the County of Trousdale, Tennessee, and CoreCivic that allows for the TDOC to take over the Trousdale County Correctional Center.

## V. CLAIMS FOR RELIEF

### COUNT #1: 42 U.S.C. § 1983—DELIBERATE INDIFFERENCE TO AND FAILURE TO PREVENT FORESEEABLE INMATE-ON-INMATE VIOLENCE (AS TO DEFENDANTS CORECIVIC, DAMON HININGER, AND STEVE CONRY; COLLECTIVELY DEFENDANTS, HEREAFTER)

69.     Plaintiff Intervenor Adams incorporates and re-alleges the foregoing allegations as if fully

_____

16 Hineman, Brinley, "Murfreesboro man charged in death of prison cellmate at Trousdale Turner Correctional Facility," Feb. 20, 2020, available at:
https://www.dnj.com/story/news/2020/02/20/murfreesboro-man-jacob-kado-charged-deathprison-cell-mate-ernest-hill-trousdale-turner/4818354002/.
17 Gregory, Chris, "Inmate killed in assault at Trousdale prison," The Lebanon Democrat, January 30, 2020, available at https://www.lebanondemocrat.com/hartsville/inmate-killed-in-assault-attrousdale-prison/article_4808fd72-b736-5dba-8607-e510d899e1e2.html.

set forth herein.

70.     At all times relevant to this Complaint all Defendants have legal duties under the Eighth Amendment to protect Intervenor Adams from violence at the hands of other prisoners and to ensure Intervenor Adams, reasonable safety at the TTCC.

71.     At all times relevant to this Complaint all Defendants have legal duties under the Eighth Amendment to provide Intervenor Adams with adequate medical staffing in the event of an emergency at the TTCC.

72.     CoreCivic has an unconstitutional policy or practice of maintaining staffing levels that are insufficient to ensure that inmates like Plaintiff Intervenor Adams and others are protected from inmate-on-inmate violence.

73.     All Defendants are and may be held liable for acting with deliberate indifference to Plaintiff Intervenor Adams' safety at the TTCC.

74.     All Defendants have failed to ensure Plaintiff Intervenor Adams' reasonable safety at the TTCC through adequate staffing, isolation of drug addicts from open bay units, and following TDOC security protocols in relation to inmates moving from pod to pod and building to building.

75.     All Defendants have acted with deliberate indifference to Plaintiff Intervenor Adams' safety while he has been an inmate at the TTCC from October 4, 2021 to present.

76.     Defendants CoreCivic, Hininger, and Conry  know that Plaintiff Intervenor Adams faces a substantial risk of serious harm at TTCC as a result of its chronic understaffing.

77.     Defendants CoreCivic, Hininger, and Conry have disregarded known risks to Plaintiff Intervenor Adams at the TTCC by failing to take reasonable measures to abate them.

78.     Defendants CoreCivic, Hininger, and Conry are actually aware of the specific and particularized risks of serious harm posed to inmates like Plaintiff Intervenor Adams as a consequence of, *inter alia*, CoreCivic's deliberate understaffing of the TTCC; CoreCivic's failure

to properly train and supervise the staff at the TTCC to ensure adequate staffing levels; TTCC's failure to adhere to safety protocols; and TTCC's failure to classify and house inmates in its care correctly and in accordance with generally accepted practices in prison management.

79. During the time Plaintiff Intervenor Adams has been housed at the TTCC he has been plagued by constant and pervasive risks of physical harm. As such, he fears for his current and future safety because Defendants continue to severally understaff the TTCC with correction officers and medical staff.

80. At the time Mr. Childress was murdered, Trousdale Turner Correctional Center's pervasive risk of harm to inmates manifested in actual harm and a dramatically outsized number of serious inmate-on-inmate attacks, only a fraction of which were ever officially documented.

81. At the time Mr. Childress was murdered, Trousdale Turner Correctional Center was plagued by longstanding, pervasive, well-known, and expressly observed inmate-on-inmate attacks that routinely went unreported to state regulators.

82. During the time that Intervenor Adams has been at the TTCC has been plagued by longstanding, pervasive, well-known, and expressly observed inmate-on-inmate attacks that routinely went unreported to state regulators.

83. At the time Mr. Childress was murdered, Defendants CoreCivic, Hininger, Conry, and Byrd had been exposed to information concerning the risk of physical harm to inmates housed at the TTCC, including audits by regulators, and they must have known about it.

84. During the time that Intervenor Adams has been at the TTCC Defendants CoreCivic, Hininger, and Conry, had been exposed to information concerning the risk of physical harm to inmates housed at the Trousdale Turner Correctional Center, including audits by regulators, and they must have known about it.

85. At the time Mr. Childress was murdered, Defendants CoreCivic, Hininger, Conry, and

Byrd had actual or constructive knowledge of the constant and pervasive risk of physical harm to inmates generally and to Mr. Childress specifically at the Trousdale Turner Correctional Center.

86. During the time that Intervenor Adams has been at the TTCC Defendants CoreCivic, Hininger, and Conry had actual or constructive knowledge of the constant and pervasive risk of physical harm to inmates generally and to Intervenor Adams specifically at Trousdale Turner Correctional Center.

87. Defendants CoreCivic, Hininger, Conry, and Byrd were additionally aware of the specific and particularized risk of serious harm posed to inmates like Mr. Childress as a consequence of the fact that—rather than maintaining inmate safety—CoreCivic's officers facilitate violence within Trousdale Turner Correctional Center by smuggling in drugs and needles to enable the drug trade, drug use, and the spread of contraband within the facility.

88. Defendants CoreCivic, Hininger, and Conry were additionally aware of the specific and particularized risk of serious harm posed to inmates like Intervenor Adams as a consequence of the fact that—rather than maintaining inmate safety—CoreCivic's officers facilitate violence within Trousdale Turner Correctional Center by smuggling in drugs and needles to enable the drug trade, drug use, and the spread of contraband within the facility.

89. To the extent that CoreCivic attempts to segregate violent inmates from non-violent inmates at Trousdale Turner Correctional Center, such attempts are rendered ineffectual by the fact that inmates are misclassified; are not meaningfully secured in their cells; and that entire pods are often left unsecured—even during lockdowns—due to understaffing.

90. Despite Defendants CoreCivic's, Hininger's, and Conry's actual awareness of the severe risks to inmate safety within Trousdale Turner Correctional Center, they have consciously and deliberately failed to address those risks because deliberate indifference to inmate safety is more profitable.

91.     Because so many previous deaths at Trousdale Turner Correctional Center have not been met with meaningful remedial action, CoreCivic continues to maintain a chronically unsafe and understaffed facility, because it does not expect that regulators or this Court will take any meaningful remedial action against it.

## CLAIM #2: LIABILITY UNDER *MONELL V. DEPT. OF SOCIAL SERVICES*, 436 U.S. 658 (1978) (AS TO DEFENDANT CORECIVIC)

92.     Intervenor Adams incorporates and re-alleges the foregoing allegations as if fully set forth herein.

93.     Defendant CoreCivic has adopted a policy and practice of severely understaffing its facilities, including Trousdale Turner Correctional Center, without regard to inmate safety because understaffing is more profitable.

94.     As a result of multiple audits identifying Trousdale Turner Correctional Center's severe understaffing issues and thousands of violent incidents-both reported and unreported-at the facility over a period of years, CoreCivic had actual knowledge of Trousdale Turner Correctional Center's chronic understaffing problems, but it opted not to staff Trousdale Turner Correctional Center adequately because doing so would have been less profitable.

95.     At the time that Intervenor Adams was brought to the TTCC on October 4, 2021, CoreCivic's employees -including Defendants Hininger and Conry -had actual knowledge that Trousdale Turner Correctional Center's chronic understaffing problems resulted in an extraordinary and outsized level of inmate-on-inmate violence at the facility.

96.     CoreCivic's policy and practice of understaffing is widespread, rampant, and endemic to CoreCivic's prison facilities, including Trousdale Turner Correctional Center.

97.      Defendants CoreCivic, Hininger, and Conry know of the heightened and chronic safety risks to inmates resulting from understaffing at the TTCC, but they have tolerated, maintained,

and promoted understaffing to generate greater profits for CoreCivic at the expense of providing safety for inmates like Intervenor Adams.

98.     Intervenor Adams' fear of violence perpetrated at the hands of others is attributable to Defendant CoreCivic's policy and practice of failing to ensure adequate staffing at its prison facilities, including TTCC, which was explicitly or impliedly authorized by Hininger and Conry, and in which they knowingly acquiesced in accordance with CoreCivic's policy, custom, and practice of prioritizing profit over inmate safety.

99.     The TTCC's chronic understaffing also continues to remain unremedied even after Mr. Childress's death.  Indeed, several more inmates have died at Trousdale Turner Correctional Center following Mr. Childress's death -including as recently as July 2022- and inmates continue to die there with dramatically outsized frequency.  In many cases, such deaths are kept hidden from and unreported to the public.

### COUNT #3:  TENN. CODE ANN. § 1-3-121
### (AS TO DEFENDANT CORECIVIC)

100.    Plaintiff Intervenor Adams incorporates and re-alleges the foregoing allegations as if fully set forth herein.

101.    Defendant CoreCivic knowingly and deliberately fails to ensure a constitutionally adequate level of inmate safety at its Tennessee-based facilities.

102.    Defendant CoreCivic knowingly and deliberately fails to ensure a constitutionally adequate level of inmate safety at its Tennessee-based facilities because it is cheaper and more profitable not to do so and because it does not fear meaningful regulatory or judicial consequences if it maintains understaffed facilities.

103.     In an effort to prevent the fact of its chronic, profit-motivated deliberate indifference to inmate safety from reaching Tennessee regulators, legislators, and others, Defendant CoreCivic

fails to document, disposes of, takes measures to conceal, and falsifies records and evidence of its deliberate indifference to inmate safety.

104.    Tenn. Code Ann. § 1-3-121 enables plaintiffs to vindicate claims for declaratory and injunctive relief in cases involving illegal and unconstitutional government action. It specifically provides that: "Notwithstanding any law to the contrary, a cause of action shall exist under this chapter for any affected person who seeks declaratory or injunctive relief in any action brought regarding the legality or constitutionality of a governmental action."

105.    Defendant CoreCivic's chronic deliberate indifference to inmate safety is in direct contravention to provisions of the Eighth Amendment to the United States Constitution.

106.    Defendant CoreCivic's actions additionally are in direct contravention to Tenn. Const. art. I, § 32, which provides "[t]hat the erection of safe prisons, the inspection of prisons, and the humane treatment of prisoners, shall be provided for."

107.    Absent, at minimum, regular independent monitoring and unannounced inspections designed to determine whether Defendant CoreCivic has remedied its chronic and profit-motivated deliberate indifference to inmate safety and other unlawful conduct described above, CoreCivic will continue to act both illegally and unconstitutionally with respect to its operation of the Trousdale Turner Correctional Center.

108.    To remedy CoreCivic's chronically illegal and unconstitutional actions at the Trousdale Turner Correctional Center, this Court should appoint an independent monitor to conduct regular unannounced inspections of the Trousdale Turner Correctional Center and report whether Defendant CoreCivic has remedied its chronic and profit-motivated unlawful conduct.

109.    In the absence of CoreCivic coming into compliance with its obligation to ensure a constitutionally adequate level of inmate safety, this Court should issue an injunction permanently enjoining Defendant CoreCivic from continuing to operate the Trousdale Turner

Correctional Center going forward.

## VI. RELIEF REQUESTED

**WHEREFORE**, Plaintiff Intervenor Adams requests the following relief:

1.    **ISSUE** a preliminary and permanent injunction ordering that Plaintiff Intervenor Adams be transferred away from the TTCC by CoreCivic and back to a TDOC operated facility; and that CoreCivic refuse to accept Plaintiff Intervenor Adams back at one of their facilities;

2.    **DECLARE** the Trousdale Turner Correctional Center to be operating illegally and unconstitutionally;

3.    **ISSUE** a preliminary injunction enjoining the Trousdale Turner Correctional Center from accepting any new inmates until they are in full compliance with generally accepted standards for prison management and the TDOC's policies for the same;

4.    **ISSUE** a preliminary injunction ordering the Trousdale Turner Correctional Center to reduce its inmate population to a level commensurate to the number of correction officers it has to ensure that critical posts are filled in full compliance with generally accepted standards for prison management and the TDOC's policies for the same;

5.    **APPOINT** an independent monitor to audit and ensure that the Trousdale Turner Correctional Center maintains compliance with minimal constitutional standards;

6.    **ASSESS** punitive damages against Defendant CoreCivic's profits arising from its chronically unconstitutional understaffing of the Trousdale Turner Correctional Center from October 4, 2021 through the time that Plaintiff Intervenor Adams is transferred away from the TTCC, or, if Intervenor Adams must remain at the TTCC, until Defendants bring the TTCC into compliance with accepted standards for reasonable safety, of not less than $1,000,000;

7.    **GRANT** such other relief as it may appear that Intervenor Adams is entitled to in accordance with FRCP 54(c);

**IN THE ALTERNATIVE, THE COURT SHOULD**

8.      **ENJOIN** the Trousdale Turner Correctional Center from continuing to operate moving forward, or,

9.      **ORDER** the TDOC to take control of the Trousdale Turner Correctional Center through a provision in the contract between the TDOC, Trousdale County, and CoreCivic that allows for such.

Dated: _July 23, 2022_                    /s/ _Chris Adams_

Christopher Adams
328180 TTCC WD 218
140 Macon Way
Hartsville, TN 37074

### CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing was placed in the U.S. Mail first-class postage prepaid on this the _23rd_ day of _July_ , _2022_ , to the following:

Brice M. Timmons
Donati Law Firm, LLC
1545 Union Avenue
Memphis, TN 38104

and

Erin Palmer Polly
K&L Gates, LLC
501 Commerce Street, Suite 1500
Nashville, TN 37203

/s/ _Chris Adams_

Christopher Adams